ORIGINAL **CRIMINAL COMPLAINT** UNDER SEAL

(Rev. 11/82)

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA <br><br> v. <br><br> HOANG XUAN LE <br> aka "Wayne" | DOCKET NO. <br><br> SA19-952M <br><br> MAGISTRATE'S CASE NO.   CLERK, U.S. DISTRICT COURT <br> FILED <br> DEC 18 2019 <br> CENTRAL DISTRICT OF CALIF. <br> BY |
|---|---|

Complaint for violation of Title 18 U.S.C. § 1111

| NAME OF MAGISTRATE JUDGE <br> HONORABLE KAREN E. SCOTT | UNITED STATES MAGISTRATE JUDGE | LOCATION <br> Santa Ana, California |
|---|---|---|

| DATES OF OFFENSES <br> 10/15/19 | PLACE OF OFFENSES <br> Pacific Ocean | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See attached affidavit.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT <br> CHRISTOPHER GICKING |
|---|---|
| | OFFICIAL TITLE <br> Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) <br> *Karen E. Scott* <br> KAREN E. SCOTT | DATE <br> 12/18/19 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA   Gregory Scally (714) 338-3592      **REC: Detention**

**Contents**

I.   INTRODUCTION .......................................... 1

II.  PURPOSE OF AFFIDAVIT ................................. 1

III. PROPERTY/PREMISES TO BE SEARCHED ..................... 3

IV.  ITEMS TO BE SEIZED .................................. 4

V.   SUMMARY OF PROBABLE CAUSE ........................... 4

VI.  STATEMENT OF PROBABLE CAUSE ......................... 6

     A.   Background of Investigation ..................... 6

          1.   Discovery of Dead Body ................... 6

          2.   Report of Missing Person and Interview of
               Victim's Girlfriend ...................... 7

          3.   Interview of Victim's Family Member ....... 10

          4.   Person Who Later Became A CHS Contacted the
               Family Member About LE's Story ............ 12

     B.   Meetings Between the CHS and LE, and LE's
          Distribution of Cocaine and Methamphetamine .... 14

          1.   November 10, 2019 Purchase of Cocaine from
               LE ........................................ 14

          2.   November 12, 2019 Meeting with LE ......... 15

          3.   November 20, 2019 Purchase of Cocaine from
               LE ........................................ 17

          4.   December 5, 2019 Purchase of Methamphetamine
               from LE ................................... 18

          5.   December 10, 2019 Purchase of
               Methamphetamine from LE ................... 18

     C.   Phone Analysis ................................. 19

          1.   LE's Use of (949) 750-5036 ................ 19

          2.   Cell Phone Records Leading to Identification
               of RITZE .................................. 20

     D.   Video and Records from Dana Point Harbor ....... 22

     E.   Traffic Stop of RITZE, Search of RITZE's Phone
          Pursuant to Warrant, and Discovery of Tracking

i

Device on Victim's Girlfriend's Vehicle ........ 25

F.   LE's Activity on December 16, 2019 ............. 29

G.   SUBJECT PREMISES 1 .............................. 29

H.   SUBJECT PREMISES 2 ............................. 30

I.   SUBJECT VEHICLE 1 .............................. 31

J.   SUBJECT VEHICLE 2 .............................. 31

K.   SUBJECT VEHICLE 3 ............................. 32

L.   SUBJECT BOAT ................................... 32

VII. ADDITIONAL TRAINING AND EXPERIENCE ON VIOLENT CRIMES 33

VIII.   TRAINING AND EXPERIENCE ON NARCOTICS OFFENSES .. 35

IX.   TRAINING AND EXPERIENCE ON EVIDENCE RESPONSE TEAM
      PROCEDURES .......................................... 41

X.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES ......... 43

XI.   SEARCH ANY TIME OF THE DAY OR NIGHT ................. 48

XII.  REQUEST FOR AUTHORITY FOR NO KNOCK EXECUTION FOR
      SUBJECT PREMISES 1 ................................. 49

XIII.   CONCLUSION ...................................... 49

**AFFIDAVIT**

I, Christopher Gicking, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately twenty-two years.  I am currently assigned to the FBI Los Angeles Field Office.  As an SA, my responsibilities include investigating bank robberies and other violations of federal law in Orange County, California.  I have received training in bank robbery and other violent offenses at the FBI Academy at Quantico, Virginia.  I have also acquired knowledge and experience about bank robberies, other violent offenses, and the various means and methods that they are committed from other sources, including formal and informal training, conversations with other law enforcement officers and investigators, informants, violent crime suspects (who I have arrested and/or interviewed), and my participation in other criminal investigations.  During my career, I have participated in numerous violent crime investigations and have made numerous arrests for bank robbery and related offenses.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of the following:

a.    a criminal complaint against, and arrest warrant for, HOANG XUAN LE, also known as "Wayne" ("LE"), for a violation of 18 U.S.C. § 18 U.S.C. § 1111: Murder in the First Degree;

1

b.   a criminal complaint against, and arrest warrant for, SHEILA MARIE RITZE ("RITZE"), for a violation of 18 U.S.C. § 3: Accessory After the Fact;

c.   a search warrant for 18060 South Third Street, Fountain Valley, California, 92708 ("SUBJECT PREMISES 1"), further described in Attachment A-1, for the items to be seized described in Attachment B-1;

d.   a search warrant for 26363 Camino De Vista, Apartment F, San Juan Capistrano, California, 92675 ("SUBJECT PREMISES 2"), further described in Attachment A-2, for the items to be seized described in Attachment B-2;

e.   a search warrant for a 2017 white Ford Explorer, California license plate 8DMB781, Vehicle Identification Number ("VIN") 1FM5K8GT4HGA43608, registered to RITZE ("SUBJECT VEHICLE 1"), further described in Attachment A-3, for the items to be seized described in Attachment B-2;

f.   a search warrant for a 2014 white diamond tricoat, four-door Cadillac ATS, California license plate 7WRW910, VIN 1G6AB5RX2E0101210, registered to LE ("SUBJECT VEHICLE 2"), further described in Attachment A-4, for the items to be seized described in Attachment B-1;

g.   a search warrant for a 2004 white, four-door Cadillac DeVille, California license plate 6UTC656, VIN 1G6KD54Y34U181932, registered to LE ("SUBJECT VEHICLE 3"), further described in Attachment A-5, for the items to be seized described in Attachment B-1; and

h.    a search warrant for a 2008 Model 215 Triumph fishing boat, with Hull Identification Number TRBJ0194A808, state registration number CF4720RR, registered to RITZE and Mica Alan Ritze, address 2882 E. Aiden[1] Place, Anaheim, CA 92806, believed to be currently located at a Storage West storage facility at 2892 Kelvin Avenue, Irvine, California, 92614 ("SUBJECT BOAT"), further described in Attachment A-6, for the items to be seized described in Attachment B-2.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  PROPERTY/PREMISES TO BE SEARCHED

4.    The property and premises to be searched are SUBJECT PREMISES 1 and 2, SUBJECT VEHICLES 1, 2, and 3, and the SUBJECT BOAT, as further described in Attachments A-1 through A-6, which are incorporated herein by reference.

---

[1] This appears to be a typo on the California Department of Motor Vehicles ("DMV") registration records for the SUBJECT BOAT, as the address for RITZE associated with a prior vanity license plate for SUBJECT VEHICLE 1 is 2882 East Alden Place, and a search on Google Maps shows that there is a 2882 East Alden Place in Anaheim, but no 2882 East Aiden Place.

## IV. ITEMS TO BE SEIZED

5.    The items to be seized are the evidence, fruits, and
instrumentalities of violations of 18 U.S.C. § 1111, Murder; 18
U.S.C. § 1112, Manslaughter; 18 U.S.C. § 1117, Conspiracy to
Murder; 18 U.S.C. § 1958, Murder for Hire and Conspiracy to
Murder for Hire; 18 U.S.C. § 113, Assaults Within Maritime and
Territorial Jurisdiction; 18 U.S.C. § 3, Accessory After the
Fact; and 21 U.S.C. §§ 846, 841, Conspiracy to Distribute and
Possess with Intent to Distribute Controlled Substances, and
Distribution of and Possession with Intent to Distribute
Controlled Substances (the "Subject Offenses"), as described in
Attachments B-1 and B-2, which are incorporated herein by
reference.

