**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 20-00002-(B)-DOC |
| | ) Volume I |
| HOANG XUAN LE and SHEILA MARIE RITZE, | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, JUNE 3, 2021

4:00 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                        ANDRE BIROTTE, JR.
                        UNITED STATES ATTORNEY

                        DENNISE D. WILLETT
                        ASSISTANT UNITED STATES ATTORNEY
                        CHIEF, CRIMINAL DIVISION

                        GREGORY S. SCALLY
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3592
                        gregory.scally@usdoj.gov

                        VIBHAV MITTAL
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3534
                        vibhav.mittal@usdoj.gov

    FOR THE DEFENDANT, HOANG XUAN LE:

                        CRAIG WILKE
                        LAW OFFICE OF CRAIG WILKE
                        305 NORTH HARBOR BOULEVARD
                        SUITE 216
                        FULLERTON, CALIFORNIA 92832
                        (714) 879-2278
                        craig@craigwilkelaw.com

    FOR THE DEFENDANT, SHEILA MARIE RITZE:

                        DAVID W. WIECHERT
                        WIECERT MUNK and GOLDSTEIN PC
                        27136 PASEO ESPADA
                        SUITE B1123
                        SAN JUAN CAPISTRANO, CA 92675
                        (949) 361-2822
                        dwiechert@aol.com

SANTA ANA, CALIFORNIA; THURSDAY, JUNE 3, 2021; 4:14 P.M.

THE COURT:  We're on the record.

We're on the record in the matter of Hoang Xuan Le and Sheila Ritze.

If you will remain seated.

Can we begin with the Government's appearance by Mr. Scally and Mr. Mittal.

MR. SCALLY:  Greg Scully and Vib Mittal for the United States.

THE COURT:  Excellent.  And Mr. Wilke?

MR. WILKE:  Good afternoon, Your Honor.

Craig Wilke, on behalf of Hoang Xuan Le, who is not present.

Waiver is on file.

THE COURT:  The waiver is on file, and I signed it.  I apologize for doing that, because I'd prefer to have him present on all occasions.  I just feel better about that.

MR. WILKE:  That's fine.

MR. WIECHERT:  Good afternoon, Your Honor.

Dave Wiechert --

THE COURT:  No, no, no, no.

-- especially when sometimes, although counsel does an excellent job, our clients sometimes aren't as appreciated, and so I want him present at all times.

04:15:41  1          I'm going to revoke, Kelly, the signature that I,

2     apparently -- he'll be present on all occasions.

3          One of the reasons for that is that I want him to

4     know with confidence about your preparation.  It's usually

04:15:55  5     extraordinary, but sometimes our clients don't know that.

6          Is he at MDC?

7          MR. WILKE:  He's at Santa Ana Jail, Your Honor.

8          THE COURT:  Santa Ana.

9          Today's date, let's move along with that.

04:16:05 10          Then, Mr. Wiechert, please.

11          MR. WIECHERT:  Thank you, Your Honor.  Good

12     afternoon.

13          David Wiechert, on behalf of Sheila Ritze, who is

14     present at counsel table.

04:16:13 15          THE COURT:  Now, let me also inquire.  There may

16     be another good reason why a client is not present.

17          Are they still going through quarantine procedures

18     over at Santa Ana Jail upon the return?  Because if so, I

19     will keep the waiver in effect, because I don't want your

04:16:28 20     client quarantined every time.

21          MR. WILKE:  Presently, no, Your Honor.  My client

22     anyway, has been vaccinated.  And if you're vaccinated,

23     they're not quarantining them.

24          THE COURT:  Okay.  If that changes, let me know

04:16:37 25     and I'll reconsider that, because I don't want your client

5

| | | |
|---|---|---|
| 04:16:40 | 1 | quarantined every time he or she comes over. |
| | 2 | How about your client? |
| | 3 | MR. WIECHERT:  Your Honor, the only down side for |
| | 4 | Ms. Ritze today in terms of her appearing is that she came |
| 04:16:54 | 5 | here very early and has been sitting in lockup all day.  I |
| | 6 | guess was cold. |
| | 7 | DEFENDANT RITZE:  I'm vaccinated, though. |
| | 8 | MR. WIECHERT:  She's vaccinated. |
| | 9 | THE COURT:  Vaccinated. |
| 04:17:02 | 10 | And are they quarantining your client upon return, |
| | 11 | Mr. Wiechert? |
| | 12 | MR. WIECHERT:  Only if they're not vaccinated. |
| | 13 | THE COURT:  Is your client at Santa Ana Jail or |
| | 14 | MDC? |
| 04:17:17 | 15 | MR. WIECHERT:  Santa Ana Jail. |
| | 16 | THE COURT:  So you both have access then. |
| | 17 | Okay.  The only reason I called you back is to |
| | 18 | make certain that our preparation is going as well as it |
| | 19 | can, after the denial of the requested continuance by |
| 04:17:29 | 20 | Mr. Wilke. |
| | 21 | And I've heard very clearly, Mr. Wilke, that you |
| | 22 | wanted or, at least, Mr. Wiechert wanted your client to |
| | 23 | proceed first and Ms. Ritze to proceed afterwards; because |
| | 24 | remember, initially, it was reverse order:  Ms. Ritze was |
| 04:17:46 | 25 | going to trial, initially, Mr. Wiechert, first and Mr. Le |

04:17:53  1    was going to trial afterwards.  That seems to have reversed.

          2    And with the motion to continue from our August date having

          3    been denied, that puts Mr. Wiechert, in a sense, in the

          4    first chair for trial purposes, so -- I mean Mr. Wilke.

04:18:16  5    Thank you.

          6            You are concerned about a transcript.  And trust

          7    me, the Government is going to get you everything you need

          8    in a timely fashion; is that correct, Counsel?

          9            MR. SCALLY:  Absolutely, Your Honor.

04:18:30 10            THE COURT:  Excellent.  Love the spirit.

         11            How are we doing with that transcript?

         12            MR. SCALLY:  Your Honor, we e-mailed the

         13    transcript for the ones that the Court identified in the

         14    minute order earlier today.

04:18:43 15            THE COURT:  Why today?  In other words, we had a

         16    session just --

         17        (Telephonic interruption)

         18            THE COURT:  Just a moment.

         19        (Pause)

04:19:14 20            THE COURT:  Why the delay?

         21            MR. SCALLY:  Your Honor, after the Court's

         22    hearing, we undertook to finalize the transcripts and then

         23    to articulate the permissible uses that we believed applied

         24    to various portions of the transcripts.  And so we provided

04:19:32 25    different-colored highlights for different permissible

*Deborah D. Parker, U.S. Court Reporter*

7

04:19:37  1    purposes.

        2            THE COURT:  What does that mean?

        3            MR. SCALLY:  So I provided the transcripts to

        4    counsel with on the transcripts yellow highlights for the

04:19:48  5    portions that we believe are either direct evidence of

        6    Counts 1 through 3, inextricably intertwined with direct

        7    evidence or 404(b).  Separately, we provided some portions

        8    that are in green highlights.

        9            Mr. Wilke has indicated, in one of our many

04:20:09 10    discussions in this case as we have been moving the case

       11    forward, that he is potentially intending to introduce some

       12    evidence concerning some traits of the victim -- of

       13    Mr. Dau -- for propensity for violence, possession of

       14    weapons, that sort of thing.

04:20:32 15            We, in designating portions of the transcripts

       16    that we provided today -- green -- indicated to Mr. Wilke

       17    that those were the portions that we would seek to introduce

       18    to -- under Rule 404(a)(2)(b)(2), which, if Mr. Wilke

       19    introduces evidence of certain traits of the victim, the

04:20:59 20    prosecution under that rule is allowed to introduce evidence

       21    of the defendant's same trait.

       22            And so that was sort of the analysis that was done

       23    for purposes of providing that to Counsel today.

       24            THE COURT:  I know that's undertaken in good faith

04:21:24 25    but, initially, my impression was that the transcripts had

*Deborah D. Parker, U.S. Court Reporter*

```
04:21:28    1   not even gotten to Mr. Wilke.  So what I'm hearing is --

            2   with no confidence in what I'm saying -- that the case has

            3   been pending since, when?  2019?

            4          MR. SCALLY:  Very early -- yes, Your Honor.  In

04:21:48    5   terms of an indictment, early '20.

            6          THE COURT:  And why haven't the transcripts in

            7   total, regardless of are, you know, yellow, green

            8   underlining, et cetera, which is -- or product that you can

            9   take up any time, am I wrong that these transcripts have not

04:22:04   10   been provided at all?

           11          MR. SCALLY:  You're not wrong, Your Honor.

           12          The --

           13          THE COURT:  Just a moment.

           14          What have we been doing then for the last year?

04:22:17   15   Why haven't these been provided to him?

           16          MR. SCALLY:  The conversations that we've had with

           17   the defense, we've asked if they wanted draft transcripts.

           18   They've indicated to us they prefer the final drafts.

           19          THE COURT:  In a year we couldn't get a final

04:22:29   20   draft transcript?  In other words, we couldn't move from a

           21   draft in this last year to a final transcript to get it over

           22   to the defense?

           23          MR. SCALLY:  We figured --

           24          THE COURT:  Nonsense.

04:22:41   25          Mr. Wilke, what's happening here?
```

04:22:43  1          MR. WILKE:  Your Honor, we didn't -- we didn't

2    refuse a request for draft transcripts.  We refused to sign

3    the stipulation that said we were precluded from --

4          *(Court Reporter requests clarification for the*

04:22:59  5          *record.)*

6          MR. WILKE:  We declined to stipulate that we would

7    not use a draft transcript for impeachment purposes.

