**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 20-00002-(B)-DOC |
| | ) Day 4, Volume III |
| HOANG XUAN LE, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

FRIDAY, NOVEMBER 12, 2021

1:18 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

TRACY L. WILKISON
ACTING UNITED STATES ATTORNEY

SCOTT M. GARRINGER
ASSISTANT UNITED STATES ATTORNEY
CHIEF, CRIMINAL DIVISION

GREGORY S. SCALLY
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3592
gregory.scally@usdoj.gov

GREGORY STAPLES
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3534
gregory.staples@usdoj.gov

FOR THE DEFENDANT, HOANG XUAN LE:

CRAIG WILKE
LAW OFFICE OF CRAIG WILKE
305 NORTH HARBOR BOULEVARD
SUITE 216
FULLERTON, CALIFORNIA 92832
(714) 870-8900
craig@craigwilkelaw.com

SHEILA S. MOJTEHEDI
STRADLING, YOCCA, CARLSON & RAUTH,
P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4000
sheila.mojtehedi@gmail.com

3

**I N D E X**

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SANDRA RITZE | | 5 | 108 | 115 |
| | | 34 | | |
| | | 90 | | |

**E X H I B I T S**

| DEFENDANT'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 525-1 Text Messages Between Sandra Ritze and Ryan Villmer | | 69 |
| 525-2 Text Messages Between Sandra and Ryan Villmer | | 71 |
| 525-3 Text Messages Between Sandra and Ryan Villmer | | 84 |
| 525-4 Text Messages Between Sandra and Ryan Villmer | | 91 |
| 525-9 Text Messages Between Sandra and Ryan Villmer | | 93 |
| 526-D Photograph | | 103 |
| 526-E Photograph from Sandra Ritze's Phone from Las Vegas Trip (Ryan Villmer) | | 106 |
| 527-A Cover Sheet – Video of Sandra and Sheila Ritze in Las Vegas at Billy Idol Concert | | 66 |
| 528-3 Texts Between Sandra Ritze and Shannon Love | | 19 |
| 528-4 Texts Between Sandra Ritze and Shannon Love | | 23 |

*Deborah D. Parker, U.S. Court Reporter*

4

| DEFENDANT'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 528-5 Texts Between Sandra Ritze and Shannon Love | | 39 |
| 528-7 Texts Between Sandra Ritze and Shannon Love | | 40 |
| 528.2 Texts Between Sandra Ritze and Shannon Love | | 11 |
| 529   Internet Search History of Sandra Ritze | | 46 |

1    **SANTA ANA, CALIFORNIA; FRIDAY, NOVEMBER 12, 2021; 1:18 P.M.**

2                              **-oOo-**

3         *(The following proceedings were had in open court*

4         *in the presence of the jury:)*

5              THE COURT:  We're back in session.  The jury is

6    present, alternates and defendant, all.

7              Counsel, thank you for your courtesy.

8              If you would be seated and your continued

9    cross-examination.

01:18:59  10                        CROSS-EXAMINATION

11    BY MR. WILKE:

12    Q    Good afternoon, Ms. Ritze.

13    A    Thank you.

14    Q    "Ritze"?

01:19:04  15    A    It's "Ritze," like the cracker.

16    Q    Before lunch we were talking about this period between

17    the time you learned of Sheila's arrest and the time you

18    first spoke to the FBI.

19    A    Okay.

01:19:20  20    Q    Okay.  And that was that period around Christmas of

21    2019, correct?

22    A    Okay.  Yes.

23    Q    Now -- and your first meeting with the FBI was on

24    January 3rd, 2020, correct?

01:19:37  25    A    Okay.

*Deborah D. Parker, U.S. Court Reporter*

6

01:19:42  1    Q    Now, we spoke earlier today as well about how when you

2    first heard of Sheila's arrest, you spent several hours on

3    the Internet looking at newspaper articles and the press

4    release from the federal prosecutor's office, correct?

01:19:57  5    A    Correct.

6    Q    And at this time -- the time of Sheila's arrest -- when

7    had been the last time you had seen --

8         *(Court Reporter requests clarification for the*

9         *record.)*

01:20:15 10   BY MR. WILKE:

11    Q    As of December 19th, 2019, prior to then, when was the

12    last time you had seen River?

13              THE COURT:  And, Deborah, the word is "River."

14              THE WITNESS:  I really don't recall.  I know that

01:20:34 15   I saw her when I went down that time in July.  So I'm not

16    sure if it was -- if I saw her at that time because --

17         *(Court Reporter requests clarification for the*

18         *record.)*

19              THE COURT:  Would you answer that again more

01:20:50 20   slowly, so we have a transcript of what --

21              THE WITNESS:  I don't recall.

22    BY MR. WILKE:

23    Q    Okay.  Well, you lived in Las Vegas, correct?

24    A    Yes.

01:20:58 25   Q    And you had last been out to Southern California in the

*Deborah D. Parker, U.S. Court Reporter*

01:21:01  1  summer during that stay in which you told us you were at
          2  Sheila's house to see River?
          3  A    Correct.
          4  Q    Sheila's apartment, correct?
01:21:11  5  A    Yes.
          6  Q    Where she made you stay there, correct?
          7  A    Yes.
          8  Q    Yes?
          9  A    Yes.
01:21:15 10  Q    Okay.  And you had to go to Sheila's house -- Sheila's
         11  apartment to see River, because Mica would not allow you to
         12  have any of his time with River?
         13  A    That's correct.
         14  Q    Okay.  And so the only way you could see River is
01:21:32 15  through Sheila, essentially?
         16  A    At that time, yes.
         17  Q    And during that trip in the summer of 2019 when you had
         18  seen River, how many days did you stay at Sheila's house?
         19  A    I think it was three.
01:21:48 20  Q    And did River -- did you take River back to Las Vegas
         21  after that?
         22  A    Yes.
         23  Q    For how long?
         24  A    Probably a week.
01:21:55 25  Q    Okay.  And this was before school had started in the

01:21:57  1   fall, correct?

2   A     This would have been summertime, yes.

3   Q     Okay.  But then River returned to Southern California

4   to go back to school in the fall, correct?

01:22:06  5   A     Yes.

6   Q     And between the start of school in 2019 and Christmas,

7   she didn't come out and stay with you, correct?

8   A     I don't think so.

9   Q     And you didn't come out here and visit with her?

01:22:20  10  A     No, I did not.

11  Q     Okay.  So it had been, approximately, five months or so

12  since you had seen River in December of 2019 --

13  A     Yes.

14  Q     -- correct?

01:22:34  15        Now, you were also -- I think testified on direct

16  examination, you were very concerned about whether Sheila

17  was a good mother, correct?

18  A     Yes.

19  Q     And that is because you came to learn that Sheila had

01:22:51  20  been drinking heavily, correct?

21  A     Correct.

22  Q     And that she had even gotten a D.U.I. arrest, correct?

23  A     Or a few.

24  Q     Okay.  A few D.U.I. arrests?

01:23:04  25  A     Um-hmm.

*Deborah D. Parker, U.S. Court Reporter*

9

| | | |
|---|---|---|
| 01:23:05 | 1 | Q    Okay.  And did you also come to believe that Sheila had |
| | 2 | driven while drunk with River in the car? |
| | 3 | A    Yes, I do believe that.  100 percent. |
| | 4 | Q    And you believed that in December of 2019, correct? |
| 01:23:18 | 5 | A    Most likely, I probably was still feeling that way, |
| | 6 | yes. |
| | 7 | Q    And you believed that River -- the most important |
| | 8 | person in your life -- was at risk if she stayed with |
| | 9 | Sheila, correct? |
| 01:23:31 | 10 | A    If she stayed with Sheila, I do believe that, yes. |
| | 11 | Q    And you believe that in 2019, correct? |
| | 12 | A    Correct. |
| | 13 | Q    Now, after you learned of Sheila's arrest on |
| | 14 | December 19, 2019, you communicated by text with a friend of |
| 01:24:12 | 15 | yours by the name of Shannon Love? |
| | 16 | A    That's my niece. |
| | 17 | Q    "Shannon" is your niece? |
| | 18 | A    She is my niece. |
| | 19 | Q    So she is the daughter of your brother? |
| 01:24:24 | 20 | A    Correct. |
| | 21 | Q    Your brother is -- what's his name? |
| | 22 | A    Tom. |
| | 23 | Q    Okay.  Tom -- what's his last name? |
| | 24 | A    Story, S-T-O-R-Y. |
| 01:24:34 | 25 | Q    Okay.  And while texting with Shannon Love, your niece, |

*Deborah D. Parker, U.S. Court Reporter*

01:24:54  1   you communicated with her about what would happen to the

2   custody of River.

3   A    Okay.

4   Q    Isn't that true?

01:25:04  5   A    Yes.

6   Q    Specifically, now in light of the fact that River's

7   mother had been arrested and charged as being an accessory

8   after the fact to murder, correct?

9   A    Correct.

01:25:21  10   Q    And Shannon said to you in a text, quote:

11        Mica need to get full custody and have total

12   control of River, correct?

13   A    Correct.

14   Q    And this was this text exchange that you had with

01:25:46  15   Shannon on December 20th, 2019, correct?

16   A    Okay.

17   Q    I would -- do you know the date that you had this text

18   exchange?

19   A    No, I don't remember the date, but I do remember the

01:26:13  20   conversation, but --

21   Q    You remember the --

22        *(Overtalking:  Unable to report.)*

23        THE COURT:  We're going to strike the answer and

24   the question.

01:26:17  25        Re-ask the question, because there's a talkover.

*Deborah D. Parker, U.S. Court Reporter*

01:26:19   1    We couldn't get a transcript.

　　　　　2    BY MR. WILKE:

　　　　　3    Q    Yes.

　　　　　4        *(Pause)*

01:27:16   5          MR. WILKE:  Your Honor, I would ask to admit

　　　　　6    what's been identified as Exhibit 528.2 by stipulation of

　　　　　7    the parties.

　　　　　8          THE COURT:  Received.

　　　　　9        *(Defendant's Exhibit 528.2 received in evidence.)*

01:27:30  10    BY MR. WILKE:

　　　　　11   Q    I'm going to show what's -- Ms. Ritze, what's been

　　　　　12   admitted as Exhibit 528-2.

　　　　　13       *(The document was published in open court.)*

　　　　　14   BY MR. WILKE:

01:27:59  15   Q    Okay.  Do you see that on the screen before you?  Let

　　　　　16   me see if I can zoom in and we'll take a look at these text

　　　　　17   messages here.

　　　　　18          Do you see that?

　　　　　19   A    Yes, I do.

01:28:13  20   Q    Okay.  So at the very top bubble, the blue bubble, it's

　　　　　21   a text message from Shannon Love to you, Sandy Ritze, on

　　　　　22   December 20th, 2019 at 2:52 a.m. UTC.

　　　　　23          Do you see that?

　　　　　24   A    I don't think that's a.m., but probably p.m.

01:28:39  25   Q    Well, let me clarify.  Do you see that it says that,

01:28:41   1   though?

2   A    Yes.

3   Q    It says --

4   A    Yes.

01:28:43   5   Q    It says "2:52 a.m. UTC."

6        Do you see it says that?

7   A    Oh, I'm so sorry.  Yes, I do.

8   Q    Do you see that?

9   A    Yes.

01:28:53  10        MR. WILKE:  May I have a moment, Your Honor?

11        *(Pause)*

12        MR. WILKE:  Your Honor, by stipulation the parties

13   would stipulate that "UTC" refers to "Universal Time" and

14   that "Pacific Time" is seven hours earlier.

01:29:19  15        THE COURT:  So the time would be?

16        MR. WILKE:  So where it says "2:52 a.m. UTC," you

17   would subtract seven hours.

18        THE COURT:  And the time would be?  Just subtract

19   seven hours, so the jury knows --

01:29:35  20        MR. WILKE:  Yeah.

21        THE COURT:  What's the time, Counsel?

22        MR. WILKE:  The time would be 7:52 p.m., the

23   previous evening.

24        THE COURT:  Stipulated to?

01:29:43  25        MR. SCALLY:  Yes, Your Honor.

01:29:44   1            THE COURT:  7:52 p.m.  Thank you.

           2   BY MR. WILKE:

           3   Q    So you see this text from Shannon that evening of the

           4   19th, actually, even though it says the 20th because of the

01:30:00   5   time difference.

           6            "This is beyond crazy."  Do you see that?

           7   A    I agree with that.

           8   Q    And she's talking about Sheila's arrest?

           9   A    Correct.

01:30:10  10   Q    And what was reported in the news media?

          11   A    I don't think Shannon had read anything.

          12   Q    Well --

          13   A    She had only heard from me.

          14        (Pause)

01:30:32  15            MR. WILKE:  Your Honor, we have a clarification.

          16   Because of the Daylight Savings, it was actually eight

          17   hours' difference, not seven.

          18            THE COURT:  Well, the jury is not having to do the

          19   subtraction, I want to get stipulation so they are not have

01:30:46  20   to convert.

          21            What's the stipulation as to the time of this

          22   e-mail?

          23            MR. WILKE:  It would be 6:52 p.m. of

          24   December 19th.

01:30:57  25            MR. SCALLY:  So stipulated, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

14

01:30:58  1          THE COURT:  6:52 p.m., December 20th.

       2          MR. WILKE:  December 19th, Your Honor.

       3          THE COURT:  I'm sorry.  December 19th.

       4          MR. WILKE:  I'm sorry.  It goes back.

01:31:11  5          THE COURT:  December 19th.

       6   BY MR. WILKE:

       7   Q    Okay.  So you don't know whether Shannon had read

       8   news articles but had you communicated with her about what

       9   you had learned, correct?

01:31:19 10   A    Yes.  That's how I believe it.

      11   Q    And her response was "This is beyond crazy," correct?

      12   A    Yes.

      13   Q    Now, was Shannon somebody you also confided in?

      14   A    Shannon is my niece, and we talk every day.

01:31:32 15   Q    You talk every --

      16          Does she live in Las Vegas or does she live out

      17   here?

      18   A    She lives in Las Vegas.

      19   Q    Do you see -- did you see her daily?

01:31:41 20   A    Pretty much.

      21   Q    And you confided in her?

      22   A    All the time, yes.

      23   Q    Okay.  And then Shannon responds back around that same

      24   time saying, "Mica need to get full custody and have total

01:32:05 25   control of River," correct?

*Deborah D. Parker, U.S. Court Reporter*

01:32:07   1    A    Yes.

           2    Q    And she's talking about Mica your stepson, correct?

           3    A    Correct.

           4    Q    And about Mica having total control over River now?

01:32:16   5    A    Yes.

           6    Q    And full custody?

           7    A    Yes.

           8    Q    Yeah?

           9    A    Yeah.

01:32:26  10    Q    And she also says in that text conversation, "And this

          11    will be a good time for you to be supportive to him."

          12    Right?

          13    A    Yes.

          14    Q    And what did you understand her to mean by that?

01:32:44  15    A    You know, she just likes me to be his mom.

          16    Q    I'm sorry?

          17    A    She likes me to be his mom.

          18    Q    Shannon thinks you should be supportive of Mica?

          19    A    As a mom.  As any mom would be -- be supportive right

01:32:59  20    now.  That's something we would say.

          21    Q    How was it that you understood you could be supportive

          22    of Mica?

          23    A    Being there for him if he needed to talk, or he just

          24    needed a shoulder to lie on, or -- hug.

01:33:14  25    Q    Well, Mica had been separated now from Sheila for a

*Deborah D. Parker, U.S. Court Reporter*

16

01:33:18  1    year, correct?

2    A    Most likely, correct.

3    Q    Mica had been -- essentially, Sheila had cheated on

4    him, correct?

01:33:26  5    A    Yes, she did.

6              THE COURT:  Would you move closer to the

7    microphone, please.

8    BY MR. WILKE:

9    Q    She cheated on him, correct?

01:33:31  10   A    Yes.

11   Q    She had an affair with another man?

12   A    Several.

13   Q    Okay.  And then she lied about it to him?

14   A    Of course.

01:33:38  15   Q    Okay.  And he put up with that for a year and a half or

16   so before he finally separated, correct?

17   A    Yes, he did.

18   Q    Okay.  But at this time, you decided you could be

19   supportive of him after the arrest of his ex-wife?

01:34:01  20   A    Yes.

21   Q    Because you thought he might be sad about that?

22   A    Yeah.

23   Q    Okay.  Isn't it, in fact, true is -- you viewed this as

24   an opportunity to rekindle your relationship with River?

01:34:20  25   A    Can you rephrase that, please?

*Deborah D. Parker, U.S. Court Reporter*

01:34:22  1   Q    Isn't it, in fact, true that you saw this as an

2   opportunity to rekindle your relationship with River?

3   A    Okay.  So I did not need to rekindle anything with her.

4   We were always the same.

01:34:38  5   Q    Okay.

6   A    River and I.

7   Q    Okay.

8   A    So there was nothing about any opportunities.  I wasn't

9   trying to do anything.

01:34:47 10   Q    Well, weren't you trying to see River more?

11   A    Well, always.  I would have -- I would have -- like I

12   lived on the same property with her.  She was at my house

13   every single solitary day.  You get kind of used to that.

14   Q    Yeah.  And that ended when she five, right?

01:35:02 15   A    It ended when they moved, yes.  So I lived through

16   that.

17   Q    Okay.  And then you lived through her parents'

18   separation?

19   A    Yes, I did.  And I was supportive to my son, too.

01:35:15 20   Q    Except he wouldn't let you see her, because he wanted

21   the time for himself, correct?

22   A    When people divorce, they get very petty.

23   Q    Okay.  My question to you was:  After he and Sheila

24   separated, your only -- Mica would not allow his time with

01:35:34 25   River -- he would allow you to take that, correct?

*Deborah D. Parker, U.S. Court Reporter*

01:35:37   1    A    At what moment in time?

2    Q    After he and Sheila separated, correct?

3    A    Like for maybe -- just a small -- maybe that visit.  It

4    wasn't like an every day all the time thing.

01:35:49   5    Q    Well, you were living in Las Vegas?

6    A    Right.

7    Q    The last time you had seen River was over the summer?

8    A    Correct.

9    Q    Five months earlier?

01:35:56  10    A    Yeah.  I was missing her, believe me.

11    Q    You had a room for River?

12    A    Yes.

13    Q    If you had your way, she would live with you?

14    A    Yes.

01:36:10  15    Q    Okay.  You viewed her mother as a danger to her?

16    A    Yes.

17    Q    And you now realize, upon reading these newspaper

18    articles, that you could protect River from her mother,

19    correct?

01:36:27  20    A    No, I cannot protect River from her mother.

21    Q    Well, you understand that if her mother is convicted of

22    murder, she's never going to have custody of her daughter

23    again?

24         (Overtalking:  Unable to report.)

01:36:39  25         MR. SCALLY:  Objection.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 01:36:40 | 1 | THE COURT:  Overruled.  Now, just a moment. |
| | 2 | Would you re-ask the question, Counsel.  There was |
| | 3 | too much talkover.  I don't think that the court reporter |
| | 4 | got the answer, nor did the Court. |
| 01:36:52 | 5 | BY MR. WILKE: |
| | 6 | Q    You understand that if River's mother, Sheila Ritze, is |
| | 7 | convicted of murder, Sheila Ritze will never have custody |
| | 8 | again? |
| | 9 | A    Okay. |
| 01:37:05 | 10 | Q    You understand that, right? |
| | 11 | A    Yes, I do. |
| | 12 | Q    You understood that in December of 2019, after learning |
| | 13 | about Sheila Ritze being arrested for being an accessory |
| | 14 | after the fact to murder, correct? |
| 01:37:19 | 15 | A    Correct. |
| | 16 | Q    That's a "yes"? |
| | 17 | A    Yes. |
| | 18 | Q    Now -- |
| | 19 | *(Pause)* |
| 01:38:31 | 20 | MR. WILKE:  Your Honor, I would seek to introduce |
| | 21 | by stipulation Exhibit 528.3. |
| | 22 | THE COURT:  528-3 or .3? |
| | 23 | MR. WILKE:  Dash. |
| | 24 | THE COURT:  -3.  Thank you.  Received. |
| 01:38:43 | 25 | *(Defendant's Exhibit 528-3 received in evidence.)* |

*Deborah D. Parker, U.S. Court Reporter*

01:38:43  1       *(The document was published in open court.)*

2    BY MR. WILKE:

3    Q    Ms. Ritze, I'm showing you what has been admitted as

4    Exhibit 528-3.  It is the continuation of that text

01:38:56  5    conversation that you were having with Sheila on the evening

6    of the 19th of December.

