**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 20-00002-(B)-DOC |
| | ) Day 5, Volume III |
| HOANG XUAN LE, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

MONDAY, NOVEMBER 15, 2021

1:03 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

TRACY L. WILKISON
ACTING UNITED STATES ATTORNEY

SCOTT M. GARRINGER
ASSISTANT UNITED STATES ATTORNEY
CHIEF, CRIMINAL DIVISION

GREGORY S. SCALLY
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3592
gregory.scally@usdoj.gov

GREGORY STAPLES
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3534
gregory.staples@usdoj.gov

FOR THE DEFENDANT, HOANG XUAN LE:

CRAIG WILKE
LAW OFFICE OF CRAIG WILKE
305 NORTH HARBOR BOULEVARD
SUITE 216
FULLERTON, CALIFORNIA 92832
(714) 870-8900
craig@craigwilkelaw.com

SHEILA S. MOJTEHEDI
STRADLING, YOCCA, CARLSON & RAUTH, P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4000
sheila.mojtehedi@gmail.com

```
 1                          I N D E X

 2

 3    PLAINTIFF'S WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 4     TUAC "TONY" HOANG          47      4      37        61
                                                 56
 5

 6     NATHANIEL DINGLE           71

 7

 8                        E X H I B I T S

 9    PLAINTIFF'S EXHIBITS:              IDENTIFICATION  EVIDENCE

10     47     Audio Recording of Wayne Le                 58
              and Tony Hoang taken by
11            Tony Hoang

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**SANTA ANA, CALIFORNIA; MONDAY, NOVEMBER 15, 2021; 1:03 P.M.**

-oOo-

*(The following proceedings were had in open court*

*in the presence of the jury:)*

THE COURT:  All right.  The jury is present, the alternates -- all counsel will be seated -- the defendant and the investigating agency.

MR. WILKE:  Thank you, Your Honor.

TUAC "TONY" HOANG, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. WILKE:  *(Continuing)*

Q    Mr. Hoang, before lunch we were talking about the October 18 text exchange that you were having with Mr. Le earlier in the day.

Do you recall that?

A    Yes.

Q    And during that text exchange, he indicated to you that if you came over, he would take you over to his friend's shop, over I think on Harbor and First, in Santa Ana; is that correct?

A    No.

Q    I'm going to direct your attention to what's been previously admitted as Exhibit 136, at page 7.  This is the text exchange between you and Mr. Le that day, right?

Do you see this?

*Deborah D. Parker, U.S. Court Reporter*

01:05:04   1   A    Those are his texts.  Can you show me the blue text?

2   Q    The green ones are your text, correct?

3        MR. SCALLY:  Objection.  I just ask the witness be

4   made more -- messages that may --

01:05:32   5        THE WITNESS:  10/16 is:  "Are you home?"

6        10/17 is "My boys..."

7        Yes, 10/18, at 9:47 a.m., I ask him if he was

8   okay.

9   BY MR. WILKE:

01:05:44  10   Q    Right.

11   A    Yes, it is.

12   Q    Those were your texts to Mr. Le, correct?

13   A    Correct.

14   Q    Okay.  The 10/17 text from the day before:

01:05:51  15        "My boys from out of state need 3-4

16        samples of whatever to show them."

17        That's your buyer, correct?  When you say "my

18   boys," that's your buyer, correct?

19   A    Yes.

01:06:04  20   Q    You were asking Mr. Le for three to four samples to

21   show your buyer, correct?

22   A    Correct.

23   Q    Okay.  And then Mr. Le responds at about 3:15 in the

24   afternoon, 3:16 in the afternoon:

01:06:20  25        "When you got off, we're going to go to

6

01:06:23  1            one of my buddy shop on Harbor and

2            first?"

3  A    That's what he said.

4  Q    You understood that to mean Harbor and First in

01:06:33  5  Santa Ana, correct?

6  A    Correct.

7  Q    And then you responded by saying that you did not want

8  to meet no one, correct?

9  A    Correct.

01:06:54  10  Q    And Mr. Le responded by saying "okay," correct?

11  A    Yes.

12  Q    And then you told Mr. Le you would head over around

13  6:30, correct?

14  A    Yes.

01:07:09  15  Q    Now, you did go over to his house later that day,

16  correct?

17  A    Yes.

18  Q    And that is his house on Third Street, in

19  Fountain Valley, correct?

01:07:31  20  A    Yes.

21  Q    And you had been inside that house before, correct?

22  A    Yes.

23  Q    And when you would go to that house, you would go

24  upstairs to his bedroom, correct?

01:07:41  25  A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 01:07:43 | 1 | Q    And he had a lock on the door of his bedroom, correct? |
| | 2 | A    Yes. |
| | 3 | Q    And that was the house that he lived in at the time |
| | 4 | with his mother and older sister, correct? |
| 01:07:56 | 5 | A    Yes. |
| | 6 | Q    His sister, you say, that kept a gun in her room that |
| | 7 | he showed you? |
| | 8 | MR. SCALLY:  Objection.  Misstates the testimony. |
| | 9 | THE COURT:  You can answer the question, sir. |
| 01:08:05 | 10 | THE WITNESS:  Can you repeat the question? |
| | 11 | BY MR. WILKE: |
| | 12 | Q    The sister -- you testified on direct examination that |
| | 13 | he showed you a gun that he had kept in his sister's |
| | 14 | bedroom? |
| 01:08:18 | 15 | THE COURT:  The objection is overruled. |
| | 16 | You can answer the question. |
| | 17 | THE WITNESS:  Yes.  That's correct. |
| | 18 | BY MR. WILKE: |
| | 19 | Q    When you got to his house, he told you that he was |
| 01:08:33 | 20 | going down to Irvine, correct? |
| | 21 | A    Yes. |
| | 22 | Q    He was not going over to Harbor and First to his |
| | 23 | buddy's shop there, correct? |
| | 24 | A    Correct. |
| 01:08:45 | 25 | Q    He was going to a restaurant down at the Spectrum? |

*Deborah D. Parker, U.S. Court Reporter*

01:08:49  1    A    Yes.

       2    Q    And he told you that he was meeting with somebody who

       3    was a marijuana supplier, correct?

       4    A    He said he had somebody -- the product's there in

01:09:06  5    Irvine.

       6    Q    He said he had some somebody who could supply the

       7    marijuana that you wanted for your buyers that were coming

       8    in, in the next few days?

       9    A    Correct.

01:09:23 10    Q    And based on that, you agreed to go with him, correct?

      11    A    Yes.

      12    Q    Now, it was your testimony that during the drive down

      13    to the Irvine Spectrum, you overheard Mr. Le's end of a

      14    conversation that he had with somebody named "Shawn"?

01:10:15 15    A    Correct.

      16    Q    Now, you also testified that you met somebody named

      17    "Shawn" down at the restaurant in Irvine, correct?

      18    A    Correct.

      19    Q    Was it your understanding that was the same Shawn that

01:10:32 20    Mr. Le had been speaking to?

      21    A    No.

      22    Q    The Shawn that you met down in the restaurant was

      23    Asian, correct?

      24    A    Correct.

01:10:42 25    Q    You later met somebody else named Shawn, who was a

*Deborah D. Parker, U.S. Court Reporter*

01:10:46  1    Caucasian?

2    A    Correct.

3    Q    And it -- later, you came to understand that the

4    Caucasian Shawn was the one that you understood Mr. Le to be

01:10:58  5    talking to on the phone when you were driving down to the

6    restaurant, correct?

7    A    Correct.

8    Q    And in this conversation that you heard, you heard

9    Mr. Le tell the Caucasian Shawn, who you later understood to

01:11:27 10    be the Caucasian Shawn, that he was meeting with Alex,

11    correct?

12    A    Yes.

13    Q    And you understood Alex to be James' brother, correct?

14    A    Yes.

01:11:43 15    Q    Okay.  You overheard Mr. Le tell this person on the

16    other end of the phone that he was going to tell Alex that

17    he had not got on the boat with his brother, correct?

18    A    Correct.

19    Q    Now, your testimony on direct examination was that,

01:12:19 20    after Mr. Le got off the phone with this person you

21    understood to be the Caucasian Shawn, you asked him what

22    that was about or what really happened, correct?

23    A    Yes.

24    Q    And it was your testimony that Mr. Le told you that he

01:12:47 25    had shot the guy on the boat, because he did not pay up.

*Deborah D. Parker, U.S. Court Reporter*

01:12:50   1            Was that your testimony?

         2    A    Yes.

         3    Q    Now, you also testified that Mr. Le told you that after

         4    shooting the man on the boat, he tied weights to his feet

01:13:44   5    and threw him overboard, correct?

         6    A    Yes.

         7    Q    Now, you first spoke to the FBI about this particular

         8    car ride on November 9th, 2019, correct?

         9    A    Yes.

01:14:32  10    Q    That was the same day you agreed to become the

        11    confidential informant for the FBI, correct?

        12    A    Yes.

        13    Q    And during this meeting with the FBI, they talked to

        14    you about the car ride down there, correct?

01:15:01  15    A    Yes.

        16    Q    And you told them, to the best of your recollection,

        17    what you recalled Mr. Le saying, correct?

        18    A    Yes.

        19    Q    You did not tell them that Mr. Le told you at that time

01:15:29  20    that he had tied the person up and threw him overboard, did

        21    you?

        22    A    I don't recall.

        23    Q    Would it refresh your memory to take a look at the

        24    report of the interview?

01:15:45  25    A    Yes.

| | | |
|---|---|---|
| 01:16:00 | 1 | MR. WILKE:  May I approach, Your Honor? |
| | 2 | THE COURT:  You may. |
| | 3 | MR. WILKE:  Thank you. |
| | 4 | *(Pause)* |
| 01:16:09 | 5 | BY MR. WILKE: |
| | 6 | Q    If you could read this paragraph, right here |
| | 7 | *(indicating)* -- |
| | 8 | A    Okay. |
| | 9 | Q    -- to yourself. |
| 01:16:52 | 10 | *(Pause)* |
| | 11 | BY MR. WILKE: |
| | 12 | Q    Having read that portion of the report, does that |
| | 13 | refresh your memory about what you told the FBI agents on |
| | 14 | November 9th, 2019? |
| 01:17:18 | 15 | A    Yes, that does refresh my memory. |
| | 16 | Q    It does?  Yes? |
| | 17 | I'm sorry.  I didn't get your answer, sir. |
| | 18 | A    Yes. |
| | 19 | Q    Okay.  And is it, in fact, true that you did not tell |
| 01:17:31 | 20 | the FBI that during that car ride down to Irvine Mr. Le told |
| | 21 | you he tied up this person after shooting him?  You did not |
| | 22 | say -- |
| | 23 | A    I did not mention it, yes. |
| | 24 | Q    You also testified on direct examination, on the car |
| 01:18:03 | 25 | ride down to Irvine, you heard Mr. Le tell Caucasian Shawn |

01:18:10   1    to get rid of the .38?

2    A    Correct.

3    Q    When you spoke to the FBI on November 9th, you didn't

4    tell them that, did you?

01:18:23   5    A    I don't recall.

6    Q    Would it -- you just read that portion --

7    A    Oh, yes.  Yes, I didn't tell them about the .38.

8    Q    So you did not tell the FBI, on November 9th, that you

9    heard Mr. Le tell this person you knew as Shawn to get rid

01:18:44  10    of the .38, correct?

11    A    Correct.

12    Q    Now --

13         (Pause)

14    BY MR. WILKE:

01:19:35  15    Q    You testified on direct examination that during this

16    car ride down to Irvine, Mr. Le told you after the call that

17    the man who was shot owed him 30- to $40,000, correct?

18    A    Correct.

19    Q    Now, again, in this meeting you had with the FBI on

01:19:59  20    November 9th, you didn't tell them that, did you?

21    A    No, I did not.

22    Q    And you were meeting with the FBI at that time in order

23    to become a confidential informant, correct?

24    A    At that time I did not know I was going to be a

01:20:24  25    confident informant [sic] when I was telling that story.

01:20:27  1   Q    No, but you had attempted to become kind of a private

       2   informant for Alex Dao, hadn't you?

       3   A    For Alex's --

       4   Q    For Alex?

01:20:40  5   A    Yes.

       6   Q    You had reached an agreement with Alex to try and

       7   obtain evidence against Mr. Le, correct?

       8   A    That's correct.

       9   Q    And it was after a meeting that you had with Alex and

01:21:01 10   an undercover FBI agent on November 9th, 2019 that you were

      11   first interviewed by the FBI about what Mr. Le supposedly

      12   told you, correct?

      13   A    That's correct.

      14   Q    And before that interview, the FBI had asked you about

01:21:26 15   whether you would consider becoming an informant, correct?

      16   A    Before November 9th?

      17   Q    Well -- let me back up.  On November 9th, you did a

      18   meeting with Alex Dao and FBI -- excuse me, Coast Guard

      19   Special Agent Harlan Espinoza, who was posing as a private

01:21:54 20   investigator, correct?

      21   A    Correct.

      22   Q    And at the end of that meeting, the Coast Guard Agent

      23   Espinoza, you were advised that he was in fact a federal

      24   law enforcement officer, correct?

01:22:09 25   A    I thought he was a PI, when I first met him; meaning a

*Deborah D. Parker, U.S. Court Reporter*

01:22:13   1   private investigator.

2   Q    At the beginning of the meeting, you were told that he

3   was a PI, correct?

4   A    Correct.

01:22:19   5   Q    But at the end of the meeting, they told you, *No, I'm a*

6   *federal agent* --

7   A    No.

8   Q    -- correct?

9         Well, following that meeting that same day?

01:22:28   10   A    I never met him after that meeting.

11   Q    You did meet with the FBI after that meeting, though,

12   correct?

13   A    Yes, I did.

14   Q    How long after the meeting with Mr. Espinoza?

01:22:37   15   A    I believe it was a couple of days.  I don't recall.

16   Q    It was in fact the same day, wasn't it?

17   A    I don't recall.

18   Q    The meeting with Alex Dao and Special Agent Espinoza,

19   who was acting in an undercover capacity, as a private

01:23:12   20   investigator, that occurred on November 9th, 2019, didn't

21   it?

22   A    Yes.

23   Q    And your first interview with FBI Agent Andrew Cho,

24   that also occurred on February -- excuse me, November 9th,

01:23:36   25   2019, correct?

*Deborah D. Parker, U.S. Court Reporter*

```
01:23:38   1              MR. SCALLY:  Objection.  Asked and answered.
           2              THE COURT:  Overruled.
           3              You can answer the question, sir?
           4              THE WITNESS:  What was the question, again, sir?
01:23:46   5    BY MR. WILKE:
           6    Q    Your first meeting with federal law enforcement, your
           7    first interview was with Special Agent Andrew Cho, correct?
           8    A    Correct.
           9    Q    And that also occurred on November 9th, 2019, correct?
01:23:59  10    A    Okay.  Yes.
          11    Q    The very same day that you had met with Agent Espinoza,
          12    who was acting undercover as a private investigator?
          13    A    Okay.
          14    Q    Correct?
01:24:09  15    A    Yes.
          16    Q    And the meeting with FBI Agent Cho occurred after the
          17    meeting with Espinoza and Alex Dao, correct?
          18    A    Correct.
          19    Q    And so by the time you were meeting with Agent --
01:24:24  20    Special Agent Cho of the FBI, you then realized that
          21    Alex Dao and the person you believed to be his investigator
          22    were working with the FBI, correct?
          23    A    Yes.
          24              MR. WILKE:  May I have a moment, Your Honor?
01:25:07  25              (Pause)
```

16

01:25:17  1    BY MR. WILKE:

       2    Q    So let's talk a little bit about why you were meeting

       3    with Alex Dao and this undercover Coast Guard investigator

       4    posing as a private investigator, okay?

01:25:39  5    A    Okay.

       6    Q    When you went down to the Irvine Spectrum with

       7    Wayne Le, on October 18, 2019, you were introduced to two

       8    people, correct?

       9    A    Correct.

01:25:57 10    Q    One person was Shawn, who's been described as the Asian

      11    Shawn, correct?

      12    A    Yes.

      13    Q    And one person was Alex Dao, correct?

      14    A    Yes.

01:26:25 15    Q    And you understood that you were meeting with these

      16    people, because this was a potential supplier for marijuana

      17    that you wanted to purchase for your buyers that were coming

      18    in, in the next few days, correct?

      19    A    Yes.

01:26:43 20    Q    You understood that this person, Shawn -- Asian Shawn

      21    was an associate of Alex Dao, correct?

      22    A    Yes.

      23    Q    And you understood that Mr. Dao and Asian Shawn had

      24    access to large quantities of marijuana for sale, correct?

01:27:11 25                  MR. SCALLY:  Objection.  Vague as to "Asian Shawn"

*Deborah D. Parker, U.S. Court Reporter*

01:27:17  1   or Alex Dao.

2           THE COURT:  Overruled.

3           MR. SCALLY:  Compound.

4           THE COURT:  Do you understand the question, sir.

01:27:24  5           THE WITNESS:  No, I don't.

6           THE COURT:  All right.  Just re-ask it, Counsel.

7   BY MR. WILKE:

8   Q    You understood that Asian Shawn and Alex Dao had the

9   ability to supply large quantities of marijuana, correct?

01:27:34  10          MR. SCALLY:  Same objection.  Asked and answered

11  and 403.

12          THE COURT:  Overruled.

13          You can answer the question, sir.

14          THE WITNESS:  I understood only Asian Shawn had

01:27:45  15  the marijuana.  Not Alex.

16  BY MR. WILKE:

17  Q    Well, you understood after meeting with Alex and

18  Asian Shawn that Asian Shawn was the person you were

19  directed to contact, correct?

01:28:03  20  A    Correct.

21  Q    And you were directed to contact Asian Shawn at a

22  house, in Irvine, at 66 Logan Street, correct?

23  A    Yes.

24  Q    But you also understood that Alex Dao was Asian Shawn's

01:28:29  25  boss, if you will?

*Deborah D. Parker, U.S. Court Reporter*

