UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,          )
                               )
      vs.                      ) SACR NO. 20-00002-(B)-DOC
                               ) Day 7, Volume II
HOANG XUAN LE,                 )
                               )
            DEFENDANT.          )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, NOVEMBER 17, 2021

1:33 P.M.


**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                        TRACY L. WILKISON
                        ACTING UNITED STATES ATTORNEY

                        SCOTT M. GARRINGER
                        ASSISTANT UNITED STATES ATTORNEY
                        CHIEF, CRIMINAL DIVISION

                        GREGORY S. SCALLY
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3592
                        gregory.scally@usdoj.gov

                        GREGORY STAPLES
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3534
                        gregory.staples@usdoj.gov


    FOR THE DEFENDANT, HOANG XUAN LE:

                        CRAIG WILKE
                        LAW OFFICE OF CRAIG WILKE
                        305 NORTH HARBOR BOULEVARD
                        SUITE 216
                        FULLERTON, CALIFORNIA 92832
                        (714) 870-8900
                        craig@craigwilkelaw.com

                        SHEILA S. MOJTEHEDI
                        STRADLING, YOCCA, CARLSON & RAUTH,
                        P.C.
                        660 NEWPORT CENTER DRIVE
                        SUITE 1600
                        NEWPORT BEACH, CALIFORNIA 92660
                        (949) 725-4000
                        sheila.mojtehedi@gmail.com

```
 1                        I N D E X

 2

 3   DEFENDANT'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    HOANG XUAN LE            10
                              16
 5                            74

 6

 7                      E X H I B I T S

 8   PLAINTIFF'S EXHIBITS:              IDENTIFICATION  EVIDENCE

 9    274   Stipulation                                    9

10

11                      E X H I B I T S

12   DEFENDANT'S EXHIBITS:              IDENTIFICATION  EVIDENCE

13    114   Spreadsheet                                   54

14    556   California Fish and                           95
            Wildlife Full Season Spiny
15          Lobster Report Card,
            9/28/19
16
      560   Photograph                                    36
17          Photograph                                    36

18    561   Photograph                                    37

19    562   Paul Le's Death Certificate                   22

20    564   Photograph                                    88

21    565   Fishing License                               92

22    570   Photograph                                    40

23    573   Union Bank Record                             74

24

25
```

*Deborah D. Parker, U.S. Court Reporter*

**SANTA ANA, CALIFORNIA; WEDNESDAY, NOVEMBER 17, 2021;**

**1:33 P.M.**

**-oOo-**

*(The following proceedings were had outside the*
*presence of the jury:)*

THE COURT:  Counsel, we're on the record.

And over the portion of the lunch hour, I was able
to look at a couple of what I'm going to call "the daily
transcripts."  We have no official transcript up to this
time.  In doing so, I'm still going to reserve my ruling.
But, tentatively, my thoughts are as follows, so you could
be guided on your presentation, and that is:  My prior
ruling was that Sheila Ritze, of course, is unavailable for
purposes of Rule 804(b)(3) and the fact the majority of
Ms. Ritze's statements were denying any culpability
whatsoever, distancing herself from the death of the victim
by saying from the beginning that, quote, she didn't know
anything was going to happen, end of quote, and that the
events were a surprise to her.

Once again, that's a transcription, 29 through 30
of Docket 235.  The defense has asked the Court to
reconsider and has argued, once again, that Ms. Ritze's
statements that she drove the boat and that she left the
boat in the water after hearing gunshots are
self-inculpatory; that those statements do not suddenly

*Deborah D. Parker, U.S. Court Reporter*

01:34:54  1   inculpate Ms. Ritze when taken in context of her entire

2   interview which largely denies any involvement in the

3   alleged plan to murder the victim.

4            The trial has now seemed to reverse that position.

01:35:17  5   And the defense is seeking the statements.

6            Correct, Mr. Wilke?

7            MR. WILKE:  I was seeking those statements before

8   trial, and I'm still --

9        (Overtalking:  Unable to report.)

01:35:27  10           THE COURT:  Before trial.  But the Government also

11   was seeking what I'm going to call the second portion of

12   that interview that was --

13           Is that correct, Counsel?

14           MR. SCALLY:  If the first statement was admitted,

01:35:36  15   the Government was going to seek to admit the second

16   statement.

17           THE COURT:  Yes.  The first statement was admitted

18   through the second statement, you'd requested.  Once again,

19   I'm going to find that they're not trustworthy.  Factors

01:35:51  20   related to trustworthiness include the time of the

21   declaration and the party to which it was made.  And the

22   existence of corroborating evidence to the extent that the

23   declaration is actually against the declarant's interest and

24   the availability of the declarant as a witness.

01:36:10  25           Once again, I'm going to cite *United States versus*

01:36:12  1   *Ospina*, Ninth Circuit, 1984.  Also, the fact that Mr. Ritze

2   made these statements to federal agents following her

3   arrest, while not dispositive, does weigh against

4   trustworthiness, given Mr. Ritze's motive to lie and her

01:36:26  5   changing statements.

6   Further, the corroborating evidence of Ms. Ritze's

7   statements are minimal, especially when the Government has

8   already charged Ms. Ritze with making false statements in

9   her first interview -- or initially charged her in 18 USC

01:36:41 10   Section 1001 and the second superseding indictment at

11   22 through 23, Docket 134.

12   These facts coupled with the fact that many of

13   Mr. Ritze's statements are not sufficiently against her

14   interests as explained previously to counsel, as well as her

01:37:06 15   arrest, as well as her changing explanations do not meet the

16   standard of trustworthiness.

17   I'm not ready to finalize that, because I think in

18   an abundance of caution, I'm simply going to reserve it, but

19   I think it will give both counsel guidance as to the Court's

01:37:26 20   decision at least.

21   The second issue is that the defense has

22   oftentimes put in a position if the Court reserves, but here

23   the intent has always been a representation that Mr. Le is

24   going to testify.  So in deciding to testify or not to

01:37:42 25   testify, the reservation should have no detrimental effect

*Deborah D. Parker, U.S. Court Reporter*

01:37:48  1    on the defense.

        2             And, Counsel, could I summon the jury now?

        3             MR. SCALLY:  Yes, Your Honor.

        4             The only --

01:37:58  5             MR. WILKE:  Could Mr. Le take the stand?

        6             THE COURT:  One of you talk.

        7             MR. SCALLY:  I do have that stipulation drafted.

        8    Counsel, and I have conferred, and I believe we're --

        9             THE COURT:  All right.  You have the stipulation.

01:38:07 10             Now, Mr. Wilke.

       11             MR. WILKE:  Should Mr. Le be on the stand before

       12    the jury?

       13             THE COURT:  Absolutely.  That was the second thing

       14    we were going to do.  Would you ask --

01:38:18 15             Mr. Le, if you would be so kind, sir, would take

       16    the witness stand.

       17             And there should be a chair for the marshal; and

       18    if not, we'll get you one.

       19             Mr. Le, outside the presence of the jury, there's

01:38:37 20    a stack of masks, or there should be.

       21             MR. LE:  I got it.

       22             THE COURT:  Got it.

       23             Okay.  The bottom portion is the black bottom

       24    strap to that mask.  Why don't you take one out.  Pull it

01:38:59 25    apart.

8

01:39:00   1          *(Pause)*

           2                  THE COURT:  Okay.  Now -- okay.

           3                  MR. LE:  That's fine.

           4                  THE COURT:  Is it comfortable?

01:39:24   5                  MR. LE:  That's fine.  It works.

           6                  THE COURT:  Counsel, then we'll summon the jury.

           7          *(Jury enters courtroom.)*

           8          *(The following proceedings were had in open court*

           9          *in the presence of the jury:)*

01:41:37  10                  THE COURT:  Would you be seated.  Thank you for

          11   your courtesy.

          12                  The jury is present.  The alternates are present,

          13   the defendant, the investigating agent.

          14                  And, Counsel, you've reached a stipulation in this

01:41:51  15   matter?

          16                  MR. SCALLY:  That's correct, Your Honor.

          17                  The parties have agreed that on November 22nd,

          18   2019, agents recovered security camera video from the

          19   Dana Point Marina, presented in Exhibits 10 and 11.

01:42:08  20                  On December 6, 2019, FBI Special Agent Christopher

          21   Gicking went to the Dana Point Marina.  And at 10:53 a.m.

          22   Pacific Time, on his FBI issued phone, the time on the live

          23   video feed at the Dana Point Marina Security System, showing

          24   the entrance to the parking lot registered 10:37 a.m.

01:42:35  25                  THE COURT:  Is that stipulated to by the

01:42:36 1   Government?

2           MR. SCALLY:  Yes, Your Honor.

3           THE COURT:  Stipulated to by the defense?

4           MR. WILKE:  Yes, Your Honor.

01:42:42 5           THE COURT:  Then that stipulation, does it have a

6   number as well?  Is it going to be entered into evidence or

7   just read?

8           MR. SCALLY:  Yes, Your Honor.

9           I intend to number it Exhibit 274 and move to

01:42:57 10  admit Exhibit 274.

11          THE COURT:  Any objection, Counsel?

12          MR. WILKE:  I'm sorry?

13          THE COURT:  Any objection?

14          MR. WILKE:  No, Your Honor.

01:43:04 15          THE COURT:  Then it is received and all of the

16  exhibits should be treated in like manner, Counsel.

17          *(Plaintiff's Exhibit 274 received in evidence.)*

18          THE COURT:  Because you have reached a number of

19  stipulations between the parties.

01:43:14 20          And with that stipulation is the Government

21  resting?

22          MR. SCALLY:  Yes, Your Honor.

23          THE COURT:  Counsel, on behalf of the defense?

24          MR. WILKE:  Thank you, Your Honor.

01:43:20 25          Defense calls Hoang Xuan Le.

*Deborah D. Parker, U.S. Court Reporter*

01:43:24  1            THE COURT:  Thank you, sir.

       2            Would you raise your hand, Mr. Le, and the clerk

       3    is going to administer an oath to you.

       4                   HOANG XUAN LE, DEFENDANT, SWORN

01:43:35  5            THE WITNESS:  Yes.

       6            THE COURT:  Thank you, sir.

       7            If you will be seated, please.  And if you would

       8    be kind enough to pull the microphone closer to you or move

       9    the chair closer to the microphone.

01:43:45 10            Sir, what is your full name?

      11            THE WITNESS:  It's Hoang, H-O-A-N-G.

      12            THE COURT:  And would you spell your first name,

      13    sir?

      14            THE WITNESS:  First name is Hoang, H-O-A-N-G;

01:43:58 15    middle name is Xuan, X-U-A-N; last name is Le, L-E.

      16            THE COURT:  Thank you.

      17            Direct examination by the defense.

      18            MR. WILKE:  Thank you, Your Honor.

      19                       DIRECT EXAMINATION

01:44:15 20    BY MR. WILKE:

      21    Q    Mr. Le, how old are you?

      22    A    I'm 40 years old now.

      23    Q    And where were you born?

      24    A    I was born in Galveston, Texas.

01:44:24 25    Q    And were your parents living there at the time?

*Deborah D. Parker, U.S. Court Reporter*

01:44:27   1    A     My parents first arrived in, I believe, Texas and then

2    we moved to California.

3    Q     Okay.  Do you have brothers and sisters?

4    A     Yes.  I have three brothers and three sisters.

01:44:41   5    Q     And are you the oldest, the youngest, or somewhere in

6    the middle?

7    A     I am the youngest of seven.

8    Q     When did your family first move to Southern California?

9    A     I believe I was one or two years old.  Probably in

01:44:58   10   1980, '82, roughly.

11   Q     And what area in Southern California did your family

12   move to?

13   A     We lived in Santa Ana, California.

14   Q     Do you recall the address?

01:45:08   15   A     Santa Ana.  1814 West Carlton Place, Santa Ana,

16   California 92704.

17   Q     And approximately where in Santa Ana is that, like

18   major cross streets?

19   A     Major cross street is Warner and Raitt, R-A-I-T-T.

01:45:33   20   Q     And did you live there your whole childhood?

21   A     Yes, I grew up in that house.

22   Q     Did you go to school in Santa Ana?

23   A     Yes, I did.

24   Q     What high school did you go to?

01:45:48   25   A     I went to Santa Ana Valley.

01:45:51   1   Q    And did you play any sports in high school?

2   A    Yes.  I played tennis and I also wrestled for Santa Ana

3   Valley.

4   Q    And did you graduate from high school?

01:46:07   5   A    Yes, I did graduate high school.

6   Q    What year?

7   A    1999.

8   Q    After high school, did you attend college?

9   A    Yes, I went to Cal State Fullerton.

01:46:22   10   Q    And what did you study?

11   A    I studied business management marketing.

12   Q    Did you graduate?

13   A    Yes, I did.

14   Q    What year did you obtain your diploma from Cal State

01:46:42   15   Fullerton?

16   A    I graduated in 2004.  Bachelor of science.

17   Q    Now, while you were in college, where did you live?

18   A    I still lived in Santa Ana with my parents.

19   Q    And your siblings or just your parents?

01:47:06   20   A    With my brothers and sisters.

21   Q    Okay.  By that time had some of them moved away by the

22   time you were in college?

23   A    Yes, some of them moved out.  Yes.

24   Q    Okay.  At some point did your parents move out of the

01:47:27   25   house in Santa Ana?

*Deborah D. Parker, U.S. Court Reporter*

01:47:32   1   A    Yes.  They moved out later, yes.

2   Q    And did you stay living in the Santa Ana house?

3   A    Yes, I remained at Santa Ana.

4   Q    Who did you live there with after your parents moved

01:47:44   5   out?

6   A    After my parents moved out, I lived with my sister,

7   Rose.

8   Q    And do you recall approximately when that was?  About

9   what year?

01:47:59   10   A    From 2005 and up.

11   Q    Until how long did you continue living in the Santa Ana

12   house with Rose, your sister?

13   A    I stayed living in Santa Ana from 2005 'til 2011.

14   Q    Now, during this time following your graduation from

01:48:23   15   college, did you get a job?

16   A    Yes, I did work.

17   Q    And what was your first job of any length of time after

18   college?

19   A    I got a job at Union Bank of California.

01:48:41   20   Q    Doing what?

21   A    I was a loan specialist at that time.

22   Q    Approximately what year?

23   A    I think 2006.

24   Q    About a year after graduating?

01:48:56   25   A    Yes.

14

01:48:57  1    Q    Within a year after graduating college.  Okay.

      2         And how long did you have that job at Union Bank

      3    as a loan specialist?

      4    A    I worked there for about four years.

01:49:12  5    Q    What -- why did you stop working there?

      6    A    I got laid off in 2009.

      7    Q    Was that following the mortgage collapse?

      8    A    When the market crashed, yes.

      9    Q    Now, during this period in college and following

01:49:35 10    college -- well, strike that.

     11         Have you ridden motorcycles in my life?

     12    A    Yes.  I do have my motorcycle license, yes.

     13    Q    When did you first start riding motorcycles?

     14    A    I got my motorcycles in -- when I was 20 years old.

01:49:56 15    Q    While you were in college?

     16    A    Yes.

     17    Q    And how -- since you were 20 years old, how many

     18    different motorcycles have you had?

     19    A    Since I started riding, over a dozen.

01:50:10 20    Q    Okay.  At the time of your arrest, did you own a

     21    motorcycle?

     22    A    No.

     23    Q    Shortly before your arrest, did you still own a

     24    motorcycle?

01:50:25 25    A    Yes.  I still had a motorcycle before my -- I sold it

*Deborah D. Parker, U.S. Court Reporter*

01:50:29 1  before my arrest.

2 Q  You had had a motorcycle in 2019; but shortly before

3 your arrest, you sold it; is that correct?

4 A  Yes.

01:50:44 5 Q  Okay.  Now, over the years, 18 years, 19 years or so

6 that you rode motorcycles, were you ever involved in any

7 accidents or collisions?

8 A  Yes.

9 Q  How many times?

01:51:05 10 A  Four times.

