**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 20-00002-(B)-DOC |
| | ) Day 8, Volume II |
| HOANG XUAN LE, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, NOVEMBER 18, 2021

11:02 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

TRACY L. WILKISON
ACTING UNITED STATES ATTORNEY

SCOTT M. GARRINGER
ASSISTANT UNITED STATES ATTORNEY
CHIEF, CRIMINAL DIVISION

GREGORY S. SCALLY
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3592
gregory.scally@usdoj.gov

GREGORY STAPLES
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES DISTRICT COURT
8000 RONALD REAGAN FEDERAL BUILDING
SANTA ANA, CALIFORNIA 92701
(714) 338-3534
gregory.staples@usdoj.gov

FOR THE DEFENDANT, HOANG XUAN LE:

CRAIG WILKE
LAW OFFICE OF CRAIG WILKE
305 NORTH HARBOR BOULEVARD
SUITE 216
FULLERTON, CALIFORNIA 92832
(714) 870-8900
craig@craigwilkelaw.com

SHEILA S. MOJTEHEDI
STRADLING, YOCCA, CARLSON & RAUTH,
P.C.
660 NEWPORT CENTER DRIVE
SUITE 1600
NEWPORT BEACH, CALIFORNIA 92660
(949) 725-4000
sheila.mojtehedi@gmail.com

3

1                          **I N D E X**

2

3    DEFENDANT'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

4      HOANG XUAN LE                   4
                                      32

5

6

7                        **E X H I B I T S**

8    DEFENDANT'S EXHIBITS:              IDENTIFICATION  EVIDENCE

9      46    Photograph                                    59

10     549   Diagram of Boat (Aerial)                      68

11     571   Google Maps Photograph of                     47
             66 Logan, Irvine,
12           California

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**SANTA ANA, CALIFORNIA; THURSDAY, NOVEMBER 18, 2021;**

**11:02 A.M.**

-oOo-

HOANG XUAN LE, DEFENDANT, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. WILKE:   *(Continuing)*

Q    Please, explain to the jury how you went from facing
the front of the boat to the back of the boat?

A    When I -- so James is standing over me.  So I grabbed
his hand -- the first -- when I grabbed his hand, I was
pushing his hand back.

        And at -- as his arm is going, his hand is like
towards this way *(indicating)* on his head, so I pulled --
when his first shot went off, I tried to bend his arm -- his
arm came down, so I tried to bend his arm towards his
back -- to the back of it.  So at that time, I'm facing the
back of the boat.  And that's when the second shot went off.
And then he pushed me down, so then that's when I fell on my
back.

Q    Okay.  So just in this first part of the struggle,
though, by the time the second shot goes off, you are
actually facing toward the rear of the boat; is that
correct?

A    Yes, I am.

Q    And James is -- his back is to you at this point,

*Deborah D. Parker, U.S. Court Reporter*

11:02:48  1    correct?

2              MR. STAPLES:  Objection.  Leading.

3              THE COURT:  Sustained.

4              THE WITNESS:  Well, he's still facing --

11:02:52  5        *(Overtalking:  Unable to report.)*

6          *(Court Reporter requests clarification for the*

7          *record.)*

8              THE COURT:  Just a moment.  Objection is

9    sustained.

11:02:54  10              Your question, Counsel.

11   BY MR. WILKE:

12   Q    When the second shot goes off, which direction is he

13   facing?

14   A    He's still -- James is still facing forward.  He's

11:03:03  15   facing the front, like towards the front of the boat.

16   Q    And you're facing the back of the boat?

17   A    Yes.

18   Q    And after the second shot went off, where did you --

19   where were you?  Were you standing?

11:03:18  20   A    The second shot, I was still standing.

21   Q    Okay.

22   A    And then I -- he pushed me down.  I fell down.

23   Q    And did you fall in this area depicted on Exhibit 547,

24   right in front of the seat *(indicating)*?

11:03:34  25              MR. STAPLES:  Objection.  Leading.

*Deborah D. Parker, U.S. Court Reporter*

|         |    |                                                           |
|---------|----|-----------------------------------------------------------|
| 11:03:35 | 1  |          THE COURT:  Sustained.                          |
|         | 2  | BY MR. WILKE:                                             |
|         | 3  | Q    Where on the -- can you look at 547 and explain the  |
|         | 4  | area where you fell down?                                 |
| 11:03:42 | 5  | A    I fell down towards the -- the back of the boat, to the |
|         | 6  | front of the chair where I was sitting at.               |
|         | 7  | Q    Okay.  So --                                         |
|         | 8  | A    So right there where I'm sitting at, Sheila has -- I |
|         | 9  | guess there's a tool compartment there that she has to clean |
| 11:04:04 | 10 | the boat.  And that's where she have [sic], like, stuff to |
|         | 11 | clean the boat or tools that you use to go fishing.      |
|         | 12 | Q    And is that where you found this handle that you spoke |
|         | 13 | about?                                                    |
|         | 14 | A    Yes, that's where I found the hand tool.            |
| 11:04:18 | 15 | Q    Okay.  And at the time you hit James in the head with |
|         | 16 | this handle, which direction was he facing?             |
|         | 17 | A    James was still facing the -- towards the front of the |
|         | 18 | boat.                                                    |
|         | 19 | Q    Okay.  And you were on the floor --                 |
| 11:04:37 | 20 |        (Court Reporter requests clarification for the    |
|         | 21 |        record.)                                          |
|         | 22 | BY MR. WILKE:                                             |
|         | 23 | Q    If I understand correctly, you were on the floor facing |
|         | 24 | towards the rear of the boat?                            |
| 11:04:42 | 25 | A    Yes.                                                 |

*Deborah D. Parker, U.S. Court Reporter*

11:04:43   1    Q    And this whole process, this whole struggle we're

2    talking about, was this more than a matter of -- more than

3    10 or 15 seconds?

4                   MR. STAPLES:  Objection.  Leading.

11:04:58   5                   THE WITNESS:  No, this was --

6                   THE COURT:  Sustained.

7                   Re-ask the question.

8    BY MR. WILKE:

9    Q    This struggle we've been talking with between you and

11:05:08  10    James for the last 20 minutes, how long did it actually last

11    on the boat?

12    A    It only lasted 15 seconds.  It was fairly short.  It

13    was very fast.

14    Q    After you hit James with the tool handle --

11:05:30  15    A    Yes.

16    Q    -- was he conscious?

17    A    Yes.

18    Q    Did he say anything to you or do anything to you that

19    made you in fear?

11:05:47  20    A    He was -- he was -- I remember -- I just remember him

21    yelling at me.  I was just scared.  I didn't comprehend what

22    he was saying.

23    Q    And that -- you said you were scared when he was

24    yelling at you.

11:05:59  25                   Were you scared when you saw the gun?

*Deborah D. Parker, U.S. Court Reporter*

11:06:02  1    A    I was scared that I was going to get shot.  I thought I

2    was getting hit with a bullet, because he's pointing at me.

3    So I never had a gun pointing at me like that or anyone

4    threatening me like that before.

11:06:18  5    Q    And as he standing over you and you hit him in the

6    head, I think you testified he grabbed your clothes?

7    A    As I -- as I hit him over the head with it, I went

8    towards -- he's facing towards me near my chair, so we're

9    kind of wrestling.  So I grab his legs to throw them over.

11:06:46  10   At the time, I thought I was going to go over the boat, too,

11   because we were both fighting.  But he grabbed my jacket,

12   like he --

13         So I'm facing the back, and he's -- he's opposite

14   of me.  And he pulls me over -- he pulls my clothes over my

11:07:02  15   head, so my jacket and my shirt all went overboard.  And I

16   was just still on my knees, when he fell over.  I was,

17   like -- the knees were towards the boat right here

18   *(indicating)*.

19   Q    When you pulled on his legs, you pulled them forward?

11:07:17  20   A    Yes.

21   Q    And he flipped --

22        *(Court Reporter requests clarification for the*

23        *record.)*

24        THE COURT:  We didn't -- just a moment.

11:07:24  25        "QUESTION:  When you pulled on his legs, you

*Deborah D. Parker, U.S. Court Reporter*

9

11:07:27   1          pulled them forward?

2          "ANSWER:  Yes.

3          "QUESTION:  And he flipped --"

4                  That's what the court reporter has.

11:07:33   5                  THE WITNESS:  Yes, James fell backwards on this

6     side of the chair.

7     BY MR. SCALLY:

8     Q     So you, essentially, pulled his legs out from him?

9                  MR. STAPLES:  Objection.  Leading.

11:07:44  10                  THE COURT:  Sustained.

11     BY MR. WILKE:

12     Q     And then after James went into the water, you observed

13     him in the water?

14     A     Yes.  He was -- he was still alive.  And he was yelling

11:07:57  15     at me, *I'm going to F-ing get you later.*

16                  So I said, *No, I'm just going to get out of here.*

17     *I just want to get away from this* --

18     Q     Was he swimming in the water?

19     A     Yes.

11:08:09  20     Q     He wasn't going underwater?

21     A     No.

22     Q     And did you consider calling the Coast Guard or the

23     police?

24     A     No.  I was scared.

11:08:27  25     Q     What were you scared of at that point after James had

11:08:31  1  gone overboard?

2  A    I was just scared of the -- the situation.  I didn't

3  know how to react.  I was just still in shock, like what was

4  going on.  And I didn't know what to do.

11:08:54  5  Q    Now, did you -- you indicated that James pulled your

6  shirt -- excuse me -- and your jacket off as he went

7  overboard?

8  A    Yeah.  He pulled my shirt.  And I had my phone in my

9  jacket.

11:09:12  10  Q    Did you have more than one phone?

11  A    At that time, I usually carried two phones.  So I lost

12  one of my phones, because I had it in my jacket.  And then

13  he took that one with him when he went over.

14  Q    Okay.  Now, after James went overboard, what happened

11:09:34  15  to the gun?

16  A    The gun was -- it fell on the boat, so I threw it back

17  at James.  I threw his backpack and the gun at him.

18  Q    What about his man purse?  Did he have that?

19  A    He had that --

11:09:50  20       *(Court Reporter requests clarification for the*

21       *record.)*

22  BY MR. WILKE:

23  Q    What about his man purse?

24  A    He still had it on.

11:09:59  25  Q    When he went overboard, did he have that on him?

*Deborah D. Parker, U.S. Court Reporter*

11:10:03   1    A    Yes.

2    Q    You had indicated that Sheila got sick.  Did that

3    happen -- when did that happen in relationship [sic] to

4    James going overboard?

11:10:19   5    A    She threw up.  When I got up, I remember seeing her

6    just puke.  I said, *Just get out of here.*

7    Q    So you're getting up off the floor?

8    A    Yes.

9    Q    And she threw up?

11:10:37  10    A    Yes.

11    Q    And when you got up off the floor that's when you threw

12    the backpack and gun at James?

13    A    Yes.

14              MR. STAPLES:  Objection.

11:10:46  15              THE COURT:  Sustained.

16              THE WITNESS:  That's when I saw the gun on the

17    floor.

18              THE COURT:  You don't have to answer the question.

19    The question was sustained.

11:10:49  20    BY MR. WILKE:

21    Q    How much longer after you got up off the floor, did you

22    throw the backpack and gun out in the water at James?

23    A    It was within, like, 10 seconds.

24    Q    Okay.  Now, where did you and Sheila take the boat to

11:11:22  25    after the -- this incident?

*Deborah D. Parker, U.S. Court Reporter*

11:11:29   1   A    After these events, so she drove back to go pick up the

2   hoop nets that we dropped off earlier.  And she was able to

3   pull up the hoop nets.  I had no energy in me to pull up

4   anything.  I just remember that she was seeing if I can pull

11:11:48   5   any up.  And I said I couldn't.  So she was pretty strong.

6   Q    Okay.  And then where did you go?

7   A    After we pulled up all the nets, we headed back to

8   the -- the landing there at the launch pad, or the -- where

9   you go park the boat back up.

11:12:12  10   Q    Okay.  And then what did you do?

11   A    What did -- she -- well -- went to go get -- I think

12   she went to -- I'm not sure who went to go get the car.

13   Q    Okay.  One of you went and got --

14   A    Yeah.

11:12:31  15   Q    -- the Explorer?

16   A    To go get the Explorer and to go pick up the boat.

17   Q    Okay.  And then where did you do?

18   A    She pulled the boat out of the water.  And we went to

19   go park the boat.  And we were just walking around to see

11:13:00  20   what was going on with the boat, if -- if I hit the boat, or

21   anything like that.  That was one thing she was worried.

22   Q    Okay.  She was worried that the boat was damaged?

23   A    Yes.

24   Q    Okay.  And she was checking -- she checked for damage

11:13:18  25   on the boat?

*Deborah D. Parker, U.S. Court Reporter*

11:13:19  1    A    Yes.

2    Q    Now, did you go home that night?

3    A    No.  I ended up sleeping for like an hour or two at her

4    house.

11:13:39  5    Q    Back at her apartment in San Juan Capistrano?

6    A    Yes.

7    Q    When -- did you know when you left James in the water

8    that he had sustained a gunshot wound to his back?

9    A    I didn't know that he was -- I didn't know that if he

11:14:15  10   was hit or not, no.

11   Q    And you didn't know whether the first shot actually hit

12   him either, did you?

13   A    No, I didn't know any of the shots hit him.

14   Q    Did you believe that James was dead that night?

11:14:31  15   A    No.  He was still breathing.  He was yelling at me, so

16   I just wanted to get away from him.

17   Q    When was the first time you actually learned that

18   James Dao had died, as a result of that incident on the

19   boat?

11:15:00  20   A    I didn't find out until December 19th.

