1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                     - - - - - - -

5    UNITED STATES OF AMERICA,        )
                                      )        <u>**CERTIFIED**</u>
6            Plaintiff,               )
                                      )
7        vs.                          ) No. 8:20-cr-00002-DOC
                                      )    Day 10, Volume I
8    HOANG XUAN LE, also known as     )
     Wayne, *also known as Wangsta*,  )
9                                     )
             Defendant.               )
10   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Jury Trial

16                 Santa Ana, California

17              Wednesday, December 1, 2021

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25

```
1    APPEARANCES OF COUNSEL:

2
     FOR THE UNITED STATES OF AMERICA:
3

4        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
5        BY:  Gregory Shepherd Scally
                 Assistant United States Attorney
6        411 West 4th Street
         8th Floor
7        Santa Ana, California 92701
         714-338-3592
8        gregory.scally@usdoj.gov

9        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
10       BY:  Gregory Staples
                 Assistant United States Attorney
11       411 West 4th Street
         8th Floor
12       Santa Ana, California 92701
         714-338-3535
13       greg.staples@usdoj.gov

14

15   FOR DEFENDANT HOANG XUAN LE:

16       Craig Wilke (CJA appointed)
         LAW OFFICE OF CRAIG WILKE
17       305 North Harbor Boulevard, Suite 216
         Fullerton, California 92832
18       714-870-8900
         craig@craigwilkelaw.com
19
         Sheila Sarah Mojtehedi (CJA appointed)
20       LAW OFFICE OF SHEILA MOJTEHEDI
         806 East Avenida Pico, Suite I-291
21       San Clemente, CA 92673
         323-412-0472
22       sheila@mojtehedi.com

23
     ALSO PRESENT:
24
          Austin Casey, Special Agent, Coast Guard
25
```

# I N D E X

**PROCEEDINGS**                                                    **PAGE**

JURY TRIAL - DAY 10, VOLUME I

DAO, Trung "Alex" (resumed)                                          5

DAO, Trung "Alex" (continued)                                       42

Sidebar proceedings                                                 63

CHO, Andrew (called)                                                72

Discussion outside presence of jury                                 93

Stipulation                                                        117

Further proceedings reported by Debbie                             118
Hino-Spaan in Volume II


## WITNESSES

| **WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| DAO, Trung "Alex" | | | | |
| By Mr. Wilke | 6 | | | |
| By Mr. Wilke (continued) | 44 | | | |
| By Mr. Scally | | 69 | | |
| CHO, Andrew | | | | |
| By Mr. Wilke | 73 | | 92 | |
| By Mr. Scally | | 90 | | |


## EXHIBITS

| EXHIBIT NO./DESCRIPTION | | IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| 563 | Photograph of four .38 caliber bullets | | 89 |
| 572 | Photograph | | 16 |

1                        **EXHIBITS  (Continued)**

2      **EXHIBIT NO./DESCRIPTION           IDENTIFICATION      IN EVIDENCE**

3
          574        Photograph                              22
4
          578        Receipt for payment                     34
5
          584        Photograph of four .38                  88
6                    caliber bullets

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, DECEMBER 1, 2021**    |
|       | 2  | **Day 10, Volume I**                                     |
|       | 3  | (9:17 a.m.)                                              |
| 09:17 | 4  | *(In the presence of the jury.)*                         |
| 09:18 | 5  | THE COURT:  All right.  Good morning.                    |
| 09:18 | 6  | First, good morning.  How is everybody?                  |
| 09:18 | 7  | MEMBERS OF THE JURY:  Good.                              |
| 09:18 | 8  | THE COURT:  A lot of enthusiasm.                         |
| 09:18 | 9  | Good morning.                                            |
| 09:18 | 10 | MEMBERS OF THE JURY:  Good morning.                      |
| 09:18 | 11 | THE COURT:  It's nice to see all of you.  Welcome        |
|       | 12 | back.  We'll get started immediately, then.              |
| 09:18 | 13 | Counsel, good morning.  All counsel are present.         |
|       | 14 | The defendant's present, the alternates, and the jury.   |
| 09:18 | 15 | And if you would recall Alex Dao, please.                |
| 09:18 | 16 | Sir, if you'd come forward again.  Thank you.            |
| 12:09 | 17 | **TRUNG "ALEX" DAO, CALLED BY THE DEFENSE,**             |
|       | 18 | **PREVIOUSLY SWORN, RESUMED THE STAND**                  |
| 09:18 | 19 | THE WITNESS:  Thank you.                                 |
| 09:18 | 20 | THE COURT:  Once again, if you'd be seated.              |
| 09:19 | 21 | THE WITNESS:  Good morning, Your Honor.                  |
| 09:19 | 22 | THE COURT:  And then if you'd, once again...             |
| 09:19 | 23 | THE WITNESS:  Do I have to switch out.                   |
| 09:19 | 24 | THE COURT:  Yes.  Do you know how to do that?            |
| 09:19 | 25 | THE WITNESS:  Yes.  Thank you, Your Honor.               |

| | | |
|---|---|---|
| 09:19 | 1 | *(Witness places clear mask on.)* |
| 09:19 | 2 | THE COURT:  Mr. Wilke, on behalf of the defense. |
| 09:19 | 3 | MR. WILKE:  Thank you. |
| 09:19 | 4 | Could the Court remind the witness he's under |
| | 5 | oath, Your Honor? |
| 09:19 | 6 | THE COURT:  Sir, the same oath that we |
| | 7 | administered to you last week -- I'm sorry -- the week |
| | 8 | before, still applies. |
| 09:19 | 9 | Do you recall that oath? |
| 09:19 | 10 | THE WITNESS:  Yes, Your Honor. |
| 09:19 | 11 | THE COURT:  That oath is still applicable today, |
| | 12 | then. |
| 09:19 | 13 | THE WITNESS:  Yes, sir.  Thank you, Your Honor. |
| 09:19 | 14 | **DIRECT EXAMINATION (Resumed)** |
| 09:19 | 15 | BY MR. WILKE: |
| 09:19 | 16 | Q.   Mr. Dao, when we were speaking last, before the break, |
| | 17 | we were talking about this period of time in which you |
| | 18 | requested that Wayne Le meet with you at the Robata Wasa |
| | 19 | Restaurant in Irvine; do you recall that? |
| 09:20 | 20 | A.   Yes, sir. |
| 09:20 | 21 | Q.   Okay.  And when you -- you, in fact, directed Wayne Le |
| | 22 | to come down and meet with you at the restaurant; correct? |
| 09:20 | 23 | A.   Uh, I asked 'em to come meet me, yes. |
| 09:20 | 24 | Q.   And when you asked him to come, you knew that he would |
| | 25 | come; correct? |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

7

| | | |
|---|---|---|
| 09:20 | 1 | A.    Uh, I hoped he would. |
| 09:20 | 2 | Q.    I'm sorry? |
| 09:20 | 3 | A.    I hoped he would, yes. |
| 09:20 | 4 | Q.    Well, in fact, you knew that Wayne would do whatever |
| | 5 | you asked him to do; correct? |
| 09:20 | 6 | A.    Uh, you mean whatever I wanted him to do? |
| 09:20 | 7 | Q.    Yeah.  That if you asked him to come down to the Robata |
| | 8 | Wasa restaurant, you knew that he would come, didn't you? |
| 09:20 | 9 | A.    Uh, most likely, yes. |
| 09:20 | 10 | Q.    Yeah.  You, in fact, told the Coast Guard agents, |
| | 11 | during your October 21, 2019, interview, uh, that you could |
| | 12 | have Wayne down there at the agent's office right then, if |
| | 13 | you asked him; correct? |
| 09:21 | 14 | A.    Uh, yes.  Again, I thought Wayne was a friend, and |
| | 15 | there's no reason for him not to. |
| 09:21 | 16 | Q.    Well, you also knew that Wayne would not do anything |
| | 17 | to, in your words, piss you off; correct? |
| 09:21 | 18 | A.    Uh, I hope not.  We were friends. |
| 09:21 | 19 | Q.    Well, you, in fact, told the agents that -- that "Wayne |
| | 20 | will not piss me off," didn't you? |
| 09:21 | 21 | A.    Uh, I'm sorry.  I don't know which -- I spoke to many |
| | 22 | agents.  Can you clarify which you're referring to? |
| 09:21 | 23 | Q.    During your October 21, 2019, interview with the Coast |
| | 24 | Guard agents. |
| 09:21 | 25 | A.    This is the time when -- a day after, or two, I found |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | out my brother was murdered?                             |
| 09:21 | 2  | Q.   Yes.  You found out your brother's body had been found; |
|       | 3  | correct?                                                 |
| 09:21 | 4  | A.   Uh, I said a lotta things.  I was under duress during |
|       | 5  | that time.  I was very angry, frustrated, so I don't recall |
|       | 6  | exact words.  But if you said I said that to the Coast   |
|       | 7  | Guard, then I guess that's true.                        |
| 09:22 | 8  | Q.   Well, sir, you knew on October 21 that your brother's |
|       | 9  | body had been found; correct?                           |
| 09:22 | 10 | A.   Yes.  Right around the same --                     |
| 09:22 | 11 | Q.   In the ocean --                                    |
| 09:22 | 12 | A.   -- time --                                         |
| 09:22 | 13 | Q.   Correct?                                           |
| 09:22 | 14 | *(Court reporter requests clarification for the*        |
|       | 15 | *record.)*                                              |
| 09:22 | 16 | THE COURT:  Repeat the question.                        |
| 09:22 | 17 | BY MR. WILKE:                                           |
| 09:22 | 18 | Q.   You knew his body had been found in the ocean; correct? |
| 09:22 | 19 | A.   Yes.                                               |
| 09:22 | 20 | Q.   Okay.  You did not know your brother had been murdered; |
|       | 21 | correct?                                                |
| 09:22 | 22 | MR. SCALLY:  Objection.  Calls for a legal              |
|       | 23 | conclusion.                                             |
| 09:22 | 24 | THE COURT:  Overruled.                                  |
| 09:22 | 25 | THE WITNESS:  I'm sorry?                                |

| | | |
|---|---|---|
| 09:22 | 1 | THE COURT:  You can answer the question, sir. |
| 09:22 | 2 | THE WITNESS:  Can you repeat that again? |
| 09:22 | 3 | BY MR. WILKE: |
| 09:22 | 4 | Q.   You did not know your brother had been murdered; |
| | 5 | correct? |
| 09:22 | 6 | A.   Not yet. |
| 09:22 | 7 | Q.   Excuse me? |
| 09:22 | 8 | A.   I just know he was killed. |
| 09:22 | 9 | Q.   You knew he -- his body had been found? |
| 09:22 | 10 | A.   In the ocean, yes. |
| 09:22 | 11 | Q.   Were you told, as of October 21, any details about the |
| | 12 | condition of your brother's body? |
| 09:23 | 13 | A.   Uh, I don't remember; but it's a possibility, yes. |
| 09:23 | 14 | Q.   In fact, throughout the investigation you were -- uh, |
| | 15 | evidence about the case was shared with you by the agents; |
| | 16 | correct? |
| 09:23 | 17 | A.   I believe so, yes. |
| 09:23 | 18 | Q.   Including, uh -- uh, well -- |
| 09:23 | 19 | Specifically, Agent Chow [sic], uh, reported to you |
| | 20 | various items that had been -- items of evidence that he had |
| | 21 | learned about the case; correct? |
| 09:23 | 22 | A.   Uh, did you say Agent "Cho"? |
| 09:23 | 23 | Q.   Agent Cho, yes. |
| 09:23 | 24 | A.   No.  The first agents that I had to speak with was |
| | 25 | strangers to me, uh, Coast Guard agents. |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

10

| | | |
|---|---|---|
| 09:23 | 1 | Q.   Right. |
| 09:23 | 2 | A.   And they were the ones that told me details. |
| 09:23 | 3 | Q.   Yeah.  But later, during the investigation -- in the |
| | 4 | two years now that this case has been investigated and |
| | 5 | brought to trial -- you've spoken to Agent Cho many times; |
| | 6 | is that correct? |
| 09:23 | 7 | A.   Yes, that is correct. |
| 09:23 | 8 | Q.   And he's (inaudible) -- |
| 09:23 | 9 | *(Court reporter requests counsel use microphone to* |
| | 10 | *be heard for the record.)* |
| 09:23 | 11 | BY MR. WILKE: |
| 09:23 | 12 | Q.   And he has kept you apprised of the status of the case; |
| | 13 | correct? |
| 09:24 | 14 | A.   Actually, no.  After, I think, a few meetings, they did |
| | 15 | not want me involved in this case any longer. |
| 09:24 | 16 | Q.   Okay.  After the -- well, you mean after the initial |
| | 17 | contact with -- with Tony Hoang? |
| 09:24 | 18 | A.   "Tony"?  I'm sorry.  My mind is -- I don't remember all |
| | 19 | the names.  Uh, is that the Asian gentleman with the tattoos |
| | 20 | on his arm? |
| 09:24 | 21 | Q.   Yes. |
| 09:24 | 22 | A.   Uh, yes. |
| 09:24 | 23 | Q.   Okay.  And after you introduced Tony Hoang to the |
| | 24 | agents, is it your (inaudible) -- |
| 09:24 | 25 | *(Court reporter requests counsel use microphone to* |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | *be heard for the record.)*                                          |
| 09:24 | 2  | THE COURT:  Counsel, we can't hear.                                  |
| 09:24 | 3  | BY MR. WILKE:                                                        |
| 09:24 | 4  | Q.  After you introduced -- after you introduced Tony Hoang          |
|       | 5  | to the FBI agents, was it your testimony that the FBI agents         |
|       | 6  | didn't want you involved in the case anymore?                       |
| 09:24 | 7  | MR. SCALLY:  Objection.  Relevance.  403.                           |
|       | 8  | Hearsay.                                                             |
| 09:24 | 9  | THE COURT:  Overruled.                                               |
| 09:24 | 10 | THE WITNESS:  Your Honor, "overruled" means I can                    |
|       | 11 | answer?                                                              |
| 09:25 | 12 | THE COURT:  You can answer, sir.  I'm sorry.                         |
| 09:25 | 13 | THE WITNESS:  Can you repeat that again, please?                    |
| 09:25 | 14 | BY MR. WILKE:                                                        |
| 09:25 | 15 | Q.  Is it your testimony, sir, that after you introduced             |
|       | 16 | Tony Hoang to the FBI agents, you were told by the FBI that          |
|       | 17 | you would not be involved in the case anymore?                      |
| 09:25 | 18 | A.  Uh, actually, I did not wanna continue being involved,          |
|       | 19 | as well.  I didn't know how much -- how dangerous it was             |
|       | 20 | going to be.                                                         |
| 09:25 | 21 | Q.  That's not my question, sir.                                     |
| 09:25 | 22 | Were you told by the FBI that they didn't want you               |
|       | 23 | involved in the case anymore?                                        |
| 09:25 | 24 | A.  More like they didn't need me anymore.                          |
| 09:25 | 25 | Q.  So you were told by the FBI that they didn't need you           |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | anymore?                                                                  |
| 09:25 | 2  | A.   Yes, I think that was more correct.                                  |
| 09:25 | 3  | Q.   Okay.  But the FBI continued to apprise you of the                   |
|       | 4  | investigation; correct?                                                   |
| 09:25 | 5  | A.   "Apprise" me?  What -- I'm sorry.                                     |
| 09:25 | 6  | Q.   Inform you of the status of the investigation.                       |
| 09:25 | 7  | A.   No.  That's when they stopped.                                       |
| 09:25 | 8  | Q.   Well, sir, you were -- in fact, participated in a                    |
|       | 9  | meeting --                                                                |
| 09:25 | 10 |          MR. WILKE:  Have a moment, Your Honor?                           |
| 09:26 | 11 | BY MR. WILKE:                                                             |
| 09:26 | 12 | Q.   You, in fact, participated in an interview of Natalie                |
|       | 13 | Nguyen on December 9, 2019; correct?                                      |
| 09:26 | 14 | A.   I'm sorry.  Are you talking about phone calls on the                 |
|       | 15 | side or actually they [sic] calling me into an official                   |
|       | 16 | testimony or some type of discussion?                                     |
| 09:26 | 17 | Q.   My question is, after you introduced Tony Hoang to the               |
|       | 18 | FBI, you continued to be involved in the investigation,                   |
|       | 19 | didn't you, sir?                                                          |
| 09:26 | 20 | A.   "Continued"?                                                         |
| 09:26 | 21 | Q.   Yes.                                                                 |
| 09:26 | 22 | A.   No.  We were -- do you -- you know when you -- one'a                 |
|       | 23 | your family members is killed, we wanted to continue to find             |
|       | 24 | out what's going on, yes.                                                 |
| 09:26 | 25 | Q.   And the --                                                          |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

13

| | | |
|---|---|---|
| 09:26 | 1 | A.    We asked continuously what's going on. |
| 09:26 | 2 | Q.    And the FBI -- specifically Agent Andrew Cho -- |
| | 3 | continued to tell you about the investigation; correct? |
| 09:27 | 4 | A.    No.  There were many agents involved. |
| 09:27 | 5 | Q.    And Agent Cho was one of them; correct? |
| 09:27 | 6 | A.    That is correct.  And the -- |
| 09:27 | 7 | Q.    And -- |
| 09:27 | 8 | *(Simultaneous speaking.)* |
| 09:27 | 9 | *(Court reporter requests clarification for the* |
| | 10 | *record.)* |
| 09:27 | 11 | THE COURT:  Just a moment. |
| 09:27 | 12 | Finish your answer, sir. |
| 09:27 | 13 | BY MR. WILKE: |
| 09:27 | 14 | Q.    And Agent Cho -- |
| 09:27 | 15 | THE COURT:  Just a moment. |
| 09:27 | 16 | (To the witness:) Finish your answer. |
| 09:27 | 17 | THE WITNESS:  And the main agent is sitting right |
| | 18 | here.  The one that I spoke to the most is right here. |
| | 19 | (Indicating.) |
| 09:27 | 20 | BY MR. WILKE: |
| 09:27 | 21 | Q.    Okay.  But you had a prior relationship with Andrew |
| | 22 | Cho; correct? |
| 09:27 | 23 | A.    That is correct. |
| 09:27 | 24 | Q.    And you spoke to Andrew Cho during this investigation; |
| | 25 | correct? |

| | | |
|---|---|---|
| 09:27 | 1 | A.   Yes. |
| 09:27 | 2 | Q.   You continued to speak to Andrew Cho after November |
| | 3 | 9th, when you -- 2019 -- when you introduced Tony Hoang to |
| | 4 | the FBI. |
| 09:27 | 5 | MR. SCALLY:  Objection.  Asked and answered, and |
| | 6 | vague as to time. |
| 09:27 | 7 | THE COURT:  Do you understand the question, sir? |
| 09:27 | 8 | THE WITNESS:  No, Your Honor.  I'm getting a |
| | 9 | little confused. |
| 09:28 | 10 | THE COURT:  Would you repeat the question, |
| | 11 | Counsel. |
| 09:28 | 12 | MR. WILKE:  Yes. |
| 09:28 | 13 | BY MR. WILKE: |
| 09:28 | 14 | Q.   You continued to speak to FBI Special Agent Andrew Cho |
| | 15 | after November 9, 2019, the day you introduced Tony Hoang to |
| | 16 | the FBI; correct? |
| 09:28 | 17 | A.   Yes.  I asked, uh -- when you say "speak" -- I asked |
| | 18 | them about what's going on with my brother's murder case, |
| | 19 | yes. |
| 09:28 | 20 | Q.   And he told you; correct? |
| 09:28 | 21 | A.   He told me certain things, yes. |
| 09:28 | 22 | Q.   Um, and, in fact, you participated and were present |
| | 23 | during an interview of Natalie Nguyen on December 9th, 2019; |
| | 24 | correct? |
| 09:28 | 25 | A.   Uh, I don't recall that, uh, in detail; but if I was, |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | then, yes, they must've called me in for one.                |
| 09:28 | 2  | Q.   Would it refresh your memory to take a look at a report |
|       | 3  | of that interview?                                           |
| 09:28 | 4  | A.   Uh, sure, if you want.  I just told you, I think -- if  |
|       | 5  | you're saying I did, then I did.                             |
| 09:29 | 6  | MR. WILKE:  May I approach, Your Honor?                      |
| 09:29 | 7  | THE COURT:  You may.                                          |
| 09:29 | 8  | *(Document shown to the witness.)*                           |
| 09:29 | 9  | MR. WILKE:  Take a look at this first paragraph.             |
| 09:29 | 10 | BY MR. WILKE:                                                 |
| 09:29 | 11 | Q.   Tell me if that refreshes your memory.                  |
| 09:29 | 12 | A.   Yes.  This is with Agent Austin Casey.  That is         |
|       | 13 | correct.                                                      |
| 09:29 | 14 | Q.   You were present during the interview (inaudible) --    |
| 09:29 | 15 | THE COURT:  Just a moment, Counsel.  If you'd go             |
|       | 16 | back to the microphone so we can hear the question.  Thank   |
|       | 17 | you.                                                          |
| 09:29 | 18 | BY MR. WILKE:                                                 |
| 09:29 | 19 | Q.   Having reviewed that report, it refreshes your memory   |
|       | 20 | about that interview which you were present at of Natalie    |
|       | 21 | Nguyen?                                                       |
| 09:30 | 22 | A.   Yes.                                                     |
| 09:30 | 23 | Q.   Thank you.  And you were, in fact, present during that  |
|       | 24 | interview; correct?                                          |
| 09:30 | 25 | A.   Yes.                                                     |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

16

09:30    1   Q.    Now, going back to, uh -- leading up to this meeting,

         2   uh, at the Robata Wasa restaurant on, uh, November 4, 2019,

         3   you knew, when you called Wayne Le and contacted him to come

         4   down and meet you at the Robata Wasa restaurant, that he

         5   would not say no to you, didn't you?

09:30    6              MR. SCALLY:  Objection.  Asked and answered.

09:30    7              THE COURT:  Sustained.

09:30    8   BY MR. WILKE:

09:30    9   Q.    Now, at the Robata Wasa restaurant, Wayne showed up

         10  with another man; correct?

09:31    11  A.    That is correct.

09:31    12  Q.    Directing your attention to --

09:31    13             MR. WILKE:  Seeking to admit by stipulation,

         14  Your Honor, Exhibit 572.

09:31    15             THE COURT:  572.  Received.

09:31    16         *(Exhibit Number 572 received in evidence.)*

09:31    17  BY MR. WILKE:

09:31    18  Q.    Directing your attention to Exhibit 572...

09:31    19         *(Exhibit displayed.)*

09:31    20  BY MR. WILKE:

09:31    21  Q.    Do you recognize that man depicted there?

