1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5   UNITED STATES OF AMERICA,        )
                                     )      <u>**CERTIFIED**</u>
6           Plaintiff,               )
                                     )
7       vs.                          )  No. 8:20-CR-00002-DOC
                                     )      Day 11, Volume I
8   HOANG XUAN LE, also known as     )
    Wayne, *also known as Wangsta*,  )
9                                    )
            Defendant.               )
10  _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17          Thursday, December 2, 2021

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25

1   **APPEARANCES OF COUNSEL:**

2

    FOR THE UNITED STATES OF AMERICA:
3

4        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
5        BY:  Gregory Shepherd Scally
              Assistant United States Attorney
6        411 West 4th Street
         8th Floor
7        Santa Ana, California 92701
         714-338-3592
8        gregory.scally@usdoj.gov

9        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
10       BY:  Gregory Staples
              Assistant United States Attorney
11       411 West 4th Street
         8th Floor
12       Santa Ana, California 92701
         714-338-3535
13       greg.staples@usdoj.gov

14

15   FOR DEFENDANT HOANG XUAN LE:

16       Craig Wilke (CJA appointed)
         LAW OFFICE OF CRAIG WILKE
17       305 North Harbor Boulevard, Suite 216
         Fullerton, California 92832
18       714-870-8900
         craig@craigwilkelaw.com
19
         Sheila Sarah Mojtehedi (CJA appointed)
20       LAW OFFICE OF SHEILA MOJTEHEDI
         806 East Avenida Pico, Suite I-291
21       San Clemente, CA 92673
         323-412-0472
22       sheila@mojtehedi.com

23

     ALSO PRESENT:
24
          Austin Casey, Special Agent, Coast Guard
25

1                          **I N D E X**

2     **PROCEEDINGS**                                              **PAGE**

3     JURY TRIAL - DAY 11, VOLUME I

4     MONGUIO, Ph.D, Ines (called)                              4

5     Further proceedings recorded by CourtSmart
      system in Volume II
6

7

8                          **WITNESSES**

9     **WITNESSES**                  **DIRECT  CROSS  REDIRECT  RECROSS**

10    MONGUIO, Ph.D, Ines

11    By Mr. Wilke                   5

12    By Mr. Wilke (continued)      55

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | **SANTA ANA, CALIFORNIA, THURSDAY, DECEMBER 2, 2021** |
| | 2 | **Day 11, Volume I** |
| | 3 | (8:39 a.m.) |
| 08:38 | 4 | *(In the presence of the jury.)* |
| 08:39 | 5 | THE COURT:  Good morning.  The jury's present, the |
| | 6 | alternates are present.  All counsel are present, the |
| | 7 | defendant and investigating agency. |
| 08:39 | 8 | Thank you. |
| 08:39 | 9 | Counsel, on behalf of the defendant, would you |
| | 10 | like to call the next witness, please. |
| 08:39 | 11 | MR. WILKE:  Thank you, Your Honor. |
| 08:39 | 12 | The defense calls Dr. Ines Monguio. |
| 08:39 | 13 | THE COURT:  Thank you. |
| 08:39 | 14 | And, doctor, if you'd be kind enough to stop at |
| | 15 | that location.  If you'd stop, Doctor.  Doctor, if you'd |
| | 16 | stop.  Would you raise your right hand, please. |
| 08:39 | 17 | Doctor, would you raise your right hand, please. |
| | 18 | Great.  Thank you so much. |
| 08:39 | 19 | **INES MONGUIO, PH.D, CALLED BY THE DEFENSE, SWORN** |
| 08:39 | 20 | THE WITNESS:  I do. |
| 08:39 | 21 | THE COURT:  Thank you. |
| 08:39 | 22 | If you'd walk along the side of the jury railing, |
| | 23 | the entrance to the jury [sic] box is closest to this wall. |
| | 24 | It's not this little door.  There's some steps. |
| 08:40 | 25 | Okay.  Thank you.  If you'd please be seated. |

08:40  1            Now, to your left -- yeah -- is a mask.  We're

2  gonna try to get the bottom strand, the black strand over

3  your head first.  So -- like this.  (Indicating.) 'cause the

4  nose portion is eventually going to be here.  Just slip that

5  back strand -- the black strand's on the bottom.

08:40  6         *(Witness puts on clear mask.)*

08:41  7            THE WITNESS:  This good enough?

08:41  8            THE COURT:  If it's comfortable for you.

08:41  9            If you'd face the jury, then, and state your full

10  name for the jurors, please.

08:41  11            THE WITNESS:  I'm sorry?

08:41  12            THE COURT:  Would you state your full name for the

13  jurors, please?

08:41  14            THE WITNESS:  Yes.  Ines, I-N-E-S, Monguio,

15  M-O-N-G-U-I-O.

08:41  16            THE COURT:  Thank you.

08:41  17            And, Counsel, this would be direct examination,

18  please.

08:41  19            MR. WILKE:  Thank you, Your Honor.

08:41  20                    **DIRECT EXAMINATION**

08:41  21  BY MR. WILKE:

08:41  22  Q.   Dr. Monguio, what is your profession?

08:41  23  A.   I'm a clinical neuropsychologist.

08:41  24  Q.   And can you briefly explain to the jury what the field

25  of neuropsychology is?

08:41  1   A.    Uh, yeah.  It's a subspecialty of the neurosciences

2   that studies the -- it studies the relation between um,

3   human behavior and the brain.  And in human behavior, it's

4   not just observable behavior but also cognition, um,

5   thinking, learning, remembering, forgetting, planning, um,

6   and also emotions, and, of course, observable behavior.

08:42  7   Q.   And as a clinical neuropsychologist, what do you do in

8   your practice?

08:42  9   A.    Um, I usually get referred, um, individuals who have

10   had acquired brain injury, either because of infections or

11   uh, trauma -- car accidents, falling from a construction

12   site -- or, um, degenerative/neurodegenerative condition,

13   the dementias or demyelination, like MS.  Um, and

14   sometimes -- uh, rarely -- I don't accept those, but

15   sometimes I've done diagnoses of ADDHD [sic] or -- or, um,

16   any of the nonacquired, uh, congenital.

08:43  17       And eventually, maybe like 10 percent of my, uh,

18   clinical work in neuropsychology has been for disability,

19   um, either mental retardation or, uh, any kind of, um,

20   congenital problems that merit a, uh -- uh, a traditional

21   rendering of disability.

08:43  22   Q.    (Inaudible.)

08:43  23       *(Court reporter requests clarification for the*

24       *record.)*

25

08:43   1   BY MR. WILKE:

08:43   2   Q.   As a clinical neuropsychologist, do you treat people

        3   with these conditions?

08:43   4   A.   Yes.

08:43   5   Q.   Does your neuropsychology practice have any other

        6   aspect to it?

08:43   7   A.   Any other what?

08:43   8   Q.   Aspect.  Is there -- in addition to clinical

        9   neuropsychology, uh, do you do any, uh -- anything else in

       10   the field of neuropsychology?

08:44  11   A.   Yes.  I also working in forensic neuro-psyche.

08:44  12   Q.   And what is forensic neuropsychology?

08:44  13   A.   Um, the -- when any clinician or any expert works in

       14   the forensic area, what we are doing is applying our

       15   knowledge of our science onto, um, legal matters, such as,

       16   um -- well, some say disability should also be defined as

       17   forensic.  I -- I think it's more clinical.

08:44  18        Uh, so, um, uh, the -- the progit [sic] -- um,

       19   injury -- uh, personal injury is, um, trying to adjust the

       20   type of injury that a patient -- um, an individual has

       21   received through whatever the injury was, and help the trier

       22   of fact determine the monetary amount that the disability,

       23   um, means.

08:45  24        Um, and workers compensation, the -- the issue is to

       25   apply causality, uh, what caused the deficits that the

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | neuropsychologist is measuring.  Um, and, uh -- and              |
|       | 2  | distribute a percentage of (unintelligible) --                   |
| 08:45 | 3  | *(Court reporter requests clarification for the*                 |
|       | 4  | *record.)*                                                        |
| 08:45 | 5  | THE COURT:  Doctor, doctor.  Doctor, we need to                  |
|       | 6  | slow down.  We're not able to get a transcript because we're     |
|       | 7  | speaking so quickly.                                             |
| 08:45 | 8  | Debbie, is the court reporter and she's trying to               |
|       | 9  | take down what you said.                                         |
| 08:45 | 10 | Deb, read back what you have.                                    |
| 08:45 | 11 | *(Court reporter requests clarification for the*                 |
|       | 12 | *record.)*                                                        |
| 08:45 | 13 | COURT REPORTER:  I heard the word "con-sol-ity"?                |
| 08:45 | 14 | THE COURT:  What was the word?                                   |
| 08:45 | 15 | THE WITNESS:  I'm sorry.  My accent.  And the mask              |
|       | 16 | is probably not making it any easier.                           |
| 08:45 | 17 | MR. WILKE:  "Causality," I think was the word.                 |
| 08:46 | 18 | Was that the word you used, Dr. Monguio?                        |
|       | 19 | Causality?                                                       |
| 08:46 | 20 | THE WITNESS:  Yes, ascribe a percentage of                     |
|       | 21 | causality -- I'll speak slower.                                 |
| 08:46 | 22 | THE COURT:  Is it "causality" or "pathology"?                  |
| 08:46 | 23 | MR. WILKE:  Causality.                                          |
| 08:46 | 24 | THE WITNESS:  What -- what caused --                           |
| 08:46 | 25 | MR. WILKE:  Yes.  Dr. Monguio, we need you to slow             |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | way down.                                                                |
| 08:46 | 2  | THE COURT:  Counsel, could you control the pace?                         |
| 08:46 | 3  | MR. WILKE:  Yeah, yes.                                                    |
| 08:46 | 4  | THE WITNESS:  I will do so.                                               |
| 08:46 | 5  | MR. WILKE:  Slow way down and shorten your answers                       |
|       | 6  | so the court reporter can get it.  Okay?                                 |
| 08:46 | 7  | THE WITNESS:  I will do my best.                                          |
| 08:46 | 8  | MR. WILKE:  Okay.                                                         |
| 08:46 | 9  | THE WITNESS:  Um --                                                       |
| 08:46 | 10 | MR. WILKE:  Let me -- let me restate the question.                       |
| 08:46 | 11 | BY MR. WILKE:                                                             |
| 08:46 | 12 | Q.   As part of your forensic neuropsychology practice, do               |
|       | 13 | you do evaluations also for criminal cases?                              |
| 08:46 | 14 | A.   Yes.                                                                 |
| 08:46 | 15 | Q.   Okay.  And between your clinical neuropsychology                     |
|       | 16 | practice and your forensic neuropsychology practice, what's              |
|       | 17 | the approximate percentage of your work?                                 |
| 08:47 | 18 | A.   Through the 30-plus years, I would say 80 clinical, 20               |
|       | 19 | criminal.                                                                 |
| 08:47 | 20 | Q.   So forensic neuropsychology is not your main focus;                  |
|       | 21 | your main focus is treating patients?                                    |
| 08:47 | 22 | A.   Correct.                                                             |
| 08:47 | 23 | Q.   Okay.                                                                |
| 08:47 | 24 | A.   Forgive me.  I include them in the clinical, not --                  |
|       | 25 | forensic as only criminal, which is what I thought you were              |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | asking me.                                                          |
| 08:47 | 2  | Q.   Okay.  That's fine.  That's fine.                             |
| 08:47 | 3  |      So let's talk a little bit about your background --           |
|       | 4  | okay? -- and your qualifications.                                  |
| 08:47 | 5  |      Please briefly describe, slowly, your educational            |
|       | 6  | qualifications.                                                     |
| 08:47 | 7  | A.   I, um, got my doctorate in 1988.  In 1989, I did my          |
|       | 8  | internship at the Veterans Administration Hospital in             |
|       | 9  | Long Beach with an emphasis in neuropsychology and                |
|       | 10 | behavioral medicine.  Then I started private practice in          |
|       | 11 | 1990, and got my first criminal case in 1992.                     |
| 08:48 | 12 | Q.   Okay.  So you said you got your Ph.D?                         |
| 08:48 | 13 | A.   Yes.                                                          |
| 08:48 | 14 | Q.   From where?                                                   |
| 08:48 | 15 | A.   (No response.)                                                |
| 08:48 | 16 | Q.   From what school?                                             |
| 08:48 | 17 | A.   Washington State University 1988.                            |
| 08:48 | 18 | Q.   And you're -- and was that in psychology?                    |
| 08:48 | 19 | A.   Yes.                                                          |
| 08:48 | 20 | Q.   And, uh, then you also indicated that you worked for         |
|       | 21 | the Veterans Administration Hospital?                             |
| 08:48 | 22 | A.   I did my internship with them, so, yes, I worked --          |
| 08:48 | 23 | Q.   And (inaudible) --                                            |
| 08:48 | 24 | A.   -- for them, but they paid me very little.                   |
| 08:48 | 25 | Q.   And how long was the internship with the --                  |

| | | |
|---|---|---|
| 08:48 | 1 | A.   One year. |
| 08:48 | 2 | Q.   And since 1989, when you got your Ph.D, uh, have you |
| | 3 | been a practicing neuropsychologist? |
| 08:49 | 4 | A.   Since 1990. |
| 08:49 | 5 | Q.   Since 1990. |
| 08:49 | 6 | A.   Yes. |
| 08:49 | 7 | Q.   Okay.  Are you licensed by the State of California? |
| 08:49 | 8 | A.   Yes. |
| 08:49 | 9 | Q.   In addition to, uh, your 30 years of experience as a |
| | 10 | clinical and forensic neuropsychologist, have you also, uh, |
| | 11 | consulted and/or taught? |
| 08:49 | 12 | A.   Yes. |
| 08:49 | 13 | Q.   And please briefly describe your teaching and |
| | 14 | consulting experience. |
| 08:49 | 15 | A.   Not consulting.  I have lectured on neuropsychology, |
| | 16 | both clinical -- in clinical use and forensic use at the |
| | 17 | forensic -- American College of Forensic Psychology for -- I |
| | 18 | think they meet once a year.  And I think I've lectured |
| | 19 | 20 times. |
| 08:50 | 20 | Q.   All right.  And are you a member of the American |
| | 21 | Academy of Clinical Neuropsychologists? |
| 08:50 | 22 | A.   Yes. |
| 08:50 | 23 | Q.   Are you a qualified medical examiner in California? |
| 08:50 | 24 | A.   Yes. |
| 08:50 | 25 | Q.   Do you regularly review articles -- journal articles |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | for scientific publications in neuropsychology?              |
| 08:50 | 2  | A.   Uh, long time ago.                                       |
| 08:50 | 3  | Q.   Okay.                                                    |
| 08:50 | 4  | A.   Not in the last 10 years or 15 years.                   |
| 08:50 | 5  | Q.   Okay.  What is the American College of Forensic         |
|       | 6  | Psychology?                                                  |
| 08:50 | 7  | A.   It's a society of Canadian and South Af- -- okay.  It's |
|       | 8  | an association based in United States, I think Southern      |
|       | 9  | California, that publishes their own journal on, um -- not   |
|       | 10 | just neuropsychology, but the application of psychology to   |
|       | 11 | legal matters.  And we meet once a year.  And there are      |
|       | 12 | presentations for three days, um, where new research or new  |
|       | 13 | teaching is distributed to the attendees.                    |
| 08:51 | 14 | Q.   And you're a member of this organization?               |
| 08:51 | 15 | A.   Yes.                                                     |
| 08:51 | 16 | Q.   And regularly participate in their training and --      |
| 08:51 | 17 | A.   Yes.                                                     |
| 08:51 | 18 | Q.   -- and meetings.  "Yes."                                 |
| 08:51 | 19 |      Are you board certified as a forensic examiner?         |
| 08:51 | 20 | A.   No.  Oh, wait.  Forensic?                                |
| 08:51 | 21 | Q.   As a forensic examiner.                                  |
| 08:51 | 22 | A.   No.                                                      |
| 08:51 | 23 | Q.   Are you a member'a the American Board of Forensic       |
|       | 24 | Examiners?                                                    |
| 08:51 | 25 | A.   Yes.                                                     |

