1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5   UNITED STATES OF AMERICA,        )
                                     )        <u>**CERTIFIED**</u>
6              Plaintiff,            )
                                     )
7          vs.                      ) No. 8:20-CR-00002-DOC
                                     )    Day 12, Volume II
8   HOANG XUAN LE, also known as     )
    Wayne, *also known as Wangsta*,  )
9                                    )
                Defendant.           )
10  _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16             Santa Ana, California

17          Friday, December 3, 2021

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25

```
1   APPEARANCES OF COUNSEL:

2

3   FOR THE UNITED STATES OF AMERICA:

4       DEPARTMENT OF JUSTICE
        OFFICE OF THE UNITED STATES ATTORNEY
5       BY:  Gregory Shepherd Scally
            Assistant United States Attorney
6       411 West 4th Street
        8th Floor
7       Santa Ana, California 92701
        714-338-3592
8       gregory.scally@usdoj.gov

9       DEPARTMENT OF JUSTICE
        OFFICE OF THE UNITED STATES ATTORNEY
10      BY:  Gregory Staples
            Assistant United States Attorney
11      411 West 4th Street
        8th Floor
12      Santa Ana, California 92701
        714-338-3535
13      greg.staples@usdoj.gov

14

15  FOR DEFENDANT HOANG XUAN LE:

16      Craig Wilke (CJA appointed)
        LAW OFFICE OF CRAIG WILKE
17      305 North Harbor Boulevard, Suite 216
        Fullerton, California 92832
18      714-870-8900
        craig@craigwilkelaw.com

19
        Sheila Sarah Mojtehedi (CJA appointed)
20      LAW OFFICE OF SHEILA MOJTEHEDI
        806 East Avenida Pico, Suite I-291
21      San Clemente, CA 92673
        323-412-0472
22      sheila@mojtehedi.com

23
    ALSO PRESENT:
24
        Austin Casey, Special Agent, Coast Guard
25
```

| 1 | **I N D E X** |  |
|---|---|---|
| 2 | **PROCEEDINGS** | **PAGE** |
| 3 | <u>JURY TRIAL - DAY 12, VOLUME II</u> |  |
| 4 | Government's Closing Argument | 4 |
| 5 | Video recording played, Exhibit Number 73 | 21 |
| 6 | Video recording played, Exhibit No. 75 | 36 |
| 7 | Further proceedings reported by Debbie |  |
|   | Hino-Spaan in Volume III |  |

|   |   |   |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, FRIDAY, DECEMBER 3, 2021** |
|  | 2 | **Day 12, Volume II** |
|  | 3 | (9:59 a.m.) |
| 08:47 | 4 | *(Outside the presence of the jury.)* |
| 09:59 | 5 | THE COURT:  All right.  Then we're on the record. |
|  | 6 | Counsel are present.  The defendant's present.  The |
|  | 7 | investigating agency's present. |
| 09:59 | 8 | Is there any reason that Court should not summon |
|  | 9 | the jury? |
| 09:59 | 10 | MR. SCALLY:  No, Your Honor. |
| 09:59 | 11 | THE COURT:  Thank you. |
| 09:59 | 12 | And, Karlen. |
| 09:59 | 13 | COURT REPORTER:  She's getting them. |
| 10:01 | 14 | *(In the presence of the jury.)* |
| 10:02 | 15 | THE COURT:  The jury's present.  The alternates |
|  | 16 | are present, the defendant, investigating agency. |
| 10:02 | 17 | If you'd be seated.  Thank you for your courtesy. |
| 10:02 | 18 | And, Counsel, this would be governments opening |
|  | 19 | argument on behalf of the government. |
| 10:02 | 20 | MR. SCALLY:  Thank you, Your Honor. |
| 10:02 | 21 | **GOVERNMENT'S CLOSING ARGUMENT** |
| 10:03 | 22 | MR. SCALLY:  When you tell people that you're |
|  | 23 | going to kill a particular person, and then you take that |
|  | 24 | person on a trip in the middle of the night to the middle'a |
|  | 25 | the ocean, and then you kill that person by beating them |

about the head, shooting them multiple times, throwing them

overboard and leaving them for dead in the ocean, that's

premeditated murder.

10:03  When you agree with someone else to kill that

particular person, and you and that someone else discusses

how you're going to do it; you say you're gonna do it on a

particular boat, and you that someone else actually go out

on that particular boat with that specific other person, and

you kill that person out on that boat, that's premeditated

murder.

10:04  That's Count One in this case.  It's also

conspiracy to murder, which is Count Two.

10:04  And when you knowingly use a gun to commit

premeditated murder, you're using a firearm to commit a

crime of violence, which is Count Three in this case.

10:04  When you kill somebody because they owe you money,

and you've heard them talk about a life insurance policy

that they have, and you've heard them talk about how their

wife will pay their debts if they die, and then after you

kill them, you put a GPS tracking device on their wife's

car, and you send this text to the person who you killed

them with, about where the tracker is and wanting your

money, that's premeditated murder.  That's not self-defense.

It's not manslaughter.  It's murder.

10:05  And when you go back in the jury room and you have

| | | |
|---|---|---|
| | 1 | that jury form, I want you to call this what it is:  Murder. |
| 10:06 | 2 | Now, the Court just instructed you on the elements |
| | 3 | that you need to find in order to find the defendant |
| | 4 | committed murder.  So let's talk about those elements in a |
| | 5 | little bit more detail. |
| 10:06 | 6 | As I said, murder in the first-degree is the first |
| | 7 | count.  And the elements are, as Judge Carter instructed |
| | 8 | you: |
| 10:06 | 9 | The defendant committed an act causing the death |
| | 10 | of James Dao; |
| 10:06 | 11 | Defendant acted with malice aforethought; |
| 10:06 | 12 | The killing was premeditated; |
| 10:06 | 13 | The killing occurred in the special maritime and |
| | 14 | territorial jurisdiction of the United States; and, |
| 10:06 | 15 | It wasn't self-defense. |
| 10:06 | 16 | So what's the evidence?  Let's take them step by |
| | 17 | step.  What's the evidence that defendant committed an act |
| | 18 | causing James Dao's death? |
| 10:06 | 19 | Well, the coroner, Dr. Paunovic, testified she |
| | 20 | found this was a homicide.  "Homicide" in her words means |
| | 21 | death by another person.  And you know that James Dao went |
| | 22 | on a fishing trip with the defendant in this case.  You |
| | 23 | heard from Natalie Nguyen about how James and the defendant |
| | 24 | met at the Asia Buffet on October 14, 2019, and the |
| | 25 | defendant invited James to go on a lobster fishing trip that |

1   night.

10:07    2          James went on that lobster fishing trip that

3   night, leaving his apartment.  There are surveillance videos

4   of that.  They're Exhibits 5 and 9.

10:07    5          They went on a boat owned by Sheila Ritze.  Those

6   are -- they're DMV records in evidence.  They're

7   Exhibits 246 through 248, and there's video surveillance

8   from the harbor.  And I'm not gonna belabor all those points

9   here and show you all that stuff this morning.  But those

10  Exhibits from the surveillance cameras from the harbor are

11  Exhibits 10 and 11.

10:08    12         And so you know that defendant committed the acts

13  causing James Dao's death based on the circumstances that he

14  went on this trip with James Dao, and then he told people

15  that he killed James Dao.

10:08    16         So he told Tony Hoang.  And it's been a few

17  weeks -- obviously, because'a the break -- but Tony Hoang

18  was the guy who was visiting defendant once a week in the

19  Summer and Fall of 2019 in connection with marijuana deals.

20  There were text messages introduced into evidence between

21  the two of them that corroborate that that's exactly the

22  nature'a their relationship.  That's Exhibit 136.

