1           **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                   Plaintiff,         )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
7           vs.                        )   Case No.
                                       )   8:20-cr-00002-DOC-1
8   HOANG XUAN LE,                     )
                                       )
9                   Defendant.         )   **Day 2, Volume I**
                                       )
10  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        JURY TRIAL

17              TUESDAY, NOVEMBER 9, 2021

18                        9:12 A.M.

19              SANTA ANA, CALIFORNIA

20

21

22

23  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25          411 WEST 4TH STREET, ROOM 1-053
            SANTA ANA, CA 92701
            dhinospaan@yahoo.com

```
 1                    APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF:

 3           TRACY L. WILKISON
             Acting United States Attorney
 4           BY:  GREGORY SHEPHERD SCALLY
                  Assistant United States Attorney
 5           411 West 4th Street
             Suite 8000
 6           Santa Ana, California 92701
             714-338-3592
 7           gregory.scally@usdoj.gov

 8           TRACY L. WILKISON
             Acting United States Attorney
 9           BY:  GREGORY W. STAPLES
                  Assistant United States Attorney
10           411 West 4th Street
             Suite 8000
11           Santa Ana, California 92701
             714-338-3535
12           greg.staples@usdoj.gov

13
     FOR DEFENDANT:
14
             LAW OFFICES OF CRAIG WILKE
15           BY:  CRAIG WILKE, ESQ.
             305 North Harbor Boulevard
16           Suite 216
             Fullerton, California 92832-1901
17           714-870-8900
             craig@craigwilkelaw.com
18
             LAW OFFICES OF SHEILA MOJTEHEDI
19           BY:  SHEILA SARAH MOJTEHEDI, ATTORNEY AT LAW
             806 East Avenida Pico
20           Suite I-291
             San Clemente, California 92673
21           323-412-0472
             sheila@mojtehedi.com
22
     ALSO PRESENT:
23
             Austin Casey, Special Agent, Coast Guard
24

25
```

UNITED STATES DISTRICT COURT

3

```
1                      I N D E X

2                                                    PAGE

3    Alternate Juror Number 49 sworn in as Juror Number 10     6

4    Jury Instructions                                         8

5    Opening Statements - Government                          20

6    Opening Statements - Defense                             30

7

8

9

10

11       WITNESSES                                         PAGE

12       CHRIS SUKRAW, CALLED BY THE PLAINTIFF
             Direct Examination by Mr. Staples              63

13       CALVIN BERGER, CALLED BY THE PLAINTIFF
             Direct Examination by Mr. Staples              69

14           Cross-Examination by Ms. Mojtehedi             77

15       ANGELA BENEFIEL, CALLED BY THE PLAINTIFF:
             Direct Examination by Mr. Staples              79

16           Cross-Examination by Mr. Wilke                 99

17

18

19

20

21

22

23

24

25
```

1          **I N D E X**
                (Continued:)
2

3              **EXHIBITS**

4                                                    **WITHDRAWN**
                                           **IN**          **OR**
5     **EXHIBIT**                        **EVIDENCE**   **REJECTED**

6     129      On-scene photos: photo of        64
               fishermen
7
      126      On-scene photos: Dao's face      75
8
      127      On-scene photos: bloody          76
9              lacerations on head

10    100      James Dao's orange jacket        87

11     27      Driver's license                 91

12    23, 24   Fishing licenses                 92

13    131      Photo of knife                   93

14    132      Physical exhibit: knife          95

15    133      Physical exhibit: cash           96

16    128      Photo of body bag tag            98

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | **SANTA ANA, CALIFORNIA; TUESDAY, NOVEMBER 9, 2021**                      |
| 2     | **9:12 A.M.**                                                            |
| 3     | **- - -**                                                                |
| 4     | **(Out of the presence of the jury.)**                                   |
| 09:12AM 5 | THE COURT:  We're in session in the matter of                        |
| 6     | *United States vs. Hoang Xuan Le*, Case Number 20-02.                    |
| 7     | Counsel, your appearances this morning, please.                          |
| 8     | MR. SCALLY:  Greg Scally, Special Agent Austin Casey                     |
| 9     | of the Coast Guard Investigative Service, and Greg Staples on            |
| 09:13AM 10 | behalf of the United States.  Good morning, Your Honor.              |
| 11    | THE COURT:  On behalf of the defense?                                    |
| 12    | Good morning, Counsel.                                                   |
| 13    | MR. WILKE:  Good morning, Your Honor.  Craig Wilke                       |
| 14    | and Sheila Mojtehedi on behalf of Wayne Le, who's present.               |
| 09:13AM 15 | THE COURT:  Good morning.                                            |
| 16    | As soon as we got the information this morning, I                        |
| 17    | asked Debbie to convey that to you informally, and now we'll             |
| 18    | make a record.                                                           |
| 19    | So you're prepared, Juror Number 10, Joshua Real,                        |
| 09:13AM 20 | called the clerk this morning, stating he was ill with the flu.      |
| 21    | I don't know how long that recovery takes.  My suggestion is we          |
| 22    | draw an alternate and proceed with the case today.                       |
| 23    | But let me get input from the Government.                                |
| 24    | MR. SCALLY:  That's fine with the Government,                            |
| 09:13AM 25 | Your Honor.  Thank you.                                              |

```
 1              MR. WILKE:  No objection to the Court's proposed
 2    procedure.
 3              THE COURT:  We'll do that in the jury's presence.
 4    Why don't we bring them in.  Debbie will simply draw from the
 5    four alternates so it's a random selection in their presence.
 6              (Pause in proceedings.)
 7              (In the presence of the jury.)
 8              THE COURT:  Counsel, thank you for your courtesy.
 9    If you'd be seated.
10              First, good morning.  Hope all of you are doing
11    well.  Pardon for the late start by 15 minutes, but we were
12    informed this morning that one of the seated jurors, Juror
13    Number 10, is unable to continue and, therefore, we're going to
14    select one of you four alternates, and one of you will become
15    one of the 12 sitting jurors.  So Debbie has got a bowl with
16    four -- your four names that she'll randomly draw.
17              THE COURTROOM DEPUTY:  Juror Number 16, Mr. Chow --
18    or Ms. -- or Juror Number 49, Damian Chow.
19              THE COURT:  Thank you very much.  If you'd take Seat
20    Number 10 and come forward for a moment.  Deb will administer
21    the oath to the individual juror.
22              And then, sir, if you'd remain standing.  If you'd
23    be kind enough to raise your right hand, please.
24              (Alternate Juror Number 49 was sworn in
25               as Juror Number 10.)
```

09:14AM  09:17AM  09:17AM  09:18AM  09:18AM

```
 1              THE COURT:  Thank you very much, sir.  If you'd be
 2     seated.
 3              Ladies and gentlemen, I'm going to read to you some
 4     preliminary instructions which will guide --
 5              Yes, sir?
 6              THE JUROR:  Sorry, Your Honor.
 7              THE COURT:  We'll need a microphone for you.
 8              THE JUROR:  So sorry about --
 9              THE COURT:  I'm sorry.  I can't hear you.  We'll
10     need that microphone.  And I apologize.  We'll have that to you
11     in a moment.  Thank you, sir.
12              Just for my record, would you identify yourself.
13              THE JUROR:  Yes.  So I'm Carlos Villanueva
14     Hernandez, alternate juror.
15              THE COURT:  Thank you.
16              THE JUROR:  There's been a change in my life right
17     now.  So yesterday I know I said I was going to be able to do
18     it and I really want to do it.  I really want to be part of the
19     jury.  You gave everybody an example, and yeah, my civic duty
20     really makes me want to do it.
21              But I talked to my employer.  They only said they
22     cover three days.  If not, we'll have to take an alternate
23     leave.  So I have to take a leave of absence.  Leave of absence
24     leaves me with unpaid leave.
25              And I just heard news yesterday that my mom needs
```

```
 1   eye surgery.  She's in Mexico.  Everything that you pay over
 2   there is out of pocket.  So I'm the sole provider for her.
 3            THE COURT:  Sir, let's do this.  Let's take this up
 4   at the end of the day out of the presence of the other jurors,
 5   with your permission, so we can start today.
 6            Would that be acceptable?
 7            THE JUROR:  That would be acceptable.
 8            THE COURT:  We'll take this up out of the presence
 9   of the other jurors, along with counsel at the end of the day.
10   Very much appreciated.  Thank you.
11                          (Jury Instructions)
12            THE COURT:  (Reading:)
13            "These are simply preliminary instructions to
14        guide us throughout these proceedings.  And, of
15        course, at the end of the case, I'll fully instruct
16        you on the law that will govern you in making this
17        decision.
18            "But you're now the jury in this case, and I
19        want to take a few moments to tell you something
20        about your duties as jurors and to give you some
21        preliminary instructions.  At the end of the trial,
22        I will give you more detailed written instructions
23        that will control your deliberations.
24            "When you deliberate, it will be your duty to
25        weigh and to evaluate all of the evidence received
```

**UNITED STATES DISTRICT COURT**

```
 1              in the case and, in that process, to decide the
 2              facts.  To those facts as you find them, you will
 3              apply the law as I give it to you, whether you
 4              agree with it or not.  You must decide the case
09:22AM  5      solely on the evidence and the law before you, and
 6              you must not be influenced by any personal likes or
 7              dislikes, opinions, prejudices or sympathy.  Please
 8              do not take into anything that I may say or do
 9              during the trial as indicating what I think of the
09:22AM 10      evidence or what your verdict should be.  That is
11              entirely up to you.
12                  "This is a criminal case brought by the
13              United States Government, and the Government
14              charges the defendant with first-degree murder --
09:23AM 15      first-degree premeditated murder in the special
16              maritime and territorial jurisdiction of the
17              United States in violation of Section 1111 of
18              Title 18 of the United States Code.
19                  "Count One alleges that, on or about
09:23AM 20      October 15th, 2019, in the Pacific Ocean off the
21              coast of Orange County, California, the defendant
22              willfully, deliberately, maliciously, and with
23              premeditation and malice aforethought unlawfully
24              killed Tri Dao by shooting him and throwing him
09:23AM 25      into the Pacific Ocean.
```

```
 1                "The defendant is charged in Count Two of the
 2          Indictment with conspiracy to commit murder within
 3          the special maritime and territorial jurisdiction
 4          of the United States in violation of Section 1117
09:24AM 5   of Title 18 of the United States Code.  Count Two
 6          alleges that, beginning on an unknown date and
 7          continuing to on or about October 15 of 2019, the
 8          defendant knowingly, willfully, and unlawfully
 9          conspired with Sheila Marie Ritze to murder
09:24AM 10  Tri Dao.
11                "The defendant is charged in Count Three of
12          the Indictment with using a firearm to commit
13          murder in violation of Section 924(c)(1)(A) of
14          Title 18 of the United States Code.
09:24AM 15        "Count Three alleges that, on or about
16          October 15, 2019, the defendant knowingly used,
17          carried, possessed, and discharged a firearm during
18          and in relation to the first-degree premeditated
19          murder of Tri Dao as charged in Count One.  The
09:24AM 20  charges against the defendant are contained in the
21          Indictment.  The Indictment simply describes the
22          charges the Government brings against the
23          defendant.  The Indictment is not evidence and does
24          not prove anything.
09:25AM 25        "The defendant has pleaded not guilty to the
```

UNITED STATES DISTRICT COURT

1        charges and is presumed innocent unless and until

2        the Government proves the defendant guilty beyond a

3        reasonable doubt.  In addition, the defendant has

4        the right to remain silent and never has to prove

09:25AM 5        innocence or to present any evidence.

6            "The evidence you are to consider in deciding

7        what the facts are consists of:

8            "First, the sworn testimony of any witness;

9            "Second, the exhibits which are received in

09:25AM 10       evidence, and;

11           "Third, any facts to which the parties agree.

12           "The following things are not evidence and

13       you must not consider them as evidence in deciding

14       the facts of this case:

09:25AM 15           "First, statements and arguments of the

16       attorneys are not evidence.  Questions and

17       objections of the attorneys are not evidence.

18       Testimony that I instruct you to disregard is not

19       evidence.  And anything that you may see or hear

09:26AM 20       when the Court is not in session, even if what you

21       see or hear is done or said by one of the parties

22       or by one of the witnesses, is not evidence.

23           "Evidence may be direct or circumstantial.

24       Direct evidence is direct proof of a fact such as

09:26AM 25       testimony by a witness about what that witness

personally saw or heard or did.  Circumstantial

evidence is indirect evidence; that is, it is proof

of one or more facts from which you can find

another fact.

09:26AM     "You are to consider both direct and

circumstantial evidence.  Either can be used to

prove any fact.  The law makes no distinction

between the weight to be given to either direct or

circumstantial evidence.  It is for you to decide

09:26AM  how much weight to give to any evidence.

     "There are Rules of Evidence that control

what can be received in evidence.  When a lawyer

asks a question or offers an exhibit in evidence

and a lawyer on the other side thinks that it is

09:27AM  not permitted by the Rules of Evidence, that lawyer

may object.  If I overrule the objection, the

question may be answered or the exhibit received.

If I sustain the objection, the question cannot be

answered or the exhibit cannot be received.

09:27AM  Whenever I sustain an objection to a question, you

must ignore the question, and you must not guess

what the answer would have been.

     "Sometimes I may order that evidence be

stricken from the record and that you disregard or

09:27AM  ignore the evidence.  That means that, when you are

1    deciding the case, you must not consider the

2    evidence that I told you to disregard.  Sometimes I

3    may order that evidence be considered only for a

4    limited purpose.  That means that, when you are

09:27AM 5    deciding the case, you may consider the evidence

6    only for the limited purpose, and you may not

7    consider the evidence for any other purpose.

8         "In deciding the facts in this case, you may

9    have to decide which testimony to believe and which

09:27AM 10   testimony not to believe.  You may believe

11   everything a witness says or part of it or none of

12   it.

13        "In considering the testimony of any witness

14   you may take into account:

09:28AM 15        "First, the witness's opportunity and ability

16   to see or hear or know the things testified to;

17        "Second, the witness's memory;

18        "Third, the witness's manner while

19   testifying;

09:28AM 20        "Fourth, the witness's interest in the

21   outcome of the case, if any;

22        "Fifth, the witness's bias or prejudice, if

23   any;

24        "Sixth, whether any evidence contradicted the

09:28AM 25   witness's testimony;

1       "Seventh, the reasonableness of the witness's

2       testimony in light of all the evidence, and;

3       "Eighth, any other factors that bear on

4       believability.

09:28AM  5       "You must avoid bias, conscious or

6       unconscious, based on a witness's race, color,

7       religious beliefs, national ancestry, sexual

8       orientation, gender identity, gender, or economic

9       circumstances in determination of credibility.

09:29AM 10       "The weight of the evidence as to a fact does

11      not necessarily depend on the number of witnesses

12      who testify about it.  What is important is how

13      believable the witnesses are and how much weight

14      you think their testimony deserves.

09:29AM 15       "A separate crime is charged against the

16      defendant in each count.  You must decide each

17      count separately.  Your verdict on one count should

18      not control your verdict on any other count.

