**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )   <u>**CERTIFIED TRANSCRIPT**</u>
                                   )
         vs.                       )   Case No.
                                   )   8:20-cr-00002-DOC-1
HOANG XUAN LE,                     )
                                   )
                  Defendant.       )   **Day 4, Volume II**
                                   )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, NOVEMBER 12, 2021

10:25 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2    **FOR PLAINTIFF:**

3            TRACY L. WILKISON
             Acting United States Attorney
4            BY:  GREGORY SHEPHERD SCALLY
                  Assistant United States Attorney
5            411 West 4th Street
             Suite 8000
6            Santa Ana, California 92701
             714-338-3592
7            gregory.scally@usdoj.gov

8            TRACY L. WILKISON
             Acting United States Attorney
9            BY:  GREGORY W. STAPLES
                  Assistant United States Attorney
10           411 West 4th Street
             Suite 8000
11           Santa Ana, California 92701
             714-338-3535
12           greg.staples@usdoj.gov

13
     **FOR DEFENDANT:**
14
             LAW OFFICES OF CRAIG WILKE
15           BY:  CRAIG WILKE, ESQ.
             305 North Harbor Boulevard
16           Suite 216
             Fullerton, California 92832-1901
17           714-870-8900
             craig@craigwilkelaw.com
18
             LAW OFFICES OF SHEILA MOJTEHEDI
19           BY:  SHEILA SARAH MOJTEHEDI, ATTORNEY AT LAW
             806 East Avenida Pico
20           Suite I-291
             San Clemente, California 92673
21           323-412-0472
             sheila@mojtehedi.com
22
     **ALSO PRESENT:**
23
             Austin Casey, Special Agent, Coast Guard
24

25

                    **UNITED STATES DISTRICT COURT**

```
 1                          I N D E X

 2   WITNESSES                                        PAGE

 3   MICA RITZE, CALLED BY THE PLAINTIFF
         Cross-Examination by Mr. Wilke (resumed)      5
 4       Redirect Examination by Mr. Staples          17

 5   SANDRA RITZE, CALLED BY THE PLAINTIFF
         Direct Examination by Mr. Scally             23
 6       Cross-Examination by Mr. Wilke               56

 7

 8

 9

10

11

12                          EXHIBITS

13                                              WITHDRAWN
                                          IN        OR
14   EXHIBIT                          EVIDENCE  REJECTED

15   241       Ritze DMV photo           26

16   104       Photo                     39

17   106       Photo                     42

18   169       Photo                     50

19   170       Photo                     51

20   171       Photo                     51

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; FRIDAY, NOVEMBER 12, 2021**

**10:25 A.M.**

**- - -**

**(Out of the presence of the jury.)**

10:25AM 5      THE COURT:  We're on the record.  The jury is not present.  All counsel are present and the defendant.

      The clerk told me during the recess that Juror Number 8 had approached her and stated --

      Karlen, that she recognized Secrest's name; is that correct.

      So I learned about that a few moments ago.

      And the total information, Karlen, that you received was?

      THE COURTROOM DEPUTY:  That she recognized the name as an acquaintance of hers.

      THE COURT:  As an acquaintance of hers.

      Do you want me to voir dire that juror separately, Counsel?

      MR. WILKE:  I think we probably should just to see --

      THE COURT:  Can we delay that until lunchtime when we have more time?

      MR. WILKE:  Yes.  Absolutely.

      THE COURT:  Then would you be kind enough to get the jury.

```
 1              (In the presence of the jury.)
 2              THE COURT:  The jury is present, the alternates, all
 3    counsel, the investigating agency.
 4              If you'd have a seat, please.  Thank you for your
 5    courtesy.
 6              Counsel, your continued cross-examination, please.
 7          MICA RITZE, GOVERNMENT'S WITNESS, RESUMED THE STAND
 8                    CROSS-EXAMINATION (resumed)
 9    BY MR. WILKE:
10    Q    Mr. Ritze, you testified yesterday about the fishing
11    license and lobster cards that are required to go fishing?
12    A    Yes.
13    Q    Okay.  Now, those are two separate licenses; correct?
14    A    Correct.
15    Q    Okay.  And if you're going to go lobster hooping, do you
16    need both or just one?
17    A    Both.
18    Q    Okay.  And is there a limit on how many lobsters you can
19    catch per day?
20    A    Yes.
21    Q    What is the limit?
22    A    If I recall, it's ten a person.
23    Q    Okay.  And is there a -- well, the last time -- strike
24    that.
25              The last time you went fishing, lobster fishing, was
```

1    in 2018; correct?

2    A    Correct.

3    Q    Do you know if that limit has since been lowered to

4    seven?

10:31AM 5            MR. STAPLES:  Objection.  Relevance.  Foundation.

6            THE COURT:  Overruled.

7            You can answer the question.

8            THE WITNESS:  It might have been 7 now.  I'm not

9    sure if it's 7 or 10.  I haven't done it in a few years and

10:31AM 10   haven't thought about it.

11   Q    BY MR. WILKE:  That's fine.

12           And in addition to a limit of the number of

13   lobsters, there's also a minimum size; correct?

14   A    Correct.

10:32AM 15  Q    They have to be -- do you remember what the size was?

16           MR. STAPLES:  Objection.  Relevance.

17           THE COURT:  Overruled.

18           THE WITNESS:  There's a measuring tool.  I did --

19   you measure from a certain part of the back to three inches or

10:32AM 20   something like that, three and a half.

21   Q    BY MR. WILKE:  Three and a half inches from the back to

22   the tail?

23   A    I believe so, yeah.  There's a special way to measure

24   them.

10:32AM 25  Q    Okay.  That's essentially so young lobsters aren't

```
 1   overfished; correct?
 2   A    Correct.
 3   Q    To maintain the lobster population; correct?
 4   A    Yes.
 5   Q    Okay.  And you -- have you ever been fishing -- in the
 6   hundreds of times that you've been fishing, either lobster
 7   fishing or just regular fishing, have you ever had your license
 8   checked?
 9   A    Yes.
10   Q    How many times?
11   A    I believe we were inspected two or three times.  One was
12   during a tournament.  We went past the line a little bit.  So
13   two or three times.
14   Q    Okay.  And one of those two or three times was during a
15   fishing tournament?
16   A    Yes.
17   Q    Okay.  And you were inspected because you said you went
18   over the line?
19   A    Yeah.  We realized we went right past the legal line where
20   you fish.  It was over at Catalina.
21   Q    Oh, okay.  Okay.  And it was -- and that led to the
22   inspection on that occasion?
23   A    Yes.
24   Q    On the one or two other times that your license was
25   checked, what were the circumstances there?
```

10:32AM (line 5)
10:32AM (line 10)
10:33AM (line 15)
10:33AM (line 20)
10:33AM (line 25)

A    We were putting our boat away at the harbor, and they had

come up and seen if we had any fish, check our licenses.

Q    Okay.  Check to make sure you didn't take more than your

limit?

10:33AM  A    Yes.  And the legal fish, the type of fish that we were

licensed to fish.

Q    Okay.  And at the time you were; correct?

A    Yes.

Q    And your understanding was that, if you didn't have a

10:34AM  license, you could get a fine --

A    Yes.

Q    -- correct?  Okay.

        Now, everybody on the boat doesn't always fish;

correct?

10:34AM  A    Correct.

Q    You can go out onto a boat and not fish and you're not

required to have a license; correct?

A    I believe it's only if you have a fishing pole in your

hand and you're actively fishing.

10:34AM  Q    But you need a license?

A    Yes.

Q    Okay.  So there's no requirement for a license just to be

on the boat; correct?

A    That is correct on the fishing license.  I'm not sure on

10:34AM  the lobster license.

```
 1   Q    Okay.  But on the lobster license, your limit of the

 2   lobster -- number of lobsters you can catch depends on how many

 3   people are on the boat with the lobster card; correct?

 4   A    Yes.  I'm pretty sure anybody that's on the boat during --

10:35AM 5   if you have hoop nets on your boat has to have a license.

 6   Q    That's your belief?

 7   A    That's my belief.  I'm not sure.

 8   Q    The times you've been fishing and lobster hooping --

 9   let's stick to lobster hooping.  You always had a lobster card?

10:35AM 10   A    Anybody on our boat did, yeah.

11   Q    And Sheila had a lobster card; correct?

12   A    Yes, and my daughter.

13   Q    And River had her own lobster card; correct?

14   A    Correct.

10:35AM 15   Q    And then if you took anybody on the boat, you required

16   them to get a lobster card as well; correct?

17   A    Correct.

18   Q    You testified on direct examination that your typical --

19   in the 20-plus times that you went lobster hooping with Sheila

10:36AM 20   prior -- from October '18 -- October 2018 and before, typically

21   you would leave at sunset; correct?

22   A    Just before, yes.

23   Q    Okay.  And you would leave just before sunset so you

24   could prep the gear and the hoop nets with the bait boxes;

10:36AM 25   correct?
```

1    A    Correct.

2    Q    With the idea being that you would want to be one of the

3    first boats in the water to get your hoop nets dropped;

4    correct?

10:36AM 5    A    Yes.  Yes.  You want to get the better spots, and you want

6    to get the first crawl, is what they call it, when the lobsters

7    start to crawl.

8    Q    Okay.  And during the height of the lobster season,

9    sometimes that was important because there would be a lot of

10:36AM 10    boats trying to basically be the first ones out there; correct?

11    A    Yeah.  There's a lot of known good spots that they would

12    try to get first.

13    Q    Okay.  The lobsters actually stay out all night; correct?

14    A    Yeah.

10:37AM 15    Q    And, in fact, there were times when you went on trips

16    that you would -- it would be such a good trip or you hadn't

17    reached your limit that you would continue lobster hooping

18    throughout the night; correct?

19    A    Correct.

10:37AM 20    Q    Okay.  Now, you also testified that the -- near the

21    Dana Point Harbor, the typical place where you would go would

22    be just off the jetty; correct?

23    A    Correct.

24    Q    Now, the jetty is made of rocks; correct?

10:37AM 25    A    Yes.

```
 1   Q     And these are large rocks; correct?

 2   A     Yes.

 3   Q     Okay.  And there's a peninsula, if you will, that extends

 4   out from the harbor, which is what we're calling the jetty;

10:37AM  5   correct?

 6   A     Yeah.

 7               MR. WILKE:  Can we have the photo.

 8   Q     I'm going to show you what's been previously admitted as

 9   550, Exhibit 550.  Okay.

10:38AM 10               Do you recognize this as the Dana Point Harbor;

11   correct?

12   A     Correct.

13   Q     And this, what I call the peninsula, but this is part of

14   what we're referring to as the jetty; correct?  This long line

10:38AM 15   here; right?

16   A     Yeah.  I think they call it breakwater.  I'm not too sure.

17   We never hoop-netted at the one you're pointing at.  It's

18   always on the outside.

19   Q     So is this the outside jetty here along the left -- upper

10:38AM 20   left-hand corner of the photo?

21   A     Correct.

22   Q     Okay.  And this -- both this break wall and this upper

23   jetty here, those are made of large rocks; correct?

