1 **UNITED STATES DISTRICT COURT**

2 **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3 **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5 UNITED STATES OF AMERICA,            )
                                       )
6              Plaintiff,              )  **CERTIFIED TRANSCRIPT**
                                       )
7       vs.                            )  Case No.
                                       )  8:20-cr-00002-DOC-1
8 HOANG XUAN LE,                       )
                                       )
9              Defendant.              )  **Day 9, Volume I**
                                       )
10 _____

11

12

13

14

15                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                              JURY TRIAL

17                    FRIDAY, NOVEMBER 19, 2021

18                            8:39 A.M.

19                      SANTA ANA, CALIFORNIA

20

21

22

23 _____

24           **DEBBIE HINO-SPAAN, CSR 7953, CRR**
             FEDERAL OFFICIAL COURT REPORTER
25           411 WEST 4TH STREET, ROOM 1-053
                 SANTA ANA, CA 92701
                 dhinospaan@yahoo.com

1                    **APPEARANCES OF COUNSEL:**

2    **FOR PLAINTIFF:**

3            TRACY L. WILKISON
             Acting United States Attorney
4            BY:  GREGORY SHEPHERD SCALLY
                  Assistant United States Attorney
5            411 West 4th Street
             Suite 8000
6            Santa Ana, California 92701
             714-338-3592
7            gregory.scally@usdoj.gov

8            TRACY L. WILKISON
             Acting United States Attorney
9            BY:  GREGORY W. STAPLES
                  Assistant United States Attorney
10           411 West 4th Street
             Suite 8000
11           Santa Ana, California 92701
             714-338-3535
12           greg.staples@usdoj.gov

13
     **FOR DEFENDANT:**
14
             LAW OFFICES OF CRAIG WILKE
15           BY:  CRAIG WILKE, ESQ.
             305 North Harbor Boulevard
16           Suite 216
             Fullerton, California 92832-1901
17           714-870-8900
             craig@craigwilkelaw.com
18
             LAW OFFICES OF SHEILA MOJTEHEDI
19           BY:  SHEILA SARAH MOJTEHEDI, ATTORNEY AT LAW
             806 East Avenida Pico
20           Suite I-291
             San Clemente, California 92673
21           323-412-0472
             sheila@mojtehedi.com
22
     **ALSO PRESENT:**
23
             Austin Casey, Special Agent, Coast Guard
24

25

**UNITED STATES DISTRICT COURT**

```
 1                        I N D E X

 2   WITNESSES                                         PAGE

 3   HOANG XUAN LE, CALLED BY THE DEFENSE
         Direct Examination by Mr. Wilke (resumed)      5
 4       Cross-Examination by Mr. Staples              17

 5

 6

 7

 8

 9

10

11

12

13

14

15                        EXHIBITS

16                                               WITHDRAWN
                                          IN        OR
17   EXHIBIT                          EVIDENCE   REJECTED

18   290        Signal messages          40

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

|     |                                                                    |
| --- | ------------------------------------------------------------------ |
|   1 | **SANTA ANA, CALIFORNIA; FRIDAY, NOVEMBER 19, 2021** |
|   2 | **8:39 A.M.** |
|   3 | **- - -** |
|   4 | **(Out of the presence of the jury.)** |

08:39AM  5      THE COURT:  All right.  We're on the record.  All

6    counsel are present.  The defendant's present.

7           MR. WILKE:  Were we going to take up the remaining

8    issues on the Government's filing with regard to his 404(b)

9    evidence?

08:39AM 10      THE COURT:  Not until you've concluded your

11   cross-examination.  Otherwise, I won't have a complete record.

12          MR. WILKE:  I've probably got 45 minutes left.

13          THE COURT:  We'll take it up at any time, but I

14   don't think it's appropriate because many of these rulings,

08:40AM 15   once again, have been requested to make evidentiary rulings

16   which were not in limine issues.  And I've given you tentative

17   thoughts for both sides.

18          So I suggest we call a recess at the end of the

19   Government -- end of the defense direct to bring up whatever

08:40AM 20   those issues are.

21          MR. WILKE:  That's fine.

22          **(In the presence of the jury.)**

23          THE COURT:  The jury is present.  The alternates are

24   present.  All parties are present.  The defendant is present --

08:41AM 25   if you'd be seated -- investigating agency is present.

```
 1          Just forewarn you, ladies and gentlemen, there are
 2   going to be numerous breaks today.  They'll be shorter breaks,
 3   but there will be times that we ask you to exit for a period of
 4   time and come back in.  So the breaks will not be as regular,
 5   they'll just be more numerous.
 6          Counsel, if you'd like to continue on with your
 7   direct examination of Mr. Le, please.
 8          MR. WILKE:  Thank you, Your Honor.
 9          HOANG XUAN LE, DEFENDANT, RESUMED THE STAND
10                  DIRECT EXAMINATION  (Resumed)
11   BY MR. WILKE:
12   Q    Now, Mr. Le, when we were talking yesterday, we were
13   talking about the time when the Coast Guard agents came to your
14   house and interviewed you.  Do you remember that?
15   A    Yes.
16   Q    Okay.  Do you recall what they told you about why they
17   were there?
18   A    They were investigating a missing person.
19   Q    Okay.  And when they -- did they tell you that?
20   A    Yes.
21   Q    When they told you they were investigating a missing
22   person, did they tell you the name of the person they were
23   investigating?
24   A    Yes.
25   Q    Who was the missing person?
```

```
 1   A     James Dao.

 2   Q     And when they told you that they were investigating James

 3   Dao being missing, did -- what did that lead you to further

 4   believe?

 5   A     That he was still missing.

 6   Q     And at that point did you know whether he was alive?

 7   A     I didn't know if he was alive or dead.

 8   Q     Now, I want to back up a little bit.  In or about

 9   September of 2019, did you purchase a GPS and Track tracker?

10   A     I -- Sheila purchased it for me.  I didn't purchase it.

11   Q     Okay.  And was it sent to you or how did you actually

12   receive it?

13   A     I received it from Sheila.  She said she had one.  And she

14   had it from her previous relationship.  And then she would let

15   me use it.

16   Q     Okay.  Was that the in-track tracker?  Well, strike this.

17         There were two trackers; correct?

18   A     There's two different trackers, yes.

19   Q     Okay.  One was an in-track -- a GPS and Track tracker.

20   Do you recall that?

21   A     I forget which is the name.  I got to see it because I

22   know one of them was good for three days and another one was

23   good for two weeks.

24   Q     Okay.  Do you recall the name of the other tracker?

25   A     I know one was just GPS and Track.
```

08:42AM (line 5)
08:43AM (line 10)
08:43AM (line 15)
08:44AM (line 20)
08:44AM (line 25)

```
 1    Q    Do you know what the other one was?

 2    A    I don't recall the name of it.

 3    Q    Was it Logistimatics?  Does that sound familiar?

 4    A    Yes.  Yes.

08:44AM 5    Q    Okay.  And did you purchase either of those?

 6    A    No.  Sheila got it for me.

 7    Q    Did she give -- did she get both of them for you?

 8    A    Yes.

 9    Q    Do you recall which was the first one she got for you?

08:44AM 10    A    It was a three-day one.  I don't remember which is the

11    name.

12    Q    Okay.  Now, when you got this tracker, this was before --

13    the first time -- the first tracker you got?

14    A    Yes.

08:45AM 15    Q    This was before the fishing trip on October 15?

16              MR. STAPLES:  Objection.  Leading.

17              THE COURT:  Sustained.

18    Q    BY MR. WILKE:  At the time you got -- when was -- did you

19    get the first tracker in relation to the fishing trip?

08:45AM 20    A    This was before October.

21    Q    Okay.  And why -- and this is the one -- this is --

22    Sheila gave you this one or ordered it for you?

23    A    She gave it to me, and then I had her renew the

24    subscription on it.

08:45AM 25    Q    Okay.  And why did you want a tracker in or about
```

September of 2019?

A      In September I wanted one to put it on my vehicles because I would let Shawn and other people borrow my cars and I didn't know where they were.  And I wanted to know because I had other

08:45AM  vehicles, like another older Cadillac that they would borrow, and I didn't know where they were -- where they would be at. So I would stick it on my other vehicles.

Q      So were there people, other than Shawn, you loaned your other car to?

08:46AM  A      Yes.  I would let other people -- like, for example, Felix was another friend -- guy that I let borrow my vehicles as well.

Q      And Shawn Whalin?

A      Yes.  I let Shawn borrow.

08:46AM  Q      And were there times when you loaned your car out that you didn't get it back when you expected it?

A      Yeah, they would borrow it for a week or two.  And when -- they said they would bring it back in a day or two, but they would hold it for a week.  And I didn't know where they were or

08:46AM  how to get ahold of them.

Q      And is that what prompted you to get this first tracker?

A      Yes.

Q      Okay.  And what did you do when you got this first tracker?  What did you do with it?

08:46AM  A      I was just playing with it.  I was just seeing how it

**UNITED STATES DISTRICT COURT**

1   works, like, logistics, to see how it works and how well does

2   it work.  So I would just stick it on my cars.

3   Q    Which car did you stick it on?

4   A    I would stick it on my -- I had a 2004 Cadillac -- I

08:47AM 5   forget the name of it now.  And then I had, also, like, a GMC

6   van.

7   Q    And did you also have the 2014 Cadillac?

8   A    Yes, I had a 2014 Cadillac.

9   Q    Okay.  And do you remember which car -- which one of your

08:47AM 10   three cars you put it on?

11   A    I would stick it on all my cars.  I would just move them

12   around just to play with it.

13   Q    Okay.  And would you do this when you would lend out one

14   of those cars?

08:47AM 15   A    Yes, I would.

16   Q    Now, after the fishing trip on October 15, 2019, did you

17   obtain a second tracker?

18   A    Yes.  We got a second tracker in November.

19   Q    Okay.  And why did you get a second tracker?

08:48AM 20   A    We got a second tracker because the first one only lasted

21   for three days, and the second one lasted for two weeks.  So I

22   wanted to be able to know where -- where, like, James was at.

23   Because I didn't know if James was coming by my house or not.

24   So I was nervous.  So -- because Natalie would come by my house

08:48AM 25   and I wouldn't know.  So I was fearful that James might

