**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )   <u>**CERTIFIED TRANSCRIPT**</u>
                                    )
      vs.                           )   Case No.
                                    )   8:20-cr-00002-DOC-1
HOANG XUAN LE,                      )
                                    )
            Defendant.              )   **Day 9, Volume III**
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, NOVEMBER 19, 2021

12:44 P.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL:**

2    **FOR PLAINTIFF:**

3          TRACY L. WILKISON
           Acting United States Attorney
4          BY:  GREGORY SHEPHERD SCALLY
                Assistant United States Attorney
5          411 West 4th Street
           Suite 8000
6          Santa Ana, California 92701
           714-338-3592
7          gregory.scally@usdoj.gov

8          TRACY L. WILKISON
           Acting United States Attorney
9          BY:  GREGORY W. STAPLES
                Assistant United States Attorney
10         411 West 4th Street
           Suite 8000
11         Santa Ana, California 92701
           714-338-3535
12         greg.staples@usdoj.gov

13

     **FOR DEFENDANT:**
14
           LAW OFFICES OF CRAIG WILKE
15         BY:  CRAIG WILKE, ESQ.
           305 North Harbor Boulevard
16         Suite 216
           Fullerton, California 92832-1901
17         714-870-8900
           craig@craigwilkelaw.com
18
           LAW OFFICES OF SHEILA MOJTEHEDI
19         BY:  SHEILA SARAH MOJTEHEDI, ATTORNEY AT LAW
           806 East Avenida Pico
20         Suite I-291
           San Clemente, California 92673
21         323-412-0472
           sheila@mojtehedi.com
22
     **ALSO PRESENT:**
23
           Austin Casey, Special Agent, Coast Guard
24

25

**UNITED STATES DISTRICT COURT**

**I N D E X**

| WITNESSES | PAGE |
|---|---|

**HOANG XUAN LE, CALLED BY THE DEFENSE**
    Redirect Examination by Mr. Wilke (resumed)    4

**ROSE LE, CALLED BY THE DEFENSE**
    Direct Examination by Ms. Mojtehedi    21

**LAN LE, CALLED BY THE DEFENSE:**
    Direct Examination by Ms. Mojtehedi    29

**ALEX DAO, CALLED BY THE DEFENSE:**
    Direct Examination by Mr. Wilke    42

**EXHIBITS**

(None offered.)

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; FRIDAY, NOVEMBER 19, 2021** |
| 2 | **12:44 P.M.** |
| 3 | **- - -** |
| 4 | **(In the presence of the jury.)** |
| 12:44PM 5 | THE COURT:  We're back in session.  The jury and the |
| 6 | alternates are present, all counsel, the defendant, |
| 7 | investigating agency.  If you'd be seated.  Thank you for your |
| 8 | courtesy. |
| 9 | And, Counsel, is there a further -- any further |
| 12:45PM 10 | cross-examination by the Government? |
| 11 | MR. STAPLES:  No, Your Honor. |
| 12 | THE COURT:  Redirect on behalf of the defense? |
| 13 | MR. WILKE:  Yes.  Thank you, Your Honor. |
| 14 | **HOANG XUAN LE, DEFENDANT, RESUMED THE STAND** |
| 12:45PM 15 | **REDIRECT EXAMINATION** |
| 16 | BY MR. WILKE: |
| 17 | Q    Mr. Le, before lunch, Mr. Staples was asking you about |
| 18 | various guns that you've had.  Do you recall that? |
| 19 | A    Yes. |
| 12:45PM 20 | Q    Okay.  I want to ask you some additional questions about |
| 21 | that. |
| 22 | Now, we saw -- you testified that, at some point in |
| 23 | 2019, you owned two different shotguns; is that correct? |
| 24 | A    Yes. |
| 12:45PM 25 | Q    Okay.  I'm going to show you what has been admitted as |

|  |  |
|---|---|
| 1 | Exhibit 280 on the screen.  Do you see that shotgun there? |
| 2 | A    Yes. |
| 3 | Q    Is that a shotgun? |
| 4 | A    Yes. |
| 12:45PM 5 | Q    Okay.  And did you own that gun and possess that gun at |
| 6 | or about the time of your arrest in December of 2019? |
| 7 | A    Yes. |
| 8 | Q    And that's the gun you -- was under your mattress; |
| 9 | correct? |
| 12:46PM 10 | A    Yes. |
| 11 | Q    Okay.  Directing your attention to Exhibit 271, do you |
| 12 | see that? |
| 13 | A    Yes. |
| 14 | Q    Is that also a shotgun? |
| 12:46PM 15 | A    Yes. |
| 16 | Q    Did you own that gun at the time of your arrest? |
| 17 | A    No. |
| 18 | Q    Did you possess that gun at the time of your arrest? |
| 19 | A    No. |
| 12:46PM 20 | Q    When did you last possess that gun, the gun depicted in |
| 21 | 271? |
| 22 | A    Probably saw it around May of 2019. |
| 23 | Q    Okay.  And so there was another picture of you holding |
| 24 | that gun.  I'm going to direct your attention to Exhibit 265. |
| 12:46PM 25 | Do you see that? |

         1    A     Yes.

         2    Q     That picture would have been taken -- who took that

         3    picture, if you know?

         4    A     I don't remember.  I think it might be James.

12:47PM  5    Q     Okay.  That picture would have been taken, though, no

         6    later than May of 2019?

         7    A     Yes.

         8    Q     And the -- that particular gun, what did you do with it?

         9    A     I sold it to a friend.

12:47PM 10    Q     Okay.  Now, there were also two weapons that you

        11    described as -- were described as an AR-15; correct?

        12    A     Yes.

        13    Q     Now, directing your attention to Exhibit 277, do you see

        14    that?

12:47PM 15    A     Yes.

        16    Q     Is that one of the AR-15s?

        17    A     Yes.

        18    Q     And where is it located in this photo?

        19    A     It's hidden underneath my bathroom sink.

12:48PM 20    Q     Okay.  And is that where the gun was on the day you were

        21    arrested?

        22    A     Yes.

        23    Q     Okay.  Was that gun kept with a clip in it?

        24    A     No.

12:48PM 25    Q     So there were no bullets in it; correct?

1    A    No.

2    Q    I'm sorry, were there bullets in the gun?

3    A    No bullets.

4    Q    Okay.  And you obtained this gun -- you were holding this

12:48PM  5    gun as collateral for a debt that you were owed?

6              MR. STAPLES:  Objection.  Leading.

7              MR. WILKE:  I'll rephrase.

8              THE COURT:  Sustained.

9    Q    BY MR. WILKE:  Explain why you had this gun.

12:48PM 10    A    This gun, I acquired through another friend of a guy that

11    used to buy drugs from me.  So he bought an ounce of cocaine

12    and didn't have the money.  So he gave me this AR as collateral

13    until he would pay me.

14    Q    Okay.  And how long had you been holding this gun as of

12:48PM 15    December 19, 2019, when you were arrested?

16    A    Roughly two or three months.

17    Q    Now, the second AR-type gun, showing you Exhibit 268, do

18    you see that?

19    A    Yes.

12:49PM 20    Q    And you described that as a gun that you received from

21    James Dao?

22    A    Yes.

23    Q    When did James Dao give you that gun?

24    A    He gave me that earlier that year in, roughly, January,

12:49PM 25    February, 2019.

```
 1   Q    And why did he give you that gun?

 2   A    Instead of giving me money, he just gave me this gun.

 3   Q    So to pay a debt he owed you?

 4   A    It was more of a -- like, a gift that he was trying to

 5   give to me.

 6   Q    Okay.  Did he -- at the time he gave you this gun, did he

 7   owe you money?

 8   A    Yes.

 9   Q    Did you credit any of the debt he owed you based on this

10   gun?

11   A    No.

12   Q    Okay.  And what did you do with this gun?

13   A    I sold it.

14   Q    For how much?

15   A    This one, I sold for around 1200.

16   Q    When did you sell it?

17   A    May of 2019.

18   Q    And then, finally, showing you Exhibit 269, do you recall

19   this?

20   A    Yes.

21   Q    This, you testified, was a .38 revolver that you bought

22   in the summer of 2019?

23   A    Yes.

24   Q    Is this the gun you testified to on direct examination

25   that you had bought at the slaphouse?
```

**UNITED STATES DISTRICT COURT**

1   A    Yes.

2   Q    At the same time you bought a .40 caliber gun?

3   A    Yes.

4   Q    Okay.  And is this gun -- when you bought this gun, was

12:50PM 5   there ammunition in it?

6   A    Yes.

7   Q    What did you do with that ammunition?

8   A    I unloaded it and left it at home.

9   Q    Okay.  What did you do with this gun?

12:51PM 10   A    This gun, I lent to a girl in December.

11   Q    December of 2019?

12   A    '19, yes.

13   Q    Was that Terren Smith?

14   A    Yes.

12:51PM 15   Q    When you lent it to her, did you give her the ammunition?

16   A    No, I did not.

17   Q    At the time of your arrest on December 19, 2019, was the

18   ammunition still at your house?

19   A    Yes, it was.

12:51PM 20   Q    Now, Mr. Staples asked you about a statement that you

21   made to Tony Hoang on or about November 10th, 2012.  Do you

22   recall those questions?

23   A    Yes.

24   Q    Okay.  The questions concerned a statement by you

12:52PM 25   about --

**UNITED STATES DISTRICT COURT**

|  | 1 | MR. WILKE:  May I have a moment, Your Honor? |
|---|---|---|
|  | 2 | **(Pause in proceedings.)** |
|  | 3 | Q    BY MR. WILKE:  -- quote, "I'm just going to off him."  Do |
|  | 4 | you recall that? |
| 12:52PM | 5 | A    Yes. |
|  | 6 | Q    Okay.  And I think Mr. Staples' question was when you |
|  | 7 | used the term "off" in making that statement, that refers to |
|  | 8 | kill him; correct? |
|  | 9 | A    Yes. |
| 12:53PM | 10 | Q    In November 10, 2019, did you intend to kill anybody? |
|  | 11 | A    No. |
|  | 12 | Q    Why did you tell Tony Hoang that you intended to kill |
|  | 13 | this person? |
|  | 14 | A    I was just trying to make myself look like a badass to |
| 12:53PM | 15 | him. |
|  | 16 | Q    To Tony Hoang? |
|  | 17 | A    Yes. |
|  | 18 | Q    On cross-examination Mr. Staples asked you about the |
|  | 19 | motorcycle accidents that you testified to. |
| 12:53PM | 20 | A    Yes. |
|  | 21 | Q    Okay.  And you -- I think you indicated that you were not |
|  | 22 | aware that you had any head injury; correct? |
|  | 23 | A    Yes. |
|  | 24 | Q    And so you never received treatment for any head injury; |
| 12:53PM | 25 | correct? |

```
       1    A      No.

       2    Q      How did you feel after those accidents?

       3    A      The accidents, it was always just a daze, like, when I

       4    would crash.  So I would be okay.  I wouldn't see blood.

12:54PM 5   Q      Okay.  So you didn't see blood, but you said you -- there

       6    was a daze?

       7    A      Yes.

       8    Q      What do you mean by that?

       9    A      Daze where I would just hit my head and I would just shake

12:54PM 10  it off.  I would be okay.

      11    Q      Okay.  So you weren't unconscious; right?

      12    A      No, I would not be unconscious.

      13    Q      Okay.  But when you say "daze," how did that make you

      14    feel?

12:54PM 15  A      It makes you feel dizzy.

      16    Q      Now, Mr. Staples also asked you whether sometimes you and

      17    James yelled at each other; correct?

      18    A      Yes.

      19    Q      Other than the time on the boat in October, in the

12:55PM 20  morning of October 15 -- I think the question was were there

      21    other times that you yelled at each other?

      22    A      Yes.

      23    Q      And I think you testified that, yes, there were; correct?

      24    A      Yes.

12:55PM 25  Q      This wasn't the first physical encounter that you had
```

UNITED STATES DISTRICT COURT

1    with Mr. Dao, was it?

2    A    No.

3    Q    You testified about the incident in the car a few months

4    earlier.  Do you recall that?

12:55PM 5    A    Yes.

6    Q    Now, even though you and James yelled at each other and

7    had prior -- a prior physical encounter, had he ever pointed a

8    gun at you directly?

9    A    This was the first time.

12:55PM 10   Q    On cross-examination, Mr. Staples asked you some

11   questions about this messages that you exchanged with Alex Dao.

12   Do you recall that?

13   A    Yes.

14   Q    Okay.  Showing you what's been admitted as Exhibit 290,

12:56PM 15   page 1, the white message up here at the top is "It's

16   around" -- "aroind" a-r-o-i-n-d "11ish.  I'll stop by.  Trying

17   to recruit more people to join."

18            Do you see that?

19   A    Yes.

12:56PM 20   Q    Okay.  And that's a message from you to Alex?

