1        **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3      **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,            )
                                         )
6                   Plaintiff,           )   **CERTIFIED TRANSCRIPT**
                                         )
7         vs.                            )   Case No.
                                         )   8:20-cr-00002-DOC-1
8   HOANG XUAN LE,                       )
                                         )
9                   Defendant.           )   **Day 10, Volume II**
                                         )
10  ───────────────────────────────────

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        JURY TRIAL

17              WEDNESDAY, DECEMBER 1, 2021

18                        1:09 P.M.

19                  SANTA ANA, CALIFORNIA

20

21

22

23   ─────────────────────────────────────────────────

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
             FEDERAL OFFICIAL COURT REPORTER
25            411 WEST 4TH STREET, ROOM 1-053
                 SANTA ANA, CA 92701
                 dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2    **FOR PLAINTIFF:**

3          TRACY L. WILKISON
          Acting United States Attorney
4          BY:  GREGORY SHEPHERD SCALLY
               Assistant United States Attorney
5          411 West 4th Street
          Suite 8000
6          Santa Ana, California 92701
          714-338-3592
7          gregory.scally@usdoj.gov

8          TRACY L. WILKISON
          Acting United States Attorney
9          BY:  GREGORY W. STAPLES
               Assistant United States Attorney
10         411 West 4th Street
          Suite 8000
11         Santa Ana, California 92701
          714-338-3535
12         greg.staples@usdoj.gov

13
    **FOR DEFENDANT:**
14
          LAW OFFICES OF CRAIG WILKE
15         BY:  CRAIG WILKE, ESQ.
          305 North Harbor Boulevard
16         Suite 216
          Fullerton, California 92832-1901
17         714-870-8900
          craig@craigwilkelaw.com
18
          LAW OFFICES OF SHEILA MOJTEHEDI
19         BY:  SHEILA SARAH MOJTEHEDI, ATTORNEY AT LAW
          806 East Avenida Pico
20         Suite I-291
          San Clemente, California 92673
21         323-412-0472
          sheila@mojtehedi.com
22
    **ALSO PRESENT:**
23
          Austin Casey, Special Agent, Coast Guard
24

25

**UNITED STATES DISTRICT COURT**

```
 1                     I N D E X

 2   WITNESSES                                   PAGE

 3   AUSTIN CASEY, CALLED BY THE DEFENSE
          Direct Examination by Mr. Wilke           6
 4
     KHOA CAO, CALLED BY THE DEFENSE
 5        Direct Examination by Ms. Mojtehedi      11
          Cross-Examination by Mr. Staples         22
 6
     CHRIS COLEMAN, CALLED BY THE DEFENSE:
 7        Direct Examination by Ms. Mojtehedi      27
          Cross-Examination by Mr. Staples         66
 8        Redirect Examination by Ms. Mojtehedi    77

 9

10

11

12

13

14                     EXHIBITS

15                                          WITHDRAWN
                                      IN       OR
16   EXHIBIT                       EVIDENCE  REJECTED

17   585        Stipulation           4

18   586        Stipulation          25

19   581-1      Sketch diagrams      54
     581-2
20
     582        Photo                61
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                 SANTA ANA, CALIFORNIA; WEDNESDAY, DECEMBER 1, 2021

 2                             1:09 P.M.

 3                               - - -

 4              (In the presence of the jury.)

 5              THE COURT:  The jury is present.  The alternates,

 6     all counsel, the defendant, investigating agency.  Thank you

 7     for your courtesy and if you'd please be seated.

 8              Mr. Wilke, if you'd like to continue your redirect

 9     examination, please.

10              MR. WILKE:  Thank you, Your Honor.

11              At this time we have no further questions of Special

12     Agent Andrew Cho.

13              I would like to read a stipulation into the record

14     that we would seek to offer as Exhibit 585.

15              THE COURT:  All right.  Exhibit 585.

16              (Exhibit Number 585 received.)

17              THE COURT:  During the recess, counsel reached the

18     following stipulation which is binding on us.

19              Counsel, if you'd read that stipulation, please.

20              MR. WILKE:  (Reading:)

21              "Plaintiff United States of America and

22          Defendant Hoang Xuan Le hereby stipulate that

23          Special Agent Andrew Cho of the Federal Bureau of

24          Investigation disclosed the fact of his prior

25          relationship with Trung Alex Dao to Assistant
```

01:09PM (line 5)
01:10PM (line 10)
01:10PM (line 15)
01:10PM (line 20)
01:10PM (line 25)

```
 1              United States Attorney Greg Scally at the outset of
 2              the investigation into the death of James" -- "of
 3              Tri James Dao."
 4                   It's so stipulated.
 5                   THE COURT:  It's stipulated by the defense,
 6      Mr. Wilke?
 7                   MR. WILKE:  Yes, Your Honor.
 8                   THE COURT:  By the Government, Mr. Scally?
 9                   MR. SCALLY:  Yes, Your Honor.
10                   THE COURT:  Mr. Staples?
11                   MR. STAPLES:  Yes, Your Honor.
12                   THE COURT:  That's binding upon us.
13                   And then is there recross-examination?
14                   MR. SCALLY:  No, Your Honor.  Thank you.
15                   MR. STAPLES:  I think he's already excused himself,
16      Your Honor.
17                   THE COURT:  That's because of the stipulation over
18      the lunch hour.
19                   So the record will reflect, then, that both counsel
20      are satisfied; is that correct?
21                   MR. WILKE:  Yes, Your Honor.
22                   MR. SCALLY:  Yes, Your Honor.  Thank you.
23                   THE COURT:  Then, Counsel, your next witness,
24      please.
25                   MR. WILKE:  Thank you.  Defense would call Special
```

          1    Agent Austin Casey, Your Honor.

          2              THE COURT:  Thank you.

          3              Sir, do you recall the oath that was administered to

          4    you about two weeks ago?

01:11PM   5              THE WITNESS:  Yes, Your Honor.

          6              THE COURT:  The same oath applies.  If you'd retake

          7    the witness stand.

          8              Once again, would you restate your name for the

          9    jury, please.

01:11PM  10              THE WITNESS:  My name is Austin Casey, C-a-s-e-y.

         11         **AUSTIN CASEY, DEFENSE WITNESS, WAS SWORN**

         12              THE COURT:  Ladies and gentlemen, obviously, the

         13    agent has previously testified.  He's being called back by the

         14    defense at this time on direct examination.

01:12PM  15              Mr. Wilke.

         16              MR. WILKE:  Thank you, Your Honor.

         17                        **DIRECT EXAMINATION**

         18    BY MR. WILKE:

         19    Q    Agent Casey, you participated in a December 27, 2019

01:12PM  20    interview at the FBI office in Orange of Shawn Whalin; correct?

         21    A    Yes, sir.

         22    Q    And during this interview, Mr. Whalin told you that Wayne

         23    Le had asked him to help sell drugs; correct?

         24    A    That's correct.

01:12PM  25    Q    And during this interview, Mr. Whalin told you that he

1    had refused Wayne Le's request to have him help sell drugs;

2    correct?

3    A    That's correct.

4    Q    During this interview, Mr. Whalin was asked about his

01:12PM 5    cell phone; correct?

6    A    Yes, sir.

7    Q    And he told you that his cell phone had been stolen four

8    days earlier; correct?

9    A    That's correct.

01:13PM 10   Q    So Mr. Whalin never produced his cell phone to

11   authorities; correct?

12   A    That's correct.

13   Q    You also participated in a March 10, 2020 interview of

14   Tony Hoang at the U.S. Attorney's Office here in this building;

01:13PM 15   correct?

16   A    Yes, sir.

17   Q    Tony Hoang testified that he had consented to the search

18   of his cell phone by agents; correct?

19   A    Yes, sir.

01:13PM 20   Q    Tony Hoang was a paid informant for the FBI; correct?

21   A    Yes, sir.

22   Q    He received cash compensation for his services; correct?

23   A    That's correct.

24   Q    In fact, Tony Hoang, when he consented to the search of

01:13PM 25   his cell phone, only consented to a search for messages with

1    Wayne Le and Alex Dao; correct?

2    A    Yes, sir.  That's correct.

3    Q    He would not consent to any further search of his cell

4    phone; correct?

01:14PM 5    A    We only asked for a limited consent.  Yes, sir.

6    Q    Now, you participated in a June 10, 2020 interview of

7    Natalie Nguyen; correct?

8    A    Yes, sir.

9    Q    And Special Agent Andrew Cho with the FBI was also

01:14PM 10   present during that interview; correct?

11   A    Yes, sir.

12   Q    And during this June 10, 2020 interview of Natalie

13   Nguyen, Ms. Nguyen expressed concern that she had still not

14   been paid the life insurance benefits from her husband's

01:14PM 15   policy; correct?

16   A    That's correct.

17   Q    You knew at that time that the life insurance company,

18   Prudential, would not release the life insurance proceeds to

19   Ms. Nguyen until the FBI cleared her in the investigation;

01:15PM 20   correct?

21   A    Yes, sir.

22   Q    You participated in a January 7th, 2021 meeting at the

23   United States Attorney's Office with the prosecutors and family

24   members of James Dao; correct?

01:15PM 25   A    Yes, sir.

```
 1    Q    At that meeting, Natalie Nguyen was present; correct?
 2    A    Yes.
 3    Q    Alex Dao was present; correct?
 4    A    Yes.
 5    Q    And other family members including James Dao's mother and
 6    his two other siblings; correct?
 7    A    Some of them were by video.  But yes, sir.
 8    Q    Okay.  Following that meeting on January 7, 2021, Natalie
 9    Nguyen contacted you; correct?
10    A    That's correct.
11    Q    You participated in a January 28th, 2021 interview of
12    Natalie Nguyen; correct?
13    A    Yes, sir.
14    Q    During that January 28th, 2021 interview of Natalie
15    Nguyen, she told you that, after the January 7th, 2021 meeting,
16    she thought to herself, quote, "Are we lacking motive?";
17    correct?
18    A    Yes, sir.
19              MR. WILKE:  I have no further questions, Your Honor.
20              THE COURT:  Cross-examination, please.
21              MR. SCALLY:  No questions, Your Honor.  Thank you.
22              THE COURT:  Thank you, Agent.  You may step down.
23              Counsel, would you like to call your next witness,
24    please.
25              MS. MOJTEHEDI:  Yes, Your Honor.  The defense calls
```

1   Khoa Cao.

2            THE COURT:  Thank you.  If someone would be kind

3   enough to get the witness.

4            Sir, if you'd step forward, please.  Now, sir, would

01:17PM  5   you raise your right hand, please.

6            **KHOA CAO, DEFENSE WITNESS, WAS SWORN**

7            THE COURT:  Thank you, sir.  If you'd walk along the

8   side of the jury railing, along this box.  If you'd be seated,

9   please.

01:17PM 10            Now, sir, there's a mask just to the left of you.

11   And if you'd be so kind if you'd take that mask.  Take the

12   bottom portion.

13            **(Pause in proceedings.)**

14            THE COURT:  Take the top portion so that indentation

01:18PM 15   is over your nose.  Take the top strap.  Put it over your head.

16   Excellent.  Now pull it down so it's over your nose.  Pull that

17   strap down, also, so it's not over your ears.

18            THE WITNESS:  It's fine.

19            THE COURT:  You sure?

01:19PM 20            Would you be kind enough to state your name for the

21   jury, please.  State your full name for the jury.

22            THE WITNESS:  Khoa Cao.

23            THE COURT:  Thank you, sir.

24            Would you spell your first name, please.

01:19PM 25            THE WITNESS:  Khoa.

```
 1              THE COURT:  Spell it, please.
 2              THE WITNESS:  K-h-o-a.
 3              THE COURT:  K-h-o-a?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Your last name?
 6              THE WITNESS:  C-a-o.
 7              THE COURT:  C-a-o.  Thank you, sir.
 8              Direct examination, please, by the defense.
 9              MS. MOJTEHEDI:  Yes, Your Honor.
10                         DIRECT EXAMINATION
11   BY MS. MOJTEHEDI:
12   Q     Mr. Cao, can you do me a favor and scoot a little closer
13   to the microphone.  I want to make sure that we can all hear
14   you.  Thank you.
15              Mr. Cao, where do you live?
16   A     In Orange.
17   Q     Okay.  How long have you been living in Orange?
18   A     40 years.
19   Q     What do you do for a living?
20   A     Construction.
21   Q     Okay.  How long have you been in the business of
22   construction?
23   A     Off and on for 20 years.
24   Q     Do you know somebody named Sheila Ritze?
25   A     Yes.
```

01:19PM (line 5)
01:19PM (line 10)
01:19PM (line 15)
01:20PM (line 20)
01:20PM (line 25)

1            MS. MOJTEHEDI:  Your Honor, displaying on the Elmo

2    what's already been admitted as Exhibit 540.

