1  CRAIG WILKE (150728)
2  craig@craigwilkelaw.com
   305 N. Harbor Blvd., Suite 216
3  Fullerton, California 92832-1901
   Telephone (714) 870-8900
4  Facsimile  (714) 879-2278
5
6  SHEILA MOJTEHEDI (313002)
   sheila@mojtehedi.com
7  806 E. Avenida Pico, Suite I-291
   San Clemente, California 92673
8  Telephone (323) 412-0472
9  Facsimile  (323) 403-4170
10
   Attorneys for Defendant
11 HOANG XUAN LE

12              UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14                  SOUTHERN DIVISION

15 UNITED STATES OF AMERICA,        Case No. 8:20-cr-0002-DOC

16          Plaintiff,              **MEMORANDUM OF POINTS AND**
                                    **AUTHORITIES IN SUPPORT OF**
17                                  **MOTION FOR JUDGMENT OF**
      v.                            **ACQUITTAL AND ALTERNATIVE**
18                                  **MOTION FOR NEW TRIAL**
19 HOANG XUAN LE,
20          Defendant.             Hearing Date:  February 28, 2022
                                    Hearing Time:  1:30 p.m.
21 _____

22

23 /

24 /

25 /

26 /

27 /

28

                            1

Defendant Hoang Xuan Le, by and through his attorneys of record Craig Wilke and Sheila Mojtehedi, hereby files a memorandum of points and authorities in support of his motion for a judgment of acquittal and alternative motion for a new trial.

Respectfully submitted,

Dated:  January 31, 2022

_____/s/_____
CRAIG WILKE
SHEILA MOJTEHEDI
Attorneys for Defendant

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 2

ARGUMENT ................................................................................................... 4

1.      The Court should enter a judgment of acquittal or alternatively grant a new trial due to insufficient evidence of premeditation, malice aforethought and an agreement to murder Dao.............................................................. *4*

2.      The Court should grant a new trial because Sandra's testimony that Sheila blamed Le, the government's failure to correct this false testimony, and the exclusion of Sheila's post-arrest statements in which she did not blame Le violated Le's right to confrontation, due process and compulsory process. ..*22*

3.      The Court should grant a new trial because the verdict was based in part on the jury's consideration of inadmissible and prejudicial hearsay and character evidence…………………………………………………………………..*26*

     a.      *Sandra's testimony about Sheila's statement ten days before Le killed Dao which implicated Le in a plan to murder Dao was inadmissible and prejudicial hearsay.* ..................................................................27

     b.      *Whalin's testimony that, a few days after killing Dao,  Le threatened to kill Whalin, Natalie and anybody else that got in his way was inadmissible character evidence and unfairly prejudicial to Le.* ....................................29

     c.      *Admission of photographs of an assault rifle and shotgun seized from Le's bedroom at his arrest as well as an undated photograph of Le holding another shotgun was error.* ........................................................30

1

4.    The circumstances of the jury deliberations violated Le's right to due process have guilt decided unanimously by an impartial jury. ...........................*31*

    a.    *A juror introduced extrinsic information about lobster fishing into the deliberations that refuted Le's testimony that he, Sheila and Dao had gone lobster fishing.* ...........................31

    b.    *A holdout juror was bullied into requesting to be excused for mental health reasons.* ...........................35

    c.    *The jury did not begin deliberations anew after the holdout juror was replaced with an alternate juror.* ...........................39

CONCLUSION ...........................41

1

## **<u>TABLE OF AUTHORITIES</u>**

*Bruton v. United States*, 391 U.S. 123 (1968) ...................................................26

*Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir. 1988) ...........................32, 33

*Grotemeyer v. Hickman*, 393 F.3d 871 (9th Cir. 2004)................................35

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ...........................................5

*Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005)............................5

*Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995) ...................................32

*Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987) .............................33

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) ..........................................26

*Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991)..........................32, 33, 35

*People v. Collins*, 17 Cal.3d 687 (1976)................................................41

*Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) .................................36

*United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992)......................6

*United States v. Begay*, 673 F.3d 1038, 1042 (9th Cir. 2011)......................6

*United States v. Benveniste*, 564 F.2d 335, 341 (9th Cir. 1977) ..................27

*United States v. Brown*, 784 F.3d 1301, 1302 (9th Cir. 2015) .....................40

*United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)........................36

*United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987) ......................29

*United States v. Jones*, 580 F.2d 219, 222 (6th Cir. 1978)..........................32

*United States v. Keating*, 147 F.3d 895, 900 (9th Cir. 1998). ...................32, 33

*United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) .................6

*United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975)..........................40, 42

*United States v. Litwin*, 972 F.3d 1155, 1168-69 (9th Cir. 2020) ............36, 40

*United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) ..................5

*United States v. Silverman*, 861 F.2d 571, 578 (9th Cir. 1988)....................29

*United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999)............36, 39, 40

*United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979) ......................33

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>
### INTRODUCTION

The indictment charged Hoang Le with first-degree premeditated murder, conspiracy to commit murder, and using a gun in furtherance of a crime of violence. (Second Superseding Indictment (hereinafter "SSI") 1-8.) The indictment alleged that Le and Sheila Ritze (hereinafter "Sheila") planned and carried out the murder of Tri Dao so that Le could collect money that Dao owed him from Natalie Nguyen (hereinafter "Natalie") whom Le knew to be a beneficiary of Dao's life insurance policy. The indictment alleged that Le carried out this plan by luring Dao aboard Sheila's boat under the guise of lobster fishing, shooting him, throwing him overboard, and leaving him in the ocean to die. Le denied that there was any such plan and testified that he acted in self-defense. After eighteen days of trial which included nearly six days of deliberations, the jury found Le guilty of the first-degree premeditated murder, conspiracy, and the related gun charge. The Court should enter a judgment of acquittal or, alternatively grant a new trial.[1]

The evidence is insufficient to prove beyond a reasonable doubt that Le committed first-degree premeditated murder and conspired with Ritze to commit murder. The physical and circumstantial evidence in the case is consistent with and largely corroborates Le's testimony that he acted in self-defense. The evidence of premeditation is limited to testimony about Le's statements, yet no reasonable juror could find these statements to be reliable nor the witnesses who testified about them to be credible. The Court should enter a judgment of acquittal because no rational trier of fact could have found that Le acted with premeditation or agreed with Ritze to murder

---

[1] A motion for a judgment of acquittal must be filed within fourteen days after the verdict. Fed. R. Crim. P. 29(c)(1). A motion for a new trial on a ground other than newly discovered evidence must be also filed within fourteen days after the verdict. Fed. R. Crim. P. 33(b)(2). The Court may extend this deadline as it is non-jurisdictional. *United States v. Leung*, 796 F.3d 1032, 1034-35 (9th Cir. 2015). On December 10, 2021, the Court extended the deadline.

2

Dao. Alternatively, should it be necessary to assess the credibility of witnesses, the Court should order a new trial to avoid a serious miscarriage of justice.

A new trial is warranted several other reasons. On redirect examination by the government, Sandra Ritze (hereinafter "Sandra") testified that Sheila blamed Le for Dao's murder. Although the Court instructed the jury that this testimony could be considered only for Sandra's state of mind and not for its truth, the testimony was so prejudicial that it could not be cured by a limiting instruction. Compounding the prejudice to Le, Sandra's testimony was untrue and left uncorrected. Sheila did not blame Le for Dao's murder. To the contrary, Sheila denied that there was any plan between her and Le to murder Dao as evidenced by her video-recorded post-arrest statements which the Court precluded Le from introducing. Sheila's post-arrest statements should have been admitted as statements against her penal interest; and, once false evidence that Sheila blamed Le for Dao's murder was before the jury, the video recording of Sheila's post-arrest statements denying any plan to murder Dao should have been admitted to correct the false evidence. Collectively, these circumstances violated Le's right to confrontation, due process and compulsory process.

The Court should also grant a new trial because the verdict was based on the jury's consideration of inadmissible and highly prejudicial hearsay and character evidence. This evidence included testimony from Sandra about a hearsay statement by Sheila ten days before Dao was killed which inculpated Le in a plan to murder Dao; testimony from Whalin that, a few days after killing Dao, Le said that he would kill Whalin, Dao's wife too and anybody else who got in his way; and evidence that Le possessed two shotguns and an assault rifle that lacked a serial number. This evidence was inadmissible, highly prejudicial, and denied Le a fair trial.

Finally, a new trial is necessary to avoid a serious miscarriage of justice due to juror misconduct. During deliberations, a juror introduced extrinsic information about lobster fishing based on her personal experience. This testimony refuted Le's testimony

3

about the circumstances surrounding Dao's death and swayed three jurors (and eventually the alternate juror) to convict. On the fifth day of deliberations, a holdout juror asked to be excused for mental health reasons after being bullied by other jurors. After replacing the holdout juror with an alternate juror, the jury failed to begin deliberations anew. These circumstances violated Le's right to have his guilt decided unanimously by an impartial jury.

## ARGUMENT

1.   **The Court should enter a judgment of acquittal or alternatively grant a new trial due to insufficient evidence of premeditation, malice aforethought and an agreement to murder Dao.**

Rule 29 of the Federal Rules of Criminal Procedure authorizes the Court to set aside the jury verdict and enter an acquittal. Fed. R. Crim. P. 29(c)(2). When presented with a Rule 29 motion, the Court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Although the Court must view the evidence in the light most favorable to the government, *id.* at 1164 (citing *Jackson*, 443 U.S. at 319, 326), it may not engage in mere speculation to sustain the verdict, *id.* at 1167 (citing *Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005)); and there must be more than "some evidence" to support each element to sustain the government's burden of proof, *id.* at 364 (citing *Jackson*, 443 U.S. at 320). "[I]f the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt," the Court must enter an acquittal. *Id.* at 365 (citing *Jackson*, 443 U.S. at 319).

