TRACY L. WILKISON
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
GREGORY S. SCALLY (Cal. Bar. No. 268073)
GREGORY W. STAPLES (Cal. Bar. No. 155505)
Assistant United States Attorneys
    8000 United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92701
    Telephone: (714) 338-3592
    Facsimile: (714) 338-3708
    E-mail:   gregory.scally@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 20-00002(B)-DOC |
|        Plaintiff, | OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND ALTERNATIVE MOTION FOR NEW TRIAL |
|          v. | |
| HOANG XUAN LE, | |
|        Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Gregory S. Scally and Gregory W. Staples, hereby submits its opposition to defendant's motion for judgment of acquittal and alternative motion for new trial.

    This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 14, 2022          Respectfully submitted,

                                  TRACY L. WILKISON
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _/s/_____
                                  GREGORY S. SCALLY
                                  GREGORY W. STAPLES
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                      **PAGE**

TABLE OF CONTENTS.................................................i

TABLE OF AUTHORITIES.............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION.................................................1

II.   STANDARDS....................................................1

      A.    Motion for Judgment of Acquittal.......................1

      B.    Motion for New Trial...................................2

III.  ARGUMENT.....................................................3

      A.    There Was Sufficient Evidence of Premeditation, Malice
            Aforethought, and Agreement to Murder..................3

      B.    Co-defendant RITZE's Post-Arrest Statements Were
            Properly Excluded......................................6

      C.    RITZE's Statement Concerning a Plan to Kill the Victim
            Was Not Inadmissible Hearsay...........................9

      D.    The Admission of Whalin's Testimony Was Proper........10

      E.    The Admission of the Photographs Were Proper..........11

      F.    Nothing About the Circumstances of Jury Deliberations
            Warrants a New Trial..................................13

            1.    Fed. R. Evid. 606(b)'s Prohibition on Information
                  from Jurors To Upset a Verdict..................13

            2.    None of the Circumstances Surrounding the
                  Dismissal of the Juror Warrant a New Trial......14

                  a.    Facts.....................................14

                  b.    The Court's Dismissal of the Juror,
                        Supported by Defendant, Was Entirely
                        Appropriate; In Any Event, Defendant Has
                        Waived Any Post-Verdict Challenge to the
                        Dismissal.................................17

                        i.    Dismissal of the juror was proper given
                              her claims regarding her mental health....17

                        ii.   Defendant waived his right to challenge
                              the dismissal of the juror................20

i

        c.   Information from the Dismissed Juror in the
Defense Affidavit Concerning Alleged
"Bullying" Falls Squarely Within the
Prohibition of Fed. R. Evid. 606(b)............21

  3.   Report of Alleged Juror Statement About Lobster
Fishing Falls Within the Prohibition of Fed. R.
Evid. 606(b), and Does Not Constitute Extraneous
Prejudicial Information Under FRE 606(b)(2)(A)......24

  4.   The Allegation that the Jury Did Not Properly
Deliberate Anew Also Rests on Incompetent
Evidence.........................................30

IV.  CONCLUSION..................................................31

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                    PAGE(S)

Adams v. United States ex rel. McCann,
  317 U.S. 269 (1942) ........................................ 14

Arreola v. Choudhury,
  533 F.3d 601 (7th Cir. 2008) .............................. 27

Gibbs v. Lizzaraga,
  2018 WL 7571323 (C.D. Cal. Sept. 17, 2018) ............... 29

Government of the Virgin Islands v. Gereau,
  523 F.2d 140 (3d Cir. 1975) ............................ 23-24

Grotemeyer v. Hickman,
  393 F.3d 871 (9th Cir. 2004) ...................... 25, 26, 28

Hard v. Burlington Northern Railroad Co.,
  870 F.2d 1454 (9th Cir. 1989) ............................. 25

Jackson v. Virginia,
  443 U.S. 307 (1979) ........................................ 1

Marquez v. City of Albuquerque,
  399 F.3d 1216 (10th Cir. 2005) ....................... 25, 26-27

Price v. Kramer,
  200 F.3d 1237 (9th Cir. 2000) ............................. 27

Rucker v. Patrick,
  2008 WL 4104230 (S.D. Cal. Sept. 3, 2008) ................ 28

Tanner v. United States,
  483 U.S. 107 (1987) ....................................... 13

United States ex rel. McCann v. Adams,
  126 F.2d 774 (2d Cir. 1942) ............................... 14

United States v. Alvarez-Valenzuela,
  231 F.3d 1198 (9th Cir. 2000) .............................. 2

United States v. Begay,
  673 F.3d 1038 (9th Cir. 2011) (en banc) .................... 5

United States v. Bolinger,
  837 F.2d 436 (11th Cir. 1988) ............................. 21

iii

United States v. Briggs,
  291 F.3d 958 (7th Cir. 2002) ................................. 23

United States v. Brito,
  136 F.3d 397 (5th Cir. 1998) ................................. 23

United States v. Budziak,
  697 F.3d 1105 (9th Cir. 2012) ................................ 25

United States v. Carter,
  2020 WL 3542376 (E.D. Cal. June 30, 2020) .................... 2

United States v. Decoud,
  456 F.3d 996 (9th Cir. 2006) ................................. 23

United States v. Del Toro-Barboza,
  673 F.3d 1136 (9th Cir. 2012) ................................ 2

United States v. Endicott,
  869 F.2d 452 (9th Cir. 1989) ................................. 2

United States v. Gootee,
  34 F.3d 475 (7th Cir. 1994) .................................. 21

United States v. Holck,
  398 F.Supp.2d 338 (E.D. Pa. 2005) ........................ 28-29

United States v. Jones,
  597 F.2d 485 (5th Cir. 1979) ................................. 21

United States v. Kellington,
  217 F.3d 1084 (9th Cir. 2000) ................................ 2

United States v. Lakhani
  480 F.3d 171 (3d Cir. 2007) .................................. 23

United States v. Leung,
  796 F.3d 1022 (9th Cir. 2015) ............................ 13, 22

United States v. Litwin,
  972 F.3d 1155 (9th Cir. 2020) ........................ 18, 19, 20

United States v. Lloyd,
  269 F.3d 228 (3d Cir. 2001) .................................. 30

United States v. Lucas,
  963 F.2d 243 (9th Cir. 1992) ................................. 1

United States v. Nance,
  502 F.2d 615 (8th Cir. 1974) ................................. 21

United States v. Navarro-Garcia,
   926 F.2d 818 (9th Cir. 1991) ................................. 28

United States v. Nevils,
   598 F.3d 1158 (9th Cir. 2010) (en banc) ...................... 1

United States v. Norton,
   867 F.2d 1354 (11th Cir. 1989) .............................. 23

United States v. Olano,
   507 U.S. 725 (1993) ........................................ 20

United States v. O'Brien,
   14 F.3d 703 (1st Cir. 1994) ................................. 27

United States v. Perez,
   116 F.3d 840 (9th Cir. 1997) ............................... 20

United States v. Pimentel,
   654 F.2d 538 (9th Cir. 1981) ................................. 2

United States v. Reed,
   575 F.3d 900 (9th Cir. 2009) ................................. 2