## V.  SUMMARY OF PROBABLE CAUSE

6.    The primary purpose of the investigation is to
determine the cause of death of a victim found by the Coast
Guard on October 16, 2019 floating in the Pacific Ocean several
miles off the California coast ("victim").  The victim had
suffered gunshot and blunt force trauma wounds when found.
According to witness statements summarized later, the victim was
last seen leaving for a fishing trip with LE.  Based on my
training and experience (including knowledge of the
investigation to date), I believe that LE and RITZE took the
victim on a fishing trip from the harbor in Dana Point,
California, late in the evening on October 14, 2019 and into the
early morning hours of October 15, 2019, as a ruse to murder the
victim at sea.

4

7.    RITZE is the registered owner, along with one other
individual, of the SUBJECT BOAT, and I believe the SUBJECT BOAT
was the boat used to take the victim out to sea on October 14,
2019.  RITZE is the registered owner of SUBJECT VEHICLE 1, and I
believe SUBJECT VEHICLE 1 was the vehicle used to tow the
SUBJECT BOAT to the launch ramp for the purported fishing trip,
and to tow the SUBJECT BOAT away from the purported fishing
trip.

8.    Since the investigation of the victim's death began,
agents have learned that LE also engaged in drug trafficking.

9.    LE lives at SUBJECT PREMISES 1, and RITZE lives at
SUBJECT PREMISES 2.  LE uses SUBJECT VEHICLES 2 and 3, which are
registered to him.

10.   LE has confessed to a confidential human source that
he took the victim out on the boat, confronted the victim about
a debt owed, shot the victim, tied weights to the victim's
ankles, and sank the victim's body in the ocean.  Based on video
obtained from the harbor and analysis of phone and other
records, I believe that RITZE was also on the boat.  Analysis of
RITZE's phone data, which was obtained pursuant to a delayed
notice warrant, has shown that she:  (1) was seeking to buy a
bullet proof vest in the days before the murder, (2) suggested
murdering (someone else) with a silencer on her boat a few weeks
before the murder, and (3) purchased a tracking device later
found on the victim's girlfriend's vehicle after the murder.
RITZE's phone also has evidence supporting the conclusion that

RITZE was canvassing for cameras at the harbor five days after
the murder.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Background of Investigation

1.   <u>Discovery of Dead Body</u>

11.   From speaking to Coast Guard Investigative Service
("CGIS") Special Agent Austin Casey, I have learned the
following:

a.   On October 16, 2019, at approximately 12:55 p.m.,
Oceanside Police Department personnel responded to a radio call
from Coast Guard Sector San Diego reporting an unidentified body
floating in the water at GPS coordinates 33°15'040"N,
117°33'114"W.  The coordinates were roughly seven nautical miles
northwest of the Oceanside Harbor entrance.  Officers responded
to the provided coordinates and located an orange object
floating in the water.

b.   Responding officers approached the object, which
the officers immediately recognized as a body.  The body was
face down in the water and was fully clothed.  The responding
officers observed the body was a male adult, approximately forty
years of age with an injury to the left side of his forehead.
The body was pulled out of the water.

c.   A preliminary examination by the San Diego
Medical Examiner's Office identified the victim.  An autopsy was
conducted by the San Diego Medical Examiner's Office on October
17, 2019, attended by SA Casey, and the medical examiner
determined the cause of death to be drowning, but causal factors

included blunt force trauma and gunshot wounds indicative of
homicide.  I have seen photos from the autopsy and observed the
victim to have a blunt force trauma wound on his forehead that
appears to be triangular in shape.

        2.   Report of Missing Person and Interview of
             Victim's Girlfriend

    12.  From speaking with CGIS SA Casey, I also learned the
following:

        a.   On October 18, 2019, the victim's girlfriend
called the Coast Guard and reported the victim missing after the
victim did not return from a fishing trip scheduled for the
night of October 14, 2019.  Pursuant to an order issued by the
Honorable Karen S. Crawford, United States Magistrate Judge,
Southern District of California, as well as through a cell phone
ping obtained directly from the provider under 18 U.S.C. 2702,
the Coast Guard obtained phone records associated with the
victim's phone which revealed that the victim's phone was last
located approximately five to six miles off the coast of
California at approximately 1:48 a.m. on October 15, 2019.

        b.   On October 19, 2019, the victim's girlfriend[2] told
investigators the following.  On October 14, 2019, the victim,
the victim's girlfriend, and LE, a resident of Fountain Valley,

---

     [2] The victim's girlfriend has a pending claim for life
insurance benefits in the wake of the victim's death.  Based on
my training and experience (including knowledge of this
investigation to date), I have found the statements of the
victim's girlfriend with respect to this investigation relayed
herein to be reliable, as they are corroborated by other
evidence obtained.  The victim's girlfriend has made a statement
related to the distribution of marijuana that she has since
changed.

California, had gone to lunch together.  While at lunch, the victim and LE had discussed going lobster fishing together that night.  Later that night, the victim was picked up at his residence for the fishing trip between approximately 10 and 10:30 p.m.  I have seen a photo from the surveillance video obtained from the victim's residence showing the victim leaving for the fishing trip, and the photo shows the victim wearing light-colored clothing and carrying a dark-colored satchel and a dark-colored backpack.[3]

c.    The victim's girlfriend further told investigators the following.  On October 17, 2019, the victim's girlfriend called LE at (949) 331-3714 ("LE's 3714 number" or "his 3714 number") as she was worried about the victim because he had not come home from the fishing trip.  LE did not answer the phone call to his 3714 number, so the victim's girlfriend drove to LE's house—SUBJECT PREMISES 1—to try to talk to LE at his home.  LE did not appear to be home, so the victim's girlfriend left a note on SUBJECT VEHICLE 2, which was parked at SUBJECT PREMISES 1, asking LE to call her.  Later that day, LE

---

[3] I have learned from SA Casey that the victim's girlfriend has reported that, in the past, the victim carried a firearm in this satchel.  However, the victim's girlfriend has also reported that the firearm was sold prior to the victim's death, and that the victim's girlfriend had personally seen the absence of the firearm from this satchel.  The victim's family member, as described below, also reported knowing the victim to have carried a firearm in the past.  The victim had a criminal history that involves firearms.  Specifically, the victim's criminal history shows two arrests from 1996 and one arrest from 2010 for firearms-related offenses, and a federal felony conviction from 1998 for Possession of Weapon/Transfer of Machine Gun.

called the victim's girlfriend from another number, and told LE
the following:

        i.   LE, the victim, and two white males named
"Shawn" and "Matt" were scheduled to leave on a fishing trip
from a boat dock in Dana Point, California, on the night of
October 14, 2019.  LE and the victim were initially introduced
to "Matt" through a man named "Jay."  "Matt" was the owner of
the boat.  A convoy of two vehicles came to pick up the victim
at the victim's residence.  The victim entered a black Toyota
with "Matt" while LE and "Shawn" rode in a different car.  The
group got drinks at a bar near the Dana Point Marina called
"Turks" and then went down to the boat.  At the last minute, LE
decided not to go on the fishing trip because it was late, and
he had some other things to do.  LE let the victim borrow his
jacket, with "Security" written on the back of it, so the victim
would not be cold while on the trip.  LE forgot to take the cell
phone associated with his 3714 number out of the jacket, and the
cell phone associated with LE's 3714 number went with the victim
on the fishing boat.  According to LE, that was why the victim's
girlfriend could not reach LE earlier.

        d.   The victim's girlfriend provided investigators
details regarding her phone communications with the victim on
the night the victim went missing.  There were multiple text
messages between the victim and the victim's girlfriend on the
night the victim went missing.  Late in the evening on October
14, 2019, the victim texted the victim's girlfriend, "The girl
has a boat," and "Professional sports fishing women."  The

9

victim later texted, "At her house/ Then headed to boat/ I'll make it count/ Catch a nice fish/ For our family to eat." At approximately 12:27 a.m., on October 15, 2019, the victim texted the victim's girlfriend a cell phone video depicting the launching of a boat that appeared to have a dark-colored Yamaha outboard engine, and also had features, such as the handrail on the boat, that appear to be consistent with the SUBJECT BOAT, which I have observed has a dark grey Yamaha outboard engine. A few minutes later at approximately 12:32 a.m., the victim sent his last message to the victim's girlfriend, which read, "Love you."