8          THE COURT:  Well, here's my concern.

9          MR. WILKE:  We -- I received my first transcript

04:23:08  10   today at 9:44 this morning.

11         THE COURT:  Mr. Wilke, I understand that.  Let me

12   slow you down, okay?

13         I know that's of concern to you that I'm not

14   granting your request for a continuance, and you already

04:23:24  15  made your record.  But I'm also concerned why these

16   documents aren't getting to you in a timely fashion and in a

17   final form.  The pandemic doesn't mean that our system

18   stops.  In fact, our court reporters have been available at

19   home.

04:23:41  20         So what seems to be building is pushing this right

21   up to the limit.  And if you got time for a story, I'm sure

22   you'll enjoy my story.

23         Mr. Steward just left.  Can you see if he's in the

24   hallway?

04:24:08  25         He'll tell you the story better than I can,

*Deborah D. Parker, U.S. Court Reporter*

04:24:10  1   because we were in consecutive sessions for six and a

2   half -- no, seven and a half weekends on the

3   Aryan Brotherhood.  And so unless you're going to spend

4   every Saturday and Sunday with me, which I would enjoy, you

04:24:31  5   better move your feet.  That's a legal ruling.

6            MR. SCALLY:  Understood, Your Honor.

7            THE COURT:  And I mean fast.

8            Is Mr. Steward gone?

9            Well, you're in consecutive session now.  And

04:24:39  10  you're in preparation, because this trial is going forward

11  in August, and Mr. Wilke is going to be extraordinarily

12  well-preserved.  And I'm a little displeased that you waited

13  a period of time when you went through your underlying

14  process.

04:24:51  15           My order was to get the transcript over to him,

16  not for you to undertake --

17           Do you understand that?

18           MR. SCALLY:  Yes, Your Honor.

19           THE COURT:  So what do I do about that?  You start

04:25:06  20  obeying my orders.

21           Do you understand me?

22           MR. SCALLY:  Yes, Your Honor.

23           THE COURT:  When I say that transcript goes over,

24  it goes over now.

04:25:12  25           MR. SCALLY:  Understood, Your Honor.

04:25:13  1              THE COURT:  All right.  Now, you two are in

         2    continuous session.  I hope you'll enjoy being in my

         3    presence tomorrow, but you'll be working in the complex

         4    courtroom and so will Mr. Wilke.

04:25:20  5              You're going to start communicating with each over

         6    these yellow, green and red, or you going to be working with

         7    me Saturday.  Your choice.

         8              MR. WILKE:  Your Honor, first off, I've done

         9    nothing to require my presence here.

04:25:33 10              Second, I'm unable --

        11              THE COURT:  You're not in trouble, Mr. Wilke.

        12              MR. WILKE:  But I can't -- I can't -- I cannot

        13    change my schedule and my other responsibilities to be here

        14    tomorrow.

04:25:40 15              THE COURT:  Oh, that's fine.  Saturday is good

        16    then.  Saturday.

        17              MR. WILKE:  Your Honor, it is -- that is

        18    unnecessary, and it's abusive.

        19              THE COURT:  Can you get this done then?  Both of

04:25:49 20    you?

        21              MR. WILKE:  It's getting done, Your Honor.  They

        22    provided me --

        23              THE COURT:  No, no, no.  When you're not getting

        24    information, I want to know that from the defense

04:25:55 25    immediately so I cure that.  And I'm not going to have a

*Deborah D. Parker, U.S. Court Reporter*

04:25:58  1   record, Mr. Wilke, where you come to me in a month in good

2   faith, which I would if I was in your position and say,

3   Judge, I'm not prepared.

4            MR. WILKE:  I've told this Court for months now

04:26:09  5   that I needed until next April.  I then asked for a trial in

6   November, then October.  The Court set it in August.

7            I re-asked it for October.  The Court is still

8   telling me I'm going to trial in August, Your Honor.

9            THE COURT:  That was on the basis of your experts,

04:26:25 10   and that was on the basis of the jurisdictional limit.  That

11   was not on the basis of transcripts that I heard about only

12   recently.  And I'm perplexed why this wasn't called to me by

13   all of you much earlier during this last year.  These

14   transcripts are so easy to prepare.

04:26:43 15            MR. WILKE:  The transcripts in this case,

16   Your Honor, are -- they're a significant piece of evidence.

17   But in terms of the trial preparation in this case, there

18   are other items of evidence that are far more demanding in

19   this case.

04:26:55 20            THE COURT:  Well, tell me what those are.  Because

21   my effort is to get you prepared, Mr. Wilke, but effort is

22   not also to grant a spurious continuance which is not

23   needed.

24            MR. WILKE:  We were turned over -- since the

04:27:05 25   Court's spring status conference, approximately two months

04:27:10  1    ago, we received mirror images of all the electronic devices

2    and electronic accounts that were either seized by the

3    Government or subpoenaed by the Government in this case.

4    That information constitutes an excess of terabytes of

04:27:26  5    information.  It took us weeks, probably over a month, to

6    get that information in a usable format.  We had to retain

7    our computer forensic expert.  We had to have him generate

8    reports on all of these items.

9            We have -- Mr. Wiechert and I have had these

04:27:49 10    reports, and we're still waiting for one more image that we

11    learned about recently.  The Government is turning it over

12    and we expect to receive it this week.

13            But we received these electronic reports from our

14    computer forensic expert three weeks ago, maybe.  Three and

04:28:03 15    a half weeks ago.

16            Your Honor, the volume of material that's been

17    produced in that is literally overwhelming.  And it takes

18    hours to comb through these reports to search and find

19    relevant information.  It is -- it is -- it is a task that

04:28:19 20    can really only be done by the lawyer, because it is,

21    essentially, a -- it requires a knowledge of the case in

22    terms of what to look for, and it requires a certain level

23    of confidence in using this electronic software in which

24    these devices are searched.

04:28:37 25            That is currently the biggest single issue that is

| | | |
|---|---|---|
| 04:28:40 | 1 | hampering trial preparation.  It's just the volume of |
| | 2 | material that were on the electronic devices that were |
| | 3 | produced in the last six to eight weeks. |
| | 4 | The transcripts, I appreciate it; but we've had |
| 04:28:51 | 5 | the tapes since the beginning of this case, Your Honor. |
| | 6 | I've listened to the tapes.  I mean, there may be -- I'm |
| | 7 | going to have somebody verify the transcripts to make sure |
| | 8 | we don't have a dispute about their translation, or |
| | 9 | transcription, but -- frankly, that in the trial preparation |
| 04:29:07 | 10 | context, that's kind of minor compared to the multiple other |
| | 11 | tasks. |
| | 12 | THE COURT:  So the transcripts really aren't the |
| | 13 | issue, right now? |
| | 14 | MR. WILKE:  Not in terms of affecting my trial |
| 04:29:16 | 15 | preparation, no.  I mean, I appreciate getting them now, |
| | 16 | and -- but I had told the Government because they offered me |
| | 17 | draft transcripts months ago, if not last year, if I would |
| | 18 | have signed off on a stip. |
| | 19 | THE COURT:  Well, what was the problem?  In other |
| 04:29:29 | 20 | words, if we're failing as a court, or court reporters, or |
| | 21 | our bureaucracy, if we're failing each of you, we need to |
| | 22 | self-correct.  We're here to serve you, especially on a |
| | 23 | murder case. |
| | 24 | MR. WILKE:  I don't think there's a problem, |
| 04:29:43 | 25 | Your Honor.  I think that -- |

*Deborah D. Parker, U.S. Court Reporter*

04:29:43  1            THE COURT:  Yes, there is.

          2            MR. WILKE:  I can tell the Court what happened --

          3            THE COURT:  Thank you, Mr. Wilke.  I've heard from

          4    you.  Now I'm going to cut you off.

04:29:48  5            There is a problem.  What have we been doing this

          6    last year?  I'm absolutely perplexed in why this hasn't

          7    occurred a long time ago.  And you two blighty came to me

          8    and quite frankly, I was harsh with you, and I admit that.