7    A    Okay.

8    Q    Okay.  Your response to Shannon when she suggested that

9    this would be a good time for you to be supportive to Mica

01:39:20  10   was that:  "Mica said he asked River what she wanted to do

11   and she said she needs to be with her granny"?

12   A    Yes.

13   Q    And you were encouraged by that?

14   A    This isn't actually -- this is all the time.  This

01:39:40  15   isn't just this one time.  This is -- she always wants to be

16   with me.

17   Q    My children always want to be with their grandmother,

18   too.

19   A    Yeah.  So.

01:39:49  20   Q    That's --

21   A    You get it.

22   Q    It's fun over grandma's house.

23   A    There you go.

24   Q    But that had to make you feel good, right, when Mica

01:40:00  25   told you that?

*Deborah D. Parker, U.S. Court Reporter*

01:40:01  1    A    Yes.  Because this was, probably, about her wanting me,

2    yes.

3    Q    And that she wanted to be with you.

4         Now, this was the week before Christmas, right?

01:40:09  5    A    Right.

6    Q    Now, the previous Christmas, Mica and Sheila separated,

7    right?

8    A    Yes.

9    Q    So River had had a pretty -- two bad Christmases in a

01:40:25 10    row.  Fair to say?

11    A    I would say yeah.

12    Q    The separation of her parents in 2018 and then learning

13    that her mother is arrested and implicated in a murder in

14    2019?

01:40:36 15    A    Yes.  It's been very difficult for her.

16    Q    And you wanted to be supportive of River during that

17    very difficult time for her, correct?

18    A    Sure.  Yes.

19    Q    And so you had talked to Mica and offered him your

01:40:50 20    support, correct?

21    A    Of course.

22    Q    And part of that support was suggesting that River come

23    stay with you over the holidays, correct?

24    A    Yes.

01:40:58 25    Q    And Mica agreed to that?

22

```
01:41:00    1   A     Yes.
            2   Q     Now, directing your attention a little further down the
            3   page, Shannon asked you in that same text conversation on
            4   December 19th in the evening:  "What would u do if he said
01:41:20    5   take her."?
            6         Do you see that?
            7   A     Okay.  Yes.
            8   Q     What did you understand Shannon to mean by that?
            9   A     Would I be -- what would I do if he said take her?
01:41:32   10   Then I would be very happy, but -- never mind.
           11   Q     But you understood Shannon to be asking you whether you
           12   would take custody of River, correct?
           13   A     Yes.
           14   Q     And if you could take custody of River, that would have
01:41:45   15   made you very happy, you just indicated, correct?
           16   A     Yes.  Shannon, though, always talks like this.  This
           17   isn't just this one conversation.  This has been since
           18   River's been born.  So this isn't a different or new thing.
           19   *Would you like to take her?  Sure, I'll take her.  Any time.*
01:42:05   20   Q     Shannon knows you well, right?
           21   A     Well.  I don't want to have River.  I just want to have
           22   my time.  I don't want to have her forever.  I know she has
           23   a dad.
           24   Q     But what you're talking about here is you taking
01:42:18   25   custody of River, correct?
```

*Deborah D. Parker, U.S. Court Reporter*

01:42:19  1    A    Sure.  Sure.  This is going on in our family.  It's a

       2    big thing.  We're freaking out.  All of a sudden the mom is

       3    where she's at.  Yeah, we're worried where she's going.

       4    Q    Shannon asked you, "Did u talk to Mica," correct?

01:42:39  5    A    Okay.

       6         MR. WILKE:  At this time, Your Honor, I seek to

       7    introduce by stipulation Exhibit 528-4.

       8         THE COURT:  528-4 received.

       9         (Defendant's Exhibit 528-4 received in evidence.)

01:42:58 10    BY MR. WILKE:

      11    Q    During this same conversation on the 19th of December,

      12    you told Shannon, quote:  "I'd take her in one second,"

      13    right?

      14    A    Yes.

01:43:14 15    Q    Meaning, you would take custody of River in one second,

      16    if the opportunity presented itself, correct?

      17    A    Not custody.  I would take her in one second.  I'm not

      18    trying to take custody.

      19         MR. SCALLY:  Your Honor, could I have a brief

01:43:29 20    moment to confer with Counsel?

      21         THE COURT:  Certainly.

      22         (Pause)

      23         MR. SCALLY:  Your Honor, I believe the witness

      24    doesn't have her mask on.

01:43:39 25         THE WITNESS:  I can't wear it.  I'm going to

01:43:42  1    faint.

2                    THE COURT:  You're going to faint with your mask

3    on?

4                    THE WITNESS:  It's completely wet.  And I'm -- I

01:43:43  5    just can't wear it.

6                    THE COURT:  Have you been vaccinated?

7                    THE WITNESS:  Yes, I have.  I have proof.

8                    THE COURT:  Double vaccinated?

9                    THE WITNESS:  Double vaccinated.  I have proof.

01:43:52  10                   THE COURT:  Okay.  Counsel, in light of that, I'm

11    going to make an exception.  The witness says she's going to

12    faint.  And I'm going to allow her to testify behind the

13    Plexiglas under these circumstances.

14                   So we can continue on.

01:44:04  15                   MR. WILKE:  That's fine for now.  I'd like to be

16    heard.

17                   THE COURT:  Can you get close to that microphone?

18                   MR. WILKE:  Can we take this matter up later today

19    in terms of -- this particular -- the mask issue?

01:44:15  20                   THE COURT:  At any time, Counsel.  But right now,

21    do you want me to take a recess?  Or do we continue on with

22    the witness?

23                   MR. WILKE:  I might want a brief recess right at

24    this time.

01:44:26  25                   THE COURT:  Ladies and gentlemen -- just a

*Deborah D. Parker, U.S. Court Reporter*

01:44:28  1   moment -- if you'd be so kind as to take a recess for just a

2   moment.

3         You're admonished not to discuss this matter

4   amongst yourselves, nor form or express an opinion

01:44:40  5   concerning the case.

6         Thank you so much.

7         We have the other masks that won't cause you --

8       *(Jury exits courtroom.)*

9       *(The following proceedings were had outside the*

01:44:58 10      *presence of the jury:)*

11        THE COURT:  Just a moment.  Don't worry.  We'll

12   get this straightened out.

13      *(Pause)*

14        THE COURT:  Okay.  Have a seat for just a moment.

01:45:12 15        Pardon me for asking:  But you're vaccinated?

16        THE WITNESS:  I promise I am.

17        THE COURT:  Now, Counsel, how would you like to

18   proceed?

19        We have a mandate that all persons are to be

01:45:25 20   masked.  By the same token, we've got a witness who is

21   allegedly becoming faint because of the masking situation.

22        MR. WILKE:  Could we have the witness excused for

23   this hearing, Your Honor?

24        THE COURT:  Oh, certainly.  Would you step down

01:45:39 25   and -- out of the presence of the jury.  We'll just have you

*Deborah D. Parker, U.S. Court Reporter*

01:45:41    1    wait out in the hallway for a moment.

            2         (Pause)

            3              THE COURT:  Let me ask you before you leave.  If

            4    we took a recess and brought you back, slowed down a little

01:45:55    5    bit, could you continue to wear the clear plastic shield for

            6    us; in other words, if we just gave you a little bit of

            7    time?

            8              THE WITNESS:  I'll try.

            9              THE COURT:  Would you try?

01:46:03   10              THE WITNESS:  Yes, absolutely.

           11              THE COURT:  Why don't we take a recess then and

           12    try again.

           13              Would that be okay?

           14              THE WITNESS:  100 percent, yeah.

01:46:09   15              THE COURT:  Counsel, let's see if that resolves

           16    itself after the recess.  So let's try to continue on so

           17    that -- first of all, we have continuity of examination.

           18    The witness is willing to try wearing the mask.  It may not

           19    be the mask, it just may be, you know -- well, maybe,

01:46:25   20    faintness.  I don't know.

           21              But why don't we take 15 minutes and then see if

           22    we continue on.

           23              Will you make that effort for us?

           24              THE WITNESS:  Absolutely.

01:46:32   25              THE COURT:  We'll see you in 15 minutes, Counsel.

*Deborah D. Parker, U.S. Court Reporter*

01:46:52  1        *(Recess taken from 1:46 p.m. to 2:00 p.m.)*

2              THE COURT:  First, we're present with the counsel

3        and without the jurors or alternates present; the defendant,

4        of course, is present; the investigating agency.

02:00:53  5              The first issue I would like to discuss with you

6        is that Karlen came to me informally and told me during the

7        recess that Counsel stipulated to excuse the alternate

8        juror; is that correct?

9              MR. WILKE:  I would stipulate to that, Your Honor.

02:01:11 10              MR. SCALLY:  Yes, Your Honor.

11              THE COURT:  Could I just suggest that we do that

12        at the end of the day when the jury leaves.  If I do that,

13        we're down two alternates.  And I don't want to give the

14        jury the impression that I'm so easily excusing people.

02:01:27 15              Would that be acceptable, Mr. Wilke?

16              MR. WILKE:  That is, Your Honor.

17              THE COURT:  Counsel, would that be acceptable?

18              MR. SCALLY:  Yes, Your Honor.

19              THE COURT:  Can Karlen informally thank him for

02:01:37 20        coming down today, but I don't want to interrupt the

21        proceedings and take additional time?

22              Would that be acceptable?

23              MR. WILKE:  That would be fine.

24              MR. SCALLY:  Absolutely, Your Honor.

02:01:46 25              THE COURT:  Then, we'll excuse Juror No. 15 at the

02:01:49   1    end of the day but not now.

2              The second issue is -- and my concern is that if I

3    create an exception and I allow this one witness to go on

4    unmasked, regardless of the vaccination status, then it

02:02:06   5    might be perceived to be treating one witness exceptionally

6    and it would undermine the mandatory masking guidelines.

7    And, therefore, on one hand, I'm trying to take into

8    consideration your right, Mr. Wilke, to a continuous

9    cross-examination.  Because breaking up your

02:02:27  10    cross-examination and bringing her back, I think, is

11    prejudicial to the defense.  And, therefore, I'm going to

12    order that she continue to wear the mask, regardless of her

13    vaccination status.

14             There's another reason also and that is, I'm

02:02:42  15    concerned if this exception is created, that it's going to

16    give the jury the idea that when we're under a mandatory

17    masking requirement that by creating an exception for the

18    witness, that one or more jurors might be, let's say, less

19    willing to wear a mask.  It's mandated at the present time.

02:03:02  20             Now, I'm going to look to each of you for

21    guidance.  If we were under a different criteria --

22    moderate, for instance -- it might be different, but we're

23    not.  We were moderate.  Then we got raised to substantial,

24    my understanding from the Jury Commissioner.  And so I think

02:03:18  25    that I'm going to choose to have mandatory masking at all

02:03:22   1   times regardless.

2   Now, Mr. Wilke, let me turn to you and get your

3   thoughts.  Let me turn to the Government.  If you disagree

4   with that, so be it.  But I'm also going to order the

02:03:31   5   following:  If, in fact, she's having trouble, then let's

6   take a recess, Mr. Wilke.  I'd prefer to have you be the one

7   asking or the Government rather than the Court checking and

8   then interceding.

9   But your thoughts.

02:03:43  10   MR. WILKE:  I agree with the Court's comments that

11   the mandatory masking rule should be applied across the

12   board and making exceptions creates problems -- not only in

13   perception, but I think some potential due process concerns.

14   And so I would oppose any exception being created for any

02:04:04  15   witness in the case.

16   THE COURT:  Let me get the Government's thoughts.

17   MR. SCALLY:  Your Honor, I think with the Court's

18   qualification that, you know, if the witness is truly

19   struggling, we could take a recess, the Government is fine

02:04:15  20   with the Court's position.

21   THE COURT:  Okay.  Then, let's bring that witness

22   in.  Let me instruct her outside the presence of the jury

23   with your permission about the mandatory masking, because I

24   don't want to do that in front of the jury.  The end result

02:04:27  25   would be that she's being treated exceptionally; in other

02:04:30   1    words, somehow giving her --

2                    MR. WILKE:  I am concerned about giving the

3       witness too much discretion to call breaks, Your Honor.

4                    THE COURT:  No.  She's not going to, Counsel.  I

02:04:40   5    think she's going to be willing to cooperate.

6                    MR. WILKE:  Okay.

7                    THE COURT:  And if that occurs, we'll probably see

8       the same conduct.  And you'll call that to my attention, and

9       I'll see it as well.

02:04:56  10            Now, if you have any better suggestion, so be it,

11      but I'm really concerned about interrupting the continuity

12      of the cross-examination or redirect in this matter and

13      recross.

14                   MR. STAPLES:  I understand the Court doesn't

02:05:07  15    supply water, but water might help her.

16                   THE COURT:  Certainly.

17                   MR. WILKE:  I can have a bottle -- I can get her a

18      bottle, if that would help.

19                   THE COURT:  Counsel, we supply water.  We supply

02:05:18  20    it for the witnesses, so we'll get water.

21                   MR. WILKE:  Oh, you have it.

22                   THE COURT:  Counsel, I leave that to you, because

23      I don't want my clerks out there getting water for you.

24      Just --

02:05:32  25          *(Pause)*

*Deborah D. Parker, U.S. Court Reporter*

02:05:40   1            THE COURT:  May we ask the witness to come in now.

2      And the Government's got --

3            Now, just a moment.  One of you put a bottle of

4      water up there for her.

02:05:49   5            MR. STAPLES:  She's on her way, Your Honor.

6            *(Ms. Sandra Ritz enters courtroom.)*

7            THE COURT:  All right.  Thank you, Ms. Ritze.

8            If you would be kind enough to re-take the stand

9      for just a moment.

02:06:21  10            And, first of all, thank you.  Would you have a

11      seat for a moment.

12            And why don't you put on a new mask.

13            THE WITNESS:  Okay.

14            THE COURT:  Let me explain to you -- we're under a

02:06:49  15      mandatory masking requirement at the present time.  And

16      regardless of the vaccination status, which is commendable

17      on your part, if we treat one witness exceptionally, it

18      might undermine the mandatory masking guidelines for jurors,

19      the Court, the staff and everyone and, therefore, I'm going

02:07:13  20      to order you to continue wearing a mask.

21            We've chosen a transparent mask because that way

22      the witness' face could be seen by the jurors, by the

23      defendant, by all counsel.  And, frankly, I've also stated

24      to counsel I'm a little concerned that if any exception is

02:07:41  25      created, that the jurors might take it less seriously and

*Deborah D. Parker, U.S. Court Reporter*

02:07:44  1    they might start unmasking.  So there I think it's kind of

2    an attempt to make certain we can keep going with jury

3    trials, and it's a small price to pay in terms of any

4    discomfort, so we can go forward as safely as possible.

02:08:03  5            In light of these concerns, in ordering you to

6    wear that mask, it's -- I want you to understand that it's

7    going to be across the board and has been for every witness.

8    If you become extraordinarily uncomfortable -- I don't mean

9    a little uncomfortable -- extraordinarily uncomfortable,

02:08:17  10   then you'll make that known to Mr. Wilke or to the

11   Government.  I'd like not to take too many recesses; but if

12   so, please, indicate and we'll attempt to take a recess.

13            Is that acceptable to you?

14            THE WITNESS:  Absolutely.

02:08:31  15           THE COURT:  Are you willing to make the effort?

16            THE WITNESS:  100 --

17            THE COURT:  I want to thank you very much.

18            Okay.  Counsel, any other comments you would ask

19   the Court to make?

02:08:38  20           MR. STAPLES:  Just that she now has a bottle of

21   water, if it's needed.

22            THE COURT:  Yes.  There's a bottle of water up

23   there.

24            THE WITNESS:  Thank you.

02:08:45  25           THE COURT:  Mr. Wilke, any other comments?

*Deborah D. Parker, U.S. Court Reporter*

02:08:46 1          MR. WILKE:  No, Your Honor.  Thank you.

2          THE COURT:  Then why don't we get the jury,

3    please, so we can continue the examination.

4          *(Pause)*

02:10:33 5          THE COURT:  Let me see, Counsel, while we're

6    waiting for the jury.  We went from substantial back to

7    moderate.  I think I'm going to hold throughout the trial to

8    the same standard, even if we drop back to moderate.  In

9    other words, we were moderate at one time, a week or so ago.

02:10:48 10   I'm going to hold to the substantial standard regardless and

11   require masking throughout.  Because even if we have that

12   discretion, coequal across the board.  So even if we drop,

13   it will be mandatory masking throughout the trial.

14          *(Jury enters courtroom.)*

02:11:20 15         *(The following proceedings were had in open court*

16          *in the presence of the jury:)*

17          THE COURT:  Be seated, Counsel.  Thank you for

18   your courtesy.

19          The jury is present, the alternates, the witness

02:11:36 20   and all counsel.

21          Let me remind the jury that this is a mandatory

22   masking situation for the federal courts and there won't be

23   any exceptions to that rule concerning the jurors, the

24   staff, the Court, counsel, and the witnesses.

02:11:53 25         And, therefore, in proceeding today, Counsel, you

*Deborah D. Parker, U.S. Court Reporter*

02:11:56   1    may continue your examination, please.

2                        MR. WILKE:  Thank you, Your Honor.

3                                CROSS-EXAMINATION

4    BY MR. WILKE:

02:12:01   5    Q    Ms. Ritze, before the break, we were discussing

6    Exhibit 528-4, which is this continuation of the text

7    exchange between you and Shannon Love on the evening of

8    December 19, 2019.

9                    Do you recall that?

02:12:25  10    A    Yes.

11    Q    Okay.  And after you told Shannon that "he texted to

12    tell me river knows and she wants me --"

13                    Do you see that?

14    A    Yes.

02:12:43  15    Q    Okay.  "He" being "Mica," correct?

16    A    Yes.

17    Q    Okay.  Your next text right after that was, quote:

18    "He's not giving her up."  Correct?

19         *(Court Reporter requests clarification for the*

02:12:55  20         *record.)*

21                    THE COURT:  Just a moment.  You dropped your

22    voice.  I want to ask you to pull that mic closer.

23                    Would you restate that question?

24                    MR. WILKE:  Yes.

25    ////

02:13:03   1   BY MR. WILKE:

2   Q     After you told Shannon, quote:  "Yes he texted to tell

3   me river knows and she wants me."

4             Do you see that?

02:13:10   5   A     Yes, I do.

6   Q     Okay.  And then within less than a minute later, you

7   told Shannon, quote:  "He's not giving her up."

8   A     Yeah.

9   Q     You mean custody, correct?

02:13:27  10   A     I didn't know where Shannon was going with this, and

11   I'm just saying, I wasn't going that way.  He's not giving

12   her up.

13   Q     Okay.  And when you said "he's not giving her up," you

14   were referring to Mica as the "he," correct?

02:13:41  15   A     Correct.

16   Q     "Giving her up," meaning -- you meant he's not giving

17   up custody of River, correct?