```
01:28:30   1              MR. SCALLY:  Same objection, Your Honor.
           2              THE COURT:  Overruled.
           3              You can answer the question.
           4              THE WITNESS:  No.
01:28:35   5   BY MR. WILKE:
           6   Q    A little more than two weeks after this meeting, you
           7   met again with Alex Dao at the same restaurant, correct?
           8   A    Yes.
           9   Q    That was on November 4, 2019, correct?
01:29:26  10   A    Yes.
          11   Q    And during that meeting with Alex Dao, you discussed
          12   marijuana, correct, with him?
          13   A    Yes.
          14   Q    And, in fact, you asked Alex Dao during that
01:29:47  15   November 4, 2019 meeting, quote:  "Does Shawn hold all the
          16   packs for you?"
          17              Do you recall asking him that?
          18   A    I don't recall.
          19   Q    Would it refresh your memory to take a look at the
01:30:04  20   transcript of that meeting between you and Alex Dao?
          21   A    Yes.
          22       (Pause)
          23              MR. WILKE:  May I approach, Your Honor?
          24              THE COURT:  You may.
01:31:18  25       (Pause)
```

*Deborah D. Parker, U.S. Court Reporter*

01:31:29  1    BY MR. WILKE:

       2    Q    Let me show you that.  Read the highlighted portion.

       3          THE WITNESS:  *(Witness so complies.)*

       4    BY MR. WILKE:

01:31:46  5    Q    After read that transcript, the meeting with Alex Dao

       6    on November 4, 2019, does that refresh your memory about

       7    whether you asked Alex, quote:  "So does Shawn hold all the

       8    packs for you?"

       9    A    Yes, I do.

01:32:04 10    Q    You asked him that, correct?

      11    A    Yes.

      12    Q    Because you understood Alex Dao to be Shawn's boss in

      13    their marijuana distribution, didn't you?

      14    A    No.  That's -- I would call -- I wouldn't call Alex as

01:32:24 15    Shawn's boss.

      16    Q    Well, you did ask Alex if Shawn was the person who

      17    holds the packs for him, didn't you?

      18    A    Yes, I did.

      19    Q    And in your experience distributing marijuana, it's not

01:32:39 20    uncommon for somebody to have somebody else hold the drugs

      21    for them, correct?

      22    A    Can you repeat the question?

      23    Q    In your experience dealing drugs, it's not uncommon to

      24    have somebody else hold the drugs for you, correct?

01:33:01 25    A    It's not uncommon.

01:33:03  1    Q    Yes.  So in case things go wrong, you're not the one

          2    holding the drugs, correct?

          3    A    Correct.

          4    Q    And that's in fact why you asked Alex, quote, "Does

01:33:14  5    Shawn hold all the packs for you," isn't it?

          6    A    That's why I asked him, yes.  I was curious if he was

          7    holding -- if he was Shawn's --

          8    Q    Now, you came to learn that Alex had clients that he --

          9    he called them "clients," who had warehouses full of

01:33:58 10    marijuana, correct?

         11    A    Yes.

         12    Q    That these clients, essentially, ran indoor marijuana

         13    grow operations out of warehouses, correct?

         14              MR. SCALLY:  Objection.  Relevance.  403.

01:34:12 15              THE COURT:  Overruled.

         16    BY MR. WILKE:

         17    Q    That's what you understood these warehouses were for,

         18    right, to run indoor marijuana grow houses, correct?

         19    A    Yes.

01:34:20 20    Q    And that's how Alex and Asian Shawn had access to large

         21    supplies of marijuana to sell, correct?

         22    A    Correct.

         23    Q    Going back to October 18th, 2019, when you went down to

         24    the Robata Wasa Japanese Restaurant at the Irvine Spectrum

01:35:02 25    with Wayne Le and met with Alex Dao and Shawn -- the Asian

*Deborah D. Parker, U.S. Court Reporter*

01:35:09  1    Shawn, okay?

        2    A    Okay.

        3    Q    During that meeting, did -- Wayne Le went and sat at

        4    the bar, correct?

01:35:21  5    A    Yes.

        6    Q    And you sat with him, correct?

        7    A    I sat next to him, yes.

        8    Q    And at some point during that meeting, Alex Dao came in

        9    from outside, correct?

01:35:33 10    A    Yes.

       11    Q    And you heard Wayne Le and Alex Dao talking, correct?

       12    A    Bits and pieces.

       13    Q    But what you heard was Wayne Le telling Alex Dao that

       14    he did not know where his brother was, correct?

01:35:57 15    A    Yes.

       16    Q    After that meeting, Wayne Le gave you the number and

       17    contact information for Asian Shawn, correct?

       18    A    Yes.

       19    Q    And you reached out to Asian Shawn to explore the

01:36:42 20    possibility of doing a marijuana deal, correct?

       21    A    Yes.

       22    Q    But I think you testified that the price was too high

       23    and you didn't want to buy marijuana from him, because they

       24    wanted too much money, correct?

01:36:57 25    A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

22

01:36:59  1    Q    It was your testimony that you did not follow through

2    on a marijuana deal with Asian Shawn because the price was

3    too high?

4    A    Correct.

01:37:11  5    Q    You, though, did reach out yourself and call Alex Dao,

6    correct?

7    A    I myself reached out to Shawn first to get the phone

8    number to Alex Dao.  And then, yes, I did reach out to Alex.

9    Q    So you got Alex Dao's phone number from Asian Shawn?

01:37:38 10    A    Yes.

11    Q    And you first called Alex on Friday, October 25th,

12    correct?

13    A    Yes.

14    Q    One week after you met him the previous Friday at the

01:38:08 15    Sushi restaurant?

16    A    Yes.

17    Q    Yes?

18    A    Yes.

19    Q    Now, Alex told you during this call that he had been

01:38:28 20    looking for his brother, correct?

21    A    Yes.

22    Q    And he told you during this call that a private

23    investigator had some information that his brother may have

24    been located in San Diego, or something like that.

01:38:50 25         Do you recall that?

*Deborah D. Parker, U.S. Court Reporter*

01:38:50   1    A    Yes.

           2    Q    And you told him that you had heard something else from

           3    Wayne, correct?

           4    A    Yes.

01:39:02   5    Q    But you didn't -- you weren't specific at that time,

           6    were you?

           7    A    No.

           8    Q    Now, after that first call, you continued to contact

           9    Alex Dao, correct?

01:39:18  10    A    Yes.

          11    Q    You sent him texts and placed calls to him, correct?

          12    A    Yes.

          13    Q    And you told him during a second call that you had with

          14    him that Wayne Le had told you the whole story that day that

01:39:45  15    you had met with him, correct?

          16    A    Yes.

          17    Q    And Alex Dao arranged and you arranged to meet at the

          18    Robata Wasa restaurant at Irvine Spectrum, on Monday,

          19    November 4, 2019, correct?

01:40:08  20    A    Yes.

          21    Q    This was after you told Alex Dao that he was not going

          22    to find his brother, correct?

          23    A    Yes.

          24    Q    Now, when you arrived at the restaurant, you came with

01:40:51  25    a woman, correct?

```
01:40:53    1    A      Yes.

            2    Q      Is that your wife?

            3              MR. SCALLY:  Objection.  Relevance.  403.

            4              THE COURT:  Counsel.  Relevance?

01:41:00    5              MR. WILKE:  The name of the woman?

            6              We have a percipient witness to a material event,

            7    Your Honor.

            8              MR. SCALLY:  Same objection, Your Honor.

            9              THE COURT:  You can answer the question.

01:41:10   10              THE WITNESS:  She was my girlfriend at that time.

           11    BY MR. WILKE:

           12    Q      She was your girlfriend?

           13    A      Yes.

           14    Q      Julie?

01:41:16   15    A      Yes.

           16    Q      Did you tell Julie about why you were meeting with

           17    Alex Dao?

           18              MR. SCALLY:  Objection.  Relevance.  403.

           19    Hearsay.

01:41:23   20              THE COURT:  Overruled.

           21              THE WITNESS:  Not in full details, no.

           22    BY MR. WILKE:

           23    Q      But some detail, correct?

           24    A      Yes.

01:41:38   25    Q      And when you and Julie arrived at the restaurant,
```

*Deborah D. Parker, U.S. Court Reporter*

01:41:46  1    Alex Dao was questioning how important this meeting was,

        2    correct?  Like, *Why am I meeting with you?  Why is this*

        3    *important,* correct?

        4    A    Yes.

01:41:57  5    Q    And you told him, quote:  "Your brother took two, three

        6    bullets" --

        7                THE COURT:  Counsel, closer to the mic.  And I

        8    couldn't hear.  I apologize.

        9                Thank you.

01:42:05 10    BY MR. WILKE:

       11    Q    You told Alex Dao, quote:  "Your brother took two,

       12    three bullets.  That's how important it is," right?

       13    A    Yes.

       14    Q    You wanted Alex Dao to believe that you had valuable

01:42:16 15    information about the whereabouts and disappearance of his

       16    brother, right?

       17    A    Yes.

       18    Q    You told Alex Dao, though, after this comment about him

       19    taking two or three bullets, you told him, quote:  "If you

01:42:36 20    want to know more details, I want some mint."

       21                Do you recall telling him that?

       22    A    "I want some mint," yes.

       23    Q    And by "mint," you meant money, correct?

       24    A    Correct.

01:43:08 25    Q    You told Alex Dao that Wayne Le had told you the whole

*Deborah D. Parker, U.S. Court Reporter*

01:43:12   1   story, correct?

2   A     Yes.

3   Q     You told Alex Dao that you had a recording of Wayne

4   that is important.

01:43:24   5          Do you recall that?

6   A     Yes.

7   Q     You, in fact, did not have a recording of Wayne telling

8   you that he had shot Alex's brother over a debt and thrown

9   him overboard after tying him up, did you?

01:43:42   10   A     No, I did not.

11   Q     In fact, through all of your meetings with Wayne Le,

12   both before and after you became a confidential informant

13   for the FBI, you never recorded a meeting in which Wayne Le

14   told you he shot James Dao, tied him up and threw him

01:44:01   15   overboard, correct?

16   A     Correct.

17   Q     You did proceed to tell Alex some details about what

18   you claim Wayne told you in the car, correct?

19   A     Yes.

01:44:33   20   Q     But you told him that if he wanted more information,

21   what you wanted was to get a house.

22          Do you recall that?

23   A     Yes.

24   Q     And by "house," you meant a residence that you could

01:44:50   25   use to grow indoor marijuana, correct?

*Deborah D. Parker, U.S. Court Reporter*

27

01:44:53  1    A    Yes.

          2    Q    Because you had been building out residence for indoor
          3    marijuana grows for other people, correct?

          4    A    Yes.

01:45:03  5    Q    That's what you had been doing for work, correct?

          6    A    Yes.

          7    Q    And you realized that there was a lot of money to be
          8    made doing this, correct?

          9    A    Yes.

01:45:12 10    Q    And you wanted to do this for yourself, correct?

         11    A    Yes.

         12    Q    Start your own business, if you will?

         13    A    Yes.

         14    Q    During this meeting in which you were offering to get
01:45:36 15    information and provide it to Alex Dao, in exchange for him
         16    setting you up in a marijuana growing operation, Alex Dao
         17    told you, quote:  "It doesn't matter how many houses you
         18    need, I could hook it all up," correct?

         19    A    Yes.

01:45:56 20    Q    He led you to believe he would do this for you,
         21    correct?

         22    A    Yes.

         23    Q    He promised you -- to set you up in your own marijuana
         24    growing operation, correct?

01:46:09 25    A    I don't think he said *I promise,* but --

01:46:10   1          *(Overtalking:   Unable to report.)*

           2    BY MR. WILKE:

           3    Q     He told --

           4              THE COURT:  Just a moment.  We had a talkover.

01:46:18   5              Did you get the full question?

           6              THE COURT REPORTER:  No.

           7              THE COURT:  Re-ask the question, Counsel.  There

           8    was a talkover.

           9    BY MR. WILKE:

01:46:24  10    Q     Alex Dao told you that in exchange for you getting

          11    information about Wayne Le's involvement in his brother's

          12    disappearance, he would set you up in a marijuana grow

          13    operation, correct?

          14    A     Yes.

01:46:52  15    Q     Now, Alex, even at this meeting, continued to press for

          16    additional details, correct?

          17    A     Yes.

          18    Q     But you -- before you would provide him with any

          19    additional details, you wanted some cash, correct?

01:47:14  20    A     Yes.

          21    Q     You asked him when he asked you for additional details,

          22    "if you can break off like 5G's right now," right?

          23    A     Yes.

          24    Q     You wanted 5,000 cash from him right then and there in

01:47:39  25    the sushi restaurant, correct?

*Deborah D. Parker, U.S. Court Reporter*

01:47:41   1    A    Yes.

2    Q    And Alex said he only had 2,000 on him, correct?

3    A    Yes.

4    Q    And he offered you that 2,000, didn't he?

01:48:01   5    A    Okay.  Yes.

6    Q    Yes?

7    A    I don't recall.

8         *(Pause)*

9    BY MR. WILKE:

01:49:27  10    Q    Would it refresh your memory to take a look at part of

11   the transcript from that meeting?

12   A    Yes.

13        *(Pause)*

14        MR. WILKE:  May I approach, Your Honor?  I'm

01:49:44  15   sorry.

16        THE COURT:  You may.

17        *(Pause)*

18   BY MR. WILKE:

19   Q    Having read that portion of the transcript of your

01:50:11  20   November 4, 2019 meeting, does that refresh your memory

21   about what Alex told you about giving you money right then?

22   A    It didn't say he was going to give me the money right

23   then.  It said that he can get me 2,00 and 3,000 later, but

24   it wasn't -- I did not see it as he had 2,000 in his pocket

01:50:37  25   right there to give to me, no.

*Deborah D. Parker, U.S. Court Reporter*

01:50:39   1   Q    Okay.  So what he said to you was, "I can maybe get

       2   2,000 for you and then another 3,000 after.  Is that okay?"

       3   A    Yes.  That's what he said.

       4   Q    You told Alex that you would -- could get a recording

01:51:27   5   of Wayne Le confessing to this, correct?

       6   A    Yes, I did say that.

       7   Q    You told him that --

       8        THE COURT:  Just a minute.  The witness is going

       9   to take a drink of water.

01:51:45  10        MR. WILKE:  Okay.

      11        *(Pause)*

      12   BY MR. WILKE:

      13   Q    Are you ready?

      14   A    Yes.

01:52:18  15   Q    But you told him you would only record -- you would not

      16   record anything and, quote:  "Not until I see money."

      17        Do you recall that?

      18   A    Yes.

      19   Q    But you did encourage him by saying, "I can almost

01:52:37  20   guarantee you the next time I see him he'll tell me the same

      21   story," correct?

      22   A    Yes.

      23   Q    And that meeting went on for over an hour, correct?

      24   A    Yes.

01:53:13  25        *(Pause)*

*Deborah D. Parker, U.S. Court Reporter*

01:53:15  1   BY MR. WILKE:

       2   Q    And at the end of that meeting, you told Alex that,

       3   quote:  "I was hoping to go home with a little something

       4   tonight," correct?

01:53:27  5   A    Yes.

       6   Q    And by that you meant money, correct?

       7   A    Yes.

       8   Q    And Alex said, "Okay.  Can I give you like about

       9   $2,000," didn't he?

01:53:48 10   A    Yes.

      11   Q    And he gave you -- you, in fact, said, "How about

      12   2,500?"  Correct?

      13   A    I don't recall that he even give me money that night.

      14   Q    Well, you said -- he said -- he asked, "Can I give you

01:54:05 15   2,000?"  Right?

      16   A    Yes.

      17   Q    After you said, "When you give me that money first, I

      18   will start doing my job."  Correct?

      19   A    Correct.

01:54:22 20   Q    And he said, "Okay.  Can I give you about 2,000?"

      21   Right?

      22   A    Yes.

      23   Q    And you said, "Around 2,000, 2,500," correct?

      24   A    Okay.

01:54:37 25   Q    And then Alex said, "This weekend, you think you can

01:54:40  1  get him?"

2          Do you recall that?

3  A     Yes.

4  Q     And by "get him," he meant, get a recorded confession

01:54:47  5  of Wayne Le, correct?

6  A     Yes.

7  Q     And you told him, "Yeah," correct?

8  A     Yes.

9  Q     Now, Alex Dao did pay you, correct?

01:55:02  10  A     Not that night, no.

11  Q     That wasn't my question, sir.

12          Alex Dao did pay you, didn't he?

13  A     He paid me -- I don't recall the amount.  Yes, he did,

14  when we met up with the PI.

01:55:19  15  Q     Paid you in cash?

16  A     Yes.

17  Q     Before you met with the PI, correct?

18  A     No.  After the -- with the PI there.  PI was the guy

19  who gave me the money.

01:55:47  20  Q     Alex Dao provided you assistance in setting up a

21  marijuana business?

22  A     He said he would.

23  Q     After this meeting at Robata Wasa?

24  A     Yes.

01:55:58  25  Q     You continued to have those discussions with him,

*Deborah D. Parker, U.S. Court Reporter*

01:56:01   1   correct?

2   A     Yes.

3   Q     And you're still hoping that that marijuana business

4   gets started, correct?

01:56:10   5   A     Now, no.

6   Q     Sir, you understood that the marijuana business could

7   be very profitable for you, correct?

8   A     It can be, but the risk as I see it as not worth it.

9   Q     The risk if you get caught by law enforcement, correct?

01:56:24  10   A     Correct.

11   Q     The risk of dealing drugs, correct?

12   A     Correct.

13   Q     Because you've been to prison before, correct?

14   A     Yes.

01:56:31  15   Q     But that didn't stop you from dealing drugs, did it?

16   A     No.

17   Q     You continued to deal drugs after you got out of prison

18   in 2018, correct?

19   A     I tried.

01:56:45  20   Q     But you did.  You tried to set up marijuana deals,

21   correct?

22   A     I tried.

23   Q     You tried to set up cocaine deals, correct?

24   A     Yes.

01:56:59  25   Q     Methamphetamine deals, correct?

*Deborah D. Parker, U.S. Court Reporter*

01:57:01    1    A    Yes.

            2    Q    You worked for marijuana growers, correct?

            3    A    Yes, I did.

            4    Q    And you conspired to establish your own marijuana

01:57:16    5    growing operation, correct?

            6            MR. SCALLY:  Objection, Your Honor.  Asked and

            7    answered and 403.

            8            THE COURT:  I'm assuming this is foundational,

            9    Counsel, so I'll allow the answer.

01:57:34   10            THE WITNESS:  Yes.

           11    BY MR. WILKE:

           12    Q    So you weren't really afraid of the risk when you did

           13    all of that, correct?

           14    A    Yes.  I was not.

01:57:47   15    Q    And as you sit here today, you're still hoping that at

           16    some point in the future, you can set up your own marijuana

           17    business?

           18            MR. SCALLY:  Objection.  Asked and answered.

           19            THE COURT:  Overruled.

01:58:00   20            You can answer, sir.

           21            THE WITNESS:  No, not today.

           22    BY MR. WILKE:

           23    Q    When was the last time you spoke to Alex Dao?

           24    A    I believe it was Christmastime, wishing him a

01:58:19   25    Merry Christmas --

*Deborah D. Parker, U.S. Court Reporter*

01:58:34  1      (Pause)

       2           THE WITNESS:  -- of 2019.

       3   BY MR. WILKE:

       4   Q    Now, Alex Dao introduced you to Agent Espinoza,

01:58:56  5   correct?

       6   A    Correct.

       7   Q    Posing as a private investigator, correct?

       8   A    Yes.

       9   Q    And then after that, you were interviewed by

01:59:05 10   Special Agent Cho on that same day, correct?  We already

      11   talked about that.

      12   A    Yes.

      13   Q    And it was on that date that you signed up to be an FBI

      14   confidential informant, correct?

01:59:16 15   A    Yes.

      16   Q    And your understanding was at that time, you would get

      17   paid by the FBI to gather evidence for them, correct?

      18   A    No.  I did not understand I would be getting paid.

      19   Q    Well, you indicated that during the meeting with

01:59:35 20   Agent Espinoza, just before the meeting with Agent Cho, you

      21   received some cash, correct?

      22   A    Can you repeat the question?

      23   Q    You testified earlier that during the meeting with

      24   Agent Espinoza, when he was posing as a private investigator

01:59:53 25   with Alex Dao, you were paid cash during that meeting,

01:59:57  1    correct?

          2    A     After the meeting, yes, agent did pay me.

          3    Q     Like how much?  Several thousand dollars, correct?

          4    A     Yes.

02:00:04  5    Q     In cash?

          6    A     Yes.

          7    Q     And then that same day, you met with Special Agent Cho,

          8    correct?

          9    A     Yes.

02:00:13 10    Q     And you signed up to be a confidential informant,

         11    correct?

         12    A     Yes.

         13          MR. SCALLY:  Objection.  Asked and answered.

         14          THE COURT:  Well, Counsel, no, I'll allow the

02:00:25 15    answer.  The case is foundational, Counsel.

         16    BY MR. WILKE:

         17    Q     And since then, you've been paid $25,000 from the FBI

         18    for your services as a confidential informant, correct?

         19    A     Yes.

02:00:38 20    Q     Not quite enough to set up your marijuana grow house,

         21    correct?

         22          MR. SCALLY:  Objection.  Argumentative.

         23          THE COURT:  Sustained.

         24    BY MR. WILKE:

02:00:47 25    Q     You had told Alex Dao that you needed about 40,000, I

*Deborah D. Parker, U.S. Court Reporter*

02:00:51   1   think, to set up the grow house; is that correct?

2   A     About 50,000.

3   Q     About 50,000?

4   A     Yes.

02:00:59   5   Q     So you're about halfway there, correct?

6              MR. SCALLY:  Objection.  Argumentative.

7              THE COURT:  Sustained.

8   BY MR. WILKE:

9   Q     Now, you told Alex after he told you that he would set

02:01:41   10   you up in this marijuana grow house that you would, quote:

11   "Go the mile to put Wayne Le away," didn't you?

12   A     Yes.

13              MR. WILKE:  May I have just a moment, Your Honor?

14              THE COURT:  You may.

02:02:19   15       *(Pause)*

16   BY MR. WILKE:

17   Q     You also told Alex during this November 4, 2019

18   meeting, after Mr. Le supposedly made these statements to

19   you, that you were not scared of Wayne Le, didn't you?

02:02:59   20   A     Yes.

21              MR. WILKE:  I have no further questions,

22   Your Honor.

23              THE COURT:  And redirect examination, please.

24              MR. SCALLY:  Thank you, Your Honor.

25   *////*

*Deborah D. Parker, U.S. Court Reporter*

38

REDIRECT EXAMINATION

BY MR. SCALLY:

Q    In saying that you were not scared of Wayne Le, what firearm --

    *(Court Reporter requests clarification for the record.)*

        THE COURT:  We couldn't hear, Counsel.  Please repeat, because you bumped the microphone.

        MR. SCALLY:  Yes, Your Honor.

BY MR. SCALLY:

Q    What firearm did you know him to have, specifically, a handgun?

        MR. WILKE:  Your Honor, this is cumulative from direct.  I didn't cross him on the handgun.

        THE COURT:  Overruled.

        THE WITNESS:  It was a .38 Special revolver.

BY MR. SCALLY:

Q    And you were asked about telling Alex Dao that you would go the mile to put Wayne away.

        Why did you say that?

A    I wanted to see justice done for Alex.

Q    Now, you were also -- you were paid some money by the FBI; is that correct?

A    Yes.

Q    And Alex offered you money; is that right?

*Deborah D. Parker, U.S. Court Reporter*

39

02:04:27   1    A     Yes.

2    Q     Would those things lead you to make up a story about

3    what Wayne told you?

4                MR. WILKE:  Objection.  Leading.

02:04:37   5                THE COURT:  Overruled.

6                You can answer the question.

7                THE WITNESS:  No.

8    BY MR. SCALLY:

9    Q     Would those things lead you to lie under oath?

02:04:45  10                MR. WILKE:  Objection.  Leading.

11                THE COURT:  Overruled.

12                THE WITNESS:  No.

13   BY MR. SCALLY:

14   Q     Now, you testified that you got -- you've gotten money,

02:04:59  15   but you also testified about -- that if it was your brother

16   who this happened to, you would want justice done; is that

17   right?

18                MR. WILKE:  Objection.  Misstates the testimony.

19                THE COURT:  Sustained.

02:05:12  20                I didn't hear about the brother, Counsel.

21   BY MR. SCALLY:

22   Q     Why did you -- why did you approach Alex, originally?

23                MR. WILKE:  Objection.  This has been asked and

24   answered on direct, Your Honor.

02:05:23  25                THE COURT:  Overruled.

*Deborah D. Parker, U.S. Court Reporter*