11 Q  Do you recall those incidents?

12 A  The first time, it was in 2003.

13 Q  What happened?

14 A  I'll describe it.

01:51:21 15 Q  Yeah.  Describe what happened in the first motorcycle

16 accident.

17 A  The first accident I had in 2003, I was driving my

18 motorcycle to school, and I got cut off on the on-ramp.  I

19 was on the 57 freeway.  And then I end up sliding for like

01:51:40 20 80 to 100-foot on the onramp.

21 Q  Did you --

22 A  Yeah.

23 Q  Okay.  Did you hit your head during that accident?

24 A  Yes, I did.

01:51:50 25 Q  Did you sustain -- were you wearing a helmet?

01:51:55  1    A    Yes, I was wearing a helmet.

2    Q    Was there any damage to the helmet as a result of that

3    accident?

4    A    Yes.  I did get scrapes on the helmet.  And I had body

01:52:06  5    gear, so my jacket was all torn up.

6              THE COURT:  Counsel, would you mind for just a

7    moment.

8              Deb, the realtime for some reason isn't working.

9              Pardon me, Counsel.  I apologize.

01:52:20  10        *(Pause in proceedings)*

11                        DIRECT EXAMINATION

12    BY MR. WILKE:    *(Continuing)*

13    Q    So in addition to this motorcycle accident in 2003, on

14    the freeway offramp, what was the next motorcycle accident

01:57:09  15    you recall getting into?

16    A    I had a small one in the parking lot at the school.  I

17    left the security chain on and I forgot to take it off, so I

18    accelerated and I fell forward.

19    Q    What year was that?

01:57:26  20    A    That was probably the same year.

21    Q    In 2003 as well?

22    A    Yes.

23    Q    Were you injured during that accident?

24    A    It was just minor.  I just somersaulted forward, but I

01:57:39  25    had my helmet on, so I was okay.

*Deborah D. Parker, U.S. Court Reporter*

01:57:42  1    Q    Was there any damage to your helmet from that accident?

2    A    Just scrapes.

3    Q    And what was the third motorcycle accident?  Do you

4    recall when that was?

01:57:56  5    A    In 2006, 2007, I was going with a few friends to the

6    Canyons.  There was a place called Cooks Corner, and it's

7    basically in the Canyons.  And I didn't steer enough, so I

8    end up hitting the rail, because it was a sharp turn.  So I

9    end up almost falling off the hill, but I hit the rail and I

01:58:22  10   bounced off the rail, roughly, like, at 50 miles an hour,

11   so --

12   Q    And, again, were you injured during that accident?

13   A    Yeah.  I end up hurting my -- both my legs.  I got cuts

14   all over my knees, rocks and stuff like that.  They were

01:58:49  15   embedded into my leg, and I had to get it out.

16   Q    Was there any damage to your helmet in that accident?

17   A    Yes.

18   Q    Describe it, please.

19   A    I end up hitting the rail -- the guardrail with this --

01:59:09  20   I hit -- it was more of an impact hit, as well as my jacket

21   I had on that time as well.

22   Q    But, specifically, was there any damage to your helmet?

23   A    Yes, there was.

24   Q    Describe the damage to your helmet.

01:59:22  25   A    It was indentations on the side of it.

*Deborah D. Parker, U.S. Court Reporter*

01:59:27   1   Q    When you say "indentations," you mean a dent in your
           2   helmet?
           3   A    Yes.
           4   Q    How did you feel after that accident?
01:59:38   5   A    I was shaken up.  And that was the last time I decided
           6   to go to the Canyon riding.
           7   Q    Did you seek medical treatment?
           8   A    No, I did not.
           9   Q    Did you feel any effects hours or days after the
01:59:57  10   accident?
          11   A    I was just more in shock of it and just bummed out.
          12   Q    Because you broke your motorcycle?
          13   A    Yes.
          14   Q    Now, after these three motorcycle accidents that you
02:00:20  15   described, have you had issues with your memory?
          16   A    Yes, I had.
          17   Q    Did you have them earlier in life when you were in
          18   college?
          19   A    My memory was okay in college.
02:00:39  20   Q    Okay.  When did you start noticing issues about your
          21   memory?  When did you first realize that you were having
          22   difficulty remembering things?
          23   A    Probably in the last 10 years.
          24   Q    Now, you said there were actually four motorcycles.
02:01:14  25        What was the fourth one?

02:01:16   1   A     The fourth one was 2016.

       2   Q     How old were you in 2016?

       3   A     Roughly 35.

       4   Q     And describe what happened during that time?

02:01:34   5   A     I was in Buena Park with a friend of mine and we were

       6   doing stunts on La Palma.  And I went -- I did a wheelie on

       7   the street and then I went up too high, so I end up flipping

       8   over on the street.

       9   Q     And were you injured?

02:01:58  10   A     Yes, I was injured again.

      11   Q     Describe your injuries.

      12   A     So the injuries is -- is the bike almost fell on top of

      13   me, so I had to push it away.  So my legs were all damaged

      14   again.

02:02:14  15   Q     Was there any damage to your helmet?

      16   A     Yes, there were damages to my helmet.

      17   Q     Describe the damage to your helmet.

      18   A     Rashes on the side of the helmet from impact.

      19   Q     Now, you had testified that you lived in the Santa Ana

02:02:38  20   house with your sister, Rose, until about 2011; is that

      21   correct?

      22   A     Yes.

      23   Q     Rose, is she your next oldest sister or sibling?

      24   A     She's the next oldest sibling from --

02:02:51  25   Q     And how much older is Rose than you?

*Deborah D. Parker, U.S. Court Reporter*

02:02:56    1   A     She's seven years older than me.

            2   Q     And what is the name of your eldest sibling?  Who is

            3   your oldest sibling?

            4   A     My oldest sister is Lonnie.

02:03:07    5   Q     And how much older is Lonnie than you?

            6   A     I think 11 or 12 years.

            7   Q     So the six children that are older than you are pretty

            8   close together in age.  Within a year or two?

            9   A     Yeah, my brothers and sisters are one year apart;

02:03:32   10   except me, I was the accident.  I was seven years apart from

           11   my sister.

           12   Q     And why did you move out of the house when -- you were

           13   living with Rose in 2011?

           14   A     We had to do a short sale on the house in Santa Ana, so

02:03:52   15   I end up moving out in 2011 and moving in with my mom and

           16   dad in Fountain Valley.

           17   Q     The Santa Ana house in 2011 was still owned by your

           18   parents?

           19   A     Previously, but it was under -- under my sister and my

02:04:12   20   name.

           21   Q     But then you short sold it and had to move in with your

           22   parents in Fountain Valley, correct?

           23   A     Yes.

           24   Q     And in 2011, you moved into a house at 10 --

02:04:24   25   18060 South 3rd Street, in Fountain Valley?

*Deborah D. Parker, U.S. Court Reporter*

02:04:30    1    A    Yes.

            2    Q    And you lived there with who?  Who was living in the

            3    house when you moved there?

            4    A    When I moved in, it was my mom and dad and my oldest

02:04:45    5    sister, Lonnie.

            6    Q    And you were living there at that same house at the

            7    time of your arrest on December 19th, 2019, correct?

            8    A    Yes.

            9    Q    And at the time of your arrest, who else was living at

02:04:59   10    that house with you?

           11    A    My mom and my oldest sister.

           12    Q    Was there also a renter who rented a room there?

           13    A    Yes.  We have other rooms vacant, so we rent them out

           14    as well.

02:05:15   15    Q    Your dad was no longer living there?

           16    A    No.  My dad passed away in 2019.

           17    Q    In what month of 2019?

           18    A    He passed away February 2019.

           19    Q    I'm going to show you what's been previously admitted

02:05:45   20    as Exhibit 140.

           21         *(The document was published in open court.)*

           22    BY MR. WILKE:

           23    Q    Do you recognize this portion of the house, the front

           24    door portion of the house?

02:05:56   25    A    Yes, I do.

22

```
02:05:57   1   Q    Is that the house you were living in, in 2019, with
           2   your parents and sister?
           3   A    Yes, it is.
           4            MR. WILKE:  Seeking to admit by stipulation
02:06:12   5   Exhibit 562.
           6            THE COURT:  562 -- 562?
           7            MR. WILKE:  Yes.
           8        (Defendant's Exhibit 562 received in evidence.)
           9        (The document was published in open court.)
02:06:28  10   BY MR. WILKE:
          11   Q    Mr. Le, do you recognize this document?
          12   A    Yes, I do.
          13   Q    Is that the death certificate for your father?
          14   A    Yes, it is.
02:06:44  15   Q    Your father's name was "Paul."  How do you pronounce
          16   the middle name?
          17   A    Xuan.
          18   Q    Le?
          19   A    Le, yes.
02:06:53  20   Q    And it shows that he passed away on February 9th, 2019?
          21   A    Yes.
          22   Q    And it shows the cause of death as in stage Parkinson
          23   disease, correct?
          24   A    Yes.
02:07:18  25   Q    Now, the time he actually passed away, was he living in
```

02:07:20  1  a hospice or acute care home?

2  A     He passed away in a senior home in Anaheim.

3  Q     When did he actually move into the senior home?  How

4  long before his death?

02:07:37  5  A     I would say, roughly, no more than a year.

6  Q     And when did he first develop Parkinson's?  The

7  symptoms of Parkinson's?

8  A     I -- like around 2011.  2012.

9  Q     So seven years or so that he was exhibiting these

02:08:07  10  symptoms?

11  A     Yes.

12  Q     Do they get worse over time?

13  A     Yes.  It gets worse over time.

14  Q     During the period from 2011 to 2019 when you were

02:08:20  15  living there, did you assist in his care?

16  A     Yes, I did assist my dad.

17  Q     Now, you were living at the house with your parents and

18  your older sister Lan, did you have your own bedroom?

19  A     Yes, I did.

02:08:44  20  Q     Did you pay rent to your parents?

21  A     No.

22  Q     Did you pay for any of the utilities?

23  A     No.

24  Q     So your parents allowed you to live there rent-free,

02:08:56  25  correct?

24

02:08:57  1    A    Yes.

       2    Q    And during this period after you lost your job at

       3    Union Bank, from that period in approximately 2009, all the

       4    way up to the time of your arrest, did you have other jobs?

02:09:15  5    A    I had small jobs.

       6    Q    Describe those small jobs that you had during that

       7    10-year period from 2009 to 2019.

       8    A    From 2009, so I was -- collect unemployment since I got

       9    laid off from Union Bank for a couple of years.  So I was

02:09:38 10    able to collect for two years.  And then it was hard finding

      11    a job, so I asked my cousins to -- proposal for us to open

      12    another lawn mower shop.

      13    Q    What do you mean "another lawn mower shop"?

      14    A    We had a property in Santa Ana on Bristol Street.  It

02:09:58 15    was previously a lawn mower shop, but the previous owner

      16    that my parents sold it to, they moved to another location,

      17    so we had an empty building.

      18    Q    So this was a building that your father owned?

      19    A    Yes, it was a building that I --

02:10:17 20    Q    Before your father developed Parkinson's decease, he

      21    ran a lawn mower shop -- a lawn mower repair business?

      22    A    Yes, he did.

      23    Q    And then in or about 2011, you tried to reopen that

      24    business?

02:10:33 25    A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

02:10:34  1    Q    With your cousin?

       2    A    With my cousin, yes.

       3    Q    And how long did you operate that business?

       4    A    We operated the business for about, I think, three or

02:10:45  5    four years.

       6    Q    So from 2011 or so to 2014 or '15?

       7    A    Yes.

       8    Q    Was the business profitable?

       9    A    It was not losing money.  We just made a little bit.

02:10:58 10    Not a lot.

      11    Q    After you shut down the business in or about 2014 or

      12    '15, did you have any other jobs?

      13    A    I end up working at DirecTV®.

      14    Q    For how long?

02:11:14 15    A    For about five months.

      16    Q    Doing what?

      17    A    I was a cable technician installer.

      18    Q    And what happened with that job?

      19    A    I got let go.

02:11:27 20    Q    Why?

      21    A    I was -- they said I was incompetent.  I couldn't

      22    remember stuff.

      23    Q    And after direct -- the DirecTV® job, did you have any

      24    other jobs?

02:11:46 25    A    I end up working as a -- car sales for Toyota, in

02:11:50  1    Garden Grove.

2    Q    For about how long?

3    A    For about four months.

4    Q    And what happened after four months?

02:11:57  5    A    I wasn't performing to their expectations, so they

6    said, *Just take some time off,* because my dad was sick.

7    They knew my dad was sick.  They said, *Just take care of*

8    *your dad and come back later on,* but I never did.

9    Q    Did you -- were you paid commission for car sales

02:12:15 10    working at Toyota?

11    A    Yes.  You are paid on commission.  You're paid hourly.

12    So it's based on a draw, whichever is higher.

13    Q    Were you making -- did you have a quota to make in

14    terms of sales?

02:12:30 15    A    Yes.  You do have a quota.

16    Q    Were you making your quota during the four months?

17    A    Some months I would and some months I would not.

18    Q    Now, when did you first begin drinking alcohol?

19    A    First start drinking alcohol when I was in college.

02:13:02 20    Q    And what was that -- what were the circumstances in

21    which you began drinking in college?  Socially?

22    A    It was socially.  I was in a fraternity.  I was -- for

23    fraternity.

24    Q    Did your drinking in college ever become a problem?

02:13:22 25    A    Not in college.

02:13:24   1   Q    And when have you done -- well, have you done illegal

2   drugs?

3   A    Yes, I done illegal drugs.

4   Q    What illegal drugs have you done -- have you used

02:13:43   5   personally?

6   A    Personally, the list starts at cocaine, Ecstasy, crack,

7   methamphetamine, Xanax, GHB, acid, mushrooms.

8   Q    Any others?

9   A    That's all I can think of.

02:14:16   10  Q    Okay.  Do you use marijuana as well?

11  A    Just a little, yeah.

12  Q    Okay.  Of those drugs you've used, which ones have

13  created the most problems for you in your life?

14  A    I usually do cocaine every day.  And that was my main

02:14:46   15  choice.

16  Q    Okay.  Let's talk about that.  When did you first start

17  using cocaine?

18  A    2004.

19  Q    Were you still in college or was it after college?

02:15:00   20  A    It was after college.

21  Q    Okay.  And when you first started using cocaine, how

22  often were you using it?

23  A    In 2004, maybe, I was -- probably once a month.

24  Q    Okay.  Over time, did the regularity of your use

02:15:23   25  increase?

02:15:24  1    A    Yes.  It did increase as time went by.

2    Q    At some point, were you using it once a week?

3    A    When I first started, like 2004, it was once a month.

4    And then as the years gone by, like, 2006, 2007, it would

02:15:42  5    just be weekly.  And time go by, it just increased.

6    Q    At what point were you using cocaine daily?

7    A    When my father died, I was doing a lot.

8    Q    So in the early 2019?

9    A    Yes.

02:16:12  10   Q    And throughout the course of 2019, did you continue to

11   use cocaine daily?

12   A    Yes.

13   Q    Did your daily use increase over the course of that

14   year?

02:16:26  15   A    Yes.

16   Q    Were you using more cocaine by the end of the year

17   daily than you were at the beginning of the year?

18   A    Usually, I would just do it at nighttime, but as the --

19   towards the end of the year, I was doing it morning and

02:16:40  20   night.  Morning, afternoon and night.

21   Q    So earlier, you were just using it at night and later

22   in the year, you were using it both in the daytime and at

23   night.

24        Is that what you're saying?

02:16:54  25   A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

02:16:55  1    Q    Now, you also indicated that you've used crack cocaine,

2    correct?

3    A    Yes.

4    Q    When did you first start using crack cocaine?

02:17:10  5    A    I would say probably in, like, 2007, 2008.

6    Q    And how was it that you came to use crack cocaine?

7    A    It was just through other friends that had it.  We

8    would go to bars and then they would -- just passing a

9    cigarette, and I would just smoke it with them.