21   Q    What happened on December 19th, 2019 that you found

22   this out?

23   A    When the federal agents came in and arrested me?

24   Q    For murder?

11:15:14  25   A    For murder.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 11:15:27 | 1 | Q    Now, we've heard testimony in this case about |
| | 2 | statements you made about this incident. |
| | 3 |             Do you recall the testimony from -- |
| | 4 | A    Yes. |
| 11:15:37 | 5 | Q    -- various witnesses? |
| | 6 |             Who was the first person that you said anything to |
| | 7 | about this incident? |
| | 8 | A    Said something to Shawn. |
| | 9 | Q    That would be Shawn Whalin? |
| 11:15:55 | 10 | A    Yes. |
| | 11 | Q    How much longer after the incident did you first say |
| | 12 | something to Shawn? |
| | 13 | A    I think I saw -- I'm not sure.  I think I saw Shawn the |
| | 14 | next day, because I think I went home. |
| 11:16:10 | 15 | Q    So the daytime of the 15th later that day? |
| | 16 | A    Yes. |
| | 17 | Q    And where did you -- did you speak to Shawn by |
| | 18 | telephone or was this in person when you told him about what |
| | 19 | happened? |
| 11:16:26 | 20 | A    This was in person. |
| | 21 | Q    Okay.  Where were you at? |
| | 22 | A    I drove over to his house. |
| | 23 | Q    For what purpose? |
| | 24 | A    To do drugs, usually. |
| 11:16:42 | 25 | Q    Do you recall what time of day it was? |

*Deborah D. Parker, U.S. Court Reporter*

11:16:50  1    A    Sometime in the afternoon.

2    Q    Was anybody else present at his house when you went

3    over there?

4    A    No.

11:16:58  5    Q    And when you spoke to him about this incident, were you

6    doing drugs with him?

7    A    Yes.

8    Q    What kind of drugs?  What type of drugs?

9    A    When I would come over to Shawn's house, I would bring

11:17:12 10    alcohol and drink for myself and we would smoke meth

11    together.

12    Q    On this day of the incident, were you using meth and

13    drinking when you were talking to him?

14    A    Yes.

11:17:27 15    Q    Now, following the incident, did you have any injuries?

16    A    Yes, I had -- I had bruises all over my leg.  I had

17    bruises on both of my -- back of my leg and my shoulders and

18    my arms.

19    Q    And when you went over to Shawn's house that day, were

11:17:57 20    the -- what were you wearing, if you recall?

21    A    Wearing a short sleeve -- I was wearing like a T-shirt

22    and jeans.

23    Q    So do you recall Shawn Whalin's testimony that he

24    noticed the bruises on your arms?

11:18:13 25    A    Yes, I remember.

11:18:14  1   Q    Did Shawn Whalin -- how did the conversation come about

        2   where you told Shawn Whalin what had happened?  Did he bring

        3   it up, or did you bring it up?

        4   A    I'm not sure who brought it up, but I just told him

11:18:27  5   that -- what happened like the night before.  Said we got

        6   into a fight and shots went off.

        7   Q    Okay.  You told him you got into a fight?

        8   A    Yes.

        9   Q    And you told him shots went off?

11:18:42 10   A    Yes.

       11   Q    Okay.  Did you tell him that you had shot him?

       12        MR. STAPLES:  Objection.  Leading.

       13        THE COURT:  No, overruled.

       14        You can answer that question.

11:18:50 15   BY MR. WILKE:

       16   Q    Did you tell Shawn Whalin that you had shot him?

       17   A    At that time, no.  I said just shots went off.

       18   Q    Did you tell Shawn Whalin anything else about the fight

       19   that you got into?

11:19:12 20   A    No.

       21   Q    Okay.  Did you tell Shawn who you got into a fight

       22   with?

       23   A    Yes.

       24   Q    And who did you tell him you got into a fight with?

11:19:24 25   A    I said, *I got in a fight with James,* if he remembered.

| | | |
|---|---|---|
| 11:19:28 | 1 | Q    And did you tell him where the fight occurred? |
| | 2 | A    It was on the boat. |
| | 3 | Q    Did you tell him that? |
| | 4 | A    Yes. |
| 11:19:35 | 5 | Q    Did you tell him how the fight got started? |
| | 6 | A    No, I just -- I just told him that it was, like, we had |
| | 7 | an argument.  And then that's all -- that's all I told him. |
| | 8 | Q    Okay.  Did you tell him that the fight was over money? |
| | 9 |        MR. STAPLES:  Objection.  Leading. |
| 11:19:56 | 10 |        THE COURT:  No, overruled. |
| | 11 |        THE WITNESS:  No, I didn't tell him. |
| | 12 | BY MR. WILKE: |
| | 13 | Q    Okay.  You did make a statement telling Shawn the |
| | 14 | story, quote:  "I took care of it"? |
| 11:20:11 | 15 |        MR. STAPLES:  Objection.  Leading. |
| | 16 |        THE COURT:  Overruled. |
| | 17 |        THE WITNESS:  No, I didn't. |
| | 18 | BY MR. WILKE: |
| | 19 | Q    Now, I think Shawn Whalin testified that you were |
| 11:20:23 | 20 | laughing when you told him the story, when you told him |
| | 21 | about what happened.  Is that -- |
| | 22 |        Do you recall that testimony? |
| | 23 | A    Yes, I remember him saying that. |
| | 24 | Q    Were you laughing when you told him about this? |
| 11:20:35 | 25 | A    No. |

| | | |
|---|---|---|
| 11:20:40 | 1 | Q    Do you sometimes laugh when you're nervous? |
| | 2 | A    When I'm nervous, yes. |
| | 3 | Q    But when you were telling Shawn Whalin about this fight |
| | 4 | you had with James on the boat the night before, were you |
| 11:20:55 | 5 | laughing then? |
| | 6 | A    No. |
| | 7 | Q    Now, who was the next person, if you recall, that you |
| | 8 | said anything to about this fight on the boat you had with |
| | 9 | James? |
| 11:21:23 | 10 | A    I think it was Tony.  Tony. |
| | 11 | Q    Okay.  Before you actually met with Tony, do you recall |
| | 12 | meeting with Vinh Doan? |
| | 13 | A    Yes.  I met him with Vinh. |
| | 14 | Q    Okay.  When you met with Vinh, was that before or after |
| 11:21:50 | 15 | you first told Tony about this? |
| | 16 | A    I think I met with Vinh afterwards. |
| | 17 | Q    Your recollection was afterwards? |
| | 18 | A    Yes. |
| | 19 | Q    The first time you mentioned anything to Tony about it, |
| 11:22:01 | 20 | where were you? |
| | 21 | A    The only -- the time is -- I think it was the time when |
| | 22 | Alex was asking me to go meet him up in Irvine. |
| | 23 | Q    Okay. |
| | 24 | A    And then -- |
| 11:22:26 | 25 | Q    Okay.  So is the -- when you and Tony went down to the |

*Deborah D. Parker, U.S. Court Reporter*

11:22:32  1   Sushi restaurant in Irvine, that's when you told Tony about

2   it?

3   A    Yes.

4   Q    Well, let's talk about the meeting you had with

11:22:40  5   Vinh Doan at the Bounce House.

6        *(Court Reporter requests clarification for the*

7        *record.)*

8   BY MR. WILKE:

9   Q    I want to ask you if -- do you recall meeting with

11:22:49 10   Vinh Doan at the Bounce -- the children's Bounce House?

11   A    Yes.

12   Q    I'm going to show what's been previously admitted as

13   Exhibit 174.

14        *(The document was published in open court.)*

11:23:00 15   BY MR. WILKE:

16   Q    Do you see that?

17   A    Yes.

18   Q    Okay.  And is that a photo of you and Vinh Doan at

19   Frog's Bounce House --

11:23:16 20   A    Yes.

21   Q    -- sometime shortly after this incident with this fight

22   you had with James on the boat?

23   A    Yes.

24   Q    Now, why were you meeting with Vinh Doan at the

11:23:29 25   Bounce House?

11:23:31    1    A    I wanted to talk to him about the incident on the boat,

            2    and I wanted to drop off profiles for him.

            3    Q    We did hear some testimony about profiles and I want to

            4    ask you just a few questions about that.  What was your

11:23:47    5    understanding of what a "profile" is?

            6    A    So what a "profile" is, is basically, like, a person's

            7    information -- basically, their -- their full name, address,

            8    date of birth, address, Social Security -- for you to run

            9    their credit and then to get credit cards that -- so

11:24:12   10    people -- so the guys can go buy -- go shopping, and --

           11    Q    Okay.  And why would you be bringing profiles to

           12    Vinh Doan at the -- on that day?

           13    A    At that time, because "V" had -- he had another friend

           14    that was able to run credit check to see if it was a good

11:24:30   15    profile, so he can apply credit cards in -- for the -- in

           16    the other people's names.  And then we would split the

           17    profit whenever that came.

           18    Q    And who proposed this plan to you?

           19    A    "V" proposed it, because he knew how to do it.  I

11:24:49   20    didn't know how to do profiles, so I had to ask other people

           21    how to obtain it.

           22    Q    Okay.  And did you try to obtain some profiles for

           23    Vinh Doan?

           24    A    Yes.  So I tried to ask other people to get profiles,

11:25:04   25    so people that I knew at the Slaphouse that were -- that had

*Deborah D. Parker, U.S. Court Reporter*

11:25:08 1    profiles, I would pay them money for profiles to give to

2    "V" -- that I would give to "V."  And if they were good

3    profiles -- I didn't know if they were good or bad, so I

4    would just give them money in advance just so they could get

11:25:23 5    started on it.

6             And then at that time, I would like text "V," say,

7    *Hey, this is a person's first name -- first, last name,*

8    *their information, personal information, date of birth,*

9    *Social Security number* to see if it was good.  And then he

11:25:38 10   can do what he knows.

11   Q    How long did you do this type of activity with

12   Vinh Doan?

13   A    This was, probably, no more than a month.

14            THE COURT:  Counsel, a little closer to the

11:25:49 15   microphone, just so we can hear.

16   BY MR. WILKE:

17   Q    And this was during this time period in October of

18   2019?

19   A    October, November.

11:25:59 20   Q    Okay.  And did you ever try to get profiles from Vinh?

21   A    I didn't -- I didn't try to get any profiles from him,

22   because I didn't know other people who knew how to do credit

23   checks at that time.

24   Q    So then you did, though, bring some profiles to Vinh,

11:26:23 25   correct?

*Deborah D. Parker, U.S. Court Reporter*

11:26:23  1    A    Yes.  Because he would ask me to get specifics for a

      2    profile.  For example, let's try to get an Asian person

      3    profile.  So let's stay away from, like, the Mexican or

      4    black people, because they got messed up credit.  So let's

11:26:35  5    try to get Asian people, because we have people like Asians

      6    who go to buy things at the mall and stuff like that, so

      7    wouldn't get questioned as much.

      8    Q    So that's what he told you?

      9    A    Yes.

11:26:50 10    Q    And were any of these profiles that -- did you ever

     11    make any money off this?

     12    A    I didn't make any money.  I lost like 4- to $500,

     13    because I would pay people to do the work in hopes that I

     14    would get a few profiles that were good.  Everything that I

11:27:08 15    gave "V" didn't work, so eventually stopped giving him

     16    stuff.

     17    Q    Who did you pay 4- to $500 to get the profiles?

     18    A    I would pay a few people at the Slaphouse, because they

     19    were -- there were guys that knew how to search the dark web

11:27:26 20    and to buy information.  So I just paid him in advance how

     21    to -- just so they can get started working.

     22    Q    Okay.  And when you were meeting with Vinh Doan

     23    following the fight you had with James, did you bring him

     24    some profiles that day?

11:27:44 25    A    Yes, I gave him -- yes, I did give him profiles.

*Deborah D. Parker, U.S. Court Reporter*

11:27:48  1  Q    But you indicated as well that you also wanted to talk

2  to him?

3  A    Yes.  I did have a talk with him.

4  Q    Okay.  So let's -- I want ask you some questions about

11:28:02  5  what you told him.

6              What did you tell him about what happened on the

7  boat?

8  A    I told "V" that I got into an issue with -- I didn't

9  give him a name.  I got into some -- some -- something with

11:28:26 10  another guy and then shot him -- that I said -- I told him I

11  shot him.  And then I exaggerated to him that the guy owed

12  me, like, 30-, 40,000.  And then --

13  Q    Why did you tell him that the guy owed you 30- to

14  40,000?

11:28:45 15  A    I wanted to -- for some reason, I just made it -- make

16  it sound like exciting.  It was just like a -- just to sound

17  like -- like a -- like this other people owe me money,

18  because I would tell the people that, like, I would collect

19  money -- a debt collector.  Just to sound like a mean

11:29:02 20  person, but I was never.

21  Q    So you had also told Shawn Whalin that the guy owed you

22  30- to 40,000, right?

23  A    Yes.

24  Q    And -- but James didn't owe you 30- to 40,000; is that

11:29:17 25  correct?

11:29:18  1    A     Correct.

2    Q     Did you tell -- did you say anything to "V"-- did you

3    tell him you shot him because he owed him 30- to 40,000?

4               MR. STAPLES:  Objection.  Leading.

11:29:29  5               THE COURT:  No, overruled.

6               You can answer that question.

7               THE WITNESS:  I -- yeah, I did.

8    BY MR. WILKE:

9    Q     Okay.  Was that true?

11:29:39 10    A     No.

11    Q     Why did you tell him -- why did you tell "V" Doan that

12    you shot this guy because he owed you 30- to $40,000?