09:31    22  A.    No.  Actually, I do not recognize this person.

09:31    23  Q.    You do not (inaudible) --

09:31    24         *(Court reporter requests counsel use microphone to*

         25      *be heard for the record.)*

09:31   1   BY MR. WILKE:

09:31   2   Q.   You do not recognize the person depicted in 572 as Tony

       3   Hoang, the man who arrived with Wayne?

09:31   4   A.   This picture must -- is this a recent picture of him?

09:31   5   Q.   My question is do you recognize the man depicted in --

09:31   6   A.   No.  I'm sorry.  Not -- not at that meeting.

09:31   7   Q.   Do you believe it was somebody else?

09:31   8   A.   Could be.  It was a more stockier, thicker gentleman.

09:31   9   Q.   Okay.  Yeah.  You, in fact -- he was a -- you -- you

      10   believed him and you observed him to be a big guy; correct?

09:32  11   A.   Uh, yes.

09:32  12   Q.   Okay.  A man with, uh, lots of tattoos; correct?

09:32  13   A.   Uh, yes.  That is correct.

09:32  14   Q.   Uh, indicative to you of somebody who maybe had been

      15   in -- to prison or involved in gang-type activity; correct?

09:32  16           MR. SCALLY:  Objection.  Relevance.  403.  Calls

      17   for improper opinion.

09:32  18           THE COURT:  Overruled.

09:32  19           You can answer the question.

09:32  20           THE WITNESS:  Uh, yes, I thought he was

      21   potential -- what you said.

09:32  22   BY MR. WILKE:

09:32  23   Q.   Gangster type, if you will.

09:32  24   A.   Yes, that's correct.

09:32  25   Q.   Okay.  And, in fact, Wayne had told you that this guy,

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Tony -- he introduced him as "Tony"; correct?                |
| 09:32 | 2  | A.   Yes, I think so.                                         |
| 09:32 | 3  | Q.   And Wayne told you that Tony had just gotten out of      |
|       | 4  | prison; correct?                                             |
| 09:32 | 5  | A.   Uh, I don't recall all the details, but that coulda      |
|       | 6  | been the case, yes.                                          |
| 09:34 | 7  | Q.   Now, you spoke with, uh, Wayne while he was sitting at   |
|       | 8  | the bar; correct?                                            |
| 09:34 | 9  | A.   Yes.                                                     |
| 09:34 | 10 | Q.   And this guy, Tony, he was not present during that      |
|       | 11 | conversation, was he?                                        |
| 09:34 | 12 | A.   Uh, no.  He was walking around.                         |
| 09:34 | 13 | Q.   And when you actually came to the bar, you were -- you  |
|       | 14 | recorded part'a that interview; correct?                    |
| 09:34 | 15 | A.   Uh, yes, I did.                                          |
| 09:34 | 16 | Q.   And, uh, you were -- in fact, this was the -- the very  |
|       | 17 | first meeting, uh, on October 18 that you had at the Robata  |
|       | 18 | Wasa restaurant; correct?  You had not previously spoken to  |
|       | 19 | law enforcement; correct?                                    |
| 09:35 | 20 | A.   No.  My mom was frantically calling me to try to reach  |
|       | 21 | Wayne.  And I was at dinner with family, and that's when I   |
|       | 22 | asked if Wayne could come see me; it was urgent.            |
| 09:35 | 23 | Q.   And you had also spoken to Natalie prior to this        |
|       | 24 | meeting; correct?                                            |
| 09:35 | 25 | A.   Yeah.  She said my brother was missing so -- to help    |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | them find him.                                               |
| 09:35 | 2  | Q.   And she had told you as well that your brother had gone |
|       | 3  | on this fishing trip with Wayne; correct?                    |
| 09:35 | 4  | A.   Yes, that is correct.                                   |
| 09:35 | 5  | Q.   Okay.  She had also told you that she had spoken to     |
|       | 6  | Wayne recently and he said that he never had gone onto the   |
|       | 7  | fishing boat; correct?                                       |
| 09:35 | 8  | A.   I'm sorry.  Can you ask that again.                     |
| 09:35 | 9  | Q.   Yeah.  You -- prior to the meeting with Wayne on        |
|       | 10 | October 18th, Natalie had told you that she had recently     |
|       | 11 | spoken to Wayne; correct?                                    |
| 09:35 | 12 | A.   No, uh, I'm confused.  She could not get ahold of       |
|       | 13 | Wayne.  That's why they -- my mom and her asked me to try to |
|       | 14 | locate Wayne and talk to him.                                |
| 09:35 | 15 | Q.   Okay.  So you had not spoken to Natalie about any       |
|       | 16 | conversation that she had with Wayne prior to your meeting   |
|       | 17 | on October 18th.                                             |
| 09:36 | 18 | A.   I'm sorry.  That's hazy.  I don't know if it was before |
|       | 19 | or after.                                                    |
| 09:36 | 20 | Q.   Okay.  That's fine.                                     |
| 09:36 | 21 | But at the Roberta Wasa restaurant, while you were           |
|       | 22 | setting at the bar with Wayne, he told you that he didn't go |
|       | 23 | on the fishing boat; correct?                                |
| 09:36 | 24 | A.   That is correct.                                        |
| 09:36 | 25 | Q.   He told you that he went down to the marina with three  |

| | | |
|---|---|---|
| | 1 | other men and your brother, including a person named Matt, |
| | 2 | Jay, and Shawn; correct? |
| 09:36 | 3 | A.   Uh, yes, I think that is accurate. |
| 09:36 | 4 | Q.   Okay.  And that they met at this bar near the marina, |
| | 5 | Turk's bar; correct? |
| 09:36 | 6 | A.   Uh, yes.  There was a bar that he took me to, yes. |
| 09:36 | 7 | Q.   And Wayne told you that he and Shawn met some girls at |
| | 8 | the bar; correct? |
| 09:36 | 9 | A.   Yes; correct. |
| 09:36 | 10 | Q.   And that they decided to stay in the bar? |
| 09:36 | 11 | A.   Yes.  That sounds correct. |
| 09:36 | 12 | Q.   And that your brother had gone on the fishing boat with |
| | 13 | Matt and Jay? |
| 09:37 | 14 | A.   Uh, yes, some'a the guys. |
| 09:37 | 15 | Q.   And he, uh -- you knew this Matt and Jay person that he |
| | 16 | was talking about to be marijuana dealers; correct? |
| 09:37 | 17 | A.   Uh, no, I didn't know them to be that.  That's what |
| | 18 | Wayne was telling me they were. |
| 09:37 | 19 | Q.   He told you that.  Okay. |
| 09:37 | 20 | And this story that Wayne told you sounded suspicious |
| | 21 | to you; correct? |
| 09:37 | 22 | A.   Uh, not at the bar.  The bar -- I trusted what he said |
| | 23 | and, uh -- I believed it, actually. |
| 09:37 | 24 | Q.   Okay.  Um, you were trying to find out more |
| | 25 | information, though, about this fishing boat; correct? |

| | | |
|---|---|---|
| 09:37 | 1 | A.   No.  I was trying to find out more information about my |
| | 2 | brother's whereabouts. |
| 09:38 | 3 | Q.   And in the course of trying to find out more |
| | 4 | information about your brother's whereabouts, you wanted |
| | 5 | more information about this boat that your brother -- you |
| | 6 | were told that your brother got on; correct? |
| 09:38 | 7 | A.   No.  Everything.  The marina, where they got off the |
| | 8 | boat -- so, yes. |
| 09:38 | 9 | Q.   And you asked Wayne to show you the marina, the boat, |
| | 10 | and the bar where all these events occurred; correct? |
| 09:38 | 11 | A.   Yes, I actually wanted them to take me that night, but |
| | 12 | my wife and my friend said probably better to go during the |
| | 13 | day.  So they -- I did ask them to do that the next day. |
| 09:38 | 14 | Q.   And Wayne came and picked you up the next day; correct? |
| 09:38 | 15 | A.   Yes, that is correct. |
| 09:38 | 16 | Q.   At your house in Irvine; correct? |
| 09:38 | 17 | A.   Yes.  Him and another individual named "Shawn." |
| 09:38 | 18 | Q.   And that house in Irvine -- |
| 09:39 | 19 | MR. WILKE:  Direct your attention to what's been |
| | 20 | previously admitted as Exhibit 571. |
| 09:39 | 21 | THE COURT:  5-7-1. |
| 09:39 | 22 | (Document displayed.) |
| 09:39 | 23 | BY MR. WILKE: |
| 09:39 | 24 | Q.   Do you recognize the house in that photo? |
| 09:39 | 25 | A.   Yes.  That's my old house. |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

22

| | | |
|---|---|---|
| 09:39 | 1 | Q.    That's the house located at 66 Logan in Irvine? |
| 09:39 | 2 | A.    Yes, that is correct. |
| 09:39 | 3 | Q.    And this is the house where Wayne and this other man |
| | 4 | picked you up the following day, October 19th; correct? |
| 09:39 | 5 | A.    Yes, that is -- that sounds correct. |
| 09:39 | 6 | Q.    And that was a Saturday; correct? |
| 09:39 | 7 | A.    Yeah, Saturday morning. |
| 09:39 | 8 | Q.    Now, this other man you understood to be Shawn; |
| | 9 | correct? |
| 09:39 | 10 | A.    Uh, yes, that's the name he gave me.  It was a white |
| | 11 | gentleman, Caucasian. |
| 09:39 | 12 | Q.    Directing your -- |
| 09:39 | 13 |         MR. WILKE:  Uh, seeking to admit by stipulation, |
| | 14 | Your Honor, Exhibit 574. |
| 09:40 | 15 |         THE COURT:  574.  Received. |
| 09:40 | 16 |         *(Exhibit Number 574 received in evidence.)* |
| 09:40 | 17 |         *(Document displayed.)* |
| 09:40 | 18 | BY MR. WILKE: |
| 09:40 | 19 | Q.    Do you recognize the person depicted in Exhibit 574? |
| 09:40 | 20 | A.    Yes.  That's the one that introduced himself as |
| | 21 | Wayne -- excuse me -- as Shawn. |
| 09:40 | 22 | Q.    As Shawn.  And he was the person that arrived with |
| | 23 | Wayne on Saturday morning to drive you down to the marina; |
| | 24 | correct? |
| 09:40 | 25 | A.    That is correct. |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

23

| 09:40 | 1 | Q.   And, again, on the ride down to the marina, you |
| | 2 | recorded the conversation in the car; correct? |
| 09:40 | 3 | A.   Uh, "recorded"?  I don't think I recorded the |
| | 4 | conversation in the car. |
| 09:40 | 5 | Q.   Okay.  Uh -- but during the conversation in the car |
| | 6 | you, uh -- this guy, Shawn -- well, let me back that up. |
| 09:40 | 7 | Wayne repeated the story about going to the bar and |
| | 8 | meeting some girls and not getting on the boat; correct? |
| 09:40 | 9 | A.   Yes, that is correct. |
| 09:40 | 10 | Q.   And this person, Shawn -- who you understood to be |
| | 11 | Shawn -- um, backed him up on that story; correct? |
| 09:41 | 12 | A.   Yes. |
| 09:41 | 13 | Q.   Now, while you were down at the marina you, in fact, |
| | 14 | took pictures; correct? |
| 09:41 | 15 | A.   I think I also took video, as well. |
| 09:41 | 16 | Q.   Directing your -- directing your attention, what's |
| | 17 | previously been admitted as Exhibit 46. |
| 09:41 | 18 | *(Exhibit displayed.)* |
| 09:41 | 19 | BY MR. WILKE: |
| 09:41 | 20 | Q.   Do you recognize this photo? |
| 09:41 | 21 | A.   Yes, I took that photo. |
| 09:41 | 22 | Q.   You took that photo October 19th when you were down at |
| | 23 | the marina; correct? |
| 09:41 | 24 | A.   Yes.  And other photos, as well. |
| 09:41 | 25 | Q.   And that depicts Wayne on the right and this guy, |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | "Shawn," on the left; correct?                               |
| 09:41 | 2  | A.    Correct.                                               |
| 09:41 | 3  | Q.    And, again, at this point your brother is still        |
|       | 4  | missing; correct?                                            |
| 09:42 | 5  | A.    Yes.  I still did not know where he was.               |
| 09:42 | 6  | Q.    You -- you had not been advised that his body had been |
|       | 7  | found; correct?                                              |
| 09:42 | 8  | A.    Not yet.                                               |
| 09:42 | 9  | Q.    Now you saw Wayne again that evening; correct?         |
| 09:42 | 10 | A.    Yes, that is correct.                                  |
| 09:42 | 11 | Q.    Wayne came down to your house in Irvine; correct?      |
| 09:42 | 12 | A.    Yes, that is correct.                                  |
| 09:42 | 13 | Q.    And he came with another man; correct?                 |
| 09:42 | 14 | A.    Uh, I think, yes.                                      |
| 09:42 | 15 | Q.    An African-American man; correct?                      |
| 09:42 | 16 | A.    Uh, I'm sorry.  I don't recall what ethnicity.  I think|
|       | 17 | he did -- came with a friend.                                |
| 09:43 | 18 | Q.    Would it refresh your memory to take a look at the     |
|       | 19 | transcript of your October 21, 2019, interview?             |
| 09:43 | 20 | A.    Uh...                                                  |
| 09:43 | 21 | Q.    -- about a description of the other man Wayne came     |
|       | 22 | with?                                                        |
| 09:43 | 23 | A.    Yes.  That's fine.                                     |
| 09:43 | 24 |          MR. WILKE:  May I approach, Your Honor?             |
| 09:43 | 25 |          THE COURT:  You may.                                |

| | | |
|---|---|---|
| 09:43 | 1 | *(Document shown to the witness.)* |
| 09:43 | 2 | BY MR. WILKE: |
| 09:43 | 3 | Q.   Does that refresh your memory about this other man |
| | 4 | that...? |
| 09:43 | 5 | A.   Yeah, I think.  It was more than one individual. |
| 09:43 | 6 | Q.   This other man, though, was -- African-American man; |
| | 7 | correct? -- a black man? |
| 09:44 | 8 | A.   I think so. |
| 09:44 | 9 | Q.   And you didn't know him; correct? |
| 09:44 | 10 | A.   No.  I did not know Wayne's friends. |
| 09:44 | 11 | Q.   Now, this "Shawn" guy that you had been introduced to |
| | 12 | that day, he appeared to you to be a tweaker; correct? |
| 09:44 | 13 | A.   I'm sorry.  Say that again? |
| 09:44 | 14 | Q.   Shawn, the man you met that day -- |
| 09:44 | 15 | A.   Yes. |
| 09:44 | 16 | Q.   -- going down to the marina, he appeared to you to be, |
| | 17 | in your words, a "tweaker"? |
| 09:44 | 18 | A.   Uh, potentially, yes. |
| 09:44 | 19 | Q.   And a tweaker is, uh, basically somebody who is a |
| | 20 | methamphetamine addict; correct? |
| 09:44 | 21 | A.   Uh, I would think so, yes. |
| 09:44 | 22 | Q.   Uses methamphetamine all the time. |
| 09:44 | 23 | A.   Or various other drugs, yes. |
| 09:44 | 24 | Q.   Now, following your interview with the Coast Guard on |
| | 25 | October 21, 2019, that's when you contacted the FBI; |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | correct?                                                         |
| 09:45 | 2  | A.   Uh, I don't remember when the FBI got involved.  I'm        |
|       | 3  | sorry.                                                           |
| 09:45 | 4  | Q.   Well, you met with Tony on November 4, 2019; correct?       |
| 09:45 | 5  | A.   Uh, November -- yes.  It was after, for sure.  Because      |
|       | 6  | the Coast Guard was the original agents.  And then I think       |
|       | 7  | the FBI got involved, and it became an operation to meet         |
|       | 8  | this "Tony" gentleman.                                           |
| 09:45 | 9  | Q.   And at the time you met with Tony on November 4             |
|       | 10 | (inaudible) --                                                   |
| 09:45 | 11 | *(Court reporter requests counsel use microphone to*            |
|       | 12 | *be heard for the record.)*                                      |
| 09:45 | 13 | THE COURT:  Repeat that, Counsel.  We didn't get a               |
|       | 14 | good transcript.                                                 |
| 09:45 | 15 | BY MR. WILKE:                                                    |
| 09:45 | 16 | Q.   When you met with Tony on November 4, 2019, the FBI was     |
|       | 17 | now involved in the investigation; correct?                      |
| 09:45 | 18 | A.   Uh, I think so.  I think I met with Tony twice,             |
|       | 19 | afterwards.                                                      |
| 09:45 | 20 | Q.   Okay.  The first time, though.                              |
| 09:45 | 21 | A.   Yes.  I believe they wanted to, uh, make sure I was         |
|       | 22 | safe.                                                            |
| 09:46 | 23 | Q.   Well, they, in fact, uh -- Agent Cho, on November 4,        |
|       | 24 | placed a monitoring device on you for the meeting with Tony      |
|       | 25 | at the Robata Wasa restaurant; correct?                          |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

27

09:46  1   A.   Uh, no.  I was not wearing a wire.  I think they had

2   some other type of monitoring device.

09:46  3   Q.   But you -- you knew that Agent Cho was the agent

4   monitoring that meeting; correct?

09:46  5   A.   No.  Actually, I thought this was Agent Casey right

6   here doing that.  (Indicating.)

09:46  7   Q.   Well, let me -- let me go back.

09:46  8        After you met with the Coast Guard on October 21, 2019,

9   you contacted Agent Cho; correct?

09:46 10   A.   Uh, yes, I contacted a few agents, actually.

09:46 11   Q.   One of them was Agent Cho?

09:46 12   A.   Yes.

09:46 13   Q.   One of them was agent (inaudible) --

09:46 14        *(Court reporter requests counsel use microphone to*

15        *be heard for the record.)*

09:46 16   BY MR. WILKE:

09:46 17   Q.   One of them was Agent Demetrios Lakadakis [sic];

18   correct?

09:47 19   A.   Yes, that is correct.

09:47 20   Q.   Agent Cho and Agent "Lakadikis" -- you had a prior

21   relationship with; correct?

09:47 22   A.   Yes.  And they knew the history of my brother and

23   myself.

09:47 24   Q.   They knew that because you had worked for Agent Cho

25   back in 2007 to 2010 or so?

| | | |
|---|---|---|
| 09:47 | 1 | MR. SCALLY:  Objection.  Relevance.  403. |
| 09:47 | 2 | THE COURT:  Overruled. |
| 09:47 | 3 | THE WITNESS:  Uh, yes. |
| 09:47 | 4 | BY MR. WILKE: |
| 09:47 | 5 | Q.   Now, we talked before the break about some'a that work |
| | 6 | you did for Agent Cho back in the late 2000s.  And you |
| | 7 | testified that you received approximately $90,000 from the |
| | 8 | FBI; correct? |
| 09:47 | 9 | A.   Yes; correct. |
| 09:47 | 10 | Q.   In fact, sir, you received substantially more than |
| | 11 | that; correct? |
| 09:47 | 12 | MR. SCALLY:  Objection.  Relevance. |
| 09:48 | 13 | THE COURT:  Overruled. |
| 09:48 | 14 | You can answer the question, sir. |
| 09:48 | 15 | THE WITNESS:  Uh, when you say "substantially |
| | 16 | more"-- for that specific case or other cases that I've |
| | 17 | helped the FBI with? |
| 09:48 | 18 | BY MR. WILKE: |
| 09:48 | 19 | Q.   For all of your cases for the FBI, that you were |
| | 20 | working with Agent Cho, you received substantially more than |
| | 21 | $90,000, didn't you? |
| 09:48 | 22 | A.   Uh, no.  I don't recall with Agent Cho 'cause I work |
| | 23 | with other federal agents, so it coulda been other agents as |
| | 24 | well. |
| 09:48 | 25 | Q.   Agent Cho was your handler; correct? |

09:48    1    A.    No.  He only came in the scene after Agent Khan was not

         2    around.

09:48    3    Q.    Okay.  Agent Khan was in the -- the initial handler;

         4    correct?

09:48    5    A.    With the FBI, yes.

09:48    6    Q.    And then it became Agent Cho; correct?

09:48    7    A.    No.  I think it was Demetrios and then Agent Cho.

09:48    8    Q.    So he was one of three handlers that you had while

         9    working for the FBI?

09:48   10    A.    Uh, yes, that is correct.

09:48   11    Q.    And during the time that you worked for the FBI, you

        12    received payments totaling close to $190,000; isn't that

        13    true?

09:49   14    A.    Uh, one hundred?  I don't -- I don't recall.  This is a

        15    long time ago, so I don't know that.  And I'm sorry.  How is

        16    this relevant -- how -- what I make at a job to my brother's

        17    murder?

09:49   18              MR. SCALLY:  Objection.  No question pending.

09:49   19              THE COURT:  Next question, please.

09:49   20    BY MR. WILKE:

09:49   21    Q.    Would it refresh your memory as to how much you were

        22    paid by the FBI to take a look at a letter from -- Assistant

        23    United States Attorney Robert Keenan -- that you're familiar

        24    with?