| | | |
|---|---|---|
| 08:51 | 1 | Q.   And have you published articles and -- uh, relating to |
| | 2 | forensic neuropsychology? |
| 08:52 | 3 | A.   Yes. |
| 08:52 | 4 | Q.   How many times? |
| 08:52 | 5 | A.   Two. |
| 08:52 | 6 | Q.   Okay.  Now -- |
| 08:52 | 7 | A.   I'm sorry.  I need to correct myself. |
| 08:52 | 8 | Yes, I am board certified by the, um -- by the Board of |
| | 9 | Forensic Examiners. |
| 08:52 | 10 | Q.   Okay. |
| 08:52 | 11 | A.   I forgot.  I don't go to their meeting anymore -- |
| 08:52 | 12 | Q.   That's what -- |
| 08:52 | 13 | A.   -- yeah. |
| 08:52 | 14 | *(Simultaneous speaking.)* |
| 08:52 | 15 | BY MR. WILKE: |
| 08:52 | 16 | Q.   Okay.  So you are a Board Certified Forensic Examiner? |
| 08:52 | 17 | A.   Yes. |
| 08:52 | 18 | Q.   Okay.  Were you asked to perform forensic |
| | 19 | neuropsychology examination of Hoang Xuan Le, the defendant |
| | 20 | in this case? |
| 08:52 | 21 | A.   Yes. |
| 08:52 | 22 | Q.   And as part of that examination, did you review any |
| | 23 | documents? |
| 08:53 | 24 | A.   Yes. |
| 08:53 | 25 | Q.   Briefly describe the documents that you reviewed. |

| | | |
|---|---|---|
| 08:53 | 1 | A.    Interviews with Mr. Le's family, medical records -- can |
| | 2 | I look in my notes?  There's other -- two -- the -- those |
| | 3 | are the two that I remember. |
| 08:53 | 4 | Q.    Would it refresh your memory to look at your notes on |
| | 5 | the -- |
| 08:53 | 6 | A.    Could I? |
| 08:53 | 7 | THE COURT:  Yes. |
| 08:53 | 8 | THE WITNESS:  Yes. |
| 08:53 | 9 | BY MR. WILKE: |
| 08:53 | 10 | Q.    Have you looked -- |
| 08:54 | 11 | *(Simultaneous speaking.)* |
| 08:54 | 12 | *(Court reporter requests clarification for the* |
| | 13 | *record.)* |
| 08:54 | 14 | THE COURT:  Just a moment.  We're going to strike |
| | 15 | both the question and the answer. |
| 08:54 | 16 | MR. WILKE:  Let me ask -- let me ask the question. |
| 08:54 | 17 | BY MR. WILKE: |
| 08:54 | 18 | Q.    Having looked at your notes, does that refresh your |
| | 19 | memory about what documents you reviewed? |
| 08:54 | 20 | A.    Yes. |
| 08:54 | 21 | Q.    What documents did you review in your examination? |
| 08:54 | 22 | A.    The investigation reports from the, uh, interviews |
| | 23 | with, uh, Mr. Le's -- uh, Mr. Le's family. |
| 08:54 | 24 | The medical records. |
| 08:54 | 25 | A document, uh, titled, um, "Family Timeline." |

| | | |
|---|---|---|
| 08:54 | 1 | Q.   Did you also, uh, review school records of Mr. Le? |
| 08:54 | 2 | A.   School records, yes. |
| 08:54 | 3 | Q.   And also his birth records? |
| 08:54 | 4 | A.   Yes. |
| 08:54 | 5 | Q.   And did you also review the Second Superseding |
| | 6 | Indictment in this case? |
| 08:55 | 7 | A.   Yes. |
| 08:55 | 8 | Q.   And that lays out the allegations, uh -- the charges |
| | 9 | against Mr. Le; correct? |
| 08:55 | 10 | A.   Yes. |
| 08:55 | 11 | Q.   As part of your neuropsychological examination, did you |
| | 12 | also conduct a clinical interview of Mr. Le? |
| 08:55 | 13 | A.   That's part of the neuropsychological evaluation |
| | 14 | always.  Yes. |
| 08:55 | 15 | Q.   Briefly describe for the jury the various aspects of |
| | 16 | the clinical examination or clinical -- of the clinical |
| | 17 | interview.  What areas do you question him about? |
| 08:55 | 18 | A.   Well, um, I'm sure colleagues will do it somewhere -- |
| | 19 | uh, other ways.  But in my practice, I look at, um, any |
| | 20 | possibility of intrauterine or birth problems, um, |
| | 21 | development, how the family -- um, the environment in which |
| | 22 | the child, the person was developing, um, may have been, um, |
| | 23 | uh -- uh, difficulty or a plus or an advantage. |
| 08:56 | 24 | Um, I look at school, um, both academically and |
| | 25 | emotionally and behaviorally.  I look at a childhood |

illnesses.  I look at accidents:  Um, climbing a tree and
falling and hurting -- um, bicycles.

08:56    Um, I look at how the -- the adult I'm -- I'm
assessing, how was the social development, did he have
friends, did he not.  I look at, uh, the possibility of
depression or anxiety or any of the anxiety-like problems --
like, uh, you know, pulling hair or biting or, um -- um,
attention disorders.  Um, then I look at drug use or alcohol
use, history of.  At the -- the, um, impulsivity.

08:57    For example, a 23-year-old guy who has five children,
that's -- well -- and is not married, that's gonna give me
an idea of how -- how thoughtful is he in his regular life.

08:57    I look at, as adults, signs of depression, anxiety, um,
psychotic disorders, um, problems staying with reality and
understanding reality, impulsivity, um --

08:57   Q.   You -- you also considered their employment history?

08:57   A.   Yes.

08:57   Q.   And I think you mentioned this, but you also considered
their history of drug and alcohol use?

08:57   A.   Yes.

08:57   Q.   Okay.  You had indicated that you look at their social
development.  Does that include their (inaudible) --

08:58        *(Court reporter requests counsel use microphone to*
*be heard for the record.)*

08:58        THE WITNESS:  Yes.

| 08:58 | 1 | THE COURT:  Strike the question.  Just reask it, |
| | 2 | Counsel. |
| 08:58 | 3 | BY MR. WILKE: |
| 08:58 | 4 | Q.   You had indicated that you interviewed, uh, the person |
| | 5 | about their social development.  Does that include |
| | 6 | interviewing them about their social relationships with |
| | 7 | others? |
| 08:58 | 8 | A.   Yes. |
| 08:58 | 9 | Q.   Okay.  And in this case, during your clinical |
| | 10 | interview, did you -- did you perform all of the these -- |
| | 11 | interview Mr. Le on all of these areas you've just spoken |
| | 12 | of? |
| 08:58 | 13 | A.   Yes. |
| 08:58 | 14 | Q.   In discussing Mr. -- with Mr. Le his social |
| | 15 | relationships, did you discuss with him his relationship |
| | 16 | with James Dao, Natalie Nguyen, and Alex Dao? |
| 08:58 | 17 | A.   Not so much with the wife.  But with James, yes. |
| 08:58 | 18 | Q.   Okay.  Did you discuss with Mr. Le (inaudible) -- |
| 08:59 | 19 | *(Court reporter requests counsel use microphone to* |
| | 20 | *be heard for the record.)* |
| 08:59 | 21 | BY MR. WILKE: |
| 08:59 | 22 | Q.   Did you discuss with Mr. Le during the interview the |
| | 23 | events leading up to the conduct charged in this case? |
| 08:59 | 24 | A.   I didn't discuss it.  Um, I -- I, uh -- I asked a few |
| | 25 | questions and then let him talk.  That's part of -- yeah. |

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

18

| | | |
|---|---|---|
| 08:59 | 1 | Q.    Okay.  So you did receive some information from Mr. Le |
| | 2 | about the events relating to this case? |
| 08:59 | 3 | A.    Yes. |
| 08:59 | 4 | Q.    Okay.  And in forming your opinion, though, did you |
| | 5 | rely on Mr. Le's description of the events leading up to |
| | 6 | this case? |
| 08:59 | 7 | A.    I'm not understanding the question. |
| 08:59 | 8 | Q.    'Kay.  As part of your -- this is -- as part of your |
| | 9 | clinical interview you spoke to Mr. Le; correct? -- |
| | 10 | including about the events -- he gave you some information |
| | 11 | about the events charged in this case; correct? |
| 09:00 | 12 | A.    Yes. |
| 09:00 | 13 | Q.    Okay.  Did you reply on that -- his description of the |
| | 14 | events charged in this case in forming your opinions about |
| | 15 | his condition? |
| 09:00 | 16 | A.    No.  I was -- I was asked to do a neuropsychological |
| | 17 | evaluation. |
| 09:00 | 18 | Q.    Okay. |
| 09:00 | 19 | A.    What I was doing -- it's definitely listening to him, |
| | 20 | but, um -- he was the center of my focus for two straight |
| | 21 | days.  Um, this is called "building rapport."  I was paying |
| | 22 | attention to what he was saying and -- |
| 09:00 | 23 | Q.    Okay. |
| 09:00 | 24 | A.    -- and, um, letting him know that I was there with |
| | 25 | him, present and listening. |

| | | |
|---|---|---|
| 09:00 | 1 | Q.   Okay.  Now, do -- the neuropsychological examination |
| | 2 | that you conducted of Mr. Le, how long did that take? |
| 09:01 | 3 | A.   Two days. |
| 09:01 | 4 | Q.   Uh, how many hours each day? |
| 09:01 | 5 | A.   The first day, I started -- we started at 9:00 and we |
| | 6 | went until 4:30 without breaks.  And the second day, we |
| | 7 | started at 9:00 and we went till 5:00 o'clock without |
| | 8 | breaks. |
| 09:01 | 9 | Q.   And when was this evaluation (inaudible)? |
| 09:01 | 10 | A.   I'm sorry? |
| 09:01 | 11 | Q.   When was this evaluation performed? |
| 09:01 | 12 | A.   June.  June 10 and -- 10 and 11. |
| 09:01 | 13 | Q.   Of this year? |
| 09:01 | 14 | A.   Yes. |
| 09:01 | 15 | Q.   2019?  Sorry.  2021? |
| 09:01 | 16 | A.   Hundred twenty-one [sic]. |
| 09:01 | 17 | Q.   Yes.  Where was this examination performed? |
| 09:01 | 18 | A.   I'm sorry? |
| 09:01 | 19 | Q.   Where was this examination performed? |
| 09:01 | 20 | A.   In the jail.  In the Santa Ana jail. |
| 09:01 | 21 | Q.   Okay.  And was Mr. Le being housed there at the time? |
| 09:01 | 22 | A.   Correct. |
| 09:02 | 23 | Q.   Was it your understanding that he'd been housed there |
| | 24 | since December of 2019? |
| 09:02 | 25 | A.   Yes. |

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

20

| | | |
|---|---|---|
| 09:02 | 1 | Q.   And at the Santa Ana jail, where in the jail, uh, was |
| | 2 | the examination performed? |
| 09:02 | 3 | A.   I don't know the jail, so I don't know that I can -- |
| 09:02 | 4 | Q.   Well, what were the -- what was the environment?  Was |
| | 5 | it a private room? |
| 09:02 | 6 | A.   It's -- |
| 09:02 | 7 | Q.   Was it in a cell? |
| 09:02 | 8 | A.   It's a private room and there were, uh, shields |
| | 9 | between, um -- between Mr. Le and I, with a slot where I |
| | 10 | could pass through the testing material. |
| 09:02 | 11 | Q.   So it was a glass divider between you? |
| 09:02 | 12 | A.   Yes. |
| 09:02 | 13 | Q.   Okay.  And you were able to slip papers in between? |
| 09:02 | 14 | A.   Correct. |
| 09:02 | 15 | Q.   Okay.  Now, in addition to reviewing records and |
| | 16 | conducting the clinical interview of Mr. Le, does your |
| | 17 | neuro-psyche examination also involve testing? |
| 09:03 | 18 | A.   Yes. |
| 09:03 | 19 | Q.   Okay. |
| 09:03 | 20 | A.   Extensive. |
| 09:03 | 21 | Q.   Okay.  And is that primarily what dist -- the testing |
| | 22 | aspect involved in a neuropsychological examination, is that |
| | 23 | the primary distinction between neuropsychological testing |
| | 24 | and a simple psychological evaluation? |
| 09:03 | 25 | A.   Um, well, I'm (unintelligible) -- |

09:03    1          *(Court reporter requests clarification for the*
         2          *record.)*

09:03    3              THE COURT:  Just a moment.

09:03    4              We didn't get the answer.

09:03    5              MR. WILKE:  Yeah.  Dr. Monguio, you need to slow
         6    down in your response.

09:03    7              THE WITNESS:  Oh.

09:03    8              MR. WILKE:  She can't -- the court reporter can't
         9    keep up with you.

09:03   10              THE WITNESS:  So not only neuropsychology does
        11    work hard to get objective measures, but neuropsychology is
        12    the one that started earlier and has done the most.  Maybe
        13    because the brain is so complex and there are so many
        14    functions.

09:04   15    Q.    But neuropsychologists rely on these standardized tests
        16    in order to diagnose people with conditions affecting their
        17    brain; correct?

09:04   18    A.    Definitely, yes.

09:04   19    Q.    Now, in administering these tests, how do you determine
        20    whether the person taking the test is cooperating and giving
        21    a valid response?

09:04   22    A.    Well, um, you do the interview and you watch like a
        23    hawk.  And then, um -- well, you administer validated
        24    objective measures that are available that test a person's
        25    effort and motivation.

09:04   1    Q.   Okay.  And -- and these tests of a person's effort and

        2    motivation, are they recognized in the field of

        3    neuropsychology as being valid indicators of whether the

        4    person is putting forth their best effort?

09:05   5    A.   Yes.

09:05   6    Q.   And did you give these validity tests to Mr. Le in

        7    administering these evaluation?

09:05   8    A.   Yes.

09:05   9    Q.   Describe briefly the validity test -- well, did you

        10   make -- did you form an opinion about whether he was putting

        11   forth his best effort?

09:05   12   A.   Yes.

09:05   13   Q.   What was that opinion?

09:05   14   A.   He was giving me the best that he could in the test

        15   measuring effort and motivation.  And he was not pretending

        16   to be more impaired than -- uh, he was not pretending to be

        17   impaired, as far as we knew.  And I could trust that the

        18   results of the rest of the neuropsychological battery gave

        19   me reliable results.

09:06   20   Q.   And what specific test did you perform that led you to

        21   conclude that he was putting forth his best effort?

09:06   22   A.   Um, my standard practice is to administer an effort or

        23   motivation test at the beginning of each session with, um --

        24   with a patient, defendant, whatever.