10:08    23         And you saw -- you heard 'em testify that on

24  October 18, 2019, three days after the boat trip, defendant

25  rides with Tony down to the Irvine Spectrum, in defendants

1  Cadillac.  Defendant's on the way to meet with Alex Dao,

2  James's brother.  And you saw video from the Irvine Spectrum

3  showing defendant and Tony Hoang arrive at the Irvine

4  Spectrum in defendant's Cadillac.

10:09  5         There are text messages showing that they were

6  gonna specifically meet up that night.  Again, that's

7  Exhibit 136.  And on the way to go meet with James's

8  brother, three days after he's killed 'em, defendant calls

9  somebody named "Shawn."  Tony's listening, uh, and defendant

10  tells Shawn he's gonna meet the brother.

10:09  11         After the phone call Tony asks, uh, defendant what

12  really happened, and defendant tells 'em, "I shot somebody

13  on a boat.  I was trying to collect money, 30- to $40,000.

14  Guy didn't wanna pay, so I shot 'em three times, dumped 'em

15  overboard."  That's at a time when nobody knows James Dao's

16  body has been recovered, much less recovered with bullet

17  wounds in it.

10:10  18         He tells Shawn Whalin that he killed James Dao.

19  Told Shawn Whalin in the days after the fishing trip, "I

20  took care of it.  I shot 'em."

10:10  21         Tells Vinh Doan, "I shot a guy on a boat."

10:10  22         And then, in this case, you have the testimony

23  from the defendant himself.  Says he hit James Dao couple

24  times on the head.  Gun went off a few times.  He threw 'em

25  overboard, and he left 'em in the ocean to die.

10:10  1          So that first element -- the defendant committed
       2    an act causing the death of James Dao -- that's met.
10:11  3          The second element is that he acted with malice
       4    aforethought.  So let's take a look at what that means and
       5    whether that's been established by the evidence in this
       6    case.  Well, there are two kinds of malice aforethought.
       7    And the one I'munna focus on first is the first one, which
       8    is, to kill with malice aforethought means you unlawfully
       9    intended to kill.
10:11  10         So the question I wanna consider for the moment is
      11    whether the evidence has established the defendant intended
      12    to kill James Dao.
10:11 13          And when you're asking yourself that question,
      14    remember what the defendant did to James Dao.  These other
      15    four things we'll get to later.  I'm just gonna focus on
      16    whether he intended to kill 'em, for the moment.
10:12 17          So, in focusing on what the defendant did to James
      18    Dao, we have to look at some photographs that are not that
      19    easy to look at.
10:12 20          He beat James Dao over the head, leaving gashes on
      21    the top of his head, and bruising on his forehead, and
      22    another gash here on the head.  That's Exhibit 118.  Skin
      23    tears and bruising to the forehead are the blunt-force
      24    injuries Dr. Paunovic talked about.
10:12 25          I won't leave this one up for very long, but it's

|        |     |                                                                        |
|--------|-----|------------------------------------------------------------------------|
|        | 1   | Exhibit 127.  And it's bloody gashes on the top of James               |
|        | 2   | Dao's head when he's found.                                            |
| 10:12  | 3   | And when that's all cleaned up, these are what                         |
|        | 4   | those gashes looked like.  And they also include a bullet              |
|        | 5   | entrance and exit wound.                                               |
| 10:13  | 6   | And if we look at Exhibit 126, we see how much                         |
|        | 7   | blood there was 36 hours later after he's floating in the              |
|        | 8   | ocean for a day and a half.  This doesn't look like                    |
|        | 9   | defendant was just trying to hurt James a little bit.  Looks           |
|        | 10  | like he was trying to kill 'em.                                        |
| 10:13  | 11  | But remember, it's not just these many, many                          |
|        | 12  | wounds to the head.  James Dao's also shot in the back.  So            |
|        | 13  | when James Dao went in the water, he'd been brutely beaten             |
|        | 14  | and shot twice.                                                        |
| 10:14  | 15  | And where did he go in the water?  If we look at                       |
|        | 16  | page 15 of Exhibit 253, you'll see the intersection here in            |
|        | 17  | the center of these concentric circles, the intersection of           |
|        | 18  | James's phone and defendant's phone, at about 1:30 in the              |
|        | 19  | morning on October 15th.                                               |
| 10:14  | 20  | And if you look at Exhibit 255, page 18, this is                       |
|        | 21  | where we get the last signal from James Dao's cellphone.               |
|        | 22  | It's about 3.38 miles from shore.                                      |
| 10:15  | 23  | So if you beat somebody up, inflicting the                             |
|        | 24  | blunt-force trauma wounds that we saw in those                         |
|        | 25  | photographs -- and they're not blunt-force trauma wounds to            |

1    the elbow, to the knee, to the shin, to the feet.  They're

2    on the head, the most vital part of your body.  You inflict

3    those, you shoot the person more than once, and then you

4    leave them in the ocean in the middle of the night, more

5    than three miles from shore, you're intending to kill that

6    person.  That's the only reasonable interpretation of that

7    evidence.  This was no accident.

10:15    8          Next element to consider is whether this was

9    premeditated.  Was this a premeditated killing.  And

10    "premeditated" means with planning or deliberation.  And

11    we'll talk about "deliberation" in a minute, but for the

12    moment I want to focus on the evidence of planning in this

13    case.

10:16    14          And the evidence that this was planned by the

15    defendant and Sheila Ritze consists of evidence from before

16    the boat trip, evidence during the boat trip, and evidence

17    after the boat trip.  So let's talk first about evidence

18    from before the boat trip, the evidence of planning that

19    establishes the element of premeditation, the third element

20    for murder in the first-degree.  And what's that evidence

21    from before the boat trip?  I want to start with Sandra

22    Ritze.

10:17    23          Again, it's been a few weeks.  Remember, Sheila

24    Ritze is sheila's mother-in-law.  She's the mother of Mica

25    Ritze, who you also heard testify.  And Sheila is the woman

who defendant -- excuse me -- Sandra is the woman who

defendant, Sheila Ritze, Shawn Whalin, and James Dao go

visit at the Palms Casino on October 4th, 2019, ten days

before the boat trip in which defendant killed James Dao.

10:18  And she's the woman who loves her granddaughter,

River, very much -- Sheila's daughter.  And after Sheila and

Sandra go to a Billy Idol concert at the Palms Casino on the

night of October 4, 2019, there are a few people hanging out

in a hotel room at the Palms in Vegas.  They are defendant,

Shawn, Sheila Ritze, and Sandra.

10:18  And defendant says at that time, clearly referring

to James, that the guy owed him 20- to $40,000; that he

couldn't get the money, but was going to find a way to get

it, and he was going to "off" him, which Sandra understood

to mean kill.

10:18  Sheila was present during those statements.

Sandra asked defendant, "How do you get your money, if you

kill somebody who owes you money?"  And defendant said, "I

won't, but I'll get satisfaction."

10:19  Defendant and Sheila talked about using the boat

to take someone out to the ocean.  Defendant said he had

access to Sheila's boat, said he could take anyone out, any

time and "off" them.

10:19  And they were talking about the man she'd just

met, whose name she didn't know, but it was clearly James

1    Dao, based on her testimony, Shawn Whalin's testimony --

2    actually, defendant's testimony -- and the phone records

3    putting 'em all at the Palms Casino.

10:19    4         Now, Sandra Ritze's testimony is consistent with

5    other evidence in this case.  So just at a simple level,

6    this trip to the Palms Casino obviously happened.  We have

7    Exhibit 105.  That's a photo of Sheila Ritze and Sandra

8    Ritze at the Billy Idol concert.  We have Exhibit 104 that's

9    Shawn Whalen, Sheila Ritze, and Wayne Le, defendant in this

10   case, in Las Vegas.