19       "I'll say a few words about your conduct as

09:29AM 20      jurors:

21       "First, keep an open mind throughout the

22      trial and do not decide what the verdict should be

23      until you and your fellow jurors have completed

24      your deliberations at the end of the case;

09:29AM 25       "Second, because you must decide this case

1    based solely on the evidence received in the case

2    and on my instructions as to the law that applies,

3    you must not be exposed to any other information

4    about the case or to the issues it involves during

09:29AM  5    the course of your jury duty.  Thus, until the end

6    of the case or unless I tell you otherwise, do not

7    communicate with anyone in any way and do not let

8    anyone else communicate with you in any way about

9    the merits of the case or anything to do with it.

09:30AM 10    This includes discussing the case in person, in

11    writing, by phone or electronic means via e-mail,

12    via text messaging, or any Internet chat room,

13    blog, website, or application, including, but not

14    limited to, Facebook, YouTube, Twitter, Instagram,

09:30AM 15    LinkedIn, Snapchat, or any other forms of social

16    media.  This applies to communicating with your

17    fellow jurors until I give you the case for your

18    deliberations, and it applies to communicating with

19    everyone else, including your family members, your

09:30AM 20    employer, the media or press, and the people

21    involved in the trial, although you may notify your

22    family and your employer that you have been seated

23    as a juror in the case and how long you expect the

24    trial to last.  But if you are asked or approached

09:31AM 25    in any way about your jury service or anything

about this case, you must respond that you've been
ordered not to discuss the matter and to report the
contact to the Court.

"Because you will receive all the evidence
and legal instructions you properly may consider to
return a verdict, do not read, watch, or listen to
any news or media accounts or commentary about the
case or anything to do with it.  Although I have no
information that there will be news reports about
the case, do not do any research such as consulting
dictionaries, searching the Internet, or using
other reference materials, and do not make any
investigation or in any way try to learn about the
case on your own.

"Do not visit or view any place discussed in
this case, and do not use Internet programs or
other devices to search for or view any place
discussed during the trial.

"Also, do not do any research about this
case, the law, or the people involved, including
the parties, the witnesses or the lawyers, until
you have been excused as jurors.  If you happen to
read or hear anything touching on this case in the
media, turn away and report it to me as soon as
possible.

1     "These rules protect each party's right to
2     have the case decided only on the evidence that has
3     been presented here before you in open court.
4     Witnesses here in court take an oath to tell the
09:32AM  5     truth, and the accuracy of their testimony is
6     tested through the trial process.  If you do any
7     research or investigation outside the courtroom or
8     gain any information through improper
9     communications, then your verdict may be influenced
09:32AM 10     by inaccurate and incomplete or misleading
11     information that has not been tested by the trial
12     process.  Each of the parties is entitled to a fair
13     trial by an impartial jury.  And if you decide the
14     case based on information not presented in court,
09:32AM 15     you will have denied the parties a fair trial.
16     "Remember that you have taken an oath to
17     follow the rules, and it is very important that you
18     follow these rules.  A juror who violates these
19     restrictions jeopardizes the fairness of these
09:33AM 20     proceedings.  If any juror is exposed to any
21     outside information, please notify the Court
22     immediately.
23     "At the end of the trial, you will have to
24     make your decision based on what you recall of the
09:33AM 25     evidence.  You will not have written transcripts of

1    the trial, and I urge you to pay close attention to

2    the testimony as it is given."

3        But you will have the ability to have readback.

4    Many federal courts don't allow that.  So if you looked at what

09:33AM   5    the court reporter is typing right now, you'll see what looks

6    like Egyptian hieroglyphics.  What she's doing is transferring

7    that information to realtime.  So I'm literally able to see and

8    hear, listen and mark evidence as I go, but you don't have that

9    advantage.

09:33AM  10        But at the end of the trial, if you need testimony

11    read back, you cannot have the transcript because this is not a

12    perfect transcript yet.  But if you request the information of

13    Witness 1 for either side or 2 or 3 or direct --

14    cross-examination or direct examination, whatever, we'll bring

09:34AM  15    you back into court and have that testimony literally reread to

16    you.

17        So I just wanted to show you the capability and

18    thank you, as the taxpayers, for this incredible gift that

19    you've given to the courts through your efforts.  And I wanted

09:34AM  20    you to see -- and later on, maybe, after you've deliberated, we

21    can give you a tour of this wonderful courthouse -- kind of

22    behind the scenes and let you see, as taxpayers, what you've

23    really blessed us with, frankly, with our thanks and

24    appreciation.  So you'll have the ability to have testimony

09:34AM  25    read back.  Okay.  (Reading:)

1    "But I urge you to pay close attention, once

2    again.  And remember, your notes are only for your

3    own personal use.  Another juror is not to be

4    influenced by another juror's notes, and even your

09:35AM  5    independent memory prevails over your notes.

6    "Now, if you wish to take notes, you may.

7    And you should have received a notepad and paper

8    this morning.  If you do take notes, though, please

9    keep them to yourself until you and your fellow

09:35AM 10    jurors go to the jury room to decide the case.  Do

11    not let note-taking distract you from being

12    attentive.  When you leave the courtroom for

13    recesses, your notes will be left in the courtroom

14    and no one will read your notes.  Whether or not

09:35AM 15    you take notes, you should rely on your own memory

16    of the evidence.  Notes are only to assist your

17    memory.  You should not be overly influenced by

18    your notes or those of your fellow jurors.

19    "The next phase of the trial will now begin.

09:35AM 20    First, each side may make an opening statement.  An

21    opening statement is not evidence.  It is simply an

22    outline to help you understand what that party

23    expects the evidence will show.  A party is not

24    required to make an opening statement.  The

09:36AM 25    Government will then present evidence and counsel

1   for the defendant may cross-examine.  Then, if the

2   defendant chooses to offer evidence, counsel for

3   the Government may cross-examine.

4        "After the evidence has been presented, I

09:36AM 5   will instruct you on the law that applies to the

6   case, and the attorneys will make their closing

7   arguments.  After that, you'll go into the jury

8   room to deliberate on your verdict."

9        Counsel on behalf of the Government, your opening

09:36AM 10   statement, please.

11        MR. SCALLY:  Thank you, Your Honor.

12              **(Opening statement - Government)**

13        MR. SCALLY:  Shortly after midnight on October 15th,

14   2019, three people boarded a boat out of Dana Point Harbor.

09:37AM 15   Those three people were Tri Dao, who went by the name of James;

16   a woman by the name of Sheila Ritze, who is the owner of the

17   boat; and Mr. Le, who goes by Wayne, the defendant in this

18   case.

19        And as the trip got under way, James was texting

09:37AM 20   with his longtime girlfriend, Natalie Nguyen.  He said things

21   like:

22        "Love you, darling.  Headed to the boat.

23        I'll make it count.  Catch a nice fish for our

24        family to eat."

09:38AM 25        Natalie responded, "Cool baby.  Get lots of

1  lobster."  And he said he would.

2          James eventually texted, "We launching.  Love you."

3          Those were the last words Natalie Nguyen ever heard

4  from James Dao because of the three people who went out on that

09:38AM  5  boat in Dana Harbor [sic] on October 15, 2019 -- James Dao,

6  Sheila Ritze, and the defendant in this case, Wayne Le -- only

7  two people came back.  James Dao never made it home.

8          Instead, on October 16th, 2019, some 36 hours after

9  this trip got underway, James Dao's body was found floating

09:39AM 10  facedown in the Pacific Ocean miles off the coast.  He had been

11  shot in the back.  He had a penetrating but not fatal gunshot

12  wound in his upper back, and the bullet was found just beneath

13  the skin.  He had another bullet wound along the top of his

14  head that wounded the scalp, and he had bloody gashes and

09:39AM 15  wounds on his head that made it look like he had been struck

16  over the head with a hard object again and again.  And his body

17  had been left in the water where he drowned.

18          The coroner determined the cause of death was

19  drowning with contributing factors being the gunshot wounds and

09:40AM 20  the blunt-force trauma to his head.  And you'll hear that the

21  defendant in this case, Wayne, didn't go to the authorities in

22  the aftermath of this boat trip.

23          To the contrary, when questioned by Natalie Nguyen,

24  James's longtime girlfriend -- when questioned by Natalie

09:40AM 25  Nguyen as to where James was when he didn't come back, Wayne

lied.  Said he hadn't gone on the boat trip at all.  And the
evidence in this case will show why, because Wayne and Sheila,
the owner of the boat, had been planning to kill James Dao on
that boat and then did so.

09:41AM         Now, James Dao was no saint while he walked this
earth.  He had a history of carrying a firearm.  He liked to
gamble, got himself into some debt, and he dealt marijuana.
Not in the legal way, licensed and bonded and certified through
the State of California, no.  No.  On the black market.  But
09:41AM James's longtime friend and business partner in his marijuana
dealings was Wayne, the defendant in this case.  And in the
course of their business and friendship, James accrued a debt
to Wayne.  And Wayne wanted to kill James because of that debt.

                Now, if you're asking yourself, "Well, if you kill
09:42AM somebody who owes you money, how do you" -- "how do you pay it?
How do you get the money?" well, you'll hear from a witness in
this case who asked Wayne that very question ten days before
Wayne killed James Dao out on that boat.

                When asked, "How do you get your money if you kill
09:42AM somebody who owes you money?"

                Wayne said, "You don't.  You don't get your money.
You get satisfaction."

                But the evidence will also show that Wayne actually
thought he could, indeed, get the money that James owed him
09:43AM through killing James.  Because James had a life insurance

policy with Natalie Nguyen, his longtime girlfriend, as one of the beneficiaries.

And James, while he was alive, would tell people -- extremely foolishly in retrospect, but he would tell people that his debts to them, any money he owed them, were secure. Because if anything happened to him, anything should happen to James, that Natalie would pay off those debts through the proceeds of the life insurance policy which Natalie would get if something happened to James, if he died.  Wayne was one of the people James had said this to.

The evidence will show Wayne took that seriously and thought, as it turned out erroneously, that, if he killed James, then he, Wayne, would be able to get the money that James owed him through Natalie from the proceeds of the life insurance policy which Natalie would receive upon the death of James.

But when James didn't return from the boat trip with Wayne and Sheila, Natalie wasn't concerned about settling up James's accounts with Wayne, squaring up any debts owed.  No. She was naturally concerned about what had happened to her longtime boyfriend and the father of their two children.

So she confronted Wayne, Natalie did, because she knew that Wayne had gone on this boat trip with James.  She asked Wayne where James was, and Wayne lied.  Said he hadn't gone on the boat trip at all.

1          So Natalie went to the police and the Coast Guard.

2   She filed a missing persons report.  You know who didn't go to

3   the police?  Wayne.  Not Sheila either.

4          And, in fact, when Natalie made her missing persons

09:46AM 5   report, the Coast Guard called Wayne, left a message for him,

6   saying, "Hey, Wayne, we're following up on a missing persons

7   report.  We're looking for a James Dao.  Please call us back

8   with any information you might have."  Coast Guard never got a

9   call back.

09:46AM 10          And when the Coast Guard visited his house a few

11   weeks later to ask questions of him about what he knew about

12   the disappearance of James Dao, Wayne told the Coast Guard he

13   never went on the boat trip.  Never went.

14          Meanwhile, Wayne, concerned with getting the money

09:47AM 15   James owed him from Natalie, a few weeks after the boat trip,

16   Wayne placed a GPS tracking device on Natalie's car to track

17   her every move.  Agents found that tracker in December of 2019,

18   two months after the fatal boat trip, and removed it from

19   Natalie's car.

09:47AM 20          Now, that's what the evidence is going to show here,

21   that Wayne, the defendant in this case, and Sheila, the owner

22   of the boat, were planning to kill James Dao on Sheila's boat.

23   James Dao went out on Sheila's boat with Wayne and Sheila, and

24   he never returned; instead, turning up dead, floating facedown

09:48AM 25   on the water with bullet wounds and gashes on his head.

25

```
          1              So what's the evidence going to be?  You'll hear
          2     from Natalie Nguyen, James Dao's longtime girlfriend and the
          3     mother of their two children.  She'll tell you about how James
          4     and Wayne had been in business together, how James owed Wayne
09:48AM   5     money, how James had a life insurance policy, and how James
          6     would tell people that his debts to them were secure because,
          7     if anything happened to him, Natalie would pay the proceeds --
          8     would pay those debts off through the proceeds of the life
          9     insurance policy.
09:48AM  10              She'll tell you how, on October 14, 2019, the
         11     calendar day right before the boat trip, or hours before the
         12     boat trip, she, Natalie, along with James and Wayne, met at a
         13     restaurant called Asia Buffet where Wayne invited James to go
         14     lobster fishing that night.  And phone analysis and
09:49AM  15     surveillance video will show that those people did, in fact,
         16     meet there that day.  And she'll say -- talk about how James
         17     left that night to go lobster fishing with Wayne and how he
         18     never came back.
         19              You may hear they didn't have a perfect
09:49AM  20     relationship.  And Natalie has a history of drug use herself.
         21     But she'll also tell you about how she went to Arizona in late
         22     November 2019.  This is about several weeks after the boat
         23     trip.  And you'll see a text from Wayne to Sheila, the other --
         24     the owner of the boat and the participant of this trip, dated
09:50AM  25     November 28, 2019, some weeks after the murder and while
```

UNITED STATES DISTRICT COURT

Natalie is in Arizona.  And the text from Wayne to Sheila says,
"Tracker went to Arizona last night.  Hmm.  I want my 100K.
Bitch is prolly trying to stash it."

You'll see location analysis showing that the GPS
tracker did go to Arizona, and you'll hear that Wayne's DNA was
on the tracking device recovered from Natalie's car.

You'll hear from, during this trial, Shawn Whalin,
who's a close friend of Wayne's at the time of the boat trip.
Shawn had a drug problem and a long rap sheet from his younger
days.  He'll be testifying pursuant to a cooperation plea
agreement in which he's hoping for a lighter sentence at his
own sentencing in exchange for his testimony.  But he was a
trusted confidant of Wayne's.  And he was basically a drug
runner for Wayne, running small amounts of dope on Wayne's
behalf.  You'll see text messages that corroborate that.

Shawn will tell you about how, before the boat trip,
Wayne told Shawn about how James owed Wayne money, and that
Wayne was going to have to take him out.  You'll also hear from
Shawn that, in the days after the boat trip, Wayne told Shawn,
"I did it.  I shot him.  I took care of my problem."  Shawn saw
some bruises on Wayne's arms, and Wayne said he had gotten in a
fight, had taken care of his problem.

You'll hear from Sandra Ritze, who's the
mother-in-law of Sheila Ritze.  You'll hear about a trip to
Las Vegas on October 4th, 2019, ten days before the boat trip

1    and James Dao's disappearance.

2         Now, the participants in this trip were Wayne;

3    James; Sheila Ritze, the owner of the boat and the other

4    participant in the boat trip; and Shawn Whalin.

09:53AM 5         Those four people go up to Las Vegas, and they meet

6    up with this woman, Sandra Ritze, who's Sheila's mother-in-law.

7    And Sheila -- excuse me -- Sandra had not previously met Wayne,

8    James, or Shawn.  And so in the lobby of the Palms Casino,

9    Sheila introduced these three people to Sandra.

09:53AM 10        Sandra caught the names of Wayne and Shawn, but

11   you'll hear from Sandra that Sheila mumbled James's name, and

12   Sandra didn't quite catch it.  So out of the earshot of the

13   other parties, Sandra followed up with Sheila, said, "Sheila, I

14   got the first two guys' names.  I didn't get the third guy's

09:53AM 15   name," referring to James.