24   A     Correct.

10:38AM 25   Q     What would happen to the boat if you would happen to run
```

```
 1  into those?
 2  A    You could damage the boat.
 3  Q    And depending on how fast you were going, it could damage
 4  it severely; correct?
 5  A    Yeah.  We had a few instances where we had to push
 6  ourselves off before we hit it.
 7  Q    And what would happen, for instance, if the propeller hit
 8  one of these rocks?
 9  A    It could damage the propeller, bend it.
10  Q    Okay.  Propellers are expensive; correct?
11  A    Yeah.  You normally -- when you back into it, you pull it
12  straight and then back out.
13  Q    But if you weren't paying attention and you got pushed
14  into it, that could damage the propeller; correct?
15  A    Yes, it could.
16  Q    Okay.  Now, you testified on direct examination that
17  typically you would try to get as close to the rocks as
18  possible without getting too close because that's -- that's
19  where the best lobster fishing was; correct?
20  A    Yeah.  Correct.
21  Q    And I think your testimony was maybe as close as 50 feet
22  out to about 200 feet from the rocks; correct?
23  A    At times we'd be even, like, ten feet off.  It would all
24  depend on the conditions of the weather and the waves.
25  Q    So if it was really calm and you weren't drunk and you
```

10:39AM  5
10:39AM  10
10:39AM  15
10:40AM  20
10:40AM  25

**UNITED STATES DISTRICT COURT**

```
 1    were all paying attention, you could get --
 2                MR. STAPLES:  Objection to the form of the question.
 3                THE COURT:  Sustained.  It's also compound.
 4    Q    BY MR. WILKE:  In calm waters, when you would go fishing
 5    at sunset and not under the influence of alcohol --
 6                MR. STAPLES:  Objection, Your Honor.  There's no --
 7    there's no evidence that this witness was ever drunk when
 8    fishing.
 9                THE COURT:  Sustained.
10    Q    BY MR. WILKE:  Well, there is -- you did testify that you
11    learned your wife had been driving the boat after drinking;
12    correct?
13    A    Yeah.  Yes.
14    Q    And I guess my question is that your willingness to go
15    close to the rocks was dependent on what the conditions were;
16    correct?
17    A    Correct.
18    Q    Because you would not want to hit the rocks and damage
19    the boat; correct?
20    A    Yeah, and put ourselves in danger.
21    Q    Now, after you -- these bait boxes that go into the hoop
22    nets, what do you put in there?
23    A    A cut-up fish and scent pads.  It's a scent pad that
24    attracts the lobster.
25    Q    What does it smell like?
```

| | | |
|---|---|---|
| 1 | A | Rotten fish.  Something like that. |
| 2 | Q | Not a pleasant smell? |
| 3 | A | No. |
| 4 | Q | Okay.  And you put that unpleasant-smelling bait into the |

10:41AM 5  bait box, and then the bait box goes into the hoop net;

6  correct?

7  A    Yes.

8  Q    And then that is dropped to the ocean floor; correct?

9  A    Correct.

10:41AM 10  Q    And your testimony, I think, was that the -- it has a

11  rope attached to the hoop net; correct?

12  A    Correct.

13  Q    And the ropes attached to the hoop nets that you

14  typically had when you went lobster fishing I think were

10:42AM 15  80 feet?

16  A    Yes, about.  And you would tie up 20, 30 feet at the end

17  so it wouldn't float in the water and get stuck in your prop.

18  Because we only needed 30 feet of it.

19  Q    Okay.  So the waters you were fishing in were, like, 30

10:42AM 20  feet deep?

21  A    Yeah.  Typically around 25.

22  Q    But you had enough rope to go as much as 80 feet;

23  correct?

24  A    Yes.  Except for it could get pulled under if you go too

10:42AM 25  deep.  You need an extra line always so you could grab the rope

```
  1   and you didn't lose your hoop net.
  2   Q    Okay.  The rope -- after the hoop net is dropped to the
  3   ocean floor, the rope is affixed to a buoy or something to keep
  4   the top of it afloat?
  5   A    Yes.  And at the very end of the rope, it has a weight
  6   attached so the end of the rope will sink back in the water to
  7   avoid getting tangled in props.
  8   Q    And the hoop net itself, is it weighted to go to the
  9   bottom of the ocean?
 10   A    Yes, it is.
 11   Q    And so the -- if you went in deeper water, you would need
 12   to maintain enough rope to tie on to the buoy; correct?
 13   A    Yeah.  We didn't have enough rope to do that.  We never
 14   tried that.
 15   Q    Well, deeper water -- say, with 80 foot of rope, what was
 16   the deepest you could drop those hoop nets?
 17   A    You only want to go 60 to 70.  That was pushing it.
 18   Q    Keep at least ten foot of extra rope?
 19   A    At least, yes.
 20   Q    Okay.  Now, in addition, after you tie the rope onto the
 21   buoy -- this would be at night; correct?
 22   A    Correct.
 23   Q    And then would you typically put some type of glow stick
 24   or something on the buoy so you could mark it?
 25   A    Yes.
```

10:42AM (line 5)
10:43AM (line 10)
10:43AM (line 15)
10:43AM (line 20)
10:44AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   Q    And so other boats wouldn't run into it hopefully?
 2   A    Yes.  And so we could find it.
 3   Q    So you could find it.  Okay.
 4        Now, you testified on direct examination that
 5   Sheila, your ex-wife, didn't like poachers?
 6   A    No.
 7   Q    That was your testimony; correct?
 8   A    Correct.
 9   Q    And she was pretty adamant in her dislike of poachers;
10   correct?
11   A    In terms of poachers against us, yeah.
12   Q    Yeah.  If somebody, you know, stole her lobsters, she
13   would be angry; correct?
14   A    Yeah.
15   Q    Okay.  And I think your testimony was that she, then,
16   didn't generally leave the hoop nets unattended --
17   A    Correct.
18   Q    -- unless she had to go to the bathroom or something like
19   that?
20   A    Correct.  Or we were picking up another friend.
21   Q    Or you're picking up somebody else?
22   A    Right.  In the harbor, yeah.
23   Q    Okay.  So at times she did leave the hoop nets
24   unattended; correct?
25   A    Yes.  Usually no longer than half an hour at the most.
```

10:44AM (line 5)
10:44AM (line 10)
10:44AM (line 15)
10:45AM (line 20)
10:45AM (line 25)

```
 1   Q    Okay.  And, typically, after you drop the hoop nets to
 2   the floor near the harbor, there's a period in which you wait
 3   for the lobster to be attracted?
 4   A    On the first crawl, yeah.  We usually -- we give it a good
 5   hour.
 6   Q    Okay.  Where you're just waiting on the boat?
 7   A    Yes.
 8            MR. WILKE:  I have no further questions, Your Honor.
 9            THE COURT:  Redirect examination, please.
10                     REDIRECT EXAMINATION
11   BY MR. STAPLES:
12   Q    You just said that, after setting the hoop nets for the
13   lobsters, that you might wait an hour?
14   A    We usually have some dinner and -- within eye distance of
15   our hoop nets.
16   Q    Okay.  So you wouldn't leave the hoop nets?
17   A    No.  We would be 100 feet, 200 feet away, just waiting.
18   Q    All right.  And in addition, you said that was just
19   during the first crawl; is that correct?
20   A    Yeah.  Because after that, by the time we got the tenth
21   one -- because you're allowed ten of the hoop nets.  By the
22   time we finished the tenth, we go back and start at the first
23   because it would take about 45 minutes.
24   Q    And in the times that you went lobster fishing with
25   Sheila Ritze, did you guys ever leave after midnight?
```

10:45AM (line 5)
10:45AM (line 10)
10:46AM (line 15)
10:46AM (line 20)
10:46AM (line 25)