```
 1   retaliate on me.  So that was one way I got the second tracker.
 2   Q    And at the time you got the second tracker, again, did
 3   you know whether James Dao was alive or dead?
 4   A    I didn't know where he was or if he was alive or dead.
 5   Q    Okay.  And if he was alive, what was your belief about
 6   what could happen to you?
 7   A    I was scared.  So I would be fearful at home if he was
 8   going to try to shoot me.
 9   Q    Now, again, during this period of time in early November,
10   November of 2019, how often were you using methamphetamine?
11   A    In November?
12   Q    Yeah.  In November of 2019.
13   A    I was using methamphetamine every day.
14   Q    And cocaine?
15   A    Yes.
16   Q    And drinking?
17   A    Yes.
18   Q    Now, in -- on or about November 8, 2019, around that time
19   period, do you recall going over to James's apartment in
20   Fullerton?
21   A    Yes.
22   Q    Why did you go over there?
23   A    To put the tracker on the couple's car.
24   Q    And did anybody go with you?
25   A    I was with a few other people.  I don't remember who
```

08:49AM  5
08:49AM 10
08:49AM 15
08:50AM 20
08:50AM 25

```
 1   exactly they were, but it was in the early morning.
 2   Q    Okay.  Do you recall, prior to going over to James's
 3   apartment, going to Shawn Whalin's house first?
 4   A    I don't know.
 5   Q    Okay.  Was Shawn Whalin one of the people that went over
 6   with you when you went over to James's apartment on
 7   November 8th?
 8   A    No.
 9   Q    You don't -- he was not?
10   A    No.
11   Q    Okay.  And what did you do with the tracker when you got
12   over to James's house?
13   A    So I had to figure out how to get into the garage.  I had
14   to wait for people to leave.  So when you leave, there's
15   people -- the garage opens.  So I drove into the garage and
16   basically walked up the stairs.  There's a stairway to go to
17   the second floor.  And that's how I accessed the vehicle, was
18   to stick the tracker underneath her -- the van.
19   Q    Okay.  And the tracker that you put on the van on or
20   about November 8th, was that the second tracker that you
21   obtained, the newer one that lasted longer?
22   A    It lasted longer.  But I think I was high at the moment,
23   and I actually put the old tracker on.
24   Q    Well, the Logistimatics tracker -- well, if you know, was
25   the Logistimatics tracker the second one?
```

08:50AM   5
08:50AM  10
08:51AM  15
08:52AM  20
08:52AM  25

**UNITED STATES DISTRICT COURT**

```
 1    A    I don't know which one exactly.  I just remembered later
 2    on that it was the three-day one.
 3    Q    Okay.  And approximately a week and a half later, do you
 4    recall receiving a notice that the battery was low on the
08:52AM  5    tracker?
 6    A    Yes.
 7    Q    Okay.  What did you do in response to that?
 8    A    I -- I didn't do nothing.
 9    Q    Okay.  Did you go -- did you go back to the apartment,
08:53AM 10    James's apartment, and replace that tracker with the low
11    battery for a second time?
12    A    I never -- I didn't.
13    Q    I'm sorry?
14    A    I don't remember.
08:53AM 15    Q    You don't remember doing that?  Okay.
16         At one point around the Thanksgiving weekend of
17    2019, do you recall learning from the tracker that the van was
18    in Arizona?
19    A    Yes.
08:53AM 20    Q    I'm going to direct your attention to what's been
21    admitted as Exhibit 139, page 2.  This is a -- appears to be a
22    screenshot of a text exchange; correct?
23    A    Yes.
24    Q    Now, did you actually take a screenshot of this text
08:54AM 25    exchange?  Do you recall?
```

1    A    No, I don't remember.

2    Q    Okay.  Does this appear to be your phone?  Do you

3    recognize the phone?

4    A    Yes.  It's my phone because I labeled Sheila as "Probation

08:54AM 5    Officer."

6    Q    That's how you referred to her on your phone?

7    A    Yes.

8    Q    Why?

9    A    Because she would always be calling me.

08:54AM 10    Q    Like a probation officer?

11    A    Yes.

12    Q    Now, Mr. Le, you've never actually been to prison;

13    correct?

14    A    No, I have never been in prison.

08:55AM 15    Q    But you have been on probation before; correct?

16    A    Yes.

17    Q    And this message, "Tracker went to Arizona last night" --

18    do you see that?

19    A    Yes.

08:55AM 20    Q    -- is that a message from you --

21    A    Yes.

22    Q    -- to Sheila?

23    A    Yes.

24    Q    Okay.  Directing your attention to page 3, Sheila

08:55AM 25    responds "hmm indeed"; is that correct?

**UNITED STATES DISTRICT COURT**

```
 1    A    Yes.

 2    Q    The response, "I'm checking up that's all I'm not rested

 3    3 to -4 hours not enough."

 4    A    Yes.

 5    Q    That's you?

 6    A    That's me in the blue text, yes.

 7    Q    And "3 to 4 hours" you're talking about what there?

 8    A    Roughly I had three to four hours of sleep that night.  Or

 9    sometimes every other night, I would sleep.

10    Q    Sheila responds, "Can I Uber you over here and take care

11    of you."

12    A    Yes.

13    Q    What did you understand her to mean by that?

14    A    She wanted me to come over, and I didn't want to come

15    over.

16    Q    Okay.  Did Sheila want -- did you have any kind of

17    romantic relationship with Sheila?

18    A    No.

19    Q    Did she appear to want one?

20    A    I thought it was more of a friendly thing.  But I didn't

21    want anything because I knew that she was in a previous

22    relationship, that she just got divorced and she was -- I

23    thought she was seeing another person.

24    Q    Okay.  You responded, "Not at the moment.  I have family

25    over"?
```

08:56AM (line 5)
08:56AM (line 10)
08:56AM (line 15)
08:56AM (line 20)
08:57AM (line 25)

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    Do you recall that you, in fact, did have family over for

3    that Thanksgiving weekend?

4    A    Yes.

08:57AM 5    Q    And then you sent this e-mail, "I want my 100k.  Bitch is

6    prolly trying to stash it."  Did you send that?

7    A    Yes.

8    Q    Okay.  What did you mean -- I'm going to ask you a couple

9    questions about this.  What did you mean when you said, "I want

08:57AM 10   my 100k"?

11   A    There was never an agreement between me and Natalie.  So

12   it was a lot of me rapping in my head because I was listening

13   to a lot of hip-hop music.  So I would say it was 100,000,

14   like, $100,000 watch on my wrist.  But it was just basically --

08:57AM 15   also, I was taking into consideration was -- basically I was

16   thinking about James and Natalie doing the fraud on the

17   insurance.  So it was kind of, like, joking, "Hey, I want my

18   money, too, if they're going to get away with this."

19        So I felt that James was going to be hiding in

08:58AM 20   Arizona because -- it's kind of funny because he's missing, and

21   no one's not -- telling me anything.  So that's how I

22   responded.

23   Q    By this time, by the Thanksgiving weekend, you had not

24   heard from Natalie for over a month; correct?

08:58AM 25   A    Correct.

1  Q    Or Alex; correct?

2  A    Correct.

3  Q    Sheila responded to you with an offer to come home and

4  take care of -- to come home so you're taken care of.  "I need

08:58AM 5  you rested up for Black Friday."  Do you see that?

6  A    Yes.

7  Q    What were you and Sheila planning to do on Black Friday?

8  A    She wanted to take me to go buy some electronics, like a

9  new computer, because I needed one, or a new iPad.  But I

08:59AM 10  didn't have the money yet.

11  Q    Okay.  But that was shortly before the Friday after

12  Thanksgiving; correct?

13  A    Yes.

14  Q    And she offers to have you over and to watch a movie;

08:59AM 15  correct?

16  A    Yes.

17           MR. WILKE:  Can I have a moment, Your Honor?

18           THE COURT:  You may.

19           **(Counsel conferred off the record.)**

08:59AM 20           MR. WILKE:  I have no further questions, Your Honor.

21           THE COURT:  Counsel, would this be a convenient time

22  for a recess or --

23           MR. STAPLES:  Can I have a moment, Your Honor?

24           THE COURT:  Sure.  Would you like to begin your

08:59AM 25  cross-examination?