21   A    Yes.

22   Q    And what are you telling him there?

23   A    I said it's Saturday, so I would be around his poker game

24   in Irvine around 11:00.  And I'll try to bring more people to

12:57PM 25   gamble at his poker game.

```
      1    Q     Had Alex asked you to do that?

      2    A     He would commonly -- yes.

      3    Q     To bring more people to his game to gamble?

      4    A     Yes.

12:57PM 5    Q     And did you try to do that for him?

      6    A     Yes.

      7    Q     Did you -- did he pay you to do that?

      8    A     He would pay me a commission.

      9    Q     If you brought somebody to the game?

12:57PM 10   A     Yes.

      11   Q     How much would he pay you?

      12   A     If the poker person would play for at least four hours,

      13   then he would pay me $100 per person.

      14   Q     And then later down -- or down further in the page

12:57PM 15   there's these messages, "What's up?  This guy Colin guy now

      16   owes me 13,500."  Do you see that?

      17   A     Yes.

      18   Q     Who's Colin?

      19   A     It's a guy that I know.

12:58PM 20   Q     Is it a guy that you brought to the poker game for Alex?

      21   A     No.

      22   Q     Okay.  Did Alex know that you knew Colin?

      23   A     Yes.

      24         MR. STAPLES:  Objection.  Foundation.

12:58PM 25         THE COURT:  Sustained.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MR. WILKE:  Did you have any prior communications with
 2   Alex about this guy, Colin?
 3   A    Yes.
 4   Q    And during those prior communications, did you advise
 5   Alex that you knew this guy, Colin?
 6              MR. STAPLES:  Objection.  Hearsay.
 7              THE COURT:  Sustained.
 8              THE WITNESS:  That I knew him, yes.
 9              THE COURT:  You don't have to answer the question.
10   Q    BY MR. WILKE:  Did you ever tell Alex you knew Colin?
11              MR. STAPLES:  Objection.  Hearsay.
12              MR. WILKE:  Not offered for the truth.  It's offered
13   to explain why Alex would send this text to him.
14              THE COURT:  And this is Mr. Le's statement about a
15   statement he might have made.
16              MR. WILKE:  The question is "Did you ever tell Alex"
17   that he knew this man -- "that you knew this man, Colin?"
18              THE COURT:  Overruled.
19              You can answer that question.
20              THE WITNESS:  Yes.
21              MR. WILKE:  Okay.
22   Q    And what was your understanding of why Alex was sending
23   you these texts with Colin's real name and, I think later on in
24   the next page, where his -- the location of his office?
25   A    He wanted me to stop by and maybe collect a debt for him.
```

```
 1   Q    Okay.  And by "collect a debt," how would you collect a

 2   debt for him?

 3   A    I would ask the guy.

 4   Q    You would go by the guy's office?

12:59PM 5   A    He was a realtor so he -- I would stop by his office and

 6   ask him for the money.

 7   Q    Okay.  Did you ever --

 8   A    Did I ever do --

 9   Q    I'm sorry.  Let me -- did you ever go by Colin's office

01:00PM 10   and try and collect the debt?

11   A    No, I didn't.

12   Q    Okay.  And Colin is Coco Colin; correct?  Same person?

13   A    Yes, it is.

14   Q    Did you ever collect any money, any debts for Alex?

01:00PM 15   A    No.

16   Q    Did he ever pay you to collect debts?

17   A    No.

18   Q    Okay.  You did tell Tony, though, that he did; correct?

19   A    Yes.

01:00PM 20   Q    Was that truthful?

21   A    No.

22   Q    So Mr. Staples showed you several maps.  Do you recall

23   those maps?  Exhibit 255-19 -- do you recall seeing the map?

24   A    Yes.

01:01PM 25   Q    Okay.  On the morning of October 15, I think your
```

UNITED STATES DISTRICT COURT

```
 1    testimony was, you believed you were about a mile offshore when
 2    the incident happened; is that correct?
 3    A    (No audible response.)
 4    Q    He asked you about how far you were offshore, and I think
 5    your testimony was a mile?
 6    A    I think that's the first time I went lobster fishing, when
 7    he was asking me.  I didn't know how far it was.
 8    Q    Okay.  Both the first time and second time, though, did
 9    you go the same approximate distance offshore?
10    A    Yes.
11    Q    Okay.  And in -- you believe it to be about a mile;
12    correct?
13    A    Yes.
14    Q    Okay.  You were not navigating the boat; correct?
15    A    Correct.
16    Q    You didn't -- prior to this trial, you hadn't seen those
17    maps, had you?
18    A    Correct.
19    Q    Now, on cross-examination, Mr. Staples also showed you
20    two fairly graphic photographs of Mr. Dao after he was taken
21    from the water on October 16th.  Do you recall those photos?
22    A    Yes.
23    Q    One that showed the upper part of his body; correct?
24    A    Yes.
25    Q    And then another one that showed his head.  I think he
```

```
 1    actually showed you two of his head; correct?
 2    A    Yes.
 3    Q    Now, when Mr. Dao went overboard, was there blood on his
 4    face?
 5    A    No.
 6    Q    When Mr. Dao went overboard, did you see -- before he
 7    went overboard, did you see the cuts to his head?
 8    A    No, I did not.
 9    Q    Did you see any blood on Mr. Dao before he went
10    overboard?
11    A    No.
12    Q    And when Mr. Dao was in the water, did you see any blood
13    on his face or head?
14    A    No.
15    Q    And from the time of the gunshots and you hitting Mr. Dao
16    with the handle, until the time that he went overboard, how
17    much time would you estimate elapsed during that period?
18    A    There was probably 30 seconds.
19    Q    30 seconds is your estimation?
20    A    Yes, more or less.
21    Q    Now, on cross-examination Mr. Staples elicited testimony
22    from you that you repeatedly lied to Alex, Natalie and, also,
23    the Coast Guard agents.  Do you recall that?
24    A    Yes.
25    Q    And why did you lie to them?
```

01:03PM (5)
01:03PM (10)
01:03PM (15)
01:04PM (20)
01:04PM (25)

**UNITED STATES DISTRICT COURT**

```
 1   A    Because I didn't want to be a part of anything that
 2   happened to James.
 3   Q    What did you think would happen to you if Alex knew that
 4   you had left his brother out in the ocean following this fight?
 5   A    He would beat me up.
 6   Q    Would you be concerned if he would do anything else?
 7   A    Yes.  I would be worried that Alex would kill me or shoot
 8   me.
 9   Q    And what were you -- when the Coast Guard came and spoke
10   to you, what did they tell you they were investigating?
11   A    They told me they were still looking for a missing person.
12   Q    When did you first learn that James Dao had died?
13              MR. STAPLES:  Objection.  Asked and answered.
14              THE COURT:  Sustained.
15              MR. WILKE:  I'm sorry?
16              THE COURT:  I sustained the objection.  I sustained
17   the objection.  I'm sorry.
18              MR. WILKE:  Okay.
19   Q    Mr. Staples also asked you questions about you lying to
20   Vinh Doan -- Vinh David Doan, Tony Hoang, and Shawn Whalin.  Do
21   you recall those questions?
22   A    Yes.
23   Q    You did tell all three of them that you had shot James;
24   correct?
25   A    Yes.
```

01:05PM (line 5)
01:05PM (line 10)
01:06PM (line 15)
01:06PM (line 20)
01:07PM (line 25)

```
 1   Q    And you did tell all three of them that you shot him
 2   during a fight; correct?
 3   A    Yes.
 4   Q    And you did -- that was true; correct?
 5   A    Shots went off, but I didn't shoot at him.
 6   Q    Okay.  You knew shots had gone off?
 7   A    Yes.
 8   Q    Okay.  Did you know he had been hit, though, with
 9   bullets?
10   A    No, I did not know.
11   Q    And you also told all three of them that James Dao owed
12   you 30-, 40,000?
13   A    Yes.
14   Q    Okay.  Was that true?
15   A    No.
16   Q    Why did you lie to them about this debt?
17   A    I was trying to make a bigger story impressive.
18   Q    Okay.  And did you -- why did you think this would
19   impress Tony, Shawn, and Vinh?
20   A    Just to sound like -- like I'm a mean person.
21   Q    Why did you want them to think that?
22   A    Just to show Alex that I'm a tough guy.
23             MR. WILKE:  I have no further questions.
24             THE COURT:  This would be recross-examination.
25             MR. STAPLES:  No recross.  Thank you.
```

01:07PM (line 5)
01:07PM (line 10)
01:07PM (line 15)
01:08PM (line 20)
01:08PM (line 25)

1    THE COURT:  Thank you.

2    Ladies and gentlemen, we're going to take a brief

3 recess.  We're going to come and get you much quicker this

4 time, probably five minutes or so.  So if you would be kind

01:08PM 5 enough to recess for just a moment.

6    **(Out of the presence of the jury.)**

7    THE COURT:  Counsel, if you'd be seated outside the

8 presence of the jury, then we'd ask Mr. Le to step down and be

9 seated at counsel table.

01:09PM 10   So, Karlen, believe it or not, would you go get the

11 jury.

12   **(Pause in proceedings.)**

13   MS. MOJTEHEDI:  Your Honor, in the interest of time,

14 can we go get our next witness?

01:10PM 15   THE COURT:  Please.  Thank you so much.

16   MS. MOJTEHEDI:  Sure.

17   **(In the presence of the jury.)**

18   THE COURT:  The jury is once again present.  All

19 counsel are present.  The alternates are present -- if you'd

01:13PM 20 please be seated.  Thank you for your courtesy -- the defendant

21 and investigating agency.

22   And, Counsel, if you'd like to call your next

23 witness, please.

24   MS. MOJTEHEDI:  Yes, Your Honor.  The defense calls

01:13PM 25 Rose Le to the stand.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Thank you.  Would you please raise your

2   right hand.

3              **ROSE LE, DEFENSE WITNESS, WAS SWORN**

4          THE COURT:  If you'd walk along the side of the jury

01:13PM 5   railing, please.  Just right here.  If you'd please be seated.

6          Would you state your name for the jurors, please.

7          THE WITNESS:  Rose Le.

8          THE COURT:  There's a plastic shield, if you'd open

9   that up.  And the bottom, see the black portion, that goes on

01:14PM 10  the bottom.  Just flip it over your head.  I'd take the yellow

11  mask off.  This will protect you.  Pull it down even more.

12          Comfortable?

13          THE WITNESS:  (No audible response.)

14          THE COURT:  All right.  Would you please state your

01:14PM 15  full name for the jurors.

16          THE WITNESS:  Rose Le.

17          THE COURT:  Spell your last name.

18          THE WITNESS:  L-e.

19          THE COURT:  Counsel, this would be direct

01:14PM 20  examination.

21                      **DIRECT EXAMINATION**

22  BY MS. MOJTEHEDI:

23  Q    Ms. Le, can you do me a favor and scoot up a bit closer

24  to the microphone, please.  And because there's a court

01:15PM 25  reporter, we ask that you speak slowly and clearly into the

```
       1    microphone.

       2              Can you please tell the members of the jury where

       3    you're from.

       4    A    I'm from -- originally from Vietnam.

01:15PM 5    Q    Okay.

       6    A    Now the United States.

       7    Q    You just said there was a time that you moved to the

       8    United States.  When was that?

       9    A    Probably about three years old.

01:15PM 10   Q    Three years old.

       11             And where did you come to in the United States when

       12   you came from Vietnam?

       13   A    I think we lived in California, then Texas, and then back

       14   to California.

01:15PM 15   Q    Okay.  And where in California did you live?

       16   A    In Santa Ana.

       17   Q    How long did you live in Santa Ana?

       18   A    Probably since third grade.  So probably -- I don't know.

       19   I'm 47 now.  So over 20 years.

01:15PM 20   Q    And do you still live in Santa Ana now?

       21   A    I do.

       22   Q    Okay.  Do you know somebody named Wayne Le?

       23   A    Yes.

       24   Q    How do you know Wayne?

01:16PM 25   A    He's my younger brother.
```

UNITED STATES DISTRICT COURT

```
 1   Q     When you say "younger brother," can you share with us how
 2   many siblings you have.
 3   A     We have seven in total.
 4   Q     Okay.  And where do you and Mr. Le fit into those lineup
 5   of seven?
 6   A     I'm second to the youngest.
 7   Q     You are second to the youngest?
 8   A     Yes.
 9   Q     Okay.  What about Mr. Le?
10   A     He's the youngest.
11   Q     Okay.  And, generally, what do your other siblings do for
12   a living?
13   A     My older brother Tommy is an RN, critical nurse in Texas.
14   The one older than him is Fong, he's, like, an underwriter for
15   an insurance company.
16         THE COURT:  I'm sorry, I couldn't hear you.  Could
17   you restate that.
18         THE WITNESS:  Sure.  The whole thing?  Okay.
19   Q     BY MS. MOJTEHEDI:  Sure.  Yeah.  That would be great.
20   A     My brother Tommy works in Texas as an RN, critical nurse.
21   My brother Fong, he's an underwriter for an insurance company.
22   My brother Danny, he is a -- works for DSL, a cable company;
23   they, like, install stuff.  And then Jeanne, my older sister,
24   is a buyer for, like, a tech company.  And then my sister Alani
25   is a -- an interpreter.
```

```
 1   Q    And what do you do for a living?

 2   A    I'm a teacher.

 3   Q    Where are you a teacher?  Which school do you teach?

 4   A    Oh, I teach at --

 5            THE REPORTER:  Your Honor --

 6            THE COURT:  Now, just a moment.  That's way too

 7   quick.  We can't get a transcript; so I'm going to strike the

 8   answer.

 9            The question was "Where are you a teacher?"

10            THE WITNESS:  I work --

11            THE COURT:  Just a moment.  Now, we're going to slow

12   way down.  Which schools do you teach at?  So please answer the

13   question.

14            THE WITNESS:  Carr Intermediate.

15   Q    And, Ms. Le, could you scoot up a little closer to the

16   mic.

17            THE COURT:  No, it's the speed, Counsel.  And you'll

18   have to control that or I'll need to.

19            MS. MOJTEHEDI:  Yes, Your Honor.  Absolutely.

20   Q    BY MS. MOJTEHEDI:  Just so we can hear you, what high

21   school did you teach -- do you teach at now?

22   A    I teach at a middle school.

23   Q    What grade do you teach?

24   A    Seventh grade.

25   Q    Okay.  Was there ever a time -- let me back up.  Do you
```

1   know if Wayne ever went to college?

2   A     Yes.

3   Q     Was there a time, after he finished college, that you

4   lived with him?

01:18PM 5   A     Yes.

6   Q     Okay.  Can you tell us what years that was.

7   A     I think he's probably -- we lived together probably about

8   2005 and on for a couple years.

9   Q     Do you -- when you say "for a couple years," what do you

01:18PM 10   mean by that?

11   A     I graduated and started working at the middle school that

12   I'm at right now.  Probably -- I started in 2005 and we were

13   living together at my -- we bought the house off of -- our

14   family home.  My parents had moved, and we bought the home that

01:19PM 15   we were raised in together.

16   Q     And how long did you live with your brother Wayne?

17   A     Probably -- from 2005 to probably 2010 or '11 almost.  So

18   five years.

19   Q     Okay.  And during those five years, did anybody else live

01:19PM 20   with you and Wayne?

21   A     We did -- we did have roommates.

22   Q     Were those family members or nonfamily members?

23   A     Nonfamily members.

24   Q     Okay.  Now, are you aware of whether Mr. Le is

01:19PM 25   right-handed or left-handed?

```
 1    A    He is left-handed.

 2    Q    Okay.  Thank you.

 3         While you lived with Mr. Le from about 2005 to 2010

 4    or '11, did you ever know him to ride motorcycles?

 5    A    Yes.

 6    Q    Okay.  And was there ever a time where you saw damage to

 7    any of his motorcycles?

 8    A    Yes.

 9    Q    Okay.  Can you tell us when that was, to the best of your

10    recollection.

11    A    I don't remember what year it was, but we were living

12    together.  And it had just happened, but he came home and --

13         THE COURT:  Just a little bit slower, please.

14         THE WITNESS:  He came home and was a little bit

15    shook up.

16         And I was, like, "What happened?"

17         And he showed me his helmet.  It was, like, really

18    dented in.  I was like "Whoa."

19         I saw his motorcycle, and I was, like, "What

20    happened?"

21         And so he told me he was, like, going on a ramp off

22    the freeway, and somebody had dinged his motorcycle from the

23    back.  And he flew off the motorcycle and literally hit -- I

24    guess, hit the side.  And so that's why there was, like, a huge

25    dent in, like, his helmet.
```

Q    Okay.  So let's break down what you just described.  You

saw that Mr. Le pointed to his motorcycle.  Did you actually

look at his motorcycle at that time?

A    No.  But I saw it, like, later that day.  I didn't go

01:21PM  outside.

Q    Okay.  And when you went outside later that day, can you

describe the condition the motorcycle was in.

A    I just remember the side being, like, super scratched up

on the side.  It's like somebody had scratched it on the side.

01:21PM  And that was all I remembered.

Q    Okay.  And you also mentioned seeing Wayne's helmet.  Can

you tell us what you observed from looking at the helmet.