3            THE COURT:  Thank you.  That's been received.

4    Q    BY MS. MOJTEHEDI:  Mr. Cao, do you recognize the person

01:20PM 5    in this photograph?

6    A    Yes.

7    Q    Who is that?

8    A    Sheila Ritze.

9    Q    Thank you.  And do you know somebody named Wayne Le?

01:20PM 10   A    Yes.

11   Q    Do you see Mr. Le anywhere in court today?

12   A    Over there (indicating).

13   Q    Okay.  Could you identify him by an article of clothing.

14   Could you identify him based on something he's wearing.

01:20PM 15   A    Yeah.  He's in a suit over there.

16           MS. MOJTEHEDI:  Okay.  Your Honor, let the record

17   reflect that the witness has identified Wayne Le.

18           MR. STAPLES:  There's two suits, Your Honor.

19           MS. MOJTEHEDI:  I can make it more specific,

01:21PM 20   Your Honor.

21   Q    Mr. Cao, can you identify Wayne Le based upon perhaps the

22   color of tie he's wearing?

23   A    Like a blue tie.

24           THE COURT:  The record will so indicate he's

01:21PM 25   identified Mr. Le.

```
 1              MS. MOJTEHEDI:  Thank you.

 2    Q    BY MS. MOJTEHEDI:  And how long have you known Sheila

 3    Ritze?

 4    A    Probably six months.

 5    Q    Six months before what date?

 6    A    I met her during -- in the summer of 2019.

 7    Q    Okay.  And how did you meet Sheila Ritze?

 8    A    Through Mr. -- Wayne.

 9    Q    And how long have you known Mr. Le?

10    A    Probably off and on for ten years, around there.

11    Q    Okay.  Did there ever come a time where you went on a

12    lobster fishing trip with Sheila Ritze and Wayne Le?

13    A    Yes.

14    Q    When was that?

15    A    I think it was October 13.

16    Q    Okay.

17    A    Yeah.

18    Q    And how did that trip come about?

19    A    It was normal.  We went lobster fishing.  I got sick and

20    then we caught some lobster and that was it.

21    Q    Let's back up for just a moment.  Who invited you to go

22    on this trip?

23    A    Wayne.

24    Q    Do you remember what Wayne said to you?

25    A    He just said, "You want to go catch some lobster?"
```

```
 1   Q    Okay.  And at the time that Mr. Le invited you to go on
 2   this lobster fishing trip, did you already know Sheila Ritze?
 3   A    Yes.
 4   Q    Okay.  And what was your understanding of Sheila's
 5   relationship with fishing?
 6   A    Wayne told me she has a boat and she's very good at it.
 7   Yeah.
 8   Q    Okay.  And as I understand, there did come a time when
 9   you went on this trip with Sheila Ritze and Wayne Le?
10   A    I didn't hear that.
11   Q    Sure.  So there came a time where you actually went on
12   this trip, on October 13th; right?
13   A    What do you mean by that?
14   Q    Sure.  Let me rephrase.
15        You ended up going on this --
16   A    Yeah.
17   Q    -- on the lobster fishing trip; right?
18        THE COURT:  We couldn't get both of you speaking
19   over the top.  So just reask your question.
20   Q    BY MS. MOJTEHEDI:  Mr. Cao, you did end up actually going
21   on the lobster fishing trip --
22   A    Yes.
23   Q    -- with Wayne Le and Sheila Ritze?
24        THE COURT:  Now, sir, your answer?
25        THE WITNESS:  Yes.
```

```
 1   Q     BY MS. MOJTEHEDI:  Do you remember what time you-all left

 2   for that trip?

 3   A     Probably around 6:00 or 7:00 at night.

 4   Q     Do you remember if it was dark or light outside when you

 5   left?

 6   A     It was in the afternoon.  So it was -- it was getting

 7   ready to get dark, yeah.

 8   Q     Okay.  Does it sound about right that you left around

 9   maybe 3:00 or 4:00 in the afternoon?

10   A     I don't remember.  It's been, you know, two years.

11   Q     Sure.  If I showed you a copy of -- let me back up.

12         Mr. Cao, you were interviewed by the FBI on or about

13   December 30th of 2019.  Do you remember that?

14   A     Yeah.  They came by the house one time.  I don't remember

15   what day, but yeah.

16   Q     Okay.  And during that interview, you spoke with the FBI

17   about what happened during that lobster fishing trip; right?

18   A     Kind of, yeah.

19   Q     Okay.

20   A     Whatever I can remember.

21   Q     If I were to show you a copy of the FBI's notes --

22   A     Uh-huh.

23   Q     -- from that interview, do you think you'd remember what

24   time of day you told them that you-all left on the lobster

25   fishing trip?
```

**UNITED STATES DISTRICT COURT**

1    A    Yeah, maybe.

2         MS. MOJTEHEDI:  Okay.  Your Honor, permission to

3    approach the witness?

4         THE COURT:  You may.

01:26PM 5    Q    BY MS. MOJTEHEDI:  Mr. Cao, take a look at the third

6    paragraph on this page.  Read it silently to yourself and then

7    let me know once you're done.

8    A    Yeah.

9    Q    Thank you.

01:27PM 10        Having read the notes from your interview with the

11   FBI on December 30th, 2019, does that refresh your recollection

12   about the time of day that you remember leaving on the lobster

13   fishing trip?

14   A    I guess we don't -- I guess we left Orange County, Garden

01:27PM 15   Grove or Westminster, at around 3:00 or 4:00.  We didn't get to

16   Sheila's house until around 5:00.  And they didn't take the

17   boat up to Dana Point until around 6:00 or 7:00.  That's what I

18   remember.

19   Q    Okay.  Thank you.

01:28PM 20        And what happened after you-all left the marina,

21   after the boat launched?

22   A    After the boat launch?

23   Q    Yeah.  So, in other words, after the boat left the

24   harbor --

01:28PM 25   A    Uh-huh.

```
 1    Q    -- what did you-all do?

 2    A    We just went out there and set the trap.

 3    Q    And after you set -- when you say you set the traps, are

 4    you referring to the lobster traps?

 5    A    Yeah, lobster traps.

 6    Q    Can you describe what those lobster traps look like.

 7    A    They're big cages like this (indicating).  So pretty

 8    much -- I didn't do it.  Sheila drove out there and she dropped

 9    it all down because I got sick.  So I went to the front of the

10    boat and lay there until they came back to the jetty.  That's

11    when I -- I pulled up one trap and that was it.

12    Q    Okay.  So I want to break down what you just said.  So

13    you mentioned that only Sheila was the one who set the traps

14    and threw them out?

15    A    Yeah.  She set the trap, and Wayne was helping her pull it

16    in.

17    Q    Okay.  And what happened after you-all set out the traps

18    in the water?

19    A    What happened?

20    Q    Yeah.  What happened next?  What did you-all do next?

21    A    Oh, I got sick; so I lay in front of the boat.  And then

22    Sheila and Wayne just -- I guess they were behind the wheel.

23    Q    Okay.  And was there ever a time where you-all went back

24    to where the lobster traps were in the water?

25    A    Yeah.  We set the trap down for, like, I'm assuming -- I'm
```

```
 1   guessing, like, 30 minutes, and then come back to pull it up,

 2   if there's any lobster.  If not, then we toss it down again.

 3   Q    Do you remember catching any lobsters that day?

 4   A    Yeah.  We probably caught around -- between seven to ten

 5   lobster, around there.

 6           MS. MOJTEHEDI:  Your Honor, I'm displaying on the

 7   Elmo what's already been admitted Exhibit 91.

 8           THE COURT:  Exhibit 91?

 9           MS. MOJTEHEDI:  Yes, Your Honor.

10           THE COURT:  Thank you.

11   Q    BY MS. MOJTEHEDI:  Mr. Cao, do you recognize this photo?

12   A    Yes.

13   Q    This is a picture of Wayne Le holding one of the lobsters

14   that you-all caught that day; right?

15   A    Yes.

16   Q    Okay.  And do you know where this picture was taken?

17   I'll scoot it up just a bit.  That might help you.

18   A    I'm assuming on the boat.

19   Q    Okay.  Does that appear to be the seat of the boat in the

20   bottom left-hand corner?

21   A    Appear to be what?

22   Q    The seat of the boat.

23   A    Maybe.

24   Q    Okay.

25   A    I'm not sure if it's the front of the seat.
```

```
 1   Q    Okay.  I'm also displaying on the Elmo what's already
 2   been admitted as Exhibit 567.
 3            Mr. Cao, do you recognize this photo?
 4   A    Yeah.
 5   Q    Can you describe what it is.
 6   A    Wayne holding a lobster.
 7   Q    Do you recognize where this photo was taken?
 8   A    Probably on the boat.
 9   Q    Okay.  And that's Mr. Le standing above a bag full of
10   lobsters?
11   A    Yes.
12            MS. MOJTEHEDI:  Just a moment, Your Honor.
13            (Counsel conferred off the record.)
14   Q    BY MS. MOJTEHEDI:  Mr. Cao, I want to back up and get a
15   little more detail about your relationship with Sheila Ritze.
16   Did you have any sort of professional relationship with
17   Ms. Ritze?
18   A    She's the property management.  And I -- she -- I do
19   construction for her --
20   Q    Okay.
21   A    -- for the property that she works for.
22   Q    How many projects would you say that you did as part of
23   your work with Sheila's HOA company or the -- excuse me, the
24   HOA company Sheila worked for?
25   A    How many projects have I done?
```

| | |
|---|---|
| 1 | MR. STAPLES:  Objection.  Relevance. |
| 2 | THE COURT:  Overruled. |
| 3 | You can answer the question. |
| 4 | THE WITNESS:  Oh, probably between 10 to 15 |
| 01:33PM 5 | projects. |
| 6 | Q    BY MS. MOJTEHEDI:  Over what time period did you do those |
| 7 | 10 to 15 projects? |
| 8 | A    Let me see.  So it was after summer.  It was around -- it |
| 9 | was around August until -- August till December. |
| 01:33PM 10 | Q    Of what year? |
| 11 | A    2019. |
| 12 | Q    Okay.  And can you describe what types of projects you |
| 13 | did? |
| 14 | A    I did some work on the condo bridges and just a lot of HOA |
| 01:34PM 15 | project -- painting, flooring -- yeah, just in general.  Not |
| 16 | anything major. |
| 17 | Q    Okay.  And were you paid by either Sheila Ritze or the |
| 18 | company she worked for for the projects that you completed? |
| 19 | A    Yes. |
| 01:34PM 20 | Q    Okay.  How much did you get paid? |
| 21 | A    Overall, you mean? |
| 22 | Q    Sure.  Overall. |
| 23 | A    Overall, probably 30-, $40,000. |
| 24 | Q    Okay.  And after -- well, were you aware that Ms. Ritze |
| 01:35PM 25 | got arrested in December of 2019? |

```
 1   A     For the UI?

 2   Q     Actually, let me back up.  So aside from the 30- to

 3   $40,000 of work that you did for Ms. Ritze, were there any

 4   other projects that you did with her or her HOA company?

 5   A     I think that was all the project until she got arrested.

 6   Yeah.

 7              MS. MOJTEHEDI:  Okay.  Just a moment, Your Honor.

 8              (Counsel conferred off the record.)

 9   Q     BY MS. MOJTEHEDI:  Mr. Cao, a moment ago you testified

10   that you did projects for Ms. Ritze's company.  How did you

11   come about doing those projects for Ms. Ritze?

12              MR. STAPLES:  Objection.  403 and relevance.

13              THE COURT:  Overruled.

14              You can answer the question.

15              THE WITNESS:  Can you repeat that question, please.

16              MS. MOJTEHEDI:  Sure.

17   Q     So a moment ago you told us that you did construction

18   projects for Ms. Ritze's HOA company.  How did you come about

19   doing those projects?

20   A     How did I come about doing the project?

21   Q     Sure.  I'll rephrase.

22              Would you say that you started doing those projects

23   for Ms. Ritze because Mr. Le connected you with Ms. Ritze?

24              MR. STAPLES:  Objection.  Leading.

25              THE COURT:  Well, it's leading, Counsel.
```

UNITED STATES DISTRICT COURT

```
 1              MS. MOJTEHEDI:  Sure, Your Honor.  I can reask it.

 2              THE COURT:  Just reask it.

 3              MS. MOJTEHEDI:  Sure.

 4    Q    Mr. Cao, how did you begin doing those construction

 5    projects for Ms. Ritze's HOA company?

 6    A    I guess through Wayne, when he first introduced me at the

 7    market.  And he told Ms. Ritze that I do construction work; so,

 8    therefore, she gave me some work through Wayne.

 9    Q    Okay.  And that's how you first started doing work for

10    Sheila Ritze's HOA company.  Fair to say?

11    A    Right.

12              MS. MOJTEHEDI:  Okay.  No further questions,

13    Your Honor.

14              THE COURT:  Cross-examination?

15              MR. STAPLES:  Can I have one moment, Your Honor?

16              (Counsel conferred off the record.)

17                        CROSS-EXAMINATION

18    BY MR. STAPLES:

19    Q    I believe you testified that, on the 13th, when you went

20    down on the boat with Sheila Ritze and the defendant, you got

21    seasick, when you went on the fishing expedition?

22    A    Yeah.

23    Q    Was that before or after the traps were set?

24    A    Before.

25    Q    Okay.  And I believe you testified that, after the traps
```