Rule 33 of the Federal Rules of Criminal Procedure authorizes the Court to vacate the judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). This authority allows the Court to grant a new trial if the verdict is

4

against the weight of the evidence and is "much broader" than the Court's authority under Rule 29. *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). In ruling on a motion for a new trial, the Court does not view the evidence in the light most favorable to the government and may evaluate for itself the credibility of the witnesses. *Id.* (citing *United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992)). A new trial is warranted where "the evidence preponderates sufficiently heavily against the verdict such that a serious miscarriage of justice may have occurred . . . ." *Id.* (citing *Alston*, 974 F.2d at 1211-12).

The verdict of first-degree premediated murder required the jury to find beyond a reasonable doubt that Le planned or deliberated before killing Dao. *See United States v. Begay*, 673 F.3d 1038, 1042 (9th Cir. 2011) (en banc) (defining "premeditation" as "planning or deliberation"); *accord* Instruction No. 13. The verdict of first-degree murder (as well as the lesser offense of second-degree murder) required the jury to also find beyond a reasonable doubt that Le acted with malice aforethought, 18 U.S.C. § 1111, which is negated if Le believed that he was in imminent danger of being killed or suffering great bodily injury and that the use of deadly force was necessary to defend against the danger. Instruction No. 23 (12/3/21-I:29-30). The verdict of conspiracy to murder required the jury to find beyond a reasonable doubt that Le and Ritze agreed to murder Dao. Instruction No. 18 (RT 12/3/21-I:26.).

The indictment alleged that Le lured Dao on to Sheila's boat by inviting him to go lobster fishing, and that Le and Sheila carried out a plan to murder Dao by shooting him and throwing him overboard so that Le could collect a debt that Dao owed him from Natalie Natalie whom Le knew to be the beneficiary of Dao's life insurance policy. The indictment offered no theory of Sheila's motive for participating in this alleged plan. Le denied that he and Sheila planned to murder Dao and testified that he acted in self defense. Considering all the evidence presented at trial, no rational juror could find beyond a reasonable doubt that Le planned or deliberated before killing Dao, that he and Sheila agreed to kill Dao, or that he did not believe that he was in imminent

danger of being killed or suffering great bodily injury such that the use of deadly force was necessary.

During the relevant period, Le was thirty-nine years old, had never been married, and still lived with his mother and sister. He had no living expenses and had received a $50,000 inheritance earlier that year following the death of his father of which his sister retained half for his benefit as the estate trustee. (RT 11/17/21-II:23; 11/19/21-III:32-33). He had a history of head trauma from past motorcycle accidents, and neuropsychological testing placed him in the bottom 2% of the population for cognitive functioning relating to visual processing and working memory. (RT 12/2/21-III:81-82). He testified that had been abusing alcohol and cocaine for several years, and had recently begun using methamphetamine regularly. Other witnesses corroborated his testimony that he was a heavy user of alcohol, cocaine and methamphetamine. For several years, he had sold small amounts of cocaine to support his own use and for spending money. He had a reputation as a person who exaggerated to make himself appear tough or more important. This reputation was evident by his nickname "Wangsta" which is slang for a wannabe gangster. Shawn Whalin and Vinh Doan both testified that the did not believe Le when he first told them about getting into a fight with Doan while they were lobster fishing. (RT 11/15/21-I: 23-24, 45-47; RT 11/16/21-II: 17.)

Le and Dao were long-time friends. (RT 11/10/21-I: 10; RT 11/17/21-II: 38, 41-44.) They also illegally trafficked in marijuana together for several years. (RT 11/10/21-I: 10-11.) Dao was a gambler who often borrowed money from family and friends, and regularly "burned" marijuana suppliers by not paying for drugs that were fronted to him. (RT 11/10/21-I: 23.) Le understood that Dao owed $30,000 to $40,000 to his brother Trung "Alex" Dao (hereinafter "Alex"), and thousands more to other family members, friends, bookies, and drug dealers whom he had burned. (RT 11/17/21-II: 81-82.) Le had heard Dao tell people that he had a $1 million life insurance policy and that Natalie would pay off his debts if something happened to him. (RT

6

11/10/21-I: 22-23; RT 11/17/21-II: 78-80.) In fact, Dao had a $250,000 life insurance policy. (RT 11/10/21-I: 21-22; Tr. Ex. 162.)

Le testified that, following his father's death in February 2019, Dao asked him if he could use his father's death certificate to make a phony death certificate that Dao could use to make a fraudulent claim for his life insurance benefits. (RT 11/17/21-II: 80-81.) Le testified that Dao offered to give Le $100,000 for helping him, but they never followed through with the plan. (RT 11/17/21-II: 83-84.) Le thought Dao was joking even though he brought it up two or three times. (RT 11/17/21-II: 82.) Although Natalie denied any knowledge of this plan, Le testified that he believed Natalie was agreeable. (RT 11/17/21-II: 82-84.) This testimony was corroborated by Le's prior consistent statement to Whalin who testified that Le had told him that Dao's wife Natalie was going to give Le money out of the insurance policy and "was going to get money from the insurance policy and pay off [Dao's] debt because she was worried that something would otherwise happen to [Dao]." (RT 11/16/21-I: 27; RT 11/16/21-II: 33-35; RT 11/16/21-III: 21, 30.) A reasonable inference from Le's prior statement to Whalin is that Le believed that Natalie knew of Dao's proposed insurance fraud scheme.

Natalie and Le both testified that Le had recently been threatened by a marijuana dealer known as "Kane" who was connected to a Mexican drug cartel and to whom Dao owed money. Le testified that Dao always carried a black .38 caliber revolver in a leather satchel, and security camera video from a Walmart where Dao purchased his fishing license and from Dao's apartment when he left to go lobster fishing with Le corroborated that Dao was carrying the satchel on October 14, 2019. (RT 11/17/21-II: 68-70; Tr. Ex. 536.) Natalie testified that Dao had carried a revolver in the past; and Dao's brother Trung Dao (hereinafter "Alex") testified that Dao always carried a gun.

The government also introduced evidence that Dao was short tempered and violent. Specifically, the government elicited testimony from Natalie about a July 2016

7

incident where Dao pointed a revolver at her while she was holding their baby and threatened to kill her after arriving home from a casino one morning to find a male friend in his apartment with Natalie. The government also elicited testimony from Natalie that, in the Summer of 2019, Dao choked Le out in the car after they left a casino, and Le had almost died. Le testified about being assaulted by Le in the car after they left a casino and described how Dao had hit him in the face and choked him because he was angry that Le wanted to leave the casino. (RT 11/17/21-II: 72-73.) Le also testified that he had seen Dao involved in two fistfights and that Dao told him about two prior gunfights in which he had been in involved. (RT 11/17/21-II: 66-68.)

Le testified that he regularly loaned money to Dao. (RT 11/17/21-II: 65.) Natalie testified that Dao had said that he money to Le but "it wasn't that much." (RT 10/11/21-I: 23.) According to Le's testimony, Dao owed him approximately $5,500 at the time of his death in October 2019. A list that Le kept on his computer documented that Dao owed him $6,450, $5,495 and $7,120 between May 11, 2019, and July 3, 2019.[2] (RT 11/17/21-II: 54-65; Tr. Exs. 114, 224.) Whalin, Vinh Doan and Tuac Hoang all testified that Le said Dao owed him $30,000 to $40,000. (RT 11/16/21-I: 25-27, 36; RT 11/16/21-II: 17, 33-34; RT 11/16/21-III: 6; RT 11/15/21-I: 17; RT 11/15/21-II: 32, 61-63.) Le admitted to saying this but testified that he was exaggerating to make himself look more important or like a big shot.

Le also admitted that, in or about June 2019, he purchased a .38 caliber revolver and ammunition at a "slap house" he frequented. (RT 11/16/21-II: 76-77.) Le unloaded the revolver but kept the bullets with it. (RT 11/16/21-II: 76.) Whalin and Tuac Hoang testified that, prior to October 14, 2019, they had seen the revolver had Le's house and he described it as a .38 caliber. Le testified that he did not carry the .38 caliber revolver or any other gun with him on October 14, 2019. In a later text message, Le offered to

---

[2] Le's bank record corroborated a list stored on Le's computer showing that Dao repaid Le $750 in May 2019. (RT 11/17/21-II: 75-76; Tr. Ex. 573.)

loan Whailin his ".38." Le testified that he lent the .38 without any ammunition to Terren Smith in December 2019 but did not give her the ammunition. (RT 11/16/21-II: 76-78.) On December 19, 2019, authorities seized four .38 caliber bullets from Le's bedroom when they arrested him. (RT 11/16/21-II: 78.) Although the medical examiner recovered a .38 caliber bullet from Dao's shoulder, it was not the same type of .38 caliber bullet as those seized from Le's bedroom.

Le testified that he met Sheila in March 2019, and they became friends. (RT 11/17/21-II: 85-86.) Sheila was a recently separated mother with a ten-year old daughter who worked full time as a property manager for large apartment and condominium complexes that often needed repairs. Le referred friends who did construction work, including Khoa Cao, to Sheila in exchange for a small commission. (RT 11/16/21-II: 59-60; RT 11/17/21-II: 86-88.) Like Le, Sheila also had a serious drinking problem, and she and Le often drank and used cocaine together. (RT 11/17/21-II: 85-86, 91.) Although Whalin referred to Ritze as Le's girlfriend, he did not know whether they were having a romantic relationship. (RT 11/16/21-II: 56.) Le denied that they had any romantic relationship.

Sheila was an avid and experienced fisherwoman who owned a fishing boat that she stored in Irvine and regularly launched from the Dana Point marina. (RT 11/17/21-II: 91, 94.) Le obtained a fishing license from the California Department of Fish and Wildlife on May 31, 2019, shortly before the first time he went fishing with Sheila. (RT 11/17/21-II: 93; Tr. Ex. 565.) The lobster fishing season began on September 29, 2019, and Le testified that Sheila was excited for it to begin. (RT 11/17/21-II: 96.) On September 28, 2019, Sheila bought Le a "lobster card" fishing license issued by the California Department of Fish and Wildlife. (RT 11/17/21-II: 95; Tr. Ex. 556). Le testified that Sheila took him and Cao lobster fishing near the Dana Point jetty on October 13, 2019. Cao corroborated this testimony.