United States v. Richter,
   782 F.3d 498 (9th Cir. 2015) ................................. 1

United States v. Rocha,
   598 F.3d 1144 (9th Cir. 2010) ............................... 1

United States v. Sanchez,
   969 F.2d 1409 (2d Cir. 1992) ................................. 3

United States v. Symington,
   195 F.3d 1080 (9th Cir. 1999) ........................... 14, 19

United States v. Tallman,
   952 F.2d 164 (8th Cir. 1991) ............................... 23

United States v. Vartanian,
   476 F.3d 1095 (9th Cir. 2006) .............................. 20

United States v. Wong,
   2014 WL 923347 (N.D. Cal. March 5, 2014) ................. 27-28

Warger v. Shauers,
   574 U.S. 40 (2014) ......................................... 13

**RULES**

Fed. R. Evid. 606 .............................................. passim

Fed. R. Evid. 803 ................................................ 9

Fed. R. Evid. 804 ................................................ 9

Federal Rule of Criminal Procedure 29 ............................ 1

Federal Rule of Criminal Procedure 33 ............................ 2

**SECONDARY SOURCE(S)**

Wayne R. LaFave, Substantive Criminal Law (3d ed. 2017) ........ . 5-6

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.     INTRODUCTION**

3     Defendant's motion for judgment of acquittal ignores settled law

4 that a court must view all evidence, and draw any reasonable

5 inferences, in favor of the government.  Viewed properly, there was

6 ample evidence to support the jury's verdicts of guilt for

7 premediated murder, conspiracy, and the firearms charge.  The motion

8 for acquittal should be denied.

9     Defendant's motion for a new trial should be denied because he

10 cannot show that his convictions constitute an exceptional case that

11 resulted in a miscarriage of justice, which is required to obtain a

12 new trial.  Defendant's request for a new trial should be denied.

13

**II.    STANDARDS**

14

**A.     Motion for Judgment of Acquittal**

15     A motion for judgment of acquittal pursuant to Federal Rule of

16 Criminal Procedure 29 is governed by the two-step process set forth

17 in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) and <u>United States v.</u>

18 <u>Nevils</u>, 598 F.3d 1158, 1161, 1164 (9th Cir. 2010) (<u>en banc</u>).  First,

19 the Court "construe[s] the evidence in the light most favorable to

20 the prosecution."  <u>Nevils</u>, 598 F.3d at 1161 (internal quotations

21 omitted).  In performing this first step, "[t]he government is

22 entitled to all reasonable inferences that can be drawn from the

23 evidence."  <u>United States v. Lucas</u>, 963 F.2d 243, 247 (9th Cir.

24 1992).  Second, the Court must evaluate whether the evidence "is

25 adequate to allow <u>any</u> rational trier of fact to find the essential

26 elements of the crime beyond a reasonable doubt."  <u>United States v.</u>

27 <u>Richter</u>, 782 F.3d 498, 501 (9th Cir. 2015) (emphasis added; citations

28 omitted).  The Ninth Circuit has explained, "[t]he hurdle to overturn

1   a jury's conviction based on a sufficiency of the evidence challenge

2   is high," United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir.

3   2010), and "any conflicts in the evidence [must] be resolved in favor

4   of the jury's verdict," United States v. Alvarez-Valenzuela, 231 F.3d

5   1198, 1201-02 (9th Cir. 2000).  In short, the jury's verdict must

6   stand if, "viewing the evidence in the light most favorable to the

7   prosecution, any rational trier of fact could have found the

8   essential elements of the crime beyond a reasonable doubt."  United

9   States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (quotations

10  omitted).

11      **B.   Motion for New Trial**

12      Under Federal Rule of Criminal Procedure 33(a), a court "may

13  vacate any judgment and grant a new trial if the interest of justice

14  so requires."  The burden of justifying a new trial rests with the

15  defendant.  United States v. Endicott, 869 F.2d 452, 454 (9th Cir.

16  1989).  The burden is a heavy one:  "[New trial] motions are

17  generally disfavored and should only be granted in exceptional

18  cases."  United States v. Carter, 2020 WL 3542376, at *2 (E.D. Cal.

19  June 30, 2020) (citing United States v. Del Toro-Barboza, 673 F.3d

20  1136, 1153 (9th Cir. 2012)); see also United States v. Pimentel, 654

21  F.2d 538, 545 (9th Cir. 1981).  While in considering a motion for new

22  trial the Court can evaluate the credibility of witnesses, such

23  motions should be granted only where "a serious miscarriage of

24  justice may have occurred."  United States v. Kellington, 217 F.3d

25  1084, 1097 (9th Cir. 2000) (citation omitted).

26      A defendant must establish a genuine concern that she was

27  wrongly convicted to overturn a presumptively valid guilty verdict:

28                                  2

1  "There must be a real concern that an innocent person may have been

2  convicted.  It is only when it appears that an injustice has been

3  done that there is a need for a new trial 'in the interest of

4  justice.'"  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir.

5  1992) (footnote omitted).

6  **III.  ARGUMENT**

7      **A.   There Was Sufficient Evidence of Premeditation, Malice**
          **Aforethought, and Agreement to Murder**

8        The evidence of premeditation, malice aforethought, and

9  agreement to murder introduced at trial, far from insufficient, was

10  overwhelming.  Indeed, evidence supporting these elements of the

11  verdict included evidence from before the boat trip, evidence from

12  the boat trip itself, and evidence from after the boat trip.

13        Sandra Ritze testified that defendant told her, ten days before

14  the murder, that he was going to "off" the victim, a statement Sandra

15  Ritze understood to mean defendant was going to kill James Dao.  RT

16  11/12/2021, Vol. II, 44-45.  Defendant told her that Dao owed him

17  money, and Sandra Ritze asked defendant how he would get the money

18  owed if he killed Dao.  <u>Id.</u> at 44.  Defendant replied that he would

19  not, but that he would get satisfaction.  <u>Id.</u> at 45.  Sandra Ritze

20  further testified that defendant and co-defendant RITZE talked about

21  using RITZE's boat to take someone out to the ocean.  <u>Id.</u> at 46-48.

22  Defendant said he had access to RITZE's boat, said he could take

23  anyone out, any time, and "off" them.  <u>Id.</u>  Sandra Ritze further

24  testified that prior to this conversation, also ten days before the

25  murder, that co-defendant RITZE, out of earshot of defendant, had

26  told her, about the victim: "We're going to be offing him this

27  weekend."  <u>Id.</u> at 37.

28

1    Sandra Ritze's testimony alone is sufficient to establish
2    premeditation, malice aforethought, and agreement to murder in this
3    case.  Sandra Ritze's testimony, moreover, was credible, because it
4    was consistent with other evidence in the case.  Her testimony about
5    defendant's use of the term "off," for example, was consistent with
6    defendant's admission in his own testimony that he told Tony Hoang he
7    was going to "off" someone, and he meant "kill."  RT 11/19/21, Vol.
8    II, 32-34.  Sandra Ritze's testimony was also consistent with phone
9    records showing that the people she said were together in Las Vegas
10   ten days before the murder were, in fact, together there at that
11   time.