3.    Interview of Victim's Family Member

13.   Through discussions with SA Casey, I learned the following:

a.    On October 20, 2019, a family member of the victim's ("the family member"),[4] contacted investigators and agreed to meet for an interview. On October 21, 2019, the family member told investigators the following:

---

[4] The family member was previously a paid confidential informant for the FBI. The family member has not been paid in connection with the assistance provided in this investigation. The family member brought a lawsuit against members of the Department of Justice in connection with his work. The lawsuit was later dropped. The family member has a misdemeanor conviction from 1996 for Carrying a Loaded Firearm in a Public Place and a 2001 misdemeanor conviction for Fight/Challenge Fight Public Place. The family member also has a federal felony conviction from 2000 for Conspiracy to Possess and Transport Machine Guns. Based on my training and experience (including knowledge of this investigation to date), I have found the statements of the family member with respect to this investigation relayed herein to be reliable, as they are corroborated by other evidence obtained.

i.    On October 18, 2019, the family member went out to dinner with his family in Irvine, California.  LE contacted the family member and agreed to meet the family member at the restaurant to talk about what happened to the victim.  LE arrived at the restaurant with an unidentified male who has since agreed to assist law enforcement as a confidential human source ("the CHS").  LE and the family member spoke about the victim at the restaurant, and LE told the family member, in substance, the following.  LE had plans to go fishing with the victim on the night of October 14, 2019.  LE and the victim got drinks at a bar called "Turks" before they planned to go fishing.  LE met some girls at Turks and then went down to the fishing boat with the victim, "Shawn," and "Matt."  LE and "Shawn" decided to go back to the girls instead of going fishing and left the victim at the boat with "Matt."  LE provided the victim with a jacket and left his phone in the pocket of the jacket.  LE and "Shawn" then returned to the bar while the victim and "Matt" discussed "packs."  The family member believed "packs" to be a reference to marijuana.

ii.    On October 19, 2019, LE and an unknown individual, known to the family member only as "Shawn," picked up the family member and drove him to the Dana Point Marina in order to point out the last location that LE and Shawn reported they had seen the victim.  LE pointed out the Turks restaurant, Dana Point Marina, and a boat slip he said he believed was associated with the fishing boat.

11

iii. LE and Shawn then dropped the family member at home.  On October 20, 2019, LE and the family member exchanged text messages using a cell phone application called Signal.  The family member and LE discussed the victim and LE reported that he did not have any news.  LE also told the family member that he did not have contact information for "Jay" or "Matt," because this information was in the phone he left with the victim in the jacket.  LE said he had been using the cell phone application "Whats App" to talk with "Jay" and "Matt" on that phone, and that was the only way he knew to contact them.

### 4.   Person Who Later Became A CHS Contacted the Family Member About LE's Story

14.   Through discussions with SA Andrew Cho and SA Casey, I learned the following.

a.   On October 25, 2019, the family member learned that the CHS wanted to talk with the family member about the victim.  The family member reached out to the CHS on multiple occasions and told investigators the following about their conversations:  The CHS said he wanted to meet with the family member in person.  LE had told the CHS a completely different story about what happened to the victim.  The CHS wanted to meet with the family member because she/he wanted to get this information off her/his chest.

b.   On November 4, 2019, the family member met the CHS to discuss her/his knowledge of LE's involvement in the murder of the victim.  This interaction was monitored and

recorded by the FBI and CGIS and the CHS told the family member
the following:

            i.   On the way to meet with the family member on
October 18, 2019, LE told the CHS about how he killed the
victim.  The victim owed LE approximately 30 to 40 thousand
dollars.  LE and "Shawn" took the victim out to a boat and
demanded the money.  LE shot the victim three times, tied
weights to the victim's ankles, and sank his body.  LE told the
CHS this story on several occasions; and during one of these
instances, the CHS obtained a partial recording of the end of
the conversation.

           ii.   The CHS believed she/he could obtain a
complete recorded confession from LE; and offered to do so for
the family member in exchange for money.

      c.   On November 9, 2019 the family member met the
CHS for a second time.  During this meet, the family member
introduced the CHS to an undercover agent acting as a private
investigator hired by the family member.  The undercover agent
paid the CHS $2000 in exchange for the partial recorded
conversation between LE and the CHS.  During the conversation,
the CHS expressed interest in working with law enforcement.  The
undercover agent advised her/him that he would contact some of
his law enforcement associates, and to expect a call.

   15.   Through discussions with FBI SA Cho and reading a
report by SA Cho about contact with the CHS, I learned the
following.  On November 9, 2019, agents from CGIS and the FBI
made contact with the CHS.  The CHS again expressed his

willingness to cooperate with law enforcement.[5]  The CHS reported
that about two days after the CHS met the family member, the CHS
met with LE to purchase marijuana.  LE said they were on a boat
and LE asked the victim when he was going to repay LE the money
owed him.  LE said the victim owed LE $30,000 to $40,000.  LE
became upset with the victim because the victim "snapped" at LE
and said he was not going to repay LE.  LE then shot the victim
three times, and "Shawn" and the captain of the boat helped LE
tie up the victim with a heavy object and throw the victim's
body overboard.

**B.   Meetings Between the CHS and LE, and LE's Distribution
       of Cocaine and Methamphetamine**

16.   Through discussions with FBI SA Cho, and reading
reports about the following meetings, I have learned the
following.

1.   November 10, 2019 Purchase of Cocaine from LE

a.   On November 10, 2019, the CHS was equipped with a
recording device and cash, and searched for contraband with

---

[5] The CHS has a criminal history to include the following
California state convictions: 05/30/2002, felony conviction for
Possession of Controlled Substances (11377(A) HS); 04/29/2003,
felony conviction for Burglary: First Degree (460(A) PC);
10/28/2011, misdemeanor conviction for Receive/ETC Known Stolen
Property (496(A) PC); 09/25/2015, felony convictions for
Possession of Control Substances for Sale (11378 HS), and False
Checks/Records/Certs/ETC (470(D) PC).  The CHS has been paid a
total of $7,350 between the recording and his other work for
this case.  Based on my training and experience (including
knowledge of this investigation to date), I have found the
statements of the CHS with respect to this investigation to be
reliable, as they are corroborated by other evidence obtained.
The CHS has been deemed reliable in part because much of, though
not all (because the earlier contacts were not all recorded) of,
her/his information concerning what has occurred between the CHS
and LE is corroborated by recordings of those interactions.

negative results.  The CHS went to SUBJECT PREMISES 1 to meet
with LE.  I am informed by SA Cho that the CHS has reported that
the CHS gave cash to LE in exchange for cocaine.  After the
meeting, SA Cho and Casey recovered a white envelope containing
suspected cocaine from the CHS.  SA Cho has observed the
suspected cocaine and believes it to be cocaine based on its
appearance and his training and experience, which includes
working narcotics investigations since 1998, as both a Special
Agent in the FBI and U.S. Customs Service Special Agent.  The
suspected cocaine weighed approximately 1.9 grams.

          b.   A review of the recording device from the meeting
between the CHS and LE revealed that LE indicated he would get
rid of someone that the CHS pretended to want to get rid of for
$10,000 up front and $10,000 after.  The CHS asked LE, "Can you
get rid of the body too?"  LE replied, "You want the body?  I
don't give a fuck, fool, go get it when I'm done and you pick it
up."  Asked if he could get rid of it, LE replied, "Yeah."
Based on my training and experience (including knowledge of this
investigation to date), I believe that LE and the CHS discussed
how LE could be hired by the CHS to murder someone.  LE also
showed the CHS a shotgun, and talked about using a cross-bow
because it is quiet.  Asked if he had a new gun, LE said, "I got
three."