          9    But the ridiculousness of the Government's position where

04:30:08 10    you were tied up in two-day litigation to move this case

         11    over here, I hope you've heard me loud and clear.  Don't

         12    ever make that representation to this Court that you're tied

         13    up in litigation for two or three days when you got a murder

         14    case for five or six weeks with these consequences.  And I

04:30:25 15    don't understand why this hasn't occurred during this last

         16    year.  And, frankly, I think there's been lack of diligence

         17    here.

         18            So you've made your record, but your record so

         19    far, Mr. Wilke, is appreciated by the Court, but your record

04:30:47 20    is:  *Judge, because of the 3-mile issue and your*

         21    *unwillingness to take this motion in a 12(b) that there's*

         22    *going to be an excessive amount of opinion testimony that*

         23    *the Government cannot state beyond a reasonable doubt*

         24    *whether it's within or outside the 3-mile limit.*

04:31:18 25            You've both somewhat inferred to me that it's

04:31:21  1   close; that there really can't be any discernment.  But I've

        2   indicated to you that I will not take that motion or make

        3   that decision until I've heard actual evidence in this

        4   matter.  And that will be at trial.

04:31:38  5       This is an anticipatory ruling as far as this

        6   Court's concerned.  And that was the Government's choice in

        7   terms of filing this case.  And I recognize the difficulty

        8   in making that decision, because if you don't know -- and

        9   it's close to 3 miles within or without -- it could be a

04:31:57 10   quarter mile in either direction, hypothetically.  And I'm

       11   making up that figure.

       12       And I do understand if you filed on the state

       13   level, you can have, or -- the state authorities filed that

       14   they could have jurisdictional problems, and you filing on

04:32:13 15   the federal level may have jurisdictional problems.

       16       I want to hear your experts.  I want to hear the

       17   best you have to offer in this regard from both sides.  And

       18   I well understand that jeopardy attaches and what's at risk

       19   for each of you in this.

04:32:30 20       So, Mr. Wilke, I'm not going to disturb your

       21   Friday.  But I have been in continuous session, and I'm

       22   going to get Mr. Steward to call you or you call

       23   Mr. Steward.  I mean, ask about that.  I'm not kidding.  We

       24   worked every weekend, but I don't want you punished by that.

04:32:49 25   By the same token, you need to be prepared, and I need to

04:32:52  1    ensure that.  And that's not going to be now because of

2    other matters.

3              MR. WILKE:  Your Honor, I just ask for notice.

4    More notice than one day.

04:33:00  5              THE COURT:  Hmm?

6              MR. WILKE:  I have -- I don't mind coming in on

7    Friday or Saturday or whatever.

8              THE COURT:  No, you've got it.

9              MR. WILKE:  I just need notice more than one day.

04:33:07  10             THE COURT:  You've already heard me back away,

11   didn't you?

12             Do you want me to belabor that and have me change

13   my ruling?

14             MR. WILKE:  No, no.  I'm -- but I'm not saying I'm

04:33:12  15   not available.  I'm just saying --

16        *(Overtalking:  Unable to report.)*

17             THE COURT:  Do you want to meet me here Saturday

18   and Sunday, like Mr. Steward, for six weekends?  No.

19             But I want your absolute diligence, which I know

04:33:20  20   you are diligent.  And I want the Government, let's say,

21   moving a little bit more expeditiously.  And I don't want

22   any surprises.

23             Now, what I'm thinking about, also, is starting

24   your case a little bit earlier.  Get out your calendars for

04:33:44  25   just a moment, because -- it depends upon what you need,

04:33:59  1    Mr. Wilke and the Government, for a fair trial because right

2    now we're starting on, I think, August -- what was it? --

3    17th, I believe.  I told you I might move that to the

4    16th and get an extra day.

04:34:29  5        I don't think, Mr. Wiechert, you were involved in

6    any of those four- to six-month trials, were you?  Aryan

7    Brotherhood, Mexican Mafia cases, with me?

8        MR. WIECHERT:  No --

9        THE COURT:  Mr. Wilke, you weren't, were you?

04:34:41  10       MR. WILKE:  Not before this Court, Your Honor, but

11   I have in other --

12       THE COURT:  No, I know you have.  That's not my

13   question.  You weren't involved in any of those lengthy

14   trials, were you?

04:34:49  15       MR. WILKE:  No.  I had the second *Florencia* trial

16   in this court, but that was only about three or four weeks.

17       THE COURT:  Right.  The first one was about four

18   months -- three or four months, wasn't it?  You had the last

19   portion of that.

04:35:12  20       I want to talk to you about your jury selection

21   process for a moment and how we get a fair jury and how much

22   notoriety this case has had or not had.

23       How much notoriety has this case had?

24       MR. WILKE:  This was widely reported in the local

04:35:29  25   papers at the time of the arrest.

19

| | |
|---|---|
| 04:35:31 | 1 |

THE COURT:  I see.

2          MR. WILKE:  And there been intermittent news

3    reports at various stages when the superseding indictment

4    came and then Ms. Ritze was charged with a homicide as well.

04:35:44  5    That generated a story as well, but most of the stories were

6    in December, January of 2000 -- December '19 and January of

7    2020.

8          THE COURT:  What papers?

9          MR. WILKE:  *L.A. Times* and *Register*, I believe,

04:35:57 10    and maybe the *Daily News* and maybe as well local television,

11    including KTLA, KABC.

12          THE COURT:  What was the oddity of this?  Was the

13    oddity the alleged murder at the high seas and the

14    jurisdictional issue?

04:36:12 15          In other words, quite frankly -- years of

16    homicides we have had, you know, drive-bys, bludgeonings,

17    et cetera.  Most of those cases don't attract a lot of

18    notoriety, unless there's something odd.  And here in, kind

19    of, looking at this, my guess was, it was the high seas,

04:36:33 20    the --

21          MR. WILKE:  I think the oddity was the highly

22    inflammatory complaint and affidavit that the U.S. Attorney

23    generated into a press release, Your Honor.  And that told a

24    story containing facts that are demonstrably false about

04:36:51 25    the circumstances surrounding the homicide.

*Deborah D. Parker, U.S. Court Reporter*

04:36:54  1          That's what I believe the oddity was.

        2          MR. WIECHERT:  I think there's actually a simpler

        3    oddity, and that is that people don't find bodies floating

        4    in the Pacific Ocean very often and you have a fishing boat

04:37:09  5    coming upon a body and all of these kinds of -- these

        6    Sopranos, Sopranos/Godfather images come to light and so the

        7    press picks up on it.

        8          MR. WILKE:  But the reports were after the

        9    complaint were filed and they quoted the affidavit.

04:37:27 10          THE COURT:  Thank you.

       11          It certainly hasn't generated the kind of

       12    notoriety that I've seen in the past with many of the cases

       13    that we've had.  But I think our readers are going to recall

       14    something about this, even if it's a year or year and a half

04:37:47 15    ago.  And although it's not a death penalty case, just the

       16    allegation of murder itself will cause a lot of attention,

       17    as well as the oddities that you pointed out.

       18          So I want to talk to you about what gets a fair

       19    jury for just a moment, because I'm going to give you the

04:38:06 20    time, but I'm not going to continue the matter.

       21          So let's just have a discussion about if you want

       22    a *Witherspoon* voir dire.  If this was a death case, we would

       23    be asking individually of each juror who came in whether

       24    they would automatically find for death or never find for

04:38:30 25    death.  The difficulty of that is you don't have a death

*Deborah D. Parker, U.S. Court Reporter*

04:38:33  1    penalty case.  But I can certainly take five to 10 jurors at

2    a time; because if one of those jurors states something, I

3    don't want to have to unring the bell by an instruction or

4    pretending that it wasn't said.  And I've given you that

04:38:49  5    infamous example -- and I'll repeat it to you -- that one of

6    my colleagues decided that he or she -- so I don't single

7    out the Judge in Superior Court -- was going to show all of

8    us judges how quickly they could get a jury.  Instead of the

9    cautiousness involved, that Judge decided to put well over

04:39:08 10   150 jurors up on the 8th or 9th.  I forget.  I think

11   Department 45 or 40.  And when either one of the counsel --

12   and I forget the attorney -- asked if they could be fair,

13   that one juror stood up and said, quote, unquote:  "I would

14   make sure that they got the death penalty, because my sister

04:39:34 15   was raped and murdered.  And I'd kill every son of a bitch

16   who did this," quote, unquote.

17          Now, pardon the expression for the record, but

18   that's exactly what was said.  Now, the Judge went on to

19   give an admonition that you're to disregard, but you can

04:39:45 20   understand Mr. Wiechert, Mr. Wilke, once that bell gets

21   wrong rung in an auditorium of that size, there's an echo

22   effect, and it's pretty hard to unring.

23          So if you want to start with an earlier juror, I'm

24   not available to you the first two weeks in August; but I'm

04:40:01 25   very much amenable to starting with the jury selection

04:40:09  1    sometime in July.  And how that takes shape could be five or

2    10 at a time.  Another five or 10 in the morning.  We could

3    usually get through, you know, 20 or 30 in a day pretty

4    easily.  So that's one opportunity.