18   A     Or fighting for her or anything.  He'll never give up.

19   Q     Okay.  I'm just asking you your text.  "He's not giving

02:13:56  20   her up," means Mica is not giving up custody of River?

21   A     Okay.

22   Q     Correct?

23   A     Yes.

24   Q     Is that what you meant by that?

02:14:04  25   A     Yes.

02:14:05  1   Q    Okay.  And that's what you told Shannon, correct?

        2   A    Okay.

        3   Q    And Shannon's response was, quote:  "Well I bet he will

        4   be easier to let u see her when u want and have her for

02:14:27  5   summers and stuff."

        6        Do you see that?

        7   A    Yes, I do.

        8   Q    And when Shannon said that she bets "he will easier,"

        9   she's referring to Mica, correct?

02:14:38 10   A    Yes.

       11   Q    And when she says "will be easier to let u see her,"

       12   he's [sic] referring to Mica being easier to let you see

       13   River than Sheila was, correct?

       14   A    Not necessarily.

02:14:54 15   Q    Well, what did you understand Shannon to mean when she

       16   said, "Well I bet he will be easier to see" -- "to let u see

       17   her when you want."

       18        What did you understand her to mean by that?

       19   A    He -- now, that -- if he -- if he was by himself, it

02:15:09 20   would be easier for me to take her once in a while.

       21   Q    Right.  Because now he would have custody all the time?

       22   A    Yeah.  Yes.

       23   Q    Where before he had to share custody with River?

       24   A    Yes.

02:15:22 25   Q    And you could only get visitation -- I'm sorry.

*Deborah D. Parker, U.S. Court Reporter*

02:15:26   1          He had to share custody with Sheila before,

2    correct?

3    A    Yes.

4    Q    And now that -- now that he no longer had to share

02:15:35   5    custody with Sheila, it would be easier for you to get some

6    of that time for yourself, correct?

7    A    Yes.

8    Q    And be able to see River more often, correct?

9    A    Yes.

02:15:47  10    Q    And, in fact, Shannon said that it would be easier for

11    you to, quote, "have her for summers and stuff," correct?

12    A    Right.  Because he'd be working, so it would be easier

13    for me to take her when she's off school.

14    Q    All right.  And go with you and live in Las Vegas over

02:16:07  15    the summer?

16    A    Yeah.  Stay with me, not really live with me.

17    Q    Okay.  But stay in the room that you had for her?

18    A    Yes.

19    Q    Okay.  Shannon continues in that conversation and she

02:16:22  20    says, quote:  "Boy my powers are strong."

21          Do you see that?

22    A    Yes.

23    Q    What did she mean by her "powers"?

24    A    She's a little clairvoyant.

02:16:35  25    Q    So she had previously indicated to you that you could

38

02:16:42  1   have more time with River?

2   A    I'm not sure exactly what she meant by that.  We'll go

3   with that.  It's fine.

4   Q    Well, she said, quote:  "I told u be patient and u will

02:16:56  5   have River."

6   A    So when I first moved to Vegas, I didn't think I was

7   going to see very much, so that's where Shannon is coming

8   from.

9   Q    And you had expressed your frustration to Shannon about

02:17:14 10   not seeing River, correct?

11   A    Sure.

12   Q    And Shannon had told you just be patient, right?

13   A    Yes.

14   Q    And she's reaffirming that here, right?

02:17:25 15   A    Yes.

16   Q    "Be patient and u will have River."  That's what she

17   told you, correct?

18   A    Yeah.

19   Q    Yes?

02:17:33 20   A    I guess, yes.  Be patient.  Not have her, but I'll get

21   to visit with her more often.

22   Q    What she said is "be patient and you will have River"?

23   A    In the text, it's very short, but I -- she does not

24   mean have River.

02:17:52 25   Q    She texted you, "I told u be patient and u will have

*Deborah D. Parker, U.S. Court Reporter*

02:17:56  1    River," correct?

2              That's what it says.

3    A    Okay.  It says that, yes.

4    Q    Okay.  You responded to that e-mail -- or that text,

02:18:10  5    correct?

6    A    I mean, I don't know.

7              MR. WILKE:  Seeking to admit what's been marked as

8    528-5, seeking to admit by stipulation.

9              THE COURT:  128-5 -- I'm sorry.  528-5, correct?

02:18:25 10              MR. WILKE:  528-5.

11              THE COURT:  All right.  Thank you.  Received.

12         (Defendant's Exhibit 528-5 received in evidence.)

13    BY MR. WILKE:

14    Q    Your response to Shannon's statement "I told u be

02:18:34 15    patient and u will have River" was:  "Yes your powers are

16    strong.  Now keep that witch in jail!!!"  Correct?

17    A    Yes, I said that.

18    Q    That conversation between you and your very close niece

19    Shannon Love occurred on December 19th, the day Sheila Ritze

02:19:12 20    was arrested, correct?

21    A    Yes.

22    Q    Now, later that same evening, you actually sent Shannon

23    a copy of the press release that had been issued by the

24    United States Attorney's Office, correct?

02:19:45 25    A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

02:19:45  1   Q    Directing your attention to what's been marked as

2   528-7 --

3               Admissible by stipulation, Your Honor.

4               THE COURT:  Received.

02:19:58  5       *(Defendant's Exhibit 528-7 received in evidence.)*

6       *(The document was published in open court.)*

7   BY MR. WILKE:

8   Q    Showing you what's been identified as 528-7, do you see

9   this text from you to Shannon Love at -- eight hours prior

02:20:13  10  to December 20th, 5:31, which would make it December 19th,

11  at approximately 9:30 in the evening, correct?

12  A    Okay.  I believe she asked for it.

13  Q    Okay.  And this was the press release that you had read

14  online earlier that day, correct?

02:20:37  15  A    Yes.

16  Q    This was the press release that identified Wayne Le by

17  name, correct?

18  A    Yes.

19  Q    This was the press release that identified statements

02:21:19  20  that Mr. Le had allegedly made to a confidential informant,

21  correct?

22  A    I don't have it in front of me, but if that's what it

23  said.

24  Q    Would it refresh your memory to look at what you had

02:21:32  25  read that day?

```
02:21:35   1   A     No, I don't want to read it.

           2   Q     So my question is:  Would it refresh your memory to

           3   read it?

           4   A     I guess.

02:21:49   5         MR. WILKE:  May I approach, Your Honor?

           6         THE COURT:  You may.

           7         (Pause)

           8         THE WITNESS:  I imagine that's what I sent.  I

           9   don't want to read that whole thing right now.  It will take

02:22:16  10   me 20 minutes.

          11         (Pause)

          12   BY MR. WILKE:

          13   Q     Having reviewed this press release from the

          14   United States Attorney's Office, does that refresh my memory

02:22:29  15   that that's in fact what she sent Shannon?

          16   A     Yes.  That -- that is what I sent her.

          17   Q     And that press release identified Wayne Le as the

          18   person who had been charged with murder, correct?

          19   A     Yes.

02:22:39  20   Q     And it identified Sheila as being charged with

          21   accessory to commit murder -- accessory after the fact,

          22   correct?

          23   A     Yes.

          24   Q     And it stated that this murder allegedly occurred on

02:22:51  25   this fishing boat, correct?
```

02:22:54  1    A    Yes, it did.

       2    Q    And that the alleged victim had been lured onto the

       3    fishing boat, correct?

       4    A    Yes.

02:23:02  5    Q    And then shot and tied with weights to his ankles and

       6    thrown overboard, correct?

       7    A    Yes.

       8    Q    And it also said that this was all over a debt of 30-

       9    to $40,000, correct?

02:23:19 10    A    Correct.

      11    Q    Now, you testified on direct examination that Wayne Le

      12    told you in Las Vegas that he planned to kill this other man

      13    over a $30,000 debt, correct?

      14         That was your testimony?

02:24:05 15    A    Yes.

      16    Q    Okay.  Very similar to what you had read in the paper

      17    in the U.S. Attorney's press release, correct?

      18    A    Yes.

      19    Q    You testified on direct examination that Wayne and

02:24:25 20    Sheila talked in Vegas in -- Las Vegas about taking people

      21    out onto the boat, luring them to the boat and using that as

      22    a way to murder someone.

      23         Do you recall that testimony?

      24    A    Yes, I do.

02:24:39 25    Q    Very similar to what you read in the U.S. Attorney's

02:24:42  1   press release, correct?

2   A    Yes.

3   Q    You, in fact, also wrote -- reviewed an article in the

4   *Los Angeles Times* during this period in late December that

02:25:21  5   you were looking up newspaper articles, didn't you?

6   A    Okay.

7   Q    And the *Los Angeles Times* article reported that this

8   murder was alleged to have occurred on the Sea König in the

9   Dana Point harbor, on October 14, quote:  "Under the guise

02:25:46 10   of an overnight fishing trip."

11        Do you recall that -- reading that in the

12   *L.A. Times*?

13   A    Okay.

14   Q    Do you recall that?

02:25:56 15   A    Yes, I do.

16   Q    You testified in direct examination -- I believe your

17   testimony was that Sheila and Wayne, while in the hotel room

18   in Las Vegas, on October 4, talked about using the boat,

19   quote, "as a guise to go lobster fishing, in order to murder

02:26:38 20   somebody."

21        That was your testimony, correct?

22   A    Yes, it was.

23   Q    Almost verbatim what you read in the *Los Angeles Times*,

24   correct?

02:26:46 25   A    If I heard that word, it's just a coincidence.  I don't

02:26:54   1   know another word to use in that way, so that's why the
           2   "guise" came out.
           3   Q     The word "guise"?
           4   A     Yeah.   G-E-I-Z-E?
02:27:04   5   Q     That's how you spell it:  G-E-I-Z-E?  That's the word
           6   that --
           7   A     It fits.
           8   Q     Your testimony, fair to say, is very similar to what
           9   was reported in the *Los Angeles Times* back in December of
02:27:22  10   2019, correct?
          11   A     Yes, it is.
          12   Q     And your testimony, fair to say, is very similar to
          13   what the U.S. Attorney's press release said, December 19,
          14   2019, correct?
02:27:34  15   A     That's why I was blown away when I read it, because I
          16   lived it.
          17   Q     So after reading all these articles online and after
          18   talking to Shannon, you spent a week -- almost two weeks
          19   with River over Christmas, correct?
02:28:02  20   A     Yes.
          21   Q     At your house in Las Vegas, correct?
          22   A     Yes.
          23   Q     And then you drove River back after the New Year's,
          24   correct?  After the New Year holiday?
02:28:14  25   A     Yes.

02:28:15   1    Q    And when driving her back to California, you actually

2    reached out to the FBI, correct?

3    A    I don't know exactly when I did, but I was not driving.

4    I was at home.

02:28:31   5    Q    So before you returned to Southern California to bring

6    River home, you contacted the FBI?

7    A    Yes, I did.

8    Q    Did you first contact Mr. Scally?

9    A    I had contacted Greg.

02:28:45  10    Q    Greg Scally?

11    A    Yes.

12    Q    And that was the name of the federal prosecutor that

13    you had read about in the papers, correct?

14    A    Yes.

02:28:52  15    Q    And you looked up on the Internet how to contact him

16    for his contact information, correct?

17    A    Yes.

18    Q    And Mr. Scally referred you to one of the FBI agents on

19    the case, correct?

02:29:02  20    A    Yes.

21    Q    And that was an Agent Gicking -- Chris Gicking, if you

22    recall?

23    A    Yes.

24    Q    And you called Agent Gicking and said you wanted to

02:29:14  25    meet with him, correct?

02:29:15   1   A    Yes.

           2   Q    And you arranged a meeting with Agent Gicking for

           3   January 3rd, 2020, correct?

           4   A    Yes.

02:29:41   5            MR. WILKE:  Your Honor, at this time, I would seek

           6   to introduce Exhibit 529 by stipulation.

           7            THE COURT:  Received.

           8        *(Defendant's Exhibit 529 received in evidence.)*

           9            THE COURT:  529.

02:29:52  10   BY MR. WILKE:

          11   Q    Now, on the day before you met Mr. Gicking, you, again,

          12   went back to the Internet to review the newspaper articles,

          13   didn't you?

          14   A    I guess.  I'm sorry.  I don't remember every time I

02:30:38  15   went.  I've done it 100 times.

          16   Q    Directing your attention to 529-12 --

          17            THE COURT:  Has this been received yet,

          18   Your Honor?

          19            MR. WILKE:  It was just admitted.

02:31:12  20            THE COURT:  Is it -- no, I received 529.  I didn't

          21   recall --

          22            MR. WILKE:  Oh, this is page 12.  529 came in.

          23   This is page 12 of --

          24            THE COURT:  My apologies.

02:31:21  25        *(The document was published in open court.)*

02:31:24   1    BY MR. WILKE:

           2    Q    Directing your attention to Exhibit 529, page 12, the

           3    entry No. 92.

           4            Do you see that?

02:31:31   5    A    Yes, I do.

           6    Q    And can you tell my what the date of that is?

           7    A    12/20/20.

           8    Q    And the time there?

           9    A    8:34.

02:31:42  10    Q    And that says "UTC."

          11            Do you see that?

          12    A    Yes, I do.

          13    Q    So we subtract eight hours.  So it's, approximately,

          14    12:30, on January 2nd, correct?

02:31:54  15    A    Okay.

          16            THE COURT:  Just a moment.  12:30 p.m.?

          17            Counsel?  Counsel, is there a stipulation?  I'm

          18    not going to have the jury subtracting time now.

          19            MR. WILKE:  May I have a moment, Your Honor?

02:32:03  20            THE COURT:  You two stipulate to the time so they

          21    don't have to go through that process.

          22        (Pause)

          23            MR. WILKE:  I apologize, Your Honor.

          24            The timing issue is partly my fault.  These have

02:32:16  25    already been converted on these records.

*Deborah D. Parker, U.S. Court Reporter*

02:32:18   1          THE COURT:  Just a moment, Counsel.  Some have and

2    some haven't.

3          MR. WILKE:  Yes.

4          THE COURT:  The first examination -- slow down --

02:32:23   5    they weren't converted.  In fact, we all converted them and

6    we were an hour off.

7          MR. WILKE:  Yes.

8          THE COURT:  I want the exact time, and I want you

9    to stipulate to that between the parties, because the jury

02:32:32  10    is not going to be subtracting time.

11          MR. WILKE:  I will, Your Honor.

12          By stipulation, the time of entry 92, on 529-12,

13    is 8:34 p.m. Pacific Time.  That is a converted time.

14          THE COURT:  8:34 p.m. on January --

02:32:55  15          MR. WILKE:  2nd.

16          THE COURT:  -- 2nd, 2020.

17          Stipulated to by the Government?

18          MR. SCALLY:  That's right, Your Honor.  Thank you.

19          THE COURT:  By the defense?

02:33:04  20          Mr. Wilke, stipulated to by the defense?

21          MR. WILKE:  Yes, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Therefore, ladies and gentlemen, you don't have to

24    subtract and add.  You have a stipulation which is binding

02:33:13  25    upon us.

02:33:13    1             Thank you.

            2   BY MR. WILKE:

            3   Q    So, Ms. Ritze, the night before you were scheduled to

            4   be interviewed by the FBI for the first time in this case,

02:33:24    5   you were looking up, doing Google searches of Sheila Ritze,

            6   correct?

            7   A    Looks like, yes.

            8   Q    Directing your attention to entry 94.  Do you see that

            9   there?

02:33:41   10   A    Yes, I do.

           11   Q    That is, in fact, the *Los Angeles Times* story, correct,

           12   about the arrest and allegations of murder, correct?

           13   A    Looks like, yes.

           14   Q    The story that ran on the day of the arrest,

02:33:56   15   December 19, 2019.

           16             Do you see that there?

           17   A    Yes.

           18   Q    2019/12/19?

           19   A    Yes, I did.

02:34:06   20   Q    So that was the same story that you had reviewed a week

           21   and a half or so earlier, the day of the arrest, correct?

           22   A    I mostly was looking up to see if anything changed like

           23   if -- about her -- she was going to court or anything like

           24   that.  I was just curious what was going on with her.  I

02:34:23   25   don't even know if I even read those.

50

| | | |
|---|---|---|
| 02:34:27 | 1 | Q    Well, we know you already -- |
| | 2 | *(Court Reporter requests clarification for the* |
| | 3 | *record.)* |
| | 4 | THE COURT:  Just -- both of you stop for just a |
| 02:34:33 | 5 | moment.  Reask the question, because you're speaking over |
| | 6 | the top of each other, and we don't have a record. |
| | 7 | MR. WILKE:  Thank you, Your Honor. |
| | 8 | THE COURT:  No, re-ask the question. |
| | 9 | BY MR. WILKE: |
| 02:34:41 | 10 | Q    You had read this *L.A. Times* articles back on |
| | 11 | December 19, 2019, correct? |
| | 12 | THE COURT:  And now your answer, please. |
| | 13 | THE WITNESS:  Yes. |
| | 14 | BY MR. WILKE: |
| 02:34:49 | 15 | Q    And you were looking it up again on January 2nd, 2019, |
| | 16 | at 8:34 in the evening, on the night before you were to be |
| | 17 | interviewed by Special Agent Chris Gicking of the FBI? |
| | 18 | MR. SCALLY:  Objection, Your Honor.  Misstates the |
| | 19 | testimony. |
| 02:35:07 | 20 | THE COURT:  Just re-ask the question, Counsel. |
| | 21 | BY MR. WILKE: |
| | 22 | Q    You looked up this same *L.A. Times* article on |
| | 23 | January 2nd, 2020, at 8:34 p.m., didn't you? |
| | 24 | THE COURT:  You may answer the question. |
| 02:35:22 | 25 | THE WITNESS:  Yes. |

02:35:23  1    BY MR. WILKE:

2    Q    Now, I want to go back in time a little bit to when you

3    invited Sheila to go to this concert in Las Vegas.

4    A    Okay.

02:36:13  5    Q    Okay.  Now, you said that you did that while you were

6    down at Sheila's house to see River, correct?

7    A    Yes.

8    Q    And that Sheila made you stay there, I think?

9    A    Yes.

02:36:31  10   Q    You indicated that you didn't want to stay there, but

11   she made you?

12   A    Yes.

13   Q    In the sense that you couldn't see River unless you did

14   stay there, is that how she made you?

02:36:45  15   A    She just wouldn't let me leave.  It wasn't anything

16   about River.

17   Q    Did she tie you up?

18   A    So I was not tied up.  I had my keys --

19        *(Overtalking:  Unable to report.)*

02:36:57  20        THE COURT:  Mr. Wilke, it's not understandable.

21   We don't have a record.

22        MR. WILKE:  That's fine.

23        THE COURT:  The question is not understandable.

24   Please, stay near the microphone.

25   *////*

BY MR. WILKE:

Q    Ma'am, you weren't locked up, were you?

A    No.

Q    You weren't locked in a room?

A    No.

Q    You weren't tied up?

A    No.

Q    When you said she made you stay there, what you meant by that is, if you wanted to see River, you had to stay there, correct?

A    Okay.

Q    That's how she made you stay there, right?

A    I pretty much thought -- yeah, okay.

Q    Because River was at her house because that was during her visitation, correct?

A    Yes.

Q    And Mica would not allow you to see River during his visitation, correct?

A    For this time.  This one time.

Q    Now, even though you felt as if you were being forced to stay at Sheila's, you decided it would be a good idea to invite Sheila to the Billy Idol concert in October, correct?

A    Yes.

Q    Now, this was not an opportunity for you to see River, correct?

02:38:23  1   A     No.

2   Q     There was no suggestion by you that, *Hey, you should*

3   *bring River to the Billy Idol concert*?

4   A     No.

02:38:32  5   Q     This was going to be you and Sheila staying at the

6   Palms Hotel going to see '80s rock legend Billy Idol?

7   A     Yes.

8   Q     Sheila was excited about coming, correct?

9   A     I thought so.

02:39:04  10  Q     She booked a plane ticket, correct?