```
02:05:24    1           You can answer the question.

            2           THE WITNESS:  I felt like if it happened -- if

            3   this was happening to my brother, then I would want someone

            4   to come forward and tell me the truth.

02:05:37    5   BY MR. SCALLY:

            6   Q    When you were being cross-examined, you were asked

            7   questions about a recording that you offered to Alex.

            8           Do you recall that?

            9   A    Yes.

02:05:57   10           MR. SCALLY:  Let me -- actually, Your Honor, if I

           11   could have the Special Agent approach to direct the witness

           12   to an exhibit.

           13           THE COURT:  Please.

           14   BY MR. SCALLY:

02:06:04   15   Q    I'll ask you to take a look -- the Special Agent is

           16   going to direct you to Exhibit 47-A.

           17       (Pause)

           18   BY MR. SCALLY:

           19   Q    And I'll ask you to take a look at that.  And if you

02:06:47   20   need a minute to read through it --

           21   A    The whole thing?

           22   Q    Let me know if you, after reading the first page to

           23   yourself, if you recognize that.

           24       (Pause)

02:07:15   25           THE WITNESS:  Yes, I do recognize this.
```

*Deborah D. Parker, U.S. Court Reporter*

02:07:17  1  BY MR. SCALLY:

2  Q    What is that?

3  A    It's the conversation between me and Wayne.  And it was

4  the recording that I handed it over to the agency.

02:07:30  5  Q    And who are you discussing in the beginning of this

6  recording?

7         Well, that wasn't a good question.  Let me direct

8  you more specifically -- what happened right before this

9  conversation, if you recall?

02:08:05  10  A    Right before this conversation, he was confessing to me

11  what he did.

12  Q    Okay.  And -- so fair to say, obviously, you only

13  turned on your recording at the time that this recording

14  begins; is that right?

02:08:20  15  A    Yes.

16         MR. WILKE:  I'm going to -- leading, Your Honor.

17  Objection.

18         THE COURT:  Sustained.

19         MR. WILKE:  Move to strike.

02:08:30  20         THE COURT:  The last answer is stricken.

21         You can re-ask the question, Counsel.

22  BY MR. SCALLY:

23  Q    Is this conversation a follow-on to that confession?

24         MR. WILKE:  Objection.  Leading.

02:08:42  25         THE COURT:  Overruled.

*Deborah D. Parker, U.S. Court Reporter*

42

02:08:43  1              You can answer that question.

          2              THE WITNESS:  Yes.

          3              MR. SCALLY:  Your Honor, at this time I'm going to

          4     move to admit Exhibit 47 in its entirety.

02:08:55  5              MR. WILKE:  Your Honor, this has been ruled on,

          6     previously.

          7              THE COURT:  Counsel, I'll take this up at a later

          8     time.  I'm not certain what you're asking, quite frankly,

          9     and I -- I'm a little concerned until I have a conference

02:09:11 10     with you and the defense.

         11              MR. SCALLY:  I'm just about done questioning the

         12     witness, Your Honor.

         13              Could we be heard on that?

         14              THE COURT:  Why don't we take a recess.

02:09:25 15              You're admonished not to discuss this matter

         16     amongst yourselves, nor to form or express any opinion

         17     concerning the case.

         18              Have a nice recess.

         19          (*Jury exits courtroom.*)

02:09:59 20              THE COURT:  Would you step down, sir.

         21              Let me go look at 47-A again in its entirety, in

         22     light of your request.  And I will rejoin you in about five

         23     minutes, okay?

         24              MR. SCALLY:  And, Your Honor, I would have one

02:10:15 25     other application.

*Deborah D. Parker, U.S. Court Reporter*

02:10:23  1          THE COURT:  Let's hear your motion now, Counsel.
          2  47-A in its entirety.
          3          MR. SCALLY:  47-A in its entirety.
          4          THE COURT:  Does 47-A include the portions that
02:10:36  5  the Court was concerned about and that the defense brought
          6  an *in limine* motion on?
          7          MR. SCALLY:  It's --
          8          THE COURT:  In other words, does this include
          9  anything about being a hitman --
02:10:55 10          MR. SCALLY:  It does not.  It does include -- in
         11  the Court's written ruling from today, the Court precluded
         12  me from introducing the beginning of this conversation,
         13  because the Court didn't see a foundation.
         14          THE COURT:  What's the beginning?  In other words,
02:11:12 15  refresh my memory before I go back and look at 47-A again.
         16          MR. SCALLY:  Yes, Your Honor.  It starts with
         17  Wayne saying:
         18          "I'm fine.  No one is picking me up yet,
         19          so.
02:11:23 20          "Tony:  No one?
         21          "Wayne:  No one.  Nobody said
         22          anything..."
         23          THE COURT:  How does that help with a question
         24  about whether this tape is a follow-on to a prior unrecorded
02:11:42 25  conversation?  In other words, we have the witness saying, *I*

*Deborah D. Parker, U.S. Court Reporter*

44

02:11:45 1  *had a prior unrecorded conversation and he basically*
2  *confessed to me.*

3          And what portions are you interested in that
4  proves that point?

02:11:57 5          MR. SCALLY:  I mean, really the first part.

6          THE COURT:  Let's read it.

7          MR. SCALLY:  "No one's picking me up yet."

8          THE COURT:  And how does that show that there was
9  a prior -- in other words, how does that show that there was
02:12:10 10 a prior confession?  It may be -- obviously, there's a prior
11 conversation.  How does that show that there's a prior
12 confession?

13          MR. SCALLY:  It -- in context, I believe the
14 witness will say he understood that to mean he's not been
02:12:29 15 arrested yet for the conduct that Wayne has just described
16 to me.

17          THE COURT:  So "picking me up" means the police
18 haven't apprehended me or caught on to my conduct?

19          MR. SCALLY:  Correct.  And then there's further
02:12:44 20 discussion about:  "If I go in, then he loses 500,000."

21          THE COURT:  Referring to the insurance money?

22          MR. SCALLY:  No, he's referring to Alex Dao here,
23 the brother.

24          THE COURT:  And how -- explain that to me.

02:13:02 25          MR. SCALLY:  Well, he says --

*Deborah D. Parker, U.S. Court Reporter*

45

02:13:03  1                THE COURT:  "He" being?

          2                MR. SCALLY:  I'm sorry.  Wayne says, "I'm his debt

          3     collector."

          4                THE COURT:  And "debt collector" is already in.  I

02:13:10  5     was concerned about the prejudicial effect earlier, but

          6     that's come to the forefront now, so there's no prejudice

          7     concerning debt collection.

          8                MR. SCALLY:  And then Wayne says on the second

          9     page, "He's protecting me," a reference to Alex Dao

02:13:24 10     protecting him from prosecution because Alex -- because in

         11     Wayne's mind, he is Alex's debt collector.

         12                THE COURT:  All right.  Mr. Wilke.

         13                MR. WILKE:  Your Honor, I understood the

         14     Government thinks that the very first sentence "I'm fine.

02:13:45 15     No one's picking me up yet" referred to a statement by

         16     Mr. Le about not getting arrested for this alleged homicide,

         17     but it's --

         18                THE COURT:  How did Mr. Le get to this location?

         19     Did he drive himself?

02:14:01 20                MR. WILKE:  This location -- we don't even know

         21     what date on this recording.  There is no foundation when

         22     this was made.  This recording, apparently, was made by the

         23     witness on his own, not when he was a confidential

         24     informant.

02:14:14 25                THE COURT:  Okay.  Will you invite the witness in

                          *Deborah D. Parker, U.S. Court Reporter*

46

02:14:16    1    and then find out.  In other words, if -- it could be

            2    construed that he's just looking for the ride.  But the

            3    Government argues that, no, this is in relation to a -- not

            4    being discovered by the police.  I have no idea how your

02:14:35    5    client even got to this location.  If he drove himself, how

            6    they came into contact with one another.

            7              MR. WILKE:  I don't -- there's no testimony or

            8    evidence in the record where this conversation occurred.

            9              THE COURT:  That's fine.  I just invited the

02:14:47   10    witness to come back in.

           11              MR. WILKE:  I don't think he'll be able to, but we

           12    can see what he can say about this.

           13       (Laughter.)

           14              MR. WILKE:  He was very -- let's just say, he was

02:14:56   15    very vague about this.

           16              THE COURT:  Why don't we ask, okay, and see if we

           17    can --

           18              MR. WILKE:  That's fine.

           19              THE COURT:  Would you invite the witness to come

02:15:04   20    back in?

           21              MR. SCALLY:  Yes, Your Honor.

           22              THE COURT:  I'd like to just know a couple of

           23    questions:  Where did they meet?  Who was there?  How did

           24    the witness get there; and if he knows, how did Mr. Le get

02:15:14   25    there?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:15:15 | 1 | (The following proceedings were had outside the |
| | 2 | presence of the jury:) |
| | 3 | (Mr. Tuac "Tony" Hoang reenters courtroom.) |
| | 4 | THE COURT:  Thank you, sir. |
| 02:15:28 | 5 | If you would be kind enough to re-take the witness |
| | 6 | stand for just a moment and counsel will have just a few |
| | 7 | questions for you. |
| | 8 | And this is going to refer to Exhibit 47-A, which, |
| | 9 | hopefully, is still up on the witness stand. |
| 02:15:48 | 10 | Counsel, your questions. |
| | 11 | MR. SCALLY:  Thank you, Your Honor. |
| | 12 | VOIR DIRE EXAMINATION |
| | 13 | BY MR. SCALLY: |
| | 14 | Q    Mr. Hoang, referring to Exhibit 47-A, where did -- who |
| 02:15:57 | 15 | was present at the time you took this recording? |
| | 16 | A    It was just me and him. |
| | 17 | Q    And by "him," do you mean Wayne? |
| | 18 | A    Yes.  This is me and Wayne? |
| | 19 | Q    And where did this take place? |
| 02:16:08 | 20 | A    It took place in his car. |
| | 21 | THE COURT:  Where was it?  Where? |
| | 22 | THE WITNESS:  In his car. |
| | 23 | THE COURT:  Okay.  Just a moment. |
| | 24 | THE WITNESS:  In front of his house. |
| 02:16:25 | 25 | THE COURT:  All right. |

*Deborah D. Parker, U.S. Court Reporter*

02:16:25  1   BY MR. SCALLY:

       2   Q     And how did -- how did you come to be in the car

       3   together?

       4   A     I don't recall.

02:16:36  5   Q     Okay.  When -- when did this occur?

       6   A     It was a couple days after the meeting with Alex in

       7   Irvine.

       8   Q     So -- and that you're referring to the October 18th,

       9   2019 meeting with Alex at the Irvine Spectrum?

02:16:58 10   A     Yes.

      11              THE COURT:  Now, Mr. Wilke, your questions?

      12              MR. WILKE:  I have no questions, not about this

      13   exhibit.

      14              THE COURT:  Counsel, why don't we meet in

02:17:10 15   10 minutes.  Let me go back and look at the transcript one

      16   more time, okay?

      17              Thank you very much.

      18              MR. STAPLES:  May the witness step down,

      19   Your Honor?

02:17:16 20              THE COURT:  Yes, sir.

      21              Thank you very much, sir.  If you will step down.

      22   We'll see you in about 10 minutes.

      23         (Recess taken from 2:17 p.m. to 2:43 p.m.)

      24         (The following proceedings were had outside the

02:43:42 25         presence of the jury:)

*Deborah D. Parker, U.S. Court Reporter*

02:43:43  1          THE COURT:  Okay.  All counsel are present.  The

2     defendant is present.

3          The Court was concerned about the first portion of

4     this transcript when the trial began, because it was

02:44:01  5     difficult to differentiate who's involved in the

6     conversation, other than, quote, unquote, Mr. Le, supposedly

7     Mr. Hoang and the reference to debt collection, the Court

8     was concerned about and initially precluded, but it came out

9     during trial.  So there's no prejudice concerning the debt

02:44:27 10     collection now.  Both sides had put that before the jury.

11          So the first two lines at page 1 now may be

12     relevant since they may allow the jury to determine, first,

13     if there was an earlier conversation that took place between

14     Mr. Hoang and Mr. Le, apparently, now about two days after

02:44:53 15     the October 18th meeting at the Irvine Spectrum, where

16     Mr. Hoang now states that they were discussing the criminal

17     activity allegedly of Mr. Le and that this was part of the

18     continuing conversation when he turned on the tape recorder.

19     And the last part of that is, obviously, the conversation

02:45:25 20     about the police not -- from the Government's standpoint,

21     the police not picking him up because of the criminal

22     activity.  Therefore, it's relevant to show that there was

23     an earlier conversation; that it doesn't necessarily pertain

24     to being picked up in a car, since his testimony is the same

02:45:52 25     car and that it centered around James Dao's death and the

*Deborah D. Parker, U.S. Court Reporter*

02:45:59   1   police not apprehending Mr. Le.

           2          The remainder of pages 1 through 2 is now

           3   admissible to show that Mr. Le's debt collection for other

           4   people, which is no longer prejudicial.  I may allow the

02:46:12   5   jury to determine whether Mr. Le was, in fact, afraid of

           6   Alex Dao, which is the second prong of the direct and cross

           7   and that is, in Wayne's -- which would be Mr. Le's own

           8   words, he's basically stating that they want me to remain

           9   out.  It's going to cost them a half million dollars if I

02:46:33  10   don't continue on with the debt collection, which the

          11   Government argues and the jury will be allowed to consider

          12   whether that's, in fact, what was meant in this

          13   conversation.

          14          I had already made the ruling concerning 47-A,

02:46:44  15   beginning at page 4 and its relevancy to show the

          16   relationship between Mr. Le and Mr. Hoang as it pertains to

          17   drug dealing.  And you've already played that portion.

          18          If you would be so kind and give a copy to each

          19   counsel.

02:47:01  20          And, Karlen, would you be kind enough to ask the

          21   jury to join us.

          22          I'll also state that if Mr. Le does testify, all

          23   this will eventually come into evidence, regardless, but --

          24          MR. WILKE:  May I have a moment, Your Honor?

02:47:20  25          (Pause)

*Deborah D. Parker, U.S. Court Reporter*

02:47:35  1          MR. SCALLY:  Your Honor, just one -- I actually

2     haven't played any portion of it yet, so I would -- you

3     know, I'd be intending to play the whole thing at this

4     point.  I know the Court had earlier ruled that pages 4 to

02:47:48  5     the end were admissible.  I just didn't actually present

6     that in direct examination, so that hasn't been presented

7     yet.  After --

8          THE COURT:  Well, then you can play it in its

9     entirety, because I'm allowing pages 1 and 2.  Is there

02:48:04 10     anything prejudicial on page 3?

11          I focused on pages 1 and 2 and 4.  So why don't

12     each of you look at page 3 to see if there's any further

13     objection to page 3.  I just glanced at those again.

14          MR. WILKE:  Well, I think the stuff on page 3

02:48:21 15     concerning the vulgarity with regard to women is somewhat

16     prejudicial, Your Honor.  Page 3, there's some vulgar terms

17     used that I think is prejudicial to my client, especially

18     with the female jurors.

19          *(Pause)*

02:49:20 20          THE COURT:  I'm sorry.  Would you go back out just

21     one moment?

22          My apologies.

23          Counsel, why is that needed?

24          *(Pause)*

02:49:36 25          THE COURT:  In other words, why can't we just end

*Deborah D. Parker, U.S. Court Reporter*

52

02:49:39  1   it, bottom of page 2?  What relevance does --

2                 "TONY:  What the fuck?

3                 "WAYNE:  Just no pussy.

4                 "TONY:  Why no pussy?"

02:49:46  5            What's the relevance?

6                 MR. SCALLY:  We can certainly skip that portion,

7   Your Honor.

8                 THE COURT:  I would suggest that -- it doesn't

9   help the Government or the defense to show whether there's a

02:49:58 10   prior conversation.

11                 MR. SCALLY:  Your Honor, the only thing -- could I

12   just ask --

13                 THE COURT:  Thank you, Counsel.  I appreciate your

14   argument.  Exclude it now.  It's not relevant.  Prejudicial.

02:50:06 15                 MR. SCALLY:  And I'm not seeking --