02:17:28  10   Q    So back in this -- how long did you use crack cocaine

11   for?

12   A    From 2007.  And it just increased as I met other

13   people.

14   Q    Okay.

02:17:43  15   A    But --

16   Q    How often would you use it?

17   A    In 2019?

18   Q    Well, between 2007 to 2019, how often were you using

19   crack cocaine?

02:17:55  20   A    It was a monthly thing.  Once a month.

21   Q    And was there a period of time back in 2009 or so in

22   which you used crack cocaine with Tony Hoang on several

23   occasions?

24   A    Yes.  Tony and I would smoke in my house in Santa Ana.

02:18:21  25   Q    And when did you first start using methamphetamine?

*Deborah D. Parker, U.S. Court Reporter*

02:18:29  1   A    Methamphetamine, not until 2019.

2   Q    When, in 2019, did you start using methamphetamine?

3   A    August of 2019.

4   Q    What were the circumstances under which you began using

02:18:51  5   methamphetamine in August of 2019?

6   A    I was around people that had it that was doing

7   methamphetamine sometimes.  But more likely, I didn't really

8   know how to smoke it until I ran into Shawn.  And Shawn

9   would kind of educate me how to smoke meth.

02:19:14 10   Q    When you say "when I ran into Shawn," are you referring

11   to Shawn Whalin?

12   A    Yes.

13   Q    Is that something that Shawn Whalin, did you -- you

14   understood him to do all the time?

02:19:27 15   A    Every time I saw Shawn, we would smoke marijuana.

16   Q    Did Shawn Whalin teach you how to smoke

17   methamphetamine?

18   A    You can say that, yes.

19   Q    And during this period through 2019, you were still

02:19:52 20   doing -- snorting cocaine on a daily basis, correct?

21   A    Yes, I was.

22   Q    Your alcohol use, we talked about.  I want to talk more

23   specifically, in 2019, how often you were drinking.

24   A    In 2019, I was drinking more as my dad's health was

02:20:13 25   going down.  So I would just drink like a 12-pack of

*Deborah D. Parker, U.S. Court Reporter*

31

02:20:20  1    Heineken every other day.

       2    Q     Six pack a day or so you were drinking?

       3    A     By -- the 12-pack is a dozen.

       4    Q     Every two days, you would go through a 12-pack?

02:20:31  5    A     Yes.

       6    Q     Were you drinking other things?

       7    A     I would drink Cognac.  I would -- Hennessy VSOP, that

       8    was normal.

       9    Q     How often were you drinking Cognac?

02:20:43 10    A     Every weekend.

       11    Q     So you're drinking beer daily and Cognac on the

       12    weekends, correct?

       13    A     Yes.

       14    Q     Did your drinking increase over the course of 2019?

02:20:53 15    A     Yes.  More towards after my dad passed away, then I

       16    would just go drinking with my friends every day.  So I

       17    would be drinking -- it did increase.  I was drinking Tido

       18    vodka daily.  Hennessy.  Pretty much anything I can get my

       19    hands on.

02:21:14 20    Q     More hard alcohol, in addition to beer?

       21    A     Yes.

       22    Q     Did your beer consumption increase as well?

       23    A     It was normal to me, because I was drinking every day.

       24    Q     Drinking beer every day?

02:21:24 25    A     Yes.

02:21:25  1   Q     By late 2019, how early in the day would you start

2   drinking?

3   A     2019?

4   Q     Yes.  Late in the year, say, October, November 2019, on

02:21:41  5   a typical day, when would you have your first drinks?

6   A     I would start drinking, 9:00 or 10:00 in the morning.

7   Q     And you would continue drinking throughout the day?

8   A     Yeah.

9   Q     And, again, during that period of time, you were using

02:21:54 10   cocaine daily, correct?

11   A     Yes, I would.

12   Q     Start in the afternoon and then --

13   A     No, because if I'm drinking -- if I start drinking,

14   like at 9:00 or 10:00 in the morning and then I'm doing

02:22:07 15   cocaine as well to off balance the alcohol.

16   Q     What does the effect of cocaine and alcohol do to you?

17   A     Well, it just makes you want to keep on drinking and

18   keep on going.

19   Q     Okay.  So the cocaine -- does the cocaine keep you

02:22:33 20   awake?

21   A     Cocaine would keep you awake.  And then alcohol is a

22   downer, so it brings you down, so you kind of go back and

23   forth.

24   Q     So you're awake, but you're drunk?

02:22:43 25   A     Yes.

33

02:22:43  1    Q    Fair to say?

      2    A    Yes.

      3    Q    After you learned how to smoke methamphetamine from

      4    Shawn Whalin, how often were you doing it?

02:23:03  5    A    Methamphetamine with Shawn, I would smoke it every day.

      6    I didn't -- thought it was normal.

      7    Q    Okay.  And that was in addition to the drinking and

      8    using cocaine, correct?

      9    A    Yes.

02:23:14 10    Q    And what effect did cocaine have on you?

     11    A    It make you stay up for a couple of days.

     12    Q    So how much sleep would you get at night during this

     13    period of time?

     14    A    Usually, I would sleep just a few hours.  Max, four

02:23:31 15    hours every other day.

     16    Q    And how long did this go on for where you were using

     17    meth, using cocaine and drinking and only getting four hours

     18    of sleep at night?

     19         How long for a period of time did this go on for?

02:23:44 20    A    I did it every day.

     21    Q    Was that how you were living at the time of your

     22    arrest?

     23    A    Yeah.

     24    Q    And how long before the time of your arrest had you

02:23:52 25    been living like that?

*Deborah D. Parker, U.S. Court Reporter*

34

02:23:59   1   A    I was -- when they came and got me, I just barely went
          2   to bed.
          3   Q    Okay.  How many weeks or months had you been living
          4   that way, consuming that amount of drugs and alcohol in a
02:24:15   5   day?
          6   A    I was still consuming when they got me.
          7   Q    Okay.  My question, Mr. Le, is:  Prior to your arrest,
          8   how long a period of time?  Had you been doing that daily?
          9   Did that start in a month before?  A week before?  Six
02:24:34  10   months before?  That's my question.
         11   A    It started -- I was arrested in December of 2019, so it
         12   was probably three months.
         13   Q    So for the last -- since September?  September/October?
         14   A    September, October, November, December.  Four months.
02:24:56  15   Q    Okay.  Did your increase -- did this increased use of
         16   drugs and alcohol at all coincide with the events that we've
         17   been hearing about on October 15th?
         18   A    Yes.
         19   Q    You started drinking and using more drugs after that
02:25:12  20   period?
         21   A    Yes.
         22   Q    Now, when you started using cocaine on a more regular
         23   basis, how did you pay for it?
         24   A    Usually, I would go pick up from another dealer and,
02:25:46  25   basically, I would buy roughly one or two ounces, and I

02:25:52   1   would sell it to my other friends that were using as well,

           2   just to make money.  And it would be -- it would pay off my

           3   habit.

           4   Q    Okay.  So, for instance, if you bought an ounce, how

02:26:03   5   much would you sell to other friends?

           6   A    I would probably make about -- close friends like $30,

           7   40 for eight ball, because -- I had a regular friend who was

           8   always buying it, and he's already --

           9   Q    An ounce -- would you sell the whole thing or would you

02:26:19  10   just sell part of it?

          11   A    When I would get an ounce of cocaine so, basically, I

          12   would do -- break it up into eighths, because -- basically,

          13   three and a half grams, which is an eight ball.  And then I

          14   would usually keep, probably, 7 grams for myself.  Three and

02:26:36  15   a half or 7 grams.  And the rest I would just get rid of for

          16   sale.

          17   Q    So out of an ounce, you would sell three-quarters of it

          18   and keep a quarter for yourself and you would use that,

          19   correct?

02:26:49  20   A    Yeah.

          21   Q    And then three-quarters of an ounce you sold.  That

          22   would be six eight balls, I think?

          23   A    Yes, it would be.

          24   Q    And you would make 30 or $40 on each one, correct?

02:27:00  25   A    Yes.

02:27:00  1    Q    So on an ounce of cocaine, you would make 180 to $240

2    and get a quarter ounce for your personal use, correct?

3    A    Yes.

4    Q    And you would -- how often were you getting an ounce of

02:27:14  5    cocaine?

6    A    I would, roughly, go through -- roughly, about

7    two ounces per week.

8    Q    Mr. Le, I'm going to --

9          MR. WILKE:  I would to seek to admit Exhibit 560.

02:28:20  10         THE COURT:  Received.

11        *(Defendant's Exhibit 560 received in evidence.)*

12         MR. WILKE:  Mr. Le, I'm seeking to admit by

13    stipulation 560 --

14         THE COURT:  Was the first one 550?

02:28:41  15        MR. WILKE:  560.

16         THE COURT:  Received.

17        *(Defendant's Exhibit 560 received in evidence.)*

18        *(The document was published in open court.)*

19    BY MR. WILKE:

02:28:48  20    Q    Mr. Le, do you recognize the room that is depicted in

21    this photograph, Exhibit 560?

22    A    Yes.  That's my bedroom.

23    Q    Is that the bedroom you were living in on

24    December 19th --

02:29:02  25    A    Yes.

| | | |
|---|---|---|
| 02:29:02 | 1 | Q   -- of 2019? |
| | 2 | A   Yes. |
| | 3 | Q   Is this a picture that was taken at the time of your |
| | 4 | arrest? |
| 02:29:12 | 5 | Do you recognize that as being taken at the time |
| | 6 | of your arrest? |
| | 7 | A   It looks like -- after they arrested me, yes. |
| | 8 | Q   And your TV was on during the arrest? |
| | 9 | A   Yes. |
| 02:29:25 | 10 | Q   You were watching Cartoon Network? |
| | 11 | A   Yes. |
| | 12 | Q   Showing you what's been admitted -- and seeking |
| | 13 | admission -- by stipulation Exhibit 561. |
| | 14 | THE COURT:  561.  Thank you.  Received. |
| 02:29:41 | 15 | *(Defendant's Exhibit 561 received in evidence.)* |
| | 16 | *(The document was published in open court.)* |
| | 17 | BY MR. WILKE: |
| | 18 | Q   Do you recognize this as a picture of your closet in |
| | 19 | your bedroom? |
| 02:29:49 | 20 | A   Yes. |
| | 21 | Q   Okay.  Taken again at the date -- on the date of your |
| | 22 | arrest? |
| | 23 | A   Yes. |
| | 24 | Q   I'm going to zoom in here to the bottom of the photo. |
| 02:30:00 | 25 | On this bottom shelf, what is this right here |

*Deborah D. Parker, U.S. Court Reporter*

02:30:04  1   *(indicating)*?

2   A      It's a debit card.

3   Q      What's it seated on?

4   A      It's sitting on a plate of cocaine.

02:30:15  5   Q      And is that cocaine that you used for personal use?

6   A      Yes.

7   Q      And why do you have a debit card there on the plate of

8   cocaine?

9   A      Usually, we use it -- I use it to make a line and then

02:30:27  10   snort the cocaine with a straw.

11   Q      Mr. Le, did you know a person named Tri Dao?

12   A      Yes, I did.

13   Q      Directing your attention to Exhibit 108 previously

14   admitted, do you recognize that as Tri Dao?

02:31:09  15   A      Yes.

16   Q      When did you first meet Tri Dao?

17   A      I think I met him, like, in 2004.

18   Q      Under what circumstances?

19   A      Just -- I think there were other friends.  We were just

02:31:32  20   hanging out.

21   Q      And after you met him, did you become friends with him?

22   A      Yes.  We remained in contact.

23   Q      Describe -- well, you said you "remained in contact."

24   At some point, did you start socializing with him on a

02:31:55  25   regular basis?

*Deborah D. Parker, U.S. Court Reporter*

02:31:57   1   A    Yes.

           2   Q    Okay.  When did that start?

           3   A    We started -- well, we talked in 2004, 2005, because we

           4   were talking about -- he was showing me guns back then, and

02:32:12   5   then that's how he got my attention alot.  So he would -- he

           6   would invite me over to his house and in his garage.  In

           7   Westminster, he would have, like, all sorts of high-powered

           8   guns.

           9   Q    Did you know anything about his background at the time?

02:32:37  10   A    No, I didn't ask him about it.

          11   Q    Did you -- why was he showing you these guns back in

          12   2004, 2005?

          13   A    He was just showing them to me.  Just showing me.  I

          14   don't know why.

02:33:00  15   Q    Did you ever purchase any guns from him?

          16   A    No.  Not in 2004, no.

          17   Q    Okay.  Did there come a point where you would go out

          18   and drink with him or go out and socialize with him?

          19   A    We would socialize more.  I'm not sure the year, like

02:33:19  20   2007 to 2009.  He had a restaurant with his brother called,

          21   I think, Oceans, in Huntington Beach.  It was like a sushi

          22   restaurant.  He would invite me to come over and drink with

          23   him.

          24   Q    And how often would you do that?

02:33:41  25   A    It was every weekend.

40

02:33:46   1    Q    For a two-year period or so?

         2    A    Yes.

         3              MR. WILKE:  Seeking to admit by stipulation

         4    Exhibit 570, Your Honor.

02:34:15   5              THE COURT:  570.  Received.

         6         *(The document was published in open court.)*

         7         *(Defendant's Exhibit 570 received in evidence.)*

         8    BY MR. WILKE:

         9    Q    Directing your attention to Exhibit 570, do you

02:34:23  10    recognize the person depicted in that photograph?

        11    A    Yes.

        12    Q    Who is that?

        13    A    It's James' brother.  His name is Alex.

        14    Q    Do you know his true name to be Trung Dao?

02:34:37  15    A    I just called him "Alex."  I don't call him by his

        16    Vietnamese name.

        17    Q    And is Alex the person that you understood James owned

        18    this restaurant in Huntington Beach?

        19    A    Yes.

02:34:54  20    Q    Now, when you would go drinking at this restaurant in

        21    Huntington Beach with James, what did you come to understand

        22    were the type of people that went to that restaurant?

        23    A    The restaurant was more of like a hub for people -- for

        24    guys to come by and slang drugs.  They would sell marijuana.

02:35:19  25    And it was just like a meet-up spot for them to do deals

02:35:25  1  together.

2  Q    Did you observe drug deals going down in this

3  restaurant?

4  A    Yes, I did.

02:35:30  5  Q    Was that fairly regular and common?

6  A    When I'm there, there's always -- there's always a few

7  gangsters there hanging out.

8  Q    And was -- showing you Exhibit 570, again, the photo of

9  Alex Dao, was he James' older or younger brother?

02:36:00 10  A    At the time, I didn't know who was older.  I always

11  thought Alex was older.

12  Q    Why did you think Alex was older?

13  A    I thought Alex was older, because he was more mature

14  and then he handled stuff more professionally.

02:36:16 15  Q    Was Alex also more successful -- did you understand

16  Alex to be more successful than his brother James?

17  A    Yes.

18  Q    Okay.  Now, did you -- after you became friends with

19  James Dao, did you meet a woman by the name of

02:36:59 20  Natalie Nguyen?

21  A    Yes, I met Natalie.

22  Q    And Natalie is the woman who testified here in court

23  last week, correct?

24  A    Yes.

02:37:08 25  Q    Do you remember what was your understanding of James'

*Deborah D. Parker, U.S. Court Reporter*

02:37:10  1    relationship with Natalie?

2    A    They were just boyfriend and girlfriend in 2004, 2005.

3    Q    Okay.  About when did you first meet Natalie,

4    approximately?

02:37:26  5    A    I think I met her in 2005.

6    Q    Okay.  At some point, did James and Natalie began

7    living together?

8    A    When I would see the both of them, they were always

9    living together.

02:37:42 10    Q    Okay.  So from 2004, 2005, you knew them to always live

11    together?

12    A    Yes.

13    Q    Okay.  And at some point, did you understand them to

14    have a child together?

02:37:57 15    A    Yes, they had a couple -- two daughters.