13    A     I wanted to sound like a tough guy.

14    Q     And why did you want to sound like a tough guy to

11:29:55 15    "V" Doan?

16    A     He's been in and out of jail.  At that time, it was

17    like I was just more or like a drug user.  And just to make

18    myself look better.

19    Q     What was your belief about how "V" Doan would look at

11:30:13 20    you, if he thought you were a tough guy?

21    A     Like -- like, they wouldn't mess with me.  Like, people

22    won't mess with me.

23    Q     Okay.  Now, when you were talking to "V," did you talk

24    to him about how far offshore you were when you shot the

11:30:41 25    guy?

11:30:41   1   A    I didn't talk to about how far.  He just asked, *How far*
           2   *were you?*  I told him I didn't know how far we were.
           3   Q    Did you tell him whether it was possible the guy could
           4   have swam back?
11:30:54   5            Did you have that discussion with him?
           6   A    That was one thing that I was afraid, because I was
           7   trying to ask him at the same time.  I didn't know how to
           8   ask, just in case anything happened to me.  I needed, like,
           9   backup just in case James came back.
11:31:16  10   Q    What were you asking "V" about that?
          11   A    I was trying to ask him, because I was -- I was kind
          12   of -- I was scared that if he came back that James would be
          13   really pissed off at me.
          14   Q    Okay.  I need to know -- I need you to tell the jury,
11:31:34  15   to the best of your recollection, what exactly you asked "V"
          16   to do for you, if anything?
          17   A    I -- I wanted him to back me up if, you know, James
          18   came back.
          19   Q    So did you express to "V" some concern that the guy
11:31:54  20   might not be dead and come back?
          21   A    Yes.  Because he asked if he could swim back shore and
          22   I said, *Yeah, possibly.*
          23   Q    So he did ask if the guy could swim back to shore?
          24   A    Yes.
11:32:09  25   Q    And you said, "Possibly"?

11:32:10  1   A    Yes.

2   Q    And did you have any discussion or say anything to "V"

3   about the man having a life insurance policy?

4   A    Yes.

11:32:31  5   Q    What did you say to him?

6   A    I said, *His wife has a policy, too, that* -- I think I

7   probably said -- *they should pay me for if anything*

8   *happened.*  But that's all I said.

9   Q    I'm sorry.  I didn't hear your answer.

11:32:48  10   A    I said, *He has a life insurance policy.*  And then

11   that's all I remember saying.

12   Q    Did you say anything to him about getting paid out of

13   the life insurance policy?

14   A    I don't recall.

11:33:02  15   Q    Okay.  Did you tell Vi that you had spoken to this

16   man's brother?

17   A    I don't remember.

18   Q    Did Vi -- to your knowledge, did Vi know James?

19   A    No.

11:33:22  20   Q    Did you tell him that "James" was the name of the

21   person who you shot?

22   A    No.

23   Q    Okay.  Did you say anything to Vi about the man you

24   shot's brother?

11:33:44  25   A    Vi didn't know Alex, so --

11:33:47 1    Q    That wasn't my question, though.  Did you say anything
        2    to Vi that the man you shot had a brother?
        3    A    No.
        4    Q    Did Vi indicate at all that he would back you up, if
11:34:09 5    you needed help?
        6    A    Yes.
        7    Q    What did he say?
        8    A    He said, *If you need something, just give him a call.*
        9    Q    Did you ever speak to him again about this incident?
11:34:25 10   A    No.
       11    Q    Now, that same -- within that same few days following
       12    the incident, do you recall having a telephone conversation
       13    with Natalie Nguyen?
       14    A    Yes.
11:34:47 15   Q    I would like to talk to you about that.  Where were you
       16    when you first spoke to Natalie Nguyen about the incident?
       17    A    I think I was in my car with Shawn.
       18    Q    And this telephone call you had with Natalie Nguyen,
       19    was it on speakerphone?
11:35:07 20   A    Yes.
       21    Q    And Shawn was in the car?
       22    A    Yes.
       23    Q    Explain to the jury what happened during the telephone
       24    call with Natalie Nguyen while Shawn Whalin was in the car.
11:35:27 25   A    Natalie was calling me, asking -- or she's asking me

*Deborah D. Parker, U.S. Court Reporter*

| | |
|---|---|
| 11:35:34 | 1 |

where James was at.  And at that time, I was like -- wasn't

sure how to react to her, reply to her.  So I just told her,

like, a story, like, we're -- like a false story, because I

don't want to be a part of it.  And at that time, I think I

told -- Shawn was, like, *Man* --

Q    We're not -- I don't want to talk about the

conversation with Shawn, yet.  I just want to --

To the best of your recollection, I want to talk

about the conversation with Natalie you had on the

speakerphone, okay?

A    Okay.

Q    Was there anything more to that conversation?

A    I just -- I told her the conversation where -- what I

thought where James was at.  And I came with the story where

he went on a separate car -- or he went on a -- he went in a

different car from mine; that we went -- we went to the

docks and then that we went separately.

Q    Okay.  And was there anything else about that story

that you told Natalie, other than going in separate cars to

the dock?

A    That James went with another guy; that -- what I say?

It was a story where I said that he went on --

James went with another guy named Matt on the boat, and I

didn't go on the boat with him.

Q    The story you told Natalie, that was not true, correct?

*Deborah D. Parker, U.S. Court Reporter*

11:37:10   1    A    Correct.

2    Q    Now, I'm going to direct your attention to what's

3   previously been admitted as Exhibit 39, page 1, first.

4        *(The document was published in open court.)*

11:37:24   5   BY MR. WILKE:

6    Q    Do you recognize -- this was a text communication --

7        Do you recognize this as a text messaging

8   communication that you had with Natalie on October 17, 2019?

9    A    Yes.

11:37:46  10   Q    And is this you here saying:

11        "What -- what going on.  Getting

12        annoyed.  Everyone calling me.  Somebody

13        stopped by my house.  Was that you?"

14        Is that your text?

11:37:59  15   A    Yes.

16    Q    Who had stopped by your house -- had somebody stopped

17   by your house before you sent that text to Natalie?

18    A    Yes.

19    Q    Did you know who?

11:38:08  20   A    I didn't know.  My roommate told me that some lady or

21   someone's girlfriend came by looking for her boyfriend.

22    Q    Your roommate is who?

23    A    I forgot her name.

24    Q    But it was not a family member, right?

11:38:23  25   A    No.

| | | |
|---|---|---|
| 11:38:23 | 1 | Q    It was one of the tenants, or -- |
| | 2 | THE COURT:  Just a moment.  I don't think we got |
| | 3 | the question or the answer. |
| | 4 | (Record read.) |
| 11:38:41 | 5 | BY MR. WILKE: |
| | 6 | Q    It was one of the persons who rented a room in your |
| | 7 | mother's house, correct? |
| | 8 | A    Yes. |
| | 9 | Q    And so after you got that message from the tenant, you |
| 11:38:56 | 10 | sent Natalie this text? |
| | 11 | A    Yes. |
| | 12 | Q    And you understood it to be Natalie, based on the |
| | 13 | tenant's description of the woman? |
| | 14 | A    Yes. |
| 11:39:05 | 15 | MR. STAPLES:  Objection.  Leading.  Move to |
| | 16 | strike. |
| | 17 | THE COURT:  Sustained.  Stricken. |
| | 18 | BY MR. WILKE: |
| | 19 | Q    Why did you understand it to be Natalie who had come to |
| 11:39:13 | 20 | your house, after the tenant told you that this woman came |
| | 21 | to your house? |
| | 22 | A    Natalie -- |
| | 23 | Q    How did you know to call Natalie? |
| | 24 | A    There was a message -- I think because Alex was telling |
| 11:39:27 | 25 | me to call her or so [sic] to find out. |

*Deborah D. Parker, U.S. Court Reporter*

11:39:31  1    Q    Okay.  So you had also communicated with Alex, and he

2    had told you to call Natalie as well?

3    A    Yes.

4    Q    This lower part of the message -- I'm still looking at

11:40:08  5    39 -- Exhibit 39, page 1:

6               "Hi, Natalie!  *Chau nen goi* asking Wayne

7               where his friend boat parking?"

8               Is that your message?

9    A    No, that's like a forwarded messages from James' mom to

11:40:23  10   Natalie, that Natalie was forwarding to me.

11               THE COURT:  Counsel, we need to take a recess at

12   this point.

13               I received a note from the jury.  They need a

14   restroom break.

11:40:35  15              You're admonished not to discuss this matter

16   amongst yourselves, nor form or express any opinion.

17               We'll come and get you in about 15 minutes.  Have

18   a nice recess.

19        (*Jury exits courtroom.*)

11:40:43  20       (*The following proceedings were had outside the*

21        *presence of the jury:*)

22               THE COURT:  All right, Counsel.  15 minutes.

23               I ask the marshals to return the gentleman a

24   little early -- thank you -- to the stand before the jury

11:41:17  25   comes in.

*Deborah D. Parker, U.S. Court Reporter*

11:41:21  1          *(Recess taken from 11:41 a.m. to 11:58 a.m.)*

       2          *(The following proceedings were had in open court*

       3          *in the presence of the jury:)*

       4                THE COURT:  We're back in session.  The jury is

11:58:43  5   present.  The alternates are present.  The defendant is in

       6   the witness stand at investigating agency is present.

       7                If you would like to continue your direct

       8   examination, please?

       9                MR. WILKE:  Thank you.

11:58:56 10                      DIRECT EXAMINATION

      11   BY MR. WILKE:

      12   Q    Mr. Le, before the break, we had been talking about the

      13   phone call you had with Natalie.

      14                Do you recall?

11:59:01 15   A    Yes.

      16   Q    I need to back up for just a moment on one item.

      17                We were talking about the meeting you had with

      18   Vinh Doan at the Bounce House.

      19                Do you recall that?

11:59:11 20   A    Yes.

      21   Q    I want to show you what was previously admitted.  It's

      22   Exhibit 180.

      23          *(The document was published in open court.)*

      24   BY MR. WILKE:

11:59:18 25   Q    Do you recognize this?

33

| | | |
|---|---|---|
| 11:59:20 | 1 | A     Yes. |
| | 2 | Q     What is it? |
| | 3 | A     It's an Excel spreadsheet of what people owe me. |
| | 4 | Q     Any person in particular? |
| 11:59:29 | 5 | A     This one was Vinh's balance -- loan. |
| | 6 | Q     And who is Vinh whose loan balance is reflected on the |
| | 7 | spreadsheet? |
| | 8 | A     It's a friend of mine that owes me money. |
| | 9 | Q     Owes you money for what? |
| 11:59:50 | 10 | A     Money that I loan him out.  Like he needed -- this one |
| | 11 | needed 5,000, so he paid back like a thousand cash.  So I |
| | 12 | deduct the money. |
| | 13 | Q     Okay.  And was this Vinh Doan? |
| | 14 | A     This is another Vinh? |
| 12:00:11 | 15 | Q     What's this Vinh's last name, if you know? |
| | 16 | A     I forgot.  I don't know his last name. |
| | 17 | Q     But it's not Vinh Doan. |
| | 18 | A     No. |
| | 19 | Q     Was this -- it says, "Lost Pack." |
| 12:00:22 | 20 | What does that refer to? |
| | 21 | A     Meaning, that Vinh -- I gave him a pound of marijuana |
| | 22 | and then he said he lost it, so he's still responsible for |
| | 23 | it. |
| | 24 | Q     Okay.  Did you ever deal in marijuana with Vinh Doan? |
| 12:00:36 | 25 | A     Yes. |

| | | |
|---|---|---|
| 12:00:37 | 1 | Q   Okay.  But that's not -- Vinh Doan is not the same |
| | 2 | person reflected on this, correct? |
| | 3 | A   Not on this one, no. |
| | 4 | Q   Did Vinh Doan owe you any money in October of 2019? |
| 12:00:50 | 5 | A   Yes. |
| | 6 | Q   For what? |
| | 7 | A   I did let him borrow, like, 2,000.  And he only paid me |
| | 8 | back 500 for him to do other stuff.  I don't know what. |
| | 9 | Q   Okay.  That was the money you loaned him when he had |
| 12:01:07 | 10 | gotten out of jail? |
| | 11 | A   I gave him 1,000 and then I loaned him another 2,000. |
| | 12 | Q   Okay. |
| | 13 | A   I don't remember. |
| | 14 | Q   We heard testimony about that.  Was that loan after he |
| 12:01:24 | 15 | was released from jail -- |
| | 16 | A   Yes. |
| | 17 | Q   -- that he testified -- |
| | 18 | Okay.  Going forward now to the conversation in |
| | 19 | your car that you had with Natalie, that you just testified |
| 12:01:37 | 20 | about before the break, following that conversation that was |
| | 21 | over the speakerphone, did you have a conversation with |
| | 22 | Shawn Whalin about that? |
| | 23 | A   Yes. |
| | 24 | Q   Okay.  Can you describe for the jury that conversation? |
| 12:02:00 | 25 | A   That -- I told Shawn that they have a -- James had an |

*Deborah D. Parker, U.S. Court Reporter*

12:02:06  1  insurance policy that she might try to collect the money on,

2  if anything goes -- something went wrong.

3  Q    And you told Shawn that who might try to collect the

4  money?

12:02:29  5  A    That -- that Natalie will try to collect the money and

6  that -- that James might try to pull a quick one; that they

7  would try to split the money and -- and just defraud the

8  insurance.

9  Q    And what made you think that, that James and Natalie

12:02:50 10  might do that?

11  A    Because I had an early experience with James that

12  that's -- I had an earlier experience with James that he

13  would say that -- he would try to collect money on the

14  insurance policy and that he would just go missing.  I

12:03:08 15  remember that -- those are his words that he would use -- he

16  would just disappear and just try to collect money on the

17  insurance.