09:49   25    A.    I do not know or recall this -- if I can see it.

| | | |
|---|---|---|
| 09:49 | 1 | MR. WILKE:  May I approach, Your Honor? |
| 09:49 | 2 | THE COURT:  No response. |
| 09:49 | 3 | MR. WILKE:  May I approach? |
| 09:49 | 4 | THE COURT:  Yes, yes. |
| 09:50 | 5 | *(Document shown to the witness.)* |
| 09:50 | 6 | MR. WILKE:  Directing your attention to that |
| | 7 | paragraph. (Indicating.) |
| 09:50 | 8 | THE WITNESS:  What year was this?  2009. |
| | 9 | Twelve years ago?  This could be right or not.  I'm not |
| | 10 | sure.  You have to talk to the prosecutor, Robert Keenan. |
| 09:50 | 11 | BY MR. WILKE: |
| 09:50 | 12 | Q.  So having looked at this letter from Mr. Keenan, that |
| | 13 | does not refresh your memory that you were paid close to |
| | 14 | $190,000. |
| 09:50 | 15 | A.  No.  Because they -- like I said, Mr. Robert Keenan was |
| | 16 | a U.S. prosecutor at the time.  They did not pay me like |
| | 17 | lump sum.  They would pay me parts.  So I don't know if |
| | 18 | that's accurate. |
| 09:50 | 19 | But if that's what you're saying, you can talk to |
| | 20 | Mr. Robert Keenan. |
| 09:51 | 21 | Q.  Well, when you would get paid, you were paid by Andrew |
| | 22 | Cho; correct? |
| 09:51 | 23 | A.  Uh, no, that's not accurate.  I was paid by various |
| | 24 | different officers, federal agents. |
| 09:51 | 25 | MR. WILKE:  Your Honor, I'm seeking to admit |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Exhibit 578.  Uh, I think -- this is not by stipulation.          |
| 09:51 | 2  | MR. SCALLY:  Objecting to relevance, Your Honor.                 |
| 09:51 | 3  | THE COURT:  I don't know what that is, Counsel.                  |
| 09:51 | 4  | *(Defense counsel confer.)*                                      |
| 09:51 | 5  | THE COURT:  Would one of you be kind enough -- I'm               |
|       | 6  | trying to pay attention so I'm not going to go through the        |
|       | 7  | exhibit books behind me.  Hand me the exhibit so I can look       |
|       | 8  | at it, quickly.                                                  |
| 09:51 | 9  | It's not beneficial for me to go through these                   |
|       | 10 | exhibit books at the same time.  And I don't have that in         |
|       | 11 | the exhibit books.                                              |
| 09:52 | 12 | MR. WILKE:  May I?                                               |
| 09:52 | 13 | THE COURT:  Yeah, if you would be so kind.  It's                 |
|       | 14 | not in the exhibit books.                                        |
| 09:52 | 15 | *(Document provided to the Court.)*                              |
| 09:52 | 16 | THE COURT:  I'm not going to receive this at the                 |
|       | 17 | present time.  You can question him on it, so I understand        |
|       | 18 | the relevance of this.                                          |
| 09:52 | 19 | BY MR. WILKE:                                                    |
| 09:52 | 20 | Q.   So my question to you, sir, is, when you were paid by       |
|       | 21 | the FBI, Special Agent Andrew Cho was the paying agent;          |
|       | 22 | correct?                                                         |
| 09:52 | 23 | A.   He was one of them, yes.                                    |
| 09:53 | 24 | Q.   And he, in fact, authorized the payments to you;           |
|       | 25 | correct?                                                         |

09:53   1              MR. SCALLY:  Objection.  Foundation.

09:53   2              THE COURT:  Well, sustained.

09:53   3              I think there are three names on that, Counsel,

        4   aren't there?  So it's not specific.  It's one of three

        5   authorized --

09:53   6              MR. WILKE:  But it -- he's -- Andrew Cho is

        7   identified specifically as having a role here.

09:53   8              THE COURT:  No.  I'm going to sustain the

        9   objection.  I think it's misstated, Counsel.  He's one of

       10   three, it appears.  He's not "the" --

09:53  11   BY MR. WILKE:

09:53  12   Q.   Well, you were --

09:53  13              THE COURT:  You can reask the question.  But it's

       14   sustained.

09:53  15   BY MR. WILKE:

09:53  16   Q.   You were the recipient of $94,440 on August 26, 2009;

       17   correct?

09:53  18   A.   Uh, first of all, that's a very long time -- and a

       19   different life.  But you're saying that I was -- I received

       20   some money from the FBI.  I remember every time there was

       21   many agents in the room, so I -- I cannot, uh, tell you if

       22   it's just Andrew.

09:53  23   Q.   Would it refresh your memory to take a look at the

       24   receipt for that payment?

09:54  25   A.   Uh, sure.  If this is helping in any way my brother's

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | case.                                                      |
| 09:54 | 2  | MR. WILKE:  May I approach, Your Honor?                    |
| 09:54 | 3  | THE COURT:  You may.                                       |
| 09:54 | 4  | *(Document shown to the witness.)*                         |
| 09:54 | 5  | BY MR. WILKE:                                              |
| 09:54 | 6  | Q.   (Inaudible.)                                          |
| 09:54 | 7  | *(Court reporter requests counsel use microphone to*      |
|       | 8  | *be heard for the record.)*                                |
| 09:54 | 9  | THE COURT:  We didn't hear the question.                  |
| 09:54 | 10 | MR. WILKE:  (Inaudible.)                                   |
| 09:54 | 11 | *(Simultaneous speaking.)*                                 |
| 09:54 | 12 | THE COURT:  Mr. Wilke, just a moment, please.             |
|       | 13 | Thank you.                                                 |
| 09:54 | 14 | All right.  Would you go back to the lectern and          |
|       | 15 | just repeat the question about whether this refreshes his  |
|       | 16 | recollection.                                              |
| 09:54 | 17 | BY MR. WILKE:                                              |
| 09:54 | 18 | Q.   Having looked at this document, sir, does that refresh|
|       | 19 | your recollection about the payment that you received on   |
|       | 20 | August 26, 2009?                                           |
| 09:54 | 21 | A.   Yes.  I see Demetrious' name at the top.  That --     |
|       | 22 | that's correct.                                            |
| 09:55 | 23 | MR. WILKE:  Your Honor, I'd be seeking to admit           |
|       | 24 | 578 at this point.                                         |
| 09:55 | 25 | THE COURT:  Received.                                      |

09:55    1              *(Exhibit Number 578 received in evidence.)*

09:55    2              *(Document displayed.)*

09:55    3     BY MR. WILKE:

09:55    4     Q.   Sir, this is the receipt for that payment; correct?

09:55    5     A.   Yes, that -- that looks correct.

09:55    6     Q.   And it shows that you received from Demetrios

         7     Laloudakis a total amount of 94,440, representing $40,000

         8     for services rendered for the period September 30th, '08, to

         9     March 13th '09; correct?

09:55   10     A.   Yes.  But if you look at it, 54,000 was for expenses.

09:55   11     Q.   And it also shows an additional $54,440 for the same

        12     period for expenses; correct?

09:55   13     A.   Yes.  That's what I just said.

09:55   14     Q.   And "Blue Dagger," that was your code name; correct?

09:55   15     A.   That is correct.

09:56   16     Q.   And the next line, the paying agent is identified as

        17     Andrew Cho; correct?

09:56   18     A.   Uh, yes, on this occasion.

09:56   19     Q.   And Demetrios Laloudakis is the witness to this

        20     payment; correct?

09:56   21     A.   That is correct.

09:56   22     Q.   Now, this wasn't the only payments you received from

        23     the FBI; correct?

09:56   24              MR. SCALLY:  Your Honor, continuing objection on

        25     relevance and 403 grounds.

| 09:56 | 1 | THE COURT:  Overruled. |
| 09:56 | 2 | You can answer the question, sir. |
| 09:56 | 3 | THE WITNESS:  Your Honor, you want me to answer |
| | 4 | that? |
| 09:56 | 5 | THE COURT:  Yes, please. |
| 09:56 | 6 | THE WITNESS:  Sorry.  Can you repeat the question |
| | 7 | again? |
| 09:56 | 8 | BY MR. WILKE: |
| 09:56 | 9 | Q.   This was not the only payment that you received from |
| | 10 | the FBI -- the payment reflected in Exhibit 578 -- was it? |
| 09:56 | 11 | A.   That is correct.  As I advised before, I worked on -- |
| | 12 | with federal agents, other cases, and they paid me different |
| | 13 | times. |
| 09:57 | 14 | Q.   You received moneys totaling close to $190,000 from the |
| | 15 | FBI during your work for them; correct? |
| 09:57 | 16 | A.   That sounds accurate. |
| 09:57 | 17 | Q.   Now, in July of 2010, you actually sued the |
| | 18 | United States Government; correct? |
| 09:57 | 19 | A.   Uh, I don't remember the exact dates, but sometime |
| | 20 | later, yes. |
| 09:57 | 21 | Q.   Well, was it -- would it refresh your memory'a take a |
| | 22 | look at the complaint of your lawsuit? |
| 09:57 | 23 | A.   No.  If you say that's accurate, then I did. |
| 09:57 | 24 | Q.   So you recall that in July 2010 you filed lawsuit |
| | 25 | against the United States; correct? |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

36

09:57    1    A.    Yes.

09:57    2    Q.    And that lawsuit was for payments that you were

         3    promised by the FBI but that you'd never received; correct?

09:58    4    A.    Uh, in addition to them releasing my name to the media.

09:58    5    Q.    Um.

09:58    6    A.    So there was many reasons for that lawsuit.

09:58    7    Q.    Well, in fact, one of your claims was that you had been

         8    promised $500,000 in compensation; correct?

09:58    9           MR. SCALLY:  Objection.  Relevance.  403.

09:58   10           THE COURT:  Counsel, an offer of proof concerning

        11    relevance.

09:58   12           MR. WILKE:  Your -- Your Honor, there -- I have a

        13    few more questions about this.

09:58   14           THE COURT:  Well, you may.  But I'm concerned now

        15    on relevance grounds.

09:58   16           MR. WILKE:  I think it goes to the scope of his

        17    informant activities for the FBI, in terms of the amount of

        18    services he provided.  'Cause he was not, uh, paid for the

        19    full amount of services.

09:59   20           THE COURT:  Sustain the objection.

09:59   21           MR. WILKE:  Okay.

09:59   22    BY MR. WILKE:

09:59   23    Q.    Well, you never received any additional funds, though,

        24    as a result of this lawsuit; correct?

09:59   25    A.    No.  We dismissed it.

| | | |
|---|---|---|
| 09:59 | 1 | Q.   You dismissed it on your own; correct? |
| 09:59 | 2 | A.   At the advice of my counsel. |
| 09:59 | 3 | Q.   And did you ever -- after dismissing this lawsuit, did |
| | 4 | you ever receive money from any -- any law enforcement |
| | 5 | agency -- FBI or any other law enforcement agency? |
| 09:59 | 6 | A.   I'm sorry?  After the lawsuit? |
| 09:59 | 7 | Q.   Yes. |
| 09:59 | 8 | A.   Uh, I don't think so. |
| 09:59 | 9 | Q.   You don't think so? |
| 09:59 | 10 | A.   No.  Unless my attorney received some and didn't tell |
| | 11 | me. |
| 09:59 | 12 | Q.   You never received any payments? |
| 09:59 | 13 | A.   No, I did not. |
| 09:59 | 14 | Q.   You never worked as a confidential informant after you |
| | 15 | dismissed your July 2010 lawsuit? |
| 09:59 | 16 | A.   I believe July 2010 was the last time I did work with |
| | 17 | the FBI. |
| 10:00 | 18 | Q.   Okay.  Or any law enforcement agency; correct? |
| 10:00 | 19 | A.   Uh, yes. |
| 10:00 | 20 | Q.   Now, after you contacted Agent Andrew Cho, uh, |
| | 21 | following your meeting with the Coast Guard, you set up a |
| | 22 | meeting withing Tony Hoang at the Robata Wasa restaurant; |
| | 23 | correct? |
| 10:00 | 24 | A.   Um -- I'm sorry.  Can you say that again? |
| 10:00 | 25 | Q.   You've testified that you met with the United States |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

38

|        |    |                                                                       |
|--------|----|-----------------------------------------------------------------------|
|        | 1  | Coast Guard agents on October 21, 2019; correct?                      |
| 10:00  | 2  | A.   Yes.                                                             |
| 10:00  | 3  | Q.   You've testified that you met with Tony Hoang while              |
|        | 4  | being monitored by the FBI on November 4th, 2019; correct?           |
| 10:01  | 5  | A.   No.  I said I was monitored by various agents.  I               |
|        | 6  | thought the Coast Guard was the head of that agency at the           |
|        | 7  | time, and the FBI.  I think it was a co- -- joint task               |
|        | 8  | force.                                                               |
| 10:01  | 9  | *(Interruption in the proceedings due to power*                      |
|        | 10 | *failure.)*                                                          |
| 10:01  | 11 | THE COURT:  Just a moment.                                           |
| 10:01  | 12 | MR. WILKE:  The electronics are...                                   |
| 10:01  | 13 | THE COURT:  We know that, Counsel.  Thank you.                       |
| 10:02  | 14 | Probably time for a recess.                                          |
| 10:02  | 15 | Do you need -- to continue on with your cross, do                    |
|        | 16 | you need the ELMO back up?                                           |
| 10:02  | 17 | MR. WILKE:  I do, yeah.                                              |
| 10:02  | 18 | THE COURT:  Ladies and gentlemen, something                         |
|        | 19 | obviously has happened with the electricity, so why don't           |
|        | 20 | you go take a recess.  And we'll get somebody up here.              |
| 10:02  | 21 | Please don't discuss this matter amongst                             |
|        | 22 | yourselves nor to form or express any opinion concerning the        |
|        | 23 | case.  Thank you.                                                    |
| 10:02  | 24 | *(Jury recesses at 10:02 a.m.)*                                      |
| 10:02  | 25 | *(Outside the presence of the jury.)*                                |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

39

| | | |
|---|---|---|
| 10:02 | 1 | THE COURT:  Thank you. |
| 10:02 | 2 | Sir, if you would step down. |
| 10:03 | 3 | Let me speak to you about scheduling. |
| 10:03 | 4 | THE WITNESS:  Can I walk down? |
| 10:03 | 5 | THE COURT:  Yeah.  Thank you, sir. |
| 10:03 | 6 | So, Counsel, if I'm speaking too loudly, I |
| | 7 | apologize.  But first, this submission by you, Mr. Wilke, |
| | 8 | and the government's perfectly acceptable to the Court. |
| 10:03 | 9 | In other words, I received an email on |
| | 10 | November 228th stating the following -- and I assume that |
| | 11 | this was agreed to by the government.  But I just saw the |
| | 12 | "CC," Mr. Scally, and received no response from you. |
| 10:03 | 13 | It states: |
| 10:03 | 14 | "On Wednesday the defense expects to |
| | 15 | complete the direct and |
| | 16 | cross-examination of Alex Dao and |
| | 17 | present testimony from FBI Agent Andrew |
| | 18 | Cho." |
| 10:04 | 19 | I didn't know if he was available.  Is he |
| | 20 | available today? |
| 10:04 | 21 | MR. SCALLY:  Yes, Your Honor. |
| 10:04 | 22 | THE COURT:  "Agent Austin Casey"? |
| 10:04 | 23 | MR. SCALLY:  Yes, Your Honor. |
| 10:04 | 24 | THE COURT:  "And Khoa Cao" -- who we ordered back, |
| | 25 | who I assume is available; is that correct? |

10:04  1          MR. WILKE:  Yes, sir.

10:04  2          THE COURT:  Now, you asked that we not start the

3    criminalist, Coleman, who would be available because of the

4    split cost.

10:04  5          MR. WILKE:  We're prepared to present him today.

10:04  6          THE COURT:  But if you want to, I was waiting to

7    find out what you and Mr. Scally agreed to.  And I just have

8    the one email.

10:04  9          MR. WILKE:  Yes.

10:04  10         THE COURT:  I have a CC.

10:04  11         MR. WILKE:  He will be here today.

10:04  12         THE COURT:  So I didn't know if this was

13   acceptable or not, but it's acceptable to me.

10:04  14         So if you both agree that you don't wanna split

15   Dr. Munguia and that you wanna have your neuropsychologist

16   back-to-back -- Daniel Martell -- I'm perfectly agreeable to

17   recessing early so we get them back-to-back.

10:05  18         If you're prepared, though, to go forward today

19   and you want that direct, just tell me as we get close to

20   that.  Depending upon whatever time, if you both agree,

21   we'll do it.

10:05  22         The second thing is that on Thursday we expected

23   to conclude the case with your rebuttal expert.

10:05  24         And I want to ask you what you believe would be a

25   fair presentation by both of you; in other words, I don't

1    want your arguments split.

10:05    2         So what I am concerned about is reading

3    instructions that might take an hour, then hopefully they're

4    still listening to you.  You present your argument for

5    however long -- and I'm not limiting you in terms of time.

6    You present your argument, whatever time.  Then we have

7    rebuttal.

10:06    8         If we can finish all that in "one-time day" [sic],

9    happy to instruct on the same day.  Or do you want me to

10    instruct on Friday, for instance, and have your arguments on

11    Monday?

10:06   12         So I need you two to tell me what gives you both a

13    fair presentation so the jury's alert.

10:06   14         And I want you to tell me if you want to follow

15    the federal process of me reading the instructions first, or

16    if you want to stipulate that I read the instructions after

17    your argument.

10:06   18         In federal court, we usually read them first; in

19    state court we read them after.  It doesn't matter.  You set

20    up a time schedule so you have the most alert jury, and tell

21    me at the end of the day what you want.

10:06   22         MR. WILKE:  That's fine, Your Honor.

10:06   23         THE COURT:  Okay.  I've got your instructions in

24    the back.  We're going after them -- or, over them.  And I

25    thank you both.  You've put in a lot of hard work.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

42

| | | |
|---|---|---|
| 10:06 | 1 | Why don't you take a 15-minute recess.  Let's see |
| | 2 | if we can get the lights back on. |
| 10:07 | 3 | For the record, there's been some kind of |
| | 4 | electronic failure.  And we have, apparently, zero lighting. |
| | 5 | The emergency lighting's on.  The ELMO's not working or any |
| | 6 | of the screens. |
| 10:07 | 7 | *(Recess held at 10:07 of a.m.)* |
| 10:33 | 8 | *(Proceedings resumed at 10:33 a.m.)* |
| 10:33 | 9 | *(In the presence of the jury.)* |
| 10:33 | 10 | THE COURT:  All right.  The jury's present.  The |
| | 11 | alternates, all counsel, the defendant, investigating |
| | 12 | agency, and the witness. |
| 10:34 | 13 | If you would be seated.  Thank you for your |
| | 14 | courtesy. |
| 10:34 | 15 | For our record, there was a power outage.  That's |
| | 16 | now been restored. |
| 10:34 | 17 | Counsel, if you'd like to then continue your |
| | 18 | examination, please. |
| 10:34 | 19 | MR. WILKE:  Thank you, Your Honor. |
| 12:09 | 20 | **TRUNG "ALEX" DAO, PREVIOUSLY SWORN, ON THE STAND** |
| 10:34 | 21 | BY MR. WILKE: |
| 10:34 | 22 | Q.   Mr. Dao, bringing you back to this meeting on |
| | 23 | November 4, 2019 -- |
| 10:34 | 24 | THE CLERK:  Excuse me, Your Honor. |
| 10:34 | 25 | Counsel, hold on a second. |

| | | |
|---|---|---|
| 10:34 | 1 | *(Clerk and court confer.)* |
| 10:34 | 2 | THE COURT:  Oh, my apologies. |
| 10:34 | 3 | Ladies and gentlemen, if you would be kind enough |
| | 4 | to return just a moment to the jury room.  My apologies. |
| | 5 | And along with the alternates please. |
| 10:34 | 6 | *(Outside the presence of the jury.)* |
| 10:35 | 7 | THE COURT:  Okay.  Thank you so much. |
| 10:35 | 8 | Kelly, thank you. |
| 10:35 | 9 | THE CLERK:  You're welcome. |
| 10:35 | 10 | THE COURT:  Let me repeat that:  Thank you. |
| 10:35 | 11 | *(Pause in the proceedings at 10:35 a.m.)* |
| 10:35 | 12 | *(Defendant brought to courtroom.)* |
| 10:48 | 13 | *(Proceedings resumed at 10:48 a.m.)* |
| 10:48 | 14 | *(In the presence of the jury.)* |
| 10:48 | 15 | THE COURT:  All right.  Then we're back in |
| | 16 | session.  Once again, all counsel are present, the |
| | 17 | defendant.  The witness is present. |
| 10:48 | 18 | And, Counsel, if you'd like to continue your |
| | 19 | examination, please. |
| 10:50 | 20 | MR. WILKE:  Thank you, Your Honor. |
| 10:50 | 21 | THE COURT:  All right.  Thank you. |
| 10:50 | 22 | MR. WILKE:  And to our IT people -- well, |
| | 23 | Your Honor, I can finish with this witness without the ELMO. |
| 10:50 | 24 | THE COURT:  Let's make sure it works, just in case |
| | 25 | you need it. |

8:20-CR-00002-DOC   - 12/1/2021 - Day 10, Volume I

44

| | | |
|---|---|---|
| 10:50 | 1 | MR. WILKE:  Thank you. |
| 10:50 | 2 | *(Brief pause in the proceedings for repair of* |
| | 3 | *document display equipment.)* |
| 10:51 | 4 | THE COURT:  Okay? |
| 10:51 | 5 | COURT TECHNICIAN:  (Indicates.) |
| 10:51 | 6 | THE COURT:  Thank you. |
| 10:51 | 7 | Counsel. |
| 10:51 | 8 | MR. WILKE:  Thank you. |
| 10:51 | 9 | (To court technician:) Thank you, sir. |
| 10:51 | 10 | THE COURT:  (To court technician:) And if -- |
| | 11 | Eddie, if you'd remain also just so we're sure it's working. |
| 10:51 | 12 | MR. WILKE:  Mr. Dao, thank you for your patience. |
| 10:51 | 13 | THE WITNESS:  Thank you. |
| 10:51 | 14 | **DIRECT EXAMINATION (Continued)** |
| 10:51 | 15 | BY MR. WILKE: |
| 10:51 | 16 | Q.   Directing your attention back to this November 4, 2019, |
| | 17 | meeting at Robata Wasa restaurant with this person "Tony." |
| | 18 | Okay? |
| 10:51 | 19 | A.   Okay. |
| 10:51 | 20 | Q.   So before this meeting, you had met with law |
| | 21 | enforcement; correct? |
| 10:51 | 22 | A.   That is correct. |
| 10:51 | 23 | Q.   Okay.  Specifically you had met with Special Agents |
| | 24 | Andrew Cho and Matthew Coughlin of the FBI; correct? |
| 10:51 | 25 | A.   I believe there's other -- there were other agents -- |

| | | |
|---|---|---|
| 10:51 | 1 | Q.    Well, they -- |
| 10:51 | 2 | A.    -- uh, Austin Casey and another individual.  I forgot |
| | 3 | their name. |
| 10:51 | 4 | Q.    But Matt -- but Agents Cho and Coughlin of the FBI were |
| | 5 | two of the agents who were present; correct? |
| 10:51 | 6 | A.    I knew another agent named Chris.  I must've been |
| | 7 | mistaken. |
| 10:52 | 8 | Q.    Chris Gicking? |
| 10:52 | 9 | A.    Yes. |
| 10:52 | 10 | Q.    Also with the FBI? |
| 10:52 | 11 | A.    I think so, yes. |
| 10:52 | 12 | Q.    Okay.  So my question is Andrew Cho and Matthew |
| | 13 | Coughlin, from the FBI, were present with you prior to your |
| | 14 | meeting at Robata Wasa restaurant; correct? |
| 10:52 | 15 | A.    Yes.  But not the only agents. |
| 10:52 | 16 | Q.    Okay.  Austin Casey being another agent; correct? |
| 10:52 | 17 | A.    Yes, and -- and many others, actually. |
| 10:52 | 18 | Q.    And you mentioned Chris Gicking of the FBI, as well; |
| | 19 | correct? |
| 10:52 | 20 | A.    Yes. |
| 10:52 | 21 | Q.    In fact, there were probably ten agents who monitored |
| | 22 | this meeting; correct? |
| 10:52 | 23 | MR. SCALLY:  Objection.  Relevance.  403. |
| 10:52 | 24 | THE COURT:  Overruled. |
| 10:52 | 25 | THE WITNESS:  Your Honor, can I answer that? |

| | | |
|---|---|---|
| 10:52 | 1 | THE COURT: You can answer, sir. |
| 10:52 | 2 | THE WITNESS: Yes. That sounds about right, I |
| | 3 | think. |
| 10:52 | 4 | MR. WILKE: Okay. |
| 10:52 | 5 | BY MR. WILKE: |
| 10:52 | 6 | Q. And you were equipped with a digital recording device, |
| | 7 | including a live transmitter for this meeting; correct? |
| 10:53 | 8 | A. Uh, yes. |
| 10:53 | 9 | Q. And that digital recording device was supplied by the |
| | 10 | FBI; correct? |
| 10:53 | 11 | A. That's correct -- or the Coast Guard. I -- I don't |
| | 12 | remember which agency. Again, it was a joint task. |
| 10:53 | 13 | Q. Would it refresh your memory to take a look at the |
| | 14 | report? |
| 10:53 | 15 | MR. SCALLY: Objection. |
| 10:53 | 16 | THE WITNESS: Uh, sure. |
| 10:53 | 17 | MR. WILKE: May I approach, Your Honor? |
| 10:53 | 18 | MR. SCALLY: Objection. Foundation. Relevance. |
| | 19 | 403. |
| 10:53 | 20 | THE COURT: Overruled. |
| 10:53 | 21 | MR. WILKE: May I approach, Your Honor? |
| 10:53 | 22 | THE COURT: You may. |
| 10:53 | 23 | *(Document shown to the witness.)* |
| 10:53 | 24 | BY MR. WILKE: |
| 10:53 | 25 | Q. Having reviewed that report, does that refresh your |

          1   memory about whether the FBI provided the digital recording

          2   device for this meeting?