09:06   25        The first day administered that count

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | (unintelligible) --                                          |
| 09:06 | 2  |        *(Court reporter requests clarification for the*      |
|       | 3  |    *record.)*                                                 |
| 09:06 | 4  |        THE WITNESS:  "Dot counting test."  D-O-T,            |
|       | 5  | counting, C-O-U-N-T-I-N-G, test.                             |
| 09:06 | 6  | BY MR. WILKE:                                                |
| 09:06 | 7  | Q.   And describe briefly what that is.  What is a dot       |
|       | 8  | counting test?                                               |
| 09:06 | 9  | A.   Yeah.  Yeah, you have dots on a page that you flip and  |
|       | 10 | and -- you ask the individual to count the dots, and you    |
|       | 11 | measure very quick -- very precisely.  Uh, the first six    |
|       | 12 | sets are, um, random -- they look random on the page.  The  |
|       | 13 | second six sets are organized.  So we have an idea that if  |
|       | 14 | you're effort -- your effort is good on the second set,     |
|       | 15 | you're going to count faster, because we process information|
|       | 16 | faster when -- when it's organized for us.  And then you -- |
|       | 17 | you, um -- you add and you take the mean and then you       |
|       | 18 | compare it to the norms and --                              |
| 09:07 | 19 |        THE COURT:  Just a little slower, please.            |
| 09:07 | 20 |        MR. WILKE:  Slow down.  You need to slow down.       |
| 09:07 | 21 |        THE WITNESS:  -- and the norms tell you whether      |
|       | 22 | the patient -- whether individual counted fast enough and   |
|       | 23 | accurately enough to be reliable --                         |
| 09:07 | 24 |        MR. WILKE:  Okay.                                    |
| 09:07 | 25 |        THE WITNESS:  -- valid.                              |

| | | |
|---|---|---|
| 09:07 | 1 | BY MR. WILKE: |
| 09:07 | 2 | Q.   So these are relatively, would you say, simple tests |
| | 3 | that rule out people that might be trying to pretend that |
| | 4 | they're impaired? |
| 09:07 | 5 | A.   Correct. |
| 09:08 | 6 | Q.   And you said you inter -- uh, you did more than one of |
| | 7 | these validity tests? |
| 09:08 | 8 | A.   Yes. |
| 09:08 | 9 | Q.   Okay. |
| 09:08 | 10 | A.   The second day I administered one test that, um, asks |
| | 11 | questions, and that would help -- no -- that would clarify |
| | 12 | whether a defendant is attempting to fake, uh, a psychosis |
| | 13 | or depression or mental retardation. |
| 09:08 | 14 | Q.   And what test was that? |
| 09:08 | 15 | A.   Uh, um -- he -- his score was 5.  And I think the |
| | 16 | cutoff is 13.  He did very well.  He's -- he was not |
| | 17 | reporting phony symptoms or, um, engaging me how to "peachy" |
| | 18 | for him -- |
| 09:08 | 19 | *(Court reporter requests clarification for the* |
| | 20 | *record.)* |
| 09:08 | 21 | BY MR. WILKE: |
| 09:08 | 22 | Q.   Could you repeat the last -- |
| 09:08 | 23 | A.   Engaging me, having "peachy" -- |
| 09:09 | 24 | *(Court reporter requests clarification for the* |
| | 25 | *record.)* |

| | | |
|---|---|---|
| 09:09 | 1 | THE WITNESS:  Having "pity" on him in any way. |
| 09:09 | 2 | BY MR. WILKE: |
| 09:09 | 3 | Q.   Which test was that, the validity test you performed |
| | 4 | the second day? |
| 09:09 | 5 | A.   It is -- um, the Miller Forensic -- Miller Forensic |
| | 6 | Assessment of Symptoms. |
| 09:09 | 7 | Q.   And you indicated that had -- well, were there any |
| | 8 | other validity tests you performed with Mr. Le during your |
| | 9 | two-day evaluation? |
| 09:09 | 10 | A.   Yes.  The California Verbal Learning Test has an |
| | 11 | embedded test -- an embedded, um, task that is a measure of |
| | 12 | motivation and effort. |
| 09:10 | 13 | Q.   And were the results of that test indicative that -- |
| 09:10 | 14 | A.   (Unintelligible.) |
| 09:10 | 15 | *(Simultaneous speaking.)* |
| 09:10 | 16 | *(Court reporter requests clarification for the* |
| | 17 | *record.)* |
| 09:10 | 18 | THE WITNESS:  Yes. |
| 09:10 | 19 | THE COURT:  No.  I'm going to have to strike the |
| | 20 | question and the answer.  I couldn't see it on realtime, |
| | 21 | Counsel. |
| 09:10 | 22 | MR. WILKE:  Yes.  I'll repeat, Your Honor. |
| 09:10 | 23 | BY MR. WILKE: |
| 09:10 | 24 | Q.   Was the -- were the test results from the California |
| | 25 | learning test, uh, reflective that Mr. Le was putting forth |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | his best efforts?                                        |
| 09:10 | 2  | A.   Yes.                                                 |
| 09:10 | 3  | Q.   And then did you also perform a Victoria Symptom     |
|       | 4  | Validity Test?                                            |
| 09:10 | 5  | A.   Yes.                                                 |
| 09:10 | 6  | Q.   And, again, were those results consistent with Mr. Le |
|       | 7  | putting forth his best efforts?                          |
| 09:10 | 8  | A.   The results were valid.  He was putting forth his best |
|       | 9  | effort.                                                   |
| 09:10 | 10 | Q.   Now, when you perform these validity tests, um, where |
|       | 11 | in the, uh, during the course of the examination -- when |
|       | 12 | during (inaudible) --                                    |
| 09:10 | 13 | *(Court reporter requests counsel use microphone to*    |
|       | 14 | *be heard for the record.)*                              |
| 09:10 | 15 | BY MR. WILKE:                                            |
| 09:10 | 16 | Q.   When you perform the validity tests, when, during the |
|       | 17 | course of the examination, do you do that?              |
| 09:11 | 18 | A.   Always at the beginning.                           |
| 09:11 | 19 | Q.   Why is that?                                       |
| 09:11 | 20 | A.   Because I want to test the patient's motivation when he |
|       | 21 | or she is at his best, at the beginning of the session.  I |
|       | 22 | don't want to test his motivation or her motivation or  |
|       | 23 | effort at the end of an eight-hour session when they're |
|       | 24 | tired.                                                   |
| 09:11 | 25 | Q.   Now, in addition -- let's talk about the specific tests |

|  |  |  |
|--|--|--|
|  | 1 | that you performed on Mr. Le to determine whether he had any |
|  | 2 | cognitive impairments.  Okay?  And in fact, that is the |
|  | 3 | purpose of your testing; correct? -- to determine whether |
|  | 4 | there are any deficits or cognitive impairments in his |
|  | 5 | brain; correct? |
| 09:11 | 6 | A.   Yes. |
| 09:11 | 7 | Q.   Okay.  Did you test to -- initially to determine his |
|  | 8 | intellectual functioning? |
| 09:12 | 9 | A.   Yes. |
| 09:12 | 10 | Q.   And what is the standard test that you performed to do |
|  | 11 | that? |
| 09:12 | 12 | A.   The Wechsler Adult Intelligence Scales, fourth version. |
| 09:12 | 13 | Q.   Is that also know as the WAIS-IV? |
| 09:12 | 14 | A.   Yes. |
| 09:12 | 15 | Q.   And is that just a test of IQ, essentially, commonly |
|  | 16 | known as a standard IQ test? |
| 09:12 | 17 | A.   It's the gold standard. |
| 09:12 | 18 | Q.   Okay.  And what was the result of Mr. Le's WAIS-IV |
|  | 19 | test? |
| 09:12 | 20 | A.   He was overall average, on the low end average. |
| 09:13 | 21 | Q.   I'm sorry.  Could you repeat what you just said?  I |
|  | 22 | didn't hear the last answer. |
| 09:13 | 23 | A.   I'm trying to work this around.  Um, his -- his full |
|  | 24 | scale IQ was, um, within the average range. |
| 09:13 | 25 | Q.   Okay.  So what was his full scale IQ? |

| | | |
|---|---|---|
| 09:13 | 1 | A. 88. That's in the 21st percentage, meaning 79 percent |
| | 2 | of people his age would do better than him. |
| 09:13 | 3 | Q. I'm sorry. We're looking at the WAIS-IV results? |
| 09:13 | 4 | A. Yes. |
| 09:13 | 5 | Q. And what was his composite score on the WAIS-IV results |
| | 6 | full scale? |
| 09:14 | 7 | A. 88. 21st percentile. |
| 09:14 | 8 | Q. 21st percentile -- |
| 09:14 | 9 | A. Yes. |
| 09:14 | 10 | Q. -- correct? |
| | 11 | And is that -- would that generally be considered his |
| | 12 | IQ score? |
| 09:14 | 13 | A. Yes. |
| 09:14 | 14 | Q. Okay. And, uh -- |
| 09:14 | 15 | A. His full scale IQ. |
| 09:14 | 16 | Q. His full scale IQ. |
| 09:14 | 17 | A. Yes. |
| 09:14 | 18 | Q. Okay. Now, in measuring his full scale IQ, did you |
| | 19 | notice discrepancies between different parts of his |
| | 20 | intelligence? |
| 09:14 | 21 | A. Yes. |
| 09:14 | 22 | Q. What was the discrepancy that you observed in measuring |
| | 23 | his intellectual functioning? |
| 09:14 | 24 | A. The worst -- the worst, um, index -- so he did worst in |
| | 25 | the subtests that required processing speed. |

| | | |
|---|---|---|
| 09:14 | 1 | Q.   What is "processing speed"? |
| 09:14 | 2 | A.   The -- the speed and/or efficiency by which an |
| | 3 | individual takes in and understands information coming from |
| | 4 | the outside. |
| 09:15 | 5 | Q.   And you indicated that he did worse on that.  What |
| | 6 | was -- uh, what percentage-tile [sic] of the population does |
| | 7 | he call into with respect -- |
| 09:15 | 8 | A.   Yeah, he was -- |
| 09:15 | 9 | *(Simultaneous speaking.)* |
| 09:15 | 10 | *(Court reporter requests clarification for the* |
| | 11 | *record.)* |
| 09:15 | 12 | BY MR. WILKE: |
| 09:15 | 13 | Q.   Okay.  What percentile of the population did Mr. Le |
| | 14 | fall into with regard to his intellectual processing speed? |
| 09:15 | 15 | A.   Yes.  82 percent of the population his age would do |
| | 16 | better than him. |
| 09:15 | 17 | Q.   So he was in the 18th percentile? |
| 09:15 | 18 | A.   Yes. |
| 09:15 | 19 | Q.   And you had indicated that his full scale IQ was in the |
| | 20 | 21st percentile? |
| 09:15 | 21 | A.   Yes. |
| 09:15 | 22 | Q.   Does that mean that 79 percent of the general |
| | 23 | population for his age would measure higher? |
| 09:16 | 24 | A.   Yes. |
| 09:16 | 25 | Q.   Okay.  Now, the fact that his processing speed was |

1    measurably lower than his composite score, did that lead you

2    to at least suspect that there may be some cognitive

3    deficit?

09:16    4    A.    The -- the full scale score is, uh -- it is composed of

5    every other index in the IQ.

09:16    6         So what I looked at to give me the idea that something

7    was going on was -- was the difference between the

8    perceptual index and the processing speed index, because the

9    tasks in the processing speed index are both visual.  And he

10   measured at the 18th percentile.

09:17    11        However, perceptual reasoning was his strong -- was

12   strong, at the 30th percentile.  So that he would do so

13   poorly at processing speed, but within the norm for

14   perceptual reasoning, gave me something to think about.

09:17    15   Q.    Okay.  And what -- in terms of when you say gave you

16   "something to think about," what is -- what is that

17   indicative of when a person's, uh, processing speed is

18   measurably lower than these other aspects of their

19   intellectual functioning?

09:17    20   A.    Well, that early in my evaluation, I didn't draw any

21   conclusions.  I just went, "Hmm, think about this."

09:18    22   Q.    Okay.  Did you also measure -- uh, well, did you also

23   measure, uh, Mr. Le's attention?

09:18    24   A.    Yes.

09:18    25   Q.    And what did you conclude -- what test (inaudible) --

09:18      1          *(Court reporter requests counsel use microphone to*

           2          *be heard for the record.)*

09:18      3    BY MR. WILKE:

09:18      4    Q.   In order to measure Mr. Le's attention, what did you

           5    do?  What test did you perform?

09:18      6    A.   I administer -- well, um, hold on.  The -- the WAIS and

           7    the one -- and the one I 'minister after the WAIS also have

           8    attention measures.  But I specifically administer the

           9    comprehensive trail-making test to measure attention in five

          10    different ways.

09:19     11    Q.   Okay.  And can you describe briefly what the

          12    comprehensive trail-making test is? -- briefly, please, and

          13    slowly.

09:19     14    A.   Yes.

09:19     15          You present to the individual a page with, um, circles,

          16    with numbers in them.  And you -- uh, circles with

          17    numbers -- uh, empty circles and designs, just a few of

          18    them.  And you have 'em practice connecting just numbers,

          19    not anything else.  And you correct if you have to.

09:19     20          And then the first trail -- um, the first task is

          21    presented on a page, just a regular -- regular page like

          22    this -- um, with circles with numbers in them.  And you tell

          23    them to connect in order, as quickly as you can, and you

          24    measure, correct if needed.

09:20     25          The second test has also circles and numbers in them,

1    but it also has circles that are empty.  So it gets -- the

2    page gets busier.  And, um, you asked the -- him or her to

3    connect the -- the numbers, the circles with numbers in them

4    in order without touching the empty circles.

09:20  5         And then the third trail, it's really, really busy

6    because it has circles with numbers, empty circles, and

7    circles with designs -- star mark -- marks.  And you ask 'em

8    to again connect the numbers in order without touching any

9    of the other circles.  So visually it's very busy.  And you

10   correct, if needed.

09:20  11        Um, then you have 'em, um --

09:20  12   Q.   Let me -- let me --

09:20  13   A.   You have 'em practice on another page with just a few

14   that has, uh, numbers and -- uh, numbers inside circles and,

15   um, square, um -- longish squares that have words that are

16   number words.  And you have 'em practice connecting in

17   order -- uh, one, two -- the -- the word "two" and so on.

09:21  18        Then you give them a real task, which is the whole

19   thing on the page.  And the last task is circles again --

20   and you have the patient practice before -- uh, circles

21   again with numbers and letters.  And you ask -- and then he

22   practices, and then you -- you give 'em the real test, which

23   is a lot more.  And then he has to alternate, um, connecting

24   in order from the first number to the first letter to the

25   second number to the third letter and so on.