10:20    11        And we have phone records that show the trip to

12   Las Vegas.  Here's Exhibit 252.  This is Sheila Ritze's

13   phone over near 151 Orangefair Avenue.  They're picking up,

14   which is -- Natalie Nguyen testified is her residence --

15   they're picking up James Dao.

10:20    16        Flip to the next page.  This is Wayne's and

17   James's phones going up the 15 to Vegas.

10:20    18        This is James's phone on the way to Vegas on the

19   15.

10:20    20        Wayne and Shawn's phones on the way to Vegas.

10:21    21        Defendant and James again on the way to Vegas.

10:21    22        And last one:  Wayne, James, Sheila, and Sandra

23   all at the Palms Casino Resort in the evening of

24   October 4th, 2019.

10:21    25        And there were introductions in the lobby.  And

8:20-CR-00002-DOC  - 12/3/2021 - Day 12, Volume II

14

1  Sandra says that that night defendant said that he was going

2  to "off the guy."  Quote, "off the guy."  You'll notice

3  defendant, when he was on the stand being questioned by

4  Mr. Staples, admitted that in November of 2019, he told Tony

5  Hoang that he was going to, quote, "off" someone.  And he

6  meant he was going to kill that person.

10:22   7        Now, what he said was, "Well, I didn't do it.  I

8  didn't mean it."  But he admitted that that's how he speaks.

9  He uses that term.  He uses that phrase.

10:22   10        So Sandra Ritze's testimony about what the

11  defendant said is credible because it reflects exactly how

12  defendant speaks -- not to mention that Shawn Whalin also

13  tells you on that same trip in Las Vegas, defendant was

14  telling him about his intention to "take out" James Dao,

15  which Shawn understood to mean kill.

10:22   16        And when we're talking about Sandra Ritze, if you

17  believe Sandra Ritze:  Case is over.  It's first-degree

18  murder.

10:23   19        So the defense has suggested that she is a

20  deliberate, brazen, unremorseful liar, saying that she

21  looked at newspaper articles before she talked to the

22  agents.  Of course, she did.  Her daughter-in-law had been

23  arrested in connection with a murder.  There was nothing

24  nefarious about her looking at newspaper articles.  Of

25  course, this was a huge deal to her and a major upheaval for

1    her family.

10:23    2            And there was a suggestion that she just read

3    those articles and decided:  I'munna make up a bunch of

4    stuff about Sheila Ritze and defendant out of thin air.

5    I'munna frame them for murder.  I'm gonna make up a bunch'a

6    lies.

10:23    7            But when confronted with the suspicion that her

8    testimony is just reflecting facts available in the

9    newspaper, she explained that.  She said, "That's why I was

10   blown away when I read it 'cause I lived it."  And in

11   telling those lies -- so the suggestion would go -- to both

12   the FBI and the Coast Guard Investigative Service, she

13   becomes a brazen criminal, committing the crime of lying to

14   federal agents, and then, in coming into court and swearing

15   an oath and telling you what she told you -- those -- all

16   these lies she made up.  She's again a brazen criminal

17   committing the crime of perjury.

10:24   18            And the suggestion that she's doing all this to

19   protect River; right?  And there's some text messages that

20   you saw where she said to -- I believe it was her niece:

21   Keep that witch in jail.

10:24   22            But after hearing how Sheila was behaving, the

23   kind of damage Sheila was doing to her family, can you blame

24   Sandra Ritze for making an off-the-cuff remark in a text

25   message, saying something like that.  Does it mean she's a

            1    perjurer and a brazen criminal?

10:25       2           And remember, why do we even have that text to

            3    consider?  Because Sandra Ritze has nothing to hide.

            4    Because when agents asked her, Hey, can we just download

            5    your phone, your entire phone, all -- everything that's on

            6    your phone, your photos, videos, texts, emails, all

            7    communications?

10:25       8           "Sure thing.  Here you go."

10:25       9           And she didn't report this threat to the police,

           10    initially.  That's true.  But she also explained that.  She

           11    said she was halfway fascinated, halfway in disbelief.  And

           12    if you had heard what she'd heard, would you've definitely

           13    thought there was a real threat to somebody's safety, or

           14    what -- might you've stayed out of it -- tried to stay out

           15    of it, thinking it was just idle talk, drunk talk?

10:26      16           But when a body turns up, think you might

           17    reconsider whether you need to keep that information to

           18    yourself?

10:26      19           Sandra still loves Sheila.  She testified about

           20    that.  Yes, she was concerned that Sheila was not a good

           21    mother because of her drinking.  And Sandra Ritze was honest

           22    about that too.  And, yes, she thought that River was at

           23    risk in 2019, due to Sheila driving with River in the car

           24    while she was intoxicated.  She was honest about that too.

10:26      25           But as everybody in the courtroom knows, families

1    are complicated, and people may be hurting or in pain for

2    whatever reason, and living in a self-destructive way, as

3    apparently Sheila was, in turning to alcohol.

10:27    4         Though they're struggling with addiction and

5    hurting their family, mutual loved ones, as Sheila

6    apparently was doing in driving under the influence with

7    River in the car, that doesn't mean we make up entirely

8    false lies about people, tell those lies to the FBI, come

9    into Court, swear an oath, and tell those lies in court.

10:27   10         And when she testified, did she strike you as

11   somebody who was a blatant criminal?  This woman who worked

12   for a family construction company for many, many years, is

13   now retired, and is a grandmother.  And her favorite person

14   in the world is her 11-year-old grand daughter.

10:28   15         Would she have read the press and said to herself,

16   I know today's the day I'm gonna frame people for a crime

17   they didn't commit and I'm gonna become a criminal today?

10:28   18         Evidence of planning from before the boat trip.

19   Let's talk about Shawn Whalin.

10:28   20         Shawn Whalin was this guy who was hanging out with

21   defendant every day.  They were buddies, did drugs together,

22   dealt drugs together.  And they were hanging out every day

23   in the Fall of 2019.

10:29   24         And Shawn Whalin told you that defendant

25   introduced James Dao to Shawn and that defendant told Shawn

1    "That's the guy who owes me money.  That's the guy who owes

2    me 30- to 40,000.  I'munna take him out," which Shawn

3    understood to mean take his life.  And the defendant asked

4    Shawn for his assistance in doing that before the boat trip.

5    Shawn declined, saying there was no way he was gonna take

6    anybody's life.

10:29  7          Defendant told Shawn, before the boat trip, "I'm

8    gonna get the money" or James's wife would give defendant

9    the money out of an insurance policy.  And defendant told

10   Shawn, while in Vegas, James owed him money.  Defendant was

11   gonna take 'em out, and defendant appeared serious.

10:30  12         Shawn saw the defendant in possession of a

13   .38 caliber, a gun consistent with the murder weapon -- on

14   defendant's bed, in his car, saw it quite a bit, saw it

15   before the fishing trip.

10:30  16         Now, on the issue of the .38, Shawn's testimony is

17   corroborated by other witnesses.  Tony Hoang told you

18   defendant showed him a .38 caliber revolver early in their

19   reacquaintance in the Summer of 2019.  Tony Hoang told you

20   it was a -- the defendant said it was a .38, defendant was

21   excited to get it, said it was his new toy, his new baby.

22   And Shawn's testimony about the .38 is corroborated by text

23   messages between Wayne, the defendant, and Shawn.

10:31  24         So here's the defendant saying to Shawn "If you

25   wanna borrow my .38, come and get at my house" -- in

1        Exhibit 144.

10:31    2                And in Exhibit 262, texts:  "Got my piece if you

3        wanna bring it."