16        And Sheila said, "Don't worry about it.  We're going

17   to be offing him this weekend."

18        Later, in a hotel room that night with some other

19   folks, Sandra made some conversation with Wayne and asked James

09:54AM 20   where he was -- or excuse me -- asked Wayne where James was.

21        Wayne said, "We offed him," which he hadn't, in

22   fact, done yet.  But he also said he was going to off James

23   because James owed him money.

24        That's when Sandra asked, "How do you get your money

09:54AM 25   if you kill a person who owes you money?"

1          And Wayne said, "You don't.  You get satisfaction."

2          Wayne and Sheila talked about Sheila's boat.  Wayne

3   talked about how he could take anybody out there and off

4   somebody really easily out there.  Sheila talked about offing

09:55AM 5   somebody while going late-night lobster fishing.

6          You'll hear from people Wayne talked to after the

7   boat trip.  So you'll hear from Tony Hoang.  This is a guy

8   who's trying to deal marijuana with Wayne and who Wayne

9   regarded as a trusted confidant, and who Wayne wanted to

09:55AM 10   befriend and impress.

11          Tony knew Wayne to have a .38 caliber revolver in

12   2019.  That's a gun that's consistent with a bullet recovered

13   from James Dao's back.  And Wayne told Tony on October 18,

14   2019, four days after this boat trip, in a car ride from

09:55AM 15   Wayne's house to the Irvine Spectrum, that he killed James --

16   shooting him three times, throwing him overboard -- because

17   James owed him money.

18          And Wayne told Tony some falsehoods about what

19   happened, also, to include that Shawn -- somebody named Shawn

09:56AM 20   was on the boat, which was not true.  But Wayne's statements to

21   Tony also included information that only the killer would know

22   at that time.  Because you'll hear it was not public

23   information at that time that James Dao's body had been found

24   with gunshot wounds in it.

09:56AM 25          Tony approached James's brother with the

information, made some attempts to get paid for the

information, and ultimately worked with the FBI as an informant

and did get compensated in connection with that work.

        But you'll hear from another person who Wayne talked

to after the murder.  You'll hear from Vinh Doan.  This is a

guy who Wayne tried to engage in identity theft with, who

Wayne, again, regarded as a trusted confidant and who will be

testifying here pursuant to a cooperation plea deal where he's

trying to -- hoping for a lighter sentence in connection with

some of his own criminal activity.

        And Wayne met with Vinh Doan after the murder.  He

told him that he shot somebody on a boat because the guy owed

him money.  And Wayne told Vinh -- Vinh Doan that Wayne was

trying to get the money through an insurance policy involving

the guy's wife.

        You'll see phone analysis and surveillance video

showing that Wayne, Sheila, and James went out on the boat the

night that James Dao was killed.

        You'll see a video of Wayne lying to Coast Guard

agents, saying that he never went on the boat trip.

        You'll hear from a ballistics expert who will tell

you that the bullet recovered from James's back was consistent

with a .38 or .357 Magnum.

        And you'll hear from the medical examiner who

determined that the cause of death was drowning with

```
 1    contributing factors being the gunshot wounds and the

 2    blunt-force trauma and that the manner of death was homicide.

 3            When the evidence is in, we'll ask you to return a

 4    verdict of guilty on all counts.  Thank you.

 5            THE COURT:  Thank you, Counsel.

 6            Counsel on behalf of the defense, would you like to

 7    make your opening statement or reserve?

 8            MR. WILKE:  No.  I'll make an opening statement.

 9            THE COURT:  All right.  Please.

10            (Opening statement - Defense)

11            MR. WILKE:  Understand what happened on that boat

12    the early morning hours of October 15.  You have to understand

13    these people --

14            THE COURT:  Counsel, just if you'd move that

15    microphone up to the edge or come back towards it so we can

16    hear.  Thank you.

17            MR. WILKE:  You'll learn in this case that Wayne

18    Le -- in 2019, 38 years old, he was living with his mother and

19    his older sister in Fountain Valley.  He's a college graduate.

20    But following college, he started using drugs.

21            His drug use coincided with a motorcycle accident

22    that he sustained in late 2000, a motorcycle accident where he

23    sustained head trauma.  And ever since then, he wasn't quite

24    right.  His memory was off and he had trouble dealing with just

25    the very basic things in life.  He had worked at a bank, but at
```

some point lost that job shortly following the crash in 2008. And ever since then, he never had a steady job.

Around that time, he started using cocaine regularly. Cocaine is not a cheap drug. A cocaine habit can be expensive. So Wayne started dealing cocaine. He would buy ounce quantities of cocaine, sell three quarters of it, and use the other quarter. And that was what he did for the ten years leading up to that night on October 15.

He also had a drinking problem daily. This man drank. His behavior and his conduct, his judgment is fueled by alcohol and cocaine.

Around 2010 he met James and Alex Dao. They're brothers. James is actually the older brother, but the far less responsible brother. Both of them were involved in criminal activity. They were well-known in the Little Saigon community here in Orange County as gangsters, as operators, as drug dealers, as persons you can get a gun from.

James made his living, as Mr. Scally told you, by moving marijuana from California out of state. He was arrested in about 2011 driving a carload of marijuana through Nebraska with his wife or his longtime partner, Natalie Nguyen. And after that time he was placed on probation and, with this prior conviction, couldn't stand to get busted again.

He knew Wayne. And he asked Wayne, "Hey, could you lease a car for me? I know how to start this business."

Wayne, always willing to help his friend and always willing to get involved with activities that maybe were just a little underhanded -- he himself was dealing cocaine.  And he admired James.  He respected him.  He looked up to him.  And he agreed to help him with his marijuana business.

And what Wayne's role was in this business was to be the guy who's -- the car would be in his name.  Wayne would be the guy who would drive the car.  And so, if they ever got busted, Wayne's driving his car, and James is just a passenger.  And even though it's James's load of marijuana, Wayne was the fall guy.

That's how James treated Wayne.  Wayne went along with it.  It's a relationship he accepted.  It's the role he undertook.  He looked at James like an older brother and was always willing to help him.  That relationship continued all the way into 2019 and that night in October of 2019.

Now, another person who you will see in this case and hear about in this case is Sheila Ritze.

Can we put Sheila Ritze on the thing.

Sheila Ritze was a property manager at Team Property Management in Orange.  They manage apartment complexes and condominium complexes throughout Orange County.  And Sheila was very successful.  She was one of their best property managers.  She had lots of complexes that she was in charge of.  And in her job as property manager, she would often need handymen,

1    contractors, electricians, plumbers, painters, things like

2    that, to make repairs, doing improvements on the property.

3            In 2019, early summer, Sheila Ritze and Wayne Le

4    met.  They were introduced by Wayne's cousin, Cindy Le, who

10:06AM 5  lived in one of the condominium complexes that Sheila managed.

6    They became fast friends.  They shared a love of alcohol.  They

7    were both alcoholics.  They both drank daily.  Sheila Ritze

8    would drink vodka like it was water; Wayne Le would drink

9    Hennessy.  Cognac was his drink of choice.  And when he didn't

10:06AM 10 have that, he would drink beer.

11           They also both liked cocaine.  Wayne always had it

12   and used it daily.  And he was generous with his cocaine.  He

13   would share it with his friends.  He would share it with

14   Sheila.  Together -- that was the basis of their relationship.

10:07AM 15 Wasn't romantic.  It -- they were drug buddies.  They were

16   drinking buddies.

17           And Sheila allowed Wayne to broker some of these

18   construction jobs that she needed for her apartment,

19   condominium complexes.  Wayne had several friends who were

10:07AM 20 contractors, and he would broker those jobs.

21           One of Wayne's friends was a guy named Khoa Cao.

22   And on October 13th, the day before the fateful trip,

23   Sheila Ritze, Khoa Cao, and Wayne Le took Sheila's 27-foot

24   Triumph ocean fishing boat out off the Dana Point Harbor.  You

10:08AM 25 see, the season for Pacific spiny lobster had opened on

34

1      September 29th.

2              And for those of you who ever had Pacific spiny

3      lobster, you would appreciate why this was such a big deal to

4      avid fishermen here in the Orange County and Southern

10:08AM 5      California area.  It's a delicacy.  It sells for $30 a pound

6      and up.  It's -- the waters off Dana Point are filled with it.

7      It's one of the most popular locations in the state for

8      obtaining Pacific spiny lobster.

9              And on the evening of October 13, Sheila, K.C.,

10:08AM 10      which she goes by -- Khoa Cao, known as K.C. -- and Wayne went

11      lobster fishing out of Dana Point Harbor.

12              Now, the way you lobster fish -- there's actually

13      two ways:  The purists dive down and scoop them up with their

14      hands.  But the easier way to lobster fish is to use what's

10:09AM 15      known as a hoop net.  Hoop net is a way to trap these lobsters.

16      It's a metal net with an opening where the lobster goes in,

17      can't get out.  You put a bait trap in the middle of the net

18      and you drop it to the ocean floor and you trap lobsters.  On a

19      good night you can pull up a net with 20 or 30 lobsters.

10:09AM 20              Now, the regulations require the lobsters to be a

21      certain size, and you're only allowed to take seven lobsters

22      per day per fisherman, provided that each fisherman has a

23      lobster card, a specific fishing license for catching lobster.

24              Now, Wayne had a lobster card.  October 13th he went

10:10AM 25      lobster fishing with Sheila Ritze, with Khoa Cao.  And that

night they had a great time.  They went out of Dana Point.  And
after going out of Dana Point, Wayne caught the biggest lobster
he ever caught.  You'll see that picture that was taken that
night, the night before they went fishing.  That's Wayne there,
holding up his catch (indicating).

So the next day, October 14, Wayne gets a call from
James, "Hey, swing by and pick up those two pounds of
marijuana.  Meet me at Asia Buffet.  Oh, yeah, by the way, I
have your $500 that I borrowed a few weeks ago when we were in
Las Vegas."

The evidence will show that Wayne, two weeks
earlier -- some of these witnesses that Mr. Scally will offer
to you are claiming that Wayne Le is planning to kill his
longtime friend over a debt -- Wayne Le is loaning James Dao
more money.

And on October 14th, when he -- when James calls
him, Wayne does exactly what James asks.  He goes by and he
picks up two pounds of marijuana and meets James and his
longtime partner, Natalie, and their two children at the
Asia Buffet restaurant, a seafood restaurant in Buena Park,
located there.  That's a picture of it there of the outside
(indicating).

In the parking lot of the restaurant, Wayne shows
James the two pounds he picked up.  James isn't impressed.
Wayne actually recorded that meeting on his phone.  Wayne

recorded that meeting in the parking lot on his phone, as he

often did, to help him remember things.  And James schools him

in this meeting about "No.  This marijuana is no good.  It

needs to be this, and it's too expensive."  And it's clear who

10:12AM  the leader and who the follower is in this relationship.

They go inside.  They have lunch.  Several hours,

they are there with a seafood buffet.  Again, this photo from

the restaurant (indicating).  Natalie is present.  Two children

are present.  James and Wayne are present.

10:13AM  And during that lunch Wayne Le tells James, "I went

fishing last night with Sheila.  We caught a bunch of lobsters.

Caught a big one."  James is like -- they're eating a $100

seafood meal here at the buffet, and James is, like, "I want to

go lobster fishing."

10:13AM  Wayne is, like, "Well, she left the boat in the

parking lot.  Let me call her."  And he does.

Sheila is always ready to go fishing.  That's what

she does.  That's what she lives for.  And when Wayne calls

her, reaches out to her, "Hey, do you want to take the boat out

10:13AM  again tonight?  My friend wants to go," she says "Sure."  And

that fishing trip is formed.

This isn't a plan between them to murder this person

that Sheila has met once in her life.  This isn't a plan for

Wayne to kill his ten-year friend over some debt for which he's

10:14AM  been in debt for years.  James always borrowed money from

Wayne.  And Wayne always lent him money.  There was nothing

that happened that changed that relationship over the years.

At the time, the evidence will show -- and you will

hear testimony and see physical evidence -- a spreadsheet that

10:14AM  Wayne kept.  He started keeping track to remember, "How much

does James owe me."

THE COURT:  Counsel, move closer to the mic.

MR. WILKE:  It was about $4500, a trivial amount.

And certainly not an amount you would kill your friend over.

10:15AM  And not an amount that Sheila Ritze would get involved in a

conspiracy to commit murder.

So that night, Wayne picks up James at his

apartment.  Before he goes, though, Wayne tells James --

because Sheila told Wayne, "Make sure he gets a lobster card.

10:15AM  Make sure he has a license."  Because when you're planning to

murder somebody, you want to create a government record showing

what you're going to do and how you're going to do it; right?

He tells James, "Go get your lobster card."  And

James does.  He goes across the street to the Walmart in that

10:15AM  picture --

If you can go back to that picture.

That picture is him walking into the Walmart,

wearing the orange jacket, with a satchel around his -- over

his shoulder.  Satchel that usually carried a .38 caliber and

10:16AM  revolver.

```
 1              THE COURT:  Counsel, move closer to the microphone
 2      so we can hear.
 3              MR. WILKE:  That's James going to buy the fishing
 4      license, the fishing license that Wayne told him to buy because
 5      Sheila told him, "He ain't going fishing unless he has a
 6      license."  And if you look, and you'll see -- and this will be
 7      admitted into evidence -- that night at the time there -- and I
 8      believe it's -- can't quite see it, but it's in the evening
 9      around 9:00 o'clock or so -- shows that James bought the
10      fishing license and the lobster card as directed.
11              So Wayne picks him up at his house.  And Wayne, like
12      usual, is running late.  That's James leaving his apartment.
13      He's supposed to leave at 8:00.  Wayne gets there around 10:00,
14      the evidence will show.  Not in dispute.  The Government can --
15      will present evidence of cell site and GPS location stuff,
16      which is not in dispute.
17              Wayne picked up James at his house.  He was running
18      late because he had been running errands.  He had picked up
19      cocaine and used the money, including the money that James had
20      given him earlier that day -- which I forgot to mention.
21              At the lunch, James paid him back -- was supposed to
22      pay him back the 500 that he borrowed two weeks earlier.  He
23      actually gave him 4- because he needed the other hundred to pay
24      for the lunch.  But he paid him $400 that afternoon.  And Wayne
25      used that money and -- most of the money to buy cocaine, which
```

was kind of his regular practice.

So Wayne's running late.  He picks up James.  They drive to Sheila's.  They get in Sheila's SUV and they drive over to the marina, a short distance from Sheila's apartment down at Dana Point Marina.  It is a warm night in the evening of October 14, early morning hours of October 15.  It's going to be undisputed that, at midnight, it was 66 degrees.  The water was 68 degrees and there was a full moon out.  It's actually a very nice fall night, a perfect night to go lobster hooping.

Lobster hooping is something that is only done at night, by the way.  That's when lobsters come out.  They sleep during the day.  So when you want to catch Pacific spiny lobsters, you have to go out at night.  So it wasn't unusual.  And the evidence will show that there were other fishermen in the area, including a boat launching right as they were coming back.