UNITED STATES DISTRICT COURT

```
  1   A     To go home or --

  2   Q     No, to go out fishing for lobster.

  3   A     No.  We always started right at 5:00, 6:00.

  4   Q     Now, you were asked questions about the potential damage

  5   to your boat from the breakwater here with the large rocks;

  6   correct?

  7   A     Correct.

  8   Q     That did not stop you from fishing as close as you could

  9   to them to try and get the best lobsters, did it?

 10   A     No.  We had a lot of experience in that boat.  We were

 11   pretty confident in our skills.

 12   Q     When you say "we," did that extend to Sheila Ritze?

 13   A     Yeah.  Yeah, we would share --

 14   Q     And just -- so how far off would you be from that

 15   breakwater once you set your pods?

 16   A     Within 10 feet to as much as 75 feet off of it.  We tried

 17   to go, like, 100, 200 feet off and we never really caught

 18   anything.  So we tried to stay close.

 19   Q     You were also asked questions about the beginning of the

 20   lobster season in October being more crowded.  Do you recall

 21   those questions?

 22   A     Yes.

 23   Q     There would be more people on the water, especially

 24   around places like the breakwater?

 25   A     Yeah.  I mean, it was usually always packed.  In the
```

```
        1   beginning of the season it was a little more because everyone

        2   wanted to get back out there after being off for so long.

        3   Q    So there would be more lobster fishermen out there?

        4   A    Yeah.

10:48AM 5   Q    And, presumably, there might be more poachers out there

        6   as well?

        7   A    Yeah.

        8   Q    Now, you also said that, with the hoop net, you can't

        9   leave it in the water more than an hour because the lobsters

10:48AM 10  can crawl out?

       11   A    I believe, like, the law is you can only have it in for a

       12   few hours, and then you have to check them or else it can be

       13   confiscated.  But, yeah, after an hour, the lobsters would not

       14   stay in there.  They would leave.

10:49AM 15  Q    And you were asked questions about Sheila Ritze driving

       16   the boat after she had been drinking.  Do you recall those

       17   questions?

       18   A    Yes.

       19   Q    I believe you said you discovered that, when you

10:49AM 20  accidentally took a sip of her water, it turned out to be

       21   vodka?

       22   A    Yeah.

       23   Q    And yet I believe you testified that, even after that,

       24   she still continued to drive the boat when she had been

10:49AM 25  drinking; is that right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    You know, it's hard to remember exactly what happened.

 2   But, yeah, and it was quite an argument to stop her from

 3   driving the boat.

 4   Q    I believe you used the word -- she said -- you said she

 5   would get aggressive?

 6   A    Yeah.  She would try to fight.

 7   Q    Fight?

 8   A    Yeah.

 9   Q    Was she ever violent with you?

10        MR. WILKE:  Objection, Your Honor.  Beyond the

11   scope.  Also 403.

12        THE COURT:  Overruled.

13        You can answer the question.

14        THE WITNESS:  Yes, she would get aggressive and

15   pushy.  And she knew I wouldn't hit her back, so she would take

16   advantage of that.

17   Q    BY MR. STAPLES:  How would she take advantage?

18   A    She's hit me a few times and got aggressive and pushed and

19   left a lot of bruises.

20   Q    When you initially separated from Sheila Ritze prior to

21   your divorce and began living apart, I believe you said that

22   your daughter came to live with you?

23   A    We -- yeah, we stayed in the house.  And then when we sold

24   the house -- I believe it was August of that year, 2019 -- I

25   moved to Brea, and she came with me.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Why did your daughter come to stay with you?
 2   A    Because I was the one that always took care of her.  And
 3   her mom was still drinking heavily at the time.
 4        MR. STAPLES:  Nothing further.  Thank you.
 5        THE COURT:  Recross-examination?
 6        MR. WILKE:  No questions, Your Honor.
 7        Your Honor, we ask him to remain on call, though.
 8        THE COURT:  We'll keep a number of the witnesses on
 9   call.
10        Now that's just as a courtesy.  I doubt you'll
11   return to court, but we don't want additional subpoenas to have
12   to go out.  We're going to be in recess over the Thanksgiving
13   break from November 20th to December 1st.  I can't imagine why
14   you would be called back next week.
15        Also, the case is going to conclude, I believe, much
16   sooner than the original time estimate, probably the week, at
17   the latest, of December 7th or 8th.  But we'll be courteous.
18   We'll notify you and make sure, if you're needed back, there's
19   plenty of time.
20        THE WITNESS:  Okay.
21        THE COURT:  Thank you very much.  You may step down.
22        If you'd be kind enough to call your next witness,
23   please.
24        MR. SCALLY:  Yes, Your Honor.  The United States
25   calls Sandra Ritze.
```

```
 1              MR. STAPLES:  May I approach, Your Honor, to remove

 2      some exhibits?

 3              THE COURT:  You may, and thank you very much.

 4              And, also, Mr. Wilke, if you have any exhibits -- I

10:52AM  5      don't know if you put any up there.  If you didn't, the

 6      Government will.

 7              I'm sorry.  If you'll be kind enough to step between

 8      the double doors.  Would you please raise your right hand and

 9      face the clerk of the Court.

10:53AM 10        SANDRA RITZE, GOVERNMENT'S WITNESS, WAS SWORN

11              THE COURT:  If you'd please walk alongside the jury

12      box, and the entrance to the witness box is close to this

13      chair -- thank you -- three steps up.  And if you'd be kind

14      enough to be seated.

10:54AM 15              After you're seated, would you face the jury,

16      please, and would you state your full name and spell your last

17      name.

18              THE WITNESS:  My name is Sandra Ritze, R-i-t-z-e.

19              THE COURT:  Now we're going to change masks for just

10:54AM 20      a minute.

21              THE WITNESS:  Thank you.

22              THE COURT:  There's a clear -- stack of clear masks

23      beside you.  The bottom portion is this -- see this black?

24      That's the first thing that goes over your head.  And then take

10:54AM 25      the top portion and put it over so that -- this indentation is
```

```
         1  for the nose.
         2          THE WITNESS:  Thank you.
         3          THE COURT:  Comfortable?
         4          THE WITNESS:  Yeah.
10:54AM  5          THE COURT:  Counsel, this would be direct
         6  examination by the Government.
         7          MR. SCALLY:  Thank you, Your Honor.
         8                DIRECT EXAMINATION
         9  BY MR. SCALLY:
10:54AM 10  Q    Good morning, Ms. Ritze.
        11  A    Good morning.
        12  Q    If I could ask you to just come as close as you can to
        13  the microphone, please --
        14  A    Okay.
10:54AM 15  Q    -- so we're able to hear you.
        16          Where do you currently live?
        17  A    I currently live in Las Vegas, Nevada.
        18  Q    How long have you lived there?
        19  A    Four years.
10:55AM 20  Q    Where did you live previous to living in Las Vegas?
        21  A    I lived here in Orange County.
        22          THE COURT:  Just a little slower.  Where did you
        23  live again?
        24          THE WITNESS:  I lived here in Orange County in a
10:55AM 25  town called Silverado.
```

```
 1                THE COURT:  Okay.  Thank you, Counsel.
 2   Q    BY MR. SCALLY:  What do you do for a living?
 3   A    I am retired.
 4   Q    What did you do for a living before you retired?
 5   A    34 years my husband and I had a construction company.
 6   Q    Your husband -- what's your husband's name?
 7   A    Don Ritze.  Ex-husband.
 8   Q    Okay.  I was just going to ask.  At this time are you
 9   divorced?
10   A    Yes.
11   Q    When did you get married, approximately?
12   A    '82.
13   Q    And did you gain stepchildren through that marriage?
14   A    Yes, I did.
15   Q    Who were those?
16   A    There are three boys.  Eric, Mica, and Matt.
17   Q    Okay.  And how old was Mica when you gained him as a
18   stepson?
19   A    Three.
20   Q    And so did you essentially raise Mica as his mother?
21   A    Yes, I did.  We had full custody.
22   Q    When Mica became an adult, what did he do for work?
23   A    Mica came and worked for our company, in the construction
24   company.
25   Q    Okay.  And what company was that?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Custom Construction.
 2   Q     Did there come a time -- and what kind of construction
 3   did that company do?
 4   A     So we mostly did repairs.  We worked for HOAs and we
 5   worked on condos.
 6   Q     And when you say "HOA," you're talking about a homeowners
 7   association?
 8   A     I'm sorry, yes, homeowners associations.
 9   Q     And so how did you get that work typically?
10   A     So basically we got that work through the managers at the
11   HOAs.  We would actually go and talk to them and sell jobs to
12   them.
13   Q     Did there come a time during the course of that work that
14   you met a woman at that time by the name of Sheila Clifton?
15   A     Yes.
16   Q     And, actually, if I could -- there should be --
17   A     I see a picture.
18   Q     On the table there in front of you, I'll have you take a
19   look at Exhibit 241.
20          THE COURT:  One of the counsel will help you find
21   that.
22          THE WITNESS:  I got it.
23          THE COURT:  You got it?
24          THE WITNESS:  Yeah, it's right in front of me.
25   Q     BY MR. SCALLY:  Is that a picture of who you originally
```

```
  1  met as Sheila Clifton?

  2  A    Yes, it is.

  3         MR. SCALLY:  Okay.  Your Honor, moving to admit

  4  Exhibit 241.

10:58AM 5         THE COURT:  Received.

  6         (Exhibit Number 241 received.)

  7  Q    BY MR. SCALLY:  How did you meet Sheila Clifton?

  8  A    I met her through -- I usually was on the telephone.  I

  9  was customer service.  So she would call me and give me jobs.

10:58AM 10        THE COURT:  All right.  Just a little slower.  Just

 11  one moment.

 12         THE WITNESS:  So she worked for the TPMS, property

 13  management, and she would call me and give us jobs.

 14  Q    BY MR. SCALLY:  And did there come a time that your

10:58AM 15  stepson Mica Ritze met, then, Sheila Clifton?

 16  A    Yes.

 17  Q    And when, approximately, was that?

 18  A    I'm guessing around 2005.

 19  Q    And did they end up in a dating relationship?

10:58AM 20  A    Yes.  Right away.

 21  Q    Okay.  And did they eventually get married?

 22  A    Yes, they did.

 23  Q    And when was that, approximately?

 24  A    I want to say around 2008.

10:58AM 25  Q    And did Sheila take Mica's last name?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     She did.

 2   Q     So did she go by Sheila Ritze after that?

 3   A     Sometimes she went by Sheila Clifton, though, with her

 4   work.

 5   Q     I'm sorry.  Can you repeat your last answer.

 6   A     So sometimes she still stayed with Clifton, but she was

 7   Ritze legally.

 8   Q     Did they have children during the course of their

 9   marriage?

10   A     They did.

11   Q     How many?

12   A     One.

13   Q     And what's that child's name?

14   A     That is River Ritze, R-i-v-e-r.

15   Q     And how old is River currently?

16   A     She is now 11.

17   Q     Is she your -- essentially your granddaughter?

18   A     Yes, she's my granddaughter.

19   Q     And just so as to not be misleading, you're not

20   technically related by blood; is that correct?

21   A     No.

22   Q     Okay.  Tell us about your relationship with your

23   granddaughter.

24   A     River is my favorite person in the world.  I love her

25   dearly.  I am her grandma.
```

10:59AM (5)
10:59AM (10)
10:59AM (15)
10:59AM (20)
11:00AM (25)

**UNITED STATES DISTRICT COURT**

1    Q    Where did Mica and Sheila live together during the first

2    years of their marriage?

3    A    They actually -- on our property in Silverado.  We had

4    eight acres, so we had two houses on the property, and they

11:00AM  5    actually lived in the other house on our property.

6    Q    And when you say "We had," you're referring to you and

7    your then husband, Don Ritze?

8    A    Yes.

9    Q    Okay.  For the first few years of Mica and Sheila's

11:00AM 10    marriage, what was your relationship with Sheila like?

11    A    So Sheila and I were very close, really close.  I just

12    absolutely adored her.

13    Q    How was Sheila as a mother during that time?

14              MR. WILKE:  Objection.  Relevance, Your Honor.

11:00AM 15              THE COURT:  Overruled.

16              You can answer the question.

17              THE WITNESS:  At first she was a wonderful mother.

18    Q    BY MR. SCALLY:  Did there come a time that your

19    relationship with Sheila changed?

11:01AM 20    A    Yes, it did.

21    Q    When was that -- when was that, approximately?

22    A    So it kind of happened slowly, but probably six years ago.

23    Q    Okay.  So approximately 2015?

24    A    Yes.  Yes.  Probably 2015.

11:01AM 25    Q    And why did that relationship change?

```
 1    A     Sheila started drinking very, very heavily, and it became

 2    very difficult to have a relationship with her.  She was always

 3    drunk.

 4    Q     Did there come a time that -- well, so you mentioned that

11:02AM 5    Sheila and Mica lived on the same property as you and Don for a

 6    period of time?

 7    A     Yes.

 8    Q     Did they subsequently move off the property to their own

 9    house in Anaheim?

11:02AM 10   A     Yes, they did.

11    Q     And was that with River?

12    A     Yes.

13    Q     Did there come a time your relationship with -- well, did

14    you get divorced from Don Ritze?

11:02AM 15   A     Yes.  We got a divorce in '17.  2017.

16    Q     Okay.  After that did you still maintain contact with

17    Mica?

18    A     Yes, I did.

19    Q     And did you maintain contact with Sheila?

11:02AM 20   A     A little bit.  Not as much as before.  No way -- just

21    definitely things started to change with Sheila and I.

22    Q     Okay.  And you maintained contact with River, though;

23    correct?

24    A     Yes.

11:02AM 25   Q     Okay.  And that's been continuous?
```

```
 1   A    The whole time.  Yes.  It never ever waned from being with
 2   River.
 3   Q    Did there come a time that Mica and Sheila's relationship
 4   changed from husband-wife?
11:03AM 5   A    Yes.
 6   Q    And did they get divorced?
 7   A    They did.
 8   Q    And so did they no longer live together at some point in
 9   their house in Anaheim?
11:03AM 10   A    Yes.  That's correct.
11   Q    And where did Sheila move to?
12   A    Sheila moved to San Juan Capistrano.  She got a condo down
13   there.
14   Q    And so as of 2019, was Sheila living in San Juan
11:03AM 15   Capistrano?
16   A    Yes.
17   Q    And where was Mica living?
18   A    Mica had got an apartment in Brea.
19   Q    Do you know Sheila to -- did you know Sheila to own a
11:04AM 20   boat?
21   A    Oh, yes.  Yes.
22   Q    Have you ever seen the boat?
23   A    Yes, I have seen it.
24   Q    Have you been on it?
11:04AM 25   A    Many times.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    What was your phone number in 2019?

 2    A    It's the same as it is now.  Do I need to say it?

 3    Q    Actually, let's just do the area code and the last four

 4    numbers.

 5    A    (714) -8575.

 6    Q    And did you know Sheila's number in 2019?

 7    A    Yes, I did.

 8    Q    Can you tell us the --

 9    A    (714) and I think the last is 8772.

10    Q    Now, as of 2019, you were living in Las Vegas; is that

11    right?

12    A    Yes.

13    Q    And about how frequently were you seeing River?

14    A    At first, not a whole lot.  When I first moved up there,

15    maybe once or twice every six months.

16    Q    Why was that?

17    A    Because Sheila was being difficult.

18    Q    And what do you mean by that?

19    A    So Mica and Sheila had to have split custody.  So each one

20    had certain times.  So whenever Mica had River, he wanted to

21    only have River.  And then he only wanted me to take time from

22    Sheila's time.

23    Q    And --

24    A    Kind of hard to work out getting to see her.

25    Q    And when you would see her, would she stay with you?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.  Yes.

 2   Q     So she would go up to Las Vegas at times?

 3   A     Yes.  She has a room in my house.

 4   Q     And did there come a time during the summer of 2019 when

 5   you visited Sheila in connection with a visit with River?

 6   A     Yes.

 7   Q     Tell us about that.

 8   A     So I went down there to go get River, and I went down to

 9   San Juan Capistrano.  She kind of made me stay there for a

10   couple days before I was able to take her.

11   Q     What do you mean by that?

12         MR. WILKE:  Object to the form of the question as a

13   narrative here.

14         MR. SCALLY:  I can --

15         THE COURT:  Just reask the question.

16         THE WITNESS:  Say the question again.

17   Q     BY MR. SCALLY:  Sure.

18         During that visit, you just stated she kind of made

19   you stay there before you could take River.  What did you mean

20   by that?

21   A     She wouldn't let me leave to take River right away.  She

22   made me stay at her house.  Made me.

23   Q     And so what did you do?

24   A     I stayed there.  I didn't want to.  She was very difficult

25   to be around at this time.
```

```
 1              MR. WILKE:  Objection.  Move to strike as
 2    nonresponsive, Your Honor.
 3              THE COURT:  Overruled.
 4    Q    BY MR. SCALLY:  And so where did this visit take place?
11:06AM  5    Was that --
 6    A    This was at her San Juan Capistrano condo.
 7    Q    And now by the time you were on this trip, did you have
 8    tickets to a Billy Idol concert?
 9    A    Yes, I did.
11:07AM 10    Q    And how many tickets did you have?
11    A    Two.
12    Q    And when was that concert scheduled for?
13    A    It was October 4th.
14    Q    Of 2019?
11:07AM 15    A    Of 2019.  October 4, 2019.
16    Q    And where was that concert scheduled to take place?
17    A    So it was in Las Vegas at the Palms hotel.
18    Q    During your visit to Sheila in San Juan Capistrano in the
19    summer of 2019, did you invite Sheila to that concert?
11:07AM 20    A    Yes, I did.
21    Q    Why did you do that?
22    A    I just really, really was hoping to reconnect with her so
23    bad because I really did love her.  And I just thought maybe
24    she'd come up and we have this time, just the two of us
11:08AM 25    together, that maybe things could get better.
```

```
 1   Q    So had -- directing your attention to that weekend,
 2   October 4th, 2019, to your recollection, was that a Friday?
 3   A    Yes.  I believe it was a Friday.
 4   Q    And had you made a reservation to stay at a hotel
 5   somewhere?
 6   A    Yes.  I made a reservation at the Palms for two nights.
 7   Q    And who were you intending to share that room with, if
 8   anyone?
 9   A    So I was going to share it with Sheila.
10   Q    And did you eventually meet up with Sheila?
11   A    Eventually.
12   Q    How did that occur?
13   A    So our plan originally was that Sheila was to come on an
14   airplane to Las Vegas, and I was going to pick her up.  And it
15   was going to be around 11:00 a.m. --
16              MR. WILKE:  Your Honor, I object to the form of the
17   question.  Asking for a narrative.
18              THE COURT:  Overruled.
19              You can respond.
20              THE WITNESS:  So she was to come at 11:00 a.m.  And
21   I got a phone call around 11:00 a.m., saying she had missed her
22   flight.
23              So I said, "What are you going to do?
24              And she said, "I'm going to get another flight."
25              So I said, "Okay.  Just call me when, you know, you
```