```
 1              (Counsel conferred off the record.)
 2              MR. STAPLES:  Your Honor, what I propose is to start
 3    my cross-examination until I reach a point where I think we may
 4    need to have a discussion.
```
09:00AM
```
 5              THE COURT:  Or the recess.  All right.  Thank you,
 6    Counsel.  So this would be cross-examination by the Government.
 7                          CROSS-EXAMINATION
 8    BY MR. STAPLES:
 9    Q    Sir, you admit you killed James Dao; correct?
```
09:00AM
```
10    A    No.
11    Q    Well, you shot him twice; correct?
12    A    I said I shot him, but I didn't say I killed him.
13    Q    You shot him twice; correct?
14    A    No, I didn't shoot him.
```
09:01AM
```
15    Q    He shot himself, sir?
16    A    No.  We were struggling for the gun.  So that's how the
17    shots came about.
18    Q    You pulled the trigger, didn't you?
19    A    No, I didn't.
```
09:01AM
```
20    Q    He pulled the trigger on himself, sir?
21    A    No, sir.  We were fighting for the gun.  So I was trying
22    to pull the gun out of his hand.  So we were both struggling
23    for the gun.  So -- I don't know how to describe it.
24    Q    Sir, he was shot twice; correct?
```
09:01AM
```
25    A    From the report, I know, yes.
```

```
 1   Q     From being there, sir, you were the one struggling when
 2   the gun went off.  He was shot twice, wasn't he?
 3               MR. WILKE:  Your Honor, asked and answered.
 4               THE COURT:  Overruled.
09:01AM  5               THE WITNESS:  There were two gunshots, yes.
 6   Q     BY MR. STAPLES:  And you beat him on the head, didn't
 7   you?
 8   A     I hit him with the broom or, like, a cleaning tool over
 9   the head later.
09:02AM 10   Q     So the answer is "yes," you beat him on the head?
11               MR. WILKE:  Objection.  Argumentative, Your Honor.
12               THE COURT:  Overruled.
13               THE WITNESS:  We were fighting.
14   Q     BY MR. STAPLES:  Sir, my question is simple.  I'm asking
09:02AM 15   you did you beat him on the head?
16   A     I didn't beat him.  I hit him with the stick.
17   Q     You did that to him, didn't you?
18   A     It was more, I thought, towards the front.  I don't
19   remember hitting the top.
09:02AM 20   Q     He came on the boat with that already on his head, sir?
21   A     No.  We were fighting.  So when he was on top of me,
22   that's when -- he was trying to get up over me, that's when I
23   was fighting back.
24   Q     Sir, this is the result of what you did to James Dao,
09:02AM 25   isn't it?
```

| | | |
|---|---|---|
| | 1 | A    It was not intentionally.  I didn't plan to do it. |
| | 2 | Q    Sir, you just said you took a stick and hit him on the |
| | 3 | head.  That was an accident? |
| | 4 | A    I didn't plan on getting in a fight with him. |
| 09:03AM | 5 | Q    Well, you were in a fight with him, sir, and you hit him |
| | 6 | on the head, didn't you? |
| | 7 | A    Yes. |
| | 8 | Q    And this was the result, wasn't it? |
| | 9 | MR. WILKE:  Your Honor, there's no foundation that |
| 09:03AM | 10 | this would -- that this was caused by the blow to the head. |
| | 11 | THE COURT:  Overruled. |
| | 12 | You can answer the question, sir. |
| | 13 | Q    BY MR. STAPLES:  I'll show you a clearer picture, sir. |
| | 14 | You saw that in court earlier, didn't you? |
| 09:03AM | 15 | A    Yes. |
| | 16 | Q    Those were the wounds to James Dao's head, weren't they? |
| | 17 | MR. WILKE:  No foundation, Your Honor.  This is not |
| | 18 | a proper question for this witness. |
| | 19 | THE COURT:  Overruled. |
| 09:03AM | 20 | Q    BY MR. STAPLES:  Sir? |
| | 21 | A    It appears, yes. |
| | 22 | Q    And those are the blows that you inflicted on the top of |
| | 23 | James Dao's head, aren't they? |
| | 24 | MR. WILKE:  Objection.  No foundation.  Calls for |
| 09:03AM | 25 | improper opinion. |

1          THE COURT:  Overruled.

2          THE WITNESS:  It appears, yes.

3   Q    BY MR. STAPLES:  And that's the bullet wound on the top

4   of his head; correct?

09:04AM 5          MR. WILKE:  Objection.  No foundation that this

6   witness has knowledge about it, Your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  I didn't know until after the report.

9   Q    BY MR. STAPLES:  And after he was shot and beaten, he

09:04AM 10  went into the ocean; correct?

11         MR. WILKE:  Objection to the form of the question,

12  Your Honor.  Mistates the records.  Mistates the testimony.

13         THE COURT:  Overruled.

14         THE WITNESS:  We got into a fight and I threw him

09:04AM 15  over.

16  Q    BY MR. STAPLES:  So my question is after he was shot and

17  beaten, you threw him in the ocean?

18         MR. WILKE:  Objection to the form of the question,

19  Your Honor.

09:04AM 20         THE COURT:  Overruled.

21         MR. WILKE:  Assumes facts not in evidence.

22         THE COURT:  Overruled.

23         THE WITNESS:  I was scared for my life.

24  Q    BY MR. STAPLES:  Sir, this will go a lot faster if you

09:04AM 25  answer my question.

```
 1                    MR. WILKE:  Objection to the commentary, Your Honor.

 2                    THE COURT:  Argumentative.  Sustained.

 3                    MR. STAPLES:  I would ask that the witness be

 4      directed to answer my questions, Your Honor.

 5                    THE COURT:  You can ask the question.

 6      Q    BY MR. STAPLES:  After he was shot and beaten, you threw

 7      him in the water; correct?

 8                    MR. WILKE:  Objection to the form of the question.

 9                    THE COURT:  Overruled.

10                    THE WITNESS:  I picked up his legs and he fell

11      overboard.

12      Q    BY MR. STAPLES:  You picked up his legs and threw him in

13      the water, didn't you?

14      A    Yes, sir.

15      Q    And then after you did that, you left him, didn't you?

16      A    Yes.

17      Q    And you testified yesterday, according to you, when he

18      went in the water, the gun was still on the boat, wasn't it?

19      A    Yes.

20      Q    He no longer had the gun with him when he went in the

21      water, did he?

22      A    Correct.

23      Q    So he could no longer shoot you at that point, could he?

24      A    Correct.

25      Q    And yet you left him in the water, didn't you?
```

```
 1    A     Yes.
 2    Q     You left him to die, didn't you?
 3    A     No.
 4    Q     Well, you didn't throw him a rope, did you?
 5    A     No.
 6    Q     You didn't throw him a life jacket, did you?
 7    A     No.
 8    Q     You didn't phone in or radio in for help, did you?
 9    A     No.
10    Q     You didn't stay with the body until help could come, did
11    you?
12    A     No.
13    Q     You left him in a dark night, as you said, in the middle
14    of the ocean and went back to shore, didn't you?
15    A     Yes.
16    Q     And you knew when you did that, he was going to die,
17    didn't you?
18    A     No.
19    Q     Well, instead of staying with him, sir, your testimony is
20    you went back and picked up your lobster hoops; correct?
21    A     Sheila drove back the boat to pick up the lobster hoops,
22    yes.
23    Q     After you told her to leave; correct?
24    A     Yes.
25    Q     And then you went, quoting your testimony, back to
```

09:06AM (line 5)
09:06AM (line 10)
09:06AM (line 15)
09:07AM (line 20)
09:07AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1  Sheila's house and fell asleep; correct?
 2  A    I'm not sure if I fell asleep.  But I rested for, like, an
 3  hour or two.
 4  Q    You don't recall testifying yesterday that you went to
 5  her house and slept?
 6  A    I -- we did go back to the house, and I rested, like,
 7  maybe an hour, two hours at most.  It wasn't a lot.
 8  Q    You don't recall saying you slept, yesterday in front of
 9  this jury?
10  A    I slept for an hour or two or rested an hour or two.
11  Q    So you're not sure?
12  A    I was still -- I was -- I was doing drugs so I was -- I
13  dozed off an hour or two.
14  Q    Well, doing drugs -- that's, in fact, what you did later
15  that day; correct?  You went to Shawn Whalin's house and took
16  drugs, didn't you?
17  A    In the morning?
18  Q    Later that day.
19  A    The day of the boat or -- like the following day in the
20  morning, and then in the afternoon when I went home, after I
21  left Sheila's house.
22  Q    You went -- you left Sheila's house sometime in the
23  morning.  You went home.  And then later that day or evening
24  you went to Shawn Whalin's to take more drugs; correct?
25  A    Yes.
```

```
 1    Q    Life as usual for you; correct?
 2    A    It wasn't normal.  It was -- it was kind of -- it was a
 3    traumatic experience for me.
 4    Q    One that you decided to handle by taking more drugs, sir?
 5    A    Yes.  It was just to get your mind away from things.
 6    Q    You testified before this jury, sir, that, at that time,
 7    you were doing drugs on a daily basis.  Do you recall that?
 8    A    Yes.
 9    Q    So when you went to Shawn Whalin's house that night to
10    take drugs, not even 24 hours after you left your friend at
11    sea, you took more drugs; correct?
12    A    Yes.
13    Q    Life as usual; correct?
14              MR. WILKE:  Objection, Your Honor.  It's
15    argumentative, the question.
16              THE COURT:  "Life as usual."
17              Do you understand the question?
18              MR. STAPLES:  I'm sorry, Your Honor?
19              THE COURT:  I'm asking the witness if he understands
20    the question when you use the phrase "life as usual."
21              THE WITNESS:  "Life" as in everyday thing?  It
22    wasn't an everyday thing for an event like that to happen to
23    me, no.  But when you do drugs, it's -- you get your mind away
24    from things and you forget about the problems.
25    Q    BY MR. STAPLES:  And your problem, sir, was you left your
```

09:09AM (line 5)
09:09AM (line 10)
09:09AM (line 15)
09:09AM (line 20)
09:10AM (line 25)

1  friend out in the ocean to die, isn't it?