A    It was just really dented in, like, probably, like, a

couple inches in.  Like, you can tell it was, like, dented,

01:21PM  like completely dented.  Like he hit a corner or something.

Q    Can you describe where on the helmet you saw that damage.

A    It was on the -- almost at the top.  Because it wasn't

usable anymore.

        THE COURT:  Just a little bit slower, please.

01:21PM          THE WITNESS:  It was very dented on the very top of

it, I'm going to say.

Q    BY MS. MOJTEHEDI:  Like, top of the head?

A    Yeah.  Like, right here on the -- like, on the top, on the

front.

01:22PM  Q    Okay.  And I may have missed this.  Did you share with us

```
 1   when you observed this, the date?
 2   A    No.  I -- maybe 2005, 2006.  But I don't remember the
 3   exact date.
 4             MS. MOJTEHEDI:  Okay.  Just a moment, Your Honor.
 5             No further questions, Your Honor.
 6             THE COURT:  Cross-examination, please.
 7             MR. SCALLY:  No questions, Your Honor.  Thank you.
 8             THE COURT:  Thank you very much, then.  You're
 9   excused from these proceedings.  You may step down.  Take the
10   mask with you and just destroy it if you'd like.
11             Counsel, if you'll call your next witness, please.
12             MS. MOJTEHEDI:  Your Honor, may I go get our next
13   witness?
14             THE COURT:  Please.  You may call your next witness.
15             Would you raise your right hand, please.
16             LAN LE, DEFENSE WITNESS, WAS SWORN
17             THE COURT:  If you'd please be seated in the witness
18   box.  If you'd be kind enough to walk along the side of the
19   jury railing.  And the entrance to the jury box is closest to
20   this wall.
21             After you're seated, would you take one of those
22   plastic masks.  And the bottom portion is this string -- you
23   can take your mask off.  The bottom portion, put it over your
24   head, please.  Thank you.  Now take the top strap and put it
25   over your head.  Top strap.  And then slide it down so it fits
```

```
 1   over your nose.

 2           Comfortable?

 3           THE WITNESS:  Yes, Your Honor.

 4           THE COURT:  Would you state your full name, please,

 5   for the jury.

 6           THE WITNESS:  My name is Lan Le.

 7           THE COURT:  Would you spell your first name, please.

 8           THE WITNESS:  L-a-n.

 9           THE COURT:  And your last name, please.

10           THE WITNESS:  L-e.

11           THE COURT:  Thank you.

12           And this would be direct examination, please.

13           MS. MOJTEHEDI:  May I proceed, Your Honor?

14           THE COURT:  Please.

15                        DIRECT EXAMINATION

16   BY MS. MOJTEHEDI:

17   Q    Ms. Le, can you make sure to scoot close to the

18   microphone so we can hear.

19           Where do you live?

20   A    I live in Fountain Valley.

21   Q    How long have you lived in Fountain Valley?

22   A    The house we live in right now, I would say 22 years

23   almost.

24   Q    How long have you lived in Orange County?

25   A    Most of my life.
```

```
 1   Q    Okay.  And what do you do for a living?
 2   A    I'm currently a medical interpreter.
 3   Q    And where do you work as an interpreter?
 4   A    I work as a freelance.
 5   Q    And where do you go to do interpreting work?
 6   A    I go to a medical doctor's office.  Right now I'm doing
 7   medical office and QME.  Mostly just doctor's office.
 8   Q    Okay.  Do you know somebody named Wayne Le?
 9   A    Yes.  That's my brother.
10   Q    Do you see him anywhere in court today?
11   A    Yes.
12   Q    Could you identify him by an article of clothing.
13   A    Yes.  He's wearing the suit, the black suit with the blue
14   tie.
15         MS. MOJTEHEDI:  Your Honor, let the record reflect
16   that Ms. Le has identified Wayne Le.
17         THE COURT:  The record will so reflect.
18   Q    BY MS. MOJTEHEDI:  Ma'am, where are you in the lineup of
19   your siblings in relation to Mr. Le?
20   A    I'm the eldest of the family.
21   Q    Oldest of the family, you said?
22   A    Yes.  Oldest of the family.
23   Q    Okay.  And was there ever a time that you lived with your
24   brother Wayne?
25   A    Yes.
```

```
 1   Q    What years was that?

 2   A    Approximately 2011.

 3   Q    Until when?

 4   A    Until the day that he got arrested.

 5   Q    Okay.  Who did Mr. -- who did your brother Wayne live

 6   with before he lived with you?

 7   A    He lived with Rose, my younger sister.

 8   Q    Okay.  And do you know where your brother Wayne lived

 9   before he lived with Rose?

10   A    Just stay in that house.  The same house in Santa Ana.

11   Q    And that's the house that your parents owned; right?

12   A    Yes.  Correct.

13   Q    Is it fair to say that, for Mr. Le's whole life, he's

14   lived with a family member?

15   A    Correct.

16   Q    Okay.  Now, from 2011 until 2019, was it just you and

17   Wayne living together?

18   A    The house we live was my mom, my dad, Wayne, and the

19   roommates.

20   Q    Okay.  And when you say "roommates," were those other

21   family members or nonfamily members?

22   A    Nonfamily member.

23   Q    Okay.

24   A    We had extra room; so it's rented now.

25              THE COURT:  I'm sorry.  Could you raise your voice
```

```
 1    just a little bit.
 2              THE WITNESS:  Yes.  Extra room and it was rented
 3    out.
 4              THE COURT:  Thank you.
 5    Q    BY MS. MOJTEHEDI:  Thank you.
 6              Now, was there a -- strike that.
 7              Was there a time when your father passed away?
 8    A    The date -- the date my dad passed away was February --
 9    the Asian new year, the Chinese new year, February -- February
10    9th.  I remember that day because I was in the parade, the
11    community parade.  And after that, we receive a phone call that
12    my dad passed away.
13    Q    What year was that?
14    A    2019.
15    Q    Okay.  Did you and any of your other family members
16    receive an inheritance after your father passed away?
17    A    My dad has a half-million-dollar life insurance policy.
18    And with that money, my mom decided, with the seven kids, she
19    wants each kid to have $50,000.
20    Q    Did that include Wayne?
21    A    Yes.
22    Q    Okay.  Do you know if Wayne received that $50,000 in one
23    lump sum?
24    A    No.  My mom told me to hold that money.  If it -- Wayne
25    needs anything that is considered appropriate, then I will help
```

01:29PM 5

01:30PM 10

01:30PM 15

01:31PM 20

01:31PM 25

```
 1    him with that.
 2    Q    And did you do that?
 3    A    Yes.
 4    Q    Was there ever a time where you believed there was an
 5    expense that was appropriate for you to spend the money on?
 6    A    Yes.  He needs a car.  He said he had a good deal to buy
 7    an old Cadillac.  And my mom agreed to it.  I told my mom about
 8    it.  And so I wrote the check for that amount.
 9    Q    And was that a white Cadillac?
10    A    Yes.
11    Q    Was that the same white Cadillac, to the best of your
12    recollection, that Wayne had in December of 2019?
13    A    Yes.
14    Q    Okay.  Do you remember how much that white Cadillac cost?
15    A    I don't remember exactly.  It could be around 17- or
16    18,000.  Don't remember.
17    Q    Okay.  And besides the purchase of that white Cadillac,
18    were there any other purchases using Wayne's share of the
19    inheritance?
20    A    He needed $5,000 or another extra $5,000 here and there.
21    And any time that -- whenever he needs the money, I always let
22    my mom know.  And she said, "Yes, go ahead."  And then I'll do
23    it.
24    Q    So, in other words, any time Wayne wanted to use that
25    money, he would have to go through you?
```

```
 1   A     Yes.  Because I will have to sign the check.
 2   Q     Okay.  And during this time when you were living with
 3   Wayne, did you know him to ride motorcycles?
 4   A     Yes.
01:33PM 5   Q     Was there ever a time that you saw any damage to any of
 6   his motorcycles?
 7   A     Twice.
 8   Q     Okay.  Let's talk about the first time.  Do you remember
 9   when that was?
01:33PM 10   A     I don't remember the timeline exactly, but I know that
11   he -- he had two motorcycle accidents.  One -- because, when I
12   come home, the motorcycle was parked on the sidewalk of the
13   gate in -- which usually you don't park there.  And it was
14   scratched up.  And then the second one, it was in the garage.
01:34PM 15   And it was almost, like, a total loss.
16   Q     Okay.  And let's focus for a moment on the first time.
17   At that time when you saw the motorcycle, did you also see
18   Wayne's helmet?
19   A     I don't -- I assume he has, but I don't pay attention to
01:34PM 20   the helmet.
21   Q     Okay.  So let's focus on just the bike.  You mentioned
22   that it was scratched up.  Where on the bike did you see that
23   it was scratched up?
24   A     On the body -- I don't know how to say it.  On the side of
01:34PM 25   the motorcycle.
```

```
 1   Q     Did you see it on both sides or just one side?

 2   A     I notice only one side.

 3   Q     Okay.  Let's talk about the second time when you

 4   mentioned that the motorcycle was -- appeared to be totaled.

 5   Can you describe what you saw.

 6   A     It was all scratched up.  It was almost, like, it's

 7   through a very rough accident.  That's why it was in the

 8   garage.  And I think Wayne's trying to fix it, trying to buy

 9   parts to fix it.

10   Q     And during that second time, did you observe the damage

11   to both sides of the motorcycle or just one side or the other?

12   A     I just know it's damaged.  It's hard for me to look back

13   to see if it's both sides or not.

14   Q     But all you remember, in your words, it appeared to be

15   totaled?

16   A     Yes.  To me it's just all messed up.  It's just too many

17   scratch marks.

18   Q     Okay.  I want to move on and talk about some of your

19   observations of Wayne's behavior while you were living

20   together.

21         Did you ever notice Wayne staying up late at night?

22   A     He -- I usually go to bed at 10:00.  And I know that he

23   stay up late after 10:00.  But I usually go to bed early, at

24   10:00.

25   Q     How did you know that Wayne was staying up late, after
```

         1   10:00 o'clock?

         2   A    Because once in a while I would, you know, get up and I

         3   see his room light is still on.  Or I hear the television

         4   because I can hear television sound from my room.

01:36PM  5   Q    And when you say you can hear the television sound from

         6   your room, is your room close to Wayne's room in the house?

         7   A    Yes.

         8   Q    Could you describe that.

         9   A    My -- the wall of my shower, my bathroom, it's right next

01:36PM 10   to his bedroom.

        11   Q    Okay.  And you mentioned that you heard the television on

        12   late at night?

        13   A    Yes.  A television -- he watched movies or something like

        14   that.

01:37PM 15   Q    Okay.  In addition to staying up late at night, did you

        16   ever understand Wayne to use drugs?

        17   A    I don't know drugs, what type of drugs.  But I do know

        18   when I go into his room one time, that I saw a medical

        19   marijuana card.

01:37PM 20           And I ask him, "What is this for."

        21           And he goes, "It's for my pain because of the

        22   accidents.  I'm in so much pain, and I need it."

        23   Q    Okay.  And besides that medical marijuana card, did you

        24   ever see anything else that suggested to you that Wayne used

01:37PM 25   drugs?

```
 1   A    I'm always suspicious because of the marijuana.  As a
 2   sister, of course, I always like to watch out for anything
 3   weird.  I look at -- one time I see, like a pocket of white
 4   powdery stuff.
 5            And I ask Wayne, "Wayne, what is this."
 6            And then he go, "Oh, sis, this is baking soda."
 7            And I look because -- I trusted him because under
 8   his bathroom there is a box of baking soda.
 9   Q    Did you know whether or not in that bag was baking soda?
10   A    I would not know to test to see if that is baking soda or
11   what.
12   Q    Could you describe what kind of bag it was.  Was it,
13   like, a Ziploc?
14   A    It was a small quarter-size bag.
15   Q    Okay.  And was there ever a time that you observed Wayne
16   drinking alcohol?
17   A    Yes.
18   Q    Can you describe that.
19   A    Before my dad passed away, I know he drink beer with his
20   buddies.  But after my dad passed away, I notice he has hard
21   liquor in his room.
22   Q    What kind of hard liquor?
23   A    Like, a bottle of vodka.
24   Q    Do you remember what kind of vodka?
25   A    White.  I just remember it might be vodka because it's
```

01:38PM (lines 5, 10, 15, 20)
01:39PM (line 25)

white.  Because I don't drink hard liquor.  I just notice a big

bottle of vodka.

Q    When you say "a big bottle," do you mean almost, like, a

jug, like, with a handle?

01:39PM  A    Yes.

Q    Okay.  Did you observe any other types of hard liquor,

maybe, in Wayne's room?

A    I notice just that hard liquor just -- anything that's

white that has -- maybe it's rum or something, then I know it's

01:39PM hard liquor.

Q    Okay.

A    I'm old.  I don't drink hard liquor, so I don't pay

attention to it.

Q    And was there ever a time where you thought Wayne was

01:40PM maybe acting under the influence of alcohol, like he was drunk?

A    Yes.

Q    Can you describe that.

A    If -- because even though we live in the same house, I

treat him like an adult.  I don't -- I don't go into his

01:40PM business too much.  If there's a family gathering, he would

come down.  He would talk.  But I feel like he's talking --

he's not very focused.  It's not very clear when he speak.  And

then he spend, like, few minutes, then he will go up, back to

his room and close the door.

01:40PM Q    Okay.  And would you say that this was worse after your

 1   dad passed away?

 2   A    I believe so.  I notice especially the -- I usually --

 3   after the funeral.  And I notice that his bedroom [sic] is

 4   always, always on.

01:41PM  5   Q    When you say "his bedroom is always on," what do you mean

 6   by that?

 7   A    I feel like -- because I say, "Are you scared of

 8   something?"

 9            And he say, "Yeah.  Dad pass away and I have to

01:41PM 10   sleep with the light on, sis."

11   Q    Okay.  And would you see the light on late at night in

12   Wayne's room?

13   A    Yes.  That's why I know.  I said, "Hey, I -- you know, I

14   see your room, the light is on.  You probably scared or

01:41PM 15   something?"

16            He said, "Yeah.  I can't sleep, sis."

17            MS. MOJTEHEDI:  Okay.  One moment, Your Honor.

18            **(Counsel conferred off the record.)**

19            MS. MOJTEHEDI:  No further questions, Your Honor.

01:42PM 20            THE COURT:  Cross-examination?

21            MR. SCALLY:  No cross.  Thank you, Your Honor.

22            THE COURT:  Thank you.

23            May the witness be excused?

24            MS. MOJTEHEDI:  Yes, Your Honor.

01:42PM 25            THE COURT:  Thank you very much.  You're excused

1  from these proceedings.  You can take the mask with you and the

2  mask you brought.

3        If you'd like to call your next witness, please.

4        MR. WILKE:  Just a moment, Your Honor.

01:44PM 5      **(Pause in proceedings.)**

6        MR. WILKE:  Your Honor, can we have a brief sidebar?

7        THE COURT:  Certainly.

8      **(Sidebar out of the presence of the jury:)**

9        MR. STAPLES:  This next witness is Alex Cox?

01:46PM 10       MR. WILKE:  Dao.  Alex Dao.