01:36PM 5
01:37PM 10
01:37PM 15
01:38PM 20
01:38PM 25

```
 1    were set, you later came back to check on them; correct?
 2    A     Yes.
 3    Q     Does that mean you went somewhere in the interim?
 4    A     I was just on the boat.
 5    Q     But did you go anywhere on the boat?
 6    A     I guess she drove around.  I'm not sure.  I don't
 7    remember.
 8    Q     Okay.  When you were sick, were you sitting up, lying
 9    down?
10    A     I was laying down.
11    Q     Could you see what was going on?
12    A     Not really.  I was sick.  So I pretty much had my eyes
13    closed.
14    Q     Okay.  Did you feel the boat moving?
15    A     Yes.
16    Q     Is that why you believe they were cruising around?
17    A     Probably, yes.
18    Q     And you said that was for about 30 minutes?
19    A     We waited for 30 minutes until we pulled the trap up, not
20    cruise around for 30 minutes.
21    Q     How long do you think you cruised around?
22    A     Probably five, ten minutes.
23    Q     Okay.  Do you recall going fishing with fishing poles on
24    that trip?
25    A     Did they have a fishing pole?
```

01:38PM (line 5)
01:38PM (line 10)
01:39PM (line 15)
01:39PM (line 20)
01:39PM (line 25)

**UNITED STATES DISTRICT COURT**

```
         1   Q     Yes.

         2   A     Yes.

         3   Q     Did they take them out and use them in --

         4   A     No.  I don't -- don't remember.  Yeah.

01:39PM  5   Q     Okay.  Did you ever look up -- you say they cruised for

         6   about five minutes; is that correct?

         7   A     Five or ten minutes.  Yeah.

         8   Q     The rest of the time you've been sitting in the water

         9   near the traps?

01:40PM 10   A     I was laying in front of the boat.

        11   Q     No.  No.  I'm sorry, sir.  You were cruising for five to

        12   ten minutes.  The remainder of that 30 minutes that you waited

        13   to go back to the traps, the boat would have been in the water

        14   near the traps?

01:40PM 15   A     Yeah.  The boat's in the water.

        16   Q     Near the traps?

        17   A     Near the trap?  Oh, I don't know.  It's dark.  So I don't

        18   really know if it's near or not.

        19            MR. STAPLES:  Okay.  One second, please.

01:40PM 20            (Counsel conferred off the record.)

        21            MR. STAPLES:  Nothing further, Your Honor.  Thank

        22   you.

        23            THE COURT:  Redirect?

        24            MS. MOJTEHEDI:  No redirect, Your Honor.  May this

01:40PM 25   witness be excused?
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Counsel, may the witness be excused?

2          MR. SCALLY:  For the Government, yes, Your Honor.

3          THE COURT:  Thank you, sir.  You're excused from

4     these proceedings.  You may step down.  Just take the mask with

01:40PM 5     you.

6          Counsel, your next witness, please.

7          MS. MOJTEHEDI:  Your Honor, before we call the next

8     witness, we have a stipulation that we'd both like to read into

9     the record and admit as an exhibit.

01:41PM 10          THE COURT:  All right.  You'd like to do so at this

11     time then?

12          MS. MOJTEHEDI:  Yes, Your Honor.

13          THE COURT:  Does it have a number?

14          MS. MOJTEHEDI:  It will in just a moment.

01:41PM 15          THE COURT:  Thank you.

16          MS. MOJTEHEDI:  We offer this as Exhibit 586.

17          THE COURT:  586.

18          **(Exhibit Number 586 received.)**

19          MS. MOJTEHEDI:  May I read it into the record?

01:41PM 20          THE COURT:  Please.

21          MS. MOJTEHEDI:  (Reading:)

22          "Plaintiff United States of America and

23     Defendant Hoang Xuan Le hereby stipulate that, on

24     October 15, 2019, at 12:00 a.m. midnight, the air

01:41PM 25     temperature in Dana Point, California, was 66

1        degrees Fahrenheit.  The water temperature in the

2        Pacific Ocean off the coast of Dana Point,

3        California, was 68 degrees Fahrenheit, and the moon

4        was full."

01:42PM 5            THE COURT:  So stipulated to by the Government?

6            MR. SCALLY:  Yes, Your Honor.

7            THE COURT:  By the defense?

8            MS. MOJTEHEDI:  Yes, Your Honor.

9            THE COURT:  Thank you, Counsel.  That's binding upon

01:42PM 10  us, then.

11           With that stipulation, your next witness, please.

12           MS. MOJTEHEDI:  The defense calls Chris Coleman to

13  the stand.

14           THE COURT:  Thank you.

01:42PM 15  **CHRIS COLEMAN, DEFENSE WITNESS, WAS SWORN**

16           THE COURT:  If you'd be kind enough to be seated in

17  this box.  And after you're seated, there should be a mask to

18  your left.  Eventually, we're going to get this indentation in

19  the nose.  So just take the mask, pull the bottom portion, the

01:43PM 20  black portion, over your head, and then take the top strap, put

21  it back over your head as well and pull it down so it's over

22  your nose.

23           Sir, would you be kind enough to state your name for

24  the jury, please.

01:43PM 25           THE WITNESS:  Yes.  Chris Coleman.

```
 1              THE COURT:  Would you spell your last name.
 2              THE WITNESS:  C-o-l-e-m-a-n.
 3              THE COURT:  Thank you.
 4              This would be direct examination by the defense.
01:44PM  5      MS. MOJTEHEDI:  May I proceed?
 6              THE COURT:  Please.
 7                        DIRECT EXAMINATION
 8  BY MS. MOJTEHEDI:
 9  Q    Mr. Coleman, what do you do for a living?
01:44PM 10  A    I am a senior forensic scientist with Forensic Analytical.
11  It's a private independent crime laboratory based out of
12  Hayward, California.  I work there in the criminalistics unit.
13  Q    How long have you been working as a senior forensic
14  scientist at the Forensic Analytical Crime Lab?
01:44PM 15  A    I've been there for four years.
16  Q    What did you do for a living before working for Forensic
17  Analytical Crime Lab?
18  A    So I've always been a forensic scientist or criminalist.
19  I started my career with the Los Angeles Police Department
01:45PM 20  Scientific Investigation Division in 1995.
21              I then moved to the Santa Clara County District
22  Attorney's Office crime laboratory in 1996.  I was there for
23  five and a half years.  I then went to the Contra Costa office
24  of the sheriff's crime laboratory where I worked for 15 years.
01:45PM 25  9 of those as the sergeant and supervisor of the firearms
```

section.  While I was with Contra Costa, I was also a range

master/armorer and instructor at the academy.  I also taught

force options.

I retired in 2016 from the Sheriff's Department.  I

01:45PM went to work for a private company in Washington, D.C., working

for the District of Columbia crime laboratory just doing

firearms casework before I came back in 2017 and joined

Forensic Analytical.

Q    Thank you.

01:46PM And can you describe what type of training you

received in your time as a criminalist.

A    Yes.  So I have a Bachelor's of Science in Forensic

Science from California State University Sacramento.  I've had

various training classes in firearms comparisons, firearms

01:46PM function testing, shooting incident reconstruction, distance

determination as well as examinations for blood spatter, crime

scenes, latent prints, and controlled substance analysis.

Some of those were in-house with Los Angeles Police

Department, Santa Clara District Attorney's Office, and the

01:46PM Contra Costa Office of the Sheriff.  Some of those classes were

given by the FBI, ATF, and the California Criminalistics

Institute, which is the research and training division of the

California Department of Justice.

Q    Do you do any continuing education as a criminalist?

01:47PM A    Yes.  We're required to get at least 40 hours every year

01:47PM

of ongoing training.  We continually take proficiency tests
throughout the year.  So it's an ongoing thing.  That helps
maintain accreditation standards as well as my certification
standards.

Q    Do you hold any professional licenses or certifications?

A    Yes.  I'm certified by the American Board of Criminalists
as a fellow.  And, previously, I held firearms, tool mark, and
distance determination certifications through the Association
of Firearm and Tool Mark Examiners, or AFTE, which is a
firearms and tool marks examiner forensic organization.

Q    And have you published in the field of firearms
specifically?

A    I have one article that was published back in 2001 on the
California assault weapons laws that help describe the various
features that they were describing for properly evidencing
people for the state of California.  It was published in their
annual newsletters.

Q    Do you have any other publications?

A    No.

Q    Okay.  Have you done any sort of presentations as a
criminalist?

A    Yes, I have.

Q    Can you describe those presentations?

A    I've given many presentations over the years in study
groups, at national conferences.  My latest one was in August

```
 1    in Miami at the California -- or the AFTE meeting that was held

 2    down there in August.  I presented on a topic on cleaning blood

 3    off of bullets.

 4    Q    And can you describe to us any experience you have

 5    testifying in court as a criminalist.

 6    A    Yeah.  I've testified 337 times in courts primarily in

 7    California.  I also testified in five or six other states,

 8    federal, state, and local courts.

 9    Q    How many times have you testified regarding firearms

10    examination?

11    A    About 260 times.

12    Q    And how many times have you testified regarding crime

13    scene processing?

14    A    Just crime scene processing itself, around 20 times.  But

15    if we're talking about crime scene processing with regards to

16    shooting incident reconstruction, which is one of my

17    specialties, I've testified to that probably 60 to 70 times.

18    Q    And in these times that you have testified in court, have

19    you been qualified as an expert in firearms examination?

20    A    Yes, I have.

21    Q    Have you been qualified as an expert in crime scene

22    processing?

23    A    Yes, I have.

24    Q    And have you been qualified as an expert in shooting

25    incident reconstruction?
```

01:49PM 5
01:49PM 10
01:49PM 15
01:50PM 20
01:50PM 25

| | |
|---|---|
| 1 | A    Yes, I have. |
| 2 | Q    In all these times that you have testified in court, has |
| 3 | there ever been a time where you were offered as an expert and |
| 4 | the court rejected your credentials? |
| 01:50PM  5 | A    No. |
| 6 | MS. MOJTEHEDI:  Okay.  Your Honor, at this time, we |
| 7 | move to qualify Chris Coleman as an expert in firearms |
| 8 | examination, shooting incident reconstruction, and crime scene |
| 9 | processing. |
| 01:50PM 10 | THE COURT:  You may proceed.  Thank you. |
| 11 | MS. MOJTEHEDI:  Thank you. |
| 12 | Q    Now, I want to direct your attention to your involvement |
| 13 | in today's case.  Were you asked to conduct a shooting incident |
| 14 | reconstruction? |
| 01:51PM 15 | A    Yes, I was. |
| 16 | Q    Can you explain to the members of the jury what that is. |
| 17 | A    So when we talk about crime scene reconstruction, we're |
| 18 | discussing looking at different aspects of physical evidence |
| 19 | and using science to go back and recreate what could have |
| 01:51PM 20 | occurred during that incident. |
| 21 | Shooting incident reconstruction is just a |
| 22 | specialized subset where we're looking at ballistic evidence, |
| 23 | whether it be bullets, cartridge cases, insect sites.  We can |
| 24 | use those along with blood stains, blood spatter, and other |
| 01:51PM 25 | physical evidence to try to go back and recreate what occurred. |

1        So shooting incident reconstruction is just kind of

2  a specialized subset of crime reconstruction where we're

3  looking at the ballistic aspects or the firearm aspects of that

4  crime scene.

01:51PM 5  Q    And in conducting these shooting incident reconstruction

6  in this case, did you review any documents?

7  A    Yes, I did.

8  Q    What documents did you review?

9  A    Oh, wow.  There's a lot of documents.  I reviewed the

01:52PM 10 autopsy and medical examiner's reports, the police reports, and

11 the crime scene reports.  I reviewed documents detailing the

12 examination of a boat.  I detailed the examinations that were

13 done by firearms examiners, looking at the ballistic evidence

14 as well as other investigative reports that were provided to

01:52PM 15 me.

16 Q    Did you review any physical evidence?

17 A    Yes, I did.

18 Q    What physical evidence did you review?

19 A    I examined the jacket and sweatshirt.  I looked at

01:52PM 20 evidence that had been recovered ammunitionwise as well as

21 examining the boat.

22 Q    Okay.  A moment ago you mentioned that you reviewed

23 ammunition that was recovered in this case.  Did you

24 specifically review the bullet that was recovered from James

01:53PM 25 Dao's back?

```
 1   A    I did not look at the bullet.