Le and Natalie testified that, on October 14, 2019, Le invited Dao to go lobster fishing later that night. While dining that afternoon at a Buena Park seafood restaurant,

9

Le showed Dao digital photographs of his catch from the lobster fishing trip he had taken the previous evening with Sheila and Cao. (RT 11/10/21-I: 20.) Natalie testified that Le said that they did not use all the gas that he had paid for because they returned early after Cao had gotten seasick. (RT 11/10-21-I: 20.) Le testified that, after he showed him the photographs, Dao expressed an interest in going, and he agreed to contact Sheila and ask her if she would take them lobster fishing later that night.

Natalie and Le also testified that Le and Dao met in the parking lot for Le to show Dao some marijuana. (RT 11/10/21-I: 20-21.) Le confirmed that Dao had asked him to pick up marijuana samples and bring them to the restaurant, and he showed the samples to Dao while they were seated in his car in the restaurant parking lot. A digital video of this meeting, with metadata establishing the date and time, depicted Le showing Dao two one-pound samples of marijuana, and Dao explaining to Le why the quality of the marijuana was insufficient to justify the asking price. Le and Natalie also testified that Dao gave Le money at the restaurant to repay him (at least in part) for $500 Dao had borrowed nine days earlier to bet on a sporting event when they were in Las Vegas.[3]

Le testified that, after leaving the restaurant, he spoke to Sheila, and she agreed to take him and Dao lobster fishing that night provided that Dao had a fishing license. Le contacted Dao and told him. Natalie confirmed that, after they left the restaurant, Le texted Dao that he needed to get a fishing license. (RT 11/10/21-I: 24.) Whalin testified that he overheard an October 14 telephone call between Le and Dao discussing the lobster fishing trip later that night, transportation from Dao's apartment, and Dao's need for a fishing license. (RT 11/16/21-I: 36-37; RT 11/16/21-I: 38; RT 11/16/21-II: 54-55.) Whalin testified that, immediately after this telephone conversation, Le told

---

[3] Natalie believed that Dao repaid Le $500. (RT 11/10/21-I: 19). Le testified that, while he loaned Dao $500 on October 5 when they were in Las Vegas, Dao repaid him $400 at the restaurant on October 14 and told him he needed $100 to pay the restaurant bill. Whalin corroborated that Le loaned Le $500 in Las Vegas on October 5..

him that he was going to "take [Dao] out" and asked Whalin if he wanted to go. (RT 11/16/21-I: 36-37; RT 11/16/21-I: 38; RT 11/16/21-II: 54-55.) Whalin testified that he did *not* understand this statement to mean that Le intended to kill Dao, but nevertheless declined Le's offer because he "doesn't like the ocean." (RT 11/16/21-I: 24-25; RT 11/16/21-II: 55; RT 11/16/21-II: 55-56.)

Le testified that he picked Dao up from his Fullerton apartment in truck which he had borrowed from his friend Vu Nugyen (hereinafter "Vu") because he did not want his Cadillac to smell like fish. Vu corroborated this and testified that he regularly loaned Le his truck. Le testified that, Sheila had told him to be at her apartment in San Juan Capistrano by 8:00 p.m., but he ran late because he had picking up cocaine from his supplier and delivering it to his customers. Surveillance camera video from Dao's apartment captured Vu's truck arriving at Dao's apartment at approximately 10:30 p.m. Le testified that he and Dao drove to Sheila's apartment, and the three of them drove in Sheila's vehicle to the Dana Point marina. Surveillance camera video from the marina showed Sheila's vehicle arriving at the marina parking lot at approximately; and the three of them trailering the boat to the launch ramp, launching the boat, parking the vehicle and trailer in the parking lot; and pulling away from the dock after midnight. Dao texted Natalie a video of himself seated at the back of the boat at the dock.

Le testified that he and Dao baited the hoop nets as Sheila piloted the boat out of the harbor. They dropped several baited hoop nets just outside the harbor near the jetty and cruised out away from the jetty playing music and drinking. Sheila piloted the boat while Le and Dao sat in rear seats near the outboard motor. Le testified that Dao had been texting on his cell phone, leaned across to Le, and demanded that he loan him $2,000. When Le told Dao that he did not have any money, Dao stood up, pointed his .38 caliber revolver at Le, and accused him of disrespecting him.

Le testified that he had been drinking and using cocaine and was under the influence of both at the time. Le described how he tried to grab the revolver from Dao's hand and they struggled over it. Le testified that the revolver discharged as Le forced

Dao's hand over above his head, discharged a second time as Dao pulled his arm down and Le twisted it behind Dao's back. Le and the fun fell to floor. Le testified that, as Dao reached down to pull him up by his jacket, Le grabbed a metal handle and hit Dao on the head with it. Dao continued to pull Le up by his jacket, and Le grabbed the back of Dao's legs, pulled them forward and flipped Dao over the back of the boat. Le testified that he directed Sheila to pilot the boat away and leave Dao in the ocean. Le also testified that, at the time, he believed that Dao would otherwise kill him. Le testified that Dao was alive and yelling at him from the water, that he did not know Dao had been shot, and the he believed that Dao may have been able to swim back to shore. Cell phone data indicated that cell phones used by Le, Sheila and Dao were approximately three miles offshore when Dao's cell phone signal stopped. Security camera video captured the boat returning to the marina, trailering the boat and leaving it in the parking lot

Dao's body was found floating in the ocean approximately thirty-six hours later. The cause of Dao's death was drowning. He had two non-fatal gunshot wounds and blunt force trauma to his head which the medical examiner considered to be contributing factors to his death. There was substantial blood on Dao's head from the blunt force trauma, and undisputed testimony that Dao's head wounds would have bled substantially and immediately. FBI crime scene analysts examined the boat for trace blood evidence using several methods, including Blue Star which detects trace amounts of blood even after a crime scence has been cleaned. No human blood was detected on the boat.

One bullet grazed Dao's scalp from the left rear toward the right front. The second bullet, which was a .38 caliber, entered Dao's upper back just left of center at a very shallow angle and lodged in his left shoulder just under the skin. Defects near the bullet hole in the back of flourescent orange polyester windbreaker that Dao was wearing when his body was found were indicative of burns caused from smokeless gunpowder emitting from the barrel or cylinder. Based on the trajectory of the bullet

and the defects in the jacket near the bullet hold, the medical examiner and the defense firearms expert opined that the gun was within inches of the entry wound in Dao's back when it discharged and nearly parallel to his back. The government firearms expert agreed that the gun was nearly parallel to Dao back when it discharged but could not say whether it was within inches of the entry wound when it discharged, even though he had no explanation for the defects to the flourescent orange polyester jacket.

Whalin testified that, a couple days after Le had gone lobster fishing with Dao, Whalin saw bruises on Le's forearms and biceps and a handprint mark as if he had been grabbed. (RT 11/16/21-I: 39-40; RT 11/16/21-III: 9.) Although Whalin did not remember the exact words Le used when Whalin asked him about the bruises (RT 11/16/21-II: 16-17), Whalin recalled Le saying that he had gotten into a fight with Dao, that he "took care of it," that he shot Dao during the fight, that Ritze threw up, and that he did not know exactly what happened to Dao. (RT 11/16/21-I: 39-41; RT 11/16/21-II: 31; RT 11/16/21-III: 9-11.)

On or about October 18, 2019, Natalie contacted Le and asked about Dao's whereabouts. Le told Natalie that did not know as he had not gone fishing. (RT 11/16/21-I: 42, 44.) This was the last time Le and Natalie spoke. The following day, Le told this same story to Dao's brother Alex. (RT 11/16/21-III: 13.) Le recruited Whalin to corroborate his false statement to Alex that he had not gone fishing. (RT 11/16/21-III: 14.) Le repeated the false story to Alex on October 19 in Whalin's presence, and Whalin corroborated it. This was the last time Le spoke to Alex. Le testified that, prior to his arrest on December 19, 2019, he was uncertain about whether Dao was dead, but that he feared Alex would harm him if he learned that he had harmed Dao. On October 19, 2019, authorities notified Dao's family, including Natalie and Alex, of his death. This information was not publicly released until two months later when Le and Sheila were arrested.

In November 2019, Le placed a tracking device on Dao and Natalie's minivan and later replaced it when the battery died with a second tracking device. Whalin

testified that Le told him that he was going was going to put a tracking device on the vehicle. (RT 11/16/21-III: 10-11.) Le testified that he did so because, after several weeks of not hearing any information about Dao, Le believed that Dao was still alive and was using the incident to perpetrate the insurance fraud he had proposed months earlier. Le sent Sheila a text after the tracking device on the van alerted him that it had traveled to Arizona. The text read, "Bitch is in Arizona, prolly [sic] trying to stash the money. I want my $100K." Le testified that, at the time, he believed that Dao and Natalie may have fraudulently collected Dao's life insurance benefits and the "$100K" referred to 10% of the $1 million dollar life insurance policy that Dao had offered Le for his help. Natalie and Le both testified that Le never asked her if she collected the insurance benefits and never asked her to pay the debt owed to him by Dao.

This evidence is consistent with or corroborates to varying degree Le's testimony that he acted in self defense. Testimony from Whalin, Sandra and Natalie is the only evidence of premeditation; and testimony from Sandra about statements by Le and Sheila is the only evidence that Le and Ritze agreed to murder Dao. Le denied making or adopting the statements attributed to him by these witnesses, and their testimony is so implausible and lacking in credibility that no rational juror could rely on it to find beyond a reasonable doubt that Le acted with premeditation. While Doan and Tuac testified about inculpatory statements Le made to them after the incident, these statements did not evidence that Le had planned or deliberated before killing Dao. Le admitted to making some of these statements while under the influence of alcohol and cocaine to make himself look tough, but testified that the statements were untrue. And, Le's testimony about the falsity of certain statements to Hoang is corroborated by physical evidence and testimony of other witnesses.