12   Sandra Ritze's testimony was also consistent with and
13   corroborated by the testimony of Shawn Whalin, who also testified
14   that during this same Las Vegas trip, defendant was telling Whalin
15   about his intention to "take out" James Dao.  RT 11/16/21, Vol. I,
16   36.  Whalin also said that defendant told Whalin before the boat trip
17   that Dao owed him money, and that defendant was going to "take him
18   out," which Whalin understood to mean "take his life."  RT 11/16/21,
19   Vol. I, 26.  Whalin also testified that defendant asked Whalin for
20   his assistance in doing that before the boat trip, but Whalin
21   declined.  Id.  Whalin also testified that defendant told him that
22   defendant was going to get the money owed by Dao from Dao's wife
23   through an insurance policy.  Id. at 27.  And it made sense that
24   defendant told this to Whalin, someone who dealt drugs, and used
25   drugs, with defendant.  Id. at 21.

26   Whalin's testimony was consistent with and corroborated by the
27   testimony from Vinh Doan, who testified that defendant told him,

28
                                  4

1    after the boat trip, that defendant had approached Dao's wife to get

2    the money Dao owed him from an insurance policy.  RT 11/15/21, Vol.

3    I, 22, 26.  This was also consistent with and corroborated by the

4    testimony of Natalie Nguyen, who testified that Dao would tell

5    people, including defendant, before his death, "If something happens

6    to me, Natalie will pay my debts through the life insurance policy."

7    RT 11/10/21, Vol. I, 22-23.  This is consistent with and corroborated

8    by defendant later tracking Nguyen by putting a tracker on her car,

9    and a text message he later sent to co-defendant RITZE about how the

10   tracker went to Arizona, and defendant wants his "100K."  RT

11   11/17/21, Vol. I, 38; Exhibit 139.  And its consistent with and

12   corroborated by defendant's statement to Tony Hoang about how he was

13   trying to get the money Dao owed him from Natalie Nguyen.  RT

14   11/15/21, Vol. II, 43-44; Exhibit 73.

15        In addition to all this direct evidence of defendant's intent,

16   "[p]remediation can be proved by circumstantial evidence."  United

17   States v. Begay, 673 F.3d 1038, 1043 (9th Cir. 2011) (en banc).

18   "Relevant circumstantial evidence includes but is not limited to the

19   defendant's prior relationship with the victim, the defendant's

20   carrying of the murder weapon to the scene, and the manner of the

21   killing."  Id.  The en banc panel in Begay also cited the LaFave

22   treatise on criminal law for the proposition that "planning activity"

23   and "motive" can be probative evidence of premeditation.  Id.

24        According to LaFave, planning activity, motive, and the nature

25   of the killing are three categories of circumstantial evidence of

26   premeditation.  Wayne R. LaFave, Substantive Criminal Law, § 14.7(a)

27   (3d ed. 2017).  One type of planning activity is "taking the

28

prospective victim to a place where others are unlikely to intrude."
Id.  Dao was taken out on a boat with only two other people on it, three miles from shore, in the middle of the night.  It is hard to imagine a location where others are less likely to intrude.

Evidence from after the boat trip also supported a finding of premeditation, malice aforethought, and agreement to murder. Defendant told Tony Hoang, Vinh Doan, and Whalin after the murder that he had killed Dao, and mentioned nothing about self-defense or Dao pointing a gun at him, but to the contrary, shared his motive to kill Dao with these witnesses.  RT 11/15/21, Vol. I, 24; RT 11/15/21, Vol. II, 22-23; RT 11/16/21, Vol. I, 45.  Defendant also put a tracker on Natalie Nguyen's car, and updated his co-defendant and co-conspirator RITZE about the tracker going to Arizona in the aftermath of the murder.  Ex. 139.

In sum, viewing the evidence in the light most favorable to the government, there was ample evidence from which a rational juror could find the essential elements of the offenses.  The motion for acquittal should be denied.  Defendant has also failed to show a serious miscarriage of justice that would warrant a new trial.  The motion for a new trial should also be denied.

**B.  Co-defendant RITZE's Post-Arrest Statements Were Properly Excluded**

Co-defendant RITZE's post-arrest statements to agents, in which she told lie after lie, were properly excluded as hearsay at defendant's trial.  The Court properly found in a pretrial order that the statement did not qualify as a statement against penal interest because it did not "solidly inculpate" RITZE.  (Dkt. No. 286, at 2 of 3.)  Rather, RITZE spent most of the interview denying any

6

culpability whatsoever, and repeatedly sought to distance herself

from the death of the victim.  Id.  Additionally, the requirement of

trustworthiness was lacking, because she made the statements to

federal agents following her arrest, an environment in which the

motive to lie is enormous.  Accordingly, the exclusion of the

statement as hearsay was correct.

The subsequent admission at trial of the statement by Sandra

Ritze that she had seen in the newspaper that RITZE had blamed

defendant does not change the analysis of this issue for several

reasons.  First, the statement that RITZE was trying to blame

everything on Le—far from being a false statement the government had

a duty to correct (as defendant argues)-was true.  RITZE's statement

was that she had no idea that the victim was going to be killed on

her boat, and that she was not involved in the killing in any way.

According to RITZE, only defendant had been involved in killing the

victim, and, indeed, only defendant even knew how the victim was shot

and went overboard-a clear shifting of blame to defendant.  See

Partial Transcript of RITZE's Statement to Law Enforcement, Dkt. No.

235-1, at 5-11, 21-22 of 22.

Second, the statement prejudiced the government as much as it

prejudiced defendant, in that it tended to undermine the charge of

Conspiracy to Murder against defendant.

Third, as the transcript makes clear, the government did not

intentionally elicit this testimony.  Defendant opened the door to

this testimony through his vigorous, nearly day-long cross-

examination which focused almost exclusively on Sandra Ritze's

reading of news articles, her motivation for testifying, and her

failure to report the substance of her testimony to law enforcement earlier.  See, e.g., RT 11/12/21, Vol. II, at 56-64, 65-68; RT 11/12/21, Vol. III, at 5-23, 34-52.  The thrust of the cross-examination was that Sandra Ritze had entirely fabricated her testimony concerning defendant's statements of intent to kill the victim based on having read newspaper articles about the case, with a motive of obtaining custody over her granddaughter.  See, e.g., RT 64-68, 72-74, 75-85, 90-107.

This line of questioning was amplified by cross-examination of Mica Ritze in an effort to undermine Sandra Ritze's testimony.  See, e.g., RT 11/12/21, Vol. I, at 21 (eliciting apparent hearsay that Sandra Ritze smoked marijuana with a medical license); 22-24 (eliciting closeness of relationship between Sandra Ritze and granddaughter); 40-41; 43 (eliciting granddaughter's custodial status).  In light of defendant's excessive focus on Sandra Ritze's motive for testifying, the testimony which revealed a portion of her actual motive (as opposed to the nonexistent motive suggested to the jury during hours of cross-examination)—to correct what she learned to be RITZE's false statements about not being involved-was proper for the jury to hear.