          2.   November 12, 2019 Meeting with LE

          c.   On November 12, 2019, the CHS called LE, and the
CHS and LE agreed to meet at SUBJECT PREMISES 1.  The CHS was
provided with a recording device and went to SUBJECT PREMISES 1

to meet with LE.  During that meeting, the CHS and LE again
discussed cocaine transactions.  SA Cho has reviewed the
recording of the meet and heard LE say, "Clear an ounce and then
we'll do a key."  Based on his training and experience
(including the context of the conversation), SA Cho believes
this to mean LE was telling the CHS that if the CHS could sell
an ounce of cocaine, LE would be willing to sell the CHS a
kilogram of cocaine.  LE showed the CHS a device that LE said
detected whether someone was wearing a wire and could identify
GPS trackers on cars.  LE also said he used call forwarding
because law enforcement can find your phone due to cell phone
pings.  LE also said in substance he was able to get out of
felony cases because he does not use his own car that would lead
back to him.

        d.   They also again discussed a potential future hit
on a person the CHS pretended to want to get rid of.  LE asked
the CHS to tell LE the scenario, and LE indicated he could
tailor the plan to the scenario.  LE asked the CHS the target's
name, and said he knew how to track people and their families.
LE suggested a sniper hit.  LE said, "Every scenario is
different.  Because I'm a debt collector, okay? ... I collect
money. . . And people give me a name.  And I show up to the door
with a list.  You owe this account and I burn the paper to burn
the evidence, you know?  They don't know who I am... They just
know someone's coming... That's why they know and they pay
upfront to me.  And I then have a crew that takes them out.  I
do it or my crew does it."  I am informed by SA Cho that the CHS

reported that the CHS understood this conversation, in context, to be LE telling the CHS how he kills people who don't pay their debt.

        3.   November 20, 2019 Purchase of Cocaine from LE

        e.   On November 20, 2019, the CHS was provided a recording device and cash.  A search of the CHS for contraband was negative.  The CHS went to SUBJECT PREMISES 1.  The CHS reported that LE arrived at SUBJECT PREMISES 1 in SUBJECT VEHICLE 2.  After going to a restaurant, LE and the CHS returned to SUBJECT PREMISES 1 and went inside.  The CHS reported that the CHS gave LE cash in exchange for cocaine.  SA's Cho and Casey met with LE and recovered a brown paper bag containing cocaine from the CHS.  SA Cho has observed the suspected cocaine and believes it to be cocaine based on its appearance and his training and experience.  The suspected cocaine weighs approximately 35.6 grams.

        f.   A review of the recording device reveals that during the meeting, LE told the CHS in substance that the Coast Guard came by LE's house earlier in the day and spoke to him. LE said in substance he knew that it was "his" wife—believed to be a reference to the victim's girlfriend—and that LE would "check her later," which the CHS interpreted to mean either going to talk with the victim's girlfriend or killing the victim's girlfriend.  LE stated in substance he was not worried because the Coast Guard had nothing on him.

4.  December 5, 2019 Purchase of Methamphetamine from LE

g.  On December 2, 2019, the CHS made a consensually recorded phone call to LE.  During the conversation, the CHS ordered one ounce of methamphetamine.  LE told the CHS that one ounce would cost $150 and he would have it ready for the CHS. LE stated that he had "four" coming, which the CHS understood to mean LE was expecting a delivery of four ounces of methamphetamine from a supplier.  The CHS asked LE if LE could supply the CHS with a "piece," meaning a handgun.  LE advised he had a Glock, new in a box, available for $700.  The CHS later changed his methamphetamine order to two ounces in another consensually recorded phone call with LE.

h.  On December 5, 2019, the CHS was provided with a recording device and cash.  A search of the CHS and the CHS's vehicle were negative for contraband.  The CHS went to SUBJECT PREMISES 1, and later reported to SA Cho that he gave LE cash in exchange for methamphetamine.  SA's Cho and Casey met with the CHS after the meeting with LE and recovered a clear ziplock bag containing suspected methamphetamine from the CHS.  The suspected methamphetamine weighed approximately 59 grams.  SA Cho has observed the suspected methamphetamine and believes it to be methamphetamine based on its appearance and his training and experience.

5.  December 10, 2019 Purchase of Methamphetamine from LE

i.  On December 10, 2019, agents met with the CHS and provided the CHS with cash and a recording device.  A search of

18

the CHS and the CHS's vehicle were negative for contraband.  The
CHS went to SUBJECT PREMISES 1 and met with LE.  The CHS
reported he gave cash to LE in exchange for methamphetamine.
SA's Cho and Casey met with the CHS after the meeting with LE
and SA Cho recovered a ziplock bag containing a clear rocky
substance suspected to be methamphetamine from the CHS.  The
suspected methamphetamine weighed approximately 62.1 grams.  SA
Cho has observed the suspected methamphetamine and believes it
to be methamphetamine based on its appearance and his training
and experience.

     **C.**   **Phone Analysis**

        1.   LE's Use of (949) 750-5036

    17.  I am informed by SA Casey of the following.  On
November 20, 2019, Coast Guard investigators went to SUBJECT
PREMISES 1 to interview LE.  LE was at the location, along with
several other unknown individuals who appeared to be family
members of LE's.  LE was visibly nervous during the interview.
LE told substantially the same story he told to the victim's
girlfriend and the family member, with some differences.  He did
not confess to being involved in the victim's disappearance.  LE
provided (949) 750-5036 ("LE's 5036 number") as his current
contact number.  I learned from California Highway Patrol
("CHP") Officer and FBI Task Force Officer Ryan Starr, and from
reading a CHP arrest report on the subject, that on or about
August 23, 2019, RITZE was arrested and during the arrest, she
provided law enforcement LE's 5036 number as the number for her
next of kin.  LE has also used LE's 5036 number to communicate

19

with the family member.  Subscriber records for LE's 5036 number
came back to LE's name up until early November 2019.

      2.   Cell Phone Records Leading to Identification of
            RITZE

    18.  From discussions with FBI SA Matt Coughlin, I have
learned the following:

      a.   Preliminary analysis of phone records received
pursuant to a November 4, 2019 warrant, issued by the Honorable
Autumn D. Spaeth, United States Magistrate Judge, for historical
cell-site information for LE's 5036 number has revealed the
following.  At approximately 10:20 p.m., on October 14, 2019, a
person using LE's 5036 number called (714) 862-8772, a number
believed to be used by RITZE ("RITZE's number"), and the two
phone users had a phone conversation that lasted approximately
three minutes and 51 seconds.  This is the last phone call made
to or from LE's 5036 number prior to the time of the boat launch
(as determined by reference to the time that the boat launch
video was sent to the victim's girlfriend's phone).  Additional
preliminary analysis of phone records revealed several contacts
between LE's 5036 number and RITZE's number earlier on October
14, 2019.  Subscriber records for RITZE's number show, as of
February 12, 2016, a listed subscriber of "M. Ritze" at 2882
East Alden Place, Anaheim, CA, an address where the Google
street view with image capture date listed as December 2017
shows what appears to be the SUBJECT BOAT parked in the
driveway.  Prior to February 2016, the subscriber for this
number was listed as "Sheila Clifton" (RITZE's maiden name) in

January 2006, and as "Sheila Ritze" in December 2008, October 2009, and September 2015.

19.   A review of RITZE's California DMV record shows that her address on file with the DMV is SUBJECT PREMISES 2; this location is approximately 2.1 miles from the Dana Point Harbor, and thus some phone records only place a cell phone in the vicinity of both of these locations.  Further preliminary phone records analysis showed that a person using LE's 5036 number travelled to the vicinity of Dana Point Harbor and SUBJECT PREMISES 2, at approximately 11:20 p.m. on October 14, 2019. Further phone data later received regarding LE's 5036 number shows that a person using that number was specifically at the complex that houses SUBJECT PREMISES 2 at approximately 12:00 a.m.  At approximately 12:10 a.m. on October 15, 2019, a phone using LE's 5036 number was located in the Dana Point Harbor area.  At approximately 12:45 a.m., a person using LE's 5036 number appeared to head out of the harbor area toward the sea. At approximately 1:47 a.m., preliminary phone records analysis shows a phone using LE's 5036 number approximately several miles out to sea, in a vicinity close to where the victim's phone appeared to be at the same time.  At approximately 2:30 a.m., a person using LE's 5036 number appeared to return to the Dana Point Harbor area.  At approximately 3:14 a.m., the user of LE's 5036 number made an approximately four minute and twenty-five-second phone call, and at that time, the phone using LE's 5036 number appears to have been in the vicinity of the harbor and SUBJECT PREMISES 2.  The phone using LE's 5036 number remained

in that vicinity on October 15, 2019 until approximately early afternoon, and then moved to the vicinity of SUBJECT PREMISES 1 at approximately 2:30 p.m.  Later that same day, at approximately 3:58 p.m., the person using LE's 5036 number returned to the vicinity of the harbor and SUBJECT PREMISES 2, and then returned back to the vicinity of SUBJECT PREMISES 1 at about 5:45 p.m.  The person using LE's 5036 number then returned to the vicinity of the harbor and SUBJECT PREMISES 2 at approximately 11:12 p.m., where the phone remained for the rest of the evening on October 15, 2019.