04:40:24  5           The second is the use of a questionnaire.  But if

6    you use a questionnaire, I'm going to limit you to about

7    five for seven pages.  I literally have, probably, 12 to 14

8    different questionnaires I've used in death cases over the

9    years.  The problem is, bigger they are, the more non-value

04:40:42 10    they are to me.  As a trial attorney, you're sifting through

11    page after page, and it's really hard for you to absorb that

12    if I bring in 100 to 150 jurors, for instance.  You can't

13    move fast enough to get that done.

14           So I would recommend going back to either the

04:41:00 15    *Aryan Brotherhood* case with Mr. Steward or the *Mexican Mafia*

16    cases and looking at those questionnaires.  Your offices

17    have them or the defense bar has them.  We have used them on

18    the *Fernandez* case.  It's about seven pages.  You take out

19    all the death allegations, and you can re -- you can do it

04:41:18 20    that way.  That's option two.

21           The third option is we just all throw them in a

22    room, which I'm amenable to.  It's quicker, quite frankly,

23    but I worry about it, so I'm offering humbly the best

24    opportunities to choose.

04:41:33 25           But the last thing I'll say is this:  In all of

*Deborah D. Parker, U.S. Court Reporter*

04:41:36    1    these cases, you got a stack of 100 jurors with all this

2    paperwork, if you decide to use a questionnaire.

3    And Kelly calls Juror No. 141. And you're going

4    down through this stack of papers trying to find 141 and

04:41:54    5    then recall 141. It's impossible for you to do. So,

6    historically, we've gotten a stipulation that we would

7    literally give you the first 12 or 18. And so you knew the

8    first 12 we were going to call into the box and you also

9    know the next six after that random shuffle. That lets you

04:42:15   10    put at least the first 18 in order so when you're having a

11    general voir dire of 12. Now, it's worked really well in

12    all the trials we've had, but that doesn't mean you'll

13    stipulate to that. I just recommend it to you.

14    And, in fact, we used it in this particular case,

04:42:32   15    didn't we, Kelly?

16    THE CLERK: Yes, Your Honor.

17    THE COURT: Yes, we gave the defense bar and the

18    Government the order of all 43 jurors that we called in.

19    You knew in order who we were going to call by

04:42:42   20    name. And so the first 12 that were seated, you basically

21    knew on both sides. So if you stipulate to that, I'm happy

22    to do that or some number thereof.

23    So why don't you two go have a conference for just

24    a moment and give me some guidance. Because if in fact

04:42:57   25    we're going to undertake some kind of jury selection, I'd

04:43:03  1    like to start that and reserve the July 26th, 27th, 28th,

2    29th and the 30th.

3              MR. WILKE:  Your Honor --

4              THE COURT:  Now, that's -- no, I'm not done

04:43:14  5    speaking, Mr. Wilke.  I'll give you unlimited time.

6              So that selection process, though, is not opening

7    statement.  You're then going away for two weeks, but it's

8    an opportunity for you.  Otherwise, we'll just do it the

9    normal, traditional way.

04:43:30  10             Now, Mr. Wilke, without interrupting you, your

11   turn.

12             MR. WILKE:  Thank you, Your Honor.

13             Your Honor, frankly, with the amount of time that

14   the Court is requiring us to go to trial, I do not have a

04:43:40  15   week in my trial preparation to give up to come in here in

16   court and do early jury selection.  I just don't.  I need

17   that week to prepare for trial.  That's issue No. 1.

18             Issue No. 2 is, we've already discussed a

19   questionnaire.  I think the parties are in agreement that

04:43:54  20   the questionnaire would be appropriate in the case.

21             THE COURT:  And I need to see it.

22             MR. WILKE:  We would expect -- the expectation was

23   that we would have that filed by mid-June around the time we

24   would be filing motions *in limine*.

04:44:10  25             THE COURT:  Why?

*Deborah D. Parker, U.S. Court Reporter*

04:44:10  1              MR. WILKE:  Your Honor, because we're working on

2    it.  Because there is quite a bit of work to do in the case.

3    It's not like we're sitting around doing nothing.

4              I have worked on this case full time since our

04:44:18  5    spring status conference.  I don't know what Mr. Scally and

6    Mr. Mittal's schedule is, but I suspect they're working

7    pretty much on this case full time as well.

8              And I think that we can have a questionnaire to

9    the Court in the next few weeks.  We also had expected to be

04:44:37 10    filing motions *in limine* in the next few weeks.

11              THE COURT:  You need to give me dates, because

12    otherwise you're going to get pushed into a box.

13              MR. WILKE:  No, we had hoped --

14              THE COURT:  And I don't have time.

04:44:48 15              MR. WILKE:  No, I understand.  But the hope was

16    that we could have motions *in limine* heard a month out

17    before trial, so sometime by mid-July.

18              THE COURT:  What date is that?

19              MR. WILKE:  Well --

04:44:58 20              THE COURT:  Find an agreement now.  Give me a date

21    so we're not dealing with, you know, fiction here.

22              MR. WILKE:  The 19th.  July 19th.  Monday,

23    July 19th for motions *in limine*.

24              THE COURT:  Just a moment.  Why don't you check

04:45:09 25    with Mr. Wiechert.  Although your motions *in limine* may get

26

| | | |
|---|---|---|
| 04:45:14 | 1 | delayed slightly, because I did some of the other rulings. |
| | 2 | MR. WILKE:  Well, this doesn't affect |
| | 3 | Mr. Wiechert, because he's not going to trial in August. |
| | 4 | THE COURT:  No, but he might be joining you in |
| 04:45:22 | 5 | some of them.  I don't know what to expect.  He joined in |
| | 6 | the other motions, so I don't know.  But I'm not going to |
| | 7 | deal with that. |
| | 8 | The point is, whether it involves you or not, |
| | 9 | Mr. Wiechert, I don't know.  But those motions *in limine* may |
| 04:45:35 | 10 | be substantial, as far as you're concerned also.  I haven't |
| | 11 | seen those. |
| | 12 | So why don't all of you pick a date whether you |
| | 13 | join in them or not. |
| | 14 | MR. WIECHERT:  There are certainly issues that |
| 04:45:46 | 15 | overlap, Your Honor.  And we're not going to be making you |
| | 16 | go and redo the same thing twice when we know what your |
| | 17 | ruling is and would have applicable -- |
| | 18 | THE COURT:  Well, that's the point.  Nobody is |
| | 19 | giving me any insight into what these motions *in limine* are. |
| 04:46:01 | 20 | So when Mr. Wilke says, *Gee, these don't involve* |
| | 21 | *Mr. Wiechert,* I wouldn't take that to the bank.  Because if |
| | 22 | I rule on a particular overlying *in limine* motion, it |
| | 23 | dramatically affects your client. |
| | 24 | So Mr. Wilke doesn't represent your client. |
| 04:46:15 | 25 | MR. WIECHERT:  If I may just add one thing, |

*Deborah D. Parker, U.S. Court Reporter*

04:46:18   1   Your Honor.

2          I have the advantage of going second and having a

3   defendant whose defenses and theories are in many ways tied

4   at the hip with Mr. Wilke's client.  I know the amount of

04:46:35   5   information that we've received from the Government over the

6   last month and a half in terms of description.  I don't know

7   what all is contained in it.  Because, as Mr. Wilke

8   indicated, we've gotten a data dump of devices that have

9   tons of material which originally when this case was brought

04:46:54  10   pre-pandemic, the snippets that were culled from that by the

11   agents were given to us, but the phones and devices and the

12   totality of the information that might be pertinent to these

13   events were not.

14          THE COURT:  And that, I think, has what -- what

04:47:14  15   has me concerned.  I just can't believe that in all the time

16   that we're supposedly preparing, that the pandemic stopped

17   the exchange of basic information.  I can't believe that the

18   transcripts didn't get prepared or shared because of the

19   pandemic.  I can't believe that the -- maybe the Courts were

04:47:37  20   closed, but certainly everybody else was working.  We were

21   exchanging through Zoom, et cetera.

22          And so that's why I'm a little concerned about

23   this last, as you say "data dump," and I think the

24   Government would probably disagree.  But I'm get really

04:47:54  25   concerned about why transcripts weren't even exchanged or

04:47:58  1    prepared or the nice underlining, outlining or colors you

       2    want to use haven't been exchanged.

       3              And so you're under a lot of pressure now.  You're

       4    going to -- by the way, if I reverse that, you would be

04:48:09  5    going first.  In other words, what you would have found, if

       6    I would have granted Mr. Wilke's position [sic], your client

       7    would be first.

       8              MR. WIECHERT:  And the only way, Your Honor, that

       9    I could be prepared in October, which is my current trial

04:48:21 10    date with Ms. Ritze, is because I can ride the coattails of

      11    a great lawyer who has -- who -- really, the task for

      12    Mr. Wilke is herculean.  That is not hyperbole here.  We

      13    have gotten a ton of information.