11  A     Yes, she did.

12  Q     And it was your intention that she would fly to

13  Las Vegas.  You guys would have a weekend together.  She

14  would fly home.

02:39:16  15          That was your expectation, correct?

16  A     Yes.  Uh-huh.

17  Q     The room that you got at the Palms, it was a two-room

18  suite?

19  A     Yes, it was.

02:39:25  20  Q     And it had a bedroom and a living room area or seating

21  room area?

22  A     Yes, it did.

23  Q     The bedroom had one king-size bed?

24  A     Yes.

02:39:33  25  Q     And then the seating room area had a couch that, maybe,

02:39:36  1   folded out or something?

2   A    Yes.

3   Q    It was very comfortable for two people, correct?

4   A    Yeah.  Yes.

02:39:43  5   Q    But not very comfortable for four?

6   A    No.

7   Q    Especially when two of those people are people you --

8   were strangers to you?

9   A    Yes.

02:39:53  10  Q    Two men, in fact, who were strangers to you, correct?

11  A    It was nothing about them.  It was mostly just wanting

12  to be with Sheila.

13  Q    Okay.  But these people she brought with her were --

14  you had met them for the first time, correct?

02:40:04  15  A    Correct.

16  Q    And the weekend that you had planned to reconnect with

17  Sheila when these other men showed up didn't go as you

18  planned, correct?

19  A    No.

02:40:16  20  Q    Okay.  Now, you testified on direct examination that

21  Sheila called you earlier in the day of October 4 and told

22  you that she had missed her flight?

23  A    Correct.

24  Q    That she would try and get another flight --

02:40:41  25  A    Yes.

02:40:41  1   Q      -- correct?

2   A      Yes.

3   Q      And then she called you back later that day and said

4   she could not get another flight, correct?

02:40:48  5   A      Yes.

6   Q      But that she would drive out, correct?

7   A      Yes.

8   Q      She, in fact, told you that her friends were going to

9   drive her, correct?

02:40:59  10   A      Yes.

11   Q      You went to the hotel before they got there, correct?

12   A      Yes.

13   Q      And you checked into the room, correct?

14   A      Yes.

02:41:14  15   Q      And when Sheila arrived, she called you?

16   A      Yes.

17   Q      And you came down to the lobby?

18   A      Correct.

19   Q      And that was late afternoon, after 3:00 o'clock.  I

02:41:27  20   think 3:00 to 5:00, sometime in that --

21   A      Sometime in that area.

22   Q      Now, when she saw Sheila in the lobby, I believe your

23   testimony was she was with three men?

24   A      Correct.

02:41:43  25   Q      And one of those men was Wayne Le, correct?

*Deborah D. Parker, U.S. Court Reporter*

02:41:47  1    A    Yes.

2    Q    One of those men was this person known as "Robert"?

3    A    Robert.

4    Q    Did Robert use any other name?

02:41:59  5    A    That's the only name I heard, was just "Robert."

6    Q    I'm going to show you what has been previously admitted

7    as 169.

8         *(The document was published in open court.)*

9    Q    The gentleman in the blue shirt, is that the person you

02:42:26  10   knew to be Robert?

11   A    Yes.  That is Robert.

12   Q    And this was a photograph that you took in Las Vegas?

13   A    Yes.

14   Q    At the racecar track the following day?

02:42:37  15   A    Yes.

16   Q    And that is Sheila next to this person you knew to be

17   Robert, correct?

18   A    Yes.

19   Q    Making some kind of hang-loose type of symbol, or

02:42:49  20   something?

21   A    Yes.

22   Q    Is that what that is?

23   A    That's Sheila.  Who knows?

24   Q    That picture, though, is kind of -- that's how Sheila

02:42:58  25   often was, correct?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:42:59 | 1 | A    Yes. |
| | 2 | Q    Joking like that?  Doing things like that? |
| | 3 | A    Yes. |
| | 4 | Q    Now, Sheila introduces these three men to you, correct? |
| 02:43:21 | 5 | A    Yes. |
| | 6 | Q    None of whom you've ever met before? |
| | 7 | A    Yes. |
| | 8 | Q    She introduced you to Wayne? |
| | 9 | A    Um-hmm.  Yes. |
| 02:43:28 | 10 | Q    She introduced you to Robert? |
| | 11 | A    Yes. |
| | 12 | Q    And she introduced you to somebody who she mumbled his |
| | 13 | name, I think, was your testimony? |
| | 14 | A    Yes. |
| 02:43:39 | 15 | Q    And the man whose name she mumbled was this Asian |
| | 16 | man -- |
| | 17 | A    Yes. |
| | 18 | Q    -- whose name you never got, correct? |
| | 19 | A    Say again? |
| 02:43:45 | 20 | Q    This Asian man whose name you never got, correct? |
| | 21 | A    Yes. |
| | 22 | Q    Now, you said that you were -- this was when you first |
| | 23 | arrived in the hotel lobby? |
| | 24 | A    Yes. |
| 02:44:00 | 25 | Q    And then there was a period of time in which you all |

*Deborah D. Parker, U.S. Court Reporter*

02:44:03  1  waited in line to see if the men could get another room,

2  correct?

3  A    I was very adamant about them getting a room.

4  Q    And you explained that to Sheila --

02:44:14  5  A    Yes.

6  Q    -- correct?

7        And she eventually she got up to the registration

8  desk and spoke to somebody and then told you that they

9  currently could not check into another room, correct?

02:44:25  10  A    Yes.  Well, I was understanding that they did get a

11  room, and they were waiting for it.

12  Q    Okay.  That she was able to get a room, but they just

13  couldn't check into the room yet?

14  A    Yes.  That's what I understood.

02:44:36  15  Q    And that's why the men then proceeded all up to your

16  room, correct?

17  A    Yes.  They had a lot of stuff.

18  Q    But the expectation was by you that they would not be

19  spending the night in your room, correct?

02:44:50  20  A    Yes.  That's correct.

21  Q    Now, you testified on direct examination that at some

22  point you asked Sheila the name of the third man?

23  A    Yes.

24  Q    Okay.  Was that in the lobby?  Or was it later as you

02:45:10  25  were walking to your room?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:45:11 | 1 | A    This was before we went up to the room in the lobby. |
| | 2 | Q    But was it immediately? |
| | 3 | A    It was very soon after they -- it was very soon.  It |
| | 4 | wasn't immediately; but it was, you know, within 15, |
| 02:45:27 | 5 | 20 minutes. |
| | 6 | Q    So 15 or 20 minutes after first being introduced to |
| | 7 | these three men, you made -- you asked Sheila what the name |
| | 8 | of the third guy was? |
| | 9 | A    Yes. |
| 02:45:39 | 10 | Q    Okay.  By that time, where were the three men? |
| | 11 | A    Behind us.  And she and I were in front walking. |
| | 12 | Q    Okay.  They weren't participating in your conversation? |
| | 13 | A    No. |
| | 14 | Q    And you didn't want to appear rude, correct? |
| 02:45:54 | 15 | A    No.  No. |
| | 16 | Q    And so you were trying to be discreet, correct? |
| | 17 | A    Yes. |
| | 18 | Q    And you asked Sheila, *I didn't get that other guy's* |
| | 19 | *name.  What's his name?* |
| 02:46:04 | 20 | A    Yes. |
| | 21 | THE COURT:  Counsel, will you move closer to the |
| | 22 | microphone. |
| | 23 | BY MR. WILKE: |
| | 24 | Q    But in trying to be discreet, you basically said it to |
| 02:46:13 | 25 | Sheila alone, correct? |

*Deborah D. Parker, U.S. Court Reporter*

02:46:15   1   A      Yes.

           2   Q      You didn't ask the guy, *Hey, what's your name?*

           3   A      I did not even talk to him.

           4   Q      And Wayne Le wasn't walking with you, correct?  He was

02:46:23   5   behind you?

           6   A      Yes.

           7   Q      And it's your testimony that when you were talking

           8   discreetly to Sheila, Sheila said, *Don't worry.  We'll be*

           9   *offing this guy*?

02:46:40  10   A      She said, *Do not look at him.  Do not talk to him.  We*

          11   *will be offing him.  We -- not I -- will be offing him this*

          12   *weekend.*

          13   Q      Okay.  She said all of that very discreetly to you as

          14   you were walking down the hallway 15 to 20 minutes, after

02:47:00  15   you first been introduced to these men?

          16   A      Yes.

          17   Q      That's your testimony?

          18   A      Yes.

          19   Q      Okay.

02:47:05  20   A      The truth.

          21   Q      So you didn't say anything to Sheila?

          22   A      I was in shock.

          23   Q      That wasn't my question.

          24   A      What is your question?

02:47:38  25   Q      You did not say anything to Sheila?

02:47:40    1    A     No.

            2    Q     You kept walking to the room?

            3    A     I was gobsmacked.

            4    Q     That wasn't my question.  You kept walking to the room?

02:47:51    5    A     We did, yes.

            6    Q     With these three men behind you?

            7    A     Yes.

            8    Q     And it's your testimony here on direct examination that

            9    when Sheila said, quote, *We'll be offing him,* you believed

02:48:05   10    that Sheila was telling you that they were planning to kill

           11    this third man, correct?

           12    A     Yes.

           13    Q     That's your testimony here in court?

           14    A     Yes.

02:48:21   15    Q     You continued on to the room?

           16    A     Yes.

           17    Q     You let the three men in?

           18    A     Yes.

           19    Q     Did Sheila appear to be -- have been already drinking

02:48:33   20    by that time?

           21    A     Yes.

           22    Q     When they came to the room, did they unload any alcohol

           23    from their bags?

           24    A     Yes.

02:48:44   25    Q     In fact, Sheila had bought a handle of --

*Deborah D. Parker, U.S. Court Reporter*

02:48:47   1          *(Court Reporter requests clarification for the*

           2          *record.)*

           3                THE COURT:  Counsel.  Counsel.

           4                MR. WILKE:  Yes.

02:48:52   5                THE COURT:  Deborah, once again, what do you need?

           6          *(Record read.)*

           7   BY MR. WILKE:

           8   Q    A handle of Tito's -- T-I-T-O-S [sic] -- vodka,

           9   correct?

02:49:07  10   A    Yes.  She did bring a bottle of vodka.

          11   Q    Well, a handle is a very large bottle --

          12          *(Overtalking:  Unable to report.)*

          13                THE COURT:  Just a moment.  We're speaking over

          14   the top of each other.

02:49:18  15                I'm going to strike the question.  Strike the

          16   answer.

          17                Your question, Counsel.

          18   BY MR. WILKE:

          19   Q    A handle is a very large bottle of vodka, correct?

02:49:26  20   A    Yes.

          21   Q    Like a jug of vodka almost, correct?

          22   A    Yes.

          23   Q    In fact, it's 1.75 liters of vodka, correct?

          24   A    I take your word for it.

02:49:35  25   Q    And that handle of vodka wasn't full at that point, was

*Deborah D. Parker, U.S. Court Reporter*

02:49:40  1  it?

2  A     No.

3  Q     In fact, do you remember how full it was when you first

4  saw it when you got back to the room?

02:49:48  5  A     It was at least half.

6  Q     Now, it's your testimony that you believed that Sheila

7  had just told you that she was planning -- she and these

8  other men were planning to kill this third man?

9  A     Yes.

02:50:07 10  Q     And you took them to your room?

11  A     Yes.

12  Q     And you sat there and you socialized with them for

13  several hours before this concert, correct?

14  A     Yes.

02:50:18 15  Q     What time did the concert start that evening?

16  A     10:00 p.m.

17  Q     So it's 4:00 o'clock in the afternoon, by the time

18  you're going up to your room?  About right?

19  A     Yeah.  4:00 or 5:00.

02:50:34 20  Q     And for then five or six hours, you socialized with

21  these four people, three of whom were planning to, in your

22  mind, kill the fourth person?

23  A     Yeah.  We didn't stay there the whole time.  We went

24  down and gambled.

02:50:52 25  Q     So there was a time in which you were away from Sheila

02:50:55   1   and the men?

2   A    I was ditching them the whole time.

3   Q    Okay.  During that time that you were away, did you

4   ever call the police and tell them that you just heard about

02:51:08   5   a plot to murder a man that was in your room?

6   A    No.

7   Q    During that time that you were away from Sheila, did

8   you ever call your son and tell them, *Sheila is planning to*

9   *kill this guy in my room*?

02:51:28  10   A    Yes.

11   Q    That day?

12   A    Yes.  I called my son, Ryan.

13   Q    You called your son Ryan that day before you went to

14   the concert?

02:51:37  15   A    No, no, no.  I'm sorry.  Not before the concert.  I

16   called him the next day.

17   Q    Okay.  So during this five- to six-hour-period between

18   the time you heard these comments and you went to the

19   concert, you didn't tell anybody about this comment by

02:52:01  20   Sheila that you understood to be a plan to murder this

21   unknown third man?

22   A    Yeah.  No, I didn't say a thing.

23   Q    Now, you said that during this period of time, you only

24   had one drink?

02:52:19  25   A    Yeah.  Probably about one drink.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:52:22 | 1 | Q    During the five to six hours before the concert? |
| | 2 | A    Yeah. |
| | 3 | Q    And then how about at the concert? |
| | 4 | A    We didn't have any cocktails at the concert. |
| 02:52:30 | 5 | Q    Okay.  So you were sober? |
| | 6 | A    Yeah. |
| | 7 | Q    Okay.  And, yet, you didn't call anybody? |
| | 8 | A    I -- |
| | 9 |      MR. SCALLY:  Objection, Your Honor.  Asked and |
| 02:52:39 | 10 | answered. |
| | 11 |      THE COURT:  Counsel, I'm going to allow the |
| | 12 | answer, but it has been asked and answered. |
| | 13 |      One more time. |
| | 14 | BY MR. WILKE: |
| 02:52:47 | 15 | Q    Despite the fact you were sober and believed you just |
| | 16 | heard about this murder plan and were away from these people |
| | 17 | for some period of time down in the casino and had the |
| | 18 | opportunity to call the police, you didn't? |
| | 19 | A    No, I did not. |
| 02:53:15 | 20 | Q    Now, I want to show you what was previously shown to |
| | 21 | you, and it's been admitted. |
| | 22 |      *(The document was published in open court.)* |
| | 23 | BY MR. WILKE: |
| | 24 | Q    You went to the concert, correct, that night? |
| 02:53:24 | 25 | A    Yes. |

02:53:25    1    Q    And that's you at the concert with Sheila?

            2    A    Yes.

            3              THE COURT:  And that's exhibit number?

            4              MR. WILKE:  105.

02:53:33    5              THE COURT:  Thank you.

            6    BY MR. WILKE:

            7    Q    This is you at the concert with Sheila, five, six hours

            8    after she told you, according to your testimony, that she

            9    was planning to kill the man you left in your room?

02:53:46   10    A    Yes.

           11    Q    This is you in the state of shock that you described --

           12    A    That's --

           13    Q    -- you were there, correct?

           14    A    Yeah.

02:53:59   15    Q    You said you were in shock?

           16    A    Yeah.  I'm in shock there.

           17         (Pause)

           18              MR. WILKE:  Your Honor -- Your Honor, by

           19    stipulation, we would seek to introduce a video that's been

02:54:43   20    identified as Exhibit 527-A.

           21              THE COURT:  527-A.  Received.

           22         (Defendant's Exhibit 527-A received in evidence.)

           23         (The document was published in open court.)

           24    BY MR. WILKE:

02:55:05   25    Q    So during this concert, does that appear -- the picture

*Deborah D. Parker, U.S. Court Reporter*

02:55:10  1   that's on the screen, does that appear to be the concert

2   stage from the seats you were sitting in?

3   A    Yes, it does.

4   Q    Okay.  And we're going to play this video now for just

02:55:20  5   a moment and then I'm going to ask you some questions about

6   it.

7   A    Okay.

8        (*The videotape was played.*)

9   BY MR. WILKE:

02:55:48  10  Q    That video clip is you and Sheila at the Billy Idol

11  concert, on October 4th -- correct?

12  A    Yes.

13  Q    Sheila is making faces into the camera, correct?

14  A    Yes.

02:56:01  15  Q    Is that Sheila making a selfie of you and her with the

16  video?

17  A    Yes.

18  Q    And that's you next to her enjoying the concert,

19  correct?

02:56:12  20  A    Yes.

21  Q    Six hours after, according to your testimony, she told

22  you about the plans to kill the man in her room?

23  A    Yes.

24  Q    Now, you testified -- you testified that you did speak

02:56:43  25  to your son, Ryan Villmer, the next day --

02:56:47  1  A    Yes.

          2  Q    -- correct?

          3            -- expressing your concern about what Sheila had

          4  told you?

02:56:55  5  A    Yes.

          6  Q    Now, Ryan is how old?

          7  A    45 -- -4.  45.

          8  Q    Is he brother to Matthew or Mica?

          9  A    He's their stepbrother.

02:57:11 10  Q    So he's your son by a prior marriage?

         11  A    Yes.

         12  Q    Is he older than Matthew and Mica?

         13  A    No, he's in between.  He's in between.

         14  Q    Okay.  Did he live with Matthew and Mica growing up?

02:57:24 15  A    Yes.  They're brothers.

         16  Q    So they were raised together?

         17  A    Yes.  They were all raised together.

         18  Q    All right.

         19            MR. WILKE:  I need a moment, Your Honor.

02:58:37 20       (Pause)

         21            MR. WILKE:  I'm going to, by stipulation,

         22  Your Honor, seek to admit Exhibit 525 --

         23            THE COURT:  525 --

         24            MR. WILKE:  -- -1.

02:59:24 25            THE COURT:  -- -1.  Received.

*Deborah D. Parker, U.S. Court Reporter*

02:59:27  1      *(Defendant's Exhibit 525-1 received in evidence.)*

         2  BY MR. WILKE:

         3  Q    Ms. Ritze, I'm showing you what's been admitted as 525.

         4       Do you recall having a text conversation with your

02:59:49  5  son, Ryan Villmer, following the concert?

         6  A    Villmer.

         7  Q    Villmer.

         8       Do you recall that?

         9  A    Yes, I do.

02:59:58 10  Q    Okay.  Now, directing your attention to the first

        11  bubble, at 8:46 UTC, which by stipulation would be 12:46, on

        12  the 5th.  12:46 a.m. after midnight -- about 45 minutes

        13  after midnight, on October 5.

        14  A    Okay.

03:01:01 15       *(Pause)*

        16       *(The document was published in open court.)*

        17  BY MR. WILKE:

        18  Q    Showing you Exhibit 525-1 -- and the time here, we

        19  would subtract eight hours for all time by stipulation.

03:01:28 20       But this is a text conversation that you had --

        21       THE COURT:  Just a moment.  What time is this?

        22       You said a little after midnight at 12:05 [sic].

        23  Is that a stipulation between Counsel?  Or does the jury

        24  need to do subtraction, again?

03:01:40 25       MR. WILKE:  No, they don't, Your Honor.  It is --

03:01:41   1   8:46 Universal Time would be 12:46 a.m.

2           THE COURT:  All right.  October 5th?

3           MR. WILKE:  October 5th, yes.

4           THE COURT:  Just a moment.  12:46 a.m., is that

03:01:54   5   stipulated to by the Government?

6           MR. SCALLY:  If I could just have a brief moment,

7   Your Honor.

8           THE COURT:  Certainly.

9           Ladies and gentlemen, let them calculate the time,

03:02:03  10   because --

11       *(Pause)*

12           THE COURT:  They can reach a stipulation.

13           MR. SCALLY:  Yes, Your Honor.  That's by

14   stipulation.

03:02:16  15           THE COURT:  All right.  Stipulation then:

16   12:46 a.m., October 5th.