16                 THE COURT:  No conversation.  It's prejudicial.

17                 MR. SCALLY:  Absolutely, Your Honor.

18            Could I just have a moment to --

19                 THE COURT:  Sure.

02:50:14 20                 MR. SCALLY:  Thank you.

21                 THE COURT:  I see absolutely no relevance.  He's

22   not going to be convicted because of swear words and gender

23   issues like this.  The real question here is whether there

24   was a prior conversation.  I'm allowing page 1 for that

02:50:29 25   purpose and page 2 to show that the fear factor is something

*Deborah D. Parker, U.S. Court Reporter*

02:50:34 1   for the jury to determine when in his own words he's saying

2   that "they want me out," referring allegedly to Alex Dao

3   from his testimony.

4               But the gender comments, I see no relevance and no

02:50:47 5   reason for those to be put before the jury.

6               MR. WILKE:  Your Honor, one other point.

7               THE COURT:  Just a moment, Counsel.

8               MR. WILKE:  Yes.

9               MR. SCALLY:  If could just have a moment, Your

02:50:56 10  Honor.  I want to make sure I know exactly when to stop it

11  and when to restart it so that none of that appears on the

12  screen.

13              THE COURT:  It's easy, Counsel.  Page 3 is

14  excluded.

02:51:10 15              MR. SCALLY:  I --

16              THE COURT:  Just do it.  Page 3 is now excluded.

17  It starts, "What the fuck?"  And it ends up -- well, you can

18  go down to:

19              "TONY:  Oh."

02:51:29 20              THE COURT:  You can start there.

21              "WAYNE:  The fun house, you know?  Okay,

22              so this is not work.  I'll just give

23              them back.

24              "TONY:  Oh."

02:51:41 25              THE COURT:  Now, are they referring to the "fun

54

02:51:44  1   house" being "girls"?  Bringing them in?

2           MR. SCALLY:  I don't know, Your Honor.

3           THE COURT:  Well, for any appellate court, it

4   reads:

02:51:58  5           "TONY:  What the fuck?

6           "WAYNE:  Just no pussy.

7           "TONY:  Why no pussy?

8           "WAYNE:  No pussy in there.

9           "TONY:  Oh.

02:52:05 10           "WAYNE:  Right.

11           "TONY:  You can't bring girls in?

12           "WAYNE:  Tsk!  Here is okay I don't

13            want...

14           "TONY:  Oh.

02:52:13 15           "WAYNE:  The fun house, you know?"

16           THE COURT:  I don't know what the "fun house"

17   refers to, but if it's involving women, it's not relevant.

18           "TONY:  Oh.

19           "WAYNE:  And then, the white thing.

02:52:24 20            I've got to go with you for a little

21            bit."

22           THE COURT:  It would seem to me that if you

23   started with Wayne and then "the white thing," probably

24   referring to narcotics:  "I've got to go with you, for a

02:52:35 25   little bit."  That's relevant.  But all of the rest of that

02:52:38   1    is just gender bias comments.  I agree with Counsel that the

           2    prejudicial effect outweighs the probative value.

           3            MR. SCALLY:  Your Honor, just for the logistics of

           4    properly redacting the exhibit, could we have -- actually,

02:53:11   5    I'm informed that we need about 15 minutes.  Perhaps what we

           6    could do, I do have the next witness available.  Perhaps we

           7    could --

           8            THE COURT:  No, I want continuity here.  We'll

           9    take the 15 minutes.

02:53:27  10            Karlen, would you ask the jury to go back in the

          11    jury room with my apologies.

          12            Take the time.

          13            MR. SCALLY:  Thank you very much, Your Honor.  I

          14    appreciate that.

02:53:37  15            THE COURT:  You don't have to.

          16            MR. WILKE:  Your Honor, there was one other point

          17    that I would just make for the record.

          18            THE COURT:  All right.  Please.

          19            MR. WILKE:  The Court's ruling seems to be

02:53:44  20    predicated at least in part on the belief that testimony or

          21    evidence about Wayne Le being a debt collector has already

          22    been elicited.  I'm not certain it has.

          23            THE COURT:  It has.

          24            MR. WILKE:  Well, my recollection of the testimony

02:53:58  25    of Natalie Nguyen was that there may have been statements by

02:54:03   1    Wayne Le expressing a desire to do that or something like

           2    that.  That's it.

           3                THE COURT:  Thank you very much.

           4                MR. WILKE:  That's the only point I would make.

02:54:12   5                THE COURT:  Counsel, why don't we take the 10 to

           6    15 minutes.

           7                MR. WILKE:  Thank you.

           8         (Recess taken from 2:54 p.m. to 3:20 p.m.)

           9         (Jury enters courtroom.)

03:22:25  10         (The following proceedings were had in open court

          11         in the presence of the jury:)

          12                THE COURT:  Thank you, Karlen.  Back in session.

          13                We're still in session.  If you would be seated,

          14    please.

03:22:55  15                The counsel are present.  The defendant and the

          16    investigating agency, the jury as well as the alternates.

          17                Counsel, if you would like to proceed now with

          18    redirect, or continue on.

          19                MR. SCALLY:  Thank you, Your Honor.

03:23:05  20                        REDIRECT EXAMINATION

          21    BY MR. SCALLY:

          22    Q    Mr. Hoang, before the break, we were talking about

          23    Exhibit 47-A.  And let me just back up.  At some point you

          24    talked about you did agree to become a confidential

03:23:21  25    informant for the Government; is that right?

57

03:23:23  1    A    Yes.

        2    Q    Prior to becoming a confidential informant, did you

        3    take a recording of a conversation between you and Wayne?

        4    A    Yes.

03:23:38  5    Q    And where were you at the time that that conversation

        6    took place?

        7    A    I was -- we were in his car in front of his house.

        8    Q    And who was present for that conversation?

        9    A    It was just me and Wayne.

03:23:57 10    Q    And when was that approximately?

       11    A    I believe it was a couple of days after the 18th.

       12    Q    Okay.  A couple days after your trip to the Irvine

       13    Spectrum with Wayne?

       14    A    Yes.

03:24:20 15    Q    Now, I think we started to talk about this.  But prior

       16    to you turning on the recording, what were you talking

       17    about?

       18    A    We were -- well, he was confessing to me prior to the

       19    recording turning on.

03:24:38 20    Q    Confessing about having -- the things you've already

       21    testified about:  Having killed this individual?

       22    A    Yes.

       23    Q    Okay.  Why did you not turn on the recording earlier?

       24    A    I didn't plan on -- I didn't have my phone ready.  I

03:25:03 25    thought about it.  I thought about it and then -- I did it

*Deborah D. Parker, U.S. Court Reporter*

03:25:09   1    without him looking.

           2            MR. SCALLY:  Your Honor, at this time, I would

           3    move to -- move to admit Exhibit 47.

           4            THE COURT:  47 is -- is it 47 or 47-A?

03:25:23   5            MR. SCALLY:  It would be 47, Your Honor.

           6            THE COURT:  47.  All right.  Received.

           7         *(Plaintiff's Exhibit 47 received in evidence.)*

           8            MR. SCALLY:  Your Honor, at this time -- so I'll

           9    ask if we could play Exhibit 47.

03:25:33  10    BY MR. SCALLY:

          11    Q    And just before we do that, Mr. Hoang, are portions of

          12    this in Vietnamese?

          13    A    Yes.

          14    Q    Okay.  And you've reviewed this transcript; is that

03:25:45  15    right?

          16    A    Yes.

          17    Q    And is -- are the translations fair and accurate?

          18    A    Yes.

          19    Q    Okay.

03:26:04  20         *(The videotape was played.)*

          21         *(Pause)*

          22            MR. SCALLY:  Okay.  We'll go ahead and play

          23    Exhibit 47.

          24         *(The videotape was played.)*

          25    ////

*Deborah D. Parker, U.S. Court Reporter*

03:34:41   1   BY MR. SCALLY:

2   Q    So Mr. Hoang, directing your attention to just the

3   first page of that where Mr. Le or Wayne says, "I'm fine.

4   No one's picking me up yet," what did you understand that to

03:35:04   5   mean in context?

6                MR. WILKE:  Objection.  Relevance.  His

7   understanding, Your Honor.

8                THE COURT:  Overruled.

9                You can answer the question.

03:35:11  10                THE WITNESS:  I can answer?

11                To my understanding that he's not being

12   investigated or the cops are not after him.

13   BY MR. SCALLY:

14   Q    In connection with what?

03:35:23  15   A    With the murder.

16   Q    And going down a little bit where it says "Nobody said

17   anything, cause uh you know.  They want me to stay out

18   because I collect money for them," who did you understand

19   him to be referring to when he said "they"?

03:35:46  20                MR. WILKE:  Same objection, Your Honor.

21                THE COURT:  Overruled.

22                You can answer the question.

23                THE WITNESS:  "They" is Alex or his friends.

24   Alex -- basically, Alex.

25   ////

*Deborah D. Parker, U.S. Court Reporter*

60

03:35:56  1   BY MR. SCALLY:

2   Q    Okay.  And what did you understand "stay out" to mean?

3   A    That means that that they don't want him busted.  They

4   don't want Wayne to be busted.  They want Wayne to be

03:36:09  5   outside collecting money.

6   Q    Not in prison?

7   A    Not in prison.

8   Q    And when he said "I work for the house," who did you

9   understand the "house" to mean?

03:36:23 10   A    I didn't know who the "house" was.

11   Q    Okay.  "If" -- when he says a little further down "If I

12   go in then he loses 500,000," what was your understanding of

13   who he -- who he's referring to there?

14   A    That would be Alex.

03:36:44 15   Q    And what did you understand "if I go in" to mean?

16   A    That means if he gets busted for the murder.

17   Q    And at the very last line of the first page, "You know?

18   Cause I'm his debt collector," who's the "his"?

19   A    Alex.

03:37:11 20   Q    And looking at the second page and that second line at

21   the end "I know who Tony is," did you understand who he was

22   referring to there?

23   A    He was referring that to me.

24   Q    Like as an example?

03:37:33 25   A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 03:37:38 | 1 | Q    And toward the middle of the page there, "He don't |
| | 2 | know" -- |
| | 3 | *I have access to someone that owes him 300,000,* |
| | 4 | who did you understand him to be there? |
| 03:38:02 | 5 | A    Alex. |
| | 6 | Q    And as he goes on -- as the conversation goes on a few |
| | 7 | lines later, "He's protecting me," who did you understand |
| | 8 | that "he" to refer to there? |
| | 9 | A    Alex. |
| 03:38:37 | 10 | Q    Now, just generally speaking, what is the rest of the |
| | 11 | conversation about between you and Wayne? |
| | 12 | A    About drug deals. |
| | 13 | Q    Turning your attention to page 8, Wayne states: |
| | 14 | "Last time, I F'd with Russian mafia, MF |
| 03:39:29 | 15 | pulls up with a Prius, get the F out of |
| | 16 | here homeboy." |
| | 17 | What did you understand that to mean? |
| | 18 | MR. WILKE:  Objection.  Relevance.  403. |
| | 19 | THE COURT:  Sustained.  Sustained. |
| 03:39:38 | 20 | MR. SCALLY:  I have nothing further, Your Honor. |
| | 21 | THE COURT:  Recross-examination, please. |
| | 22 | MR. WILKE:  Thank you. |
| | 23 | RECROSS-EXAMINATION |
| | 24 | BY MR. WILKE: |
| 03:39:54 | 25 | Q    Mr. Hoang, this recording we just heard was the |

*Deborah D. Parker, U.S. Court Reporter*

03:39:57  1    recording that you made before you became a confidential

2    informant for the FBI, correct?

3    A    Correct.

4    Q    And according to your testimony, you made this

03:40:07  5    recording immediately after Wayne Le had told you that he

6    shot James Dao over a debt and tied him up and threw him

7    overboard, correct?

8    A    Yes.

9    Q    You didn't get that part of this purported statement on

03:40:33  10   tape, correct?

11   A    Correct.

12   Q    But somehow you were able to secretly turn on your

13   recording device after you say Mr. Le confessed to you,

14   correct?

03:40:46  15   A    Yes.

16   Q    Sir, isn't it in fact true that when Mr. Le told you on

17   that meeting about what happened on the boat, he told you

18   that James Dao snapped at him?

19   A    Yes.

03:41:30  20   Q    Now, you testified that once you turned on the

21   recording, Mr. Le told you that "No one's picking me up

22   yet."

23        Do you recall that?

24   A    Yes.

03:41:52  25   Q    And you understood him to be saying that the police

03:41:57   1    hadn't arrested him, correct?

           2    A    Yes.

           3    Q    Which was obvious because you were sitting there in his

           4    car talking to him, correct?

03:42:03   5    A    Yes.

           6    Q    Now, during this meeting that you recorded, this part

           7    of the meeting that you recorded, Wayne Le was under the

           8    influence of drugs, correct?

           9    A    I don't know that.

03:42:21  10    Q    Well, he was talking in a manner.  You've seen Wayne Le

          11    on drugs many times, correct?

          12    A    Yes.

          13    Q    We saw him on the earlier videotape when you were up in

          14    his bedroom.

03:42:32  15         Do you recall those videos?

          16    A    Yes, I do.

          17    Q    When he was not wearing his shirt, correct?

          18    A    Yes.

          19    Q    Talking fast in his room, correct?

03:42:40  20    A    Yes.

          21    Q    He was using drugs in front of you during that meeting,

          22    correct?

          23    A    Yes.  On both meetings.

          24    Q    You've seen him use drugs?

03:42:49  25    A    Yes.

64

| | | |
|---|---|---|
| 03:42:50 | 1 | Q    Cocaine, particularly, correct? |
| | 2 | A    Yes.  And meth. |
| | 3 | Q    And crack cocaine, correct? |
| | 4 | A    No, not at that time. |
| 03:43:10 | 5 | Q    Well, back in the day? |
| | 6 | A    Yes.  Back in the days, yes. |
| | 7 | Q    When you first started using drugs with him back in |
| | 8 | 2010, '12, that period of time, correct? |
| | 9 | A    Yes. |
| 03:43:20 | 10 | Q    You've seen him drink heavily, correct? |
| | 11 | A    Yes.  At times. |
| | 12 | Q    At times.  When he would come over -- when you would go |
| | 13 | over to his house, he would offer you Hennessy Cognac, |
| | 14 | correct? |
| 03:43:41 | 15 | A    No. |
| | 16 | Q    Offer you beer? |
| | 17 | A    Beer. |
| | 18 | Q    Do you recall him drinking Hennessy up in his room? |
| | 19 | A    I don't recall. |
| 03:43:50 | 20 | Q    All right.  So during this meeting in his car that you |
| | 21 | recorded where he does not actually say anything about what |
| | 22 | happened on the boat, he made a statement to you that, |
| | 23 | quote:  *Nobody said anything.  They want me to stay out* |
| | 24 | *because I collect money.* |
| 03:44:16 | 25 | Do you recall that? |

*Deborah D. Parker, U.S. Court Reporter*

65

03:44:16  1    A    Yes.

2    Q    You just testified about it?

3    A    Yes.

4    Q    Do you recall that?  I'm sorry.  Wait until my

03:44:23  5    question.

6            Do you recall that statement?

7    A    Yes.

8    Q    And you testified that you understood "they" refers to

9    Alex, correct?

03:44:35  10   A    Yes.

11   Q    Alex Dao, right?

12   A    Yes.

13   Q    The brother of James Dao, the person who was missing,

14   correct?

03:44:45  15   A    Yes.

16   Q    And the person who you say Wayne Le told you he had

17   shot, correct?

18   A    Yes.

19           MR. WILKE:  Just a moment, Your Honor.

03:45:17  20       *(Pause)*

21   BY MR. WILKE:

22   Q    Now, during this recorded meeting that you had with

23   Wayne Le, Wayne Le made a statement, *If I go in, he loses*

24   *$500,000,* correct?

03:46:53  25   A    Correct.

66

03:46:53  1    Q    And you testified that you understood the "he," who was
        2    going to lose 500,000, was going to be Alex, correct?
        3    A    Yes.
        4    Q    And Wayne was telling you or told you that he was
03:47:06  5    Alex's debt collector, correct?
        6    A    Yes.
        7    Q    And you understood that Wayne Le was telling you that
        8    he worked for Alex Dao, correct?
        9    A    Yes.
03:47:18 10    Q    That Alex Dao was a large high-level drug dealer,
       11    correct?
       12    A    Yes.
       13    Q    That Alex Dao -- I think you already testified to
       14    this -- he also owned this gambling house in Irvine,
03:47:42 15    correct?
       16    A    I don't recall.
       17    Q    Okay.  But you did understand Alex Dao to be this
       18    large-scale drug dealer, correct?
       19    A    Yes.
03:47:50 20    Q    And Wayne told you that he did -- worked for the house
       21    and that he was the only one who knew how to collect the
       22    debts for Alex, correct?
       23    A    Correct.
       24    Q    He told you that Alex was therefore protecting him,
03:48:09 25    correct?