16    Q    Over time do you remember when they had their first

17    daughter, approximately?

18    A    I think they had their first daughter in 2012.  They're

19    still young.  I don't know.

02:38:10 20    Q    And did you know their daughters?

21    A    Yes, I would hang out and play with them.

22    Q    Okay.  Now, did Natalie, to your knowledge, also use

23    cocaine and alcohol?

24    A    Yes.  Natalie did a lot of cocaine and a lot of

02:38:37 25    alcohol.

02:38:38    1    Q    Did you two share that in common?

            2    A    Yes.  Me and Natalie, we would hang out and do cocaine

            3    parties like all night and be drinking all night, yes.

            4    Q    How many times would you estimate that you did that

02:38:52    5    with Natalie?

            6    A    Over a dozen times.

            7    Q    Over how long a period?  When did that start?

            8    A    Just doing -- 2019.

            9    Q    So over a dozen times, just in 2019?

02:39:09   10    A    Yes.

           11    Q    When did you first start staying up all night with

           12    Natalie drinking and using cocaine?

           13    A    I think couple years:  2018, 2019.

           14    Q    So the last couple of years, that became something that

02:39:24   15    you and Natalie did together.

           16    A    Yeah.

           17    Q    Would James be present during these times that you were

           18    up all night with Natalie drinking and using cocaine?

           19    A    Sometimes he'll be there; sometimes he's not.  Usually,

02:39:37   20    he's out at the casino.

           21    Q    What casinos?  Locally?

           22    A    Yes.  He was a regular.  Usually, he goes to

           23    Crystal Casino.

           24    Q    Where is that at?

02:39:48   25    A    It's in L.A.  I think Commerce area.

*Deborah D. Parker, U.S. Court Reporter*

02:39:56  1   Q     And he would leave Natalie home alone with his

2   daughters?

3   A     Yeah.

4   Q     Did James know you were with Natalie when he was out at

02:40:05  5   the casino?

6   A     Yeah.  He would be okay with it.

7   Q     Did he know that you and Natalie were using alcohol and

8   drinking?

9   A     Yes, he would know.

02:40:23  10   Q     And he never -- did he ever express any -- that he had

11   any problem with that with you?

12   A     He didn't have any issues with me.  He just didn't want

13   his wife to be doing it all the time, because he would have

14   to take care of the kids the next day and she would have to

02:40:40  15   sleep the next day.  So that's why he would get upset about.

16   Q     Now, these times where you would stay up all night with

17   Natalie, where did that happen at?

18   A     It would happen in the apartment where she's living at

19   with her two daughters.

02:41:04  20   Q     Would that include -- would that be the apartment in

21   Fullerton that we heard testimony about, near Orange in

22   Fullerton?

23   A     Yes, it is.

24   Q     Now, going back to about 2011, 2012, did there come a

02:41:35  25   time -- James asking you about leasing a car?

*Deborah D. Parker, U.S. Court Reporter*

02:41:38  1    A    Yes.   James asked me to do a business venture with him
2    to go back and forth to Vegas, since he had a lot of Vegas
3    connections and to drive out with marijuana.  So I end up
4    buying --
02:41:55  5              Well, it was a purchase.  It was a purchase for
6    like a newer -- a used Nissan Armada.  A white one.
7    Q    Okay.  And so James asked you to buy this car so the
8    two of you could transport marijuana from
9    Southern California to Las Vegas?
02:42:17 10    A    Yes.
11    Q    Did you do that?
12    A    Yes.
13    Q    How did you pay for the car?
14    A    Well, I gave the down payment for it, and then it was
02:42:27 15    under my name.  And then James said he would pay me monthly.
16    So, supposedly, proceeds from Vegas, whichever.  He said it
17    was cheaper.  The monthly payments were like $700 a month.
18    So he say he would make the monthly payments and then,
19    eventually, pay me back for the down payment that I gave.
02:42:47 20    Q    Okay.  And after you bought this Nissan Armada, did you
21    begin regularly driving out with James to Las Vegas?
22    A    It would be -- yes, we would drive out every week.
23    Q    Okay.  And during those trips, what would you do?
24    A    I would just stay in the room or go drinking.
02:43:10 25    Q    Let me rephrase:  What did you take out to Vegas --

*Deborah D. Parker, U.S. Court Reporter*

02:43:15    1            What, if anything, did you transport to Las Vegas

            2    during these trips?

            3    A    It was just marijuana and I brought cocaine with me.

            4    Q    Okay.  And how much marijuana would you typically

02:43:31    5    transport to Las Vegas?

            6    A    Anywhere from, like, 10 to 20 pounds.

            7    Q    And where would you and James get this marijuana from?

            8    A    James had various sources of who he would get his weed

            9    from.

02:43:48   10    Q    And you said you always brought cocaine.  How much

           11    cocaine did you bring?

           12    A    For me, I was -- maybe an eight ball.  Roughly, three

           13    and a half grams.

           14    Q    Was that just for your personal use?

02:44:04   15    A    Yeah.

           16    Q    Okay.  And then when you would transport this marijuana

           17    to Las Vegas, would you meet with somebody and sell it to

           18    them?

           19    A    I wouldn't sell it.  It was James.  He had people in

02:44:19   20    Vegas already.  He had people lined up, like, people that he

           21    knew in Vegas that he would do transactions.

           22    Q    Okay.  And how long did these trips take?  Did you

           23    spend the night there or did you turn around and come right

           24    back?

02:44:34   25    A    It will be a day trip.

*Deborah D. Parker, U.S. Court Reporter*

47

02:44:36  1    Q    Would you -- would you ever spend the night there at

2    the hotel?

3    A    Yes, we would.

4    Q    Who would pay for the room?

02:44:44  5    A    James would usually get the rooms comped.

6    Q    Why would he get the room comped?

7    A    He would get the rooms comped, because he would always

8    be gambling so he wouldn't have to pay for it.

9    Q    What type of gambling did James do during these trips

02:45:01  10   to Las Vegas?

11   A    He would be up all night.  He would just go gamble.

12   Q    Do you know what he played?

13   A    His favorite game that he would play was Pai Gow.

14   Q    Did James, to your knowledge, also bet on sporting

02:45:19  15   events?

16   A    Yes.  He would bet on sports.

17   Q    How often?

18   A    Well --

19   Q    Was it a regular --

02:45:32  20   A    It was a regular thing.  It wasn't seasonal.  It was

21   every weekend.

22   Q    Okay.  What money would James use to gamble with when

23   you did these trips to Las Vegas?

24   A    He would get money from the -- the marijuana that he'd

02:45:52  25   sell in Vegas and then he would use that money to gamble.

*Deborah D. Parker, U.S. Court Reporter*

48

02:45:58  1   Q    Now was that James' money?  Or was he using somebody

2   else's money?

3   A    He supposed to repay back to the supplier, but he would

4   never pay back the supplier.

02:46:08  5   Q    If he lost, you mean?

6   A    He lost and he wouldn't pay them back.

7   Q    Now, when you would drive out to Vegas with this 10 to

8   20 pounds of marijuana, typically, who would do the driving?

9   A    It would -- I would always drive.  James was always bad

02:46:28 10   at driving, so it's always me driving.  I'm always, like,

11   the driver, so I'm driving to Vegas and driving back home.

12   Q    And how do you know that James was a bad driver?

13   A    James would always back into -- he would back into

14   other cars from -- just from the parking lot, or he would

02:46:49 15   get easily distracted, because he's always on his phone

16   texting.

17   Q    And did James ask you to drive when you were driving

18   out there?

19   A    Yes.  I didn't mind.  I enjoyed the drive.

02:47:14 20   Q    Did there come a time where you stopped receiving the

21   money from James for the monthly car payment?

22   A    Roughly about a year into our little business adventure

23   [sic], he stopped making the payments for the vehicle, and

24   then he end up selling -- he end up giving the car to a

02:47:46 25   buddy of his, at that time.  His name was Jared.  And then

*Deborah D. Parker, U.S. Court Reporter*

02:47:51  1    Jared was supposed to make the payments to me.

       2    Q      Did Jared make the payments?

       3    A      So Jared would make the payments on the Nissan and he

       4    would meet me up to give me the money for the vehicle.

02:48:21  5    Q      After you and James stopped using the Nissan Armada to

       6    drive out to Las Vegas, did you continue your trips to

       7    Las Vegas in a different car?

       8           Let me rephrase that:  At some point, you and

       9    James no longer had the Armada, correct?

02:48:43  10   A      Yeah.  We didn't --

       11   Q      After about a year, I think you said.

       12   A      Couple of years.

       13   Q      When you no longer had the Armada, did you still

       14   continue to drive to Las Vegas with James, regularly?

02:48:59  15   A      It cut down, because I was working with my cousins at

       16   the time, I think.  And it was roughly, probably, every

       17   month I would go with him.

       18   Q      Okay.  And did these monthly trips to Las Vegas

       19   continue over time?

02:49:16  20   A      They continued over time.  And then it increased, like,

       21   in 2015 and up.

       22   Q      Okay.  And by 2019, were you still going to Las Vegas

       23   at least monthly with James?

       24   A      Yes.  I was going monthly to Vegas with James.

02:49:32  25   Q      And under the same circumstances where you and James

02:49:37  1    would transport marijuana to Las Vegas, correct?

2    A    Yes.

3    Q    And what car would you-all drive in 2019 to get to

4    Las Vegas?

02:49:46  5    A    I had an older Lexus® IS250, and we would take my car

6    and drive up to Las Vegas.

7    Q    And that was a car registered in your name, correct?

8    A    To my sister's name.  Under my -- it was a 2006

9    Lexus® IS250.

02:50:04 10    Q    And you would always drive?

11    A    Yeah, it was me driving.

12    Q    And then at some point, did you buy a white Cadillac --

13    a 2014 Cadillac?

14    A    Yeah, I bought the Cadillac in summer of 2019.

02:50:22 15    Q    With what money?

16    A    With my dad's death certificate -- death, they left

17    money for me, so that's how I was able to buy the car.

18    Q    How much money did you get following your father's

19    death?

02:50:39 20    A    I think, like, 25,000.

21    Q    And after getting the white Cadillac, did you use that

22    car to drive to Las Vegas?

23    A    I don't think I did.

24    Q    In terms of these trips just with James, correct?  You

02:51:00 25    never drove that car with James to Las Vegas?

*Deborah D. Parker, U.S. Court Reporter*

```
02:51:03    1   A      No, we cut back.  We didn't -- the only time is when we
            2   went to -- in October, when we went with Shawn and Sheila.
            3   Q      Okay.  The one we heard --
            4   A      Because we'll just take her -- the van.  We would take
02:51:23    5   Natalie's van to Vegas.
            6   Q      When did you start taking Natalie's van to Vegas?
            7   A      After I sold my Lexus® -- after I got rid of my car,
            8   because I didn't want to -- because James, he would wreck
            9   cars.  So we would drive to Vegas and back --
02:51:40   10          (Overtalking:  Unable to report.)
           11   BY MR. WILKE:
           12   Q      Let's slow that down for a minute.
           13          At some point, you wrecked or sold your Lexus®?
           14   A      Yes.
02:51:48   15   Q      And after that -- and that was in 2019?
           16   A      Yes.
           17   Q      And after that happened, you said something about
           18   renting cars?
           19   A      Yes.  James would rent cars.  One time we were coming
02:52:00   20   back from -- and my water heater blew, so my engine ended up
           21   overheating.  So I had to get another engine.
           22   Q      This was in the Lexus®?
           23   A      Yeah.
           24   Q      And then how many trips after that did you take to
02:52:13   25   Las Vegas with a rental car, approximately?
```

*Deborah D. Parker, U.S. Court Reporter*

02:52:18  1    A    Probably every couple weeks.

2    Q    Okay.  And between the time you -- your engine blew up

3    on your Lexus® and October 15, 2019, how many trips other

4    than the trip with Shawn Whalin and Sheila did you take with

02:52:40  5    James to Las Vegas?

6    A    Probably be once a month at least.

7    Q    So there was at least four or five trips there?

8    A    Yes.

9    Q    Now, did you ever know James and Natalie to get into

02:53:14  10   arguments?

11            THE COURT:  Would you repeat that, Counsel, a

12   little slower?

13   BY MR. WILKE:

14   Q    Did you know James and Natalie to get into arguments?

02:53:22  15   A    Yes.  They would always argue.

16   Q    And were there times when Natalie would kick James out

17   of the house?

18   A    Yes.  There were a few times when Natalie would kick

19   James out of the house and James would end up sleeping in my

02:53:42  20   house and would sleep in my bed for a couple of times.

21   Q    How many times did James sleep over at your house after

22   Natalie kicked him out?

23   A    I would say at least three or four times.

24   Q    And I want to talk to you about your loaning money

02:54:06  25   James, okay.  We've heard testimony here about debts owed to

*Deborah D. Parker, U.S. Court Reporter*

| 02:54:11 | 1 | you by James. |

2      Do you recall hearing that?

3   A   Yes.

4   Q   Let's talk about that.  Now, during your over 10-year

02:54:22  5  relationship with James, was it common for you to lend him

6   money?

7   A   Yes.

8   Q   How often would you lend him money?

9   A   He would always ask to borrow money.  If he's short a

02:54:42  10  hundred dollars here, he would ask if I could lend it to

11   him, and I would lend it to him.

12   Q   Okay.  You would always lend it to him?

13   A   Usually, yes.

14   Q   Why -- what was the reason you wouldn't lend it to him?

02:54:57  15  A   It's if I didn't have the money.

16   Q   But if you had the money, you would always lend it to

17   him, correct?

18   A   Yes.

19   Q   And over time did he pay that money back?

02:55:11  20  A   Not all the time.

21   Q   Sometimes he would; sometimes he wouldn't?

22   A   Correct.  Sometimes he would and sometimes he wouldn't.

23   Q   Okay.  At some point, did you start -- well, at some

24   point, did you start keeping track of the money that you

02:55:32  25  would lend him?

*Deborah D. Parker, U.S. Court Reporter*

02:55:33  1    A    Yeah.  I was trying to keep track.  In 2019, I made an

2    Excel spreadsheet on -- just to remind myself of how much

3    money is going out and how much he owes me.

4              MR. WILKE:  May I have a moment, Your Honor?

02:55:51  5         *(Pause)*

6    BY MR. WILKE:

7    Q    This spreadsheet that you made -- this

8    Excel spreadsheet, where did you keep that at?  Where was

9    that stored?

02:56:20  10   A    So I made an Excel Spreadsheet on my computer, and I

11   would let -- James and his wife -- *Hey, this is how much he*

12   *owes me*, because I wanted to keep records, because I

13   wanted --

14             MR. WILKE:  Seeking to admit by stipulation

02:56:46  15   Exhibit 114.

16             THE COURT:  114 received.

17        *(Defendant's Exhibit 114 received in evidence.)*

18        *(The document was published in open court.)*

19   BY MR. WILKE:

02:56:52  20   Q    I'm showing you Exhibit 114.

21             Do you recognize this as a copy of the spreadsheet

22   you just mentioned?

23   A    Yes, it is.

24   Q    Okay.  So it has a date up here "5/11/19."

02:57:10  25             Do you see that?

*Deborah D. Parker, U.S. Court Reporter*

55

02:57:14  1   A    Yes.

2   Q    Is that the date you first decided to create a

3   spreadsheet to keep track of money James owed you?

4   A    Yes.  So that's the date I created it.  Basically, I

02:57:24  5   write a description to see what he borrowed.

6   Q    We'll get to that.  Let's take it one step at a time.

7   The date up here, 5/11/19, is the date you first created

8   this spreadsheet?

9   A    Yes.

02:57:39 10   Q    Now, these aren't the first debts James ever owed to

11   you, correct?

12   A    This is after -- this is a most recent one?

13   Q    Let me rephrase that:  This spreadsheet only reflects

14   the debts as of 5/11/19, correct?

02:58:08 15   A    Yes.

16   Q    Okay.  It doesn't reflect earlier loans that you had

17   given James, correct?