18  Q    And when you were in the car with Shawn, after this

19  call with Natalie, did you know whether James was dead?

12:03:24 20  A    No, I did not know.

21  Q    Did you know whether he was alive?

22  A    No, I didn't know.

23  Q    Did you say -- well, strike that.

24       Did Shawn Whalin make any statement to you to the

12:03:55 25  effect of *God is watching and will punish you*?

*Deborah D. Parker, U.S. Court Reporter*

36

| | | |
|---|---|---|
| 12:04:00 | 1 | A    Yes. |
| | 2 | Q    What did he say? |
| | 3 | A    He said, *Wayne, if you do anything wrong, God is going* |
| | 4 | *to punish you.*  That's what he said. |
| 12:04:09 | 5 | Q    And that was in response to what?  What did you say -- |
| | 6 | did you say anything to him right before that that led him |
| | 7 | to say that? |
| | 8 | A    I had a conversation with him that there was a fight |
| | 9 | and the gun went off. |
| 12:04:23 | 10 | Q    Was that a different conversation than you had with him |
| | 11 | from the one you just testified about earlier, on the day of |
| | 12 | the -- of the fight? |
| | 13 | A    I think it was a different conversation. |
| | 14 | Q    Okay.  Did you -- did you tell Shawn, again, what |
| 12:04:44 | 15 | happened for a second time, or -- |
| | 16 | A    I'm not sure on that one, because Natalie is asking |
| | 17 | questions.  And then I think Shawn is just asking if |
| | 18 | anything did happen.  That's what -- what's what he |
| | 19 | commented on. |
| 12:05:03 | 20 | Q    Okay.  I want to go back to this text exchange you had |
| | 21 | with Natalie where she is -- you ask her why everybody is |
| | 22 | trying to get ahold of you.  Do you recall we were talking |
| | 23 | about it earlier? |
| | 24 | A    Yes. |
| 12:05:24 | 25 | Q    Page 3 of that, you say: |

*Deborah D. Parker, U.S. Court Reporter*

12:05:25  1     "Don't accuse me of everything.  I

2     protect you and peeps around us."

3     Do you recall sending her that message?

4  A Yes.

12:05:35  5  Q When you sent her that message, did you feel like she

6  was accusing you of something?

7  A That time, yes.

8  Q What did you think she was accusing you of?

9  A Of doing something to James.

12:05:54  10  Q Okay.  And you said:

11     "We have a common interest.  We on the same team."

12     Do you see that?

13  A Yes.

14  Q What did you mean by that when you sent her that text?

12:06:02  15  A I said, like, we all -- me, James and --

16   *(Court Reporter requests clarification for the*

17   *record.)*

18    THE WITNESS:  I'm sorry.  I said, the three of

19  us -- James, Natalie and myself -- were always supposed to

12:06:16  20  work together.  Why are we always fighting?

21    So I said, *Just try to be on the same page with*

22  *one another.*

23  BY MR. WILKE:

24  Q Okay.  And directing your attention to page 4 of

12:06:37  25  Exhibit 39, Natalie responds:

*Deborah D. Parker, U.S. Court Reporter*

12:06:42  1          "I don't think I need to meet up with
          2          you.  You've said everything over the
          3          phone yesterday already.  I don't think
          4          you are telling the whole story.  I need
12:06:51  5          to go file a missing person report as
          6          James has been missing now for four
          7          days."
          8          Correct?
          9  A     Yes.
12:06:58 10  Q     So this text conversation was after the phone
         11  conversation in which Shawn Whalin was in your car, correct?
         12  A     Yes.
         13  Q     Now, going back to that phone -- that conversation you
         14  had with Shawn Whalin in your car, following the phone
12:07:18 15  conversation with Natalie, okay?  I just want to go back to
         16  that for a moment, okay?
         17  A     Yes.
         18  Q     During that conversation, did you say anything to Shawn
         19  to the effect of:  *If anybody gets in the way, including
12:07:30 20  *you, I will take you out*?
         21  A     No.
         22  Q     Okay.  Did you say anything to Shawn about James owed
         23  you money and you would collect from him, one way or
         24  another?
12:07:42 25  A     No.

*Deborah D. Parker, U.S. Court Reporter*

12:07:45  1   Q    And did you say anything to Shawn about handling

2   Natalie?  You would handle her?

3   A    No.

4   Q    Was there any mention at that time to Shawn Whalin

12:07:57  5   about a GPS tracker?

6   A    I'm not sure exactly when -- when I told Shawn that,

7   but -- because I was -- I was, like, afraid to see where

8   James was at.

9   Q    Well, I'm not there yet.

12:08:16  10        The question is:  During this conversation, did

11   you say anything to Shawn Whalin about a GPS tracker?

12   A    No.

13   Q    Okay.  At some later point, did you say something to

14   Shawn about a GPS tracker?

12:08:33  15   A    Yes.

16   Q    Do you know how much longer after this conversation

17   with him in the car?

18   A    Not until, like, a GPS -- it wasn't until like a month

19   later or so or a couple weeks afterwards.

12:08:45  20   Q    It wasn't just --

21        *(Court Reporter requests clarification for the*

22        *record.)*

23        THE COURT:  Too quick, Counsel, and a little bit

24   closer to the microphone so we can hear.

25   ////

40

12:08:53  1   BY MR. WILKE:

2   Q    The conversation you had with Shawn about a GPS tracker

3   did not occur within a few days after the incident on the

4   boat, correct?

12:09:02  5   A    Correct.

6   Q    Okay.  We'll come back to that then.

7        So going back to Exhibit 39, this was the text

8   conversation that you had with Natalie the following day,

9   correct?

12:09:25 10   A    Yes.

11   Q    After the phone call?

12   A    Yes.

13   Q    And she told you during this conversation that she

14   needed to go file a missing persons report on James.

12:09:42 15        Do you see that?

16   A    Yes.

17   Q    Okay.  And you didn't discourage her from doing that,

18   did you?

19   A    No.

12:10:06 20   Q    Directing your attention to page 5 of that text

21   conversation, you say, "I got 'A' calling me."

22        Do you see that?

23   A    Yes.

24   Q    Who is "A"?

12:10:20 25   A    I got Alex calling me.

*Deborah D. Parker, U.S. Court Reporter*

12:10:22  1    Q    And had Alex been calling you?

2    A    Yes.

3    Q    And had you actually spoken to him at the time you sent

4    Natalie this text?

12:10:31  5    A    Yes.

6    Q    What was the conversation that you had with Alex, prior

7    to sending Natalie this text?

8    A    I believe that Alex was trying to get me to talk to the

9    mom -- James' mom -- their mom -- just to make -- just to

12:10:54 10    make sure that he's okay.

11    Q    Okay.  Now, Natalie said:

12              "I'm not accusing you of anything.  I'm

13              just saying you're not telling the truth

14              about something.  If you want to help

12:11:19 15              find James...be honest."

16              Do you see that?

17    A    Yes.

18    Q    And you responded, "I wish he would too"?

19    A    Yes.

12:11:28 20    Q    Who are you referring to as "he"?

21    A    James.

22    Q    What did you think James was not being honest about?

23    A    He wouldn't tell the truth like where he's at.

24    Q    Okay.  So at that time, did you believe that James may

12:11:42 25    be hiding?

```
12:11:43   1   A     Yes.

           2   Q     You asked Natalie for help with "cash to re-up,"

           3   correct?

           4   A     Yes.

12:11:55   5   Q     And by "re-up," what did you mean for that?

           6   A     "Re-up" is, basically, for me to go pick up more drugs.

           7   Q     And was that something that Natalie and/or James would

           8   help you with at times?

           9   A     Natalie would help me -- she would help me, because she

12:12:15  10   would want some, too, as well, so...

          11   Q     You told Nat -- you told Natalie that you were

          12   "burdened and bummed out"; is that correct?

          13   A     Yes.

          14   Q     That you "gotta pick up to feed" your guys?

12:12:42  15   A     Yes.

          16   Q     Who are your guys?

          17   A     I only had, like, Shawn and another friend.

          18   Q     And how -- why did you say you have to feed them?

          19   A     It was, basically -- I would buy them, actually, food

12:12:58  20   so -- because Shawn never had money to buy food, so I would

          21   go to McDonald's and feed all my friends all my -- feed my

          22   friends like that and buy them food.  And sometimes it was

          23   just involve buy them -- buying drugs so they can help me

          24   flip it.

12:13:13  25   Q     Okay.  You told Natalie you only had $200, correct?
```

*Deborah D. Parker, U.S. Court Reporter*

43

12:13:16   1   A     Yes.

2   Q     And that you just "wanna party like old days.  Acid

3   time weekend and roll."

4   A     Yes.

12:13:24   5   Q     What were you talking about there?

6   A     Before like with me, and -- back, like Natalie -- we

7   used to do Ecstasy and just hang out on the weekend.  Just

8   hang out and chill.  Acid.  Just LSD.  Just relaxing.

9   That's it.

12:13:41  10   Q     Had you done LSD with Natalie before?

11   A     I done it, yes.

12   Q     With Natalie?

13   A     She just watches me, just so I don't go too crazy.  So

14   I don't pass out and stuff like that.

12:13:53  15   Q     So she didn't -- you don't know her to use it?

16   A     She does cocaine all day.

17   Q     Okay.  And then you said, "Picking up at 3.  If you

18   wanna party lmk."

19         "LMK" is "let me know"?

12:14:07  20   A     That is correct.

21   Q     Her response was, "No.  Are you high right now?"

22   A     Yes.

23   Q     Were you high right then?

24   A     Yes.

12:14:18  25   Q     You asked her about Lisa transferring cash anytime

*Deborah D. Parker, U.S. Court Reporter*

12:14:26  1    soon.  "I was told Friday I get 500"?

2    A    Yes.

3    Q    Who's "Lisa"?

4    A    The "Lisa" I am referring to is the one in Vegas that

12:14:36  5    owes money.

6    Q    Okay.  And who told you that you were going to get 500

7    on Friday?

8    A    Usually, James.  He gets the money transferred to his

9    account, so I'm just trying to get my money back.

12:14:49  10   Q    Okay.  Now, she said she didn't know anything about

11   that, but she did know that James borrowed $500 from you in

12   Vegas and that he paid you back, correct?

13   A    From what she knows, yes.

14   Q    At the buffet, correct?

12:15:09  15   A    Yes.

16   Q    She did tell you that James' mom is going crazy,

17   correct?

18   A    Yes.

19   Q    And that you promised to call her since yesterday,

12:15:18  20   correct?

21   A    Yes.

22   Q    Who did you make that promise to, to call James' mom?

23   A    It was Alex who was trying to have me call, like I

24   didn't call.

12:15:27  25   Q    And you didn't call her, did you?

12:15:29  1   A     No.

2   Q     She said that James' mom was bugging Alex and her --

3   Natalie -- to call her.  And she told you to call her or

4   meet her in person, so she can feel less anxious, correct?

12:15:45  5   A     Yes.

6   Q     And then she gave you her -- James' mom's number,

7   correct?

8   A     Yes.

9   Q     Did you ever call James' mom?

12:15:57  10   A     I don't remember.

11   Q     Now, that same day, did you -- were you contacted,

12   again, by Alex?

13   A     Yes.

14   Q     Okay.  And what was the nature of that call?  Why did

12:16:20  15   he call you or contact you?

16   A     What day are we talking about?  Which day are we

17   talking about?

18   Q     We're now on, I believe, Friday, October 18th.

19   A     Okay.

12:16:31  20   Q     So the day -- at some point that evening, you drove

21   down to Irvine, correct, to meet with Alex?

22   A     Yes.

23   Q     Okay.  So prior to going down to Irvine, had Alex

24   contacted you?

12:16:44  25   A     Yes.

| | | |
|---|---|---|
| 12:16:44 | 1 | Q    What did he tell you? |
| | 2 | A    He said he wanted to talk in person and to meet in |
| | 3 | Irvine at the sushi restaurant. |
| | 4 | Q    Did he tell you what time to meet him at? |
| 12:17:00 | 5 | A    Sometime, 7:00 or 8:00 p.m. |
| | 6 | Q    Did he tell you why he wanted to talk to you? |
| | 7 | A    Yes.  He wanted to talk about James. |
| | 8 | Q    Okay. |
| | 9 | A    Where he's at. |
| 12:17:11 | 10 | Q    Now, what did you know about Alex at the time? |
| | 11 | A    Like, how I know -- what I know about him? |
| | 12 | Q    Yeah, at the time.  What you know about Alex at the |
| | 13 | time when he called you to come meet with him at the Irvine |
| | 14 | sushi restaurant? |
| 12:17:35 | 15 | A    That I knew that Alex was -- he was -- he was -- he |
| | 16 | wanted to talk to me in person.  What I knew of him was that |
| | 17 | he -- he would intimidate me, so I would be afraid of him. |
| | 18 | Q    When you say he would intimidate you, so in the past, |
| | 19 | he intimidated you? |
| 12:17:55 | 20 | A    Yeah.  He can be a scary person, so... |
| | 21 | Q    I think we already talked about this earlier yesterday, |
| | 22 | but what did you know about what he did for money? |
| | 23 | A    What Alex did for money, I knew that he sold marijuana. |
| | 24 | And he would be, like, the main guy that's in charge of the |
| 12:18:21 | 25 | poker house.  So he did illegal gambling.  And he would be |

12:18:27  1   the man behind the manager, so basically he tried to keep

2   his hands clean.