10:53     3   A.   Uh, it said Austin's name on there too.  He's Coast

          4   Guard.

10:54     5   Q.   But it -- it does say that Austin was present prior to

          6   the meeting.

10:54     7   A.   Yes.

10:54     8   Q.   But it also says that the FBI supplied the digital

          9   transmitting device; correct?

10:54    10   A.   Again, that one, I don't know who supplied it.

10:54    11   Q.   Okay.

10:54    12   A.   I just used whatever they gave me.

10:54    13   Q.   Now, we spoke a little bit about the substance of this

         14   meeting prior to the break.  But I have a few more questions

         15   about that.

10:54    16       This guy, "Tony," you had only met once before;

         17   correct?

10:54    18   A.   That's correct.

10:54    19   Q.   And that was when Wayne brought him with him the week

         20   before on October 18th; correct?

10:54    21   A.   Right.  I kinda just saw him.  I didn't really meet

         22   him.

10:54    23   Q.   Okay.  And, uh -- but this guy, "Tony," had called you

         24   two or three times since that first meeting; correct?

10:55    25   A.   Texts mostly.  But, yes, he tried'a reach out to me.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

48

| | | |
|---|---|---|
| 10:55 | 1 | Q.   And he reached out to you saying he had information |
| | 2 | about your brother; correct? |
| 10:55 | 3 | A.   That is correct. |
| 10:55 | 4 | Q.   And this was after you had learned from the Coast Guard |
| | 5 | that your brother's body had been found; correct? |
| 10:55 | 6 | A.   Correct. |
| 10:55 | 7 | Q.   And, uh, that is what led to the FBI placing a |
| | 8 | monitoring device on you and you going in for this meeting; |
| | 9 | correct? |
| 10:55 | 10 | A.   Uh, I'm sorry. |
| 10:55 | 11 | Q.   Well, that was the purpose of the meeting:  To record |
| | 12 | what information Tony -- this guy, "Tony," claimed to have; |
| | 13 | correct? |
| 10:55 | 14 | A.   Yeah, I was -- I wanted to find my brother, so I wanted |
| | 15 | to meet with Tony, but the federal agents told me don't meet |
| | 16 | with him until they can make sure that I'm safe, so they |
| | 17 | were there for that reason also. |
| 10:56 | 18 | Q.   But the point you met with Tony, though, you knew your |
| | 19 | brother was deceased; correct? |
| 10:56 | 20 | A.   That is correct. |
| 10:56 | 21 | Q.   The information, though, that your brother was deceased |
| | 22 | was not public; correct? |
| 10:56 | 23 | A.   I don't think so -- unless someone leaked it out. |
| 10:56 | 24 | Q.   You were specifically told by the authorities not to |
| | 25 | disclose that information; correct? |

| | | |
|---|---|---|
| 10:56 | 1 | A.   That is correct. |
| 10:56 | 2 | Q.   Okay.  During that meeting with Tony on November 4, |
| | 3 | 2019, he wanted to sell you information; correct? |
| 10:56 | 4 | A.   That is correct. |
| 10:56 | 5 | Q.   And we talked about that earlier, and I won't -- I |
| | 6 | won't repeat that.  But clearly he was motivated to get |
| | 7 | money for himself; right? |
| 10:56 | 8 | MR. SCALLY:  Objection.  Foundation.  Calls for |
| | 9 | speculation. |
| 10:56 | 10 | THE COURT:  Overruled. |
| 10:56 | 11 | You can answer the question. |
| 10:56 | 12 | THE WITNESS:  Uh, he said he had information that |
| | 13 | my family -- maybe really important 'cause he knew I was |
| | 14 | looking for my brother, so he was trying to contact me |
| | 15 | during that time, yes. |
| 10:57 | 16 | BY MR. WILKE: |
| 10:57 | 17 | Q.   And then he tried to sell you that information; |
| | 18 | correct? |
| 10:57 | 19 | A.   Uh, I think so, yes. |
| 10:57 | 20 | Q.   He -- he wanted cash that day; correct? |
| 10:57 | 21 | MR. SCALLY:  Objection.  Asked and answered from |
| | 22 | before the break. |
| 10:57 | 23 | THE COURT:  Overruled. |
| 10:57 | 24 | THE WITNESS:  I believe so, yes. |
| | 25 | |

| | | |
|---|---|---|
| 10:57 | 1 | BY MR. WILKE: |
| 10:57 | 2 | Q.   And he wanted -- he offered to get a recorded |
| | 3 | confession from Wayne Le in exchange for $50,000; correct? |
| 10:57 | 4 | A.   I don't remember the amount'a money, but he said he had |
| | 5 | some kind of recording; that's correct. |
| 10:57 | 6 | Q.   He, in fact, told you he wanted to set up a marijuana |
| | 7 | grow business; correct? |
| 10:57 | 8 | A.   Yes, he, uh, mentioned that. |
| 10:58 | 9 | Q.   When he told you that, you said, quote, "I got you"; |
| | 10 | correct? |
| 10:58 | 11 | A.   Yes.  Whatever he needed. |
| 10:58 | 12 | Q.   Now, what he told you -- the information that he |
| | 13 | provided you at the November 4th meeting was information |
| | 14 | that he claimed Wayne Le had told him; correct? |
| 10:58 | 15 | A.   Uh, yes.  I -- I believe that and a recording. |
| 10:58 | 16 | Q.   And he did -- he did not tell you that he was present |
| | 17 | for the fishing trip, did he? |
| 10:58 | 18 | A.   Uh, no.  I don't think he was at the fishing trip. |
| 10:58 | 19 | Q.   What he told you was that Wayne Le had told him what |
| | 20 | had happened during the fishing trip; correct? |
| 10:58 | 21 | A.   Uh, during and after, yes. |
| 10:58 | 22 | Q.   Tony Hoang told you that Wayne Le had said that he and |
| | 23 | Shawn had gone down to the marina; correct? |
| 10:59 | 24 | MR. SCALLY:  Objection.  Hearsay. |
| 10:59 | 25 | MR. WILKE:  Not offered for its truth, Your Honor. |

10:59    1              THE COURT:  This is not for the truth of the

         2    matter asserted, Counsel?

10:59    3              MR. WILKE:  It's not offered for its truth,

         4    Your Honor.

10:59    5              THE COURT:  All right.

10:59    6              So, ladies and gentlemen, I know you've had some

         7    inquiries about what that ruling means, and we'll explain

         8    that in the jury instructions to you; but this portion is

         9    not offered for the truth of the matter asserted.

10:59   10              And, Counsel, what is it offered for, so the jury

        11    understands?  State of mind?

10:59   12              MR. WILKE:  It's offered for this witness's state

        13    of mind, Your Honor.

10:59   14              THE COURT:  State of mind.

10:59   15              All right.  Thank you.

10:59   16    BY MR. WILKE:

10:59   17    Q.   Tony Hoang told you that Wayne Le had said that he and

        18    Shawn -- this person, Shawn, had gone down to the marina;

        19    correct?

10:59   20    A.   Uh, are you talking about a conversation at the meeting

        21    or previous to the meeting?

11:00   22    Q.   I'm talking your conversation with Tony Hoang on

        23    November 4, 2019, that was monitored and recorded by the

        24    FBI.

11:00   25    A.   Okay.  And so can you repeat the question, please?

11:00    1    Q.   Yes.  During this meeting, Tony Hoang told you that
         2    Wayne Le had said that this guy, Shawn, had been with him
         3    that night; correct?
11:00    4    A.   I don't recall if he said Shawn's with him.  I just
         5    recall him saying he had information that Wayne did
         6    something to my brother.
11:00    7    Q.   Okay.  But at the meeting he told you what that
         8    information was; correct?
11:00    9    A.   Uh, briefly.  He "keeped" hiding that -- this
        10    recording.  He did not wanna produce it until we offered him
        11    some kinda monetary value.
11:00   12    Q.   And in order to get you to give him money, he told you
        13    what Wayne had told him; correct?
11:00   14    A.   Uh, he was being, what you call, kinda shady.  He did
        15    not wanna give me the details.  He just said that he knows
        16    my brother's missing and I'm not gonna find 'em.
11:01   17    Q.   Okay.  And you kept pushing him for some details,
        18    though; correct?
11:01   19    A.   Absolutely.
11:01   20    Q.   Yes.  And he did give you some details; correct?
11:01   21    A.   No.  He -- again, he was trying to be shady.  He wanted
        22    me to offer some type of money or help --
11:01   23    Q.   Okay.
11:01   24    A.   -- for him to give me further details.
11:01   25    Q.   Okay.  Didn't he, in fact, tell you that Shawn was also

|        |    |                                                               |
|--------|----|---------------------------------------------------------------|
|        | 1  | involved?                                                     |
| 11:01  | 2  | A.   I don't recall that.  I'm sorry.                         |
| 11:01  | 3  | Q.   Would it refresh your memory -- take a look at the       |
|        | 4  | transcript of that meeting?                                   |
| 11:01  | 5  | A.   Yes.  If you have that transcript.                       |
| 11:01  | 6  |           MR. SCALLY:  I'munna lodge another objection,       |
|        | 7  | Your Honor, based on relevance.  I don't -- state of mind     |
|        | 8  | doesn't seem relevant.                                        |
| 11:02  | 9  |           THE COURT:  Counsel, on relevance grounds?          |
| 11:02  | 10 |           MR. WILKE:  Your Honor, it goes to not only this    |
|        | 11 | witness's state of mind, but it also goes to demonstratively  |
|        | 12 | false statements made by -- purportedly made by the          |
|        | 13 | defendant.  There's been testimony about these statements,   |
|        | 14 | and I'm seeking to elicit testimony about the statements --   |
| 11:02  | 15 |           THE COURT:  But this isn't being offered for the    |
|        | 16 | truth?  That's --                                             |
| 11:02  | 17 |           MR. WILKE:  It is not being offered for the truth.  |
|        | 18 | In fact, these are demonstratively false statements.         |
| 11:02  | 19 |           THE COURT:  But for the jury to weigh that, they'd  |
|        | 20 | have to be offered for the truth, wouldn't they Counsel?     |
| 11:02  | 21 |           MR. WILKE:  No.  Just that the statements were      |
|        | 22 | said, Your Honor.                                             |
| 11:02  | 23 |           THE COURT:  Counsel?                                |
| 11:02  | 24 |           MR. SCALLY:  This is not the right witness,         |
|        | 25 | Your Honor.                                                   |

| | | |
|---|---|---|
| 11:02 | 1 | THE COURT:  Sustained. |
| 11:02 | 2 | BY MR. WILKE: |
| 11:03 | 3 | Q.   Sir, you've testified that you -- that Mr. Hoang did |
| | 4 | not provide you with any details about Wayne Le's |
| | 5 | statements; is that your testimony? |
| 11:03 | 6 | A.   No.  I said he was trying to hide the details.  He only |
| | 7 | told me that I would never find my brother again. |
| 11:03 | 8 | Q.   Okay.  But then during the meeting he actually did |
| | 9 | provide you with some details, didn't he? |
| 11:03 | 10 | A.   Very little, yes. |
| 11:03 | 11 | Q.   One of those details was this person Shawn had been |
| | 12 | present; correct? |
| 11:03 | 13 | MR. SCALLY:  Same objection, Your Honor. |
| 11:03 | 14 | THE COURT:  Sustained. |
| 11:03 | 15 | BY MR. WILKE: |
| 11:03 | 16 | Q.   He told you -- uh, Tony Hoang told you that, uh, he was |
| | 17 | told by Wayne that this happened over a 30- to $40,000 debt; |
| | 18 | correct? |
| 11:03 | 19 | MR. SCALLY:  Same objection, Your Honor. |
| 11:03 | 20 | THE COURT:  Sustained. |
| 11:04 | 21 | BY MR. WILKE: |
| 11:04 | 22 | Q.   And Tony Hoang told you that Wayne Le had said that he |
| | 23 | had shot your brother, tied 'em up, put weights on his |
| | 24 | ankles, and let 'em sink into the ocean -- |
| 11:04 | 25 | MR. SCALLY:  Same -- |

| | | |
|---|---|---|
| 11:04 | 1 | BY MR. WILKE: |
| 11:04 | 2 | Q.   -- right? |
| 11:04 | 3 | MR. SCALLY:  Same objection, Your Honor. |
| 11:04 | 4 | THE COURT:  Well, Counsel, we've had Tony Hoang |
| | 5 | testify; correct? |
| 11:04 | 6 | MR. WILKE:  We did. |
| 11:04 | 7 | THE COURT:  We had Mr. Le testify; correct? |
| 11:04 | 8 | MR. WILKE:  We did. |
| 11:04 | 9 | THE COURT:  And -- |
| 11:04 | 10 | MR. WILKE:  (Inaudible.) |
| 11:04 | 11 | *(Court reporter requests counsel use microphone to* |
| | 12 | *be heard for the record.)* |
| 11:04 | 13 | THE COURT:  We've had Tony Hoang testify. |
| 11:04 | 14 | MR. WILKE:  Yes.  This would corroborate |
| | 15 | Tony Hoang's testimony on this point, Your Honor. |
| 11:04 | 16 | THE COURT:  Just a moment. |
| 11:05 | 17 | And, Counsel, your objection is hearsay? |
| 11:05 | 18 | MR. SCALLY:  Yes.  It's -- apparently, based on |
| | 19 | that argument, it's a prior consistent statement.  But |
| | 20 | there's no -- the requirements for a prior consistent |
| | 21 | statement are not met here. |
| 11:05 | 22 | THE COURT:  I'm going to overrule that objection, |
| | 23 | Counsel. |
| 11:05 | 24 | You can ask the question. |
| 11:05 | 25 | MR. WILKE:  Thank you, Your Honor. |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

56

| | | |
|---|---|---|
| 11:05 | 1 | BY MR. WILKE: |
| 11:05 | 2 | Q.   Tony Hoang told you that Wayne Le had said that he had |
| | 3 | shot your brother, tied 'em up, put weights on his ankles, |
| | 4 | and let him sink in the ocean, didn't he? |
| 11:05 | 5 | A.   Uh, I don't remember when he said those details.  It |
| | 6 | coulda been the second meeting.  Um, but there is part -- |
| | 7 | conversation that he started giving us details later. |
| 11:05 | 8 | Q.   In fact, (inaudible) -- |
| 11:05 | 9 | *(Court reporter requests counsel use microphone to* |
| | 10 | *be heard for the record.)* |
| 11:05 | 11 | THE COURT:  Counsel, we can't hear you. |
| 11:05 | 12 | BY MR. WILKE: |
| 11:05 | 13 | Q.   Isn't it in fact true that he told you this at the |
| | 14 | first meeting on November 4? |
| 11:06 | 15 | A.   Again, I don't recall.  At the time I was very, um -- |
| | 16 | and it was not a good state of mind, knowing my brother |
| | 17 | would not be found again. |
| 11:06 | 18 | Q.   Well, you knew that before this meeting; correct? |
| 11:06 | 19 | A.   This added to it. |
| 11:06 | 20 | Q.   Okay.  You knew that they had found your brother's |
| | 21 | body; correct? |
| 11:06 | 22 | MR. SCALLY:  Objection.  Asked and answered. |
| 11:06 | 23 | THE COURT:  Sustained. |
| 11:06 | 24 | BY MR. WILKE: |
| 11:06 | 25 | Q.   Would it refresh your memory to take a look at the |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | transcript from the November 4, 2019 meeting with Tony       |
|       | 2  | Hoang?                                                        |
| 11:06 | 3  | MR. SCALLY:  Objection.  Relevance.                          |
| 11:06 | 4  | THE COURT:  You can refresh his recollection,                |
|       | 5  | Counsel, concerning the date and when this was said.         |
| 11:06 | 6  | MR. WILKE:  May I approach?                                   |
| 11:06 | 7  | THE COURT:  You may.                                         |
| 11:07 | 8  | BY MR. WILKE:                                                 |
| 11:07 | 9  | Q.   Having looked at that, does that refresh your memory   |
|       | 10 | about what Tony Hoang told you at the meeting?               |
| 11:07 | 11 | A.   Yes, that could be.                                     |
| 11:07 | 12 | Q.   And he, in fact, told you that Wayne Le had said that  |
|       | 13 | he shot your brother, tied 'em up, put a weight on his       |
|       | 14 | ankle, and let 'em sink out in the ocean?                    |
| 11:07 | 15 | A.   Yes.  That's possible.                                  |
| 11:07 | 16 | Q.   Well, that's what he told you; correct?                |
| 11:07 | 17 | A.   Yes.  Uh, again, I do not recall the exact words, if   |
|       | 18 | that's what they're saying.                                  |
| 11:08 | 19 | Q.   Now -- and he told you that Wayne Le said that this    |
|       | 20 | occurred over a debt; correct?                               |
| 11:08 | 21 | A.   Uh, I'm sorry.  A "death"?                              |
| 11:08 | 22 | Q.   Tony Hoang told you that Wayne Le had said that he had |
|       | 23 | shot your brother, tied 'em up, threw 'em overboard over a   |
|       | 24 | debt; correct?                                               |
| 11:08 | 25 | A.   I believe that and to prove a point.                   |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

58

| | | |
|---|---|---|
| 11:08 | 1 | Q.   Well, what he, in fact, said is that he understood that |
| | 2 | James owed Wayne 30- to $40,000; correct? |
| 11:09 | 3 | A.   Uh, I think that coulda been correct, yes. |
| 11:09 | 4 | Q.   And when he -- when Tony Hoang told you what Wayne Le |
| | 5 | had said, that didn't make any sense to you, did it? |
| 11:09 | 6 | A.   Which part? |
| 11:09 | 7 | Q.   The part about shooting him, tying him up, and throwing |
| | 8 | him overboard over a debt; correct? |
| 11:09 | 9 | A.   At that point my mind was spinning, yes. |
| 11:09 | 10 | Q.   And that didn't make any sense to you, did it? |
| 11:10 | 11 | A.   The sense about the debt or the sense that he kill -- |
| | 12 | Wayne killed my brother? |
| 11:10 | 13 | Q.   Over a debt, yes.  That made no sense to you; correct? |
| 11:10 | 14 | A.   I didn't know what to make sense of at that time, |
| | 15 | Attorney Wilke. |
| 11:10 | 16 | Q.   Well, didn't you, in fact, tell Tony Hoang at that |
| | 17 | meeting after he told you what Wayne Le had said, quote, |
| | 18 | "that story doesn't make any sense," unquote? |
| 11:10 | 19 | A.   I don't know or recall if I said those exact words. |
| 11:10 | 20 | Q.   Would it refresh your memory to take a look at the |
| | 21 | transcript of that meeting? |
| 11:10 | 22 | A.   Sure. |
| 11:10 | 23 | MR. WILKE:  May I approach, Your Honor? |
| 11:10 | 24 | THE COURT:  You may. |
| 11:10 | 25 | *(Document shown to the witness.)* |

11:11   1              THE WITNESS:  So I'm responding to him --

11:11   2              MR. WILKE:  Just read the document to yourself.

3   And then I'll ask you the next question.  Let me know when

4   you're done.

11:11   5              THE WITNESS:  Okay.

11:11   6   BY MR. WILKE:

11:11   7   Q.   Having read this portion of the transcript, does that

8   refresh your memory about whether you told Tony Hoang, after

9   he told you what Wayne Le said, quote, "that story doesn't

10   make any sense"?

11:11  11   A.   Not the entire story.  I was responding to the sentence

12   where he said, "Shawn hid the gun" and "Wayne were

13   involved."  I said that did not make sense.

11:11  14        So you can read the sentence right before that to

15   clarify for the jurors, if you'd like.

11:11  16   Q.   Okay.  Didn't you, in fact, tell Tony Hoang, after he

17   told you the story that Wayne Le had said, that that story

18   doesn't make any sense?

11:11  19              MR. SCALLY:  Objection.  Relevance.

11:11  20              THE COURT:  Overruled.

11:12  21              THE WITNESS:  Again, I was responding to the

22   details --

11:12  23   BY MR. WILKE:

11:12  24   Q.   "Yes" or "no" question, sir.  Did you make that

25   statement to Tony Hoang?