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

33

| | | |
|---|---|---|
| 09:21 | 1 | Q.   Okay.  Dr. Monguio, just if I can summarize here:  It's |
| | 2 | a written test; correct? -- that the patient or the person |
| | 3 | you're evaluating performs; correct? -- with a pencil and |
| | 4 | paper; correct? |
| 09:22 | 5 | A.   Not written.  The test is printed.  I buy them from the |
| | 6 | publisher. |
| 09:22 | 7 | Q.   Oh, I understand.  It's a -- it's a piece of paper with |
| | 8 | various symbols and dots on the paper; correct? |
| 09:22 | 9 | A.   Yes. |
| 09:22 | 10 | Q.   And the subject has a pencil and he connects the -- |
| 09:22 | 11 | A.   Correct.  It's a trail. |
| 09:22 | 12 | *(Simultaneous speaking.)* |
| 09:22 | 13 | *(Court reporter requests clarification for the* |
| | 14 | *record.)* |
| 09:22 | 15 | THE COURT:  Just a moment. |
| 09:22 | 16 | MR. WILKE:  Thank you. |
| 09:22 | 17 | THE COURT:  No.  Counsel, wait. |
| 09:22 | 18 | *(Record read.)* |
| 09:22 | 19 | BY MR. WILKE: |
| 09:22 | 20 | Q.   Okay.  Let me -- let me just, if I understand what |
| | 21 | you're -- your testimony here, Dr. Monguio. |
| 09:23 | 22 | The test involves a piece of paper; correct? -- that |
| | 23 | has the testing information on it; correct? |
| 09:23 | 24 | A.   The stimuli, yes. |
| 09:23 | 25 | Q.   And this paper with the stimuli on it is presented to |

|  |  |  |
|---|---|---|
|  | 1 | the subject who's given a pencil; correct? |
| 09:23 | 2 | A.   Yes. |
| 09:23 | 3 | Q.   And he's given instructions about connecting the |
|  | 4 | symbols on the paper; correct? |
| 09:23 | 5 | A.   No. |
| 09:23 | 6 | Q.   Well -- |
| 09:23 | 7 | A.   He has to connect the numbers in the circles on the |
|  | 8 | page. |
| 09:23 | 9 | Q.   The numbers and the circles and he has to connect them |
|  | 10 | in order? |
| 09:23 | 11 | A.   Correct. |
| 09:23 | 12 | Q.   Okay.  So it's essentially "connect the dots"; correct? |
|  | 13 | Like it's almost a "connect the dots" thing following a |
|  | 14 | certain set of rules that are specified on the test; |
|  | 15 | correct? |
| 09:23 | 16 | A.   Um, I'm -- I'm not sure I can agree. |
| 09:24 | 17 |      For me, "connect the dots" is -- is -- it is a very |
|  | 18 | visual -- I mean, you're trying to connect the dots so what |
|  | 19 | you're doing looks like -- like a little house. |
| 09:24 | 20 | Q.   Yes.  And here it's random, though.  The "connect the |
|  | 21 | dots" is random; correct?  It just has to be done in a |
|  | 22 | certain order? |
| 09:24 | 23 | A.   Therefore, not random. |
| 09:24 | 24 |      The -- the result -- the visual result of connecting |
|  | 25 | the numbers has no relevance to the task that I'm asking the |

|       | 1  | individual to perform for me. |
| 09:24 | 2  | Q.   Yes.  No.  I understand that. |
| 09:24 | 3  |      But the point of the test is to determine how quickly |
|       | 4  | the person can go from one symbol to the next correct |
|       | 5  | symbol, and how quickly he can perform that with accuracy; |
|       | 6  | correct? |
| 09:24 | 7  | A.   Okay.  Yes. |
| 09:24 | 8  | Q.   Is that -- is that accurate? |
| 09:24 | 9  | A.   I'm -- I'm having trouble with you using the word |
|       | 10 | "symbol" for a number or a letter. |
| 09:25 | 11 | Q.   Whatever it is, whether it's a number or a letter -- it |
|       | 12 | could be either -- but he's given instructions:  Go from "1" |
|       | 13 | to "A" to "2" to "B" -- something like that; correct? |
| 09:25 | 14 | A.   Correct. |
| 09:25 | 15 | Q.   Okay.  So he's given those instructions -- |
| 09:25 | 16 | A.   Yes. |
| 09:25 | 17 | Q.   -- correct? |
| 09:25 | 18 |      And then he's timed on performing that task; correct? |
| 09:25 | 19 | A.   Yes. |
| 09:25 | 20 | Q.   And then when you review the completed, uh, product, |
|       | 21 | you determine whether he did it accurately within the amount |
|       | 22 | of time specified. |
| 09:25 | 23 |          MR. STAPLES:  Object to the leading questions, |
|       | 24 | Your Honor. |
| 09:25 | 25 |          THE COURT:  You can lead an expert, Counsel, under |

|       |    | the code.  Overruled. |
|-------|----|-----------------------|
| 09:25 | 2  | BY MR. WILKE: |
| 09:25 | 3  | Q.   So you also, then, uh, determine how accurate he was in |
|       | 4  | completing the task; correct? |
| 09:25 | 5  | A.   No.  The accuracy I determine as I'm watching -- |
| 09:25 | 6  | Q.   Okay. |
| 09:25 | 7  | A.   -- the subject perform the task. |
| 09:25 | 8  | At the end, what I do is to compare the time that it |
|       | 9  | took to complete each trail with the norms, what the average |
|       | 10 | normative sample of people doing that same task, um, did -- |
|       | 11 | how was the normal -- quote/unquote, normal average |
|       | 12 | individual, uh, performed that same task.  And then I |
|       | 13 | compare how he performed with how average Joe performs. |
| 09:26 | 14 | Q.   Okay.  And then I think you indicated that there are |
|       | 15 | five separate trails in this test; correct? |
| 09:26 | 16 | A.   Yes. |
| 09:26 | 17 | Q.   There's five parts to this test; right? |
| 09:26 | 18 | A.   Yes. |
| 09:26 | 19 | Q.   What are referred to as "trails"; correct? |
| 09:26 | 20 | A.   Correct. |
| 09:26 | 21 | Q.   This is the comprehensive trail-making test? |
| 09:26 | 22 | A.   Yes. |
| 09:26 | 23 | Q.   And is it accurate to say that each trail becomes more |
|       | 24 | complex? |
| 09:26 | 25 | A.   Yes. |

09:26  1    Q.    Okay.  So by the fifth trail of these -- connecting

       2    these numbers, letters in a particular order -- by the fifth

       3    trail, that is the most complex kind of task that the person

       4    is asked to do and being timed for; correct?

09:27  5    A.    Um, it depends.  Because, um, the third trail -- the --

       6    depends on how an individual operates.

09:27  7          The third trail is very -- is -- for someone who has --

       8    who is distractible, has problems processing visual

       9    information quickly and efficiently, the third trail is more

      10    complex than the fourth trail that has just number and

      11    letter words.  There's fewer -- there's less information on

      12    the page.

09:27 13          So the Trail 4, for some individuals is as easy as

      14    Trail 1 or 2.  But Trail 3, if it's visually and -- and

      15    speed of processing and distractibility -- Trail 3 is very

      16    complex.

09:28 17    Q.    How about Trail 5?  What's the complexity level of

      18    that?

09:28 19    A.    Yeah.  Um, that one is -- is a classic.  Um, what the

      20    individual has to do is to process...

09:28 21          Okay.  So, um, multitasking is an extreme attempt to do

      22    what we do normally, um, any of us, which is to be able to

      23    keep in mind and operating, um, more than one channel at one

      24    time.  So "parallel processing" refers to our ability to be

      25    operating this one system of letters -- okay? -- but at the

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | same time we know that the system of numbers is also        |
|       | 2  | operating, so there's a parallel processing.                |
| 09:29 | 3  | And task -- Trail 5, the last task, you ask the             |
|       | 4  | individual to switch between the operating system of letters|
|       | 5  | and the operating system of, um -- of numbers so that he has|
|       | 6  | to go and access the parallel processes of one system       |
|       | 7  | letters, one system numbers.                                |
| 09:29 | 8  | Q.   So it measures a person's ability to keep two different|
|       | 9  | sets of thoughts in his head at the same time, if you will; |
|       | 10 | is that fair?                                               |
| 09:29 | 11 | A.   Yes.  And go between one and the other.                |
| 09:29 | 12 | Q.   Okay.  So let's talk about the results on these --     |
|       | 13 | Trail 3, which you've talked about -- and Trail 5.          |
| 09:29 | 14 | In what percentile of the population did Mr. Le fall        |
|       | 15 | into on the Trail 5 that measures his -- the parallel       |
|       | 16 | processing --                                               |
| 09:29 | 17 | A.   Uh, yes.                                               |
| 09:30 | 18 | Q.   -- or ability to keep two different ideas in his head  |
|       | 19 | at the same time.  What percentage of the population, did he |
|       | 20 | measure?                                                    |
| 09:30 | 21 | A.   Trail 3, which is --                                   |
| 09:30 | 22 | Q.   My question here is Trail 5.                           |
| 09:30 | 23 | A.   Oh, 5.  In Trail 5, he did the second percentile.      |
| 09:30 | 24 | Q.   Meaning that 98 percent of the population in his range |
|       | 25 | are better at parallel processing that we discussed than he |

|         |    |                                                               |
|---------|----|---------------------------------------------------------------|
|         | 1  | is; correct?                                                  |
| 09:30   | 2  | A.   At the speed of efficiently doing parallel processing.   |
| 09:30   | 3  | Q.   Okay.                                                     |
| 09:30   | 4  | A.   I don't have access at how good or how poor his          |
|         | 5  | parallel processing is.  But the speed of moving from one     |
|         | 6  | system to --                                                  |
| 09:30   | 7  | Q.   Is (inaudible) --                                         |
| 09:30   | 8  | *(Simultaneous speaking.)*                                     |
| 09:30   | 9  | *(Court reporter requests clarification for the*              |
|         | 10 | *record.)*                                                     |
| 09:30   | 11 | THE COURT:  Strike the question.  Strike the                  |
|         | 12 | answer.  There's talkover, Counsel, so we can't get an        |
|         | 13 | accurate transcript.                                          |
| 09:30   | 14 | BY MR. WILKE:                                                  |
| 09:30   | 15 | Q.   So his -- he measures in the bottom 2 percent of the     |
|         | 16 | population in terms of the speed by which his brain can       |
|         | 17 | switch from one idea to another; correct?                     |
| 09:31   | 18 | A.   For his age.                                              |
| 09:31   | 19 | Q.   "For his age."                                           |
| 09:31   | 20 | A.   Yes.                                                      |
| 09:31   | 21 | Q.   And then what percentile of the population did Mr. Le    |
|         | 22 | measure in determining on Trail 3 --                          |
| 09:31   | 23 | A.   First percentile.                                         |
| 09:31   | 24 | Q.   The what?                                                 |
| 09:31   | 25 | A.   First percentile.                                         |

| | | |
|---|---|---|
| 09:31 | 1 | Q.   So 99 percent of the population would measure better |
| | 2 | than he does; correct? |
| 09:31 | 3 | A.   His age, yes. |
| 09:31 | 4 | Q.   And the Trail 3 on the comprehensive trail-making test |
| | 5 | again measures what? |
| 09:31 | 6 | A.   Efficient -- efficient and accurate and fast processing |
| | 7 | of visual information so that only the relevant stimulus is |
| | 8 | attended to. |
| 09:32 | 9 | Q.   So, uh, his -- so, for instance, a person's ability to, |
| | 10 | uh, weed out the background noise, if you will? |
| 09:32 | 11 | A.   Yes, that's good.  The visual background noise, yes. |
| 09:32 | 12 | Q.   Distractions that are around them? |
| 09:32 | 13 | A.   Irrelevant information. |
| 09:32 | 14 | Q.   Uh, the person's ability to focus on the task in front |
| | 15 | of them? |
| 09:32 | 16 | A.   Correct. |
| 09:32 | 17 | Q.   And 99 percent of the population in his age -- are |
| | 18 | better than that -- than he is? |
| 09:32 | 19 | MR. STAPLES:  Objection.  Asked and answered. |
| 09:32 | 20 | THE COURT:  Overruled. |
| 09:32 | 21 | You can answer the question, Doctor. |
| 09:32 | 22 | THE WITNESS:  Yes, his age. |
| 09:32 | 23 | BY MR. WILKE: |
| 09:33 | 24 | Q.   Now, were there other tests that you performed on |
| | 25 | Mr. Le that you determined were significant in reaching your |

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | opinions?                                                       |
| 09:33 | 2  | A.    Yes.                                                      |
| 09:33 | 3  | Q.    Which other tests would you, uh, note?                    |
| 09:33 | 4  | A.    I need to look at my notes.                               |
| 09:33 | 5  | Q.    Would it refresh your memory to review your -- your       |
|       | 6  | report there?                                                   |
| 09:33 | 7  | A.    Yes, please.                                              |
| 09:33 | 8  |       Um, I was also called to attend to -- um, okay.  In the   |
|       | 9  | California Verbal Learning Test, um, there were -- there was    |
|       | 10 | indication of potentially some difficulty learning new         |
|       | 11 | material when, um, learned material may have interfered with   |
|       | 12 | the new learning.                                               |
| 09:34 | 13 | Q.    When you say "some difficulty," how does that -- how      |
|       | 14 | did Mr. Le measure relative to the general population for      |
|       | 15 | his age?                                                        |
| 09:34 | 16 | A.    Um, he -- his recall of the -- of his -- okay.  So in     |
|       | 17 | the California Verbal Learning Test you read a list of 16      |
|       | 18 | words, five times, and you ask for the -- for what the        |
|       | 19 | individual remembers after every reading.  And then you read  |
|       | 20 | another list of also 16 words, um, to the patient.            |
| 09:34 | 21 |       And he -- uh, Mr. Le did at the 7th percentile.  So      |
|       | 22 | 93 percent would have done better, his age, in remembering    |
|       | 23 | words read after he had learned another list of 16 words.     |
| 09:35 | 24 | Q.    And did you also perform tests that measured Mr. Le's    |
|       | 25 | visual and spacial functioning?                                |

| | | |
|---|---|---|
| 09:35 | 1 | A.    Yes. |
| 09:35 | 2 | Q.    What is -- |
| 09:35 | 3 | A.    The Rey -- |
| 09:35 | 4 | *(Simultaneous speaking.)* |
| 09:35 | 5 | MR. WILKE:  Hold on. |
| 09:35 | 6 | BY MR. WILKE: |
| 09:35 | 7 | Q.    What is visual and spacial functioning? |
| 09:35 | 8 | A.    It's the cognitive function that takes care of |
| | 9 | understanding and organizing visual information in space. |
| 09:35 | 10 | Q.    When you say "in space," what do you -- what do you |
| | 11 | mean by that? |
| 09:35 | 12 | A.    Um, understanding how volume -- visual volume functions |
| | 13 | in space.  It's not -- so visual -- visual can be just flat. |
| | 14 | Right?  It just -- it -- just get in visual information. |
| | 15 | This is a cross. |
| 09:36 | 16 | Spacial is, if this cross is in space, does it go |
| | 17 | backwards?  Does it go frontward.  Is it -- how does the |
| | 18 | visual information relate to the space? |
| 09:36 | 19 | Q.    So three (inaudible) -- |
| 09:36 | 20 | *(Court reporter requests clarification for the* |
| | 21 | *record.)* |
| 09:36 | 22 | BY MR. WILKE: |
| 09:36 | 23 | Q.    So is that the same as his ability to process |
| | 24 | three-dimensional information? |
| 09:36 | 25 | A.    Um, in part. |

09:36   1   Q.   What does visual spacial functioning tell you about a

        2   person's -- how a person's brain works or whether the person

        3   has some sort of impairment --

09:36   4   A.   Um, usually they are going to be having problems with

        5   parietal, which is back of temporal, and very rarely

        6   occipital.  But, for me, in this type of evaluations, what

        7   I'm most interested is -- in is the -- how the patient --

        8   the subject integrates or understands the visual information

        9   in relationship to the spacial relationship to the next bit

       10   of information.