10:31    4                And Shawn Whalin asks, "What piece?"

10:31    5                And defendant responds "38."

10:31    6                It makes sense that this is who defendant is

7        telling his secrets to.  Somebody who you're offering to

8        lend your .38 caliber to, somebody who you're dealing drugs

9        with -- that's who you're going to bring along with you when

10       you lie to James Dao's brother about whether you were on the

11       boat trip or not.

10:32    12               This is Exhibit 46.  Wayne, the defendant -- here

13       on the right -- with Shawn Whalin, down at the harbor,

14       backing up Wayne on his story to Alex that he didn't go on

15       the boat trip.

10:32    16               That's who you're going to tell about your plan to

17       kill someone.  And when that plan is accomplished, that's

18       who you're gonna tell that you accomplished that plan

19       with [sic] -- the guy you hang out with every day and who

20       you commit other crimes with.

10:32    21               Now, there's a suggestion that Shawn Whalin was

22       just telling you whatever he thinks the agents want him to

23       say and the, kind of, supposedly dramatic testimony was

24       supposed to be the -- you know, Andrew Cho, the agent who

25       interviewed him, told him that a .38 doesn't come in a

semiautomatic version; it's just a revolver.

10:33    The defense expert just testified to that,
couple days ago, himself.  So there's nothing wrong with
that information.

10:33    And did Andrew Cho somehow influence Shawn
Whalin's testimony by calling this a murder?

10:33    Remember what Shawn Whalin had already told Andrew
Cho.  He told 'em "Defendant told me, he -- James, owed 'em
money."

10:33    He told 'em, "Defendant said he was gonna kill
James.  Defendant asked me for help in killing 'em.  I said
no."

10:33    "Before he killed him, he said he was going to get
the money from an insurance policy.  He told me that he
killed James."

10:33    That's a murder that Shawn described to Special
Agent Cho.  So Special Agent Cho didn't give Shawn the idea
that this was a murder.

10:34    And do you think Shawn Whalin is smart enough to
kind of glean and discern and divine, kinda figure out,
"Okay.  What is it that the agents want me to say?  And I'm
just gonna come in and say it"?

10:34    He's a guy who's able to tailor his testimony to
what he thinks other people want 'em to say -- and, in a
way, that is consistent with all this other evidence?

8:20-CR-00002-DOC  - 12/3/2021 - Day 12, Volume II

21

10:34    1       So Shawn said he was -- said the defendant was

2    going to try to get the money from the guy's life insurance.

3    all right?  That's one of the things Shawn told you.

10:34    4       Well, that's consistent with Doan's testimony.

5    The defendant said he was gonna get the money from the guy's

6    life insurance policy.  It's consistent with Natalie's

7    testimony that James would tell people, "If something

8    happens to me, Natalie will pay my debts through the life

9    insurance policy."  It's consistent with the defendant

10    tracking Natalie and sending the text to Sheila going to

11    Arizona and how he wants his "hundred K."  It's consistent

12    with defendant's statement to Tony Hoang about trying to get

13    the money from the wife.

10:35   14       In fact, let's play that recording, Exhibit 73.

15    This is a recording of defendant telling Tony Hoang:  "I'm

16    trying to get the money from the wife."

10:36   17     *(Video recording played, not reported.)*

10:38   18     MR. SCALLY:  So if Shawn Whalin's making it all up

19    up, he's a criminal mastermind who knows how to make up

20    testimony that's consistent with a ton of other evidence in

21    this case.

10:38   22       Now, briefly, before I move on to the next topic,

23    the evidence of planning also includes the spreadsheets.  So

24    defendant was keeping spreadsheets of the money owed to him

25    by James Dao.  And you also saw he was keeping spreadsheets

of money owed to him by other individuals.  But these
spreadsheets, in Exhibits 114 and 224, and all his comments
to Shawn Whalin show that the debt was weighing on him.

10:39    And, of course, you heard from Natalie Nguyen.
And in particular, you heard about the life insurance
policy, which is Exhibit 162.

10:39    And, in addition to Natalie's testimony about --
Natalie told you that James would tell the defendant and
others that if anything had happened to him, his debts would
be paid through Natalie.  And you saw her being questioned
by us and the defense about some extremely uncomfortable
subjects -- intimate details about her family history -- and
she told you the truth about James having a gun at one time
and -- domestic violence incident in 2016.  She told you the
truth about all of it:  The good, the bad, and the ugly.

10:40    In addition to Natalie's testimony, I wanna turn
to the evidence of the boat trip itself.  So evidence from
the boat trip itself that is also evidence of planning.

10:41    If you're gonna kill somebody, where are you gonna
take 'em?  To a public place?  Crowded shopping center?
Stadium?  Grocery store?  No.  You're gonna take them to
somewhere where nobody else is around, where others are
unlikely to intrude, others are unlikely to witness what
you're planning on doing.

10:41    James Dao was taken out on a boat with only two

|  | 1 | other people on it, more than three miles from shore, in the |
|---|---|---|
|  | 2 | middle'a the night. |
| 10:42 | 3 | And Mica Ritze described for you a typical lobster |
|  | 4 | fishing tip with Sheila, which he had done more than |
|  | 5 | 20 times.  He said they typically leave just before sunset |
|  | 6 | to get to the first crawl.  They never started after |
|  | 7 | midnight.  They would stay about 75 feet from the jetty. |
|  | 8 | Put your hoop nets down and you wait, and you don't go very |
|  | 9 | of far because people -- there are poachers who poach the |
|  | 10 | lobster if you leave your hoop nets there.  And Sheila |
|  | 11 | didn't like poachers.  And she wouldn't go for a cruise or a |
|  | 12 | joy ride. |
| 10:42 | 13 | The typical fishing trip was like the fishing trip |
|  | 14 | on October 13th, 2019 -- |
| 10:43 | 15 | *(Exhibit displayed.)* |
| 10:43 | 16 | MR. SCALLY:  Looking at Exhibit 298, page 12 of |
|  | 17 | 14 -- where the farthest anybody gets from the jetty is down |
|  | 18 | here.  Really quite close to the jetty.  That's the typical |
|  | 19 | lobster fishing trip. |
| 10:43 | 20 | But in this case, on October 15th, where did they |
|  | 21 | go?  Looking at page 14 of Exhibit 298. |
| 10:43 | 22 | *(Exhibit displayed.)* |
| 10:43 | 23 | MR. SCALLY:  They go 3.43 miles farther.  Way out. |
|  | 24 | Way out there. (Indicating.) |
| 10:44 | 25 | Now, in addition to evidence from the boat trip |

|     |    |
|-----|----|
|     | 1  | itself and evidence of the boat trip, additional evidence |
|     | 2  | that the killing was premeditated and planned includes |
|     | 3  | evidence from after the boat trip.  So let's start with |
|     | 4  | Shawn Whalin here. |
| 10:44 | 5  | Couple days after the boat trip, Shawn's at |
|     | 6  | defendant's house, smoking weed, marijuana, and defendant |
|     | 7  | says, "I took care of it.  I shot 'em," meaning he acted in |
|     | 8  | accordance with his earlier plan to kill James Dao, which he |
|     | 9  | had told Shawn about.  And defendant was laughing as he told |
|     | 10 | Shawn Whalin about having killed James Dao.  Shawn saw some |
|     | 11 | bruises like a handprint on defendant's forearms. |
| 10:45 | 12 | And then Shawn was with defendant when he got -- |
|     | 13 | had a phone call with Natalie in the car.  And Shawn could |
|     | 14 | hear both sides.  Natalie asked where her husband was. |
|     | 15 | Defendant said he hadn't gone on the fishing trip at all, |
|     | 16 | lying.  Defendant was laughing, saying to Shawn -- like it |
|     | 17 | was no big deal. |
| 10:45 | 18 | And Shawn said, "If you did this, God will punish |
|     | 19 | you."  And defendant said, "If anybody gets in the way, I'll |
|     | 20 | take them out.  The wife owes me money.  I'munna collect one |
|     | 21 | way or the other.  Gonna put a GPS tracker on her, handle |
|     | 22 | her too."  Wayne didn't tell Shawn that James pulled a gun |
|     | 23 | on him or anything like that. |
| 10:45 | 24 | He also tells Tony Hoang that he killed 'em over a |
|     | 25 | debt. |