The evidence will show that, as they launched the boat from the marina, Natalie -- as Mr. Scally told you, Natalie and James are texting each other.  James is in the boat, texting, with Wayne in the background.  You can see it.  Not exactly what you would allow if your plan is to take this man out on the boat and murder him, as the Government contends in this case.

They launch the boat.  They cruise at five miles an

hour outside of the harbor.  They get out past the jetty.  And
just a short distance off the jetty is where the lobsters are.
They drop the hoops -- they bait the nets.  They drop the
hoops, and then they cruise around because you have to wait.
You just wait for the lobsters to hit.

So what do you do when you wait?  You open yourself
a beer, you turn on some music through the Bluetooth sound
system on Sheila's boat, and you cruise around.

And they cruise out to sea, further out, away from
where all of the lobster hoops are.  Because if you run into a
lobster hoop, a net, or a buoy on which a net is attached, you
can ruin your propeller.  And they're just cruising around
after dropping the nets.

Sheila's driving the boat.  Wayne is sitting on
the -- I always confuse port and starboard, but what would
essentially be, in a car, the rear passenger seat.  So the seat
to the left side of the photo here.

James is sitting in the rear seat that would be
behind the driver's seat, or the far seat.  And they're sitting
in the back of the boat because that's where the least amount
of wind is when you're sitting in the boat.  Sitting in the
front at the very windy spot.

Sheila is in the captain's seat, which is the far
seat in that picture, driving the slow speed, maybe ten miles
an hour, just cruising around.  Wayne's drinking a beer, trying

1   to snort a little cocaine without it blowing away off his key

2   while sitting in the back of the boat.

3          James is frantically texting.  He is on his phone

4   and texting.  Wayne kind of sees it, but doesn't pay much

10:21AM 5   attention.  But James seems to be getting irritated.

6          And he leans over to Wayne, while seated down in the

7   back of the boat, and says, "Hey, buddy, I need you to loan me

8   some money."

9          Now Wayne never says "no" to James.  But on this

10:22AM 10  occasion, Wayne didn't have any money because he had spent it

11  all on cocaine earlier in the evening before he picked up

12  James.  James didn't know that.  And James did know that he had

13  given Wayne $400 earlier that day.  And James is angry.

14          James is a gangster at heart.  And when a gangster

10:22AM 15  feels disrespected, it's an affront to his -- everything he

16  stands for.

17          When Wayne denied James's request for money, Wayne

18  just kept minding his own business.  And the next thing he

19  knew, James is standing next to him at the rear of the boat,

10:23AM 20  while he's seated in that seat, the rear -- what I'll call the

21  passenger seat, standing over him with his gun out, pointed

22  down toward Wayne, his .38 caliber revolver that he carried in

23  his satchel.

24          And you will hear testimony from Wayne Le in this

10:23AM 25  case that, when he saw that .38 caliber pointed at him, he

reacted and he grabbed it with his left hand because he's

left-handed.  James had the gun in his right hand; Wayne goes

for the gun in his left hand, and they struggle over the gun.

And in a very brief period of time during this struggle, the

10:23AM   gun discharges two, maybe three times.  One as the gun's over

his head, one as the -- he's twisting the gun behind his back

trying to get it out.

And that is consistent with the evidence in this

case that shows that James had a grazing wound across his scalp

10:24AM   that did not penetrate.  It did break the skin, but it didn't

penetrate the skull.  Grazed the top of his head.

And a second gunshot wound that came in at an angle,

almost parallel to the back of his -- to his back, and it

entered just past the midline of his back, a very slight upward

10:24AM   trajectory, and lodged in his shoulder back over here

(indicating).

That's what the evidence will show.  If this were a

premeditated murder on a boat that is essentially this far

away, this evidence is consistent with a struggle -- struggles

10:25AM   I just described to you -- and not first-degree premeditated

murder.

After the second shot goes off -- and that shot goes

off as Wayne twists around, he and -- Wayne ends up facing the

rear of the boat with James now standing in front of that seat,

10:25AM   over him.  Wayne does not actually know James has been hit with

a bullet.  He does know that James is angry, and he is looking

over him like he is going to kill him.  That's what Wayne

believes.

Wayne grabs a tool that's in the side compartment, a

10:25AM  handle -- a long-handle tool.  And as James reaches down, Wayne

hits him in the head.  And the evidence will show that there is

trauma to both his forehead and the top of his head consistent

with being hit in the head with a metal object, as Wayne will

describe.

10:26AM  James reaches down, attempts to pull up Wayne by his

jacket causing Wayne to grab James around -- behind the legs

and pull.  And James flips over the back of the boat on that

side, as demonstrated in the picture.

When James is out of the water, he was alive.  He

10:26AM  was yelling at Wayne still, "I'm going to kill you."  The

evidence will show that the blunt-force trauma to the head and

the gunshot wounds were nonfatal.  The cause of death here was

drowning, and that James was alive when he entered the water.

At this point, Wayne is fueled on adrenaline and

10:27AM  cocaine.  Told Sheila, "Drive.  Get out of here."

Folks, this is not murder, and it's certainly not

first-degree premeditated murder.  There's no planning here.

There's no premeditation.  Wayne Le reacted to a situation, and

it's a reaction that we're all allowed to do.

10:27AM  The law permits.  The person reasonably believes

that their life is in danger, they're allowed to use reasonable

force under the circumstances to protect their own life.

That's what happened on this boat.

Now, you heard from Mr. Staples what he calls

10:28AM evidence.  None of these witnesses that he will present were

there on the boat, have any firsthand knowledge of what

happened on the boat.  All of these witnesses, their entire

basis of testimony is what they claim Wayne Le told them.  So

some of it is undisputed.  Some of it is very much in dispute.

10:28AM I'd just like to put a little bit of it in context for you.

Wayne Le did lie to Natalie Nguyen and Alex Dao

about whether he was on the boat.  Within a few days after this

fateful night, Natalie is trying to reach Wayne.  She called

his phone number, but the phone number she was calling --

10:29AM actually, that phone went overboard; so he didn't have it.  It

had been in --

One of the things I forgot to mention is that when

James went overboard, he actually had a hold of Wayne's jacket

and pulled it back over his head and off as he went overboard.

10:29AM And Wayne's phone was in that jacket.

So Wayne didn't actually get the messages from

Natalie because that was the number she had been calling.  But

she showed up at his house, and he did talk to her.  He told

her a lie.  He said, "No, I didn't get on the boat.  We went

10:29AM down to the marina, and there were these two other guys.  James

went fishing with them, and I stayed in the bar with Shawn."
That's what he told Natalie.

Now, he told Natalie this because that day James's
brother Alex had gotten involved. Alex, the gangster. Alex,
the man connected with organized Asian criminal gangs here in
Orange County, as Wayne understood it. Alex, the guy who ran
an illegal gambling operation in Irvine, this house in this
very peaceful suburban neighborhood. And Wayne knew that once
Alex got involved, if Alex learned that Wayne had gotten in
this fight with James and left him out in the ocean, there
would be retribution. The lie to Natalie, the lie to Alex was
out of Wayne's fear of James's brother Alex.

Now, a couple things happened right around that same
time that really affected Wayne Le's thinking on the whole
situation. So when James went over into the water, he was
alive and he was yelling.

Wayne, at the time when he told Sheila "Just go" --
yeah, he wasn't quite sure how far they were from shore, but he
knew they could see the shore. And in his mind, he thought,
"He'll swim back. Screw him." Excuse my language, but that
was his attitude. "Guy just tried to kill me. I'm not going
to pick him back up."

As they went back to shore, though, Wayne started
having doubts. It's a little farther than he thought. They
picked up the nets. They were closer to shore, and he was

1      uncertain.

2             Did he call the Coast Guard?  Did he call the

3      police?  No.  Mr. Scally is right about that.  He didn't.  He

4      didn't.  Guy went overboard while he was high on cocaine and

10:32AM 5      drunk, while the boat driver was drunk, while they were in a

6      beef over money from their drug-dealing activity.  It's not

7      surprising he didn't call the Coast Guard or the authorities.

8      It doesn't mean he murdered him.

9             But something else happens.  Wayne's not entirely

10:33AM 10     clear whether James is -- is dead or alive, frankly.  And one

11     of their friends that weekend -- I think it's -- it's the 18th,

12     that Friday night, three days after this happened.  You'll hear

13     evidence and hear testimony about this text exchange between

14     Wayne Le and a friend of both him and James.

10:33AM 15            And in this text exchange Wayne tells this person,

16     "James is missing."

17            And the friend says, "He's not missing.  He's

18     hiding."  Wayne gets to thinking maybe he is hiding.  Maybe he

19     is hiding.

10:34AM 20            You see, as Mr. Scally told you, James often told

21     people about this insurance policy.  And he often boasted about

22     it.  "I have a million-dollar policy.  Don't worry.  Loan me

23     the money.  If anything happens to me, Natalie will pay you."

24     Wayne had heard that story several times because James told it

10:34AM 25     all the time.  He was constantly borrowing money from his

friends, from his family members, and from drug dealers, who he
would get to front him or give him drugs on credit.

James's problem was that he was a worse gambler than
he was a drug dealer because he would get drugs on credit,
he'll sell them, take the money and go to the casino.  Now, if
he had a good night at the casino, there's no problem.  But if
he lost the money, he was in debt to a drug dealer.

And he had people all over town looking for him.
This 5- -- $4500 debt that he owed to Wayne Le was nothing.  He
owed thousands of dollars to other people; to his own brother
Alex, tens of thousands of dollars.  But to other drug dealers,
he owed money.  And he was constantly looking over his
shoulder.

There will be evidence in this case that he was
threatened repeatedly by other people to the extent that there
was a kidnapping attempt against him just months earlier over a
drug debt gone down.

This pressure that James was under may explain, in
part, why he reacted the way he did on the boat, but it also
gives context to something that happened several months earlier
that bore on Wayne's thinking after the fateful night on the
boat.

In February of 2019, Wayne Le's father died after a
lengthy battle of Parkinson's.  Upon hearing this, James asked
Wayne, "Do you have a death certificate?"

1          He said, "Yeah, I have a death certificate."

2          And James says, "You know, maybe we could Photoshop

3     the death certificate, put my name on it and have Natalie make

4     a claim on the insurance proceeds.  And if you do" -- "if you

10:36AM 5     help me do this, Wayne, I'll give you 10 percent."

6          Okay.  Wayne's, like, "Sure, James.  Whatever.  My

7     father just died, but that's okay.  Yeah, sure."

8          Because that's what Wayne always did.  He always

9     went along with it.  But that plan never went anywhere.  It was

10:37AM 10    discussed.  It was discussed more than once.  James brought it

11    up.  But it never materialized.

12         But then after the night on the boat and after Wayne

13    learns from their mutual friend he's not missing, he's hiding,

14    and after James never shows, the other thing that happens here

10:37AM 15    is on October 19th, Coast Guard agents interview Natalie

16    Nguyen.

17         They tell Natalie, "We found James.  We found him in

18    the ocean.  He's dead."

19         The family knew he was dead.  The family that had

10:38AM 20    contacted for that five days leading up to that -- four days

21    leading up to that had been in constant contact with Wayne.

22    They knew it.  But the Coast Guard said, "Don't tell anybody.

23    It's not public yet."  And they kept that information nonpublic

24    until Wayne's arrest two months later.

10:38AM 25         What did happen is Natalie and Alex stopped calling

Wayne.  And Wayne started getting paranoid.  "What's going on
here?"  And what he started to think was "They're running a
scam.  James got back to shore and has now figured out a way to
run a scam that he told me about months earlier."

10:38AM    That text message that Mr. Scally told you about,
that's what that's about.  "I want my hundred thousand."  It's
his 10 percent of the million-dollar insurance policy.
Actually, the policy was only about 250-, but James always told
people "a million-dollar policy."  That's what that text was
10:39AM about.

        So the rest of the Government's case is these four
witnesses that Mr. Scally told you about, none of whom were on
that boat and none of whom who has any firsthand knowledge of
the events.  All of them will testify about things that they
10:39AM say Wayne Le said either before or after the night of the
fishing trip.  Their testimony is only as good as whether you
can believe Wayne Le was truthful to them.  He repeatedly lied
about these events to various people right out of the gate.

        The other dispute is every one of these meetings,
10:40AM Wayne was in his typical drunk and coked-out state.  That was
just his normal state during this period of time in his life.

        What you also will hear is that Wayne really wanted
to curry favor with these folks.  Wayne had never been to
prison himself, but each one of these guys -- Shawn Whalin,
10:40AM Tony Hoang, Vinh Doan -- were all convicts with long records.

1    And Wayne wanted to impress them.

2            Each one of these guys knew Wayne is not a real

3    gangster.  They knew he was a poser.  In fact, his nickname

4    that they referred to him as was "Wangsta," W-a-n-g-s-t-a.

10:41AM 5    Wangsta.  It's a wannabe gangster.  Wayne took the name.

6    That's how they looked at it.  None of them took him seriously.

7            So when Wayne told Shawn Whalin, Tony Nguyen, Vinh

8    Doan about what statements he made on the boat, did he tell

9    them everything?  Probably not.  Did he embellish?  Probably.

10:41AM 10   But what you also hear is each one of these witnesses has a

11   motive to embellish themselves here in court, to make these

12   testimony and these statements that much more incriminating in

13   order to assist the FBI and the United States Attorney's Office

14   to secure a conviction in this case.  They are all motivated to

10:42AM 15   get a conviction here.

16           And when you have somebody -- when you have Wayne Le

17   making blustering statements, it doesn't take much to add a

18   little more, make it just fit into what the Government needs

19   them to say.  And that's what you'll hear in this case.

10:42AM 20           Tony Hoang.  Tony Hoang, you'll hear testimony from

21   him.  He's an ex-con who -- again, he got paid to give evidence

22   against Wayne.  He was promised by Alex Dao not only cash if he

23   could get evidence against Wayne, but to set him up in an

24   illegal marijuana grow house if he could get evidence against

10:43AM 25   Wayne.  Tony Hoang had just gotten out of prison himself after

doing a prison term for fraud and forgery, I believe, and, himself, had been working in a marijuana house cutting marijuana and trimming it, but wanted to start his own marijuana business.

10:43AM          On the evening of October 18, Tony Hoang came over to Wayne's house. Wayne had been summoned that very evening to go see Alex down at the Irvine restaurant, the sushi restaurant. Wayne, as I told you earlier, was scared of Alex.

          "Tony, why don't you come along with me. Meet this 10:43AM guy. He's a marijuana connection. You should meet him. He can get you connected."

          And Wayne goes down and Tony goes with him. They go to the sushi restaurant, and that's the meeting where Wayne tells Alex this lie about "I wasn't on the boat." But 10:44AM meanwhile Tony sees an opportunity. He hears who Alex is and what his reputation is, and he sees an opportunity.

          And when Wayne tells him -- tells Tony that they had gotten in this fight on the boat, that the gun had gone off and James went overboard, Tony sees the opportunity to sell this 10:44AM information to Alex. He reaches out to Alex and attempts to broker a deal for this information with Alex. And Alex promises him money if he can get it on tape.

          Now, ultimately, Tony becomes an FBI informant. And what he tells the FBI is that Wayne confessed to him to 10:44AM shooting James three times, tying weights to his ankles,

throwing him overboard, with Shawn Whalin, out on this boat.
That's the story.  And that he did it over a 30- to $40,000
debt.  That's the story that Tony Hoang tells the FBI in
mid-November of 2019.  Never on tape.  Not corroborated by any
10:45AM of that.