11:08AM  (line 5)
11:08AM  (line 10)
11:09AM  (line 15)
11:09AM  (line 20)
11:09AM  (line 25)

```
 1    either land or whatever because it's easy."
 2            She never called me back saying she got on the
 3    plane.  She called me saying she was getting a ride.
 4            And I said "With who?"  And she wouldn't tell me.
 5            She said, "I'll just be driving up."
 6    Q    BY MR. SCALLY:  And driving -- it was your understanding
 7    she was driving from Orange County?
 8    A    Yes.
 9    Q    Okay.  And did you -- at some point that day, did she
10    arrive?
11    A    Yeah.  I believe she arrived between 3:00 and 5:00.  I
12    can't remember exactly the time.
13    Q    And did you eventually meet up with her?
14    A    Yes.
15    Q    And where did that occur?
16    A    In the lobby.  I came downstairs.
17    Q    In the lobby of?
18    A    Of the Palms restaurant -- I mean Palms hotel.  I'm sorry.
19    Q    And who, if anyone, was Sheila with?
20    A    I just noticed she was with three guys that I did not
21    know.
22    Q    None of whom you had met previously?
23    A    None.
24    Q    Okay.  Did she introduce them to you?
25    A    Okay.  So I asked her -- I said right away -- I said, "Who
```

```
 1    are you with?"  And she said --
 2              MR. WILKE:  Your Honor, nonresponsive.  Objection.
 3              THE COURT:  Just reask the question.
 4    Q    BY MR. SCALLY:  Well, did she introduce them to you?
 5    A    She did.
 6    Q    Okay.  Tell us about how that introduction occurred.
 7    A    So she said, "Sandy, this is" -- "that guy's Wayne.  This
 8    guy's Robert.  And the other guy is (indiscernible)."
 9              And I'm, like, "What did she just say?"
10              THE COURT:  The other guy was who?
11              THE WITNESS:  She mumbled and said, "That guy is
12    (indiscernible)."  That's really how she said it.  She said,
13    "That guy is (indiscernible)."
14              So I was kind of pissed because, first of all, I
15    wanted to know where these boys were staying, and I don't know
16    this guy's name.  And I just wanted to make sure they're
17    getting a room.  So we sat there in front of the lobby, trying
18    to get a room for about an hour.  Then --
19    Q    BY MR. SCALLY:  At some point did you follow up with
20    Sheila about the third --
21    A    Yes.
22    Q    -- individual?
23    A    Yeah.  So we were standing there and --
24              THE COURT:  Just a moment.  We're going to stop.
25    Strike the question.  Strike the answer.  You're going to
```

         1    repeat the question.  Slow down, both of you, so we don't have

         2    a talk-over.

         3              THE WITNESS:  I apologize.

         4              THE COURT:  No, you don't have to.

11:11AM  5              But by the same token, Counsel, you'll control this.

         6              MR. SCALLY:  Yes, Your Honor.  Thank you.

         7    Q    Ms. Ritze, at some point did you follow up with Sheila

         8    about the name of the third person she was with, the name that

         9    you had not gotten?

11:12AM 10              MR. WILKE:  Objection.  Calls for hearsay,

        11    Your Honor.

        12              THE COURT:  Overruled.

        13              You can answer the question.

        14              THE WITNESS:  So I did.  I said, "Sheila, I got

11:12AM 15    Wayne's name and I got Robert's name.  But when you said the

        16    other guy's name, you mumbled.  I didn't hear it.  What is his

        17    name?"

        18              She said, "I do not want you to look at him.  I

        19    don't want you to talk to him."  Should I keep going?

11:12AM 20    Q    BY MR. SCALLY:  Please.

        21    A    "We will be offing him this weekend."

        22              MR. WILKE:  I'm going to object.  Move to strike as

        23    hearsay, Your Honor.

        24              THE COURT:  Overruled.

11:12AM 25    Q    BY MR. SCALLY:  How did you -- what did you understand

         1    "offing" to mean?

         2              MR. WILKE:  Objection.  Relevance.  403.

         3              THE COURT:  Overruled.

         4              And you can answer the question.

11:13AM  5              THE WITNESS:  I believe that she was going to kill

         6    him.  That's what I thought "offing" meant.

         7    Q    BY MR. SCALLY:  What was your reaction at the time?

         8    A    I was so shocked.  There's three guys with her, and she's

         9    the one who -- to kill one.  And I don't want them in my room.

11:13AM 10    Q    Did she appear to be joking?

        11    A    No, she was not joking.

        12              MR. WILKE:  Objection.  Move to strike, Your Honor.

        13    Speculation.

        14              THE COURT:  Overruled.

11:13AM 15    Q    BY MR. SCALLY:  Did you confront Sheila at that time

        16    about that statement?

        17    A    Yes.

        18    Q    What, if anything, do you remember saying?

        19    A    She basically was telling me -- well, she did tell me not

11:13AM 20    to look at this guy or talk to him.  That was really it.

        21              MR. WILKE:  Objection.  Move to strike as hearsay.

        22              THE COURT:  Overruled.

        23    Q    BY MR. SCALLY:  I guess what I mean to ask is did you

        24    follow up with Sheila and ask her further questions at that

11:13AM 25    time?

```
 1  A    Not really, no.  I didn't know what to say.  I was in
 2  shock.
 3  Q    Now I'm going to show you -- I'm going to ask you to take
 4  a look at the exhibits in front of you.  Should be the second
 5  page in the exhibits there.  There should be an Exhibit 104.
 6  And I'll ask if you recognize that.
 7  A    Yes, I do.
 8  Q    What do you recognize?
 9              THE COURT:  Just a minute.  Exhibit 104?
10              MR. SCALLY:  I'm sorry.  Yes, Your Honor.
11              THE COURT:  And then your question, Counsel.
12  Q    BY MR. SCALLY:  What do you recognize Exhibit 104 to be?
13  A    This is a picture I took of Robert, Sheila, and Wayne as
14  we were standing out front of the Palms hotel.
15  Q    Okay.  And to the best of your recollection, was that
16  taken the next day?
17  A    Yes.
18              MR. SCALLY:  Okay.  Your Honor, I'd move to admit
19  Exhibit 104 into evidence.
20              THE COURT:  Received.
21              (Exhibit Number 104 received.)
22  Q    BY MR. SCALLY:  Okay.  And, Ms. Ritze, I've put
23  Exhibit 104 up on the screen.  Can you indicate who's who in
24  this photograph.
25  A    Robert is on the left and Wayne is on the right.  And
```

11:14AM (line 5)
11:14AM (line 10)
11:14AM (line 15)
11:15AM (line 20)
11:15AM (line 25)

1    Sheila would be the girl in the middle.

2    Q    What happened after the introductions in the lobby?  Did

3    there come a time that members of this party went up to your

4    room?

11:15AM 5    A    Yes.  We stayed in line forever, trying to get them a

6    reservation is what I thought we were doing.  And then all of a

7    sudden, they just walked over and Sheila said, "No.  They just

8    have to go to your room.  There's no rooms right now."

9    Q    I'm going to ask you to just slow down.

11:16AM 10             THE COURT:  Just one moment.

11             Did the court reporter get that?  If not, I'll have

12   her repeat it.

13             THE REPORTER:  Yes, I got it.

14             THE COURT:  Okay.  Thank you.

11:16AM 15             Court reporter was able to get that.

16             THE WITNESS:  I'm sorry.  I will slow down.  I

17   apologize.

18   Q    BY MR. SCALLY:  So at some point did you proceed to your

19   room?

11:16AM 20   A    Yes.

21   Q    And who all went up to your room?

22   A    All four of us.

23   Q    And when you say "all four," who are you referring to?

24   A    So that would be myself, Sheila, Wayne, and Robert.

11:16AM 25   Q    And what about the other --

```
 1   A    Oh, I'm sorry.  The five of us.  I apologize.  And the
 2   other gentleman I still don't know the name of.
 3   Q    Okay.
 4   A    I apologize.
 5   Q    And that other gentleman, was he Asian?
 6   A    Yes, he appeared to be.
 7   Q    And so did those five people hang out in your room at the
 8   Palms Casino for some period of time?
 9   A    Yes.
10   Q    Okay.  And was that all before the concert?
11   A    Yes.
12   Q    Did there come a time -- you went to the concert?
13   A    Yes.
14   Q    And did you go by yourself, or did you go with Sheila?
15   How did that work?
16   A    I went at first by myself because she wouldn't come with
17   me at first.  So I just left by myself.
18   Q    Had you gotten a sense by that time if Sheila had been
19   drinking?
20   A    Yes, she had been.
21   Q    I'm sorry.  Can you repeat that.
22   A    Yes, she had been drinking.
23   Q    Okay.  At some point did she join you at the concert?
24   A    Yes.
25   Q    Okay.  I'm going to show you what's already in evidence,
```

1    I believe, as Exhibit 105 and ask if you can tell us who's in

2    that photograph.

3    A    This is Sheila on the left, and this is me on the right.

4    Q    Where is that photograph taken?

11:18AM  5    A    This is sitting in our seats at the concert.

6    Q    On October 4th?

7    A    Yes.  This would be October 4th.

8    Q    Okay.  And I'll ask you to look in the pile in front of

9    you at Exhibit 106.  And I'll ask if you recognize that.

11:18AM 10    A    Yeah.  That's the concert.

11    Q    Is that a fair and accurate photograph of the concert?

12    A    I'd say yes.

13           MR. SCALLY:  Move to admit Exhibit 106, Your Honor.

14           MR. WILKE:  No objection.

11:18AM 15           THE COURT:  Received.

16           **(Exhibit Number 106 received.)**

17    Q    BY MR. SCALLY:  Is that a photo basically from your seats

18    at the Billy Idol concert?

19    A    Yes.

11:18AM 20    Q    Now, after the concert, did you and Sheila go back to

21    your room?