2  A    I didn't know what was going to happen.

3  Q    Sir, you were more than three miles offshore, weren't

4  you?

09:10AM 5  A    I'm not sure how far we were from the shore.  Because we

6  were -- we were catching for lobsters, and I'm not navigating

7  the boat.

8  Q    Well, you testified that, once James Dao went in the

9  water, you told Sheila Ritze to turn the boat around and go

09:10AM 10  back to shore; correct?

11  A    I didn't say, "Turn the boat around."  I just said to get

12  away because I wanted to get away from the situation.

13  Q    Sir, you didn't want to go farther out to sea, did you?

14  A    I didn't want to go further back.  I wanted to get out of

09:11AM 15  the situation and just go home.

16  Q    You wanted to go home, sir; correct?

17  A    Yes.

18  Q    So you told her to head back to shore?

19  A    No.  I said just to go away.  That's all I said.

09:11AM 20  Q    And she headed back to shore?

21  A    She headed back to -- I went to go pick up the hoop nets.

22  Q    Correct.  You didn't keep cruising; correct?

23  A    No.

24  Q    You didn't go farther out; correct?

09:11AM 25  A    Correct.

```
 1   Q     Showing you Exhibit 255, do you recognize this, sir?

 2   A     Looks like a map.  Yes.

 3   Q     You were in court when the agent testified about this;

 4   right?

 5   A     Yes.

 6   Q     This shows the location of your phone on the evening that

 7   James Dao was killed, doesn't it?

 8             MR. WILKE:  Your Honor, this witness has no

 9   knowledge of this exhibit.  This is improper cross-examination.

10             THE COURT:  Overruled.

11             You can answer the question.

12             THE WITNESS:  From my understanding from the

13   investigator, yes.

14   Q     BY MR. STAPLES:  Okay.  Well, you don't deny that it's

15   accurate, do you?

16             MR. WILKE:  Your Honor, this witness has no

17   foundation or expertise to opine on the accuracy of this

18   exhibit.

19             THE COURT:  As far as the actual accuracy, I don't

20   know if the witness would know that, Counsel.  Sustained.

21   Q     BY MR. STAPLES:  I'm going to show you page 2 -- page 19

22   of Exhibit 255.  This is October 15 at 2:08 a.m.  Do you see

23   that?

24   A     Yes, I do.

25   Q     And it says at that point you were approximately 3.46
```

09:11AM  (line 5)
09:12AM  (line 10)
09:12AM  (line 15)
09:12AM  (line 20)
09:12AM  (line 25)

         1    miles offshore; correct?

         2    A    Yes, it does.

         3    Q    A minute later --

         4         MR. WILKE:  Your Honor, at this point, this is not

09:13AM  5    cross-examination.  It's closing argument here.

         6         THE COURT:  Overruled.

         7         MR. WILKE:  This witness has no knowledge or --

         8         MR. STAPLES:  Your Honor, I object to speaking

         9    objections.

09:13AM 10         MR. WILKE:  -- basis to testify about these

        11    exhibits.

        12         THE COURT:  Overruled.

        13    Q    BY MR. STAPLES:  You see this one at 2:09; correct?

        14    A    Yes, I can see.

09:13AM 15    Q    It's a minute later from the one we just looked at;

        16    correct?

        17    A    Yes.

        18    Q    And it says now you're 3.04 miles offshore; correct?

        19    A    It says roughly, yes.

09:14AM 20    Q    That's almost a half mile closer inshore; right?

        21    A    From the previous one, yes.

        22    Q    So you would agree that the farthest out you were was the

        23    3.4 miles; correct?

        24         MR. WILKE:  Objection, Your Honor.  No foundation.

09:14AM 25    And there's no evidence that this is the universe of all data

```
 1    points here.
 2                    THE COURT:  Overruled.
 3                    You can answer.
 4                    THE WITNESS:  Yes.
 5    Q    BY MR. STAPLES:  So this would have been the farthest
 6    point you were out, and the boat turned around.  This is where
 7    you would have left James Dao, isn't it?
 8                    MR. WILKE:  Your Honor, objection.  No foundation
 9    that this witness can testify about this data.
10                    THE COURT:  Overruled.
11                    THE WITNESS:  I wouldn't know exactly.  But just
12    going based on the map.
13    Q    BY MR. STAPLES:  The point is James Dao wasn't an Olympic
14    swimmer, was he?
15                    MR. WILKE:  Objection.  No foundation.
16                    THE COURT:  Sustained as to its form.
17                    MR. STAPLES:  I'm sorry?
18                    THE COURT:  Sustained as to its form.
19    Q    BY MR. STAPLES:  You didn't know James Dao to be a
20    prolific swimmer, did you?
21    A    He wasn't a strong swimmer.
22    Q    He wasn't a strong swimmer?
23    A    Not Olympic swimmer.  No, he's not.
24    Q    Particularly with a bullet in his back?
25                    MR. WILKE:  Objection.  No foundation that the
```

```
 1    witness knew that.
 2                 THE COURT:  Overruled.
 3                 THE WITNESS:  I didn't know.
 4                 THE COURT:  You can answer the question.
 5                 THE WITNESS:  I didn't know.
 6    Q    BY MR. STAPLES:  You say you didn't know because you saw
 7    no blood; is that correct?  You testified yesterday you didn't
 8    see any blood; is that right?
 9    A    Correct.  There was no blood.
10    Q    Okay.  Showing you 126, you saw this in testimony;
11    correct?
12    A    I saw this picture, yes.
13    Q    This is a picture that was taken of James Dao after he
14    spent 36 hours in the ocean.  Do you understand that?
15    A    Yes.
16    Q    You see the blood everywhere; correct?
17    A    Yes, I do.
18    Q    This picture was also taken when his body was pulled
19    after 36 hours in the ocean.  Do you see the blood there?
20    A    Yes.
21    Q    And it's your testimony that despite two gunshots going
22    off, which, whether you knew it or not, as you say, hit him --
23    one on the top of the head, one in the shoulder -- and he was
24    beaten about the head and face, that you saw no blood.  Is that
25    your testimony?
```

09:15AM
09:15AM
09:16AM
09:16AM
09:16AM

```
  1   A    I didn't see blood at that moment.  He wasn't bleeding out
  2   or anything like that.
  3   Q    So your answer is -- your testimony is you say you did
  4   not see blood?
09:17AM 5   A    No, I didn't see blood.
  6   Q    Now, you told the jury that James Dao pulled a gun on
  7   you; is that correct?
  8   A    That's correct.
  9   Q    You're a liar, aren't you?
09:17AM 10  A    No.
 11   Q    Well, sir, you lied to Alex Dao, didn't you?
 12   A    I told him a different story, yes.
 13   Q    That's a lie, isn't it?
 14   A    I lied to Alex, yes.
09:17AM 15  Q    You told him that you didn't go out on the boat with
 16   James Dao, his brother; correct?
 17   A    Yes.
 18   Q    And that was a lie, wasn't it?
 19   A    Yes.
09:17AM 20  Q    You told him his brother went out on the boat with
 21   another person; correct?
 22   A    Yes.
 23   Q    And that was a lie, wasn't it?
 24   A    I told him a lie because I was scared of Alex.
09:18AM 25  Q    Sir, I'm just asking you to answer my questions.
```

**UNITED STATES DISTRICT COURT**

```
 1   A    Yes.
 2   Q    You told him you were in a bar at Turcs with other
 3   people, correct, that night?  Correct?
 4   A    Yes.
 5   Q    And that was a lie, wasn't it?
 6   A    Yes.
 7   Q    We saw the video of you going and leaving.  You never
 8   went into the bar that night, did you?
 9   A    No.
10   Q    That was a lie, wasn't it?
11   A    Yes.
12   Q    And you lied because you were afraid, as you put it, that
13   Alex would kick your ass; is that right?
14   A    Yes.
15   Q    You also lied to Natalie Nguyen, didn't you?
16   A    Yes.
17   Q    You told her you didn't go on the fishing trip; correct?
18   A    Yes.
19   Q    A lie; correct?
20   A    Yes.
21   Q    You told her you didn't know where her husband was;
22   correct?
23   A    Yes.
24   Q    That was a lie, wasn't it?
25   A    Yes.
```

09:18AM  (line 5)
09:18AM  (line 10)
09:18AM  (line 15)
09:18AM  (line 20)
09:19AM  (line 25)

```
 1   Q    You knew where he was because you left him in the ocean,
 2   didn't you?
 3   A    Yes.
 4   Q    Now, you weren't afraid Natalie Nguyen was going to kick
 5   your ass, were you?
 6   A    I was scared that she was communicating with Alex.
 7   Q    So you were still afraid and that's why you lied.  Is
 8   that it?
 9   A    Yes.
10   Q    Didn't want to get into any trouble; correct?
11   A    Yes.
12   Q    Told her you didn't want -- you told the jury you didn't
13   want to be a part of it.  Is that what it was?
14   A    Yes.
15   Q    But you were a part of it, weren't you, sir?
16   A    Yes.
17   Q    You were the reason that Alex -- excuse me -- James Dao
18   was left out in the ocean, wounded; correct?
19   A    Yes.
20   Q    So that was a lie; correct?
21   A    That we got into an altercation.
22   Q    When the Coast Guard came to talk to you, you lied to
23   them also; correct?
24   A    Yes.
25   Q    You told them, also, that you didn't go on the fishing
```

09:19AM  (line 5)
09:19AM  (line 10)
09:19AM  (line 15)
09:19AM  (line 20)
09:20AM  (line 25)

1    trip; correct?