11       THE COURT:  Alex who?  Dao?

12       MR. STAPLES:  D-a-o.  His lawyer, Bobby Samini, is

13  here.  B-o-b-b-y S-a-m-i-n-n- --

14       MR. WILKE:  -i-n-i.

01:46PM 15       MR. STAPLES:  Right.  This is, we told you before,

16  the one we had.  My understanding -- Mr. Wilke can fill in --

17  he spoke to Mr. Samini.  We don't anticipate any need to

18  interject a Fifth Amendment objection.  Our proposal, in the

19  event that there is, if it's okay with the Court and Mr. Samini

01:46PM 20  and Mr. Wilke are fine with it, we're going to have Mr. Samini

21  sit up in the front row of the gallery.  If he believes there's

22  a question, which we think is unlikely, but if there is a

23  question that he needs to assert the Fifth, he's going to rise

24  and ask you for a sidebar rather than assert the Fifth.

01:46PM 25       THE COURT:  Is that acceptable to both of you?

|  | 1 | MR. WILKE:  It is. |

```
            1            MR. WILKE:  It is.

            2            THE COURT:  To the defense and the Government?

            3            MR. WILKE:  Yes, Your Honor.

            4            THE COURT:  Then let's proceed.

01:46PM     5            (Open court in the presence of the jury.)

            6            MR. WILKE:  Your Honor, the defense calls Alex Dao.

            7            THE COURT:  Thank you.

            8            If you'd step between the double doors.

            9            ALEX DAO, DEFENSE WITNESS, WAS SWORN

01:47PM    10            THE COURT:  If you'd walk along the jury railing.

           11    The entrance is closest to the wall.  If you'll be seated.  We

           12    have a mask for you.  And if you'd like to interchange -- the

           13    way to put this mask on is the bottom portion, it has that

           14    black knot.  It's the first thing you're going to slip over

01:47PM    15    your head.  Pull it up just a bit over your nose.

           16            Comfortable?

           17            THE WITNESS:  Thank you, Your Honor.

           18            THE COURT:  Would you state your full name for the

           19    jury, please.

01:47PM    20            THE WITNESS:  My name is Alex Dao.

           21            THE COURT:  Would you spell your last name.

           22            THE WITNESS:  D-a-o.

           23            THE COURT:  Thank you.  This would be direct

           24    examination by the defense.

01:47PM    25            MR. WILKE:  Thank you, Your Honor.
```

|  |  |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MR. WILKE: |
| 3 | Q    Good afternoon, Mr. Dao. |
| 4 | A    Thank you, sir. |
| 01:48PM 5 | Q    Mr. Dao, from approximately 2006 to 2011, did you have a |
| 6 | relationship with the Federal Bureau of Investigation? |
| 7 | A    Yes, I did. |
| 8 | Q    What was that relationship? |
| 9 | A    I was a confidential informant for the FBI. |
| 01:48PM 10 | Q    And in your capacity as a confidential informant for the |
| 11 | FBI, what did you actually do? |
| 12 | A    How detailed can I get?  It's very -- pretty complicated. |
| 13 | Q    We don't need to get too detailed, but -- |
| 14 | THE COURT:  Counsel, move that microphone just a |
| 01:48PM 15 | little closer so we can hear you. |
| 16 | MR. WILKE:  Thank you, Your Honor. |
| 17 | Your Honor, may I have permission to lead this |
| 18 | witness a bit? |
| 19 | THE COURT:  Well, you can do that unless I hear an |
| 01:49PM 20 | objection.  I'm not certain -- |
| 21 | MR. SCALLY:  I'd object at this point. |
| 22 | THE COURT:  All right.  Then there will be |
| 23 | nonleading questions, Counsel. |
| 24 | MR. WILKE:  Thank you, Your Honor. |
| 01:49PM 25 | Q    BY MR. WILKE:  As a confidential informant, did you work |

```
 1   in an undercover capacity?

 2   A     Yes, I did.

 3   Q     And in the undercover -- in your undercover capacity,

 4   what -- did you pretend to be somebody you weren't?

 5   A     Yes.  The FBI had me play different roles.

 6   Q     Okay.  And was this undercover activity that you were

 7   performing for the FBI -- did that occur here in Orange County?

 8   A     Yes.  And various other locations.

 9   Q     Okay.  Did you say in several locations in Orange County?

10   A     Yes.  Not just Orange County.

11   Q     Okay.  And let's be specific to the Orange County

12   activities, okay?

13   A     Okay.

14   Q     Did you own a restaurant in late 2000- -- from about

15   2009, 2010?

16   A     Yes, I think -- yes, I did have a restaurant during that

17   time.

18   Q     And did you use that restaurant as a location at which

19   you conducted some of these undercover activities?

20   A     Not in the beginning.  I originally wanted to open a sushi

21   restaurant for the purpose of having a sushi restaurant.

22   Q     Okay.  So you opened a restaurant to be a restaurant

23   owner; correct?

24   A     That is correct.

25   Q     But while you were a restaurant owner, you became a
```

```
 1    confidential informant for the FBI; correct?
 2    A    Yes.  That is correct.
 3    Q    And as a confidential informant for the FBI, did you
 4    perform some of those confidential informant activities at your
 5    restaurant?
 6    A    I don't believe so.  Most of it was outside of my
 7    restaurant.  I did not want to involve any of my guests or
 8    clientele.
 9    Q    Okay.  Was your restaurant, though, a location that was
10    frequented by people who at least appeared to be involved in
11    criminal activity?
12    A    The area was the city of Westminster and there are a lot
13    of Asians in that city.  Yes.  Whether or not they were
14    committing crimes, I do not know.
15    Q    Okay.  But, sir, your investigation was targeting people
16    who were committing crimes; correct?
17    A    No.  Only specific targets by the FBI, not people coming
18    into my restaurant.
19    Q    The targets of your investigation, did they know you to
20    be a restaurant owner?
21    A    Yes.  I think they did background checks on me.
22    Q    Okay.  And, in fact, you posed as a person who laundered
23    money for organized crime; correct?
24    A    Did you say "laundered money"?
25    Q    Yeah.  You posed as a person who was a financial person
```

1  for criminals; correct?  That was your part of your persona as

2  a confidential informant; correct?

3  A     Not the laundered part, but they made me look to be a very

4  sophisticated person that the underworld could approach for

01:52PM  5  various financial advice.

6  Q     Okay.  You were a restaurant owner; correct?

7  A     Yes, sir.

8  Q     And, also, a real estate broker?

9  A     That is correct, sir.

01:52PM 10  Q     Okay.  And you used your knowledge and experience as a

11  restaurant owner and a real estate broker as part of your

12  confidential informant activities?

13  A     Yes.  Because a lot of the Asians, they did not understand

14  real estate.  So I was able to speak two languages and explain

01:52PM 15  to them how they can acquire real estate and various different

16  types of loans and capacity.

17  Q     These investigations that you were involved in with the

18  FBI, there were actually more than one; correct?

19  A     Yes.  There were a few.  That's why I'm not sure what I

01:52PM 20  can divulge here.

21  Q     One of the investigations targeted a former FBI agent;

22  correct?

23  A     Yes.  That is correct.

24  Q     Okay.  Fair to say that was the most serious

01:53PM 25  investigation that you participated in?

```
 1    A    Yes.  I would think so.

 2    Q    I believe it involved a murder-for-hire plot or something

 3    like that; is that correct?

 4    A    Yes.  Apparently this gentleman was an FBI agent, and he

 5    turned rogue and started committing all kinds of high-level

 6    crimes when the FBI approached me.  That's what they explained

 7    to me.

 8    Q    Okay.  And you worked in an undercover capacity to obtain

 9    recordings and from this rogue FBI agent; correct?

10    A    Yes.  I followed the instructions of the FBI for that

11    case.  That is correct.

12    Q    And he was charged and prosecuted; correct?

13    A    That is correct.

14    Q    Successfully; correct?

15    A    That is correct.

16    Q    Fair to say this was a big case for the local FBI office?

17              MR. SCALLY:  Objection.  Foundation.

18              THE COURT:  Sustained.

19    Q    BY MR. WILKE:  Did you understand this to be an important

20    case for the local FBI office?

21    A    That is my belief, yes.

22    Q    And you were promised a financial reward as a result of

23    your activity; correct?

24    A    Yes.

25              MR. SCALLY:  Objection.  Relevance.
```

| | | |
|---|---|---|
| | 1 | THE COURT:  Overruled. |
| | 2 | Q    BY MR. WILKE:  You can answer. |
| | 3 | You were promised a financial reward? |
| | 4 | THE COURT:  I believe he did, Counsel. |
| 01:54PM | 5 | MR. WILKE:  I'm sorry.  I didn't hear the answer. |
| | 6 | THE COURT:  He did answer. |
| | 7 | MR. WILKE:  Was the answer "Yes"? |
| | 8 | THE COURT:  Would you answer again, sir. |
| | 9 | THE WITNESS:  Yes, there was.  But there were |
| 01:54PM | 10 | details on that; so I didn't know what I could provide. |
| | 11 | Q    BY MR. WILKE:  That's fine.  You were promised a |
| | 12 | several-hundred-thousand-dollar reward; correct? |
| | 13 | MR. SCALLY:  Objection.  Relevance.  403. |
| | 14 | THE COURT:  Counsel? |
| 01:54PM | 15 | MR. WILKE:  Your Honor, it goes to the significance |
| | 16 | of his value to the FBI. |
| | 17 | MR. SCALLY:  Same objection. |
| | 18 | THE COURT:  I don't understand the relevance to this |
| | 19 | case, Counsel. |
| 01:54PM | 20 | MR. WILKE:  I'd ask for a sidebar. |
| | 21 | THE COURT:  Ladies and gentlemen, would you excuse |
| | 22 | us for just one moment. |
| | 23 | Counsel, if I could see you at sidebar. |
| | 24 | **(Sidebar out of the presence of the jury:)** |
| 02:09PM | 25 | MR. WILKE:  Yes.  So, Your Honor, these are all |

foundational questions as to what I expect to elicit from

Mr. Dao, that his handler, at the time of this undercover

investigation, was Special Agent Andrew Cho, the FBI case agent

in this case, and that he -- so that's the significance of this

02:09PM 5  question.  I would expect to elicit it.

This is a large investigation.  He received a large

financial reward.  Agent Cho actually received an accommodation

as a result of this investigation.  And that after he was

contacted by Tony Hoang with information that Tony Hoang first

02:09PM 10  provided to him about Wayne Le's statements, it was Alex Dao

contacting the FBI that brought the FBI in on this case and,

specifically Agent Cho, this agent with whom he had a prior

relationship.

THE COURT:  I'm going to repeat back to you so I

02:09PM 15  understand.

This is really an effort to undermine Agent Cho's

involvement in -- whatever that is in this case?

MR. WILKE:  Yes.

THE COURT:  And an effort to show that, if Alex Dao

02:09PM 20  made statements or entered into certain kind of activities,

this was an accommodation?

MR. WILKE:  They had a prior relationship base.

THE COURT:  I understand that.  I'm trying to relate

that to this matter.

02:09PM 25  MR. WILKE:  The matter here is Agent Cho lacks

```
 1    objectivity because of his personal relationship -- prior
 2    relationship with the Dao family.
 3              THE COURT:  But Agent Cho hasn't testified.
 4              MR. WILKE:  He will.  He will.
 5              THE COURT:  Just a moment.  It's hard for me to
 6    understand right now how he's relevant because Agent Cho hasn't
 7    testified.
 8              MR. WILKE:  He interviewed all the major witnesses
 9    in this case --
10              THE COURT:  I understand that.
11              MR. WILKE:  -- and either elicited -- I'm sorry, but
12    I can make that offer, Your Honor.
13              THE COURT:  If you'll let me get a word in edgewise,
14    I'd appreciate it.
15              MR. WILKE:  Yes.
16              THE COURT:  I don't understand what Agent Cho will
17    be undermined on.
18              MR. WILKE:  Got it.
19              THE COURT:  I need that offer of proof --
20              MR. WILKE:  Got it.
21              THE COURT:  -- please.
22              MR. WILKE:  Witnesses have already testified,
23    including Shawn Whalin, that Agent Cho interviewed him.  He
24    also -- Agent Cho also interviewed Sandra Ritze and
25    interviewed -- I believe interviewed Tony Hoang as well, and
```

02:09PM 5
02:09PM 10
02:09PM 15
02:09PM 20
02:09PM 25

Vinh Doan.

THE COURT:  Just a moment.  Let me stop you there so I fully understand.  How does Alex Dao's involvement undermine the credibility or lack of credibility of Agent Cho as to his interaction with any one of those -- or all of those four people?

MR. WILKE:  Okay.

THE COURT:  And I'm getting concerned because I feel more that Alex Dao may be putting up as a character witness. So I'd really like to hear where you're going with this.  But this is an attack on character through Alex Dao.

MR. WILKE:  I intend to say and argue in closing this was not an objective investigation by the FBI.  Because Andrew Cho -- Special Agent Andrew Cho was not a neutral or objective investigator.  He had a preexisting relationship with the victim and the victim's family here; that they went to him and he -- despite this -- what I would contend is a conflict of interest, was permitted to be the lead FBI investigator on this case.

THE COURT:  Now all -- these are all things that are difficult for a Court because I'm hearing this relationship. So I'm going to repeat back to you what I'm hearing.  Somehow there's a relationship that I'm hearing for the first time.

Was this Alex or the investigator dating somebody in the family or a friend of the family?

1          MR. WILKE:  For years he worked with Alex Dao.  He

2     also worked with James Dao.

3          THE COURT:  All right.

4          MR. WILKE:  He worked with his brother and the

02:09PM 5     alleged victim in this case for years.

6          THE COURT:  As informants?

7          MR. WILKE:  He was -- they were both informants at

8     the time.  Okay.

9          Additionally, this particular investigation that I'm

02:09PM 10    currently questioning Alex Dao about was a major investigation

11    in Andrew Cho's career.  He received an accommodation for it.

12    He received a cash bonus for it.

13         THE COURT:  I understand.  But no matter how this is

14    embellished, no matter how much money, I'm trying to see the

02:09PM 15    linkage.  I understand that you're going to generally argue

16    that the agent in charge is biased and lacks credibility.

17         MR. WILKE:  Correct.

18         THE COURT:  I understand.  I don't understand yet

19    how that affects Shawn Whalin.  Was he the agent that

02:09PM 20    interviewed Shawn Whalin?

21         MR. WILKE:  Yes, and put words in his mouth.

22         THE COURT:  Was he the agent that interviewed Tony

23    Hoang?

24         MR. WILKE:  Multiple times, yes.

02:09PM 25         THE COURT:  Was he the agent who interviewed Sandra?