 2   Q    I'm sorry?

 3   A    I did not.

 4   Q    Okay.  Did you review photographs of that bullet?

 5   A    Yes.  There's photographs in the reports that were done by

 6   the criminalist.

 7             MS. MOJTEHEDI:  Okay.  Your Honor, I'm showing this

 8   witness what has already been admitted as Exhibit 21.

 9             THE COURT:  Exhibit 21.

10   Q    BY MS. MOJTEHEDI:  Mr. Coleman, do you recognize this

11   photo?

12   A    Yes, I do.

13   Q    What do you recognize it to be?

14   A    This is the projectile that was removed from Mr. Dao's

15   back.

16   Q    Okay.  Can you describe the characteristics of this

17   bullet.

18   A    Yes.  So this is a -- what we would call a .38 or .357

19   caliber projectile.  It's an approximately 158 grain

20   semi-jacketed hollow point.  This bullet is actually

21   manufactured by Remington for their lines of ammunition in use

22   in .38 special and .357 magnum ammunition.

23   Q    Okay.  And what type of gun can shoot this type of

24   bullet?

25   A    .38 or .357 magnum revolver.
```

```
 1    Q    So both of those types of guns are revolvers?
 2    A    That's correct.
 3    Q    Okay.  Besides the bullet that was recovered from James
 4    Dao's back, did you review any other ammunition in this case?
 5    A    I reviewed some ammunition, I believe, that were taken
 6    from the vehicle as well as some that was found in the house.
 7    Q    Okay.  I want to direct your attention to the cart that's
 8    behind you, if you'll turn around.  There's a baggie, I
 9    believe, that should be at the bottom that's Exhibit 563.
10          Your Honor, that's already been admitted into
11    evidence.
12    A    It's right here (indicating).
13    Q    Oh, right in front of you.
14          Do you recognize these as the bullets that you
15    reviewed which were recovered from Mr. Le's car?
16    A    Yes.
17          MS. MOJTEHEDI:  Okay.  Your Honor, I'm putting on
18    the Elmo what's already been admitted as Exhibit 584.
19          THE COURT:  584.
20    Q    BY MS. MOJTEHEDI:  Mr. Coleman, do you recognize the
21    picture that's now displayed on the Elmo?
22    A    It appears to be what's up here, just a picture of it
23    before one of them was taken apart.
24    Q    Okay.  So there's four bullets in that picture; right?
25    A    That's correct.
```

01:54PM  5
01:55PM 10
01:55PM 15
01:55PM 20
01:56PM 25

Q     And could you hold up that baggie that you're holding.
You said before one of them was taken apart.  What do you mean
by that?

A     Well, you can see that there's three intact rounds.  And
01:56PM   then this little plastic box there's a -- one of the rounds has
been disassembled through the bullet, and then the powders come
out of the cartridge.

Q     What is your understanding of why one of those bullets is
in that small box?

01:56PM   A     Probably to see the full shape and size of the bullets and
maybe to examine the powder that was inside.

Q     Okay.  And were you able to determine whether those same
bullets in the baggie you were just holding were the same type
of bullets that was found in James Dao's back?

01:57PM   A     They're different types of bullets.  They're not the same.

Q     Can you explain to the jury why that is.

A     So -- do they have the picture in front of them?  So these
bullets here are what we call full metal jacket bullets.  So
they have -- they have a jacket that completely encases the
01:57PM   core.  There's a lead core inside there.  The jacket goes
around the top of it and all the way around and covers it up.

        The semi-jacketed hollow point that was removed from
Mr. Dao's back, it has an open nose where the lead is open at
the front, and it's formed into a hollow point.  So they're
01:57PM   different constructions.  They're different types of bullets.

1    Q    In your professional opinion, do you have any doubt that

2    these two bullets -- or these two sets of bullets, I should

3    say, are not the same?

4    A    They're not the same.  They're different.

01:58PM  5    Q    Okay.  Let's transition and talk about what you could

6    determine from reviewing the autopsy photos.  Earlier you told

7    us that you did review the autopsy photos in this case.  Is

8    that standard practice as a criminalist?

9    A    When you're doing shooting incident reconstruction, yes.

01:58PM 10    Q    Okay.  I'm displaying on the Elmo what has already been

11    admitted as Exhibit 501-1.

12            Mr. Coleman, do you recognize what I just displayed?

13    A    Yes.  This was a diagram that was in the medical

14    examiner's report.

01:59PM 15    Q    What do you understand this diagram to show?

16    A    It's showing the locations of injuries where the

17    entrance -- the bullet entrance wound was and then where -- the

18    location under the skin where the bullet was recovered.

19    Q    Okay.  Now, I want to display what's already been

01:59PM 20    admitted as Exhibit 501-4.  Does this appear to you to be a

21    zoomed-in -- excuse me.  What do you recognize this photo to

22    be?

23    A    This is a diagram that was also in the medical examiner's

24    report, showing injuries to the top of Mr. Dao's head.

01:59PM 25    Q    Can you describe for us in more detail what this diagram

1    shows.

2    A     It's showing several, like, lacerations, I believe, as

3    well as a -- where bullet injuries occurred.

4    Q     Okay.  And can you identify which parts of this show

02:00PM 5    where the bullet injuries occurred, to the best of your

6    ability.

7    A     I believe the -- where they're showing the little hole

8    there -- so right here (indicating).  I believe from reading

9    the report along with the diagram, that this is where the

02:00PM 10   bullet entered the skin on the top of Mr. Dao's head.

11   Q     Okay.  And to the best of your recollection, do any of

12   these other parts of this diagram show other injuries you

13   understood to be bullet wounds?

14   A     I believe this one forward here -- oops -- is showing

02:01PM 15   where there was a slit-like exit where the bullet exited his

16   scalp.

17   Q     Okay.  And in reviewing the medical examiner's report,

18   how did you understand the direction of the bullet to have

19   traveled?

02:01PM 20   A     The bullet was traveling from back to front and from right

21   to left.

22   Q     Okay.  And would you describe the wounds that are

23   depicted in this diagram, specifically the bullet wounds, as

24   shallow or deep?

02:01PM 25   A     It was shallow.

```
 1    Q    Why would you say they are shallow?
 2          MR. STAPLES:  Excuse me, Your Honor, I'm going to
 3    object as vague as to "wounds."  Are we talking about the
 4    bullet or what?
 5          MS. MOJTEHEDI:  I can be specific, Your Honor.
 6          THE COURT:  Thank you.
 7    Q    BY MS. MOJTEHEDI:  Mr. Coleman, a moment ago you
 8    identified two parts of this diagram that you understood to
 9    show the bullet wounds.  A moment ago I also asked you if you
10    understood the bullet wounds that we were just talking about to
11    be shallow or deep, and you told us that it was shallow.
12          What makes you say that it was shallow?
13    A    It was described in the medical examiner's report as like
14    a shallow, grazing-type wound.  It did not perforate the skull,
15    but it did go through the scalp.
16    Q    So, in other words, it didn't get to the bone; right?
17    A    Correct.  It didn't perforate the bone or break into the
18    bone.
19    Q    Okay.  I'm now showing you what has been admitted as
20    Exhibit 501-2.
21          THE WITNESS:  How do I clear what I wrote on there,
22    Your Honor?  How do I clear the screen?
23          THE COURT:  Oh, that's above my pay grade.
24    Q    BY MS. MOJTEHEDI:  Mr. Coleman, what do you understand
25    this diagram to be?
```

02:01PM 5
02:02PM 10
02:02PM 15
02:02PM 20
02:03PM 25

```
 1   A    This is a diagram of the back of Mr. Dao showing the
 2   bullet entry and where the bullet was recovered under the skin.
 3   Q    Okay.  Can you show, as you did with the previous
 4   diagram, where you understand the bullet entry wound to be
 5   reflected.
 6   A    Yes.  This is our entrance wound here (indicating).  You
 7   can see even in the notes it says "GSW entrance," gunshot
 8   wound.
 9   Q    And I also see that there are two numbers that are coming
10   from the gunshot wound entrance.  Could you describe to us what
11   those reflect.
12   A    Are you talking about the numbers with the TOH and the
13   LOM?
14   Q    Let's start with the 3/16 and the 3/4.  Could you
15   describe what that is?
16   A    Yeah.  Those are the dimensions of the injury.
17   Q    Okay.  And I see that -- I see there's one that says
18   "3/4," and it's pointing to a circle encapsulating the smaller
19   circle.  Could you describe to us what that is.
20   A    Yes.  That initial entrance or that hole there is
21   three-quarters of an inch.
22   Q    But then there's also this second part that's "3/16."
23   Could you describe to us what that is.
24   A    That might be referring to the diameter.  One of them
25   might be the length and the other is the diameter.  But they're
```

**UNITED STATES DISTRICT COURT**

1    referring to the actual defect in the back.

2    Q    Okay.  And in reviewing the medical examiner's diagrams

3    and reports, were you able to understand which direction this

4    bullet was coming from?

02:05PM 5    A    Yes, I was.

6    Q    Could you describe to us what direction that is.

7    A    So it's going from right to left, pretty much no deviation

8    up or down, and just slightly forward.

9    Q    And when you say "from right to left," just so we're

02:05PM 10    clear, you mean traveling from the right side over to the left

11    side?

12    A    That's correct.

13    Q    Okay.  And in reviewing either this diagram or the

14    medical examiner's other documents, were you able to determine

02:06PM 15    how deep this gunshot wound was?

16    A    Yes.

17    Q    How deep?

18    A    It was pretty shallow.

19    Q    What do you mean by that?

02:06PM 20    A    The bullet basically just kind of went underneath the skin

21    and followed along the back.  It didn't go very deep.  It was

22    recovered right underneath the skin in this location over here.

23    And it was just under the skin.  And they describe it as a

24    shallow, penetrating wound.

02:06PM 25    Q    Were you able to understand the angle of the gunshot

**UNITED STATES DISTRICT COURT**

```
 1    wound?
 2    A    Yes.
 3    Q    Could you describe to us the angle.
 4    A    That's a very shallow angle, going to the back.
 5    Q    Well, what do you mean by "very shallow angle"?
 6    A    Meaning that it's -- I mean, I didn't see any probes that
 7    they used to try to show or demonstrate the angle.  And it
 8    wasn't measured.  But it would probably be, I'd say, under 15
 9    degrees, if I had to guess.  Probably less than that.
10              It's just very shallow and, basically, entered the
11    back and followed along the back underneath the skin, where it
12    came to rest.
13    Q    Okay.  And earlier you told us that you also examined the
14    clothing of James Dao.  Did you also review the orange jacket
15    that was recovered from Mr. Dao?
16    A    Yes, I did.
17    Q    Let's talk about that jacket.  Behind you now in the
18    cart -- yes -- at the bottom should be a bag with
19    "Exhibit 100," which has already been admitted as the orange
20    jacket.  You may want to put on some gloves next to you,
21    Mr. Coleman.
22              Is this the orange jacket that we were just
23    referring to?
24    A    Yes, it is.
25    Q    It's the same one that you reviewed as part of your
```

02:07PM 5
02:07PM 10
02:07PM 15
02:08PM 20
02:09PM 25

1   review of this case?

2   A    Yes, it is.

3   Q    Okay.  Now, in analyzing this orange jacket, did you

4   observe anything notable?

02:09PM 5   A    Yes.

6   Q    Describe to us what you observed.

7   A    So first off, we have this very pronounced hole in the

8   back.  That's our entrance wound into the jacket.  On the inner

9   side of the jacket you'll see it has a liner in there and

02:09PM 10   there's a rip in here in the lining.  And they don't line up

11   perfectly because it was coming in there pretty steep -- or

12   shallow angle into the jacket.  So when it came to the outer

13   shell, it then moved a little bit before it went to the inner

14   shell.

02:09PM 15        Also, in the back of the jacket there were some

16   small -- looked like pinprick-type holes on the one side of the

17   jacket, on the right side of the hole.  So right in this area

18   right here (indicating), there's a bunch of these small, like,

19   pinprick-type holes.

02:10PM 20        To me, it looked like that was probably burning

21   powder particles that caused that damage.

22   Q    Let me pause you right there.  You just said a lot; so

23   let's unpack it.

24        I'm going to display on the Elmo what's already been

02:10PM 25   admitted as Exhibit 502.  Do you recognize this to be a

1    photograph of the back of the orange jacket that you were just

2    showing to the members of the jury?

3    A    Yes, it is.

4    Q    Okay.  You told us that there were two holes, one on the

02:10PM 5  outer part and one on the inner lining that didn't quite match

6    up?

7    A    That's correct.

8    Q    Is this hole right here -- or this black spot in the

9    photograph that hole that you were just referring to?

02:11PM 10  A    Yes.  That's the bullet hole in the outer shell of the

11   jacket.

12   Q    Okay.  And to the best of your understanding, did that

13   hole match up with where the gunshot wound was, from the

14   medical examiner's report?

02:11PM 15  A    Yes.  It was slightly offset a bit by, like, an inch.  But

16   it was in line with where the defect on the inner shell of the

17   jacket was.

18   Q    Okay.

19   A    But they are in approximately the same location.

02:11PM 20  Q    You also told us that you observed some small holes just

21   to, I suppose, the right of the larger hole that we can see in

22   this photograph.  Can you show us -- well, I'll point them out

23   to you.

24        Do you see, I guess, these spots right here that I'm

02:12PM 25  pointing to (indicating)?