Whalin had known Le for approximately twenty years but had no contact with him for ten years prior to August 2019 when they encountered each other at a local "slap house." Thereafter, they began drinking alcohol and using methamphetamine together daily. Whalin testified that, prior to October 4, 2019, Le told him, while they

14

were drinking and using methamphetamine at Le's house, that he was going to going to "take [Dao] out" which Whalin understood to mean that he was going to kill Dao. (RT 11/16/21-I: 25-27, 36; RT 11/16/21-II: 33-34; RT 11/16/21-III: 6.) Whalin testified that Le asked for his assistance, but he refused. (RT 11/16/21-I: 26.) Whalin also testified that he did not believe Le and so never alerted Dao despite driving with him for several hours to and from Las Vegas and staying with him in a hotel room on the October 4 weekend. (RT 11/16/21-II: 20-21, 66-67.)

Le denied ever telling Whalin that he intended to kill Dao. Le and Whalin both testified that, on October 14, 2019, Le told Whalin about the plan to go lobster fishing later that night and said that he was going to "take [Dao] out" and asked Whalin if he wanted to go. Although Whalin testified that Le used the exact same phrase as before, Whalin did not understand the phrase to refer to killing Dao. Whalin's memory was admittedly poor due to years of methamphetamine and heroin abuse as well as head trauma. His character for untruthfulness was evident by multiple felony convictions going back thirty years. And, he had every incentive to shape his testimony into the government's narrative in the hope of lowering his sentence on federal charges to which he had pleaded guilty which carried a maximum term of forty-five years imprisonment.

Sandra testified that, on October 4, 2019, she met Sheila in the lobby of the Palms Hotel in Las Vegas, and Sheila was with three men. (RT 11/12/21-II: 35.) Sheila introduced the men as Wayne, Robert and another name that Sandra did not hear. (RT 11/12/21-II: 36.) They all remained in the hotel lobby for approximately one hour trying to get a room for the men. (RT 11/12/21-II: 36.) At some point, Sandra asked Sheila about the name of the other man, and Sheila replied, "I do not want you to look at him. I don't want you to talk to him. . . . We will be offing him this weekend." (RT 11/12/21-II: 37.) Sandra testified that she understood Sheila to be saying that she was

going to kill him and that Sheila was not joking.[4] (RT 11/12/21-II: 38.) Nevertheless, Sandra did not notify authorities or hotel security. Rather, she attended a concert later that evening with Sheila and allowed Le and Whalin to stay in her room.

Le testified that he did not hear Sheila make this statement or otherwise say anything to Sandra about "offing" somebody. (RT 11/18/21-I: 13-14.) Le testified that, at times when she was drunk, Sheila would joke about getting rid of persons on her boat, but he did not take her seriously. (RT 11/18/21-I: 14-16.)  Le testified that Sheila was drunk when they arrived in Las Vegas as she had consumed almost half of the 1.75 liter bottle of vodka during the drive. (RT 11/18/21-I: 16.) Sandra and Whalin corroborated Le's testimony that Sheila was drunk at the time.

Sandra also testified that, after she and Sheila returned from the concert later that night, they had a conversation with Le and Whalin over drinks in the hotel room. (RT 12/11/21-II: 43-44; RT 11/12/21-II: 45-46, 48.).) According to Sandra, when she asked about the other man's whereabouts, Le said that the other man owed him $20,000 to $40,0000, and he could not get the money from him "so he was going to find a way to get it [she] guess[ed]." (RT 11/12/21-II: 44.) According to Sandra, Le said that "he was going to off" this other man, and Le "seemed extremely serious." (RT 11/12/21-II: 44.) Sandra also testified that "they said[] they were going to off him." (RT 11/12/21-II: 45.) Sandra testified that she asked Le how he would get his money if he offed the man, and

---

[4] Although Sandra and Whalin identified a photograph of Dao as one of the three men, it was Dao rather Whalin who was introduced to Sandra as Robert. This is evident by the fact that Whalin went go-karting with Sandra, Sheila and Le the following day; and a photograph of the race results board showed that he was using his true name Shawn. Sandra's confusion on this point suggests that any statement by Sheila about "offing" the unidentified man referred to Whalin rather than Dao.

Le "said that he wouldn't get his money from the guy because it would have to be satisfaction that way. . . . He would off him for satisfaction."[5] (RT 11/12/21-II: 45).

Sandra also testified that Sheila and Le talked about "using the boat as a guise to go lobster hunting at night and take someone out there and off them, and how easy it would be to do that." (RT 11/12/21-II: 46.) Sandra testified that Sheila and Le were "very good friends," and that Le said that he knew he had access to the boat. (RT 11/12/21-II: 46.) After refreshing her recollection with a transcript of her grand jury testimony, Sandra testified that Le "could take somebody out on that boat at any time and off them; that Sheila would allow him to take the boat and she'd drive. She was a . . . very good captain." (RT 11/12/21-II: 47-48.) Sandra testified that Le "mentioned that there was a girlfriend that really liked the guy and that she was going to be a problem." (RT 11/12/21-II: 48-49.)

Whalin, who was present during the conversation in the hotel room afer Sandra and Sheila returned from the concert, did not recall hearing any conversation about a murder plan. (RT 11/12/21-II: 45-46, 48.) While Le admitted to having a conversation after Sandra and Sheila returned from the concert, Le denied making any statement or hearing Sheila make any statement about a murder plan. (RT 11/18/21-I: 21-25.)

Sandra testified that, even though she believed that Le and Sheila intended to murder this man she had met earlier that day, she did not notify authorities or hotel security. Although she claimed that she was in shock, she also admitted that she went to the casino to gamble with Le and Sheila later that night; went go cart racing with Le, Sheila and Whalin the following day; socialized with Le and Sheila at the pool the following day; and went to dinner with Sheila and her son the following evening. (RT

---

[5] Sandra's testimony about Le's statements that he intended to kill Dao over a debt so that he would get "satisfaction" are remarkably similar to Sheila's recorded statements to her coworkers that the Court excluded. Sandra spoke to Angela Mesa, who was one of Sheila's co-workers, "[m]any times" about Sheila's arrest. (RT 11/12/21-II: 59-60.)

11/12/21-II: 49-51; Tr. Exs 169-171.) After Le and Sheila purportedly told her about their plan to murder Dao, Sandra replied to a text from her son Ryan stating that Sheila's friends were "nice enough." (RT 11/12/21-II: 53.)

Sandra did not report Le and Sheila to authorities until January 3, 2020, almost three months after they purportedly said they were going to commit murder. (RT 11/12/21-II: 52.) Prior to contacting authorities, Sandra read multiple news reports and the United States Attorney's press release about the arrest of Le and Sheila on December 19, 2019, from which Sandra learned that Le had told an informant that he lured Dao to a boat under the "guise" of a lobster fishing, killed Dao over a $30,000 debt, shot him, tied weights to his ankles, and sank his body in the ocean. (RT 11/12/21-II: 60-66; RT 11/12/21-III: 41-42.) Sandra acknowledged that her testimony about Le's statements to her on October 4, 2019, was very similar if not verbatim to the United States Attorney's press release and a Los Angeles Times report that she read on December 19, 2020, following the arrest of Le and Sheila. (RT 11/12/21-III: 42-44.) In fact, Sandra testified that Sheila had used the word "guise" in describing how she would use her boat to commit a murder but could not spell the word. (RT 11/12/21-III: 44.) which   Sandra had also spoke to Sheila's co-worker Angela Mesa many times about the case after learning of Sheila's arrest. Sandra believed her granddaughter River, who was the most important person in her life, was not safe in Sheila's custody due to Sheila's alcohol and drug abuse. (RT 11/12/21-II: 54, 57; RT 11/12/21-III: 8-9.) On December 19, 2019, following Sheila's arrest but before Sandra contacted authorities, Sandra had a text exchange with her niece about obtaining custody of River, or at least being able to see River more often. (RT 11/12/21-II: 54-55; RT 11/12/21-III: 9-24, 34-37; Tr. Ex. 528-2 to 528-5) Sandra understood at the time that Sheila was charged with accessory after the fact to murder and would lose custody of River if convicted. (RT 11/12/21-III; 9-24, 34-39.) During this text exchange, Sandra texted, "let's keep that witch in jail." (RT 11/12/21-III: 39; Tr. Ex. 528-5.)

Natalie testified that, as they were walking out of the restaurant, Le asked her if she made sure the insurance policies were up to date which she understood to refer to Dao's life insurance policy. (RT 11/10/21-I: 21.) Natalie testified that she responded by asking Le why he was "always asking about that," to which Le replied, "Well, you never know what might happen." (RT 11/10/21-I: 21.). Le denied making any such statement.

Despite being interviewed by authorities multiple times where she was specifically questioned about the insurance policy and Le, and having numerous telephone calls with the USCGIS case agent as well as the cell phone numbers for both the USCGIS and FBI case agents, Natalie first told authorities about this purported statement by Le on January 28, 2021, more than fifteen months after her first interview by authorities. She told authorities that Le made this statement after meeting with the prosecutors and USCGIS case agent on January 9, 2021. Although she denied later telling the prosecutors and case agent that she believed, following the January 9 meeting, that the prosecution's lacked evidence of motive, the USCGIS case agent testified that she told him and the prosecutors this at the January 28 meeting.