Last, the limiting instruction written by and agreed to by defendant was sufficient to cure any error.  RT 11/12/21, Vol. III, 124; RT 11/13/21, Vol 1, 53-54.  The jury was told repeatedly that they could not consider Sandra Ritze's testimony that RITZE blamed defendant as evidence that RITZE actually did blame the defendant. Id., see also RT 12/3/21, Vol. 1, at 39.

## C.   RITZE's Statement Concerning a Plan to Kill the Victim Was Not Inadmissible Hearsay

Defendant argues that the Court should have excluded evidence of co-defendant RITZE's following statement, ten days before the murder, to Sandra Ritze, about the victim, as inadmissible hearsay: "I do not want you to look at him.  I don't want you to talk to him... We will be offing him this weekend."  RT 11/12/21, Vol. II, at 37.

The statements were admissible under the statement against interest exception to the hearsay rule under Fed. R. Evid. 804(b)(3). Federal Rule of Evidence 804(b)(3) provides an exception to the hearsay rule where: (a) the declarant is unavailable, (b) a reasonable person in the declarant's position would have made the statement only if the person believed it to be true because, when made, it had so great a tendency to expose the declarant to criminal liability; and (c) the statement is supported by corroborating circumstances that clearly indicate its trustworthiness.  The government here incorporates its arguments made in Dkt. 234, pages 11-15 of 22.  Briefly, all the prongs are met for this hearsay exception, because: (1) RITZE was unavailable because she was exempted from testifying about the subject matter of the statement because of her privilege against self-incrimination, Fed. R. Evid. 804(a)(1); (2) the statements obviously inculpate her tremendously, insofar as they represent statements about her intention to commit a premeditated murder; and (3) the statements are trustworthy because they were made to RITZE's close family member, who she referred to as her "best friend" on the day she made the statement.

The statements were also admissible under the state of mind exception to the hearsay rule pursuant to Fed. R. Evid. 803(3).  The

government here incorporates the arguments from docket number 234, pages 16-21 of 22.  Briefly, the statements were admissible as a statement of RITZE's then-existing state of mind, and the statements satisfied the requirements of contemporaneousness, chance for reflection, and relevancy.

Last, the statements were admissible as nonhearsay, because they were also offered not for the truth of the matter asserted, but to show the existence of the murder conspiracy.  The government here incorporates the argument made in docket number 234, page 22 of 22.

**D.   The Admission of Whalin's Testimony Was Proper**

Whalin testified that after the boat trip, he was riding in a car with defendant, when defendant received a phone call from the victim's widow, Natalie Nguyen ("Nguyen").  RT 11/16/21, Vol. I, 41-42.  Whalin said Nguyen asked defendant where her husband was, and defendant (falsely) denied having gone on the fishing trip at all. Id.  Whalin testified that after the call, he said to defendant, "if he had did anything to [the victim], that God was watching him and was gonna punish him."  Id. at 43.  Whalin further testified that defendant then said, in substance, if anybody got in the way, including Whalin, defendant would take them out.  Id.  Whalin further testified that defendant told him that Nguyen owed him money and "he was gonna collect it from her one way or another."  Id. at 45. Whalin further testified that defendant "said that he was gonna put a tracker on [Nguyen], and he would find where she was so he could collect the money.  And if she didn't give him the money, then he was gonna have to handle them too."  Id.  Whalin understood "handle" and "to take out" to mean "to kill."  Id.

10

Whalin's testimony in this regard was not inadmissible character evidence offered to prove defendant's propensity for violence. Rather, it was offered to complete the narrative of Whalin's testimony, to give context to defendant's statements.  In particular, defendant's statement that he "was gonna have to handle them too," followed his earlier conversation with Nguyen, in which he falsely told Nguyen he had not gone on the fishing trip, and after Whalin's comment about God punishing defendant if defendant had done something to the victim, constituted an admission that defendant killed the victim.  This <u>was</u> a live issue that remained in dispute during the trial, as defendant did <u>not</u> admit to having killed the victim during his testimony, contrary to his argument in his motion (Motion, at 33 of 45).  <u>See</u> RT 11/19/21, Vol. I, at 17.  Moreover, defendant's statements that he put the tracker on Natalie Nguyen's car were further evidence of his motive for the murder.  These were all permissible purposes for which this evidence was admitted, and this argument should be rejected.

**E.    The Admission of the Photographs Were Proper**

The government offered evidence of defendant's comfort with and possession of guns, to rebut defendant's testimony that he was fearful of James Dao and Alex Dao.  As the government argued at the time, "[t]o be able to evaluate whether he reasonably feared other people, the jury must hear about his comfort with guns, insofar as that bears on whether defendant would be likely to in fact fear someone such as James Dao and/or Alex Dao, as someone who had no facility with guns might be expected to fear such people, or alternatively, as the jury could infer, he would not be likely to

have feared such individuals given his facility with guns himself." Dkt. No. 330, at 6 of 9.  The Court ruled that it would "allow photos of the shotguns, et cetera, to refute that he's so fearful of Mr. Dao."  RT 11/19/21, Vol. II, 13.

This was appropriate evidence that needed to be before the jury for its full evaluation of defendant's credibility in his repeated claims that he feared the victim and Alex Dao.  See RT 11/17/21, Vol. II, at 39 (defendant's testimony that in the past the victim had shown defendant "high-powered guns"); id. at 40-41 (defendant's testimony that Alex Dao ran a restaurant where drug deals occurred and gangsters hung out); id. at 66-69 (defendant's testimony that he knew Dao to get into gunfights and fistfights, knew Dao to carry a revolver and to have other large guns); id. at 71-73 (defendant's testimony regarding Dao's alleged assault of defendant prior to the murder); RT 11/18/21, Vol. I, at 97; RT 11/18/21, Vol. II at 7-10, RT 11/19/21, Vol. I, at 20 (defendant's testimony about being scared of Dao the night of the murder); RT 11/18/21, Vol. II, at 46, 50-51, 55; RT 11/19/21, Vol. I, at 30-32, 36 (defendant's testimony about fearing Alex Dao); RT 11/19/21, Vol. I, at 9-10, 59-60 (defendant's testimony about fearing Dao after defendant killed him).  The weakness of defendant's argument is underscored by the fact that he cites no case law that the admission of this evidence was error. Accordingly, this argument should be rejected.

**F.   Nothing About the Circumstances of Jury Deliberations Warrants a New Trial**

1.   Fed. R. Evid. 606(b)'s Prohibition on Information from Jurors To Upset a Verdict

"The prohibition on admitting juror testimony to challenge the validity of a verdict is longstanding." United States v. Leung, 796 F.3d 1022, 1033 (9th Cir. 2015) (citing Warger v. Shauers, 574 U.S. 40 (2014)).  It dates back to the eighteenth century, but "in modern jurisprudence, this principle is found in Federal Rule of Evidence 606(b), which is a powerful shield against the efforts of litigants to overturn verdicts based on the real or perceived flaws of the juries that decided their cases." Id.  "Indeed, the Supreme Court has interpreted the Rule to bar testimony regarding jurors' drug use, insanity, inability to understand English, and hearing impairments." Id. at 1034 (internal quotation marks omitted).