20.  Historical cell-site records for RITZE's phone appear to show that RITZE's phone was at SUBJECT PREMISES 2 prior to and after the boat trip where it is believed the victim was murdered.  The historical cell-site records do not provide any known activity showing a location for RITZE's phone during the boat trip.

21.  RITZE is the registered owner, along with one other individual, of the SUBJECT BOAT.  According to a Facebook page in the name of "Sheila Ritze" (that depicts a person that matches the DMV photo of RITZE), there are photos of RITZE fishing, as well as a photo depicting what appears to be the SUBJECT BOAT.  A Facebook photo shows the boat to be labeled "Sea Konig" on the side.  I have seen the SUBJECT BOAT and observed it to be labeled "Sea Konig" on the side.

D.   **Video and Records from Dana Point Harbor**

22.  I have reviewed video obtained from the harbor on the night of the fishing trip and the video sent from the victim to

22

his girlfriend the night of the fishing trip, and learned the
following.

        a.   Video obtained from the harbor on the night of
the murder shows a white Ford Explorer—which is consistent with
SUBJECT VEHICLE 1, though the license plate is not visible in
the video—arrive at the harbor.  The video shows what appears
to be three individuals preparing to take a white fishing boat,
consistent in appearance with the SUBJECT BOAT, out to sea.  In
particular, an individual depicted in the video believed to be
the victim appears to be wearing light-colored clothing, which
matches clothing (1) that I have been informed by SA Casey was
found on the victim's dead body, and (2) clothing I observed on
the victim on surveillance video from the victim's apartment
depicting the victim leaving for the fishing trip.

        b.   The video of the parking lot at the harbor also
appears to show a male and a female (who appears to be heavyset
and have a light-colored ponytail).  A short time later, the
white Ford Explorer is seen pulling the white fishing boat into
the launch ramp.  The boat depicted appears to have a dark
outboard engine, consistent with the dark grey Yamaha outboard
engine that I have seen on the SUBJECT BOAT.

        c.   The video shows the Explorer—which I believe to
be SUBJECT VEHICLE 1—backing the boat into the water.  The
video shows, through following the individuals from the parking
lot to the boat, what appears to be three individuals leaving on
the boat.  The video the victim sent to his girlfriend prior to
the launch shows what appears to be a male—believed to be LE—

wearing what appears to be a dark-colored baseball cap, and what sounds like a woman's voice can be heard also.  A dark-colored Yamaha outboard engine consistent with the engine on the SUBJECT BOAT can be seen on the video also.

        d.    The video from the harbor shows that the boat with the three individuals leaves the boat launch ramp area and goes out to sea.  The video later shows that, when the boat returns to the launch ramp area, what appears to be only two individuals are seen getting off the boat, based on analysis of the video by following the individuals from that area to other nearby areas captured on other cameras.  Video from another nearby camera shows what appears to be a male, consistent in size and shape with LE, and a female, consistent in size, shape, and hair color with RITZE, inspecting the trailer and also what appears to be the lighting system of the same boat.  The video shows that the boat was left in a parking lot at the harbor.  In approximately the late morning or early afternoon of October 15, 2019, the video shows that an individual believed to be RITZE returned to the boat, and towed it out of the harbor parking lot in the white Explorer that is consistent in appearance with SUBJECT VEHICLE 1.  That video also shows that the boat is labeled "Sea Konig" on the side (i.e., matching the depiction of the boat depicted in a photo on RITZE's Facebook account and matching the SUBJECT BOAT); though the "Konig" is blurry, the letters depicted on the side of the boat appear to be consistent with the letters in the word "Konig."

23.   I have reviewed records obtained from the Dana Point Harbor, and a report by SA Cho concerning conversations with Kelly Rinderknecht, General Manager of the Marina at Dana Point. A report titled "Unpaid Overnight Parking" dated October 15, 2019, reveals that on October 15, 2019, a boat trailer loaded with the SUBJECT BOAT had a parking permit that was valid until 3:21 a.m. on October 16, 2019.  According to Rinderknecht, the parking permits are valid for exactly 24 hours.  Based on my review of the video from the harbor, I have seen that an individual associated with the boating trip described above appears to have approached the pay machine associated with the parking lot at the harbor at approximately 3:23 a.m. on October 15, 2019.

**E.    Traffic Stop of RITZE, Search of RITZE's Phone Pursuant to Warrant, and Discovery of Tracking Device on Victim's Girlfriend's Vehicle**

24.   On November 25, 2019, the Honorable Karen E. Scott, United States Magistrate Judge, issued a warrant relating to the search of digital devices found on RITZE's person or in RITZE's vehicle.  Judge Scott authorized delayed notice of the warrant for 30 days.

25.   I have read a report by CHP Officer Kevin Futrell and spoken to Officer Futrell, and learned the following.

a.    On December 4, 2019, CHP Officer Futrell conducted a traffic stop on SUBJECT VEHICLE 1, driven by RITZE, in Santa Ana, California.  RITZE, who had a suspended license, was arrested for Driving With a Suspended License.  The warrant issued on November 25, 2019 was executed on December 4, 2019,

and CHP impounded RITZE's vehicle.  During the execution of the warrant, I observed SUBJECT VEHICLE 1, at that time located on North Fairmont Street in Santa Ana, California.  I found approximately $9,700 in cash in a backpack located in the back of SUBJECT VEHICLE 1.

b.   During the traffic stop, CHP Officer Futrell observed a phone on a mount on the dashboard of SUBJECT VEHICLE 1.  Officer Futrell recovered the phone from the mount on the dashboard in SUBJECT VEHICLE 1.

26.   Pursuant to the warrant, the phone recovered from SUBJECT VEHICLE 1 was searched and preliminary analysis of that phone has revealed the following.

a.   I am informed by SA Coughlin and SA Casey that preliminary analysis on RITZE's phone indicates the following. RITZE's phone[6] arrived at the Dana Point Harbor at approximately the same time as the boating trip party arrived according to the video obtained from the harbor.  The location information further indicates that RITZE's phone left the harbor at approximately the same time as the boat is seen leaving the harbor out to sea on the video obtained from the harbor.  The location information further indicates that RITZE's phone returned to the harbor at approximately the same time as the boat is seen returning to the harbor.  The location information further indicates that RITZE's phone again left the harbor at

---

[6] It is possible that these records reflect the location data for an Apple Watch synced to RITZE's phone, rather than the location data for the phone itself, but that analysis is ongoing.

approximately the same time as the individuals who were on the boat are seen leaving the harbor after the boat trip on the video.

b.    I am informed by SA Casey, and have reviewed a preliminary forensic report regarding, the following.  RITZE's phone contains a note dated October 19, 2019, believed to be a record of RITZE canvassing the Dana Point Harbor for surveillance cameras five days after the homicide, and the same day LE took the family member to the harbor to point out where LE reported he had last seen the victim.  The note reads: "Video to Turks noted cameras video to Embarcadero noted cameras only on Embarcadero building however three different cameras one very old to call newer take her [sic] in the clear as long as I mention that I'm only concerned about the photos that were taken prior to launching may have been sent to somebody don't know how to answer that one That's the scary part."  In addition to the video sent from the victim's phone to the victim's girlfriend's phone noted above, a photo of a part of a boat was sent from the victim's phone to the victim's girlfriend's phone also.  The items depicted in that photograph match items observed on the SUBJECT BOAT when the SUBJECT BOAT was preliminarily searched on December 9, 2019, pursuant to a warrant authorizing its preliminary search.[7]

c.    I am informed by SA Casey that RITZE's phone also contained browser history relating to GPS trackers, and e-mail