      14              And part of the focus on the jurisdictional issue,

04:48:41 15    which you normally don't have in any federal case -- this

      16    was a very complicated jurisdictional issue.  It involved a

      17    bunch of devices and where they are.  It involves currents

      18    and water temperatures and all sorts of things.  That's

      19    shaken out, but that was an issue that we've been working on

04:49:02 20    probably for 12 months.  The first appearance I made in this

      21    Court, I raised the issue of jurisdiction.

      22              THE COURT:  There's a very interesting case in

      23    front of the California Supreme Court about this bootlegger.

      24    There was a bootlegger back in the 1930s.  And the

04:49:19 25    bootlegger runs a gambling ship off of Santa Monica Bay.

*Deborah D. Parker, U.S. Court Reporter*

04:49:23  1   And one, Warren Burger, the Attorney General of California,

       2   decides that that bootlegger has had enough bootlegging

       3   3 miles out at sea.  So there's about 400 officers that,

       4   apparently, decide -- joint federal and state -- to go out

04:49:38  5   and stop the bootlegger who's infamous.  And he's running a

       6   gambling casino.  And they can't quite figure out the 3-mile

       7   limit, so they take the headlands of Santa Monica Bay.  They

       8   take the two direct points.  They draw a line and all of a

       9   sudden, it gets extended from 3 miles to about eight and a

04:49:56 10   half or 9 miles.  That may not be relevant to our case, but

      11   it's pretty interesting.

      12          Also, to finish the shaggy dog story, apparently,

      13   as they tried to board, they used fire hoses and nets to

      14   keep the feds and the state folks off.  So it's pretty

04:50:15 15   hilarious as people dropped into the ocean.  Nobody got

      16   hurt, apparently -- initially, anyway.

      17          But we go clear back with this constant problem of

      18   this 3-mile jurisdictional limit.  And I think the Court's

      19   decision on that is going to be, probably, precedent-setting

04:50:29 20   either way.  And, quite frankly, we're still doing research

      21   on it.

      22          So we're going to meet, again, next week, because

      23   I want to make certain that you're prepared.  And if the day

      24   of July 19th is agreeable, we can start with a jury

04:50:47 25   questionnaire, but here's the way it works:  We bring in the

*Deborah D. Parker, U.S. Court Reporter*

04:50:50  1    jurors -- well, strike that.

2            Is Avenatti going on that date?  Because we

3    promised Judge Selna that we would clear out the Court on

4    the Avenatti matter.

04:51:01  5            In other words, we didn't want 150 jurors in, but

6    I think he's going in July, isn't he?

7            MR. SCALLY:  July 12th, I believe.

8            THE COURT:  July 12th.  And you're okay,

9    August 17th.  Okay.

04:51:12 10            MR. WILKE:  I wouldn't -- the Court, on July 19th,

11    I think the understanding -- at least the parties'

12    understanding was, we would have a -- I don't think there's

13    a need to bring a jury in on that date.

14            THE COURT:  Well, there's three or four ways to do

04:51:27 15    it.  Let's run through those:  One, you bring the jury in

16    and they fill out the questionnaire here.  The benefit of

17    that is they take it seriously.  They don't ask their

18    friends.  They don't discuss it with anybody.  We collect

19    those questionnaires and then we go through it for cause.

04:51:45 20    Some of those people will be excused, and I'll do all of

21    those.  I won't use the magistrate judges for that -- along

22    with you.

23            Then from that questionnaire, I wouldn't expect to

24    bring in jurors separately, in a *Witherspoon-Hovey*

04:52:05 25    situation.  And that's worked pretty well in terms of

04:52:09  1    fairness, because we've gotten rid of the fringes on both

2    sides.  We've seen the obvious problems.  And it's narrowed

3    your questions.  Usually we get a jury, quite frankly, in a

4    day.  That's one option.

04:52:20  5          The other option is, you can send the jury

6    questionnaire home, Mr. Wilke.  Then, the whole community

7    gets to participant.  Because everybody's excited about a

8    murder case, so everybody wants to visit their neighbor,

9    friends, son, daughter, mom or dad.  No, but I'll leave that

04:52:36 10   to your wisdom.

11          MR. WILKE:  I would object to that procedure.

12          THE COURT:  I would just recommend that we bring

13   them in.  But if we're bringing them in on July 19th, I need

14   to know where Judge Selna is, because we've all kind of gave

04:52:54 15   a pledge of making certain that Avenatti didn't have 100

16   jurors in that we had.

17          MR. WILKE:  I don't think we need them in a month

18   before, though.  I think we have them in a week before.

19          THE COURT:  I'm not available to you.

04:53:06 20          MR. WILKE:  Oh!

21          THE COURT:  I'm available to you the week of the

22   26th through the 30th, and that's it.

23          MR. WILKE:  Well, I think the closest to the

24   actual trial date is the best.  So if we could bring them in

04:53:17 25   on the 26th and --

04:53:20   1            THE COURT:  Let me do this:  Let me sign you up

           2   for the 26th and put you on the calendar now.  Let me go

           3   talk to Judge Selna as a courtesy, okay?  Make certain he's

           4   done with the Avenatti selection.

04:53:33   5            MR. SCALLY:  Your Honor, I'm sure Mr. Mittal is

           6   capable of handling that portion for the Government, but I

           7   do feel like I need to let the Court know.  I am intending

           8   to be in trial before Judge Carney the week of July 20th, on

           9   a murder case, and it may -- I think it's going to be a

04:53:50  10   short case, but I think it may move into approximately the

          11   26th and 27th.

          12            THE COURT:  Well, what's your suggestion then?

          13            MR. SCALLY:  That Mr. Mittal would be able to

          14   handle that portion.  I just don't want the Court to be

04:54:05  15   surprised.  Or we can do it the last day of that week, and

          16   I'd be more likely to be here.

          17            THE COURT:  No, the 26th is fine.  And we can vary

          18   it that week and see.  If it's a short case, we can get you

          19   back.  But I do want to bring in a number of jurors.  So

04:54:21  20   let's count the number of jurors we need for a moment.

          21            This is higher math, Mr. Wilke.  Are you ready?

          22            Write down 12.  And I'm assuming, although I

          23   haven't checked, it's not 20 and 20 like a death case.  Is

          24   it 10 and six still?  Death cases are 20 and 20.  It's

04:54:45  25   co-equal for both sides.  A non-death should still be 10 or

04:54:51  1    six, but I want you to verify that for a moment.

2              So Mr. Wilke is adding for us.  12 --

3              MR. WILKE:  We're at 28, Your Honor.

4              THE COURT:  Okay.  10 -- not yet, though -- and

04:55:06  5    six is 28.  Watch out.  How many alternates?

6              MR. WILKE:  Four.

7              THE COURT:  How long do you estimate the case to

8    take?

9              MR. WILKE:  With the jurisdictional issue, three

04:55:17  10   to four weeks; without the jurisdictional issue, two to

11   three weeks.

12             THE COURT:  You're trying to entice me into a

13   shorter case.

14             MR. WILKE:  Just telling it like it is,

04:55:27  15   Your Honor.

16             THE COURT:  The *Aryan Brotherhood*, we had 10

17   alternates.  We used six or seven, but that was an

18   eight-month case.  Most of the six-month cases, we've had

19   eight.  What do you think?  Five?  Four?

04:55:48  20            MR. WILKE:  I think four is probably enough.

21            MR. SCALLY:  That's fine with the Government,

22   Your Honor.

23            THE COURT:  Okay.  We'll have to be careful so

24   that once we select them, we don't get a pop-up.  We just

04:55:57  25   had that in this case where somebody had a problem.

*Deborah D. Parker, U.S. Court Reporter*

04:55:59  1        MR. WILKE:  Your Honor, my concern is as well, I
        2  saw a little bit of it today.  It is the, kind of, mechanics
        3  of the courtroom with the jurors.
        4        THE COURT:  I'm happy to move you next door to the
04:56:08  5  complex courtroom, but I don't think you want that.
        6        MR. WILKE:  No, I don't necessarily want that, but
        7  I want as many of the jurors as possible in this half of the
        8  courtroom and not that half of the courtroom.
        9        THE COURT:  Well, you should have come up and
04:56:19 10  watched.  It was extraordinary what occurred here.  You
       11  weren't here.  So I hear the complaint, but I don't have you
       12  here to watch how smoothly it actually went.
       13        MR. WILKE:  I saw a little bit of it this
       14  afternoon.  It seemed to go fairly smooth.
04:56:29 15        THE COURT:  No, you didn't see the jury selection.
       16  That's where you have the problems, Mr. Wilke, so I think
       17  everybody did very, very well.
       18        Okay.  So can we mark you down for the 26th then?
       19        MR. SCALLY:  Yes, Your Honor.
04:56:49 20        THE CLERK:  July 26th or June?
       21        THE COURT:  I'm saying July 26th.
       22        MR. WILKE:  Your Honor, my understanding of it --
       23        THE COURT:  Mr. Wilke, enough.
       24        July 26th.  Now, we need the jury questionnaire,
04:56:56 25  and we need that prepared.  So when do I get to look at that

*Deborah D. Parker, U.S. Court Reporter*

04:57:01  1   on your schedule?