17           Thank you, Counsel.

18   BY MR. WILKE:

19   Q    You had received this e-mail from your son, Ryan,

03:02:24  20   asking how you were.

21           Do you recall that?

22   A    Yes.

23   Q    He asked you how you are and how everything was going,

24   correct?

03:02:33  25           *(Court Reporter requests clarification for the*

03:02:33  1    *record.)*

2              THE WITNESS:  Yes.

3    BY MR. WILKE:

4    Q    Directing your attention to page 2, 525-2, Ryan -- even

03:02:52  5    though you hadn't responded, he said, "Well, have fun."

6              Do you see that?

7    A    Yes.

8    Q    And then this green bubble down here is your first

9    response to his three texts.  And, again, that's at,

03:03:08 10    approximately, 12:46 in the morning -- that morning right

11    after the concert.

12             You had left the concert by that point, correct?

13    A    At what time?

14    Q    It's a quarter to 1:00 in the morning?

03:03:22 15    A    Yes.  We -- we're probably in the casino.

16             MR. WILKE:  I had not sought to admit it,

17    Your Honor.  I'm sorry.  I seek to admit 525-2.

18             THE COURT:  Received.

19             *(Defendant's Exhibit 525-2 received in evidence.)*

03:03:43 20             MR. WILKE:  Thank you.

21    BY MR. WILKE:

22    Q    It was about a quarter to 1:00 in the morning when you

23    responded to Ryan, correct?

24    A    Yes.  Okay.

03:03:49 25    Q    Now, this was -- when you responded to Ryan, were you

03:03:54   1   in your room or were you in the casino?

2   A     In the casino.

3   Q     And when you responded to Ryan, had you gone back up to

4   your room yet after the concert?

03:04:05   5   A     No.

6   Q     This was immediately after the concert?

7   A     Right -- probably, yeah, right -- probably in the

8   casino just playing around.

9   Q     But you had testified earlier about going back to the

03:04:14   10   room after the concert in which you had a conversation with

11   Wayne Le.

12         Do you recall that?

13   A     Yes.

14   Q     So when you responded to Ryan at, approximately, a

03:04:22   15   quarter to 1:00 in the morning, you had not yet done that,

16   correct?

17         *(Court Reporter requests clarification for the*

18         *record.)*

19   BY MR. WILKE:

03:04:31   20   Q     You had not gone back to the room, correct?

21   A     Correct.

22   Q     Okay.  You did tell -- now, when you did respond to

23   Ryan, however, this was after you had heard Sheila,

24   according to your testimony, tell you that they had been --

03:04:52   25   were planning to off this third guy, correct?

73

03:04:56   1   A    Yes.

2   Q    And it was your testimony that you had been in shock

3   and had believed that she had just told you about a plan to

4   kill a man who had been in your room earlier that day?

03:05:08   5   A    I wasn't sure, but -- I mean, it was -- yeah, she had

6   said it, so I was -- it was in my head.

7   Q    Well, you testified earlier on direct examination that

8   you believed that she was telling you about a plan to kill

9   this third man?

03:05:23   10   A    Okay, yes.  Yes.

11   Q    That was your testimony?

12   A    Okay, yes.  Yes, that's -- yeah.

13   Q    Having some doubt about that now?

14   A    No, I'm not having a doubt about it.  It's just the way

03:05:32   15   you said it, so I just --

16   Q    So you testified earlier today that you believed her to

17   be serious?

18   A    Yes.

19   Q    That she had told you about a plan to kill this man?

03:05:41   20   A    Yes.

21   Q    And to not even worry about his name, because they were

22   going to be killing him that weekend, correct?

23   A    Yes.

24   Q    So it was some urgency in your mind that this man was

03:05:54   25   going to be killed?

74

03:05:57   1    A    Most likely.

           2    Q    And after your son -- your 46-year-old adult son

           3    reached out to you asking you about how things were going,

           4    you told him, quote:  "She brought two guys with her.

03:06:22   5    They're nice enough.  But kinda bored with them.  The

           6    concert was good."

           7    A    That's what a mother says to her son when she doesn't

           8    want him to worry.  100 percent.  At that time, I didn't

           9    want him to freak out like I was.

03:06:52  10    Q    Now --

          11            MR. WILKE:  We need just a moment for the next

          12    exhibit, Your Honor.

          13            THE COURT:  Certainly.

          14        *(Pause)*

03:08:16  15    BY MR. WILKE:

          16    Q    So testified on direct examination that at some point,

          17    you came back to your room after the concert, correct?

          18    A    Yes.

          19    Q    And that when you came back to the room, you couldn't

03:08:26  20    get in because the door was locked?

          21    A    Yes.

          22    Q    The security chain or bolt, is that what you were

          23    talking about?

          24            THE COURT:  Counsel, if you will move closer to

03:08:36  25    the microphone, please.

*Deborah D. Parker, U.S. Court Reporter*

```
03:08:36   1              Thank you.

           2   BY MR. WILKE:

           3   Q     The security chain or the security bolt on the hotel

           4   door was locked, correct?

03:08:42   5   A     I was unable to open it.

           6   Q     Even though you had a key?

           7   A     Yes.

           8   Q     And you realized when you did that, that these three

           9   men that you had left in your room were still there?

03:08:56  10   A     Yes.

          11   Q     Or that's what you believed, correct?

          12   A     Yes.  Yes.

          13   Q     And you were -- what was the word you used to describe

          14   how you felt?

03:09:09  15   A     Pissed off?

          16   Q     Okay.

          17   A     Mad.

          18   Q     Now, you testified that you went -- you got into the

          19   room?

03:09:20  20   A     Yes.

          21   Q     And then proceeded to socialize with these men that

          22   were in your room?

          23   A     Yes.

          24   Q     Okay.  Now, the third man was gone --

03:09:35  25   A     Yes.
```

| | | |
|---|---|---|
| 03:09:35 | 1 | Q    -- correct? |
| | 2 | The man whose name you never had learned, correct? |
| | 3 | A    Now, he's gone. |
| | 4 | Q    Okay.  So it's your testimony today and it was during |
| 03:09:42 | 5 | this time you had this conversation with Wayne Le? |
| | 6 | A    Yes. |
| | 7 | Q    That was your testimony, correct? |
| | 8 | A    Yes. |
| | 9 | Q    Now, Wayne Le, you had just met that day? |
| 03:09:56 | 10 | A    Yes. |
| | 11 | Q    You had no prior relationship with him? |
| | 12 | A    Never seen him before. |
| | 13 | Q    And you had just been gone to a concert for several |
| | 14 | hours, correct? |
| 03:10:06 | 15 | A    Yes. |
| | 16 | Q    But before that the only, really, interaction you had |
| | 17 | had with him was these five hours or so between the time |
| | 18 | they arrived and you went to the concert, correct? |
| | 19 | A    Yes. |
| 03:10:19 | 20 | Q    And I think you testified that you went to the concert |
| | 21 | earlier -- |
| | 22 | A    Yes. |
| | 23 | Q    -- than Sheila? |
| | 24 | A    Yes. |
| 03:10:25 | 25 | Q    She stayed up in the room and hung out with her friends |

*Deborah D. Parker, U.S. Court Reporter*

03:10:29  1  a little bit longer, correct?

2  A    For about a half an hour.

3  Q    And during that half an hour, you went down to the

4  casino?  Or did you actually go to your concert seats?

03:10:42  5  A    No, I went to the concert.

6  Q    And you went to your seat alone?

7  A    Went to my seat alone.

8  Q    How did that make you feel?

9  A    I'm a single lady.  I do it all the time.

03:10:53 10  Q    Okay.  But were you a little, again, irritated or in

11  your words, peeved off?

12  A    I was really mad at her that she did not come down with

13  me.  I had spent a lot of money this weekend on -- to do

14  this.

03:11:17 15      (Pause)

16  BY MR. WILKE:

17  Q    So when you came back, you had this conversation with

18  Wayne Le you said, correct?

19  A    Yes.

03:11:33 20  Q    Who you had just met and spent --

21      (Court Reporter requests clarification for the

22      record.)

23  BY MR. WILKE:

24  Q    You had just met and you spent a few hours with,

03:11:46 25  correct?

*Deborah D. Parker, U.S. Court Reporter*

03:11:47   1    A      Yes.

           2    Q      And this guy, Robert, was he also part of this

           3    conversation?

           4    A      Robert was very quiet, but he was there.

03:11:54   5    Q      In the -- where in the hotel room did this conversation

           6    occur?

           7    A      In the hotel room, in the living room area.

           8    Q      And were you all seated for that?

           9    A      Yes.

03:12:03  10    Q      Okay.  And when you came back to the room, Wayne Le was

          11    in his underwear, correct?

          12    A      Yes.

          13    Q      And so did he have this conversation with you in his

          14    underwear?

03:12:16  15    A      No.  He put on his pants.

          16    Q      And when you came back to the room, this person,

          17    Robert, was actually naked, correct?

          18    A      And in my bed.

          19    Q      He was naked and in your bed?

03:12:34  20    A      Correct.

          21    Q      Did he participate in the conversation while naked?

          22    A      He put his clothes on.

          23    Q      Okay.  So this -- when you came back and found these

          24    two strange men in your room in your underwear -- in their

03:12:54  25    underwear and naked, how did that make you feel?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 03:12:58 | 1 | A    Yeah.  It was very upsetting. |
| | 2 | Q    You also saw that these men had drugs, correct? |
| | 3 | A    Yes. |
| | 4 | Q    They were doing cocaine, correct? |
| 03:13:10 | 5 | A    Yes. |
| | 6 | Q    And they had been drinking, correct? |
| | 7 | A    Yes. |
| | 8 | Q    And how did that make you feel? |
| | 9 | A    I don't do drugs, so I didn't like it that much. |
| 03:13:22 | 10 | Q    Okay.  Now -- and it was your testimony, it was during |
| | 11 | this period of time both Wayne Le and Sheila Ritze told you |
| | 12 | about -- that they could take people out on the boat to kill |
| | 13 | them, correct? |
| | 14 | A    Yes. |
| 03:14:19 | 15 | Q    And lure them out on the boat under the guise of a |
| | 16 | fishing trip? |
| | 17 | A    Yes. |
| | 18 | Q    It's your testimony -- |
| | 19 | A    Lobster fishing? |
| 03:14:27 | 20 | Q    Well, I think your words were:  Under the guise of a |
| | 21 | fishing trip, correct? |
| | 22 | A    I think I said "lobster." |
| | 23 | Q    Well, under the guise of a lobster fishing -- |
| | 24 | A    Yes. |
| 03:14:37 | 25 | Q    -- trip, correct? |

*Deborah D. Parker, U.S. Court Reporter*

03:14:37   1    A     Yes.

           2    Q     Just as the *L.A. Times* reported.

           3          MR. SCALLY:  Objection.  Asked and answered.

           4          THE COURT:  It's also a statement.  I'm going to

03:14:45   5    strike the statement, Counsel.

           6          Please, ask a question.

           7    BY MR. WILKE:

           8    Q     Now, during the concert, Sheila had also been drinking?

           9    A     Yes.

03:14:58  10    Q     Was the bottle of Tido's gone by those early morning

          11    hours when you got back to your hotel room?

          12    A     Yes.

          13    Q     They had finished the handle of Tido's?

          14    A     Plus I bought a bottle and they drank that, too.

03:15:11  15    Q     You bought a second bottle of Tido's?

          16    A     Yes.

          17    Q     A handle?

          18    A     No.

          19    Q     Just a liter?

03:15:18  20    A     Yes.

          21    Q     So they'd gone through almost three liters of Tido's

          22    that day?

          23    A     Yes.

          24    Q     And that's Tido's vodka, correct?

03:15:32  25    A     Yes.

03:15:32  1       *(Pause)*

          2   BY MR. WILKE:

          3   Q     And it was, I believe, your testimony that it was

          4   during this period of time in the early morning hours of

03:16:37  5   October 5th that Wayne Le made statements to you about this

          6   other man owing him a debt?

          7   A     Yes.

          8   Q     And about how he would get satisfaction by killing him,

          9   even though he wouldn't get paid --

03:16:54 10   A     Yes.

         11   Q     -- correct?

         12             That's your testimony?

         13   A     Yes.

         14   Q     Okay.  Now, you already testified that you were in

03:17:05 15   shock about Sheila's comment about -- earlier in the evening

         16   about offing this man?

         17   A     Yes.

         18   Q     So when you heard these statements from Wayne Le as you

         19   claim you did, did you believe it?

03:17:22 20   A     Yes.

         21   Q     Okay.  Well, that -- did you contact the authorities

         22   after hearing those statements?

         23   A     No.

         24   Q     Your son, Ryan, had reached out to you just an hour or

03:17:40 25   so earlier, correct?

03:17:41  1    A    Yes.

2    Q    But you didn't reach out to him and send him a text

3    saying, *These guys are killers,* did you?

4    A    If I would have said that, he would -- it would have

03:17:52  5    been bad.  He would have -- my kids -- all boys -- are very

6    protective.  At the time I didn't know if I believed them.

7    It was just --

8    Q    So you didn't know whether you believed them at the

9    time?

03:18:07  10   A    It was up and down:  I guess.  No.  Yes.  Maybe.

11   Q    So you weren't in shock?  You were just in disbelief?

12   A    Halfway fascinated and halfway disbelief and halfway

13   everything.

14   Q    Well, you didn't believe him enough to call the police,

03:18:27  15   did you?

16   A    Didn't think they would believe me.

17   Q    You didn't believe them enough to call hotel security,

18   did you?

19   A    I thought about it.  No, I did not.

03:18:37  20   Q    You didn't believe them enough to even call your adult

21   sons, did you?

22   A    At the time, no.  But I did call Ryan the next day, and

23   he did come.

24   Q    It was during this time in your room that you testified

03:19:18  25   on direct examination that Wayne Le also made the statement

*Deborah D. Parker, U.S. Court Reporter*

03:19:20    1    about the girlfriend could be a problem?

            2    A    Yes.

            3    Q    You didn't tell anybody about that, did you?

            4    A    No.

03:19:39    5    Q    Now, in fact, later that evening, did you go back down

            6    to the casino?

            7    A    Yes.

            8    Q    To gamble?

            9    A    Yes.

03:19:51   10    Q    After hearing these statements about this plot to

           11    murder somebody?

           12    A    Yes.

           13    Q    That you weren't sure whether to believe or not?

           14    A    I'm not crazy.  Yes.

03:20:11   15    Q    And you went with Sheila, correct?

           16    A    Yeah.

           17    Q    Was Mr. Le with you?

           18    A    Yes.

           19    Q    Was he watching over you?

03:20:20   20    A    No.

           21    Q    Was this person known as Robert with you?

           22    A    Yes.

           23    Q    Was he watching over you?

           24    A    No.

03:20:29   25    Q    Was Sheila with you?

03:20:31  1    A      Yes.

          2    Q      Sheila was lit up, wasn't she?

          3    A      Yes.

          4    Q      She was drunk?

03:20:36  5    A      Yes.

          6    Q      In fact, you all went back down to gamble and Sheila

          7    hit a slot, didn't she?

          8    A      She won a jackpot, yes.

          9    Q      What time did you actually get back to your room, after

03:21:23 10    going back down to the casino?

         11    A      So I came back up by myself.  And I must have --

         12    probably, around 3:00.  Maybe around that time.

         13    Q      And Sheila, Robert and Mr. Le came back after that?

         14    A      No -- wait, wait.  Sheila, Robert, yes.  The three of

03:21:42 15    them, yes.

         16    Q      And the next morning, you continued your conversation

         17    by text with your son Ryan, correct?

         18    A      I don't know.  I don't see it.

         19           MR. WILKE:  Seek to admit by stipulation 525-3.

03:22:15 20           THE COURT:  525-3 received.

         21           (Defendant's Exhibit 525-3 received in evidence.)

         22           (The document was published in open court.)

         23    BY MR. WILKE:

         24    Q      Showing you what's been admitted as 525-3, the top

03:22:46 25    bubble -- the blue bubble is from Ryan to you, correct?

*Deborah D. Parker, U.S. Court Reporter*

03:22:51  1   A     The blue is not from me.

       2   Q     No, it's Ryan to you --

       3   A     Okay.  Yes.  Yes.

       4   Q     -- correct?

03:22:56  5         And that's his response -- "Make the best of it.

       6   There is always Shannon, electrician, ha, ha, ha" -- to your

       7   e-mail is that we last -- or your last text that we last

       8   looked at, that the men Sheila was with were, quote, "Nice

       9   enough" but you were bored with them.

03:23:14  10        Do you recall that?

      11   A     Actually, Wayne was nice.

      12   Q     I'm sorry, ma'am?

      13   A     That's why I said "nice enough."  Before I heard -- he

      14   didn't do anything, because I talked to Sheila first.  I

03:23:22  15  didn't know anything about him when I said "nice enough."

      16   He was nice at first.

      17   Q     Okay.  But his response was "Make the best of it,"

      18   correct?

      19   A     Yeah.  Yeah.

03:23:36  20  Q     To that?

      21   A     Yeah.

      22   Q     And then later the next day, at -- October 5th --

      23         (Pause)

      24   BY MR. WILKE:

03:24:23  25  Q     Showing you 525, sub 3, -3 --

*Deborah D. Parker, U.S. Court Reporter*

03:25:15   1          *(Pause)*

           2     BY MR. WILKE:

           3     Q     So this response to you, at -- October 5th, 2019 --

           4          *(Pause)*

03:26:33   5               THE COURT:  All right, Counsel, would this be a

           6     convenient time for a jury break?

           7               MR. WILKE:  We could, Your Honor.  We're trying to

           8     reach a stipulation on the timing on these.

           9               THE COURT:  Then, ladies and gentlemen, why don't

03:26:42  10     you take 15 minutes.  We'll come and get you right away.

          11     And thank you very much for your courtesy.

          12               Please don't discuss this matter, nor form or

          13     express an opinion on the case.

          14          *(Jury exits courtroom.)*

03:26:52  15          *(The following proceedings were had outside the*

          16          *presence of the jury:)*

          17               THE COURT:  Ms. Ritze, you may take a break.

          18               THE WITNESS:  Thank you, Your Honor.

          19               THE COURT:  Counsel, about 15 minutes.

03:27:21  20          *(Recess taken from 3:27 p.m. to 3:45 p.m.)*

          21          *(The following proceedings were had outside the*

          22          *presence of the jury:)*

          23               THE COURT:  Counsel, we're on the record.

          24               The jury is not present.  The defendant is present

03:45:34  25     along with counsel.

*Deborah D. Parker, U.S. Court Reporter*

03:45:35   1          Apparently, you're communicating with Karlen and
           2    she's come to me, informally, and said that you've asked
           3    that Doan be released, because we won't be getting to him
           4    today; is that correct?  And if so, you're more than free to
03:45:47   5    release him today.
           6          MR. STAPLES:  Yes, correct.  Thank you,
           7    Your Honor.
           8          THE COURT:  Counsel?
           9          MR. WILKE:  No objection, Your Honor.
03:45:53  10          THE COURT:  Not "objection."  I mean, if you're
          11    going -- we need to know not where you're -- strike that.
          12          Let me say this another way:  If you believe
          13    you're going to take a good part of the rest of the day with
          14    this witness, you have no time constraints by the Court; but
03:46:08  15    if we're not going to get to Doan, we should release him
          16    today and bring him back on Monday.
          17          MR. WILKE:  I think that will be until 4:30 with
          18    this witness.  Like another 40 minutes, or so.
          19          THE COURT:  Well, if so, then we're not going to
03:46:20  20    get to Doan.  We'll see if we can get this witness on and
          21    off the stand at some point today so we have continuity.
          22          Why don't you release Doan.
          23          The employer is here, also, I believe.
          24          Sir, you've been -- as the employer, come on up
03:46:36  25    for just a moment.  Yeah, I want to thank you.