```
03:48:11    1    A    Yes.
            2    Q    Well, in fact, you learned that that wasn't true,
            3    correct?
            4    A    Correct.
03:48:23    5    Q    Alex wasn't protecting him, correct?
            6    A    Correct.
            7    Q    When you told Alex that Wayne Le had made statements
            8    that he had shot Alex's brother and threw him overboard,
            9    Alex offered to pay you money to get a recorded confession,
03:48:43   10    correct?
           11         Correct?
           12    A    Yes.
           13    Q    And you also then learned that Alex Dao went to the
           14    FBI, correct?
03:48:53   15    A    Yes.
           16    Q    Because after your November 9th meeting, you were then
           17    interviewed by Agent Cho, correct?
           18    A    Correct.
           19    Q    You promised Alex Dao -- you told Alex Dao at your
03:49:12   20    11 -- November 4 meeting that you had this recording,
           21    correct?
           22    A    Yes.
           23    Q    And the purpose of the 11/9 -- the November 9th meeting
           24    with you and Alex Dao and the undercover agent, who was
03:49:25   25    posing as a private investigator, was for you to sell this
```

03:49:31  1    recording, correct?

2    A    Correct.

3    Q    And you did, in fact, sell this recording, correct?

4         MR. SCALLY:  Objection, Your Honor.

03:49:37  5         Beyond the scope of redirect.

6         THE COURT:  Overruled.

7    BY MR. WILKE:

8    Q    You did, in fact, sell them this recording, correct?

9    A    Yes.

03:49:44 10    Q    This recording that does not contain a confession with

11   regard to the shooting, correct?

12        MR. SCALLY:  Objection.  Argumentative and beyond

13   the scope.

14        THE COURT:  Overruled.  As far as "beyond the

03:49:56 15   scope," no, you can answer the question.

16        Overruled.

17        THE WITNESS:  Can you repeat the question?

18   BY MR. WILKE:

19   Q    You went there to sell Alex Dao this recording that

03:50:05 20   does not contain any confession as to the shooting of Alex's

21   brother, correct?

22   A    Correct.

23   Q    You went there to sell Alex Dao this recording in which

24   Wayne Le implicates Alex Dao in large-scale drug

03:50:25 25   trafficking, correct?

03:50:28  1          MR. SCALLY:  Objection.  Foundation for knowledge.

      2          THE COURT:  Overruled.

      3          You can answer the question still.

      4          THE WITNESS:  Correct.

03:50:42  5  BY MR. WILKE:

      6  Q    Sir, you were trying to shake down Alex Dao, weren't

      7  you?

      8  A    No, sir.

      9  Q    You had him pay you $2,000 for this recording when he

03:50:58 10  was concerned about what happened to his brother, correct?

     11  A    Yes.

     12  Q    And all this recording shows is that Wayne Le is saying

     13  that he works for Alex Dao in illegal activity?

     14          MR. SCALLY:  Objection.  Evidence speaks for

03:51:14 15  itself.

     16          THE COURT:  I'm going to sustain that objection,

     17  Counsel.

     18          MR. WILKE:  I have no further questions,

     19  Your Honor.

03:51:46 20          THE COURT:  All right.  The witness left on-call,

     21  Counsel, as all the other witnesses are?

     22          Sir, we're going to ask you to remain on-call.

     23  The case is going to conclude -- a good possibility -- by

     24  December 3rd, but I'll just say December 8.  If we need to,

03:52:03 25  both parties will find you.  They'll be courteous, okay?

*Deborah D. Parker, U.S. Court Reporter*

03:52:06  1            Take the mask with you.  And thank you very much,

2    sir.  You may step down.

3            Counsel, your next witness, please.

4            MR. SCALLY:  Yes, Your Honor.

03:52:12  5            The United States calls Special Agent Nathaniel

6    Dingle.

7            THE COURT:  All right.  Thank you.

8            MR. SCALLY:  Your Honor, may I approach the

9    witness stand?

03:52:27 10            THE COURT:  Certainly.

11        *(Pause)*

12            THE COURT:  Sir, would you step forward between

13   the double doors.

14         NATHANIEL DINGLE, PLAINTIFF'S WITNESS, SWORN

03:53:06 15            THE WITNESS:  I do.

16            THE COURT:  Thank you, sir.

17            Would you walk along the jury railing.  The

18   entrance to the jury box is closest to this wall.

19        *(Pause)*

03:53:19 20            THE COURT:  Thank you, sir.  If you will be

21   seated.

22            And after you're seated, there's a stack of

23   transparent masks.

24            THE WITNESS:  Okay.

03:53:35 25            THE COURT:  Take one of those, would you?  And the

03:53:37  1    way to put this on is take the bottom portion with the black

          2    strap -- see it?

          3              THE WITNESS:  Yes.

          4              THE COURT:  Put that on first.

03:53:47  5              Now, take the top strap, put it around and slip it

          6    down so that indentation is for your nose, okay?

          7              THE WITNESS:  All right.

          8              THE COURT:  Thank you.

          9              And, Counsel -- I'm sorry, sir.

03:54:00 10              Would you state your full name for the jury,

         11    please.

         12              THE WITNESS:  Nathaniel Dingle.

         13              THE COURT:  And would you spell your last name,

         14    sir.

03:54:07 15              THE WITNESS:  D-I-N-G-L-E.

         16              THE COURT:  Thank you.

         17              Direct examination, please.

         18              MR. SCALLY:  Thank you, Your Honor.

         19                        DIRECT EXAMINATION

03:54:12 20    BY MR. SCALLY:

         21    Q    Good afternoon, Special Agent Dingle.

         22    A    Good afternoon.

         23    Q    Who do you work for?

         24    A    I work for the Federal Bureau of Investigation.

03:54:21 25    Q    And what is your title there?

```
03:54:23   1    A    I'm a Special Agent.

           2    Q    How long have you been with the FBI?

           3    A    19 years.

           4    Q    What is your educational background, post-high school?

03:54:34   5    A    I have a bachelor's degree in computer information

           6    systems from DeVry University.

           7    Q    Where are you assigned in the FBI?

           8    A    I'm a supervisory Special Agent in Washington, D.C.

           9    Q    And where were you previously assigned?

03:54:52  10    A    San Diego.

          11    Q    What kinds of cases did you work in San Diego?

          12    A    I was on a violent crimes squad.  We investigated any

          13    type of violent crimes, including robberies, assaults

          14    against federal officers, kidnappings for ransom, those

03:55:11  15    types of matters.

          16    Q    Are you familiar with the term "CAST"?

          17    A    I am.

          18    Q    Is that an acronym?

          19    A    It is.

03:55:19  20    Q    What does it stand for?

          21         (Court Reporter requests clarification for the

          22         record.)

          23         THE WITNESS:  Cellular Analysis Survey Team.

          24    BY MR. SCALLY:

03:55:31  25    Q    Are you a CAST agent?
```

*Deborah D. Parker, U.S. Court Reporter*

03:55:36   1    A      An asset, yes.

           2    Q      And what do you as a CAST asset?

           3    A      So "CAST" was formed in 2010, as a result -- by about

           4    10 people, as a result of the increased use of cellular

03:55:51   5    records in criminal investigations.  It has since grown to,

           6    approximately, 80 assets that are across the United States.

           7    And we have three main responsibilities:  The first

           8    responsibility is locating people.  This can be historic or

           9    realtime, and it can be for a variety of reasons.  The first

03:56:16  10    a lot of people would always think of is cases, such as

          11    fugitive cases, where you're looking for someone that has

          12    committed a crime and you're trying to find them and

          13    apprehend them.

          14           The second part would be along the lines of child

03:56:32  15    abductions, so any large child abduction -- I guess any

          16    child abduction at all in the United States, CAST typically

          17    responds to.  And in those cases we're attempting to find

          18    both the perpetrator and the victim and recover them.

          19           It can also be for cases that aren't necessarily

03:56:51  20    thought of as -- that aren't criminal in nature at all, such

          21    as a missing hiker that's at risk or an Alzheimer patient

          22    that has gone missing.

          23           *(Court Reporter requests clarification for the*

          24           *record.)*

03:57:08  25           THE WITNESS:  Sorry.  I'll try to slow down a bit.

03:57:08   1          The second thing that CAST -- our second

2    responsibility is training.  So once you join CAST, you are

3    expected to continue to teach, not only other agents what

4    CAST is and try to get more people in so that we can further

03:57:28   5    help.  But we try to get our services out to all of the

6    local law enforcement agencies so that they know and they

7    can request help, whether they have a missing kid or a

8    missing hiker, and they know to call and get assistance.

9          And the third thing -- our third responsibility is

03:57:46   10   what I'm doing here today is testifying.

11   BY MR. SCALLY:

12   Q    And Special Agent Dingle, we'll talk about this in more

13   detail; but just generally speaking, when you talk about

14   locating people, is that through analysis of phone records?

03:58:03   15   A    Any type of location records.  Phone is the most common

16   but really any type of location records.

17   Q    What sort of training did you have to become a CAST

18   asset?

19   A    So to become a certified CAST asset, it requires over

03:58:19   20   400 hours of specialized training.  The training is a

21   combination of FBI training and outside training.  So along

22   the lines, we learn how to look at cell phone records from

23   all of the major providers.  We learn how to map those, how

24   to testify to those, how to show those.  But we also receive

03:58:43   25   some training from places such as the Florida Institute of

*Deborah D. Parker, U.S. Court Reporter*

03:58:46  1  Technology, who come in and teach us all about cellular
        2  analysis theory and radio frequency theory, so how cell
        3  phones work, how a cellular network functions and how those
        4  two work together.
03:59:07  5        We receive training directly from the different
        6  cellular providers.  They come in and we have not only their
        7  legal compliance folks, but their engineers.  And they'll
        8  come in and they will talk to us directly about each of
        9  their services directly, how they differ, what we can get
03:59:27 10  from all of those companies.
        11        And then we actually have a moot court section at
        12  the end, kind of the final practical in front of all of our
        13  peers so, you know, show that we can present what we have
        14  done.
03:59:43 15  Q    After -- excuse me.  After your training to become a
        16  CAST asset, have you had additional training since then in
        17  the analysis of location records?
        18  A    We do.  We have yearly recertification that is required
        19  in order to remain a CAST-certified asset.  That training
04:00:07 20  involves once again bringing in all of those cellular
        21  providers, the engineers and the legal compliance folks.
        22  They talk about any changes that are going on in their
        23  network.  Anything that we have seen throughout the year
        24  that we have questions on, we can ask them directly and get
04:00:25 25  feedback from them.

*Deborah D. Parker, U.S. Court Reporter*

04:00:26  1           We also bring in various technology companies that

2    have to do with location services, whether that be Qualcomm

3    or whether that be companies that involve GPS location

4    services or other location tracking.  And they will come and

04:00:50  5    they will present on their services and how they could

6    potentially help us.

7    Q    And do some of those additional providers include

8    vehicle information?

9    A    Yes.

04:01:05  10   Q    Tracking devices?

11   A    Yes.

12   Q    Wi-Fi?

13   A    Yes.

14   Q    Do you yourself provide any training?

04:01:14  15   A    I do.  So you're encouraged, as I kind of spoke of, to

16   continue to provide training as well once you become

17   certified.  And I am a member of our training cadre that

18   provides the advanced trainings, so our advance courses and

19   certification courses to individuals that are interested in

04:01:40  20   becoming certified CAST assets.

21   Q    And how often do you do that?

22   A    So we normally do the advanced courses, each of them

23   once a year, so that comes out to about four separate

24   courses once a year.  And then we have some of the lower

04:01:57  25   level courses that we do.  Pretty much every single week,

*Deborah D. Parker, U.S. Court Reporter*

04:02:01    1    we're holding one of the courses.  So I'm not involved in

            2    those obviously every single week, but I do the advanced

            3    ones every year.

            4    Q    One of the topics that I expect we'll discuss is cell

04:02:12    5    sites.

            6              Can you tell us what "cell sites" are?

            7    A    So a "cell site" is another word for a cell tower.  We

            8    use the word "cell site" more often now, because a cell

            9    tower, what everyone thinks of is a giant metal structure

04:02:29   10    that goes up into the sky that has antenna, facing in

           11    different directions.

           12              However, in large cities -- and I know I'm from --

           13    originally from San Diego.  There was actually city code

           14    down there that they don't want giant structures that look

04:02:45   15    like cell phone towers, because they're an eyesore, so we

           16    typically have other things that are not typically a cell

           17    site.  Like you might have a big tall building that they put

           18    an antenna on.  So it is a cell tower, but it's not a real

           19    cell tower.  They're just using the structure that is

04:03:07   20    currently there.  There are other things like poles

           21    downtown.  When you get into the newer technology and it's

           22    not going as far, like 5G, it could be on any post that's

           23    down on a city street corner.  Or if you get on to rural

           24    neighborhoods, they might try to disguise them as things

04:03:24   25    such as water towers so that they're not an eyesore on the

04:03:29  1    community.

2    Q    I'll just ask you to just try to slow down just a

3    little bit, but what is cell site analysis?

4    A    "Cell site analysis" is the review of cellular records.

04:03:43  5    So by law, all cell providers are required to a keep record

6    of all transactions that occur on their network.  Those are

7    going to be the voice transactions, text and data.  So those

8    combined are known as "Call Detail Records" or "CDRs."

9              The Call Detail Records are very similar to what

04:04:12  10   you would have if you've ever looked at your phone bill at

11   the end of the month.  That's a little less common now.  If

12   you imagine back in the days when they actually charged for

13   minutes and you had to look at your cell phone bill to find

14   out how many minutes you had, there were -- you'll see that

04:04:29  15   there's a record of the date and time of a call, the calling

16   party, the call party and the duration of that.

17             So the Call Detail Records are, essentially, that

18   same thing; however, we're getting a little bit more

19   information on the end of that.  So the information that

04:04:48  20   we're getting on that that you would typically not see and

21   mostly not care about, is what cell site was actually used

22   when that transaction occurred.  So that's going to be that

23   cell tower that was used when you made that phone call or

24   you made that text.

04:05:04  25             And then, additionally, the cell phone providers

*Deborah D. Parker, U.S. Court Reporter*