18   A    No.

19   Q    And it doesn't reflect the times that James had paid

02:58:17 20   you back before, correct?

21   A    No.

22   Q    That had been going on for many years, correct?

23   A    Yes.

24   Q    Going back to the Nissan Armada purchase that you did,

02:58:30 25   correct?

*Deborah D. Parker, U.S. Court Reporter*

02:58:32  1    A    Yes.

       2    Q    Did you go back even before the Nissan Armada purchase?

       3    A    No.

       4    Q    So that was really the first time when you bought that

02:58:42  5    Nissan Armada that you loaned money to James?

       6    A    Yes.

       7    Q    But ever since then and ever since you began

       8    transporting marijuana to Las Vegas with James, there was a

       9    regular practice that you would loan money to James,

02:58:58 10    correct?

      11    A    Yes.

      12    Q    And that he would pay you back, correct?

      13    A    Sometimes.  Not all the time.

      14    Q    Okay.  And it was when -- what prompted you to start

02:59:13 15    keeping track in 2019?

      16    A    I was just -- because I wouldn't remember how much he

      17    would owe me.  It would be months down the road when he

      18    would pay me sometimes, so I wouldn't remember.  This way I

      19    would keep track and remember what he would pay me.

02:59:30 20         MR. WILKE:  Okay.  So let's look at this exhibit:

      21    Exhibit 114.

      22         (The document was published in open court.)

      23    BY MR. WILKE:

      24    Q    It indicates "Car rental up North total was 1,400."

02:59:40 25    There's a thousand dollars owed?

02:59:42  1   A    Yeah, because -- we went up north, and -- 2018, so the

2   bill came out to, like, $1,400 in January.  So he hasn't

3   paid me back, so that's why I started trying to keep that

4   can so I know.  He only gave me like $400.

02:59:59  5   Q    And he had agreed to pay for that rental car to drive

6   up north?

7   A    Yeah, because it was his choice for me to get the

8   rental car.

9         THE COURT:  Just a moment.  Just one moment,

03:00:10 10   Counsel.

11        (Pause)

12        THE COURT:  Okay.  All right, Counsel.

13   BY MR. WILKE:

14   Q    So one question I think I forgot to ask you:  When you

03:00:25 15   were transporting marijuana to Las Vegas, approximately how

16   much per pound would be made off those transactions?

17   A    I don't know, because it was all handled by James.

18   Q    Okay.  Would James pay you for any of those

19   transactions?

03:00:51 20        Did you make any money for driving out there with

21   him?

22   A    He would give me $100 for the day, just hanging out or

23   just driving there.  So that was my expense that he would

24   give me 100 for the day.

03:01:05 25   Q    So if he made -- if he transported -- if he were

03:01:10   1   transporting 20 pounds and he made $100 per pound, he would

2   make $2,000 and pay you 100 and that's how that relationship

3   worked, correct?

4   A    Yes.

03:01:19   5   Q    And did you understand, you know, there was at least

6   $100 per pound to be made off these marijuana deals?

7   A    I understood it would be 100 to 4- or 500.

8   Q    If he did 20 pounds, 2,000 would be the minimum.  Maybe

9   he's making as much as, you know, 8,000 or 10,000, correct?

03:01:41  10   A    Yeah.

11   Q    And, yet, he would still pay you $100 a day for that,

12   correct?

13   A    Yes.

14   Q    And you were okay with that?

03:01:50  15   A    Yes.

16   Q    There's a "personal 20 pack deal (911 deposit to

17   Natalie."

18        Do you recall what that was?

19   A    Yeah.  It was, basically -- I remember it was just

03:02:09  20   Natalie needed money.  So she has an emergency, so I put

21   911.  So I transferred 1,500 to that lease account.  I

22   Zelled it to her.

23   Q    And "Lisa out door popcorn."

24        Do you recall when that was?

03:02:26  25   A    Yeah.  It was, basically, weed that I gave to James and

03:02:31  1   then he sold it to his other person in Vegas.

2   Q    Okay.  And "natalie lost.  Due Tuesday.  1140 divide by

3   2."

4          What was that entry?

03:02:45  5   A    I forget.

6   Q    Okay.  The next one:  "Brass knuckles based on 96 I

7   took 4.  Got july 3 it's May 21.  1100."

8          Do you see that?

9   A    Yeah.  That was basically brass knuckles.  It's basic

03:03:02  10  name brand for marijuana.  It comes in a vape pin.  It was

11  based on 100, so I took out four for myself.

12  Q    Okay.

13  A    And then the balance owed.

14  Q    "Personal loan of $800 to you" -- "of 800 to you cash

03:03:21  15  given 500 Natalie.  Got back 700."

16          What was that?

17  A    So it was like another 800 that I gave to James, but

18  so -- he asked for 800 and I gave Natalie 500 -- gave

19  Natalie 500 and then he gave me back 700, so he owed 600

03:03:49  20  left from that.

21  Q    Okay.  And then "Missing P40 PAID 800."  Do you see

22  that?

23  A    Yeah.

24  Q    It shows "800" in the column over here.

03:04:00  25          What was that?

*Deborah D. Parker, U.S. Court Reporter*

03:04:01   1    A    It was another gun that I had that James took.

           2    Q    What kind of gun?

           3    A    It was a 4040.  Like 40-millimeter.

           4    Q    .40 caliber?

03:04:13   5    A    Yeah.  So I paid like 800 for it.

           6    Q    And you gave that gun to James?

           7    A    Yeah.

           8    Q    When was -- when did you obtain that gun,

           9    approximately?

03:04:24  10    A    It's roughly around this -- so this has to be May.

          11    This is around June, July.

          12    Q    And so, yeah, you have a reference here about July 3,

          13    indicating that this version of the spreadsheet was at least

          14    made July 3 or later; is that correct?

03:04:50  15    A    Yeah.  I think we got it, like, July last year.  Year

          16    before.

          17    Q    And when did you -- this .40 caliber gun that you

          18    obtained, when did you give it to James, if you recall?

          19    A    I don't remember.

03:05:11  20    Q    Okay.  But you believe it was sometime over the summer

          21    of 2019?

          22    A    Yeah.

          23    Q    And James had said he would pay you $800 for it.

          24    A    Well, I said I paid $800, so I just wanted my money

03:05:31  25    back.

*Deborah D. Parker, U.S. Court Reporter*

```
03:05:31    1    Q    You paid $800 for it.  Where did you buy it from?

            2    A    Usually, I buy it from the Slaphouse.

            3    Q    You mean a person at the Slaphouse?

            4    A    So what happened -- yes, there's people always selling

03:05:45    5    stuff at the Slaphouse, so they're selling --

            6    Q    What is the "Slaphouse"?

            7    A    What is a Slaphouse?

            8    Q    What is a Slaphouse?  Can you describe for the jury

            9    what a Slaphouse is?

03:05:56   10    A    "Slaphouse" is basically a residential house that

           11    people come in and gamble.  They play a game called Fish,

           12    which is pretty popular.  And these operations, they run 24

           13    hours a day.  And so they're always operating, so it's

           14    pretty normal in Santa Ana and Garden Grove.

03:06:18   15    Q    This game Fish is a card game?  Is a video game?  Is

           16    it --

           17    A    "Fish" is a video game that people would sit around.  I

           18    believe maybe 12 people can sit at a table and then they

           19    just putting money into the machine and playing the game.

03:06:38   20    Q    Okay.  And, typically, are drugs sold at these

           21    Slaphouses?

           22    A    Yes.

           23    Q    Okay.  And you meet people at the Slaphouse who do

           24    things like sell guns?

03:06:53   25    A    Yes.
```

03:06:54   1    Q    The particular Slaphouse where you bought this

2    .40 caliber gun, what street was that located on --

3    A    Santa Ana.

4    Q    -- in Santa Ana?  Is that the Slaphouse near Shawn

03:07:06   5    Whalin's house?

6    A    Yes.

7    Q    Is that on Riatt Street?

8    A    It was on a small street called Rita, R-I-T-A.

9    Q    Oh, Rita Street?

03:07:15  10    A    Yes.

11    Q    Around the corner from Shawn Whalin's house where he

12    lived with his mother?

13    A    Shawn lived on Rene Street, one block away.  It's right

14    behind his house.

03:07:26  15    Q    Okay.  Now, on this spreadsheet as well, it shows a

16    total of 6,450 on this line, correct?

17    A    Yes.

18    Q    But then it shows minus 750 received, deposit

19    Union Bank, correct?

03:07:38  20    A    Yes.

21    Q    And money was deposited into your Union Bank account on

22    that date?

23    A    Yes.

24    Q    And then it also indicates "Cash App 295."  What's

03:08:08  25    "Cash App"?

03:08:09  1   A     "Cash App" is a money exchange where people can send

2   money to like Zelle, if you're familiar.

3   Q     And you received 295 from James?

4   A     Yes.

03:08:20  5   Q     Okay.  Showing -- at some point after July 3, the debt

6   was "5495," correct?

7   A     Yes.

8         MR. WILKE:  Okay.  Now, I'm going to show you what

9   was previously admitted as Exhibit 224.

03:08:46 10   (The document was published in open court.)

11  BY MR. WILKE:

12  Q     Do you see this?

13  A     Yes.

14  Q     Does this appear to be a different version of the same

03:08:54 15  spreadsheet we were just looking at:  Exhibit 114?

16  A     It's similar.

17  Q     Okay.  It shows the 5/11/19 date, correct?

18  A     Yes.

19  Q     Which was the date created, correct?

03:09:14 20  A     Yes.

21  Q     But it actually -- for instance, this heading says

22  "James balance."

23        Do you see that?

24  A     Yes.

03:09:24 25  Q     Okay.  "James" refers to Tri Dao, the person we've been

03:09:29  1    talking about?

2    A    Yes.

3    Q    Directing your attention back to Exhibit 114, this also

4    is titled "JAMES BALANCE 5/11/2019," but it appears to be

03:09:41  5    actually a different spreadsheet as this is all in capitals,

6    correct?

7    A    Yes.

8    Q    We're going back to Exhibit 224.  This is in upper --

9    "James" is capitalized, but the rest is in lower case,

03:09:56  10   correct?

11   A    Correct.

12   Q    Now, do you recall creating these two different

13   spreadsheets?

14           My question is:  Why is there more than one

03:10:11  15   spreadsheet that appears to be very similar?

16   A    I think I was trying to make it more neat.

17   Q    Okay.  Do you know which one you created first and

18   which one you created second?

19   A    I couldn't tell from this.

03:10:29  20   Q    Okay.  All right.  Well --

21   A    I see this one is more recent, because it goes by the

22   date, since I put "June 22nd."

23   Q    It shows some transactions on June 22nd that aren't

24   shown on Exhibit 114, correct?

03:11:09  25   A    That is correct.

*Deborah D. Parker, U.S. Court Reporter*

03:11:10  1   Q    Okay.  And by this time, the $5,495 debt had increased

2   to $7,120?

3   A    I believe so.  I can't see it on the screen.

4   Q    Oh, I'm sorry.  Do you see that?

03:11:29  5   A    Yes.

6   Q    Okay.  Now, again, this was a spreadsheet that you used

7   to keep track of money James owed you, correct?

8   A    Yes.

9   Q    In October of 2019, do you recall approximately how

03:11:52  10  much money James owed you?

11  A    In October, roughly, about 5,500.

12  Q    Okay.  So less than the 7,100 on this Exhibit 224,

13  correct?

14  A    Yes.

03:12:11  15  Q    And is that because he had paid you back some of the

16  money?

17  A    Yes.

18  Q    Now, in fact, you went to Las Vegas, was your testimony

19  about this Las Vegas trip, on October 4, with Sheila Ritze,

03:12:28  20  Shawn Whalin and James Dao, correct?

21  A    Yes.

22  Q    And that was -- during that trip to Las Vegas, did you,

23  in fact, loan James more money?

24  A    Yes.

03:12:40  25  Q    How much?

*Deborah D. Parker, U.S. Court Reporter*

66

| | | |
|---|---|---|
| 03:12:41 | 1 | A     500. |
| | 2 | Q     For what? |
| | 3 | A     So he could place a sports bet. |
| | 4 | Q     Okay.  And that 500 that you loaned James in Las Vegas, |
| 03:12:52 | 5 | did he pay that back? |
| | 6 | A     He paid me back on a later date.  He only paid me back |
| | 7 | 400. |
| | 8 | Q     When did he pay you back -- when did he pay you back |
| | 9 | for the $500 that you lent him? |
| 03:13:12 | 10 | A     When we ate at the restaurant, Asia Buffet, with his |
| | 11 | wife and two kids. |
| | 12 | Q     At -- on October 14th, 2019, the afternoon before that |
| | 13 | evening fishing trip, correct? |
| | 14 | A     Yes. |
| 03:13:30 | 15 | Q     And he paid you in cash? |
| | 16 | A     Yes. |
| | 17 | Q     Okay.  Now, in the period of time that you knew |
| | 18 | James Dao, did you know him to be a violent person? |
| | 19 | A     He would get into fights, yes. |
| 03:14:08 | 20 | Q     Did you actually see those? |
| | 21 | A     Yes. |
| | 22 | Q     How many times? |
| | 23 | A     Two times. |
| | 24 | Q     These were fistfights or fights with weapons? |
| 03:14:22 | 25 | A     He would get into fistfights. |

*Deborah D. Parker, U.S. Court Reporter*

67

| | | |
|---|---|---|
| 03:14:25 | 1 | Q    When was the last time you saw him get into a |
| | 2 | fistfight? |
| | 3 | A    I'm not sure when.  2019? |
| | 4 | Q    Okay.  Do you remember the circumstances? |
| 03:14:44 | 5 | A    No, I don't remember. |
| | 6 | Q    Did James ever tell you about instances where he |
| | 7 | assaulted a person with a gun? |
| | 8 | A    He would tell me that he's always -- he's in a gun |
| | 9 | fight with people, so... |
| 03:15:11 | 10 | Q    You say he would always tell you that.  How many times |
| | 11 | did he tell you that type -- describe that kind of incident? |
| | 12 | A    He would -- he would tell me in 2019, probably, about |
| | 13 | five or six times he'd been in two fights with people. |
| | 14 | MR. STAPLES:  I'm going to object to the hearsay |
| 03:15:30 | 15 | and ask that a limited instruction be given only upon -- |
| | 16 | MR. WILKE:  We have no objection to that. |
| | 17 | THE COURT:  This isn't offered for the truth of |
| | 18 | the matter.  It's offered for the state of mind, and we'll |
| | 19 | further instruct you about that.  There are a couple of |
| 03:15:47 | 20 | rulings that the Court made that you'll get further |
| | 21 | instructions on at the end of the case. |
| | 22 | Counsel. |
| | 23 | BY MR. WILKE: |
| | 24 | Q    So James told you about five or six different times in |
| 03:15:58 | 25 | 2019 where he was involved in some type of incident |

*Deborah D. Parker, U.S. Court Reporter*

68

```
03:16:00   1    involving a gun?

           2    A      Yes.

           3    Q      And what did he tell you about what he did during those

           4    incidents?

03:16:13   5    A      He always tells me that he got away.  He won the fight,

           6    and he's good at shooting.

           7    Q      Did you know James to own any guns?  Did you know

           8    whether James owned any guns?

           9    A      Yes.

03:16:51  10    Q      How did you know that he owned guns?

          11    A      Because he would -- he would carry with him.  He would

          12    show me.

          13    Q      What type of gun did James carry with him?

          14    A      He had a .38.  He had a black .38 revolver.

03:17:09  15    Q      Okay.

          16    A      He always had other guns.  He had 9-millimeter.  He

          17    had, AR-15 in his house.

          18    Q      AR-15 is a rifle?

          19    A      Yes.

03:17:23  20    Q      Did he keep that -- I think we heard, large gun kept in

          21    a tennis --

          22    A      He had a gun case for it.  Natalie knew about it.

          23    Q      Was it the case about the size of a tennis racket?

          24    A      Yeah, you keep it.  It's big, like, a tennis bag.

03:17:46  25    Q      And you said you also saw him with a 9-millimeter, I
```

03:17:50  1    think you said?