3            MR. STAPLES:  I'm going to object on foundation,

4   Your Honor, and move to strike.

12:18:38  5            THE COURT:  More foundation.

6            MR. WILKE:  Your Honor, it's offered for his state

7   of mind.  The question was what he knew about him.

8            THE COURT:  Overruled.

9            MR. STAPLES:  Then I'd ask it not to be received

12:18:46 10   for the truth.

11            MR. WILKE:  No objection.

12            THE COURT:  So, ladies and gentlemen, this isn't

13   for the truth.  This goes to state of mind.

14   BY MR. WILKE:

12:18:54 15   Q    Showing you what's been previously admitted as 571, do

16   you recognize the house depicted in the photograph?

17        *(The document was published in open court.)*

18            THE WITNESS:  Yes.  That's the house that Alex had

19   to run poker games.

12:19:05 20            MR. WILKE:  I'm sorry.  I don't think this exhibit

21   has been admitted, Your Honor.

22            MR. STAPLES:  No objection.

23            THE COURT:  It's received.

24        *(Defendant's Exhibit 571 received in evidence.)*

25   ////

12:19:10  1   BY MR. WILKE:

2   Q    I'm sorry.  Could you repeat your answer?

3   A    Yes.  This is the house that Alex ran in Irvine for

4   poker games.

12:19:19  5   Q    And this is the house that you've been to?

6   A    Yes, I would go.

7   Q    While the poker games were going on?

8   A    Yes.

9   Q    So when Alex told you to meet him at the Irvine sushi

12:19:36  10   restaurant on Friday night, did you consider telling him,

11   "No"?

12   A    I didn't want to say "no" to him, because he would be

13   upset.  So I said, yes, I would meet him up.

14   Q    And before you went -- left your house for Irvine, did

12:19:57  15   anybody come over to your house?

16   A    I had Tony that came by my house, so --

17   Q    Stop for just a moment.  Let me ask the questions,

18   okay?

19        So Tony came to your house before you went to

12:20:10  20   Irvine?

21   A    Yes.

22   Q    Directing your attention to 572, do you recognize the

23   person depicted in that photo?

24        *(The document was published in open court.)*

12:20:23  25        THE WITNESS:  Yes.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 12:20:24 | 1 | BY MR. WILKE: |
| | 2 | Q    Who's that? |
| | 3 | A    Tony. |
| | 4 | Q    Why did Tony come to your house on October 18, 2019? |
| 12:20:35 | 5 | A    He wanted to talk about marijuana. |
| | 6 | Q    And how long have you known Tony? |
| | 7 | A    I known Tony, roughly, around 2007 to 2009.  And then |
| | 8 | he just kind of fell out.  And then I re-met him again in |
| | 9 | 2019. |
| 12:20:53 | 10 | Q    Okay.  During the period 2007, 2009, what was your |
| | 11 | relationship with Tony back then? |
| | 12 | A    Tony and I -- he would -- well, we would just do |
| | 13 | cocaine together.  And then Tony would bring a lot of, like, |
| | 14 | baseball size of crack cocaine and we would smoke it. |
| 12:21:17 | 15 | Q    And you had no contact with him from about 2009 to |
| | 16 | 2019? |
| | 17 | A    That's correct. |
| | 18 | Q    And then when you became reacquainted with him, in |
| | 19 | 2019, what did you understand Tony had been doing for the |
| 12:21:35 | 20 | last 10 years or so? |
| | 21 | A    Well, he did tell me that he just got out of prison and |
| | 22 | just doing marijuana deals. |
| | 23 | Q    Okay.  And did Tony and you discuss doing marijuana |
| | 24 | deals or trying to do some marijuana business together? |
| 12:21:50 | 25 | A    Yes. |

*Deborah D. Parker, U.S. Court Reporter*

12:21:51  1    Q    Just, generally, describe what those -- that

2    relationship was and what those --

3    A    So the relationship was when I reacquainted with Tony

4    was -- one thing was he asked me if I wanted to work at a

12:22:04  5    grow house with him, because he was setting up construction

6    for people to grow marijuana.  And he asked me if I wanted

7    to work as a daily worker, making like 100, $150 a day,

8    some -- sometime up north, like northern California.  That

9    doesn't sound too bad, if it's consistent.

12:22:24 10              And as -- also, he asked me if he had -- if I had

11    buyers for marijuana buyers or sellers.

12    Q    Okay.  And when Tony came over to your house on

13    October 18th, you understood he was coming over to talk

14    about marijuana deals?

12:22:44 15    A    When he came over, yes.  That is correct.

16    Q    Now, had Alex already called you and summoned you down

17    to Irvine that evening?

18    A    Yes.

19    Q    Okay.  And when Tony came over to your house, did you

12:22:59 20    invite Tony to go with you?

21    A    Yes.

22    Q    Why?

23    A    I didn't want to go by myself to go see Alex.

24    Q    Why not?

12:23:11 25    A    Well, because I don't want to face Alex.  Like when I'm

12:23:14  1  by myself, if anything happens, then he's going to kick my

2  ass.

3  Q    And did you tell Tony why you wanted him to go with

4  you?

12:23:26  5  A    I just -- I just only told Tony about -- that I'm just

6  going to introduce you to the connect, which is the supplier

7  for the marijuana.  So he can deal directly with him and so

8  I won't have to be the middle person.

9  Q    And did Tony agree to go with you?

12:23:53 10  A    Yes.

11  Q    Now, at some point while riding in the car with Tony

12  that evening, did you make statements to Tony about what

13  happened on the boat?

14  A    I told Tony that I shot -- shot the guy.

12:24:18 15  Q    Did you tell Tony where you were at when you shot the

16  guy?

17  A    I told him that we went fishing and then that he owed

18  me money.

19  Q    Did you tell him you shot him because he did not pay

12:24:34 20  up?

21  A    No.

22  Q    Did you tell him that you tied weights to his feet and

23  threw him overboard?

24  A    No.

12:24:51 25  Q    Did you tell him how much money the guy owed you?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 12:24:56 | 1 | A    I told him 30-, 40,000. |
| | 2 | Q    That's what you had also told Shawn, correct? |
| | 3 | A    Yes. |
| | 4 | Q    And Vinh, correct? |
| 12:25:03 | 5 | A    Yes. |
| | 6 | Q    Did you tell him that Shawn was the -- also on the boat |
| | 7 | when this happened? |
| | 8 | A    No. |
| | 9 | Q    And did you tell him there was a third guy on the boat |
| 12:25:23 | 10 | as well when this happened:  The captain? |
| | 11 | A    I didn't tell him until later. |
| | 12 | Q    But during that conversation that night, while driving |
| | 13 | in the car to or from Irvine Spectrum, did you tell him that |
| | 14 | Shawn and another guy -- the captain -- were on the boat? |
| 12:25:52 | 15 | A    I don't think I said this time.  I don't recall. |
| | 16 | Q    Okay.  Now, do you recall having a conversation on the |
| | 17 | phone with Shawn while driving either to or from Irvine? |
| | 18 | A    No.  The only conversation I had with Shawn was that |
| | 19 | Shawn -- I don't need to -- we don't -- |
| 12:26:17 | 20 | (Court Reporter requests clarification for the |
| | 21 | record.) |
| | 22 | THE WITNESS:  That Shawn, *You don't need to go* |
| | 23 | *with me to Irvine.  I got another friend that's going to go* |
| | 24 | *with me to Irvine.* |
| | 25 | //// |

| | | |
|---|---|---|
| 12:26:22 | 1 | BY MR. WILKE: |
| | 2 | Q    So had you previously asked Shawn if he would go with |
| | 3 | you to Irvine? |
| | 4 | A    Yes. |
| 12:26:29 | 5 | Q    To see Alex? |
| | 6 | A    Yes. |
| | 7 | Q    Why did you choose to take Tony rather than Shawn to |
| | 8 | Irvine? |
| | 9 | A    Tony was there at my house at the right place at the |
| 12:26:41 | 10 | right time. |
| | 11 | Q    Did Tony appear to be more intimidating than Shawn as |
| | 12 | well? |
| | 13 | MR. STAPLES:  Objection.  Leading. |
| | 14 | THE COURT:  Sustained. |
| 12:26:51 | 15 | BY MR. WILKE: |
| | 16 | Q    Well, you testified that you wanted Tony to go with |
| | 17 | you, because you were worried about Alex. |
| | 18 | Do you recall that? |
| | 19 | A    Yes. |
| 12:26:59 | 20 | Q    What was your view about how Alex would see Tony, as |
| | 21 | opposed to how he would see Shawn? |
| | 22 | A    Well -- well, Alex wouldn't do anything with me.  He |
| | 23 | wouldn't do nothing to me, as long as I'm with someone else, |
| | 24 | so -- |
| 12:27:16 | 25 | Q    Okay.  During -- so during the car ride, though, with |

*Deborah D. Parker, U.S. Court Reporter*

12:27:24  1   Tony to Irvine, there was a short call with Shawn about how

2   he didn't need to go with you?

3   A     That's correct.

4   Q     Was there any mention to Shawn about getting rid of the

12:27:34  5   .38?

6   A     No.

7   Q     Did you ever tell Shawn to get rid of the .38?

8   A     No.

9   Q     Now, when you got to the Irvine Spectrum, where did you

12:28:04  10  go?

11  A     We went to the parking structure, and then we -- Tony

12  and I walked to the restaurant.

13  Q     Okay.  And where did you go when you got to the

14  restaurant?

12:28:16  15  A     I went to the bar and tried to find Alex, but I

16  couldn't find him, so we were texting each other back and

17  forth.  So I said I was just at the bar inside the

18  restaurant, so I just sat down and ordered drinks.

19  Q     While you were at the bar at the restaurant, where was

12:28:35  20  Tony?

21  A     Tony was next to me.

22  Q     And at some point, did you meet up with at Alex at the

23  bar at the restaurant?

24  A     Yes.  Alex met with me at the bar.

12:28:47  25  Q     And did you have a conversation with Alex?

*Deborah D. Parker, U.S. Court Reporter*

12:28:52  1   A    Yes, I had a small -- yes, I did have a conversation

2   with Alex.

3   Q    Describe that conversation you had with Alex.

4   A    So I think this conversation -- Alex was asking me

12:29:05  5   about where James was.  And I told him a story that I didn't

6   go with James.  I didn't want to be -- I told him a lie,

7   that I went with Shawn.  It was just me and Shawn; that we

8   went to -- that all three of us went to the -- we went to

9   Dana Point.  And then me and Shawn went to a bar.  And we

12:29:34  10   met some girls.  And James went with another guy on a

11   boat -- on a yacht, or something like that, to go fishing.

12   A bigger boat and that we went our separate ways.  Because I

13   didn't want nothing -- a part of it.

14   Q    And that story you told Alex wasn't true, correct?

12:29:53  15   A    Correct.

16   Q    And why did you lie to Alex about what happened on the

17   boat?

18   A    I -- I was scared of Alex, so I didn't want any -- I

19   didn't want to -- anything to do with it.

12:30:11  20   Q    Did -- what was Alex's response when you told him this

21   story that you didn't go on the boat?

22   A    He was okay with it.  And I had to show him the next

23   day.

24   Q    When you say you "had to show him," how did that come

12:30:28  25   about?

12:30:28  1         What did he say to you?

2    A    So he said to meet up, I think -- to meet up on

3    Saturday, to take him to the Dana Point where we -- where

4    me -- where the story I told him earlier that -- where we

12:30:45  5    went fishing.

6    Q    And at some point then, did you ask Shawn to back you

7    up on this alibi?

8    A    When I -- I saw Shawn in the morning on Saturday, and

9    then I just told him to just -- let's go along with the

12:31:11  10   story.  And I want to go pick up Alex.  That we went to the

11   bar, at Turks, and we went our separate ways.

12   Q    So Saturday morning, you spoke with Shawn about this?

13   A    Yes.

14   Q    And you wanted him to back up this story you had told

12:31:31  15   to --

16   A    To Alex.

17   Q    -- to Alex, correct?

18         And did Shawn agree to do that?

19   A    Yes.

12:31:42  20   Q    Okay.  Now, what did you do that Saturday now that

21   we're at Saturday, October 19th?  Where did you go?

22   A    I picked up Shawn and we drove to Irvine.  I drove him

23   in my Cadillac.  So I went to go pick up Alex at the Irvine

24   house.

12:32:15  25   Q    The Logan -- the 66 Logan house?

*Deborah D. Parker, U.S. Court Reporter*

12:32:17   1   A    Yes.   The house in Irvine.

2   Q    Okay.   And when you picked up Alex, when you went to

3   the Logan house, on Irvine, what did you do?

4   A    I just waited on the curbside.   Shawn sat in the

12:32:30   5   backseat.   Alex sat in the passenger seat.

6   Q    Did you all go into the house at all?

7   A    No.

8   Q    Not at that time?

9        Okay.   And during the drive, did you then drive to

12:32:43   10   the marina in Dana Point?

11   A    Yes.   We all drove down to Dana Point, yes.

12   Q    And during the drive to the marina, was there any

13   discussion about what had happened the night you were

14   supposed to go fishing with James?

12:32:59   15   A    I was just coordinating a story with me and Shawn to

16   Alex to see what we did, that me and Shawn, we -- we were

17   with James and another friend of his that -- we went

18   fishing.   That we went to the bar.   And then I showed him

19   the slip where they went fishing at.

12:33:20   20   Q    This is once you got to the marina, correct?

21   A    Yes.

22   Q    Okay.   But on the drive down there, was there any

23   discussion -- did you tell -- explain what happened, again,

24   what happened to Alex while you were driving down there in

12:33:36   25   Shawn's presence?