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

60

| | | |
|---|---|---|
| 11:12 | 1 | A.   After various statements, yes -- by "Tony," yes. |
| 11:12 | 2 | Q.   In one of those statements you questioned, quote, "How |
| | 3 | is he going to collect from my brother in the ocean?"; |
| | 4 | correct? |
| 11:12 | 5 |          MR. SCALLY:  Objection. |
| 11:12 | 6 | BY MR. WILKE: |
| 11:12 | 7 | Q.   You said that? |
| 11:12 | 8 |          MR. SCALLY:  Objection.  Relevance. |
| 11:12 | 9 |          THE COURT:  Overruled. |
| 11:12 | 10 |          THE WITNESS:  Uh, possibly, yes. |
| 11:12 | 11 | BY MR. WILKE: |
| 11:12 | 12 | Q.   You, in fact, did say that, sir.  Do you need to look |
| | 13 | at the transcript again? |
| 11:12 | 14 | A.   No.  If you're reading it, then that sounds to be |
| | 15 | accurate.  I said a lotta things at that meeting. |
| 11:12 | 16 | Q.   Well -- |
| 11:12 | 17 | A.   My brother just got murdered, Mr. Wilke. |
| 11:12 | 18 | Q.   No, you -- you knew your brother's body had been found. |
| 11:12 | 19 | A.   That sentence says my -- |
| 11:12 | 20 | Q.   Sir, you -- |
| 11:12 | 21 |     *(Simultaneous.)* |
| 11:12 | 22 |     *(Court reporter requests clarification for the* |
| | 23 |     *record.)* |
| 11:12 | 24 |          THE COURT:  Mr. Wilke, wait for the answer. |
| | 25 | |

| | | |
|---|---|---|
| 11:12 | 1 | BY MR. WILKE: |
| 11:12 | 2 | Q.   Sir, you have no knowledge whether your brother was |
| | 3 | murdered, do you? |
| 11:12 | 4 | MR. SCALLY:  Objection.  Calls for a legal |
| | 5 | conclusion. |
| 11:12 | 6 | THE COURT:  Overruled. |
| 11:12 | 7 | THE WITNESS:  You just gave me the statement right |
| | 8 | there; right? |
| 11:12 | 9 | BY MR. WILKE: |
| 11:12 | 10 | Q.   Sir -- |
| 11:12 | 11 | A.   And it said he murdered my brother; right? |
| 11:13 | 12 | Q.   Sir, all you know is what Tony Hoang told you; correct? |
| 11:13 | 13 | A.   Exactly. |
| 11:13 | 14 | Q.   That's all you know; correct? |
| 11:13 | 15 | A.   That's a murder; correct? |
| 11:13 | 16 | Q.   You -- you -- |
| 11:13 | 17 | THE COURT:  Mr. Wilke, just a moment.  You're |
| | 18 | moving too quickly on the answer, so we're not getting the |
| | 19 | answer on the realtime. |
| 11:13 | 20 | MR. WILKE:  Okay. |
| 11:13 | 21 | THE COURT:  So the question was, "Sir, all you |
| | 22 | know" -- |
| 11:13 | 23 | MR. WILKE:  -- is what -- |
| 11:13 | 24 | THE COURT:  No, Counsel. |
| 11:13 | 25 | "-- is what Tony Hoang told you; correct?" |

| | | |
|---|---|---|
| 11:13 | 1 | ANSWER:  "Exactly." |
| 11:13 | 2 | THE WITNESS:  Yes. |
| 11:13 | 3 | THE COURT:  QUESTION:  That's -- oh, I'm reading |
| | 4 | back. |
| 11:13 | 5 | THE WITNESS:  I'm sorry, Your Honor. |
| 11:13 | 6 | THE COURT:  That's up to -- that's what we have in |
| | 7 | the transcript. |
| 11:13 | 8 | MR. WILKE:  Strike that last question. |
| 11:13 | 9 | THE COURT:  No, no.  We're not going to.  In other |
| | 10 | words, that's the transcript.  You need to slow down and let |
| | 11 | the witness finish the answer, please. |
| 11:13 | 12 | And reask your question. |
| 11:13 | 13 | MR. WILKE:  Okay. |
| 11:13 | 14 | BY MR. WILKE: |
| 11:13 | 15 | Q.   Sir, all you know is what Tony Hoang told you; correct? |
| 11:13 | 16 | A.   Yes, that my brother was murdered. |
| 11:13 | 17 | Q.   And all Tony Hoang knows is what Wayne Le told him; |
| | 18 | correct? |
| 11:14 | 19 | MR. SCALLY:  Objection.  Foundation. |
| 11:14 | 20 | THE COURT:  I'm going to sustain that. |
| 11:14 | 21 | MR. WILKE:  Okay. |
| 11:14 | 22 | BY MR. WILKE: |
| 11:15 | 23 | Q.   You've known your brother his whole life; correct? |
| 11:15 | 24 | A.   That is correct. |
| 11:15 | 25 | Q.   You knew him to be stubborn; correct? |

| | | |
|---|---|---|
| 11:15 | 1 | A.   That's one of his traits; yes. |
| 11:15 | 2 | Q.   You knew him to be hot-tempered; correct? |
| 11:15 | 3 | MR. SCALLY:  Objection.  404(a). |
| 11:15 | 4 | THE COURT:  Sustained. |
| 11:15 | 5 | BY MR. WILKE: |
| 11:15 | 6 | Q.   Your brother had borrowed money from you in the past; |
| | 7 | correct? |
| 11:15 | 8 | A.   That is correct. |
| 11:15 | 9 | MR. WILKE:  Your Honor, may I be heard on that |
| | 10 | prior objection that was sustained? |
| 11:16 | 11 | THE COURT:  You may, Counsel. |
| 11:16 | 12 | Just a moment.  We'll see you at sidebar for one |
| | 13 | moment, Counsel. |
| 11:16 | 14 | Excuse us for one moment, ladies and gentlemen. |
| 11:16 | 15 | *(Pause in the proceedings at 11:16 a.m.)* |
| 11:16 | 16 | *(Outside the presence of the jury.)* |
| 11:16 | 17 | *(Sidebar proceedings reported as follows:)* |
| 11:16 | 18 | THE COURT:  We're at sidebar. |
| 11:16 | 19 | Last question was hot-tempered. |
| 11:16 | 20 | MR. WILKE:  "You knew him to be hot-tempered." |
| 11:16 | 21 | THE COURT:  You've got to slow down.  I've said |
| | 22 | that on the record time and time again.  We're not getting |
| | 23 | an accurate question. |
| 11:16 | 24 | MR. WILKE:  The question "You knew your brother to |
| | 25 | be hot-tempered" -- government only raised objection under |

| | |
|---|---|
| 1 | Rule 404(a).  Court sustained.  It is not offered to |
| 2 | corroborate the defendant's testimony about his knowledge of |
| 3 | James hot-temperedness.  He's testified to that both the |
| 4 | prior incident where James sucker-punched him in the car and |
| 5 | then the incident on the boat.  It corroborates that |
| 6 | testimony and is not offered as characteristic evidence. |
| 11:17  7 | THE COURT:  All right.  I sustained it because I |
| 8 | believed it went to character. |
| 11:17  9 | Counsel. |
| 11:17  10 | MR. SCALLY:  It does. |
| 11:17  11 | THE COURT:  I'm going to reverse that ruling. |
| 12 | It's an incorrect ruling by the Court.  You may ask the |
| 13 | question. |
| 11:17  14 | MR. WILKE:  Thank you. |
| 11:17  15 | MR. SCALLY:  Your Honor, I'd ask for a limiting |
| 16 | instruction, then. |
| 11:17  17 | THE COURT:  Absolutely.  What would you like me to |
| 18 | say limiting, Counsel?  Because by this time the jury is |
| 19 | going to have difficulty sorting out. |
| 11:17  20 | MR. STAPLES:  Your Honor, I know you've made your |
| 21 | decision.  I don't see how that is relevant, what this |
| 22 | witness believed. |
| 11:18  23 | THE COURT:  I'm sorry? |
| 11:18  24 | MR. STAPLES:  If this witness believed his brother |
| 25 | was hot-tempered or not has nothing to do with what his |

|           |    |                                                                      |
|-----------|----|----------------------------------------------------------------------|
|           | 1  | client believed.                                                     |
| 11:18     | 2  | MR. WILKE:  So --                                                    |
| 11:18     | 3  | THE COURT:  Just a moment.                                           |
| 11:18     | 4  | MR. STAPLES:  To ask him that question is plainly                    |
|           | 5  | irrelevant.                                                          |
| 11:18     | 6  | THE COURT:  'cause it only goes to character.                        |
| 11:18     | 7  | MR. STAPLES:  Also it doesn't explain what his                       |
|           | 8  | client knew.  The issue is what does his client know about           |
|           | 9  | James Dao.  And what his brother thought is irrelevant.              |
| 11:18     | 10 | MR. WILKE:  It -- it corroborates --                                 |
| 11:18     | 11 | THE COURT:  In other words -- let me repeat that                     |
|           | 12 | back to you, because then it would only go to character,             |
|           | 13 | which would be improper.                                             |
| 11:18     | 14 | MR. STAPLES:  Yes.                                                    |
| 11:18     | 15 | THE COURT:  And it's really the defendant's state                    |
|           | 16 | of mind that we're interested in.                                    |
| 11:18     | 17 | MR. STAPLES:  It's the only thing that matters,                      |
|           | 18 | not this witness's state of mind.                                    |
| 11:18     | 19 | MR. WILKE:  It -- it --                                               |
| 11:18     | 20 | THE COURT:  Well, I hate to waffle on that,                          |
|           | 21 | Mr. Wilke.  Let me hear from you again on that.  It does             |
|           | 22 | seem to strike at character.                                         |
| 11:18     | 23 | MR. WILKE:  Had the defendant not testified as to                    |
|           | 24 | his knowledge of the victim's hot-temperedness, I would              |
|           | 25 | agree with the defendant [sic], but the defendant -- he              |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | testified about the incident on the boat where the victim    |
|       | 2  | was -- assaulted him after feeling disrespected.             |
| 11:19 | 3  | THE COURT:  Now, just a moment.  You haven't been            |
|       | 4  | limited concerning that.                                     |
| 11:19 | 5  | MR. WILKE:  Okay.                                            |
| 11:19 | 6  | THE COURT:  You haven't been limited concerning             |
|       | 7  | the incident in the car --                                   |
| 11:19 | 8  | MR. WILKE:  In the car.                                      |
| 11:19 | 9  | THE COURT:  -- and the sucker-punching.                     |
| 11:19 | 10 | MR. WILKE:  Thank you.                                       |
| 11:19 | 11 | THE COURT:  But how does this witness's opinion             |
|       | 12 | about the hot-temperedness --                                |
| 11:19 | 13 | MR. WILKE:  Once Wayne.                                      |
| 11:19 | 14 | THE COURT:  -- go beyond character?                         |
| 11:19 | 15 | MR. WILKE:  Once the defendant here demonstrates            |
|       | 16 | that he has knowledge of the hot-temperedness, any evidence  |
|       | 17 | supporting that at this point is not just character          |
|       | 18 | evidence -- is corroborative of the defendant's testimony.   |
| 11:19 | 19 | MR. STAPLES:  It -- but it's only for character.            |
| 11:19 | 20 | THE COURT:  Yeah, I -- I hate to waffle on this,            |
|       | 21 | but it does seem to simply strike at --                      |
| 11:20 | 22 | MR. WILKE:  Character.                                       |
| 11:20 | 23 | THE COURT:  -- character.  I'm going to hold to             |
|       | 24 | the ruling.  I apologize on the record for going back and    |
|       | 25 | forth between the two of you.  But that's final.  Thank you. |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | It's sustained.                                             |
| 11:20 | 2  | And you have -- Mr. Wilke, you have the                    |
|       | 3  | hot-temperedness, in terms of the actions by the parties in |
|       | 4  | terms of the sucker punches, *et cetera*.                   |
| 11:20 | 5  | *(Sidebar proceedings concluded.)*                          |
| 11:20 | 6  | *(In open court.)*                                          |
| 11:20 | 7  | *(In the presence of the jury.)*                            |
| 11:20 | 8  | THE COURT:  Thank you.  Counsel, please.           |
| 11:20 | 9  | MR. WILKE:  Thank you, Your Honor.                 |
| 11:21 | 10 | BY MR. WILKE:                                               |
| 11:21 | 11 | Q.   Mr. Dao, your brother had borrowed money from you in  |
|       | 12 | the past; correct?                                          |
| 11:21 | 13 | A.   Yes.  What brother hasn't?                            |
| 11:20 | 14 | Q.   And he had never paid you back for that money; correct? |
| 11:21 | 15 | A.   No.  He did on some occasions.                        |
| 11:21 | 16 | Q.   But on some occasions, he didn't; correct?           |
| 11:21 | 17 | A.   That is correct.                                      |
| 11:21 | 18 | Q.   Your brother had hurt your sister with a bad deal;    |
|       | 19 | correct?                                                    |
| 11:21 | 20 | MR. SCALLY:  Objection.  Relevance.                |
| 11:21 | 21 | THE COURT:  Sustained.                             |
| 11:21 | 22 | BY MR. WILKE:                                               |
| 11:21 | 23 | Q.   Your other siblings essentially didn't want anything to |
|       | 24 | do with your brother; correct?                             |
| 11:21 | 25 | MR. SCALLY:  Objection.  Relevance.                |

11:21   1              THE COURT:  Sustained.

11:21   2              MR. WILKE:  Okay.

11:21   3    BY MR. WILKE:

11:21   4    Q.   Sir, you knew that your brother usually carried a

        5    firearm; correct?

11:21   6    A.   Uh, not "usually."  Potentially, yes.  He used to work

        7    for the government so I would imagine he wanted to protect

        8    himself.

11:22   9    Q.   Sir, is it in fact true that you told Tony Dao [sic] on

       10    October 4, 2019, quote, "My brother usually carries.  I

       11    mean, how the F did he get caught offguard like that?"

11:22  12    A.   That is potential, yes.

11:22  13    Q.   You, in fact, said that to Mr. Dao [sic]; correct? --

       14    to Mr. Hoang; correct?

11:22  15    A.   Sorry.  Who?

11:22  16         (Simultaneous speaking.)

11:22  17         (Court reporter requests clarification for the

       18         record)

11:22  19              THE COURT:  Yes.  You don't have a transcript.  I

       20    can read that back to you, but you'll need to reask the

       21    question, because there's a speak-over for the record and

       22    the court reporter cannot take an accurate transcript.

11:22  23              MR. WILKE:  Thank you, Your Honor.

11:22  24    BY MR. WILKE:

11:22  25    Q.   On the November 4, 2019, meeting with Tony Hoang,

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | didn't you, in fact, say, quote, "my brother usually carries       |
|       | 2  | too, though.  I mean, how the F did he get caught offguard          |
|       | 3  | like that?"                                                         |
| 11:23 | 4  | A.  Yes, that sounds accurate.                                      |
| 11:23 | 5  |       MR. WILKE:  No further questions, Your Honor.                 |
| 11:23 | 6  |       THE COURT:  And this would then be                           |
|       | 7  | cross-examination.                                                 |
| 11:23 | 8  |                     **CROSS-EXAMINATION**                           |
| 11:23 | 9  | BY MR. SCALLY:                                                      |
| 11:23 | 10 | Q.  Just picking up right there, Mr. Dao.                           |
| 11:23 | 11 | A.  Yes, sir.                                                       |
| 11:23 | 12 | Q.  The questions you were just asked about your brother           |
|       | 13 | carrying a gun and what you said about that in October of          |
|       | 14 | 20- -- or November of 2019 -- at the time of your brother's        |
|       | 15 | death you hadn't been in touch with your brother for a long        |
|       | 16 | time; correct?                                                     |
| 11:23 | 17 | A.  Many years.  That is correct.                                  |
| 11:23 | 18 | Q.  So you had no idea whether he was -- he often carried a        |
|       | 19 | gun in October of 2019; isn't that correct?                        |
| 11:23 | 20 | A.  That is correct.  I actually was trying to get context         |
|       | 21 | for the federal agents, listening on the phone -- on the           |
|       | 22 | conversation.                                                      |
| 11:23 | 23 | Q.  Now, you were also asked about payments that you               |
|       | 24 | received from the FBI back in 2009.  Do you recall those           |
|       | 25 | questions?                                                          |

| | | |
|---|---|---|
| 11:24 | 1 | A.   Yes, I do. |
| 11:24 | 2 | Q.   Those -- those had nothing to do with this case; |
| | 3 | correct? |
| 11:24 | 4 | A.   No.  Entirely different case. |
| 11:24 | 5 | Q.   And you weren't paid anything in connection with this |
| | 6 | case; correct? |
| 11:24 | 7 | A.   Not a dollar. |
| 11:24 | 8 | Q.   You were asked about continued contact with the FBI |
| | 9 | after your initial contacts with Tony in this case. |
| 11:24 | 10 | Do you remember those questions? |
| 11:24 | 11 | A.   Uh, yes. |
| 11:24 | 12 | Q.   And you were asked about being present for a meeting |
| | 13 | with Natalie Nguyen on December 9, 2019. |
| 11:24 | 14 | Do you recall that question? |
| 11:24 | 15 | A.   Uh, yes, I do. |
| 11:24 | 16 | Q.   At no point in this investigation did you interview |
| | 17 | Natalie Nguyen; correct? |
| 11:24 | 18 | A.   No.  I was not interviewing her. |
| 11:24 | 19 | Q.   And, uh, at no point were you working with the agents |
| | 20 | to ask her questions about the case; correct? |
| 11:24 | 21 | A.   No. At no time. |
| 11:24 | 22 | Q.   In fact, the reason that the two of you were together |
| | 23 | for that meeting was to discuss the release of your |
| | 24 | brother's body from the coroner's office to a mortuary of |
| | 25 | your family's choosing; isn't that right? |

11:25   1    A.   That is entirely correct.

11:25   2    Q.   In terms of additional contact with the FBI and law

3    enforcement in connection with this case, you were informed

4    by the FBI and my office that you have statutory rights as a

5    victim in this case; right?

11:25   6    A.   That is correct.

11:25   7    Q.   And you were (unreportable) --

11:25   8        *(Court reporter requests clarification for the*

9        *record.)*

11:25  10            MR. SCALLY:  Sure.

11:25  11    BY MR. SCALLY:

11:25  12    Q.   And you were informed by the FBI and my office that you

13    have statutory rights as a victim in this case; correct?

11:25  14    A.   That is correct.

11:25  15    Q.   And you were informed that you have a right to know

16    what's happening, as a surviving member of the family of

17    James Dao; correct?

11:25  18    A.   Yes, that is correct.

11:25  19    Q.   And so in other meetings that you had with law

20    enforcement in this case, after your initial meetings, they

21    were in your status as the family member of the person who

22    was killed, weren't they?

11:26  23    A.   100 percent correct.  Yes.

11:26  24            MR. SCALLY:  No further questions, Your Honor.

11:26  25            THE COURT:  And redirect.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

72

| | | |
|---|---|---|
| 11:26 | 1 | MR. WILKE:  I've no questions, Your Honor. |
| 11:26 | 2 | THE COURT:  All right. |
| 11:26 | 3 | May the witness be excused, Counsel? |
| 11:26 | 4 | MR. SCALLY:  On the government's behalf, yes, |
| | 5 | Your Honor. |
| 11:26 | 6 | MR. WILKE:  Yes, Your Honor. |
| 11:26 | 7 | THE COURT:  All right.  Mr. Dao, thank you. |
| | 8 | You're excused from these proceedings.  Take the mask with |
| | 9 | you and just destroy it. |
| 11:26 | 10 | THE WITNESS:  Thank you, Your Honor. |
| 11:26 | 11 | THE COURT:  Thank you very much.  If you'd take |
| | 12 | the mask with you. |
| 11:26 | 13 | THE WITNESS:  Okay. |
| 11:26 | 14 | *(Witness steps down.)* |
| 11:26 | 15 | THE COURT:  Counsel, if you'd like to call your |
| | 16 | next witness, please. |
| 11:26 | 17 | MR. WILKE:  Defense calls Andrew Cho, Your Honor. |
| 11:26 | 18 | THE COURT:  Thank you. |
| 11:27 | 19 | Thank you. |
| 11:27 | 20 | Sir, would you be kind enough to raise your right |
| | 21 | hand. |
| 11:27 | 22 | **ANDREW CHO, CALLED BY THE DEFENSE, SWORN** |
| 11:27 | 23 | THE WITNESS:  I swear. |
| 11:27 | 24 | THE COURT:  Thank you, sir.  If you'd be kind |
| | 25 | enough to walk along the side of the jury railing, walk |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

73

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | right to the wall.  If you would please be seated.     |
| 11:27 | 2  |         After you're seated, sir, would you face the jury |
|       | 3  | and would you state your full name, please.            |
| 11:27 | 4  |         THE WITNESS:  Andrew Cho.                       |
| 11:28 | 5  |         THE COURT:  Would you spell your last name.    |
| 11:28 | 6  |         THE WITNESS:  C-H-O.                            |
| 11:28 | 7  |         THE COURT:  Thank you.  This would be direct   |
|       | 8  | examination.                                           |
| 11:28 | 9  |         MR. STAPLES:  Your Honor, the witness needs a  |
|       | 10 | clear mask.                                            |
| 11:28 | 11 |         THE COURT:  I'm sorry.  Thank you very much.   |
| 11:28 | 12 |         Sir, the way you put that on -- it should be off |
|       | 13 | to your left.  And take the bottom string, put that over |
|       | 14 | your head, the black portion.  Then top string.  Okay? |
| 11:28 | 15 |     *(Witness changes to clear mask.)*                 |
| 11:28 | 16 |         THE COURT:  All right.  Thank you very much.   |
| 11:28 | 17 |         Now, sir, once again the spelling of your last |
|       | 18 | name, please.                                          |
| 11:28 | 19 |         THE WITNESS:  C-H-O.                            |
| 11:28 | 20 |         THE COURT:  Thank you.  Once again this would be |
|       | 21 | direct examination by the defense.                     |
| 11:28 | 22 |         MR. WILKE:  Thank you, Your Honor.             |
| 11:28 | 23 |               **DIRECT EXAMINATION**                   |
| 11:28 | 24 | BY MR. WILKE:                                          |
| 11:28 | 25 | Q.   Mr. Cho, what do you do for a living?             |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