09:37  11   Q.   Okay.

09:37  12   A.   So it's more -- it's more up here, than occipital or

       13   parietal.

09:37  14   Q.   So more in the frontal part of the brain --

09:37  15   A.   Yes.

09:37  16   Q.   -- rather than the rear is what you're saying?  "Yes."

09:37  17        And in measuring Mr. Le's visual and spacial

       18   functioning, did you perform a test known as the Rey Complex

       19   Figure Test?

09:37  20   A.   Yes.

09:37  21   Q.   And briefly explain what is involved in that test?

09:38  22   A.   The -- you present to the individual a figure that is

       23   very complicated, very complex.  It's -- it doesn't have --

       24   it doesn't relate to much of anything that we would see in

       25   real life.  Um, um, some patients try to flip it over so

|        |    |                                                                        |
|--------|----|------------------------------------------------------------------------|
|        | 1  | that it looks like a little house, but you cannot let that             |
|        | 2  | be.  You have to give it to them as -- as intended.                    |
| 09:38  | 3  | And it's -- if you want to -- if -- if you think about                 |
|        | 4  | it, or if the individual is normal, um, he sees the                    |
|        | 5  | structure as, um, a very easy figure to remember with                  |
|        | 6  | crosses and diagonals, and then there's a triangle and                 |
|        | 7  | another triangle.  So if the patient organizes as, uh -- as            |
|        | 8  | any of us would, there are, um -- uh, squarish, um, "figure"           |
|        | 9  | with some very basic divisions and then internal details.             |
|        | 10 | There's some external details, as well.                                |
| 09:39  | 11 | And how the patient organizes the information is                       |
|        | 12 | important.  So I always look to see how they copy it.  And I           |
|        | 13 | give different color pencils to give me an idea, when I look           |
|        | 14 | at the drawing again:  How did he do that?  What did he --             |
|        | 15 | did he first draw -- uh, this is good organization.  This --           |
|        | 16 | did he first draw the square and then the diagonals, and              |
|        | 17 | then the cross?  That's good organization.                             |
| 09:39  | 18 | If he starts -- well, anyway, yeah.                                     |
| 09:39  | 19 | Q.  And in performing the Rey Complex Figure Test on                   |
|        | 20 | Mr. Le, how did he perform relative to the general                     |
|        | 21 | population for his age?                                                 |
| 09:40  | 22 | A.  The copy of the figure was disorganized, according to             |
|        | 23 | my notes.  I have the entire file here so I can look at how           |
|        | 24 | he did.  But in the system that we're using currently, there          |
|        | 25 | are no norms for the copies, so it's just observational.              |

09:40   1          But then the more fully an individual organizes the

        2     copy, the more difficult it is to remember because there is

        3     no structure.  There's -- there's a whole bunch -- it's a

        4     difference between having to remember, um, 16 words compared

        5     to the lyrics of your favorite song that has 16 words.  The

        6     lyrics are organized around a theme.  The 16 words are --

        7     you know, whatever.

09:41   8          So if the information that the patient took in when

        9     copying is not organized, there -- just a whole lot --

       10     there's 64 different details that you can, um -- by one

       11     method, there's 64 different, uh, details that you can

       12     measure, um, versus, you know, 18 or 20 or 32, if it's well

       13     organized.

09:41  14     Q.   Well --

09:41  15     A.   It's a lot harder to remember information that has not

       16     been understood.

09:41  17     Q.   Okay.  Dr. Monguio, how did Mr. Le perform on the Rey

       18     Complex Figure Test as compared to the general population

       19     for his age?

09:41  20     A.   In the immediate copy -- I mean, in the immediate

       21     recall, at 10 minutes, he did at the second percentile.

09:41  22     Q.   Meaning that his immediate recall was in the bottom

       23     2 percent of the population?

09:42  24     A.   Yes.

09:42  25     Q.   Or 98 percent of the population would have better

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | immediate recall on this --                               |
| 09:42 | 2  | A.   Correct.                                             |
| 09:42 | 3  | Q.   And what other component does that measure?         |
| 09:42 | 4  | A.   I'm sorry?                                           |
| 09:42 | 5  | Q.   Is there another score on that test, another component |
|       | 6  | to recall that the Rey Complex Figure Test measures?     |
| 09:42 | 7  |      *(Simultaneous speaking.)*                           |
| 09:42 | 8  | BY MR. WILKE:                                             |
| 09:42 | 9  | Q.   Any other results on the Rey Complex Figure Test?   |
| 09:42 | 10 | A.   What -- what did -- what?                            |
| 09:42 | 11 | Q.   -- measured his delayed recall, as well?            |
| 09:42 | 12 | A.   The delay recall, he did at the first percentile.   |
| 09:42 | 13 | Q.   Okay.  So his delayed recall was even lower than his |
|       | 14 | immediate recall?                                         |
| 09:42 | 15 | A.   Yes.                                                 |
| 09:42 | 16 | Q.   Okay.                                                |
| 09:42 | 17 | A.   But not by much.                                     |
| 09:42 | 18 | Q.   Okay.  But the difference between being in the second |
|       | 19 | percentile and first --                                   |
| 09:42 | 20 | A.   It's not very much.  It -- what -- the most important |
|       | 21 | thing is in realizing that because there is not much     |
|       | 22 | difference between immediate and delayed recall, uh, the |
|       | 23 | poor, quote/unquote, memory is not, uh -- is not due to, uh, |
|       | 24 | decay of the memory, as in delayed, or in problems accessing |
|       | 25 | the information.  Rather, it's that he never got it in.  It |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | was too disorganized.  What he got in was too disorganized   |
|       | 2  | to stick, so he couldn't retrieve it because it had never    |
|       | 3  | gotten in.                                                   |
| 09:43 | 4  | Q.   Okay.  Now, did you also perform testing relating to    |
|       | 5  | Mr. Le's executive functioning?                              |
| 09:43 | 6  | A.   I'm sorry?                                              |
| 09:43 | 7  | Q.   Did you also perform neuropsychological testing         |
|       | 8  | relating to Mr. Le's executive functioning?                  |
| 09:43 | 9  | A.   Oh, yes.                                                |
| 09:43 | 10 | Q.   And executive functioning is, uh -- refers to those     |
|       | 11 | cognitive processes that manage, uh, one's ability to manage |
|       | 12 | themselves and achieve their goals?                          |
| 09:44 | 13 | A.   Uh, among other things, but, yes, executive functions   |
|       | 14 | are well -- efficiently working executive functions are      |
|       | 15 | necessary for planning and achieving the goals.              |
| 09:44 | 16 | Q.   And was one of the tests that you performed the         |
|       | 17 | Halstead-Reitan Categories [sic] Test?                       |
| 09:44 | 18 | A.   Yes.                                                    |
| 09:44 | 19 | Q.   And is this a test of abstract concept, learning,       |
|       | 20 | memory, cognitive flexibility --                             |
| 09:44 | 21 | A.   Yes.                                                    |
| 09:44 | 22 | Q.   -- and ability to benefit from feedback?               |
| 09:44 | 23 | A.    yes.                                                   |
| 09:44 | 24 | Q.   Now, briefly again describe how this test is            |
|       | 25 | administered, what he has to do under this test.             |

09:44  1    A.   Okay.  So you, um -- you have, um -- the version that I

2    use is, um -- is not for computer.  It's through an actual

3    book -- um, five books.

09:45  4         You -- you show the individual a page.  You explain the

5    test:  "I'm going to show you a page.  Something on the page

6    will remind you of number from 1 to 4."  And then you put a

7    strip of paper.  It says "1" to "4."  You can point to -- to

8    the -- to the number or tell me.

09:45  9         And if you [sic] correct, say correct, if you

10   incorrect --

09:45  11        *(Court reporter requests clarification for the*

12        *record.)*

09:45  13             THE COURT:  We couldn't get the answer, Counsel.

09:45  14             I'm going to strike answer.

09:45  15             Counsel reask the question.

09:45  16             MR. WILKE:  Yes, Your Honor.

09:45  17             THE COURT:  It's because we can't take an accurate

18   transcription because of the speed.

09:46  19   BY MR. WILKE:

09:46  20   Q.   I just -- could you just give the jury a brief

21   description of what this test entails, what is involved in

22   administering and taking this test?

09:46  23   A.   Okay.  You -- you tell the subject that -- something

24   about the abstract arrangement that you're presenting to him

25   visually has to be understood as Number 1 through 4.

| | | |
|---|---|---|
| 09:46 | 1 | Q.   So can we stop there for a minute. |
| 09:46 | 2 | A.   Yeah. |
| 09:46 | 3 | Q.   You show the subject an image of some type; correct? |
| 09:47 | 4 | A.   Yes. |
| 09:47 | 5 | Q.   A visual image; correct? |
| 09:47 | 6 | A.   Yes. |
| 09:47 | 7 | Q.   Is that a photograph?  Is it a drawing?  What is that? |
| 09:47 | 8 | A.   It's a matte black page with symbols on them. |
| 09:47 | 9 | Q.   Okay.  With -- |
| 09:47 | 10 | A.   White or colored. |
| 09:47 | 11 | Q.   Okay.  So it's a page with symbols on 'em. |
| 09:47 | 12 |      And then what do you then ask the subject to do when |
| | 13 | you show him this page with these symbols on it? |
| 09:47 | 14 | A.   Tell me what number you think this represents:  1 to 4. |
| 09:47 | 15 | Q.   And this test measures his ability to do what? |
| 09:47 | 16 | A.   Abstract thinking, concept formation, staying on set -- |
| | 17 | meaning, uh, if -- being able to keep accurate track of what |
| | 18 | the theme is, um, flexibility -- cognitive flexibility, and |
| | 19 | problem-solving. |
| 09:48 | 20 | Q.   Okay.  And how did Mr. Le -- |
| 09:48 | 21 | A.   Oh, wait. |
| 09:48 | 22 |      And, um, ability to benefit from feedback. |
| 09:48 | 23 | Q.   Okay.  And how did Mr. Le perform relative to the |
| | 24 | general population for his age group and education level? |
| 09:48 | 25 | A.   Second percentile. |

09:48   1   Q.   Now, this test includes a measurement within the

        2   person's education level?

09:48   3   A.   Yes.

09:48   4   Q.   Now, you know from your records that Mr. Le has a

        5   college degree from Cal State Fullerton?

09:49   6   A.   Yes.

09:49   7   Q.   Does that fact affect your test results and/or the

        8   ultimate opinions that you reach regarding cognitive

        9   impairments of Mr. Le?

09:49  10   A.   Uh, his grades were pretty lackluster in a field that,

       11   if I remember correctly, was marketing/business, which is

       12   very concrete.  It doesn't -- it, um -- it's very concrete

       13   and structured.  So a person with a low average IQ --

09:49  14        Well, I can't remember if that was before or after his

       15   motorcycle accident.

09:49  16   Q.   We'll get there.  I'm just -- I'm just saying, for

       17   this -- for purposes of our discussion right now on this

       18   test that we been talking about, the Halstead-Reitan

       19   Categories [sic] Test, that test measures -- compares --

       20   compares a person not only within their age group, but

       21   within their educational level, as well --

09:50  22   A.   Yes.

09:50  23   Q.   -- correct?

09:50  24        And considering both of those factors by Mr. Le, he

       25   measured in the second percentile?

09:50   1   A.    Correct.

09:50   2   Q.    Meaning the -- 98 percent of the population his age and

        3   education level would perform higher?

09:50   4   A.    Yes.

09:50   5   Q.    All right.

09:50   6         Now, did you also measure, uh, Mr. Le for verbal

        7   fluency?

09:50   8   A.    Yes.

09:50   9   Q.    What is "verbal fluency"?  Briefly explain what that is

        10  to the jury.

09:50   11  A.    Yes.  Um, well, this task does it.

09:51   12        Verbals fluency can be the speed by which we can say

        13  what we know, like numbers [sic] of boy -- I mean, names of

        14  boys or names of animals, um, the speed by which I can

        15  retrieve what I know.  Um, that's one verbal fluency.

09:51   16        Another verbals fluency is the speed by I can retrieve

        17  things I know with unusual rules.  For example, give me all

        18  the words you can in 60 -- in 60 seconds that start with the

        19  letter "T," but it cannot be the name of a person or a place

        20  or a day of the week.  So those are unusual rules.

09:51   21        And I've gotta go:  Uh, I know lot of words that start

        22  with "T," but I have to stay within these rules.

09:51   23        So that's also fluency.

09:51   24  Q.    Okay.  And in performing the verbal fluency test, did

        25  you reach any conclusions about Mr. Le with respect to his

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | verbal fluency?                                                 |
| 09:52 | 2  | A.   Yes.                                                       |
| 09:52 | 3  | Q.   What did you determine?                                    |
| 09:52 | 4  | A.   Well, I...                                                 |
| 09:52 | 5  | Q.   Specifically, what did you determine as to whether he      |
|       | 6  | was impaired or not in verbal fluency?                          |
| 09:52 | 7  | A.   I -- I'm sorry.  I didn't hear you.                        |
| 09:52 | 8  | Q.   Specifically, what, if anything, did you determine         |
|       | 9  | about whether Mr. Le was impaired --                           |
| 09:52 | 10 | A.   Yes.                                                       |
| 09:52 | 11 | Q.   -- with respect to verbal fluency?                         |
| 09:52 | 12 | A.   I did not expect that he was going to be borderline        |
|       | 13 | impaired when retrieving words that with a certain -- that     |
|       | 14 | started with a certain letter, particularly compared to how    |
|       | 15 | well he did in producing words from cat -- that he knew.       |
| 09:53 | 16 | So what he knew, producing words that belonged to              |
|       | 17 | categories, he did at the 75th percentile.                     |
| 09:53 | 18 | When the constraints were -- starts -- start by a              |
|       | 19 | certain letter, he did only at the 16th percentile, which is   |
|       | 20 | borderline impaired.                                           |
| 09:53 | 21 | Q.   Okay.  So this discrepancy between his vocabulary, if      |
|       | 22 | you will, and then his ability to recall words when given      |
|       | 23 | certain limiting parameters, was that significant to you --    |
|       | 24 | this difference between 16th percentile and 75th percentile?   |
| 09:53 | 25 | A.   Uh, yes.  That -- that type of flexibility that I         |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | described when -- uh, about the constraints and uh, you      |
|       | 2  | know, the phonetic constraints on a word, that's -- that's   |
|       | 3  | usually associated with, uh, left frontal, um, part of the   |
|       | 4  | brain.                                                       |
| 09:53 | 5  | Not only -- I mean, it -- the -- it's not -- the brain       |
|       | 6  | is very complex and each of us is a universe.  But it's      |
|       | 7  | usually associated with, uh, frontal "left."                 |
| 09:54 | 8  | Q.   Okay.  In measuring Mr. Le's executive functioning, did |
|       | 9  | you also perform what is a standardized test known as the    |
|       | 10 | Color-Word Interference Test?                                |
| 09:54 | 11 | A.   Yes.                                                    |
| 09:54 | 12 | Q.   What does that measure?                                 |
| 09:54 | 13 | A.   Processing speed, um, speed of reading, speed of        |
|       | 14 | color-naming.  Both of them are, uh, speed and processing    |
|       | 15 | speed, and inhibition of overlearned responses.             |
| 09:54 | 16 | Q.   What is "inhibition of overlearned responses"?          |
| 09:54 | 17 | A.   We tend to do what we've done a lot.  And if we have to |
|       | 18 | do something that is different from what we've learned, what |
|       | 19 | we've done a lot, then we have to inhibit the response that  |
|       | 20 | first comes out so we can do this other thing that we have   |
|       | 21 | to do.                                                       |
| 09:55 | 22 | Q.   Okay.  And how did Mr. Le perform under that portion'a  |
|       | 23 | the test that measures his, uh, ability to inhibit an        |
|       | 24 | overlearned response --                                      |
| 09:55 | 25 | A.   Second percentile.                                      |