10:45   1        He tells Vinh Doan.  Now, defendant considered

2   Doan a friend.  Defendant helped Doan's wife with money

3   while Doan was in jail.  This is the type'a person who you

4   tell your secrets to.  And they meet at the bounce house on

5   October 18th, 2019, three days after defendant's killed

6   James Dao.

10:46   7        And defendant says, "I killed somebody out on a

8   boat, fishing.  Guy owed me 30- to 40,000.  I asked for the

9   money.  After that, I shot the guy a few times.  He went in

10   the ocean.  Guy was alive when he went in.  We were very

11   offshore -- very far offshore, in the middle of nowhere" --

12   and defendant was worried that the body -- the body would

13   show up with Wayne, uh -- defendant's jacket and phone.

14   Defendant said he'd approached the wife for the money owed.

15   She had said he had a life insurance policy.  Defendant said

16   he would get the money through the life insurance policy

17   through the guy's wife.  Never said James pulled a gun on

18   'em or threatened 'em or anything like that.

10:47   19        And Doan also didn't initially report this.  Story

20   didn't sound true to him.  And maybe it was natural for Doan

21   not to believe defendant at that time.

10:47   22        But when a body turns up, you have to come

23   forward.  And when a body turns up, it sounds a lot like --

24   lot less like empty bragging, false boasting.  This was

25   real.

10:47  1            And then what does he do?  Defendant?  He lies.

2      He lies to everybody who asks him the whereabouts of James

3      Dao.  So let's take a look at Exhibit 39, his texts with

4      Natalie Nguyen.

10:48  5            Natalie Nguyen, realizing her husband hasn't

6      returned from the fishing trip with defendant, calls 'em,

7      goes over to his place.

10:48  8          *(Exhibit displayed.)*

10:48  9            MR. SCALLY:  (reading:)

10:48  10           "Somebody stopped by my house.  Was it you?

10:48  11           DEFENDANT:  "Getting annoyed."

10:48  12           Getting annoyed that Natalie's trying to find her

13     dead husband*. (Reading:)*

10:48  14               "I don't know anything."  Lies.

10:48  15               "Shaking my head."

10:49  16               "I'm a friend not a foe."

10:49  17           I just killed your husband, father of your two

18     kids.  I'm your friend.  Lies.

10:49  19               "I need cash to re up."

10:49  20           Feeling her out about the money.  And she rebuffs

21     him immediately:  "I've no money."

10:49  22               "What are you talking about?

10:49  23               "Are you high?

10:49  24               "I'm calling you about" --

10:49  25               -- my dead husband.  This isn't somebody who's

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | devastated by a tragic incident, that wasn't their fault, by |
|       | 2  | killing James Dao.  He felt no remorse about it whatsoever,   |
|       | 3  | because he planned to do it.                                 |
| 10:49 | 4  | So what does he do next?  Well, next, when Natalie            |
|       | 5  | isn't gonna give 'em the money, he's gonna put a tracker...   |
| 10:50 | 6  | He's gonna put a tracker on her car.  This tracker            |
|       | 7  | that the agents found on Natalie's car. (Indicating.)  And,  |
|       | 8  | of course, we were able to tie that to the defendant 'cause, |
|       | 9  | as you'll see in Exhibit 273 -- parties have agreed --       |
|       | 10 | defendant's DNA is on the tracker.  Now, here's the tracker.  |
|       | 11 | And it's not as though he stuck the tracker on and kinda     |
|       | 12 | forgot about it, wasn't important to 'em, not a big deal,    |
|       | 13 | wasn't really paying attention to it.  No.  Here are         |
|       | 14 | screenshots from his phone.                                  |
| 10:51 | 15 | *(Exhibit displayed.)*                                        |
| 10:51 | 16 | MR. SCALLY:  He's paying attention'a the tracker.            |
|       | 17 | All right.  And where is it?  It's at Natalie's mom's on     |
|       | 18 | Nicklett Avenue in Fullerton, on November 26, 2019, little   |
|       | 19 | over a month after he killed James Dao.                      |
| 10:51 | 20 | Here's Exhibit 192.                                          |
| 10:51 | 21 | *(Exhibit displayed.)*                                        |
| 10:51 | 22 | MR. SCALLY:  Where's the tracker?  It's in Arizona           |
|       | 23 | on November 27th, 2019.                                      |
| 10:51 | 24 | And if you turn to the back pages of Exhibit 192,           |
|       | 25 | you'll see what we talked about as "metadata" in this case.  |

| | | |
|---|---|---|
| | 1 | And you'll see that the metadata for Exhibits 191 and 192 |
| | 2 | shows that these screenshots were taken by the defendant on |
| | 3 | November 28, 2019, around 10 minutes after 1:00 in the |
| | 4 | afternoon. |
| 10:52 | 5 | And right after that -- well, let me update my |
| | 6 | co-conspirator, the person I agreed to kill James Dao with. |
| | 7 | Let me update that person about the tracker. |
| 10:52 | 8 | *(Exhibit displayed.)* |
| 10:52 | 9 | MR. SCALLY:  (Reading:) |
| 10:52 | 10 | "Tracker went to Arizona last night. |
| | 11 | Hm." |
| 10:52 | 12 | And it's tough to see here.  Get it into the -- |
| | 13 | where it's a little easier to see.  But if you take a look |
| | 14 | at Exhibit 139 -- you'll have all these in the jury room -- |
| | 15 | you see "November 29 at 1:12 p.m.," right after he was |
| | 16 | taking those screenshots.  He sends this text message and he |
| | 17 | says, "I want my hundred K.  Bitch is probably tryin'a stash |
| | 18 | it" -- showing why this whole thing happened in the first |
| | 19 | place. |
| 10:53 | 20 | Now, I mentioned earlier the "premeditation" means |
| | 21 | with planning or deliberation.  And what I've been talking |
| | 22 | about for the last several minutes is the evidence of |
| | 23 | planning in this case.  But even if there wasn't planning, |
| | 24 | even if somehow you reject that the defendant and Sheila |
| | 25 | were outright planning this -- which I submit you should not |

1    because it's been proven beyond a reasonable doubt based on

2    all the evidence I just reviewed with you -- but even if you

3    reject that, then you still have to consider whether this

4    killing happened with deliberation.  And in making that

5    assessment, you have to focus on what conduct of the

6    defendant actually accomplished the killing of James Dao.

10:54   7    So you have on this slide some of the instructions

8    that Judge Carter gave you concerning the nature of

9    premeditation.

10:54   10    *(Exhibit displayed.)*

10:54   11    MR. SCALLY:  It says:

10:54   12    "The amount of time needed for

13    premeditation of a killing depends on

14    the person and the circumstances."

10:54   15    "Must be long enough, after forming

16    the intent to kill, for the killer to

17    have been fully conscious of the intent

18    and to have considered the killing."

10:54   19    So in making that assessment, even if there wasn't

20    planning -- which there was -- but if there wasn't, what

21    conduct actually accomplished the killing?  Though the

22    beating and shooting of James Dao were contributing factors

23    to his death, remember Dr. Paunovic testified that the cause

24    of death was drowning.