They repeatedly sent Tony to meet with Wayne with
video cameras, body wires being recorded.  They never got that
confession on tape.  What they did have, though, is Tony saying
that Wayne said that.  And those specific details, all of which
10:45AM are demonstratively false -- demonstratively false -- and the
evidence will show that those specific details are false, all
of those details get reprinted in the local media following
Wayne Le's arrest on December 19.

They're on the TV news.  They're in the
10:46AM "L.A. Times," the "Orange County Register."  They're all over
the Internet.  Anybody who knows Wayne Le, Sheila Ritze can
type in their name and find these stories with these statements
that Tony Hoang attributed to Wayne Le.

So what happens?  Well, Wayne Le is arrested on
10:46AM December 19th.  Eight days later, Shawn Whalin's arrested on a
federal gun charge, I believe.

Shawn Whalin, methamphetamine addict.  His criminal
career started when he was 18 as a car burglar and thief.  And
he worked his way up to bigger crimes over the years, but had a
10:47AM serious methamphetamine addiction.

Wayne had come back into contact with him that

summer and tried to get him work doing contractor work, having

him run errands.  Wayne did have him, as Mr. Scally

characterized it, deliver drugs for him.

10:47AM          So they called him a drug runner because there's no

dispute.  That's what Wayne Le did.  He sold small amounts of

cocaine and some other drugs, including later got into

methamphetamine after he met Mr. Whalin.

          But Shawn Whalin is arrested by the FBI.  A SWAT

10:47AM team raids his house in Santa Ana, where he lives with his

mother as well, and he's transported down to the FBI station in

Orange where the agents talk to him on the way down there.  And

by the time they turn on the tape recorder at the FBI office,

he is primed to go.  He will tell the FBI whatever they want to

10:48AM hear because they have told him, "You could implicate him in a

homicide, and he's going down for it."

          And Shawn Whalin gives this story that's been

repeated.  In the process, he tells the FBI what the FBI has

already reported to the local papers.  Shawn Whalin gets

10:48AM prosecuted, he's looking at 45 years in federal prison.  And

he's going to come in here, and they're going to ask you to

believe his testimony to convict this man on first-degree

murder on that.

          Vinh Doan, third guy.  Again, lives with his cousin

10:49AM at some point.  Vinh Doan is a fraudster in identity thief,

54

somebody who steals people's identities, credit card numbers,

things like that, sells them.  A whole black market of that

for, you know -- that's what he does.

Did Wayne get involved in that?  Sure, Wayne got

involved in that.  He would -- he would get identities, and

Vinh Doan would pay him for them, because Wayne is looking to

make another buck.  And he would do that.  But Vinh Doan is

awaiting sentencing on federal fraud charges where he's looking

at 62 years in prison.  Okay?

And that week after that fateful boat trip, Wayne

meets with him and he tells him he got in that fight.  He tells

him James went overboard.  "The gun went off and James went

overboard."  That's what he told him he did.  He thought he was

his friend.  And he was confiding in him.

Now, I don't know what Mr. Doan is going to say when

he comes to court.  My belief is he will talk something a

little bit closer to what was reported in the papers because

he, again, has every incentive to corroborate the Government's

case to avoid 62 years in prison.

There's one more witness.  That's Sandra Ritze, the

mother-in-law.  She's the woman on the right; the woman on the

left is Sheila Ritze (indicating).  That picture is taken on

the evening of October 4 at the Palms hotel casino in

Las Vegas, right before that somewhat famous pop star from

the '80s Billy Idol is about to take the stage.

Sheila Ritze -- I'm sorry -- Sandra Ritze is the mother-in-law of Sheila Ritze.  This relationship is somewhat unusual at this time because Sandra Ritze had divorced her husband in 2016.  And when she divorced her husband in 2016, Sheila Ritze's husband sided with his father and basically cut off contact with Sandra.  And when Mica, Sheila Ritze's husband, cut off contact with Sandra, Sandra lost contact with her granddaughter, River.  And you will hear testimony about how motivated Sandra Ritze was to bring that relationship back in, to rekindle that relationship with her ten-year-old granddaughter.

2018, Sheila Ritze separates from Mica Ritze.  And Sandra, seeing an opportunity to rekindle the relationship, reaches out to Sheila and says, "Hey, why don't you come out to Las Vegas?  I've got these concert tickets, and we'll have a great time.  I'll get a hotel room.  We'll gamble a little bit. We'll go to this concert."

Sheila is, like, "Great.  Absolutely.  I'm there."

October 4, 2020, Sheila Ritze is flying out of Long Beach Airport to Las Vegas to meet her mother-in-law.  She gets Wayne to drive her to the airport.  She misses her flight. Wayne's been up all night, doing drugs.  They're running late. She misses her flight.

Wayne offers to drive her to Las Vegas.  She cannot get another flight that afternoon, and he offers to drive her

to Las Vegas.  He goes to Las Vegas all the time with James.

What's another trip on Friday out there?  Sheila agrees.

Wayne calls Shawn Whalin saying, "Hey, I'm going to

Vegas.  Why don't you come with me.  I can use some help

driving.  I've been up all night."  Whalin's got nothing else

to do and a free trip to Vegas sounds good to him.  So he goes.

And Wayne also calls James.  Says, "Hey, we're

driving to Vegas.  Do you have any marijuana you need to move?"

James is, like, "Yes, I do."  And he joins the trip,

too, moves the marijuana to Las Vegas.

And the four of them drive from Southern California

to Las Vegas.  Sheila has never met James before, barely knows

Shawn.  I think she may have met him once before -- once or

twice before, but barely knows him, but has never met James

before.  They drive out there.

Sheila is her usual kind of drunk self.  She's

drinking along the way.  Wayne is using drugs to stay awake

during the drive.  And James is mostly silent.  And they get

out to Las Vegas after the drive, and they get there in the

late afternoon, early evening on, I believe, a Friday night.

Sandra comes and meets them in the lobby, and there

is an introduction.  And James then leaves because James had a

hotel room at another casino.  He's not going to stay there.

There's some talk about Sheila trying to get Wayne a hotel

room -- Wayne and Shawn a hotel room so they could spend the

1    night rather than drive home again, since Wayne now has not

2    slept for 36 hours or something like that.

3           And so they go up to Sandra's room and there is some

4    type of comment made.  I know Sandra Ritze is going to come in

10:55AM  5    here and testify about a comment made about "offed" or "offing

6    James."  She's made several statements.  It seems to change

7    depending on who's talking to her and depending on how many

8    times the FBI talks to her.

9           MR. SCALLY:  Your Honor, I'm going to object as to

10:55AM 10    argument.

11           THE COURT:  Sustained.

12           MR. WILKE:  The evidence will show that her

13    statements changed over time, Sandra Ritze's statements, the

14    specifics of it.  But it was something to the effect of, "Oh,

10:56AM 15    we offed him."  Nothing sinister.  They got rid of him.  They

16    let him off.  He went to another casino.  And at the time,

17    there's no sinister motive or intent attributed to Sandra

18    Ritze.

19           Mr. Scally says she's going to come in here and

10:56AM 20    testify that she was told that weekend of October 4th about a

21    plan to murder Tri Dao, James -- Tri James Dao.  Yet the

22    evidence will show that she didn't tell anybody about that.

23    She didn't tell the police about that.  She didn't tell her

24    relatives about that.  She told nobody about that.

10:56AM 25           There was no plan.  There was a joke about offing

```
 1   him, meaning "We left" -- "We got rid of him," which is he went
 2   to another casino after borrowing $500 from Wayne.  But there
 3   was no plan told to her.  What happened?  Where does this story
 4   come from?
 5          THE JUROR:  Excuse me, can I use the restroom,
 6   please?
 7          THE COURT:  I'm sorry?
 8          MR. WILKE:  I think the juror is asking to use the
 9   restroom.
10          THE COURT:  Counsel --
11          MR. WILKE:  We can take a break.  I have about two
12   minutes left.
13          Could you wait two minutes?  I'll try and speed it
14   up here.  I have about two minutes left.
15          There was no plan.  There was no plan discussed.
16   And she didn't tell anybody about this conversation because it
17   didn't happen and she didn't take it seriously.  We know she
18   didn't take it seriously.  These photos you can see in the
19   evidence, that's her the next day after supposedly hearing
20   about this plan to murder.  She goes go-karting with James and
21   Whalin at the go-kart --
22          THE COURT:  Counsel, move closer to the microphone,
23   please.  Thank you.
24          MR. WILKE:  They go to the Billy Idol concert that
25   night.  They go to dinner the next night.  She enjoys her
```

Timestamps in left margin: 10:57AM (lines 5, 10, 15, 20), 10:58AM (line 25)

**UNITED STATES DISTRICT COURT**

weekend in Vegas, but now will come in and tell you that there
was this plan she heard about to commit murder.

          What happened is when Sheila got arrested, Sandra
heard about it.  She spent hours on the Internet, gobbling
up --

          MR. SCALLY:  Your Honor, I'm going to object as to
argument.

          THE COURT:  Sustained.

          MR. WILKE:  She read news reports about it, learned
what Tony Hoang would say.  Spent that week -- after Sheila was
arrested, Mica allowed River to come stay with her.  And she
learned that, with Sheila in jail, she could get custody of
River.

          And when she drove River back, January 2nd, right
after the holidays, she called the FBI and said, "I have
information."

          One final thing -- two final points.  We like to
trust law enforcement, but here the law enforcement
investigating agent --

          MR. SCALLY:  Object as to argument.

          MR. WILKE:  This is not argument, Your Honor.

          The evidence will show -- the evidence will show the
FBI case agent in this case had a prior preexisting
relationship with Alex Dao, one that went back ten years.  Alex
Dao used to be a confidential informant for the FBI, and he

1    made this agent's career, the biggest case of his life.

2          And when Alex Dao wanted the FBI's involvement, he

3    went to his friend and former colleague, this agent, got him

4    involved.  It's one thing to call somebody you know.  It's

10:59AM 5    another thing to then take over the investigation.  Agent Cho

6    took over the investigation.  He was the interviewing agent for

7    every one of these critical witnesses.  The evidence will show

8    that.

9          And, finally, the evidence will show that all the

11:00AM 10   physical evidence in this case is consistent with the events on

11   this boat as described to you by Wayne Le in his testimony.  No

12   premeditation, no evidence of premeditation.  The injuries to

13   James, consistent with the struggle.  The gunshot wounds were

14   nonfatal despite having to have been fired within close range

11:00AM 15   because of confines of the boat.  And there's a lack of blood

16   on the boat, consistent with a very quick struggle in which

17   James goes overboard.

18          Finally, the Government's theory of this case of

19   premeditation is that Wayne Lee --

11:00AM 20         MR. SCALLY:  Your Honor, object as to argument.

21         MR. WILKE:  The evidence that the --

22         THE COURT:  Sustained.

23         MR. WILKE:  Wayne Le was motivated by the desire to

24   collect off the insurance policy.  The evidence will show that

11:01AM 25   Wayne Le never asked Natalie about the insurance policy

following the fateful fishing trip.  How does he collect on the
insurance policy if he doesn't ask for the money?  He never
did.  That will be undisputed in this case.  So the
Government's theory will not be supported by the evidence.

11:01AM         In the end, when you hear all of the evidence in
this case, there's -- you will come to the conclusion that this
was not a plan -- premeditated plan to murder James Dao.  You
will come to the conclusion that this is not murder, not
first-degree murder, not premeditated murder.  And you will
11:01AM return a verdict of not guilty.

        Thank you for your time.

        THE COURT:  Ladies and gentlemen --

        Thank you, Counsel.

        -- why don't we take a 20-minute recess.  You're
11:01AM admonished not to discuss this matter amongst yourselves nor
form or express any opinion concerning the case.  We'll come
and get you in 20 minutes with the first witness.  Thank you.

        **(Recess from 11:01 a.m. to 11:23 a.m.)**

        **(In the presence of the jury.)**

11:23AM         THE COURT:  Thank you, Counsel.

        We're back in session.  If you'd be seated.

        The jury is present, the alternates are present.

        Counsel on behalf of the Government, would you call
your first witness, please.

11:23AM         MR. STAPLES:  Yes, Your Honor.  The United States

```
 1   calls Chris Sukraw, S-u-c-r-a-w [sic].
 2              THE COURT:  Thank you.
 3              Thank you, sir.  If you'd step forward, please,
 4   between the double doors.
 5              Now, sir, would you stop at this location.  Would
 6   you raise your right hand, please.
 7              CHRIS SUKRAW, GOVERNMENT'S WITNESS, WAS SWORN
 8              THE COURT:  If you'd please walk around the side of
 9   the jury railing towards the wall.  If you'd be seated, please.
10              Would you be kind enough to face the jury.  Would
11   you state your full name, please, and spell your last name,
12   please.
13              THE WITNESS:  Chris Sukraw, S-u-k-r-a-w.
14              THE COURT:  Thank you.
15              Direct examination by the Government.
16              MR. STAPLES:  Yes, Your Honor.
17              We ask that -- the Court indicated that we can get
18   him a clear mask.
19              THE COURT:  Clear mask.  There's a mask right beside
20   you.  We have a whole stack of them, if you'd be so kind.  And
21   it goes this way (indicating).  It's -- the indentation is at
22   the top.
23              This will be direct examination, then.
24   ///
25   ///
```

|    | **DIRECT EXAMINATION** |
|----|------------------------|
| 1  | **DIRECT EXAMINATION** |
| 2  | BY MR. STAPLES: |
| 3  | Q    Good morning, Mr. Sukraw. |
| 4  | A    Good morning. |
| 5  | Q    Can you pull the microphone a little closer to you. |
| 6  | A    Good morning. |
| 7  | Q    Thank you. |
| 8  |      What town do you live in? |
| 9  | A    Trabuco Canyon. |
| 10 | Q    What do you do for a living? |
| 11 | A    I'm a creative director. |
| 12 | Q    Do you also, as a hobby, occasionally fish? |
| 13 | A    Yes. |
| 14 | Q    Were you fishing recreationally in October 2019? |
| 15 | A    Yes. |
| 16 | Q    Do you recall going on a fishing trip in October 2019 |
| 17 | where a body was found in the water? |
| 18 | A    Yes. |
| 19 | Q    Where was that, approximately? |
| 20 | A    A few miles off the coast of Camp Pendleton. |
| 21 | Q    So it's out in the ocean? |
| 22 | A    Yes. |
| 23 | Q    And what type of boat were you on? |
| 24 | A    A personal watercraft, fishing boat. |
| 25 | Q    And what were you fishing for that day? |

Timestamps in left margin: 11:25AM (line 5), 11:26AM (line 10), 11:26AM (line 15), 11:26AM (line 20), 11:26AM (line 25)

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
| 1      | A  | Local fish.  Anything.                                       |
| 2      | Q  | But you were using rods and reels?                           |
| 3      | A  | Correct.                                                     |
| 4      | Q  | And who else was with you that day?                          |
| 11:26AM 5 | A | Three of my friends.                                       |

1    A    Local fish.  Anything.

2    Q    But you were using rods and reels?

3    A    Correct.

4    Q    And who else was with you that day?

11:26AM 5    A    Three of my friends.