22    A    Yes.

23    Q    And who was in the room when you arrived?

24    A    So I was hoping nobody was going to be in my room because

11:19AM 25    they were supposed to have gotten a room.  So when I went to

```
  1   open my door with my key, the hotel lock was locked.  So I
  2   pushed on it.
  3          And I looked at Sheila, and I go, "Sheila, you told
  4   me they were going to be gone," and kind of got a little bit
  5   pissed at her for that.
  6          I don't know if you want me to go on.
  7   Q   I'm sorry.  So who -- and let me ask you had you been
  8   drinking that evening?
  9   A   I had about one drink.  Sheila -- no.  I had one drink,
 10   yes.
 11   Q   You had about one drink?
 12   A   Yeah, about one drink.
 13   Q   Fair to say you were not drunk?
 14   A   No, I was not drunk.
 15   Q   So who was in the room when you arrived?
 16   A   So when I came upstairs this time, Wayne opened the door,
 17   and Robert was still there as well.
 18   Q   And what about the third gentleman whose name you had not
 19   gotten?  Was he in the room at that time?
 20   A   No.  He was gone.
 21   Q   Okay.  So did you and Sheila go into the room?
 22   A   Yes, we did.
 23   Q   And so was there a period of time where you, Sheila,
 24   Wayne, and Robert hung out in the hotel room that night?
 25   A   Yes.
```

**UNITED STATES DISTRICT COURT**

```
            1   Q    Did you make conversation with Wayne during that period
            2   of time?
            3   A    Yes.
            4   Q    What, if anything, did you talk about?
11:20AM     5   A    So we talked about their jobs, and we talked about the
            6   boat.
            7   Q    Let me ask you did you at some point ask where the other
            8   guy was?
            9   A    Yes, I did.
11:21AM    10   Q    And how did Wayne respond?
           11   A    It was -- Wayne responded.  And he said that they had
           12   offed him.
           13   Q    What else did he say about that, if you remember?
           14   A    He didn't say anything else about that right then.
11:21AM    15   Q    Okay.  Did he talk about a debt?
           16   A    Yes, he did.
           17              MR. WILKE:  Objection.  Leading.
           18              THE COURT:  Overruled.
           19   Q    BY MR. SCALLY:  What did he say?
11:21AM    20   A    Well, he -- so the guy's gone.  So I'm just asking why the
           21   guy's gone, and he said the guy owed him money.  And he said he
           22   owed him between 20- and $40,000 and that he couldn't get the
           23   money from the guy.  So he was going to find a way to get it, I
           24   guess.
11:22AM    25   Q    Did he say anything about what he was going to do to the
```

| | |
|---|---|
| 1 | guy? |
| 2 | A     Yes. |
| 3 | Q     What did he say? |
| 4 | A     He said he was going to off him.  That's what they said. |
| 11:22AM 5 | They were going to off him. |
| 6 | Q     I'm sorry.  Let's -- just to be clear, that's what Wayne |
| 7 | said? |
| 8 | A     Yes.  He said it as well. |
| 9 | Q     I'm sorry.  Can you repeat that? |
| 11:22AM 10 | A     Yes.  He did say it as well as Sheila had said it. |
| 11 | Q     Did Wayne appear serious? |
| 12 | A     Yes.  He seemed extremely serious. |
| 13 | Q     Was Sheila present during those statements? |
| 14 | A     Yes. |
| 11:23AM 15 | Q     Did you ask Wayne about how he would get his money if he |
| 16 | offed the guy? |
| 17 | A     Yes.  He said that he wouldn't get his money from the guy |
| 18 | because it would have to be satisfaction that way.  He said he |
| 19 | wouldn't get the money. |
| 11:23AM 20 | Q     He wouldn't get the money, but -- |
| 21 | A     He would off him for satisfaction. |
| 22 | Q     For whose satisfaction, did you understand? |
| 23 | A     Himself.  Wayne's satisfaction. |
| 24 | Q     Did Wayne talk about Sheila's boat? |
| 11:23AM 25 | A     Yes, he did; she as well. |

UNITED STATES DISTRICT COURT

```
 1   Q     I'm sorry?
 2   A     She did as well.  They both had a conversation.
 3   Q     And what did they say?
 4   A     So they started talking about going out on --
11:23AM 5  Q     I'm sorry.  I want to make sure we're clear about who's
 6   saying what.
 7   A     Okay.  So she and Wayne were both talking.  Robert wasn't
 8   really talking that much.  He was very quiet.  So Sheila and
 9   Wayne were talking about using the boat as a guise to go
11:24AM 10 lobster hunting at night and take someone out there and off
11   them, and how easy it would be to do that.
12   Q     Did they say anything about how far out they would go?
13   A     No.  I never heard anything about how far they'd go out,
14   that I remember.
11:24AM 15 Q     Did Wayne talk about having access to that boat?
16            MR. WILKE:  Objection.  Leading.
17            THE COURT:  Overruled.
18            You can answer the question.
19            THE WITNESS:  He knew Sheila had the boat.
11:24AM 20            MR. WILKE:  Objection.  Move to strike as
21   speculation.
22            THE COURT:  Stricken.
23            Reask the question, Counsel.
24            MR. SCALLY:  Thank you, Your Honor.
11:24AM 25 Q     Did he talk about having access to her boat?
```

UNITED STATES DISTRICT COURT

|   |   |
|---|---|
| 1 | MR. WILKE:  Objection.  Leading. |
| 2 | THE COURT:  Overruled. |
| 3 | You can answer that question. |
| 4 | THE WITNESS:  Yes.  He said he knew he had access. |
| 11:25AM 5 | He and Sheila were very good friends. |
| 6 | Q   BY MR. SCALLY:  Do you remember anything else that he |
| 7 | said about that boat? |
| 8 | A   No, I don't remember him saying anything else about the |
| 9 | boat. |
| 11:25AM 10 | Q   Would it refresh your recollection to look at a |
| 11 | transcript of your grand jury testimony? |
| 12 | A   Yeah. |
| 13 | MR. SCALLY:  Your Honor, may I approach the witness? |
| 14 | THE COURT:  You may. |
| 11:26AM 15 | Q   BY MR. SCALLY:  I'll direct your attention to lines 5 |
| 16 | through 8.  Please let me know when you're done reading that. |
| 17 | A   Okay.  I thought I said that. |
| 18 | Q   Ms. Ritze, does that refresh -- |
| 19 | THE COURT:  Just a moment.  If you'd go back to the |
| 11:26AM 20 | microphone, please. |
| 21 | MR. SCALLY:  I apologize, Your Honor.  Yes. |
| 22 | THE COURT:  Thank you. |
| 23 | Q   BY MR. SCALLY:  Did that refresh your recollection? |
| 24 | A   Yes. |
| 11:26AM 25 | Q   And what, if anything else, did Wayne say about the boat? |

 1    A    Wayne said that he could take somebody out on that boat

 2    any time and off them; that Sheila would allow him to take the

 3    boat and she'd drive.  She was a good -- a very good captain.

 4    Q    And what, if anything, did Sheila say about the lobster

11:27AM  5    trip?

 6    A    Well, she was very willing to go along with everything he

 7    said.

 8            MR. WILKE:  Objection.  Move to strike as

 9    speculation, Your Honor.  Nonresponsive.

11:27AM 10            THE COURT:  Sustained.  Stricken.

11            Reask the question, Counsel.

12            MR. SCALLY:  If I could have just a brief moment,

13    Your Honor.

14            THE COURT:  Certainly.

11:27AM 15            **(Pause in proceedings.)**

16    Q    BY MR. SCALLY:  Now, during the statements you've been

17    talking about, were both Wayne and Sheila present for all of

18    these statements?

19    A    Yes.

11:27AM 20    Q    Do you recall a statement from Wayne concerning a

21    girlfriend?

22    A    Yes.

23    Q    What was that, to your recollection?

24    A    It was very brief.  He had mentioned that there was a

11:28AM 25    girlfriend that really liked the guy and that she was going to

```
 1   be a problem.
 2   Q    And when you say "the guy" --
 3   A    I'm sorry.  I never knew his name.
 4   Q    But who is your understanding of who they were referring
 5   to?
 6           MR. WILKE:  Objection.  Calls for speculation.
 7   Irrelevant.  403.
 8           THE COURT:  Overruled.
 9           You can answer the question.
10           THE WITNESS:  I knew exactly who they were talking
11   about.  They were talking about the guy that Sheila mumbled his
12   name and the guy that was gone.
13   Q    BY MR. SCALLY:  Now, did they end up staying in the room?
14   A    Yes.
15   Q    And the next day --
16   A    No.  We went out -- the next day hasn't happened yet.  We
17   went out for a little bit.
18           MR. WILKE:  Objection, Your Honor.  There's no
19   question pending here.
20           THE COURT:  Counsel, your question.
21           MR. SCALLY:  I'll ask the question.  Thank you,
22   Your Honor.
23   Q    What did you do the next day?
24   A    So the next day we went to a track where we road little
25   cars.
```

UNITED STATES DISTRICT COURT

```
 1   Q    And I'm going to show you -- well, sitting in front of
 2   you should be 169.  I'll ask you if you recognize that.
 3   A    Okay.
 4   Q    Do you recognize that?
 5   A    Yes.
 6   Q    What is that?
 7   A    So this actually is in front of the Palms.  It's just a
 8   picture of Robert, Sheila, and I.
 9   Q    And does that fairly and accurately depict you, Robert,
10   and Sheila on that date?
11   A    Yes.
12            MR. SCALLY:  Your Honor, I'd move to admit
13   Exhibit 169.
14            THE COURT:  Received.
15            (Exhibit Number 169 received.)
16   Q    BY MR. SCALLY:  So putting that up on the screen, can you
17   indicate who's who in that photo?
18   A    Yes.  Sheila is on the left, the girl.  Next to her is
19   Robert.  And I'm in the background waving.
20   Q    And are you sort of smiling in that photo?
21   A    Sort of, yeah.
22   Q    And did you say that you proceeded to a -- where did you
23   go together that day?
24   A    So we went to this car racing place where you could rent
25   little cars and you race.
```

11:29AM  5

11:30AM  10

11:30AM  15

11:30AM  20

11:30AM  25

```
 1   Q    And if you look behind that exhibit to the next page,
 2   I'll ask you to look at actually pages -- Exhibits 170 and 171
 3   and ask if you recognize those.
 4   A    Yes, I do.
 5   Q    And are those photos from the racetrack?
 6   A    Uh-huh.  Yes, they are.
 7            MR. SCALLY:  Your Honor, I'd move to admit
 8   Exhibits 170 and 171.
 9            THE COURT:  170 and 171 are received.
10            (Exhibit Numbers 170 and 171 received.)
11   Q    BY MR. SCALLY:  So showing you 170, do you see your name
12   up there?
13   A    Yes, I do.
14   Q    And do you see Sheila's name?
15   A    Yes, I do.
16   Q    And do you see Wayne's name?
17   A    No.  Oh, yes, I do.  Wayne.  Sorry.  Wayne's down there.
18   Q    And showing you 171, can you identify the individuals in
19   that photograph?
20   A    I believe that's Robert first.  That would be Sheila, me.
21   And I do not see Wayne in this picture.
22   Q    Now, did -- did this trip eventually end?
23   A    Yes.
24   Q    And so did Sheila go back to Southern California, to your
25   knowledge?
```

```
      1  A    Yes.

      2  Q    And did you separate from Wayne and Robert as well?

      3  A    They left shortly after the racing.

      4  Q    Did you contact law enforcement at that time?

11:32AM 5  A    No, I did not.

      6  Q    Why not?

      7  A    Well, a number of reasons.  I was scared.  I talked to my

      8  brother.  He said to keep out of it.  So I did not call any law

      9  enforcement.

11:33AM 10 Q    Did you -- when did you ultimately contact law

     11  enforcement?

     12  A    When I found out what had happened.  When I read the --

     13  when my son had called me and told me that Sheila had been

     14  arrested.

11:33AM 15 Q    And which son was that?

     16  A    This would be Matt.  Matthew.  This would be Matthew.

     17  Q    And so what did you do?

     18  A    Well, I read it and I freaked out because it said that she

     19  wasn't part of it, and I knew she was.

11:33AM 20 Q    And so did you contact law enforcement at that time?

     21  A    Yes, I did.

     22  Q    Was that within a few days of reading the news?

     23  A    Yes.

     24  Q    Now, did you then meet with law enforcement?

11:33AM 25 A    Yes, I did.
```