2    A    Yes.

3    Q    And that was a lie, wasn't it?

4    A    Yes.

09:20AM 5    Q    But you told them that James Dao did go on the trip with

6    other people; correct?

7    A    Yes.

8    Q    That was a lie, wasn't it?

9    A    Yes.

09:20AM 10   Q    You told the Coast Guard that you loaned your jacket to

11   James Dao because it was cold; correct?

12   A    Yes.

13   Q    That was a lie, wasn't it?

14   A    Yes.

09:20AM 15   Q    You told them that you loaned James Dao your phone,

16   correct?

17   A    Yes.

18   Q    And that was a lie, wasn't it?

19   A    Yes.

09:21AM 20   Q    You told them that you had been in a bar with a group of

21   four men that night; correct?

22   A    It was me and Shawn and two other girls.  It wasn't four

23   guys.

24   Q    Well, you told them there were four people; correct?

09:21AM 25   A    We met two people, yes.

```
 1   Q     But that was a lie, wasn't it?

 2   A     Yes.

 3   Q     You told them that James Dao went off with some guy named

 4   Matt to go fishing; correct?

 5   A     Yes.

 6   Q     That was a lie, wasn't it?

 7   A     Yes.

 8   Q     You told them you didn't know Shawn Whalin's last name.

 9   That was a lie, wasn't it?

10   A     I didn't know at the moment.

11   Q     Sir, you put in for a life insurance policy in Shawn

12   Whalin's name, didn't you?

13   A     I'm sorry.  One more time.

14   Q     You tried to apply for a life insurance policy in Shawn

15   Whalin's name, didn't you?

16   A     No.  I was helping him get information because I didn't

17   want his mom to be without any money.  So, Shawn, he would get

18   into accidents and he said he flatlined, like, a couple --

19   three times.

20         So I said -- we were high at the moment.  I said,

21   "Hey, Shawn, this is something to look into."  So I gave the

22   life insurance to contact him directly so he would be able to

23   communicate.  So that's what I did for him.

24         MR. STAPLES:  I move to strike as nonresponsive,

25   Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Counsel, you can continue to ask
 2    questions.
 3    Q    BY MR. STAPLES:  You needed to know his last name to get
 4    a life insurance policy; correct?
 5    A    For Shawn?  I asked him what his last name was.  But yes.
 6    Q    You knew Shawn Whalin's last name when the Coast Guard
 7    interviewed you well after the night that James Dao was killed;
 8    correct?
 9    A    I don't remember.
10    Q    Well, first you said you didn't, and now you say you
11    don't remember.  Which is it, sir?
12    A    This was -- you're asking me about when we were looking
13    out for life insurance for Shawn.  And then that's when he -- I
14    would know.  But when the Coast Guard came, I don't remember at
15    that moment.
16    Q    Well, the fact is --
17              One moment.
18              (Counsel conferred off the record.)
19    Q    BY MR. STAPLES:  Now, each instance that you lied to Alex
20    Dao, Natalie Nguyen, and the Coast Guard, you did it because
21    you didn't want to get in trouble; correct?
22    A    No.  Well, I told Alex and them that I wanted to be away
23    from the situation, yes.
24    Q    But you lied to them.  You just admitted it; right?
25    A    Yes.
```

09:22AM (line 5)
09:23AM (line 10)
09:23AM (line 15)
09:24AM (line 20)
09:24AM (line 25)

1    Q    And you lied to them because you were afraid to get in

2    trouble; correct?

3    A    I was afraid of Alex, yes.

4    Q    So the answer is "yes," you lied to stay out of trouble?

09:24AM 5    A    Yes.

6                MR. WILKE:  Objection.  Asked and answered,

7    Your Honor.

8                THE COURT:  Overruled.

9                MR. STAPLES:  I'm sorry.  I didn't hear the answer,

09:24AM 10   Your Honor.

11               THE COURT:  Reask the question.

12   Q    BY MR. STAPLES:  You lied in each instance with Alex Dao,

13   Natalie Nguyen, and the Coast Guard to keep yourself out of

14   trouble; correct?

09:25AM 15   A    Yes.

16   Q    And, in fact, you're in trouble right now, aren't you?

17   A    I'm in jail.  Yes.

18   Q    You are facing a murder charge; correct?

19   A    Yes.

09:25AM 20   Q    A first-degree murder charge; correct?

21   A    Yes.

22   Q    You can't get much more in trouble than that, can you?

23   A    No.

24   Q    But you also lie to boost yourself; correct?

09:25AM 25   A    Yes.

**UNITED STATES DISTRICT COURT**

```
 1   Q    You lied to David Doan and to Shawn Whalin about James
 2   Dao owing you 30- to $40,000, didn't you?
 3   A    Yes.
 4   Q    And you lied when you told David Doan that you shot the
 5   guy because he owed you 30- or $40,000; correct?  That's your
 6   testimony?
 7   A    Yes.
 8   Q    Now, you also lied here when you said you were never a
 9   collector for Alex Dao, didn't you?
10   A    Correct.
11   Q    You admit that you lied about that?
12   A    Yes.
13   Q    You did do collections for Alex Dao; correct?
14   A    No.
15           MR. STAPLES:  Can we pause for a moment, Your Honor?
16           THE COURT:  Certainly.
17           (Pause in proceedings.)
18           MR. STAPLES:  Your Honor, I'm going to show the
19   witness what's been identified as Exhibit 290.  We're getting
20   copies for counsel, the Court, and the witness.  May Mr. Scally
21   approach?
22           THE COURT:  Certainly.  Just give that copy to
23   Karlen, Counsel, so I have a copy.
24   Q    BY MR. STAPLES:  I'm going to ask you to take a look at
25   290.
```

09:26AM (line 5)
09:26AM (line 10)
09:26AM (line 15)
09:27AM (line 20)
09:28AM (line 25)

1          THE COURT:  Has 290 been received, Counsel?

2          MR. STAPLES:  I have not offered it yet, Your Honor.

3          MR. WILKE:  Your Honor, may I have a sidebar about

4    this exhibit?

09:28AM 5          THE COURT:  We can for just a moment.

6          Excuse me, ladies and gentlemen.

7          **(Sidebar out of the presence of the jury:)**

8          THE COURT:  We're at sidebar.  Counsel are present.

9          Counsel?

09:32AM 10          MR. WILKE:  Thank you.  I'm seeing this exhibit for

11    the first time.  I don't know what was previously produced.

12    And I just didn't see it, but it was not previously identified

13    as a Government exhibit.  And I'm not sure it was ever

14    previously produced in discovery.

09:32AM 15          It appears to be as a -- on its face, some kind of

16    screenshot or Cellebrite download of Alex Dao's text messages.

17    I don't see anything on here that indicated that it connects --

18    it is a text messaging with my client, Wayne Le.

19          But I -- from -- my understanding from the line of

09:32AM 20    questioning, where it's going, is that Mr. Staples is going to

21    seek to now impeach my client on his testimony that he, in

22    fact, was not a collector for Alex Dao, even though he had told

23    people he was.

24          And there's another issue here, Your Honor, and that

09:32AM 25    is Alex Dao -- the Government is not calling Alex Dao.  They

1  have not immunized him.  The defense is calling Alex Dao.  Alex

2  Dao has given prior statements that were recorded, that I do

3  have, denying that Wayne worked for him or collected anything

4  for him.  Yet I am essentially precluded from questioning Alex

09:32AM 5  Dao about anything of his own criminal activity because he

6  would otherwise have a privilege -- a Fifth Amendment

7  privilege.

8          The Government has not immunized him.  So I have

9  told Alex Dao's attorney that I would not ask him any questions

09:32AM 10  on the stand about any illegal activity that he may currently

11  be involved in or recently been involved in.  But now

12  Mr. Staples appears to be trying to get this in with denying me

13  any ability to rebut it because of his Fifth Amendment

14  privilege for which they are not willing to immunize Alex Dao.

09:32AM 15          THE COURT:  Thank you.

16          Is there a nexus that this witness would know of

17  these texts?

18          MR. SCALLY:  It's from his Google account.

19          THE COURT:  It's from Le's Google --

09:32AM 20          MR. STAPLES:  It was produced.

21          THE COURT:  Overruled.

22          **(Open court in the presence of the jury.)**

23  Q    BY MR. STAPLES:  Have you had time to review Exhibit 290?

24  A    Yes.

09:32AM 25  Q    Do you recognize it?

```
 1   A    Yes.
 2   Q    This is a message exchange from your Google account,
 3   isn't it?
 4   A    This was earlier, yes.
 5          MR. STAPLES:  And I would move 290 into evidence,
 6   Your Honor.
 7          THE COURT:  Received.
 8          (Exhibit Number 290 received.)
 9   Q    BY MR. STAPLES:  Showing you page 1 of 290, do you see
10   the name at the top, "Alex Dao"?
11   A    Yes.
12   Q    And these messages in blue are -- excuse me -- in blue,
13   those are from Alex Dao, aren't they?
14   A    Yes.
15   Q    And these messages in the light background, those are
16   coming from you, aren't they?
17   A    Yes.
18   Q    And this message here to you from Alex Dao says, "What's
19   up?  The Colin guy now owes me $13,500."  Do you see that?
20   A    Yes.
21   Q    He gives his real name and says, "Has an office near
22   u" -- meaning "you"; right? -- "in Huntington Beach and
23   Fountain Valley."  Do you see that?
24   A    Yes.
25   Q    "Wake me up" -- "When you wake up, give me a ring";
```

1  correct?

2  A    Yes.

3  Q    He's contacting you about helping to collect this debt,

4  isn't he?