**UNITED STATES DISTRICT COURT**

```
 1                    MR. WILKE:  Yes.

 2                    THE COURT:  Was he the agent who interviewed Vinh

 3       Doan, better known as David?

 4                    MR. WILKE:  I believe so, but I'm not certain on

02:09PM  5       that one.

 6                    THE COURT:  So, generally speaking, he's involved in

 7       most of the interviews?

 8                    MR. WILKE:  Yes.

 9                    THE COURT:  And you believe he put words in the

02:09PM 10       mouth of whom?

11                    MR. WILKE:  Whalin testified --

12                    THE COURT:  I understand.

13                    MR. WILKE:  -- to that, that the term "murder" was

14       first raised by Agent Cho in the investigation.

02:09PM 15                    THE COURT:  And do you have the same type of -- and

16       I saw that at the time.  Not that I subscribed to it.  I heard

17       that testimony, and I would allow that.

18                    What about the other witnesses I named?

19                    MR. WILKE:  Well, I believe -- and Mr. Staples on

02:09PM 20       redirect examination -- I think it was Mr. Staples or

21       Mr. Scally on redirect examination repeatedly asked this line

22       of questioning about whether the witnesses had talked to each

23       other and -- expecting and anticipating an argument that they

24       couldn't have all concocted this because they never met each

02:09PM 25       other.  The common denominator is Mr. Cho here.
```

| | |
|---|---|
| 1 | THE COURT:  It's easier for the Court, not |
| 2 | necessarily mandated, that I have Agent Cho, or at least -- |
| 3 | MR. WILKE:  We expect to call him. |
| 4 | THE COURT:  Pardon? |
| 02:09PM 5 | MR. WILKE:  We expect to call him. |
| 6 | THE COURT:  But that depends on how far I let you go |
| 7 | now.  So I'm not trying to curtail you, but my impression, up |
| 8 | to this time, was that the Government wasn't calling Alex Dao. |
| 9 | You're entitled to call him. |
| 02:09PM 10 | Are you going further than that attack?  Is this |
| 11 | going to be a character attack on Alex Dao. |
| 12 | MR. WILKE:  No. |
| 13 | THE COURT:  That is, those kinds of efforts where |
| 14 | you are going to elicit through other than the objection |
| 02:09PM 15 | hearsay, basically that, "I wish I could have gotten to my |
| 16 | brother first"?  I mean, I forget the exact words, but you |
| 17 | elicited a question about it appearing that Alex Dao thought so |
| 18 | little of his brother that he was making a statement that he |
| 19 | wanted to -- |
| 02:09PM 20 | MR. WILKE:  I'm not going to elicit that. |
| 21 | THE COURT:  Okay. |
| 22 | MR. WILKE:  That's part of our agreement. |
| 23 | THE COURT:  Let me hear from the Government. |
| 24 | MR. SCALLY:  Your Honor, this is a side show that |
| 02:09PM 25 | risks confusing issues. |

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Counsel, that is not going to be

2     helpful.  Your comment is stricken.  It's ridiculous.

3          MR. SCALLY:  The cross-examination that Mr. Wilke

4     has done of all those civilian witnesses has been sufficient to

02:09PM  5     explore whether they have had words put in their mouths.  He's

6     engaged in extremely extensive cross-examination of them.

7     That's sufficient.

8          There's no indication that anything wrong was done

9     by Special Agent Cho, from any of their testimony, and there's

02:09PM 10     no actual indication of any actual conflict of interest.  He

11     didn't have a personal relationship with Alex Dao or James Dao.

12     He was their handler or one of their handlers in criminal cases

13     in this profession of work.

14          THE COURT:  I'm going to allow a certain extent of

02:09PM 15     this, but I'm concerned that I'm not going to allow what I

16     think you would like to get in.  If I heard Agent Cho to begin

17     with and I had a sufficient foundation, I might let you go much

18     further.  If I had a written offer of proof and I could

19     thoroughly examine this, I might let you go further.  But based

02:09PM 20     upon this representation, it appears to me that Alex Dao was

21     being called in a fashion where I'm literally speculating.

22          You're not precluded from arguing that one agent

23     gathered all this information.  You're never precluded from

24     arguing that they fed this information to different people

02:09PM 25     inadvertently or consciously.  You're not precluded from

```
 1    arguing that there's a special relationship, as you wish,
 2    between the two that would motivate this.  I'm just not getting
 3    enough information right now to feel comfortable.  And I'm
 4    afraid of cutting you off when you have a viable ground.
 5              But right now it appears to me that, if you're
 6    representing that Cho should be called, we ought to be hearing
 7    from Cho, or I should be having a hearing of Cho out of the
 8    presence -- I'm not worried about Alex Dao being -- he is going
 9    to be here when he's told to be here.
10              MR. WILKE:  I believe I'll elicit from Mr. Dao right
11    now that he knows Andrew Cho --
12              THE COURT:  Just a moment.  Acceptable.
13              MR. WILKE:  -- that he worked with Andrew Cho during
14    this period in which he was a confidential informant --
15              THE COURT:  More than relevant.
16              MR. WILKE:  -- that he was paid about 90- to
17    $100,000 as a confidential informant --
18              THE COURT:  There's an objection.  It's fine.
19              MR. WILKE:  -- and that after learning from Tony --
20    after being contacted by Tony Hoang about statements that
21    Mr. Le purportedly made to Tony Hoang -- so that's where the
22    investigation started.  Tony --
23              THE COURT:  Don't stray now.  Stay focused with me.
24              MR. WILKE:  Tony Hoang contacted Alex Dao.
25              THE COURT:  I don't have any concern about Tony
```

02:09PM (lines 5, 10, 15, 20, 25)

1    Hoang.  There's an inference that there's a suggestion made.

2    I'll leave that to both sides.

3         MR. WILKE:  Alex Dao reached out to people he knew

4    in the FBI to bring federal investigators into this case,

02:09PM 5    including Andrew Cho.  Then I expect to --

6         THE COURT:  Slow down.  Alex Dao, you're going to

7    elicit testimony, is actually the one who reached out to other

8    FBI agents to specify that Cho, a special agent, is going to be

9    the agent in charge of this case?

02:09PM 10        MR. WILKE:  I don't know that.  But the

11   circumstances are very suspicious, Your Honor, because of the

12   preexisting relationship.  I believe and I've conferred with

13   the former special agent in charge of the FBI, Mr. Weichert had

14   shared that information with me that had the agent in charge

02:09PM 15   known of this prior relationship.  Agent Cho would not have

16   been assigned to this investigation.

17        I believe that conflict of interest, that prior

18   relationship was undisclosed to his superiors, and I believe

19   that it has -- he has a bias in this case of -- previously

02:09PM 20   undisclosed bias that is relevant to this investigation.

21        THE COURT:  I need to hear that out of the presence

22   of the jury.  Right now this is extraordinarily speculative.

23   I'm not cutting you off, but I need more.  Unfortunately, you

24   may get a series of objections that I have to sustain.  I'm not

02:09PM 25   wanting to do that.  But on this present record you're not

```
 1    precluded from examining him, but I caution those objections
 2    will be forthcoming, and many of them will be sustained.
 3               MR. WILKE:  I'm going to cut to the chase right now
 4    with Mr. Dao and elicit that he has this prior relationship as
 5    a confidential informant with Agent Cho.
 6               THE COURT:  I've never precluded you from that.  I
 7    never intended to.
 8               Let's get Agent Cho in here, out of the jury, and
 9    I'm happy to have that hearing.  Happy to let you lay that
10    foundation.  But right now you're not precluded from arguing
11    that this is an insidious plot.  But based upon this, the
12    questions right now are going too far from my perspective, and
13    these objections are probably going to be sustained unless I
14    can get a better foundational feeling.
15               MR. WILKE:  That's fine.
16               (Open court in the presence of the jury.)
17               MR. WILKE:  May I proceed, Your Honor?
18               THE COURT:  Please.
19    Q    BY MR. WILKE:  Mr. Dao, before the sidebar, we were
20    discussing your work as an FBI informant back in --
21    approximately ten years ago or so.  Do you recall that?
22    A    I think 10 or 15, yes.
23    Q    10 or 15.
24               And during your work as an FBI informant -- how long
25    did that go on for?
```

UNITED STATES DISTRICT COURT

A     I don't recall the exact time frame, but a few years at
least.

Q     And during that time, how much were you paid by the FBI
approximately?

02:09PM  A     Well, that's -- that's where it gets a little tricky,
because originally the FBI came to me just for information and
advice based on who I was and what I knew.  The monetary part
did not come until later once they realized how dangerous the
operation started getting.

02:10PM  Q     And after you began receiving money from them, how much
did you receive from the FBI?

A     I do not recall because they -- you know, they would pay
portions after certain months or time frame.  So I never kept
an accounting of that.  It was during the duration of maybe
02:10PM  three years.

Q     It was -- I'm sorry?

A     It was a duration of maybe three years or more.

Q     Was it approximately $90,000, sir?

A     Yes.  No, that's the one -- are you talking about the
02:10PM  whole time?  Because I've done other cases.  That's why.

Q     Okay.

A     Are you referring to one specific case?

Q     I'm just referring to your time as an FBI informant.  How
much money have you received from the FBI?

02:10PM  A     That could be accurate, yes.  Or more, actually.

```
  1   Q    So it's approximately $90,000?

  2   A    Yes.  Give or take a few thousand.

  3   Q    Okay.  And this investigation that we've been speaking

  4   about involving the rogue FBI agent, did you work with specific

02:11PM 5   FBI agents on that investigation?

  6   A    Yes, I had to.  I was told to work with specific agents

  7   for that case.

  8   Q    Was one of those agents Special Agent Andrew Cho of the

  9   FBI?

02:11PM 10  A    Yes, that is correct.

  11  Q    Now, you first -- directing your attention to October 18,

  12  2019, do you recall meeting -- do you know Wayne Le?

  13  A    Yes.

  14  Q    The defendant, seated here to my left?

02:11PM 15  A    That is correct.

  16  Q    On October 18, 2019, did you have a meeting with Wayne Le

  17  at the Robata Wasa restaurant in Irvine?

  18  A    I believe that's the correct date.  I don't know exactly

  19  the date.  It was in October.

02:12PM 20  Q    But it was within a few days after your brother, James

  21  Dao, had been missing; correct?

  22  A    Yes.  That is correct.

  23  Q    Okay.  And the meeting at the Robata Wasa restaurant in

  24  Irvine -- did you summon Wayne to that meeting?

02:12PM 25  A    I asked him to come because my mom was trying to get ahold
```

| | |
|---|---|
| 1 | of Wayne and she could not.  So she asked me to reach out to |
| 2 | him because Wayne is considered a friend. |
| 3 | Q    Okay.  And did Wayne Le show up? |
| 4 | A    Yes, he did. |
| 02:12PM 5 | Q    Was he with anybody? |
| 6 | A    Yes.  He was with a larger Asian fellow. |
| 7 | Q    Had you met that person before? |
| 8 | A    That is the first time I met that gentleman. |
| 9 | Q    Did you come to know that person to be a man by the name |
| 02:13PM 10 | of Tony Hoang? |
| 11 | A    Yes, sir. |
| 12 | Q    And during that meeting on October 18, 2019, did you |
| 13 | question Mr. Le about when he last saw your brother? |
| 14 | A    Yes, I did. |
| 02:13PM 15 | Q    And what did he tell you? |
| 16 | A    In a brief -- as brief a moment for the jurors as |
| 17 | possible, he just said that he did see my brother.  He hung out |
| 18 | with my brother.  He then went on a fishing or lobster trip |
| 19 | with my brother and that -- I think that was it.  And then I -- |
| 02:13PM 20 | little details like where they were.  I don't recall exactly. |
| 21 | But it was at a bar.  It was kind of loud too. |
| 22 | Q    Didn't he, in fact, tell you that he had planned to go on |
| 23 | a trip with your brother, but he didn't actually go on the |
| 24 | boat? |
| 02:14PM 25 | A    Yes.  He later said -- because I would ask him more, like, |

```
 1    "Well, if you went on with him, why are you here?  And where is
 2    my brother?"
 3              And he said to me that he did end up not going on
 4    the boat, I think, and my brother went with someone else.
 5    Q    And he told you the names of a Matt and Jay who went on
 6    the boat with your brother?
 7    A    He gave me various names, yes.
 8    Q    Okay.  Were you suspicious of this story he told you?
 9    A    I mean, at the time when I met Wayne, again, he was
10    considered a family friend.  He knows my brother.  He knows my
11    family.  So I did not put any suspicion on that.  I thought
12    what he told me was actually the truth.
13    Q    Okay.  And at the time your mother was asking you for
14    assistance in helping to find out where your brother was;
15    correct?
16    A    That is correct, sir.
17    Q    Did you, in fact, hire a private investigator?
18    A    When you say "private investigator," later?
19    Q    No.  Either -- around this time, did you hire a private
20    investigator to try and help locate your brother?
21    A    We were thinking about doing that.
22    Q    But you never did?
23    A    I don't know what my parents did, but I did not myself.
24    Q    Okay.  Shortly after this, within a week after this
25    meeting -- strike that.
```

1        You learned the following day that your brother's

2   body had been discovered in the ocean; correct?

3   A    No.  Because when we met at the Japanese restaurant, I

4   totally believed Wayne, that he left my brother off at some

02:15PM 5   docks in Dana Point.  Because he met me the next morning with

6   another individual that I had -- at that point I was still

7   clueless.  And I went into a vehicle with them.  I sat in the

8   car with them, and they took me to the harbor where they said

9   they left my brother.

02:16PM 10  Q    But later that day, let's say the following day, the

11  Sunday now, did you learn from Natalie that she had been told

12  by the Coast Guard investigative agents that James's body had

13  been found?

14  A    I don't think it was Natalie because I don't talk to

02:16PM 15  her -- or I haven't seen her for years.  So I think it was my

16  mom that is the one that called me, crying, and told me that

17  information.

18  Q    And you learned that the day after you had been to the

19  marina with Wayne Le and this other person; correct?

02:16PM 20  A    It's either the day after or two days after that.  But

21  pretty close to each other, yes.

22  Q    Okay.  And then within a day or so after that, you met

23  with Coast Guard investigators at the Orange County Sheriff's

24  Department; isn't that correct?

02:16PM 25  A    I believe it was the Orange County Sheriff's or their

1    department down in the -- near the city.

2    Q     In where?

3    A     Around the city.  I forgot which location.

4    Q     Okay.  But you met with agents that you understood to be

02:17PM 5    agents with the Coast Guard Investigative Service?

6    A     That is correct.

7    Q     Okay.  And you had a lengthy interview with them;

8    correct?

9    A     I believe so.  I -- sorry.  My recollection two years ago,

02:17PM 10   I'm a little hazy how long the interview was.

11   Q     Okay.  But you do recall interviewing with the agents in

12   this office, the two agents?

13   A     That is correct.  And I recognize one of the agents right

14   now.

02:17PM 15   Q     Is it Agent Casey?

16   A     That is correct.

17   Q     And after interviewing with the Coast Guard agents, did

18   you have subsequent meetings with FBI agents?

19   A     I don't think I had subsequent meetings.  I think

02:18PM 20   something happened where it was a federal situation, and the

21   administration part, I wasn't clear of.  But following that,

22   later on, the FBI did get involved, yes.