```
 1   A     Yes.
 2   Q     Are those consistent with the small pinprick holes that
 3   you just pointed to on the actual jacket?
 4   A     Yes, they are.
 5   Q     Okay.  Did you observe the small holes anywhere else on
 6   the jacket?
 7   A     No, I did not.
 8   Q     Can you observe any sort of overall pattern for how the
 9   holes show up?
10   A     There's not really an overall pattern.  We just have a
11   distribution of these holes in this one area right there that
12   kind of extend out back to the right a little bit.  But there
13   isn't, like, a definable pattern necessarily.
14   Q     Sure.  Can you actually hold up the jacket and point out
15   to the members of the jury where those holes, I guess, appear
16   on the jacket.
17   A     So here's our bullet hole here.  Those holes, they start
18   about right here (indicating), either go up that way -- but
19   primarily they're right in this area right here (indicating).
20   Just a few scattered out that way.
21   Q     Thank you.
22         In your professional opinion, what can explain those
23   pinprick holes?
24   A     Well, because of the type of material that we're dealing
25   with, it's a synthetic material, burning powders -- burning
```

02:12PM  (line 5)
02:12PM  (line 10)
02:12PM  (line 15)
02:13PM  (line 20)
02:13PM  (line 25)

1    particles of smokeless powder would account for those.

2    Q    You said burning particles of powder?

3    A    Smokeless powder, yes.

4    Q    Smokeless powder, okay.  Can you explain to the members

02:13PM 5    of the jury where those burning particles of smokeless powder

6    could have come from in a revolver.

7    A    So there's two places that they can occur.  That can be

8    coming out of the barrel or the muzzle end of the barrel or

9    from the cylinder gap.  Where the cylinder of the revolver

02:14PM 10   meets up with the barrel, there's a small gap to allow that

11   cylinder freely to line up each of the different cartridges

12   with the barrel.  And that gap will allow gases to escape,

13   which would include burning particles of powder.

14   Q    And when exactly do these burning particles of powder

02:14PM 15   come out of the gun?

16   A    When the gun is fired.

17   Q    Okay.  And can you tell us how far away those cluster of

18   holes appear from the larger hole that we can see in

19   Exhibit 502?

02:14PM 20   A    They start about 2 and a half inches to the one edge to

21   about 3 inches where the center of the pattern of them -- or

22   the center of the cluster of them begin.  So about 2 and a half

23   inches is where they start.

24   Q    Okay.  Aside from the main large defect and the smaller

02:15PM 25   holes that we've been talking about, did you observe any

```
 1  gunshot residue on the orange jacket?
 2  A    No, I did not.
 3  Q    Okay.  And based upon your understanding of this case,
 4  could you explain why gunshot residue does not appear on the
 5  jacket?
 6  A    The gunshot residue does not appear on the jacket because
 7  it was washed off by the water.
 8  Q    What do you mean by that?
 9  A    Mr. Dao was found in the ocean, floating -- or probably
10  been out there, guestimate of 36 to 38 hours.  Those particles
11  were washed off by the action of the waves.
12         I've taken items that I fired at close range with
13  guns to create gunshot residue patterns and run it through one
14  cycle on the washing machine without any detergent and have
15  been able to remove almost all the particles with just one
16  30-minute cycle.  So water agitating the surface can remove the
17  particles, the smokeless powder, and gunshot residue that would
18  occur on the fabric.
19  Q    Okay.  And based on --
20         MS. MOJTEHEDI:  Just a moment Your Honor.
21         (Counsel conferred off the record.)
22  Q    BY MS. MOJTEHEDI:  Mr. Coleman, can you explain to the
23  members of the jury what gunshot residue is.
24  A    Yes.  So there's actually two components to what we call
25  gunshot residue.  First, there's the vaporous gases created
```

02:15PM (line 5)
02:15PM (line 10)
02:16PM (line 15)
02:16PM (line 20)
02:16PM (line 25)

         1    from the primer.  So when the primer is struck, it explodes.

         2    And it contains a chemical composition that includes a primer

         3    explosive and oxidizer and fuel.  That would send a vapor.

         4           So when that's vaporizing after the primer is struck

02:17PM  5    and explodes, it begins the smokeless powder particles burning.

         6    Once those particles start burning, the powder charge will

         7    burn.  That creates a lot of gas, and that gas is what pushes

         8    the bullet out of the barrel.

         9           So now we have a mixture of these burning particles

02:17PM 10    of smokeless powder as well as the vaporous components from the

        11    primer material.  Plus there might be other things that are in

        12    the barrel.  Sometimes -- if you have, like, a plain lead base

        13    on the bullet, sometimes they will vaporize off and we'll get

        14    some extra lead that might be in there.  Any other materials

02:17PM 15    that might be in that barrel as the bullet is coming through

        16    and that hot gas is pushing it out can be picked up and burned

        17    up and come out the muzzle of the gun.

        18           So -- but primarily, when we speak of gunshot

        19    residue, we're talking about the primer material, the vaporous

02:18PM 20    primer material, and the nitrites from the smokeless powder

        21    particles.

        22    Q    And gunshot residue is emitted from the gun once it's

        23    been shot; right?

        24    A    That's correct.

02:18PM 25    Q    Okay.  Based on your review of the evidence in this case,

```
 1   were you able to conclude anything about the distance of where
 2   the gun was that fired the wound in Mr. Dao's head?
 3               MR. STAPLES:  Objection.  Foundation.
 4               THE COURT:  Overruled.
 5               THE WITNESS:  I can't really opine to the distance
 6   on the head because we don't have any evidence that gives me
 7   any indication of that.  So it's kind of an indeterminate
 8   thing.
 9   Q    Were you able to come to a conclusion about the distance
10   of the gunshot wound in the back?
11   A    Yes, I was.
12   Q    What is that conclusion?
13   A    I believe that the firearm that fired the shot was fairly
14   close to the back to be able to do that trajectory in his back
15   and leave these burn marks from smokeless powder particles that
16   created the defects in the jacket.
17   Q    Okay.  Let's break that down.  When you say that you
18   believe the gun was fairly close to Mr. Dao's back, what do you
19   mean by that in terms of inches, centimeters, whatever metric
20   you'd like to use?
21   A    Probably within 18 inches or closer.
22   Q    Why do you believe the gun was within 18 inches or
23   closer?
24   A    We don't see burning particles, the smokeless powder, past
25   18 inches.  We will find unburned particles of smokeless powder
```

02:18PM  5
02:19PM 10
02:19PM 15
02:19PM 20
02:20PM 25

1    that will get ejected out up to 3 to 4 feet depending on the

2    type of powder that's in the cartridge.  But burning powder

3    burns up pretty quickly and it doesn't -- we don't see it out

4    past about 18 inches.  18 inches is about the max that I've

02:20PM 5    ever seen or heard of burning smokeless powder particles found.

6    Q    So if I understand you correctly, what you're saying is

7    based on these small pinprick holes that we've been talking

8    about, based on the fact that those appear to be burns in the

9    jacket, you believe that the gun was within 18 inches?

02:20PM 10   A    That's correct.

11   Q    Within that spectrum of 18 inches, can you opine if it's

12   perhaps on the closer end, on the farther end, anything to that

13   effect?

14   A    I believe it's on the closer end.

02:20PM 15   Q    Why is that?

16   A    Because the way this pattern is, I believe -- it's

17   possible that these particles are coming from the muzzle.  But

18   I actually believe that these particles might be coming from

19   that cylinder gap which means that the cylinder gap has to be

02:21PM 20   up in that area, and the muzzle would be in front of where we

21   see those particles.  And if that's the case, then we have our

22   shot that's pretty close because of the shallow angle and

23   nature of the shot.

24   Q    If you had to estimate how close beyond the 18 inches,

02:21PM 25   can you do so?

**UNITED STATES DISTRICT COURT**

```
 1    A      Yeah.

 2    Q      How much would you say?

 3    A      I'd say it's probably somewhere between maybe 3 and 6

 4    inches from the surface.  It could be closer.  I can't come up

02:21PM 5    with an exact number because I would have to do experimentation

 6    with the actual gun and ammunition and the same kind of fabric

 7    to come up with, you know, a more rigid or scientific number.

 8           But just based on things I've shot in the past and

 9    research and literature I've reviewed, this kind of -- those

02:22PM 10   particles like that, I think it's pretty close, probably within

11    6 inches.

12    Q      Okay.  So, in other words, based on the pattern of those

13    small pinprick holes, you believe that the gun was within 6

14    inches?

02:22PM 15   A      Yes.

16    Q      Okay.  And in reviewing the jacket plus your review of

17    the medical examiner's documents, were you able to conclude

18    which direction this gunshot wound came from?

19    A      Yes.

02:22PM 20   Q      What did you conclude?

21    A      That it's coming from the left side of Mr. Dao heading

22    toward the right side from -- and it's from behind him, but at

23    a very shallow angle going into his back.

24    Q      Okay.  So to be clear, if this is looking at the back of

02:23PM 25   the jacket, that's from the right-hand side traveling towards
```

**UNITED STATES DISTRICT COURT**

1    the left-hand side?

2    A    That's correct.

3         MS. MOJTEHEDI:  Okay.  Your Honor, I hate to

4    interrupt my own examination, but this is a bit distracting

02:23PM 5  with the Elmo flashing.  Could we take a break and perhaps get

6    that fixed?

7         THE COURT:  We'll try.  But because the power went

8    out, I'm not certain that that's going to be possible.  We'll

9    make an effort.

02:23PM 10        Ladies and gentlemen, why don't you take a recess.

11   You're admonished not to discuss this matter amongst

12   yourselves, nor form or express any opinion concerning the

13   case.  We'll fix that Elmo during the recess.  Thank you.

14        **(Recess from 2:23 p.m. to 3:00 p.m.)**

03:00PM 15        THE COURT:  We're back in session, the alternates,

16   all counsel, the defendant.

17        Ladies and gentlemen, let me apologize to you.

18   Apparently, with the power shortage, et cetera, we're rebooting

19   every system in the courthouse.  Our apologies.

03:00PM 20        Counsel, if you'd like to continue, please.

21        MS. MOJTEHEDI:  Yes, Your Honor.

22   Q    Mr. Coleman, before we took a recess, we were talking

23   about your analysis of the orange jacket and the ballistic

24   evidence in this case.  I want to transition and talk about

03:00PM 25   your review of the boat itself.

1              Earlier you told us that you examined the boat in

2      question; right?

3      A     Yes, I did.

4      Q     Can you tell the members of the jury what you did to

03:00PM  5     examine the boat.

6      A     I came down in June -- it was June 8.  We went out to the

7      yard that the boat was in.  I got into the boat.  I took

8      pictures, examined the areas, looked around.  And then I did a

9      lidar scan of the back end of the boat to get measurements that

03:01PM 10     I can go back and look at in my home lab.

11     Q     Can you explain to us what a lidar scan is.

12     A     Lidar is a device that uses light -- pulses of light to

13     measure distances.  It stands for light detection and ranging.

14     And it's similar to radar, but it uses light rather than radio

03:01PM 15     waves.  It basically pulses out a laser and can measure

16     distances.  But it sends out multiple ones so I can look at and

17     do basically a three-dimensional scan of an area very quickly.

18              They're actually on new cell phones and iPads and

19     stuff.  They've been using them for about two years now on

03:01PM 20     those devices.  But they were out commercially before then and

21     really expensive devices that you can purchase for a crime

22     scene reconstruction.

23     Q     Why did you do a lidar scan of the boat?

24     A     Rather than trying to go and take measurements and write

03:02PM 25     everything down of every possible combination of things that

**UNITED STATES DISTRICT COURT**

could come up, it's a lot easier to laser scan something.  I've been using laser scans since about 2007 with big commercial laser scanners.

Lidar makes it very easy to do small areas, like inside a vehicle, inside a room.  We can even do a lidar in this room fairly quickly.  And I can go back and look, and if there's a measurement I forgot about, I already have the data captured in my scan so I can go back and measure what I want later on at a different time.

Q    So is it fair to say that doing the lidar scan was to get in part, measurements of the boat?

A    Yes.  So it would give me dimensions and stuff much quicker and much more accurately than if I were to sit in there with a tape measure for hours, trying to figure out every possible combination.

Q    Why did you try to determine the measurements of the boat?  Or why did you take the measurements of the boat in this case?

A    I wanted to look at different things like how -- what the distance was between the captain's seat in the back to the engine mount toward the rear of the boat, how wide the boat was, how tall the sides of the boats were at different locations within the back of the boat.  That was primarily why I did the lidar scan.

Q    Okay.  And were you taking these measurements, doing the