Doan[6] testified that on October 18, 2019, Le called and said he needed to talk in person. (RT 11/15/21-I: 13-14.) Le met Doan that afternoon at a bounce house where Doan was at with his daughter. (RT 11/15/21-I: 14-16.) Le told Doan that he killed Dao. (RT 11/15/21-I: 16-17.) Le said that Dao owed him "like 30- or 40,000," that he "took the guy fishing[,] . . . asked for the money and he shot the guy, few times, and the guy fell into the ocean." (RT 11/15/21-I: 16-19.) Le admitted to making this statement, but denied that the amount of the debt or that he asked Dao for the money was true. Le

---

[6] Doan and Le had known each other for about ten years. (RT 11/15/21-I: 6.) Doan testified that he tried to avoid Le in order to stay out of trouble. (RT 11/15/21-I: 7.) Specifically, Doan testified over defense objection that Le's "drinking . . . leads to aggression sometimes." (RT 11/15/21-I: 8.) Doan testified that Le lent him $2,000 when he (Doan) got out of jail of which Doan had repaid $500. (RT 11/15/21-I: 8-9.)

said that Dao was alive after the shots were fired, that the guy grabbed his jacket as he was falling into the water, that he slipped out of the jacket during the struggle, and that Dao fell into the ocean with his jacket. (RT 11/15/21-I: 17, 20, 47-48.) Le was concerned that his phone was inside his jacket because it would place him at the location. (RT 11/15/21-I: 21-22.) Le said that James was alive when he went into the ocean, but it was "not possible" for him to have swam back in because they were very far out offshore and in the "middle of nowhere." (RT 11/15/21-I: 20-21.) Doan had not previously told authorities that Le made this statement; rather, Doan told authorities that Le said that they "were very far out" and he was "pretty sure" Dao was dead. (RT 11/15/21-I: 50-51.) Le testified that he told Doan that he was not sure if Dao was dead. Le told Doan that there had been a struggle on the boat and that shots were fired, although Doan understood that the struggle happened after Le shot James. (RT 11/15/21-I: 19-20, 47.) Le said that he was going to get his money through the life insurance policy from Dao's wife; and that he had approached her for money owed to him, but she said she had no money but James has a life insurance policy. (RT 11/15/21-I: 22, 24, 26.) Le admitted to making this statement, but both he and Natalie denied that he ever asked Natalie to pay Dao's debt.

Tuac Hoang testified that, while driving to the Irvine Spectrum with Le to meet Dao's brother Alex about buying marijuana, he overheard Le talking to a person named Shawn over the telephone. (RT 11/15/21-II: 20.) Le told Shawn that he was going to tell Alex that that "he (Le) and his friend got on the boat without the guy and came back . . . ." (RT 11/15/21-II: 20.) Hoang testified that Le told Shawn to get rid of the .38 caliber revolver. (RT 11/15/21-II: 21-22.) In his initial statement to the FBI on November 9, 2019, Hoang did not say that he heard Le tell Shawn to get rid of the .38 caliber revolver. (RT 11/15/21-II: 23; RT 11/15/21-III: 11-12.) While Whalin testified that he was aware Le had a .38 caliber revolver, he denied that Le ever told him to get rid of it. Le also denied that he ever told Shawn to get rid of the .38 caliber revolver.

Hoang testified that, after the call ended, he asked Le what really happened. (RT 11/15/21-II: 21.) Le said the he "shot some guy on the boat . . . because 'em didn't pay up." (RT 11/15/21-II: 21.) Le said he shot the guy three times, tied him up, tied weight onto his foot, and dumped him over the boat. (RT 11/15/21-II: 22; RT 11/15/21-III: 9-10.) Le admitted to making these statements, but they were demonstrably and contradicted by the medical examiner's testimony. Hoang testified that Le said the guy owed him $30,000 to $40,000. (RT 11/15/21-II: 22). Le admitted to saying this, but that it was an exaggeration. Hoang also testified that Le said that he, Shawn, the captain and the guy were on the boat.[7] Whalin and Le both testified that Whalin had not gone on the boat.

Hoang testified that, a few days later, Le told him the story again about how he shot the guy, and "was just bragging that he did it." (RT 11/15/21-II: 31.) Le said that he went to go collect $30,000 or $40,000 and the guy would not pay up, there was an argument, and he shot the guy three times. (RT 11/15/21-II: 32.) Le said that Dao "snapped" at him. (RT 11/15/21-III: 62.) Le said that he, Shawn and the captain tied the man up with some heavy weights and threw him overboard. (RT 11/15/21-II: 32-33.) Le sounded serious to Hoang. (RT 11/15/21-II: 33.) Le was "boast about it, . . . like he's a bad ass and . . . he does these things . . . trying to win me over as a friend." (RT 11/15/21-II: 48.)

Hoang recorded this meeting but did not turn on the recorder until after Le "confessed" to him. (RT 11/15/21-III: 57-58.) During the recorded portion of the meeting, Le said he was fine and that no one was picking him up yet. (RT 11/15/21-III: 59.) Le said that nobody said anything because "they way me to stay out because I collect money for them," and Hoang understood "they" to refer to Alex or his friends. (RT 11/15/21-III: 59.)  Le said that he "works for the house" and, if he goes in" Alex

---

[7] In his initial statement to the FBI on November 9, 209, Hoang did not say that Le told him that they had tied the man up after he shot him, or that Le said that the guy owed him $30,000 to $40,000. (RT 11/15/21-II: 23; RT 11/15/21-III: 11-12.)

1    loses $500,000. (RT 11/15/21-III: 60.) Le said he had access to someone who owed

2    Alex $300,000. (RT 11/15/221-III: 61.) Hoang sold this recording to Alex for $2,000.

3    (RT 11/15/21-III; 68-69.) Hoang later learned that this was not true as Alex had gone to

4    the FBI. (RT 11/15/22-III: 67.)

5            Le submits this testimony from Whalin, Sandra, Natalie's testimony is so lacking

6    in credibility that no rational juror could rely on it to find beyond a reasonable doubt

7    that Le acted with premeditation. Le also submits that the testimony from Doan and

8    Hoang does not establish that he acted with premeditation. Without proof beyond a

9    reasonable doubt that Le acted with premeditation, there is no evidence of plan to

10   murder Sheila and no evidence to disprove Le's testimony that he acted in self-defense.

11   For these reasons, the Court should enter a judgment of acquittal or alternatively grant a

12   new trial.

13            2.    **The Court should grant a new trial because Sandra's testimony**

14                  **that Sheila blamed Le, the government's failure to correct this**

15                  **false testimony, and the exclusion of Sheila's post-arrest**

16                  **statements in which she did not blame Le violated Le's right to**

17                  **confrontation, due process and compulsory process.**

18            Prior to trial, Le moved to sever his trial from Sheila's trial. That motion was

19   based on the ground that the introduction at a joint trial in which she declined to testify

20   of her post-arrest statements that implicated would violate his right to confrontation.

21   (CR 44.) The government opposed the motion, but requested that it be denied without

22   prejudice to afford the parties the opportunity to meet and confer as to whether some of

23   Sheila's post-arrest statements could be introduced without violating Le's confrontation

24   right. (CR 48.) At a hearing on Sheila's application for reconsideration of her detention

25   order at which Le and his counsel were not present, the Court granted Le's motion to

26   sever. (CR 66.)

27            Sixteen months later, the government moved in limine to exclude certain post-

28   arrest statements by Sheila that Le sought introduce as statements against penal interest

under Fed. R. Evid. 804(b)(3). (CR 214.) Specifically, Le sought to introduce a portion of a video-recording of Sheila's post-arrest interview by FBI Special Agent Matthew Coughlin and USCGIS Special Agent Austin Case in which Sheila said that she took Le and Dao on her boat to go lobster fishing, that she heard gunshots while piloting the boat, that she turned around to see Le wrestle Dao overboard, that she saw Le holding a handgun, and that she piloted the boat back to marina at Le's direction leaving Dao in the ocean. (CR 235 (Ex. A).) Le opposed this motion, arguing that these statements by Sheila were admissible under Fed. R. Evid. 804(b)(3) as statements against her penal interest and their exclusion would violate his right to compulsory procees. (CR 235.) The Court granted the govenment's motion and excluded all post-arrest statements by Sheila. (CR 286.)

At trial, Sandra testified that her son Matthew contacted her on December 19, 2019, and told her that Sheila's boss Kathy Poembra had told him that Sheila had been arrested. (RT 11/12/21-II: 52, 57-58.)  Sandra immediately searched the internet for news of Sheila's arrest, and read multiple news reports about the arrest as well as the United States Attorney press release which detailed the prosecution theory and the information from the criminal complaint. (RT 11/12/21-II: 58; RT 11/12/21-III: 6.)

On redirect examination, government counsel elicited the following testimony from Sandra:

Q      [H]ad there been a long period of time during which you were very close to Sheila?

A      Yes. Very good friends. I was the maid of honor in their wedding.

Q      Did you have nicknames for each other?

A      Yes.

Q      What were they?

A      So I was "MIL" and she was "DIL": Mother-in-law, daughter-in-law. And we always called each other that. And it's sad. I'm very sad about this whole thing. And I'm not trying to do anything to be mean to Sheila.

23

> *But when I saw that she was trying to blame everything on him, I was just*
> *in shock.*

(RT 11/12/21-III: 110 (emphasis added).)

On recross examination, Sandra admitted that she had not spoken with Sheila after her arrest. (RT 11/12/21-III: 116.) Sandra testified that she read news reports that Sheila made statements blaming Le and "said some crazy story about having PTSD and that . . . she was blaming it all on him." (RT 11/12/21-III: 116-17.) Sandra also testified that she also heard this from another person whose name she could not remember. (RT 11/12/21-III: 117-19.) Defense counsel requested a limiting instruction and alternatively a mistrial. (RT 11/12/21-III: 121). The Court gave the following limiting instruction:

> You've heard testimony that Sheila Ritze may have made statements about
> Wayne Le. You may not consider this testimony for its truth. Specifically,
> you may not consider this testimony for the truth of the statements or for
> the truth of the fact that Sheila Ritze made this statement. You may only
> consider this testimony for considering Sandra Ritze's state of mind.