"[T]he plain text and history of Rule 606(b) dictate that a party seeking to impeach a verdict cannot resort to juror testimony about any statement made or incident that occurred 'during deliberations.'" Id. at 1036 (citing Warger, 574 U.S. at 52-53). This prohibition "exists for good reason—it protects jurors from harassment and maintains the integrity and finality of jury verdicts." Id.  "While persistent inquiry into internal jury processes could in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior, our very system of trial by jury might not survive such efforts to perfect it." Id. (quoting Tanner v. United States, 483 U.S. 107, 120 (1987)) (quotation marks omitted).  "Once a jury has pronounced its judgment, Rule 606(b) helps ensure jurors' ability to separate and

melt anonymously into the community from which they came." <u>Id.</u> at 1038 (quoting <u>United States ex rel. McCann v. Adams</u>, 126 F.2d 774, 776 (2d Cir.) (L. Hand, J.), <u>set aside on other grounds</u>, 317 U.S. 269 (1942)) (quotation marks omitted).

### 2. None of the Circumstances Surrounding the Dismissal of the Juror Warrant a New Trial

#### a. Facts

During deliberations, the foreperson sent a note that read: "One of the jurors is unable to continue. <u>She cannot make a decision.</u> To quote: 'I can't do this.' She would like to be excused but the rest of the jury would like to continue to deliberate with an alternate if necessary." RT, 12/9/21, Jury Note 3, at 4 (emphasis added). The Court immediately requested and received defense input. <u>Id.</u> at 4-5. Defendant (through counsel) cautioned the Court about inquiring any further of the jurors about the note because of the risk of receiving answers as to the status of deliberations. <u>Id.</u> at 5. The Court proposed sending a note back asking that the juror in question, if this were true, send a note individually; defendant agreed to that proposal. <u>Id.</u> at 7, 10, 11, 13. Juror 2 subsequently sent a note stating, "I am asking to be excused from further deliberation. My experience in the jury deliberations has put my mental health in a position that has become dangerous to me. At this point I am unable to continue to subject myself to this and I need to protect my mental health." RT, 12/9/21, Jury Note 3-A, at 4. The Court immediately requested and received input from both sides. <u>Id.</u> at 4, 6. The government requested that the juror be dismissed. <u>Id.</u> at 5.

Defendant cited the Court to <u>United States v. Symington</u>, 195 F.3d 1080, 1087 (9th Cir. 1999), as "set[ting] forth, uh, 'any

14

1   reasonable possibility test' that the... request to removing a juror
2   stems from the juror's views on the merits of the case... and if
3   we're there... I don't think removal is, is allowed." Id. at 6-7.
4   The Court asked if there was a further step it should take before
5   making a decision, whether defendant was requesting a mistrial, and
6   whether defendant was requesting further inquiry of the juror by the
7   Court.  Counsel for defendant replied, "I have no further statement,
8   Your Honor." Id. at 10.  The Court suggested putting two questions
9   to the juror.  Id. at 10-17.  Defendant supported the further
10  inquiry.  Id. at 17.

11       Asked whether the worsening of her mental health was based on
12  pressure from other jurors to reach a specific verdict, Juror 2 said,
13  "Yes." Id. at 18.  Asked if she were able to make a decision
14  applying the law to the facts of the case, Juror 2 answered that she
15  could not answer only "yes" or "no" without elaborating.  Id. at 19.
16  The Court cited the parties to Symington and requested the parties'
17  positions.  Both sides proposed denying her request to be excused and
18  sending her back to deliberate.  Id. at 20.  The Court denied her
19  request to be excused and sent Juror 2 back to deliberate.  Id. at
20  25.  The Court then re-instructed the full jury on the Ninth Circuit
21  Pattern Jury Instruction on Duty to Deliberate.  Id. at 27-29.

22       The same day, the court received a note from the foreperson that
23  said: "Juror Number 2 is extremely stressed and has informed us she
24  will not be capable of any further deliberation.  She's indicated
25  that she has had thoughts of hurting herself in order to be removed
26  from this process.  She presents clearly as distressed and in crisis.
27  The rest of the jurors would like to continue with the deliberation

28                                 15

process, but are unable to due to her <u>inability to go on with the</u> <u>processes</u>.  There's a concern that her vote does not represent the result of a complete and comprehensive deliberation, but rather a way to remove herself from a process that is causing her extreme stress and potentially causing harm to her mental health."  RT, 12/9/21, Jury Note 4, 4-5 (emphasis added).  The parties met and conferred and proposed two questions be put to the juror, with the agreement that if the answer to both questions was "yes," the parties would agree that the juror should be dismissed.  <u>Id.</u> at 5, 6.

The Court asked the juror the two proposed questions.  Asked whether it was true she would not be capable of further deliberation, Juror 2 replied, "Yes."  <u>Id.</u> at 8.  Asked whether it was true that she had had thoughts of hurting herself to remove herself from the process, Juror 2 replied, "Yes."  <u>Id.</u>  The Court then asked both parties if either party would like "any further inquiry."  <u>Id.</u> Defendant, through counsel, stated, "No, Your Honor."  <u>Id.</u>  The Court then turned to the parties for their respective positions, and defendant, through counsel, requested that the government go first, stating, "Go ahead."  <u>Id.</u> at 9.  The government stated its position that Juror 2 should be excused.  <u>Id.</u>  Defendant, through counsel, supported the government's request for dismissal, stating, "I believe there's independent grounds to excuse her despite her earlier answer that, I think, caused us some pause, um, and I think the Court would be within its... within its discretion to excuse her, replace her with a randomly selected alternate."  <u>Id.</u>  The Court, having heard defendant's support for dismissal of Juror 2, dismissed Juror 2.  <u>Id.</u> at 20-22.  Defendant did not ask for a mistrial.

16

b.   *The Court's Dismissal of the Juror, Supported by*
     *Defendant, Was Entirely Appropriate; In Any*
     *Event, Defendant Has Waived Any Post-Verdict*
     *Challenge to the Dismissal*

i. Dismissal of the juror was proper given her

claims regarding her mental health

Defendant's argument regarding Juror 2 appropriately refers only to the information that was already known to all parties, including defendant, at the time that defendant joined in the government's request that the juror be excused.  See Motion, 4(b), at 39-43 of 45. That information reveals, in no uncertain terms, that the request for discharge of the juror, jointly made by the government and defendant, was based on the juror's inability to continue deliberating ("She cannot make a decision") and the apparently serious threat to her mental health ("She presents clearly as distressed and in crisis") posed by her continued service on the jury.  Ignoring the inadmissible allegations in the Noohi affidavit (discussed further below), and considering the position of the district court at the time the juror was dismissed-as the Court should do at this stage-it was wholly unclear what the juror's position was in deliberations. At that time, the parties and the Court could only speculate.  See RT 12/9/21, Jury Note 3, at 8-9 (Court's statement that "if this is a holdout juror... [y]ou don't know what that juror's holding out for")(emphasis added).

Accordingly, the request for discharge did not stem from doubts the juror harbored about the sufficiency of the evidence, because no one—not the Court, nor defendant, nor the government—had any idea what Juror 2's view of the evidence-if she indeed harbored any ("She

17

1    cannot make a decision")-was at the time she was dismissed. <u>See</u>

2    <u>United States v. Litwin</u>, 972 F.3d 1155, 1168-69 (9th Cir. 2020).