---

[7] See the footnote below regarding prior warrants and orders issued in the case.

correspondence between RITZE and a company selling GPS trackers indicating that a tracker purchased by RITZE was activated on or prior to November 6, 2019; this correspondence was forwarded by RITZE to a contact listed as "Wayne Le," i.e., LE. RITZE's phone also contains a photo of a GPS tracking device. On December 13, 2019, on a car used by the victim's girlfriend, agents found a tracking device matching the tracking device in the photo from RITZE's phone.

        d.   I am also informed by SA Casey that RITZE's phone contained a message dated September 5, 2019, which I have reviewed, to a person who appeared to be unrelated to the homicide, about another person who also appeared to be unrelated to the homicide, in which RITZE stated, "That guys a dick I think I'm in order [sic] a silencer on eBay take his ass out on the boat what do you think."

        e.   I am also informed by SA Casey that RITZE's phone contained messages, which I have reviewed, dated October 4, 2019, in which RITZE appears to be trying to purchase a bullet proof vest.

        f.   I am also informed by SA Casey that RITZE's phone contained a photograph dated December 2, 2019, of what appears to be a text message thread on another phone, which contained two photographs that appear to have been taken from the top of a parking garage, one of them looking down onto a ground-level parking lot, accompanied by the text, "Irvine sniping."

28

g.   I am informed by SA Casey that RITZE's phone
contained multiple photographs of driver's licenses belonging to
individuals who are neither LE nor RITZE.[8]

h.   I am also informed by SA Casey that RITZE's phone
contained text message correspondence with a contact listed as
"Jorge Carwash Man" on October 24, 2019, in which RITZE stated,
"I need the boat washed and it is in Irvine is that ok?"  It was
unclear from the text communications whether RITZE actually
hired the contact to wash the SUBJECT BOAT, which I have
observed to be at a storage facility in Irvine.

**F.   LE's Activity on December 16, 2019**

27.   I have reviewed a surveillance summary received from
the surveillance team leader, FBI SA Scott O'Day, regarding
surveillance of LE on December 16, 2019.  On that date, LE was
observed by surveillance agents going to the rear vicinity of a
strip of businesses containing a gun store in Hacienda Heights,
California, and appears to have taken delivery of a box
estimated to have measurements of approximately four feet by one
foot, consistent with a box containing a rifle.

**G.   SUBJECT PREMISES 1**

28.   SUBJECT PREMISES 1 is the address listed on LE's
California driver's license.  SUBJECT PREMISES 1 is also
reported to be LE's residence by the victim's girlfriend.
Surveillance on LE between the homicide and the present has also
indicated that SUBJECT PREMISES 1 is LE's residence, in that

---

[8] Given the nature of the evidence gathered to date (along
with my training and experience), I believe that the photographs
may be targets of other murders for hire.

investigators have seen LE go in and out of SUBJECT PREMISES 1 on multiple occasions in the last few weeks.  The CHS has met with LE at SUBJECT PREMISES 1 on multiple occasions in the last several weeks, as described above.  Coast Guard investigators found LE at SUBJECT PREMISES 1 when they interviewed him on November 20, 2019.  GPS data obtained for various phones associated with LE pursuant to the warrants described in the footnote below since the homicide has indicated that, in the last few weeks, LE has spent most of his nights at SUBJECT PREMISES 1.  I have seen a Player's Card account record for an account opened November 22, 2019, for Wayne Le—i.e., LE—at Texas Station Casino in Las Vegas, Nevada, which lists LE's address as SUBJECT PREMISES 1.  Surveillance conducted on November 22, 2019, revealed that LE and RITZE were driving in a direction consistent with going to Las Vegas, Nevada.

### H.    SUBJECT PREMISES 2

29.   SUBJECT PREMISES 2 is the address listed on RITZE's California driver's license.  SUBJECT PREMISES 2 is also the address listed on the registration for SUBJECT VEHICLE 1, which is registered to RITZE.  GPS data obtained for RITZE's phone pursuant to the warrant described in the footnote below has indicated that, in the last few weeks, RITZE has spent most of her nights at SUBJECT PREMISES 2.  I am informed by Orange County Sheriff's Department Investigator Marc Claypool that on December 4, 2019, Investigator Claypool observed RITZE leaving the balcony in front of SUBJECT PREMISES 2 and get into SUBJECT VEHICLE 1.  The insurance policy for the SUBJECT BOAT shows that

the named insured is Matthew Ritze and the address is SUBJECT PREMISES 2.  During her arrest on December 4, 2019, RITZE provided SUBJECT PREMISES 2 as her address.

30.  I have reviewed a document called a Property/Casualty Claim filed on October 11, 2019, by Matthew Ritze, reporting a claim of damage to the SUBJECT BOAT while it was parked at a location outside SUBJECT PREMISES 2.  Matthew Ritze listed his home address as SUBJECT PREMISES 2.

**I.    SUBJECT VEHICLE 1**

31.  SUBJECT VEHICLE 1, believed to be the white Ford Explorer depicted in the video obtained from the harbor described above, is registered to RITZE.  RITZE was arrested driving SUBJECT VEHICLE 1 on December 4, 2019.

32.  In SUBJECT VEHICLE 1, pursuant to the warrant issued for SUBJECT VEHICLE 1 described in the footnote below, on December 4, 2019, I found a California Insurance ID Card for SUBJECT VEHICLE 1 and the named drivers on SUBJECT VEHICLE 1 are both LE and RITZE.  The "Named Insured" for SUBJECT VEHICLE 1 is listed as LE.

**J.    SUBJECT VEHICLE 2**

33.  SUBJECT VEHICLE 2 is registered to LE.  On November 8, 2019, LE was observed by FBI TFO Jeff Williams bringing items from the garage of SUBJECT PREMISES 1 and putting the items in the trunk of SUBJECT VEHICLE 2.  LE and other individuals then got into SUBJECT VEHICLE 2 and left the location.

34.  I am informed by SA Cho that the CHS reported that, prior to the November 20, 2019 purchase of cocaine by the CHS,

LE arrived at SUBJECT PREMISES 1 driving SUBJECT VEHICLE 2.  I
am informed by SA Cho that on December 10, 2019, during the
meeting described above, LE invited the CHS to go for a ride in
SUBJECT VEHICLE 2, and turned the ignition on in SUBJECT VEHICLE
2, which was parked outside of SUBJECT PREMISES 1.

35.  I am informed by FBI SA Scott O'Day that on December
16, 2019, LE was observed driving SUBJECT VEHICLE 2 away from
SUBJECT PREMISES 1.

**K.   SUBJECT VEHICLE 3**

36.  SUBJECT VEHICLE 3 is registered to LE.  A covert
camera intermittently placed outside of SUBJECT PREMISES 1 has
captured the presence of SUBJECT VEHICLE 3 at that location on
numerous days between November 7, 2019 and the present.

37.  On or about November 12, 2019, I observed an
individual the CHS reported to be "Shawn" exiting SUBJECT
PREMISES 1 and getting into SUBJECT VEHICLE 3, and driving away
in SUBJECT VEHICLE 3.

**L.   SUBJECT BOAT**

38.  The SUBJECT BOAT, believed to be the boat depicted in
the surveillance obtained from the Dana Point harbor described
above, is registered to RITZE and Mica Alan Ritze.

39.  On December 6, 2019, the Honorable Autumn D. Spaeth,
United States Magistrate Judge, issued a warrant to search the
SUBJECT BOAT, located at a Storage West storage facility at 2892
Kelvin Avenue, Irvine, California, 92614.  The warrant was
executed on the SUBJECT BOAT on December 9, 2019.  Agents
observed and photographed wires and items on the SUBJECT BOAT

that appeared to match wires and devices depicted in a
photograph sent from the victim's phone to the victim's
girlfriend's phone the night of the fishing trip.  Small traces
of items that tested positive for blood in a presumptive test
were also found on the SUBJECT BOAT; I am informed by Julia
Thorson, a Criminalist at the San Diego Sheriff's Crime Lab,
that some of those items have been determined not to be human
blood, though analysis of other portions is pending.

40.  I saw the SUBJECT BOAT at the storage facility on
December 9, 2019, and observed the SUBJECT BOAT to be labeled
"Sea Konig" on the side.  On December 17, 2019, Task Force
Officer Mike McAloney went to the storage facility at 2892
Kelvin Avenue, Irvine, California, 92614, and observed the
SUBJECT BOAT to still be at that location.