2        MR. WILKE:  My expectation would be that we'd file

3   it on the June 21st, which would be the dates we'd file

4   motions *in limine*.  That's the dates we discussed.

04:57:14  5        THE COURT:  No.

6        MR. WILKE:  It's four weeks' notice on motions

7   *in limine* to be heard on the 19th of July.

8        THE COURT:  No.  It's either going to be on the

9   14th for the -- you can file your motions *in limine* on the

04:57:24 10   14th, but I want -- or 21st, whatever you want, but I want

11   the questionnaire to me much earlier.  That takes some time.

12        MR. WILKE:  Before June 21st?

13        THE COURT:  Yeah.  June 14th.

14        MR. WILKE:  Okay.

04:57:39 15        THE COURT:  And if you can't draft it, I'll draft

16   it for you.  It's easy to do.

17        And I want time reserved by each of you that week

18   so we can go over that questionnaire.

19        MR. WILKE:  And then on the 26th, Your Honor?

04:58:03 20   That would be --

21        THE COURT:  Now, just a moment.

22        *(Pause)*

23        THE COURT:  I originally had a 15-day time

24   estimate for you.

04:58:30 25        That seems to have expanded now.  I've just heard

36

04:58:35   1    four to five weeks.  I hadn't heard that before.

           2              MR. WILKE:  Well, 15 days is four weeks,

           3    basically.

           4              THE COURT:  No, it's not.

04:58:43   5              MR. WILKE:  Four-day weeks.

           6              THE COURT:  No, sir.  It's five-day weeks here.

           7              MR. WILKE:  Well, when I say four to five weeks,

           8    I'm saying -- I'm saying 20 to 24 days.  So if that's --

           9              THE COURT:  Okay.  That's changed.  I thought,

04:59:03  10    Mr. Wilke, that -- originally, we started with an eight-day

          11    or 12 -- I'm sorry, three-week estimate.  That was the

          12    estimate, and we could fit you in.

          13              But I'm not going to be available from August 2nd

          14    to August 12th.  And now I'm concerned, because I don't want

04:59:27  15    your cases split.  In other words, I don't want the

          16    Government presenting partially and then the Court is not

          17    available for two weeks.

          18              MR. WILKE:  We're not starting until the 17th.

          19              THE COURT:  Can you try the case five days a week

04:59:50  20    from the 16th to the 20th, the 23rd to the 27th, the 30th

          21    through the 3rd and the 6th through the 10th?  That's five

          22    weeks:  25 days.

          23              MR. SCALLY:  For the Government, yes, Your Honor.

          24              MR. WILKE:  Yeah, I think that's fine.  I don't

05:00:06  25    think it will take that long, though.  That's more than

*Deborah D. Parker, U.S. Court Reporter*

05:00:07  1    enough time.

2              THE COURT:  I don't either, but I'm trying to be

3    kind right now.  So I'm generally asking to support all of

4    you -- and be very careful with your answers, because I'm

05:00:19  5    not going to be available from the 13th to the 22nd.

6              MR. SCALLY:  That's in September, Your Honor?

7              THE COURT:  September, right.

8              And, originally, this was supposed to be a

9    three-week case and then we got into the jurisdictional

05:00:32 10    issues and expanded it to 24 days or whatever.

11             MR. WILKE:  No, I --

12             THE COURT:  Thank you, Mr. Wilke.

13             All right.  Now, can you try it within that period

14   of time?  Yes or no?

05:00:41 15             MR. WILKE:  Yes.

16             THE COURT:  Okay.  Counsel?

17             MR. SCALLY:  Yes, Your Honor.

18             MR. WILKE:  On four-day weeks we could try it in

19   that period of time.

05:00:47 20             THE COURT:  You're going to be here five days a

21   week, Mr. Wilke, so clear your calendar.

22             Kelly, let's go over these dates again.  The 26th,

23   counsel are ordered back.

24             MR. WILKE:  Of July?

05:01:07 25             THE COURT:  Of July.

05:01:09  1          Remind me, Kelly, to pay the courtesy of calling

2   Judge Selna.

3          I get the jury questionnaire, not the *in limine*.

4   You can file the *in limine* later, or course on the 21st or

05:01:26  5   whatever.  But I get the jury questionnaire by the 14th.

6          MR. WILKE:  Of June?

7          THE COURT:  June.  And that's going to take a

8   little bit of time.  I know each of you will work

9   diligently.  But, really, I've got 14 different

05:01:44 10   questionnaires that I've used, so I'm going to want to look

11   at that very closely.

12          If we used a questionnaire, then are we in

13   agreement that it does not go out during the jury summons;

14   that we bring the jury in on some date before?  And what

05:02:06 15   date would we actually bring them in on, because I'm not

16   available until -- well, it could be the 8th -- strike that.

17          It could be the -- in other words, we got to bring

18   them back.

19          MR. WILKE:  To do the questionnaire and to have

05:02:23 20   them read the indictment.

21          THE COURT:  Exactly.

22          MR. WILKE:  August 12th.  And the Court is back.

23   Then we get the questionnaires that day --

24          THE COURT:  No, I'm confusing you.  I'm going to

05:02:33 25   go over this, again.  I'm not available from the 2nd through

39

05:02:38   1    the 13th.

2          MR. WILKE:  I thought you were available that last

3    part of the week.

4          THE COURT:  I can actually -- I can resume on the

05:02:47   5    13th, on a Friday, if you want.

6          MR. WILKE:  That would be fine.

7          THE COURT:  And if that's the case --

8          MR. WILKE:  That's enough time with the

9    questionnaire to have the weekend.

05:03:26  10          THE COURT:  Mr. Wilke, maybe we can move these

11    dates back.  Work with me for a moment.  Not the trial date,

12    but the days to make it more convenient.

13          Let's do better than that.  Let's walk through it,

14    again.

05:04:56  15      (Pause)

16          THE COURT:  All right, Counsel.  Do you each have

17    a calendar in front of you?  Can you track this?

18          Once again, if the questionnaire is filled out on

19    the 26th, that would give us a lot of time to go through

05:05:08  20    cause that week, and we'll do that together.  I won't assign

21    that out to a magistrate judge.

22          And, Mr. Wilke, if we've gone through cause -- and

23    Counsel for the Government -- is there any reason to bring

24    them in on the 13th?  Wouldn't we just bring them in when

05:05:31  25    the indictment was --

05:05:35    1          MR. WILKE:  I don't think there is, Your Honor.

2    But my preference would be to bring them in on the 13th, do

3    the questionnaires then, come back on Monday and do cause

4    challenges on the 16th.

05:05:46    5          THE COURT:  No.  In my past experience, it's

6    laborious.  When I get 100 of these questionnaires, even if

7    they're seven to 10 pages, you have no idea the amount of

8    work that goes into that.  It's extraordinary.

9          MR. WILKE:  I've done it before, Your Honor.  I

05:06:00   10    think we can do it in a day with the questionnaires; I do.

11          THE COURT:  But you've got to go through all of

12    those over the weekend.  And then when do you give me time

13    to make decisions for cause?

14          In other words, you've filled out these

05:06:12   15    questionnaires.  When do I sit down and make those rulings,

16    if there's differences between the two of you?

17          MR. WILKE:  I think we show up Monday.  Each party

18    gives their cause challenges and the Court's rulings and we

19    go home.  I think it's a one-day thing.

05:06:25   20          If we're talking -- if we're having a five-page

21    questionnaire, we're talking 500 pages of documents.  It's

22    not -- in my experience, the cause challenges are pretty

23    obvious.  The people who are cause challenges are pretty

24    clear in their cause challenges.

05:06:54   25          The other concern, Your Honor, is that a

*Deborah D. Parker, U.S. Court Reporter*

05:06:56    1   three-week gap allows this jury to just talk to people

            2   outside of the presence of the Court, without -- outside the

            3   daily admonition, after they have been read the charges,

            4   after they've had the questionnaire.  I'm really concerned

05:07:09    5   about a two-week delay between advising the jury and then

            6   coming back to court.

            7            THE COURT:  I think that's a really good point,

            8   something I hadn't considered.  I have in the past, but I

            9   think you're absolutely right.  It gives them too long to

05:07:19   10   debate and talk to their neighbors.

           11            Okay.  Kelly, I'm going to tentatively run

           12   through -- don't write this down, Kelly, because I'm

           13   changing too often.