03:46:40  1          I think all of us were placed in a difficult

2    position with the employee of yours, representing that he

3    called you and gotten consent.  I don't know if that's true

4    or not.  You'll sort that out with your own employee, but

03:46:55  5    his statement was that he had consent to serve on our jury.

6          MR. MOELJANTO:  Yes.

7          THE COURT:  I won't go any further with that, but

8    I want to thank you for coming down today.  It's courteous

9    on your part.

03:47:08  10          If your statement is he's not going to be

11    compensated for the time, then I think counsel are prepared

12    to stipulate for economic hardship and to release him.  And

13    that was conveyed to me also informally by Karlen, but I'd

14    like to get a record of this.  And if this is true with a

03:47:24  15    full realization that if we drop below 12, then -- well,

16    let's not assume.  Let's hope for the best.

17          And, Counsel, is this the stipulation by the

18    Government?

19          MR. SCALLY:  Yes, Your Honor.

03:47:37  20          THE COURT:  And, Mr. Wilke, is this a stipulation

21    by the defense?

22          MR. WILKE:  Yes, Your Honor.

23          THE COURT:  Then, I'm going to ask you to go back

24    to your employment with our appreciation for voluntarily

03:47:47  25    coming down.  We're not going to release him now.  We're

03:47:49  1   going to release him at the end of the day so that there's

2   no influence with the rest of the jury.

3          Thank you very much, sir.

4          UNIDENTIFIED EMPLOYER:  Thank you.

03:47:55  5   THE COURT:  And, Karlen, would you be kind enough

6   to get the jury.

7       *(Pause)*

8          THE COURT:  Counsel, let's release him at the end

9   of the day so that the jury can leave this weekend without

03:48:41 10  any discussion by him inadvertently about being excused.

11         MR. SCALLY:  Makes sense.

12      *(Witness re-entered the courtroom.)*

13         THE COURT:  And if you would, please, re-take the

14  stand again.

03:48:55 15  THE WITNESS:  Okay.

16         THE COURT:  Thank you.

17      *(Jury enters courtroom.)*

18      *(The following proceedings were had in open court*

19      *in the presence of the jury:)*

03:50:25 20  THE COURT:  Then we're back in session.

21         All counsel are present, the defendant and the

22  investigating agency.

23         And if you will be seated.  Thank you for your

24  courtesy.

03:50:33 25  And, Counsel, your continued cross-examination.

*Deborah D. Parker, U.S. Court Reporter*

03:50:37   1         MR. WILKE:  Thank you, Your Honor.

  2                 CROSS-EXAMINATION

  3  BY MR. WILKE:

  4  Q    Ms. Ritze, I'm going to continue showing you what was

03:50:41   5  admitted as Exhibit 525-3, your continued text conversation

  6  with your adult son, Ryan Villmer, on --

  7         MR. WILKE:  I'll try to get the time right here.

  8         It's what?

  9     (Pause)

03:51:08 10  BY MR. WILKE:

11  Q    This was his response to you the night before about to

12  "make the best of it" in response to your statement about

13  the two men were kind of boring.

14        Do you recall that?

03:51:34 15  A    Yes, I do.

16  Q    Okay.  And then you didn't communicate with him, again,

17  until the next morning, correct?

18  A    Yes.

19  Q    Directing your attention to the middle text.

03:51:49 20  A    Yes.

21  Q    And this would be about 10:50 the next morning.  Late

22  morning the next day, correct?

23  A    Yes.

24  Q    And it says on the thing "551 UTC," but we subtract

03:52:07 25  seven hours, and so it's about 10:51 in the morning?

03:52:11  1    A    Okay.

          2    Q    Okay?

          3    A    Yes.

          4    Q    All right.  And you told him, "So they didn't sleep all

03:52:17  5    night," correct?

          6    A    Yes.

          7    Q    And you were referring to Sheila and her two male

          8    friends, correct?

          9    A    Yes.

03:52:26 10    Q    And were you able to sleep that night?

         11    A    Barely, but I went into the other room.

         12    Q    Where the bed was?

         13    A    Yes.

         14    Q    The one that Robert had been on -- sleeping on naked

03:52:38 15    when you first came back to the room?

         16    A    Yeah.  Thanks for reminding me of that one.

         17    Q    And Ryan engages you in text and he asks you "Who,"

         18    correct?

         19    A    Yes.

03:52:52 20              MR. WILKE:  Seeking to admit 525-4 by stipulation.

         21              MR. SCALLY:  No objection, Your Honor.

         22              THE COURT:  Received.

         23         *(Defendant's Exhibit 525-4 received in evidence.)*

         24    BY MR. WILKE:

03:53:00 25    Q    He says, "I'm guessing Sheila and friends.  Sara text

*Deborah D. Parker, U.S. Court Reporter*

03:53:04  1  me this morning and wanted to know if you were ok."

2        Do you see that?

3  A    Yes.

4  Q    Okay.  And you responded, "I'm alright."  Correct?

03:53:16  5  A    Yes.

6  Q    This was in response to your adult son's inquiry about

7  how you were doing, correct?

8  A    Yes.

9  Q    Okay.  And who's Sara?

03:53:27 10  A    Sara is a friend.

11  Q    Okay.

12  A    I don't know what that regards to [sic].

13  Q    Well --

14  A    Why she's asking if I'm okay.

03:53:35 15  Q    Okay.  And you told Ryan, quote:  "They were supposed

16  to get a room."  Correct?

17  A    Yes.

18  Q    And you were referring to Wayne and this guy Robert,

19  correct?

03:53:48 20  A    Yes.

21  Q    Okay.  And then you told him that you kicked him out of

22  your room at 4:00 a.m. and then Sheila let them back in?

23  A    Yes.

24  Q    And was it --

03:54:04 25        (Court Reporter requests clarification for the

*Deborah D. Parker, U.S. Court Reporter*

03:54:04  1        *record.)*

       2              MR. WILKE:  Yes, I'm sorry.

       3   BY MR. WILKE:

       4   Q    Was it at -- was that true?  Did you kick them out of

03:54:07  5   your room at 4:00 a.m.?

       6   A    This is not true.

       7   Q    Okay.

       8   A    I was just telling him that I kicked them out, but

       9   they -- I didn't kick them out.

03:54:16 10   Q    But you told your adult son that?

      11   A    Yes.

      12   Q    Okay.  Did you go to bed around 4:00 a.m. that morning?

      13   A    Yes.

      14   Q    Now, you -- during that text conversation with Ryan,

03:55:04 15   you told him that you thought, quote, "...she's doing coke,"

      16   correct?

      17   A    I can't see it.

      18   Q    Directing your attention to the bottom of page -- the

      19   last text on Exhibit 525-9.

03:55:29 20              MR. WILKE:  Admitted by stipulation, Your Honor.

      21              THE COURT:  Received.

      22        *(Defendant's Exhibit 525-9 received in evidence.)*

      23        *(The document was published in open court.)*

      24   BY MR. WILKE:

03:55:36 25   Q    This is a text from you to Ryan at, approximately,

*Deborah D. Parker, U.S. Court Reporter*

94

03:55:41  1   11:18 in the morning, the following day, where you say "I

2   think she's doing coke cuz he dropped a baggie right in

3   front of me"?

4   A     Yes, I wrote that.

03:55:51  5   Q     Okay.  And by "she," you meant Sheila, correct?

6   A     Yes.

7   Q     And by "he," did you mean Wayne Le?

8   A     I don't know.

9   Q     Okay.  But you saw a bag of cocaine in the hotel room,

03:56:05 10   correct?

11   A     Yes.

12   Q     And that was either "he" being either "Wayne Le" or

13   "Robert," correct?

14   A     It could have been "she."  I -- I could have put she's

03:56:17 15   doing it, because -- I would put "because she dropped it."

16   That might be a typo on my part.

17          Well, do you think she's doing coke, because I

18   would have, probably, put "she" dropped it in front of me.

19   I don't know why I put "he."

03:56:28 20   Q     Well, did you see somebody drop a bag of cocaine the

21   night before?

22   A     It was Sheila.  That's why I'm saying I think that was

23   a typo.

24   Q     So you saw Sheila drop a bag of cocaine?

03:56:38 25   A     Yes.  I didn't see them.

*Deborah D. Parker, U.S. Court Reporter*

95

| | | | |
|---|---|---|---|
| 03:56:39 | 1 | Q | Did you see Sheila use cocaine? |
| | 2 | A | Yes. |
| | 3 | Q | Did you see Wayne Le use cocaine? |
| | 4 | A | No. |
| 03:56:46 | 5 | Q | I'm sorry? |
| | 6 | A | No. |
| | 7 | Q | Did you see Robert -- the person you identified as |
| | 8 | | "Robert" use cocaine? |
| | 9 | A | No. |
| 03:56:51 | 10 | Q | So you just saw Sheila? |
| | 11 | A | Just Sheila. |
| | 12 | Q | Where was Sheila when she dropped the bag of cocaine? |
| | 13 | A | In the living room. |
| | 14 | Q | And can you describe the bag? |
| 03:56:57 | 15 | A | It was a regular zippy -- Ziploc bag that was just like |
| | 16 | | a little -- you know, looked like a round thing white. |
| | 17 | Q | Was it a sandwich-size bag -- |
| | 18 | A | Yeah. |
| | 19 | Q | -- or a smaller than that? |
| 03:57:09 | 20 | A | Smaller.  Small like a snack-size bag. |
| | 21 | Q | A snack-size bag of cocaine. |
| | 22 | A | Thank you. |
| | 23 | Q | Now, Ryan responded when you told him about this bag of |
| | 24 | | cocaine that you saw.  And he said to you, "You think not |
| 03:57:51 | 25 | | letting me sleep last time making me sleep with you and now |

*Deborah D. Parker, U.S. Court Reporter*

03:57:55  1   having to deal with your coked out friends."

2            Do you see that?

3   A    I do.

4   Q    And he's talking about your relationship with Sheila

03:58:03  5   and how she's been treating you, correct?

6   A    Making me sleep.  I don't know what the heck this

7   means.  "And now having to deal with your coked" -- I don't

8   know what that means; I really don't.  I'm sorry.

9   Q    That's fine.  He suggested you leave and call Matt?

03:58:26 10   A    I was talking to him on the phone as well, too.  This

11   was just in between.  Yeah, he wanted me to call Matt.

12   Q    And while talking to him on the phone and texting him,

13   you never told him about this murder plan that you claimed

14   to have heard the night before, correct?

03:58:41 15   A    I told him then.

16   Q    Oh, you told him on the phone?

17   A    Yeah.  I told him he needed to get out and come over

18   right now.

19        *(Court Reporter requests clarification for the*

03:58:50 20        *record.)*

21            THE WITNESS:  I told him to come on out to the

22   Palms, because I needed him.

23   BY MR. WILKE:

24   Q    Did you tell him that you had heard about this plan to

03:58:58 25   murder somebody?

*Deborah D. Parker, U.S. Court Reporter*

03:58:58   1   A      Yes.

           2   Q      When did you tell him that?

           3   A      Then.

           4   Q      What time?

03:59:03   5   A      I don't know.  I just -- I remember telling him.  I

           6   said, because I needed him to come and spend the night with

           7   me.

           8   Q      Okay.  It wasn't, though, the night before when you

           9   first heard about the plan?

03:59:14  10          (Court Reporter requests clarification for the

          11          record.)

          12                THE WITNESS:  No.

          13   BY MR. WILKE:

          14   Q      And it wasn't -- was it before you told him about the

03:59:24  15   bag of coke that you saw Sheila with?

          16   A      I don't remember.  I probably saw her doing the coke

          17   and then told him.

          18   Q      Okay.  About the coke?

          19   A      Yeah.

03:59:36  20   Q      And also about the murder plan?

          21   A      Yeah.

          22   Q      So his text to you suggesting you leave and call Matt

          23   was after you told him about the murder plan?

          24   A      Yeah.

03:59:48  25   Q      Well, he didn't come rushing over when you told him

03:59:51 1    about the murder plan, correct?

2    A    Yes, he did.  Yes, he did.

3    Q    Well, this is --

4    A    I don't know what time he came, because he kind of came

04:00:02 5    later.  It might have been -- because we went out to dinner:

6    Ryan, Sheila and I.

7    Q    Okay.  So he came over for dinner that evening?

8    A    Yeah.

9    Q    Well, this -- this suggestion by him to call Matt was

04:00:14 10   at 11:21 in the morning?

11   A    Okay.

12   Q    Is it your testimony that you sometime before then had

13   told him about this murder plan that was going to go down

14   that weekend?

04:00:24 15   A    Yes.

16   Q    And, yet, he waited until dinnertime to come over and

17   have dinner with you?

18   A    Yeah.  It was not dinnertime.  It was, probably, like

19   2:00-ish.

04:00:38 20   Q    Okay.  Well, we'll get there.

21   A    Yeah.

22   Q    Now, you said, quote, "I'm gonna stop complaining now.

23   It's ok.  I'll live.  Just disappointed."

24        Do you see that?

04:00:52 25   A    Yes.

99

04:00:52 1  Q    And that was at, approximately, 11:22 a.m. on

2  October 5th, 2019, correct?

3  A    Yes.

4  Q    After you claimed to have heard this -- about this plan

04:01:07 5  to murder, correct?

6  A    Yes.

7  Q    And after you claim to have told your 47-year-old son

8  who lives in Las Vegas with you that two men staying in your

9  room are planning to murder a third man that weekend and are

04:01:23 10  concerned the girlfriend could be a problem?

11         MR. SCALLY:  Objection.  Asked and answered.

12         THE COURT:  Counsel, this has been asked and

13  answered a number of times.  Now one more time.

14         You can answer that question, please.

04:01:34 15  BY MR. WILKE:

16  Q    When you responded to Ryan at 11:22 a.m., on

17  October 5th, this was after all of these statements that

18  you've testified to about this murder plan you've been told,

19  correct?

04:01:52 20  A    Correct.

21  Q    And this was after you now claim you told Ryan about

22  what you had heard?

23  A    Correct.

24  Q    You told Ryan -- you didn't tell Ryan you were scared,

04:02:10 25  did you?

*Deborah D. Parker, U.S. Court Reporter*

04:02:10   1   A      Yeah, I think I did.

           2   Q      Well, in fact, what you told him, "I'm gonna stop

           3   complaining now"?

           4   A      Yeah.

04:02:18   5   Q      "It's ok."  Correct?

           6   A      Yeah.

           7   Q      "I'll live," correct?

           8   A      Yes.

           9   Q      "Just disappointing"?

04:02:28  10   A      This is -- you guys don't know me.  This is how I talk.

          11   I don't try and make problems.  I was trying to like -- I

          12   didn't know what was going on.  So I was really

          13   disappointed, yes.

          14   Q      And it was at that point as well is when you suggested,

04:02:47  15   "Ryan, why don't you come down," right?

          16   A      Yes.

          17   Q      "Do you want to come down here?  The casino is nice."

          18   A      Okay.  What time is this one at, because he did come

          19   after that?

04:02:59  20   Q      11:25 a.m.

          21   A      Okay.  Oh, yeah.  Okay.  So he came around 2:00.

          22   Q      Okay.  You told him the casino was nice.  And you told

          23   him if he came down he could have VIP parking here, right?

          24   A      I have VIP parking.

04:03:30  25   Q      You didn't tell him, *Please, come down, because there's*

*Deborah D. Parker, U.S. Court Reporter*

04:03:33  1   *two murderers in my room who are going to murder a third guy*

2   *this weekend*?

3   A    I wasn't -- I wasn't going to put that in a text.  That

4   scared me.  What if they got my phone?

04:03:45  5   Q    Now, at approximately 1:00 p.m. -- 1:04 p.m., on the

6   5th, you told Ryan, "So I'm [sic] guess the guys might leave

7   today."

8            Do you see that?

9   A    Yes.

04:03:59  10  Q    And by "the guys," you were referring to Mr. Le and

11  this person Robert?

12  A    Yes.

13  Q    The third guy, the unknown man who you had met the day

14  before, you hadn't actually seen him since you left for the

04:04:13  15  concert, correct?

16  A    Correct.

17  Q    You told Ryan at approximately 1:04 in the afternoon on

18  that Saturday, "We're gonna make reservations at Bobby Flay

19  for dinner."

04:04:32  20           Are you interested, right?

21  A    Yeah.

22  Q    You didn't tell him, *I need you to come down here*

23  *because I'm in danger,* did you?

24  A    Like I said, I'm not putting that in a text.  I didn't

04:04:41  25  know who was going to get my phone.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 04:04:43 | 1 | Q    You told him, *Come down here for dinner at Bobby Flay,* |
| | 2 | *and I'll get you some VIP parking.* |
| | 3 | A    These guys have left by now. |
| | 4 | Q    Well, they were going to leave, correct? |
| 04:04:50 | 5 | A    Okay.  So now -- by now, they've left -- they're |
| | 6 | leaving in this time zone. |
| | 7 | Q    Well, in fact, that morning after you heard about this |
| | 8 | murder plan, you went go-karting with all these guys, |
| | 9 | correct? |
| 04:05:09 | 10 | A    Yeah. |
| | 11 | Q    You went to an indoor go-karting establishment at -- |
| | 12 | very near the hotel, correct? |
| | 13 | A    Right across the street. |
| | 14 | Q    You had your phone with you, correct? |
| 04:05:35 | 15 | A    Most likely. |
| | 16 | Q    Well, you, in fact, took pictures while go-karting, |
| | 17 | correct? |
| | 18 | A    Were those on my phone?  I don't remember taking them. |
| | 19 | I probably did. |
| 04:06:01 | 20 | Q    Showing you what's been admitted -- |
| | 21 |          MR. WILKE:  Admissible by stipulation.  I would |
| | 22 | seek to admit it now:  526-D. |
| | 23 |          THE COURT:  526-B? |
| | 24 |          MR. WILKE:  "D" as in "dog." |
| 04:06:12 | 25 |          THE COURT:  526-D. |

*Deborah D. Parker, U.S. Court Reporter*

04:06:14   1              MR. WILKE:  Thank you.

           2              THE COURT:  Received.

           3       *(Defendant's Exhibit 526-D received in evidence.)*

           4       *(The document was published in open court.)*

04:06:16   5   BY MR. WILKE:

           6   Q    Do you recognize this photograph as one you took at the

           7   go-kart place?

           8   A    I mean, it's been a couple of years.  I don't remember

           9   taking that picture, but -- okay.  If it's on my phone, I

04:06:30  10   took it.

          11   Q    You did testify earlier as to Exhibit 169, as a

          12   photograph taken at the go-kart establishment, correct?

          13              MR. SCALLY:  Objection.  Asked and answered.  403.

          14              THE COURT:  Overruled.

04:06:44  15   BY THE WITNESS:

          16   Q    And that is Sheila in the picture, correct?

          17   A    Yes.

          18   Q    And that's Robert in the picture?

          19   A    Correct.

04:06:52  20   Q    The man naked in your bed, the night before?

          21   A    Yes.

          22   Q    And that's you in the picture in the back, correct?

          23   A    Yes, it's me.

          24   Q    Waving?

04:07:00  25   A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

04:07:00   1    Q    With a smile on your face?

           2    A    With a smile.

           3              MR. WILKE:  Exhibit 171, previously been admitted.

           4    BY MR. WILKE:

04:07:11   5    Q    This is, again, at the go-kart establishment, correct?

           6    A    Yes.

           7    Q    The following day, correct?

           8    A    Yes.

           9    Q    After you heard about this plan to murder this man in

04:07:19  10    your room, correct?