```
04:05:09   1   are required to keep a list of where all those cell sites
           2   are located.  So that's going to be the actual GPS latitude
           3   and longitude points for where that cell site is located,
           4   which direction the antenna are facing and the different
04:05:28   5   sectors on each cell site.  So when you combine the Call
           6   Detail Records with that list of cell site locations, you
           7   can get an approximate area where a device was at any given
           8   time when a transaction, like a phone call or a text message
           9   or potentially data transactions, occurs.
04:05:53  10   Q    Does that process allow you to determine exactly where
          11   a phone has been?
          12   A    It does not.  I can't give you an exact location.  I'm
          13   not going to be able to tell you a specific address.  It's
          14   going to be a general geographic area.  And depending how
04:06:08  15   close the other cell sites are to that area would depend how
          16   close or how far I can kind of narrow that.
          17   Q    Do those records concerning the location of a device
          18   exist whether somebody is making a call or not?
          19   A    They can.  So there are additional records that cell
04:06:45  20   phone providers obtain for the purposes of keeping track
          21   of -- optimization.  So whether you're using the phone or
          22   not, some phone providers will actually keep track of an
          23   approximate location where you are.
          24         So the cell site will actually reach out to your
04:07:11  25   device and request the distance, so there's a measurement
```

*Deborah D. Parker, U.S. Court Reporter*

04:07:16   1   taken for how far the signal takes to get from your --

2   sorry -- from the cell site to your device and back to the

3   cell site.  And that can give an approximate location where

4   your device is.

04:07:30   5   Q    Now, in addition to cell site analysis, are you also

6   able to obtain data on the location of a phone from other

7   sources?

8   A    We can, yes.

9   Q    What are some of those sources?

04:07:44  10   A    So Google is probably one of the most popular options.

11   So individuals that have Android phones, specifically,

12   Google oftentimes will keep track of those devices.  Outside

13   of whether you're actually using the device, making a phone

14   call or text message, it will keep track of the general

04:08:08  15   location.  We can also look at stuff such as vehicles.  A

16   lot -- almost all vehicles now have tracking information

17   inside of them that will keep track of the location of those

18   vehicles.

19   Q    The data from Google, is that known as Google Location

04:08:28  20   Data?

21   A    It is, yes.

22   Q    And are you also able to obtain location data from GPS

23   trackers?

24   A    I can, yes.

04:08:35  25   Q    How do those work?

81

04:08:36   1   A     So GPS tracker is a device that can -- it's, typically,

           2   a magnetic device that can be placed on something else.  And

           3   it's all based on line of sight with satellites in the sky.

           4   So depending on the number of satellites, it will record the

04:08:58   5   location of where that device is when it's activated at any

           6   given time.

           7   Q     Now, the types of analyses you've been talking about

           8   here -- excuse me, for both phone records and other

           9   technology providers, in approximately how many cases have

04:09:17  10   you performed this type of analyses?

          11   A     I have testified as an expert 10 times on this material

          12   in the past.

          13   Q     Okay.  And how many times have you actually done this

          14   kind of analysis without testifying?

04:09:36  15   A     It would be in the several hundred.

          16   Q     Is your work subject to peer review?

          17   A     It is, yes.

          18   Q     Can you describe the peer-review process?

          19   A     So after we complete analysis, if it is going forward

04:09:50  20   to trial, we will actually send it to another certified

          21   member on our team and they will actually go through line by

          22   line through the cell phone records and they will actually

          23   test it in an additional system, not the one that we do the

          24   primary analysis in, to make sure that the analysis is the

04:10:09  25   same.  So that's a way to make sure if there are any errors

*Deborah D. Parker, U.S. Court Reporter*

04:10:14  1  in the system or if we have missed anything, like if we've
          2  missed a voice call or a text, it will fix that and we can
          3  make sure that it is accurate.

          4          MR. SCALLY:  Your Honor, at this time, I would
04:10:28  5  move to qualify Special Agent Dingle as an expert in
          6  technology location analysis, as it relates to cell site
          7  analysis, Google location analysis and GPS trackers?

          8          THE COURT:  You may proceed.

          9          MR. SCALLY:  Thank you, Your Honor.

04:10:40 10  BY MR. SCALLY:
         11  Q    Special Agent Dingle, are the familiar with the format
         12  of the records provided by T-Mobile®, Verizon, AT&T and
         13  Sprint?

         14  A    I am, yes.

04:10:56 15  Q    And in connection with this case, were you provided
         16  records from those companies for a number of phone numbers?

         17  A    I was.

         18  Q    Are those records voluminous?

         19  A    They are.

04:11:07 20  Q    Were you asked to perform an analysis of those records
         21  for certain dates in the fall of 2019?

         22  A    I was.

         23  Q    And were those dates provided to you by another agent?

         24  A    They were.

04:11:17 25  Q    Did you perform the requested analysis?

*Deborah D. Parker, U.S. Court Reporter*

04:11:20  1    A    I did.

          2    Q    Did you create maps that reflect that analysis?

          3    A    I did, yes.

          4    Q    Now, with respect to the Google location data you

04:11:35  5    received -- did you receive Google location data in this

          6    case as well?

          7    A    I did.

          8    Q    And are those records voluminous?

          9    A    They are.

04:11:43  10   Q    And were you asked to perform a similar analysis for

          11   certain dates in the fall of 2019, with respect to those

          12   records?

          13   A    I was.

          14   Q    And same for GPS trackers.  Did you perform an analysis

04:11:57  15   with respect to some GPS location information that you

          16   received in this case?

          17   A    I did.

          18   Q    And are those records voluminous?

          19   A    They are.

04:12:07  20   Q    Did you create maps that reflect all of the analysis

          21   we've just been talking about, both the cell site analysis,

          22   the Google location analysis and the GPS tracker location

          23   analysis?

          24   A    I did.

04:12:22  25   Q    If you could look in front of you, there should be a

04:12:25   1    stack of exhibits labeled:  Exhibits 249, 250 -- well, all

           2    the way through 255?

           3    A    I see those.

           4    Q    Do those exhibits fairly and accurately summarize your

04:12:44   5    analysis of the voluminous data in the phone records, Google

           6    location records and tracking device records?

           7    A    They do, yes.

           8    Q    Would using those exhibits assist you in providing your

           9    testimony to the jury?

04:12:59  10    A    They would.

          11          MR. SCALLY:  I request permission to publish

          12    Exhibits 249 through 255 as demonstrative exhibits.

          13          THE COURT:  You may do so.

          14        (The document was published in open court.)

04:13:18  15    BY MR. SCALLY:

          16    Q    So Special Agent Dingle, looking at the first report

          17    here, looks like there's a -- are these the three numbers

          18    that -- that are -- oh, sorry.

          19          Looking at Exhibit 249, you have three numbers

04:13:44  20    listed there.  Are these the three numbers that relate to

          21    this report?

          22    A    They are, yes.

          23    Q    And if you can -- I'm just going to turn to page 3 of

          24    that exhibit.

04:13:59  25          Can you tell us what we're seeing here?

85

04:14:02  1   A    So this is an example of cell sites.  So the picture on

2   the left would be the top of what everyone, I believe, is --

3   what they think of as a cell tower.  So it's the giant metal

4   structure.  Goes up in the sky with antenna facing off in

04:14:24  5   multiple directions.

6        The one in the middle is a very poorly designed

7   tree that is not really a tree.  And those are very common

8   in cities as well, because they can look decent from a

9   distance.  But as you can see at the top of that, there are

04:14:41  10  the antenna on that.  And at the base there would be a

11  switching station for that cell site.

12       And the one on the right is an example of what you

13  might see in a rural area.  So, sometimes, you'll see an

14  actual water tower that has cell site on the outside of it.

04:14:58  15  This one is not a water tower at all.  It is only a cell

16  site that is very nicely disguised.  It's actually at a

17  winery to make it blend into that area, but it's really just

18  a cell site.

19  Q    And let me turn to page 4 of that exhibit, and I'll ask

04:15:16  20  if you can explain to the jury what we're seeing here?

21  A    So as you saw on those previous photos, the cell sites

22  are -- they have antenna that face in different directions.

23  So they are typically sectorized.  They have three sectors

24  in most cases.  So what that means is when a cell site is

04:15:49  25  used, only one of those sectors is going to be providing

*Deborah D. Parker, U.S. Court Reporter*

04:15:53  1    service to a device.  So we know then not only which cell

2    site is being used, but we know a direction off of that

3    cell site that the device is located.

4              So, for an example, if the device was located due

04:16:12  5    north -- so if you think of the cell site as a circle,

6    360 degrees due north would be zero or straight up here at

7    the top where the north end is.  And that would be an

8    azimuth or a center point of zero.

9              So because they're sectorized -- and they are

04:16:31 10    usually three sectors -- that would be broken up into three

11    separate sections.  360 divided by 3 is 120.  So that would

12    be 120 degrees is each sector.  If your center point is

13    zero, you're going to be -- at 300 degrees is going to be

14    your left angle and 60 degrees is going to be your right

04:16:55 15    angle.  And that's going to be 120 degree, being -- for lack

16    of a better word, that the radio frequency is pushing off

17    and providing service from that sector.  If the device would

18    move to the other sector, it would move and hit that

19    azimuth.

04:17:11 20              So when we're looking at these, as you will see on

21    the map -- and I think on the next slide --

22    Q    I'll go ahead and move to page 5 of the exhibit.

23         *(The document was published in open court.)*

24    BY MR. SCALLY:

04:17:22 25    Q    And if you can tell us --

04:17:24   1   A    So this is what you're going to see on our map.  It's

2   120-degree arc which represents that sector -- that

3   120-degree arc -- and which direction it is facing.

4            So the center section here that's kind of closed

04:17:39   5   and shaded, that does not represent the actual coverage area

6   of that cell site.  All that's doing is that's helping

7   provide the direction that we're facing.  So if we have more

8   than one sector that's being used, that would be helpful.

9   And this one it's not necessarily as obvious, but sometimes

04:17:58  10   we have multiple sectors.  And that helps show that that's

11   the direction that we're facing.

12   Q    And so getting to page -- the final page, is this a --

13   page 6 of Exhibit 249, can you read the phone numbers and

14   the date at the top for this?

04:18:21  15   A    So this is October 14th, 2019, at 3:10 p.m.  And this

16   is for T-Mobile® phone No. (949) 750-5036, and that's in

17   green.

18            There's a Verizon cell phone.  That's (714)

19   889-8783.  That is in brown.

04:18:45  20            And a Verizon number (213) 929-0848, which is in

21   red.

22   Q    Is there any location, sort of looking in the bottom

23   left, that you've noted as a location of interest on this

24   map?

04:19:04  25   A    There is.  There is a box with a white No. 2, which is

04:19:09   1   the location of Asia Buffet, which is 8360 La Palma Drive --

           2   excuse me, La Palma Avenue, D-1, Buena Park, California.

           3   Q    Okay.  And so is the -- I'm circling a "No. 2" in the

           4   map.

04:19:33   5             Does that "2" represent the location of

           6   Asia Buffet on this map?

           7   A    It does.

           8   Q    And can you tell us what the other -- the other markers

           9   on this map are:  So the green and the red and the brown on

04:19:50  10   the left?

          11   A    Right.  So right down on -- pretty much on top of that

          12   red -- excuse me, green 2 is a cell site activation for that

          13   phone number, ending in 5036, the T-Mobile® number.  And

          14   that occurred at 3:10:12 p.m.

04:20:11  15             And we're also seeing a timing advance arc.  That

          16   timing advance arc is the additional information we've

          17   talked about before that the carrier will actually keep

          18   track of how far away from the cell site a device is at any

          19   given time.  So in this case, it is .15 miles from the cell

04:20:31  20   site which goes over the approximate area of Asia Buffet.

          21             On the left side of the screen, we have the other

          22   two devices -- the Verizon numbers, ending in 8783 and

          23   0848 -- that they're actually making a phone call between

          24   each other.  So at 3:10:21 p.m., the number ending in 0848

04:21:01  25   is calling the device ending in 8783.  And they are both on

89

04:21:07    1    that same cell site, so they're in that same coverage area

            2    of that cell site.

            3    Q      And so does your analysis reflect -- or is your

            4    analysis consistent with these three phones being in the

04:21:21    5    area of Asia Buffet at about the same time on that date?

            6    A      So they're in the same general area.  I would -- I

            7    would say that the two phones from Verizon are not at

            8    Asia Buffet at this time, but they are in the area just west

            9    of that.

04:21:43   10    Q      Okay.  Thank you.

           11            I'm going to direct your attention to Exhibit 250,

           12    and we'll skip ahead -- we'll skip ahead to page 6, or

           13    page 7, rather.

           14            Can you tell us what we see here?

04:22:08   15    A      So this is an illustration kind of describing what I've

           16    showed in that last slide of what timing advances.  So

           17    timing advance is that measurement from the cell site to the

           18    device and back that gives the approximate location of the

           19    device.  So the further out from the cell site it is, the

04:22:29   20    larger this arc is going to be.  Because we don't know where

           21    in that 120 degrees that cell site -- that device is.  We

           22    just know a distance.  So the device can be anywhere within

           23    that arc.  So you'll see those throughout the presentations.

           24    Q      And so let me show you then page 8 of Exhibit 250 and

04:22:56   25    ask if you can tell us what we're seeing here?

04:22:59   1   A     So this is an example of what we're going to see for

2   the Google location history records.  There will be actually

3   two that I use.  I do not use the cellular points, because

4   in my experience, they are not overly accurate.  So I'm only

04:23:15   5   using GPS and Wi-Fi.

6           So the GPS points are going to be GPS points that

7   Google has pulled.  That's GPS directly from your phone so

8   they will have the highest accuracy, normally less than 10

9   meters.  And the Wi-Fi points are going to be points that

04:23:44  10   Google has saw a Wi-Fi point.  It knows where that device

11   is, because someone else has connected to it.  And they have

12   their location turned on so they get the GPS coordinates of

13   it.  And by measuring the signal of that Wi-Fi, so the

14   signal strength, so they can tell how far you are from that

04:24:08  15   Wi-Fi point.

16           So think of it as you have a router, a Wi-Fi

17   router in your house.  If you have a Google device or

18   someone else does and they've ever been there, Google

19   probably has a location of your router in your house.  So if

04:24:24  20   someone else comes to visit or someone drives down the

21   street and sees that router, they don't actually have go

22   into your house.  They don't have to actually connect, log

23   into it.  Google knows where that is and your device sees it

24   and says, *Yeah, it's that far.  The signal strength is one*

04:24:43  25   *bar, two bars, three bars*.  Google can then estimate how far

*Deborah D. Parker, U.S. Court Reporter*

04:24:49  1  you are from your router in your house.  So you'll see this

         2  throughout where someone will be driving down a street.

         3  They won't go into any of the buildings, but Google can keep

         4  track of where you are when you going down the street

04:25:04  5  because it sees all those Wi-Fi routers.

         6  Q    Moving to page 9 of Exhibit 250 -- and Special Agent,

         7  to your right is a -- is a screen, and I believe if you

         8  touch it -- it's a touchscreen.

         9         If you could, first, let us know what's the date

04:25:31 10  and the numbers that this analysis pertains to?

        11  A    So this is October 18th, 2019, at 5:59 p.m.  And this

        12  is related to a T-Mobile® device, ending in 5036 and an AT&T

        13  device, ending in 1799.

        14  Q    And is that 657/296 as the prefix?

04:25:57 15  A    It is.

        16  Q    And is there a -- what are we seeing in this -- in this

        17  exhibit?

        18  A    So this exhibit we're seeing the two different devices.

        19  Each have a cell site activation at 5:59 p.m.  One is

04:26:20 20  5:59:09 p.m.  That's the AT&T device.  The other one is

        21  5:59:35 p.m.  The T-Mobile® device also has a timing advance

        22  record.  It's a little bit hard to see, because it's right

        23  here *(indicating)*.  And it's right against that tower.  So

        24  it's only .05 miles.  So it's pretty much right against the

04:26:49 25  cell site.

04:26:51   1          And then just above that, right here

2     (*indicating*) -- you might have to remove that.  That kind of

3     blocks it there -- is a Wi-Fi point as well.  So not only do

4     we have the timing advance, but we also have a Google Wi-Fi

04:27:09   5     hit that is 22 meters.  So it's saying that that is in that