        2    A    Yes.

        3    Q    Is that a square handgun that requires a clip for the

        4    ammunition?

03:17:58  5    A    Yes.

        6    Q    This .38, you said you saw him carry that?

        7    A    Yes.

        8    Q    How often did he carry it?

        9    A    He would always carry it with him.  He would --

03:18:16 10    wouldn't want to leave home without it.

       11    Q    Where would he carry it?

       12    A    He would carry it in his bag.  He would have like a

       13    little purse -- man purse.

       14    Q    I'm going to show you what's --

03:18:36 15         MR. WILKE:  Is this in already?

       16    (Pause)

       17         MR. WILKE:  I'm going to show you what's been

       18    previously admitted as Exhibit 536.

       19    (The document was published in open court.)

03:18:44 20    BY MR. WILKE:

       21    Q    Do you recognize the purse depicted in that photograph?

       22    A    Yes.

       23    Q    What's the date at the bottom of the photograph?  Can

       24    you see that?

03:19:00 25    A    October 14th, 2019.

*Deborah D. Parker, U.S. Court Reporter*

70

| | | |
|---|---|---|
| 03:19:02 | 1 | Q    At what time? |
| | 2 | A    10:46. |
| | 3 | Q    10:46? |
| | 4 | A    10:46. |
| 03:19:12 | 5 | Q    Okay.  Do you recall the testimony that this was taken |
| | 6 | from the surveillance camera at James' apartment on that |
| | 7 | date and time? |
| | 8 | A    Yes. |
| | 9 | Q    Do you see the strap -- is this James depicted in the |
| 03:19:26 | 10 | photograph? |
| | 11 | A    Yes. |
| | 12 | Q    Do you see the strap across his chest there? |
| | 13 | A    Yes. |
| | 14 | Q    What is that? |
| 03:19:31 | 15 | A    He carries like a man purse. |
| | 16 | Q    Is that the man purse that you knew him to carry the |
| | 17 | .38 revolver in? |
| | 18 | A    Yes. |
| | 19 | Q    He also has another strap over his shoulder.  Do you |
| 03:19:42 | 20 | see that? |
| | 21 | A    Yes.  It's a backpack. |
| | 22 | Q    And on the night of October 14, 2019, did you pick him |
| | 23 | up from his apartment? |
| | 24 | A    Yes, I did. |
| 03:19:55 | 25 | Q    And was he carrying his man purse and his backpack? |

*Deborah D. Parker, U.S. Court Reporter*

03:19:59  1   A    Yes, he was.

2           THE COURT:  Counsel, why don't you pick a

3    convenient time for the recess.

4           MR. WILKE:  Let me just pinpoint, if I could.

03:20:22  5   BY MR. WILKE:

6    Q    Directing your attention to what's been previously

7    introduced as Exhibit 535, do you, again, recognize the

8    person in the orange jacket to be James Dao?

9    A    Yes.  That is James.

03:20:34 10   Q    And, again, this strap going across his shoulder,

11   what's that?

12   A    That's his -- that man purse.

13   Q    Okay.

14   A    Man bag.

03:20:44 15   Q    This orange jacket, do you recall him bringing that

16   with him when -- on October 14th, when you picked him up?

17   A    I know because in here, in the courtroom, but I don't

18   remember the colors that he's wearing.

19   Q    You don't remember the color that night?

03:21:00 20   A    No.

21   Q    But we saw that jacket introduced into evidence,

22   correct?

23   A    Yes.

24   Q    Now, in addition to carrying a gun and in addition to

03:21:19 25   witnessing these fights, was there an incident in the summer

03:21:22  1    of 2019 where you were assaulted by James?

2    A    Yes.  There was a time when we were -- well, we were at

3    a casino.  I think it was Lucky Girl, or something like

4    that.  And I wanted to leave, because it's like past

03:21:40  5    2:00 o'clock, and I couldn't drink alcohol and I rather be

6    just home or getting high.  And I didn't want to be there,

7    because I don't gamble.  So we were there for a couple of

8    hours.  And then I asked him, just leave, a few times.  So I

9    had to wait in the car for about an hour or so.

03:22:03 10         When he finally came out, then we were -- we were

11    at the light and then that's when he hit me.  He

12    sucker punch me.  I was driving, so he hit me on my right

13    side.

14    Q    While you were at the light?

03:22:20 15    A    Yeah.  While I was at the light.  I had my seatbelt on.

16    And I tried to move around and I couldn't move around, so he

17    put me in a headlock.  So he -- he was trying to choke me

18    out, so...

19    Q    Did you fight back?

03:22:36 20    A    I was trying to move back and forth trying to hit him,

21    because -- I couldn't hit him because of the seatbelt.

22    Q    We heard testimony from Natalie Nguyen about him

23    sustaining a black eye.

24    A    No, I didn't give him a black eye.

03:22:51 25    Q    And why was he so angry at you?

*Deborah D. Parker, U.S. Court Reporter*

03:22:57  1   A    He was mad at me because he said it was my fault that

2    he lost, because I was trying to rush him.  So he just blame

3    me, and -- yes.

4    Q    Did -- and this happened in the summer of 2019?

03:23:11  5   A    Yes, it did.

6    Q    Did James ever apologize for this incident?

7    A    No, he doesn't apologize.

8    Q    And even after this incident, though, you continued to

9    be his friend and go to Las Vegas with him?

03:23:24 10   A    Yes.

11            MR. WILKE:  I think it's a good time to break,

12   Your Honor.

13            THE COURT:  Ladies and gentlemen, we'll come and

14   get you in about 15 minutes.  You're admonished not to

03:23:34 15   discuss this matter amongst yourselves, nor form or express

16   any opinion.

17            Have a nice recess.

18        (*Jury exits courtroom.*)

19        (*The following proceedings were had outside the*

03:24:10 20        *presence of the jury:*)

21            THE COURT:  Counsel, we'll recess about 10 to the

22   hour.

23            And if you'll take the gentleman.

24            I'm sorry.  20 to the hour.

03:24:27 25            Thank you, Deborah.

03:25:12  1        *(Recess taken from 3:25 p.m. to 3:46 p.m.)*

          2        *(The following proceedings were had in open court*

          3        *in the presence of the jury:)*

          4              THE COURT:  Please, be seated.  Thank you for the

03:46:14  5    courtesy.

          6              All counsel are present, the defendant and

          7    investigating agent, the jury and the alternates.

          8              Counsel, if you would like to continue your direct

          9    examination.

03:46:24 10              MR. WILKE:  Thank you, Your Honor.

         11              HOANG XUAN LE, DEFENDANT'S WITNESS, SWORN

         12                     DIRECT EXAMINATION

         13    BY MR. WILKE:

         14    Q    Mr. Le, I'm going put back up on the screen here

03:46:30 15    Exhibit -- what was previously admitted as Exhibit 114,

         16    which is this spreadsheet that you created, correct?

         17    A    Yes.

         18    Q    One of two we've looked at.

         19              Now, this document indicates that on 5/13 received

03:46:47 20    deposit from Union Bank 750.  Do you see that?

         21    A    Yes.

         22    Q    I'm going to -- seeking to admit by stipulation,

         23    Your Honor, Exhibit 573.  It's a two-page bank record.

         24              THE COURT:  All right.  Received.

03:47:01 25        *(Defendant's Exhibit 573 received in evidence.)*

03:47:01   1          *(The document was published in open court.)*

2     BY MR. WILKE:

3     Q     Showing what's been admitted as Exhibit 573, do you

4     recognize this as page 1 of 2 of a Union Bank statement in

03:47:14   5     your name --

6     A     Yes.

7     Q     -- for the period:  5/4/19 to 6/5/19?

8     A     Yes.

9     Q     Directing your attention down to the additions column,

03:47:29  10     on 5/13, does it reflect an office deposit of $750?

11     A     Yes.

12          *(The document was published in open court.)*

13     BY MR. WILKE:

14     Q     Going back to Exhibit 114, is that what's reflected

03:47:39  15     here on your spreadsheet?

16     A     Yes.

17     Q     You previously testified about this .40 caliber gun

18     that you had given to James that you had paid $800 for.

19              Do you recall that testimony?

03:47:56  20     A     Yes.

21     Q     At the time you bought that .40 caliber gun, did you

22     also purchase a second gun?

23     A     Yes.

24     Q     What kind of gun was that?

03:48:08  25     A     I picked up a .38 revolver.

*Deborah D. Parker, U.S. Court Reporter*

76

03:48:11   1    Q    Okay.  A .38 caliber revolver?

2    A    Yes.

3    Q    And the .38 caliber revolver, did you buy that at the

4    Slaphouse as well?

03:48:22   5    A    Yes, I did.

6    Q    And that was in -- approximately, when?

7    A    It was around the same time as I bought the 40, so it

8    must have -- around, I think, June.  June, July.

9    Q    Of 2019?

03:48:40  10    A    2019, yes.

11    Q    When you bought the .38 caliber gun revolver, did it

12    have any ammunition in it?

13    A    Yes, it did.

14    Q    What did you do with the ammunition after you bought

03:48:51  15    it?

16    A    I kept the ammunition with the gun.

17    Q    Okay.  Did you keep the gun loaded at your house?

18    A    No, I did not.

19    Q    So you unloaded the ammunition that was in the gun?

03:49:06  20    A    Yes.

21    Q    At some point, what did -- what happened to the

22    .38 caliber revolver?

23    A    I lent it to a friend.

24    Q    Who?

03:49:22  25    A    To Tarren Smith.

*Deborah D. Parker, U.S. Court Reporter*

03:49:25   1    Q    When was that?

2    A    I let her borrow her in December of 2019 --

3    Q    Now, there was a --

4         -- may I have a moment, Your Honor?

03:49:46   5         THE COURT:  Yes.

6    BY MR. WILKE:

7    Q    I'm showing you what was previously admitted as

8    Exhibit 144.

9         *(The document was published in open court.)*

03:50:00  10    BY MR. WILKE:

11    Q    Do you recognize this as a text exchange between you

12    and Shawn Whalin?

13    A    Yes.

14    Q    Okay.  And is this your text in the green?

03:50:16  15    A    Yes.

16    Q    And it says, *If you want to borrow my .38, come and get*

17    *out my house or my BB gun is in the car now,* correct?

18    A    Yes.

19    Q    And the .38 you're referring to, is this .38 caliber

03:50:29  20    revolver you bought in or about June of 2019?

21    A    Yes.

22    Q    And the one you later gave to Terren Smith, correct?

23         *(Court Reporter requests clarification for the*

24         *record.)*

03:50:41  25         MR. WILKE:  T-E-R-R-E-N.

*Deborah D. Parker, U.S. Court Reporter*

```
03:50:46   1    BY MR. WILKE:
           2    Q    Sometime, I think you said in December of 2019?
           3    A    Yes.
           4    Q    Okay.  Why did Shawn need to borrow your .38 or BB gun,
03:51:06   5    if you recall?
           6              Do you recall?
           7    A    I think he was trying to intimidate somebody.  I don't
           8    remember.
           9    Q    Did you loan it to him at that time?
03:51:24  10    A    No.
          11    Q    Now, when you loaned the gun to Terren Smith in 2019,
          12    did you give -- did you give the ammunition to her?
          13    A    No, I didn't.
          14    Q    You just gave her the gun?
03:51:41  15    A    Yes.
          16    Q    And was that ammunition still in your house or car on
          17    December 19th, 2019 when you were arrested?
          18    A    Yes, it was.
          19    Q    Now, we heard testimony in this case from
03:52:12  20    Natalie Nguyen about James telling people about his life
          21    insurance policy.
          22              Do you remember that?
          23    A    Yes.
          24    Q    Did James tell you about his life insurance policy?
03:52:26  25    A    Yes, he did.
```

79

03:52:27   1          THE COURT:  Counsel, could you move the mic a

2     little closer?

3               MR. WILKE:  Yes.  Sorry.

4               THE COURT:  Thank you.

03:52:32   5     BY MR. WILKE:

6     Q    When did you first learn about James' life insurance

7     policy?

8     A    He would tell people about it in 2018, 2019.

9     Q    And what were the circumstances that he would tell

03:52:48  10     people about it?

11     A    Any time, like, people -- he would tell them, *Say, just*

12     *collect the money from my life insurance.  If anything*

13     *happens to me, I have a million-dollar policy.*

14          That's what I would recall.

03:53:04  15     Q    So the first you heard about this was when you heard

16     James telling other people about it, correct?

17     A    Yes.

18     Q    Did James ever tell you that, in order to get you to

19     loan him money?

03:53:17  20     A    No.

21     Q    Okay.  But he did -- you did hear him say that to other

22     people in your presence several times, correct?

23     A    Yes.

24     Q    And would you -- did you ever have any conversations

03:53:40  25     with Natalie Nguyen about James' life insurance policy?

*Deborah D. Parker, U.S. Court Reporter*

03:53:45   1    A    We never had any conversations, no.

2    Q    Was Natalie Nguyen ever present when James made these

3    statements about his life insurance policy?

4    A    Natalie is around, yes.

03:54:02   5    Q    Would she be around when James would tell other people

6    about the life insurance policy?

7    A    Yes.

8    Q    Okay.  And would James ever say anything to you about

9    the life insurance policy outside of the situations where he

03:54:17  10    was actually trying to get somebody else to loan him money?

11    A    I don't understand.

12    Q    Okay.  Other than -- well, let me strike that.

13         Did you understand, based on what you heard James

14    say, that he had a $1 million life insurance policy?

03:54:36  15    A    That he had a million-dollar policy, yes.

16    Q    Okay.  Now, did you tell James when your father died?

17    A    Yes, I told James.

18    Q    And that was in February of 2019, correct?

19    A    Yes.

03:54:54  20    Q    Did James say anything to you about your father's death

21    certificate?

22    A    Yes.  James -- he said that if I can get a copy of the

23    certificate, maybe he can fake his own death and collect

24    money on the life insurance.

03:55:10  25              MR. STAPLES:  Objection.  Hearsay.  Move to

*Deborah D. Parker, U.S. Court Reporter*

03:55:11  1    strike.

2                    MR. WILKE:  Goes to --

3                    THE COURT:  Just a moment.

4                    MR. WILKE:  Yes.

03:55:16  5        *(Pause)*

6                    MR. WILKE:  Not offered for its truth, Your Honor.

7                    THE COURT:  Once again, this portion is not

8    offered for the truth of the matter.  It only goes to

9    listener's state of mind and actions.

03:55:37 10    BY MR. WILKE:

11    Q    Okay.  Could you repeat your answer about what -- what

12    James said after you told him about your father's death?

13    A    James, he would joke around.  He said maybe we can get

14    a copy -- if I can get a copy of the life insurance and he

03:55:54 15    can fake his own death, that he would be able to collect and

16    pay off all his bills.

17    Q    And did James often discuss his debts to other people?

18    A    I'm not sure.

19    Q    Were you aware that James owed many people money?

03:56:16 20    A    Yes, I knew James owed people money.

21    Q    Okay.  What was your understanding of who James owed

22    money to?

23    A    He owed his brother, Alex, like 30, 40,000; his family

24    members in the thousands and then other drug dealers and

03:56:35 25    suppliers.  Drug dealers that supply, like, marijuana that

03:56:40  1    he would -- he would get the product.  And we call it

2    "burn."  Basically, he would get the product fronted and he

3    wouldn't never -- wouldn't pay him back, so those guys would

4    be upset about him.

03:56:52  5    Q    How about bookies?  Did he owe bookies, too?

6    A    Yeah, he owed bookies, too.  He owed quite a few,

7    actually.  He would pretend to be, like, an agent, sometimes

8    an agent, basically, cover like five other people that

9    gambles.  And as they pay their debts back, he would keep

03:57:11 10    the money, so they were upset about that, too.