12:33:38  1   A    We didn't really talk alot, when we were driving down.

       2   It was more of Alex saying disgruntled things about his

       3   brother, saying, "Where is my brother?"  That his brother

       4   owes him, like, 40,000.  So that he's upset.  He wants to be

12:33:54  5   able to find him.  And that's it.

       6   Q    Okay.  Did Alex make any statement to the effect that

       7   he wanted to harm his brother?

       8   A    Yeah.  Alex would say that -- that he would -- he would

       9   say bad things about it.

12:34:15 10   Q    But, specifically, on the drive down to the Dana Point

      11   Marina, did he say something to that effect in Shawn's

      12   presence?

      13   A    Yes.  That he wanted to kick his brother's ass for not

      14   paying him.

12:34:29 15   Q    Did Alex accuse you of doing anything to his brother?

      16   A    No.

      17   Q    And then --

      18        MR. WILKE:  Is this in already?  This is not in?

      19   Okay.

12:34:42 20        (Pause)

      21        MR. WILKE:  Seeking to admit by stipulation,

      22   Exhibit 46.

      23        THE COURT:  4-6?

      24        MR. WILKE:  Yes.

12:34:57 25        THE COURT:  Exhibit 46 is received.

59

| | | |
|---|---|---|
| 12:34:58 | 1 | (Defendant's Exhibit 46 received in evidence.) |
| | 2 | BY MR. WILKE: |
| | 3 | Q    Do you recognize this photo? |
| | 4 | A    Yes. |
| 12:35:02 | 5 | Q    Is that, Saturday, October 19th, you and Shawn Whalin |
| | 6 | at the marina when you were -- |
| | 7 | A    Yes. |
| | 8 | Q    And this was when Alex was with you, correct? |
| | 9 | A    Yes. |
| 12:35:14 | 10 | Q    Is this when you were pointing out to him some area in |
| | 11 | the marina where you last saw his brother? |
| | 12 | A    Yes.  This is where I was telling Alex, where his |
| | 13 | brother James and another guy went on another fishing boat, |
| | 14 | where -- where they went.  And then me and Shawn went back |
| 12:35:36 | 15 | to the bar and left. |
| | 16 | Q    Okay.  You didn't take this photo, though, did you? |
| | 17 | A    That's Alex taking the picture. |
| | 18 | Q    How do you know that? |
| | 19 | A    Because he has a camera.  And he's just taking a |
| 12:35:48 | 20 | picture of myself and Shawn. |
| | 21 | Q    Okay.  And so you saw Alex taking pictures? |
| | 22 | A    Yes. |
| | 23 | Q    After this trip to the marina, did you meet, again, or |
| | 24 | discuss the incident on the boat, again, with Tony?  Did you |
| 12:36:37 | 25 | have another discussion with Tony about the incident on the |

*Deborah D. Parker, U.S. Court Reporter*

12:36:39   1   boat?

2   A    No.

3   Q    So the only discussion you had with Tony would have

4   been the discussion when you were driving to the Irvine

12:36:50   5   sushi restaurant?

6   A    Yes.

7   Q    Was there any -- did Tony ever meet Shawn?

8   A    Yes.  There was another time, I believe, like on a

9   Monday when Tony came by the house, again, and he was asking

12:37:04  10   me about the situation with me and James.  And then that's

11   when Shawn was over at my house.  We were in --

12          Shawn was at my house.  We were in my car.  And

13   then Tony came over and surprised.  And then I told -- we

14   were talking -- I was talking to Shawn, *Hey, let's make up a*

12:37:30  15   *story or whatever what -- to Tony and about what happened on*

16   *the boat.*

17          And I was trying to sound like a bad ass, saying,

18   *I shot the guy three times.*

19          And then Shawn said, *He was the captain of the*

12:37:51  20   *boat.*  And then Shawn said that he tied him up and then tied

21   weights and threw him off the boat.

22   Q    So the statement to Tony about the guy being tied up

23   was made by Shawn?

24   A    Yes.

12:38:06  25   Q    But you did tell Tony during this time that you tried

*Deborah D. Parker, U.S. Court Reporter*

12:38:09  1    to be a bad ass, told him you shot the guy three times?

2    A    Yes.

3    Q    Did you tell Tony that this was -- you were trying to

4    collect the debt, the 30- to $40,000 debt?

12:38:27  5    A    Yes.

6    Q    Okay.  And were both you and Shawn trying to sound,

7    basically, like bad asses, if you will, in your words?

8    A    Yes.

9    Q    Did you shoot the guy three times?

12:38:51  10   A    No.

11   Q    Did you tie him up?

12   A    No.

13   Q    Did you ever tie up James?

14        Was shown on the boat on the night of the fishing

12:39:04  15   trip?

16   A    No.

17   Q    Did James owe you 30- to $40,000?

18   A    No.

19   Q    Did you ever try to collect the debt that James did owe

12:39:10  20   you at the time?

21   A    No.

22        *(Pause)*

23   BY MR. WILKE:

24   Q    So we heard a recording, Exhibit 47, which Tony made

12:39:40  25   during -- apparently, right after this conversation in which

*Deborah D. Parker, U.S. Court Reporter*

62

```
12:39:45   1   Shawn was present.
           2          Did you and Tony go somewhere in the car after
           3   this conversation which Shawn was present?
           4   A    The one at the restaurant?
12:39:59   5   Q    No, after the restaurant.  Couple days after you went
           6   to the marina.  You just testified about these statements
           7   that were made between you and Shawn to Tony, a few days
           8   after the marina.
           9          Do you recall that?
12:40:14  10   A    Okay.
          11   Q    Okay.  After that conversation, were you and Tony alone
          12   at some point?
          13   A    Yes.
          14   Q    In the car?
12:40:23  15   A    Yes.
          16   Q    Did you know if Tony turned on a recorder?
          17   A    No.
          18   Q    Now, do you recall hearing this tape where you tell
          19   Tony that, no --
12:40:43  20          "I'm fine.  No one is picking me up yet.
          21          No one.  Nobody said anything, cause,
          22          you know.  They want me to stay out
          23          because I collect money for them."
          24          Do you recall that?
12:40:53  25   A    Yes.
```

63

| | | |
|---|---|---|
| 12:40:53 | 1 | Q   And do you recall saying that to Tony? |
| | 2 | A   Yes. |
| | 3 | Q   And is that -- why were you telling Tony this? |
| | 4 | A   I was just making up a story.  It was just -- I was -- |
| 12:41:05 | 5 | I was high at the time, just saying whatever sounds cool. |
| | 6 | Q   You told Tony, "I work for the house"? |
| | 7 | A   Yes. |
| | 8 | Q   What were you trying to impress him with by saying |
| | 9 | that? |
| 12:41:16 | 10 | A   When I said I work for the house is, basically, I work |
| | 11 | for Alex's poker house and, basically, sound like I collect |
| | 12 | money for him. |
| | 13 | Q   Okay.  And you said, "If I go in then he loses |
| | 14 | 500,000"? |
| 12:41:31 | 15 | A   Yes. |
| | 16 | Q   And so the "he" there, you're referring to is Alex, |
| | 17 | correct? |
| | 18 | A   Yes. |
| | 19 | Q   And that's what you were telling Tony, correct? |
| 12:41:44 | 20 | A   Yes. |
| | 21 | Q   You said, "You know?  Cause I'm his debt collector"? |
| | 22 | A   Yes. |
| | 23 | Q   You're referring to Alex, correct? |
| | 24 | A   Yes. |
| 12:41:50 | 25 | Q   Were you Alex's debt collector? |

*Deborah D. Parker, U.S. Court Reporter*

12:41:54  1   A    No.

        2   Q    Did you believe Alex would lose $500,000, if you went

        3   in?

        4   A    No.

12:42:01  5   Q    Did you work for Alex?

        6   A    No.

        7   Q    Okay.  Now, that Saturday that you took Alex to the

        8   marina, did you actually go to the Logan Street house that

        9   night -- later that night?

12:42:17 10   A    Yes.

       11   Q    For what?

       12   A    To hang out and do drugs.

       13   Q    And why were you going over there to hang out and do

       14   drugs, the very day that you drove to the marina with Alex?

12:42:37 15   A    Because, usually, every Saturday, I -- I try to be

       16   there for the game that he has and just out of respect for

       17   Alex, so...

       18   Q    And what would you do at the games?

       19   A    I would, basically, just drink -- drink and snort a lot

12:42:58 20   of cocaine with people and just entertain people.

       21   Q    Did you ever stand by the door?

       22   A    Yes, I would -- sometimes I would help Alex by standing

       23   by the door, because I would have to pat down people, just

       24   make sure they have no weapons coming in.

12:43:14 25   Q    Did you ever bring, like, alcohol over to the house for

12:43:18  1    Alex, or cigarettes, things like that?

2    A    Yes.  I would do errands.  Like he would ask me to go

3    pick up cigarettes or go pick up alcohol for him and then he

4    would give me, like, 10 bucks.

12:43:29  5    Q    So you ran errands for Alex sometimes?

6    A    Yes.

7    Q    So you kind of did work for the house.  Is that fair?

8    A    I was more of an errand boy, yes.

9    Q    But you weren't a debt collector, were you?

12:43:40 10    A    No.

11    Q    You weren't in charge of collecting $500,000 in debt

12    for Alex, correct?

13    A    No.

14    Q    And then why did you go to the house that particular

12:43:50 15    night, knowing that Alex was concerned about his brother?

16    A    Just so I'm not in the wrong; that I didn't do

17    anything, so...

18        (Pause)

19    BY MR. WILKE:

12:44:44 20    Q    Now later, Alex -- I'm sorry, not Alex.

21        Tony started coming over fairly regularly to buy

22    drugs, correct?

23    A    Yes.

24    Q    What kind of drugs was he trying to get from you?

12:45:05 25    A    First, he was picking up cocaine from me, like small

12:45:10  1   amounts, for example, like an eight ball, which is like

2   three and a half grams.  And then he would pick up an ounce

3   from me.  And then later on, he would ask me to get him

4   crystal meth for him.

12:45:26  5   Q    Did you get crystal meth for him?

6   A    I originally got crystal meth --

7        *(Court Reporter requests clarification for the*

8        *record.)*

9             THE WITNESS:  I got it for him.

12:45:40  10  BY MR. WILKE:

11  Q    Okay.  After he asked you to do that?

12  A    Yes.

13  Q    And prior to that time, were you generally -- were you

14  dealing crystal meth?

12:45:52  15  A    I was dealing mostly with cocaine.

16  Q    Okay.  Did you know that Tony was -- had become a

17  confidential informant for the FBI?

18  A    No, I didn't.

19  Q    But during these times he was coming over to meet with

12:46:15  20  you, he was coming over to buy drugs, correct?

21  A    Yes.

22  Q    What was the single largest drug transaction you had

23  with Tony, if you recall?

24  A    The largest transaction I had with Tony was, I got him

12:46:29  25  two ounces of crystal meth.

```
12:46:33   1   Q    For how much money is that?
           2   A    Crystal meth was, roughly, $150 per ounce.  So say
           3   $300.
           4   Q    Now, do you recall Tony coming over to your house -- at
12:47:03   5   some point, on November 20th, the Coast Guard agents came to
           6   your house, correct?
           7   A    Yes.
           8   Q    And you repeated the story to the Coast Guard,
           9   essentially, the same one that you had told to Alex that you
12:47:17  10   didn't get on the boat, correct?
          11   A    Yes.  I repeated the same story that I told Alex
          12   that -- with the Coast Guard.
          13   Q    I want to go back -- I'm sorry.  I need to go back,
          14   just briefly.
12:47:40  15        Do you know a person by the name of Gus Valentine?
          16   A    Yes, I do know Gus.
          17   Q    And how do you know Gus?
          18   A    I've known Gus for about 10 years.
          19   Q    And does -- and does Gus also know James?
12:48:05  20   A    I introduced Gus to James, yes.
          21   Q    And, approximately, when, if you know?  If you
          22   remember.
          23   A    I introduced Gus and James -- I'm not sure exactly --
          24   within 2015, 2016, roughly.
12:48:35  25   Q    So by 2019, Gus had known James for three to four
```

*Deborah D. Parker, U.S. Court Reporter*

```
12:48:39  1    years?

          2    A     Yes.

          3    Q     Okay.

          4          (Pause)

12:49:38  5                MR. WILKE:  We need a moment, Your Honor.

          6                THE COURT:  Certainly.

          7          (Pause)

          8                MR. WILKE:  Your Honor, I am seeking to admit a

          9    text messaging conversation.  It's identified Exhibit 549,

12:50:25 10    pages 1 and 2.  It is being offered not for its truth but

         11    for its effect on the recipient of these communications,

         12    which is Mr. Le.

         13                THE COURT:  I'm sorry?

         14                MR. WILKE:  It's being offered for the effect on

12:50:39 15    the --

         16                THE COURT:  Any objection?

         17                MR. STAPLES:  With a limiting instruction, no

         18    objection.

         19                THE COURT:  And once again, it's not for the

12:50:46 20    truth --

         21                MR. WILKE:  The effect on Mr. Le who received

         22    these texts.

         23                THE COURT:  All right.  Received.

         24          (Defendant's Exhibit 549 received in evidence.)

12:50:53 25                MR. WILKE:  Thank you, Your Honor.
```

```
12:50:53   1    BY MR. WILKE:
           2    Q    So do you -- going back to Friday, October 18th, the
           3    same day you went down to see Alex at the Irvine sushi
           4    restaurant, do you recall that?
12:51:08   5    A    Yes.
           6    Q    In the late afternoon, early evening, do you recall
           7    having a text conversation with Gus Valentine?
           8    A    Yes.
           9    Q    Showing you what's been admitted by stipulation as
12:51:22  10    Exhibit 569, page 1 -- and, particularly, this here
          11    (indicating).  It starts here with this middle one.
          12            Do you see that?
          13    A    Yes.
          14    Q    It says:  "James missing...they think I know what
12:51:52  15    happened since we were hanging out."
          16    A    Yes.
          17    Q    That's you sending this to Gus Valentine, correct?
          18    A    Yes.
          19    Q    You're "Wayne Og" -- "From:  Wayne OG; To
12:52:14  20    Gus Valentine," correct?
          21    A    Yes.
          22    Q    And the time on that it says:  "10/19, 2:35 a.m. UTC,"
          23    which would be 10:18, at 7:35 p.m., correct?
          24    A    Yes.
12:52:48  25    Q    And when you tell James -- you tell Gus "James missing
```