74

| | | |
|---|---|---|
| 11:28 | 1 | A.    Okay.  I'm an FBI Special Agent, sir. |
| 11:28 | 2 | Q.    How long've you been doing that? |
| 11:28 | 3 | A.    Almost 20 years. |
| 11:28 | 4 | Q.    When did you start with the FBI? |
| 11:28 | 5 | THE COURT:  We're going to slow down again.  I'm |
| | 6 | going to strike the question. |
| 11:28 | 7 | Reask the question, please. |
| 11:29 | 8 | BY MR. WILKE: |
| 11:29 | 9 | Q.    When did you start with the FBI? |
| 11:29 | 10 | A.    Year of -- |
| 11:29 | 11 | Q.    I can't hear. |
| 11:29 | 12 | A.    Year of 2002. |
| 11:29 | 13 | Q.    Were you a case agent on the investigation in this |
| | 14 | case? |
| 11:29 | 15 | A.    Yes. |
| 11:29 | 16 | Q.    When did you become a case agent on the investigation |
| | 17 | in this case? |
| 11:29 | 18 | A.    Uh, late October of 2019. |
| 11:29 | 19 | Q.    Okay.  When did you first learn about this case? |
| 11:29 | 20 | A.    Approximately week or so before the official case was |
| | 21 | opened.  I think it was -- the FBI opened the case in |
| | 22 | October of 29 [sic]. |
| 11:29 | 23 | Q.    And who did you first hear about this case from? |
| 11:29 | 24 | A.    I received a call from the Coast Guard Investigative |
| | 25 | Service case agent down in San Diego. |

| | | |
|---|---|---|
| 11:29 | 1 | Q.   Okay.  Isn't it in fact true that the first you learned |
| | 2 | about this case was when you were called by Alex Dao? |
| 11:30 | 3 | MR. SCALLY:  Objection.  Leading. |
| 11:30 | 4 | THE COURT:  Reask the question, Counsel. |
| 11:30 | 5 | Sustained. |
| 11:30 | 6 | BY MR. WILKE: |
| 11:30 | 7 | Q.   It's your testimony, sir, that the first you learned |
| | 8 | about this case was from the United States Coast Guard? |
| 11:30 | 9 | A.   Uh, yes. |
| 11:30 | 10 | Q.   Didn't you, in fact, speak to Alex Dao prior to your |
| | 11 | involvement in the case? |
| 11:30 | 12 | MR. SCALLY:  Objection.  Leading. |
| 11:30 | 13 | THE COURT:  Overruled. |
| 11:30 | 14 | You can answer that question. |
| 11:30 | 15 | THE WITNESS:  I -- I can't remember if I did. |
| 11:30 | 16 | BY MR. WILKE: |
| 11:30 | 17 | Q.   Okay.  Well, sir, you had a prior relationship with |
| | 18 | Alex Dao; correct? |
| 11:30 | 19 | MR. SCALLY:  Objection.  Leading. |
| 11:30 | 20 | THE COURT:  Overruled. |
| 11:30 | 21 | THE WITNESS:  Are you...? |
| 11:30 | 22 | Yes. |
| 11:30 | 23 | BY MR. WILKE: |
| 11:30 | 24 | Q.   Okay.  And that relationship dated back to |
| | 25 | approximately February of 2007, when he began working as a |

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | confidential informant for the FBI; correct?             |
| 11:30  | 2  | A.   Yes.                                                 |
| 11:30  | 3  | Q.   You worked with Alex Dao for approximately three years? |
| 11:30  | 4  |       MR. SCALLY:  Objection.  Leading.                   |
| 11:30  | 5  |       THE COURT:  Overruled.                              |
| 11:31  | 6  |       THE WITNESS:  Uh, no.                               |
| 11:31  | 7  | BY MR. WILKE:                                             |
| 11:31  | 8  | Q.   Okay.  How long did you work with Alex Dao?          |
| 11:31  | 9  | A.   I was, uh -- it was about nine months, nine to       |
|        | 10 | ten months.                                              |
| 11:31  | 11 | Q.   Okay.  And, uh, did you -- you worked with Alex Dao on |
|        | 12 | more than one investigation; correct?                    |
| 11:31  | 13 | A.   I don't -- uh, no.  Just on that one investigation.  |
| 11:31  | 14 | Q.   So the only -- the one investigation that you recall |
|        | 15 | working with Alex Dao, was that the investigation of a   |
|        | 16 | person named Vu Tran?                                     |
| 11:31  | 17 | A.   Correct, yes.                                        |
| 11:31  | 18 | Q.   Mr. Tran was a former FBI agent; correct?           |
| 11:31  | 19 | A.   Yes, sir.                                            |
| 11:31  | 20 | Q.   And that investigation resulted in the prosecution of |
|        | 21 | Mr. Tran; correct?                                        |
| 11:31  | 22 | A.   Yes, sir.                                            |
| 11:31  | 23 | Q.   And, I believe, a 30-year sentence; correct?        |
| 11:32  | 24 |       MR. SCALLY:  Objection.  Relevance.                 |
| 11:32  | 25 |       THE COURT:  Sustained.                              |

| | | |
|---|---|---|
| 11:32 | 1 | BY MR. WILKE: |
| 11:32 | 2 | Q.   The, uh -- as a result of that investigation, you |
| | 3 | received an accommodation [sic]; correct? |
| 11:32 | 4 | MR. SCALLY:  Objection.  Relevance. |
| 11:32 | 5 | THE COURT:  Sustained. |
| 11:32 | 6 | MR. WILKE:  Your Honor, this goes to bias and the |
| | 7 | relationship with the witness. |
| 11:32 | 8 | THE COURT:  Counsel, sustained. |
| 11:32 | 9 | MR. WILKE:  Okay. |
| 11:32 | 10 | BY MR. WILKE: |
| 11:32 | 11 | Q.   As a result of that investigation you worked with Alex |
| | 12 | Dao, you received a financial bonus from the FBI; correct? |
| 11:32 | 13 | MR. SCALLY:  Objection.  Relevance. |
| 11:32 | 14 | MR. WILKE:  Goes -- |
| 11:32 | 15 | THE COURT:  Sustained. |
| 11:32 | 16 | MR. WILKE:  Goes to the nature of the |
| | 17 | relationship, Your Honor. |
| 11:32 | 18 | THE COURT:  Counsel, thank you.  Sustained. |
| 11:32 | 19 | BY MR. WILKE: |
| 11:32 | 20 | Q.   Now, at the time you became the case agent on this |
| | 21 | case, did you advise your superiors that you had a prior |
| | 22 | relationship with Alex Dao? |
| 11:33 | 23 | MR. SCALLY:  Objection.  Relevance. |
| 11:33 | 24 | THE COURT:  You can answer that question. |
| | 25 | Overruled. |

| | | |
|---|---|---|
| 11:33 | 1 | THE WITNESS:  Yes, they knew.  Yes. |
| 11:33 | 2 | BY MR. WILKE: |
| 11:33 | 3 | Q.   And it's your -- and who specifically did you advise |
| | 4 | that you had this prior relationship with Alex Dao? |
| 11:33 | 5 | MR. SCALLY:  Objection.  Relevance. |
| 11:33 | 6 | THE COURT:  Overruled. |
| 11:33 | 7 | THE WITNESS:  Direct supervisor. |
| 11:33 | 8 | BY MR. WILKE: |
| 11:33 | 9 | Q.   Which is who? |
| 11:33 | 10 | A.   He was, uh, acting, um -- acting at the time.  Um, |
| | 11 | Steve Wrathal.  And there was another -- the current |
| | 12 | supervisor named George Boykins. |
| 11:33 | 13 | Q.   Would you spell those names, please. |
| 11:33 | 14 | A.   Steve, S-T-E-V-E-N, Wrathal, W-R-A-T-H-A-L. |
| 11:33 | 15 | And George, G-E-O-R-G-E, Boykins, B-O-Y-K-I-N-S. |
| 11:33 | 16 | Q.   And when did you -- is your testimony that you advised |
| | 17 | supervisors Wrathal and Boykin [sic] about your prior |
| | 18 | relationship with Alex Dao? |
| 11:34 | 19 | A.   They actually knew before -- before that. |
| 11:34 | 20 | Q.   That's not my question. |
| 11:34 | 21 | Did -- is it your testimony that you advised them? |
| 11:34 | 22 | A.   Uh, yes. |
| 11:34 | 23 | Q.   And when did you advise supervisors Wrathal and Boykin |
| | 24 | about your prior relationship with Alex Dao? |
| 11:34 | 25 | MR. SCALLY:  Objection.  Relevance.  403. |

| | | |
|---|---|---|
| 11:34 | 1 | THE COURT:  No. |
| 11:34 | 2 | You can answer that question. |
| 11:34 | 3 | Overruled. |
| 11:34 | 4 | THE WITNESS:  It was shortly after the case, uh, |
| | 5 | was opened. |
| 11:34 | 6 | BY MR. WILKE: |
| 11:34 | 7 | Q.   So after you became the case agent on the case? |
| 11:34 | 8 | A.   No.  I did report -- there was a phone call -- can I |
| | 9 | explain? |
| 11:34 | 10 | Q.   I'm just trying to -- my question is, when did you |
| | 11 | advise your supervisor that you had a prior relationship |
| | 12 | with Alex Dao? |
| 11:34 | 13 | A.   It was prior to opening up the investigation in |
| | 14 | October -- late October of 2019. |
| 11:35 | 15 | Q.   Did you view your prior relationship with Alex Dao as |
| | 16 | any sort of conflict of interest in investigating the death |
| | 17 | of his brother? |
| 11:35 | 18 | A.   No. |
| 11:35 | 19 | Q.   You thought you could be fair; correct? |
| 11:35 | 20 | A.   Yes. |
| 11:35 | 21 | Q.   You thought you could look at this case objectively; |
| | 22 | correct? |
| 11:35 | 23 | A.   Yes. |
| 11:35 | 24 | MR. SCALLY:  Objection.  Leading. |
| 11:35 | 25 | THE COURT:  Overruled. |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

| | | |
|---|---|---|
| 11:35 | 1 | BY MR. WILKE: |
| 11:35 | 2 | Q.   You understand that an investigator needs to be |
| | 3 | objective; correct? |
| 11:35 | 4 | A.   Yes, sir. |
| 11:35 | 5 | Q.   And not jump to conclusions; correct? |
| 11:35 | 6 | A.   Yes, sir. |
| 11:35 | 7 | Q.   You understand that the crime of murder is a very |
| | 8 | serious crime; correct? |
| 11:35 | 9 | A.   Yes, sir. |
| 11:35 | 10 | Q.   You also understand that not every homicide is a |
| | 11 | murder, don't you? |
| 11:35 | 12 | A.   Yes. |
| 11:36 | 13 | Q.   Sir, by November 4, 2019, that's about the time you |
| | 14 | started your investigation; correct? |
| 11:36 | 15 | A.   Yes, sir. |
| 11:36 | 16 | Q.   That was the first meeting (inaudible) -- |
| 11:36 | 17 | THE COURT:  Counsel, if you'd go closer to the |
| | 18 | microphone.  We can't pick up your question. |
| 11:36 | 19 | BY MR. WILKE: |
| 11:36 | 20 | Q.   That was the first meeting between Alex Dao and |
| | 21 | Tony Hoang at the Robata Wasa restaurant; correct? |
| 11:36 | 22 | MR. SCALLY:  Objection.  Leading. |
| 11:36 | 23 | THE COURT:  Overruled. |
| 11:36 | 24 | THE WITNESS:  Yes. |
| | 25 | |

| 11:36 | 1 | BY MR. WILKE: |
| 11:36 | 2 | Q.   And by that time -- |
| 11:36 | 3 | A.   That I was involved in, yes. |
| 11:36 | 4 | Q.   Right. |
| 11:36 | 5 |      After the FBI had opened its investigation; correct? |
| 11:36 | 6 | A.   Yes, sir. |
| 11:36 | 7 | Q.   Okay.  And by November 4, 2019, you had already |
|       | 8 | determined in your mind that James Dao had been murdered? |
| 11:36 | 9 |           MR. SCALLY:  Objection. |
| 11:36 | 10 | BY MR. WILKE: |
| 11:36 | 11 | Q.   Hadn't you? |
| 11:36 | 12 |           MR. SCALLY:  Objection.  Relevance. |
| 11:37 | 13 |           THE COURT:  Overruled. |
| 11:37 | 14 |           THE WITNESS:  I had the opportunity to view the, |
|       | 15 | uh, photos of Mr. Dao when he was recovered.  I knew that -- |
| 11:37 | 16 | BY MR. WILKE: |
| 11:37 | 17 | Q.   Sir, my question is, by November 4, 2019, you had |
|       | 18 | already determined in your mind that James Dao had been |
|       | 19 | murdered; correct? |
| 11:37 | 20 | A.   I had suspicion based on the evidence that I observed. |
| 11:37 | 21 | Q.   Well, you -- in fact, in your report, beginning |
|       | 22 | November 4, 2019, you characterized this event as a murder, |
|       | 23 | didn't you? |
| 11:37 | 24 | A.   That's the title of the case, uh, that -- that, um, |
|       | 25 | that's assigned by the FBI, yes.  For that "45 Charlie" |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

82

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | classification, that's what it is.                           |
| 11:37 | 2  | Q.   Okay.  But you referred to these -- you -- you can       |
|       | 3  | investigate a murder; correct?                               |
| 11:37 | 4  | A.   You have --                                             |
| 11:37 | 5  | Q.   The FBI investigates --                                 |
| 11:37 | 6  |      (Simultaneous speaking.)                                |
| 11:38 | 7  |      (Court reporter requests clarification for the         |
|       | 8  |      record.)                                                |
| 11:38 | 9  |          THE COURT:  Counsel, just a moment.  Move closer    |
|       | 10 | to the microphone once again.  We can't hear the question.   |
| 11:38 | 11 | BY MR. WILKE:                                                |
| 11:38 | 12 | Q.   Sir, it's one thing to investigate whether a murder     |
|       | 13 | occurred; correct?                                          |
| 11:38 | 14 | A.   Yes.                                                    |
| 11:38 | 15 | Q.   And the FBI classified this as a murder investigation;  |
|       | 16 | correct?                                                     |
| 11:38 | 17 | A.   Yes.                                                    |
| 11:38 | 18 | Q.   Under the "45 Charlie" code, I believe is your          |
|       | 19 | terminology; correct?                                        |
| 11:38 | 20 | A.   I put a request -- I write a summary of opening -- um,  |
|       | 21 | an opening document that's approve -- ultimately approved by |
|       | 22 | the FBI.                                                     |
| 11:38 | 23 | Q.   To only a murder investigation?                         |
| 11:38 | 24 | A.   Yes.                                                    |
| 11:38 | 25 | Q.   The purpose of an investigation of a murder is to       |

|  |  |  |
|---|---|---|
|  | 1 | determine whether a murder occurred; correct? |
| 11:38 | 2 | A.   Yes. |
| 11:38 | 3 | Q.   Okay.  And on November 4, 2019, within days of opening |
|  | 4 | your file, you had determined that this was a murder; |
|  | 5 | correct? |
| 11:38 | 6 | A.   I had suspicions based on what I reserve -- uh, |
|  | 7 | observed, sir. |
| 11:39 | 8 | Q.   You reported in your reports that the meeting at the |
|  | 9 | Robata Wasa restaurant was in order for Tony to provide |
|  | 10 | information about Dao's brother's murder; correct? |
| 11:39 | 11 | A.   If that's what's written on the report, yes, sir. |
| 11:39 | 12 | Q.   Fair to say that you had a fairly substantial role in |
|  | 13 | this investigation, sir? |
| 11:39 | 14 | A.   I was -- yes. |
| 11:39 | 15 | Q.   In addition to -- you monitored the meeting between |
|  | 16 | Alex Dao and Tony Hoang on November 4, 2019; correct? |
| 11:39 | 17 | A.   Yes, sir. |
| 11:39 | 18 | Q.   Correct? |
| 11:39 | 19 | A.   Yes, sir. |
| 11:39 | 20 | Q.   You interviewed Tony Hoang on November 9th, 2019; |
|  | 21 | correct? |
| 11:40 | 22 | A.   Yes, sir. |
| 11:40 | 23 | Q.   You monitored four meetings between Tony Hoang and |
|  | 24 | Wayne Le between November 12th and December 5th, 2019; |
|  | 25 | correct? |

11:40  1    A.   If that's what the reports reflect.  I can't remember

2    the exact date, sir.

11:40  3    Q.   But you monitored those meetings between Tony Hoang

4    after he became an informant with Wayne Le; correct?

11:40  5    A.   Whatever meeting he had that -- that I directed, yes.

11:40  6    Q.   You interviewed Natalie Nguyen on December 9, 2019;

7    correct?

11:40  8    A.   I don't know the exact date; but if that's what's

9    reflected on the report, yes, I did.

11:40  10   Q.   Would it refresh your memory to take a look at the

11   report, sir?

11:41  12   A.   Yes.

11:41  13        MR. WILKE:  May I approach, Your Honor?

11:41  14        THE COURT:  You may.

11:41  15        *(Document shown to the witness.)*

11:41  16        THE WITNESS:  This is a report filed by Coast

17   Guard, yes.

11:41  18   BY MR. WILKE:

11:41  19   Q.   Having reviewed that report (inaudible) --

11:41  20        THE COURT:  Just a moment.

11:41  21        Counsel, go back to the microphone.  We can't hear

22   the question.

11:41  23   BY MR. WILKE:

11:41  24   Q.   Agent Cho, after reviewing the Coast Guard report, does

25   that refresh your memory about whether you were present

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | during this November -- December 9, 2019, meeting at which           |
|       | 2  | Natalie Nguyen provided information?                                  |
| 11:41 | 3  | A.   Yes, sir.                                                        |
| 11:41 | 4  | Q.   You were; correct?                                               |
| 11:41 | 5  | A.   (No response.)                                                   |
| 11:41 | 6  | Q.   Correct?                                                         |
| 11:41 | 7  | A.   Yes, sir.                                                        |
| 11:41 | 8  | Q.   As was Alex Dao; correct?                                        |
| 11:41 | 9  | A.   With -- with Alex Dao?                                           |
| 11:41 | 10 | Q.   Alex Dao was also present during that meeting; correct?          |
| 11:42 | 11 | A.   If the report says, yes.                                         |
| 11:42 | 12 | Q.   And during this meeting Natalie Nguyen was asked                 |
|       | 13 | questioning; correct?                                                 |
| 11:42 | 14 | A.   Yes.                                                             |
| 11:42 | 15 | Q.   And she answered those questions; correct?                       |
| 11:42 | 16 | A.   Um, I assume so, yes.                                            |
| 11:42 | 17 | Q.   You interviewed Vinh Doan on December 23rd, 2019?                |
| 11:42 | 18 | A.   Yes, sir.                                                        |
| 11:42 | 19 | Q.   You interviewed Shawn Whalin December 27th, 2019?                |
| 11:42 | 20 | A.   Yes, sir.                                                        |
| 11:42 | 21 | Q.   You interviewed Sandra Ritze on January 3rd, 2020?               |
| 11:42 | 22 | A.   Yes.                                                             |
| 11:42 | 23 | Q.   You interviewed Shawn Whalin again on March 13, 2020;            |
|       | 24 | correct?                                                              |
| 11:43 | 25 | A.   Um, if that's what the report reflects, yes.                     |

| | | |
|---|---|---|
| 11:43 | 1 | Q.   Refresh your memory -- take a look at the report, sir? |
| | 2 | (Verbatim.) |
| 11:43 | 3 | THE WITNESS:  Yes, sir. |
| 11:43 | 4 | MR. WILKE:  May I approach, Your Honor? |
| 11:43 | 5 | THE COURT:  You may. |
| 11:43 | 6 | BY MR. WILKE: |
| 11:43 | 7 | Q.   Having reviewed that report, does that refresh your |
| | 8 | memory? |
| 11:43 | 9 | A.   Yes, sir. |
| 11:43 | 10 | Q.   You were -- uh, participated in the interview of Shawn |
| | 11 | Whalin on March 13th, 2020; correct? |
| 11:44 | 12 | A.   Yes, sir. |
| 11:44 | 13 | Q.   You participated in a third interview of Shawn Whalin |
| | 14 | on March 17th, 2020; correct? |
| 11:44 | 15 | A.   Yes, sir. |
| 11:44 | 16 | Q.   You participated in another interview of Natalie Nguyen |
| | 17 | on June 10, 2020? |
| 11:44 | 18 | A.   If that's what the report reflects, yes. |
| 11:44 | 19 | Q.   And -- and another interview of Natalie Nguyen you |
| | 20 | participated in on August 14, 2020? |
| 11:44 | 21 | A.   If that's what the report reflects, yes, sir. |
| 11:44 | 22 | Q.   And then finally a more recent interview of |
| | 23 | Natalie Nguyen on June 29, 2021; correct? |
| 11:44 | 24 | A.   Yes, sir. |
| 11:44 | 25 | Q.   You also became the contact person for Prudential |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