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

54

| | | |
|---|---|---|
| 09:55 | 1 | Q.    Mean- -- the bottom 2 percent of the population? |
| 09:55 | 2 | A.    Yeah, which... |
| 09:55 | 3 | Q.    Did you consider this to be a, uh -- a severe |
| | 4 | impairment? |
| 09:55 | 5 | A.    Uh, yeah.  Um, the fourth is moderate-severe.  The |
| | 6 | scale (unintelligible) -- |
| 09:55 | 7 | *(Court reporter requests clarification for the* |
| | 8 | *record.)* |
| 09:55 | 9 | THE COURT:  Just one more time, Mr. Wilke, please. |
| 09:56 | 10 | MR. WILKE:  I think the response was "the scale |
| | 11 | score 4 is moderate-severe." |
| 09:56 | 12 | THE WITNESS:  The scale of 4 -- |
| 09:56 | 13 | THE CLERK:  Your Honor.  (Indicates.) |
| 09:56 | 14 | A JUROR:  Can we use the restroom? |
| 09:56 | 15 | THE COURT:  Absolutely. |
| 09:56 | 16 | Let's take a recess.  15 to 20 minutes. |
| 09:56 | 17 | You're admonished not to discuss the matter |
| | 18 | amongst yourselves nor to form or express any opinion |
| | 19 | concerning the case.  Have a nice recess. |
| 09:56 | 20 | *(Jury room recesses at 9:56 a.m.)* |
| 09:56 | 21 | *(Outside the presence of the jury.)* |
| 09:56 | 22 | THE COURT:  All right.  Thank you, Counsel. |
| 09:56 | 23 | Then we'll be in recess until quarter after. |
| | 24 | Would that be acceptable? |
| 09:56 | 25 | All right.  Thank you very much. |

| | | |
|---|---|---|
| 09:56 | 1 | Doctor, you may step down.  Thank you. |
| 09:56 | 2 | *(Recess held at 9:56 a.m.)* |
| 10:21 | 3 | *(Proceedings resumed at 10:23 a.m.)* |
| 10:23 | 4 | *(In the presence of the jury.)* |
| 10:23 | 5 | THE COURT:  All right.  Counsel, we're back in |
| | 6 | session.  The jury's present, the alternates, all counsel. |
| 10:23 | 7 | If you'd like to continue with your examination, |
| | 8 | Counsel. |
| 10:23 | 9 | MR. WILKE:  Thank you Your Honor. |
| 10:24 | 10 | **DIRECT EXAMINATION (Continued)** |
| 10:24 | 11 | BY MR. WILKE: |
| 10:24 | 12 | Q.  Dr. Monguio, when we -- uh, before the break, we were |
| | 13 | talking again about the neuropsychological testing you |
| | 14 | performed on Mr. Le. |
| 10:24 | 15 | And was one of the tests you performed known as the |
| | 16 | "sorting" test? |
| 10:24 | 17 | A.  Yes. |
| 10:24 | 18 | Q.  And what is the sorting test designed to test for? |
| 10:24 | 19 | A.  Concept formation, reasoning, ability to communicate, |
| | 20 | abstract categories, communative [sic] flexibility, and |
| | 21 | remaining on set, meaning knowing what you're doing and |
| | 22 | keeping track'a what you're doing. |
| 10:24 | 23 | Q.  And briefly describe what is the process of conducting |
| | 24 | a sorting test.  What does the person actually do? |
| 10:25 | 25 | A.  You give the patient, um, six cards that are cut out of |

|       | 1  | cardboard in different shapes and sizes and different colors |

                    1    cardboard in different shapes and sizes and different colors

                    2    and with different information on them.

     10:25          3        And he has to sort -- sort them into two categories of

                    4    three cards, each, uh, without repeating the sorting, and

                    5    being able to describe each -- the principles used for

                    6    each'a the two sorts.

     10:25          7    Q.   And then when you scored Mr. Le's results for this

                    8    sorting test, what percentile of the population did he fall

                    9    into?

     10:25         10    A.   Fifth and first.

     10:25         11    Q.   Describe the specific results and how they differed?

     10:25         12    A.   The first "roundabout" of the test, um, the results --

                   13    the performance of the patient on the first round of the

                   14    test is measured as "number of correct sorts," and also the

                   15    quality of the description of the correct sorts.

     10:26         16        And those he did at the fifth percentile.

     10:26         17    Q.   'Kay.  And what is the second part'a that test?

     10:26         18    A.   The second part is the administrator does the

                   19    sorting -- the correct sorting in front of them.  And he has

                   20    to tell me what my sorting principles are.

     10:26         21    Q.   And how did he do on --

     10:26         22    A.   He did at the first --

     10:26         23        *(Simultaneous speaking.)*

     10:26         24        *(Court reporter requests clarification for the*

                   25        *record.)*

10:26    1          THE WITNESS:  He did at the first percentile on

         2    the second part of the test.

10:27    3    BY MR. WILKE:

10:27    4    Q.   Now, what did that indicate to you with regard to

         5    deficits that Wayne Le has?

10:27    6    A.   He does very poorly, um, in concept information on his

         7    own, but he does even worse in recognizing the concept that

         8    someone else presents to him.  He has very poor

         9    problem-solving.

10:27    10          The, um, abstraction -- in other words, the, um -- his

         11   ability to perceive abstract general characteristics in

         12   things in the world is very poor.

10:28    13   Q.   And then one last test I'd like to talk about.

10:28    14          Did you administer what is known as the "proverb" test?

10:28    15   A.   Yes.

10:28    16   Q.   What is the "proverb" test?

10:28    17   A.   Um, I read to him -- to the person I'm testing, I read

         18   to him -- I think there are 18 proverbs.  Some of them are

         19   very common, like *Don't judge a book by its cover.*  And some

         20   of them are a little bit less well-known, like *An old*

         21   *dogs [sic] plows a straight row.*  And I ask him to tell me

         22   in his words what it means.

10:28    23   Q.   Okay.  And how did Mr. Le perform on this test?

10:28    24   A.   Um, when I -- there are various measures, uh, various

         25   scores that I can get from the results.

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

58

10:29   1        And his ability to abstract was below one percentile,

2   was at this point 0.4 percentile.

10:29   3   Q.   So, uh, that measures his ability to engage in any kind

4   of abstract thinking?

10:29   5   A.   His ability to perceive or "think of" in abstract terms

6   is very poor.

10:29   7   Q.   And were there any other, uh, measurements from that

8   test that you deemed to be significant?

10:29   9   A.   Um, when -- when I give 'em the choice to recognize the

10   true meaning of the proverb -- so I write the proverb -- uh,

11   it's -- it's printed -- um, the proverb, and then he has

12   multiple choice, choosing the four that he ca -- uh,

13   choosing one of four that he thinks the -- the meaning of

14   the proverb means, then he did 100 percent.

10:30   15        So he can recognize the abstraction; he just cannot

16   come up with it.

10:30   17   Q.   And, again, it's a discrepancy between his ability to

18   recognize an abstraction but not actually come up with it

19   himself, is that significant in your opinion?

10:30   20   A.   It is significant to me in terms of what it means by

21   the test.  But it -- also significant bes -- because

22   obviously his motivation, his effort, is pretty good if he

23   got 100 percent on what he knew how to do.

10:30   24   Q.   Now, these various tests that you performed, are these

25   tests typically relied on by forensic neuropsychologists in

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | determining whether a person has cognitive deficits?                   |
| 10:31 | 2  | A.   Yes.                                                               |
| 10:31 | 3  | Q.   And as a result of your neuropsychological evaluation,            |
|       | 4  | which included the record review, the clinical                         |
|       | 5  | (inaudible) --                                                         |
| 10:31 | 6  | *(Court reporter requests counsel use microphone to*                   |
|       | 7  | *be heard for the record.)*                                            |
| 10:31 | 8  | BY MR. WILKE:                                                           |
| 10:31 | 9  | Q.   As a result of your neuropsychological examination that           |
|       | 10 | included review of records, clinical interview of Mr. Le,              |
|       | 11 | and the neuropsychological testing over two days, did you              |
|       | 12 | reach any opinion about whether Mr. Le has any specific                |
|       | 13 | cognitive deficits?                                                    |
| 10:31 | 14 | A.   Yes.                                                               |
| 10:31 | 15 | Q.   What was your opinion with regard to whether Mr. Le has           |
|       | 16 | any specific cognitive deficits?                                       |
| 10:32 | 17 | A.   In my opinion, he has impairment in speed and                     |
|       | 18 | efficiency of information processing.  He organizes very               |
|       | 19 | poorly whether it be visual or verbal information.  He                 |
|       | 20 | learns appropriately; but his first exposure to information,           |
|       | 21 | he performs very poorly.                                               |
| 10:32 | 22 | Q.   Okay.  Did you determine specifically whether he has --           |
|       | 23 | I'm sorry.                                                             |
| 10:32 | 24 | Did you determine whether he has any specific cognitive                |
|       | 25 | deficits relating to parallel processing or the ability to             |

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | shift from one subject to another in his mind?                |
| 10:33 | 2  | A.   Um, um, yes.  But I was also getting -- I'm sorry.  I'm   |
|       | 3  | trying to slow down, but I was also thinking that, um, part    |
|       | 4  | of the -- part of the problems with process -- uh, speed and  |
|       | 5  | efficiency of processing is leading -- is interfering with    |
|       | 6  | his ability to efficiently and quickly attend to the          |
|       | 7  | material in parallel processing.                              |
| 10:33 | 8  | Q.   Okay.  So are you saying that his deficits in            |
|       | 9  | processing speed are related to his deficits in parallel      |
|       | 10 | processing?                                                    |
| 10:33 | 11 | A.   The other way.                                           |
| 10:33 | 12 | Q.   His deficits in parallel processing are related to his  |
|       | 13 | deficits in processing speed?                                 |
| 10:34 | 14 | A.   Yes, sir.                                                |
| 10:34 | 15 | Q.   Okay.                                                    |
| 10:34 | 16 | A.   And, uh, one more.                                       |
| 10:34 | 17 |      And he has had significant deficits in organization.     |
|       | 18 | No impulsivity.  This is important.                           |
| 10:34 | 19 | Q.   I'm sorry?                                               |
| 10:34 | 20 | A.   No impulsivity.                                          |
| 10:34 | 21 | Q.   "No impulsivity"?                                        |
| 10:34 | 22 | A.   Yes.  No impulsivity, but really poor organization.     |
| 10:34 | 23 | Q.   Did you also determine whether he has any deficits in   |
|       | 24 | attention?                                                    |
| 10:34 | 25 | A.   Yes.                                                     |

| | | |
|---|---|---|
| 10:34 | 1 | Q.   What did you determine? |
| 10:34 | 2 | A.   His attention is unreliable. |
| 10:34 | 3 | Q.   Meaning that it is inconsistent? |
| 10:34 | 4 | A.   It -- it's not consistent.  He can get, um, very |
| | 5 | distracted -- or he can stay in focus, but staying in focus |
| | 6 | is also unreliable. |
| 10:35 | 7 | Q.   Okay.  And did you determine whether he has any |
| | 8 | deficits in his working memory? |
| 10:35 | 9 | A.   Yes. |
| 10:35 | 10 | Q.   What is "working memory"? |
| 10:35 | 11 | A.   It's the function that allows us to keep in the front |
| | 12 | of the memory those things that we need for just that time. |
| 10:35 | 13 | So it goes -- the working memory picks up stuff from |
| | 14 | what we know and then brings it to the front for just long |
| | 15 | enough for us to do the task that we want to do. |
| 10:35 | 16 | It's sort of equivalent to you bringing all of the |
| | 17 | materials that you need to fix dinner, fix you car, so that |
| | 18 | everything is there when you need it. |
| 10:35 | 19 | Q.   Does this affect -- you had indicated that you found |
| | 20 | deficits in his organization.  Does this -- his deficits in |
| | 21 | working memory relate to his deficits in organization? |
| 10:36 | 22 | A.   They're all interconnected because, um, if your |
| | 23 | organization is poor, then you don't bring -- you don't |
| | 24 | remember -- you don't bring all of the materials you need to |
| | 25 | fix the car or to fix the dinner.  You had to go back and |

8:20-CR-00002-DOC   - 12/2/2021 - Day 11, Volume I

62

|  | 1 | do -- it's -- so they're all -- yeah.  Uh, it -- we're a |
|  | 2 | system.  Everything works together. |
| 10:36 | 3 | Q.   Okay.  And were there any other specific cognitive |
|  | 4 | deficits other than processing speed, attention, parallel |
|  | 5 | processing, working memory, and organization that you |
|  | 6 | observed? |
| 10:36 | 7 | A.   Well, it's -- again, it's all related.  But he -- he |
|  | 8 | processes information very inefficiently. |
| 10:37 | 9 | Q.   All right.  And your conclusion that he's -- that |
|  | 10 | Mr. Le suffers from these specific cognitive deficits, is |
|  | 11 | that conclusion supported by the testing results that we've |
|  | 12 | been discussing earlier today? |
| 10:37 | 13 | A.   Yes. |
| 10:37 | 14 | Q.   Those results showing that he regularly performed in |
|  | 15 | the very lower percentages of the population for his age |
|  | 16 | group? |
| 10:37 | 17 | A.   Yes. |
| 10:37 | 18 | Q.   Now, based on your neuropsychological examination, did |
|  | 19 | you reach any conclusions about the cause of these cognitive |
|  | 20 | deficits? |
| 10:37 | 21 | A.   Yes. |
| 10:37 | 22 | Q.   What was your opinion about the likely cause of |
|  | 23 | Mr. Le's cognitive deficits? |
| 10:38 | 24 | A.   Well, since there was no information I had received |
|  | 25 | about any congenital abnormalities in him, then, um, I |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | looked at other possible causes.  One of them was the three |
|       | 2  | motorcycle accidents he had.  And the other one was the |
|       | 3  | poly-substance -- multiple substance abuse that he had had |
|       | 4  | for years. |
| 10:38 | 5  | Q.   Can I stop you there for just a moment? |
| 10:38 | 6  | A.   I'm sorry? |
| 10:38 | 7  | Q.   Can I stop you there for just a moment? |
| 10:38 | 8  | A.   Yeah. |
| 10:38 | 9  | Q.   I want to follow up. |
| 10:38 | 10 | When you said you had no information about congenital |
|       | 11 | deficiencies or defects, is that something that woulda been |
|       | 12 | sustained at birth? |
| 10:38 | 13 | A.   Yes. |
| 10:38 | 14 | Q.   Okay. |
| 10:38 | 15 | A.   Or early childhood. |
| 10:38 | 16 | Q.   "Or early childhood." |
| 10:38 | 17 | A.   Yeah, like autism or whatever. |
| 10:38 | 18 | Q.   Or potentially some problem in his pregnancy or |
|       | 19 | delivery by his mother, things like that? |
| 10:39 | 20 | A.   Yes. |
| 10:39 | 21 | Q.   Could that be a cause of cognitive deficits of the type |
|       | 22 | you observed in Mr. Le? |
| 10:39 | 23 | A.   Not in my experience. |
| 10:39 | 24 | Q.   Okay. |
| 10:39 | 25 | A.   But I always consider it, just in case. |

10:39    1    Q.    Okay.  And then you also considered the motorcycle

         2    accidents that were described by both Mr. Le and his

         3    sisters; correct?