10:55   25    And what caused that?  Well, defendant throwing

1    him overboard -- beaten, bloodied, shot -- and then

2    defendant and Sheila Ritze leaving him in the ocean, taking

3    a long, long ride back to shore -- going over 3 miles back

4    to shore -- knowing full well this will kill a man, fully

5    conscious of the intent to kill, and considering the

6    killing.

10:55   7          So even if you reject the evidence of planning,

8    based on what the defendant did -- in leaving a beaten and

9    shot man in the ocean and heading back to shore -- this was

10   a killing with deliberation.  Defendant had time to form the

11   intent to kill 'em and to have been fully conscious of that

12   intent to've considered the killing.

10:56   13         This wasn't something where you act immediately.

14   One shot to the heart and the person's dead, and it can't

15   be -- can't be walked back, can't be changed, can't be

16   undone.  That isn't this case.  Defendant had time.

10:56   17         Now, the next element's fairly straightforward.

18   It's what's called the jurisdiction element:  That the

19   killing occurred within the special maritime and territorial

20   jurisdiction of the United States.  And that special

21   maritime and territorial jurisdiction includes the

22   territorial sea from the mean low tide point on the shore

23   extending seaward to twelve miles offshore.  In other words,

24   if the killing occurred between shore and 12 miles offshore,

25   it occurred within the special maritime and territorial

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | jurisdiction of the United States.                           |
| 10:57 | 2  | And the best evidence you have of the location of            |
|       | 3  | the killing is the last signal you get from James Dao's      |
|       | 4  | phone, at 1:48 a.m., where it's intersecting with            |
|       | 5  | defendant's phone.  That's page 18 of Exhibit 255.  And it's |
|       | 6  | 3.38 miles from shore.  So that element is met.              |
| 10:57 | 7  | Element five of Murder in the First-Degree.                  |
|       | 8  | Defendant didn't act in self-defense.  So government has to  |
|       | 9  | prove the defendant did not act in reasonable self-defense,  |
|       | 10 | and defendant doesn't have to prove anything.  And that      |
|       | 11 | burden on the government never shifts.  But defendant did    |
|       | 12 | testify and testified to that he basically acted in          |
|       | 13 | self-defense.  And you have to evaluate his testimony and    |
|       | 14 | decide whether you believe it.                               |
| 10:58 | 15 | In making that evaluation, I suggest you start by            |
|       | 16 | thinking about how many people his testimony's inconsistent  |
|       | 17 | with.  He's denying the testimony of so many people in order |
|       | 18 | to make his claim:                                           |
| 10:58 | 19 | He didn't tell Sandra Ritze that James Dao owed              |
|       | 20 | 'em money.  He didn't tell Sandra Ritze he was gonna "off"   |
|       | 21 | James Dao.  He didn't, on his telling, say he would --       |
|       | 22 | wouldn't get the money by "offing" him, but would get        |
|       | 23 | satisfaction.  He didn't tell Sandra Ritze he could take     |
|       | 24 | somebody out on the boat and off them.                       |
| 10:59 | 25 | According the defendant, he didn't tell Shawn                |

| | | |
|---|---|---|
| | 1 | Whalin he was gonna take out James Dao.  He didn't tell |
| | 2 | Shawn Whalin, before the boat trip, that he was gonna get |
| | 3 | the money from the wife, from an insurance policy.  He |
| | 4 | didn't tell Shawn Whalin, the day after, "I shot 'em."  He |
| | 5 | didn't tell Shawn Whalin, the day after, "I took care of |
| | 6 | it."  He wasn't laughing when he told Shawn Whalin about the |
| | 7 | killing. |
| 10:59 | 8 | He didn't tell -- on his "telling," he didn't tell |
| | 9 | Vinh Doan they were far offshore.  He didn't tell Vinh Doan |
| | 10 | that James couldn't've swam back to shore. |
| 10:59 | 11 | He didn't tell Natalie Nguyen -- or, he didn't ask |
| | 12 | Natalie Nguyen about the life insurance policy that day at |
| | 13 | Asia Buffet. |
| 10:59 | 14 | He didn't tell Tony Hoang that he shot the guy |
| | 15 | because he didn't pay up. |
| 10:59 | 16 | No.  They're all liars.  They're all liars -- for |
| | 17 | you to believe the defendant. |
| 11:00 | 18 | But, to the contrary, in this case -- there's one |
| | 19 | person involved in this case who's on the record lying over |
| | 20 | and over again about what happened on the boat.  It's not |
| | 21 | any of the government's witnesses.  It's the defendant. |
| 11:00 | 22 | Who did he lie to?  He lied to Natalie Nguyen. |
| | 23 | Told her:  Never went on the boat at all. |
| 11:00 | 24 | He lied to Alex Dao:  Said he never went on the |
| | 25 | boat at all. |

11:00   1               And, most importantly, he lied to the Coast Guard

2       Investigative Service.  You saw a video -- and you'll have

3       it back there, if you wanna watch it again -- Exhibit 78.

4       That's a video of the Coast Guard approaching Wayne and

5       asking him about what he knew about James Dao and his

6       whereabouts.  Defendant lies, says James -- James went with

7       some other people.  Says he --

11:01   8               "Oh, I loaned my jacket to James."

9               Lies.

11:01  10               "I loaned my phone to James."  Lie.

11:01  11               "I was in a bar with four other

12              people."  Lie.

11:01  13               "James went off with somebody named

14              Matt or Jay or both of 'em to go

15              fishing."  Lies.

11:01  16               And why -- why did he lie to Charlie? -- Charlie

17      Twomey, who you heard testify briefly, and who was on that

18      Exhibit.  Is he -- is he afraid of Charlie Twomey?  You

19      watch that video.  Charlie Twomey doesn't strike you as

20      being threatening at all.  No.  He lied because he was

21      afraid of getting in trouble.

11:01  22               So when you evaluate his testimony about what

23      happened on the boat, keep in mind his history of lying

24      about this exact topic.

11:01  25               Now -- so his testimony's inconsistent with so

```
 1    many witnesses.  He lies about this very topic.  But his
 2    story's also inconsistent with the forensic evidence.  And
 3    maybe kind of as a subsection of that, let me just start by
 4    noting:  James Dao was shot in the back.
 5         You might just start and end your analysis of
 6    self-defense with that fact:  James Dao was shot in the
 7    back.
 8         But, more specifically, let's evaluate the
 9    testimony in light of the other forensic evidence in this
10    case.  Defendant testified that he hit James over the head.
11    He grabbed a brown, uh -- a broom or a stick or something
12    and he hit James over the head "like two times."  That was
13    the testimony.
14         (Exhibit displayed.)
15         MR. SCALLY:  A bruise here.  (Indicating.)
16         A bruise here.  (Indicating.)
17         A bruise here.  (Indicating.)
18         A bruise here.  (Indicating.)
19         A gash there.  (Indicating.)
20         What is that?  Five.
21         Exhibit 125.
22         (Exhibit displayed.)
23         MR. SCALLY:  Great big gash here. (Indicating.)
24         Gash here.  (Indicating.)
25         Gash here.  (Indicating.)
```

11:03 1    Great big gash here.  (Indicating.)

11:03 2    And I'm not circling these other ones 'cause,

3 remember, that's the bullet entrance and exit wound.

11:04 4    But what is that?  Nine?  Nine times?  Maybe cut

5 it in half to be charitable.  Maybe one or two of these were

6 from the same blow.  Cut it in half; make it four or five.