6    Q    Okay.  Who were they?

7    A    Don Stenersen, Ramon Marzolo, and one of Ramon's friends.

8    Q    And whose boat actually was it?

9    A    Was Ramon's.

11:27AM 10    Q    And he was skippering the boat that day?

11    A    Yes.

12    Q    In front of you should be an exhibit.  Do you see it?

13    It's Exhibit 129.

14    A    Yes.

11:27AM 15    Q    Do you recognize that?

16    A    Yes.

17    Q    What is it?

18    A    It's Ramon's boat.

19    Q    And is that -- do you know when that picture was taken?

11:27AM 20    A    That day.

21    Q    The day in October when you found the body in the water?

22    A    Correct.

23         MR. STAPLES:  Okay.  I move to admit Exhibit 219,

24    Your Honor -- excuse me -- 129.

11:27AM 25         THE COURT:  129 received.

|       |   |                                                              |
|-------|---|--------------------------------------------------------------|
|       | 1 | **(Exhibit Number 129 received.)** |
|       | 2 | Q    BY MR. STAPLES:  So this is the boat you were on that day |
|       | 3 | when the body was found? |
|       | 4 | A    Correct. |
| 11:27AM | 5 | Q    And which person are you on the boat? |
|       | 6 | A    On the very left with the straw hat. |
|       | 7 | Q    That would be you? |
|       | 8 | A    Correct. |
|       | 9 | Q    And which one is the skipper? |
| 11:28AM | 10 | A    The one right next to me. |
|       | 11 | Q    That would be the skipper and owner of the boat? |
|       | 12 | A    Yes. |
|       | 13 | Q    Okay.  So tell the jury how it is that you came across |
|       | 14 | the body. |
| 11:28AM | 15 | A    We were trolling, going about eight miles an hour, a few |
|       | 16 | miles off the coast.  Off in the distance we noticed something |
|       | 17 | approaching.  As it got closer, we identified that it was a |
|       | 18 | body. |
|       | 19 | So we stopped the boat.  And for a moment we thought |
| 11:28AM | 20 | maybe we should turn it over, but realized there was nobody |
|       | 21 | around for miles.  So there was no chance of, you know, |
|       | 22 | potentially saving the individual.  So we stopped, stayed close |
|       | 23 | to the body, and radioed the Coast Guard. |
|       | 24 | Q    Okay.  And you say you thought about turning over the |
| 11:29AM | 25 | body.  What position was the body in when you came upon it? |

```
        1   A    It was facedown, arms and legs down in the water along

        2   with the head.  So we just saw the back.

        3   Q    And do you recall what -- was it clothed?

        4   A    Yeah.  Gray pants and an orange life jacket.

11:29AM 5   Q    Okay.  And you said you initially thought about turning

        6   it over but did not.  And you -- a call was made.  Who made the

        7   call?

        8   A    Ramon.

        9   Q    The skipper?

11:29AM 10  A    (No audible response.)

        11  Q    Do you know who he called?

        12  A    We just radioed the Coast Guard on his VHF radio.

        13  Q    All right.  And did they indicate they would respond?

        14  A    Yes.

11:29AM 15  Q    And what did you do after that?

        16  A    We stayed by the body, drifted next to it.

        17  Q    How far were you from the body during the time you were

        18  waiting?

        19  A    I'd say no further than 20 feet.  We stayed pretty close

11:30AM 20  to it.

        21  Q    And how long did it take, approximately, for a rescue

        22  vessel to arrive?

        23  A    About an hour.

        24  Q    And during that whole time, you were just circling near

11:30AM 25  the body?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    Drifting.  We stayed pretty close without having to start

 2   up the boat very many times.

 3   Q    During that time, since you saw the body to when the

 4   rescue boat arrived, did anybody on the boat try to touch the

 5   body?

 6   A    No.

 7   Q    Did the boat bump up against the body?

 8   A    No.

 9   Q    Once the rescue boat arrived, what did you do?

10   A    Rescue boat approached us.  We pointed to the body, which

11   was obvious.  They took our information and went and retrieved

12   the body.

13   Q    Okay.  And once they took your information and retrieved

14   the body, you were free to go?

15   A    Yes.

16   Q    About how far offshore were you when you found the body?

17   A    I'd say a few miles.  Three to five.

18   Q    Could you see the shore from where you were?

19   A    Yes.

20   Q    What were the weather conditions like when you found the

21   body?

22   A    It was mixed.  For most of the morning, we had periods of

23   dense fog, but then it would break, and then it would be sunny

24   and foggy again.  So it was kind of mixed.

25   Q    So when you were around the body, did you see any sharks?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     No.

 2   Q     Any seabirds?

 3   A     No.

 4   Q     No sort of marine life near the body?

11:31AM 5   A     No.

 6   Q     Did you see any other boats during the time you were out

 7   there?

 8   A     Not during that time.  Not anywhere close enough that they

 9   would have been able to -- I mean, there's always boats on the

11:31AM 10  shoreline, you know, off -- miles away, but nobody close.

 11  Q     Okay.  Thank you, sir.

 12          I have no further questions.

 13          THE COURT:  Cross-examination, please.

 14          MS. MOJTEHEDI:  No cross, Your Honor.

11:32AM 15          THE COURT:  May the witness be excused, Counsel?  Or

 16  would you like the witness left on call?

 17          MR. STAPLES:  He may be excused, Your Honor.

 18          THE COURT:  Counsel?

 19          MR. WILKE:  Yes.

11:32AM 20          THE COURT:  Sir, thank you for your time.  Be

 21  careful stepping down.  You're excused from these proceedings.

 22          Counsel, would you be kind enough to call your next

 23  witness.

 24          MR. STAPLES:  United States calls Oceanside Police

11:32AM 25  Officer Calvin Berger.
```

UNITED STATES DISTRICT COURT

|   | |
|---|---|
| 1 | THE COURT:  Thank you, sir.  If you'd be kind enough |
| 2 | to step through the doors, please. |
| 3 | Would you raise your right hand, please. |
| 4 | **CALVIN BERGER, GOVERNMENT'S WITNESS, WAS SWORN** |
| 11:33AM 5 | THE COURT:  Thank you, sir.  Would you be kind |
| 6 | enough to walk along the side of the jury railing towards this |
| 7 | wall.  There's an entrance closest to the wall.  And then would |
| 8 | you be seated, please. |
| 9 | THE WITNESS:  Thank you. |
| 11:33AM 10 | THE COURT:  After you're seated, would you face the |
| 11 | jury.  Would you state your full name. |
| 12 | THE WITNESS:  Calvin Berger. |
| 13 | THE COURT:  Would you spell your last name. |
| 14 | THE WITNESS:  B-e-r-g-e-r. |
| 11:33AM 15 | THE COURT:  Thank you. |
| 16 | Direct examination by the Government. |
| 17 | **DIRECT EXAMINATION** |
| 18 | BY MR. STAPLES: |
| 19 | Q    Good morning, Officer Berger. |
| 11:34AM 20 | A    Good morning. |
| 21 | Q    Where are you currently working? |
| 22 | A    I currently work for the city of Oceanside Police |
| 23 | Department in their Harbor unit. |
| 24 | MR. STAPLES:  I'm sorry.  And can we get a clear |
| 11:34AM 25 | mask for the witness, Your Honor. |

```
      1              THE COURT:  Yes.  Thank you so much.
      2              There's a stack of masks there.  And the indented
      3    portion, you see -- it's the other way around.  It will be
      4    easier for you --
11:34AM  5              THE WITNESS:  Thank you.
      6              THE COURT:  Put the back portion on the bottom so
      7    the indented portion you'll have for your -- okay.  Great.
      8              Counsel, thank you.
      9              MR. STAPLES:  Thank you, Your Honor.
11:34AM 10    Q    BY MR. STAPLES:  I believe you stated you've been with
     11    Oceanside Police Department about five years?
     12    A    Yes, sir.
     13    Q    What did you do before that?
     14    A    I was a student and worked as a lifeguard at a resort.
11:34AM 15    Q    Where were you a student?
     16    A    Cal State University San Marcos.
     17    Q    What was your major?
     18    A    Criminology and justice studies.
     19    Q    Okay.  And prior to joining the Oceanside Police
11:35AM 20    Department, did you undergo any training for that job?
     21    A    I attended a six-month regional training academy.
     22    Q    Okay.  And you mentioned that you are currently assigned
     23    to the Harbor unit of the Oceanside Police Department.  Can you
     24    tell the jury what that is.
11:35AM 25    A    We conduct maritime and land-based patrols within the
```

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | Oceanside Small Craft Harbor District as well as providing |
| 2 | search and rescue operations to the immediate areas surrounding |
| 3 | the city of Oceanside. |
| 4 | Q    So is it fair to say, from what you said, that you sort |
| 11:35AM 5 | of have two missions, one being law enforcement within the area |
| 6 | of the marina -- |
| 7 | A    Yes, sir. |
| 8 | Q    -- and the other being called upon occasionally to do |
| 9 | search and rescue? |
| 11:35AM 10 | A    Yes, sir. |
| 11 | Q    Do you recall being on duty on October 16th, 2019, when |
| 12 | you got a call regarding a rescue? |
| 13 | A    Yes, sir. |
| 14 | Q    Do you recall about what time that came in? |
| 11:36AM 15 | A    I believe it was around noon.  Maybe 1:00 o'clock in the |
| 16 | afternoon. |
| 17 | Q    And who did the call come from? |
| 18 | A    United States Coast Guard Sector San Diego. |
| 19 | Q    And what was the call about? |
| 11:36AM 20 | A    It was a reference to a possible body located floating in |
| 21 | the water approximately seven nautical miles northwest of |
| 22 | Oceanside. |
| 23 | Q    And why would the Coast Guard call you instead of going |
| 24 | to get it themselves? |
| 11:36AM 25 | A    Coast Guard typically, unless they are at sea, stations |

**UNITED STATES DISTRICT COURT**

```
 1   out of San Diego.  So often for calls in the northern area of
 2   San Diego County, it's a toss-up between us and the Orange
 3   County Sheriff's Department, who is their closest asset
 4   available to assist and respond.
```
11:36AM
```
 5   Q    Okay.  So you got the call.  Did you go ahead and
 6   respond?
 7   A    Yes, sir.
 8   Q    What did you do?
 9   A    Myself, Officer Ephron and Officer Cuniff responded to the
10   GPS coordinates on Oceanside Rescue Boat 3.
```
11:37AM
```
11   Q    All right.  For the jury can you tell them what the GPS
12   coordinates are.  Not the actual coordinates, but how to use
13   them.
14   A    It's essentially a longitude and latitude that allows us
```
11:37AM
```
15   to find a specific location at sea where there aren't many
16   other landmarks.
17   Q    So using those locations, about how long did it take you
18   to get to that spot?
19   A    I would say about an hour.
```
11:37AM
```
20   Q    And when you got there, did you locate another boat?
21   A    Yes, sir.
22   Q    One moment, please.  I'm showing you what's been admitted
23   as Exhibit 129.  Is this the boat you located?
24   A    Yes, sir.
```
11:38AM
```
25   Q    And did you and your partners speak with these fishermen
```

1   here?

2   A    Yes, sir.

3   Q    And are they the ones that told you they found the

4   boat -- body, I mean?

11:38AM 5   A    Yes, sir.

6   Q    Did they point to an object in the water?

7   A    Yes, sir.

8   Q    And what did you see?

9   A    From there, it was just an orange object floating in the

11:38AM 10   water.

11   Q    Okay.  And what did you do at that point?

12   A    Officer Cuniff maneuvered our vessel closer to the object

13   so we can identify it.

14   Q    And when you got close to the object, what did you see?

11:38AM 15   A    We observed what appeared to be a body floating facedown

16   in the water.

17   Q    And was it clothed?

18   A    Yes, sir.

19   Q    What was it wearing?

11:38AM 20   A    An orange windbreaker-type shirt and pants and boots.

21   Q    Once you determined it was a man floating facedown in the

22   water, what did you do?

23   A    Officer Ephron grabbed the man's left arm, I grabbed his

24   right arm, and we pulled him onto our boat.

11:39AM 25   Q    Okay.  Prior to pulling him onto the boat, did

1    Officer Ephron try to see if the person was alive?

2    A    He was floating facedown in the water.  Once he grabbed

3    his left arm, he felt what he recognized as rigor mortis,

4    indicating that the body was deceased.

11:39AM 5    Q    And just for clarity, can you tell the jury what

6    rigor mortis is.

7    A    It's a stiffening of the limbs of the body that occurs

8    after death.

9    Q    All right.  Now, I believe you testified that you and the

11:39AM 10   other officer pulled the body on board your rescue vessel?

11   A    Yes, sir.

12   Q    At that point did you turn the body over?

13   A    Yes, sir.

14   Q    And what did you see?

11:39AM 15   A    I observed a wound to the subject's forehead and the top

16   of his scalp.

17   Q    Okay.  In front of you there should be an exhibit.  Do

18   you see an exhibit marked 126?

19   A    Yes, sir.

11:40AM 20   Q    Do you recognize that?