UNITED STATES DISTRICT COURT

```
          1    Q    Did they ask you for consent to download your phone?
          2    A    Yes, they did.
          3    Q    What did you say?
          4    A    I said "Yes."
11:34AM   5    Q    And so are we in possession of basically your entire
          6    phone?
          7    A    Pretty much, yes.
          8    Q    Did you -- who's Ryan Villmer?
          9    A    Ryan would be my son.
11:34AM  10    Q    Okay.  And so he's another son of yours?
         11    A    Yes.  I have four boys.
         12    Q    And did you text Ryan during the weekend that Sheila
         13    brought some people with her and they're nice enough?
         14    A    Yes, I did.
11:34AM  15    Q    What were you thinking when you sent that text?
         16    A    So "nice enough" to me means something probably different
         17    than probably someone would think.  "Nice" -- I meant "Yeah,
         18    they're nice enough."  But I was just scared to tell my son
         19    anything because he would have got mad at me.
11:35AM  20    Q    Why would he get mad at you?
         21    A    He would have made me leave.  He would have said, "Why did
         22    you stay?"
         23    Q    Why did you stay?
         24    A    Because I was trying to get back with Sheila.  And I kept
11:35AM  25    hoping that Wayne and Robert would leave.  Sorry.
```

**UNITED STATES DISTRICT COURT**

```
  1   Q     What is the -- did you have much contact with Sheila

  2   after that weekend?

  3   A     Not really.

  4   Q     Do you -- who is -- tell us about the custody of your

11:35AM 5   granddaughter.  What's that situation like right now?

  6   A     Right now?  Mica has full custody now.

  7   Q     And prior to you learning of Sheila's arrest --

  8   A     Uh-huh.

  9   Q     -- what was the situation?

11:36AM 10   A     Well, it was pretty bad because Sheila was not being a

 11   good mom, in my opinion.

 12   Q     Why not?

 13   A     Sorry?

 14           MR. WILKE:  Objection.  Relevance.  403.

11:36AM 15           THE COURT:  No.  Overruled.

 16           You can answer the question.

 17           THE WITNESS:  Ask me again.

 18   Q     BY MR. SCALLY:  Why -- or how was it that Sheila was not

 19   being a good mom?

11:36AM 20   A     She was overdrinking and drinking and driving with my

 21   daughter in the car -- my granddaughter in the car.  She was

 22   treating her horribly, and it was sad to see.  Sorry.

 23   Q     Who is Shannon Love?

 24   A     Shannon Love is my niece.  She lives in Vegas.

11:36AM 25   Q     And after Sheila's arrest, did you have some text contact
```

1   with Shannon?

2   A     Yes.  We text all the time.

3   Q     And at some point did you say to Shannon via text, "Keep

4   that witch in jail"?

11:37AM 5   A     I might have, yes.

6   Q     Why did you say that?

7   A     At the time I was very upset with her.  I mean, I just

8   can't even explain how sad and everything this seemed.  Yeah, I

9   might have said that.

11:37AM 10   Q     Well, would it refresh your recollection to see a --

11   you're not saying you didn't say that?

12   A     No.  I most likely -- yes, I most likely -- yes, I said

13   that.

14   Q     Okay.  Do you know somebody by the name of Natalie

11:37AM 15   Nguyen?

16   A     No.

17   Q     Do you know somebody by the name of Tony Hoang?

18   A     No.

19   Q     Do you know somebody by the name of Vinh Doan?

11:38AM 20   A     No.

21   Q     Since that weekend, have you ever met Robert again?

22   A     No.

23   Q     Do you like Robert?

24   A     He was all right.

11:38AM 25              MR. SCALLY:  If I could have a brief moment,

| | |
|---|---|
| 1 | Your Honor. |
| 2 | THE COURT:  Certainly. |
| 3 | **(Counsel conferred off the record.)** |
| 4 | MR. SCALLY:  I have nothing further.  Thank you, |
| 11:39AM 5 | Your Honor. |
| 6 | THE COURT:  Cross-examination, please. |
| 7 | MR. WILKE:  Thank you, Your Honor. |
| 8 | **CROSS-EXAMINATION** |
| 9 | BY MR. WILKE: |
| 11:39AM 10 | Q    Good morning, Ms. Ritze. |
| 11 | A    Good morning. |
| 12 | Q    Since Sheila's been arrested, what's been -- how often |
| 13 | have you seen River? |
| 14 | A    Oh, many times. |
| 11:39AM 15 | Q    Mica has full custody? |
| 16 | A    Yes, he does. |
| 17 | Q    And he lets you take River to come stay with you; |
| 18 | correct? |
| 19 | A    Yes. |
| 11:40AM 20 | Q    She now has a bedroom at your house in Las Vegas; |
| 21 | correct? |
| 22 | A    She's always had a bedroom at my house. |
| 23 | THE COURT:  Counsel, just a little closer with the |
| 24 | mic.  Thank you. |
| 11:40AM 25 | Q    BY MR. WILKE:  You said ever since she moved to |

```
  1  Las Vegas, River's always had a bedroom there; correct?
  2  A    She's always had a bedroom in my house since she was born.
  3  Q    Even when you were living on the same property?
  4  A    Correct.
  5  Q    So you are -- feel very close to River?
  6  A    Yes, we are very close.
  7  Q    I think you described her as your favorite person in the
  8  world?
  9  A    Favorite person.
 10  Q    When you first learned about Sheila's arrest, that was
 11  the very day she was arrested; correct?
 12  A    Right around there.  I don't know if it was the same exact
 13  day.  It might have been.
 14  Q    December 19th, 2019, does that sound right?
 15  A    Okay.  Yeah, I don't remember the exact day.
 16  Q    Do you remember it being approximately one week before
 17  Christmas of that year?
 18  A    I remember it was in December, the beginning of December.
 19  Q    Okay.  And you learned about it because your son called
 20  you?
 21  A    Yes.  Matt.
 22  Q    Would that be your son Matt?
 23  A    No, it would be Matthew who called me.
 24  Q    Matthew was the first one that told you about it?
 25  A    Correct.
```

11:40AM 5
11:40AM 10
11:40AM 15
11:41AM 20
11:41AM 25

1    Q    And he had seen it on the news?

2    A    Yes.

3    Q    And when he told you about it, you looked at the news;

4    correct?

11:41AM 5    A    You know what?  I was trying to think how he saw it, and I

6    just remembered his -- okay.  So Kathy is the property

7    manager's -- she's the owner of the Team Management that Sheila

8    worked for.  She called Matthew and told Matthew.

9    Q    So Sheila's boss?

11:41AM 10   A    Sheila's boss, okay, called Matthew and told him.

11   Q    And Matthew told you?

12   A    Correct.

13   Q    And that all happened shortly after Sheila was

14   arrested --

11:42AM 15   A    Yes.

16   Q    -- in December of 2019?

17   A    Yes.

18   Q    Okay.  And did you know the people over at Team Property

19   Management?

11:42AM 20   A    Yes.

21   Q    Because you did business with them in the past; right?

22   A    Yes.

23   Q    And did you speak to any of them as well about the

24   situation with Sheila?

11:42AM 25   A    No.

**UNITED STATES DISTRICT COURT**

```
 1    Q    Ever?
 2    A    I have since then, yes, I have.  About three months ago I
 3    did see them.
 4    Q    Okay.  And you talked about the situation with Sheila
11:42AM  5    when you saw them?
 6    A    Briefly.
 7    Q    Okay.  And in the days and weeks following Sheila's
 8    arrest, did you speak to any of those people at her place of
 9    employment?
11:42AM 10    A    No.
11    Q    None of them at all?
12    A    No.  I'm retired.
13    Q    Excuse me?
14    A    I'm retired.  So I don't talk to them as much.
11:42AM 15    Q    Okay.  Were you friends with any of them, though, even
16    after you stopped -- even after you retired?
17    A    Not really.
18    Q    Do you know --
19    A    Acquaintances.
11:43AM 20    Q    Do you know anybody named Angela Mesa?
21         THE COURT:  I'm sorry.  Angela Mesa?
22         MR. WILKE:  Mesa.
23         THE COURT:  Thank you.
24    Q    BY MR. WILKE:  Is -- she's a friend of yours?
11:43AM 25    A    Yes, she is.
```

UNITED STATES DISTRICT COURT

```
         1   Q    Did she also work for Team?

         2   A    No.

         3   Q    But did she also know Sheila?

         4   A    Yes.

11:43AM  5   Q    Did you speak to Angela Mesa about the arrest?

         6   A    Yes.

         7   Q    Many times?

         8   A    No.

         9   Q    But at the time that you learned about the arrest?

11:43AM 10   A    Yes.

        11          MR. WILKE:  Can I have a moment, Your Honor?

        12          (Counsel conferred off the record.)

        13   Q    BY MR. WILKE:  After you spoke to Matthew, you went to

        14   the Internet to find out what you could?

11:44AM 15   A    Yes.

        16   Q    You accessed the Internet through your phone; correct?

        17   A    iPad.

        18   Q    iPad?

        19   A    Uh-huh.

11:44AM 20   Q    Okay.  And you were looking for the news reports?

        21   A    Sure.  Yeah.

        22   Q    And you found them?

        23   A    Yes.

        24   Q    That's a "yes"?

11:44AM 25   A    Yes.
```

|  |  |
|--|--|
| 1 | Q     And you read them? |
| 2 | A     Yes. |
| 3 | Q     Did you also see the TV reports? |
| 4 | A     No.  I've never -- I'm in Vegas.  Nothing was on up there. |
| 11:44AM 5 | Q     But you did see the news reports from, for instance, the |
| 6 | "Los Angeles Times"? |
| 7 | A     "The Register." |
| 8 | Q     "The Orange County Register"? |
| 9 | A     I think that was it. |
| 11:44AM 10 | Q     Well, you actually looked at multiple news reports; |
| 11 | correct? |
| 12 | A     I might have, yes. |
| 13 |        MR. WILKE:  Can I have a moment? |
| 14 |        THE COURT:  Certainly. |
| 11:45AM 15 |        **(Counsel conferred off the record.)** |
| 16 | Q     BY MR. WILKE:  You looked at Internet news reports from |
| 17 | NBC Los Angeles; correct? |
| 18 | A     I'm going to be honest.  I have no idea which ones they |
| 19 | were.  I just read -- it came up on the Internet and I just |
| 11:45AM 20 | read it.  I didn't pay attention.  So I don't know which |
| 21 | magazine.  I did not see it on the news, though. |
| 22 | Q     Okay.  That's fine. |
| 23 |        Ms. Ritze, isn't it true that, on December 19th, |
| 24 | 2019, you looked at 32 -- |
| 11:46AM 25 |        THE COURT:  Counsel just a moment, please. |

62

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | **(Pause in proceedings.)**                                  |
| 2   | THE COURT:  My apologies.  Just one moment, Counsel.          |
| 3   | **(The Court and clerk conferred off the record.)**          |
| 4   | THE COURT:  Thank you, Counsel.  My apologies.               |
| 5   | Please proceed.                                              |
| 6   | MR. WILKE:  Thank you, Your Honor.                           |
| 7   | Q   Ms. Ritze, isn't it true that, on December 19th, 2019,   |
| 8   | after hearing from Matt Ritze about Sheila's arrest, you looked |
| 9   | at 30 different news reports on the Internet?                |
| 10  | A   I have no idea how you'd know that.  But, I mean, I might |
| 11  | have -- I'm not real great on the computer all the time.  So I |
| 12  | might have been messing around.  But -- I don't know 30 times, |
| 13  | but okay.  I have no idea if it's 30 times.                  |
| 14  | Q   Okay.  You were on the Internet, searching this issue    |
| 15  | from approximately 9:30 at night?                           |
| 16  | A   Okay.                                                    |
| 17  | Q   Does that sound about right?                             |
| 18  | A   Maybe.                                                   |
| 19  | Q   No.  Excuse me.  From approximately 9:30 in the morning. |
| 20  | A   I really have no recollection.  I just remember looking it |
| 21  | up.  It could have been 100 times.  It could have been 10.  I |
| 22  | have no idea.                                                |
| 23  | Q   Okay.  And you continued looking at the Internet about   |
| 24  | this issue until about 3:00 o'clock in the afternoon?        |
| 25  | A   Honestly, I've done it -- for the last four years, I've  |

Timestamps in left margin: 11:47AM (line 5), 11:47AM (line 10), 11:47AM (line 15), 11:48AM (line 20), 11:48AM (line 25)

         1    been looking it up.