09:34AM 5  A    He's asking me to help him because I knew the guy.

6  Q    My question is he's asking you to help collect a debt?

7  A    Yes.

8         MR. WILKE:  Objection.  Asked and answered,

9  Your Honor.

09:34AM 10        THE COURT:  Overruled.

11        Your answer is?

12        THE WITNESS:  Yes.

13  Q    BY MR. STAPLES:  And you tell him, "What's up, my

14  brother?  That guy has really bad credit"; correct?

09:34AM 15  A    Yes.

16  Q    And he later asked you, "You ready to hit up Coco Colin";

17  correct?

18  A    That's Alex messaging me.

19  Q    That's what I said.  He later asked you, "You ready to

09:34AM 20  hit up Coco Colin?  His deal closed"; correct?

21  A    Yes.

22  Q    And that was asking you to help with collecting another

23  debt; correct?

24  A    The same person, yes.

09:35AM 25  Q    You say it's the same person, but in the first one --

```
 1   never mind.
 2   A     Colin is Coco.
 3   Q     Yes.  So when you testified yesterday that you didn't
 4   collect debts for Alex Dao, that wasn't true, was it?
 5   A     I didn't -- he asked me to do it, but I never was able to
 6   collect any money for these guys.
 7   Q     You tried to help Alex Dao collect a debt, didn't you?
 8   A     I would offer assistance, yes, if I could.
 9   Q     And, in fact, the cut-off message at the beginning says,
10   "Around 11ish I'll stop by.  Trying to recruit more people to
11   join."  Do you see that?
12   A     Yes.
13   Q     And that was to join in a debt collection, wasn't it?
14   A     Around 11:00 o'clock, meaning I'll stop by his poker house
15   and recruit more people to have more players to join his game.
16   Q     Now, you knew David Doan was a criminal; correct?
17   A     I didn't know his record.  I didn't know.
18   Q     Well, you knew he had been in prison; right?
19   A     David Doan, I thought he only went to jail, like county
20   jail.  That's all I knew.
21   Q     You know he had been to jail; right?
22   A     Yes.
23   Q     You knew he was doing identity theft, didn't you?
24   A     I didn't know.
25   Q     Sir, you testified that you were going to give him
```

```
 1  profiles; isn't that right?

 2  A     He asked me for profiles, yes.

 3  Q     And you knew what profiles were for; right?

 4  A     Yes.

 5  Q     They were used to commit identity theft; right?

 6  A     Yes.

 7  Q     So my question is you knew David Doan committed identity

 8  theft, didn't you?

 9  A     I didn't find out until later.  I didn't know.

10  Q     That's not my question, sir.  I'm telling you -- I'm

11  asking you, you knew David Doan committed identity theft,

12  didn't you?

13  A     I didn't know -- I didn't know when he did -- I thought he

14  got in trouble for drugs.  And I found out later, when he got

15  out of jail, that he told me that he got in trouble for

16  identity theft.  So that's when I knew.

17  Q     So you knew he dealt drugs; correct?

18  A     Yes.

19  Q     And you later found out he did identity theft; correct?

20  A     Yes.

21  Q     And you wanted to impress him; correct?

22  A     Yes.

23  Q     That's why you told him you shot a guy who owed you 30-

24  to $40,000; correct?

25  A     Yes.
```

**UNITED STATES DISTRICT COURT**

```
           1   Q    You wanted to impress a criminal; correct?

           2   A    Yes.

           3   Q    And you knew Tony Hoang was a criminal; correct?

           4   A    Yes.

09:38AM    5   Q    You knew he had been to prison; correct?

           6   A    Yes.

           7   Q    You knew he had been in there for counterfeiting and drug

           8   offenses; correct?

           9   A    I didn't know what he was in jail for.  I just know that

09:38AM   10   he did prison.

          11   Q    Okay.  And that impressed you, didn't it, that he had

          12   been to prison?

          13   A    That he was a tough guy, yes.

          14   Q    Part of being a tough guy is you've been in and out of

09:39AM   15   prison; correct?

          16   A    Yes.

          17   Q    And you were impressed by that; right?

          18   A    Like, cool, yes.

          19   Q    You thought it was cool; correct?

09:39AM   20   A    Yes.

          21   Q    And you yourself wanted to be a tough guy too; right?

          22   A    Yes.

          23   Q    And you lied to him when you said, on the recording we

          24   heard, that no one had picked you up yet when he asked you what

09:39AM   25   was going on regarding the killing of James Dao; correct?
```

**UNITED STATES DISTRICT COURT**

```
        1   A     Yes.

        2   Q     Because you wanted to impress another criminal; correct?

        3   A     Yes.

        4   Q     And you knew Shawn Whalin was a criminal; correct?

09:39AM  5   A     Yes.

        6   Q     That he had been in prison in and out his whole life;

        7   correct?

        8   A     Yes.

        9   Q     For theft and burglary; correct?

09:39AM 10   A     Yes.

       11   Q     And you thought that was great too -- right? -- that he

       12   had been in and out of prison?

       13   A     Yes.

       14   Q     And you wanted to impress Shawn Whalin, didn't you?

09:40AM 15   A     Yes.

       16   Q     And so you told -- you lied to him about the guy owing

       17   you 30- to $40,000; correct?

       18   A     Yes.

       19   Q     And similarly, your friend of many years, James Dao, you

09:40AM 20   knew he had been to prison too; correct?

       21   A     Yes.

       22   Q     And you knew he was a criminal; correct?

       23   A     Yes.

       24   Q     You knew that because you were dealing drugs with him,

09:40AM 25   weren't you?
```

|     |     |
| --- | --- |
| 1 | A    Yes. |
| 2 | Q    Now, in addition to -- and these guys were all your |
| 3 | friends, weren't they? |
| 4 | A    That I hung around with, yes. |
| 09:40AM 5 | Q    You don't consider them friends?  Or you're just afraid |
| 6 | to use the word? |
| 7 | A    No.  They're friends. |
| 8 | Q    These are the people you chose to spend your time with; |
| 9 | right? |
| 09:40AM 10 | A    Yes. |
| 11 | Q    These are the people that you wanted to emulate; correct? |
| 12 | A    Emulate, like -- |
| 13 | Q    You wanted to be like them; right? |
| 14 | A    Not really. |
| 09:41AM 15 | Q    You said you wanted to be a tough guy; correct? |
| 16 | A    I was just trying to act like a tough guy, but I was |
| 17 | never. |
| 18 | Q    Sir, a few moments ago you just testified that you |
| 19 | thought going in and out of prison was a cool thing; correct? |
| 09:41AM 20 | MR. WILKE:  Objection.  That mistates the testimony, |
| 21 | Your Honor. |
| 22 | THE COURT:  Overruled. |
| 23 | THE WITNESS:  For him it was. |
| 24 | Q    BY MR. STAPLES:  You said that was part of what made them |
| 09:41AM 25 | tough guys; right? |

```
 1   A     Yes.

 2   Q     And you want to be a tough guy; right?  You wanted to be

 3   a tough guy; correct?

 4   A     Yes.

 5   Q     You wanted to be like them; correct?

 6   A     Not like them.  I lived a different life.

 7   Q     Oh, you led a different life by dealing drugs with them?

 8   Is that your testimony, sir?

 9   A     Mine was I was just -- I was doing drugs --

10   Q     My question, sir --

11             MR. WILKE:  Your Honor, can he answer the question?

12             THE COURT:  Did you finish your question -- your

13   answer?

14             Reask the question, Counsel.

15   Q     BY MR. STAPLES:  Your life was different by dealing drugs

16   with him.  Is that your testimony?

17             THE COURT:  Now your answer.

18             THE WITNESS:  Yes.

19   Q     BY MR. STAPLES:  Your life was different by trying to do

20   profiles with David Doan; is that correct?

21   A     I was learning how to do it.

22   Q     Sir, you -- excuse me.  Go ahead.

23   A     I was only learning how to do it.  I didn't know how to do

24   it yet at that time.

25   Q     But you wanted to do it; right?
```

09:41AM   5
09:42AM  10
09:42AM  15
09:42AM  20
09:42AM  25

1   A     I was -- I wanted to learn how to do it to make money,

2   yes.

3   Q     To make money for yourself; correct?

4   A     To make a profit, yes.

09:42AM 5   Q     And you understand identity theft is just another form of

6   lying, isn't it?

7   A     It was fraud.  That's all I knew.

8   Q     It's another form of lying, isn't it?

9   A     Yes.

09:43AM 10   Q     When you commit identity theft, you are creating

11   documents stating that you are someone that you are not; right?

12   A     Yes.

13   Q     And then you go to a store and present that to buy stuff;

14   correct?

09:43AM 15   A     Yes.

16   Q     And you're telling that store "I'm this person on the

17   card"; correct?

18   A     Yes.

19   Q     But you're not, are you?

09:43AM 20   A     Correct.

21   Q     That is a lie, isn't it?

22   A     Correct.  It wouldn't be me that's shopping at -- I would

23   have other people go in to do it, but it wasn't me.