23   Q     Now, you maintain contact with FBI agents that you had

24   met back from when you were a confidential informant; correct?

02:18PM 25   A     Yes.  I try to do that.

```
 1   Q    Okay.  And, in fact, upon learning about your brother's
 2   death, you contacted one or more of these FBI agents; correct?
 3   A    That -- I'm not sure if I contacted or they reached out to
 4   me because during that time, it was a sad time in our family.
 5   And I do not remember who contacted who.
 6   Q    Okay.  Well, you remember an FBI agent by the name of, I
 7   believe, Dimitri Laloudakis (phonetic)?
 8   A    Yes.  He was one of my handlers back in -- 15 years ago.
 9   And I did, I think -- I believe I talked to him too.  I spoke
10   to a few law enforcements during that time.
11   Q    He was actually Agent Cho's partner back when you were a
12   confidential informant; correct?
13   A    Partner or their whole team.  There were a few agents
14   involved.
15   Q    And then after learning about your brother's death, did
16   you contact Agent Andrew Cho?
17   A    I think so.  That's why I'm hazy as to when I did that.  I
18   just remember I needed to get advice and help because the
19   situation was a lot more serious.
20   Q    Now, your brother, James Dao --
21   A    Yes, sir.
22   Q    He had also been a confidential informant back when you
23   were; correct?
24   A    I think on his own situation, he might have been, yes.
25   Q    And, in fact, you knew him to also work with Agent Cho;
```

02:18PM 5
02:19PM 10
02:19PM 15
02:19PM 20
02:19PM 25

```
 1    correct?
 2                MR. SCALLY:  Objection.  Foundation.
 3                THE COURT:  If you know, you can answer that
 4    question.
02:20PM  5          THE WITNESS:  I do, Your Honor.
 6                I do not.
 7                THE COURT:  Okay.  You do not.
 8    Q    BY MR. WILKE:  You don't know whether he did work with
 9    Agent Cho?
02:20PM 10   A    No, sir.  I was told not to ask questions.
11    Q    I'm sorry?
12    A    I said I was not to ask questions about what my brother
13    did.
14    Q    Now, the FBI became one of the lead investigating
02:20PM 15   agencies in the investigation of your brother's death; correct?
16                MR. SCALLY:  Objection.  Foundation.
17                THE COURT:  I'm not sure, Counsel.
18                Just restate the question.
19    Q    BY MR. WILKE:  You met with FBI agents several times over
02:20PM 20   the last couple years; correct?
21    A    Yes, sir.
22    Q    Concerning the investigation of your brother's death;
23    correct?
24    A    That is correct.
02:20PM 25   Q    Including Agent Andrew Cho; correct?
```

**UNITED STATES DISTRICT COURT**

```
 1  A     Yes, sir, I did.
 2  Q     Now, after this meeting that you had at the Robata Wasa
 3  restaurant on October 18, 2019, you were contacted by this
 4  person that you came to know as Tony Hoang; correct?
 5  A     Yes, sir.  That's correct.
 6  Q     And he told you that he had information about your
 7  brother; correct?
 8  A     Yes, sir, he did.
 9  Q     And at the time you contacted him, you had -- or the time
10  he contacted you, you had only recently learned that your
11  brother's body had been found; correct?
12  A     That's correct.
13  Q     You met with Tony Hoang on or about November 4th, 2019;
14  correct?
15  A     I apologize.  I don't remember the next time that we met.
16  But I had conversations via text with the gentleman.  And then
17  we had a scheduled meeting that I ended up taking.
18  Q     Right.  And this meeting that you had with him was about
19  two weeks after the meeting where you had first met him --
20  correct? -- with -- when he was with Wayne?
21  A     I think you're correct on timing, yes.
22  Q     And during this meeting, Mr. Hoang said that he had
23  information about Wayne being involved in your brother's death;
24  correct?
25  A     Yes.  But previous to that, he was texting me that he kept
```

Timestamps in left margin: 02:21PM (line 5), 02:21PM (line 10), 02:22PM (line 15), 02:22PM (line 20), 02:22PM (line 25)

wanting to meet with me.  Because he did not want to talk over

the phone for some reason when I was really adamant to try to

get him to tell me what it is that he keeps wanting to talk to

me about.

02:23PM 5  Q    Before you met with Tony Hoang, you actually met with

Agent Cho; correct?

A    Actually, no.  I met with a few agents, not just Andrew

Cho.

Q    But Agent Cho was one of them; correct?

02:23PM 10 A    Yes.

Q    And you were equipped with a secret recording device;

correct?

A    Oh, no.  Not when I'm meeting with the FBI agents.  We

just go on trust.

02:23PM 15 Q    No.  For the meeting with Tony Hoang, you were equipped

with a recording device; correct?

A    Yes.  It was actually a scheduled meeting where law

enforcement knew about the meeting and were there with me, yes.

Q    They were monitoring the meeting; correct?

02:23PM 20 A    Yes, sir.  That is correct.

Q    And, in fact, Agent Cho was the agent monitoring the

meeting; correct?  Monitoring the recording; correct?

A    That, I don't know because I think there was, like, ten

FBI agents at that location or more actually.  They were in the

02:24PM 25 restaurant.

UNITED STATES DISTRICT COURT

```
 1   Q    And during this meeting, Tony Hoang asked you for money;
 2   correct?
 3   A    Yes, sir.  He actually asked me for money or to help find
 4   some kind of building for him.  If I were to agree, he would
 5   give me something that I really needed.
 6   Q    Okay.  He indicated he would get a recording for you if
 7   you would give him $50,000 to start a business; correct?
 8   A    I think that is accurate, yeah.  Either was 20- or 50-.
 9   It was some amount that I remember he did ask for.
10   Q    And he told you during this meeting that Wayne Le had
11   said that he shot your brother; correct?
12   A    I think so.  And maybe some other bragging stuff that
13   Wayne did with him.
14   Q    He told you during this meeting that Wayne Le had said
15   that he shot your brother and tied him up and threw him
16   overboard.  Do you recall that?
17   A    Yeah.  And that I was not going to find the body.
18   Q    You would not find the body?
19   A    That is correct.
20   Q    He told you that he would get a recording of this for
21   you; correct?
22   A    That is correct, sir.
23   Q    Now, you were very concerned for your family, and this
24   was very traumatic for you and your family, correct, this whole
25   situation?
```

02:24PM (line 5)
02:24PM (line 10)
02:25PM (line 15)
02:25PM (line 20)
02:26PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes, sir.  It still is.
 2   Q     And you wanted to find out what truly happened to your
 3   brother; correct?
 4   A     Yes, sir, I did.
 5   Q     When Tony Hoang told you that Wayne Le had said this to
 6   him, you didn't believe it was true, did you?
 7   A     Not at the time, no.
 8   Q     You, in fact, never imagined that Wayne Le would have
 9   that kind of evil heart to do something to James like that;
10   isn't that correct?
11   A     At the time, yes.
12   Q     And you never imagined in a million years that Wayne Le
13   would do anything to James; correct?
14   A     I mean, not anything.  I know they hang out as brothers
15   and friends.  So they probably argued before.  I've heard about
16   those.  And they always seem to make up and hang out again and
17   party together.
18   Q     But you never imagined that he would do anything like
19   killing your brother; correct?
20   A     That is correct.  It was a shock to our family.
21   Q     Now, you did know Wayne Le as somebody who tried to show
22   off; correct?
23   A     Yes, sir.
24   Q     You, in fact, referred to him by the name Wangsta Wayne;
25   correct?
```

```
 1   A    I believe that was one of his nicknames, yes.

 2   Q    And you understand the term "Wangsta" to mean a wannabe

 3   gangster?

 4   A    I do now.

02:28PM 5   Q    Okay.  But, in fact, didn't you, in fact, have him in

 6   your phone as Wangsta Wayne?

 7   A    Yeah.  That's what he wanted us to save his contact as.

 8   Q    You believed him to be somebody who, quote, likes to act

 9   the part; correct?

02:28PM 10   A    What do you mean?  What part?

11   Q    The part of a gangster.  He likes to act the part?

12   A    Yes, amongst other things.

13   Q    When Tony Hoang told you that Wayne Le had said he had

14   shot your brother and tied him up and threw him overboard, you

02:29PM 15   believed that Wayne was trying to show off; correct?

16            MR. SCALLY:  Objection.  403.  Asked and answered.

17            THE COURT:  Sustained.

18   Q    BY MR. WILKE:  When -- after Tony Lee -- or Tony Hoang

19   told you this, you believe that Wayne Le, if he said that, he

02:29PM 20   did it to make Tony respect him, like a homeboy; correct?

21            MR. SCALLY:  Objection.  Relevance.  403.

22            THE COURT:  Sustained.

23   Q    BY MR. WILKE:  You told Tony Hoang that Wayne likes to

24   pretend being a gangster; correct?

02:29PM 25            MR. SCALLY:  Objection.  Hearsay.  Relevance.  403.
```

```
 1              THE COURT:  Sustained.  It's been asked and answered
 2       also, Counsel.
 3       Q    BY MR. WILKE:  Now, Tony Hoang told you that Wayne had
 4       said that everyone is afraid of him.  Do you recall him telling
02:30PM  5       you that?
 6       A    Wait.  I'm sorry.  Can you repeat the question.
 7       Q    Tony Hoang, during the meeting at Robata Wasa, told you
 8       that Wayne had said to him that everyone is afraid of him.  Do
 9       you recall Tony telling you that?
02:30PM 10       A    I'm confused because the meeting at the Robata Wasa with
11       Wayne, Tony didn't speak to me.  He was just walking around.
12       Q    No.  No.  The second meeting.
13       A    Oh, I'm sorry.  Okay.
14       Q    Just you and Tony.
02:30PM 15       A    I'm sorry.  We met at the same location.
16       Q    Yes.
17       A    Okay.  So you're saying the second meeting with Tony?
18       Q    During the second meeting, Tony told you that Wayne had
19       told him that everyone is afraid of him.  Do you recall that?
02:31PM 20              MR. SCALLY:  Objection.  Hearsay.  403.
21              MR. WILKE:  Not offered for its truth, Your Honor.
22              THE COURT:  Just a moment.
23              Counsel, it's hearsay, isn't it?
24              MR. WILKE:  It's not offered for the truth.
02:31PM 25              THE COURT:  What's it offered for?
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. WILKE:  The listener.  I'm going to elicit his
 2    response to that statement.
 3              THE COURT:  I'm still not understanding.  Doesn't
 4    matter the response.  What's it offered for?  What's the
 5    relevance?
 6              MR. WILKE:  It is offered to show the support
 7    that -- it is not offered for its truth, Your Honor.
 8              THE COURT:  I've already heard that, and I
 9    apologize.  What's it offered for?
10              MR. WILKE:  It is offered to show this witness's
11    opinion about the defendant's statements with regard to these
12    types of acts.
13              THE COURT:  Sustained.
14    Q    BY MR. WILKE:  Now, you weren't afraid of Wayne Le, were
15    you?
16    A    I had no reason to be at that time.
17    Q    And you didn't know anybody who was, did you?
18    A    I mean, I've heard of people.  Wayne has, on frequent
19    occasions, hung out in our -- what you saw, locations where we
20    talk.  I don't know if it's true, but he has told me he's a
21    tough guy.  So I respect that.
22    Q    Okay.  In fact, you thought that, when he talked like a
23    tough guy, it was all BS, didn't you?
24    A    Not all the time.
25    Q    Well, didn't you, in fact, tell Tony Hoang "bullshit"
```

02:31PM  5

02:32PM 10

02:32PM 15

02:32PM 20

02:33PM 25

```
 1   when he said that Wayne told him that everyone was afraid of
 2   him?
 3   A    I don't think that was my response if that's what Tony
 4   said.  I was still shocked that Tony was telling me that a
 5   friend of ours killed my brother.  So I don't know what my
 6   other responses were after that.
 7   Q    When Tony Hoang told you about the statements that he
 8   said Wayne said to him, your belief was that Wayne was just
 9   bragging; correct?
10            MR. SCALLY:  Objection.  Relevance.  403.  Calls for
11   opinion testimony.
12            THE COURT:  No.  This is your personal thought and
13   opinion.  You can answer that question.
14            THE WITNESS:  Would you like me to answer that,
15   Your Honor?
16            THE COURT:  Please.
17            THE WITNESS:  I'm sorry.  Can you repeat the
18   question, sir.
19            MR. WILKE:  Yes, I can.  Thank you.
20   Q    BY MR. WILKE:  When Tony Hoang told you about these
21   statements, you questioned Tony Hoang about why Wayne would
22   brag to him about that; correct?  Do you recall that?
23   A    I think that is accurate.  Yes, I did ask him why Wayne
24   would confess to him something like that.
25   Q    And you asked Tony whether Wayne was just trying to get
```

The timestamps in the left margin: 02:33PM (line 5), 02:34PM (line 10), 02:34PM (line 15), 02:34PM (line 20), 02:35PM (line 25).