```
  1   lidar scan, doing the physical examination of the boat to
  2   understand whether or not a struggle could have happened in the
  3   back of the boat?
  4   A     Yes.  And, also, just so I had a basis and a foundation
03:03PM  5   for, you know, what eventually happened, Mr. Dao going out in
  6   the back of the boat or falling out of the boat or going out on
  7   the boat just to look at the sides to see how that could occur
  8   and how likely or probable certain scenarios would be.
  9   Q     Okay.  I'm showing you what's already been admitted as
03:04PM 10   Exhibit 549.  Mr. Coleman, do you recognize this to be an
 11   aerial diagram of the boat that we've been talking about?
 12   A     Yes, it is.
 13   Q     This is the same boat that you conducted the lidar scan
 14   which you were describing a moment ago?
03:04PM 15   A     That's correct.
 16          MS. MOJTEHEDI:  Okay.  Your Honor, I move to admit,
 17   pursuant to stipulation, Exhibit 581, pages 1 and 2.
 18          THE COURT:  Has 549 been received as well?
 19          MS. MOJTEHEDI:  Yes, Your Honor.  549 was previously
03:04PM 20   received.
 21          THE COURT:  All right.  Thank you.
 22          Any objection to 581, pages 1 and 2, Counsel?
 23          MR. STAPLES:  No, Your Honor.
 24          THE COURT:  Received.  Thank you.
03:04PM 25          (Exhibit Number 581-1 and -2 received.)
```

| | |
|---|---|
| 1 | Q    BY MS. MOJTEHEDI:  Mr. Coleman, do you recognize this to |
| 2 | be a drawing with measurements of the boat that we were just |
| 3 | discussing? |
| 4 | A    Yes. |
| 03:05PM 5 | Q    Okay.  Did you do this drawing with these measurements? |
| 6 | A    No, I did not. |
| 7 | Q    Okay.  I want to show you page 2 of Exhibit 581.  Do you |
| 8 | also understand this to be a diagram of that same boat? |
| 9 | A    Yes. |
| 03:05PM 10 | Q    And it also contains measurements of the different |
| 11 | features of the boat? |
| 12 | A    That's correct. |
| 13 | Q    Okay.  Now, a moment ago you told us that you took |
| 14 | measurements and you reviewed -- you analyzed the boat to |
| 03:05PM 15 | determine whether or not, you know, the events that you were |
| 16 | asked to review were plausible.  Did you come to a conclusion, |
| 17 | in your professional experience? |
| 18 | A    Yes. |
| 19 | Q    What was your conclusion? |
| 03:06PM 20 | A    That because the back edge of the boat in the very back |
| 21 | was only 20 inches high and then it starts to angle up to about |
| 22 | 24 inches at the sides in the rear of the boat, if you think |
| 23 | about it, this isn't a very big boat; and if it's out in the |
| 24 | ocean and it's moving and it's dealing with the waves, that |
| 03:06PM 25 | it's very possible that somebody could fall out of the back of |

1    the boat fairly easily if they were in a struggle.

2    Q    Okay.  So just to provide a little bit more detail about

3    what you just said, based on this diagram here, is it also your

4    understanding that the distance between the -- what we'll call

03:06PM 5    the passenger chair and the edge of the boat, that walkway

6    there is about 19.5 inches?

7    A    That's correct.

8    Q    Okay.  And you also told us a moment ago that -- the

9    height of the back of the boat, could you say what that was.

03:07PM 10   A    At the rear edge of the boat from the floor inside the

11   boat to the back edge was about 20 inches high.

12   Q    20 inches high.  Okay.

13          And then -- and this area that we were just talking

14   about --

03:07PM 15          MS. MOJTEHEDI:  Your Honor, I'm showing what's

16   already been admitted as Exhibit 547.

17          THE COURT:  547.  Thank you.

18   Q    BY MS. MOJTEHEDI:  A moment ago when we were describing

19   measurements of the boat, that 19.5 measurement that we just

03:07PM 20   talked about, that's the distance between this chair and the

21   side of the boat?

22   A    That's correct.

23   Q    And the height of the boat -- the back of the boat you

24   were referring to is behind, fair to say, that chair there?

03:08PM 25   A    That's correct.

1   Q    Okay.  And based upon your dimensions that you took of

2   the boat and your analysis of the boat, you were able to

3   conclude that a struggle could have happened on the back of the

4   boat?

03:08PM  5   A    Yeah.  There's enough room behind those captain's chairs

6   for a struggle to occur.  And it also would be very easy for

7   somebody to fall off the back of the boat or the side of the

8   boat back there if they were in that struggle.

9   Q    Would it have been, in your professional opinion, easier

03:08PM 10   to fall off the back of the boat if the boat was actually

11   moving?

12   A    Yes.

13   Q    Okay.  Now, let's transition and talk about testing for

14   blood.  Are you familiar with whether or not the FBI, Coast

03:08PM 15   Guard, or any other law enforcement agency did any sort of

16   testing to detect blood on the boat?

17   A    Yes.

18   Q    Okay.  Can you describe to the members of the jury the

19   types of testing that law enforcement did to see if there was

03:09PM 20   blood on the boat.

21   A    They did a visual examination first, just looking with the

22   naked eye.  They then used an alternate light source, which you

23   use special filtered glasses and a special frequency of light,

24   and that brings up biological stains like blood a lot easier.

03:09PM 25   You can see them and it helps contrast with other surfaces.

|       |    |                                                                           |
|-------|----|---------------------------------------------------------------------------|
|       |  1 | They also used BLUESTAR, which is a chemical agent                         |
|       |  2 | that will help to illuminate blood and have blood show up.  And            |
|       |  3 | then they used phenolphthalein, which is a spot test that we               |
|       |  4 | use for checking areas for blood.                                          |
| 03:09PM |  5 | Q    Okay.  I want to talk about those, I believe, four tests            |
|       |  6 | that you just described: the visual test, alternate light                  |
|       |  7 | source test, BLUESTAR, and phenolphthalein.  To the best of                |
|       |  8 | your understanding, are those tests performed in a certain                 |
|       |  9 | order?                                                                     |
| 03:10PM | 10 | A    They typically are, yes.                                            |
|       | 11 | Q    Can you describe to us what that order generally is.                  |
|       | 12 | A    Generally you would use just your visual light with                   |
|       | 13 | flashlights or a light source, just white light, looking to see           |
|       | 14 | if you can see obvious blood stains.                                       |
| 03:10PM | 15 | Next you would go to alternate light to try to find                     |
|       | 16 | things that might be hidden because of the -- either the dark              |
|       | 17 | nature of the surface, areas where it might occur, weird                   |
|       | 18 | textures, or something like that.                                          |
|       | 19 | Next you would go to -- typically you would use                         |
| 03:10PM | 20 | something like BLUESTAR, and that would be because you could             |
|       | 21 | spray it over an area, and then you're looking for areas of                |
|       | 22 | blood that might have been cleaned up or in corners or creases             |
|       | 23 | that might be harder to see because it will actually start to              |
|       | 24 | luminesce with very small concentrations of blood.                        |
| 03:11PM | 25 | Now, phenolphthalein is used as a spot test example.                    |

So if I were to find a spot, either visually or with the alternate light source, I can go and swab that stain and test it with phenolphthalein to see if it does contain something that appears to be blood.  And the phenolphthalein is basically a presumptive test for blood.  So it's used once you find an area that you're interested in to determine whether or not it really is blood and not something like ketchup or salsa or some other stain.

Q    So in doing these tests, do they also pick up other biological matter?

A    Yes, they can.

Q    Okay.  And which one of these tests weeds out whether or not the biological matter is actually blood?  Human blood, I should say.

A    That takes specific genetic testing that you would do back in the laboratory once you found samples and tested it.

Q    And to your knowledge, did the FBI or any law enforcement that did the testing, were they able to determine -- did they weed out between other biological matter and whether or not there was human blood on the boat?

A    My understanding is they found two spots that contained blood.  They had them tested and they came back as not human blood.

Q    Okay.  So in your experience, is conducting the alternate light source, BLUESTAR, the visual -- excuse me -- the visual

1 testing, alternate light source, BLUESTAR, and phenolphthalein

2 the gold standard when it comes to testing for blood in your

3 field?

4 A    It's a pretty comprehensive series and standard protocol

03:12PM 5 of tests to do when you're looking for blood.

6 Q    Okay.  Now, I'm showing you, again, what's already been

7 admitted as Exhibit 547.

8         Mr. Coleman, do the tests that we just talked about

9 have the ability to detect blood in crevices like the ones that

03:13PM 10 we're seeing in this picture?

11 A    Yes.  Sometimes using the alternate light source.  It

12 might be hard to see with visible light.  Sometimes the

13 alternate light source will help those areas glow.  But

14 definitely the chemical testing using BLUESTAR helps to

03:13PM 15 identify things that are in crevices or stains in corners or

16 cracks.

17 Q    Okay.  Showing you what's already been admitted as

18 Exhibit 545, do you recognize this to be the floor that is

19 behind the two -- the captain's chair and the passenger side

03:14PM 20 chair in front of the engine?

21 A    Yes.

22 Q    Would the tests that we just talked about now pick up any

23 blood in the crevices that we see in this picture here?

24 A    They should be able to if there's a sufficient quantity of

03:14PM 25 blood there.

UNITED STATES DISTRICT COURT

Q    Okay.  Earlier you told us that one of the tests that you

described actually lights up if you turn the lights off and

perform a certain procedure.  Which test was that?

A    That's BLUESTAR.

Q    Okay.  Can you describe to us what that process is and

what you would expect to see if you see biological matter.

A    BLUESTAR is a chemical luminescent solution.  You spray it

on an area to coat the area.  And then you spray an activator

over it, and the chemicals will start to, I guess, mix.  And if

blood is present and the specific components of blood, the

areas where the blood are will start to glow.  And we use

alternate light source or ultraviolet light to look at it.  So

you're using, like, a black light to look at those areas.  And

those areas will glow, and then you can take photos of them and

go and concentrate on collecting samples of the areas that are

glowing.

Q    Okay.  And these tests that you're describing now, could

they pick up, I guess, blood after someone's maybe tried to

clean that area?

A    Yes.

        MS. MOJTEHEDI:  Okay.  At this time, Your Honor, I

move to admit Exhibit 582 by stipulation.

        THE COURT:  Received.

        **(Exhibit Number 582 received.)**

Q    BY MS. MOJTEHEDI:  Mr. Coleman, a moment ago you told us

```
  1    that when the BLUESTAR testing is conducted, if there is blood

  2    or other biological matter, you would expect for that surface

  3    to light up?

  4    A     Correct.

03:16PM 5    Q     Is this picture depicting that BLUESTAR testing?

  6    A     It looks like it does.

  7    Q     Okay.  And these glowing parts -- this glowing surface is

  8    what you were talking about a moment ago; right?

  9    A     That's correct.  Yes.

03:17PM 10    Q     Okay.  Mr. Coleman, a moment ago you also told us that

 11    these tests will pick up blood if there is a sufficient

 12    quantity.  What did you mean by that?

 13    A     So with just visible light, you have to have enough blood

 14    there that you can actually see the heme or the red component

03:17PM 15    to it.  Alternate light allows you to see smaller

 16    concentrations of it that might not be visible with the naked

 17    eye using just visible white light.