(RT 11/12/21-III: 124.) The Court later denied Le's request for reconsideration of the order granting the government motion in limine to exclude Sheila's post-arrest statements in light of Sandra's testimony. In its final instructions to the jury, the Court again gave a limiting instruction as follows:

> You heard testimony from Sandra Ritze that, following Sheila Ritze's
> arrest, Sandra Ritze learned of statements purportedly made by Sheila
> Ritze about the defendant in this case. You may not consider evidence of
> the statements purportedly made by Sheila Ritze for their truth.

(Instruction No. 30.)

Sandra's testimony that Sheila blamed Le for Dao's murder was based on multiple layers of hearsay and clearly not admissible for its truth. Any relevance to Sandra's credibility of her belief that Sheila had blamed Le for Dao's murder was

24

substantially outweighed by the danger of unfair prejudice to Le. Fed. R. Evid. 403. Given Le's defense that there was no plan between him and Sheila to murder Dao and he killed Dao in self defense, the prejudice to Le from the jury hearing that Sheila had blamed him for Dao's murder could not be cured through a limiting instruction.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that admission of a non-testifying codefendant's post-arrest statement that implicates the defendant violates the defendant's Sixth Amendment right to confrontation. *Id*. at 135-36. The Court specifically rejected the argument that a limiting instruction could cure the prejudice to a defendant, reasoning that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* This is one of those contexts.

The prejudice to Le was magnified by the fact that Sandra's testimony was not true. Sheila did not blame Le for Dao's murder. Rather, in her post-arrest interview, Sheila stated that she took Le and Dao on her boat to go lobster fishing, heard gunshots while piloting the boat, turned around to see Le wrestle Dao overboard, saw Le holding a handgun, and piloted the boat back to marina at Le's direction leaving Dao in the ocean. (CR 235 (Ex. A).) This statement is largely consistent with Le's testimony that there was no plan to murder Dao and he acted in self defense. Yet, Sandra's testimony that Sheila blamed Le following their arrest clearly implied otherwise.

When the government becomes aware that the jury was presented with false testimony affecting a witness' credibility, it has a constitutional duty to correct the record. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Nonetheless, after hearing Sandra testify that Sheila blamed Le following their arrest, the government made no effort to correct the record. To the contrary, the govenment continued to oppose Le's request to introduce the video recording of Sheila's post-arrest statement from which the jury would have heard her describe the events on the boat in a manner consistent with Le's claim that there was no plan to murder Dao and he acted in self defense.

Le continues to submit that the Court erred in excluding the video recording of Sheila's post-arrest statements that he sought to introduce and that the exclusion of this evidence violated his right to compulsory process.[8] (CR 235.) This error was compounded by Sandra's false testimony that Sheila blamed Le following their arrest. The video recording of Sheila's post-arrest statement would have shown Sandra's testimony on this point to be untrue. The Court should grant a new trial because these circumstances collectively violated Le's rights to confrontation, compulsory process and due process.

3.   **The Court should grant a new trial because the verdict was based in part on the jury's consideration of inadmissible and prejudicial hearsay and character evidence.**

Three additional evidentiary rulings were erroneous and prejudicial to Le. Sandra's testimony about Sheila's hearsay statement ten days before Dao was killed which inculpated Le in a plan to murder Dao was inadmissible and prejudicial hearsay. Whalin's testimony that Le said a few days after killing Dao that he would kill Dao's wife too and anybody else that got in his way was inadmissible and prejudicial character evidence. And, evidence that Le possessed two shotguns and an assault rifle that lacked a serial number was also inadmissible and prejudicial character evidence. These erroneous evidentiay rulings denied Le a fair trial.

_____

[8] To be admissible under Fed. R. Evid. 804(b)(3), a statement against penal interest need not be a confession nor even implicate the declarant in the crime with which she is charged. *United States v Paguio*, 114 F.3d 928, 934 (9th Cir. 1977); *United States v. Benveniste*, 564 F.2d 335, 341 (9th Cir. 1977). Rather, it need only have a "tendency" to expose the declarant to criminal liability such that a reasonable person in her position would not have made the statement unless she believed it to be true. Fed. R. Evid. 804(b)(3)(A). By placing Sheila at the scene of the crime and implicating her in leaving Dao in the ocean to die, Sheila's statements had a tendency to expose her to criminal liaibility for accessory after the fact, 18 U.S.C. § 3, if not manslaughter, 18 U.S.C. § 1112. Sheila's post-arrest statements were were supported by corroborating circumstances as they were made immediately following her arrest, recorded on video, and were consistent with the physical and circumstantial evidence.

1        **a.**    ***Sandra's testimony about Sheila's statement ten days before***

2                  ***Le killed Dao which implicated Le in a plan to murder Dao***

3                  ***was inadmissible and  prejudicial hearsay.***

4        Sandra testified that, on October 4, 2019, she met Sheila in the lobby of the

5  Palms Hotel in Las Vegas, and Sheila was with three men. (RT 11/12/21-II: 35.) Sheila

6  introduced the men as Wayne, Robert and another name that Sandra did not hear. (RT

7  11/12/21-II: 36.) Sandra identified a photograph of Shawn Whalin as the person she

8  understood to be Robert, and a photograph of Dao as the other man.[9] They remained in

9  the hotel lobby for approximately one hour trying to get a room for the men. (RT

10  11/12/21-II: 36.) Over defense counsel's objection, Sandra testified that she asked

11  Sheila about the name of the other man, and Sheila replied, "I do not want you to look

12  at him. I don't want you to talk to him. . . . We will be offing him this weekend." (RT

13  11/12/21-II: 37.) Sandra testified that she understood Sheila to be saying that she was

14  going to kill him and that Sheila was not joking. (RT 11/12/21-II: 38.) This testimony

15  was admitted over Le's objection. (RT 11/12/21-II: 37-38.)

16        Prior trial, Le had moved in limine to exclude this testimony as hearsay. (CR

17  210.) The government contended that the statement was admissible under the hearsay

18  exception for statements against penal interest, Fed. R. Evid. 804(b)(3); the hearsay

19  exception for statements of then-existing state of mind, Fed. R. Evid. 803(3); and as a

20  non-hearsay statement offered to prove the existence of a conspiracy.  (CR 234.) The

21

22

23

24

25       _____

26        [9] Sandra may have been confused about the identity the man introduced to her as Robert. Le testified that, at Dao's request, Sheila introduced him as Robert. A

27  photograph of Sandra, Sheila, Le and Whalin go-karting the following day depicts the name "Shawn W" on the race results, suggesting that the other man was introduced to

28  her as "Robert."

Court denied Le's motion in limine, ruling that Sheila's statement "is not inadmissible hearsay as it is [Sheila's] then-existing intent or plan . . . ."[10] (CR 298: 3.)

The Court's ruling on Le's motion in limine was erroneous. While a statement of a conconspirator during the course of and in furtherance of a conspirator may be admissible non-hearsay, Fed. R. Evid. 801(d)(2)(E), the government did not nor could not offer Sheila's statement as co-conspirator non-hearsay because there was no evidence, independent of the statement itself, that Sheila and Le had conspired to murder Dao at the time of the statement, much less that the statement furthered any such conspiracy. *See United States v. Silverman*, 861 F.2d 571, 578 (9th Cir. 1988) ("when the proponent of the co-conspirator's statement offers *no* additional proof of defendant's knowledge of and participation in the conspiracy, the statement must be excluded from evidence.")

The government cannot circumvent the rule treating certain co-conspirator statements as non-hearsay by offering the evidence for Sheila's state of mind because the jury was not instructed that the statement was admitted for the limited purpose of proving Sheila's state of mind. The statement was also not admissible under the hearsay exception for statements of then-existing state of mind, Fed. R. Evid. 803(3), because the statement implicates Le, and Rule 803(3) does not provide a hearsay exception to statements about the motive, intention or plan of others. *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987). Finally, any probative value of the statement to Sandra's

---

[10] The Court declined rule on whether Sheila was unavailable to the government as a witness which is a prerequisite to admission of hearsay as a statement against penal interest under Rule 804(b)(3). (CR 298.) Le incorporates by reference the arguments in his reply to the government's opposition to his motion in limine that Sheila's statement was not admissible under the hearsay exception for statements against penal interest under Rule 804(b)(3) because she was not unavailable to the government as a witness, her statement about Le's future conduct of Le did not tend to expose her to criminal liability, and the corroborating circumstances do not clearly indictate that the statement was trustworthy. (CR 253.)

1  state of mind was substantially outweighed by the danger of unfair prejudice to Le. Fed.

2  R. Evid. 403.

3        **b.    *Whalin's testimony that, a few days after killing Dao,  Le***

4                ***threatened to kill Whalin, Natalie and anybody else that got in***

5                ***his way was inadmissible character evidence and unfairly***

6                ***prejudicial to Le.***

7        Whalin testified that, a few days after Le first told him that he had shot Dao, he

8  (Whaling) overheard a telephone conversation between Le and Natalie Natalie in which

9  Natalie, who sounded very concerned, asked Le were Dao was. (RT 11/16/21-I: 41-42.)

10  Le told Natalie that he did not know and that he did not go on the fishing trip. (RT

11  11/16/21-I: 42, 44.) After the call, Whalin testified that he told Le that, if he had done

12  anything to Dao, "God was watching him and was gonna punish him." (RT 11/16/21-I:

13  43.) Whalin testified that Le was "in a laughing demeanor, like it was no big deal" and

14  replied that he would take out anybody who got in the way including Whalin. (RT

15  11/16/21-I: 42-43.) Whalin testified that Le also said Natalie "owed him money and

16  that he was gonna collect it from her one way or another," and that if she did not give

17  him the money, he "was gonna have to handle them too." (RT 11/16/21-I: 45.) Whalin

18  understood Le to me that he would kill Natalie. (RT 11/16/21-I: 45.) Although Whalin

19  had not previously taken Le seriously, he did so after this conversation because Natalie

20  seemed very concerned about Dao. (RT 11/16/21-I: 45-46; RT 11/16/21-III: 18.)