3       <u>Litwin</u> and <u>Symington</u> are not to the contrary, and nothing in

4    those opinions requires a new trial in this case.  Unlike those

5    cases, this Court unambiguously did <u>not</u> remove the juror because she

6    disagreed with her fellow jurors.  Rather, the Court, faced with a

7    serious mental health issue afflicting Juror 2, expressed by both the

8    jury foreperson and Juror 2 herself (the latter both in writing and

9    in open court), thoughtfully consulted with both parties every step

10    of the way.  The Court dismissed Juror 2, with defendant's support,

11    because she was unambiguously unable to continue deliberating.

12       Indeed, according to the first note, the jury foreperson

13    reported that Juror 2 could not make a decision, and quoted Juror 2

14    as saying "I can't do this."  RT, 12/9/21, Jury Note 3, at 4.  In her

15    individual note to the Court, Juror 2 confirmed the foreperson's

16    note, saying that her "experience in the jury deliberations has put

17    my mental health in a position that has become dangerous to me," and

18    that she was "unable to continue to subject myself to this".  RT,

19    12/9/21, Jury Note 3-A, at 4.  She then stated in open court that the

20    worsening of her mental health was due to pressure from other jurors

21    to reach a specific verdict.  <u>Id.</u> at 18.  However, crucially, this

22    answer did not include any information about what that verdict was,

23    what verdict she preferred, how many jurors were seeking a particular

24    verdict, or any other such information.  When she said she would have

25    to elaborate to answer whether she could continue, the Court properly

26    sent her back to deliberate further.

27

28

The mental health concern, however, appeared to become only more serious, as the jury reported that Juror 2 had informed the rest of the jury that "she will not be capable of any further deliberation," and "had thoughts of hurting herself in order to be removed from this process." RT, 12/9/21, Jury Note 4, 4-5. Juror 2 confirmed these representations in open court, and only then did the Court dismiss Juror 2.

"[T]here are various reasons why a district court may properly, and in its discretion, remove a juror from service once the jury has begun deliberating." Litwin, 972 F.3d at 1158. "Determining whether such a dismissal was a violation of the defendant's constitutional right to a unanimous jury verdict, or instead a permissible response to a juror's recalcitrance, bias, or incapacity, is a sensitive task." Id. "There are, of course, many situations where this core Sixth Amendment right is not implicated because the juror is removable for reasons that have nothing to do with her views on the case." Id. "In addition, courts have also found just cause to dismiss jurors who, although available and physically capable of serving, are nonetheless found to be unable to perform their duties properly." Id. (citation and quotation marks omitted)(emphasis added). The court in Symington itself emphasized that "[c]ases subject to this rule [finding dismissal improper under the reasonable possibility test]... are infrequent." Symington, 195 F.3d at 1087, n.6.

Here, Juror 2 suffered from serious mental health issues, to the point where she believed that continuing to deliberate would pose a danger to herself. In these circumstances, dismissal is completely

1   appropriate, because the impetus for dismissal is "unrelated to ...
2   her position on the merits." Litwin, 972 F.3d at 1170.  This was
3   that scenario: Juror 2 was "unable to perform [her] duties properly."
4   Litwin, 972 F.3d at 1158.  Juror 2 was dismissed because of her
5   mental health issues (the "independent grounds" referenced by
6   defendant), and not because of her views on the merits, which were
7   wholly unknown.  See also United States v. Vartanian, 476 F.3d 1095,
8   1099 (9th Cir. 2006) (distinguishing Symington on the grounds that
9   juror was dismissed because of her misconduct and not because of her
10  views on the merits).

11              ii.  Defendant waived his right to challenge the
12                   dismissal of the juror

13        Defendant has waived any objection to this Court's dismissal of
14  the juror, given defendant's support for the dismissal.  In the Ninth
15  Circuit, "waiver" of a right is defined as the "intentional
16  relinquishment or abandonment of a known right," United States v.
17  Perez, 116 F.3d 840, 845 (9th Cir. 1997) (quoting United States v.
18  Olano, 507 U.S. 725, 733 (1993)), as opposed to "forfeiture," which
19  is the "failure to make a timely assertion of a right[.]"  Id.
20  "Forfeited rights are reviewable for plain error, while waived rights
21  are not."  Id.  Here, defendant waived his right to any further
22  review of the dismissal of the juror, by intentionally relinquishing
23  and abandoning any objection to the dismissal.  There was no question
24  that the "right" to be asserted here—that of a potential mistrial if
25  the juror's dismissal was based on her doubts about the sufficiency
26  of the evidence-was known to defendant.  Indeed, he contemporaneously

27
28
                                    20

cited the very case he cites now in support of his motion for a new trial.  RT, 12/9/21, Jury Note 3-A, at 6-7.

Courts have looked with extreme disfavor upon motions for new trial based on court decisions at trial to which defendants did not object.  "A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains."  United States v. Nance, 502 F.2d 615, 621 (8th Cir. 1974).  For example, a defendant cannot learn of juror misconduct during trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was influenced by that misconduct.  United States v. Bolinger, 837 F.2d 436 (11th Cir. 1988); see also United States v. Jones, 597 F.2d 485, 588 n.3 (5th Cir. 1979) (defendant cannot gamble on a favorable verdict and then complain in a post-verdict motion about the verdict); United States v. Gootee, 34 F.3d 475, 479 (7th Cir. 1994) (upholding district court's finding that defendant had waived claim regarding juror misconduct first brought in motion for new trial).

Here, defendant was plainly aware of the law concerning the dismissal of jurors once deliberations have begun.  It was defendant who first raised the Symington case with the Court.  In light of his awareness of the law, defendant waived his right to later challenge the dismissal of Juror 2 when he did not object, and in fact agreed to the dismissl of the juror, and did not move for a mistrial.

> c.  *Information from the Dismissed Juror in the Defense Affidavit Concerning Alleged "Bullying" Falls Squarely Within the Prohibition of Fed. R. Evid. 606(b)*

Though defendant's motion for new trial based on the alleged "bullying" of Juror 2 does not cite the new hearsay allegations from

Juror 2 in paragraphs 3-7 of Noohi's Declaration, those allegations are clearly offered to support this portion of defendant's motion. (Decl. Noohi, Dkt. No. 440, ¶¶ 3-7.)  But all of this is covered by the plain language of Rule 606(b), is not properly before the Court, and should not be considered by the Court in adjudicating this Motion.  "During an inquiry into the validity of a verdict... a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b)(1).  Paragraphs 3 through 7 of Noohi's Declaration clearly rest on a juror's testimony about statements made and incidents that occurred during the jury's deliberations, and on the jurors' mental processes.

Indeed, literally every sentence of every one of those paragraphs constitutes juror testimony about statements made and incidents that occurred during the jury's deliberations. Accordingly, as in Leung, "the portion of the motion relevant here rest[s] solely on an affidavit from one juror," which "attempts to shed light on the internal affairs of the jury."  Leung, 796 F.3d at 1034, 1036.  "But parsing how jurors considered the evidence or their mental states while hearing testimony is exactly what Tanner and the plain text of Rule 606(b) seek to prevent."  Id. at 1036. Accordingly, like the defendant in Leung, defendant is "not entitled to a new trial or evidentiary hearing on the basis of the post-verdict" juror information.  Id. at 1038.