**VII.  <u>ADDITIONAL TRAINING AND EXPERIENCE ON VIOLENT CRIMES</u>**

41.  Based on my training and experience investigating
violent crimes, including executing dozens of search warrants on
digital devices such as cellular telephones, laptops, thumb
drives, and related devices, I have learned that perpetrators of
violent crimes often use digital devices to assist in carrying
out the violent crime.  I am also familiar with this from
speaking with other agents and law enforcement officers about
their experiences and the results of their investigations and
interviews.  This can include, for example, using the Internet
or mapping software to research locations—such as, in a case
like this, where the victim resides, where the location of the
planned attack will take place, what the fastest route is

between such locations at a certain time, and the fastest route
to where co-conspirators are located to ease meeting up.  This
can also include using the Internet to research methods of
carrying out a violent crime, including queries about how to
obtain, use, or conceal a gun, or how to conceal a body.  This
also commonly includes communicating with others regarding a
violent crime via text message, applications, telephone, or
social media.  In particular, in this case, it appears that
RITZE communicated with LE multiple times on the day of the
murder, up to and including LE's last communication before the
boat left the harbor.  Communications between RITZE and LE,
between LE and other individuals, and between RITZE and other
individuals, both prior to, around the time of, and since the
murder, may constitute evidence of LE's, RITZE's, "Shawn's," or
other unknown co-conspirators' involvement in the murder, and
may lead to evidence of other co-conspirators.  Moreover,
certain digital devices may capture the location of a user which
may be relevant to an investigation.  Digital devices of
perpetrators of violent crimes also often include photographs
that are evidence of the crimes perpetrated, for example,
evidence of perpetrators' (1) presence at a particular location,
(2) possession of certain clothing, (3) association with a
particular vehicle, residence, boat, or person, or (4) proceeds
of a particular violent crime.

     42.  Based on my training and experience (including
knowledge of this this investigation to date), I believe that
records as far back as January 1, 2019 will be relevant to this

investigation, in that establishing a pattern of contact between LE, RITZE, "Shawn," and others will assist investigators in determining deviations from that pattern around the time of the murder.  Moreover, learning the extent of RITZE's contact with LE and others requires looking at a wider range of time than just a few weeks or months.  Furthermore, the planning for a murder may take weeks or months, and the development of a motive for a murder—such as the accumulation of a large debt——may similarly take a long time.

43.  Accordingly, there is probable cause to believe that communications between LE and RITZE, LE and others, and RITZE and others, and location information and the other information described below, between January 1, 2019, and the present, will constitute evidence of the Subject Offenses.  LE and RITZE have continued to associate, LE and RITZE appear to have recently placed a tracker on the victim's girlfriend's car, and LE has considered an additional murder in discussions with the CHS.  There is probable cause to believe that records going back to January 1, 2019, and continuing to the present, will contain evidence of the Subject Offenses.

**VIII.     TRAINING AND EXPERIENCE ON NARCOTICS OFFENSES**

44.  Based on my experience and training, including working narcotics offenses for eight years, and working on a Violent Crime Squad that includes members of a gang task force who regularly investigate narcotics offenses, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics dealers.  I have also

spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews.  I am knowledgeable in the methods and modes of narcotics operations and the language patterns of narcotics trafficking.  I have become familiar with the methods of operation typically used by narcotics traffickers.  Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

a.   Narcotics traffickers will frequently keep records, documents, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence.  Individuals involved in narcotics trafficking often conceal evidence of their drug trafficking in their residences.  Narcotics traffickers also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences.

b.   Narcotics traffickers often continue their criminal activity indefinitely.  Narcotics traffickers begin trafficking in small quantities of narcotics.  As they develop their customer base and their supply contacts, they are able to deal in larger quantities of narcotics.  Thus, those who are trafficking in ounce or greater quantities of narcotics are not typically new to the business; rather, they have established their contacts and customers over months or years.

c.   Narcotics traffickers often keep records of their illegal activities for a period of time extending beyond the time during which they actually possess controlled substances, in order to maintain contact with criminal associates for future narcotics transactions, and to have records of prior transactions for which, for example, they might still be owed narcotics proceeds, or might owe someone else money.  Such records are often kept on digital devices.

d.   Individuals involved in narcotics trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware, cellophane, heat sealers, glassine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.).  Individuals involved in narcotics trafficking commonly store these items in their residences, vehicles, and in other areas to which the traffickers have ready access.

e.   Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit and commonly obtain narcotics from their suppliers on credit.  Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to thwart law enforcement

detection.  The aforementioned books, records, receipts, notes,
ledgers, correspondence, etc., are commonly maintained where the
narcotics traffickers have ready access to them, such as their
residences and vehicles.  These records are commonly kept on
digital devices.

        f.   Individuals involved in narcotics trafficking
sometimes have in their possession -- that is, on their persons,
at their residence and/or at their stash houses or vehicles --
firearms, including handguns, pistols, revolvers, rifles,
shotguns, machine guns and/or other weapons, as well as
ammunition and ammunition components, that are used to protect
and secure the narcotics traffickers' property.

        g.   Individuals involved in narcotics trafficking
generally sell narcotics for cash proceeds, as LE did to the CHS
in this case.  Therefore, narcotics traffickers typically may
have thousands of dollars in cash on hand both as proceeds of
sales, to purchase their own supplies, and profits from their
narcotics trafficking activities (such as profits from sales or
profits from the transportation of narcotics or narcotics
proceeds).  In addition, narcotics traffickers often have other
assets generated by their narcotics business, or purchased with
cash earned, such as precious metals and stones, jewelry, real
estate, vehicles, and other valuables.  Narcotics traffickers
often keep these items, and records reflecting their purchase or
sale such as automobile titles or deeds to property, as well as
evidence of financial transactions relating to obtaining,
transferring, secreting, or spending large sums of money

acquired from engaging in drug trafficking activities in their residences and automobiles.  Records of these items are often kept on digital devices.

h.    Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

i.    Narcotics traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sales.  Such narcotics traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.  Records of an inventory may be kept on digital devices.

j.    Narcotics traffickers will often conceal controlled substances and narcotics proceeds in hidden compartments or manufactured spaces, to include within the walls of their residences, within furniture contained in their residences, and within secret compartments of their vehicles.

k.    Narcotics traffickers often require the use of one or more telephones or other digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.  For example, based on my training and experience and investigation in this case, I believe that LE used a cellular device to communicate with the CHS to negotiate the cocaine transactions and the

methamphetamine transactions described above.  In addition, I
know that professional narcotics operations depend upon
maintaining timely long-distance and local contacts with the
original suppliers and those down the organizational chain to
the local traffickers.  Telephones and other digital devices
enable narcotics traffickers to maintain contact with narcotics
associates, narcotics suppliers, and narcotics customers.

       l.   I am aware that narcotics traffickers maintain in
their residences or vehicles telephone and address books,
telephone bills, and other books and papers which reflect, among
other things, the names, addresses, and/or telephone numbers of
their customers, co-conspirators, and associates in the drug
trafficking organization, even if said items are in code.  In
addition, data, records, documents, materials, programs, or
other items contained on cellular telephones used by drug
traffickers often contain, among other things, information
relating to the purchase, sale, transport, or distribution of
drugs, the location of previous drug transactions or stash
houses, and/or the identity or whereabouts of traffickers and
co-conspirators involved in narcotics trafficking.
Communications on digital devices often include telephone calls,
text messages, e-mail communications, social media
communications, and communication via cell phone app, between
the trafficker and the co-conspirators, as well as Global
Positioning System ("GPS") information, other locational
information, and identifying information about the trafficker
and co-conspirators.