           14            So your suggestion is if I bring them in on

05:07:30   15   August 13th, the first thing is, we probably wouldn't be

           16   interfering with any other court.  We don't have a Monday or

           17   Tuesday, or whatever.

           18            Now, it's a Monday-Wednesday, but that can change

           19   back to Tuesdays.  Number two, that means that we'll get

05:07:50   20   that duplicated for you.  And we would read the indictment

           21   on the 13th as well.

           22            All right.  So we're going to read the indictment

           23   on the 13th.  We're going to give them -- or are you going

           24   to give them the questionnaire and not read the indictment

05:08:22   25   and wait to read it until Tuesday?

*Deborah D. Parker, U.S. Court Reporter*

05:08:26   1          MR. WILKE:  I think they have to be read at least

2     a summary of the charges and the names of the potential

3     witnesses at that point.  Maybe that's part of the

4     questionnaire.  But I think they need to know the nature of

05:08:38   5     the case in order to answer the questionnaire.

6          THE COURT:  Also, in the questionnaire, if you

7     have a question about whether they have any prior knowledge,

8     it would be helpful if the indictment was read, because then

9     you've got them checking off the box.  Fair enough.

05:08:51  10          Okay.  So read the indictment.  Distribute the

11    questionnaire.  Collect the questionnaire.  Try to get

12    that --

13          MR. WILKE:  Make a copy of it.

14          THE COURT:  Well, in the past, the Court's had to

05:09:00  15    also copy it.  But because there's been an objection

16    sometimes in a murder case, especially death cases, the

17    Government has control over those initially.  Trust me.

18          MR. WILKE:  I get it.  I get it, but I have full

19    confidence in Mr. Scally and Mr. Mittal's ability to copy a

05:09:14  20    questionnaire.

21          THE COURT:  And that means work over the weekend

22    on the 14th or the 15th, either collectively or

23    individually.  I get the for-cause on the 16th.

24          Now, that assumes something:  That we're deciding

05:09:32  25    for cause, initially, on the papers.  That doesn't preclude

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 05:09:36 | 1 | you from raising cause objections during the selection |
| | 2 | process.  So all we're really going to do is weed out the |
| | 3 | really -- the extremes on the other side, okay? |
| | 4 | Do you want me to reread the indictment on the |
| 05:09:51 | 5 | 17th? |
| | 6 | MR. WILKE:  No. |
| | 7 | THE COURT:  We just start the jury selection and |
| | 8 | good faith on the 17th; is that correct? |
| | 9 | MR. WILKE:  Yes. |
| 05:09:58 | 10 | THE COURT:  All right.  I can't guarantee you, but |
| | 11 | in the past we've been able to get a jury in one day -- even |
| | 12 | with your Aryan Brotherhood.  Even with 30 murders. |
| | 13 | MR. WILKE:  My understanding is the Court will |
| | 14 | allow attorney voir dire. |
| 05:10:20 | 15 | THE COURT:  Yes.  And remember it's not what |
| | 16 | people say to you.  Sometimes, it's the way they say it, |
| | 17 | where your intuition is valuable.  They can give you an |
| | 18 | answer, but somehow just intuitively, it's not the juror you |
| | 19 | want. |
| 05:10:33 | 20 | MR. WILKE:  Can I ask one more question, |
| | 21 | Your Honor? |
| | 22 | During the voir dire, we'll have the entire panel |
| | 23 | in the courtroom, or we'll be doing it in segments? |
| | 24 | THE COURT:  Once you have the jury questionnaire, |
| 05:10:42 | 25 | I'm going to do the entire panel. |

*Deborah D. Parker, U.S. Court Reporter*

44

```
05:10:44   1          MR. WILKE:  We'll have 100 people in the
           2   courtroom?
           3          THE COURT:  No.  You see, you asked -- you assumed
           4   something.  No, I'm going to have a lot of people
05:10:54   5   downstairs.  It's going be beamed down, just like the Aryan
           6   Brotherhood trials.  We'll have a limited number of jurors
           7   here, and the rest will be down in the jury room, or next
           8   door.
           9          Okay.  Let me make it simple for you.  The
05:11:12  10   Mexican Mafia trials, in 2002.  We had to wire four
          11   different courtrooms.  And when I read the indictment, we
          12   had some jurors here; some next door, in Judge Tevrizian's
          13   court; some in another judge's court, all on the eighth
          14   floor of the Roybal.
05:11:30  15          MR. WILKE:  So, Your Honor --
          16          THE COURT:  We did that three different times,
          17   Mr. Wilke.
          18          Then, here, we wired so that when I'm reading the
          19   indictment and we have a number of jurors here, whatever we
05:11:41  20   are capable of holding by that time -- whether it's 20 or 30
          21   or 50 with the new CDC rules -- the rest are downstairs in
          22   the jury room.  And if I don't have enough room down there,
          23   then we also have the next-door court wired.
          24          MR. WILKE:  The only reason I ask Your Honor is
05:12:02  25   because at a minimum and without waiving any other objection
```

*Deborah D. Parker, U.S. Court Reporter*

05:12:05  1    to this procedure, at a minimum I would want a member of the

2    defense team in every room that we have jurors in to monitor

3    what is happening.

4              THE COURT:  Then, you'll know if it's two or three

05:12:16  5    rooms.  Because, minimally, it's going to be the jury room

6    downstairs.  You can already anticipate that.  And if, in

7    fact, we still have the 6-foot rule, then it will also be in

8    the complex courtroom next door.

9              MR. WILKE:  Your Honor, for the record, I have to

05:12:47 10    object to this procedure.

11             THE COURT:  Now, you're closed on the 6th -- so

12    that's a holiday -- of September.  So, really, here are the

13    numbers of days you have:  You've got -- count carefully

14    because you've going to have the 18th, hopefully, for

05:13:04 15    opening statements.  Hopefully, you'll get a jury on the

16    17th.  You'll have the 19th and the 20th; the 23rd through

17    the 27th -- so you're working on eight days of actual

18    testimony -- the 30th through the 3rd, so now you're working

19    on 13 days.

05:13:25 20             I'll tell you a secret.  Right before Labor Day,

21    you're going to get one or two jurors who are going to catch

22    a plane, because the plane flights are cheaper.  And they're

23    going to want to leave on a Thursday, I'll guarantee you.

24    People are going to want to get an early jump down the

05:13:42 25    highway.

46

05:13:43  1          So holding a jury in the past in my court has been

       2   very hard on the day or two before Labor Day.  Usually, we

       3   can coax them into a Thursday.  Then you got four days that

       4   next week.  And then I can't be back in session until the

05:13:59  5   23rd.  So count your days: 13, 14, 15, 16, 17.

       6          Now, I instruct the jury and they go out, and I'm

       7   not here for a week and a half.

       8          Okay.  I'm going to make a suggestion to you.  If

       9   after your extraordinarily well-reasoned arguments,

05:14:35 10   Mr. Wilke, concerning lack of preparation, I'm going to

      11   change the date slightly.  Then we have an absolutely clear

      12   run of this case and then we move this case to September --

      13   last week of September or the first week of October.

      14          MR. WILKE:  I would have no objection and make

05:14:54 15   that motion, Your Honor.

      16          MR. SCALLY:  Your Honor, the very last week of

      17   September, I have a family commitment.

      18          THE COURT:  You'll keep it.  I won't interfere

      19   with that.

05:15:05 20          MR. WILKE:  I would welcome an October trial date

      21   in this, Your Honor, particularly if we can avoid any --

      22   breaking it up.

      23          THE COURT:  What I'm trying to avoid is if we

      24   didn't finish for some reason, Mr. Wilke, the case getting

05:15:17 25   divided out by 10 days --

*Deborah D. Parker, U.S. Court Reporter*

05:15:20  1          MR. WILKE:  I agree.

2          THE COURT:  -- with a jury coming back.

3          MR. WILKE:  Can I say something else, Your Honor,

4     is that I didn't fully appreciate the logistics of the jury

05:15:28  5     selection procedure.

6               I would object to any procedure that beams out the

7     video of the courtroom to jurors in another room.  I would

8     have no objection to individually conducted or group

9     conducted voir dire but in the courtroom and not where it's

05:15:44 10     overheard by the other members of the panel.

11               I have to have the opportunity in court to monitor

12     all potential jurors during the proceedings, and that

13     includes from the moment voir dire starts.

14          THE COURT:  What's your suggestion?  Where would I

05:15:56 15     take this case with the CDC restrictions of 6 feet right

16     now?  Or where would we get a jury room large enough,

17     Mr. Wilke, for 100 to 150 --

18          MR. WILKE:  We do the initial reading of the

19     indictment is fine.  But at that point when we start

05:16:13 20     conducting voir dire, we do it sequestered or groups of

21     sequestered jurors, not by video remote where I have no

22     ability to see the reaction of the other jurors.

23          THE COURT:  You totally misunderstand.  It's

24     ridiculous.  Of course, you're not going to do that.  You're

05:16:29 25     raising an issue -- you're almost going to have voir dire in

05:16:32    1    the presence of those jurors.