          11    A    Yes.

          12              MR. SCALLY:  Objection, Your Honor.

          13    Argumentative.

          14              THE COURT:  Sustained.

04:07:23  15    BY MR. WILKE:

          16    Q    And this person with their arms up in the back here --

          17    A    Yes.

          18    Q    -- that's you, isn't it?

          19    A    Yes, it is.

04:07:30  20    Q    With your arms open, enjoying yourself at the go-kart

          21    establishment?

          22              MR. SCALLY:  Objection.  Asked and answered.  403.

          23              THE COURT:  Sustained.

          24    BY MR. WILKE:

04:07:47  25    Q    After going go-karting, you actually went to the hotel

*Deborah D. Parker, U.S. Court Reporter*

04:07:54  1    pool, correct?

2    A    Yes.

3    Q    And Mr. Le went with you, correct?

4    A    Yes.

04:08:00  5    Q    And Sheila went with you, correct?

6    A    Yes.

7    Q    And this person known as Robert went with you, correct?

8    A    Yes.

9    Q    And you hung out at the pool for a while, correct?

04:08:13  10   A    Yes.

11   Q    Had some drinks?

12   A    Yes.

13   Q    Some appetizers?

14   A    No.

04:08:18  15   Q    Just drinks?

16   A    Just drinks.

17   Q    With Wayne and Sheila and Robert --

18   A    Yes.

19   Q    -- the day after you heard about this murder plan?

04:08:26  20   A    Yes.

21        MR. SCALLY:  Objection.  Argumentative.  Asked and

22   answered.

23        THE COURT:  Overruled.  This is a new area

24   concerning the pool.  The other has been asked and answered

04:08:34  25   about the go-kart, et cetera.

04:08:36   1    BY MR. WILKE:

           2    Q    And then you had testified that you had told your son,

           3    Ryan, about this murder plan you heard about, correct?

           4    A    Yes.

04:08:48   5    Q    And that you invited him over for dinner that night at

           6    Bobby Flay's, correct?

           7    A    Yes.

           8    Q    And he agreed to come?

           9    A    Yes.

04:08:57  10    Q    And he came that evening, correct?

          11    A    Yes.

          12    Q    For dinner at Bobby Flay's?

          13    A    Yes, he did.

          14         MR. WILKE:   Seeking to admit 526-E by stipulation,

04:09:13  15    Your Honor.

          16         THE COURT:   526-E is received.

          17         (Defendant's Exhibit 526-E received in evidence.)

          18         (The document was published in open court.)

          19    BY MR. WILKE:

04:09:17  20    Q    Do you recognize the person pictured in this

          21    photograph?

          22    A    That would my son, Ryan.

          23    Q    That's your son, Ryan, correct?

          24    A    Uh-huh.   That's right, yes.

04:09:30  25    Q    Eating at the Bobby Flay's restaurant, correct?

04:09:34  1    A      Looks like it, yes.

       2    Q      That evening of October 5th, 2019, correct?

       3    A      Yes.

       4    Q      After the time that you claim you told him about this

04:09:43  5    murder plan?

       6           MR. SCALLY:  Objection.  Asked and answered.

       7    Argumentative.  403.

       8           THE COURT:  Sustained.

       9    BY MR. WILKE:

04:09:50 10    Q      This was in the evening, this picture?

      11    A      This is dinnertime.

      12    Q      Okay.  Directing your attention to 526-F, is that a

      13    picture of the steak dinner you were eating that night?

      14    A      That was Sheila's steak dinner.

04:10:08 15    Q      Did you take that picture on your phone?

      16    A      I did.

      17           MR. WILKE:  I need just a moment, Your Honor.

      18           THE COURT:  Certainly.

      19        (Pause)

04:10:30 20           MR. WILKE:  I have no further questions.

      21           THE COURT:  Now, Counsel, so we hear this in a

      22    block of time, if you both believe it's valuable for

      23    redirect and recross, then the witness will be able to be

      24    excused at the end of the day.  We'll start with a new

04:10:47 25    witness; if not, then I don't either one of you pushed for

*Deborah D. Parker, U.S. Court Reporter*

04:10:51  1    time.

2              So, Counsel, if you're going to be --

3              MR. SCALLY:  Just a moment, Your Honor.

4              THE COURT:  -- lengthy, then we'll invite the

04:10:56  5    witness back; if not, let's see if we can conclude the

6    witness' testimony, because we'd like to hear this in a

7    block of time, if possible.

8              MR. WILKE:  I think we can get through it today,

9    Your Honor.

04:11:07 10              THE COURT:  Well, we'll see.

11              Redirect examination, Counsel.

12                    REDIRECT EXAMINATION

13    BY MR. SCALLY:

14    Q    Ms. Ritze, on cross-examination, you were asked some

04:11:24 15    questions about October 4th, 2019 while you were in

16    Las Vegas.

17              Do you recall those questions?

18    A    Yes.

19    Q    And do you recall you were asked some questions about

04:11:41 20    why you didn't call the police on that day?

21    A    Yes.

22    Q    Were you still trying to connect with Sheila?

23    A    Absolutely.  I wanted her back in my life.  I really

24    did.

04:11:59 25    Q    Sheila is the mother of your favorite person in the

04:12:03   1    world; is that right?

2    A     Yes.

3    Q     And we watched a video of you at the concert, right?

4    A     Yes.

04:12:12   5    Q     What was going on in your mind at that time?

6    A     I was just trying to make the best of it.  I just

7    didn't know what to think or what to believe.  I was -- it

8    was hard.  I was just -- I really just didn't know what to

9    think.

04:12:32  10    Q     When -- on cross-examination, you were asked some

11    questions about your visit to Sheila in, I think, the summer

12    of 2019?

13    A     Yes.

14    Q     In San Juan Capistrano?

04:12:47  15    A     Yes.

16    Q     And counsel -- defense counsel asked you if -- about

17    Sheila made you stay there, right?

18    A     Yes.

19    Q     And asked if -- asked if you -- she tied you up and you

04:13:02  20    wanted to explain something and defense counsel wouldn't let

21    you explain.

22              Do you recall that?

23              MR. WILKE:  I would object.  Characterization.

24              THE COURT:  Sustained.  Stricken.

04:13:11  25              Just ask the question, Counsel.

04:13:11  1  BY MR. SCALLY:

2  Q    Is there anything -- what happened that you had to stay

3  there?

4  A    Sheila was just acting so crazy.  I don't remember any

04:13:27  5  specific thing, but she was just -- she just very lost, and

6  I was just trying to be friends with her, really.  She

7  didn't make they stay.  I didn't like that she did -- the

8  way that she did it.  You guys have to understand how Sheila

9  is.  She's a very -- *(unreportable)*.  She's -- she's out

04:13:48  10  there.  And you kind of just, kind of -- you sink back and

11  do whatever she wants.

12  Q    And had there been a long period of time during which

13  you were very close to Sheila?

14  A    Yes.  Very good friends.  I was the maid of honor in

04:14:02  15  their wedding.

16  Q    Did you have nicknames for each other?

17  A    Yes.

18  Q    What were they?

19  A    So I was "MIL" and she was "DIL": Mother-in-law,

04:14:13  20  daughter-in-law.  And we always called each other that.  And

21  it's sad.  I'm very sad about this whole thing.  And I'm not

22  trying to do anything to be mean to Sheila.  But when I saw

23  that she was trying to blame everything on him, I was just

24  in shock.

04:14:28  25  Q    Were "MIL" and "DIL" terms of endearment?

*Deborah D. Parker, U.S. Court Reporter*

04:14:32  1   A    Yes.  Yes.  Yes.

2   Q    Now, when you were getting ready to meet with the FBI

3   back in 2020, had you ever met with an FBI agent before to

4   talk about murder previous to that?

04:14:48  5   A    Absolutely not.

6   Q    Had you ever met with any law enforcement to talk about

7   a murder involving a close family member?

8   A    No.

9   Q    How were you feeling at that time?

04:15:01 10   A    I was really, really just -- I had so much in me that I

11   just needed to get it out.

12   Q    And you were asked some questions about your concern

13   about whether Sheila was a good mother.

14           Do you remember those questions?

04:15:28 15   A    Yes.

16   Q    And were you aware that she had sustained one or more

17   D.U.I.s?

18   A    Yes.

19   Q    And that she had -- you were aware that she had driven

04:15:44 20   drunk with River in the car?

21   A    Yes.  And several accidents as well.

22   Q    And that you were worried that River was at risk if she

23   stayed with Sheila.

24           Do you remember that?

04:15:57 25   A    Yes.  River believed it as well.

04:16:05 1            MR. WILKE:  I'm going to object and move to

2      strike.  That's -- No foundation.  Speculation.  Hearsay.

3                  THE COURT:  Just a moment.

4                  MR. WILKE:  The last statement of the witness.

04:16:15 5                  THE COURT:  Wait just a minute, Counsel.

6            *(Pause)*

7                  THE COURT:  Sustained as to "River believed it as

8      well."  Stricken.

9      BY MR. SCALLY:

04:16:29 10    Q    Would that belief on your part lead you to make up lies

11     to wrongfully imprison Sheila?

12     A    No.  I would never do that.  Absolutely not.  Even

13     hurts my feelings that anybody would ever think that.

14     Q    You were asked -- I'm sorry.

04:17:00 15    A    I'm okay.

16     Q    You were asked some questions about your text messages

17     that seem to indicate that with Sheila's arrest you might

18     have -- you might -- it would be easier for you to see

19     River.

04:17:27 20          Do you remember those questions?

21     A    Yes.

22     Q    And a question about the prospect of Mica, potentially,

23     being easier to deal with to let you see River more so than

24     you had earlier with Sheila.

04:17:44 25          Do you remember those questions?

*Deborah D. Parker, U.S. Court Reporter*

04:17:45  1   A    Yes.

2   Q    Would the prospect of Mica being easier to deal with to

3   see River than Sheila, would that lead you to make up

4   stories about Sheila?

04:18:05  5   A    No, it would not.

6   Q    Would that lead you to lie under oath?

7   A    No.  I would never lie under oath or lie.

8   Q    You were asked some questions about looking up some

9   news articles --

04:18:23  10  A    Yes.

11  Q    -- about the case.

12        Do you recall those questions?

13  A    Yes.  Yes, I did that.

14  Q    When you heard the news, what was your initial

04:18:32  15  reaction?

16  A    Which news?

17  Q    Well, I think you said Matt -- your son, Matt, called

18  you to let you know of Sheila's arrest; is that correct?

19  A    Yes.  Matt called me.

04:18:46  20  Q    What was your initial reaction?

21  A    What my initial reaction was that everything that they

22  said they were going to do was done, in my opinion.  And

23  that's what -- that's why I read it.  So I'm like, this is

24  like the story that they told me.  Now I'm reading it again.

04:19:05  25  So that's why it just seemed so weird to me.

04:19:09  1   Q    And now this news of the arrest, this involved a member

2   of your family; is that right?

3   A    The news of the arrest -- oh, oh.

4   Q    Sheila was a --

04:19:20  5   A    Oh, it was huge news in our family.  Huge.

6   Q    Did you consider Sheila to be a part of your family?

7   A    Yes.  I will never not consider her my DIL:

8   Daughter-in-law.

9   Q    And I think -- this was huge news your entire family?

04:19:43 10   A    It was huge news in the whole community, because of her

11   being a huge -- she was a big property manager.  She knew

12   thousands of people.

13   Q    Were you, fair to say, interested in finding as much

14   about it as you could?

04:19:58 15   A    I couldn't get enough of it.  I just -- yeah, I just --

16   I was so involved in it, yes.

17   Q    So you were curious about the situation?

18   A    Yes, I was very curious.

19   Q    Were you reading those articles in order to make up

04:20:20 20   stories to tell the FBI?

21   A    No.  All those stories were told to me.

22   Q    And were you reading the news stories so you could make

23   up lies so you could get custody of River?

24   A    No, I was not doing that.  I can see River any time I

04:20:44 25   want now, or -- not now because of that, but I can see River

*Deborah D. Parker, U.S. Court Reporter*

04:20:48   1   any time I want.  It would have happened either way, because

2   we would have worked everything out.

3             MR. SCALLY:  No further questions, Your Honor.

4             THE COURT:  This will be recross-examination.

04:21:15   5                    RECROSS-EXAMINATION

6   BY MR. WILKE:

7   Q     Sheila was well-known in the property management

8   community, correct?

9   A     Yes.

04:21:23  10   Q     She had a very successful career, correct?

11   A     Yes, she did.

12   Q     She controlled a lot of construction contracts,

13   correct?

14   A     Yes.

04:21:32  15   Q     She earned her money by commission in fact, didn't she?

16   A     No --

17   Q     Well, the more property she managed --

18         *(Overtalking:  Unable to report.)*

19             THE COURT:  Just a moment.  There was a

04:21:42  20   speak-over.

21             So, Counsel, the question was:

22             "She earned her money by commission in

23             fact, didn't she?

24             Was your answer:  "No"?

04:21:50  25             THE WITNESS:  No.

04:21:51 1    BY MR. WILKE:

2    Q    Well, the more property she managed, the more money she

3    made --

4    A    Yes.

04:21:56 5    Q    -- through her employer, correct?

6         "Commission" was a bad word?

7    A    Yeah.

8    Q    And the more property she managed, the more control she

9    had over construction contracts, correct?

04:22:08 10        MR. SCALLY:  Objection, Your Honor.  Beyond the

11   scope of redirect.

12        THE COURT:  It's beyond, Counsel.

13        MR. WILKE:  I'm sorry?

14        THE COURT:  It's beyond the scope.

04:22:15 15   BY MR. WILKE:

16   Q    Now, you said that you were -- after reading the news

17   articles, I think your testimony on redirect examination, *I

18   was in shock that she was trying to blame everything on him.*

19   A    Yes.

04:22:37 20   Q    Now, you didn't speak to Sheila after her arrest,

21   correct?

22   A    No.

23   Q    And none of the news reports had indicated that Sheila

24   had made any statement to the authorities, did they?

04:22:50 25   A    Yes, they did.

*Deborah D. Parker, U.S. Court Reporter*

04:22:51    1    Q    In fact, the news reports reported about an informant

            2    who had made statements about Wayne --

            3    A    That's not what I read.

            4         (Court Reporter requests clarification for the

04:22:56    5         record.)

            6              THE COURT:  The question was:  In fact, the news

            7    reports reported about an informant who had made statements

            8    about --

            9              And your answer was:  "That's not what I read."

04:23:13   10              Now, that's what the court reporter has.  So why

           11    don't you re-ask the question, because we didn't get the

           12    last part of the question.  The jury heard it, but we don't

           13    have a transcript.

           14              Re-ask the question.

04:23:24   15    BY MR. WILKE:

           16    Q    Is it your testimony in court here today under oath

           17    that these newspaper stories you read on your telephone

           18    reported that Sheila made statements blaming Mr. Le?

           19    A    Yes.

04:23:40   20    Q    That's your testimony?

           21    A    She said some crazy story about having PTSD and that

           22    she -- yeah, she never -- she was blaming it all on him.

           23    Q    And you heard that from news reports, according to you

           24    on news reports?

04:24:06   25    A    So I heard it from a news report and I heard from a

04:24:09  1  person, but I can't who I heard it from.

2  Q    Well, it was these -- your testimony is that when

3  you -- that this is what prompted you to go to the police,

4  correct?

04:24:22  5  A    Yes.

6  Q    So this is what was in your mind before you went and

7  spoke to the FBI on February 3rd, correct?

8  A    What exactly are you asking?  I'm sorry.

9  Q    This statement -- this testimony that you've now come

04:24:39  10  up with on redirect examination --

11          MR. SCALLY:  Objection.  Argumentative.

12          THE COURT:  Sustained.  Stricken.

13  BY MR. WILKE:

14  Q    You testified on redirect examination that you

04:24:48  15  understood that Sheila was trying to blame everything on

16  him?

17  A    That is what I thought.  Yes.

18  Q    But you were told that by somebody?

19  A    So I -- the story about --

04:24:57  20  Q    It's a "yes" or "no" question.

21          You're saying you were told that by somebody.

22          MR. SCALLY:  Objection.

23          THE COURT:  Sustained.

24          THE WITNESS:  Yes, I was.

04:25:04  25          THE COURT:  Just a moment.  We're going to strike

*Deborah D. Parker, U.S. Court Reporter*

04:25:06   1   the question, strike the answer.  If it's going to be "yes"

2   or "no," you have to indicate at the beginning of the

3   question; otherwise, the witness is entitled to complete the

4   answer.

04:25:15   5   BY MR. WILKE:

6   Q    Is it your testimony, yes or no, that somebody told you

7   that Sheila was trying to blame everything on Mr. Le?

8   A    That was partially it, yes.

9   Q    And is it your testimony that you read something in the

04:25:32  10   news that Sheila was trying to blame everything on Mr. Le?

11   A    Yes, I did.  I didn't know it was against the law to

12   read the news.

13   Q    It's not, ma'am.

14   A    Okay.  Thank you.

04:25:51  15   Q    And you understood at the time that Sheila was charged

16   with accessory after the fact, correct?

17   A    That's what I believed, yes.

18        *(Pause)*

19            MR. WILKE:  Hold on.

04:27:20  20        *(Pause)*

21            MR. WILKE:  Your Honor, we need a sidebar.

22            THE COURT:  Excuse me for a moment, ladies and

23   gentlemen.  Just one minute.

24            Deborah, if I can see you for a moment.

04:28:27  25        *(The following was held at sidebar:)*

*Deborah D. Parker, U.S. Court Reporter*

| | |
|---|---|
| 04:38:02 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:38:06 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:38:09 | 10 |

04:38:02  1            THE COURT:  All right.  We're at sidebar.

        2            MR. WILKE:  Your Honor, on redirect examination,

        3    Mr. Scally elicited from the witness that she had read in

        4    the news that Sheila Ritze was trying to blame everything on

04:38:06  5    Wayne Le, okay.

        6            On recross-examination --

        7            THE COURT:  Well, it was more specific.  It was --

        8            MR. WILKE:  I was in shock.

        9            THE COURT:  Just a moment, Counsel.

04:38:09 10            MR. WILKE:  He went on to -- she had read this --

       11    she heard it from a friend.  Had read it in the newspaper

       12    article.  She was in shock.  It was so weird.  And there was

       13    also a statement about her claiming PTSD, so the --

       14            I'm asking at this time for a limiting instruction

04:38:16 15    to be given to the jury today while this issue is out there

       16    that what Sandra Ritze read in the news or was told by

       17    anybody else as to what Sheila Ritze said is not admissible

       18    for its truth.  And you may not consider it for its truth.

       19            THE COURT:  Well, Counsel, your position on that?

04:38:23 20            MR. SCALLY:  I believe that testimony was elicited

       21    on recross.

       22            THE COURT:  It was on recross-examination.

       23            MR. WILKE:  But the first question, Your Honor --

       24            THE COURT:  It doesn't matter when it was.  The

04:38:26 25    issue is you're now getting into newspaper accounts and

*Deborah D. Parker, U.S. Court Reporter*

04:38:27  1    articles.  And once those have come up, the question is

2    whether they are admissible or not for the truth of the

3    matter asserted to show if these statements were made.

4    That's very dangerous grounds for both of you.

04:38:32  5         On the defense side, I will caution you but let

6    you conduct your case -- through a bunch of true or not

7    true, it's going to be difficult for you to rebut.  On the

8    prosecution side, you want a grave risk of a mistrial.  Not

9    from the Court but at least an appealable issue that I don't

04:38:39 10    quite -- I'll look to both of you for wisdom, and I'll wait

11    for your respected request.

12         MR. WILKE:  My request is for a limiting

13    instruction and I'm prejudiced if this isn't given now.

14    Alternatively, I'm moving for a mistrial.  What's now

04:38:44 15    elicited by the Government, it was elicited at first in the

16    Government's redirect is that Sheila Ritze made statements

17    implicating Wayne Le.  That's why we severed her, and I was

18    not allowed to get in those.  I sought to introduce some of

19    these documents, precluded me from doing that and the

04:38:50 20    Government has elicited testimony that Sheila Ritze has

21    given incriminating statements against Wayne Le.