6     same location.  So these two devices are most likely in the

7     same general location here.

8     Q    And is it your understanding that those two devices

9     belong to Wayne Le, the defendant, and a cooperator in the

04:27:34  10     case?

11     A    That's correct.  One thing we haven't mentioned on

12     these, is there's different colored dots the map.  So the

13     green dots are going to be the T-Mobile® cell sites and the

14     blue dots are going to be the AT&T cell sites.  That's why

04:27:57  15     we may not see the devices on the same cell site, because

16     we're using two different providers that have powers or cell

17     cites in different locations.

18     Q    And is this exhibit consistent with these two phones

19     being in Fountain Valley at the same time?

04:28:14  20     A    Yes.

21     Q    Moving to page 10 of Exhibit 250, I think we're looking

22     at the same phones; is that right?

23     A    Correct.

24     Q    And -- but for -- we've advanced about a half hour in

04:28:27  25     time to 6:26 p.m.?

| 04:28:29 | 1 | A     Correct. |

A   Correct.

Q   And where are those two phones now, approximately?

A   They are approximately at Irvine Spectrum Center.

Q   Okay.  And moving along to page 11, have we advanced, again, another half hour to about 6:57 p.m.?

A   We have.

Q   Are we looking again at the same phones?

A   Correct.

Q   Are they still in the vicinity of the Irvine Spectrum?

A   Correct.  And let me just clarify, because I know I spoke earlier about the device can be anywhere along these arcs we're seeing.  What we're looking at here is all of these activities occurred at 6:57p.m.  And we're seeing multiple cell sites are being utilized for that T-Mobile® device.  So the thing that we're looking for in order to get a more exact location, when we're looking at T-Mobile® True Call or timing events is we're looking for an intersection between two towers, which we had on the previous slide and we also have on this slide.

So in this case, instead of saying it's anywhere along this arc across the bottom, we have an intersection at the same minute that intersects right over the lower portion of Irvine Spectrum Center.  So that would be a more exact location where that device is at that time instead of saying it's anywhere along -- like all the way out at Chapman

94

04:30:12   1   University or in the Center.  We can now say that it is now

2   over in the left at Irvine Spectrum Center.

3   Q    And moving to page 12 of the same exact, same phones.

4   We've gone forward in time to 7:16 p.m.  Still in the

04:30:33   5   vicinity of Irvine Spectrum Center?

6   A    Correct.

7   Q    And moving forward in time to 7:41 p.m., same phone.

8   Still in the vicinity of Irvine Spectrum Center?

9   A    Correct.  And there's one difference on this slide is

04:30:51   10   there is a purple circle instead of the 120-degree arc.  The

11   reason we have that is, that circle is an omni-directional

12   cell site.  So that means that is it's not sectorized.  So

13   it sends the same cell signal out in all directions.

14   However, that cell site is inside an Apple store located

04:31:16   15   within Irvine Spectrum Center.

16   Q    Turning to Exhibit 251 -- and I'll skip ahead to

17   page 6 -- can you tell us the phone number and the date and

18   time this relates to?

19   A    So this is a Verizon phone (714) 889-8783.  And this is

04:31:49   20   on October 17th, 2019, between 1:31 p.m. and 2 -- excuse me

21   1:56 p.m.

22   Q    And is it your understanding that phone was used by

23   Natalie Nguyen on that date?

24   A    Yes.

04:32:03   25   Q    And is there a location of interest here located at --

95

| | | |
|---|---|---|
| 04:32:09 | 1 | identified with a "2" in the middle? |
| | 2 | A    There is. |
| | 3 | Q    And what does that represent? |
| | 4 | A    It's 10 -- excuse me, 18060 3rd Street, Fountain |
| 04:32:24 | 5 | Valley, California. |
| | 6 | Q    And is it your understanding that's an address |
| | 7 | associated with Wayne Le in this case? |
| | 8 | A    Correct. |
| | 9 | Q    And so does this slide -- is this basically consistent |
| 04:32:38 | 10 | with Natalie Nguyen's phone being in the vicinity of Wayne |
| | 11 | Le's residence, on October 17th, at the times indicated? |
| | 12 | A    It is, yes. |
| | 13 | Q    Turning then -- turning then to Exhibit 252 -- and I'll |
| | 14 | skip ahead to page 9.  And I'll ask:  What is this phone -- |
| 04:33:15 | 15 | what's the phone and the date that we're analyzing here? |
| | 16 | A    So there's a Sprint phone No. (714) 862-8772.  And |
| | 17 | there's also going to be one location point associated with |
| | 18 | the waynelesr@gmail.com account.  And this is on |
| | 19 | October 4th, 2019 between 12:26 p.m. and 12:29 p.m? |
| 04:33:45 | 20 | Q    And what's the location that's noted as the location of |
| | 21 | interest? |
| | 22 | Can you also just maybe circle it or indicate |
| | 23 | using the touchscreen? |
| | 24 | A    So there's a "1" here.  That is represented:  151 |
| 04:34:06 | 25 | Orangefair Avenue, Fullerton, California. |

*Deborah D. Parker, U.S. Court Reporter*

04:34:10   1    Q    Is it your understanding that's a residence associated

2    with Natalie Nguyen and James Dao at this time?

3    A    Correct.

4    Q    And so is this exhibit essentially showing that --

04:34:22   5    well, in the Sprint phone number, is it your understanding

6    that's associated with Sheila Ritze at that time?

7    A    Correct.

8    Q    So does this exhibit show that both a phone -- a Google

9    location data associated with Wayne Le and a phone

04:34:39   10   associated with Sheila Ritze were in the vicinity of

11   James Dao and Natalie Nguyen's apartment on October 4th,

12   2019?

13   A    It does, yes.

14   Q    Turning to the next page, are we later in the same day

04:34:57   15   on the same date here, at October 4th, 2019, after about

16   2:00 o'clock?

17   A    Yes.  Correct.

18   Q    And the 5036 number and the -- is that one that's

19   associated with Wayne to your knowledge?

04:35:16   20   A    It is.

21   Q    And the 0848 is associated with James Dao, to your

22   knowledge?

23   A    Correct.

24   Q    Where did the phones appear to be located at this time?

04:35:28   25   A    So they are on a freeway here -- Barstow freeway,

97

04:35:35  1    approximately, at 2:13 to 2:14 p.m.  And the progression

       2    we're going to see is that they are traveling from where we

       3    started at that residence to Las Vegas.  And this is a point

       4    along that way.

04:35:52  5    Q    So then turning to page 11 of that exhibit, is this

       6    another -- another -- moving forward in time on that same

       7    day but we're seeing James Dao's phone and Google location

       8    data for Wayne Le, basically, on the way to Vegas?

       9    A    Correct.  In this it looks like there was bit of a pit

04:36:17 10    stop.  They're there for approximately 45 minutes.

      11    Q    So turning to page 12 of 15, we're looking at the 5036

      12    number for Wayne and another T-Mobile® number.

      13         Can you read that number for us, please?

      14    A    This is T-Mobile2® No. (949) 542-2376.

04:36:44 15    Q    Is it your understanding that number is associated with

      16    Shawn Whalin?

      17    A    Yes.

      18    Q    And so does this exhibit or this page of the exhibit,

      19    basically, show that Wayne's phone and Shawn Whalin's phone

04:37:01 20    appear to be together on the way to Vegas?

      21    A    It does, yes.

      22    Q    And turning to page 13 of that exhibit, looks like

      23    we're later on the same day looking at Wayne's phone and

      24    James Dao's phone and, again, this is another point on the

04:37:23 25    way to Vegas?

*Deborah D. Parker, U.S. Court Reporter*

04:37:25    1   A    Correct.  This is in Primm, Nevada now at that

            2   approximate location.

            3   Q    And lastly, page 14 of that exhibit.  Looks like we

            4   have quite a few phones here.  Can you indicate for us -- it

04:37:50    5   looks like it's October 4th, 2019, during the 7:00 o'clock

            6   hour?

            7   A    Correct.

            8   Q    And we're looking at a 5036 number associated with

            9   Wayne?

04:38:03   10   A    Correct.

           11   Q    A 0848 number associated with James Dao?

           12   A    Correct.

           13   Q    An 8772 number associated with Sheila Ritze?

           14   A    Correct.

04:38:15   15   Q    And (714) 404-8575 number associated with Sandra Ritze?

           16   A    Correct.

           17   Q    If you tell us what we're seeing in the markings there

           18   and feel free to use the touch screen please.

           19   A    Sure.  So there's a lot of information going on, on

04:38:30   20   this screen.  But, generally, what it's showing is within

           21   that approximately 20 minute time frame that all of these

           22   devices are in the same general location in Las Vegas.  So

           23   we have Wi-Fi points here (indicating) that show them right

           24   at the hotel.  We actually have a cell site that's another

04:38:54   25   omnidirectional that shows within the hotel there.

04:38:57  1          We show all of these *(indicating)* along here are

2     cell sites that are within that same general location for

3     the hotel, as well as that one facing towards the hotel.

4          And then we have the Sprint number that is -- at

04:39:15  5     that time, it's approximately somewhere out here

6     (indicating) along this arc.  It's not going to draw, but a

7     couple dots there.

8     Q    And what is the location of interest?

9          So if I clear the markings and circle the orange

04:39:33  10    marker there, what does that refer to?

11    A    That's the Palms Casino Resort, 4321 West Flamingo

12    Road, Las Vegas, Nevada.

13    Q    Turning then to Exhibit 253 -- and I'll just show you

14    the first page -- is this, basically, an analysis of Wayne's

04:40:08  15    5036 number, James Dao's 0848 number and Sheila Ritze's 8772

16    number?

17    A    It is.

18    Q    As well as Google location data for

19    waynelesr@gmail.com?

04:40:24  20    A    Correct.

21    Q    So I'm going to skip ahead to page 9 of the exhibit.

22         And are we looking at October 14th, 2019, at

23    approximately 10:49 to 10:50 p.m.?

24    A    Correct.

04:40:49  25    Q    And what's this location of interest here that's listed

04:40:53  1    as "1"?

2    A     It is 151 Orangefair Avenue, Fullerton, California.

3    Q     And is it your understanding that's the address of

4    Natalie Nguyen and James Dao at that time?

04:41:06  5    A     Correct.

6    Q     And what is the -- what are cell sites telling us here?

7    A     So here we have, once again, some overlapping timing

8    events that is putting it right about at the location of

9    that address, the 151 Orangefair between 10:49 p.m. and

04:41:27 10    10:50 p.m.

11    Q     So consistent with Wayne's phone and James Dao's phone,

12    both being in the vicinity of James Dao's apartment on that

13    date at that time?

14    A     Correct.

04:41:38 15    Q     Turning the page to page 10 of Exhibit 253, are we

16    looking, again, at the same two phones and adding in a phone

17    associated with Sheila Ritze?

18    A     We are, yes.

19    Q     And are we now up to about an hour later:  11:43 to

04:42:02 20    11:57 p.m.?

21    A     We are, yes.

22    Q     And do we have a location of interest indicated by the

23    "4" there?

24    A     We do.

04:42:14 25    Q     And what is that?

04:42:17  1   A      26363 Camino De Vista, San Juan Capistrano, California.

2   Q      Is it your understanding that's a residence associated

3   with Sheila Ritze?

4   A      Yes.

04:42:35  5   Q      What are we seeing from the devices at this time?

6   A      We are seeing the Verizon phone, ending in 0848, is on

7   a cell site on the right side of the map but facing in a

8   southwest direction.  And we actually have a timing advance

9   arc .87 miles from that cell site that goes along there and

04:42:58  10  ends right about at the residence.

11          We have the Sprint device, which is facing --

12  it's, again, on the right side of the map, but it's facing

13  to the left towards the residence.

14          And we have one without a timing advance arc and

04:43:18  15  one that does that's 1.36 miles that overshoots the

16  residence a bit.  And then we have a lot of different arcs

17  for the 5036 number.  And it's pretty much between .68 miles

18  and .87 miles that are once again on the left side of the

19  map.  They're facing to the right towards the residence that

04:43:44  20  all intersects over that residence.  And we also have some

21  GPS and Wi-Fi points with the Google location history that

22  put it right at the residence.

23  Q      And so is that these two -- this red and blue dot that

24  indicate Google location data associated with Wayne Le?

04:44:07  25  A      Correct.  And the next slide will be a zoomed-in view

*Deborah D. Parker, U.S. Court Reporter*

102

04:44:10  1   of that.

2   Q    So let's turn then to Exhibit -- excuse me, page 11 of

3   Exhibit 253.

4             And is that what we see?  A zoomed-in version of

04:44:22  5   the prior exhibit?

6   A    Correct.  And it's showing those points more or less

7   directly on that pin.

8   Q    So, essentially, is this consistent with these three

9   parties being at Sheila Ritze's residence?

04:44:39  10  A    It is, yes.

11  Q    Turning then to page 12 of Exhibit 253, looks like we

12  move forward in time.  We passed the calendar date of -- at

13  midnight onto October 15th, at 12:12 a.m.; is that right?

14  A    Correct.

04:44:59  15  Q    And what are we seeing in this exhibit?

16  A    So we're seeing the T-Mobile® number with 5036 and the

17  Verizon number with 0848 that are both intersecting in the

18  area of the Dana Point dock there.  And we also have a Wi-Fi

19  point that is also putting it right in the center at the

04:45:27  20  dock.

21  Q    Is that that blue dot there (indicating)?

22  A    It is, yes.

23  Q    So is this, essentially, consistent with Wayne and

24  James Dao being at the dock at that time?

04:45:41  25  A    It is, yes.

*Deborah D. Parker, U.S. Court Reporter*

04:45:43  1   Q     Moving to page 13 of Exhibit 253, have we moved forward

2   in time here about half an hour to 12:46 to 12:48 a.m.?

3   A     We have.

4   Q     And what, if any, movement are we seeing from the

04:46:02  5   phones?

6   A     So we're now seeing that the devices, based on the

7   timing advance and the overlaps, appear to be out on the

8   water.  So there's a little jetty that you have to go

9   through to get out to the ocean.

04:46:17 10   Q     And is that -- let me just stop you for a second.

11        Is that jetty within the oval that I just drew

12   there in the center of the page?

13   A     It is, yes.

14   Q     Okay.  Continue, please.

04:46:29 15   A     And the devices are now outside that area.  And there's

16   a circle right here (indicating) that's actually Google GPS

17   point.  That pretty much goes right over the intersection of

18   those two timing advance arcs that are also intersecting.

19   And that's showing that the devices are most likely in that

04:46:50 20   area, pretty exact area with the GPS.  And they remain in

21   that area until about 1:05 a.m.

22   Q     Okay.  And let me -- so consistent with Wayne --

23   Wayne's phone and James' phone being in that area, from this

24   time until about 1:05 a.m.; is that correct?

04:47:15 25   A     Right.

04:47:15    1   Q    And moving to the next slide, it looks like we have a
            2   zoomed-in version of the last slide; is that right?
            3   A    Correct.
            4   Q    And so does this show the jetty you're referring to
04:47:31    5   here *(indicating)*?
            6   A    Correct.
            7   Q    And is this *(indicating)* the Google location data point
            8   you were referring to?
            9   A    It is, yes.
04:47:42   10   Q    And what's the range of error with respect to the
           11   Google location point at that time?
           12   A    250 meters.
           13   Q    And moving to page 15 of Exhibit 253, it looks like
           14   we've moved forward here until about half an hour later from
04:48:06   15   1:28 a.m. to 1:34 a.m.  And we're looking, again, at Wayne's
           16   5036 number and James Dao's number; is that correct?
           17   A    Correct.
           18   Q    And what do we see in this slide?
           19   A    So this -- we're seeing, once again, overlapping arcs
04:48:24   20   between the different phones that are intersecting all in
           21   the same area out at sea.  And we're also seeing a GPS point
           22   from the Google location history that starts out at 237
           23   meters and stays center on that same spot and just keeps
           24   getting worse and worse signal, up until 4,989 meters, which
04:48:50   25   is the largest circle.  And then we get no more location

*Deborah D. Parker, U.S. Court Reporter*

04:48:54  1    information from Google after that point in time.

2    Q     So when you're talking about the Google location data,

3    is this -- where I just circled, is the red dot in there

4    that center point of that Google location?

04:49:14  5    A     Yes.  There's one smaller in there that's really tight.

6    Would be the 237 meters.  The one you circled would be the

7    next biggest.

8    Q     Oh, I'm sorry.  Okay.  So it's just that little red

9    dot; is that right?

04:49:33 10    A     Right.

11    Q     And so you were explaining that it -- the location data

12    appears to be fairly -- fairly accurate and then gets less

13    accurate over time?

14    A     Correct.  So 237 meters out at sea is a very big

04:49:57 15    accuracy.  It's pretty tight.  And then we get four more

16    points after that that stay centered on that same latitude

17    and longitude, but the degree of error gets worse and worse.

18    Q     Would that be consistent with that phone malfunctioning

19    in some way?

04:50:16 20    A     Yeah.  For some reason it cannot get a good lock on the

21    GPS and Google is estimating the last known location and the

22    approximate area that it could have traveled.

23    Q     Would that be consistent with a phone going in the

24    water?

04:50:32 25              MR. WILKE:  Objection.  Leading.

*Deborah D. Parker, U.S. Court Reporter*

04:50:34  1          THE COURT:  Overruled.

2          You can answer that question.

3          THE WITNESS:  That's possible.

4          MR. WILKE:  Objection.  I want to move to strike.

04:50:42  5  Speculative.

6          THE COURT:  Overruled.

7  BY MR. SCALLY:

8  Q    Moving to page 16 of Exhibit 253, looks like we've

9  moved ahead in time here to 3:00 a.m.; is that correct?

04:50:55 10  A    Correct.

11  Q    And is this Wayne's 5036 number?

12  A    It is.

13  Q    And what are we seeing in this exhibit?

14  A    So we're, once again, seeing the overlap arcs for one

04:51:14 15  phone in this case and it's overlapping once again on the

16  dock.

17  Q    And so what happened to James Dao's phone?  What's the

18  status of James Dao's --

19          MR. WILKE:  Objection.  Calls for speculation,

04:51:28 20  Your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  There's no further activity on that

23  device.

24  BY MR. SCALLY:

04:51:32 25  Q    And turning then to page 17 of Exhibit 253, what do we