11    Q    And when James suggested using your father's death

12    certificate to create a death certificate for himself, in

13    order to file an insurance claim, did you understand him to

14    be serious?

03:57:34 15    A    I took it that he was joking at the time, but it was

16    possible that -- with him, everything just goes.

17    Q    Okay.  Did he mention that idea more than once?

18    A    Yes.

19    Q    How many times?

03:57:47 20    A    I would say two or three times.

21    Q    And during those times that he brought up this -- this

22    idea about faking his own death for the life insurance, was

23    Natalie present?

24    A    She was around, yes.

03:57:59 25    Q    Was she present to where she could hear those

*Deborah D. Parker, U.S. Court Reporter*

03:58:01  1    conversations?

2    A    Yes, she was in the room.

3    Q    Were -- at the time this was happening, were you all

4    drinking and using drugs together?

03:58:13  5    A    It was me and Natalie doing the drinking and the drugs

6    and then James would do a line or so of cocaine with us.

7    Q    Would James also drink?

8    A    He would -- well, me and Natalie, we'll be drinking all

9    night or all morning.  He'll take, like, a sip or two.

03:58:32  10   Q    So he used very small amounts where you and Natalie

11   used very large amounts?

12   A    Yes.

13   Q    Fair to say?

14        Did he say what he would do after Natalie would

03:58:57  15   file a false claim, in order to get the benefits?

16   A    He would tell me, *Hey, Wayne, if you can do it, I'll*

17   *give you 50- to 100,000.*  That's what he would joke around

18   with me.

19   Q    Okay.  Where would he go if he was supposed to be dead?

03:59:15  20   What was his idea of where he would --

21   A    His idea, he'll be somewhere else.  He won't be here in

22   California.

23   Q    Did he ever talk about going to Mexico?

24   A    I don't remember.

03:59:31  25   Q    And did you ever hear Natalie say anything indicating

*Deborah D. Parker, U.S. Court Reporter*

84

03:59:34  1   that she was willing or agreeable to do this plan?

2         MR. STAPLES:  Objection.  Hearsay.

3         THE COURT:  Counsel, I'm not sure that this goes

4   to state of mind or subsequent conduct.

03:59:54  5         MR. WILKE:  We'd offer it for his state of mind,

6   Your Honor.  And, specifically, to explain other conduct

7   later by Mr. Le for which the Government has introduced

8   evidence already.

9         THE COURT:  Overruled.

04:00:07  10        You can answer the question.

11  BY MR. WILKE:

12  Q    You said -- what was Natalie's reaction when James was

13  discussing this plan to possibly fake his own death?

14  A    She would be okay with it.  She would just be happy,

04:00:20  15  because she needed the money.

16  Q    And did she express that openly in front of you?

17  A    Yeah.

18  Q    Did you and James and/or Natalie ever actually attempt

19  to create a fake death certificate?

04:00:42  20  A    No, we didn't.

21  Q    I'm going to show what's been previously admitted as

22  Exhibit 540.

23        *(The document was published in open court.)*

24  BY MR. WILKE:

04:01:09  25  Q    Do you recognize the person depicted there

*Deborah D. Parker, U.S. Court Reporter*

85

| | | |
|---|---|---|
| 04:01:11 | 1 | *(indicating)*? |
| | 2 | A    Yes. |
| | 3 | Q    Who is that? |
| | 4 | A    Sheila Ritze. |
| 04:01:16 | 5 | Q    Okay.  And when did you first meet Sheila Ritze? |
| | 6 | A    I met Sheila, roughly, March of 2019. |
| | 7 | Q    And what were the circumstances by which you met |
| | 8 | Sheila? |
| | 9 | A    She was the HOA lady for my cousin's complex, Cindy. |
| 04:01:40 | 10 | Q    And did Cindy introduce you to Sheila? |
| | 11 | A    We -- we did meet together at a bar. |
| | 12 | Q    That was the first time you met Sheila? |
| | 13 | A    Yes. |
| | 14 | Q    And what was the purpose of that meeting? |
| 04:01:58 | 15 | A    It was just going out for drinks. |
| | 16 | Q    Okay.  Do you recall which bar? |
| | 17 | A    We went to Beach Girls in Huntington Beach. |
| | 18 | Q    And what did you -- during that first time you met |
| | 19 | Sheila, did it appear that she liked to drink? |
| 04:02:17 | 20 | A    Yes. |
| | 21 | Q    Okay.  And did she drink a lot? |
| | 22 | A    They were pretty drunk.  They were drinking, yes. |
| | 23 | Q    This was a time when you drank a lot, too, correct? |
| | 24 | A    Yes. |
| 04:02:34 | 25 | Q    And could Sheila keep up with you? |

*Deborah D. Parker, U.S. Court Reporter*

04:02:38   1   A    At that time, I didn't know her too much, so --
           2   Q    Okay.  So over time, did you develop a social
           3   relationship with Sheila?
           4   A    Yes.
04:02:46   5   Q    And did you drink with her every time you saw her?
           6   A    Yeah.
           7   Q    And were you two -- could you keep up with each other
           8   drinking?
           9   A    Yes, we would.  I would be able to keep up with her and
04:03:00  10   she would keep up with me.
          11   Q    And fair to say that Sheila, like yourself, drank a lot
          12   during this period of time, correct?
          13   A    Yes.
          14   Q    At -- now, you said that Sheila was an HOA manager?
04:03:23  15   A    Yes.
          16   Q    That's a homeowners' association manager?
          17   A    Yes.
          18   Q    And that's for apartment and condominium complexes,
          19   correct?
04:03:32  20   A    Yes.
          21   Q    And in socializing with Sheila, did you come to learn
          22   that as an HOA manager, she controlled contracts for
          23   construction, plumbing, electrical work, roofing and things
          24   like that?
04:03:48  25   A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

87

04:03:51  1    Q     Did you and Sheila discuss obtaining work -- that type

2    of work through you?

3    A     Not the first time we met.  We were just kind of just

4    drinking.  But, eventually, in May, we would discuss about

04:04:07  5    work, because she had a lot of contracts and I had a lot of

6    friends who were contractors.  And then, I would be able to,

7    maybe, make a little commission from the jobs she would give

8    to my friends that were in contracting.

9    Q     And did she agree to that?

04:04:23  10    A     She agreed to it, yes.

11    Q     And did you enter into that arrangement with Sheila?

12    A     Yes, we did.

13    Q     And between May of 2019 and your arrest in December of

14    2019, how many jobs do you think she booked through you?

04:04:45  15    A     From that -- from May to October, roughly about five

16    jobs.

17    Q     About five jobs.  And how much total work was that in

18    terms of -- financially, how much was involved?

19    A     Usually, they're redoing like little small walkways or

04:05:04  20    bridges.  So a couple thousand dollars each job.

21    Q     For each job?

22    A     Yes.

23    Q     Okay.  So maybe $10,000 worth of construction work over

24    a five-month period?

04:05:14  25    A     Yes.

*Deborah D. Parker, U.S. Court Reporter*

04:05:15   1    Q    And then how much did you actually make off that work?

2    A    I was supposed to split five percent with her.  Like

3    10 percent and we would split five and five.

4    Q    So if it was $10,000 worth of work, you would get a

04:05:30   5    thousand and you'd give Sheila back 500?

6    A    Yeah.

7    Q    And that was the arrangement?

8    A    Yes.

9    Q    And do you know a person named Khoa Cao?

04:06:02  10    A    Yes.

11         MR. WILKE:  Admitted by stipulation Exhibit 564,

12    Your Honor.

13         THE COURT:  Received.  564.

14    *(Defendant's Exhibit 564 received in evidence.)*

04:06:11  15    *(The document was published in open court.)*

16    BY MR. WILKE:

17    Q    Did you recognize the person depicted in Exhibit 564?

18    A    Yes.  K.C.

19    Q    Is that Khoa Cao?

04:06:19  20    A    Yes.

21    Q    And he goes by the name "K.C."?

22    A    Yes.

23    Q    And what does he do for a living?

24    A    He does construction.

04:06:28  25    Q    What type of construction?

04:06:29  1   A    He does remodeling for homes, commercial.  He does
       2   melts work, fencing, stuff like that.
       3   Q    And did you -- how do you know K.C. or Khoa Cao?
       4   A    We've been longtime friends as well.
04:06:48  5   Q    How long?
       6   A    Say 10 years.
       7   Q    Okay.  And did you obtain construction work for him
       8   through Sheila Ritze's property management company?
       9   A    Yes, he obtained work.  And then Sheila and him opened
04:07:05 10   up an office together.
      11   Q    What do you mean they were opening up an office
      12   together?
      13   A    To set up more jobs for homeowner association [sic].
      14   Q    So Sheila and him, after -- and this was after you
04:07:18 15   introduced them?
      16   A    Yes.
      17   Q    And she provided some work for him?
      18   A    Yes.
      19   Q    They -- your understanding was they had entered an
04:07:27 20   agreement that they would start a company to, basically, do
      21   work for homeowner associations?
      22   A    That is correct.
      23   Q    Now, after you met Sheila, in or about March, having
      24   drinks with her cousin Cindy --
04:07:54 25             THE COURT:  Counsel, would you move that

*Deborah D. Parker, U.S. Court Reporter*

04:07:55  1    microphone a little closer?

       2    BY MR. WILKE:

       3    Q    After meeting Sheila, did you begin seeing her more

       4    regularly?

04:08:01  5    A    Yes.

       6    Q    Why would you see her more regularly?

       7    A    Well, to just meet up to have drinks and socialize.

       8    Q    Okay.  Was there some period of time where you started

       9    using cocaine with Sheila?

04:08:18 10    A    Yeah.

      11    Q    When was that?  How long had you known her before you

      12    guys started using cocaine together?

      13    A    In the summer of 2019, probably, like, a month later

      14    after meeting her.

04:08:31 15    Q    Okay.  And then when you -- then how often during the

      16    summer of 2019 were you socializing with Sheila Ritze?

      17    A    Probably like every week.

      18    Q    Okay.  And when you would socialize, would that be at a

      19    bar, at your house?

04:08:53 20         Where would that be?

      21    A    It would be all three.  Sometimes it would be at her

      22    house late night.  She'll just ask to come over.  I'll be

      23    home in the afternoon.  She'll get off from work and she'll

      24    ask what I'm doing and just come over and come by for a

04:09:09 25    drink.  That's usually how we would meet up.

*Deborah D. Parker, U.S. Court Reporter*

04:09:11  1    Q    And when you would socialize with her, would you always

2    drink together?

3    A    Yes.

4    Q    Would you always use cocaine?

04:09:18  5    A    Yes.

6    Q    Okay.  Was there ever any romantic relationship between

7    you and Sheila?

8    A    No.

9    Q    Was there ever any -- did she ever express any romantic

04:09:33  10   feelings toward you?

11   A    I thought later that she liked me, but I didn't know.

12   I just looked at her as a friend and as a business partner.

13   Q    But you never had a romantic relationship with

14   Sheila Ritze?

04:09:46  15   A    No.

16   Q    Did you ever introduce her as your girlfriend?

17   A    No.

18   Q    Did you ever refer to her as your girlfriend?

19   A    No.

04:09:56  20   Q    Now, did Sheila have any hobbies she was passionate

21   about?

22   A    She enjoyed fishing.

23   Q    Did she talk about fishing?

24   A    She talked about fishing a lot on her -- about her boat

04:10:14  25   and that was her hobby.

04:10:21  1  Q    And did you -- in the summer of 2019 -- well, strike

2  that.

3           I'm going to show you what's been previously

4  admitted as Exhibit 452.

04:10:36  5       (The document was published in open court.)

6  BY MR. WILKE:

7  Q    Do you see that boat depicted in the photo?

8  A    Yes.

9  Q    Do you recognize that as Sheila Ritze's boat?

04:10:43 10  A    Yes.

11  Q    And how many times had you been on that boat,

12  approximately?

13  A    Like three to five times.

14  Q    Okay.  The first time you went, was that in the summer

04:10:56 15  of 2019?

16  A    Yes.

17  Q    And did she take you out fishing -- you and some other

18  people?

19  A    We were supposed to go fishing.  I think we just

04:11:08 20  cruised around the water.  Kind of cruised, I think.

21           MR. WILKE:  Seeking to admit by stipulation

22  Exhibit 565, Your Honor.

23           THE COURT:  565 received.

24       (Defendant's Exhibit 565 received in evidence.)

25  ////

*Deborah D. Parker, U.S. Court Reporter*

04:11:40  1  BY MR. WILKE:

2  Q    Mr. Le, do you recognize this document here, up on the

3  screen?

4  A    Yes.

04:11:45  5  Q    Is this the fishing license that you obtained back in

6  2019?

7  A    End of May, yes.

8         THE COURT:  Is this a dual marking, as the same

9  exhibit?

04:12:06 10         MR. WILKE:  No, I don't believe so, Your Honor.

11  We saw a fishing license from somebody else, yes.

12  BY MR. WILKE:

13  Q    And Exhibit 565, this is your fishing license?

14  A    Yes, it is.

04:12:39 15  Q    Showing that it became valid on 5/31/19?

16  A    Yes, sir.

17  Q    May 31 of 2019?

18  A    Yes.

19  Q    Was that about the time that you first went fishing on

04:12:50 20  Sheila Ritze's boat?

21  A    Yes.

22  Q    Okay.  Or -- but you didn't actually catch any fish

23  that day?

24  A    No.

04:12:59 25  Q    But did she require you to obtain a fishing license

94

| | | |
|---|---|---|
| 04:13:02 | 1 | before coming out to her boat? |
| | 2 | A    Yes. |
| | 3 | Q    And what was your understanding of how experienced |
| | 4 | Sheila was as a fisherwoman? |
| 04:13:27 | 5 | A    She knew how to navigate the boat really well, so she |
| | 6 | knew how to find the fish.  She has a fish finder.  It's |
| | 7 | like coordinates where the fishes -- where you can see them, |
| | 8 | so you can estimate where the fish are and how deep they |
| | 9 | are. |
| 04:13:44 | 10 | She knew where the fishes -- I guess, where the |
| | 11 | paddies at, I guess. |
| | 12 | Q    The kale paddies? |
| | 13 | A    Yeah.  So she knew -- she knew the area. |
| | 14 | Q    And did Sheila ever share with you any of her fishing |
| 04:14:05 | 15 | exploits, like the biggest fish she had ever caught, things |
| | 16 | like that? |
| | 17 | A    She would tell me about what she caught on a certain |
| | 18 | rod.  Like a small 30-pound rod, she caught, like, a |
| | 19 | 200-pound shark and different fishes that she caught. |
| 04:14:21 | 20 | Q    Did she show you pictures sometimes of those and post |
| | 21 | it on Facebook and things like that? |
| | 22 | A    Yes.  Social pictures, yes. |
| | 23 | Q    Now, you went fishing or out on the boat a few other |
| | 24 | times that summer? |
| 04:14:57 | 25 | A    Yes. |

*Deborah D. Parker, U.S. Court Reporter*

04:14:59  1    Q    At some point, you went lobster fishing with her,

        2    correct?

        3    A    Yes.

        4         MR. WILKE:  Seeking to admit by stipulation

04:15:17  5    Exhibit 556, Your Honor.

        6         THE COURT:  556 is received.

        7         *(Defendant's Exhibit 556 received in evidence.)*

        8    BY MR. WILKE:

        9    Q    Showing you what's been admitted as Exhibit 556, do you

04:15:29  10   recognize this as a California Fish and Wildlife Full Season

        11   Spiny Lobster Report Card, valid from 9/28/19?

        12   A    Yes.

        13   Q    And this document -- you can actually read down here --

        14   it shows that it was obtained on 9/27/19, at 11:50 a.m.

04:15:55  15        Do you see that?

        16   A    Yes.

        17   Q    Did you obtain this lobster card?

        18   A    Sheila bought it for me.

        19   Q    And is that when you first -- the first time you

04:16:03  20   went -- did she buy it for the first time you went lobster

        21   fishing with her?