70

```
12:52:52   1    ...think I know what happen since" -- "...they think I know
           2    what happen since we were hanging out."
           3              Gus responds:  "Wow," correct?
           4    A    Yes.
12:53:00   5    Q    Directing your attention to page 2, Gus then responds:
           6    "He's not missing.  He's hiding."
           7    A    I can't see it.  Can you lower, the --
           8    Q    Oh, I'm sorry.
           9              Do you see this -- his response here in response
12:53:18  10    to your text about James being missing?
          11    A    Yes.
          12    Q    Okay.  Gus told you that "He's not missing.  He's
          13    hiding."
          14    A    I can't see the top text.
12:53:30  15    Q    Oh!  Do you see that?
          16    A    Yes.
          17    Q    Okay.  Do you recall receiving this reply from Gus?
          18    A    Yes.
          19    Q    And was Gus a person that you and James were involved
12:53:42  20    with marijuana dealing?
          21    A    Yes.
          22    Q    And when Gus told you -- you asked Gus, "You know
          23    where?"  Do you see this?
          24    A    Yes.
12:53:53  25    Q    Did you believe Gus when he said that?
```

*Deborah D. Parker, U.S. Court Reporter*

12:53:56  1   A    Yes.

2   Q    Okay.  Did Gus ever respond to your request:  "Do you

3   know where?"

4   A    No.  I think I called him.

12:54:17  5   Q    In fact, directing your attention to page 3 and 4 --

6   I'll just put the whole rest of this --

7        *(The document was published in open court.)*

8   BY MR. WILKE:

9   Q    Directing your attention to page 3 of that, your next

12:54:33 10   communication with Gus Valentine was not until December 3rd,

11   2019, correct?

12   A    Yes.

13        THE COURT:  Counsel, why don't you pick a

14   convenient time to recess in the next five minutes.

12:54:49 15        MR. WILKE:  Almost done, Your Honor.  Thank you.

16   BY MR. WILKE:

17   Q    Now, on November 20th, after the Coast Guard

18   interviewed you, did you speak to Tony that day?

19   A    I'm not sure, but yes.

12:55:13 20   Q    Okay.

21        MR. STAPLES:  I move to strike as an ambiguous

22   answer.

23        MR. WILKE:  Your Honor, I'm going to have more

24   than five minutes at this point.  I was hoping to get

12:55:23 25   through today, but I think I probably have 15 to 20 minutes.

*Deborah D. Parker, U.S. Court Reporter*

72

12:55:26   1            THE COURT:  We'll need to recess then, Counsel.

           2            MR. WILKE:  Then this will be a good time.

           3            THE COURT:  Then this will be a good time.

           4            All right.  You're admonished not to discuss this

12:55:32   5   matter amongst yourselves, nor to form or express any

           6   opinion concerning the case.

           7            We'll see you tomorrow at 8:30.

           8            *(Jury exits courtroom.)*

           9            *(The following proceedings were had outside the*

12:55:43  10        *presence of the jury:)*

          11            THE COURT:  The jury is no longer present,

          12   Counsel.

          13            Could I just ask a scheduling issue, and that is:

          14   When you can work with Karlen on all of the exhibits?

12:56:19  15   Because that's going to take an hour or so, and I'm not

          16   certain, you know, how pressed for time you're going to be

          17   with the jury instructions.

          18            Can you do that today and catch up?

          19            MR. WILKE:  On the exhibits?

12:56:34  20            THE COURT:  Yes.

          21            MR. WILKE:  I think we can get caught up on the

          22   exhibit list today.

          23            THE COURT:  Would you work informally with Karlen?

          24            The second is:  How are we going to handle the

12:56:45  25   jury instructions?  In other words, I think now it looks

| | | |
|---|---|---|
| 12:56:48 | 1 | like maybe the case -- probably by December 8th, and I'm |
| | 2 | guessing about that.  But I would imagine a good portion of |
| | 3 | the day tomorrow on cross-examination and any other |
| | 4 | witnesses you may or may not get to. |
| 12:57:06 | 5 | MR. WILKE:  So -- |
| | 6 | THE COURT:  Then back on the 1st, 2nd, 3rd.  And |
| | 7 | I'm not quite certain what each of your time estimate is, |
| | 8 | because I want to keep you fresh, if I can. |
| | 9 | MR. WILKE:  Yeah. |
| 12:57:17 | 10 | THE COURT:  And I think you need to recess at |
| | 11 | 3:00 o'clock tomorrow. |
| | 12 | MR. WILKE:  We do, yeah. |
| | 13 | THE COURT:  Remind me. |
| | 14 | MR. WILKE:  So I don't think we'll have the |
| 12:57:25 | 15 | defense case in completely by tomorrow. |
| | 16 | THE COURT:  I understand. |
| | 17 | MR. WILKE:  I do believe -- |
| | 18 | THE COURT:  You have one witness who's available |
| | 19 | on the 1st. |
| 12:57:34 | 20 | MR. WILKE:  I have one witness who is available on |
| | 21 | the 1st.  I do believe, I won't -- I'll have more than one |
| | 22 | witness on the 1st.  I don't believe I'll get through all |
| | 23 | the other witnesses before Friday of this week.  I think |
| | 24 | I'll get through most of them, but I think -- like I ordered |
| 12:57:50 | 25 | Mr. Cao back on the 1st. |

74

```
12:57:51   1            THE COURT:  Let's sort through this, though.  This
           2   is Thursday.  And tomorrow there's going to be some amount
           3   of cross-examination.  You'll have a couple of witnesses
           4   available?
12:58:01   5            MR. WILKE:  I will, yeah, including Alex Dao and
           6   Andrew Cho.
           7            THE COURT:  Now, there's Alex Dao.  Is he -- do we
           8   know from his counsel if he may be taking the
           9   Fifth Amendment?
12:58:17  10            MR. STAPLES:  Your Honor, I received the text from
          11   him on break.  I've not called him back.  And he asked me to
          12   call him today.
          13            THE COURT:  Is it appropriate if we take that
          14   outside the presence of the jury, initially?
12:58:27  15            MR. WILKE:  I believe it is, Your Honor.  I think
          16   it's probably proper to do that.
          17            THE COURT:  It's always the proper procedure, but
          18   I just want to make certain each of you understand that.
          19            What happens then if he takes the Fifth Amendment?
12:58:40  20   Is he then placed in front of the jury to make those -- or
          21   to take the Fifth Amendment through his counsel?
          22            MR. WILKE:  So I would think that it has to go on
          23   a question-by-question basis.  If we voir dire him outside
          24   the presence of the jury, I think there are relevant
12:58:58  25   questions that he can answer that don't implicate him.
```

*Deborah D. Parker, U.S. Court Reporter*

12:59:05   1          THE COURT:  I would like you to research that for

2     me, before Alex Dao takes the stand; in other words, the

3     proper procedures, the number of questions that would be

4     asked.  Because, normally -- well, I'll wait until

12:59:17   5     "normally" and see what your research discloses.  We were

6     already looking at that issue.

7          MR. WILKE:  I think there's several areas though

8     that --

9          THE COURT:  You two can discuss that informally

12:59:27   10    without taking the time this evening.

11         When are we going to do the jury instructions?

12         MR. WILKE:  Your Honor, Mr. Scally and I have

13    discussed this.  The proposal that I think we would jointly

14    submit to the Court is to allow the parties to submit a

12:59:42   15    joint set of jury instructions and then the objectionable

16    ones to the court in writing.  And --

17         THE COURT:  My question is when?

18         MR. WILKE:  Okay.  We would ask to submit -- be

19    able to do those over the break and have those filed with

12:59:55   20    the Court before returned by the 30th.  The Court is

21    returning on the 1st, I guess.

22         THE COURT:  We're coming back to the 1st, but I'm

23    available earlier.  Let's leave it at the 1st, because we

24    didn't know what the plane schedules were.

01:00:12   25         MR. WILKE:  I think we could have those filed

01:00:15  1   easily by Monday, the 29th.

2           THE COURT:  Is that acceptable, so each of you

3   have a decent Thanksgiving?

4           MR. SCALLY:  Yes, Your Honor.  Thank you.

01:00:19  5           MR. WILKE:  That gives us time.  And then we can

6   do a conference, probably, either --

7           THE COURT:  You can meet and confer informally

8   then on Tuesday of that week before we reconvene?

9           MR. WILKE:  We meet and confer almost daily now,

01:00:35 10   Your Honor, so that won't be a problem.

11           MR. SCALLY:  I'm sorry, Your Honor.  Were you

12   talking about being in court for that conference on the

13   Tuesday, or just --

14           THE COURT:  No.  If you're meeting informally,

01:00:41 15   I'll leave it at that.

16           MR. WILKE:  We're talking daily.

17           THE COURT:  I accept that, and there's no reason

18   to bring you into court.

19           Well, I can't gauge when we would send this to the

01:00:51 20   jury, but it looks like the last date, probably, is as late

21   as December 8th, Monday.  And we could be sending it to the

22   jury earlier.  And all I'm trying to do is get a gauge in

23   terms of what each of you want, because it's your decision.

24   You might be arguing this on Friday, but you may not be.

01:01:09 25   And it may be detrimental for you to argue it on Friday and

01:01:13   1   have it go to the jury 5:00 o'clock with two days off.

2        So let's just see how we're proceeding, and we'll

3   decide on the 1st or 2nd what that looks like in terms of

4   fairness.

01:01:26   5        MR. WILKE:  I think we definitely get all the

6   evidence in those three days.  Question on whether we have

7   enough time to close and instruct before Friday.  I think

8   that's where we're at.

9        THE COURT:  Because even if you get the evidence

01:01:38  10   in, first of all, I don't want the arguments split.

11        Number two, I question whether I would be

12   instructing, for instance, on a Friday and then you're

13   arguing on a Monday.  But by the same token, if you tell me

14   that you would like the Court to do that, there's a benefit

01:01:55  15   and detriment.  The first is, by the time I get done reading

16   the instructions, as scintillating as they are, you may not

17   have a very attentive jury.

18        MR. WILKE:  Does the Court instruct first or

19   second?

01:02:10  20        THE COURT:  In state court you instruct at the

21   end.  In federal court, we instruct first.  As long as you

22   stipulate, I'll do either.  The federal court procedure is,

23   though, we instruct first.  The state court procedure is,

24   you usually instruct after.  As long as you stipulate, but

01:02:26  25   right now, I'll follow the federal court procedure of

*Deborah D. Parker, U.S. Court Reporter*

01:02:30   1   usually instructing first, because it saves a lot of time.

2   And you're able to point to the instructions, because I've

3   already given those instructions.  And, therefore, each of

4   you have credibility, according to what the Court read.

01:02:45   5        But I don't care.  I just want the jury fresh for

6   your argument.  And I get concerned that the Court is

7   instructing for, let's say, an hour to an hour and a half.

8   And the Government argues for whatever period of time and

9   then you argue, hopefully, after lunch when they're fresh

01:03:03  10   and not before, or splitting the argument.  So we'll gauge

11   that later on.  But just in fairness to both of you, it's

12   not what we're going to do.  It's kind of how you have the

13   jury's attention during your respective arguments, okay?

14   And we can decide that down the line.

01:03:20  15        Karlen, Counsel -- there you are.  You

16   disappeared.  They're going to work with you informally and

17   catch up with all the jury instructions.

18             MR. STAPLES:  Exhibits, Your Honor?

19             THE COURT:  Exhibits, I'm sorry.  Thank you,

01:03:40  20   Counsel.

21        All of the exhibits, because that's an hour's time

22   that's going to come to you on December 2nd or 3rd, along

23   with the instructions.

24        The last general question I have is:  If the

01:03:52  25   Government was to guess -- I know you're going to ask for

79

01:03:55  1   first degree.

2           Are you going to be requesting a second degree

3   murder instruction?

4           MR. SCALLY:  Yes, Your Honor.

01:04:02  5           THE COURT:  Are you going to be requesting

6   voluntary manslaughter?

7           MR. SCALLY:  No, Your Honor.

8           THE COURT:  Just a moment.  Are you going to be

9   requesting second degree?

01:04:09 10           MR. WILKE:  No.

11           THE COURT:  Are you going to be requesting

12   voluntary manslaughter?

13           MR. WILKE:  Yes.

14           THE COURT:  Well, strike that.  You would like

01:04:15 15   voluntary only, but the Court's minimally going to instruct

16   in all likelihood on first degree.  That leaves second

17   degree.  And second degree is missing the element of

18   premeditation and deliberation.  I'm going to want a

19   specific record that you're waiving and specifically not

01:04:39 20   requesting second degree.

21           MR. WILKE:  I am not requesting second degree

22   murder and would object to the instruction being given.

23           THE COURT:  And is that because it lacks malice

24   aforethought?