87

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Insurance; correct?                                          |
| 11:45 | 2  | A.   I was one of, uh, several in the FBI, yes.              |
| 11:45 | 3  | Q.   Yes.  You, in fact, advised the Prudential insurance    |
|       | 4  | company that any inquiries regarding the life insurance      |
|       | 5  | policy needed to come through you; correct?                  |
| 11:45 | 6  | A.   Yes.  'Cause I needed to confer with my prosecutor,     |
|       | 7  | yes.                                                         |
| 11:45 | 8  | Q.   Now, you also seized multiple items of evidence during  |
|       | 9  | this case; correct?                                          |
| 11:45 | 10 | A.   Yes, sir.                                               |
| 11:45 | 11 | Q.   In fact, on November 18, 2019, you obtained two         |
|       | 12 | cellphones belonging to James Dao; correct?                 |
| 11:45 | 13 | A.   Yes, sir.                                               |
| 11:45 | 14 | Q.   You were given those cellphones by his brother, Alex;   |
|       | 15 | correct?                                                     |
| 11:45 | 16 | A.   Yes, sir.                                               |
| 11:45 | 17 | Q.   Now, FBI policy requires you to enter these into an FBI |
|       | 18 | database within ten days; correct?                           |
| 11:46 | 19 | A.   Yes, sir.                                               |
| 11:46 | 20 | Q.   You did not actually enter these phones into the        |
|       | 21 | database until almost two months later; correct?            |
| 11:46 | 22 | A.   Yes, sir.                                               |
| 11:46 | 23 | Q.   You held onto those phones; correct?                    |
| 11:46 | 24 | A.   Yes, sir.                                               |
| 11:46 | 25 | Q.   Sir, you were present during a search of Wayne Le's     |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | house and during his arrest on December 19, 2019; correct? |
| 11:46 | 2  | A.   Yes, sir.                                             |
| 11:46 | 3  | Q.   During the search'a that house, agents seized four,   |
|       | 4  | .38 caliber bullets; correct?                              |
| 11:46 | 5  | A.   Yes, sir.                                             |
| 11:46 | 6  | Q.   Can you take a look below at Exhibit -- Exhibit 563.  |
|       | 7  | It's on the lower shelf there.  It's in the clear plastic  |
|       | 8  | bag, I believe.                                            |
| 11:47 | 9  | A.   Yes, sir.                                             |
| 11:47 | 10 | Q.   Do those appear to be the four bullets seized from    |
|       | 11 | Wayne -- the four, .38 caliber bullets seized from         |
|       | 12 | Wayne Le's house (inaudible) --                            |
| 11:47 | 13 |      *(Court reporter requests counsel use microphone to*  |
|       | 14 |      *be heard for the record.)*                           |
| 11:47 | 15 |           MR. WILKE:  I'll repeat the question.           |
| 11:47 | 16 | BY MR. WILKE:                                              |
| 11:47 | 17 | Q.   Do those appear to be the four .38 caliber bullets    |
|       | 18 | seized from Wayne Le's house on December 19, 2019?         |
| 11:47 | 19 | A.   Yes.                                                 |
| 11:47 | 20 |           MR. WILKE:  Seeking to admit by stipulation     |
|       | 21 | Exhibit 584, Your Honor.                                   |
| 11:47 | 22 |           MR. SCALLY:  No objection, Your Honor.          |
| 11:47 | 23 |           THE COURT:  Received.  584.                     |
| 11:47 | 24 |      *(Exhibit Number 584 received in evidence.)*          |
| 11:47 | 25 |           MR. WILKE:  And I'm seeking to move 563 into     |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       |  1 | evidence.                                                            |
| 11:47 |  2 | MR. SCALLY:  No objection.                                           |
| 11:47 |  3 | THE COURT:  Each are received.                                       |
| 11:47 |  4 | 563, Karlen, as well as 584.                                         |
| 11:47 |  5 | *(Exhibit Number 563 received in evidence.)*                         |
| 11:48 |  6 | BY MR. WILKE:                                                        |
| 11:48 |  7 | Q.   Although one of those bullets has now been disassembled         |
|       |  8 | for testing, does this photo represent the four bullets             |
|       |  9 | seized from Wayne Le's house on (inaudible) --                       |
| 11:48 | 10 | *(Court reporter requests counsel use microphone to*                |
|       | 11 | *be heard for the record.)*                                          |
| 11:48 | 12 | THE COURT:  Just a moment.  We're going to strike                    |
|       | 13 | the question.  It's not understandable.                             |
| 11:48 | 14 | And, Counsel, please reask the question.                            |
| 11:48 | 15 | BY MR. WILKE:                                                        |
| 11:48 | 16 | Q.   Three of the four actual bullets are intact; correct?          |
| 11:48 | 17 | A.   Yes, sir.                                                       |
| 11:48 | 18 | Q.   One of the bullets has been disassembled; correct?             |
| 11:48 | 19 | A.   Yes, sir.                                                       |
| 11:48 | 20 | Q.   And is it your understanding it was disassembled for           |
|       | 21 | testing in this case?                                               |
| 11:48 | 22 | A.   Yes, sir.                                                       |
| 11:48 | 23 | Q.   Okay.  Directing your attention to Exhibit 584 on the          |
|       | 24 | screen.  Does that appear to accurately represent the four          |
|       | 25 | bullets before they were -- the one was disassembled?               |

| | | |
|---|---|---|
| 11:48 | 1 | A.   It appears to be, yes, sir. |
| 11:48 | 2 | MR. WILKE:  Have a moment, Your Honor? |
| 11:48 | 3 | I've no further questions, Your Honor. |
| 11:48 | 4 | THE COURT:  Cross-examination, please. |
| 11:49 | 5 | **CROSS-EXAMINATION** |
| 11:49 | 6 | BY MR. SCALLY: |
| 11:49 | 7 | Q.   Special Agent Cho, you were asked questions about the |
| | 8 | FBI policy requiring entry of phones into a database; is |
| | 9 | that right? |
| 11:49 | 10 | A.   Into the evidence?  Yes. |
| 11:49 | 11 | Q.   Okay.  And it -- you indicated that that was done sort |
| | 12 | of late, according to the policy; is that right? |
| 11:49 | 13 | A.   Yes, sir. |
| 11:49 | 14 | Q.   Was that eventually done? |
| 11:49 | 15 | A.   Yes, sir. |
| 11:49 | 16 | Q.   Okay.  And did you fill out any paperwork necessary |
| | 17 | based on, um -- you filled out paperwork about that -- that, |
| | 18 | uh, being late; correct? |
| 11:49 | 19 | A.   Yes, I did. |
| 11:49 | 20 | Q.   Okay.  At no time during this investigation did Alex |
| | 21 | Dao ask questions of Natalie Nguyen as part'a the |
| | 22 | prosecution investigative team; correct? |
| 11:50 | 23 | A.   Yes. |
| 11:50 | 24 | Q.   And at no time did -- um, was Alex Dao gathering facts |
| | 25 | by asking, uh, Natalie Nguyen questions; correct? |

| | | |
|---|---|---|
| 11:50 | 1 | A.   Yes. |
| 11:50 | 2 | Q.   And, in fact, in that December 9, 2019, meeting, uh, |
| | 3 | where Alex Dao and Natalie Nguyen were both present, the |
| | 4 | reason they were together was to discuss the release of |
| | 5 | James Dao's body from the coroner to an appropriate |
| | 6 | mortuary; correct? |
| 11:50 | 7 | A.   Yes, sir. |
| 11:50 | 8 | Q.   Your prior relationship with Alex Dao didn't make you |
| | 9 | investigate this case any differently from any other case; |
| | 10 | correct? |
| 11:50 | 11 | A.   No, sir. |
| 11:50 | 12 | Q.   And, in fact, you -- you had no personal relationship |
| | 13 | of any sort with Alex Dao "ever"; correct? |
| 11:50 | 14 | A.   Yes, sir. |
| 11:50 | 15 | Q.   You -- any relationship you had was limited to a |
| | 16 | professional relationship; correct? |
| 11:50 | 17 | A.   That's correct, sir. |
| 11:51 | 18 | Q.   You were his handler, with him working as a |
| | 19 | confidential informant; correct? |
| 11:51 | 20 | A.   I was a co-handler.  The primary handler was another |
| | 21 | agent.  He has since retired, yes. |
| 11:51 | 22 | Q.   And that was back in the -- |
| 11:51 | 23 | A.   2007 time frame. |
| 11:51 | 24 | Q.   Okay.  You didn't know Alex Dao at that time or any |
| | 25 | other time as a friend; correct? |

| 11:51 | 1 | A.    Correct. |

11:51  1   A.    Correct.

11:51  2   Q.    You didn't -- you've never spent time with him and his

3   family outside of -- outside of the confines of a case;

4   correct?

11:51  5   A.    That's correct.

11:51  6   Q.    In fact, Alex Dao sued the government based on your

7   work with him; correct?

11:51  8   A.    Yes, he did.

11:51  9   Q.    Naming you in the lawsuit; correct?

11:51  10  A.    Yes, sir.

11:51  11         MR. SCALLY:  Nothing further, Your Honor.

11:51  12         Thank you.

11:51  13         THE COURT:  Recross-examination [sic], please.

11:51  14         MR. WILKE:  Thank you, Your Honor.

11:51  15              **REDIRECT EXAMINATION**

11:51  16  BY MR. WILKE:

11:51  17  Q.    Agent Cho, when did you first (inaudible) --

11:52  18         THE COURT:  Counsel, I couldn't hear the question.

11:52  19  BY MR. WILKE:

11:52  20  Q.    When did you first advise the prosecutors about your

21  prior relationship with Alex Dao?

11:52  22         MR. SCALLY:  Objection.  Relevance.  403.  And

23  beyond the scope.

11:52  24         THE COURT:  Ladies and gentlemen, we're going to

25  have you go to lunch right now.  I want to speak to Counsel

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | for a moment.  And we don't want you to take additional                   |
|       | 2  | time, so we'll see up at 1:00 o'clock.  You're admonished                 |
|       | 3  | not to discuss this matter amongst yourselves nor form or                 |
|       | 4  | express any opinion concerning the case.                                  |
| 11:52 | 5  | Have a nice lunch.                                                        |
| 11:52 | 6  | *(Jury recesses much at 11:52 a.m.)*                                      |
| 11:52 | 7  | *(Outside the presence of the jury.)*                                     |
| 11:53 | 8  | THE COURT:  And, Agent, thank you.  If you would                          |
|       | 9  | be kind enough to step down.  Have a nice lunch.  I'd like                |
|       | 10 | to speak to counsel outside your presence.                                |
| 11:53 | 11 | If you'd remain in the hallway, I'd appreciate it.                        |
| 11:53 | 12 | *(Witness steps down, exits the courtroom.)*                             |
| 11:53 | 13 | **DISCUSSION OUTSIDE PRESENCE OF JURY**                                   |
| 11:53 | 14 | THE COURT:  All right.  I'm going to surmise that,                        |
|       | 15 | from the questioning concerning the lateness of the phones,               |
|       | 16 | that this is an attempt to impeach the credibility of the                 |
|       | 17 | investigation.  I'm assuming that until I hear from you.  So              |
|       | 18 | let me tell you what I'm hearing for a moment.                            |
| 11:54 | 19 | But I don't think there's any contention between                         |
|       | 20 | the parties that these are, for instance, the four bullets               |
|       | 21 | or the physical evidence that's been gathered.  It's been                 |
|       | 22 | stipulated to.                                                            |
| 11:54 | 23 | And now we're into an area that I'd like to                               |
|       | 24 | discuss with both of you because I'm going to anticipate                  |
|       | 25 | something that may not happen; and that is, questions                     |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | concerning the relationship of Agent Cho to Alex Dao, and   |
|       | 2  | his investigation and some alleged impropriety of his        |
|       | 3  | involvement because of his prior handling of Alex Dao in     |
|       | 4  | 2007.                                                        |
| 11:54 | 5  | Is that accurate?                                            |
| 11:54 | 6  | MR. WILKE:  Your Honor, the --                              |
| 11:54 | 7  | THE COURT:  That's just a yes or no answer.                 |
| 11:55 | 8  | MR. WILKE:  It's part -- partially accurate.                |
| 11:55 | 9  | THE COURT:  Well, then I don't have any further             |
|       | 10 | discussion.  I'm going to ask you if that's accurate.       |
| 11:55 | 11 | Is that accurate?                                            |
| 11:55 | 12 | MR. WILKE:  Could the Court repeat its question?           |
| 11:55 | 13 | THE COURT:  Is that accurate?                               |
| 11:55 | 14 | MR. WILKE:  No, the...?                                     |
| 11:55 | 15 | THE COURT:  No.  I'm not going to repeat it.  You          |
|       | 16 | heard it.                                                    |
| 11:55 | 17 | MR. WILKE:  I think --                                      |
| 11:55 | 18 | THE COURT:  I'm asking now --                               |
| 11:55 | 19 | MR. WILKE:  I think it's partially accurate,               |
|       | 20 | Your Honor.  If I can --                                     |
| 11:55 | 21 | THE COURT:  All right.                                      |
| 11:55 | 22 | MR. WILKE:  I'm not sure it's complete.                     |
| 11:55 | 23 | THE COURT:  It's -- am I about to then hear a              |
|       | 24 | series of witnesses, or additional witnesses, who are going |
|       | 25 | to speak to the alleged impropriety of Agent Cho's          |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

95

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | involvement in this continuing investigation?                       |
| 11:55 | 2  | MR. WILKE:  No.                                                     |
| 11:55 | 3  | THE COURT:  Then what am I about to hear?                           |
| 11:55 | 4  | MR. WILKE:  I think --                                              |
| 11:55 | 5  | *(Court reporter requests counsel use microphone to*               |
|       | 6  | *be heard for the record.)*                                         |
| 11:55 | 7  | MR. WILKE:  I believe, if --                                        |
| 11:56 | 8  | THE COURT:  Now very succinctly, Mr. Wilke,                         |
|       | 9  | because --                                                          |
| 11:56 | 10 | MR. WILKE:  Yes.                                                    |
| 11:56 | 11 | THE COURT:  -- this ruling's potentially going                     |
|       | 12 | against you.  So very succinctly now.                               |
| 11:56 | 13 | MR. WILKE:  The government, Your Honor, has been,                   |
|       | 14 | um, very not forthcoming on --                                      |
| 11:56 | 15 | THE COURT:  I understand that.                                      |
| 11:56 | 16 | I just asked you a question.  Now, what was the                     |
|       | 17 | question I just asked you?                                          |
| 11:56 | 18 | MR. WILKE:  "What am I about to hear?"                              |
| 11:56 | 19 | THE COURT:  Exactly.  What am I about to hear now                   |
|       | 20 | as an offer --                                                      |
| 11:56 | 21 | MR. WILKE:  My --                                                   |
| 11:56 | 22 | THE COURT:  -- of proof?                                            |
| 11:56 | 23 | MR. WILKE:  My belief is the agent, uh, if he                       |
|       | 24 | testifies truthfully, will testify he only recently                 |
|       | 25 | disclosed this information about his prior relationship with        |

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | Alex Dao to the prosecutors -- within the last three months.          |
| 11:56 | 2  | THE COURT:  I see.  Now, just a moment.                                |
| 11:56 | 3  | I'm about to hear in front of the jury, I surmise,                     |
|       | 4  | an objection.                                                          |
| 11:56 | 5  | What would that objection be?                                         |
| 11:56 | 6  | MR. SCALLY:  Relevance, Your Honor.  I mean, what                      |
|       | 7  | the prosecution knew, when, is not relevant to this, uh --             |
|       | 8  | this witness's testimony.  It's also beyond the scope of my            |
|       | 9  | cross.                                                                 |
| 11:56 | 10 | THE COURT:  I am not too concerned about the                          |
|       | 11 | scope.  We'll have direct and cross, redirect and recross.             |
|       | 12 | And so concerning the scope, that's overruled.                        |
| 11:57 | 13 | The issue is, is it a general attack on the way                       |
|       | 14 | the case was investigated; and if so, what's the relevance?           |
|       | 15 | In other words, what's the lynchpin here?                             |
| 11:57 | 16 | Is it, for instance, physical evidence that was                      |
|       | 17 | allegedly tampered with?  Is it a phone recording that's              |
|       | 18 | allegedly tampered with; and if so -- Mr. Wilke, back to the          |
|       | 19 | microphone this time.  Thank you.  I want specificity.                |
| 11:57 | 20 | MR. WILKE:  Yes.                                                       |
| 11:57 | 21 | THE COURT:  I don't want a general statement --                       |
| 11:57 | 22 | MR. WILKE:  I understand.                                              |
| 11:57 | 23 | THE COURT:  -- because, unfortunately, um, you                        |
|       | 24 | need to be specific.                                                   |
| 11:57 | 25 | MR. WILKE:  I understand.                                              |

| 11:57 | 1 | On -- on direct examination of Agent Cho, |
|---|---|---|
| | 2 | Your Honor, we elicited, uh, testimony regarding his |
| | 3 | activities during the investigation, including his |
| | 4 | participation -- |
| 11:57 | 5 | THE COURT:  I understand that.  I'm gonna repeat |
| | 6 | them to you.  Listen very carefully because you're not |
| | 7 | answering my question, so I'm warning you. |
| 11:58 | 8 | He monitored Tony Hoang and Alex Dao. |
| 11:58 | 9 | He interviewed Tony Hoang and Wayne Le. |
| 11:58 | 10 | He interviewed Natalie Nguyen. |
| 11:58 | 11 | He interviewed Vinh Doan. |
| 11:58 | 12 | He interviewed Shawn Whalin. |
| 11:58 | 13 | He interviewed Sandra Ritze. |
| 11:58 | 14 | Then Shawn Whalin again. |
| 11:58 | 15 | Shawn Whalin again. |
| 11:58 | 16 | Natalie Nguyen again. |
| 11:58 | 17 | Natalie Nguyen on August 14, 2020, which was the |
| | 18 | second to the most recent. |
| 11:58 | 19 | And Natalie Nguyen on June 2, 2021. |
| 11:58 | 20 | He also was the contact person for Prudential |
| | 21 | insurance. |
| 11:58 | 22 | He also seized multiple items of evidence:  Two |
| | 23 | cellphones of James Dao.  He did not enter those into the |
| | 24 | database within 10 days and, therefore, allegedly it was |
| | 25 | supposed to be, uh -- he entered those -- I'm sorry -- |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

98

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | two months later.                                       |
| 11:58 | 2  | Not my question.                                        |
| 11:58 | 3  | MR. WILKE:  And -- and he testified --                  |
| 11:58 | 4  | THE COURT:  I'm aware of what he testified.             |
| 11:58 | 5  | MR. WILKE:  No.  Just one point that's critical         |
|       | 6  | here, Your Honor, to the impeachment:  By November 4 he was |
|       | 7  | (inaudible) --                                          |
| 11:59 | 8  | THE COURT:  No.  Back to the microphone,                |
|       | 9  | Mr. Wilke.                                              |
| 11:59 | 10 | MR. WILKE:  By November 4, 2019, he was already         |
|       | 11 | characterizing this event as a murder, even though his  |
|       | 12 | investigation had just started.  Okay?  That's the other |
|       | 13 | critical point here.                                    |
| 11:59 | 14 | THE COURT:  Just a moment.                              |
| 11:59 | 15 | His testimony was equivocal.  What he specifically      |
|       | 16 | said -- you asked a leading question about murder.  His  |
|       | 17 | response was -- just a moment.                          |
| 11:59 | 18 | "Murder investigation," quote/unquote.  In other        |
|       | 19 | words, you asked the leading question, "If you had       |
|       | 20 | determined it was a murder" and read a statement to him. |
| 11:59 | 21 | His response, though, was he was involved in a          |
|       | 22 | murder investigation.                                   |
| 11:59 | 23 | MR. WILKE:  And then in -- when confronted with         |
|       | 24 | the statement in his report, he acknowledged what his report |
|       | 25 | says -- that he was characterizing this as a murder.    |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

99

11:59   1          THE COURT:  I'm concerned about the relevance

        2   because --

11:59   3          MR. WILKE:  So --

11:59   4          THE COURT:  -- until your client's statement about

        5   what occurred, I would think that most people would view

        6   this as a murder investigation.

12:00   7          And this is the first time we're hearing at trial,

        8   you know, the fact that it could be argued that it's

        9   self-defense.

12:00  10          MR. WILKE:  Well --

12:00  11          THE COURT:  And so how else would they categorize

       12   this without your client's statement?

12:00  13          MR. WILKE:  So, Your Honor, I don't dispute that

       14   it was a murder investigation.  That's not my impeachment.

12:00  15          THE COURT:  Well, that's what he said,

       16   quote/unquote.  I'll can read it back to you.

12:00  17          MR. WILKE:  But he also said -- yes, he tried to,

       18   I think, uh, minimize what it says in his report.

12:00  19          But, Your Honor, there's another point here

       20   that -- to link this up.  Not only does he characterize the

       21   events as a murder as of November 4, 2019, we hear testimony

       22   from Shawn Whalin that, when they questioned him, it was

       23   Agent Cho who characterized this, uh -- the statement, uh,

       24   that Shawn Whalin -- the information that Shawn Whalin had

       25   provided him about what Wayne Le said -- as murder.

```
12:01    1              It was Agent Cho who called it a murder at that

         2      interview before Shawn Whalin ever did.  Okay? -- or before

         3      Shawn Whalin actually had this story that he now has now.

12:01    4              THE COURT:  I'm having a difficult time

         5      understanding the relevance of this.

12:01    6              MR. WILKE:  So -- so the relevance of this last

         7      question, Your Honor, goes to the agent's attempt to say

         8      that his supervisor's were aware of this.

12:01    9              THE COURT:  If you'd go back to the microphone,

        10      Mr. Wilke.

12:01   11              MR. WILKE:  We haven't [sic] been unable to

        12      contact or communicate with his supervisors.  We learned the

        13      name for the first time now.

12:01   14              THE COURT:  Just a moment.

12:01   15              Now, Counsel.  Counsel, that would be --

12:01   16              MR. WILKE:  We learned that today.

12:01   17              THE COURT:  Counsel.

12:01   18              Boykins.  Wrathal.

12:01   19              MR. WILKE:  We've received no discovery that --

        20      that his disclosure of his prior relationship with Alex Dao

        21      had been disclosed to his supervisors at the outset'a this

        22      investigation.

12:02   23              THE COURT:  I think we're --

12:02   24              MR. WILKE:  And --

12:02   25              THE COURT:  -- we're going astray, Mr. Wilke --
```

12:02    1                 MR. WILKE:  One more --

12:02    2                 THE COURT:  -- my original point.

12:02    3            *(Simultaneous speaking.)*

12:02    4                 THE COURT:  (To court reporter:)  When Counsel

         5      speak over me, you'll take my transcription, not Counsel's.

12:02    6                 I don't understand the relevance.  And I'm going

         7      to stay with this -- you're about to get an adverse ruling,

         8      so listen very carefully to me now.

12:02    9                 If the import of this is another agent coming in

        10      and stating that this was an improper procedure, I want to

        11      know that, and I want that offer of proof, and I want to

        12      discuss that out of the presence of the jury.

12:02   13                 Is another agent going to be coming in and casting

        14      the opinion, by the defense, that this is somehow an

        15      improper procedure by Alex -- or, by Agent Cho?

12:02   16                 MR. WILKE:  I don't have that witness, Your Honor.

12:02   17                 But I have also not -- I've asked this question

        18      repeatedly of the government.

12:02   19                 THE COURT:  Just a moment, Counsel.  I'm sorry.

        20      This is my turn now.  And you'll answer my questions now.

12:03   21                 So would your argument be that there's an

        22      impropriety in Agent Cho's being involved in this

        23      investigation because he was a handler of Alex Dao?

12:03   24                 MR. WILKE:  Impropriety's not the term --

12:03   25                 THE COURT:  Okay.  Counsel.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

102

| 12:03 | 1 | *(Simultaneous speaking.)* |

12:03  2          THE COURT:  Counsel.  Counsel.

12:03  3          MR. WILKE:  Yes.

12:03  4          THE COURT:  That's not gonna work with this Court.

5      And I'm gonna repeat this to you very carefully.

12:03  6          We'll use a different word than "impropriety."

7      Don't pick that apart for a moment.  I'm asking you a very

8      simple question:

12:03  9          Are you going to attack -- you can fill in

10     whatever word you'd like to -- but is this an attack

11     concerning the credibility of Cho because of the way he

12     investigated or was involved with Alex Dao in 2007?  And you

13     can say "impropriety" --

12:04  14         MR. WILKE:  Yes.

12:04  15         THE COURT:  -- "attack."

12:04  16         MR. WILKE:  Yes.

12:04  17         THE COURT:  Simple.

12:04  18         MR. WILKE:  Yes.

12:04  19         THE COURT:  Now, we both know that.  We could've

20     gotten to that 10 minutes ago.  So it's very simple.

12:04  21         MR. WILKE:  I didn't know that was --

12:04  22         THE COURT:  Let me repeat that:  We could've

23     gotten to that 10 minutes ago.  So it's very simple.