10:39    4    A.    Yes.

10:39    5    Q.    Uh, you reviewed the reports of the interviews of his

         6    sisters Lan Le and Rose Le; correct?

10:39    7    A.    Yes.

10:39    8    Q.    And they described -- and Mr. Le described -- uh,

         9    three -- actually, four separate, I believe, motorcycle

        10    incidents, three of which were, uh -- some significance;

        11    correct?

10:39   12    A.    Yes.

10:39   13    Q.    In describing those motorcycle accidents, uh, did you

        14    consider the fact that there was damage to the helmet that

        15    Mr. Le was wearing at the time?

10:40   16    A.    Yes.

10:40   17    Q.    And how did that figure into your conclusions?

10:40   18    A.    The force of the impact was sufficient to dent a

        19    helmet -- a device that is intended to absorb a lot of

        20    force.

10:40   21    Q.    And that dent in the motorcycle helmet was described

        22    both by Mr. Le and his sister, correct?

10:40   23    A.    Yes.

10:40   24    Q.    Relating to his very first motorcycle accident;

        25    correct?

| | | |
|---|---|---|
| 10:40 | 1 | A.   Yes. |
| 10:40 | 2 | Q.   Now, briefly describe, if you will, the effect of head |
| | 3 | trauma of this nature and how it can damage the brain and |
| | 4 | lead (inaudible) -- |
| 10:41 | 5 | *(Court reporter requests counsel use microphone to* |
| | 6 | *be heard for the record.)* |
| 10:41 | 7 | BY MR. WILKE: |
| 10:41 | 8 | Q.   Briefly describe, if you will, how head trauma of the |
| | 9 | type we've been talking about can damage the brain and lead |
| | 10 | to these types of cognitive deficits that you've determined |
| | 11 | Mr. Le has. |
| 10:41 | 12 | A.   Yes.  The -- the texture of the brain is very soft.  I |
| | 13 | often describe it as, uh, soft "scramble" eggs.  But it also |
| | 14 | has different areas of density.  There are some areas that |
| | 15 | are denser, heavier than others.  And this soft material is |
| | 16 | encased in membranes -- in three protective membranes, and |
| | 17 | is floating inside the skull. |
| 10:42 | 18 | And the skull is not equally -- is not equally smooth |
| | 19 | on the inside.  The back of the -- of the skull -- the |
| | 20 | inside of the back of the skull, which is very old, is very |
| | 21 | smooth.  But the front of the skull, where the -- where |
| | 22 | the -- where the frontal part of "us" sit, um, it's -- the |
| | 23 | inside is very rigid-y [sic].  It's not -- behind the eyes |
| | 24 | and holding, um -- it's like a -- kind of a cup, and it's |
| | 25 | very "rigid-y."  It -- it's rough. |

10:42   1        And the brain that is moving -- like any other

        2    substance -- the brain that is moving, is moving inside the

        3    liquid in the direction that it's moving.  When it is

        4    stopped --

10:42   5    Q.   Like, for instance -- I'munna stop you right there.

10:42   6        When the brain is stopped quickly, as when you have a

        7    traumatic head injury; correct? -- such as a motorcycle

        8    accident?

10:43   9    A.   Correct.  So it's moving and it's stopped.  And the

        10   brain inside keeps moving.  And it hits the front -- the cup

        11   that is where the brain in the front rests.

10:43   12       And, as I'm sure that you can imagine, it also

        13   torques --

10:43   14   Q.   Are you saying, "torques"?

10:43   15   A.   Torques, T-O-R-K-E-S [sic].

10:43   16       -- because of the acceleration -- there's not much

        17   room -- all of this is causing the -- the bottom of the

        18   frontal lobe to be moving against really "rigid-y" sharp

        19   bone.

10:43   20       And also, because of the different density of certain

        21   centers in the brain, some parts of the brain move faster

        22   than others.  It's like -- I don't know if anybody makes

        23   fruit Jello salad anymore.  But, you know, if you're

        24   carrying your fruit jello salad in the car, and there's a

        25   sudden break, some -- the bananas are going to move further

|  |  |  |
|---|---|---|
|  | 1 | than apples.  You know, the different density of the fruit |
|  | 2 | is going to move at different speeds. |
| 10:44 | 3 | So all of that -- all of that causes, uh, stretching |
|  | 4 | and sheering and damage to the axons -- the connections of |
|  | 5 | the -- the cells.  So in injuries, such like, um, the -- the |
|  | 6 | football players and multiple motorcycle accidents or |
|  | 7 | whatever, um, there's certain issues that seem to be |
|  | 8 | frontal, but there's also issues having to do with multiple |
|  | 9 | stretching and torquing of the axons because of the type -- |
|  | 10 | the physics of, um, the accident. |
| 10:45 | 11 | Q.   And can these types of injuries (inaudible) -- |
| 10:45 | 12 | *(Court reporter requests counsel use microphone to* |
|  | 13 | *be heard for the record.)* |
| 10:45 | 14 | BY MR. WILKE: |
| 10:45 | 15 | Q.   Can these -- this type of injury that you've been |
|  | 16 | discussing, it -- can that be sustained even when the |
|  | 17 | person, for instance, is not rendered unconscious by the -- |
| 10:45 | 18 | A.   I'm sorry.  I'm not hearing you. |
| 10:45 | 19 | Q.   The type of injury to the brain that you've just been |
|  | 20 | discussing, can that be sustained even when the person is |
|  | 21 | not rendered unconscious -- |
| 10:45 | 22 | A.   Oh, yeah. |
| 10:45 | 23 | Q.   -- by the trauma? |
| 10:45 | 24 | A.   Oh, yeah. |
| 10:45 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 10:45 | 1 | A.    Yeah. |
| 10:45 | 2 | Q.    Now, did you consider in your clinical evaluation, |
| | 3 | including the records you reviewed and your interview of |
| | 4 | Mr. Le, uh, you received information that he has abused |
| | 5 | alcohol and drugs for approximately ten years prior his |
| | 6 | arrest; correct? |
| 10:45 | 7 | A.    Yes. |
| 10:45 | 8 | Q.    Okay.  And did you consider the effects of |
| | 9 | approximately ten years of alcohol and cocaine abuse and use |
| | 10 | of other drugs on whether that would explain the cognitive |
| | 11 | deficits that you determined Mr. Le has? |
| 10:46 | 12 | A.    Yes. |
| 10:46 | 13 | Q.    And what conclusions, if any, did you reach about the |
| | 14 | effect of Mr. Le's substance and alcohol abuse on his |
| | 15 | cognitive deficits? |
| 10:46 | 16 | A.    Um, yes.  Um, I considered the alcohol first because |
| | 17 | it's what he started with.  And, um, the results of memory |
| | 18 | testing were not consistent with the kind of memory deficits |
| | 19 | that we know happens with chronic alcohol abuse. |
| 10:46 | 20 | And, um, importantly also, I considered that he had |
| | 21 | been, um, abstain-ient [sic] -- that "mean" he had been |
| | 22 | clean for a year and a half, um, after I saw him.  And the |
| | 23 | research points out that unless there is a memory deficits, |
| | 24 | usually -- I mean, known to be associated with alcohol, um, |
| | 25 | the cognitive effects of chronic alcohol abuse, a |

1    year-and-a-half post-sobriety, um, are not -- are not

2    measurable.

10:47    3    Q.    Okay.  And so with -- so regard to the alcohol abuse,

4    the fact that he had been in custody for a year and a half,

5    in your opinion, ruled out that as a possible cause of his

6    cognitive deficits; correct?

10:47    7    A.    My opinion, based on all of the research that I read.

10:47    8    Q.    Okay.  And as well as his testing on certain memory

9    testing that --

10:47    10    A.    Yes.

10:47    11    Q.    -- Mr. Le -- you performed on Mr. Le was not consistent

12    with the type of cognitive deficits seen in long-term

13    alcohol abuse; correct?

10:48    14    A.    Correct.

10:48    15    Q.    Okay.  And let's talk about -- Mr. Le has -- has

16    testified here, and I think you have received information

17    that, uh, he started using cocaine ten years prior his

18    arrest, maybe before then, but with -- had used it regularly

19    for at least ten years leading up to this, and used it

20    heavily in the year leading up to his arrest.

10:48    21        Did you consider his use of cocaine over the ten-year

22    period and his heavy use of cocaine in the year leading up

23    to his arrest in ruling out that as a cause of his cognitive

24    deficits?

10:48    25    A.    Yes.

10:48   1    Q.   Okay.  And why is that?

10:48   2    A.   Again, a year and a half of sobriety.  But, to me, more

3    interestingly, um, cocaine doesn't seem to -- this -- by the

4    research that is available there -- and I'm talking 2021,

5    not -- not all research -- doesn't seem to impair cognitive

6    function long-term.  It impairs cognitive function at the

7    time when the person is intoxicated.  But -- I mean, I found

8    a piece of research that said it actually may protect, um,

9    users against the deleterious -- uh, the bad effects of the

10   alcohol.

10:49   11       So those two things combine:  One that he was a

12   year-and-a-half sober; and that, at a year and a half, none

13   of the research says that there are permanent effects, um,

14   except the alcohol dementia that I've already, uh,

15   mentioned.  And that the research that I' found -- uh, the

16   research -- multiple research that I looked at and found,

17   um, there were no measurable effects of cocaine on cognition

18   six months after the last time they used.

10:50   19   Q.   Okay.  Mr. Le's testified as well that he, over

20   the years that he started using drugs, at times used crack

21   cocaine, LSD, um, and some pills, including, I believe,

22   Xanax, and a few other substances.

10:50   23       Would this type of drug use explain the cognitive

24   deficits, in your opinion?

10:50   25   A.   Um, um -- no.  Um, it -- from what I remember of my

         1    interview with him, uh, the -- the Ecstasy, which was, uh,
         2    one of his favorite things to use, mixed with other stuff,
         3    um, so far, we don't know that the Ecstasy done that way is
         4    going to cause cognitive deficit -- deficits.
10:51    5        I don't know how much Ketamine he used.  But we don't
         6    have very good data on Ketamine intoxication either.
10:51    7        And again, the most important thing is that it's
         8    18 months after he took in anything.
10:51    9    Q.   And -- and, again, Mr. Le has testified that beginning
         10   in 2019, he, uh -- within, uh, six months of his arrest, he
         11   started using methamphetamine fairly regularly.
10:51    12       Again, would that explain these cognitive deficits that
         13   you observed in June of 2021?
10:51    14   A.   Again, not with 18 months of sobriety.
10:51    15       And, you know, his use of meth, um, was relatively
         16   short.  And if he is -- and -- and I have not, from my
         17   lengthy interview and from everything I have reviewed, um,
         18   there was no -- no -- no information regarding a typical
         19   symptom of heavy meth use, which is the hallucinations, the
         20   paranoia, um, um, so, uh, no, I don't think so.
10:52    21       No.  I believe it does not.
10:52    22   Q.   Okay.  Now, following your neuropsychological
         23   examination of Mr. Le, you (inaudible) a report of your
         24   findings; correct?
10:52    25   A.   I'm sorry?

8:20-CR-00002-DOC   - 12/2/2021 - Day 11, Volume I

72

10:52   1    Q.   Following your neuropsychological examination of

        2    Mr. Le, you re -- prepared a report of your findings;

        3    correct?

10:53   4    A.   Yes.

10:53   5    Q.   Okay.  And, thereafter, do you understand that a second

        6    neuropsychological examination was performed on Mr. Le by a

        7    Dr. Daniel Martell?

10:53   8    A.   Yes.

10:53   9    Q.   And did you understand Dr. Daniel Martell to be a

        10   neuropsychologist retained by the prosecutors to examine

        11   Mr. Le?

10:53   12   A.   Yes.

10:53   13   Q.   Did you have the opportunity to review Dr. Martell's

        14   report of his neuropsychological examination of Mr. Le that

        15   was conducted on October 18, 2021?

10:53   16   A.   Yes.

10:53   17   Q.   And did Dr. Martell agree with any of your conclusions?

10:53   18   A.   Uh, yes.

10:53   19   Q.   What specifically were your points of agreement?

10:53   20   A.   Well, um, he seemed to agree with the results of the

        21   ways that -- the WAIS-IV that I administered because he used

        22   it in his report as, um, a reference point.

10:54   23   Q.   Okay.  The WAIS-IV showing this, uh -- that Mr. Le has

        24   an IQ of, I believe, 80 -- I'm sorry -- 88.  A full scale IQ

        25   of 88; is that correct?

| | | |
|---|---|---|
| 10:54 | 1 | A.   Yes. |
| 10:54 | 2 | Q.   In the 21st percentile? |
| 10:54 | 3 | A.   Correct. |
| 10:54 | 4 | Q.   And a -- but a slightly lower composite score in his |
| | 5 | processing speed; correct? |
| 10:54 | 6 | A.   Yes. |
| 10:54 | 7 | Q.   In the 18th percentile; correct? |
| 10:54 | 8 | A.   Yes. |
| 10:54 | 9 | Q.   And Mr. -- Dr. Martell did not (inaudible) -- |
| 10:55 | 10 | *(Court reporter requests counsel use microphone to* |
| | 11 | *be heard for the record.)* |
| 10:55 | 12 | THE COURT:  Repeat that. |
| 10:55 | 13 | BY MR. WILKE: |
| 10:55 | 14 | Q.   Dr. Martell did not appear to have any disagreement |
| | 15 | with your test results there; correct? |
| 10:55 | 16 | A.   Correct. |
| 10:55 | 17 | Q.   And, uh, did -- did Dr. Martell conduct his own |
| | 18 | testing? |
| 10:55 | 19 | A.   Yes. |
| 10:55 | 20 | Q.   And, in fact, didn't Dr. Martell's test -- was one'a |
| | 21 | the tests Dr. Martell performed a Symbol Digit Modalities |
| | 22 | Test? |
| 10:55 | 23 | A.   Yes. |
| 10:55 | 24 | Q.   And that is a test of speed and information processing; |
| | 25 | correct? |

| | | |
|---|---|---|
| 10:55 | 1 | A.   Yes. |
| 10:55 | 2 | Q.   That's not a test that you performed; correct? |
| 10:56 | 3 | A.   Correct. |
| 10:56 | 4 | Q.   It's a different test. |
| 10:56 | 5 | A.   Yes. |
| 10:56 | 6 | Q.   Is it common for neuropsychologists to perform |
| | 7 | different tests after a person has already received an |
| | 8 | earlier neuropsychological examination? |
| 10:56 | 9 | A.   Sometimes, yes.  Sometimes we have to. |
| 10:56 | 10 | Q.   And you have to because the performance of the earlier |
| | 11 | examination may teach the person something about how to do |
| | 12 | the test better; correct? |
| 10:56 | 13 | A.   Yes.  The repetition of the same test, uh, can -- can |
| | 14 | result in invalid results because we all learn. |
| 10:56 | 15 | Q.   Including people (inaudible) -- |
| 10:56 | 16 | *(Court reporter requests counsel use microphone to* |
| | 17 | *be heard for the record.)* |
| 10:56 | 18 | BY MR. WILKE: |
| 10:56 | 19 | Q.   Including people with cognitive deficits? |
| 10:56 | 20 | A.   Oh, yeah. |
| 10:56 | 21 | Q.   They -- they can learn from taking the test; correct? |
| 10:56 | 22 | A.   Yes.  We learn with neurons, yeah. |
| 10:56 | 23 | Q.   So the second neuropsychologist commonly will perform a |
| | 24 | different test to measure the same thing; correct? |
| 10:57 | 25 | A.   When we can, yes. |

| | | |
|---|---|---|
| 10:57 | 1 | Q.   And that appears to be what Dr. Martell did in |
| | 2 | performing the Symbol Digit Modalities Test; right? |
| 10:57 | 3 | A.   Yes. |
| 10:57 | 4 | Q.   And, in fact (unreportable) -- |
| 10:57 | 5 |    *(Court reporter requests clarification for the* |
| | 6 |    *record.)* |
| 10:57 | 7 | BY MR. WILKE: |
| 10:57 | 8 | Q.   Dr. Martell's testing determined that Mr. Le had |
| | 9 | moderate to severe deficit in rapid visual information |
| | 10 | processing; correct? |
| 10:57 | 11 | A.   Um, um -- well, um -- |
| 10:57 | 12 |    MR. STAPLES:  Your Honor, object at this point, if |
| | 13 | she's merely commenting on Dr. Martell's report. |
| 10:57 | 14 |    Dr. Martell is going to be testifying as a |
| | 15 | witness.  These questions are appropriate to him. |
| 10:57 | 16 |    THE COURT:  Overruled. |
| 10:57 | 17 |    This is her comparison, apparently, of the |
| | 18 | reports, Counsel, and her opinion. |
| 10:57 | 19 |    MR. WILKE:  Do you want me to repeat the question, |
| | 20 | Dr. Monguio? |
| 10:57 | 21 |    THE WITNESS:  No, no.  It's -- it's -- I -- I |
| | 22 | agree that that's what the report says.  I don't agree that |
| | 23 | the Symbol Digit Modality Test only measures rapid visual |
| | 24 | information processing.  It -- there's -- there's a lot -- |
| | 25 | there's many other functions that are needed to perform that |