7 It's not, "I grabbed the stick and I hit 'em two times."

11:04 8    Now, he also testified that he didn't see any

9 blood.  Dr. Paunovic testified -- I'm not gonna put the

10 photo back up -- but you've seen the photo, number of times

11 in this trial, of James Dao all the blood all over his face

12 when his body was found.  Dr. Paunovic testified there

13 woulda been more blood 36 hours earlier, and that the head

14 bleeds a lot, there are a lot of nerves in the head.

11:05 15    Chris Coleman, the defense criminalist, testified

16 that the head would bleed profusely and right away.  In

17 fact, I believe the quote was "blood flow would be right

18 away."  So the notion that defendant didn't see any blood is

19 not consistent with the forensic evidence in this case.

11:05 20    He also testified that he thought maybe James Dao

21 could've "swum" back from where they were.

11:05 22    For more than three mile from shore?  It's a long

23 ways.  Triathlons -- Ironman triathlons don't even involve a

24 3-mile swim.  Think they're 2.4.  Add a mile to that.  And,

25 in Ironmans, they don't do 'em fully clothed, in the middle

```
 1  of the night, with nobody else around, with two bullet holes
 2  in 'em, bleeding profusely from blunt-force trauma wounds
 3  bullet wounds.
```

11:06
```
 4          Defendant's testimony that he thought James
 5  might'a swum back is a blatant lie.  In fact, let's listen
 6  to defendant saying on a recording that there's no way James
 7  is alive in November of 2019.  Let's play exhibit 75,
 8  please.
```

11:06
```
 9          (Video recording played, not reported.)
```

11:08
```
10          MR. SCALLY:  Defendant was also unwilling to tell
11  you -- he was unwilling to say James Dao didn't shoot
12  himself.  Would only say that the gun went off.  Wouldn't
13  admit that he pulled the trigger.
```

11:09
```
14          James Dao shot himself?  He's quite the
15  contortionist.  Remember when Chris Coleman was on the stand
16  and Mr. Staples was talking to 'em?  Mr. Staples took out a
17  ruler and figured out where the bullet came from.  Right
18  about there.  (Indicating.)  Would've come from this angle.
```

11:09
```
19          How exactly James Dao got his hand behind himself
20  to shoot himself in the back at that angle is a mystery.
21  And do the same thing, shoot himself in the -- in the head,
22  from the back.  So his story is inconsistent with the
23  forensic evidence.  Remember he also lied in his testimony
24  about how far offshore they were on October 13th.  So he's
25  trying to make the October 13th trip with K.C. Cao -- excuse
```

1  me -- Khoa Cao, known as K.C. -- and Sheila sound like any

2  other -- sound like a lobster trip -- that these were both

3  normal lobster trips.  But they weren't similar at all.

11:10   4       *(Exhibits displayed.)*

11:10   5       MR. SCALLY:  Here's where he went with K.C. Cao

6  with Sheila Ritze. (Indicating.)

11:11   7       Here's where he went to kill James Dao.

8  (Indicating.)

11:11   9       His story's also inconsistent with what he told

10  everybody else when he wasn't in trouble:

11:11   11      Oh, I just -- yeah, maybe I said some'a those

12  things.  It was all just empty boasting.  It was all

13  bragging.  I was tryin'a be a tough guy, tryin'a be, in his

14  words, "a bad ass."

11:11   15      You know what would make a real tough guy, a real

16  bad ass?  Tell the story:  This guy, I was out fishing with

17  'em; he asked me for money.  I told 'em I wouldn't give it

18  to 'em.  He pulled a gun on me.  I got the gun away from

19  him.  I hit 'em a couple times, threw 'em overboard where he

20  drowned, getting what he deserved for pulling a gun on me.

11:12   21      Never told that story.  Didn't tell that story to

22  anybody.

11:12   23      Now, let me move on from Murder in the First

24  Degree.  And the other counts, I won't take as much time

25  with.

11:12    1              Now, if you don't find premeditation, then you get

2       to Murder in the Second Degree.  And the difference is the

3       premeditation element.  You don't have to find premeditation

4       to find defendant guilty of Murder in the Second Degree.

11:12    5              And the elements of Murder in the Second Degree,

6       then, are basically the same:

11:12    7              He committed an act causing death;

11:12    8              Acted with malice aforethought;

11:12    9              Killing occurred in -- within the jurisdiction;

10      and,

11:13   11              No self-defense.

11:13   12              And I talked earlier:  Malice aforethought can be

13      two things.  One is "intended to kill."

11:13   14              I've already talked to you about how the evidence

15      establishes that defendant intended to kill James Dao.  So

16      if you find that there's no premeditation -- which I submit

17      has been proven beyond a reasonable doubt that there was --

18      but if you don't find that, then you should still convict

19      him of Murder in the Second Degree.

11:13   20              Now, there is another way to convict 'em of Murder

21      in the Second Degree based on malice aforethought.  I said

22      earlier it's "unlawfully intended to kill" or four things.

23      What are those four things?

11:13   24              They're that defendant intentionally committed an

25      act causing death.  We know that to be true.

11:14   1            The natural and probable consequences of the act

2     were dangerous to human life.

11:14   3            At the time of the act, defendant knew the act was

4     dangerous to life.

11:14   5            And defendant act -- deliberately acted with

6     conscious disregard to human life.

11:14   7            So it's important to note that his conduct meets

8     all of that too, because he intentionally did the acts that

9     caused James Dao's death:  Intentionally beat 'em,

10    intentionally shot 'em, intentionally threw 'em overboard.

11:14  11            And the consequences of those acts were obviously

12    dangerous to James Dao's life.  Now, at the time'a the act,

13    defendant knew that.  And in leaving a beaten and shot man

14    in the middle'a the ocean, defendant was, at the very least,

15    acting deliberately -- deliberately asking with conscious

16    disregard for human life.

11:14  17            That's not proven just beyond a reasonable doubt

18    but beyond any doubt.  If you reject the existence of

19    premeditation, you should still find the defendant guilty of

20    Murder in the Second Degree.

11:15  21            I'munna talk briefly about voluntary manslaughter

22    and Counts Two and Three before I finish up.

11:15  23            Voluntary manslaughter relies on the defendant's

24    testimony, which should be rejected.  That's what I already

25    talked about.  And even if you believe his testimony, you

1    should still convict him on Murder in the Second Degree,

2    because this killing wasn't done in a sudden quarrel or heat

3    of passion.  You mainly know that because defendant's

4    testimony is full of lies.  But even if you believe his

5    testimony, it's again not as though he responded with a

6    quick shot that could -- couldn't be undone, and James Dao

7    was dead in an instant.

11:16    8        No.  The killing occurred over the time that it

9    took for him to shoot James -- once in the head, once in the

10   back -- beat 'em about the head many times, throw 'em

11   overboard, and accomplish the long, three-mile ride back to

12   shore.  That's not sudden.  That's not in a heat of passion.

13   That's with deliberation.

11:16    14       Now, Counts Two and Three.  Now, the verdict form

15   should make this clear, but I wanna make certain I state it

16   as well.  You're only gonna get to Counts Two and Three if

17   you find defendant guilty of First-Degree Murder.

11:17    18       So if you find something less than First-Degree

19   Murder -- which I submit you shouldn't -- but if you do,

20   then you're not gonna consider Counts Two and Three.  You're

21   not gonna consider Conspiracy to Murder and you're not gonna

22   consider Using a Firearm to Commit a Crime of Violence.

11:17    23       But I submit you should find him guilty of

24   First-Degree Murder.  So you should be considering

25   Conspiracy To murder.  And in considering that, the question

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | basically becomes -- so how do you know (reading):                 |
| 11:17 | 2  | "From October 4, 2019, to                                          |
|       | 3  | October 15th, 2019, there was an                                   |
|       | 4  | agreement to murder James Dao; the                                 |
|       | 5  | defendant joined that agreement knowing                            |
|       | 6  | of its purpose or its object, and                                  |
|       | 7  | intending'a help accomplish it, and that                           |
|       | 8  | somebody committed an overt act for the                            |
|       | 9  | purpose of carrying out the conspiracy"?                           |
|       | 10 | (As read.)                                                         |
| 11:17 | 11 | Well, this boils down to:  How do you know                         |
|       | 12 | Sheila's in on it beforehand?                                      |
| 11:17 | 13 | And I wanna remind you some'a the testimony from                   |
|       | 14 | Sandra Ritze, in the lobby of the Palms Casino, where she          |
|       | 15 | testified about how the, uh, introductions went.  And Sheila       |
|       | 16 | introduced to Sandra -- Wayne -- defendant as "Wayne," Shawn       |
|       | 17 | as "Robert," and Sheila mumbled -- whatever James's name           |
|       | 18 | was.                                                               |
| 11:18 | 19 | And Sandra said -- followed up with Sheila outside                 |
|       | 20 | earshot of the others and said, "Hey, I got the first two          |
|       | 21 | people's names, but I didn't get the third guy's name.  What       |
|       | 22 | was his name again?"                                               |
| 11:18 | 23 | And what did Sheila say?  She said, "Don't look at                 |
|       | 24 | 'em.  Don't talk to him.  We'll be offing him this weekend."       |
| 11:18 | 25 | Sandra understood this to mean killing and she                     |

            1    thought Sheila was serious.  And remember Mica said Sheila

            2    doesn't really joke.  And you heard about Wayne and Sheila

            3    discussing together the plot to kill James Dao out on a

            4    boat, up in that hotel room at the Palms Casino.

11:19       5         And then who is it the defendant's texting? -- in

            6    that Exhibit 139, that I've already showed you a couple

            7    times.  Who is it that he's texting about "tracker went to

            8    Arizona," and "I want my hundred K"?  It's Sheila, 'cause

            9    she's in on it.

11:19      10         And if we look at the trackers -- I'munna show you

           11    Exhibit 90, which is a photograph recovered from Sheila

           12    Ritze's phone.

11:19      13         *(Exhibit displayed.)*

11:19      14         MR. SCALLY:  I'munna put the tracker, which is

           15    Exhibit 96, next to Exhibit 90.

11:19      16         *(Exhibit displayed.)*

11:19      17         MR. SCALLY:  Same tracker.  This photo from

           18    Sheila's phone was present on her phone prior to the murder,

           19    so she had the tracker before the murder.

11:20      20         *(Exhibit displayed.)*

11:20      21         MR. SCALLY:  And if we look at Exhibit 88, another

           22    phone or -- excuse me -- another photograph from Sheila's

           23    phone dated -- and you can see it on -- in the metadata down

           24    here.  It's July 19, 2019.  You compare it to a photo of the

           25    tracker actually recovered from Natalie's car.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | (Indicating.)  Same tracker.                                       |
| 11:20 | 2  | And emails recovered from Sheila's phone -- excuse                 |
|       | 3  | me -- screenshots -- a screenshot of a Logistimatics Tracker       |
|       | 4  | in Exhibit 92.                                                     |
| 11:20 | 5  | *(Exhibit displayed.)*                                             |
| 11:20 | 6  | MR. SCALLY:  In Exhibit 95, an email from                          |
|       | 7  | Logistimatics to Sheila Ritze.                                     |
| 11:21 | 8  | And who does she send it to?  She forwards it to                   |
|       | 9  | the defendant.  This is November 7th, 2019, a few weeks            |
|       | 10 | after James Dao's killed on that boat -- with Sheila and           |
|       | 11 | defendant.                                                         |
| 11:21 | 12 | Also recovered from Sheila's phone an update on                    |
|       | 13 | November 19 as to where the tracker is.                            |
| 11:21 | 14 | *(Exhibit displayed.)*                                             |
| 11:21 | 15 | MR. SCALLY:  Where is it?  It's on Orangefair                      |
|       | 16 | Avenue in Fullerton.  Right where Natalie Nguyen lives.            |
| 11:22 | 17 | "Using a Firearm During and in Relation to the                     |
|       | 18 | Murder of James Dao" is very simple.  If you find he               |
|       | 19 | committed first-degree murder, all you need to find is he          |
|       | 20 | used the gun during and in relation to that crime, and you         |
|       | 21 | could find him guilty of Count Three.                              |
| 11:22 | 22 | Court instructed you about reasonable doubt.                       |
|       | 23 | Reasonable doubt is a doubt based upon reason and common           |
|       | 24 | sense.                                                             |
| 11:22 | 25 | And the trial process can seem a little clunky, a                  |

| | | |
|---|---|---|
| | 1 | little unnatural -- attorneys objecting to one another's |
| | 2 | questions and kinda technical jury instructions.  But at the |
| | 3 | end'a the day, when you go back in that room to deliberate, |
| | 4 | nobody's gonna ask you to leave your common sense at the |
| | 5 | door.  To the contrary, that's why you're here. |
| 11:23 | 6 | These decisions about how to interpret the |
| | 7 | evidence using common sense, they're not left to -- to me or |
| | 8 | any'a the other attorneys, or even the Court.  It's for you |
| | 9 | to decide. |
| 11:23 | 10 | The evidence shows in this case beyond a |
| | 11 | reasonable doubt that the defendant committed First-Degree |
| | 12 | Murder.  When you're considering that verdict form, I want |
| | 13 | you to call this what it is:  A first-degree murder. |
| 11:23 | 14 | Thank you. |
| 11:23 | 15 | THE COURT:  And, Counsel, recess? |
| 11:23 | 16 | MR. WILKE:  Yes, please, Your Honor. |
| 11:23 | 17 | THE COURT:  All right. |
| 11:23 | 18 | Before we begin with the defense argument, let's |
| | 19 | take that hour for lunch.  And can we all return at 12:30, |
| | 20 | in an hour? |
| 11:23 | 21 | You're admonished not to discuss this matter |
| | 22 | amongst yourselves nor to form or express any opinion |
| | 23 | concerning the case. |
| 11:23 | 24 | We'll see you at 12:30. |
| 11:23 | 25 | *(Jury recesses at 11:23 a.m.)* |

| | | |
|---|---|---|
| 11:24 | 1 | *(Outside the presence of the jury.)* |
| 11:24 | 2 | THE COURT:  All right. |
| 11:24 | 3 | Then, Counsel, we're in recess.  Thank you. |
| 11:24 | 4 | *(Lunch recess held at 11:24 a.m.)* |
| 11:24 | 5 | *(Further proceedings reported by Debbie* |
| | 6 | *Hino-Spaan in Volume III.)* |
| 11:24 | 7 | -oOo- |
| 11:24 | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

11:24    1                              -oOo-

11:24    2

11:24    3                           CERTIFICATE

11:24    4

11:24    5         I hereby certify that pursuant to Section 753,

         6    Title 28, United States Code, the foregoing is a true and

         7    correct transcript of the stenographically reported

         8    proceedings held telephone in the above-entitled matter and

         9    that the transcript page format is in conformance with the

        10    regulations of the Judicial Conference of the United States.

11:24   11

11:24   12    Date:  January 14, 2022

11:24   13

11:24   14
11:24                              /s/ Debbie Gale
11:24   15                         _____
11:24                              DEBBIE GALE, U.S. COURT REPORTER
11:24   16                         CSR NO. 9472, RPR, CCRR

11:24   17

        18

        19

        20

        21

        22

        23

        24

        25

**Certified for the U.S. District Court CM/ECF**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**