21   A    Yes, sir.

22   Q    What is it?

23   A    This is the body we located on that day.

24   Q    And does that accurately reflect how the body appeared

11:40AM 25   when you pulled it out of the water?

| | |
|---|---|
| 1 | A    Yes, sir. |
| 2 | MR. STAPLES:  I move to admit 126, Your Honor. |
| 3 | THE COURT:  Received. |
| 4 | **(Exhibit Number 126 received.)** |
| 11:40AM 5 | MR. STAPLES:  Thank you. |
| 6 | Q    This is the body that you and your partner pulled from |
| 7 | the water? |
| 8 | A    Yes, sir. |
| 9 | Q    And this is the orange windbreaker he was wearing? |
| 11:40AM 10 | A    Yes, sir. |
| 11 | Q    All right.  And just so it's clear, because it's not, |
| 12 | this red discoloration on his face, what was that? |
| 13 | A    That is blood. |
| 14 | Q    As well as on his jacket? |
| 11:41AM 15 | A    Yes, sir. |
| 16 | Q    And what's this red tarp here -- or excuse me -- this |
| 17 | yellow tarp? |
| 18 | A    Those are emergency blankets we have on our vessel. |
| 19 | Q    Is this what you wrapped him in prior to bringing him |
| 11:41AM 20 | into the dock? |
| 21 | A    Yes, sir. |
| 22 | Q    And the red there, is that also blood? |
| 23 | A    Yes, sir. |
| 24 | Q    Did you also see blood on the top of his head? |
| 11:41AM 25 | A    Yes, sir. |

**UNITED STATES DISTRICT COURT**

```
 1    Q    There should be another exhibit in front of you marked
 2    127.  Do you see that?
 3    A    Yes, sir.
 4    Q    Do you recognize that photograph?
 5    A    Yes, sir.
 6    Q    What is it?
 7    A    That is the top of the victim's head.
 8              MR. STAPLES:  Move to admit 127, Your Honor.
 9              THE COURT:  Received.
10              (Exhibit Number 127 received.)
11    Q    BY MR. STAPLES:  Is that how the head appeared when you
12    found it?
13    A    Yes, sir.
14    Q    Thank you.
15              It had these lacerations or injuries to it?
16    A    Yes, sir.
17    Q    Now, once you and your partner brought the body on board,
18    did you attempt to do any examination of it?
19    A    Officer Ephron observed blood on the subject's back as
20    well and located a puncture on the subject's back.
21    Q    Okay.  Beyond that, did you do anything?
22    A    No, sir.
23    Q    What did you do then?
24    A    We transported the body back to the Oceanside Patrol dock.
25    Q    Okay.  And when you got to the dock, what did you do?
```

11:41AM (line 5)
11:41AM (line 10)
11:42AM (line 15)
11:42AM (line 20)
11:42AM (line 25)

```
 1    A      The San Diego county medical examiner responded.

 2    Q      All right.  So other than when you brought the body on

 3    board and Officer Ephron seeing the blood on the back and the

 4    puncture wound on the back, you made no other effort to examine

 5    the body?

 6    A      No, sir.

 7    Q      Were you leaving that for the medical examiner?

 8    A      Yes, sir.

 9          MR. STAPLES:  Thank you.  I have no further

10    questions.

11          THE COURT:  Cross-examination.

12          MS. MOJTEHEDI:  Yes, Your Honor.

13          May I proceed?

14          THE COURT:  You may.

15                    CROSS-EXAMINATION

16    BY MS. MOJTEHEDI:

17    Q      Officer, on direct examination, you told us that you and

18    your partner recovered the body from the water; right?

19    A      Yes, ma'am.

20    Q      You grabbed one arm and your partner grabbed the other,

21    and you pulled him on board?

22    A      Yes, ma'am.

23    Q      In doing that, you didn't observe anything tied to the

24    body's hands, if you will; right?  Nothing tied to Mr. Dao's

25    wrists?
```

```
 1  A     No, ma'am.

 2  Q     You didn't observe anything tied to his ankles?

 3  A     No, ma'am.

 4  Q     And you didn't observe anything weighing him down in the

 5  water, perhaps tied to his legs?

 6  A     No, ma'am.

 7             MS. MOJTEHEDI:  Thank you.  No further questions.

 8             THE COURT:  Redirect?

 9             MR. STAPLES:  No redirect, Your Honor.

10             THE COURT:  May the witness be excused, Counsel?

11             MR. STAPLES:  Yes, Your Honor.

12             THE COURT:  Counsel?

13             MS. MOJTEHEDI:  Yes, Your Honor.

14             THE COURT:  Thank you.  You're excused from these

15  proceedings.  Thank you.

16             Counsel, if you'd like to call your next witness,

17  please.

18             MR. STAPLES:  Yes, Your Honor.  The United States

19  calls Angela Benefiel, B-e-n-e-f-i-e-l.

20             THE COURT:  Thank you.

21             If you'd step forward, please, between the doors.

22  If you'd raise your right hand, please.

23         ANGELA BENEFIEL, GOVERNMENT'S WITNESS, WAS SWORN

24             THE COURT:  If you'd please walk alongside the jury

25  railing towards this wall.  It's not the small door.  There's
```

```
 1    some staircases right here.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  If you'd please be seated.  And after
 4    you're seated, would you face the jury.  Would you state your
 5    full name, please.
 6              And we have a mask.  Let me see that for just a
 7    moment.  Try the bottom --
 8              THE WITNESS:  This one's tricky.
 9              THE COURT:  Try the bottom first, the black portion.
10              Would you state your name for the jury.
11              THE WITNESS:  Sure.  Angela Benefiel.
12              THE COURT:  Would you slow down just a little bit.
13    Once again.
14              THE WITNESS:  Angela Benefiel.
15              THE COURT:  Would you spell your last name.
16              THE WITNESS:  B-e-n-e-f-i-e-l.
17              THE COURT:  Thank you.
18              This would be direct examination.
19                      DIRECT EXAMINATION
20    BY MR. STAPLES:
21    Q    Ms. Benefiel, where do you work?
22    A    I work at the San Diego County Medical Examiner's Office.
23              THE COURT:  We're going to have you pull the
24    microphone closer to you.  And I'm going to have you state that
25    a little more slowly.
```

```
 1            THE WITNESS:  Okay.  I work at the San Diego County
 2  Medical Examiner's Office.
 3            THE COURT:  Thank you.
 4  Q    BY MR. STAPLES:  And what is your position there?
 5  A    I am a supervisor for investigations.
 6  Q    And have you also worked as an investigator?
 7  A    Yes, I have.
 8  Q    Can you tell the jury just briefly what an investigator
 9  for the Medical Examiner's Office does.
10  A    Sure.  So, briefly, the investigations unit fields all
11  calls of incoming reports of death, determines whether or not
12  we need to accept jurisdiction, responds to scenes.  When we go
13  to scenes, we do a preliminary assessment of the body, take
14  photographs, document, and write reports, and also notify
15  families of deaths and so forth.
16  Q    And how long have you been a supervisor?
17  A    A supervisor, probably about four years.
18  Q    And how long have you been with the San Diego Medical
19  Examiner's Office in total?
20  A    About a little over eight years.
21  Q    So the first four years you were an investigator; is that
22  correct?
23  A    That is correct.
24  Q    And what did you do prior to working at the San Diego
25  County Medical Examiner's Office?
```

```
 1    A    I was also a medical investigator for Sedgwick County,
 2    which is located in Kansas.
 3    Q    How long did you do that for?
 4    A    About 13 years.
 5    Q    Okay.  And can you tell the jury your educational
 6    background.
 7    A    Sure.  I have a master's degree in anthropology with an
 8    emphasis in forensics.
 9    Q    And where did you get your degree?
10    A    Wichita State University.
11    Q    And in addition to your education, do you have any
12    certificates?
13    A    I do.  I am board-certified with the American Medicolegal
14    Board -- Death Investigators.
15    Q    And do you receive training on an ongoing basis?
16    A    I do.  I'm required to -- in order to maintain my
17    certification, I do need to complete 50 hours of continuing
18    education every five years.
19    Q    And as a supervisor in the San Diego County Medical
20    Examiner's Office, how many people -- how many investigators do
21    you supervise?
22    A    Under my direct supervision, I believe currently I have
23    seven.
24    Q    Now, are there certain procedures you generally follow
25    when you respond to a scene where there's a dead body?
```

A     Yes.

Q     Could you tell the jurors what those are.

A     So when we respond to a scene, we essentially make contact with the responding law enforcement agencies, take down basic information, proceed to where the individual is at.  And from that point we begin to do our documentation, which essentially that means to kind of assess the general area surrounding the decedent as well as do a brief body examination along with taking photographs, documenting what we see, collecting evidence and, again, just working alongside the law enforcement agency to kind of recover all of that.

Q     And the purpose of this recovery in gathering this evidence -- what do you do with it once you get it?

A     Depends who is going to accept jurisdiction of whatever we collect.  But the purpose of collecting the evidence is, obviously, to gear towards identifying the decedent as well as possibly determining a potential cause and manner of death.

Q     And who makes that determination?

A     The pathologist.

Q     So in a lot of cases, this evidence that you gather in the photographs and so forth, does that get forwarded to the medical examiner?

A     I'm sorry, can you say that again.

Q     Yes.  I'm sorry.  It's hard with the masks.  The evidence that you gather, the photographs and so forth and the things

```
 1   you find, is that what you then forward to the medical
 2   examiner?
 3   A    Absolutely.
 4   Q    And that's the person who will then conduct the autopsy?
 5   A    Correct.
 6   Q    Is it safe to say the goal of your procedures is to try
 7   and keep the evidence intact in the way you found it?
 8   A    Yes.
 9   Q    Now, these procedures you described when you typically
10   respond to a scene that's on land where you survey around the
11   surrounding area and so forth, would that apply to a body that
12   had been pulled from the water and brought back to shore?
13   A    I'm not sure I quite understand your question.
14   Q    Well, in other words, when you respond to a body that had
15   been pulled from the water, is your focus mainly on the body?
16   A    Yes.
17   Q    Okay.  And, in fact, were you on duty October 16th, 2019,
18   when you got a call regarding a body that had been found at
19   sea?
20   A    I believe so, yeah.
21   Q    And did you respond to that?
22   A    Yes, I did.
23   Q    Do you remember where you went?
24   A    The exact location, not 100 percent, but I do believe I
25   know it was in Oceanside.  I don't know exactly who the docking
```

```
 1   belonged to, but we did respond to a dock off of -- in

 2   Oceanside.

 3   Q    So it was a dock in Oceanside marina?

 4   A    Yes.

 5   Q    And were there police officers there?

 6   A    Yes.

 7   Q    And were they the ones you spoke with when you arrived?

 8   A    Yes.

 9   Q    Were they the ones who had found the body -- or recovered

10   the body?

11   A    Recovered, yes.

12   Q    So when you got to the dock, you spoke with the officers.

13   What did you do next?

14   A    We proceeded to get on board the boat where the decedent

15   remained.  And from that point we began to do the documentation

16   as I described before.

17   Q    Okay.  So the boat you're referring to, just for clarity,

18   that was the police rescue vessel?

19   A    I believe so, yes.

20   Q    And you take photographs?

21   A    Yes, sir.

22   Q    I'm going to show you what's already in evidence as

23   Exhibit 126.  Is this one of the photographs you took?

24   A    I believe so, yes.

25   Q    And, I mean, do you recognize that as the scene you
```

```
  1    responded to?
  2    A    Yes.
  3    Q    And is this how the body appeared at the time you arrived
  4    at the scene?
11:53AM  5    A    I don't recall that exactly.  This could have been a
  6    subsequent photograph.  I'm not for sure.  But it is
  7    probably --
  8    Q    How long were you on the scene?
  9    A    Roughly an hour.
11:53AM 10    Q    Okay.  So it would have been a picture taken within an
 11    hour of you getting there?
 12    A    Absolutely.
 13    Q    And showing you 127 already in evidence, did you also
 14    take this picture?
11:54AM 15    A    Yes.  I believe so.
 16    Q    Do you know whose hand that is holding the head?
 17    A    I'm not 100 percent certain, but I would assume it would
 18    be mine.
 19    Q    Okay.
11:54AM 20         MR. WILKE:  I'm going to move to strike, Your Honor.
 21    Speculation.
 22         THE COURT:  Sustained.
 23    Q    BY MR. STAPLES:  Did you have an assistant with you then?
 24    A    I was training the investigator that responded with me.
11:54AM 25    Q    So you had another person working with you while you were
```

**UNITED STATES DISTRICT COURT**

1    looking at the body?

2    A      I did.

3    Q      Now, in addition to photographing, what else did you do?

4    A      As you can tell with the pictures, we were conducting an

11:54AM 5    examination of the body to look for any signs of injury to

6    document those and also collect evidence or potentially find

7    IDs and so forth.  So we went through the clothing.

8    Q      Okay.  When you went through the clothing, did you go

9    through the orange jacket --

11:55AM 10   A      Yes.

11   Q      -- that was on the body?

12           MR. STAPLES:  May I approach, Your Honor?  I have a

13   physical exhibit.  It's marked 100.

14           THE COURT:  You may.  Do you need any gloves to

11:55AM 15   handle that?

16           MR. STAPLES:  I don't believe so, Your Honor.

17           THE COURT:  All right.

18   Q      BY MR. STAPLES:  Ma'am, I've placed a bag next to you

19   marked 100.  Can you tell me if you recognize it.

11:55AM 20   A      That appears to be the jacket that the gentleman is

21   wearing in the pictures.  Do I have to fully remove it?

22   Q      Yes.

23   A      Okay.  Can I use gloves?

24           THE COURT:  Deb, do we have some gloves available?

11:56AM 25           MR. STAPLES:  Actually, Your Honor, may I approach?

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE COURT:  Please.                                                   |
|       | 2  | We're going to give you some gloves to handle that.                  |
|       | 3  | And there should be some Handi Wipes up there also.                  |
|       | 4  | THE WITNESS:  Thank you.                                             |
| 11:56AM | 5 | Now that I'm gloved up, it does look like the jacket                |
|       | 6  | and -- from what I'm seeing here.                                     |
|       | 7  | Q    BY MR. STAPLES:  And that's the jacket that you would           |
|       | 8  | remove from the body during the course of your examination?          |
|       | 9  | A    Yes, sir.                                                        |
| 11:57AM | 10 | MR. STAPLES:  Move to admit Exhibit 100, Your Honor.              |
|       | 11 | THE COURT:  Just one moment.  Is it Exhibit 100?                    |
|       | 12 | MR. STAPLES:  100, Your Honor.                                      |
|       | 13 | THE COURT:  100.                                                    |
|       | 14 | Any objection, Counsel?                                             |
| 11:57AM | 15 | MR. WILKE:  No objection, Your Honor.                             |
|       | 16 | THE COURT:  Received.                                              |
|       | 17 | **(Exhibit Number 100 received.)**                                  |
|       | 18 | Q    BY MR. STAPLES:  All right.  And you're holding it up.         |
|       | 19 | There's discoloration on that.  Do you know what the cause of       |
| 11:57AM | 20 | that discoloration is?                                              |
|       | 21 | A    I could assume that it would be blood.  But at this point,     |
|       | 22 | I can't tell.                                                       |
|       | 23 | MR. WILKE:  Your Honor, move to strike.                           |
|       | 24 | Speculation, Your Honor.                                            |
| 11:57AM | 25 | THE COURT:  Overruled.                                            |

```
 1              You can answer the question.  You assume it to be
 2    blood?
 3              THE WITNESS:  Yes.
 4    Q    BY MR. STAPLES:  In fact, the picture you took,
 5    Exhibit 126, shows blood on the jacket; correct?
 6    A    Correct.
 7    Q    And when you rolled the body over, was there blood on the
 8    back as well?
 9    A    Yes, there was.
10    Q    As part of your investigation, did you look for any holes
11    in the jacket?
12    A    Yes, I did.
13    Q    Did you find any?
14    A    Yes, I did.
15    Q    Can you see if you can locate it on that jacket for the
16    jury.
17    A    So there is a hole here in the back and --
18    Q    Can you point to the jury for it.
19    A    This one on top where my right hand is pointing to
20    (indicating).  This down here, I'm not sure what that is.  I
21    don't recall that.  But this one here, I do recall that
22    (indicating).
23    Q    Okay.  And you can put the bag back or put it down or
24    back in the jacket [sic], ma'am.
25              When you found the hole in the jacket, did you look
```

1    at the body itself to see if there was a hole?

2    A    I looked for anything that would coordinate with that

3    defect, yes.

4    Q    And did you find anything?

11:58AM  5    A    To my recollection, yes.

6    Q    What did you find?

7    A    I do recall seeing a defect.  I don't remember exactly

8    what it was.

9    Q    Was it a puncture?

11:58AM 10    A    A puncture or something, yes.

11              MR. WILKE:  Going to object.  Move to strike.

12    Speculation, Your Honor.

13              THE COURT:  Overruled.

14    Q    BY MR. STAPLES:  Was he wearing a T-shirt under the

11:58AM 15    jacket?

16    A    I would have to refer to my pictures and report.

17    Q    Would it refresh your recollection to look at your

18    report?

19    A    Yes, it would.

11:59AM 20              MR. WILKE:  May I have a moment, Your Honor?

21              **(Counsel conferred off the record.)**

22              MR. STAPLES:  May I approach, Your Honor?

23              THE COURT:  Certainly.

24              MR. STAPLES:  For the record, I'm showing her an

12:00PM 25    Oceanside Police Department officer report, dated 10/16/2019,

```
  1    by Jennifer Luecht, L-u-e-c-h-t.
  2              THE COURTROOM DEPUTY:  Is there an exhibit number?
  3              THE COURT:  No.  He's just refreshing her
  4    recollection.  We don't need one.
12:01PM 5              THE WITNESS:  Okay.
  6    Q    BY MR. STAPLES:  Ma'am, did reading that report refresh
  7    your recollection as to whether you found a hole in a T-shirt
  8    on the body?
  9    A    Yes, I did.
12:01PM 10   Q    And did you?
  11   A    Yes, I did.
  12   Q    And did that hole correspond in position to where the
  13   hole in the jacket was?
  14   A    Yes, it did.
12:01PM 15   Q    Thank you.
  16              Now, in addition to looking at the jacket, did you
  17   check the pockets -- any pockets on the body?
  18   A    Yes, I did.
  19   Q    And did you find any items in there?
12:01PM 20   A    To my recollection, I did find a few.  The one that
  21   recalls most easily is the -- like, a wallet-type -- it had his
  22   driver's license in it as well as a fishing license.
  23   Q    All right.  In front of you should be some exhibits.  And
  24   you should have an Exhibit 127 in front of you.
12:01PM 25   A    Yes, I do.
```

```
 1    Q    I'm sorry, 27.  I apologize.

 2    A    Uh-huh.

 3    Q    Do you have that in front of you?

 4    A    I do.

12:02PM 5   Q    Do you recognize that?

 6    A    I do.

 7    Q    What is that?

 8    A    That is the wallet that I'm referring to.  It's not really

 9    a wallet.  Maybe it's a cardholder or something to that effect.

12:02PM 10          MR. STAPLES:  And I would move to admit 27,

11    Your Honor.

12          MR. WILKE:  No objection.

13          THE COURT:  Received.

14          (Exhibit Number 27 received.)

12:02PM 15   Q    BY MR. STAPLES:  So this orange around here, that would

16    be the cardholder/wallet?

17    A    Correct.

18    Q    And what is it that you found?

19    A    Inside of it I do recall seeing his driver's license as

12:02PM 20   well as the fishing license.

21    Q    And I'll try to zoom in.  Can you read the name?

22    A    Yes.  The last name being Dao, first name being Tri Minh.

23    Q    Okay.  Did you also find fishing licenses?

24    A    I did.

12:02PM 25   Q    Would you take a look at Exhibit 23 and 24, please.
```

```
 1    A    Okay.
 2    Q    Do you recognize those?
 3    A    I do.
 4    Q    What are they?
12:03PM  5    A    The fishing license.
 6              MR. STAPLES:  We'd move to admit 23 and 24,
 7    Your Honor.
 8              MR. WILKE:  No objection.
 9              THE COURT:  Received.
12:03PM 10         (Exhibit Number 23, 24 received.)
11    Q    BY MR. STAPLES:  Showing you, ma'am, Exhibit 23, is that
12    one of the licenses you found on the body?
13    A    It is.
14    Q    I'm going to zoom in.  Can you read the name on it?
12:03PM 15    A    Yes.  It is Tri Minh Dao.
16    Q    If you look at the top, you see where it says, "Full
17    Season Spiny Lobster Report Card"?
18    A    Yes, I do.
19    Q    And if you look to where I'm pointing -- I'm going to
12:04PM 20    zoom in -- can you read the date?
21    A    I can.  It is 10/14 of 2019.
22    Q    Is there a time?
23    A    There is.  It's 9:16 and 26 seconds p.m.
24    Q    Thank you.
12:04PM 25              And showing you 24 --
```

UNITED STATES DISTRICT COURT

1      MR. STAPLES:  Did I move to admit 24, Your Honor?

2      THE COURT:  Yes.  23 and 24 have both been received.

3   Q    BY MR. STAPLES:  This was also found in the pocket of the

4   body?

12:04PM  5   A    Correct.

6   Q    And this one says it's the fishing license?

7   A    Correct.

8   Q    And I don't know on this -- oh, it says -- excuse me.

9   Can you read the dates that it's valid to?

12:05PM 10   A    Sure.  It's valid from 10/14/2019 to 12/31/2019.

11   Q    Thank you.

12      In addition to the driver's license and the fishing

13   licenses, did you find anything else on the body?

14   A    I do recall, like, a small knife.

12:05PM 15   Q    Okay.  If you would take a look at Exhibit 131.

16   A    Okay.

17   Q    Do you recognize that?

18   A    I do.

19   Q    What is it?

12:05PM 20   A    It's a small knife that is sheathed.

21   Q    Is that the knife that you found on the body?

22   A    It is.

23      MR. STAPLES:  I would move to admit 131, Your Honor.

24      THE COURT:  Received.

12:05PM 25      **(Exhibit Number 131 received.)**

**UNITED STATES DISTRICT COURT**

94

1     MR. WILKE:  Can I have a moment, Your Honor?

2     **(Counsel conferred off the record.)**

3   Q   BY MR. STAPLES:  This is a photograph of the knife?

4   A   It is.

12:06PM 5   Q   Thank you.

6     MR. STAPLES:  Your Honor, I have a physical exhibit.

7   It's the knife.  It's not on the list, but we would like to add

8   it as Exhibit 132 and ask permission to approach the witness.

9     THE COURT:  Exhibit 132.

12:06PM 10    And you may approach the witness.  And if you want

11  some gloves to handle that...

12  Q   BY MR. STAPLES:  Ma'am, I've handed you the physical

13  exhibit marked 132.

14    Do you recognize that?

12:07PM 15  A   I do.

16  Q   And can you pull the microphone closer to you.

17  A   I do.

18  Q   And is that the knife that you found that's reflected in

19  the photograph in Exhibit 131?

12:07PM 20  A   It appears to be, yes.

21  Q   And was it in the sheath when you found it?

22  A   Yes, it was.

23  Q   And just so the jury can see, can you take it out of the

24  sheath and show the jury the knife.

12:07PM 25  A   (Witness complies.)

```
 1   Q     Did you examine the knife when you found it?

 2   A     I don't recall that.

 3   Q     Okay.  Thank you.

 4         MR. STAPLES:  And I would move to admit Exhibit 132,

 5   Your Honor.

 6         THE COURT:  Received.

 7         (Exhibit Number 132 received.)

 8   Q     BY MR. STAPLES:  Now, did you also find some cash on the

 9   body?

10   A     I believe so.

11         MR. STAPLES:  Again, I have some physical -- a

12   physical exhibit, Your Honor, I'd like to mark as 133 that's

13   not on the list.

14         THE COURT:  133.

15         MR. STAPLES:  It consists of loose currency.  I'd

16   like to approach.

17         THE COURT:  You may.

18   Q     BY MR. STAPLES:  Do you recognize what 133 is?

19   A     I do.

20   Q     Do you see the investigation -- or the investigation

21   numbers on it?

22   A     I believe so, yeah.  This is not my department.  So it's

23   different.

24   Q     Do you recognize that as the cash you recovered from the

25   body?
```

12:08PM (lines 5)
12:08PM (line 10)
12:08PM (line 15)
12:09PM (line 20)
12:09PM (line 25)

UNITED STATES DISTRICT COURT

```
 1   A     I do.

 2   Q     Can you open it and count it.

 3   A     Uh-huh.  I think I need scissors.

 4            MR. STAPLES:  May I approach, Your Honor?

 5            THE COURT:  You may.

 6            MR. STAPLES:  While she's doing that, Your Honor, I

 7   would move to admit 133.

 8            THE COURT:  Received.

 9            (Exhibit Number 133 received.)

10            THE WITNESS:  It consists of one $5 bill and eight

11   1s.

12   Q     BY MR. STAPLES:  Thank you, ma'am.

13            So what's the total?

14   A     $13.

15   Q     You can put it back in the bag now.

16   A     Okay.

17   Q     Thank you.

18            Did you also find an inhaler on the body?

19   A     To my recollection, yes.

20   Q     An inhaler -- I mean something that an asthmatic might

21   use?

22   A     Correct.

23   Q     So all of these items that we've just gone through,

24   including the photographs you took, what did you do with all

25   that when you were done?
```

UNITED STATES DISTRICT COURT

1    A    So based on the apparent circumstances, the property and

2    everything that was collected, I believe was turned over to the

3    law enforcement agency.

4    Q    Okay.  And what was done with the body?

12:11PM  5    A    We collected the body and transported him back to the

6    Medical Examiner's Office.

7    Q    When a body is being prepared for delivery to your

8    office, what steps do you take?

9    A    Again, in this type of circumstances, we place individual

12:11PM 10   bags over the hands, head, and feet.  And he was placed inside

11   a vinyl pouch and transported -- or once that's done, then we

12   seal it and transport him to the Medical Examiner's Office.

13   Q    Now, you said in these circumstances you place bags on

14   the hands and the feet, I believe?

12:11PM 15   A    Uh-huh.

16   Q    What do you mean by "these circumstances"?

17   A    When an individual has unexplained blunt-force injuries as

18   well as any other type of trauma that is not consistent with

19   being just found in the water.

12:12PM 20   Q    All right.  And so why do you bag the hands and the feet?

21   A    To preserve any evidence.

22   Q    That might be on the hands or feet?

23   A    Correct.

24   Q    Thank you.

12:12PM 25        Now, you say that you would place the body in a bag

**UNITED STATES DISTRICT COURT**

and seal it.  Would you look at Exhibit 128, which should be in
front of you.

A    Yes.

Q    Do you recognize that?

12:12PM A    I do.

Q    What is it?

A    So that is the seal and body tag that we use.

Q    All right.  And is this the one that you used in this
case?

12:12PM A    Correct.

       MR. STAPLES:  Your Honor, I'd move 128 into
evidence?

       THE COURT:  Received.

       **(Exhibit Number 128 received.)**

12:12PM Q    BY MR. STAPLES:  So this is -- excuse me -- this is the
tag that was placed on the body in this case?

A    Correct.

Q    And what is this red device that looks like a clamp here?

A    The red is basically -- it's a seal that we use.  It's a
12:13PM tamper-evidence seal that, as soon as you unzip or you try to
enter the bag, it breaks, and it breaks the seal.  So it's a
seal that we use to ensure the integrity of the body.

Q    All right.  And then focusing in on the tag itself,
that's the name that you found on the driver's license?

12:13PM A    Correct.

```
 1    Q    What's this number here?

 2    A    That is our case number.

 3    Q    The medical examiner's case number?

 4    A    Correct.

 5    Q    And that's the date that you examined it?

 6    A    Correct.

 7    Q    And what's that number?

 8    A    That number coordinates with the seal, the red

 9    tamper-proof seal.

10    Q    Okay.  Thank you, Ms. Benefiel.

11              MR. STAPLES:  Nothing further, Your Honor.

12              THE COURT:  Counsel, would this be a convenient time

13    for lunch or short cross-examination?

14              MR. WILKE:  Three minutes tops.

15              THE COURT:  Please, for continuity.

16              This will be cross-examination.

17                         CROSS-EXAMINATION

18    BY MR. WILKE:

19    Q    Ms. Benefiel -- am I pronouncing it correctly?

20    A    Yes, you are.

21    Q    Thank you.

22              So as a medical examiner investigator, one of your

23    primary tasks, when you arrive at a scene where there is a

24    deceased body, is to identify the deceased body; correct?

25    A    Correct.
```

```
     1   Q    Sometimes that is very easy to do; correct?

     2   A    Correct.

     3   Q    And sometimes it's very difficult to do; correct?

     4   A    Correct.

12:15PM  5   Q    When the deceased has his California driver's license on

     6   him, it makes your job pretty easy; correct?

     7   A    Sometimes, yes.

     8   Q    Well, in this case, you were able to identify the

     9   identity of the deceased from his California driver's license

12:15PM 10   and the photo on his driver's license; correct?

    11   A    Correct.

    12   Q    In addition to his California driver's license, you were

    13   also -- you had at least two other forms of identification;

    14   correct?

12:15PM 15   A    Correct.

    16   Q    Including the California fishing license; correct?

    17   A    Yes.

    18   Q    And the spiny lobster card; correct?

    19   A    Yes.

12:15PM 20   Q    And both of those forms of identification, the fishing

    21   license and the spiny lobster card, both indicated that they

    22   were obtained at approximately 9:05 and 9:16 p.m. on the

    23   evening of October 14, 2019; correct?

    24   A    Correct.

12:16PM 25   Q    By the decedent Tri Minh Dao; correct?
```

```
 1   A      Correct.

 2              MR. WILKE:  I have no further questions, Your Honor.

 3              THE COURT:  Redirect?

 4              MR. STAPLES:  No, Your Honor.  Thank you.  The

 5   witness may be excused.

 6              THE COURT:  Counsel, is that acceptable to the

 7   defense as well?

 8              MR. WILKE:  Yes, sir.

 9              THE COURT:  You're excused from these proceedings.

10   Thank you for your attendance.  Take the mask with you.

11              Counsel, why don't we take the recess at this time

12   and take an hour and 15 minutes as we did yesterday with the

13   jury.

14              All right.  Ladies and gentlemen, you're admonished

15   not to discuss this matter amongst yourselves, nor form or

16   express any opinion.  Let's say within an hour 15 minutes and

17   see how comfortable you are with that.  If we can get down to

18   an hour, we'd like to, but let's stay with an hour 15 minutes.

19   Please leave your notes on the seats you occupy and have a nice

20   recess.

21              (Out of the presence of the jury.)

22              THE COURT:  Counsel, if you'd be seated for just a

23   moment.  The jury is no longer present.  The alternates are no

24   longer present.

25              I suggest that you two meet and confer concerning
```

1   the alternate juror who called our attention to an inability to

2   serve after stating yesterday categorically that he could

3   serve.  I don't think any of us expected to lose one alternate

4   this early in the proceedings.  So we have three.

12:18PM 5        And without a stipulation, quite frankly, I'm a

6   little concerned both for that juror, who may have financial

7   hardship, but for the lateness of that information when we

8   could have easily selected another alternate yesterday.

9        I'm welcome to any suggestions.  But without a joint

12:18PM 10  stipulation by both of you, perhaps the employer could be

11  called in by the Court.  And most folks are pretty patriotic in

12  the sense of a willingness to serve if they know the import,

13  but that discloses information to the employer.

14       So I'm going to order you to meet and confer for a

12:18PM 15  few moments.  I don't want to take this up in the presence of

16  the jury.  This is today or even tomorrow because I'd like to

17  continue on with this evidence uninterrupted.  And I'm a little

18  concerned about the ease of which a juror could leave us at

19  this point and ever getting below 12.

12:19PM 20       Have a nice recess, Counsel.

21       MR. WILKE:  Thank you, Your Honor.

22       MR. SCALLY:  Thank you, Your Honor.

23       **(Proceedings concluded at 12:19 p.m.)**

24            --oOo--

25

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

          I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME
COURT REPORTER, in and for the United States District Court for
the Central District of California, do hereby certify that
pursuant to Section 753, Title 28, United States Code that the
foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.


*Date:  January 16, 2022*




                              */S/ DEBBIE HINO-SPAAN*

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**