         2    Q    You had been reading news reports about the case?

         3    A    Trying to find out -- yes.  See what's going on, yes.

         4    Q    But that very first day, December 19th, you spent four

11:48AM  5    hours reading news reports about this; correct?

         6    A    I do not recollect four hours at all.  I don't recollect

         7    that long.

         8            Did you guys go on my phone?  Is that how you know

         9    this?

11:49AM 10    Q    Well, if I showed you a printout of your Internet

        11    activity from December 19, 2019, from your phone, would that

        12    refresh your recollection about how long you were on the phone,

        13    looking up news articles about Sheila's arrest?

        14    A    Well, since I have no memory of it at all, probably that

11:49AM 15    would not really help me.

        16    Q    Okay.  One of the -- one moment.

        17            **(Counsel conferred off the record.)**

        18    Q    BY MR. WILKE:  One of the things you found on the

        19    Internet was a press release that was issued by the

11:50AM 20    United States Attorney's Office; correct?

        21    A    Okay.

        22    Q    And it described the allegations that had been made in

        23    court about what had happened; correct?

        24    A    I guess so.

11:50AM 25    Q    And you learned from those allegations that a person was

**UNITED STATES DISTRICT COURT**

 1  shot and thrown overboard; correct?

 2  A    Correct.

 3  Q    From Sheila's boat; correct?

 4  A    Correct.

11:50AM 5  Q    And it was a person identified as Wayne Le; correct?

 6  A    Correct.

 7  Q    And you recognized the name as the person that you had

 8  met in Las Vegas; correct?

 9  A    Yes.

11:50AM 10  Q    And you also read allegations in that press release about

 11  how this alleged murder was over a debt for approximately

 12  $30,000; correct?

 13  A    I read that, yes.

 14        THE COURT:  Counsel, before your next question, does

11:51AM 15  either counsel mind if we bring in the gentleman who was

 16  supposed to be here at 11:45 -- Karlen just informed me that

 17  he's outside -- unrelated to this case, of course?

 18        MR. WILKE:  Oh, that's fine.  Are we going to break,

 19  then, at this time?

11:51AM 20        THE COURT:  Well, no.  We can bring him in while you

 21  finish your questions.

 22        MR. WILKE:  I have significantly more questions.

 23        THE COURT:  Pardon me?

 24        MR. WILKE:  It's seven minutes to noon right now.  I

11:51AM 25  have significantly more questions of this witness.

1          THE COURT:  I know you do.  You're not hearing me.

2     I'm simply asking, during the remainder of the ten minutes

3     before lunch, if he's to remain outside or can he come in and

4     have a seat?

11:51AM 5          **(Counsel conferred off the record.)**

6          MR. WILKE:  I have no objection.

7          MR. SCALLY:  There's a stipulation to him coming

8     into the courtroom.  That's fine, Your Honor.

9          THE COURT:  Ladies and gentlemen, this is unrelated

11:52AM 10    to this case or the substance of this case.

11          I'm sorry, Counsel.  Please continue.

12          MR. WILKE:  Thank you, Your Honor.

13          THE COURT:  And then take a convenient breaking

14     point in your cross-examination, what's comfortable for you.

11:52AM 15          MR. WILKE:  I can fill probably the next five or ten

16     minutes, Your Honor.

17     Q    You learned from reading these news reports that there

18     was an allegation that Mr. Le had made statements about

19     committing this crime; correct?

11:52AM 20          THE COURT:  Counsel, would you repeat that.  Would

21     you go back to that mic.  And I apologize, but we can't hear.

22     Thank you.

23     Q    BY MR. WILKE:  Ms. Ritze, from reading the news reports

24     and the United States Attorney's press release, you learned

11:52AM 25     that there was an allegation that Mr. Le had confessed to a

1  confidential informant; correct?

2  A    Yes.

3  Q    You learned from reading these news reports that Mr. Le

4  had supposedly said that he had confronted the victim over a

11:53AM 5  debt and shot the victim; correct?

6  A    Correct.

7  Q    And you learned from these news reports that Mr. Le

8  supposedly said that he had tied weights to the victim's ankles

9  and sank the victim's body in the ocean.  Do you remember

11:53AM 10  reading that?

11  A    Okay.

12  Q    Do you remember reading that?

13  A    Yes.

14  Q    You also learned from reading these news reports that

11:53AM 15  this confidential informant had stated that Mr. Le confessed to

16  him that he had killed the victim over this debt, this $30,000

17  debt that you spoke of; correct?

18  A    Correct.

19  Q    Initially, though, when Sheila was arrested, she was not

11:54AM 20  initially charged with murder, was she?

21  A    Correct.

22  Q    And you learned that she had been charged only as being

23  an accessory after the fact to murder; correct?

24  A    Yes.

11:54AM 25  Q    Now, that week, that week before Christmas of 2019, did

```
        1   you speak to Mica?

        2   A     I don't remember.

        3   Q     Isn't it, in fact, true that River came out to stay with

        4   you?

11:55AM  5   A     Yes, she stayed out with me many times.  I don't remember

        6   if it was right then.

        7   Q     Didn't she spend the Christmas holiday with you?

        8   A     Oh, after -- yes, she did, I believe.  Yes.  After

        9   Christmas.

11:55AM 10   Q     And for how long did she stay with you?

       11   A     Probably a week.

       12   Q     Okay.  In fact, when you first spoke to the agents on

       13   January 3rd, 2020, you were out in Southern California to drive

       14   River back and return her to Mica; correct?

11:55AM 15   A     Okay --

       16           MR. SCALLY:  Objection.  Misstates the testimony.

       17   Assumes facts not in evidence.

       18           MR. WILKE:  I can rephrase.

       19   Q     You first spoke to FBI agents on January 3rd, 2020;

11:55AM 20   correct?

       21   A     Correct.

       22   Q     Okay.  And you were out -- and you spoke with them in

       23   Southern California; correct?

       24   A     Yes.

11:56AM 25   Q     At a Starbucks in Orange, I believe?
```

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    And you, in fact, had contacted the FBI; correct?

3    A    Yes.

4    Q    Told them you had information, you wanted to talk to

11:56AM 5    them?

6    A    Yes.

7    Q    And you were coming out to California because you were

8    bringing Mica -- bringing River back to Mica?

9    A    Okay.  Yes.

11:56AM 10         MR. WILKE:  Your Honor, this might be a good place

11   to break.

12         THE COURT:  All right.  Ladies and gentlemen, I'm

13   going to ask you to return at 1:15, an hour and 20 minutes.

14   You're admonished not to discuss this matter amongst

11:56AM 15   yourselves, nor form or express any opinion concerning the

16   case.  Have a nice lunch.  Thank you.

17         **(Out of the presence of the jury.)**

18         THE COURT:  Could we have Juror Number 8 -- and I

19   forgot the name.  I think it's Natalie Adams.  If you could

11:57AM 20   remain for just a moment.  Ms. Adams, if you'd have a seat for

21   just a moment.

22         Counsel, if you'd be seated for just a moment.

23         We're on the record.  All counsel are present still

24   as well as the --

11:58AM 25         If you'd have a seat, please, in the audience --

```
 1   thank you -- as well as the defendant.

 2             You were very kind, and we want to thank you for

 3   disclosing the information so promptly.  I don't know that it

 4   has any bearing, but just to be safe, I think all counsel

 5   wanted the Court to address you.

 6             JUROR NUMBER 8:  Yes.

 7             THE COURT:  You informed Karlen, our clerk, during

 8   the recess that you might have recognized or have some

 9   knowledge of the gentleman, Mr. Secrest, I think --

10             JUROR NUMBER 8:  Yes.

11             THE COURT:  -- who was involved in some kind of

12   fishing expertise.

13             JUROR NUMBER 8:  Yes.

14             THE COURT:  Could you tell us a little bit of what

15   you know about him; and, if there is some kind of

16   acquaintanceship, what that acquaintanceship is.

17             JUROR NUMBER 8:  Sure.  So I've never met him.  So I

18   do not know him personally.  But my sister's fiancé is a

19   fisherman as well as my roommate's boyfriend.  He's a fisherman

20   as well.  So that name, like, rang a bell as soon as they said

21   "fishermen."

22             THE COURT:  So you have no friendship with him?

23             JUROR NUMBER 8:  No.  Not at all.

24             THE COURT:  You've never met the gentleman?

25             JUROR NUMBER 8:  Exactly.
```

**UNITED STATES DISTRICT COURT**

           1          THE COURT:  But you know of his relationship to

           2  fishing in some way through --

           3          JUROR NUMBER 8:  Close relationships.

           4          THE COURT:  -- family?

11:59AM    5          JUROR NUMBER 8:  Yes.

           6          THE COURT:  Okay.  Counsel, do you wish to have the

           7  Court inquire further of this juror?

           8          MR. WILKE:  Just one quick question about any

           9  discussions with the two acquaintances.

11:59AM   10          THE COURT:  I'll ask the question.  What's the

          11  question, Counsel?

          12          MR. WILKE:  Question about discussions about the

          13  acquaintances, about the case, who were fishermen that she

          14  knows.

11:59AM   15          THE COURT:  Any of the people that you've identified

          16  who know of this gentleman, Mr. Secrest -- do they have a

          17  personal relationship with him, to your knowledge?

          18          THE WITNESS:  Not a personal.  It's more of an

          19  acquaintance.

11:59AM   20          THE COURT:  But they met him?

          21          JUROR NUMBER 8:  They met him, yes.

          22          MR. WILKE:  Did she speak to these other people

          23  about Mr. Secrest?

          24          THE COURT:  Have you spoken to these other people

12:00PM   25  about Mr. Secrest?

**UNITED STATES DISTRICT COURT**

```
 1              JUROR NUMBER 8:  I have not.
 2              MR. WILKE:  Nothing further.
 3              MR. SCALLY:  Nothing further.
 4              THE COURT:  I want to thank you and -- very humbly
12:00PM 5  thank you for calling that out to our attention.  With all of
 6  the witnesses, it's very much appreciated.
 7              Please don't discuss this matter with any of the
 8  other jurors in terms of our inquiry.  Thank you.
 9              (Juror Number 8 left the courtroom.)
12:00PM 10             THE COURT:  All right.  Counsel, the juror is no
11  longer present.  Is there any concern on either counsel's part?
12              MR. SCALLY:  Not from the Government, Your Honor.
13              MR. WILKE:  No objection.
14              THE COURT:  All right.  The second, as we finally
12:00PM 15 resolved the issue between the two of you of whether you're
16  going to request the boat coming in -- and by the way, as long
17  as you both stipulate, the Court will be amenable to probably
18  any stipulation you enter into.  But I know that there's a
19  request by the defense concerning a demonstrative demonstration
12:01PM 20 with the defendant.  I'm not inclined to grant that.
21              And I'm not inclined to grant a view of the boat.  I
22  think that's adequately covered by the photographs.  But if you
23  two have met and conferred and you have an agreement or a
24  stipulation, I'm glad to entertain that, and I would
12:01PM 25 reconsider.
```

1          MR. STAPLES:  We no longer want to present the boat.

2    And we do not agree to the in-court demonstration.

3          THE COURT:  All right.  We'll take that up when

4    counsel makes a formal request, if you do.

12:01PM 5          Why don't you go get lunch for a couple of the

6    attorneys.  But I'd like to speak to the employer, Harley

7    Moeljanto, concerning the alternate Juror Number 15.

8          MR. STAPLES:  Your Honor, just briefly before some

9    of us go --

12:01PM 10          THE COURT:  Well, we may all be staying.

11          MR. STAPLES:  Even if we stay, you had mentioned

12    earlier that you might dismiss the jury or excuse the jury

13    early today.

14          THE COURT:  I'm not thinking so now.

12:02PM 15          MR. STAPLES:  That's fine.

16          THE COURT:  We're on track.  And, quite frankly, it

17    seems to me that we don't want to interrupt the cross,

18    redirect, recross.  And I think that literally you're not only

19    on schedule, but, in all likelihood, you're going to be calling

12:02PM 20    Vinh Doan.

21          MR. STAPLES:  Yes.  We have him out here now.

22          THE COURT:  And you should be prepared to proceed

23    with him.

24          MR. STAPLES:  We will.

12:02PM 25          THE COURT:  Now, I'm not quite certain how to

resolve this.  I can do this informally, but I'd like counsel

with me if we have that informal conversation in chambers.  I

can do that on the record.

But this is the gentleman who represented that he

12:02PM  could serve.  I checked with his employer.  I don't imagine

that any of you would have selected this gentleman if there

would have been any financial hardship.  But I think we find

ourselves in quite a quandary now.

And if you'd like that on the record with the

12:03PM  defendant present and investigator, I'll conduct it in that

fashion.  If you'd like it in chambers, I'd appreciate having

one counsel at least from each perspective side.

MR. WILKE:  Your Honor, I think it needs to be on

the record.

12:03PM  THE COURT:  All right.  I'm going to ask the

gentleman who's present, Mr. Harley Moeljanto --

Thank you very much, sir.  If you'd be kind enough

to come up to the lectern.

First of all, it's a pleasure meeting you.  And

12:03PM  you've been extraordinarily responsive and polite, and it's

appreciated.  We have a situation where we've summoned a little

over 200 jurors initially.

Counsel, can I disclose the charges to the gentleman

with the admonition that he not speak to the alternate about

12:03PM  this?

        1              MR. SCALLY:  That's fine for the Government,

        2    Your Honor.

        3              MR. WILKE:  That's fine, Your Honor.

        4              THE COURT:  All right.  They're charges of murder in

12:03PM  5    this case.  And because of the gravamen of the case, we --

        6    after summoning those 200 jurors, we got down to about 105 that

        7    responded in a lengthy jury selection process.  From that, the

        8    alternate Juror Number 15, apparently, is one of your

        9    employees.

12:04PM 10              MR. MOELJANTO:  Yes.

       11              THE COURT:  Both sides agree that he would be a fair

       12    and impartial juror and they've selected him to be an

       13    alternate.  Shortly after doing that, he informed us that he

       14    was only being paid for three days.

12:04PM 15              MR. MOELJANTO:  Yes.

       16              THE COURT:  So everything turned around on us where

       17    he wouldn't be here.  Is it possible that you could have some

       18    forbearance and that this gentleman could serve with us for

       19    these -- about ten days?  I think we have -- my best guess,

12:04PM 20    we're going to finish in about a week, maybe a week and a half

       21    early.  And we're going to be in session, so you know --

       22              Karlen, I'll need a copy of the days that we're in

       23    session that Debbie printed.

       24              -- we're going to give you a copy.  So we're going

12:05PM 25    to print that out, a copy of the days that we're in session

                        UNITED STATES DISTRICT COURT

```
  1    that we gave to all the jurors.
  2              And if I could have a copy also.  Deb printed it
  3    last week.
  4              Counsel, do one of you have a copy also?
12:05PM  5         MR. SCALLY:  I don't think we've received it,
  6    Your Honor.  I apologize.
  7              THE COURT:  I'd like five copies, then.
  8              We're going to show you the days.  And I'll tell you
  9    now the -- we've been in session for four days already.  Next
12:05PM 10    week we are going to be in session Monday, Tuesday, Wednesday,
 11    Thursday, Friday; five days.  We're then breaking and we're
 12    going to be in recess, obviously, on Saturday, November 20th,
 13    all the way through December 1st.  So that employee is back
 14    with you.
12:06PM 15              The reason for that is when we were discussing how
 16    we would proceed with the case, we needed to get started before
 17    the Christmas holidays.  And our evaluation was we probably
 18    couldn't hold jurors over the Thanksgiving week.  And we didn't
 19    know about airfares, if any of the jurors were taking a plane.
12:06PM 20    The airlines charge a lot of money on Monday and a lot of money
 21    on Tuesday.  But they seem to break that rate sometimes
 22    Tuesdays and Wednesdays.  So we were cautious.
 23              And, originally, we thought that the case would go
 24    to the jury sometime the week of December 13.  I don't think
12:06PM 25    that that's true any longer.  There's a good chance -- in fact,
```

1    beyond a good chance that the week is going to finish

2    December 8th, someplace in that period of time.  The Government

3    is about two days ahead of schedule, in my estimation.  They'll

4    probably rest their case on Wednesday.

12:07PM 5         The defense will probably start with some of their

6    witnesses on Thursday and Friday, take that break and come back

7    on the 1st, 2nd, and 3rd.  That may be optimistic on my part,

8    but we're going to give you a schedule.

9         So don't let the week of December 15th, 16th, 17th,

12:07PM 10   18th, and 19th be a concern to you.  Look at the week of

11   December 8th -- I'm sorry.  My apologies -- the 13th, 14th,

12   15th, 16th, 17th.  We think we're going to finish the 6th, 7th,

13   or 8th.  We're in session on Friday between Veterans Day and

14   the weekend.

12:08PM 15        Can this gentleman stay with us?

16        MR. MOELJANTO:  He can stay as long as needed.

17        THE COURT:  Okay.

18        MR. MOELJANTO:  He can stay as long as needed here.

19        THE COURT:  I can't thank you enough.  He was

12:08PM 20   worried about his salary, but I promise you, we're going to

21   proceed in a speedy fashion.  We don't want your company hurt.

22        MR. MOELJANTO:  Right.  So that's the issue right

23   now.  I mean, I understand the --

24        THE COURT:  Would he be paid in that period of time?

12:08PM 25   Because if not, then he's going to claim a financial hardship.

And if he can't get rent or food, I need to make that inquiry
and then, you know, possibly release him, which would be a
concern.

MR. MOELJANTO:  Our company policy is maximum up to
12:08PM three days.

THE COURT:  Maximum what?

MR. MOELJANTO:  Three days.  We will pay the jury
duty for up to three days.

THE COURT:  But why were we told -- and I got a
12:08PM record -- we may be back to you, and I'm going to ask you to
remain -- that he checked with his employer and he was -- we
were assured he could sit for this period of time?  And who
made that decision -- in other words, we're really asking you
humbly to see if you can pay him for this extra period of time
12:09PM so that financial hardship isn't being created.

MR. MOELJANTO:  We cannot make exceptions for just
one employee.  What I understand, we are not obligated to pay,
but we have -- this is in our employee handbook, that it apply
to everybody up to three days.  He can take vacations.  He can
12:09PM take leave of absence.  It's really up to the employee.

THE COURT:  Who makes that decision, sir?

MR. MOELJANTO:  That's when we started the company.

THE COURT:  I know your employer handbook, but there
have been many exceptions by many other companies.  There's
12:09PM many other companies that have policies of this kind.  But when

**UNITED STATES DISTRICT COURT**

         1    they hear of jury service, especially of this magnitude, many

         2    other companies have been willing to volunteer that employee.

         3           MR. MOELJANTO:  We will support him to be here.  We

         4    don't have a problem.  We will not fire him or harass him for

12:10PM  5    that.  I mean, we will support him.  But we will pay up to

         6    three days.  We follow other companies.  Most cases that's

         7    usually one to three days.  And that's why we have that.

         8           THE COURT:  I understand that.

         9           MR. MOELJANTO:  I was the one that made that

12:10PM 10    decision.

        11           THE COURT:  I see.  Can you make that exception for

        12    us?  In other words, these are extraordinary circumstances in a

        13    case that has grave consequences for both sides.

        14           MR. MOELJANTO:  I cannot make that -- I cannot do

12:10PM 15    that because we are small company.  We are 11 engineers with

        16    us.  And we lost one person for the case here.  We're talking

        17    about 10 percent of our revenue already.  So it's -- it will be

        18    difficult for us to do that.

        19           THE COURT:  Counsel, your thoughts?

12:11PM 20           MR. WILKE:  I have no questions.

        21           MR. SCALLY:  No questions.

        22           THE COURT:  I'm going to ask you to return at 1:30

        23    today.  Can you do that?

        24           MR. MOELJANTO:  Pardon me?

12:11PM 25           THE COURT:  Can you return at 1:30?

1          THE WITNESS:  Sure.  I'll wait here.

2          THE COURT:  If it's more convenient, it can be

3    3:00 o'clock.  We'll take a break.  Would that be better?  We

4    want to do a little bit of research.

12:11PM 5          MR. MOELJANTO:  Okay.

6          THE COURT:  Can we meet again at 3:00 o'clock?

7          MR. MOELJANTO:  Okay.

8          THE COURT:  Thank you so much.  Thank you for your

9    courtesy.  Thank you.

12:11PM 10         **(Mr. Moeljanto left the courtroom.)**

11         THE COURT:  I'm going to leave this to both of you.

12   Obviously, if we fall below 12 jurors, there would have to be a

13   stipulation.  I don't know that that stipulation would be

14   forthcoming.  We might make it by excusing the gentleman.  But

12:12PM 15   over that ten days that we're gone, we might lose one or more

16   jurors as well.  We already have one juror who sacrificed

17   moving her mother to the state of Washington and put that off.

18         So why don't the two of you meet and confer.  I know

19   I've got the power to enforce this.  I would oftentimes and

12:12PM 20   hope that I wouldn't exercise that power.  But, obviously, the

21   gentleman has a small business.  He's concerned.

22         But it's put us in a terrible position where we have

23   a juror who represents that they checked with their employer

24   and can serve.  And now we find out, whether he did or not,

12:12PM 25   that employer isn't willing, if they were consulted, to go

**UNITED STATES DISTRICT COURT**

1  against the handbook when reality came, or he didn't check.

2  And I don't think we want to inquire any further of that juror

3  in that regard nor embarrass the juror in any way.

4          So would you be kind enough to meet and confer.  If

12:13PM 5  you have any wisdom, at 3:00 o'clock, Mr. Wilke, I'd appreciate

6  it, as well as the Government.  But cautious -- I know so far

7  we set up the case with this gentleman going first.  The next

8  is Sheila Ritze.  And so if you fall below that -- and

9  Mr. Weichert's here --

12:13PM 10          I want you to hear that as well.

11          If there's a mistrial in this matter, Sheila Ritze

12  would be the next person who goes to trial.  And that might

13  affect the defense's request that Mr. Le be tried first.  I

14  don't know.  I'll leave that to you.  And if you could do some

12:13PM 15  research, et cetera, hopefully we'll either reach a stipulation

16  or find some way to keep that juror.  If not, then I'll make

17  the decision concerning hardship or not.

18          Thank you very much, Counsel.  We are in recess.

19          **(Proceedings concluded at 12:13 p.m.)**

20                      **--oOo--**

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  January 15, 2022

16

17

18

19                              /S/ DEBBIE HINO-SPAAN

20                              Debbie Hino-Spaan, CSR No. 7953
                                Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**