24   Q     So it's okay if other people lie and you make money?  Is

09:43AM 25   that your testimony, sir?

```
 1   A    It was just for them to go do it.  Just -- for me, it was
 2   to get the information, and I would be -- be the back person.
 3   Q    My question, sir, it's okay, in your mind, for the other
 4   people to do the lying as long as you get money?  Is that your
 5   testimony?
 6   A    Yes.
 7   Q    So you're okay with that kind of lying.  Is that what
 8   you're telling the jury?
 9   A    It's just for them to do fraud.  It was something new for
10   me.  I didn't know how to do it yet.
11   Q    But you understood it involved lying, didn't you?
12   A    Yes.
13   Q    Lying for you to make money; correct?
14   A    Yes.
15   Q    And you were all right with that, weren't you?
16   A    Yes.
17   Q    Now, in addition to the people I mentioned, you also went
18   to slaphouses, didn't you?
19   A    Yes.
20   Q    And those are illegal gambling establishments; right?
21   A    Yes, they are.
22   Q    These are against the law; correct?
23   A    Yes.
24   Q    You testified that there are drug deals going on at these
25   slaphouses; correct?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     And that's where you chose to spend time; correct?

 3   A     Yes.

 4   Q     You also testified you could buy guns there at these

 5   slaphouses; correct?

 6   A     Yes.

 7   Q     And you chose to spend time there; correct?

 8   A     Yes.

 9   Q     In fact, you testified you yourself bought two guns at

10   this illegal slaphouse; correct?

11   A     Yes.

12   Q     A .38; correct?

13   A     Yes.

14   Q     And a P40; correct?

15   A     Yes.

16   Q     And the P40, you testified you gave that to Shawn -- you

17   offered to -- excuse me.  You gave the P40 to Shawn Whalin;

18   correct?

19   A     No.  I gave it to James.

20   Q     I apologize.  You gave it to James.  Shawn Whalin, you

21   offered to loan your .38 to; correct?

22   A     Yes.

23   Q     And you testified that the reason he wanted it was to

24   intimidate people; correct?

25              MR. WILKE:  Objection.  I think that misstates the
```

```
 1   testimony here.
 2              THE COURT:  Overruled.
 3              You can answer the question.
 4              THE WITNESS:  Yes.
 5   Q    BY MR. STAPLES:  You loaned -- you were offering --
 6   willing to loan your .38 to Shawn Whalin so he could use it to
 7   intimidate people; correct?
 8   A    Yes.
 9   Q    And that was okay with you; correct?
10   A    Yes.
11   Q    You didn't have a problem with that?
12   A    It was him doing it, not me.
13   Q    It was your gun, sir, wasn't it?
14   A    My gun what?
15   Q    It was your gun that you were offering to Shawn Whalin to
16   intimidate someone, wasn't it?
17   A    Yes.
18   Q    And you were okay with that?
19   A    Yes.
20   Q    Because you wanted to be a tough guy like Shawn Whalin;
21   right?
22   A    Yes.
23   Q    You wanted to impress him; right?
24   A    I was just offering help, yes.
25   Q    I'm sorry?  I didn't hear your answer.
```

```
 1   A    Just offering help for what Shawn -- whatever he was

 2   trying to do.

 3   Q    Oh, you were being helpful, sir?

 4   A    Well, if you want to -- I was offering him help if he

 5   wanted it.  Yes.

 6   Q    So you were offering to help him go intimidate someone

 7   else with a gun.  That's your testimony?

 8   A    I would give it to him, and he can do what he does.

 9   Q    But you testified you knew he wanted it to intimidate

10   someone, didn't you?

11   A    Yes.

12   Q    Now, in addition to hanging out at slaphouses, you

13   testified you would drink at Alex Dao's restaurant in

14   Huntington Beach.  Do you recall that?

15   A    Yes.

16   Q    And you testified that there were a lot of gangsters in

17   there; correct?

18   A    Yes.

19   Q    A lot of drug deals going on; correct?

20   A    Yes.

21   Q    And you were fine with that, weren't you?

22   A    Yes.

23   Q    That was your element, wasn't it?

24   A    Yes.

25   Q    Now, you testified that, I believe from 2009 until the
```

```
 1    time you were arrested, that you tried to work various small

 2    jobs; correct?

 3    A    Yes.

 4    Q    The fact is you're a drug dealer, aren't you?

 5    A    I was a small one, just paying for my habits.  Not --

 6    nothing big.  It was just small quantity.

 7    Q    That's not my question, sir.

 8         You were a drug dealer, weren't you?

 9    A    A small one, yes.

10    Q    That's important in your mind, that you were small?  Is

11    that your testimony?

12    A    I was a small-time drug dealer, yes.

13    Q    So it's okay, in your mind, to sell small amounts of meth

14    and cocaine?

15              MR. WILKE:  Objection.  Argumentative.  403.

16              THE COURT:  Overruled.

17              THE WITNESS:  I was just really paying for my

18    habits.  Yes.

19    Q    BY MR. STAPLES:  You were also loaning money, weren't

20    you?

21    A    I let people borrow money, yes.

22    Q    Up to $5,000; correct?

23    A    Yes.

24    Q    And you got that money from dealing drugs, didn't you?

25    A    No.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Where did you get it from?
 2   A    I would ask other people that I knew had money, and I
 3   would get -- borrow from them.  It would not always be my
 4   money.
 5   Q    You're saying when you loaned money to people like David
 6   Doan and James Dao, you were using other people's money.  Is
 7   that your testimony?
 8   A    When I loaned David, it was my money.  The 5,000 was for a
 9   different Vinh.  It was not the same Vinh.  So that was another
10   person I had to borrow money from because I didn't have $5,000.
11        So with James, I borrow -- he would borrow money
12   from me directly.  So he would owe me directly on that.
13   Q    Now, in the days, weeks, and months following the night
14   that James Dao was killed, you never really showed any remorse,
15   did you?
16   A    I was sad when I found out.  I didn't --
17   Q    I'm talking about starting with the night that you left
18   him in a cold, dark sea going on where you never really showed
19   any remorse, did you?
20   A    I was not in the right state of mind.
21   Q    My question is you did not show any remorse, did you?
22   A    I was worried.  Yes.
23   Q    I didn't ask if you were worried, sir.  You did not show
24   any remorse, did you?
25   A    Can you define "remorse."
```

09:49AM 5
09:50AM 10
09:50AM 15
09:51AM 20
09:51AM 25

Q    Regret.  You showed no regret over leaving James Dao in the dark sea in the middle of the night, did you?

A    I wouldn't -- I felt bad because I didn't have the money. If I had the $2,000, then I would have lent it to him and this would never have happened.  That's what plays back in my mind because I -- I remember that he asked me -- he wanted to go to the casino, and I just didn't have the money.  And I felt bad because I guess I cussed at him and he didn't, like, take that very gently.  So he was upset at me.

Q    That's not my question, sir.

     You did not feel regret over leaving your friend James Dao out in the middle of the ocean in the middle of the night, did you?

     MR. WILKE:  Your Honor, this has been answered now --

     THE COURT:  Overruled.

     THE WITNESS:  Felt bad.

Q    BY MR. STAPLES:  Do you even understand what the word "regret" means, sir?

A    Like I regret not having the money?

Q    Okay.  You regretted not having the money, but you didn't regret leaving your friend out in the ocean, did you?

A    I thought he was just going to be alive.  I thought he would have swam to the rocks or something.  That's all I thought of because he was -- he was alive and yelling at me,

```
 1   and I wanted to get away from him.
 2   Q    You didn't testify to that yesterday.  You didn't testify
 3   about any rocks being around where you were, did you?
 4   A    I thought he would be able to swim.  But I don't know.
 5   Q    Showing you 126.  This is a picture of James Dao on
 6   October 16th.
 7              MR. WILKE:  This has been covered, and the defendant
 8   has not seen this photo other than in court.
 9              THE COURT:  Overruled.
10   Q    BY MR. STAPLES:  Okay.  October 16th, this is your friend
11   James Dao; right?
12   A    Yes.
13   Q    Two days later this is you, isn't it?
14   A    Yes.
15   Q    You don't look very regretful in this, do you?
16   A    I haven't slept in that picture.  I was just -- I'm just
17   usually joyful and just smile with people all the time.
18   Q    You're joyful two days after leaving your friend in the
19   middle of the night in the middle of the ocean; correct?
20   A    I was just taking a picture.  I didn't know that he died.
21   It was -- I was just asking for information with the --
22   Q    You didn't know that he died.  You just knew you
23   abandoned him in the middle of the night in the ocean; correct?
24              MR. WILKE:  This is cumulative now, Your Honor.
25              THE COURT:  Overruled.
```

```
 1              THE WITNESS:  Yes.
 2    Q    BY MR. STAPLES:  And you didn't really show any remorse
 3    or regret to Natalie Nguyen, did you?
 4    A    No.
 5    Q    You lied to her, didn't you?
 6    A    Yes.
 7    Q    She was pleading with you to tell her where her husband
 8    was, wasn't she?
 9    A    Yes.
10    Q    And you knew where he was, didn't you?
11    A    Not exactly.
12    Q    Not exactly, because you left him drifting in the ocean;
13    right?
14    A    He went into the water, yes.
15    Q    And you left him there?
16    A    Yes.
17    Q    But you didn't even tell Natalie Nguyen that you were on
18    the boat with him, did you?
19    A    No.
20    Q    Instead, you asked to borrow money from her, didn't you?
21    A    Yes.
22    Q    You asked to borrow $200 from the wife of the man you
23    left out in the ocean; right?
24    A    No.  I said I had $200.  All I had was $200 and if she had
25    any money.
```

09:54AM (line 5)
09:54AM (line 10)
09:55AM (line 15)
09:55AM (line 20)
09:55AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    Q    So you asked her for money?

 2    A    I asked her for money, yes.

 3    Q    And in response to her pleas for information regarding

 4    her husband, your response was you were getting annoyed, wasn't

09:56AM 5    it?

 6    A    I was getting annoyed because people are calling me, yes.

 7    Q    So you were annoyed; correct?

 8    A    Yes.

 9    Q    You told her not to accuse -- stop accusing you; correct?

09:56AM 10   A    Yes.

11    Q    That's not regret, is it?

12    A    No.

13    Q    In addition, you started tracking her, didn't you?

14    A    That was later.  Yes.

09:57AM 15   Q    I'm sorry?

16    A    That was later.  Yes.

17    Q    And, to be clear, you were tracking Natalie, not James

18    Dao, were you?

19    A    I was tracking the both of them because they had the same

09:57AM 20   car.  James and Natalie would use the same van.  So that was

21    their only transportation.

22    Q    Sir, after you had told Sheila Ritze that the "Tracker

23    went to Arizona," you sent this text, didn't you?

24    A    Yes.

09:57AM 25   Q    And it says, "I want my 100k.  Bitch prolly trying to
```

**UNITED STATES DISTRICT COURT**

```
 1   stash it"; right?
 2   A     Yes.
 3   Q     And you're talking about Natalie Nguyen there; right?
 4   The bitch is Natalie Nguyen, isn't it?
09:58AM 5   A     Yes.
 6   Q     You weren't talking about James Dao, were you?
 7   A     No.
 8   Q     You testified earlier that you sent this because, if
 9   James and Natalie got their insurance, you wanted your cut;
09:58AM 10  correct?
11   A     I was joking about it.
12   Q     Because James Dao wouldn't give you a cut, would he?
13   A     He -- we talked about this before.  Like, James would joke
14   around about the life policy, and this was, like, earlier in
09:58AM 15  the year because Natalie wanted a life policy on me as well
16   because I was doing so much drugs.  So they wanted to get a
17   life policy on me too.  So we would joke around a lot.
18   Q     If James Dao had managed to survive the ocean and was
19   doing the insurance fraud that he joked about, he would not
09:59AM 20  give you $100,000, would he?
21   A     He would probably -- he said, like, 50,000.
22   Q     Sir, at the time you sent this text, you were afraid he
23   was going to kill you.  This is after you left him on the
24   water; right?
09:59AM 25  A     Yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q    So James Dao was not going to give you $100,000 if you

 2   ran into him again; right?

 3   A    I don't know.

 4   Q    You don't know?  Sir, you testified you were afraid that

10:00AM 5   James Dao was going to come and get you and get revenge;

 6   correct?

 7   A    Yes.

 8   Q    So he's not going to give you $100,000 from a life

 9   insurance policy, is he?

10:00AM 10   A    No.

11   Q    This is not talking about James Dao.  This is talking

12   about Natalie Nguyen, isn't it?

13   A    Yes.

14   Q    Now, you didn't express any remorse or sympathy to James

10:00AM 15   Dao's mother, did you?

16   A    No.  I didn't know how to respond to her.

17   Q    So the answer is "no"?

18   A    No.

19   Q    You know she left you a message; right?

10:00AM 20   A    I'm not sure.

21   Q    She left you a message, pleading with you to call her,

22   didn't she?

23   A    I think so.

24   Q    And, in fact, Natalie Nguyen sent you her phone number,

10:01AM 25   didn't she?
```

**UNITED STATES DISTRICT COURT**

```
      1   A    Yes.
      2   Q    And Alex Dao asked you to call her, didn't she -- didn't
      3   he?
      4   A    Yes.
10:01AM 5 Q    She's here in court, isn't she?
      6   A    Yes.
      7   Q    But you, to this day, never said one word of regret to
      8   her, have you?
      9   A    No.
10:01AM 10 Q   Because you do not regret what you did, do you?
     11   A    No.  Because I can't talk to her.
     12   Q    Before that, before you were arrested, you never said
     13   anything to her; correct?
     14   A    I never said anything to her, no.
10:01AM 15 Q   To the grandmother of the little girls who called you
     16   Uncle Wayne; correct?
     17   A    Yes.
     18   Q    To the mother of your friend for ten years, you never
     19   said a word of sympathy or regret, did you?
10:01AM 20 A   I didn't know he died until I was picked up.  So I --
     21   Q    No, you just lied about where he was; right?  You let his
     22   mother worry rather than telling the truth; right?
     23   A    Yes.
     24   Q    And that, sir, is because you did not regret what you
10:02AM 25 did; correct?
```

1   A    I didn't know how to react.

2   Q    My question, again, is you never showed any sign of

3   remorse for what you did to James Dao because you didn't regret

4   it; correct?

10:03AM 5   A    I did regret it.

6   Q    Your testimony is you regretted not having $2,000, sir.

7         MR. WILKE:  Objection, Your Honor.  It's

8   argumentative.

9         THE COURT:  Overruled.

10:03AM 10        THE WITNESS:  I regretted it after the fact.

11  Q    BY MR. STAPLES:  In fact, far from exhibiting any regret,

12  you continued in your gangster lifestyle; correct?

13  A    I continued to get high, just do drugs.

14  Q    Continued to deal drugs also; right?

10:03AM 15  A    Yes.

16  Q    Tried to get in the game of profiles; right?

17  A    Yes.

18  Q    Boasting to your gangster friends; right?

19  A    Yes.

10:03AM 20  Q    Telling them how you shot a guy who owed you 30- to

21  $40,000; right?

22  A    Yes.

23  Q    Trying to impress your gangster friends; right?

24  A    Yes.

10:04AM 25  Q    Showing them you were a tough guy too; right?

```
  1   A     The same, yes.

  2             MR. STAPLES:  This might be a good time for a break,

  3   Your Honor.

  4             THE COURT:  Ladies and gentlemen, why don't we take

10:04AM 5   20 minutes.  You're admonished not to discuss this matter

  6   amongst yourselves, nor form or express any opinions concerning

  7   the case.

  8             (Out of the presence of the jury.)

  9             MR. SCALLY:  Your Honor, I don't know if the Court

10:05AM 10  got the Government's file from yesterday concerning some

  11  additional exhibits.

  12            THE COURT:  I haven't looked at anything.  There

  13  was -- I wasn't aware there was a filing.

  14            MR. SCALLY:  We did file a --

10:05AM 15            THE COURT:  Let's have a seat.  Let's find out if

  16  the defense has the filing.

  17            Do you have a filing from last evening?

  18            MR. WILKE:  We didn't file anything, Your Honor.

  19            THE COURT:  That's not my question.

10:05AM 20            MR. WILKE:  No, we didn't file anything last night.

  21            THE COURT:  That's not my question.  Did you get the

  22  Government's filing?

  23            MR. WILKE:  Oh, yes.

  24            THE COURT:  I have not seen it nor have I read it.

10:05AM 25            MR. SCALLY:  I apologize, Your Honor.  The filing is
```

1    a seven-page -- six-page brief regarding some additional

2    exhibits that the Government believes --

3              THE COURT:  I'll have to have time to look at that,

4    Counsel.

10:06AM 5              MR. SCALLY:  Absolutely, Your Honor.

6              THE COURT:  Discontinue your cross-examination,

7    then, or what?  Because I'm not going to make decisions after

8    this long attention I paid --

9              MR. SCALLY:  I can go a bit longer.

10:06AM 10              THE COURT:  -- and the hours I put on?  I'm not

11    going to rush that.  So if you're filing at the last moment --

12              MR. SCALLY:  Understood, Your Honor.

13              THE COURT:  -- I haven't read it.

14              MR. WILKE:  Your Honor, there's one issue I'd like

10:06AM 15    to raise at this time.  The last questioning, the most recent

16    questioning by Mr. Staples of the defendant, he repeatedly

17    asked the defendant about whether he ever spoke to the --

18    Mr. Dao's -- James Dao's mother about what happened or

19    expressed regret or remorse to James Dao's mother or his wife.

10:06AM 20              Your Honor, that is a commentary on the defendant's

21    exercise of his privilege against self-incrimination.  At this

22    point, I would I move for a mistrial based on that line of

23    questioning.

24              THE COURT:  Thank you.  Denied.

10:06AM 25              MR. WILKE:  I would ask the Court --

**UNITED STATES DISTRICT COURT**

THE COURT:  When am I going to be able to read this?
Because otherwise, you're going to discontinue your
cross-examination.  In other words, if you want a ruling, I
have to have the time hopefully to pay thoughtful consideration
10:07AM  to filings.  I'm going to come in the evening -- I'm not
chiding for that, but all the other issues, I've been able to
look at over the weekend or whatever.  And these last-minute
filings, quite frankly, are a little interesting, let's say
that, and then you expect the Court to make an intelligent
10:07AM  ruling.

You're welcome to discontinue your cross-examination
or continue on.  Your choice.  But I haven't read those
documents yet, nor was I notified that they would be filed.

MR. SCALLY:  I'm sorry, Your Honor?

10:07AM  THE COURT:  Nor was I notified that they would be
filed last evening.

Your call.  Your decision.  Are you going on or are
you discontinuing your cross?

MR. SCALLY:  Can I have a brief moment, Your Honor?

10:07AM  THE COURT:  Certainly.

MR. STAPLES:  Withdraw the motion.  I'll just finish
up.

THE COURT:  Now, I can go back and read them, but
I'm not going to be rushed or pushed into making decisions at
10:08AM  the last moment.  If you want me to, I'll go back to read them

1    in the next 15 or 20 minutes, but I'm not going to rush those,

2    nor am I going to rush the defense in their response because I

3    have no idea what they are.

4              All right.  We're in recess now.

10:08AM  5         **(Proceedings concluded at 10:08 a.m.)**

6                      **--oOo--**

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  January 16, 2022*

16

17

18

19                            */S/ DEBBIE HINO-SPAAN*
                         _____

20                            *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**