```
 1  him -- get Tony to trust him to do business.  Do you recall
 2  that?
 3              MR. SCALLY:  Objection.  Relevance.  403.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  I can answer, Your Honor?
 6              THE COURT:  You can, sir.
 7              THE WITNESS:  I'm sorry, Attorney Wilke, can you
 8  repeat that again?
 9              MR. WILKE:  Yes, sir.
10  Q    You asked Tony whether Wayne was just trying to get him,
11  Tony, to trust him in order to do business?
12  A    Do business with me or --
13  Q    No, to do business with Tony, that Wayne -- you asked him
14  whether Wayne would be saying that just to get Tony to do
15  business with him.
16  A    I thought they were already doing business.  I wouldn't
17  ask that, I don't think, because they came together previously.
18  Q    Well, do you recall telling -- saying to Tony Hoang, "Why
19  the eff would he brag about it to you?  That's" -- "You think
20  he's just trying to get you to trust him to do business?"  Do
21  you know what I mean?
22              Do you recall asking Tony that?
23  A    I think the first part might be accurate.  The second part
24  I don't think I would ask that because I thought they were
25  friends.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Would it refresh your memory to take a look at the
 2   transcript?
 3   A    Yes, please.
 4            MR. WILKE:  May I approach, Your Honor?
 5            THE COURT:  You may.
 6            (Pause in proceedings.)
 7            THE WITNESS:  I don't think that's entirely
 8   accurate.
 9   Q    BY MR. WILKE:  You don't think you said that?
10   A    I said the first part.  I did question why he would brag
11   to him about any murder.
12   Q    You questioned Tony about whether he would do that in
13   order to do business with him?
14   A    Yeah.  I had no idea they were trying to do business.  I
15   thought they were friends.
16   Q    Okay.  Now, you knew that Wayne Le was trying to do some
17   construction work; correct?
18   A    Yes, sir.
19   Q    And you, in fact, tried to give him some construction
20   work, correct?
21   A    Yes, sir, I did.
22   Q    Explain to the jury what the work was you tried to give
23   to him.
24   A    Wayne and his family owned various real estates.  And he
25   told me he would be the one that handles fixing up their
```

02:36PM (line 5)
02:37PM (line 10)
02:37PM (line 15)
02:38PM (line 20)
02:38PM (line 25)

|     |     |                                                                        |
| --- | --- | ---------------------------------------------------------------------- |
|            | 1  | family's real estate including remodeling and doing various            |
|            | 2  | things.  I had a house in Irvine and the floor was very dirty,         |
|            | 3  | and he wanted to have me pay him to replace the flooring and to        |
|            | 4  | laminate the flooring.                                                 |
| 02:38PM    | 5  | Q    Initially did you agree to do that?                               |
|            | 6  | A    Not at the time because I still -- I'm sorry, I don't --          |
|            | 7  | I've never seen him actually do the work.  He was just telling         |
|            | 8  | me about it.                                                           |
|            | 9  | Q    Okay.  But did he bring some laminate flooring to your           |
| 02:39PM    | 10 | house?                                                                 |
|            | 11 | A    Ultimately, yes, later down the road.                            |
|            | 12 | Q    And did you have him do the work?                                |
|            | 13 | A    I don't recall if he finished it.  He might have started        |
|            | 14 | it, yes.                                                               |
| 02:39PM    | 15 | Q    Do you recall him bringing two different colors of              |
|            | 16 | laminate flooring over to your house?                                  |
|            | 17 | A    Yes.  That is correct.  He did bring two different types        |
|            | 18 | of flooring.                                                           |
|            | 19 | Q    Right.  And when you saw that, you didn't want to have          |
| 02:39PM    | 20 | two different kinds of laminate flooring on your floor;               |
|            | 21 | correct?                                                               |
|            | 22 | A    That's correct, sir.                                             |
|            | 23 | Q    So you didn't have him do the work, did you?                     |
|            | 24 | A    No.  I think it just sat in the garage for some time.           |
| 02:39PM    | 25 | Q    Now, Wayne never did any kind of collection work for you        |

```
        1    ; correct?
        2    A    No.  He tried.  Again, like I said, he's a friend.  He
        3    wanted to be the tough -- you know, the tough guy.  And he did
        4    ask to help me on certain things like that if he knew that
02:40PM  5    people owed me money.
        6    Q    But he never actually collected money for you; correct?
        7    A    No.  Unless he did and he kept it.  That, I wouldn't know.
        8    Q    Now, you knew that your brother and Wayne had this long
        9    relationship; correct?
02:40PM 10    A    As to how long, I'm not accurate on that.  But at least a
       11    few years, yes.
       12    Q    Okay.  And they would hang out often; correct?
       13    A    Yes.  That's my understanding.
       14    Q    They would go out to eat; correct?
02:40PM 15    A    Yes.  That is correct.
       16    Q    They would -- you believe they looked out for each other;
       17    correct?
       18    A    Yes.  They acted like they were brothers too.
       19    Q    Okay.  You knew, though, that your brother and James
02:41PM 20    [sic] would also party together; correct?
       21    A    Did you say my brother and James or --
       22    Q    I'm sorry, your brother and Wayne.  I apologize.  I
       23    misspoke.  Your brother and Wayne, they would party together.
       24    You knew that; correct?
02:41PM 25    A    Yes, that's correct.
```

```
 1    Q    You knew them to go to Vegas all the time; correct?
 2    A    Yes.  That's one of the things my brother did, I think,
 3    for a living.
 4    Q    Okay.  You knew that Wayne knew your brother's children;
02:41PM 5    correct?
 6    A    Yes.  I think they hung out a lot.
 7    Q    And that they referred to him as Uncle Wayne; correct?
 8    A    Yes.  I found out recently after the situation.  I didn't
 9    know about the uncle part.
02:41PM 10   Q    But you understood that your brother and Wayne were very
11    close; correct?
12    A    That is correct.
13    Q    Now, you first met Wayne back during that period of time
14    when you were working as a confidential informant for the FBI;
02:42PM 15   correct?
16    A    No.  If my recollection is correct, I think I met him
17    after the cases.  I was still maintaining contact with the FBI
18    when my brother introduced me to this individual named Wayne,
19    who you see here.  And they said it was a good homie, good
02:42PM 20   friend, and that's how I met him.
21    Q    Okay.  Mr. Dao, in your statement of October 21, 2019, to
22    the agents, the one at the station, do you recall telling them
23    that Wayne saw you at your restaurant where you met with
24    high-powered -- high gang members?  Do you recall telling him
02:43PM 25   that?
```

**UNITED STATES DISTRICT COURT**

```
  1   A    I think he might have frequented my restaurant, yes.  But
  2   who he saw me with, I don't remember that statement.
  3   Q    Would it refresh your memory to take a look at the
  4   transcript of that statement?
02:43PM 5   A    Yes.  Thank you.
  6             MR. WILKE:  May I approach, Your Honor?
  7             THE COURT:  You may.
  8             (Pause in proceedings.)
  9   Q    BY MR. WILKE:  Have you read it?
02:44PM 10  A    Yes.
 11   Q    Having read that portion of the transcript, does that
 12   refresh your memory about what you told the agents during your
 13   October 21, 2019 interview?
 14   A    It might have been mostly accurate because a lot of gang
02:44PM 15  members did frequent my restaurant.  But I don't know in that
 16   context because it's been a few years.  So I'm going to trust
 17   you on that one.
 18   Q    Well, it's your words.  I wasn't there, sir.
 19   A    Oh, I'm sorry.  I don't recall the exact words I used,
02:44PM 20  then.
 21   Q    Okay.  But the question is, back in the late 2000s, Wayne
 22   would frequent your restaurant; correct?
 23   A    Yeah, the late 2000.  So I would -- that sounds accurate
 24   in the time frame.  So maybe we've known him in our family --
02:45PM 25  it's 2021 -- back in '16 or '15.
```

```
 1   Q    2009, 2010, that period of time when you were working as
 2   a confidential informant.
 3   A    Oh, actually, I never actually was close to Wayne.  He
 4   might have frequented.  But I actually got to know him during,
 5   I think, 2016-17 time frame.
 6   Q    Okay.  But you knew that he had been at your restaurant
 7   back during that time, didn't you?
 8   A    Not at the time.  It was later that my brother said, "Hey,
 9   you remember this guy?  He was at your place."
10        And then I was, like, "Oh, okay.  So he's been to my
11   place.  Nice to meet you."
12   Q    So you later learned that he used to frequent your
13   restaurant?
14   A    That is correct.
15   Q    At a time when you were working as a confidential
16   informant; correct?
17   A    I don't think he knew that I was.
18   Q    No.  I'm not asking that.
19   A    Oh, okay.  I'm sorry.  I misunderstood the question.
20   Q    Back during this period in the late 2000s, that is the
21   period you were working as a confidential informant?
22   A    That is correct, yes.
23   Q    And you also owned the sushi restaurant?
24   A    That is correct, sir.
25   Q    And while you were working as a confidential informant,
```

```
 1   you were playing the role of somebody involved in criminal

 2   history; correct?

 3   A    Yes.  That was the role given to me.  Yes.

 4   Q    Do you recall -- in fact, you knew that Wayne believed

 5   that you were connected, didn't you?

 6              MR. SCALLY:  Objection.  Foundation.

 7              THE COURT:  If there is some kind of conversation --

 8   I'm going to sustain the objection.  It just needs further

 9   foundation, Counsel, as to what Wayne believed and why.

10              MR. WILKE:  Okay.

11   Q    Do you recall, sir, telling the agents on October 21,

12   2019, that Wayne would see you with these big-name gangs?

13   A    You're asking if I remember a conversation with an FBI

14   agent or who?  I don't remember that one.

15   Q    During your October 21, 2019 interview with the Coast

16   Guard agents, do you recall telling them that Wayne, quote,

17   "would see me with the big-name gangs"?

18   A    See me where?

19   Q    Back during the time you were working as a confidential

20   informant.

21   A    No.  That doesn't make sense because, like I told you, I

22   didn't even know Wayne was Wayne, who he is now, until around

23   2015, 2016, after my brother reminded me that he has a friend

24   that used to frequent my restaurant.

25   Q    Okay.  But, in fact, by 2019, when you're speaking to the
```

02:47PM 5
02:47PM 10
02:48PM 15
02:48PM 20
02:48PM 25

```
 1   agents, you knew by that time that Wayne would have seen you
 2   with these big-name gangs; correct?
 3   A    I don't recall who he saw me with.  That's what I'm
 4   saying.
 5   Q    Do you recall telling the agents that in your interview
 6   on October 21, 2019?
 7   A    I do remember interviewing with the Government agents.
 8   And I did tell them that Wayne might have seen me with those
 9   type of people.  But I don't remember where I said it was or
10   when.
11   Q    Okay.  In fact, you did say, quote, "He would see me with
12   the big-name gangs"?
13   A    Maybe.  I'm not sure.
14   Q    Would it refresh your memory to take a look at the
15   transcript?
16   A    Yeah.  I think I might have said that.  I just don't
17   remember the time.  Because, again, I did not know him closely
18   during that time of my restaurant.
19   Q    Well, I'll just ask my question again.
20        Did you, in fact, tell the agents that Wayne, quote,
21   "would see me with the big-name gangs"?
22   A    Potentially, yes.
23   Q    Do you have any doubt in your mind about whether you said
24   that?
25   A    Yeah, because I don't remember when I said that.
```

02:49PM (line 5)
02:49PM (line 10)
02:49PM (line 15)
02:49PM (line 20)
02:50PM (line 25)

```
         1   Q     Would you like to take a look at the transcript?

         2   A     Sure.  But that's what I'm saying, I just don't remember

         3   the time frame when I said it and when he met me.

         4   Q     I'm just asking about your statement on October 21, 2019.

02:50PM  5   A     Then I can answer that that might have been correct.

         6   Q     Is there any doubt in your mind about whether you did, in

         7   fact, say that, sir?

         8   A     Yeah, but that's what I'm saying.  You're asking me for

         9   time frame.  He's seen me with potential gangsters or not?  I

02:50PM 10   don't know who he saw me with.

        11   Q     That's not my question.  My question is on October 21,

        12   2019, did you tell the federal agents that Wayne, quote, "would

        13   see me with the big-name gangs"?

        14   A     October -- this is two years -- and this is the time of my

02:50PM 15   brother's murder?

        16   Q     After -- a day after you learned of your brother's death.

        17   A     And I told federal -- you're saying I told federal agents

        18   that Wayne saw me with big-time gangsters.

        19   Q     With big-name gangs.

02:51PM 20   A     When, though?

        21   Q     I'm just asking you if you told that to the federal

        22   agents.

        23   A     I don't think so.  Now you're -- it doesn't make sense

        24   because I told you my life has changed 15 years ago.  So that

02:51PM 25   doesn't make sense that that was recent.
```

```
 1  Q    Well, no.  You were talking about your period of time
 2  when you were working as a confidential informant, sir.
 3  A    Oh, you're saying that that is referencing --
 4  Q    Yes.  All of my questions about this are referencing the
 5  period of time in which you were working as a confidential
 6  informant.
 7  A    Then, yes, that is a possibility that I repeated to the
 8  agents that if Wayne was at my restaurant, he might have seen
 9  me with that type of people.
10  Q    Big-name gangs?
11  A    Yes.
12  Q    Okay.  Now, you knew that Wayne always respected you;
13  correct?
14  A    You mean, like, did I know 100 percent?
15  Q    Well, didn't you, in fact, tell the agents that Wayne
16  always respected you?
17  A    I don't know about always, but I was hoping that.  Yes.
18  Q    Well, you, in fact, told them that Wayne always respected
19  you; correct?
20  A    I don't know about the -- I think what I meant to say was
21  that he acted like he always respected me.  I don't know about
22  always or if that's true.  Wayne actually was always a
23  respectable individual.
24  Q    Didn't you, in fact, tell the agents on October 21, 2019,
25  that Wayne, quote, "always respected" you?
```

02:51PM  5
02:51PM 10
02:52PM 15
02:52PM 20
02:53PM 25

**UNITED STATES DISTRICT COURT**

1           MR. SCALLY:  Objection.  Asked and answered.

2    Relevance.  403.

3           THE COURT:  You can answer it one more time, sir.

4           THE WITNESS:  Repeat the question, sir.

02:53PM  5    Q    BY MR. WILKE:  Didn't you tell the agents on October 21,

6    2019, that Wayne, quote, "always respected" you?

7    A    I think the word "always" is -- I don't know if that's

8    exactly what I said.  I think he acted like he respected me all

9    the time.

02:54PM  10   Q    Would it refresh your memory to take a look at the

11   transcript of that interview?

12   A    Yes.

13          MR. WILKE:  May I approach, Your Honor?

14          THE COURT:  You may.

02:54PM  15   Q    BY MR. WILKE:  Mr. Dao, having read that, does that

16   refresh your recollection about whether you told the agents on

17   October 21, 2019, that Wayne always respected you?

18   A    Thank you for showing me that.  After reading that, that

19   is a possibility, yes.

02:54PM  20   Q    That's, in fact, what you said; correct?

21   A    Yes.

22   Q    You, in fact, knew that Wayne was afraid of you because

23   he knew about your background; correct?

24          MR. SCALLY:  Objection.  Foundation.

02:55PM  25          THE COURT:  Overruled.

1          MR. SCALLY:  Relevance.

2          THE COURT:  You can answer the question, sir.

3          Overruled.

4          THE WITNESS:  Your Honor, would you like me to

02:55PM  5    answer that question?

6          THE COURT:  Yes, please.

7          THE WITNESS:  I'm sorry, Attorney Wilke, can you --

8    Q    BY MR. WILKE:  Yes.

9          Mr. Dao, you, in fact, knew that Wayne Le was afraid

02:55PM 10    of you because he knew of your background; correct?

11   A    No.  That is entirely not correct.  He would come hang

12   out.  So no reason to be afraid of me.

13   Q    You, in fact, told the agents on October 21, 2019, that

14   Wayne was afraid of you because he knows of your background,

02:56PM 15   didn't you?

16   A    In the context -- you said this was the interview after my

17   brother's murder?

18   Q    After you learned of your brother's death.

19   A    What was the sentence before that?  Did they ask me why

02:56PM 20   Wayne would come see me?  Because maybe that's why I was

21   explaining to the agents that maybe because Wayne was scared of

22   me, that's why he went to see me.  It was in reference to their

23   questioning.

24   Q    And you told the agents that Wayne is afraid of you

02:56PM 25   because he knows your background, didn't you?

UNITED STATES DISTRICT COURT

1    A    Could be afraid of me.  That's why he showed up to the

2    meeting.

3    Q    You, in fact, told him that he is afraid of you; correct?

4    A    No, I don't believe that to be accurate.  Maybe someone

02:57PM 5    typed that not with the right words.  Because I can't tell

6    Wayne -- I can't tell 100 percent whether someone is afraid of

7    me or not.  I just was referencing why he showed up to meet me

8    when my mom tried to call him.  And he never called her back,

9    but he would come see me.

02:57PM 10   Q    Okay.  And what you told the agents was, quote, "I guess

11   he's afraid of me because he knows of my background"; correct?

12   A    That might have been my guess, yes.

13   Q    Would you like to look at the transcript?

14        THE COURT:  Counsel, I think he just repeated the

02:57PM 15   same thing.  You read "I guess," and he --

16        MR. WILKE:  Think he said "I might" --

17        THE COURT:  No, he said "I guess."

18   Q    Did you tell the agents, "I guess he's afraid of me

19   because he knows of my background"?

02:57PM 20   A    No.  I'm saying -- I'm guessing maybe that's why he's

21   afraid of me, because of my background.

22   Q    And that's what you told the agents; correct?

23   A    Yeah, but I don't know the exact verbiage.

24        MR. WILKE:  Your Honor, I think this is a good place

02:58PM 25   to stop.  We're breaking at 3:00?  I'm going to have to have

```
 1   the witness back.
 2            THE COURT:  And you'll have cross-examination.  At
 3   least -- well, we'll discuss that.
 4            We're going to hand out the table.  And if I could
 5   get one also.
 6            You can see from what we're handing out to you, this
 7   is the original -- well, strike that.  We modified it
 8   significantly because, when we first handed out the schedule to
 9   you, we really did expect the case might conclude December 13th
10   through the 17th, and we didn't know a time frame.  So for all
11   of our planning purposes we're, obviously, on November 19th.
12            We're going to order you to return on Wednesday,
13   December 1st.  But I'm going to ask you to return at
14   9:00 o'clock in the morning, not 8:30.  I want a little more
15   time with counsel in the morning that day before you come in
16   just because we're resuming to make certain we have the
17   equipment operating, you know, whatever we need
18   technologically.
19            Counsel, if you two would meet and confer for just a
20   moment so I'm not making a mistake.  Would you give us the best
21   time estimate between the two of you on when you think the
22   evidence might conclude.  Just have a conference so we pay the
23   courtesy to the jury because I think we're about two weeks
24   ahead of schedule, frankly.
25            But I don't want to represent that to you yet, but
```

1    I'd like to get some definite times for your employer, for your

2    family.  But I think we're way earlier than you would

3    anticipate.

4                    **(Counsel conferred off the record.)**

03:00PM  5            THE COURT:  Let the counsel talk about that.

6    They've got the best wisdom about who else they'll be calling,

7    although I heard the representations outside your presence.

8            MR. WILKE:  Your Honor, I think the parties' best

9    estimate is that the evidence will be complete by Friday,

03:01PM 10    December 3rd.

11            THE COURT:  At the latest?

12            MR. SCALLY:  We believe that to be the case.  Yes,

13    Your Honor.

14            THE COURT:  Okay.  By Friday, December 3rd?

03:01PM 15            MR. WILKE:  We believe so.  That's our best guess.

16            THE COURT:  Then my guess is that the case will be

17    submitted to you for your deliberations on December 6th, and

18    that that would be the concluding arguments and the

19    instructions by the Court.  Okay.

03:01PM 20            Now, obviously, we don't know the deliberation

21    process or how long that would take, but we originally

22    anticipated December 13th through the 17th.  We weren't quite

23    certain.  Now we're pretty certain the evidence will conclude

24    by December 3rd.

03:01PM 25            We're going to break for this extended period of

**UNITED STATES DISTRICT COURT**

time because of the Thanksgiving recess.  We didn't know your

travel plans.  We didn't know -- the 12 of you nor the

alternates, we didn't know if you were taking a plane, driving

by car.  And if any one of you were outside the area, we'd have

to stop the whole proceedings anyway.  So maybe we've been

overly cautious.

But in planning this, all parties wanted to move

forward.  And the holiday season is a hard time with

Thanksgiving and Christmas.  So we decided to start the case,

by agreement of all counsel and the Court, during this time

period.

I'm going admonish you in the strongest terms.

Please do not discuss this matter with anyone.  Don't even form

an opinion concerning this case.  Don't reach out to anybody,

gather any information, do any independent investigation.  Let

this case go during this recess.

If we can all assemble -- obviously, we need all of

you, 12 of you and the two alternates left.  So we're going to

see you on December 1st at 9:00 o'clock.  Have a wonderful

Thanksgiving.

**(Out of the presence of the jury.)**

THE COURT:  We're outside the presence of the jury

with counsel, the defendant present.

I know you're here with counsel, and I haven't been

introduced to your counsel.

             1              MR. SAMINI:  Good afternoon, Your Honor.  Bobby
             2     Samini.  I represent the witness on the stand.
             3              THE COURT:  Thank you for your courtesy.  We're
             4     going to order the gentleman back, let's say, at 8:45 -- 15
03:03PM      5     minutes beforehand -- so we're ready to go at 9:00 o'clock on
             6     December 1st.  It's obvious that counsel hasn't concluded
             7     direct, and I don't know how long cross-examination will be.
             8              But I want to thank you for your courtesy.  We'll
             9     see you December 1st, sir, at 8:45.
03:04PM     10              THE WITNESS:  Okay.  Thank you, Your Honor.  Have a
            11     good holiday, Your Honor.
            12              THE COURT:  Thank you very much.
            13              Now, quickly, Counsel --
            14              Sir, take the mask with you -- take it with you.
03:04PM     15              What do you need the Court to do over the recess in
            16     preparation for continuing on?  In other words, what do I need
            17     to be aware of without assembling you again?  It seems to me
            18     that the instructions, if I would -- to give you some thoughts,
            19     I would prepare the following; first, second, and voluntary.  I
03:04PM     20     can always extract those if they're not appropriate after
            21     argument, but I would encourage you to make certain that first
            22     degree, second degree, voluntary.
            23              Are either one of you requesting involuntary
            24     manslaughter?
03:04PM     25              MR. SCALLY:  No, Your Honor.

1            MR. WILKE:  No, Your Honor.

2            THE COURT:  All right.  Second, if the jury were to

3    conclude a voluntary manslaughter, would that then be counter

4    to any hypothetical decision that they might make concerning

03:05PM 5    conspiracy to commit murder?  By that I'm saying they would be

6    two incongruent verdicts.

7            And if, in fact, you're preparing instructions, you

8    might consider an instruction that's stated that if you were to

9    reach an involuntary manslaughter, then conspiracy to commit

03:05PM 10   murder -- well, I'll leave that to you to reason between the

11   two of you.  But you can see how --

12           MR. WILKE:  I understand.

13           THE COURT:  -- how contra that would be.

14           Now, you can continue on and include both.  That

03:05PM 15   might be for the Court's decision if there were contradicted

16   verdicts.  But I warn you about that.

17           The second is if you look at the Ninth Circuit

18   instructions concerning self-defense -- they're excellent.

19   Everything the Ninth Circuit does is excellent.  But you might

03:06PM 20   also look at the state self-defense instructions because they

21   are more robust, let's say.  But they're state instructions

22   that I'm not mandated to follow that.

23           MR. WILKE:  Does the Court have a preference over

24   the CALJIC or CALCRIM?

03:06PM 25           THE COURT:  No I always go with the Ninth Circuit

because it's our circuit.  But there are other instructions

historically where the state courts deal a lot more with this

concept on occasion than the federal courts.  I'm not amiss to

looking at those, but I'm not representing that I will follow

03:06PM   those.

The second thing is you can modify these

instructions, and I will thoughtfully consider them.  But I

would encourage you to be very thoughtful if you're doing that

because I'm not inclined to go beyond the pattern instructions

03:06PM  unless there's a real specific case that's recent or in the use

notes that caution me, because the Ninth Circuit rules

committee and state committees do an excellent job.  They

usually don't reverse themselves.  And when I get into the

nuances of what the Fourth Circuit thinks or the Second Circuit

03:07PM  or the Fifth Circuit, I'm getting into pretty dangerous ground

in terms of modification.  So I'd just encourage you.

Lastly, to keep you focused, this is one of the

first cases where we haven't spent late nights.  That's because

you two have worked so well together and fairly, and that's a

03:07PM  compliment to both the Government and the defense.

But when do you want me to look at these

instructions?  And I know that you're working together on those

over the recess.  I'm going to let you go about your business

because you've been cooperative, but you have to reserve, if we

03:07PM  don't complete these, the weekend.  You've got to be certain

```
 1   that you give me -- so I give you back that time and keep you

 2   fresh -- the weekend of the 4th and 5th.  And that way, in case

 3   we're running into instructions, we're not recessing an

 4   unnecessary delay for the jury.

03:08PM 5            MR. SCALLY:  Understood.

 6            MR. WILKE:  Understood.

 7            THE COURT:  And, finally -- and I'm going to let you

 8   go in just a moment -- can you give me a little bit of a

 9   preview.  We have Alex Dao on the stand now.

03:08PM 10            MR. WILKE:  Yes.

11            THE COURT:  After Alex Dao, there was another family

12   member who was going to testify.  Does that conclude the family

13   members?

14            MR. WILKE:  No.  We have Khoa Cao, the man you

03:08PM 15   ordered back on the 1st about the fishing trip on the 13th.

16            THE COURT:  I know who he is.

17            MR. WILKE:  Yes.

18            THE COURT:  Does he need an attorney?  Because the

19   inference has been debt collection and "dope 13,500" in a text.

03:08PM 20   But as you shake your head, remember.  If you were counsel

21   representing Mr. Cao, you might -- if counsel asked a question

22   about a debt collection of 13,500 in a text message -- and you

23   can pull it up if you want -- you might be advising your client

24   to take the Fifth.  That's not your determination.  It's my

03:09PM 25   duty.  And I have to instruct.
```

1            So what's your position with Cao?

2            MR. WILKE:  There's no text message linking him to

3     any debt collection, Your Honor.

4            THE COURT:  You can pull it up, then.  I want you to

03:09PM  5     pull up the text message involving the collection of $13,500.

6            MR. WILKE:  Do we have an exhibit number there?

7            THE COURT:  I probably do, but just a moment.

8            MR. SCALLY:  Oh, Your Honor, I think --

9            THE COURT:  Just pull it up.

03:09PM 10            MR. SCALLY:  Yes, Your Honor.

11            MR. WILKE:  That's Alex Dao.

12            THE COURT:  I'm not requesting that.  I'm ordering

13     it now.  I want to look at that text message one more time.

14            MR. SCALLY:  I think it's 290.

03:10PM 15            MR. WILKE:  Your Honor, this is -- we think it's

16     290, but it's --

17            THE COURT:  Counsel, put the message up on the

18     board.

19            MR. WILKE:  Yeah.  We found the text here.  It's

03:10PM 20     referring to a person by the name of Coco Colin.

21            THE COURT:  Counsel, thank you.

22            Is this the beginning of the message?

23            MR. WILKE:  This is the beginning of the message

24     right here, Your Honor, page 1 of 290.

03:10PM 25            THE COURT:  Counsel, you don't need to explain this

```
 1    to me unless you want to be here all day.

 2               "What's up?  This Colin guy now owes me 13,500."

 3               It's Colin "Cao" now?

 4               MR. WILKE:  No.

 5               THE COURT:  This is somebody else?

 6               MR. WILKE:  Somebody different.

 7               THE COURT:  Now go down the message.

 8               MR. WILKE:  Oh, you want that still?

 9               THE COURT:  Go down and find Cao's name.

10               MR. WILKE:  There's a --

11               MR. SCALLY:  On the next page.

12               THE COURT:  It's on this e-mail strip.

13               MR. WILKE:  His name is not on this, Your Honor.

14               THE COURT:  Just Coco Colin is.

15               MR. WILKE:  Yeah, that's not Khoa Cao.

16               THE COURT:  No relation?

17               MR. WILKE:  No relation.

18               THE COURT:  No relation.

19               MR. WILKE:  None whatsoever.

20               THE COURT:  Excellent.  Thank you so much.

21               So no Fifth Amendment issues, then, with this

22    gentleman?

23               MR. SCALLY:  Not that we're aware of.

24               THE COURT:  After this gentleman, who might be

25    called?  And not in any particular order.  Who's called?
```

1      MR. WILKE:  I've already told the Government this,

2  Your Honor.

3      THE COURT:  Well, I don't know that.

4      MR. WILKE:  So the additional witnesses would be --

03:12PM  5      THE COURT:  I know there's a psychologist who wasn't

6  available until December 1st.  And I represented to you that,

7  no matter where the case was, we would recess even if we were

8  early.

9      MR. WILKE:  We would call Special Agent Andrew Cho.

03:12PM 10  We would call Chris Coleman; he's our ballistics criminalist.

11  We would call Mr. Cao.  We would call Dr. Monguio.

12      THE COURT:  And Dr. Monguio wasn't available until

13  December 1st?

14      MR. WILKE:  She is available December 1st, and I

03:12PM 15  checked with her also December 2nd.  So we would put her on

16  last.  And we don't want her coming down here and not getting

17  on the stand.  So I'm probably shooting for Thursday on her.

18      THE COURT:  Now when you say that you would conclude

19  Friday, that makes me a little suspicious that the Government's

03:12PM 20  going to ask for rebuttal testimony.

21      MR. SCALLY:  We would be.

22      THE COURT:  Of course you would.  And who are you

23  planning on?  And are they available?

24      MR. SCALLY:  Yes, Your Honor.  Dr. Martell has

03:13PM 25  indicated he's available starting December 1st.

|   |   |   |
|---|---|---|
| | 1 | THE COURT:  Who is he? |
| | 2 | MR. SCALLY:  Dr. Daniel Martell. |
| | 3 | THE COURT:  Who is he? |
| | 4 | MR. SCALLY:  The psychiatric -- or psychologist who |
| 03:13PM | 5 | examined Mr. Le. |
| | 6 | THE COURT:  So we have a counterbalance |
| | 7 | psychologist? |
| | 8 | MR. SCALLY:  Yes, Your Honor. |
| | 9 | THE COURT:  And who else? |
| 03:13PM | 10 | MR. STAPLES:  Your Honor, there may be one other |
| | 11 | witness, but we prefer not to disclose it until the defense |
| | 12 | case is closed. |
| | 13 | THE COURT:  Okay.  You're both struggling with the |
| | 14 | identification of the ballistics in this case.  Where is this |
| 03:13PM | 15 | going to lead us?  You could not make the identification from |
| | 16 | the weapon.  And you have an expert coming in to say that it |
| | 17 | isn't the weapon? |
| | 18 | MR. WILKE:  No.  We have an expert to come in and |
| | 19 | say that the bullets that they found in Mr. Le's house are not |
| 03:14PM | 20 | the same type that are consistent with a .38.  They're .38 |
| | 21 | caliber bullets, but they are not the same type of bullets |
| | 22 | taken from the victim. |
| | 23 | THE COURT:  Then let's do this.  Let's recess, then, |
| | 24 | and wish everyone a wonderful Thanksgiving.  And we'll take the |
| 03:14PM | 25 | other matters up -- because I know you have a plane, I think, |

1    Mr. Wilke, to catch.

2              MR. WILKE:  Thank you, Your Honor.

3              MR. SCALLY:  Thank you, Your Honor.

4              **(Proceedings concluded at 3:14 p.m.)**

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  January 16, 2022*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**