 18         The chemical processing, on the other hand, is very

 19    sensitive.  So we can look at the elutions of blood that would

03:17PM 20    be unseeable to the naked eye or to alternate light source.  So

 21    they'll pick up the eluted concentrations from areas that have

 22    been either watered down or cleaned up.  We might see swipe

 23    marks from where somebody was trying to clean up blood.  And

 24    it's not visible to the naked eye and we don't see it because

03:17PM 25    it's a small enough concentration that the alternate light
```

UNITED STATES DISTRICT COURT

         1    source doesn't pick it up.

         2           But the chemical luminescence from the chemicals are

         3    very sensitive and they'll pick these concentrations up, and

         4    then we find them that way.

03:18PM   5    Q    Okay.  So, in other words, if there is maybe a drop of

         6    blood that someone missed while cleaning, these tests could

         7    pick them up?

         8    A    Yes.

         9           MS. MOJTEHEDI:  Okay.  Your Honor, at this time, I'd

03:18PM  10    seek to both move into evidence and read a stipulation into the

        11    record.

        12           THE COURT:  What are you seeking to -- is it the

        13    stipulation you're moving into evidence?

        14           MS. MOJTEHEDI:  Yes, Your Honor.  That's right.

03:18PM  15           THE COURT:  Please read that.

        16           MS. MOJTEHEDI:  That's Exhibit 587.

        17           THE COURT:  Thank you.

        18           MS. MOJTEHEDI:  May I go ahead and read it?

        19           THE COURT:  Please.

03:18PM  20           MS. MOJTEHEDI:  (Reading:)

        21           "Plaintiff United States of America and

        22       Defendant Hoang Xuan Le hereby stipulate as

        23       follows:  On December 19th, 2019, agents of the

        24       Federal Bureau of Investigation seized a 2008 Model

03:19PM  25       215 Triumph fishing boat with Hull Identification

                        UNITED STATES DISTRICT COURT

1        Number US-TRBJ0194A808 and California Registration

2        Number CF4720RR, registered to Sheila Marie Ritze

3        and Mica Alan Ritze from the Storage West facility

4        located at 2892 Kelvin Avenue in Irvine,

03:19PM 5        California.

6            "After transporting the boat to an FBI

7        warehouse located in San Diego, California, agents

8        seized and searched the interior of the boat for

9        the possible presence of blood using alternate

03:19PM 10       light source, BLUESTAR, and phenolphthalein.

11       That's at LR_00005104, LR_00005105,

12       LR_00037513-37514.

13           "Alternate light source search uses a

14       monochromatic light source to assist in locating

03:20PM 15       and identifying potential blood evidence.

16           "BLUESTAR is a visualizing agent that, when

17       sprayed on a surface, will produce a chemical

18       reaction that emits an intense blue light upon

19       contact with certain substances including blood.

03:20PM 20       BLUESTAR is an extremely" -- "is extremely

21       sensitive and will detect a trace amount of blood

22       and other substances that are not otherwise

23       visible.  Because BLUESTAR also reacts to

24       substances other than blood, it is used as a

03:21PM 25       presumptive test for the presence of blood.

1          "Phenolphthalein is a color reactive test

2     that is more specific than alternate light source

3     and BLUESTAR.  Phenolphthalein is used to rule out

4     substances other than blood that have been detected

03:21PM 5     by alternate light source and BLUESTAR before

6     additional testing is done to confirm the presence

7     of blood.

8          "By using alternate light source, BLUESTAR,

9     and phenolphthalein, FBI agents determined that

03:21PM 10     blood may have been present on the floor mat and on

11     the front bench at the bow of the boat, which is

12     the area located at the front of the boat.  No

13     other potential blood evidence was detected in the

14     interior of the boat.

03:22PM 15          "FBI agents collected the floor mat and

16     samples from the front bench and transferred these

17     items to the San Diego County Sheriff's Department

18     Regional Crime Laboratory for DNA analysis.  DNA

19     analysis conducted by the San Diego County

03:22PM 20     Sheriff's Department Regional Crime Laboratory

21     confirmed the presence of blood on the floor mat

22     and the samples retrieved from the front bench of

23     the boat.  The DNA analysis also determined that

24     the blood found on the floor mat and front bench of

03:22PM 25     the boat was not human blood."

```
 1              No further questions, Your Honor.
 2              THE COURT:  Is that stipulated to by the defense?
 3              MS. MOJTEHEDI:  Yes, Your Honor.
 4              THE COURT:  And the Government?
03:22PM 5       MR. SCALLY:  Yes, Your Honor.
 6              THE COURT:  That's a binding stipulation upon the
 7      jury.
 8              Then cross-examination, please.
 9                        CROSS-EXAMINATION
03:22PM 10  BY MR. STAPLES:
11  Q    I'm a little unclear.  You worked as a criminalist for
12  LAPD, I think.  The 20 or 30 years you said you spent working
13  in law enforcement as a criminalist, did you work strictly in
14  the lab or did you respond to crime scenes?
03:24PM 15  A    I was a crime scene responder and worked in the lab my
16  entire career.
17  Q    Okay.  I assume you responded to a number of scenes where
18  there were gunshot wounds and things like that.
19  A    Yes, I have.
03:24PM 20  Q    And in your experience you would agree that head wounds
21  in particular tend to bleed profusely?
22  A    Yes, they do.
23  Q    And in particular -- I'm showing you Exhibit 125 -- when
24  you have wounds like this, including one being a gunshot wound,
03:24PM 25  you expect it to bleed pretty heavily?
```

A     Yes, I would.

Q     And you would agree that the bleeding starts almost instantaneously?

A     Yes, it does.

03:24PM  Q     Like when you cut yourself shaving, it doesn't start bleeding 15 seconds later; right?  It starts right away?

A     You start having blood flow right away.

Q     And similarly, with the face, wounds to the face -- I'm showing you 118 -- those would bleed pretty profusely, wouldn't 03:25PM they?

A     Yes, they would.

Q     And, again, they would bleed right away?

A     Yes.

Q     I want to go back to your analysis of the bullet wounds. 03:25PM You produced two reports to the defense in this matter; correct?

A     That's correct.

Q     By the way, how much are you being paid?

A     I just -- I get a salary from my company.  I'm not being 03:25PM paid a specific fee.  I'm just getting paid hourly.

Q     So the fee gets paid to your company?

A     The fee goes to my company, and I just get paid my salary.

Q     So you produced two reports to the defense in this case; correct?

03:25PM  A     That's correct.

```
 1   Q    And I believe in your first report you address the
 2   gunshot wound to the back or the shoulder; correct?
 3   A    That's correct.
 4   Q    And I think you said that you were asked to do a shooting
 5   incident recreation?
 6   A    Reconstruction.
 7   Q    Reconstruction.  Thank you.
 8        But neither report did you mention the head wound;
 9   is that correct?
10   A    That's correct.
11   Q    Okay.  And in your testimony you said that you believe it
12   was shallow, the head wound?
13   A    That was how it was described in the medical examiner's
14   report.  I never -- I didn't attend the autopsy.  And from the
15   pictures of the autopsy, I can't tell.  So I'm going by what
16   the medical examiner said.
17   Q    Okay.  But you would agree even a shallow bullet wound to
18   the head can be serious; correct?
19   A    Yes.
20   Q    And, in fact, you would agree -- or you're aware that the
21   coroner determined that the bullet wound to the head was a
22   contributing factor to the death of James Dao?
23        MS. MOJTEHEDI:  Objection, Your Honor.  This is
24   beyond the scope.  Outside of this witness's expertise.
25        THE COURT:  Overruled.
```

03:26PM (line 5)
03:26PM (line 10)
03:26PM (line 15)
03:26PM (line 20)
03:27PM (line 25)

 1              You can answer the question, sir.

 2              THE WITNESS:  I'm not aware that that's what the

 3     medical examiner said, no.

 4     Q    BY MR. STAPLES:  You read her report?

03:27PM 5    A    I did read through the report.

 6     Q    Now, I believe you testified that, and correct me if I

 7     use the wrong terminology, that one of the things you do in

 8     analyzing a bullet wound is trying to determine what you call

 9     trajectory?

03:27PM 10   A    That's correct, or bullet path.

 11    Q    Bullet path.

 12              And so I'm going to show you what the defense showed

 13    you, which is Exhibit 501-4.  Actually, I'm going to turn it

 14    upside down so it orients a little better.  This is a

03:28PM 15   diagram -- supposed to be a diagram of a human head; correct?

 16    A    That's correct, from the top.

 17    Q    From the top.  And this is the nose; correct?

 18    A    That's correct.

 19    Q    Here are the ears; right?

03:28PM 20   A    Correct.

 21    Q    And I believe you testified that this is the bullet

 22    entrance wound; correct?

 23    A    Yes.

 24    Q    And this is where the bullet exited; correct?

03:28PM 25   A    That's correct.

```
      1  Q    Now, it's safe to say that bullets generally travel in a
      2  straight line?
      3  A    Fairly close to it, yes.
      4  Q    So -- and I understand this is an approximation of a
03:28PM 5  drawing, but would it be fair to say that the direction of this
      6  bullet was somewhere along that line?
      7  A    Yes.  That's a pretty fair approximation, yes.
      8  Q    So a person's facing this way.  The bullet came back from
      9  somewhere -- would you call that a fairly large angle -- back
03:29PM 10 towards this -- back towards the front?
     11  A    I would almost measure the angle.
     12  Q    If you look at this being zero, right, it would be more
     13  than 90 degrees; correct?
     14  A    Well, yeah, we don't do angles over 90 degrees.  So I look
03:29PM 15 at it from bisecting through his nose and the back of his head.
     16  But we're still looking at somewhere between 40, maybe 50
     17  degrees.  About 45-degree angle.
     18  Q    And you determined that -- you were unable to determine
     19  the distance for this particular wound; correct?
03:29PM 20 A    That's correct.
     21  Q    But can you rule out that it was point-blank?
     22  A    Yes.
     23          MS. MOJTEHEDI:  Objection, Your Honor.  Vague as to
     24  "point-blank."
03:29PM 25          THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Q    BY MR. STAPLES:  You understand what I mean by |
| | 2 | "point-blank"? |
| | 3 | A    Yes.  You're talking about a contact shot. |
| | 4 | Q    Right. |
| 03:30PM | 5 | A    Yes.  It was not a contact shot. |
| | 6 | Q    Can you rule out that it was not a shot within close |
| | 7 | proximity to the scalp due to the absence of damage to the |
| | 8 | scalp? |
| | 9 | A    Yes. |
| 03:30PM | 10 | Q    In other words, if the bullet was within a few inches of |
| | 11 | the person's scalp, I believe what you described as the gases |
| | 12 | and the various things in addition to the bullet coming out of |
| | 13 | the muzzle would cause -- you would expect to cause damage to |
| | 14 | the area of the scalp; correct? |
| 03:30PM | 15 | A    That's correct.  You'll see stippling or tattooing as well |
| | 16 | as potentially burning from the hot gases coming out of the |
| | 17 | muzzle if it's really close. |
| | 18 | Q    And that's not seen on the scalp of James Dao; correct? |
| | 19 | A    That's correct. |
| 03:30PM | 20 | Q    Now, similarly -- I'm showing you 501-2.  And you |
| | 21 | testified about this earlier, if you will recall.  And this, |
| | 22 | again, is from the coroner's office.  It has the -- her |
| | 23 | notations regarding information concerning the bullet wound and |
| | 24 | its position; correct? |
| 03:31PM | 25 | A    Correct. |

**UNITED STATES DISTRICT COURT**

```
 1   Q    And, once again, that circle there represents the entry
 2   wound; correct?
 3   A    That's correct.
 4   Q    And what the coroner has over here is where the bullet
 5   was recovered from; correct?
 6   A    That's correct.
 7   Q    And, once again, with the premise that most bullets
 8   travel in a straight line, it would show that the bullet was
 9   fired at about this level?
10   A    That's correct.
11   Q    And would have come from this direction in; correct?
12   A    That's correct.
13   Q    Now, you stated that it came in at an angle to the back?
14   A    A slight angle, yes.
15        MR. STAPLES:  Your Honor, I would ask permission to
16   have Agent Casey stand and ask if the witness could explain to
17   the jury the size of the angle he's talking about so they can
18   visualize it.
19        THE COURT:  I'm a little reluctant.  I think I've
20   precluded that kind of demonstration from both the defense and
21   the Government.
22        MR. STAPLES:  All right.
23        THE COURT:  He can describe it, Counsel.
24   Q    BY MR. STAPLES:  Well, can you just show the jury on your
25   own back perhaps what kind of angle you're talking about.
```

```
 1   A    Well, it's shallow because you have an entrance, and the
 2   bullet just kind of falls underneath the skin and ends up over
 3   here (indicating).  So it wasn't, like, out a couple feet that
 4   way to come in.  It had to have been fairly close, off the
 5   side.
 6         So it's coming in not quite parallel to the back,
 7   because it did penetrate in, but just off of parallel, if that
 8   makes sense.
 9   Q    It does.  Thank you.
10         Now, with respect to the bullet wound to the back
11   and the orange jacket, you testified that it might possibly
12   have been a muzzle -- that the -- excuse me -- the powder marks
13   or powder burns may have actually come from the muzzle of the
14   gun?
15   A    It's possible.
16   Q    I'm sorry, I meant the cylinder.  I apologize.
17   A    Right.  It's possible that the smokeless powder particles
18   that I believe are responsible for making those little
19   pinprick-type holes from burning through that fabric could have
20   come from the muzzle.  But I believe it makes more sense that
21   they came from the cylinder gap because of their distribution.
22   Q    And when they come out of the cylinder, do they come
23   in -- come straightforward like it would from the muzzle, or do
24   they deviate to the side?
25   A    They shoot out the side.
```

```
 1   Q    Okay.  And does the phenomenon, if you will, of the
 2   unburned powder going off from the cylinder mean that nothing
 3   comes out of the muzzle?
 4   A    No.
 5   Q    It would still be the unburned powder as well as the
 6   gases and so forth coming out of the muzzle?
 7   A    That's correct.
 8   Q    Wouldn't you, then, expect to see damage from the muzzle
 9   if those were cylinder burns?
10   A    If it was far enough back that the hot -- the particles
11   were still burning, unless they went through the hole.
12   Q    If they had gone through the hole -- you're talking about
13   the hole in the jacket --
14   A    That's correct.
15   Q    -- would they have been identifiable on the body itself?
16   A    Probably not because of the layers of clothing.
17   Q    Now, with respect to the -- your opinion regarding the
18   distance of the bullet that was fired into the shoulder, I
19   thought you said -- correct me if I'm wrong -- that it was
20   within 18 inches and most likely, in your opinion, within 3 to
21   6 inches from the bullet wound?
22   A    I'm talking about the muzzle of the gun.
23   Q    Correct.
24   A    So the gun itself, yes.
25   Q    And is it my understanding that you are basing that -- at
```

03:34PM (line 5)
03:34PM (line 10)
03:35PM (line 15)
03:35PM (line 20)
03:35PM (line 25)

1   least the first determination of the 18 inches based on your

2   experience that powder -- and forgive me, the unburned powder

3   does not travel farther than 18 inches?

4   A    No.  The partially burned and burning powder usually burns

03:36PM 5   up within 18 inches.  Unburned powder, powder that's not

6   burning, can traject a lot farther.

7   Q    I'm sorry.  Which are the ones that you say caused the

8   holes in the --

9   A    They were burning particles of smokeless powder.

03:36PM 10  Q    Okay.  But do you agree that it's easier to get a more

11  accurate -- or it's more accurate to try to get a distance

12  determination if you have the original gun to do a test?

13  A    Oh, definitely.  Having the gun and the ammunition and

14  doing a test on the same type of fabric would be the best way

03:36PM 15  to figure out an exact distance.

16  Q    Now, with respect to these various blood tests that the

17  FBI applied to the boat to search for blood, you referred to

18  BLUESTAR.  Is that sometimes known as luminol?

19  A    No.  They're different products.  They do the same, but

03:37PM 20  luminol is different than BLUESTAR.  But they're both chemical

21  luminescent reagents that react with blood.

22  Q    Do they function in pretty much the same way?

23  A    Yes, they do.

24  Q    And you mentioned that they can pick up blood even if

03:37PM 25  someone has tried to wash it away; is that correct?

```
 1   A    That's correct.
 2   Q    But it is possible that you could defeat luminol with a
 3   sufficient number of washings, isn't it?
 4   A    Yeah.  If you dilute everything down or clean it away,
 5   then, yes, there would be nothing there for the luminol to
 6   find.
 7   Q    And that job would be made easier if there wasn't a lot
 8   of blood to begin with?
 9   A    That's correct.
10   Q    And if it was confined to one space?
11   A    Yes.
12   Q    For instance, if the person producing the blood was only
13   present on the spot where the blood is for a few seconds, then
14   that would be easier to isolate and clean; correct?
15   A    Yes.
16   Q    Now, you talked about your analysis of the boat to
17   determine if it would have been -- I won't use the word "easy,"
18   but possible for James Dao to have fallen overboard; correct?
19   A    That's correct.
20   Q    And particularly so if he was in a struggle?
21   A    That's correct.
22   Q    And you would agree that it would be a virtual certainty
23   he would go over if he was in a struggle in which the person he
24   was struggling with grabbed his legs to throw him over;
25   correct?
```

1    A     Yeah.

2    Q     Okay.  One moment, please.

3              **(Counsel conferred off the record.)**

4    Q     BY MR. STAPLES:  With respect to this idea of a struggle,

03:38PM  5    just so it's clear for the jury, you're not telling them there

6    was a struggle; correct?

7    A     That's correct.

8    Q     You were not there?

9    A     I was not present.

03:39PM 10    Q     And so what you're doing is you're basing your opinions

11    off of the evidence you've seen and what you've been provided?

12    A     That's correct.

13              MR. STAPLES:  Thank you.  I have nothing further.

14              THE COURT:  Redirect examination?

03:39PM 15              MS. MOJTEHEDI:  Yes, Your Honor.

16              May I proceed?

17              THE COURT:  You may.

18                    **REDIRECT EXAMINATION**

19    BY MS. MOJTEHEDI:

03:39PM 20    Q     Mr. Coleman, on cross-examination, Mr. Staples showed you

21    this diagram previously admitted as Exhibit 501-4.  Let me put

22    this back up.  And when he asked you, based upon the diagram

23    and other evidence in the case, whether or not the distance of

24    the gunshot was close or far, you said that you believed it

03:40PM 25    wasn't in close proximity.

1          What did you mean by that?

2   A    It wasn't a contact shot or within, say, 4 to 6 inches.

3   Q    And when you say it wasn't a contact shot, what does that

4   mean?

03:40PM 5   A    A contact shot is when the muzzle of the gun is held up

6   against the surface that's being struck.

7   Q    So, in other words, completely up against the surface?

8   A    That's correct.

9   Q    Okay.  You also told us that you would expect to see more

03:41PM 10  stippling if it was, for example, a contact shot or within a

11  couple of inches.  Is that fair to say?  That's what you --

12  A    You wouldn't see stippling if it was a contact shot.

13  You'd see it if it was not a contact shot but if it was within,

14  say, 6 to -- around 4 to 6 inches.

03:41PM 15           **(Counsel conferred off the record.)**

16  Q    BY MS. MOJTEHEDI:  And what is stippling, Mr. Coleman?

17  A    So stippling and another term that's called "tattooing"

18  are basically artifacts of unburned smokeless powder hitting

19  the skin.

03:42PM 20           So tattooing is when there's enough energy in those

21  particles that they actually embed themselves under the skin

22  like the ink of a tattoo.  That's all a tattoo is.  We're

23  putting ink underneath the skin.  So that's what tattooing is.

24           Stippling is when there's enough energy for that

03:42PM 25  particle that, when it strikes the surface, it doesn't have

```
 1   enough to penetrate into the skin, but leaves a small abrasion.
 2   Those abrasions are called stippling.  And that will happen
 3   through hair, sometimes through loose-weave clothing, if it's
 4   close enough and has enough force.  So those are artifacts that
 5   we look at for shots that are not covered by some kind of
 6   material to kind of help gauge the distance that the muzzle
 7   might have been.
 8            We start to see stippling or tattooing disappear,
 9   depending on the type of powder, anywhere from 6 to 12 inches.
10   And then really large powder or rifle cartridges we see
11   stippling or tattooing up to maybe 18 inches.  But typical
12   handguns, most of that is going to be gone by the time we reach
13   to 12 inches.
14   Q    And you also just mentioned the presence of hair when
15   you're analyzing the stippling.  Does hair get in the way of
16   whether stippling could occur?
17   A    Yes, it does.
18   Q    Okay.
19            (Counsel conferred off the record.)
20            MS. MOJTEHEDI:  Just a moment, Your Honor.
21   Q    BY MS. MOJTEHEDI:  On cross-examination, Mr. Staples
22   showed you a photograph of Mr. Dao's head.  You understand that
23   photo to be taken after his hair was shaved; right?
24   A    Correct.
25   Q    And to the best of your understanding, his hair was not
```

1    shaved in the way that it was in that photograph at the time of

2    the incident; right?

3    A     That's correct.

4    Q     Can you explain whether a gunshot coming at a shallow

03:44PM  5    angle in the way you testified -- whether you would expect to

6    see stippling with a shot like that?

7    A     In the head?

8    Q     Yes.

9    A     If it was close enough and depending on the type of

03:45PM 10    powder, yes.  If it -- there's enough energy and you have some

11    unburned powder particles, you will see stippling and

12    tattooing.

13    Q     When you say that, if it's "close enough," what do you

14    mean by that?

03:45PM 15    A     Muzzle's pretty close -- because you have to have that gas

16    forcing it out at pretty high velocity, and it's not slowing

17    down.  So probably in the realm of 3 inches, maybe, up to --

18    maybe up to 4 inches or so.  Depends on the type of powder.

19          We know that this bullet, at least the one recovered

03:45PM 20    from the back, was manufactured by Remington.  And Remington is

21    known to use flake powder in their handgun cartridges, which

22    burns up pretty quickly and doesn't travel long distances like

23    Ball Powder would that's used in Federal and Winchester.  So it

24    does limit the range if it's the same type of ammunition that

03:45PM 25    was used for the head shot.

UNITED STATES DISTRICT COURT

```
 1   Q    So assuming that the same type of ammunition was used for
 2   the head shot, you would expect to see stippling on the head if
 3   it was no more than a couple of inches away?
 4   A    Yeah.  Within 6 inches or closer.
 5   Q    And that takes into account the angle of the gunshot
 6   wound that we've been talking about here?
 7   A    Yes.  Because the powder's going to be coming out in a
 8   cone around the trajectory of the bullet.
 9        MS. MOJTEHEDI:  Okay.  No further questions,
10   Your Honor.
11        THE COURT:  Recross-examination?
12        MR. STAPLES:  No.  Thank you, Your Honor.
13        THE COURT:  May the witness be excused, Counsel?
14        MR. STAPLES:  Yes, Your Honor.
15        THE COURT:  Sir, thank you very much.  You may step
16   down and take the mask with you.  You can destroy it.  Thank
17   you, sir.
18        Counsel, your next witness, please.
19        MS. MOJTEHEDI:  We have no more witnesses for today.
20   There's one more witness for tomorrow.
21        THE COURT:  For tomorrow.  All right.
22        We believe that the case is actually going to be
23   submitted to you even earlier than next Monday.  We believe the
24   case has every possibility of coming to you this Friday for
25   argument and instructions on the law.
```

1          Now, that means that there will be a recess tomorrow

2    for about two hours.  In other words, not an hour.  So from

3    about 11:00 to -- maybe two and a half hours that we'll need

4    until probably -- well, I'm going to guess 11:15 or 11:30 to

03:47PM 5    about 1:30, 1:45.  We'll give you some more time, but there's

6    going to be a break in the day.

7          But we believe that there are two more witnesses,

8    one for the defense and one for the Government.  And so we

9    think you're going home earlier tomorrow than normal.  And I'm

03:47PM 10   going to just implore you not to discuss this matter with

11   anyone, not to form or express any opinion on this case.

12         And we'll see you tomorrow, then, at 8:30, if that's

13   acceptable to all of you.  Please drive safely tonight.

14         **(Out of the presence of the jury.)**

03:48PM 15         THE COURT:  Counsel, if you'd have a seat.

16         Just a couple thoughts.  First, we've laid out all

17   of the instructions next door in the complex courtroom on

18   tables for us to look at so they're in what I call a walkabout.

19   We can see them.  But I want to keep you as fresh as possible

03:48PM 20   tonight because we're still in the middle of the presentation

21   for both sides.  So let's agree it's not going to be a late

22   evening.  But if we can have about an hour of your time, I

23   think we can start word processing tonight and get a lot of

24   what I call the busy work out of the way and then reserve the

03:49PM 25   time tomorrow for arguments.

1        But in doing that, I'd ask that both parties

2   stipulate that the defendant need not be present for this

3   informal discussion with no final determination, and the

4   investigating agent not be present.  This is just an informal,

03:49PM 5   if you will, processing layout.

6        I will indicate to you, though, I am, in all

7   likelihood, going to give second-degree, and I'm going to give

8   involuntary manslaughter, both requests by the Government and

9   by the defense.  But beyond that, I'd like to discuss the

03:49PM 10   self-defense instructions.  Some of those are state

11   instructions, some of those are modified.  Some of those are

12   the federal Ninth Circuit instructions.

13        But I need the defendant's permission and consent

14   that that can be discussed amongst counsel informally tonight.

03:50PM 15        MR. WILKE:  Can I have a moment, Your Honor?

16        **(Counsel and defendant conferred off the record.)**

17        MR. SCALLY:  And that's all fine with the

18   Government, Your Honor.  Thank you.

19        THE COURT:  Just a moment.  Let me --

03:50PM 20        MR. WILKE:  No objection, Your Honor, from the

21   defense.

22        THE COURT:  Is that acceptable?

23        MR. WILKE:  That is, Your Honor.

24        THE COURT:  Mr. Le, is that acceptable?

03:50PM 25        THE DEFENDANT:  Yes, Your Honor.

1       THE COURT:  Any formal determination concerning the

2  Court's decisions will be made on the record with you present.

3  But I think we may be able to word process and -- just to

4  discuss preliminarily some of my thoughts and concerns with

03:50PM  5  both parties, get some initial input from them tonight, and

6  hopefully try to keep them fresh so they're going home before

7  6:00 o'clock tonight.

8       Does that meet with the Government's concern, also,

9  in terms of your investigating agency?

03:50PM 10       MR. SCALLY:  Yes, Your Honor.

11       THE COURT:  Then we're in recess until tomorrow at

12  8:30.  And if I can borrow counsel, let's go next door.

13       **(Proceedings concluded at 3:51 p.m.)**

14                          **--oOo--**

15

16

17

18

19

20

21

22

23

24

25

1              *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5               I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  January 16, 2022*

16

17

18

19                            */S/ DEBBIE HINO-SPAAN*
                              _____

20                            *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**