21        Le moved in limine to exclude this testimony. (CR 215: 2, 13.) The government

22  offered the evidence for the purpose of "complete the narrative" of Whalin's testimony.

23  (CR 215: 22.) The Court ruled that the purported statement by Le that he "was gonna

24  have to handle them *too*," was an admission to killing Dao and, therefore, relevant. Yet,

25  Le never disputed that he killed Dao. Defense counsel admitted in opening statement

26  that Le killed Dao in self defense, and Le testified to this at trial. And, when considered

27  in the context of Le's immediately preceeding statement, the word "too" is more fairly

28  read as an admission to Le's intent to take out anybody who got in the way including

29

Whalin. Any probative value that the statement had to an issue that was not in dispute at trial was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Whalin's testimony that, within a few days of killing Dao, Le threatened to kill him, Natalie and anybody else that got his was improper character evidence from which the jury would necessarily conclude that Le had a character for violence. Such evidence is inadmissible to prove that Le acted in accordance with the character or trait on a particular occasion. Fed. R. Evid. 404(a)(1). The exceptions to this rule that allow the prosecution to offer evidence to rebut evidence offered by the defendant of a pertinent character trait, Fed. R. Evid. 404(a)(2)(A), and evidence to rebut evidence offered by the defendant of the alleged victim's pertinent trait as well as evidence of the defendant's same trait, Fed. R. Evid. 404(a)(2)(B), do not apply because Le never offered evidence of a pertinent trait of him or Dao. This testimony was highly prejudicial because it depicted Le as indiscriminately homicidal and rebutted Le's claim of self defense with inadmissible character evidence.

> c.   ***Admission of photographs of an assault rifle and shotgun seized from Le's bedroom at his arrest as well as an undated photograph of Le holding another shotgun was error.***

Over the defense objection, the Court admitted photographs of an assault rifle and shotgun seized from Le's bedroom on December 19, 2019, when he was arrested, as well as a photograph of Le holding a different shotgun. (RT 11-19-21-II:13; Tr. Exhs 265, 267, 268, 269, 277, 280.) These photographs had no relevance to any issue in the case, constituted impermissible character evidence, and were highly prejudicial particularly since Le claimed that he acted in self defense.

4.     **The circumstances of the jury deliberations violated Le's right to due process have guilt decided unanimously by an impartial jury.**

A defendant has a due process right to have his guilt or innocence determined solely by the evidence presented at trial, a right to an impartial jury, and a right to have all twelve jurors fully participate in delberations. Here, the jury considered extrinsic evidence, a holdout juror was bullied into requesting to be excused for mental health reasons, and the jury did not begin deliberations anew after the holdout was replace with an alternate juror. These circumstances violated Le jury trial rights. Should the government dispute the facts supporting this argument, Le requests an evidentiary hearing to question jurors under oath about these matters.

a.     ***A juror introduced extrinsic information about lobster fishing into the deliberations that refuted Le's testimony that he, Sheila and Dao had gone lobster fishing.***

A "fundamental tenet[]" of the American criminal justice system is that a defendant's conviction must be based only on the evidence presented during trial. *United States v. Keating*, 147 F.3d 895, 900 (9th Cir. 1998). Jury exposure to information not in evidence deprives a defendant of his Sixth Amendment rights to confrontation, cross-examination, and assistance of counsel. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995). It does not allow the defendant to rebut, argue the significance of, and take steps to lessen the impact of, adverse evidence. *Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir. 1988).

A juror's personal experience constitutes extrinsic evidence when a juror has personal knowledge regarding the issues involved in the litigation that might affect the verdict. *Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991). This includes a juror's "past personal experiences in the absence of any record evidence on a given fact, as personal experiences are relevant only for purposes of interpreting the record evidence." *Id.* (citing *United States v. Jones*, 580 F.2d 219, 222 (6th Cir. 1978)).

31

"A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material could have affected the verdict." *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988); *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). In other words, if even one juror could have been affected by the extrinsic information, a new trial is required. *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (citing *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979)). Because this inquiry is objective, the Court need not ascertain whether the extrinsic information actually influenced any specific juror. *Keating*, 147 F.3d at 901-02 (citations omitted).

In determining whether extrinsic information could have affected the verdict, the Court considers (1) whether the extrinsic information was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic information was introduced before a verdict was reached, and if so, when during the deliberations; and (5) any other factors which may bear on the issue of the reasonable possibility of whether the introduction of the material affected the verdict. *Navarro-Garcia*, 926 F.2d at 822-823; *Borg*, 60 F.3d at 612; *Marino*, 812 F.2d at 504. Among these other factors is whether the extrinsic information "relates directly to a material aspect of the case." *Navarro-Garcia*, 926 F.2d at 823; *Lawson*, 60 F.3d at 613. When the issue of juror misconduct by extrinsic evidence is raised by the defense, the government must show beyond a reasonable doubt that the extrinsic evidence did not affect the verdict. *Navarro-Garcia*, 926 F.2d at 821 (citations omitted).

Here, the legitimacy of the lobster fishing trip was integral to Le's claim of self-defense.  Despite substantial evidence that lobster fishing was the actual purpose of the excursion, and no testimony from any witness that it was impossible to go lobster fishing in the timeline provided at trial, a juror's explanation of her own experience lobster fishing refuted Le's claim.

During voir dire, defense counsel questioned DM (Juror 6) about her occupation as a nurse. (RT 11/8/21-II: 91). Counsel advised her that there may be expert testimony from medical professionals and asked whether she would be "able to evaluate that testimony without adding [her] own specialized knowledge to [it]" and whether she would "only judge whether the government has met its burden of proof or not, based on the evidence presented . . . in court[] and not fill in the gaps for [the government] based on [her] own personal experience." (*Id.*). As to both questions, DM responded that she believed that she could. (*Id.*).

Yet, during deliberations, DM told the other jurors that she had been lobster fishing. (Crawford Decl. ¶¶ 2-3). She explained that the process of setting the cages and dropping them is lengthy, and that it takes one hour to pull the baskets out of the water. (*Id.*) According to AD (Juror 9), DM explained the process of lobster fishing to other jurors and was able to answer their questions because she had been lobster fishing on more than one occasion. (*Id.*) According to BJR (Juror 2), DM shared her personal experience about lobster fishing and told the other jurors that it was impossible to go lobster fishing as Le had described it. (Noohi Decl. ¶ 8). DM said that, based on her personal experience, it takes longer to put the cages in the water than Le had described and, therefore, they could not have been lobster fishing. (*Id.*) The timeline of events was critical to the jury's deliberations as demonstrated by the fact that it wrote in out on a board during deliberations. (Crawford Decl. ¶ 3).

In *Navarro-Garcia*, the court held that the district court abused its discretion by failing to hold an evidentiary hearing on the allegations of juror misconduct; and that the defendant's allegations, if true, would warrant a new trial. The defendant was charged with various offenses in connection with the importation of 300 pounds of marijuana when she attempted to cross the border from Mexico into the United States. At trial, she argued that someone put the packages in the trunk of her car while she was parked at a dance club. One of the jurors informed the other jurors during "deliberations that when his children sit in the back seat of his car, the bottom scrapes

his driveway although normally it does not," *Navarro-Garcia*, 926 F.2d at 820-21, though it was unclear if the juror's recounting of this information was based on an experiment he conducted over the weekend or based on past experience, *id.* at 822. "He further speculated to the jury that if the added weight were situated in the trunk rather than in the back seat, the effect would be even more pronounced." *Id.* The court noted that "no evidence was presented at trial regarding the effect on a 1985 Mercury Grand Marquis or any other car of weight in the trunk," *id.* at 822, and that the "key issue in deciding Navarro-Garcia's guilty or innocence was whether she had knowledge of the contraband." *Id.* An affidavit from the defendant's attorney recounted how "the entire jury then discussed the question of the weight in the trunk and how that would or would not make the driver aware that something had transpired with the car if, as defendant Navarro-Garcia contended through other witnesses, a three hundred pound weight was placed in her trunk while she was inside a night club." *Id.* at 823.

Like *Navarro-Garcia*, DM's statements constitute extrinsic evidence.  While Le presented substantial evidence about the legitimacy of the lobster fishing trip, no evidence was presented about how long it ordinarily takes to complete the various steps involved in lobster fishing, especially considering that Sheila was an expert at lobster fishing.  All the factors for a new trial or, at a minimum, an evidentiary hearing are satisfied. Whether the trip was for lobster fishing, as Le contends, was a "central disputed issue in the case." *Id.* at 823. Multiple jurors reported that Mowbray reported her prior experience lobster fishing, including how long it took in her experience to drop the hoops. The jurors relied extensively and exclusively on Mobray's prior experience lobster fishing to discredit Le's testimony, specifically focusing on the timeline provided by the government through cell site data.

This case is distinguished from *Grotemeyer v. Hickman*, 393 F.3d 871 (9th Cir. 2004), a habeas case involving charges of first-degree burglary, assault, and related crimes. The Ninth Circuit found that a doctor juror's reference "to her medical expertise in concluding that [the defendant] was mentally disturbed and that his

condition caused him to commit the crime" was not improper extrinsic evidence. There, unlike this case, was substantial evidence whereby jurors could infer the defendant suffered a mental condition, namely nailing his door shut, testimony that he experienced brain damage from a prior car accident and the general inconsistency between the defendant's story versus the physical evidence of injuries to the victim. The court commented that the juror's testimony was simply "an exercise in comparing testimony with known truth (gravity) and rejecting it for inconsistency with that known truth."

### b. *A holdout juror was bullied into requesting to be excused for mental health reasons.*

Although the Court may dismiss for good cause after the jury begins deliberations, Fed. R. Crim. P. 23(b)(3), it may not dismiss a juror during deliberations "'if the request for discharge stems from doubts the juror harbors about the sufficiency of the evidence.'" *United States v. Litwin*, 972 F.3d 1155, 1168-69 (9th Cir. 2020) (quoting *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999)). The Sixth Amendment right to a trial by an impartial jury requires a unanimous verdict in order to convict, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020); and "it does not take much to see that removing a juror merely because she disagrees with her fellow jurors on the proper outcome of the case would provide an obvious endrun around the unanimous jury verdict guarantee." *Litwin*, 972 F.3d at 1169. "'Such a result is unacceptable under the Constitution.'" *Id.* (quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)). Accordingly, when faced with a juror who refuses to agree with other jurors about the strength of the government's case, the Court has two options – declare a mistrial or send the jury back to deliberate. *Litwin¸* 972 F.3d at 1169; *Symington*, 195 F.3d at 1085-86.  "This rule is attentive to the twin imperatives of preserving jury secrecy and safeguarding the defendant's right to a unanimous verdict from an impartial jury." *Symington*, 195 F.3d at 1088.

The jury began deliberations on the afternoon of Friday, December 3, 2021. After approximately ninety minutes of deliberations, the jury left for the weekend. It returned on Monday, December 6, 2021, at 8:30 a.m. At 9:44 a.m. that morning, the jury sent its first note, signed for VG (Juror 7) as the foreperson, asking the Court to "clarify whether or not jurors can look upon (compare) each other's notes." On Wednesday, December 8, 2021, the jury sent its second note, again signed by the foreperson, advising the Court that AM (Juror 1) "needs to leave the courthouse no later than 4:15 p.m." on Thursday, December 9; and AD (Juror 9) "needs to leave . . . no later than 2:30 p.m." on Monday, December 13. The Court responded that it would accommodate the jury's schedule.

On Thursday, December 9, 2021, at or around 8:50 a.m., foreperson VG sent Jury Note Number 3, which stated the following: "One of the jurors is unable to continue. She cannot make a decision. To quote 'I can't do this.' She would like to be excused[,] but the rest of the jury would like to continue to deliberate with an alternate if necessary." After conferring with counsel, the Court responded to the jury in writing as follows: "If the juror is personally asking to be excused, that juror may send a note to the Court individually. That note should include the reason the juror is asking to be excused without revealing any numerical or other information about the jury's deliberations or voting." (RT 12/9/21: 8-9).

On Thursday, December 9, 2021, at 9:45 a.m., Jury Note 3-A, was received. Although signed by foreperson VG, it appears to have been written by Juror 2, BJR. It reads as follows:

> I am asking to be excused from further deliberation. My experience in the jury deliberations has put my mental health into a position that has become dangerous to me. At this point[,] I am unable to continue to subject myself to this[,] and I need to protect my mental health. Juror #2[.]

After conferring with counsel, the Court summoned BJR (Juror 2) to the courtroom outside the presence of the other jurors and asked her two questions but

limited her response to "yes" or "no." First, the Court asked BJR, "Without revealing any information about where the jury stands, numerically or otherwise, is this worsening of your mental health based on pressure from other jurors to reach a specific verdict?" (RT 12/9/21: 18). BJR responded "Yes." (Id.) Second, the Court asked BJR, "Regardless of the deliberative process and any positions you've taken, are you physically or mentally unable to make any decision . . . applying the law to the facts of this case?" (RT 12/9/21: 18-19). BJR responded, "Your Honor, I don't know how to answer this question. . . . I'm sorry. . . . [W]ithout elaborating, I can't give you an answer right here. " (RT 12/9/21: 19). The Court clarified BJR's response by asking "Without getting into the discussions or the deliberations?" (RT 12/9/21: 19). BJR responded, "Exactly." (RT 12/9/21: 19). The Court told BJR, "Then we do not want you to answer. It's just a yes or no." (RT 12/9/21: 19).

After conferring with counsel, the Court declined to excuse BJR. (RT 12/9/21: 26). The Court advised BRJ of its decision outside the presence of the jury and then brought the other jurors back to the courtroom to advise them of its decision and reread the jury instruction regarding the duty to deliberate. (RT  12/9/21: 26-29). The Court recessed at 11:37 a.m.

Thirty-one minutes later, at 12:14 p.m., foreperson VG sent Jury Note 4 to the Court which read as follows:

Juror #2 is extremely stressed and has informed us that she will not be capable of any further deliberation. She has indicated that she has had thoughts of hurting herself in order to be removed from this process. She presents clearly as distressed and in crisis. The rest of the jurors would like to continue with the deliberation process but are unable to due to her inability to go on with the process. There is a concern that her vote does not represent the result of complete [and] comprehensive deliberation, but rather a way to remove herself from a process that is causing her extreme stress and is potentially causing harm to her mental health.

37

Juror 2 also asked the Court to be removed from the other jurors. (RT 11/9/21: 6). The Court "removed her to a separate room for her own well being" and had the marshall keep "a thoughtful watch on her." (RT 11/9/21: 6). After conferring with counsel, the Court asked BJR outside of the presence of the other jurors to answer "yes" or "no" to two questions. (RT 12/9/21: 8). First, the Court asked, "We received a note informing us that you will not be capable of any further deliberation; is that true?" (*Id*.) BJR answered "yes." (*Id*.) Second, the Court asked, "We received a note informing us that you've had thoughts of hurting yourself to be removed from this process; is that true?" (*Id*.) BJR again answered "yes." (*Id*. at 9). Government counsel advised the Court that Ritchie should be excused. (*Id*.) Defense counsel stated his belief that there were "independent grounds to excuse her . . . [and] the court would be within its discretion to excuse her [and] replace her with a randomly selected alternate." (*Id*.) The Court excused BJR from the jury. (Id. at 20).

In *Symington*, the Ninth Circuit reversed a conviction because "the district court could not have been 'firmly convinced' that the impetus for [a juror's] dismissal was unrelated to her position on the merits of the case." *Id.* The juror at issue was dismissed by the district court on the basis that she was "either unwilling or unable to deliberate with her colleagues." *Id.* at 1084. When questioning the jurors before the dismissal, the juror in question recounted that she "found [herself] backed up against the wall for a vote every time, an objection to [her] vote on a specific count or an element of the count" and she felt "bullied" and "she became intimidated when everyone talked at once and demanded that she justify her views as soon as she stated them." *Id.* The other jurors who had requested her dismissal claimed she seemed "confused and unfocused," refused to discuss her views, and the jurors were "blocked and blocked and blocked" in that the juror was "an obstacle to reaching a verdict". *Id.* at 1083-84. The Ninth Circuit, in reversing the defendant's conviction, noted that "[w]hile there may have been some reason to doubt [the juror's] abilities as a juror, there was also considerable evidence to

38

suggest that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case." *Id.* at 1088.

Here, the decline in Juror 2's mental health was not due to "reasons that have nothing to do with her views on the case," *Litwin*, 972 F.3d at 1169, but instead was because the other jurors bullied her because she was a holdout vote. BJR confirmed in open court that the "worsening of [her] mental health [was] based on pressure from other jurors to reach a specific verdict." She was unable to answer whether she was "physically or mentally unable to make any decision . . . applying the law to the facts of this case" without getting into the "discussions or the deliberations" with the jurors. After the Court declined to excuse BJR, the follow-up note from the foreperson confirmed the other jurors were concerned that "her vote does not represent the result of complete [and] comprehensive deliberation" because the other jurors believed her vote was "a way to remove herself from a process that is causing her extreme stress and is potentially causing harm to her mental health." Finally, and again in open court, BJR confirmed she was not "capable of any further deliberation." With these facts, it was improper for the Court to dismiss BJR because there was more than a "reasonable possibility" that the impetus for her dismissal was due to her views on the merits of the case. *Symington*, 195 F.3d at 1087.

### c. *The jury did not begin deliberations anew after the holdout juror was replaced with an alternate juror.*

When a juror is replaced during deliberations, the Court must instruct the jury to begin deliberations anew. Fed. R. Crim. P. 24(c). In this situation, the jury must "discard[] any conclusions they have already reached." *United States v. Brown*, 784 F.3d 1301, 1302 (9th Cir. 2015) (footnote omitted). Failing to do so creates an "inherent coercive effect" upon the alternate juror who has joined the jury. *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975) (en banc). As observed by the California Supreme Court, the "require that 12 persons reach a unanimous verdict is not met

unless those 12 reach their consensus through deliberations which are the common experience of all of them." *People v. Collins*, 17 Cal.3d 687 (1976). Further:

> The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity.

*Id.*

After excusing BJR (Juror 2) on the fifth day of deliberations, the Court randomly selected the first alternate juror LL to replace her. (RT 12/9/21: 24-25). The Court instructed the jury that BJR was being replaced with LL and "not [to] speculate about the reason for the substitution." (*Id.*) The Court also instructed the jurors that they "must start [their] deliberations anew . . . [and] should disregard entirely any deliberations taking place before the alternate was substituted and consider freshly the evidence as if the previous deliberations had never occurred." (*Id.*) The Court recessed at 1:51 p.m. (*Id.* at 27). The jury deliberated until 4:15 p.m. (*Id.*) The jury resumed deliberations at 8:30 a.m. the following morning. At 12:07 p.m., after approximately five and one-half hours of deliberations with the newly-seated juror, the foreperson sent a note stating that the jury had reached a unanimous verdict.

Alternate juror LL recalls that after he was seated as a juror, the other jurors had the evidence and timeline mapped out on a whiteboard and that they proceeded to explain to him their timeline of the events. (Crawford Decl.) Thus, the jurors failed to adhere to the Court's express instruction to "start the deliberations anew." As observed by the Ninth Circuit, when other jurors have already agreed that the accused is guilty, the inheret coercive effect upon the alternate juror is substantial. *Lamb*, 529 F.2d at 1156.

## CONCLUSION

For the foregoing reasons, the Court should enter a judgement of acquittal. Altnernatively, the Court should order a new trial or an evidentiary hearing on the juror misconduct claim.

Respectfully submitted,

Dated: January 31, 2022                    _____/s/_____
                                           CRAIG WILKE
                                           SHEILA MOJTEHEDI
                                           Attorneys for Defendant

41