The Ninth Circuit has said that Rule 606(b) bars the very type of allegations made concerning the dismissed juror here.  In a case

where a dismissed juror provided information after the verdict, as here, the Ninth Circuit said, unambiguously: "Rule 606(b) clearly bars consideration of the declaration's allegation that the juror said that she was subjected to pressure by other jurors for being a 'holdout for acquittal,'" clearly ruling out any consideration of paragraphs 3 through 7 of the Noohi affidavit. United States v. Decoud, 456 F.3d 996, 1019, n.11 (9th Cir. 2006).

Courts have also specifically held that evidence of intimidation or harassment of one juror by another is within the prohibition of Rule 606 and not competent to impeach a verdict.  In a case where a juror alleged threats by the jury foreperson to get the juror to convict, the Third Circuit found the juror testimony to be "so clearly within the rule" and said that "testimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of the Rule." United States v. Lakhani, 480 F.3d 171, 185 (3d Cir. 2007).  This is a longstanding, unanimous rule across the Circuits.  See, e.g., United States v. Norton, 867 F.2d 1354, 1366 (11th Cir. 1989) (noting that "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict"); United States v. Briggs, 291 F.3d 958, 961 (7th Cir. 2002) (barring evidence of one juror being "'intimidated' by other jurors into finding [the defendant] guilty"); United States v. Brito, 136 F.3d 397, 414 (5th Cir. 1998) (deeming evidence of internal coercion inadmissible per Rule 606(b)); United States v. Tallman, 952 F.2d 164, 167 (8th Cir. 1991) ("To admit proof of contentiousness and conflict to impeach a verdict under Rule 606(b) would be to eviscerate the rule."); Gov't. of the V.I. v.

23

1  Gereau, 523 F.2d 140, 150 (3d Cir. 1975) ("evidence of ...

2  intimidation or harassment of one juror by another and other intra-

3  jury influences on the verdict is within the rule, rather than the

4  exception, and is not competent to impeach a verdict") (emphasis

5  original).

6      The fact that the declaration itself is by a private

7  investigator who relays hearsay from the juror should have no

8  significance.  Obviously, if a party could evade the strictures of

9  Rule 606(b) simply by submitting hearsay statements of otherwise

10  incompetent testimony, Rule 606(b) would be a nullity.  Indeed, the

11  Rule itself makes this clear, in stating "[t]he court may not receive

12  a juror's affidavit or evidence of a juror's statement on these

13  matters."  Fed. R. Evid. 606(b)(1) (emphasis added).

14      The relevant paragraphs should be stricken and not considered by

15  the Court.

16      3.   Report of Alleged Juror Statement About Lobster
          Fishing Falls Within the Prohibition of Fed. R. Evid.

17            606(b), and Does Not Constitute Extraneous Prejudicial
          Information Under FRE 606(b)(2)(A)

18

19      Likewise, the alleged statements by one of the jurors concerning

20  her experience lobster fishing, contained in paragraphs 2 and 3 of

21  the Declaration of Deborah Crawford, and paragraph 8 of the Noohi

22  Declaration, constitute a juror's testimony about "statement[s] made

23  or incident[s] that occurred during the jury's deliberations."  Fed.

24  R. Evid. 606(b).  Accordingly, "[t]he court may not receive ...

25  evidence of a juror's statement on these matters."  Id.

26      Moreover, the alleged statements about the juror's personal

27  experience lobster fishing do not fall within the exception specified

28  in the Rule, allowing a juror to testify about whether "extraneous

prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A).  Courts are unanimous in applying the doctrine that "[a] juror's personal experience... does not constitute 'extraneous prejudicial information.'" Marquez v. City of Albuquerque, 399 F.3d 1216, 1223 (10th Cir. 2005) (citing Weinstein's Federal Evidence § 606.03(1)(b)).  Rather, "it is expected that jurors will bring their life experiences to bear on the facts of a case."  Hard v. Burlington Northern Railroad Co., 870 F.2d 1454, 1462 (9th Cir. 1989).

The Ninth Circuit has repeatedly applied this rule.  After a guilty verdict in a trial for child pornography crimes, the defense requested a new trial based on juror reports that "during deliberations, several of the more 'computer savvy' jurors speculated that [defendant] may have re-installed his LimeWire program, which they suggested could explain the lack of forensic evidence of distribution of child pornography." United States v. Budziak, 697 F.3d 1105, 1111 (9th Cir. 2012).  The Ninth Circuit affirmed the district court's denial of a new trial, without an evidentiary hearing, saying that "[t]he alleged juror comments referred not to extraneous evidence, but to the jurors' personal life experiences with computers and with the LimeWire program," id., just as here, the alleged comment referred not to extraneous evidence, but to the juror's personal life experience with lobster fishing.  The Ninth Circuit went on, calling it "well established" that "a juror's past personal experiences may be an appropriate part of the jury's deliberations." Id. (citing, inter alia, Grotemeyer v. Hickman, 393 F.3d 871, 879 (9th Cir. 2004)).

25

1     Similarly, in Grotemeyer, the Ninth Circuit considered, post-

2 verdict, allegations that a physician-juror "had improperly used her

3 medical expertise during deliberations," Grotemeyer, 393 F.3d at 875.

4 The Court there was careful to distinguish "extrinsic evidence being

5 introduced into the jury room" as being "altogether different from a

6 juror sharing her own experiences with her colleagues on the jury."

7 Id. at 877 (emphasis original).  The Court noted typical instructions

8 to juries to draw inferences that jurors "feel are justified in the

9 light of your experience and common sense."  Id. at 879 (emphasis

10 original).  The Court further explained that "[e]valuation of

11 credibility necessarily relies on experience," and found that the

12 very "advantage of jurors over judges [as factfinders] is their

13 diversity of experiences."  Id.  "Ideally, at least someone on a jury

14 of twelve will be able to contribute to the rest of the jury some

15 useful understanding about whatever evidence comes up."  Id. at 880.

16 Assuming the truth of the allegations in the affidavits, that is what

17 occurred here, and thus, as in Grotemeyer, "no impermissible

18 extrinsic evidence was discussed," and the denial of an evidentiary

19 hearing is appropriate.  Id. at 881.

20     Other cases confirm that the juror's alleged statements here

21 were entirely appropriate and did not introduce outside evidence into

22 the jury deliberations.  In a case alleging excessive force through

23 the use of a police dog, the trial court received a note during

24 deliberations that "one of the jurors was holding herself out as as

25 expert in police dog training," and made three assertions during

26 deliberations concerning police dogs, including that "police dogs do

27 not bite unless the suspect is fleeing" and "police dogs do not bite

28

the first part of the body they come across." <u>Marquez</u>, 399 F.3d at
1222-23. The "alleged 'extraneous prejudicial information' was the
juror's personal experience with training police dogs," in the same
way the alleged extraneous prejudicial information here is the
juror's personal experience with lobster fishing. <u>Id.</u> at 1223. The
Tenth Circuit flatly rejected the defense appeal of the district
court's denial of an evidentiary hearing on this topic, finding no
extraneous prejudicial information to have been brought before the
jury, which triggered Fed. R. Evid. 606(b)'s exclusion of any
testimony on the matter. <u>Id.</u> at 1223. "The inquiry is not whether
the jurors 'became witnesses' in the sense that they discussed any
matters not of record, but whether they discussed specific extra-
record <u>facts</u> relating to the defendant..." <u>Marquez</u>, 399 F.3d at 1223
(emphasis original). In this case, there was no such discussion of
matters not of record. <u>See also</u> <u>Price v. Kramer</u>, 200 F.3d 1237, 1255
(9th Cir. 2000) (recognizing that jurors' personal experiences did
not constitute extraneous evidence); <u>Arreola v. Choudhury</u>, 533 F.3d
601, 606 (7th Cir. 2008) ("Although jurors may not go beyond the
record to develop their own evidence, they are entitled to evaluate
the evidence presented at trial in light of their own experience.");
<u>United States v. O'Brien</u>, 14 F.3d 703, 708 (1st Cir. 1994) ("[I]n
gauging witness credibility and choosing from among competing
inferences, jurors are entitled to take full advantage of their
collective experience and common sense."); <u>United States v. Wong</u>,
2014 WL 923347, *3 (N.D. Cal. March 5, 2014) (juror's use of personal
experience in banking industry to evaluate the weight and credibility
of the testimony was proper and did not constitute extraneous

1   information); Rucker v. Patrick, 2008 WL 4104230, *11, notes 4-8

2   (S.D. Cal. Sept. 3, 2008) ("a juror familiar with guns [can]

3   explain[] to the rest of the jury the relevance of evidence

4   introduced at trial about the gun and the impact of that evidence on

5   intent" without introducing extraneous information into the

6   deliberations) (collecting cases).

7        Defendant's argument does not compel a different result.

8   Against this avalanche of case law holding that statements like the

9   alleged statements of the juror here are not improper extrinsic

10  evidence, are perfectly appropriate discussions for a jury to have,

11  and, in any event, are barred from consideration at this point in the

12  process by Fed. R. Evid. 606(b), defendant cites only a 1991 case,

13  United States v. Navarro-Garcia, 926 F.2d 818, 820 (9th Cir. 1991),

14  which predates the Ninth Circuit cases cited above, including

15  Budziak, Grotemeyer, and Price.  More important, Navarro-Garcia is

16  easily distinguished.  In that case, a juror engaged in an out-of-

17  court experiment while the jury was in recess for the weekend, and

18  had reported the results of the experiment to the jury.  Navarro-

19  Garcia, 926 F.2d at 820.  The Ninth Circuit said that "out-of-court

20  experiments are plainly extrinsic evidence," distinguishing Navarro-

21  Garcia from this case.  The rest of the opinion concerning past

22  experience is dicta, which the Ninth Circuit made plain in Grotemeyer

23  when it specifically called this discussion in Navarro-Garcia "obiter

24  dicta," and only promoted to good law the portion of Navarro-Garcia's

25  discussion of experience that said "a juror's past personal

26  experiences may be an appropriate part of the jury's deliberations."

27  Grotemeyer, 393 F.3d at 879; see also United States v. Holck, 398

28

1  F.Supp.2d 338, 367 (E.D. Pa. 2005) (recognizing <u>Grotemeyer</u>'s

2  superseding of <u>Navarro-Garcia</u>); <u>Gibbs v. Lizzaraga</u>, 2018 WL 7571323,

3  *22 (C.D. Cal. Sept. 17, 2018) (distinguishing <u>Navarro-Garcia</u> in case

4  where juror "simply reported what had been his personal experience"

5  as opposed to conducting outside investigation).

6         Defendant also argues that because there was no evidence on this

7  point, <u>Navarro-Garcia</u> requires an evidentiary hearing.  But there <u>was</u>

8  evidence on the topic of how lobster trips with RITZE were conducted,

9  even specifically their timing.  Specifically, Mica Ritze testified

10 extensively about how lobster fishing was done, including testimony

11 specifically concerning various things that impacted the timing of

12 such trips.  <u>See, e.g.</u>, RT 11/10/21, Vol. III, at 119-129 (Mica Ritze

13 testimony on direct examination about the routine in lobster fishing

14 trips with RITZE, including that they would not leave the area for

15 more than 20 minutes); RT 11/12/21, Vol. I, at 56-61 (Mica Ritze

16 testimony on cross-examination about the routine in lobster fishing

17 trips with RITZE, including that one can't leave hoop nets "down for

18 more than an hour or [the lobsters] just leave the cage"); <u>id.</u> at 75-

19 76 (Mica Ritze testimony on cross regarding typical speed of boat

20 used on fishing trips in different locations); RT 11/12/21, Vol. II,

21 9-17 (Mica Ritze testimony on cross regarding process of lobster

22 fishing, including timing of trips away from hoop nets and length of

23 time necessary to wait for lobsters to crawl); <u>id.</u> at 17-18 (Mica

24 Ritze testimony on redirect concerning length of time needed to put

25 down ten hoop nets, and typical distance from shore).  Additionally,

26 the CAST expert testified about what the phone records showed about

27 where the boat was at various times during the trip.  <u>See</u> RT

28

                                    29

11/15/21, Vol. III, 99-107 (CAST expert testimony regarding timing of movement of phones).  Defendant himself testified on the topic of the process of lobster fishing, and the timing involved in the trip during which he murdered the victim.  RT 11/18/21, Vol. I, 48-49, 61, 84, 85-86 (defendant's testimony regarding how long it took to get to the jetty); 86-87 (defendant's testimony regarding how long they drove out toward the open sea).

Finally, even if the alleged statements were somehow competent evidence that could be considered at this point, and such evidence did constitute extraneous information, it is hard to imagine the prejudice to defendant.  Factors relevant to analysis of whether extraneous information to which a jury was exposed was prejudicial includes, inter alia, the strength of other evidence to support the verdict.  U.S. v. Lloyd, 269 F.3d 228 (3d Cir. 2001).  In this case, in light of how facially inconsistent and implausible defendant's trial testimony was, no prejudice to defendant could have occurred from a juror's observation from personal experience that defendant's testimony about setting and retrieving lobster pots was not credible given the timeline.  It was simply one more thing about defendant's testimony that did not ring true.

### 4.   The Allegation that the Jury Did Not Properly Deliberate Anew Also Rests on Incompetent Evidence

The defense allegation that the jury did not properly deliberate anew upon the alternate juror being seated on the jury rests entirely on the sole paragraph on page 3 of the Crawford affidavit.  That paragraph relays a juror's statement concerning statements made concerning a whiteboard, and the jurors' mental processes concerning the significance of evidence.  A court "may not receive ... evidence

of a juror's statement on these matters."  Fed. R. Evid. 606(b)(1).
Accordingly, this paragraph should be stricken and the motion for new
trial on this ground denied.

**IV.   CONCLUSION**

Defendant's motions for a judgment of acquittal or a new trial
should be denied.