## IX.   TRAINING AND EXPERIENCE ON EVIDENCE RESPONSE TEAM PROCEDURES

45.   Based on my training, experience, knowledge of this investigation, and conversations with other law enforcement agents and Evidence Response Team agents, including information received from FBI SA Stephanie Woods, I am aware of the following:

a.   Blood evidence can be important evidence of murder and related offenses primarily because it can be used to identify a specific person, as the blood contains DNA that can be directly compared to other DNA samples and potentially matched to a degree.  Additionally, blood evidence can be used to tie either the victim or a suspect to the location the evidence is found.  Blood spatter patterns can also provide significant information to aid the reconstruction of the events of the crime.  The FBI's Evidence Response Team ("ERT") typically attempts to visually locate possible blood spatter at a crime scene on scene when other chemical and forensic techniques are unavailable.  Upon visually finding possible blood, a presumptive blood test which reacts to the presence of human or animal blood may be conducted.  Although these tests may indicate that the substance tested could be blood, a swab of the substance must be sent to a forensic laboratory for confirmation.

b.   It should be noted that presumptive blood tests for latent blood may react to other substances and therefore produce false positives.  For example, some substances such as

certain cleaning agents, insecticides, various glues, paints, and varnishes, among other things, may react with the testing chemicals similar to how blood would react.  Therefore, a swab of the reactive area must be sent to a forensic laboratory to make any conclusions as to whether the area contained blood.

c.   Blood at crime scenes may be latent, or not visible to the naked eye, since individuals who commit violent crimes may try to clean up, cover up, or otherwise destroy any evidence of its presence.  In these cases, ERT may conduct further presumptive blood tests to help identify areas where latent blood may be present.  These tests, however, typically require a controlled environment in which ERT can adjust lighting conditions, set up cameras, and use other possible alternative light sources for visualization.  Additionally, sufficient time is needed to perform these tasks as they cannot be done quickly on scene.

d.   Typically, searches done on scene, including the previous search on December 9, 2019, conducted by the government of the SUBJECT BOAT, do not offer a controlled environment or sufficient time to perform these additional presumptive blood tests.  Additionally, the time limit and operating environment of the past search of the SUBJECT BOAT also prevented a more detailed search of the crevices and some compartments of the boat, as these crevices and compartments could not be accessed at the time.

e.   Accordingly, this application seeks authorization to seize the SUBJECT BOAT and SUBJECT VEHICLE 1 in order to

42

allow for the additional tests and analysis described above to
occur in a controlled environment and with sufficient time.
This application is not requesting authorization to seize
SUBJECT VEHICLES 2 or 3.

## X.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[9]

46.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

---

[9] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

47.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. With the exception of RITZE's iPhone XR, I do not know the passcodes of the devices likely to be found in the search.

c. With respect to RITZE's iPhone XR phone with phone number (714) 862-8772, I am informed that Detective Joseph Jun saw that phone on December 4, 2019, during the execution of the warrants relating to digital devices on RITZE's person and in SUBJECT VEHICLE 1 described in the footnote below, and that the iPhone XR has a facial recognition feature, with no fingerprint unlock feature. Though the password to this device was learned from RITZE during her arrest on December 4, 2019, RITZE may have since changed the password to this device, as it was given back to her after that arrest.

d.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LE's or RITZE's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LE's or RITZE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

49.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.[10]

――――――――――

[10] Many of the prior applications for warrants and court orders in this case have been geared toward obtaining evidence similar to some of the evidence sought here, including communications between LE and RITZE concerning the homicide, location information for digital devices associated with LE and RITZE, and forensic evidence relating to the homicide. Accordingly, out of an abundance of caution, I list here the prior warrants and orders obtained from the Court in connection with this investigation.  On October 23, 2019, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, issued a warrant for historical cell site information and other records relating to a phone number believed to be used by the victim.  On October 23, 2019, and October 29, 2019, the Honorable Barbara L. Major, United States Magistrate Judge, Southern District of California, issued orders for pen registers and related information for a phone believed to be used by the individual who later became the CHS, a phone believed to be used by the victim's girlfriend, a phone believed to be used by the family member, and two phones believed to be used by LE.  On November 4, 2019, the Honorable Autumn D. Spaeth, United States Magistrate Judge, Central District of California, issued a warrant for historical cell-site and prospective cell-site and GPS information relating to a phone believed to be used by the CHS and two phones believed to be used by LE.  Also on November 4, 2019, the Honorable Autumn D. Spaeth, United States Magistrate Judge, issued an order for a pen register and related orders for a phone believed to be used by the CHS, two phones believed to be used by LE, a phone believed to be used by the victim's girlfriend, and a phone believed to be used by the family member.  On November 6, 2019, the Honorable Autumn D. Spaeth, United States Magistrate Judge,

## XI.   <u>SEARCH ANY TIME OF THE DAY OR NIGHT</u>

50.   There is good cause for the warrant to be issued such that the warrants can be executed at any time of the day or night because of the danger that LE and RITZE present to the agents executing the warrants.  In particular, I am informed by FBI Supervisory SA David Kinkaid, SWAT Team Leader for FBI Los Angeles Division, that approaching the SUBJECT PREMISES under

---

issued an order for a cell-site simulator relating to a phone believed to be used by the CHS and two phones believed to be used by LE.  On November 8, 2019, the Honorable Autumn D. Spaeth, United States Magistrate Judge, issued a warrant for a Google account associated with the victim.  On November 14, 2019, the Honorable John D. Early, United States Magistrate Judge, Central District of California, issued a warrant for historical cell-site and prospective cell-site and GPS information for a phone believed to be used by LE.  On November 22, 2019, the Honorable Karen E. Scott, United States Magistrate Judge, Central District of California, issued an order for a pen register and related orders for a phone believed to be used by LE and a phone believed to be used by RITZE.  On November 25, 2019, the Honorable Karen E. Scott, United States Magistrate Judge, issued a warrant for historical cell site information for a phone believed to be used by LE, and issued a warrant for prospective cell-site information and authorizing the use of a cell-site simulator for a phone believed to be used by RITZE and a phone believed to be used by LE.  Also on November 25, 2019, the Honorable Karen E. Scott, United States Magistrate Judge, issued two warrants relating to digital devices found on RITZE's person or in SUBJECT VEHICLE 1.  On November 27, 2019, the Honorable Shashi H. Kewalramani, United States Magistrate Judge, Central District of California, issued a warrant for a tracking device on SUBJECT VEHICLE 1, and issued a warrant for historical cell-site information for a phone believed to be used by RITZE, and related to the order for historical cell-site information issued by the Honorable Karen E. Scott, United States Magistrate Judge, on November 25, 2019.  On December 6, 2019, the Honorable Autumn D. Spaeth, United States Magistrate Judge, issued a warrant to search the SUBJECT BOAT for digital devices, including any GPS system, and authorizing forensic processing and the seizure of limited categories of tangible property.  On December 9, 2019, the Honorable John D. Early, United States Magistrate Judge, issued a warrant to search electronic systems onboard SUBJECT VEHICLE 1.  On December 11, 2019, the Honorable John D. Early, United States Magistrate Judge, issued an amended warrant to search electronic systems onboard SUBJECT VEHICLE 1.

cover of darkness will enhance the safety of the agents executing the warrants.

## XII. REQUEST FOR AUTHORITY FOR NO KNOCK EXECUTION FOR SUBJECT PREMISES 1

51.  LE is believed to have ready access to firearms within SUBJECT PREMISES 1.  Knocking and announcing the presence of agents may allow LE time to access those firearms and potentially present a significant risk to the safety of agents executing the warrant at SUBJECT PREMISES 1.  To minimize the risk to the safety of agents executing the warrant at SUBJECT PREMISES 1, I respectfully request authorization for agents and officers executing the warrant for SUBJECT PREMISES 1 to enter SUBJECT PREMISES 1 without knocking and announcing their presence.

## XIII.   CONCLUSION

52.  For all the reasons described above, there is probable cause to believe that LE violated 18 U.S.C. § 1111, and RITZE violated 18 U.S.C. § 3, 1111: Accessory After the Fact to Murder in the First Degree.

//

//

53.    Further, there is probable cause to believe that the
items listed in Attachments B-1 and B-2, which constitute
evidence, fruits, and instrumentalities of violations of the
Subject Offenses, will be found at, in, or on SUBJECT PREMISES 1
and 2, SUBJECT VEHICLES 1-3, and the SUBJECT BOAT, as described
in Attachments A-1 through A-6.

_____
CHRISTOPHER GICKING, Special
Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 18th day of December, 2019.

_____
UNITED STATES MAGISTRATE JUDGE
          KAREN E. SCOTT

50