2    MR. WILKE:  I had understood the Court to say

3    you're going to video part of the feed from the courtroom

4    down to the jury room during the voir dire process.

05:16:41    5    THE COURT:  Yes.  But we're going to bring -- all

6    the jurors are going to hear the same questions we're asking

7    of 12 in the box.

8    MR. WILKE:  I have to be able to see --

9    THE COURT:  Mr. Wilke, you're not listening.

05:16:51    10    Twelve in the box.  You're able to talk to them.  They've

11    heard the general questions, but none of those jurors even

12    in the audience are participating anyway.

13    Think about what I'm saying for a moment.  We've

14    got 20 jurors out here.  That's absolutely no different than

05:17:08    15    hearing the initial questions that I'm asking, if you're

16    here with 20 out there or downstairs, because we're going to

17    have 12 in the box you're talking to.  You're always going

18    to be voir diring jurors personally, because I'm giving you

19    that discretion.

05:17:24    20    MR. WILKE:  I get that, Your Honor.  But I have

21    other jurors -- potential jurors in this case, monitoring

22    and watching the proceedings, listening to my questions,

23    knowing they're going to be asked those questions, yet I

24    have no ability to monitor them during that process.

05:17:37    25    THE COURT:  You told me you're going to have a

*Deborah D. Parker, U.S. Court Reporter*

05:17:39  1    member of the defense team present.

2               MR. WILKE:  A law clerk?  It's not sufficient,

3    Your Honor.  It's not.  I'd object on Constitutional

4    grounds.  I have to be able to have -- monitor all

05:17:51  5    members -- potential members of this jury during voir dire.

6               THE COURT:  So what's your suggestion, Mr. Wilke,

7    because it's certainly worked with a nine-month trial, an

8    eight-month trial, four six-month trials.

9               MR. WILKE:  My suggestion is --

05:18:00 10               THE COURT:  This is the first time I've heard --

11               MR. WILKE:  -- I think pushing this case back

12    further creates a higher likelihood that we'll be able to

13    minimize these restrictive procedures that would violate my

14    client's Constitutional rights.

05:18:12 15               So I think I'm asking for the October trial date,

16    not just because I need it for preparation but also that I'm

17    hoping some of these restrictions are eased up and we can

18    actually conduct a normal trial in this case where I get to

19    listen and observe all the potential members of this jury at

05:18:31 20    every stage of the proceedings.

21               THE COURT:  We still couldn't get enough jurors in

22    here.  We haven't been able to do that with Mexican Mafia,

23    the Aryan Brotherhood, F-13.  We couldn't get enough jurors

24    in.

05:18:42 25               MR. WILKE:  In those cases, though, correct me if

*Deborah D. Parker, U.S. Court Reporter*

05:18:42   1    I'm wrong, I don't know --

           2        *(Court Reporter requests clarification for the*

           3        *record.)*

           4            MR. WILKE:  In the past, I know before Judge Selna

05:18:53   5    we have done that, Your Honor.  We got that in Mr. Ojeda's

           6    case, and it worked fine.  And if that's, I think, what is

           7    required, I think that's --

           8            THE COURT:  So what was the process there?  What

           9    were you satisfied --

05:19:08   10           MR. WILKE:  We had a questionnaire.  The charges

           11   or summary of the charges was read to the entire panel

           12   partly seated in the courtroom, partly downstairs.  But at

           13   the point that the jurors were being questioned, the

           14   questioning process of any juror started, we were doing that

05:19:27   15   with a limited number of jurors or at some times only one

           16   juror in the courtroom.

           17           THE COURT:  I guess -- I apologize to you.  I'm

           18   missing this conversation.  I don't see any difference.

           19           MR. WILKE:  The difference is that the jurors are

05:19:45   20   only being -- participating at an individual level.  If

           21   they're observing the proceedings but I've not had the

           22   opportunity to observe them, I think there's a fundamental

           23   difference there, Your Honor.

           24           If I'm in a regular courtroom and I ask a question

05:20:04   25   of a juror here and I get a reaction from a juror observing,

*Deborah D. Parker, U.S. Court Reporter*

05:20:08  1  that is significant to me.  But I won't know that if that

2  juror is downstairs or the room next door.  That's the

3  difference.  That's why the procedure is not the equivalent

4  of what a normal trial --

05:20:18  5          THE COURT:  You know, I'm not going to argue with

6  you on that.  I disagree with you, but I'm not going to set

7  a record that really is a great concern to you.  So why

8  don't you make the suggestion, because I'm not going to give

9  you individual voir dire.  So you set up the courtroom so we

05:20:36  10  have a good record of what you want rather than complain,

11  and let's hear the methodology we would go about.

12          MR. WILKE:  I would ask that the Court bring the

13  jurors in, in groups and conduct the voir dire in groups and

14  not broadcast that to the remaining jurors seated down in

05:20:55  15  the jury instruction room.

16          THE COURT:  Now, when I do that, if I have 50

17  people here, hypothetically, that still leaves 50 people

18  downstairs.  And I'm not speaking to 50 people.  I'm only

19  speaking to 12 people in the jury box.

05:21:23  20          MR. WILKE:  But I'm observing 50 people when this

21  is happening.  That's the difference.

22          THE COURT:  And so when we've depleted the 30

23  people in the audience who might come up because of

24  peremptories, or cause, or whatever, then you suggest I call

05:21:38  25  up the other 50 from downstairs, or 30, whatever number.

*Deborah D. Parker, U.S. Court Reporter*

05:21:46   1              MR. WILKE:  If at some point we have no others

           2    left, yes, then we bring the rest of the group upstairs and

           3    we continue with voir dire.

           4              THE COURT:  And they wouldn't have heard any of

05:21:57   5    the prior questions.  Then, we would start anew.

           6              MR. WILKE:  Correct.  But we'd have questionnaires

           7    on each one of them.  So the questioning is going to be very

           8    specific to jurors.

           9              THE COURT:  I don't think I have any concerns with

05:22:09  10    that.  I think it's laborious.  I don't necessarily agree,

          11    but I'm happy to comply with that.

          12              MR. WILKE:  I would prefer that.  And my concern

          13    is not being able to monitor the jurors during the process.

          14    That's my concern.

05:22:26  15              THE COURT:  Fine.

          16              MR. WILKE:  Okay.

          17              THE COURT:  Let's do it.

          18              MR. WILKE:  I appreciate that.

          19              I also would welcome an October trial date for all

05:22:33  20    the reasons previously stated and the additional reason that

          21    I think the further back we get, the more likely it is we're

          22    going to be able to run a more normal trial outside of these

          23    COVID restrictions.

          24              THE COURT:  I'm not as concerned about that.  I'm

05:22:49  25    concerned about splitting the testimony or the jury going

                        *Deborah D. Parker, U.S. Court Reporter*

05:22:56  1    into deliberation when I'm gone for eight or nine days.

2              And, Mr. Wilke, I think you raised a good point.

3    If the regulations are lifted, we would get more jurors into

4    a courtroom for you to observe.

05:23:23  5              MR. WILKE:  Yes.

6              THE COURT:  I think that's an excellent point.

7              So I have three concerns now:  One, any split in

8    the presentation of the evidence between the parties, which

9    would leave a 10-day hiatus, whether it's the middle of the

05:23:38 10   Government case or your case, Mr. Wilke.

11             Number two, that we would get to a point where we

12   made it within 15 days, but in a sense I'd instructed and

13   the jury is about to go out to deliberate and another judge

14   would have to come in.  I don't think that's appropriate.

05:23:55 15            And number three, I think your point is well

16   taken, and that is, if the CDC restrictions are relaxed,

17   then we can get more jurors up into this courtroom.

18             I agree.  Mr. Wilke, I think it's very

19   well-reasoned.  Thank you.

05:24:12 20            So now let's see if we can accommodate you,

21   because one week doesn't make a substantial difference to

22   the Court if you've got personal matters, but those are not

23   professional matters.

24             COURT REPORTER GALE:  One second, Your Honor.

05:24:27 25   We're going to switch to CourtSmart.

05:24:29    1          (At *5:24 p.m., proceedings were adjourned.)*

2          (*Further proceedings reported by CourtSmart.*)

3                           -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Deborah D. Parker, U.S. Court Reporter*

```
05:24:29   1                        CERTIFICATE

           2              I hereby certify that pursuant to Section 753,

           3    Title 28, United States Code, the foregoing is a true and

           4    correct transcript of the stenographically reported

05:24:29   5    proceedings held in the above-entitled matter and that the

           6    transcript page format is in conformance with the

           7    regulations of the Judicial Conference of the United States.

           8

           9    Date:   July 5, 2021

05:24:29  10

          11

          12                          _____
                                      /s/DEBORAH D. PARKER
          13                   DEBORAH D. PARKER, OFFICIAL REPORTER

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```