22         THE COURT:  I would suggest to you that it

23    actually came up in the cross-examination, but it doesn't

24    matter when it came up.  In other words, you opened the

04:38:56 25    door, quite frankly, to this examination and inquiring

*Deborah D. Parker, U.S. Court Reporter*

04:38:56   1   whether this information came from and the Government then

2   told you on cross.  I'm not finding fault.  What I am

3   saying, though, it is hearsay.  And the difficulty is in

4   giving that instruction and not for the truth of the matter

04:39:01   5   asserted.  It looks like the Court is making a value

6   judgment.  By the same token, it is hearsay, and I think

7   we're going to -- into this with a psychologist, if you

8   called a psychologist, with limiting instructions.

9              I'm going to look to both of you for wisdom on

04:39:07  10   this.

11             MR. SCALLY:  Your Honor, stipulate to an *in limine*

12   instruction.

13             MR. WILKE:  At this time?

14             MR. SCALLY:  At this time.

04:39:10  15             THE COURT:  Quite frankly, It's an appealable

16   issue that doesn't need to go up.  I think I'm going to have

17   to give this a number of things, if the defense follows

18   through with a psychologist and some of the information that

19   may be forthcoming, which I think we could all foresee,

04:39:16  20   quite frankly.  Also, the danger is if these newspaper

21   articles were requested by either of you, the Court is on

22   very shaky claims admitting them, because these newspaper

23   articles are damning and there's no way to cross-examine

24   what the press got right and what the press got wrong or the

04:39:23  25   initial information that was released.  And so, therefore, I

04:39:24  1    think that the limiting instruction should be confined,

2    though, explicitly and I'm going to have you write that out

3    for a moment.  Let's see what the Government and you will

4    accede to in just a moment.

04:39:28  5            MR. WILKE:  I'm writing right now.

6            THE COURT:  The Government gets to participate

7    also.

8            MR. SCALLY:  Thank you, Your Honor.

9            THE COURT:  Unfortunately, I have had this

04:39:30 10    situation numerous times before.  There's another way of

11    handling this, but I won't suggest it to you, because it's

12    very difficult; that is, going through each newspaper

13    article and having the Court take judicial notice, but that

14    gets the Court involved, and I'm reluctant to do that.

04:39:36 15            Let the record reflect that each counsel is

16    ferociously writing separately from one another and they

17    will compare their well-written notes to one another at

18    sidebar.  And I'm trying to cause a little bit of chuckle in

19    a serious situation right now between counsel.

04:39:41 20            Mr. Wilke, why don't you show the Government your

21    suggestion.  And I think the Government can show you theirs.

22    And I think we'll reach accommodation very quickly.  This is

23    a very simple admonition by the Court, but I want it

24    specific, because otherwise it sounds like it's a wholesale

04:39:48 25    repudiation of the witness.

*Deborah D. Parker, U.S. Court Reporter*

04:39:48  1           Show this to each other.

       2      *(Pause)*

       3           THE COURT:  Mr. Wilke, it looks like you're

       4      writing a paragraph.

04:39:50  5           Let's see.  This is taking too long.

       6      *(Pause)*

       7           THE COURT:  This is theirs.  I got it.

       8      *(Pause)*

       9           THE COURT:  Now, you two talk about this.

04:39:53 10      *(Pause)*

      11      *(The following proceedings were had in open court*

      12      *in the presence of the jury:)*

      13           THE COURT:  Counsel have reached an agreement and

      14      asked the Court to read the following to you this evening.

04:39:56 15      You've heard testimony that Sheila Ritze may have made

      16      statements about Wayne Le.  You may not consider this

      17      testimony for its truth.  Specifically, you may not consider

      18      this testimony for the truth of the statements or for the

      19      truth of the fact that Sheila Ritze made this statement.

04:40:01 20      You may only consider this testimony for considering

      21      Sandra Ritze's state of mind.

      22           Agreed to by the defense?

      23           MR. WILKE:  Yes, Your Honor.

      24           THE COURT:  And agreed to by the Government?

04:40:04 25           MR. SCALLY:  Yes, Your Honor.

04:40:05  1          THE COURT:  Counsel, on behalf of the defense?

       2          MR. WILKE:  Yes, Your Honor.  I have no further

       3    questions.

       4          THE COURT:  Now, may the witness --

04:40:07  5          MR. SCALLY:  No further questions, Your Honor.

       6    Thank you.

       7          THE COURT:  There won't be anyway, Counsel.

       8    Direct, cross, redirect, recross.

       9          All right.  Now, we're going to ask you to remain

04:40:10 10    on call.  From this point forward and throughout the day,

      11    we're asking a number of witnesses to remain available, but

      12    we'll be very polite.  I doubt that you're returning to

      13    court; and if you are, this case is going to conclude at

      14    least a week earlier than anticipated.  And as a courtesy to

04:40:16 15    you and the other witnesses, we'll be in session five days

      16    next week; but from November 20th to our resumption on

      17    December 1, we're not in session.

      18          On December 1st, 2nd and 3rd -- which is

      19    Wednesday, Thursday and Friday -- we'll be back in session.

04:40:21 20    But my expectation is that the case will go to the jury very

      21    early the week of December 8th, okay?  And if we need you,

      22    we'll find you, but I want to save additional subpoenas.

      23          You may step down.  Take the mask with you,

      24    please, and then destroy it.  All right.  Thank you.

04:40:27 25          Now, I'm going to send you home, ladies and

04:40:27  1    gentlemen.  I want to thank you.  All right.  Extraordinary

2    service on your part.

3         Please do not discuss this matter with anyone or

4    form or express an opinion about this case.  Has anybody

04:40:31  5    talked to anybody about the case so I can start all over

6    again?

7         That's a general way of saying, Don't, okay?

8    Leave the notebooks and pads on the seat you occupy.  We

9    have another matter this evening unrelated to you.

04:40:34  10   Please, drive safely.  Have a good weekend.  We'll

11   see you at 8:30 then on Monday.

12        Sir, if you would remain.  Juror No. 15, I would

13   like to speak to you.

14        Sir, if you could remain.

04:41:08  15   *(Jury exits courtroom.)*

16        *(The following proceedings were had outside the*

17        *presence of the jury:)*

18        THE COURT:  Counsel, if you will be seated for

19   just a moment.

04:41:22  20   Mr. Carlos Hernandez, by stipulation of both

21   counsel, you're excused from these proceedings, based upon

22   financial hardship.

23        We asked the jury -- the clerk to convey our

24   appreciation to your employer for coming down today.  You're

04:41:37  25   excused from these proceedings, with the admonition not to

04:41:41   1   have any conversation with this jurors in this matter, nor

           2   even your being excused today, in case you're going to the

           3   parking lot.

           4           Understood?

04:41:48   5           JUROR NO. 15:  Yes.

           6           THE COURT:  Thank you very much, sir.

           7           Counsel, is that stipulated to by the plaintiff?

           8           MR. SCALLY:  Yes.

           9           THE COURT:  And by the defendant?

04:41:56  10           MR. WILKE:  Yes, Your Honor.

          11           THE COURT:  All right.  Thank you very much.

          12       *(Juror No. 15 excused.)*

          13           THE COURT:  I don't propose to start jury

          14   instructions this weekend.  But one of the areas that you

04:42:12  15   need to anticipate is when we're going to get to those

          16   instructions.

          17           In the Government's memorandum filed on

          18   November 5th, on page 7, if you'll turn to that, lines 23

          19   through 27 -- better yet, I can more quickly read this to

04:42:53  20   you.

          21           "At end of the case, the Government may

          22           request an instruction on the lesser

          23           included offense of second degree

          24           murder.  Defense counsel has indicated

04:43:03  25           he will be objecting to such a request

*Deborah D. Parker, U.S. Court Reporter*

04:43:06   1          and requesting an instruction on the

2          lesser included offense of involuntary

3          manslaughter."

4          So regardless of your positions now, that's going

04:43:16   5    to take a little bit of time in argument and thought on all

6    of our parts.

7          Second degree murder can also be, for want of

8    better words, an inherently dangerous act.  That's not the

9    exact wording.  It can be what I call recklessness to a

04:43:39  10    higher degree.  The old example given would be:  If I was

11    driving down the street and someone started shooting into a

12    parked car and there was somebody asleep, the inherently

13    dangerous act of just shooting into the parked car, not

14    realizing another human being is present, can in fact lead

04:43:56  15    to a second degree murder.  It's commonly called "implied

16    malice aforethought."

17          Of course second degree murder also is a

18    specific-intent crime.  So there's two ways in a sense, two

19    avenues to get to second degree murder.  Voluntary

04:44:14  20    manslaughter is heat of passion.  So we already know going

21    in, if the defense is self-defense, you're entitled to argue

22    not only alternative theories, you're entitled to be

23    instructed that if they didn't accept a complete

24    self-defense, they could certainly consider heat of passion.

04:44:29  25    You're not precluded.

04:44:29  1          My initial thought is that voluntary manslaughter
          2   would be given by the Court.  And my initial impression is
          3   that second degree murder would be given by the Court as
          4   well, if requested.

04:44:38  5          Now, that's only a thought this evening.  That's
          6   not a ruling.  But if you request lesser includeds [sic],
          7   then there's a good possibility that the Court will instruct
          8   on voluntary, second and first degree murder.  I do not see
          9   any theory of involuntary manslaughter, but you can argue
04:44:57 10   that later.  Those are only impressions to send you away
         11   this weekend to work on whatever you want to.

         12          Where are you in the case, as far as the
         13   Government is concerned?  First of all, how are you and the
         14   defense holding out?

04:45:08 15          You seem very focused.

         16          MR. WILKE:  Just tired, Your Honor.

         17          THE COURT:  No, you're alert.  And, Mr. Wilke,
         18   you're doing fine.  Both of you are.

         19          I just want to check in.  How are you holding up?
04:45:21 20   This is a pretty full and complete day.

         21          MR. SCALLY:  Raring to go, Your Honor.

         22          THE COURT:  Not too much.

         23          MR. STAPLES:  I serve at the Court's pleasure.
         24   I'm doing fine.

04:45:36 25       (Laughter.)

04:45:39   1              THE COURT:  Mr. Wilke.

           2              MR. WILKE:  Well, Mr. Scally is in a much better

           3    position than I am.

           4              THE COURT:  But you've got a weekend coming up

04:45:44   5    now.

           6              Let's hear who the Government is going to call, as

           7    a courtesy, on Monday so that we're well-prepared.

           8              And you represented, but you're not held to --

           9              I think you said Vinh Doan would be next; is that

04:45:58  10    correct?

          11              MR. SCALLY:  That's correct, Your Honor.

          12              And I think -- my belief at the moment is that we

          13    would be calling Vinh Doan and then Tony Hoang and that that

          14    would probably take up Monday.

04:46:18  15              THE COURT:  Tony Hoang has presented quite a

          16    problem for the court, both in terms of the intertwined

          17    conversations that Tony Hoang had.  Part of those were the

          18    *in limine* motions where I have precluded a portion about

          19    being a hitman in future murders, which the Government has

04:46:38  20    argued goes to malice of forethought, premeditation and

          21    deliberation.  There's a portion, though -- and can I get

          22    that -- bring out the transcript for just a moment, could

          23    you?

          24              We're constantly going through these transcripts

04:46:56  25    time and time again, because this is an intertwined

04:46:59  1   conversation.  And let me lay out to you a number of places

2   where it may be inevitable that this kind of conversation is

3   coming in, so we can be prepared for arguments about why it

4   should and shouldn't.

04:47:13  5        First, I made a very cautious ruling concerning

6   the initial preclusion of the Government to argue, because

7   it's difficult to sort out being a hitman for a future

8   uncommitted crime, but there is testimony now in the record

9   that he was a collector.  I'm going to hold to that ruling,

04:47:36  10  initially, but I'll caution both of you in the *limine* motion

11  that that's an evidentiary issue and not an *in limine*

12  ruling.  So the first issue is going to be -- listen very

13  carefully, Mr. Wilke.  I'm not going to retrace this.

14       The first issue is going to be on

04:47:54  15  cross-examination, if the argument eventually becomes that

16  they don't have a relationship.  This tape shows that they

17  have an absolute relationship, an ongoing relationship.  So

18  you can expect without the Court making a ruling that that's

19  going to come in front of this Court probably as a motion

04:48:12  20  from the Government that they've alluded to, and I'm going

21  to need to make a decision depending upon the strength of

22  the cross-examination and where Mr. Wilke goes with this.

23  And that's his call.

24       The second problem is that part of this tape is

04:48:31  25  absolutely relevant.  I'm going to read the portion that

*Deborah D. Parker, U.S. Court Reporter*

132

04:48:35   1   you're not precluded from in just a moment into the record.

2   The third is, if your client is taking the stand,

3   there's some inevitability that the Government may not be

4   precluded, although there's going to be a motion for

04:48:52   5   prejudice.  So I'm just trying to foresee all the things

6   that come in front of us.  And the Government then argues:

7   Your client is taking the stand, and we're entitled to talk

8   to him about being a hitman in the future and those

9   statements made or even play a portion of the tape.

04:49:06  10   And, finally, if that isn't complicated enough

11   looking forward, if a psychologist is called, there may be

12   the motion in front of the Court that the psychologist could

13   be examined on cross-examination:  Did you consider the

14   following statements.  And the request would then be that

04:49:28  15   they're not allowed for the truth of the matter asserted;

16   that they're hearsay, et cetera.

17   I have no ruling at the present time, but I'm

18   trying to look forward to all of the things that occurred in

19   terms of fairness to both of you.  And the portion in the

04:49:45  20   transcripts, once again, that I've been going over this

21   weekend begins at Exhibit 16.  So you can look at it this

22   weekend and make a proper record before Tony Hoang

23   testifies.  Look at lines 27 through 42, on pages 15

24   LR0003487 and lines 1 through 17, on page 16, LR00034848 of

04:50:28  25   Government's Exhibit 16 to their opposition to defendant's

*Deborah D. Parker, U.S. Court Reporter*

04:50:33  1    motion to exclude evidence of defendant's other acts, which

2    is Docket 259.

3              Now, let me slow down so all of you can get this

4    over the weekend.  Before Tony Wang is called, let's have

04:50:45  5    another meet and confer so you are prepared.

6              That statement read as follows, line 27, page 15:

7              "LE:  Every scenario is different.

8              Because I'm a debt collector okay?

9              "CHS:  -- who we now know as "Hoang" --

04:51:30  10             "Yeah.

11             "LE:  I collect money.

12             "CHS:  Okay.

13             "LE:  and people give me a name.  And I

14             show up to the door with a list.  You

04:51:41  15             owe this account and burn the paper to

16             burn the evidence.  They don't know who

17             I am.

18             "CHS:  Okay.

19             "LE: They just know someone's coming.

04:51:51  20             "CHS:  Yeah."

21             THE COURT:  Now, we're on page 16:

22             "LE:  That's how they know and they pay

23             up right F-for me.  And if not then I

24             have a crew that takes them out.  I do

04:52:06  25             it or my crew does it.

*Deborah D. Parker, U.S. Court Reporter*

04:52:09  1          "CHS:  *That guy-guy, that day, he went*
          2          *with you?*
          3          "LE:  I don't know.  I'm not admitting
          4          nothing.  I'm talking about things, ok?
04:52:20  5          The other way, I will never admit to
          6          anything, eh?
          7          CHS:  Uh-huh.
          8          LE:  You know, okay?
          9          CHS:  [UI]
04:52:32 10          "LE:  I don't know.  I'm just admitting
         11          other issues, other areas that I know
         12          about that people -- when I run into
         13          trouble that's how I know. I'm supposed
         14          to protect both sides."
04:52:44 15          There's a strong argument that that pertains to
         16  the present murder and not saying anything about it.
         17          I'm reserving that judgment so we have a fuller
         18  argument, so you're alert over the weekend to pay very close
         19  attention to that.  I may allow the Government to get that
04:52:58 20  in on your direct.  I am still precluding the rest about the
         21  hitman, et cetera.  And I still believe that there's
         22  intertwining here where the prejudice initially outweighs
         23  the probative value.  Any argument that there is not a
         24  strong relationship and an ongoing relationship that
04:53:14 25  misleads the jury -- not intentionally, by the way, that

*Deborah D. Parker, U.S. Court Reporter*

04:53:18  1   misleads the jury that this is some informant who just came
        2   forward, flippantly, isn't appropriate.  Hoang and Le have a
        3   strong relationship, as the tapes show.  So I'm going to be
        4   cautious and still preclude the Government.  But as I said
04:53:34  5   in my *in limine* motion, this is subject to change.  This is
        6   an evidentiary issue.
        7           And I caution both of you that whether Mr. Le
        8   takes the stand or not is critical, because I don't see,
        9   eventually, how this evidence isn't going to be coming in,
04:53:52 10   if Le is on the stand when the Government moves to introduce
       11   and to question Mr. Le, including even playing a portion of
       12   the tape.
       13           So let me leave that to you tactically for a
       14   moment -- transparency, and I keep examining this area
04:54:05 15   because there is a strong indication that it goes to
       16   premeditation and deliberation.
       17           So I want to wish you a good weekend.  We have
       18   another civil matter this evening that we need to resolve.
       19           MR. WILKE:  I need one more point, Your Honor --
04:54:20 20           THE COURT:  Mr. Wilke.
       21           MR. WILKE:  -- before we leave for the day.
       22           When we were in sidebar in the back, my client
       23   wasn't there, but I did suggest a mistrial.  I would move
       24   for a mistrial based on the eliciting of testimony from
04:54:33 25   Sandra Ritze about what Sheila Ritze may have said about

*Deborah D. Parker, U.S. Court Reporter*

136

04:54:38  1   Wayne Le.  I would make that motion now.

2          I understand the Court gave the limiting

3   instruction requested by the defense, but I'm making that

4   motion now for my record.

04:54:46  5          THE COURT:  And Mr. Le wasn't present.  I think he

6   deserves that courtesy to know about your able request.

7          MR. WILKE:  I would ask for a ruling on my motion

8   for a mistrial, Your Honor.

9          THE COURT:  Denied.

04:54:56  10          All right.  Now, Counsel, is there anything

11   further this evening?

12          MR. WILKE:  Nothing further, Your Honor.

13          THE COURT:  For the Government?

14          MR. SCALLY:  Nothing further.

04:55:02  15          THE COURT:  Mr. Le, all of you have a good

16   weekend.

17          Get rested, because next week will be a pretty

18   full --

19          MR. STAPLES:  Is it okay to leave things neatly?

04:55:08  20          THE COURT:  Yes.  We've got some civil matters

21   this evening and we've got some civil matters in the morning

22   on Monday.  They're fine off to the side.  I can't imagine

23   why anybody would be --

24          MR. STAPLES:  Thank you, Your Honor.

04:55:20  25          THE COURT:  Good night now.

*Deborah D. Parker, U.S. Court Reporter*

04:55:21 1      *(At 4:55 p.m., proceedings were adjourned.)*

2                              -oOo-

3

4                          CERTIFICATE

04:55:21 5          I hereby certify that pursuant to Section 753,

6      Title 28, United States Code, the foregoing is a true and

7      correct transcript of the stenographically reported

8      proceedings held in the above-entitled matter and that the

9      transcript page format is in conformance with the

04:55:21 10     regulations of the Judicial Conference of the United States.

11

12     Date:  January 1, 2021

13

14

04:55:21 15                       _____/s/DEBORAH D. PARKER_____
                                  DEBORAH D. PARKER, OFFICIAL REPORTER
16

17

18

19

20

21

22

23

24

25

*Deborah D. Parker, U.S. Court Reporter*