```
04:51:43   1    see here?

           2    A      So between 3:27 a.m. and 3:30 a.m., we see the device

           3    ending in 5036 is back in the vicinity of the 26363

           4    Camino De Vista, San Juan Capistrano address.

04:52:06   5    Q      Thank you.

           6           Turning then -- turning then to Exhibit 254 and --

           7    is this -- so looking at the cover sheet on page 1 of

           8    Exhibit 254, was this analysis of a Logistimatics and GPS

           9    and Track Tracking Device that you did?

04:52:38  10    A      It was.

          11    Q      And also a phone number associated with Natalie Nguyen?

          12    A      Correct.

          13    Q      And a (714) 622-0867 number associated with Wayne?

          14    A      Correct.

04:53:00  15    Q      Okay.  And to include Google location data from the

          16    same Google account we've been talking about?

          17    A      That's correct.

          18    Q      Okay.  I'm going to skip ahead to page 4, so you can

          19    orient us according to the new code in this exhibit.

04:53:20  20    A      You're still going to see, potentially, GPS stuff,

          21    which are going to be the red and the blue.  However, we're

          22    also now going to see a green point, which is going to be

          23    any Logistimatics GPS points.  And we're going to see orange

          24    points, which are for the GPS and Track GPS points.

04:53:41  25    Q      And so we'll start on page 5.
```

04:53:51   1          And so looks like we're talking -- we're looking

2    at October 21st of 2019, at about 8:00 p.m.; is that right?

3    A    Correct.

4    Q    And it looks like there's a location of interest

04:54:05   5    designated as a "2."

6                Is that Wayne's residence?

7    A    It is.

8    Q    And what's the blue indicator -- the blue dot here

9    *(indicating)* and the orange -- or, yeah, orange dots?  What

04:54:24   10   do those indicate?

11   A    So the blue are two Google precision location hits

12   using Wi-Fi, between 7:59 p.m. and 8:01 p.m.  And the two

13   orange points are the GPS and track hits between

14   8:00 o'clock and 8:01 p.m.  And they both show on the same

04:54:49   15   location.

16   Q    So is this both consistent with --

17        *(Court Reporter requests clarification for the*

18        *record.)*

19   BY MR. SCALLY:

04:54:55   20   Q    Is this consistent with both the GPS and Track Tracking

21   Device and the phone associated with Wayne's Google account

22   being at Wayne's residence on that date and time?

23   A    It is, yes.

24   Q    So moving to page 6 of that exhibit, it looks like we

04:55:19   25   moved forward to November 1 of 2019.

109

04:55:22  1           Do we see a Logistimatics Tracking Device?

        2    A    We do.

        3    Q    And where is this?

        4    A    So this is -- the point here, this is the time we see

04:55:36  5    this device come online.  And this is in Greensboro,

        6    North Carolina.

        7    Q    Are you familiar with the relationship of Greensboro to

        8    the company Logistimatics?

        9    A    Yes.  That is the headquarters for Logistimatics.

04:55:55 10    Q    So is it your understanding they turn the tracking

       11    devices on when they ship them?

       12    A    Yes.  It looks like they turn them on to make sure they

       13    work before they ship them out.

       14    Q    And turning to page 7 of Exhibit 254, is our location

04:56:13 15    of interest, again, Wayne's residence there at the "2"?

       16    A    It is.

       17    Q    And where is the Logistimatics Tracking Device here on

       18    November 4th of 2019?

       19    A    It's just outside the residence.  Looks like on the

04:56:29 20    street outside that house.

       21    Q    So moving to page 8 -- and it looks like we've moved

       22    forward to November 8th of 2019; is that correct?

       23    A    Correct.

       24    Q    And, again, are we at Wayne's residence here denoted by

04:56:47 25    the "2"?

*Deborah D. Parker, U.S. Court Reporter*

04:56:47  1   A     We are.

2   Q     And does this show, basically, the Logistimatics

3   Tracker in green, the GPS tracker in orange and Wayne's

4   Google location data in blue?

04:57:06  5   A     It does.

6   Q     So is this consistent with both trackers and the phone

7   associated with the Google account for Wayne being at his

8   residence?

9   A     It is, yes.

04:57:18 10   Q     Okay.  So moving ahead to Exhibit 9 -- excuse me,

11   page 9.

12         MR. SCALLY:  Thank you, Counsel.

13   BY MR. SCALLY:

14   Q     -- of Exhibit 254, what are we looking at here?

04:57:33 15   A     So we're starting on the left side of the screen at

16   2:56 a.m.  And we see a Google precision location point at

17   2:56 a.m. in the vicinity of the address, 18060 Third

18   Street, of Wayne's residence.  And we also see the

19   Logistimatics and the GPS and track points at that same

04:58:00 20   location.

21         The devices then pretty much move all the way

22   across the street -- across the screen.  You can see the

23   route they take.  And in the end, they end up on the far

24   right of the screen, if you'll slide it just a little bit,

04:58:14 25   at an address of 1409 South Rene Drive, Santa Ana,

*Deborah D. Parker, U.S. Court Reporter*

04:58:20   1    California.

           2    Q    And is it your understanding that's an address

           3    associated with Shawn Whalin?

           4    A    It is, yes.  There's also a cell activation on a cell

04:58:31   5    site in that same location.

           6    Q    And is that a phone number ending in 0867 associated

           7    with Wayne Le?

           8    A    It is, yes.

           9    Q    So then turning to page 10 of Exhibit 254, are we

04:58:52  10    looking at GPS data for the two tracking devices from

          11    November 8th of 2019?

          12    A    We are.

          13    Q    Is that at about 5:00 -- a little before 6:00 in the

          14    morning?

04:59:04  15    A    It is, yes.

          16    Q    And is this location of interest denoted by "1,"

          17    151 Orangefair Avenue, in Fullerton, California?

          18    A    Correct.

          19    Q    And is that, as you understood it, Natalie Nguyen's

04:59:19  20    residence?

          21    A    Correct.

          22    Q    And so are those trackers in the vicinity of

          23    Natalie Nguyen's residence on this date and time?

          24    A    They are.

04:59:28  25    Q    Moving forward to page 11, what do we see here?

*Deborah D. Parker, U.S. Court Reporter*

04:59:39    1    A     So this is showing a zoomed-out view of this area, on

            2    November 8th, 2019, between 7:22 a.m. and 7:44 a.m.   And

            3    what you can see is, in the top of the map -- and I kind of

            4    blew it up in the corner -- is at that address denoted as

05:00:02    5    "1," which was Natalie Nguyen's residence.   The

            6    Logistimatics tracker is still in that location.

            7            The other tracker, the GPS and Track Tracker, is

            8    now on the bottom portion of the screen and there's also a

            9    cell site activation for a phone number associated with

05:00:21   10    Wayne, ending in 0867.   And they show that they are in the

           11    same location.   So the two trackers now are in separate

           12    locations.

           13    Q     So is it fair to say that the Logistimatics tracker has

           14    been left up here *(indicating)* near the residence of Natalie

05:00:37   15    Nguyen, from what you can tell?

           16    A     Yes.

           17    Q     And the GPS and Track Tracker has returned to -- is

           18    this Wayne's residence, from your understanding?

           19    A     I don't believe his residence is right there.   I don't

05:00:50   20    believe, but his car is down there.   He's -- sorry, I don't

           21    know his car is there.   The cell phone device is making a

           22    transaction and the device is with it.

           23    Q     And then moving to page 12 of Exhibit 254, are we,

           24    again, looking at Wayne's residence at the "2" on that?

05:01:17   25    A     Correct.   So now at 8:03 a.m. that GPS and Track device

*Deborah D. Parker, U.S. Court Reporter*

05:01:21   1   has returned to the residence.

           2   Q    And moving then to page 13 of Exhibit 254, are we

           3   moving to the next day here:  November 9th?

           4   A    We are, yes.

05:01:38   5   Q    And are we seeing -- what are we seeing in this

           6   exhibit?

           7   A    So we're seeing that a device associated with Natalie,

           8   the Verizon telephone number ending in 8783, has an

           9   activation at 6:46 p.m.  And on that same time, that

05:01:59  10   Logistimatics Tracker is in that same general location.

          11   Q    And so we're seeing that -- is this Natalie Nguyen's

          12   residence over here (indicating) with the one?

          13   A    It is, yes.

          14   Q    And the tracker appears to be following

05:02:14  15   Natalie Nguyen's phone at this point?

          16   A    Correct.

          17   Q    Moving to page 14 of Exhibit 254.  Actually, let me

          18   just skip ahead to page -- let me skip ahead to page 16.

          19             And we've moved --

05:02:41  20             THE COURT:  Counsel, just one moment.  Why doesn't

          21   everybody stand up for just one second.  Just stand up for a

          22   second and stretch.

          23        (Pause)

          24             THE COURT:  Counsel.

05:02:54  25             Well, have a seat now.  Thank you.

*Deborah D. Parker, U.S. Court Reporter*

05:02:59  1          MR. SCALLY:  Continue, Your Honor?

        2          THE COURT:  Please.

        3   BY MR. SCALLY:

        4   Q    Looking at page 16, what are we seeing in this exhibit?

05:03:07  5   A    So, here, we're seeing travel of the GPS and Track

        6   device from -- it starts on the lower portion of the screen

        7   at 9:01 p.m. in the vicinity of the 18060 3rd Street

        8   address.  And it proceeds north to the top of the screen,

        9   which is indicated as a "7," which is 1120 Nicklett Avenue,

05:03:39 10   Fullerton, California.

       11   Q    Do you understand that to be another address associated

       12   with Natalie Nguyen?

       13   A    Yes.

       14   Q    So moving ahead to page 17 of Exhibit 254, what are we

05:03:56 15   seeing here?

       16          Well, what's the date, first of all?

       17   A    It's November 26th, 2019.  And this is between

       18   2:05 p.m. to 10:57 p.m.  And this is showing travel of that

       19   device from -- a starting location of the 1120 Nicklett

05:04:16 20   Avenue address to a location in Chandler, Arizona.

       21   Q    And so the "7" to the left that I've just circled, is

       22   that one of those addresses associated with Natalie Nguyen?

       23   A    It is, yes.

       24   Q    And I think you've indicated that this, basically,

05:04:32 25   shows the tracker ending up in or near Chandler, Arizona; is

05:04:37   1   that right?

           2   A    Correct.

           3   Q    And this is on November 26th, 2019; is that correct?

           4   A    Correct.

05:04:43   5   Q    And if we look at page 18, do we have, on November 26,

           6   the Logistimatics device basically at Wayne's residence?

           7   A    Correct.

           8   Q    And moving to page 19, on November 27th, do we see the

           9   GPS and track device moving around Chandler, Arizona?

05:05:18  10   A    Correct.

          11   Q    And that's on November 27th of 2019; is that right?

          12   A    Correct.

          13   Q    And the last page of this particular exhibit, what are

          14   we seeing here?

05:05:28  15   A    So this is -- it starts on the right side of the screen

          16   this time, and it is the device leaving Chandler, Arizona,

          17   at approximately 9:07 a.m. and proceeding west back towards

          18   California.  And the last point on that tracker is at

          19   7:25 p.m. and then it stops.  And there is no further

05:05:50  20   activity.

          21   Q    Okay.  And this is on November 30th of 2019?

          22   A    Correct.

          23   Q    And this is, basically, the tracker returning from

          24   Arizona to a location in Southern California?

05:06:03  25   A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

05:06:10  1    Q    And moving to the last exhibit for you, Special Agent

2    Dingle, Exhibit 255, if we turn to page 8 of 255, I'll ask

3    you what we're looking at here.

4    A    So these slides are going to be certain times where

05:06:36  5    there were intersections between either the same device on

6    multiple towers or both devices.  And when I say "both

7    devices," I mean the T-Mobile® device, ending in 5306 and

8    the Verizon device, ending in 0848.

9              On this one is October 15th, 2019, at 1:23 a.m.

05:07:08  10   That intersection is, approximately, 3.1 miles from shore.

11   Q    And so just to orient the jury, again, this is,

12   basically, the night of the boat trip; is that right?

13   A    Correct.

14   Q    And this is Wayne's 5036 number and James Dao's 0848

05:07:30  15   number?

16   A    Correct.

17   Q    And they're intersecting here at a location that's

18   about 3 miles out to sea at about 1:23 a.m.?

19   A    Correct.

05:07:40  20   Q    And looking then at page 9, is this later the same

21   morning at about 1:25 and are we just seeing a location

22   point for James Dao's phone?

23   A    Correct.

24   Q    And is that, approximately, 3.25 miles from the shore?

05:08:04  25   A    It is.

*Deborah D. Parker, U.S. Court Reporter*

05:08:05  1    Q    Moving to page 10, are we seeing an analysis of both

        2    Wayne's phone, James Dao's phone and Wayne's Google account

        3    at about 1:28 a.m., on October 15th, 2019?

        4    A    We are.

05:08:23  5    Q    And does that put the location of those devices at

        6    about 3.17 miles offshore?

        7    A    Correct.

        8    Q    And moving to page 11, are we, again, seeing analysis

        9    of Wayne's phone and James Dao's phone now at about

05:08:45 10    1:31 a.m. on October 15th?

       11    A    Correct.

       12    Q    And does that put those phones at approximately

       13    3.21 miles together offshore?

       14    A    It does.

05:08:54 15    Q    And moving to page 12, at about 1:41 a.m. on the 15th,

       16    are we, again, looking at Wayne and James' phones?

       17    A    Yes.

       18    Q    And does their intersection put them at about

       19    3.38 miles offshore?

05:09:12 20    A    It does.

       21    Q    And looking at page 13, at about 1:42 a.m., does the

       22    intersection of those same phones, again, put them at about

       23    3.38 miles offshore?

       24    A    It does.

05:09:27 25    Q    And looking at page 14, at 1:43 a.m., does the two data

*Deborah D. Parker, U.S. Court Reporter*

118

05:09:33   1    points that you have for Wayne's phone put it at about

2    3.42 miles offshore?

3    A    Correct.

4    Q    And moving to page 15, we're moving to 1:44 a.m.

05:09:58   5         Does the intersection of Wayne's phone and James'

6    phone put them at about 3.29 miles offshore?

7    A    Correct.

8    Q    And moving to a minute later, at 1:45 a.m., does that

9    same intersection of the same phones put them at about

05:10:20  10    3.31 miles offshore?

11    A    It does.

12    Q    And just a couple more slides.  A few more slides for

13    you, Special Agent Dingle.  At 1:47 a.m., does the

14    intersection of those same phone put them at about

05:10:37  15    3.21 miles offshore?

16    A    Correct.

17    Q    And a minute later, at 1:48 a.m., does the intersection

18    of those same two phones put them at about 3.38 miles

19    offshore?

05:10:51  20    A    It does.

21    Q    And now was that the last -- in the last slide, was

22    that the last data point we have for James Dao's phone?

23    A    I believe so, yes.

24    Q    Okay.  And then at 2:08 a.m., do we have Wayne's phone

05:11:16  25    at approximately 3.46 miles offshore?

*Deborah D. Parker, U.S. Court Reporter*

05:11:19   1   A    Correct.

2   Q    And lastly, at about 2:09 a.m., do we have Wayne's

3   phone at about 3.04 miles offshore?

4   A    Correct.

05:11:34   5        MR. SCALLY:  If I could have just a brief moment,

6   Your Honor.

7        THE COURT:  Certainly.

8        *(Pause)*

9        THE COURT:  Counsel, why don't you call the time

05:11:54  10   so we're not interrupting the examination to recess this

11   evening.

12        MR. SCALLY:  You're suggesting recess, Your Honor?

13        THE COURT:  No, I'm making certain that each side

14   has continuity.

05:12:08  15        You tell me when it's convenient.

16        MR. SCALLY:  Oh, I'm just about done, Your Honor.

17        THE COURT:  Okay.

18        *(Pause)*

19   BY MR. SCALLY:

05:12:32  20   Q    Special Agent Dingle, are you aware, when a tracking

21   device is employed, who has access to the location data?

22   A    Typically, I believe it would be only the individual

23   that subscribes to the account from that company.  So

24   whoever would have the logging information for that device

05:12:57  25   would be able to log in and see where that device is

05:12:59  1  located.

        2  Q    Typically, the purchaser of that?

        3  A    Correct.

        4         MR. WILKE:  Objection, Your Honor.  Speculation.

05:13:08  5  Relevance.

        6         THE COURT:  Overruled.

        7         You can answer.  Your answer was?

        8         THE WITNESS:  "Correct."

        9  BY MR. SCALLY:

05:13:13 10  Q    Other than the analysis and preparation of the maps

       11  we've discussed, were you otherwise involved in this

       12  investigation?

       13  A    I was not, no.

       14         MR. SCALLY:  No further questions.

05:13:22 15         Thank you, Your Honor.

       16         THE COURT:  And cross-examination tomorrow

       17  morning, Mr. Wilke?

       18         MS. MOJTEHEDI:  No recross -- no cross,

       19  Your Honor, yes.

05:13:31 20         THE COURT:  Counsel, any other questions?  If not,

       21  we'll excuse the witness.

       22         MR. SCALLY:  No, Your Honor.  Thank you.

       23         THE COURT:  We're going to leave you on-call.  I

       24  doubt that you'll be called back, but you're excused from

05:13:40 25  these proceedings.

*Deborah D. Parker, U.S. Court Reporter*

05:13:42  1            THE WITNESS:  Okay.  Thank you, Your Honor.

          2            THE COURT:  Ladies and gentlemen, sorry for

          3    keeping you late but we've had a continuous presentation.

          4    So, please, drive safely.  We'll see you at 8:30.

05:13:49  5            Please, don't discuss this matter, nor form or

          6    express any opinion concerning the case.

          7            Good night.

          8        (Jury exits courtroom.)

          9        (The following proceedings were had outside the

05:14:00 10        presence of the jury:)

         11            THE COURT:  Thank you, sir.

         12            Counsel, we're going to take another matter this

         13    evening, unrelated to yours.

         14            Is the gentleman in custody?

05:14:26 15            Do you have anything further this evening?

         16    Otherwise, we'll see you at 8:00 o'clock tomorrow.

         17            Who will be your first witness tomorrow, just so

         18    everyone is prepared?

         19            MR. SCALLY:  It will likely be Vu Nguyen, who is

05:14:37 20    very short and then Shawn Whalin.

         21            MR. WILKE:  We have one in limine issue with

         22    Whalin.  We can take it up in the morning.  The Court is

         23    already familiar with it.

         24            THE COURT:  All right.  We'll see you tomorrow

05:14:48 25    morning.  Get some rest, okay, for both parties and stay

05:14:52   1   focused on your respective cases.

2           MR. SCALLY:  Thank you, Your Honor.

3      *(At 5:14 p.m., proceedings were adjourned.)*

4

5                          -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

        I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Date:   January 4, 2022



                        _____/s/DEBORAH D. PARKER_____
                        DEBORAH D. PARKER, OFFICIAL REPORTER