        22   A    Yes.

        23   Q    Would that have been around that date 9/27 or

        24   9/28/2019?

04:16:15  25   A    That's when she obtained it, yes.

*Deborah D. Parker, U.S. Court Reporter*

04:16:17   1   Q     Okay.  Prior to the night -- you went out fishing with

           2   Sheila and Tri Dao, late in the evening, on October 14,

           3   correct?

           4   A     Yes.

04:16:30   5   Q     And prior to that night, how many times had you been

           6   lobster fishing?

           7   A     One time.

           8   Q     Okay.  Did Sheila -- prior to the opening of lobster

           9   season, did she express excitement and enthusiasm about

04:16:53  10   lobster fishing?

          11   A     She couldn't wait until the season started.

          12   Q     And even before the season started, did she indicate to

          13   you that she was going to take you out lobster fishing?

          14   A     Yeah.

04:17:05  15   Q     Okay.  And that led to her buying you a fishing license

          16   back on September 27th, correct?

          17   A     Yes.

          18   Q     The one time before October 14 --

          19         MR. WILKE:  Well, we'll come back to that.

04:17:30  20   BY MR. WILKE:

          21   Q     Do you recall Sheila telling you about her intention to

          22   travel to Las Vegas on October 4, 2019?

          23   A     She wanted to go to Vegas, yes.

          24   Q     That she was planning a trip to Las Vegas?

04:17:55  25   A     Yes.

*Deborah D. Parker, U.S. Court Reporter*

04:17:55   1   Q     What did she tell you about that trip?

           2   A     That she was going to fly to Las Vegas to meet up with

           3   her mother-in-law.

           4   Q     For what purpose?

04:18:04   5   A     To watch the Billy Idol concert.

           6   Q     And did you -- did she ask you for a ride to the

           7   airport?

           8   A     Yes.  She asked me for a ride to the airport, yes.

           9   Q     Did you agree?

04:18:17  10   A     Yes.

          11   Q     On the morning of October 4, did you drive her to the

          12   airport?

          13   A     Yes.  I took her to Long Beach Airport.

          14   Q     The night before, what had you done?

04:18:33  15   A     I was doing drugs all night.

          16   Q     And had you slept at all that night?

          17   A     No, I didn't sleep yet.

          18   Q     And what time in the morning did you drive Sheila to

          19   the airport, on October 4th?

04:18:48  20   A     I think it was, like, 8:00 or 9:00 in the morning.

          21   Q     And you drove her to Long Beach Airport, correct?

          22   A     Yes.

          23   Q     What happened after you arrived at the airport?

          24   A     So I asked her to go to see if she missed her flight,

04:19:04  25   so I wasn't sure if she was going to miss it.  I told her to

*Deborah D. Parker, U.S. Court Reporter*

04:19:09   1   go find out, and then I'll just wait across the street.

2   Q    Were you running late for her flight?  Was she running

3   late?

4   A    She was running late for her flight, because I think

04:19:18   5   she got to check in, like, half an hour earlier.  And then

6   we were just right on time for boarding time.  So she was

7   trying to see if she can board it.  So I just dropped her

8   off, and I told her, *I'll just wait across the street so*

9   *you're not waiting for a ride.*

04:19:32  10        So I waited in the parking lot across the street

11   from the terminal.

12   Q    At some point did she contact you by phone or text,

13   telling you she had missed her flight?

14   A    Yes, she called me and said that she missed her flight

04:19:46  15   and that she was trying to look for another flight.

16   Q    And did you wait for her at the Long Beach Airport

17   parking terminal?

18   A    Yes, I did wait.

19   Q    How long did you wait?

04:20:02  20   A    Probably 30 minutes and then went to go pick her back

21   up.

22   Q    And did she call you again about whether she could get

23   another flight?

24   A    There were none available.

04:20:12  25   Q    What happened then?

04:20:14  1    A    I was just being nice and say, *If you really want to*

2    *go, I'll drop you off.*

3             And she said, *Yeah.*  I didn't think she was going

4    to say yeah, but --

04:20:26  5    Q    So you offered, thinking she wouldn't take you up on

6    the offer, and she did?

7    A    Yes.

8    Q    You offered to drive her to Las Vegas?

9    A    Yes.

04:20:39  10   Q    After she agreed to drop -- to your offer to drive her

11   to Las Vegas, did you contact anybody?

12   A    I contacted Shawn to see --

13   Q    Why?

14   A    Because I wanted him to drive to Vegas, because I was

04:20:53  15   afraid that I couldn't drive, because I had been up all

16   night.  And I thought it was just going to be a one-day

17   trip.

18   Q    And what did you tell Shawn about that trip to

19   Las Vegas, what the purpose was?

04:21:08  20   A    I said, *We're just going to drop Sheila off for the*

21   *concert.*  That's all.  I didn't say like he's going to go.

22        *(Court Reporter requests clarification for the*

23        *record.)*

24             THE WITNESS:  Just -- Shawn -- I need him to drive

04:21:24  25   with me to Vegas to drop off Sheila.

*Deborah D. Parker, U.S. Court Reporter*

04:21:30  1    BY MR. WILKE:

2    Q     And did you tell Shawn that you would spend the night

3    there?

4    A     I didn't say.

04:21:39  5    Q     Other -- and did Shawn agree to go?

6    A     Yes, he did.

7    Q     Did you tell Shawn anything else before he agreed to

8    go?

9    A     No.

04:21:51  10   Q     Did you tell him you would provide the drugs for the

11   trip?

12              MR. STAPLES:  Objection.  Leading.

13              THE COURT:  Sustained.  Re-ask the question.

14              THE WITNESS:  I would bring the --

04:22:01  15             THE COURT:  Just a moment, sir.

16              Sustained.  Re-ask the question.

17   BY MR. WILKE:

18   Q     Did you say anything else to Shawn to encourage him to

19   go with you?

04:22:09  20   A     I'll just bring the party --

21             *(Court Reporter requests clarification for the*

22             *record.)*

23              THE WITNESS:  I told Shawn that I would bring

24   party supplies, which meant drugs, like methamphetamine --

04:22:20  25   that's his choice -- and coke.

04:22:23    1    BY MR. WILKE:

2    Q    Okay.  And other than Shawn Whalin, did you contact

3    anybody else before you left for Las Vegas?

4    A    I don't know when.  I asked James later when I was at

04:22:39    5    Shawn's house, if he wanted to go along, too, since I'm

6    going.

7    Q    I want to show you what was previously admitted as

8    Exhibit 223.

9        *(The document was published in open court.)*

04:22:53   10    BY MR. WILKE:

11    Q    Do you see this exhibit?

12    A    Yes.

13    Q    I think this was identified as a WhatsApp message taken

14    from James' phone?

04:23:09   15    A    I think that's my phone.  And then James text me,

16    "Let's go to the Canelo night."

17             And then I think replied, "Let's go."  And then I

18    probably ask him, say, "Do you want to go to Vegas today?"

19             And then I, probably, "Let me know.  I'm going

04:23:26   20    there right now."  And then I told him, "I have three packs

21    available."  We can meet -- just case we can't go in the

22    same car, that's what I meant.

23    Q    So this text -- you understand this WhatsApp message to

24    be you asking, down here at the bottom, at 9:32 a.m., you

04:23:45   25    asking James if he wanted to go to Vegas today?

*Deborah D. Parker, U.S. Court Reporter*

04:23:48   1    A    Yeah.

2    Q    And you telling James that you were heading up there

3    and that you have a "three pack GH," what's that?

4    A    I have a three pack of greenhouse at home, if you want

04:23:59   5    to flip it, we can meet in Vegas and just -- and then I told

6    him if he can just go see my mom and go grab the weed to go

7    sell.  It's just sitting there.

8    Q    Who's your mom?

9    A    My mother.

04:24:13  10    Q    Is she in Vegas?

11    A    No, my mom is in Fountain Valley.

12    Q    Okay.

13    A    I think we were in a rush.  I believe we were in a rush

14    to go drop her off for the -- I don't know why -- the

04:24:24  15    concert.

16    Q    Okay.  But your mom wasn't in Las Vegas, correct?

17    A    No.

18    Q    Did you know James to have his mother in Las Vegas?

19    A    No.

04:24:35  20    Q    Okay.  Did he have any relatives in Las Vegas?

21    A    No.

22    Q    So when you see "go see my mom and grab the packs," are

23    you referring to going by your house and getting the

24    marijuana and saying "hi" to your mother?

04:24:50  25    A    Yes.

04:24:51  1    Q    That's what that refers to?

       2    A    Yes.

       3    Q    And James knew your mother, right?

       4    A    Yes.

04:24:55  5    Q    And you knew his mother, right?

       6    A    I seen her a couple times, yes.

       7    Q    And this last one "Let me know so I'll let my mom know

       8    to let you in"?

       9    A    Basically, to tell my mom somebody is going to come by

04:25:12 10    the house and it's okay for them to go to my room.

      11    Q    James, though, did not actually go to your house, did

      12    he?

      13    A    No.

      14    Q    Did you pick him up at his apartment?

04:25:24 15    A    Yeah.  We end up picking him up.

      16    Q    Okay.  Why was that?  Why didn't he go to your house?

      17    A    He didn't have a ride.

      18    Q    And when you picked him up at his apartment, did you

      19    first go home?

04:25:39 20    A    Yes.

      21    Q    Did you pick up the three packs of greenhouse?

      22    A    I don't think I did.

      23    Q    Why not?

      24         *(Court Reporter requests clarification for the*

04:25:51 25         *record.)*

04:25:51  1    BY MR. WILKE:

2    Q    Why didn't you?

3    A    I don't remember, but -- I don't think I brought it.

4    Q    And did you -- Sheila was in your car, correct?

04:26:03  5    A    Yes.

6    Q    Did you bring any alcohol in the car?

7    A    Yeah.  I believe I brought -- I grabbed a bottle of

8    Tido's.

9    Q    And that would be a large, jug-size bottle.

04:26:18  10   A    Yeah, large, the big jug of Tido vodka.

11   Q    Often referred to as a handle?

12   A    Yes.

13   Q    And it holds 1.75 liters of vodka?

14   A    Yes.

04:26:30  15   Q    And when you left your house, was it full?  Unopen?

16   A    It was a new bottle, yes.

17   Q    Now, during the ride to Las Vegas, who was doing the

18   driving?

19   A    I was.

04:26:53  20   Q    Okay.  And where was Sheila seated?

21   A    Passenger seat.

22   Q    And where was Shawn seated?

23   A    Shawn and James was seated in the back.

24   Q    With Shawn at which side and James at which side, if

04:27:07  25   you recall?

*Deborah D. Parker, U.S. Court Reporter*

04:27:10  1    A     I don't know.

2    Q     Okay.  But they were in the backseat.  You and Sheila

3    were in the front.  And you were driving, correct?

4    A     Yes.

04:27:25  5    Q     During the drive there, was there any discussion about

6    whether you all would spend the night in Las Vegas?

7    A     I don't know.

8    Q     You don't recall?

9    A     No.

04:27:39  10   Q     Did you understand that Sheila had intended to spend

11   the night there?

12   A     Yes.

13   Q     And that she had already had a hotel room that she was

14   going to share with her mother-in-law?

04:27:50  15   A     Yes.

16   Q     Was there any discussion -- did Sheila offer to allow

17   you to sleep in the hotel room with her and her

18   mother-in-law?

19   A     When we got there, or --

04:28:05  20   Q     During the drive, or -- stick to during the driving,

21   right now.

22   A     During the drive, I think James was trying to check --

23   see what room was available, but it wasn't any talks that I

24   was going to spend the night before Sheila, no.

04:28:23  25   Q     Did James indicate that he had obtained a hotel room?

*Deborah D. Parker, U.S. Court Reporter*

04:28:27  1   A    He was just checking to see what hotel rooms were

2   available.

3          THE COURT:  Counsel, why don't you pick a

4   convenient time to recess tonight.

04:28:36  5          MR. WILKE:  I think this will be it, Your Honor.

6   The next part is fairly lengthy.

7          THE COURT:  You're admonished not to discuss this

8   matter amongst yourselves, nor form or express any opinion

9   concerning the case, and we'll see you at 8:30 tomorrow

04:28:46 10   morning.

11          For your planning purposes, remember you're

12   recessing at 1:00 o'clock tomorrow, so you'll have afternoon

13   free.

14          Counsel, can I also just talk to the jury about an

04:29:01 15   anticipated date?

16          I think we're getting close enough so we can -- a

17   little bit about the date.

18          Folks, have a seat for a second.  For your

19   planning purposes, you should know that the case is probably

04:29:07 20   going to you two weeks earlier than we anticipated.  The

21   latest possible date would be, Monday, December 8.  There's

22   some chance that we're actually going to get this case to

23   you on December 2nd or 3rd.  So when you return, there may

24   be one or more days of testimony; but the outside, from

04:29:25 25   talking to all counsel, will be December 8th.

04:29:27  1          So we're about two weeks ahead of what we

2    initially stated to you.

3          So, please, stay healthy, okay?  Vitamins, good

4    night's rest.  Go home and beat the traffic, and we'll see

04:29:39  5    you tomorrow.

6          *(Jury exits courtroom.)*

7          *(The following proceedings were had outside the*

8          *presence of the jury:)*

9          THE COURT:  Sir, could you ask civil counsel to

04:30:04 10    come in and have a seat.

11          *(Pause)*

12          THE COURT:  Would you be seated for just a moment.

13          Counsel, we haven't finished direct, so it's

14    premature for any request by the Government.  I want to hear

04:30:18 15    the entire block of testimony.  And my suggestion is that

16    you go home and get some rest tonight.  We're right in the

17    heart of this case, right now.  Stay fresh as possible, and

18    we'll see you tomorrow at 8:00.

19          MR. WILKE:  We're only going to 1:00 tomorrow.

04:30:33 20    And we're going to work through lunch?  I assume we're just

21    going to go --

22          THE COURT:  I can't hear you.  I'm sorry.

23          MR. WILKE:  Just for scheduling purposes, we're

24    not going to take a lunch break tomorrow.

04:30:43 25          Would that be correct?

*Deborah D. Parker, U.S. Court Reporter*

108

04:30:44   1          THE COURT:  We are but at 1:00 o'clock.  Let's

2    work from 8:30 to 1:00.

3          MR. WILKE:  No -- just maybe a recess, but nothing

4    else in between.

04:30:53   5          So I've got several witnesses that I told to be

6    here at 8:30 tomorrow.  One, I hope to be here and would

7    ask -- I think he's going to be on tomorrow with cross, like

8    the rest of the day.

9          THE COURT:  I do, too.  That's why --

04:31:07  10          MR. WILKE:  So I'm going to ask the Court, when

11   the one shows up tomorrow, to order him back the following

12   day -- following day at 8:30.

13          THE COURT:  And which witness is that?

14          MR. WILKE:  That would be Khoa Cao, the one we had

04:31:19  15   a little difficulty serving.  I would like to, basically,

16   tell my other witnesses to be here Friday at 8:30.

17          THE COURT:  Fine.

18          MR. WILKE:  Okay.

19          THE COURT:  Now, anything else this evening?

04:31:32  20          MR. SCALLY:  No, Your Honor.

21          MR. STAPLES:  No, Your Honor.

22          MR. WILKE:  Thank you.

23          THE COURT:  Good night.  See you tomorrow morning.

24          Oh, just a moment.  Counsel, would you wipe the

04:31:39  25   desks now, as well as the microphone, because we have a

*Deborah D. Parker, U.S. Court Reporter*

04:31:43  1    civil matter this evening.

2                 And for the marshals, 8:00 o'clock tomorrow?

3                 THE MARSHAL:  Yes, sir.

4                 THE COURT:  Thank you very much.

04:31:55  5        *(At 4:31 p.m., proceedings were adjourned.)*

6

7                                 -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

   I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  January 7, 2022



          /s/DEBORAH D. PARKER
       DEBORAH D. PARKER, OFFICIAL REPORTER