01:04:51 25           MR. WILKE:  Well, I would object -- even if it

*Deborah D. Parker, U.S. Court Reporter*

01:04:53  1  were giving a second degree instruction, I would object to

2  the implied malice instruction.

3          THE COURT:  I understand that.  See how we

4  strayed?

01:05:03  5          That's not my question.  My question is what I'm

6  going to call the specific intent second degree, not the

7  implied malice aforethought where you have an inherently

8  dangerous act.  I'm only focused on the intent element that

9  would come with the second degree.  Because there I want a

01:05:23 10  clear record, if I didn't give that, there is a specific

11  waiver.  Because in the appellate court, they might decide

12  that premeditation and deliberation was lacking but wonder

13  why a second degree wasn't given when you artfully argued

14  that premeditation and deliberation is lacking.

01:05:47 15          So we'll leave that on the table, but I want a

16  thorough record of that.

17          MR. WILKE:  That's fine.

18          THE COURT:  The last thing is:  What do you do

19  with the conspiracy?  Do you believe that conspiracy to

01:05:58 20  commit murder has both the first and second degree

21  encapsulated within conspiracy to commit murder or is it

22  just conspiracy to commit murder?

23          MR. SCALLY:  I think that is a hard question, and

24  we did some pretrial litigation on this.

01:06:17 25          The Court may recall, there was a motion to

01:06:21   1    dismiss surplusage in the indictment and that sort of

2    addressed this issue.  I think as a matter of practicality,

3    it may be something we can resolve through a joint set of

4    jury instructions.

01:06:36   5          THE COURT:  Just a moment.  Here's the reason.  I

6    want to assume, thinking ahead, that the Court gives both

7    first degree and second degree.  Mr. Wilke objected to

8    second degree.

9          Now, the defense is in a difficult position of

01:06:55 10    either acceding to the second degree in a conspiracy, once

11    again, rolling the dice with all or nothing.

12          MR. WILKE:  Couple of things, Your Honor.  As a

13    practical matter on the conspiracy charge, there's no

14    effective difference on the sentence, because it's the same

01:07:13 15    stat max under the statute.  So that's one.

16          THE COURT:  So it doesn't matter if it's first

17    degree or second degree.

18      *(Overtalking:  Unable to report.)*

19          MR. WILKE:  So -- and then the second issue, I

01:07:25 20    just think a -- the earlier litigation had to do with

21    surplusage, because it had been charged as a conspiracy to

22    commit first degree premeditated murder.

23          THE COURT:  It has no --

24      *(Court Reporter requests clarification for the*

01:07:39 25      *record.)*

*Deborah D. Parker, U.S. Court Reporter*

82

01:07:40  1          MR. WILKE:  There was a surplusage motion to

2  strike the first degree premeditated allegation from the

3  conspiracy of surplusage because, one, it doesn't matter.

4  But two, it -- it's just very confusing because conspiracy

01:07:55  5  by itself requires a plan.  It essentially subsumes

6  premedition in my mind.  And to try to instruct the jury,

7  that just seems unnecessary and unnecessarily confusing.

8  And, particularly, where it doesn't effect the stat max, we

9  would be asking -- the Government and I will meet and confer

01:08:14 10  about this, but we think the instruction should just be

11  conspiracy to commit murder, defining the elements of murder

12  as malice, unlawful killing with malice aforethought.

13          THE COURT:  I think you're not going to reach an

14  agreement, which is why I'm starting to talk to you now

01:08:30 15  about that.

16          MR. SCALLY:  Actually, Your Honor, I think we may

17  reach an agreement on that.

18          THE COURT:  I doubt it, because you want second

19  degree and the defense doesn't want second degree murder.

01:08:40 20  You already had a substantial difference.

21          MR. SCALLY:  I agree.  I don't think we'll reach

22  agreement on the substantive count.  I think we might be

23  able to reach agreement on the conspiracy count.

24          MR. WILKE:  I agree with that.

01:08:53 25          THE COURT:  Now, if that's the case, in a

*Deborah D. Parker, U.S. Court Reporter*

01:08:54    1    conspiracy, you have overt acts.  Unlike a RICO, where you

2    have racketeering acts, this issue faced the

3    Central District in our case in 2001, involving the

4    Mexican Mafia.  And there at the time, there was no law that

01:09:11    5    properly defined -- not the issue we have here, but what the

6    burden of proof was concerning an individual racketeering

7    act within a RICO violation.

8            This Court made the decision that that was by

9    clear and convincing -- strike that, by reasonable doubt,

01:09:30   10    just as the substantive count.  And the argument by the

11    Government at that time was that the racketeering act should

12    be by a preponderance of the evidence.

13            Judge Fletcher and the panel upheld the Court's

14    ruling in the *Fernandez* case that it was beyond a reasonable

01:09:47   15    doubt.  So in a RICO, when you have racketeering acts, it's

16    beyond a reasonable doubt.

17            Here, we have potentially overt acts.  And those

18    overt acts have to be set forth.  What overt acts, as you

19    start talking informally, are you setting forth?  And, of

01:10:07   20    course, you have to wait until the end of the case.

21            Second, what is the burden proof that you must

22    meet on an overt act?  Or is it simply subsumed that beyond

23    a reasonable doubt applies to not only the conspiracy but

24    also the overt acts?  In other words, is the Government

01:10:31   25    going to come back and argue as they did in 2002 that

01:10:35  1   there's some lesser burden on an overt act or that an overt

2   act even needs to be proven?

3          Because the defense in all likelihood will come

4   back and say, *When you set forth an overt act, we want to*

01:10:48  5   *see what the jury is doing, potentially, and have some kind*

6   *of indication that, first, that the standard of proof is*

7   *high,* whatever that means.  And, historically, on occasion,

8   the defense has argued that they'd like to know what overt

9   acts have been proven, in case the client is convicted, for

01:11:08  10  appellate purposes.

11          Now, I'm laying all that parade of horribles to

12  both of you so you don't get caught on a Thursday or Friday,

13  because they have been redundant with the *Mexican Mafia*

14  cases, the *Aryan Brotherhood* cases.  We've gone through this

01:11:21  15  time and time again.  So just start thinking that through.

16  Not that you'll agree, but it may be a little more

17  complicated than we assume right now.

18          All right.  We're in recess.

19          MR. WILKE:  Thank you.

01:11:29  20          THE COURT:  Have a nice evening.

21          MR. SCALLY:  Your Honor, if I may just bring one

22  more thing to the Court's attention.

23          THE COURT:  Okay.

24          MR. SCALLY:  Hopefully, very quickly.

01:11:39  25          Upon the close of cross-examination, I think we're

01:11:41  1  expecting to apply to the Court for permission to

2  cross-examine defendant, concerning certain exhibits that

3  have not already come in, to include some of those

4  recordings and that sort of thing.  I was thinking about,

01:11:55  5  potentially, filing something in writing for the Court's

6  consideration.

7         THE COURT:  I would appreciate it only in the

8  sense that I would like to have a good record, whatever I

9  do.  And second --

01:12:08  10         Just a minute.  I'll be right back.  Hang on a

11  minute.

12         (Pause)

13         THE COURT:  If you're going to do that, I would

14  suggest --

01:13:08  15         (Pause)

16         THE COURT:  We're now on the record.

17         Counsel, some of the things that the Court has

18  been going through, is struggling with this issue with the

19  "hitman."  Amongst many other things that I have tried to

01:13:31  20  anticipate is, first, to the exclusion by the Government

21  getting into that area for the reasons I previously stated.

22  But I forewarned all parties that could change if Mr. Le

23  took the stand.

24         So, Sandra, for instance, she -- Le allegedly

01:13:46  25  tells Sandra that he was a hitman and was going to off him,

01:13:50  1    which is Exhibit 7, at LR00030175 -- you might start taking

2    this down.

3              MR. WILKE:  I'm sorry.  What's the Court reading

4    from, because he never --

01:14:01  5              THE COURT:  My own preparation, with all of your

6    *in limine* motions after the last two months, so I'm going to

7    pay you a tremendous courtesy right now.

8              MR. WILKE:  But there was no testimony from Sandra

9    about him --

01:14:13 10              THE COURT:  Counsel, listen very quickly.  This is

11    a tremendous courtesy, believe me.

12              I haven't made a decision.  I'm telling you what

13    to go look at.  So, first, there's some statement concerning

14    Le telling Sandra that he was a hitman and was going to off

01:14:31 15    them.  And I want you to look at Exhibit 7, at LR00030175.

16              Allegedly, with Shawn Whalin, you need to look at

17    Le telling Whalin that he wanted to be hired as a hitman,

18    and was not scared of anything at Exhibit 8, LR006166:

19              Tony Hoang, you need to look at Exhibit 15.  Now

01:14:58 20    Hoang says:

21              "Teach me to how to do that shit, so I

22              can get rid of some people too, shit.

23              Le:  Well, that's what happened, too!

24              Hoang:  Huh?

01:15:10 25              "Le:  Even he knows what I do too.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 01:15:13 | 1 | There's the problem.  His brother pays |
| | 2 | for the same thing, too.  The fuck? |
| | 3 | Okay.  He pays to take out the trash." |
| | 4 | "Okay so he -- Dude, what the fuck?  How |
| 01:15:26 | 5 | you ask, how you ask the trash man where |
| | 6 | the fuck the trash is actually at?" |
| | 7 | "That's it.  You actually did it... |
| | 8 | "400?  You?  Yeah...you the trigger man? |
| | 9 | I'm not the one that, I'm no [sic] -- I |
| 01:15:39 | 10 | just take out the trash...I [sic] don't |
| | 11 | tell them who I am...no one knows who I |
| | 12 | am...I am an outside person...that's |
| | 13 | it...And I get paid to do what I do.  I |
| | 14 | don't know nothing about it.  You just |
| 01:15:52 | 15 | tell me the person, and I'll get it |
| | 16 | done." |
| | 17 | "Yeah, well, find out, who owes money or |
| | 18 | what and then...and that's how I do my |
| | 19 | business...They don't go out -- they |
| 01:16:03 | 20 | just say, we know this person, that's |
| | 21 | all they know.  And ok, I'll take care |
| | 22 | of it.  They give the money half up |
| | 23 | front and the rest later." |
| | 24 | "I want to teach me -- "I want you to |
| 01:16:16 | 25 | teach me how you do that shit, you know? |

01:16:19  1      Alright.  Ok.  That's easy.  What do you

2      want to learn first?  What do you wanna

3      do?  You gotta tell me in person so I

4      can describe in detail.  Fuck.  SO [sic]

01:16:28  5      it doesn't get sloppy.  What you did

6      last time was sloppy?  There was one

7      thing I had, but I caught on real fast.

8      That's why I did certain deals.  I did

9      certain stuff to fix that problem.  But

01:16:40 10      it's okay.  I did something else

11      to-to-to throw away other things."

12      "I wanna be you know I wanna get away

13      with this shit.  I don't want anything

14      sloppy.  You understand what I'm saying

01:16:53 15      [sic]?  Yeah...Mhm.  Is he easy to get

16      at?  Is he easy to -- will he come see

17      you?  Will he come out to say hi to you

18      or me?  HE [sic] doesn't know me so he

19      should say hi right?  You mean a set

01:17:09 20      up?"

21      "What did you do last time?  That's what

22      I wanna know.  What'd you do last time?

23      I don't know.  TO [sic] get away.  Huh?

24      Uh, my other previous ones?  Yeah.  Mmm

01:17:21 25      go hand out just out play, that's all.

*Deborah D. Parker, U.S. Court Reporter*

01:17:24   1          Take him out to play?  Yeah.  How long
           2          do I have to take him out?  Okay you got
           3          to tell me specific situation so I know
           4          how to analyze it."
01:17:33   5          And then, text message, Exhibit 27, Le wants to be
           6   a hitman going forward.
           7          Now, all I'm asking you to do is this:  You
           8   started bringing *in limine* motions which were not *in limine*
           9   motions.  These are evidentiary issues.  And I paid the
01:17:47  10   courtesy to giving you some tentative thoughts and rulings.
          11   And, quite frankly, the Court could have held back.  But I
          12   also warned you that these were not final rulings.  So along
          13   the way, I've constantly considered these.
          14          You asked me where I get them.  This is the two
01:18:00  15   months of research you've been asking me to do.  That's
          16   where I get them, on weekends, in fact.  So you have a
          17   tremendous courtesy.
          18          I'm encouraging you if you want these in, you
          19   better lay out to the Government with specificity the exact
01:18:14  20   areas and give them to the defense to make a good record, if
          21   I'm going to exclude them or a good record, if I'm going to
          22   include them.
          23          Now, I can't order you to do that, but I'm not
          24   going to be slowing down too much tomorrow.
01:18:29  25          MR. SCALLY:  Understood.

01:18:30   1          THE COURT:  So, therefore, you have an afternoon

2    off.  You can have an hour you can spend with Karlen getting

3    caught up.  And we're in recess.  We'll see you tomorrow at

4    8:00 o'clock.

01:18:41   5          Counsel, also, for the record, remember we're

6    fortunate.  Normally in my Court, you'd be here to 6:00,

7    7:00, 8:00 o'clock tonight, because I would know every piece

8    of evidence the next day.  This is one of the first trials

9    that hasn't occurred, because you're working so well

01:18:58  10   together.  And that's a compliment to both of you.

11          MR. SCALLY:  Thank you, Your Honor.

12          *(At 1:19 p.m., proceedings were adjourned.)*

13

14                         -oOo-

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

       I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:   January 2, 2022

                              _____/s/DEBORAH D. PARKER_____
                          DEBORAH D. PARKER, OFFICIAL REPORTER