12:04  24         Attack, impropriety, credibility -- whatever you

25     want to call it.  And I'm going to come back to, What

|   |   | specific area are you arguing that this agent's actions |
|---|---|---|
|       | 1 | specific area are you arguing that this agent's actions |
|       | 2 | caused this non-credibility?  Is it a -- |
| 12:04 | 3 | MR. WILKE:  His. |
| 12:04 | 4 | THE COURT:  -- unrecorded statement, for instance, |
|       | 5 | when he took a report? |
| 12:04 | 6 | Is it the collection of bullets? |
| 12:04 | 7 | Is it the -- or are they the cellphones that were |
|       | 8 | turned in late? |
| 12:04 | 9 | Or, is it just a general attack on character? |
| 12:04 | 10 | MR. WILKE:  It is the interview of the witnesses, |
|       | 11 | Your Honor. |
| 12:04 | 12 | THE COURT:  Okay.  Which witness? |
| 12:04 | 13 | MR. WILKE:  All the major ones:  Shawn Whalin, |
|       | 14 | Natalie Nguyen, Vinh Doan. |
| 12:05 | 15 | THE COURT:  Okay.  And that's because there was no |
|       | 16 | recording? |
| 12:05 | 17 | MR. WILKE:  On those, correct. |
| 12:05 | 18 | THE COURT:  And that's -- |
| 12:05 | 19 | MR. WILKE:  And even in some there was. |
| 12:05 | 20 | THE COURT:  Counsel... |
| 12:05 | 21 | And that's because, it's long been argued, that |
|       | 22 | the FBI can't afford tape recordings.  Just joking with you, |
|       | 23 | but I'm not. |
| 12:05 | 24 | And the end result is, they don't use tape |
|       | 25 | recorders and, therefore, there's always been an attack on |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | the FBI for the nonuse of those recorders.                           |
| 12:05 | 2  | And, therefore, your position is credibility's an                    |
|       | 3  | issue?                                                                |
| 12:05 | 4  | MR. WILKE:  Yes.                                                      |
| 12:05 | 5  | THE COURT:  "Yes."                                                    |
| 12:05 | 6  | All right.  Now let me hear from the government                       |
|       | 7  | for a moment.                                                         |
| 12:05 | 8  | MR. SCALLY:  Your Honor, there's --                                   |
| 12:05 | 9  | THE COURT:  Now, Counsel, you say that that's not                    |
|       | 10 | relevant.  But it's a little disturbing that we have, from           |
|       | 11 | the defense's perspective, the argument that in 2007 he's            |
|       | 12 | the handler of Alex Dao.  The implication and argument to            |
|       | 13 | the Court is that somehow an early opinion is formed that            |
|       | 14 | this is a murder.                                                    |
| 12:06 | 15 | I'm somewhat discounting that because, without the                   |
|       | 16 | defendant's statement that we're hearing for the first time          |
|       | 17 | in court, there's no other way to categorize this.  It's a           |
|       | 18 | murder investigation.  You're not going to categorize this           |
|       | 19 | as a murder with self-defense because that explanation's             |
|       | 20 | never been forthcoming until we've gotten to trial -- except         |
|       | 21 | with Mr. Wilke's representation about the defense.                    |
| 12:06 | 22 | So the investigators couldn't've known that this                     |
|       | 23 | was self-defense because there was nothing that the                  |
|       | 24 | defendant had stated to them.  So whether it's categorized           |
|       | 25 | as a "murder" or "murder investigation" is almost irrelevant         |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | to the Court.  It's gonna be categorized in some way.        |
| 12:06  | 2  | The words "homicide" could've been used, um -- but           |
|        | 3  | end result is "murder's" a pretty common phraseology in this |
|        | 4  | investigation.                                               |
| 12:06  | 5  | The question is, is it appropriate that this agent           |
|        | 6  | is the agent that should be interviewing these witnesses and |
|        | 7  | making a report, most of these with no recording?            |
| 12:07  | 8  | Let me repeat that:  No recording.                           |
| 12:07  | 9  | Or are these interviews recorded?                            |
| 12:07  | 10 | So let's go down the list:                                   |
| 12:07  | 11 | Interview of Natalie Nguyen, June 29, 2021.  Was             |
|        | 12 | that recorded?                                               |
| 12:07  | 13 | MR. SCALLY:  No, Your Honor.                                 |
| 12:07  | 14 | THE COURT:  Why?                                             |
| 12:07  | 15 | MR. WILKE:  I don't --                                       |
| 12:07  | 16 | THE COURT:  Why?  I asked you a question.                    |
| 12:07  | 17 | MR. SCALLY:  I'm not sure the policy --                      |
| 12:07  | 18 | THE COURT:  Yes, you are.  Why?                              |
| 12:07  | 19 | Local law enforcement uses recorders.                        |
| 12:07  | 20 | MR. SCALLY:  They do have a secondary witness at             |
|        | 21 | each of these interviews, Your Honor.                        |
| 12:07  | 22 | THE COURT:  Counsel, local law enforcement uses              |
|        | 23 | recorders.                                                   |
| 12:07  | 24 | August 14, 2020.  Recording of Natalie Nguyen?               |
|        | 25 | Recorded?                                                    |

12:08   1                  MR. SCALLY:  No, Your Honor.

12:08   2                  THE COURT:  Why?

12:08   3                  MR. SCALLY:  I don't --

12:08   4                  MR. STAPLES:  If I may, Your Honor?  May I step

        5      in?

12:08   6                  THE COURT:  No.

12:08   7                  MR. SCALLY:  I don't believe that --

12:08   8                  THE COURT:  One at a time.  Then I'll get to you,

        9      Mr. Staples.

12:08  10                  MR. STAPLES:  Okay.

12:08  11                  THE COURT:  This isn't tag team now.

12:08  12                  MR. SCALLY:  I don't believe that any of the

       13      interviews are recorded except the one of Shawn Whalin, who

       14      was a target.

12:08  15                  THE COURT:  I know.  Why?

12:08  16                  MR. SCALLY:  Well, Shawn Whalin was a target of

       17      the investigation.

12:08  18                  THE COURT:  I understand that, Counsel.  You

       19      didn't answer my question.  I'll go through them one by one.

       20      You're gonna be as specific as Mr. Wilke.

12:08  21                  Natalie Nguyen, again.

12:08  22                  Shawn Whalin.  Shawn Whalin.  One of those is

       23      recorded.

12:08  24                  Sandra Ritze.

12:08  25                  Shawn Whalin.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

107

| | | |
|---|---|---|
| 12:08 | 1 | Vinh Doan. |
| 12:08 | 2 | No recordings.  Why? |
| 12:08 | 3 | MR. SCALLY:  The only ones that I could speak |
| | 4 | to -- |
| 12:08 | 5 | THE WITNESS:  Why? |
| 12:08 | 6 | MR. SCALLY:  With Shawn Whalin, two of those are |
| | 7 | preparation for Grand Jury.  I don't have a practice of |
| | 8 | recording those interviews.  When we prep witnesses for |
| | 9 | Grand Jury, we don't typically record. |
| 12:09 | 10 | THE COURT:  You picked one or two, Counsel, for |
| | 11 | the Grand Jury.  You've avoided my question now. |
| 12:09 | 12 | MR. SCALLY:  Well, the other ones I don't have |
| | 13 | knowledge of how -- what the agents' operating procedures |
| | 14 | are. |
| 12:09 | 15 | THE COURT:  So, therefore, what we're operating on |
| | 16 | the best recollection of the agent involved; correct? |
| 12:09 | 17 | MR. SCALLY:  Well, of the witness involved, |
| | 18 | Your Honor. |
| 12:09 | 19 | THE COURT:  Well, just a moment. |
| 12:09 | 20 | The agent's taking what the witness says, Counsel. |
| | 21 | In other words, the agent is sitting there listening, and |
| | 22 | them putting in a 302 report a summary of what that agent's |
| | 23 | hearing. |
| 12:09 | 24 | MR. SCALLY:  Those aren't evidence.  The evidence |
| | 25 | is what the witness testifies to.  And Mr. Wilke has an |

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

108

|  |  |  |
|---|---|---|
|  | 1 | adequate, uh -- |
| 12:09 | 2 | THE COURT:  No.  No, Counsel.  The evidence is |
|  | 3 | what goes into these reports also.  I'm sorry. |
| 12:09 | 4 | When you take a statement from a witness, that is |
|  | 5 | potentially evidence.  Impeaching evidence, corroborating |
|  | 6 | evidence -- that's evidence. |
| 12:09 | 7 | MR. SCALLY:  None of these witnesses testified to |
|  | 8 | any impropriety by Special Agent Cho during their direct |
|  | 9 | exam -- during their cross-examination by Mr. Wilke.  He had |
|  | 10 | an opportunity to cross-examine each one of these witnesses |
|  | 11 | as to, you know, "You just -- you're just saying what |
|  | 12 | Special Agent Cho told you to say; right?"  And none of 'em |
|  | 13 | testified to any impropriety whatsoever. |
| 12:10 | 14 | THE COURT:  So where are we going with this?  This |
|  | 15 | is the one time I really want an offer of proof between the |
|  | 16 | two of you.  I really wanna have an understanding of what's |
|  | 17 | about to happen with these subsequent witnesses. |
| 12:10 | 18 | So when Agent Casey is called, what's the purpose? |
| 12:10 | 19 | MR. WILKE:  Yes, Your Honor.  Agent Casey -- |
| 12:10 | 20 | Have a moment? |
| 12:10 | 21 | THE COURT:  Now, I want an offer of proof. |
| 12:11 | 22 | MR. WILKE:  Agent Casey is primarily being called |
|  | 23 | as an impeachment witness, Your Honor. |
| 12:11 | 24 | THE COURT:  Counsel, what is he going to state |
|  | 25 | impeaching? |

12:11   1           MR. WILKE:  Okay.  I expect Agent Casey to testify

        2    that he participated in the December 27, 2019, interview of

        3    Shawn Whalin at the FBI office.

12:11   4           THE COURT:  Counsel, we can cut right to it.

        5    What's the purpose?  Is he going to be --

12:11   6           MR. WILKE:  He's --

12:11   7           THE COURT:  -- casting an opinion about the

        8    investigation?

12:11   9           MR. WILKE:  No, no.  He's just --

12:11  10           THE COURT:  Okay.  Then we'll move on to the next

       11    one.  As long as I am not startled by some opinion testimony

       12    and concerning whether it's relevant or not and have to

       13    take --

12:11  14           MR. WILKE:  No.

12:11  15           THE COURT:  -- another sidebar.

12:11  16           What about Agent Casey?  What's he testifying to?

12:11  17           MR. WILKE:  That's -- Austin Casey.  That is

       18    Agent Casey.  He's -- he's testifying as to prior statements

       19    by witnesses that they denied making.  He's an impeach --

       20    he's a prove-up impeachment witness.

12:12  21           THE COURT:  But he's not going to process or

       22    procedure.  In other --

12:12  23           MR. WILKE:  No.

12:12  24           THE COURT:  -- words, this attack on the process

       25    or procedure is an issue that I need to deal with, with one

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | witness:  The present witness on the stand, Mr. Cho.      |
| 12:12 | 2  | MR. WILKE:  I -- my intention on Agent Casey --           |
| 12:12 | 3  | THE COURT:  Is the only witness I have to deal            |
|       | 4  | with concerning this kind of testimony, concerning the    |
|       | 5  | process and procedure being followed or not Agent Cho?    |
| 12:12 | 6  | Yes or no.                                                |
| 12:12 | 7  | MR. WILKE:  One question to (inaudible) --                |
| 12:12 | 8  | *(Court reporter requests counsel use microphone to*      |
|       | 9  | *be heard for the record.)*                               |
| 12:12 | 10 | THE COURT:  Counsel, microphone.                          |
| 12:12 | 11 | MR. WILKE:  One -- I have one question --                 |
| 12:12 | 12 | THE COURT:  Counsel, yes or no.                           |
| 12:12 | 13 | MR. WILKE:  I can't answer yes or no without              |
|       | 14 | explaining, Your Honor.                                   |
| 12:12 | 15 | THE COURT:  Then explain it.                              |
| 12:12 | 16 | MR. WILKE:  Okay.  If the Court permits Agent Cho         |
|       | 17 | to answer this last question, I would have no questions of |
|       | 18 | Agent Casey beyond --                                     |
| 12:12 | 19 | THE COURT:  What's your --                                |
| 12:12 | 20 | MR. WILKE:  -- beyond impeachment.                        |
| 12:12 | 21 | THE COURT:  And what's your last question?                |
| 12:12 | 22 | MR. WILKE:  My -- the question for Agent Casey?           |
| 12:13 | 23 | The one additional question would be when did he          |
|       | 24 | first learn Agent Cho's prior relationship with Alex Dao. |
| 12:13 | 25 | But if -- if we learn that Alex -- that Agent Cho         |

| | | |
|---|---|---|
| | 1 | did not tell the prosecutors until two or three months |
| | 2 | ago -- which is what I believe he will testify to -- when I |
| | 3 | first got discovery on this issue, Your Honor, I received it |
| | 4 | in or about September of this year.  Okay?  That's when I |
| | 5 | first learned of Agent Cho's prior relationship with Alex |
| | 6 | Dao. |
| 12:13 | 7 | And at that time, the fact that this had not been |
| | 8 | previously disclosed to me tells me that the prosecutors |
| | 9 | didn't know about it either.  They've been forthcoming on |
| | 10 | *Brady* and *Giglio* material, Your Honor.  And when -- I |
| | 11 | believe I got it shortly after they did.  So I believe -- |
| 12:13 | 12 | THE COURT:  Counsel -- thank you, Counsel. |
| 12:13 | 13 | Thank you, Counsel. |
| 12:13 | 14 | When did you first hear about this information |
| | 15 | concerning the research with Agent Cho and Alex Dao? |
| 12:14 | 16 | MR. SCALLY:  We knew from the beginning of the |
| | 17 | case, Your Honor. |
| 12:14 | 18 | THE COURT:  I'm sorry? |
| 12:14 | 19 | MR. SCALLY:  We knew from the beginning of the |
| | 20 | case, Your Honor. |
| 12:14 | 21 | THE COURT:  Okay.  And that was disclosed to the |
| | 22 | defense? |
| 12:14 | 23 | MR. SCALLY:  At -- through the process of other |
| | 24 | discovery, yes. |
| 12:14 | 25 | THE COURT:  When? |

```
12:14    1              MR. SCALLY:  I believe it was August of, uh --
         2    approximately August of this year.
12:14    3              THE COURT:  Now, just a moment.
12:14    4              So we've known about this from August of this
         5    year?
12:14    6              MR. SCALLY:  No.  The defense has known about this
         7    from August of this year.
12:14    8              THE COURT:  I see.
12:14    9              And so is there a concern on either of your part
        10    concerning fairness in this matter?  In other words, is the
        11    defense then caught by surprise?
12:14   12              MR. WILKE:  If that's gonna --
12:14   13              THE COURT:  I can't hear you.
12:14   14              MR. WILKE:  That's not the answer I expected,
        15    because I would've expected the government to have turned
        16    this information over far sooner.  But if --
12:14   17              THE COURT:  Just -- just a moment.
12:14   18              You've had this information since August.  The
        19    only surprise that I've heard -- and I don't mean "only" --
        20    are the two supervising agents, who you've represented
        21    you've heard for the first time today; and that, is "Boykin"
        22    and the --
12:15   23              MR. WILKE:  Yes.
12:15   24              And we have no discovery that they were actually
        25    informed of this.  But --
```

12:15   1          THE COURT:  And, once again, what's the relevance?

        2   Is it a general attack on process and procedure?  In other

        3   words, it's a Catch 22.  We're coming clear back to the

        4   original question I've asked you.

12:15   5          MR. WILKE:  Okay.

12:15   6          Your Honor, I'll withdraw the question at this

        7   point.

12:15   8          THE COURT:  Pardon me?

12:15   9          MR. WILKE:  If Mr. Scally is representing that

       10   he --

12:15  11          THE COURT:  Counsel, I can't hear you.

12:15  12          MR. WILKE:  If Mr. Scally is representing to the

       13   Court that Agent Cho disclosed his prior relationship with

       14   Alex Dao since the beginning of this investigation to the

       15   prosecutors, I'll withdraw the question.  That was not --

       16   I'll withdraw the question that I just -- that -- that's

       17   pending that the Court took this sidebar for.  Because that

       18   was not my belief, but I accept Mr. Scally's representation

       19   of that.

12:15  20          THE COURT:  If that's the case, what's left for

       21   the Court to decide at this sidebar at the present time?

12:16  22          You two have a discussion about that.  You've been

       23   working very well together.  It's not a criticism of either

       24   one of you.  I just don't wanna be surprised.

12:16  25          *(Defense and government counsel confer.)*

12:16  1            MR. WILKE:  I'll withdraw the question,

2    Your Honor.

12:16  3            THE COURT:  So does that then resolve this issue?

12:16  4            MR. SCALLY:  Yes.

12:16  5            MR. WILKE:  I believe it does.  There's no further

6    questions.

12:16  7            THE COURT:  Okay.  First of all, let me express to

8    both of you, and pardon my bluntness, but I appreciate that.

12:16  9            What I don't want is the continued sidebar, when

10   we can resolve these outside the presence of the jury.

11   Because I think it's prejudicial to one or both sides when

12   those sidebars occur.  It looks like something's being

13   hidden from the jury.  So I'm glad we could resolve it.

12:16 14            Now I wanna make certain:

12:16 15            Mr. Wilke, are you satisfied?

12:16 16            MR. WILKE:  I'd like 'em to bring in the FBI

17   supervisors.  I -- I think they should bring in the FBI

18   supervisors and produce some document that disclosure was

19   made to the FBI supervisors.  If that's not, in fact,

20   accurate, I think they have a duty to disclose that.

12:17 21            MR. SCALLY:  We'll look into it, Your Honor.

12:17 22            I mean, from our understanding, that's accurate;

23   but, I mean, I can confer with counsel if he has --

12:17 24            THE COURT:  Do you wanna reach a stipulation?

12:17 25            MR. SCALLY:  -- a specific discovery request.

12:17  1           MR. WILKE:  I'm requesting all discovery about

       2    his -- Agent Cho's disclosure of his prior relationship with

       3    Alex Dao to supervisors Boykin and --

12:17  4           THE COURT:  And eventually, what's the relevance

       5    of that?  Once again, it's an attack on process or

       6    procedure.  What's the relevance -- in other words, how that

       7    affects either the bullets that are gathered.

12:17  8           And I think your response is going to be there's a

       9    bias on the Agent's part when he's taking a statement from a

      10    witness where he's preformed a determination that this is a

      11    murder and, because there's no recording, that accuracy

      12    might be in question.

12:17 13           MR. WILKE:  Couldn't've said it better myself,

      14    Your Honor.

12:17 15           THE COURT:  Okay.

12:17 16           MR. SCALLY:  There's -- there's -- I mean, in

      17    terms of the discovery request for Cho's disclosure of his

      18    prior relationship with Alex Dao, I don't -- I mean, we'll

      19    look into it.

12:18 20           THE COURT:  The case is coming to an end.  You

      21    both told me tomorrow.  So what position does that place the

      22    Court in?  In other words, it may be absolutely irrelevant,

      23    from my I perspective.  But it may have relevance.

12:18 24           I just don't want a record going up, if there's a

      25    conviction, that there's some cause or concern.  And the

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

116

```
  1   government's getting attacked, when you can easily resolve

  2   this.  'Cause this is going to be an appealable issue --

  3   everything will be appealable, if there's a first or second

  4   degree murder conviction or voluntary.  So you two have a

  5   discussion now.
```

12:18   6         Now, Mr. Staples, your turn.  I cut you off.  I

  7   just don't like tag teams back and forth.  You have the

  8   microphone now.

12:18   9         MR. STAPLES:  I apologize.  I didn't mean to

  10   interrupt.  And I have nothing.

12:19   11         THE COURT:  Okay.

12:19   12         If you do, you're more than welcome to speak.  I

  13   just don't like the back and forth with two counsel.

12:19   14         And if you need a recess for all this and you both

  15   stipulate, and they can remember this case, we'll go over to

  16   next week or the week after.  So be very careful about what

  17   you state to this Court.  I would suggest you have an

  18   informal conversation, 'cause these are issues that don't

  19   need to go up on appeal.  These are easily resolved right

  20   now.

12:19   21         MR. SCALLY:  Your Honor --

12:19   22         THE COURT:  No.  Counsel, you have a conversation.

12:19   23         Can't resolve it, then I'll work that out for you.

12:19   24     *(All government counsel and all defense counsel*

  25     *confer.)*

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

117

12:19   1          MR. WILKE:  I think we have a stipulation,

2  Your Honor, that resolves it.

12:19   3          THE COURT:  All right.  The stipulation.

12:19   4                    **STIPULATION**

12:19   5          MR. WILKE:  The stipulation would be that

6  Agent Cho disclosed his prior relationship with Alex Dao to

7  the prosecutors at the outset of this investigation.

12:20   8          THE COURT:  Counsel, on behalf of the government.

12:20   9          MR. SCALLY:  That -- we're prepared to stipulate

10  to that, Your Honor.

12:20  11          THE COURT:  Now, does that resolve this entire

12  area, so that I'm not having a sidebar?  It doesn't look

13  like the defense is hiding something?  That's what I'm

14  trying not to create, Mr. Wilke, is that -- those sidebars,

15  I think they're damaging.

12:20  16          MR. WILKE:  No.  I think that's fine, Your Honor.

17  That resolves the issue.  And also alleviates any need to

18  pursue any information from his supervisors.

12:20  19          THE COURT:  Acceptable to the government?

12:20  20          MR. SCALLY:  Yes, Your Honor.

12:20  21          THE COURT:  Mr. Wilke, do you want to state that

22  stipulation when we come back into session?

12:20  23          MR. WILKE:  Yes.

12:20  24          THE COURT:  Then we're back in session at

25  1:00 o'clock.  Thank you very much.

8:20-CR-00002-DOC  - 12/1/2021 - Day 10, Volume I

118

12:20  1            MR. SCALLY:  Thank you, Your Honor.

12:20  2       *(Lunch recess held at 12:20 p.m.)*

12:21  3       *(Further proceedings reported by Debbie Hino-Spaan*

       4    *in Volume II.)*

12:21  5                          -oOo-

12:21  6

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

```
12:21   1                        -oOo-

12:21   2

12:21   3                    CERTIFICATE

12:21   4

12:21   5       I hereby certify that pursuant to Section 753,

        6   Title 28, United States Code, the foregoing is a true and

        7   correct transcript of the stenographically reported

        8   proceedings held telephone in the above-entitled matter and

        9   that the transcript page format is in conformance with the

       10   regulations of the Judicial Conference of the United States.

12:21  11

12:21  12   Date:  January 12, 2022

12:21  13

12:21  14
12:21                          /s/ Debbie Gale
12:21  15                      _____
12:21                          DEBBIE GALE, U.S. COURT REPORTER
12:21  16                      CSR NO. 9472, RPR, CCRR

12:21  17

       18

       19

       20

       21

       22

       23

       24

       25
```