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | test.                                                  |
| 10:58 | 2  | BY MR. WILKE:                                           |
| 10:58 | 3  | Q.   What other functions does the Symbol Digit Modality |
|       | 4  | Test measure?                                           |
| 10:58 | 5  | A.   Uh, working memory, notably.                      |
| 10:58 | 6  | Q.   Okay.  So, measures both working memory and attention |
|       | 7  | and speed of information --                            |
| 10:58 | 8  | A.   Attention and speed; but most importantly, for good |
|       | 9  | performance in this test, working memory is heavily    |
|       | 10 | involved.                                              |
| 10:58 | 11 | Q.   Okay.  And in that test, though, Dr. Martell did  |
|       | 12 | determine, uh, that Mr. Le indicate -- that his test   |
|       | 13 | resulted indicated a moderate to severe in --          |
| 10:58 | 14 | A.   Correct.                                           |
| 10:58 | 15 | Q.   -- information processing; correct?               |
| 10:58 | 16 | A.   Correct.                                           |
| 10:58 | 17 | Q.   And would you construe those test results, uh, as |
|       | 18 | consistent with yours with regard to both information  |
|       | 19 | processing and the speed of information processing?    |
| 10:59 | 20 | A.   And working memory, yes.                          |
| 10:59 | 21 | Q.   Did -- uh, are you familiar with the, uh, D-KEFS Design |
|       | 22 | Fluency Test?                                          |
| 10:59 | 23 | A.   Yes.                                               |
| 10:59 | 24 | Q.   And is that another test that Dr. Martell performed? |
| 10:59 | 25 | A.   Yes.                                               |

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

77

| | | |
|---|---|---|
| 10:59 | 1 | Q.   Is that a test that you performed? |
| 10:59 | 2 | A.   Not on Mr. Le, no. |
| 10:59 | 3 | Q.   Okay.  And did Dr. -- and the D-KEFS design fluency |
| | 4 | test measures, um, a person's executive skills; is that |
| | 5 | fair? |
| 11:00 | 6 | A.   Um, "executive skills" is an umbrella term. |
| 11:00 | 7 | Q.   Okay.  What does the D-KEFS Design Fluency Test measure |
| | 8 | more specifically? |
| 11:00 | 9 | A.   Um, initiation, visual processing, creativity, um, |
| | 10 | inhibition from perseveration -- |
| 11:00 | 11 | *(Court reporter requests clarification for the* |
| | 12 | *record.)* |
| 11:00 | 13 | THE WITNESS:  -- "perseveration," impulsivity, |
| | 14 | working memory -- because you have to keep track of what you |
| | 15 | just did -- um, and speed, of course. |
| 11:00 | 16 | BY MR. WILKE: |
| 11:00 | 17 | Q.   And what? |
| 11:00 | 18 | A.   Speed.  Speed.  Speed. |
| 11:00 | 19 | Q.   "Speed"? |
| 11:00 | 20 | A.   Speed. |
| 11:00 | 21 | Q.   Processing speed? |
| 11:00 | 22 | A.   Yes. |
| 11:00 | 23 | Q.   Okay.  But that's not its primary function to measure |
| | 24 | processing speed? |
| 11:00 | 25 | A.   Again, we're a system.  Everything is interrelated. |

|  | 1 | But you can have processing speed without the need for |

But you can have processing speed without the need for
creativity or, uh, um, working memory, or certain --
setting -- to follow the rules to create a design with four
straight lines.

11:01  Q.   Now, in his performance of the design fluency test, in
his evaluation, did Dr. Martell determine that Mr. Le's
performance showed mild impairment?

11:01  A.   Um, I can't find that section.  Can you repeat?

11:01  Q.   Yeah.  To refresh your memory, can I refer to page 13
of Dr. Martell's report.

11:01  A.   Oh, there it is.  At the -- yeah.

11:01  Q.   Yeah.  Now, uh, did Dr. Martell think that the mild
impairment that his test results showed was significant?

11:02  A.   Um, from -- from -- Mr. Le did an impair- --
mild-to-moderate impairment in his first trial, in the first
part of the test.  And then, again, as he's demonstrated
with me a number of times, he did better with the second and
the third.  But the first one was at the fifth percentile.

11:02  Q.   Okay.  And --

11:02  A.   I'm sorry.  As is -- "5" is -- "7 percentile."

11:02  Q.   Which would be consistent with an impairment; correct?

11:02  A.   Yes.

11:02  Q.   -- at the "7" percentile.

11:02       But did Dr. Martell consider that to be significant?
Where do you disagree with Dr. Martell about that, if

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | anything?                                                  |
| 11:03 | 2  | A.   Well, according to his opinion, he -- he wrote that   |
|       | 3  | Mr. Le performed poorly in that first test because he had  |
|       | 4  | misunderstood the instructions.                            |
| 11:03 | 5  |      But that's unlikely, given the way that the test is    |
|       | 6  | administered.                                              |
| 11:03 | 7  | Q.   Why do you say that?                                   |
| 11:03 | 8  | A.   Um, so you -- you, um, demonstrate to the patient what |
|       | 9  | you want 'em to do, on the first page.  And then, on that   |
|       | 10 | same page, there are three -- three places -- three designs |
|       | 11 | where he's supposed to practice.  And you correct them so   |
|       | 12 | that he understands what the task is supposed to be.  I     |
|       | 13 | won't bore you with what it is, but trust me.  And then you  |
|       | 14 | flip the page of the book that the "D-KFES" provides, flip  |
|       | 15 | it over so that the patient sees the instructions, and you  |
|       | 16 | say, "So that you don't have to worry about remembering,    |
|       | 17 | here are the instructions" -- oops -- "Here are the         |
|       | 18 | instructions for you."                                      |
| 11:04 | 19 |      So, um, you -- you explain and demonstrate.  You have  |
|       | 20 | the patient, uh, practice, and then you flip the rules so   |
|       | 21 | that the patient can look at them.                          |
| 11:04 | 22 |      So I'm not sure how Mr. Le would misunderstand the     |
|       | 23 | instruction, particularly when, in the second trial, he did |
|       | 24 | fine, and the instructions were not repeated.  And in the   |
|       | 25 | third one he did fine, and the instructions were not        |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | repeated.  So it seems to me that he understood the                    |
|       | 2  | instructions; it's just that he performed poorly on the                |
|       | 3  | first trial.                                                           |
| 11:04 | 4  | And then, as he's demonstrated over and over again, he                 |
|       | 5  | does better when he learns, when he practices.                         |
| 11:04 | 6  | Q.   And does the -- would -- can you draw any conclusions             |
|       | 7  | from the fact that in the second and third (inaudible) --             |
| 11:05 | 8  | A.   I' -- I'm losing you.                                             |
| 11:05 | 9  | Q.   I'm sorry.                                                         |
| 11:05 | 10 | Can you draw any conclusions from the fact that in the                 |
|       | 11 | second and third trials of this test administered by                   |
|       | 12 | Dr. Martell, uh, Mr. Le did better?  What conclusions do you           |
|       | 13 | draw from that?                                                        |
| 11:05 | 14 | A.   He learns.  And he wants to learn.  His motivation is            |
|       | 15 | impeccable.                                                            |
| 11:05 | 16 | Q.   Does that suggest he was putting forth his best                  |
|       | 17 | effort --                                                              |
| 11:05 | 18 | A.   Yes.                                                              |
| 11:05 | 19 | Q.   -- during the testing by Dr. Martell?                            |
| 11:05 | 20 | A.   Correct.                                                          |
| 11:05 | 21 | Q.   Okay.  Now, finally one more test that Dr. Martell, uh,          |
|       | 22 | performed here had to do with his validity testing --                  |
|       | 23 | performed by Dr. Martell.  We talked about that earlier with           |
|       | 24 | regard to --                                                           |
| 11:05 | 25 | A.   Oh, yes.                                                          |

| 11:05 | 1 | *(Simultaneous speaking.)* |
| 11:05 | 2 | *(Court reporter requests clarification for the* |
| | 3 | *record.)* |
| 11:05 | 4 | THE COURT:  Once again, Counsel. |
| 11:05 | 5 | MR. WILKE:  Thank you. |
| 11:05 | 6 | BY MR. WILKE: |
| 11:05 | 7 | Q.   Dr. Martell, like you, also performed validity testing; |
| | 8 | correct? |
| 11:06 | 9 | A.   Yes. |
| 11:06 | 10 | Q.   And he determined that the validity testing produced, |
| | 11 | quote, "mixed results"; correct? |
| 11:06 | 12 | A.   Yes. |
| 11:06 | 13 | Q.   That it was valid on some of the earlier-administered |
| | 14 | validity testing; correct? |
| 11:06 | 15 | A.   The earlier validity testing, I think it was only one, |
| | 16 | the Rey 15 Item, which is not a very good motivational -- |
| 11:06 | 17 | Q.   Okay. |
| 11:06 | 18 | A.   -- test. |
| 11:06 | 19 | Q.   Well -- |
| 11:06 | 20 | (Simultaneous speaking.) |
| 11:06 | 21 | *(Court reporter requests clarification for the* |
| | 22 | *record.)* |
| 11:06 | 23 | THE COURT:  Counsel, just reask the question. |
| 11:06 | 24 | BY MR. WILKE: |
| 11:06 | 25 | Q.   In addition to the Rey's [sic] 15-item test, he did |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | also perform a CVLT-II Forced Trial [sic] test?            |
| 11:06 | 2  | A.   That's an embedded measure.  The CVLT-II is the       |
|       | 3  | learning -- the verbal learning test.  And the last -- the |
|       | 4  | last task, um, I -- I mentioned it as well -- um, the last |
|       | 5  | task is an embedded forced choice task that you -- that    |
|       | 6  | gives you a really good measure of whether the patient is  |
|       | 7  | trying his best or not.                                    |
| 11:07 | 8  | Q.   And on -- on the fourth [sic] choice -- the CVLT-II   |
|       | 9  | Forced Choice Trial [sic], Dr. Martell also determined that|
|       | 10 | Mr. Le's scores were valid; correct?                       |
| 11:07 | 11 | A.   Yeah.                                                  |
| 11:07 | 12 | Q.   Suggesting from that that Mr. Le was putting forth his|
|       | 13 | best effort; correct?                                       |
| 11:07 | 14 | A.   Yes.                                                   |
| 11:07 | 15 | Q.   Okay.  Now, Dr. Martell, though, also performed a test|
|       | 16 | known as the Validity Indicator Profile?                    |
| 11:07 | 17 | A.   Yes.                                                   |
| 11:07 | 18 | Q.   Are you familiar with that test?                       |
| 11:07 | 19 | A.   Yes.                                                   |
| 11:07 | 20 | Q.   Okay.                                                  |
| 11:07 | 21 |      And Dr. Martell performed that test at the end of the |
|       | 22 | testing; correct?                                           |
| 11:07 | 23 | A.   That's what his report says, yes.                     |
| 11:08 | 24 | Q.   Okay.  Now -- and from that testing, doctor -- the -- |
|       | 25 | Dr. Martell scored the results as invalid; correct?        |

8:20-CR-00002-DOC  - 12/2/2021 - Day 11, Volume I

83

| 11:08 | 1 | A.    That's what he wrote, yes. |
|---|---|---|
| 11:08 | 2 | Q.    Okay.  And, to Dr. Martell, that suggested that Mr. Le, |
| | 3 | uh, may not'a been putting forth his best effort on that |
| | 4 | test; correct? |
| 11:08 | 5 | A.    Correct. |
| 11:08 | 6 | Q.    Do you have any opinion about whether that test negates |
| | 7 | the other test results obtained by Dr. Martell? |
| 11:08 | 8 | *(Court reporter indicates realtime computer feed* |
| | 9 | *is frozen.)* |
| 11:09 | 10 | THE COURT:  All right.  We were gonna recess at |
| | 11 | 11:15 anyway.  Let's let the jury go. |
| 11:09 | 12 | You're admonished not to discuss this matter |
| | 13 | amongst yourselves nor to form or express any opinion |
| | 14 | concerning the case. |
| 11:09 | 15 | *(Lunch recess held at 11:09 a.m.)* |
| 11:09 | 16 | *(Further proceedings recorded with CourtSmart* |
| | 17 | *system to be separately transcribed in Volume II.)* |
| 11:09 | 18 | -oOo- |
| 11:09 | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 11:09 | 1 | -oOo- |
| 11:09 | 2 | |
| 11:09 | 3 | CERTIFICATE |
| 11:09 | 4 | |
| 11:09 | 5 | I hereby certify that pursuant to Section 753, |
| | 6 | Title 28, United States Code, the foregoing is a true and |
| | 7 | correct transcript of the stenographically reported |
| | 8 | proceedings held telephone in the above-entitled matter and |
| | 9 | that the transcript page format is in conformance with the |
| | 10 | regulations of the Judicial Conference of the United States. |
| 11:09 | 11 | |
| 11:09 | 12 | Date:  January 13, 2022 |
| 11:09 | 13 | |
| 11:09 | 14 | |
| 11:09 | | /s/ Debbie Gale |
| 11:09 | 15 | _____ |
| 11:09 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| 11:09 | | CSR NO. 9472, RPR, CCRR |
| 11:09 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |